UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARISTA RECORDS LLC; ATLANTIC RECORDING CORPORATION; BMG MUSIC; CAPITOL RECORDS, INC.; ELEKTRA ENTERTAINMENT GROUP INC.; INTERSCOPE RECORDS; LAFACE RECORDS LLC; MOTOWN RECORD COMPANY, L.P.; PRIORITY RECORDS LLC; SONY BMG MUSIC ENTERTAINMENT; UMG RECORDINGS, INC., VIRGIN RECORDS AMERICA, INC.; and WARNER BROS. RECORDS INC., <br><br> Plaintiffs, <br><br> v. <br><br> LIME WIRE LLC; LIME GROUP LLC; MARK GORTON; and GREG BILDSON, <br><br> Defendants. | CIVIL ACTION NO. 06 CV. 5936 (GEL) <br><br><br><br><br> **DEFENDANTS' ANSWER AND LIME WIRE'S COUNTERCLAIMS** <br><br> **JURY TRIAL DEMANDED** |

Defendants Lime Wire LLC ("Lime Wire"), Lime Group LLC ("Lime Group"), Mark Gorton ("Gorton") and Greg Bildson ("Bildson") (collectively, "Defendants") respond to Plaintiffs' Complaint as follows:

## NATURE OF THE ACTION

1.     Defendants lack sufficient knowledge to admit or deny the allegations of the first sentence in paragraph 1 of the Complaint and on that basis deny the allegations. Defendants deny the allegations of the second sentence in paragraph 1 of the Complaint. Defendants Lime Group, Gorton and Bildson deny the allegations of the third sentence in paragraph 1 of the Complaint. Defendant Lime Wire admits that it has designed, distributed, supported and maintained the LimeWire software but denies the remaining allegations in the third sentence in paragraph 1 of the Complaint.  Defendants deny the allegations of the fourth sentence in paragraph 1 of the Complaint.

2.     Defendants deny the allegations of paragraph 2 of the Complaint.

3.     Defendants deny the allegations of paragraph 3 of the Complaint.

## JURISDICTION AND VENUE

4.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 4 of the Complaint and on that basis deny the allegations.

5.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 5 of the Complaint and on that basis deny the allegations.

6.     Defendants admit that personal jurisdiction lies over them in the Southern District of New York but deny the remaining allegations of paragraph 6 of the Complaint.

7.     Defendants admit the allegations of paragraph 7 of the Complaint.

## THE PLAINTIFFS AND THEIR BUSINESS

8.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 8 of the Complaint and on that basis deny the allegations.

9.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 9 of the Complaint and on that basis deny the allegations.

10.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 10 of the Complaint and on that basis deny the allegations.

11.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 11 of the Complaint and on that basis deny the allegations.

12.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 12 of the Complaint and on that basis deny the allegations.

13.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 13 of the Complaint and on that basis deny the allegations.

14.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 14 of the Complaint and on that basis deny the allegations.

15.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 15 of the Complaint and on that basis deny the allegations.

16.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 16 of the Complaint and on that basis deny the allegations.

17.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 17 of the Complaint and on that basis deny the allegations.

18.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 18 of the Complaint and on that basis deny the allegations.

19.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 19 of the Complaint and on that basis deny the allegations.

20.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 20 of the Complaint and on that basis deny the allegations.

21.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 21 of the Complaint and on that basis deny the allegations.

22.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 22 of the Complaint and on that basis deny the allegations.

23.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 23 of the Complaint and on that basis deny the allegations.

24.     Defendants lack sufficient knowledge to admit or deny the allegations of the first three sentences in paragraph 24 of the Complaint and on that basis deny the allegations. Defendants deny the allegations of the fourth sentence in paragraph 24 of the Complaint. Defendants lack knowledge sufficient to admit or deny the allegations of the last sentence in paragraph 24 of the Complaint and on that basis deny the allegations.

25.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 25 of the Complaint and on that basis deny the allegations.

26.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 26 of the Complaint and on that basis deny the allegations.

27.     Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 27 of the Complaint and on that basis deny the allegations.

## THE DEFENDANTS

28.     Defendant Lime Wire admits that it has designed, built, distributed, sold and supported certain software known as LimeWire but denies the remaining allegations of paragraph 28 of the Complaint. Defendants Lime Group, Gorton and Bildson deny the allegations of paragraph 28 of the Complaint.

29.     Defendants admit the allegations of paragraph 29 of the Complaint.

30.     Defendants deny the allegations of the first sentence of paragraph 30 of the Complaint but admit that Lime Wire is a Delaware limited liability corporation with its principal place of business in New York, New York. As to the second sentence of paragraph 30 of the Complaint, Defendants deny those allegations but admit that Lime Wire designed, updated, improved and distributed the LimeWire software.

31.     Defendants deny the allegations of paragraph 31 of the Complaint.

32.     Defendants deny the allegations of paragraph 32 of the Complaint but admit that that defendant Gorton is the Chief Executive Officer of defendant Lime Wire.

33.     Defendants deny the allegations of paragraph 33 of the Complaint but admit that defendant Bildson is currently the Chief Technology Officer and Chief Operating Officer of defendant Lime Wire.

34.     Defendants deny the allegations of paragraph 34 of the Complaint.

35.     Defendants deny the allegations of paragraph 35 of the Complaint.

## BACKGROUND DESCRIPTION OF THE ILLEGAL CONDUCT

36.     Defendants deny the allegations of paragraph 36 of the Complaint.

37.     Defendants deny the allegations of paragraph 37 of the Complaint but admit that defendant Lime Wire has designed, distributed, sold, supported and maintained the LimeWire software.

38.     Defendants deny the allegations of the first sentence of paragraph 38 of the Complaint except they admit that LimeWire is a P2P software application that has been designed to allow users both to exchange files and to handle open-ended schema and xml based searches. Defendants deny the allegations of the second sentence of paragraph 38 of the Complaint but admit that defendant Lime Wire developed and maintained the LimeWire software. Defendants deny the remaining allegations of paragraph 38 of the Complaint.

39.     Defendants deny the allegations of the first sentence of paragraph 39 of the Complaint but admit that defendant Lime Wire designed, updated and distributed two versions of the LimeWire software.  Defendants admit the remaining allegations of paragraph 39 of the Complaint.

40.     Defendants admit the allegations of the first and second sentences of paragraph 40 of the Complaint. Defendants deny the remaining allegations of paragraph 40 of the Complaint.

41.     Defendants admit the allegations of the first sentence of paragraph 41 of the Complaint. Defendants deny the remaining allegations of paragraph 41 of the Complaint but admit that the LimeWire software application can automatically launch upon startup of a user's computer for Windows versions only, unless the user designates otherwise.

42.     Defendants deny the allegations of paragraph 42 of the Complaint.

43.     Defendants deny the allegations of paragraph 43 of the Complaint.

44.     Defendants deny the allegations of paragraph 44 of the Complaint.

45.     Defendants deny the allegations of paragraph 45 of the Complaint but admit that the LimeWire software application contains a third party Java-based built-in audio player component.

46.     Defendants deny the allegations of paragraph 46 of the Complaint but admit that the LimeWire website states that "[t]he purchase of LimeWire PRO gives users better search results, turbo-charged download speeds, connections to more sources, [and] a guarantee of no ads or nagware…"

47.     Defendants deny the allegations of paragraph 47 of the Complaint.

48.     Defendants deny the allegations of paragraph 48 of the Complaint but admit that the LimeWire website operated by defendant Lime Wire contains the statement "Keep in mind that many users disobey copyright laws".

49.     Defendants deny the allegations of paragraph 49 of the Complaint but admit that defendant Gorton, as Chief Executive Officer of defendant Lime Group, received a letter dated September 13, 2005 from Steven M. Marks, as general counsel for the Recording Industry Association of America, and that this letter speaks for itself.

50.     Defendants deny the allegations of paragraph 50 of the Complaint.

51.     Defendants deny the allegations of the first three sentences of paragraph 51 of the Complaint but admit that defendant Lime Wire distributes the LimeWire software and provides upgrades and updates to this software. Defendants deny the allegations of the last sentence of paragraph 51 except that defendant Lime Wire admits these allegations.

52.     Defendants deny the allegations of paragraph 52 of the Complaint but admit that defendant Lime Wire has the ability to send messages to computers running the Lime Wire software application.

53.     Defendants deny the allegations of paragraph 53 of the Complaint but admit there
are methods to allegedly prevent the exchange of copyrighted works which defendant Lime Wire
has implemented as an optional feature since the release of version 4.11.

54.     Defendants deny the allegations of paragraph 54 of the Complaint.

55.     Defendants deny the allegations of paragraph 55 of the Complaint.

56.     Defendants deny the allegations of paragraph 56 of the Complaint except that
Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 56 of the
Complaint concerning how many copies of the LimeWire software have been downloaded.

## COUNT I:  INDUCEMENT OF COPYRIGHT INFRINGEMENT

57.     Defendants incorporate paragraphs 1-56 by reference as if fully set forth herein.

58.     Defendants deny the allegations of paragraph 58 of the Complaint.

59.     Defendants deny the allegations of paragraph 59 of the Complaint.

60.     Defendants deny the allegations of paragraph 60 of the Complaint.

61.     Defendants deny the allegations of paragraph 61 of the Complaint.

62.     Defendants deny the allegations of paragraph 62 of the Complaint.

63.     Defendants deny the allegations of paragraph 63 of the Complaint.

64.     Defendants deny the allegations of paragraph 64 of the Complaint.

65.     Defendants deny the allegations of paragraph 65 of the Complaint.

66.     Defendants deny the allegations of paragraph 66 of the Complaint.

67.     Defendants deny the allegations of paragraph 67 of the Complaint.

68.     Defendants deny the allegations of paragraph 68 of the Complaint.

69.     Defendants deny the allegations of paragraph 69 of the Complaint.

## COUNT II:  CONTRIBUTORY COPYRIGHT INFRINGEMENT

70.     Defendants incorporate paragraphs 1-56 by reference as if fully set forth herein.

71.    Defendants deny the allegations of paragraph 71 of the Complaint.

72.    Defendants deny the allegations of paragraph 72 of the Complaint.

73.    Defendants deny the allegations of paragraph 73 of the Complaint.

74.    Defendants deny the allegations of paragraph 74 of the Complaint.

75.    Defendants deny the allegations of paragraph 75 of the Complaint.

76.    Defendants deny the allegations of paragraph 76 of the Complaint.

77.    Defendants deny the allegations of paragraph 77 of the Complaint.

78.    Defendants deny the allegations of paragraph 78 of the Complaint.

79.    Defendants deny the allegations of paragraph 79 of the Complaint.

80.    Defendants deny the allegations of paragraph 80 of the Complaint.

81.    Defendants deny the allegations of paragraph 81 of the Complaint.

82.    Defendants deny the allegations of paragraph 82 of the Complaint.

## COUNT III:  VICARIOUS COPYRIGHT INFRINGEMENT

83.    Defendants incorporate paragraphs 1-56 by reference as if fully set forth herein.

84.    Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 84 of the Complaint and on that basis deny the allegations.

85.    Defendants deny the allegations of paragraph 85 of the Complaint.

86.    Defendants deny the allegations of paragraph 86 of the Complaint but admit that the LimeWire software contains certain filtering mechanisms.

87.    Defendants deny the allegations of paragraph 87 of the Complaint.

88.    Defendants deny the allegations of paragraph 88 of the Complaint.

89.    Defendants deny the allegations of paragraph 89 of the Complaint.

90.    Defendants deny the allegations of paragraph 90 of the Complaint.

91.    Defendants deny the allegations of paragraph 91 of the Complaint.

92.    Defendants deny the allegations of paragraph 92 of the Complaint.

93.    Defendants deny the allegations of paragraph 93 of the Complaint.

94.    Defendants deny the allegations of paragraph 94 of the Complaint.

## COUNT IV:  COMMON LAW COPYRIGHT INFRINGEMENT OF PRE-1972 RECORDINGS

95.    Defendants incorporate paragraphs 1-56 by reference as if fully set forth herein.

96.    Defendants deny the allegations of paragraph 96 of the Complaint.

97.    Defendants deny the allegations of paragraph 97 of the Complaint.

98.    Defendants deny the allegations of paragraph 98 of the Complaint.

99.    Defendants deny the allegations of paragraph 99 of the Complaint.

100.    Defendants deny the allegations of paragraph 100 of the Complaint.

## COUNT V:  UNFAIR COMPETITION AS TO PRE-1972 RECORDINGS

101.    Defendants incorporate paragraphs 1-56 by reference as if fully set forth herein.

102.    Defendants deny the allegations of paragraph 102 of the Complaint.

103.    Defendants deny the allegations of paragraph 103 of the Complaint.

104.    Defendants deny the allegations of paragraph 104 of the Complaint.

105.    Defendants deny the allegations of paragraph 105 of the Complaint.

106.    Defendants deny the allegations of paragraph 106 of the Complaint.

107.    Defendants deny the "prayer" paragraph contained in pages 26 and 27 of the Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiffs have failed to join indispensable parties.

**Third Affirmative Defense**

Plaintiffs' claims are barred by the doctrine of copyright misuse.

**Fourth Affirmative Defense**

Plaintiffs' claims are barred by the doctrine of unclean hands.

**Fifth Affirmative Defense**

Plaintiffs' claims are barred by laches.

**Sixth Affirmative Defense**

Plaintiffs lack standing.

**Seventh Affirmative Defense**

Plaintiffs do not own or control the rights giving rise to the claims purportedly raised in the Complaint.

**Eighth Affirmative Defense**

Plaintiffs' claims are barred in whole or in part to the extent they seek to claim copyright or other intellectual property rights as to works that are in the public domain and therefore not protected.

**Ninth Affirmative Defense**

Plaintiffs' claims are barred by the Audio Home Recording Act.

**Tenth Affirmative Defense**

Any injury that Plaintiffs' may have allegedly suffered is a result of independent acts taken by third parties for which Defendants are not responsible.

**Eleventh Affirmative Defense**

Plaintiffs' claims are barred because they cannot establish that the accused products or services are incapable of substantial non-infringing uses.

**Twelfth Affirmative Defense**

Plaintiffs' claims are barred by license, consent, acquiescence, waiver, and estoppel.

**Thirteenth Affirmative Defense**

Plaintiffs' claims are barred by the Digital Millennium Copyright Act.

**Fourteenth Affirmative Defense**

Plaintiffs' claims are barred by the doctrine of fair use.

**Fifteenth Affirmative Defense**

Plaintiffs' claims for statutory damages are barred by the U.S. Constitution.

**Sixteenth Affirmative Defense**

Plaintiffs' claims are barred for lack of subject matter jurisdiction to the extent Plaintiffs lack valid registrations of copyrights alleged in the Complaint.

**Seventeenth Affirmative Defense**

Plaintiffs' claims are barred to the extent they have caused fraud upon the Copyright Office.

**Eighteenth Affirmative Defense**

Plaintiffs' claims are barred by the first sale doctrine.

**Nineteenth Affirmative Defense**

Plaintiffs' claims are barred by their failure to mitigate damages.

**Twentieth Affirmative Defense**

Plaintiffs' claims are barred to the extent they have forfeited or abandoned copyright.

**Twenty-First Affirmative Defense**

Plaintiffs' claims are barred because of deceptive and misleading advertising in connection with the distribution of their copyrighted works.

### Twenty-Second Affirmative Defense

Plaintiffs' claims are barred to the extent any persons, based on whose behavior Plaintiffs seek to hold Defendants liable, are innocent infringers.

## COUNTERCLAIMS

Counterclaimant Lime Wire LLC ("Lime Wire") hereby alleges as follows:

## PARTIES

1.     Counterclaimant Lime Wire is a Delaware limited liability corporation with its principal place of business located in New York, New York.

2.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Arista Records LLC is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of New York.

3.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Atlantic Recording Corporation is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of New York.

4.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant BMG Music is a general partnership duly organized and existing under the laws of the State of New York, with its principal place of business located in the State of New York.

5.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Capitol Records Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of New York.

6.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Elektra Entertainment Group Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of New York.

7.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Interscope Records is a general partnership duly organized and existing under the laws of the State of California, with its principal place of business located in the State of California.

8.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant LaFace Records LLC is a limited liability corporation duly organized and existing under the laws of State of Delaware, with its principal place of business located in the State of New York.

9.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Motown Record Company LP is a limited partnership duly organized and existing under the laws of the State of California, with its principal place of business located in the State of New York.

10.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Priority Records LLC is a limited liability company with its principal place of business located in the State of California.

11.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant SONY BMG MUSIC ENTERTAINMENT is a general partnership duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of New York.

12.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant UMG Recordings, Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of California.

13.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Virgin Records America, Inc. is a corporation duly organized and existing under the laws of the State of California, with its principal place of business located in the State of New York.

14.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Warner Bros. Records Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of California.

## JURISDICTION AND VENUE

15.     This Court has personal jurisdiction over Counter-Defendants, all of whom do business in the State of New York and in this District. Moreover, Counter-Defendants' conduct occurred in part in the State of New York and in this District.

16.     Counts I and II of the Counterclaim allege antitrust violations under the Sherman Act, 15 U.S.C. §1, and the Clayton Act, 15 U.S.C. §15. Accordingly, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 4 and 5.

17.     Supplemental subject matter jurisdiction exists for Counts III, IV, V and VI of the Counterclaim under 28 U.S.C. §1367 because these claims are so related to the Plaintiffs' claims in this lawsuit that they form part of the same case or controversy. Supplemental subject matter jurisdiction also exists for Counts III, IV, V and VI of the Counterclaim under 28 U.S.C.

§1367 because these claims are so related to Counts I and II of the Counterclaim that they form part of the same case or controversy arising under federal antitrust law.

18.     Venue is proper in this District under 28 U.S.C. §1391 and 15 U.S.C. §§ 15 and 22.

## ALLEGATIONS COMMON TO ALL COUNTERCLAIMS

### The Development of Digital Technology Disrupts the Plaintiffs' Traditional Distribution Models

19.     Over the years, the music industry has largely profited, not directly from the ownership of copyrights, but by controlling the sale and distribution of the physical products (i.e., records, audio cassettes and CDs). Recent developments in technology changed all that. Physical records and CDs are no longer essential for consumers to own or play copyrighted audio content and likewise, the traditional roles of manufacturing, selling and distributing physical products at retail locations or through the mail, are no longer necessary for consumers to receive copyrighted audio content. Instead, consumers can now purchase music with ease over the Internet by picking and choosing individual songs, instead of a whole album or CD, while sitting at home on their computer.

20.     This revolution was accomplished over a relatively short period of time, with the advent of the emergence of the Internet and the ability to copy music files with relative ease using MP3 technology. Until recently, the digital information on a single music CD required hundreds of computer floppy disks to store, and downloading even a single song from the Internet took hours. MP3 technology, which essentially "compresses" an audio file by limiting its audio bandwidth, now allows rapid and efficient conversion of CD recordings to computer files easily accessed over the Internet. The ability of a consumer to copy a digital audio file on his or her hard drive had powerful, commercial consequences when the general public began to utilize the Internet in the mid 1990s.

21.     The Internet is a network built out of millions of hosts/users all over the world. Once limited to the domain of the scientific community, the Internet is now used by millions of people around the world in a multitude of different ways including information gathering, communication and the exchange of goods and services. Internet search engines such as Google provide all Internet users the means to locate and download digital files of all types, including MP3, video and executable files, from millions of websites around the world. Millions of Internet users have also begun using their computers to connect to each other directly, forming powerful user-friendly networks that allow these users to search for, locate and distribute digital files and data. This technology is known as "peer-to-peer" or simply, "P2P".

22.     True P2P technology is totally decentralized, meaning there are no central servers that assist in the searching and downloading of files. There are many systems that are referred to as P2P but in fact are not, even though they appear to be totally decentralized on their face. For example, AOL Time Warner's instant messaging application appears to be a peer-to-peer network because the user's friend will receive the message. But AOL Time Warner's system , like all major instant messaging systems, have some sort of central server on the back end that facilitates computers/users to communicate with one another.

23.     The most famous P2P application, Napster, did not qualify as a true P2P application. Although Napster users connected to one another to exchange MP3 files, the directory of the files that a user was searching for was located on servers run by Napster. These servers acted as "brokers" for users, they answered search queries and brokered client connections.

24.     In contrast, Lime Wire has developed and distributed a communication software program that is truly decentralized P2P technology. Unlike the Napster architecture, the LimeWire application does not rely on any central server, database or other single point of

authority to organize a network or to broker transactions, and there are no LimeWire servers that
maintain directories of file names to facilitate search requests or to broker client transactions.
Using the P2P networking functionality of the application, users may search for any share and
kind of computer file, including text, images, audio, video and software files, with other users
connected to the network. No LimeWire server assists in the transfer and copying of files that
may be shared by users of the LimeWire application.  Users who install LimeWire on their
computers do so by their own volition and are only able to install the LimeWire application if
they first agree not to use the application to infringe the copyrights of others.  Thereafter, those
persons make use of LimeWire in the manner that they alone choose.

     25.    As a result of the proliferation of the Internet and the ease to exchange MP3
files, consumers were no longer restricted in choice and not dependent exclusively on the
physical media products and distribution channels that historically had been controlled by the
Counter-Defendants, and on which the business and profits of the music industry have
historically been based.  The "major" four record labels –UMG, Warner Bros., Sony/BMG and
EMI (the "Major Labels") – sell and distribute over 85% of all pre-recorded music in the United
States.  The advent of seamless digital distribution changed all that, and has threatened the
strangle-hold that the Major Labels have had over the market for the distribution of music.  The
Major Labels' initial response was a concerted refusal to license their copyrights and to litigate
their online competitors out of the marketplace.

**Plaintiffs' Illegal and Anticompetitive Activities In The Market of Online Distribution of Music**

     26.    Ultimately Counter-Defendants and their co-conspirators could not resist the
technological tide and had to recognize that online music distribution was not going to go away.
During 2000, each of the Major Labels, through their distribution companies, launched their own
digital distribution websites.  But Counter-Defendants and their co-conspirators had larger

desires—they joined together and embarked on a scheme to cartelize that market and its financial promise for themselves. Their goal was simple: to destroy any online music distribution service they did not own or control, or force such services to do business with them on exclusive and/or other anticompetitive terms so as to limit and ultimately control the distribution and pricing of digital music, all to the detriment of consumers. And to do so, Counter-Defendants and their co-conspirators had at their disposal a potent weapon—the exclusivity rights inherent in their copyrights—that they deployed with a vengeance, by unlawfully extending and pooling those rights to cartelize the network for the online distribution of music. They also pooled their huge monetary resources to combat and eventually defeat many of their online competitors.

27.    Counter-Defendants' latest attack on such "disruptive" technology is not new, for history shows that when new technology is invented that potentially disrupts the exclusive distribution channels content owners are accustomed to and profit from, they usually attack such technology with vengeance. Piano rolls, radios, cassette recorders, VCR's, digital audio tape, and MP3 players, just to name a few, were each met with protestations of gloom and doom and attempts to stop them. But the technologies the content owners wanted to ban—jukeboxes, record players, radio stations and VCR's—have not only made the world a better place, but have made content owners wealthier, too.

28.    This case is but one part of a much larger modern conspiracy to destroy all innovation that content owners cannot control and that disrupts their historical business models. In recent years, copyright owners have tried to prevent the exploitation of new technology by suing makers of software, makers of devices that play music (RIAA v. Diamond Multimedia Systems), ISP's, Internet search engines, venture capitalists that invest in Internet companies (Hummer Winblad), software that allows one to share and download their music online (MP3.com) and even the lawyers who represent these companies (Universal, which acquired

MP3.com after litigating it into a forced sale, sued MP3.com's counsel in the underlying case.)

Their goal is quite simple:  to prevent the development of any technology—even the Internet—

that is not designed and organized to control piracy.

29.    Counter-Defendants and their co-conspirators pursued and effected their plan

to dominate the market for online recorded music distribution by various means.  Among these

was the formation and use of two captive joint ventures—MusicNet and pressplay—that became

the exclusive vehicles through which Counter-Defendants and their co-conspirators would

license music content for online distribution.  These joint ventures were formed in mid-2001,

with the ostensible aim of providing platforms for the digital distribution of music.  MusicNet

was a joint venture among EMI, BMG and Warner Music.  Pressplay was a joint venture

between UMG and Sony Music.

30.    Counter-Defendants and their co-conspirators persistently and concertedly

refused to license any online distribution of their copyrighted works by any entity other than

their own captive joint ventures.  MusicNet and pressplay, and later a company called iMesh

(described hereinafter), have served as the vehicles through which Counter-Defendants and their

co-conspirators imposed anticompetitive contract terms in the form of unduly restrictive

licensing agreements.  The formation of these captive joint ventures has led the Court overseeing

the Napster Litigation to observe—even on an underdeveloped record—that MusicNet and

pressplay "look bad, sound bad and smell bad

31.    Counter-Defendants and their co-conspirators further conspired to use

MusicNet and pressplay as a means to pool their copyrights for anticompetitive purposes.

Specifically, they intended to use their captive joint ventures to effect a price-fixing arrangement

among horizontal competitors in the wholesale distribution of recorded music in digital form to

retail digital distribution companies.  Upon information and belief, MusicNet's wholesale price

was a share of a licensee's revenues, subject to a minimum payment, to be shared among the Major Labels, rather than a price per copy or work. That pricing system, by design and effect, eliminated price competition among BMG, EMI and Warner Music in offering their recorded music in digital form through MusicNet to retail digital distribution companies. And since these agreements established MusicNet as the sole source for Sony and Universal content as well, MusicNet eliminated wholesale price competition among all the major distribution companies. Among other pernicious results, independent retailers faced excessive wholesale prices, and consumers faced higher-than-average prices.

32.     Pressplay's pricing system had a similarly anticompetitive purpose. At the time, Sony and Universal—the two distribution companies that formed the joint venture—accounted for nearly half of all sales of recorded music. Counterclaimant alleges on information and belief that pressplay set both wholesale and retail prices for other retail digital distributors. As a result, all competition between Universal and Sony could be eliminated at both the wholesale and retail level.

33.     Counter-Defendants and their co-conspirators also used MusicNet and pressplay as a means to facilitate other unlawful collusive activity. As a condition of its license agreements, licensees were obligated not to negotiate with the Major Labels directly. The joint ventures were therefore part and parcel of Counter-Defendants' and their co-conspirators' concerted refusal to deal with others seeking to enter into and compete in the online recorded music distribution space, and a means by which the participating distribution companies sought to enhance their market power and stifle competition through combination and joint action. In addition, Counter-Defendants and their co-conspirators used MusicNet and pressplay as conduits for colluding to fix prices for licenses. On information and belief, Counterclaimant alleges that the captive joint ventures provided a forum in which executives of the parent distribution

companies met to discuss their own pricing and prices of competitors. Given the corporate affiliations of the joint ventures and the market power they wielded, Counterclaimant alleges on information and belief that those discussions allowed them to set prices both inside and outside the joint ventures in a coordinated and anticompetitive manner. Indeed, MusicNet and pressplay offered their basis service plans for $9.95 per month. Lime Wire further alleges on information and belief that since for each distribution company the price rules of their affiliated joint venture operated to reduce price competition, each distribution company had an independent incentive to accommodate the joint venture when setting its own prices.

34. Although the Counter-Defendants have for the most part divested themselves of these illegal joint ventures, their illegal effects continue through today. The Attorney General of the State of New York, as well as the Department of Justice, have begun separate investigations into the pricing of online distribution of music by the music industry. And there are reportedly over fourteen (14) separate class action lawsuits recently filed against the Major Labels for online price-fixing. The Major Labels are no strangers to this sort of activity--they have pled guilty to price-fixing in the sale of CD's, and recently admitted to doling-out payola to radio stations. Moreover, anticompetitive and collusive activities by the Counter-Defendants continue through today as described below.

35. In taking the above actions, Counter-Defendants' and their co-conspirators' purpose and effect was to delay, suppress and/or eliminate competition in the market for the online distribution of recorded music, to further concentrate their power over the market and to eventually set prices for online distribution to insure their continued profitability. Through their concerted and unlawful actions, Counter-Defendants and their co-conspirators have been successful in shutting down many peer-to-peer companies and continue to reap the profits of their collusive activities.

**Lime Wire's Efforts to Compete**

36.   In July, 2003, Lime Wire created a website known as "MagnetMix" that linked digital rights managed, licensed, and copyrighted content available over the Internet through the LimeWire software application.  At the time the website was created, any content that was linked through this website was done so without charge but it was Lime Wire's intention to utilize this application as a means to ultimately charge customers for downloading copyrighted content (via subscription-based, per-download fee or ad-supported).

37.   Lime Wire created MagnetMix for the business purpose, among other things, of acquiring, distributing, and selling licensed, digitally rights managed, copyrighted content over the Internet.  Lime Wire actively solicited licensed content from media and content owners that would then be distributed, first from independent labels and artists, as well as from independent retailers/distributors such as CDBaby, which provides a feed for all of their WeedShare content.  Weedshare is an online music store and file-sharing system with an innovative payment structure that also includes digital rights management of the content.  In addition, MagnetMix was created to foster Lime Wire's vision of making free content available over the Internet.

38.   In addition to using the MagnetMix website, it was Lime Wire's intent to use a step-by-step plan to educate users that downloading copyrighted material was potentially illegal, and to instead encourage users to purchase music "legally" by re-directing them to "legal" sites such a iTunes, or by using the DRM-wrapped technology in MagnetMix and have users purchase content through that site.  As part and parcel of this plan, Lime Wire intended to use a robust hash-based filtering mechanism in an attempt to prevent users from downloading copyrighted material and thus essentially "forcing" users to consent to "legally" downloading copyrighted works.  By providing significant incentives to encourage users of Lime Wire to pay

for or otherwise permissively use the DRM content which would result in remuneration (in such form and value as determined by the copyright owners) to the copyright owners, Lime Wire intended to promote and encourage only appropriate file sharing and to share the proceeds of works lawfully exchanged by users of the Lime Wire software with legal sites such as iTunes, or by purchasing such works through MagnetMix. Obviously, to test and succeed in Lime Wire's business plan, Lime Wire needed to utilize a robust filtering mechanism to prevent users from downloading copyrighted works and to allow non-discriminatory, fair, and competitive access to the Counter-Defendants' copyrighted works to make available for download and purchase by users of the LimeWire application. Lime Wire has, in fact, developed such a filter application, by deploying what is known as a "hash-based" filter. This filter operates to block files based on certain metadata (hash) unique to each work, acting as a unique identifier. In order for such a filter to work, content owners must provide those unique hashes to Lime Wire, and many content owners have agreed to do so free of charge.

39.    However, for anticompetitive and wrongful purposes, the Counter-Defendants and their co-conspirators have concertedly declined to participate, refused to do business and have denied Lime Wire reasonable access to the hashes of their copyrighted works. In addition to refusing to allow access to these hashes, the Counter-Defendants have insisted that Lime Wire utilize their "preferred" methodology of filtering based on acoustic fingerprinting technology, such as Audible Magic, and have gone so far as to "suggest" that the only viable alternative is for Lime Wire to proceed to do as deal with its "preferred" (i.e., licensed) peer-to-peer company iMesh, so as to continue their control over digital distribution of their content over the Internet. This boycott and collusive activity was directed at and intended to injure Lime Wire because it owned and operated a service for the digital distribution of copyrighted works, which it intended

to use to forge a direct relationship with Lime Wire users so as to compete directly with the Counter-Defendants and their affiliates in their roles as distributors of copyrighted works.

40.    iMesh is the Counter-Defendants' latest venture to "funnel" their efforts to control the distribution of their content over U.S.-based P2P companies. iMesh is allegedly the only "authorized" P2P file-sharing company in the U.S. It claims to have been granted a license by the Major Labels to allow distribution of their content, and also offers a "one-stop shop" for what iMesh promotes as the only RIAA-approved filtering mechanism. While from all outward appearances iMesh is not controlled by the RIAA and the Counter-Defendants, dealings with iMesh by Lime Wire and other P2P companies demonstrate, in reality, that is not the case. iMesh officials, including their CEO who used to be head of the RIAA, boast that because they are the only RIAA-sanctioned business, they are the sole means by which P2P companies in the United States can survive. Upon information and belief, iMesh and the Counter-Defendants, thorough the RIAA, have implemented a plan in an attempt to "force" all P2P companies based in the United States to accept iMesh's purchase offers or they will be sued. iMesh's and the RIAA's goal is to have these P2P companies concede, under the threat of expensive litigation, to sell their assets for essentially nothing, with the promise of a "get out of jail free" card from the RIAA. In return, the P2P company must simply turn-over its user base (which is the single largest asset typically) to iMesh so they can then force a conversion to the iMesh platform which, in turn, will lead to huge profits to iMesh and, of course, the Major Labels.

41.    Evidence of iMesh's close ties with the Counter-Defendants, and the control it exerts over iMesh, is undeniable. When Lime Wire approached the RIAA to obtain appropriate licenses and to seek approval of its hash-based filtering system, officials at the RIAA, while very careful to not directly state that iMesh was the only "approved" mechanism to convert to a "legal" site, certainly implied it given the fact that they rejected any other alternatives proposed

by Lime Wire and instead, demanded that Lime Wire (and others) convert their user base on a very short schedule, using only acoustic fingerprinting technology to filter, which inescapably points to only one solution: iMesh, who has both the "approved" filtering and the only RIAA-"approved" short-conversion plan. Further evidence of iMesh's close relationship with the RIAA is the fact that iMesh disclosed to Lime Wire financial statements of Sharman Networks (who recently settled with the Major Labels), in an effort to leverage Lime Wire into accepting iMesh's one-sided, take-it-or-leave-it proposal. Clearly, like MusicNet and pressplay, Counter-Defendants and their co-conspirators are using iMesh as a means to facilitate their unlawful collusive activities. And like before, the Counter-Defendants have at their disposal their powerful copyrights to pick and choose with whom they would do business and on what terms.

42. In furtherance of a conspiracy to monopolize and drive Lime Wire out of business, the Counter-Defendants and their co-conspirators have also implemented various strategies to control or stop the means by which others, including Lime Wire, offer digital technology useful for sharing digital files. Those strategies include (a) targeting Lime Wire and other peer-to-peer companies in an effort to drive them out of business through boycott and concerted exclusionary practices; (b) collusively refusing to license content to any digital distributor of content over the Internet on other than a restricted license basis aimed at preventing decentralized peer-to-peer file sharing software from distributing that licensed content; (c) selectively and concertedly licensing content in a discriminatory and anticompetitive manner simultaneously to promote companies owned and affiliated with or approved by the Counter-Defendants that distribute digital files through decentralized peer-to-peer software such as iMesh; (d) concertedly pressuring advertisers and other vendors and customers of Lime Wire and other peer-to-peer companies to stop doing business with them; (e) by collusively employing certain anti-piracy methods that redirect or disrupt users of "non-approved" digital distribution

technology (such as peer-to-peer); (f) by employing other unified anti-piracy protection methods, such as digital watermarking and other security technology, that prevent users from copying their own music for their own personal use, thereby improperly restricting consumer's legitimate fair use rights; and (g) engaging in unfair business practices intending to drive Lime Wire and any peer-to-peer provider out of business.

43.     Counter-Defendants' concerted anticompetitive scheme has been directed at Lime Wire because Lime Wire is a market participant and a competitor of the Counter-Defendants' affiliates in the separate markets for the digital distribution within the United States of copyrighted commercially valuable musical works over the Internet. The means by which the Counter-Defendants sought to harm Lime Wire was through a concerted refusal to deal with Lime Wire to deprive it of hashes so it could filter their copyrighted works using hash-based filtering technology developed by Lime Wire, among other things.

44.     This concerted conduct was intended to further the Counter-Defendants' goal of monopolizing the relevant market and promoting their control of digital distribution of such content. Although exclusive distribution rights to a copyrighted work are within the bundle of rights received by a copyright owner, an anticompetitive agreement among multiple copyright owners not to distribute their content to targeted third parties, such as Lime Wire, or to destroy the revenue streams and business of distribution competitors, is not within the limited grant of a copyright monopoly conferred by the government. The Counter-Defendants' goal was to concertedly extend their collective monopoly in the ownership of copyrighted content into a collective monopoly over the digital distribution of that content by destroying competitive technology and businesses, and to delay and suppress the distribution of copyrighted content until they could effectively control the pricing of that content across all avenues of digital distribution.

45.    In addition, and as part of their scheme to control the marketplace, upon information and belief the Counter-Defendants by agreement are refusing to license their content to third parties except under so-called "dead end licenses" (hereinafter "DEL") which are restrictive in their terms beyond restrictions reasonably required for pro-competitive, profit maximizing purposes. A DEL is a one-time license to retrieve a digital file from a server only. Even though digital rights managed technology exists to assure the copyright owner is remunerated each time a DRM file is downloaded from either a peer or a server, the collective decision by the Counter-Defendants to use only DELs precludes licensing at all to peer-to-peer platforms such as LimeWire.

46.    This concerted business strategy by the Counter-Defendants is intended by them, over time, to exercise control and monopolize the relevant market. The first monopolistic purpose of this conspirational conduct is to drive distributors of content using peer-to-peer platforms out of business. The second monopolistic purpose is to limit the means for future digital distribution of musical works in a way that the Counter-Defendants can in the future more directly control the relevant market, which they have done by inflating the price across the board of licensing their content.

47.    The Counter-Defendants with monopolistic intentions are pursuing a digital distribution "world" without peer-to-peer distribution in which the Counter-Defendants achieve a monopoly over the means of digitally distributing content over the Internet. The exclusive use of DEL's assures that the Counter-Defendants effectively license mere "store fronts," such as Rhapsody and iTunes for a limited time on a one- license basis. In addition, Counter-Defendants have colluded to price their licenses so that most independent digital distributors cannot literally afford to stay afloat unless they have another product tied to the distribution of music. For example, it is a well-known fact that Major Labels charge at least 70-80 cents for each 99 cent

iTunes download, and that the only way Apple can justify and profit from such an onerous licensing regime is because it makes such large profits on the sale of iPods.

48.     The Counter-Defendants' collective decision to limit third party licenses to DELs to fix prices and licensing terms and refuse to license peer-to-peer providers, except upon unfair and unreasonable terms, promotes their monopolistic plan. Using peer-to-peer distribution would not allow the Counter-Defendants to position themselves to control retail distribution in the future. Once content is distributed to a peer, it is distributable by a peer in the future. Although the content owner would be remunerated each time the file was distributed by a peer, the Counter-Defendants would lack the means to stop further distribution in order to acquire control of the entity directly providing digital copyrighted content to the user in the future.

49.     The Counter-Defendants have concertedly promoted the distribution of licensed content through companies in which many of the Counter-Defendants and their corporate affiliates have or had direct equity interests, such as Musicnet, pressplay and Roxio or through entities that they have a business relationship with, such as iMesh or Mashboxx, with the purpose and intent of monopolizing the market for the digital distribution of copyrighted content over the Internet.

50.     The Counter-Defendants have unreasonably and concertedly refused to do business with Lime Wire in order to harm Lime Wire in its business or property and to prevent the use of decentralized peer-to-peer technology for the secure distribution of their licensed, copyrighted content.

51.     Upon information and belief, the conspiratorial acts of the Counter-Defendants to coerce actual and potential advertisers, vendors, and customers of Lime Wire to stop doing business with Lime Wire include, among others, the Counter-Defendants have collectively required that contracts for the provision of content to other Internet Service

Providers (ISPs) have a clause forbidding those ISPs from doing business with providers of peer-to-peer software, including Lime Wire.

52.     Upon information and belief, in furtherance of the Counter-Defendants' anticompetitive scheme, the Counter-Defendants have engaged in, among other things, the following wrongful, unlawful and unfair conduct:

(a)     Violating state and federal personal privacy laws and the Digital Millennium Copyright Act ("DMCA") anti-hacking provisions by hacking and exploring the files of LimeWire users in order to frighten legitimate users of the LimeWire;

(b)     Falsely claiming that Lime Wire promotes child pornography;

(c)     Falsely claiming that Lime Wire is a "pirate";

(d)     Falsely claiming that Lime Wire is a "smut peddler";

(e)     Falsely claiming that their goal is to deter illegal file sharing, when their true motive is to deter all uses, legitimate and illegitimate, of peer-to-peer technology;

(f)     Threatening users of peer-to-peer technology with potential litigation and liability, based upon information obtained by illegal means;

(g)     Pressuring artists not to license their works to providers of peer-to-peer software, such as Lime Wire, that were not owned or controlled by the Counter-Defendants;

(h)     Refusals to deal with, and boycotts of, ISP's around the world that had entered, or proposed to enter, into advertising arrangements with Lime Wire; and

(i)     Refusals to give Lime Wire hashes of their copyrighted content so

as to allow Lime Wire to effectively filter these works.

53.     The Counter-Defendants, individually and collectively, through the Recording

Industry of America (the "RIAA") and other organizations and companies, have engaged in these

unfair business practices, for the specific purpose of eliminating sources of decentralized peer-to-

peer file sharing and acquiring a monopoly over digital distribution of commercially valuable

copyrighted music and movie content.  In fact, these same persons and entities have been both

secretly and publicly engaged in promotion of their own digital distribution technologies which

permitted exchanges of copyright infringing files, such as instant messengering, email and other

similar technologies only, in each case engineering the technologies to use a central server thus

retaining for themselves the same knowledge and control held by Napster.  They have also

utilized peer-to-peer technology to "test" the distribution of their works.

54.     Lime Wire is informed and believes that each of the named parties in this

action was, and is, the agent and co-conspirator of the other in connection with the concerted

conduct alleged in these counterclaims and aided and assisted the named parties in doing the

wrongful acts alleged herein, including but not limited to conspiring with the named parties to

unreasonably restrain trade and making statements and performing acts in furtherance of the

combination and conspiracy alleged herein, and that Lime Wire's damages as alleged herein

were proximately caused by them.  Lime Wire is informed and believes that the parties and co-

conspirators have utilized, and continue to utilize, the RIAA, as well as their employees,

attorneys, representatives, and agents, to plan, coordinate, and perpetrate the wrongful acts

alleged herein.  More specifically, Lime Wire alleges that the named Counter-Defendants have

developed the scheme to monopolize the relevant market described herein, and to destroy Lime

Wire principally through the RIAA, and that the co-conspirators have perpetrated the acts of

conspiracy through attorneys of the RIAA and the named Counter-Defendants with the specific intention of using the attorney-client privilege to keep secret their acts in furtherance of conduct that constitutes criminal conspiracy under Title 15 of the United States Code.

## CLAIMS FOR RELIEF

### COUNT I
### CONSPIRACY IN RESTRAINT OF TRADE IN VIOLATION OF § 1 OF THE SHERMAN ACT AND § 15 OF THE CLAYTON ACT

55.     Lime Wire realleges and incorporates in this Count the preceding allegations of this Counterclaim as if fully set forth herein.

56.     The Counter-Defendants have contracted, combined and conspired with the intent to unreasonably restrain trade in the market for the online distribution of recorded music.

57.     As a direct and proximate result of this concerted refusal to deal, unduly restrictive and exclusive licensing arrangements, unlawful pooling of their copyrights, price-fixing arrangements, refusal to provide access to the hashes of their content, and other anticompetitive activities, Lime Wire has been and will continue to be injured in its business and property.

### COUNT II
### MONOPOLIZATION IN VIOLATION OF § 2 OF THE SHERMAN ACT

58.     Lime Wire realleges and incorporates in this Count the preceding allegations of this Counterclaim as if fully set forth herein.

59.     The Counter-Defendants, when they act in concert, have monopoly power in the relevant market for the digital distribution within the United States of commercially valuable copyrighted sound recordings over the Internet, and have concertedly acted with specific intent to maintain and exercise that monopoly power to dictate (i) the terms, conditions, and technology by which such works will be digitally distributed, and (ii) the entities allowed to digitally distribute such works, in violation of § 2 of the Sherman Act.

60.    As a direct and proximate result of the violations alleged herein, Lime Wire has been and will continue to be damaged by the Counter-Defendants.

## COUNT III
## VIOLATION OF THE DONNELLY ACT (N.Y. GEN. BUS. LAW §340)

61.    Lime Wire realleges and incorporates in this Count the preceding allegations of this Counterclaim as if fully set forth herein.

62.    The Counter-Defendants have contracted, combined and conspired in an unreasonable and illegal restraint of trade as described above.

63.    Additionally, the Counter-Defendants, when they act in concert, have monopoly power in the relevant market for the digital distribution within the United States of commercially valuable copyrighted sound recordings over the Internet, and have concertedly acted with specific intent to maintain and exercise that monopoly power to dictate (i) the terms, conditions, and technology by which such works will be digitally distributed, and (ii) the entities allowed to digitally distribute such works, in violation of the Donnelly Act.

64.    As a direct and proximate result of the violations alleged herein, Lime Wire has been and will continue to be damaged by the Counter-Defendants.

## COUNT IV
## VIOLATION OF THE CRAWFORD-FELD ACT (N.Y. GEN. BUS. LAW §369-A)

65.    Lime Wire realleges and incorporates in this Count the preceding allegations of this Counterclaim as if fully set forth herein.

66.    The Counter-Defendants have contracted, combined and conspired in an unreasonable and illegal restraint of trade as previously described above in violation of New York General Business Law § 369 a.

67.    The Counter-Defendants and their co-conspirators additionally contracted, combined and conspired as described above.

68.     As a direct and proximate result of this illegal conduct, Lime Wire has been and will continue to be injured in its business and property.

## COUNT V
## VIOLATION OF N.Y. GEN. BUS. LAW §349

69.     Lime Wire realleges and incorporates in this Count the preceding allegations of this Counterclaim as if fully set forth herein.

70.     The Counter-Defendants employed unlawful, unfair and/or deceptive business practices, as described above, that are consumer-oriented and have broad impact on consumers at large.

71.     The Counter-Defendants' false allegations and unlawful, unfair and/or deceptive business practices are each aimed at deterring the consumer from engaging in legitimate business with Lime Wire.

72.     As a direct and proximate result of this these deceptive trade practices, Lime Wire has been and will continue to be injured in its business and property.

73.     As a direct and proximate result of this these deceptive trade practices, consumers have been and will continue to be injured.

## COUNT VI
## TORTIOUS INTERFERENCE OF PROSPECTIVE BUSINESS RELATIONS

74.     Lime Wire realleges and incorporates into this Count the preceding allegations of the Complaint as if fully set forth herein.

75.     As described above, Lime Wire has lost both actual and potential customers because of Counter-Defendants' improper actions.  Moreover, Lime Wire has lost potential business dealings with one or more third parties because of Counter-Defendants' threats and actions.

76.     Counter-Defendants were aware of these relationships.

77.    There was a reasonable probability that these customers and business clients would have entered into a business relationship with Lime Wire but for the Counter-Defendants' tortious and unlawful activities and wrongful means that interfered with these prospective business relationships.

78.    As a proximate result of Counter-Defendants' conduct, Lime Wire has been damaged.

## PRAYER FOR RELIEF

WHEREFORE, Defendants/Counterclaimant pray for relief as follows:

79.    That Plaintiffs take nothing as a result of their Complaint, that Plaintiffs' claims be dismissed with prejudice and that Defendants be awarded their costs and reasonable attorneys' fees.

80.    On Count I of the Counterclaim:

(a)    An award of actual damages in an amount according to proof, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

(b)    An award of attorneys fees, costs and expenses of suit incurred herein; and

(c)    Such other and further relief as this Court may deem just and proper.

81.    On Count II of the Counterclaim:

(a)    An award of actual damages in an amount according to proof, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

(b)    An award of attorneys fees, costs and expenses of suit incurred herein; and

(c)   Such other and further relief as this Court may deem just and proper.

82.   On Count III of the Counterclaim:

(a)   An award of actual damages in an amount according to proof;

(b)   An award of attorneys fees, costs and expenses of suit incurred herein; and

(c)   Such other and further relief as this Court may deem just and proper.

83.   On Count IV of the Counterclaim:

(a)   An award of actual damages in an amount according to proof;

(b)   An award of attorneys fees, costs and expenses of suit incurred herein; and

(c)   Such other and further relief as this Court may deem just and proper.

84.   On Count V of the Counterclaim:

(a)   An award of actual damages in an amount according to proof;

(b)   An award of attorneys fees, costs and expenses of suit incurred herein; and

(c)   Such other and further relief as this Court may deem just and proper.

85.   On Count VI of the Counterclaim:

(a)   An award of actual and punitive damages in an amount according to proof;

(b)  An award of attorneys' fees, costs and expenses of suit incurred herein; and

(c)  Such other and further relief as this Court may deem just and fair.

## DEMAND FOR JURY TRIAL

Defendants hereby demand a trial of this action by jury.

Dated:  September 25, 2006

Respectfully submitted,

Of counsel:

*Lauren E. Handler*

Lauren E. Handler
SDNY (LH 6908)
PORZIO, BROMBERG & NEWMAN, P.C.
100 Southgate Parkway
P.O. Box 1997
Morristown, NJ  07962-1997
(973) 889-4326 (Telephone)
(973) 538-5146 (Facsimile)
lehandler@pbn.com
*Attorneys for Defendants*

Charles S. Baker
Eric D. Wade
Joseph D. Cohen
PORTER & HEDGES, LLP
1000 Main Street, 36th Floor
Houston, Texas  77002
(713) 226-6000 (Telephone)
(713) 228-1331 (Facsimile)
cbaker@porterhedges.com
ewade@porterhedges.com
jcohen@porterhedges.com