UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
                                                         :

ARISTA RECORDS LLC; ATLANTIC RECORDING      :
CORPORATION; BMG MUSIC; CAPITOL RECORDS,      :
INC.; ELEKTRA ENTERTAINMENT GROUP INC.;      :
INTERSCOPE RECORDS; LAFACE RECORDS LLC;      :
MOTOWN RECORD COMPANY, L.P.;      :
PRIORITY RECORDS LLC; SONY BMG MUSIC      :
ENTERTAINMENT; UMG RECORDINGS, INC.;      :
VIRGIN RECORDS AMERICA, INC.; and      :
WARNER BROS. RECORDS INC.,      :
                                                     :

                   Plaintiffs/Counterclaim Defendants,      :
                                                        :           06 Civ. 5936 (GEL)
                               -v.-                              :
                                                         :        **OPINION AND ORDER**

LIME GROUP LLC; MARK GORTON; GREG      :
BILDSON; M.J.G. LIME WIRE FAMILY LIMITED      :
PARTNERSHIP,      :
                                                         :
                           _____ Defendants,      :
                                                          :
and      :
                                                          :
LIME WIRE LLC,      :
                                                         :
                     Defendant/Counterclaim Plaintiff. :
                                                          :
----------------------------------------------------------------------x

Katherine B. Forrest, Cravath, Swaine & Moore LLP,
New York, NY (Kenneth L. Doroshow, Recording Industry
Association of America, Washington, DC, on the brief)
for Plaintiffs and Counterclaim Defendants.

Charles S. Baker, Joseph D. Cohen, Porter & Hedges, LLP
(Lauren Handler, Porzio, Bromberg & Newman,
Morristown, NJ, on the brief) for Defendants and
Counterclaim Plaintiff.

GERARD E. LYNCH, <u>District Judge</u>:

Plaintiffs/counter-defendants are thirteen major record companies that filed a complaint alleging copyright infringement under federal law and assorted claims under New York State law against defendants Lime Group LLC, its wholly-owned subsidiary Lime Wire LLC ("Lime Wire"), two officers of the corporate entities, and a limited partnership controlled by one of the officers. (Compl. ¶¶ 29-35.[1]) All defendants have answered the Complaint. In addition, defendant/counter-plaintiff Lime Wire filed antitrust counterclaims under sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and section 4 of the Clayton Act, 15 U.S.C. § 15, alleging that counter-defendants conspired through various illegal means to restrain trade and monopolize the market for the digital distribution within the United States of copyrighted sound recordings over the internet. Lime Wire also asserts ancillary counterclaims under New York State law for conspiracy in restraint of trade, deceptive trade practices, and tortious interference with prospective business relations. Counter-defendants now move pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Lime Wire's counterclaims. For the reasons discussed below, the motion will be granted.

## BACKGROUND

The following facts are taken from Lime Wire's Restated First Amended Counterclaims ("FAC") (Doc. #42), except where noted. All factual allegations in the FAC are assumed to be true for purposes of this motion. <u>See</u> <u>Manufacturers Hanover Trust Co. v. Yanakas</u>, 7 F.3d 310, 312 (2d Cir. 1993).

---

[1] All references to the Complaint in this opinion are to the First Amended Complaint (Doc. # 45).

I.      Technological Advances in the Music Distribution Industry

Counter-defendants are thirteen major record companies that collectively own the rights to "the vast majority of copyrighted sound recordings sold in the United States." (Compl. ¶ 23.) Through exclusive recording contracts with artists and control over promotion and physical distribution channels, counter-defendants have become the dominant players in the music distribution industry. (FAC ¶¶ 22, 30.) Four record labels (the "Major Labels") — each of whom own distribution companies that are parties to this litigation — sell and distribute over 85% of all recorded music in the United States.[2] (Id. ¶ 22.)

Traditionally, the recording, duplication, and physical distribution of music to retailers and consumers required considerable resources that few individual artists could afford without the assistance of record companies in the music distribution industry. (Id.) With the development of the internet and new technology in the 1990s, however, the costs of recording and distributing music dropped significantly. (Id. ¶ 23.) Artists could digitally record their own songs using their own equipment and personal computers, and digital music could be distributed at very low cost over the internet to consumers without the need for physical products (e.g., records, cassette tapes, and compact discs) or physical store locations. (Id.) "[U]nburdened by any tangible media" (id.), consumers could play digital music on handheld devices such as iPods and cell

---

[2] The four Major Labels are (1) EMI, which owns Capitol Records, Inc., Priority Records LLC, and Virgin Records America, Inc.; (2) Sony, which owns Arista Records LLC, BMG Music, LaFace Records LLC, and Sony BMG Music Entertainment; (3) Warner Music Group, which owns Warner Bros. Records Inc., Atlantic Recording Corporation, and Elektra Entertainment Group Inc.; and (4) Universal Music Group, which owns UMG Recordings, Inc., Interscope Records, and Motown Record Company, L.P. (Letter from Charles S. Baker, Esq., to the Court, dated Nov. 16, 2007, at 7.) For purposes of this opinion, the terms "distribution companies," "record companies," and "counter-defendants" are used interchangeably.

phones and were no longer "dependent exclusively on the physical media products and distribution channels that historically had been controlled by the Counter-Defendants" (id. ¶ 27).

At the forefront of these technological advances were companies such as Napster, which developed a file-sharing application that allowed networked users to exchange digital files through centralized servers that acted as "brokers."[3] (Id. ¶ 42.) Counter-plaintiff Lime Wire designed and distributed a similar file-sharing application utilizing "peer-to-peer" ("P2P") technology, which allows users to search and download files directly from other online users without utilizing a centralized server.[4] (Id. ¶ 43.) In addition to its P2P application, Lime Wire also created the "MagnetMix" website, which provided users of its software application with links to licensed, copyrighted music content. (Id.) At its creation, MagnetMix provided links to such content for free, but Lime Wire alleges that it intended to utilize MagnetMix in conjunction with its P2P application "as a means to ultimately charge customers for downloading copyrighted content." (Id.)

---

[3] Although Napster users connected to one another to exchange digital files, centralized servers run by Napster maintained directories of all the files that users were sharing online. (FAC ¶ 42.) Unfortunately for Napster, the vast majority of files exchanged through its file-sharing network were copyrighted, see Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 924 (2005) (describing Napster as a "notorious file-sharing service"), and the company was eventually held liable for vicarious and contributory copyright infringement, see A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001).

[4] In its Corrected First Amended Answer (Doc. # 42), Lime Wire expressly denies the allegations of copyright infringement set forth in the record companies' Complaint. (D. Corrected First Amended Ans. ¶¶ 65-108.) According to the FAC, "[u]sers who install Lime Wire on their computers do so by their own volition and are only able to install the Lime Wire application if they first agree not to use the application to infringe the copyrights of others." (FAC ¶ 43.) As a result, individuals using Lime Wire's file-sharing application do so without its assistance and "in the manner that they alone choose." (Id.)

II.    <u>Alleged Anticompetitive Conduct</u>

In response to the technological changes affecting the music distribution industry,

counter-defendants, through an array of allegedly anticompetitive activities, "conspired to delay

and disrupt the entry and emergence of . . . alternative means for distribution, and to extend their

oligopoly in the distribution of recorded music over the new market for the electronic distribution

of music via the Internet."  (<u>Id</u>. ¶ 28.)

A.    <u>Price-Fixing and Exclusive Distributorship Agreements</u>

1.    <u>MusicNet and pressplay</u>

In 2000, each of the Major Labels, through their distribution companies, launched its own

website for the digital distribution of music.  (<u>Id</u>. ¶ 33.)  By mid-2001, the record companies

changed course and formed two joint ventures — MusicNet and pressplay — that became the

exclusive vehicles through which counter-defendants would license music content for online

distribution.[5]  (<u>Id</u>. ¶¶ 34, 35.)  Counter-defendants allegedly used these joint ventures "as conduits

for colluding to fix prices" as they "provided a forum in which executives of the parent

distribution companies met to discuss their own pricing and prices of competitors."  (<u>Id</u>. ¶ 38.)

Through the joint ventures, the record companies allegedly "pool[ed] their copyrights" and

"effect[ed] a price-fixing arrangement" for licenses at both the wholesale and retail levels.  (<u>Id</u>. ¶

36.)  In particular, the FAC alleges that "MusicNet's wholesale price was a share of a licensee's

revenues, subject to a minimum payment, to be shared among the Major Labels, rather than a

_____

[5] MusicNet was a joint venture among EMI (whose subsidiaries are parties to this litigation), BMG and Warner Music, and also allegedly served as the sole source for Sony and UMG music content as well.  (FAC ¶¶ 34, 36.)  Pressplay was a joint venture between UMG and Sony Music.  (<u>Id</u>. ¶ 34.)

price per copy or work."[6]  (Id.)  This pricing scheme purportedly "eliminated wholesale price competition among all the Counter-Defendants and their co-conspirators" and resulted in "excessive wholesale prices" for retailers and "higher than competitive prices" for consumers. (Id.)  Pressplay, which apparently functioned as a retail distributor, similarly "set both wholesale and retail prices for other retail distributors."  (Id. ¶ 37.)  Counter-defendants also allegedly coordinated to set fixed prices across the two joint ventures as both MusicNet and pressplay charged consumers "$9.95 per month" for their basic service plans.  (Id. ¶ 38.)  As a condition of receiving license agreements from the joint ventures, moreover, retail licensees were "obligated not to negotiate with the Major Labels directly."  (Id.)

> 2.    iMesh

Although counter-defendants eventually divested their interests in the two joint ventures (id. ¶ 39), they allegedly conspired again to control the distribution of their content by emerging P2P companies (id. ¶ 47; see id. ¶ 35).  According to the FAC, the record companies conspired to deal exclusively with a P2P company called iMesh, which has "been granted a license by the Major Labels to allow distribution of their content," and offers the only filtering mechanism (acoustic fingerprinting technology) approved by the Recording Industry Association of America ("RIAA").[7]  (Id. ¶ 47.)  Although counter-defendants do not own interests in iMesh (id.; see id. ¶ 56), they have allegedly implemented a plan "to coerce all P2P companies based in the United

---

[6] It is unclear whether MusicNet's "wholesale price" was for a blanket license to all works in the Major Labels' catalogs, see Broadcast Music, Inc. v. CBS, 441 U.S. 1, 24 (1979) (subjecting "blanket license" pricing scheme to rule of reason analysis), or for a more limited license to a subset of those works.

[7] Filtering mechanisms prevent P2P users from downloading copyrighted songs from other networked users without authorization.

States to accept iMesh's purchase offers" and turn over their user base for conversion to the iMesh platform, or face litigation by the RIAA. (Id. ¶ 47.) When Lime Wire approached the RIAA to obtain licenses and seek approval of its hash-based filtering system,[8] RIAA officials rejected its proposals and "demanded" that Lime Wire convert its user base and use only acoustic fingerprinting technology. (Id. ¶ 48; see id. ¶ 46.) iMesh also purportedly disclosed to Lime Wire the financial statements of another company that had recently settled with counter-defendants in an attempt to pressure Lime Wire to accept iMesh's buyout proposal. (Id. ¶ 48.) The record companies have also allegedly refused to license their content to third parties except under so-called "dead end licenses," which are one-time licenses to retrieve a digital file from a server. (Id. ¶ 52.) Because P2P applications do not utilize a centralized server, such "dead end" licensing allegedly precludes P2P retailers utilizing non-iMesh platforms from obtaining licenses from the Major Labels. (Id.)

### B. Mandatory Licensing for Hash-Based Filtering

As noted above, Lime Wire developed and distributed a P2P application that enabled users to search and download files directly from other networked users without using a centralized server. (Id. ¶ 43.) In July 2003, Lime Wire also created the MagnetMix website, which provided links to licensed, copyrighted content through Lime Wire's P2P application. (Id.) Because MagnetMix was allegedly created for the business purpose of "acquiring, distributing, and selling" such content over the internet, Lime Wire "actively solicited licensed content from media

---

[8] Hashes are metadata that act as unique identifiers for digital files. (FAC ¶ 45.) Lime Wire designed its filtering system to block copyrighted files based on the hashes unique to each work. (Id.) See infra at 8.

and content owners," specifically, "independent labels and artists" and "independent retailers/distributors."[9]  (Id. ¶ 44.)

Lime Wire alleges that it intended to implement a "step-by-step plan to educate users that downloading copyrighted material was potentially illegal, and to instead encourage users to purchase music legally" through MagnetMix, or re-direct them to licensed sites such as Apple's iTunes store.  (Id. ¶ 45.)  As part of this plan, Lime Wire developed a "hash-based filtering mechanism to inhibit users from downloading copyrighted material without a license."[10]  (Id.) This hash-based filtering system was integral to the commercial viability of MagnetMix because without it, users could simply use Lime Wire's P2P application to download copyrighted content illegally from other networked users without charge, instead of purchasing such content legally through MagnetMix.[11]

Although "many content owners have agreed" to provide their unique hashes to Lime Wire (id.), counter-defendants and their co-conspirators allegedly declined to provide Lime Wire with any hashes unless it first obtained a licence from Altnet, a company which purportedly held the proprietary rights to hash-based filtering (id. ¶ 46).  According to Lime Wire, however, the patents Altnet owns are invalid (id. ¶ 47), and counter-defendants allegedly conspired with Altnet to "force" Lime Wire and other P2P companies to obtain a license from Altnet in order to obtain

---

[9] Notably, the FAC does not allege that Lime Wire solicited licensed, copyrighted content from any of the counter-defendants.

[10] See supra note 8.

[11] See FAC ¶ 45 ("Lime Wire planned to utilize a robust filtering mechanism to inhibit users from downloading copyrighted works and to allow competitive access to the Counter-Defendants' copyrighted works to make available for download and purchase by users of the LimeWire application.").

the necessary hashes (id. ¶ 46; see id. ¶ 47).  Through this mandatory licensing regime, counter-defendants allegedly engaged in "boycott and collusive activity" intended to injure Lime Wire as a retailer in the digital distribution market.  (Id. ¶ 46.)

C.    Other Alleged Anticompetitive Conduct

The FAC further alleges that counter-defendants conspired "to coerce actual and potential advertisers, vendors, and customers" to stop doing business with Lime Wire.  (Id. ¶ 58.)  Specifically, counter-defendants allegedly "required that contracts for the provision of content to Internet Services Providers (ISPs) have a clause forbidding those ISPs from doing business with providers of peer-to-peer software, including Lime Wire" (id.), and refused to deal with ISPs "around the world that had entered, or proposed to enter, into advertising arrangements with Lime Wire" (id. ¶ 59).  The FAC also alleges that counter-defendants, "individually and collectively, through the [RIAA] and other organizations and companies, have engaged in . . . unfair business practices" (id. ¶ 60), including (1) hacking and exploring files of Lime Wire software users; (2) falsely claiming that Lime Wire "promotes child pornography" and is a "pirate" and "smut peddler"; (3) threatening users of P2P software with litigation, based upon information obtained by illegal means; and (4) pressuring artists not to license their works to providers of P2P software that were not owned or controlled by counter-defendants (id. ¶ 59).

In sum, Lime Wire contends that counter-defendants and their co-conspirators have engaged in an integrated conspiracy to foreclose competitors and monopolize the market for the digital distribution of copyrighted music over the internet.  Counter-defendants, in contrast, characterize Lime Wire's allegations as merely a strategic attempt to "muddy the issues," "increase the burden on copyright owners," and "transform a straightforward infringement case

into a sprawling, complex and meritless antitrust action." (Counter-D. Mem. 1.) Counter-defendants now move to dismiss Lime Wire's counterclaims pursuant to Fed. R. Civ. P. 12(b)(6), raising numerous challenges to the sufficiency of Lime Wire's pleading, discussed in turn below.

## DISCUSSION

A complaint, or in this case, a counterclaim, may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) where it fails to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1974 (2007). As the Second Circuit has recently instructed, Twombly requires that a party bringing a claim satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). A party's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 127 S. Ct. at 1964-65 (internal quotation marks and alteration omitted). In order to state a claim, the factual allegations contained in the pleading "must be enough to raise a right to relief above the speculative level." Id. at 1965; see In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) ("While Twombly does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiffs' claims across the line from conceivable to plausible." (internal quotation marks and alteration omitted)).

When deciding a 12(b)(6) motion to dismiss a counterclaim, the Court must take as true the facts as alleged in the counterclaim. See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174-75 (1965); Universal Acupuncture Pain Servs., P.C. v. State Farm Mut. Auto. Ins. Co., 196 F. Supp. 2d 378, 382 (S.D.N.Y. 2002). The Court may consider documents

incorporated in the counterclaim by reference, matters of which judicial notice may be taken, or documents that the counter-plaintiff relied on in bringing suit. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002). The Court must construe the counterclaim liberally and draw all reasonable inferences in the counter-plaintiff's favor. See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). However, conclusory statements cannot "substitute for minimally sufficient factual allegations." Paycom Billing Servs. v. Mastercard Int'l, Inc., 467 F.3d 283, 289 (2d Cir. 2006) (internal quotation marks omitted); see Amron v. Morgan Stanley Inv. Advisors Inc., 464 F.3d 338, 344 (2d Cir. 2006) (noting that "bald assertions and conclusions of law will not suffice" to defeat motion to dismiss (internal quotation marks omitted)).

I.    Federal Antitrust Claims

Lime Wire alleges that counter-defendants have conspired to foreclose competition in and monopolize the market for the digital distribution within the United States of copyrighted music over the internet. It seeks treble damages under sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and section 4 of the Clayton Act, 15 U.S.C. § 15.[12] (FAC ¶¶ 93-96.) Counter-defendants raise a number of defenses, including: (1) that Lime Wire lacks standing to prosecute its antitrust counterclaims because it has not suffered antitrust injury and is not a proper antitrust plaintiff, (2) that Lime Wire has failed to define a relevant market, (3) that Lime Wire's Sherman Act § 1 claim fails because the FAC does not sufficiently allege the existence of a conspiracy, and

---

[12] The Sherman Act contains the substantive prohibitions against anticompetitive conduct, while private parties are granted the right to sue for violations of the antitrust laws by § 4 (damages) and § 16 (injunctive relief) of the Clayton Act. See Paycom, 467 F.3d at 290.

(4) that Lime Wire's Sherman Act § 2 claims fail because the FAC erroneously relies on a "shared monopoly" theory of liability.

A.  Antitrust Standing

While Congress intended the antitrust laws to prevent the concentration of market power and protect competition, not every injured plaintiff may seek to recover damages.  See Associated Gen. Contractors v. California State Council of Carpenters, Inc., 459 U.S. 519, 534 (1983) ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." (internal quotation marks omitted)).  A private plaintiff seeking to recover under the antitrust laws must demonstrate "antitrust standing." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., ___ F.3d ___, No. 06 Civ. 4908, 2007 WL 3071637, at *3 (2d Cir. Oct. 23, 2007).  To establish antitrust standing, a plaintiff not only must allege injury-in-fact to its "business or property" caused by the antitrust violation,[13] 15 U.S.C.

---

[13] Preliminarily, counter-defendants argue that Lime Wire lacks standing to sue under the antitrust laws because it is not yet a functioning business participating in the digital distribution market.  (Counter-D. Mem. 12-13.)  Lime Wire, in turn, asserts that it is precisely counter-defendants' anticompetitive conduct that foreclosed it from entering the market.  (Counter-P. Mem. 13.)  "Under § 4 of the Clayton Act, it is as unlawful to prevent a person from engaging in a business as it is to drive a person out of business."  Waldron v. British Petroleum Co., 231 F. Supp. 72, 81 (S.D.N.Y. 1964).  Where a party "alleges that [it] has been prevented from engaging in a business, [it] must show that [it] had the intention and preparedness to engage in that business."  Id.; see Indium Corp. of Am. v. Semi-Alloys, Inc., 611 F. Supp. 379, 385 (N.D.N.Y. 1985) (observing that, in determining whether plaintiff has demonstrated the "requisite intention and preparedness," courts consider, inter alia, "[a]ffirmative action on the part of plaintiff to engage in the proposed business").  Lime Wire alleges that it created a P2P file-sharing application, developed the MagnetMix website, secured licenses and hashes from independent artists and labels, entered into advertising arrangements with ISPs, and attempted to obtain hashes from counter-defendants but were turned down.  Collectively, these affirmative steps are sufficient to demonstrate that Lime Wire had the "requisite intention and preparedness" to enter the digital distribution market, Indium, 611 F. Supp. at 385, and that it was "ready, willing, and able" to operate as a retail distributor of counter-defendants' music, id. at 385 n.14 (emphasis omitted).  Accordingly, although Lime Wire is only a prospective retail distributor, it may nevertheless assert damages as a "business" under Section 4 of the Clayton Act.  See 2A

§ 15(a), but also must make "a showing of a special kind of 'antitrust injury,' as well as a showing that the plaintiff is an 'efficient enforcer' to assert a private antitrust claim." Port Dock, 2007 WL 3071637, at *3.

The notion of "antitrust injury" grew from the recognition that a competitor may be injured not only by prohibited anticompetitive activity, but also by competition itself, and that the antitrust laws were not intended to afford the latter injuries a remedy. See Balaklaw v. Lovell, 14 F.3d 793, 797 (2d Cir. 1994). Antitrust injury, then, simply means "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); accord Paycom, 467 F.3d at 290. To demonstrate antitrust injury, "a plaintiff must show (1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." Blue Tree Hotels Inv., Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 220 (2d Cir. 2004). The antitrust injury requirement thus ensures that a "plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990).

Even where a plaintiff adequately alleges an antitrust injury, it may still lack standing if it is not an "efficient enforcer" of the antitrust laws. Paycom, 467 F.3d at 290 (internal quotation marks omitted). The relevant factors to consider in determining whether a party who states an antitrust injury is nevertheless not a proper antitrust plaintiff include:

> (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons

Phillip E. Areeda et al., Antitrust Law ¶ 349, at 225 (3d ed. 2007) (noting that Clayton Act § 4's "business or property" requirement "is typically found [where] plaintiff's entry" into the market is "relatively likely" (internal quotation marks omitted)).

whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of antitrust injury.

Port Dock, 2007 WL 3071637, at *3. "The weight to be given the various factors will necessarily vary with the circumstances of particular cases." Paycom, 467 F.3d at 291 (internal quotation marks and alteration omitted).

### 1.    Price Restraints

As described above, Lime Wire alleges a conspiracy among counter-defendants to fix prices for licenses at both the wholesale and retail levels. At the wholesale level, Lime Wire alleges that counter-defendants used their joint ventures, MusicNet and pressplay, "to effect a price-fixing arrangement among horizontal competitors" (FAC ¶ 36) — i.e., among the record companies themselves.[14] Although such a horizontal price-fixing arrangement is *per se* unlawful under § 1 of the Sherman Act, see Leegin Creative Leather Prods. v. PSKS, Inc., ___ U.S. ___, 127 S. Ct. 2705, 2713 (2007),[15] Lime Wire has not established that *it* suffered injury-in-fact as a

---

[14] "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 243 (2d Cir. 1997) (internal quotation marks omitted).

[15] Although § 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade," 15 U.S.C. § 1, the Supreme Court has "never taken a literal approach" to this language, Leegin, 127 S. Ct. at 2712 (internal quotation marks omitted). Instead, the Court has instructed that § 1 only prohibits "unreasonable restraints." Id. (internal quotation marks omitted). The so-called "rule of reason" is the "accepted standard for testing whether a practice restrains trade in violation of § 1." Id. Under this rule, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited" as an unreasonable restraint on competition. CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 80 (2d Cir. 1999) (internal quotation marks omitted). Some restraints, however, "are deemed unlawful *per se*," thus eliminating "the need to study the reasonableness of [the] restraint in light of the real market forces at work." Leegin, 127 S. Ct. at 2713 (internal quotation marks

result of counter-defendants' purported arrangement.  See Atlantic Richfield, 495 U.S. at 342

(noting that the "*per se* rule is a method of determining whether § 1 of the Sherman Act has been

violated, but it does not indicate whether a private plaintiff has suffered antitrust injury").

Although Lime Wire "actively solicited licensed content" from "independent labels and

artists" and "independent retailers/distributors" (FAC ¶ 44), the FAC contains no allegation that

Lime Wire ever attempted to obtain or purchase a license from any of the counter-defendants or

their respective joint ventures.[16]  Lime Wire's retail competitors may have "faced excessive

wholesale prices" for licenses as a result of the alleged price-fixing scheme (id. ¶ 36), but Lime

Wire itself has not alleged any facts demonstrating that it suffered such harm.  Although Lime

Wire's attempt to obtain *hashes* from counter-defendants suggests that it intended eventually to

obtain *licenses* from them, nothing in Lime Wire's pleading indicates that it has, in fact, sought

(or imminently will seek) such licenses from counter-defendants.  Accordingly, Lime Wire

cannot claim that it has suffered injury-in-fact as a result of counter-defendants' wholesale price-

fixing scheme.

Lime Wire's allegation that counter-defendants, though their joint ventures, concertedly

fixed prices for digital music licenses at the retail level (id. ¶¶ 37-38) similarly fails to state

_____

omitted).  "Restraints that are *per se* unlawful include horizontal agreements among competitors
to fix prices or to divide markets."  Id. (citations omitted).

[16] Although Lime Wire asserts in its memorandum of law in opposition to the motion to
dismiss that counter-defendants have "all refused to grant [Lime Wire] licenses to their catalogs
of recorded music even at . . . artificially high prices" (Counter-P. Mem. 6), this allegation does
not appear in the FAC itself, and thus cannot be considered by the Court in evaluating counter-
defendants' motion to dismiss.  See Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.
1993) (noting that on motion to dismiss, consideration of factual allegations is limited to those
allegations contained in complaint).

antitrust injury. Although such vertical price-fixing arrangements may in some circumstances be unlawful, see Leegin, 127 S. Ct. at 2722 (holding that vertical minimum price-fixing agreements, like vertical maximum price-fixing agreements, "should be evaluated under the traditional rule of reason" (citing State Oil Co. v. Khan, 522 U.S. 3, 22 (1997)), Lime Wire has not established that *it* suffered injury-in-fact stemming from any such agreement.

To the extent Lime Wire claims that it was an interbrand retail competitor of counter-defendants' joint ventures,[17] Lime Wire lacks standing to challenge the retail price-fixing agreement because the FAC contains no allegation that the fixed retail prices were predatory. See Atlantic Richfield, 495 U.S. at 339 (holding that vertical maximum price-fixing agreement "does not cause a competitor antitrust injury unless it results in predatory pricing"). Even accepting as true Lime Wire's allegation that MusicNet and pressplay concertedly fixed prices for their basic service plans at "$9.95 per month" (FAC ¶ 38), this arrangement did not result in antitrust injury to Lime Wire because it was not constrained, at least in any anticompetitive way, in setting its own prices or offering its own level of services. To the extent counter-defendants' (non-predatory) price-fixing agreement resulted in lower prices being charged by retailers, "[t]his is not *antitrust* injury; indeed, cutting prices in order to increase business often is the very essence of competition." Atlantic Richfield, 495 U.S. at 338 (internal quotation marks omitted);

_____

[17] "Interbrand" competition refers to competition between dealers of different "brands" of products in the same market, while "intrabrand" competition refers to competition between dealers in the same brand of product. See Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC, 317 F. Supp. 2d 301, 320 (S.D.N.Y. 2003). In this case, Lime Wire alleges that counter-defendants collectively "pool[ed] their copyrights" to fix prices at both the wholesale and retail levels. (FAC ¶ 36.) Accordingly, for purposes of this opinion, retail distributors of counter-defendants' music are intrabrand competitors, while interbrand competition is provided by retailers that sell music by "independent labels and artists" not affiliated with counter-defendants. (Id. ¶ 44.)

see Port Dock, 2007 WL 3071637, at *3 (discussing Atlantic Richfield).  Similarly, if $9.95 per month was higher than a competitive market price, such conduct would harm consumers and violate the Sherman Act, but as a competitor of the joint ventures, Lime Wire would suffer no injury and indeed "stood to gain from any conspiracy to raise the market price."  Atlantic Richfield, 495 U.S. at 337 (internal quotation marks omitted); see Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 585 n.8 (1986) (noting that a competitor "may not complain of conspiracies that . . . set minimum prices at *any* level").  To the extent Lime Wire claims that it was an intrabrand competitor of the joint ventures, moreover, given the absence of any allegation that Lime Wire actually sought to obtain licenses from any of the counter-defendants, Lime Wire was, at best, only a prospective intrabrand competitor.[18]  Accordingly, even if other intrabrand competitors suffered harm from counter-defendants' vertical price-fixing scheme, Lime Wire itself cannot claim that it suffered any actual injury, much less that it suffered the kind of direct, non-speculative injury that would make it an "efficient enforcer" to remedy such a scheme.  Paycom, 467 F.3d at 290 (internal quotation marks omitted).

Accordingly, Lime Wire has failed to demonstrate the requisite antitrust injury necessary to establish standing to challenge counter-defendants' alleged fixing of prices at either the wholesale or retail levels.

---

[18] Although a prospective competitor may have antitrust standing to challenge anticompetitive conduct that directly harmed its ability to enter the market, see supra note 13, it cannot sue under the antitrust laws to challenge conduct which has not (yet) caused it to suffer injury-in-fact.

2.        Exclusive Distributorship Agreements

Lime Wire also alleges that counter-defendants concertedly entered into various exclusive distribution agreements — first through their joint ventures, and later, through iMesh (FAC ¶¶ 35, 47) — and imposed other distribution restraints, including requiring licensees to refrain from "negotiat[ing] with the Major Labels directly" (id. ¶ 38), offering only "dead end licenses" (id. ¶ 52), and "coerc[ing] all P2P companies based in the United States to accept iMesh's purchase offers" and turn over their user base for conversion to the iMesh platform, or face litigation by the RIAA (id. ¶ 47). As with the price-fixing arrangements discussed above, however, Lime Wire fails to allege any actual injury that it has suffered as a result of these restraints.

As noted above, Lime Wire does not allege that it sought any licenses, "dead end" or otherwise, from any of the counter-defendants,[19] nor does it allege that it has ever been prevented from negotiating with the record companies directly. Although Lime Wire asserts that it "approached the RIAA to obtain appropriate licenses" (id. ¶ 48), Lime Wire does not plead any facts describing the relationship between counter-defendants and the RIAA, or the scope of the RIAA's authority to act on their behalf. See Twombly, 127 S. Ct. 1971 n.12 (noting that a conspiracy to restrain trade cannot be inferred "just because [one] belong[s] to the same trade guild as one of his competitors"). Indeed, according to the RIAA's own website, a company wishing to offer "digital downloads of music" needs to obtain "licenses" for such content, which

_____

[19] See Reading Int'l, 317 F. Supp. 2d at 309, 322 (finding antitrust injury where plaintiffs specifically asserted that distributor defendants had entered into exclusive distribution arrangements and defendants "refuse[d] *even to receive* or consider offers" from plaintiffs to obtain licenses).

"are granted by *individual* copyright owners," not the RIAA.[20]  Lime Wire's allegation that

RIAA officials "demanded" that it convert its user base on a short schedule and use only acoustic

fingerprinting technology to filter (FAC ¶ 48), as well as its allegation that counter-defendants

conspired with iMesh to coerce Lime Wire into accepting iMesh's buyout proposal by disclosing

to Lime Wire the financial statements of another company that had recently settled with counter-

defendants, are also insufficient to state injury-in-fact because such actions are more in the

nature of preliminary negotiations than a concrete refusal to deal.

Accordingly, even though Lime Wire contends that it eventually planned to operate as a

retail distributor of counter-defendants' music (see id. ¶ 45), the FAC contains no allegation that

Lime Wire actually took the critical antecedent step of seeking any licenses from any of the

counter-defendants.  Lime Wire's retail competitors — in particular, those that have been

refused licenses, those that have obtained only "dead end" licenses, or those that have been

precluded from negotiating with counter-defendants directly — may have standing to challenge

counter-defendants' distribution restraints, but Lime Wire itself, as merely a prospective

distributor of counter-defendants' music, cannot establish that it has suffered injury-in-fact as a

result of those restraints.

---

[20] See RIAA Home Page, http://www.riaa.com (last visited Nov. 30, 2007) (emphasis added); see also Doron Precision Sys., Inc. v. FAAC, Inc., 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (noting that on "a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination" (internal quotation marks omitted)).

3.     <u>Mandatory Licensing for Hash-Based Filtering</u>

Lime Wire alleges that counter-defendants concertedly refused to provide it with "reasonable access" to hashes of their copyrighted works by requiring it first to seek a license for hash-based filtering technology from Altnet, which allegedly held the proprietary rights to such technology.  (<u>Id</u>. ¶ 46.)  In contrast to the restraints alleged above, which may have harmed competition generally but did not injure Lime Wire specifically, counter-defendants' mandatory licensing regime inflicted direct and concrete antitrust injury on Lime Wire by raising its costs and thus impeding its ability, and the ability of other P2P retailers utilizing hash-based filtering technology, to operate as effective competitors in the digital distribution market.  Accordingly, Lime Wire has established antitrust standing to challenge counter-defendants' mandatory licensing scheme.

The record companies assert that Lime Wire fails to explain how their refusal to provide hashes actually harmed Lime Wire's P2P service or MagnetMix.  (Counter-D. Mem. 12-13.) The FAC, however, specifically alleges that Lime Wire developed MagnetMix "for the business purpose . . . of acquiring, distributing, and selling licensed, digitally rights managed, copyrighted content over the Internet," that MagnetMix "linked digital rights managed, licensed, and copyrighted content available over the Internet through the LimeWire software application," and that Lime Wire "planned to utilize a robust filtering mechanism to inhibit users from downloading copyrighted works and to allow competitive access to the Counter-Defendants' copyrighted works to make available for download and purchase by users of the LimeWire application."  (FAC ¶¶ 43-45.)  Construed liberally, Lime Wire's pleading adequately explains that the acquisition of hashes for use in its hash-based filtering system was integral to the success

of MagnetMix because, without the identifying hashes, Lime Wire's customers could simply use its P2P software application to illegally download copyrighted content from other users for free, instead of purchasing such content legally through MagnetMix.

In light of this commercial rationale for procuring hashes, counter-defendants' mandatory licensing regime effectively raised the costs for Lime Wire and other retail distributors whose business models relied on hash-based filtering technology, thereby reducing the ability of such distributors to compete effectively with other intrabrand retailers selling counter-defendants' music. See Primetime 24 Joint Venture v. NBC, 219 F.3d 92, 98, 101-02 (2d Cir. 2000) (holding that "coordinated efforts . . . to impose costs upon [plaintiff] as a way of stifling competition" states claim under Sherman Act). Although "the primary purpose of the antitrust laws is to protect interbrand competition," Khan, 522 U.S. at 15, the "antitrust laws are not entirely unconcerned with intrabrand restraints," Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp., 312 F. Supp. 2d 379, 394 (E.D.N.Y. 2004). As the Eleventh Circuit observed in Graphic Products Distributors, Inc. v. ITEK Corp.:

> The argument . . . that the reduction or elimination of intrabrand competition is, by itself, never sufficient to show that a trade restraint is anticompetitive must rest, at bottom, on the view that intrabrand competition — regardless of the circumstances — is never a significant source of consumer welfare. This view is simply not supported by economic analysis, or by the cases. A seller with considerable market power in the interbrand market — whether stemming from its dominant position in the market structure or from the successful differentiation of its products — will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pressure on the retail price at which the good is sold.

717 F.2d 1560, 1572 n.20 (11th Cir. 1983).

Given counter-defendants' ownership and control of "the vast majority of copyrighted sound recordings sold in the United States" (Compl. ¶ 23), the digital distribution market for copyrighted music appears structured in such a way that intrabrand competition — i.e., competition among retail distributors of counter-defendants' music — serves as "a critical source of competitive pressure on price, and hence of consumer welfare." Graphic Prods. Distribs., 717 F.2d at 1573. Accordingly, although a decrease in intrabrand competition may sometimes be correlated with greater interbrand competition, see Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 54-55 (1977) (discussing potential pro-competitive effects of vertical non-price restraints), Lime Wire has pled sufficient facts to demonstrate that counter-defendants' mandatory licensing requirement not only caused injury to Lime Wire specifically, but also "plausibly" injured competition generally by reducing the ability of P2P retailers using hash-based filtering technology to compete effectively against other intrabrand competitors. Port Dock, 2007 WL 3071637, at *7 (noting that plaintiff must plead facts "'plausibly suggesting' an anticompetitive aspect to the refusal to deal," quoting Twombly, 127 S. Ct. at 1966); Primetime 24 Joint Venture, 219 F.3d at 103. Although counter-defendants may ultimately establish a legitimate business purpose for their mandatory licensing requirement (i.e., that Altnet owns the patents to hash-based filtering),[21] Lime Wire's allegations are sufficient to state an antitrust injury as this stage of the litigation.

In addition, Lime Wire has also demonstrated that its injury makes it an "efficient enforcer," and thus a proper antitrust plaintiff, to challenge the mandatory licensing regime.

---

[21] See Linens of Europe, Inc. v. Best Mfg., Inc., No. 03 Civ. 9612, 2004 WL 2071689, at *13 (S.D.N.Y. Sept. 16, 2004) (noting that issue of whether it "would have been illegal" to use proprietary design to supply product to a third party is an issue reserved for summary judgment).

Paycom, 467 F.3d at 290. In particular, Lime Wire alleges that the record companies' concerted refusal to provide it with "reasonable access" to their hashes directly harmed its ability to develop MagnetMix as a commercially viable entity (FAC ¶ 46), thus precluding it not only from becoming a retail distributor of counter-defendants' digital music, but also effectively foreclosing Lime Wire from the digital distribution market entirely, given the record companies' dominant market share. See Xerox Corp. v. Media Sciences Int'l Inc., No. 06 Civ. 4872, 2007 WL 2685063, at *4 (S.D.N.Y. Sept. 14, 2007) (noting that "threatened injury (of direct exclusion from the marketplace) is exactly the type that antitrust laws were designed to prevent"). As a prospective retailer allegedly foreclosed from the market, Lime Wire falls within the "identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." Paycom, 467 F.3d at 290 (internal quotation marks omitted). In contrast to the pricing and distribution restraints described above, moreover, where other plaintiffs more directly harmed by counter-defendants' anticompetitive conduct may be entitled to recover damages, conferring antitrust standing on Lime Wire to challenge the mandatory licensing regime raises no "risk that other plaintiffs would be entitled to recover duplicative damages," or that "damages would be difficult to apportion among possible victims of antitrust injury." Port Dock, 2007 WL 3071637, at *3.

Accordingly, Lime Wire has alleged sufficient facts to establish antitrust standing to challenge counter-defendants' imposition of a mandatory licensing scheme for distributors utilizing hash-based filtering technology.

### 4. Other Alleged Anticompetitive Conduct

The FAC contains various other allegations of anticompetitive conduct, none of which are sufficient to confer antitrust standing on Lime Wire. For example, Lime Wire alleges that counter-defendants collectively required internet service providers ("ISPs") to refrain from dealing with P2P companies and refused to do business with ISPs that had entered (or proposed to enter) into advertising arrangements with Lime Wire. (FAC ¶¶ 58, 59.) Although such conduct might conceivably have caused antitrust injury to P2P retailers, and although Lime Wire itself may have suffered an injury-in-fact (e.g., lost advertising revenue), Lime Wire's allegations fail to explain how its injury is "of the type the antitrust laws were intended to prevent." Brunswick Corp., 429 U.S. at 489. Left to its own speculation, the Court might surmise that perhaps Lime Wire's theory of antitrust injury is that, as a result of counter-defendants' conduct towards ISPs, fewer ISPs will do business with Lime Wire, thus causing Lime Wire to lose advertising revenue and web traffic, thereby decreasing the total number of users of Lime Wire's P2P application, thereby diminishing the ability of Lime Wire to generate revenue through MagnetMix, thereby ultimately preventing MagnetMix from operating as an effective competitor in the digital distribution market. Even assuming *arguendo* that such harm would be sufficient to confer antitrust standing on Lime Wire, the FAC does not specifically articulate any of the links in this causal chain. See Associated Gen. Contractors, 459 U.S. at 526 (observing that it is improper "to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged"). Accordingly, Lime Wire fails to demonstrate that it suffered antitrust injury stemming from counter-defendants' restraints on ISPs.

Lime Wire also contends that counter-defendants engaged in various unfair business practices, including hacking and exploring files of Lime Wire users, and falsely claiming that Lime Wire "promotes child pornography" and is a "pirate" and "smut peddler." (FAC ¶ 59.) These allegations, however, fundamentally involve injuries to Lime Wire itself, not to competition generally. See Paycom, 467 F.3d at 290 (noting that the antitrust laws "were enacted for the protection of *competition*, not *competitors*" (internal quotation marks omitted)); Xerox Corp., 2007 WL 2685063, at *4 ("Mere allegations of business disparagement are not the type of injuries to competition that the antitrust laws were designed to prevent." (internal quotation marks omitted)). Although Lime Wire may be able to assert state tort law claims against counter-defendants for such conduct, it lacks standing to challenge this conduct under the federal antitrust laws.[22]

In sum, the vast majority of Lime Wire's allegations do not state a claim for relief under the Sherman Act because they either fail to allege "an adverse effect on competition market-wide," or they do not allege a "cognizable harm" to Lime Wire itself. Todd v. Exxon Corp., 275 F.3d 191, 213 (2001). Lime Wire only has antitrust standing to challenge counter-defendants' mandatory licensing regime for hash-based filtering technology. Accordingly, its Sherman Act claims may proceed only on this narrow ground.

---

[22] Lime Wire also alleges that counter-defendants threatened users of P2P with litigation based upon information obtained by illegal means, and pressured artists not to license their works to providers of P2P software that were not owned or controlled by counter-defendants. (FAC ¶ 59.) These allegations, which "mention[] no specific time, place, or person," are wholly conclusory and devoid of any factual content. Twombly, 127 S. Ct. at 1970 n.10. Accordingly, they are insufficient to state a claim for relief. See id. at 1966 n.5 (requiring plaintiff in antitrust claim to allege sufficient facts to cross "the line between the conclusory and the factual").

B.     Market Definition

Counter-defendants assert that Lime Wire fails to state a claim under both §§ 1 and 2 of the Sherman Act because it has not provided a coherent definition of the relevant market. (Counter-D. Mem. 17-18.)  "In order to survive a motion to dismiss, a claim under Sections 1 and 2 of the Sherman Act must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized."  Xerox Corp., 2007 WL 2685063, at *5 (internal quotation marks omitted); Brown Shoe Co. v. United States, 370 U.S. 294, 324 (1962) (noting that "area of effective competition" determined by reference to a product market and a geographic market (internal quotation marks omitted)).  In particular, counter-defendants assert that Lime Wire has alleged "nine different and largely overlapping markets," and that it fails to offer a factually-supported, rational explanation for any of the markets alleged.  (Counter D. Mem. 4.)

 Because counter-defendants raise no specific objection to Lime Wire's designation of the United States as the relevant geographic market, the only pertinent inquiry is whether Lime Wire has adequately alleged a relevant product market.  "A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced — price, use and qualities considered."  PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (internal quotation marks omitted).  The alleged product market "must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes — analysis of the interchangeability of use or the cross-elasticity of demand — and it must be plausible."[23]

_____

[23] Cross-elasticity of demand refers to "the extent to which consumers will change their consumption of one product in response to a price change in another."  Flash Elecs., 312 F. Supp. 2d at 391.

Todd, 275 F.3d at 200 (internal quotation marks and citation omitted). "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." Id. at 199-200.[24]

Although counter-defendants seize on Lime Wire's use of different terminology in various sections of the FAC to describe the relevant product market, construing the allegations in the counterclaim as a whole, see Yoder v. Orthomolecular Nutrition Inst. Inc., 751 F.2d 555, 562 (2d Cir. 1985), it is clear that Lime Wire defines the relevant product market as the market for the digital distribution of copyrighted music over the internet. (Counter-P. Mem. 18; see, e.g., FAC ¶¶ 28, 56, 63.) To the extent that scattered sections of the FAC contain minor differences in the description of the relevant product market, such discrepancies are "mere technical defects"

---

[24] As an initial matter, Lime Wire claims that it is not required to plead a relevant market to support its per se Sherman Act § 1 claims of "price fixing" and "group boycott." (Counter-P. Mem. 15.) See In re European Rail Pass Antitrust Litig., 166 F. Supp. 2d 836, 844 (S.D.N.Y. 2001) (noting that in antitrust cases governed by per se analysis, "it is well settled that plaintiff is excused from defining the relevant product market" (internal quotation marks omitted)). As explained above, however, Lime Wire has not established standing to challenge any of counter-defendants' alleged price fixing schemes. Moreover, counter-defendants' mandatory licensing regime does not constitute a "group boycott" — i.e., an unlawful agreement among horizontal competitors to pressure a supplier or customer not to deal with another competitor. Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co., 472 U.S. 284, 293-94 (1985); Balaklaw, 14 F.3d at 800. Such boycotts are per se unlawful because they involve concerted action by competitors "to protect their own turf." Lawrence A. Sullivan & Warren S. Grimes, The Law of Antitrust § 5.8b, at 299 (2d ed. 2006); see FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 458 (1986) (observing that "the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor"). In contrast, counter-defendants' mandatory licensing requirement is not aimed at excluding horizontal competitors, but rather, constitutes an effort "to impose terms they concertedly favor on vertically related buyers," and thus "evoke quite different policy questions" from the "classic boycott." Sullivan, The Law of Antitrust § 5.8b, at 299. Such concerted refusals to deal are analyzed under the rule of reason, see Indiana Fed'n of Dentists, 476 U.S. 458-59, and thus Lime Wire must plead a relevant market to survive counter-defendants' motion to dismiss.

in Lime Wire's pleading insufficient to justify dismissal.  <u>Arfons v. E.I. Du Pont de Nemours &</u> <u>Co.</u>, 261 F.2d 434, 435 (2d Cir. 1958) ("It is now well established that dismissals for mere technical defects or ambiguities in the pleadings are not favored.").

In addition, Lime Wire alleges sufficient facts to offer a plausible explanation of why the relevant product market should be limited to the digital distribution of copyrighted music over the internet.  The FAC expressly distinguishes this market from the "sale and distribution of physical products (<u>i.e.</u>, records, audio cassettes and CDs)," discusses the differences between physical recordings and digital music files "unburdened by any tangible media such as a CD," and describes consumers' ability to arrange, place, and play digitally recorded music on their personal computers, iPods, and other hand held devices.  (FAC ¶¶ 23-24.)  Read broadly, these allegations provide at least a "plausible" reason why consumers would not respond to a "slight increase" in the prices charged by digital distributors of music by switching to physical products such as audio cassettes or CDs — <u>i.e.</u>, that such physical products are not readily compatible with consumers' preferences and expectations regarding the portability, arrangement, and playing of music.  <u>Todd</u>, 275 F.3d at 200, 202.

Accordingly, Lime Wire has adequately alleged a relevant product market for its claims under §§ 1 and 2 of the Sherman Act.

C.      <u>Sherman Act § 1</u>

Count One of Lime Wire's FAC alleges a "conspiracy in restraint of trade" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[25]  (<u>See</u> FAC ¶¶ 62-64.)  As the Supreme Court

---

[25] Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.

recently instructed in Bell Atlantic v. Twombly, to state a § 1 claim for conspiracy, a party must state "allegations plausibly suggesting (not merely consistent with) agreement." 127 S. Ct. at 1966; see In re Elevator Antitrust Litig., 502 F.3d at 50 ("[I]t is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement."). To survive a motion to dismiss, a pleading must contain "enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made." Id. (alteration in original) (internal quotation marks omitted). While Twombly does not impose a heightened pleading standard, a complaint must contain enough facts to "nudge [plaintiff's] claims across the line from conceivable to plausible." Twombly, 127 S. Ct. at 1974.

Preliminarily, because Lime Wire has established antitrust standing only with respect to its challenge to counter-defendants' mandatory licensing regime for hash-based filtering technology, the Court's inquiry is confined solely to the question of whether Lime Wire has alleged sufficient facts plausibly suggesting an agreement among counter-defendants to impose this licensing requirement in concert.[26] Counter-defendants assert that Lime Wire has not alleged any facts plausibly suggestive of a conspiracy, while Lime Wire contends that the record companies' refusal to provide it with "reasonable access" to their hashes runs counter to each company's economic self-interest (FAC ¶ 46), and thus sufficiently establishes the existence of concerted action. (Counter-P. Mem. 23 n.10; Counter-P. Letter Br., May 24, 2007, at 2-3.)

As with the plaintiffs' claim in Twombly, Lime Wire's contention that the record companies conspired to impose a mandatory licensing regime relies either on wholly conclusory

---

[26] Thus, although the FAC alleges an actual business combination formed by counter-defendants — i.e., MusicNet and pressplay (FAC ¶ 34) — Lime Wire cannot rely on this allegation because it lacks standing to challenge any restraints related to the joint ventures.

statements of concerted action, or, at best, on mere parallel conduct. Lime Wire sprinkles the words "conspired," "concerted," and "concertedly" throughout the FAC,[27] but its pleading "furnishes no clue as to which of the [thirteen counter-defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place." Twombly, 127 S. Ct. at 1970 n.10. Indeed, the FAC does not allege any facts identifying which record companies were actually approached by Lime Wire, which companies refused to provide hashes or required Lime Wire to seek a license from Altnet, when such refusals took place or how they were effectuated, or whether any of the companies were aware of each other's actions.

The closest Lime Wire comes to alleging concerted action is its claim that it approached the RIAA to "seek approval of its hash-based filtering system" but was turned down. (FAC ¶ 48.) As noted above, however, Lime Wire fails to plead any facts describing the relationship between counter-defendants and the RIAA, or the extent to which the RIAA is authorized to act on their behalf. Without this factual context, Lime Wire's allegation that the record companies "utilized" the RIAA as a vehicle for concerted action (id. ¶ 61) is wholly conclusory. See Paycom, 467 F.3d at 289 (noting that conclusory statements cannot "substitute for minimally sufficient factual allegations" (internal quotation marks omitted)). Moreover, even assuming arguendo that the RIAA was authorized to act on behalf of all counter-defendants, the FAC does not allege that the RIAA implemented the alleged mandatory licensing scheme; rather, the FAC specifically alleges that it was counter-defendants themselves — not the RIAA acting as their

---

[27] See, e.g., FAC ¶ 46 (alleging that "Counter-Defendants and their co-conspirators have concertedly . . . refused to do business and have denied Lime Wire reasonable access to the hashes of their copyrighted works"); id. (alleging that "Altnet . . . conspired with [counter-defendants] to 'force' Lime Wire and other P2P companies to enter into a license with Altnet in order to obtain the[] necessary hashes").

agent — that directly "force[d] Lime Wire and other P2P companies to enter into a license with Altnet." (FAC ¶ 46.) Accordingly, Lime Wire's allegations regarding the RIAA not only fail to plausibly suggest the existence of a conspiracy, but also do not implicate the narrow ground upon which Lime Wire's § 1 claim rests.

The FAC also contains no facts plausibly suggesting that counter-defendants' refusal to provide Lime Wire with "reasonable access to the hashes of their copyrighted works" (id.) was the result of anything other than independent decision-making by each company to refrain from doing business with "the operator of a peer-to-peer network that was and is, in each record company's respective judgment, a notorious vehicle for massive copyright infringement." (Counter-D. Mem. 20.) See Verizon Commc'ns Inc. v. Trinko, 540 U.S. 398, 408 (2004) (observing that "as a general matter, the Sherman Act does not restrict the long recognized right of [a] . . . manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal" (alteration in original) (internal quotation marks omitted)); Primetime 24 Joint Venture, 219 F.3d at 99 (noting that "owners of copyrights may individually refuse to deal with a party seeking a license").[28]

Although Lime Wire alleges that counter-defendants conspired to "force" it and other P2P companies to enter into a license with Altnet (FAC ¶ 46), there is an "obvious alternative

_____

[28] Lime Wire relies heavily on Primetime 24 Joint Venture v. NBC, in which the Second Circuit held that a plaintiff satellite broadcaster's allegation that the major television networks concertedly refused to issue it licenses to copyrighted programs stated a § 1 claim. 219 F.3d at 103-04. (Counter-P. Mem. 21-22.) The plaintiff in Primetime 24, however, explicitly alleged facts plausibly suggestive of a conspiracy. See id. at 102 (alleging that networks' affiliates "sent identical rejection letters," and that two networks "specifically discouraged their affiliated stations from dealing with [plaintiff]"). The FAC, in contrast, contains no such facts from which an agreement among counter-defendants can plausibly be inferred.

31

explanation" for the record companies' insistence on the licensing requirement — i.e., that each company independently decided (whether rightly or wrongly) that Altnet legitimately owned the patents to hash-based filtering.[29]  Twombly, 127 S. Ct. at 1971 ("[W]hile the plaintiff may believe the defendants conspired . . . , the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy." (internal quotation marks omitted)).  Although the ultimate validity of Altnet's patents is a question of fact that cannot be resolved at this stage of the litigation, nothing in the FAC suggests that the record companies' insistence that Lime Wire obtain a license from Altnet "was anything more than the natural, unilateral reaction" of each company to avoid the transparently clear risk of litigation that would arise if it were to provide hashes to Lime Wire, and thereby (potentially) facilitate Lime Wire's infringement of Altnet's patents.  Id. at 1971.  Even assuming *arguendo* that Lime Wire can ultimately prove that Altnet's patents are invalid, each record company — regardless of the behavior of the other record companies — still had ample reason to steer clear of potential litigation by taking the simple precautionary step of requiring Lime Wire to obtain a license from Altnet.  Accordingly, "when viewed in light of common economic

---

[29] Indeed, as sellers of hashes, counter-defendants, at least in the absence of other economic reasons to restrict their pool of distributors, see, e.g., GTE Sylvania, 433 U.S. at 54-55 (discussing potential efficiency gains from vertical non-price restraints), would prefer to have more buyers to bid up the price for hashes and reduce the ability of any one buyer to exert significant market power, see Todd, 275 F.3d at 202 ("A greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question.").  Counter-defendants' alleged refusal to sell hashes to any retailer without a license from Altnet would thus arguably *depress* the price for hashes, hardly an incentive for counter-defendants to conspire to take such action.  Presumably then, a record company would only require a buyer of hashes to obtain a license from Altnet if that company determined that Altnet's patents were valid; otherwise, it would solicit bids from a larger pool of buyers, and thus be able to sell its hashes for a higher price.

experience," counter-defendants' alleged licensing requirement does not plausibly suggest the existence of concerted action.[30] Id.

In sum, Lime Wire has failed to plead facts plausibly suggesting a "meeting of the minds" among any of the counter-defendants to refuse "reasonable access" to their hashes (FAC ¶ 46) by imposing a mandatory licensing regime for hash-based filtering technology. Twombly, 127 S. Ct. at 1966. Because Lime Wire's allegations regarding the existence of a conspiracy cross neither "the line between the conclusory and the factual," nor the line between the "factually neutral and the factually suggestive," its § 1 claim must be dismissed. Id. at 1966 n.5; see id. at 1966 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

        D.     Sherman Act § 2

Counts Two through Four of the FAC allege that counter-defendants, acting together as a group, monopolized, attempted to monopolize, and conspired to monopolize the market for the digital distribution of copyrighted music over the internet, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.[31] (FAC ¶¶ 65-73.) All three of Lime Wire's § 2 claims are thus premised on a

---

[30] Lime Wire also alleges that the joint ventures "provided a forum in which executives of the parent distribution companies met to discuss their own pricing and prices of competitors." (FAC ¶ 38.) Although is not entirely clear from the FAC whether counter-defendants had already divested their interests in the joint ventures by the time they implemented the licensing requirement (see id. ¶ 39), even assuming arguendo that they had not divested their interests, it is well settled that "the mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." See Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., 996 F.2d 537, 545 (2d Cir. 1993).

[31] Section 2 of the Sherman Act makes it illegal for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize

theory of "shared monopoly" — i.e., that all 13 counter-defendants can be held collectively liable as if they were a single monopolist or potential monopolist.

Claims under Section 2 of the Sherman Act involve challenges to market dominance by "single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 454 (1993). Although some commentators have suggested that a shared monopoly among several firms could be attacked under § 2 even though no individual firm possessed the power to set prices or exclude competition, see, e.g., Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 810 (1996), cited in Flash Elecs., 312 F. Supp. 2d at 397, Lime Wire does not cite a single case upholding a § 2 claim on the basis of a shared monopoly. The Second Circuit has specifically rejected the shared monopoly theory in the context of a § 2 claim alleging attempted monpolization. See H.L. Hayden Co. of N.Y. v. Siemens Med. Systems, Inc., 879 F.2d 1005, 1018 (2d Cir. 1989) (holding that "market shares of [defendants] could not be aggregated to establish an attempt to monopolize").[32] Moreover, "districts courts in this and other districts have uniformly held or approved the view that allegations of a 'shared monopoly' do not state a claim under section 2 of the Sherman Act." Linens of Europe, Inc. v. Best Mfg., Inc., No. 03 Civ. 9612, 2004 WL 2071689, at *1 n.1 (S.D.N.Y. Sept. 16, 2004); accord Klickads, Inc. v. Real Estate Bd. of N.Y., No. 04 Civ. 8042, 2007 WL 2254721, at *8-9 (S.D.N.Y. Aug. 6, 2007); Kahn

---

any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

[32] The only other court of appeals decision to address specifically the shared monopoly theory is Harkins Amusement Enterprises, Inc. v. General Cinema Corp., 850 F.2d 477 (9th Cir. 1988). In that case, the Ninth Circuit declined to decide "whether the shared monopoly theory may be viable under some circumstances." Id. at 490.

v. iBiquity Digital Corp., No. 06 Civ. 1536, 2006 WL 3592366, at *5 (S.D.N.Y. Dec. 7, 2006);

Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc., 405 F. Supp. 2d 1141, 1152-53

(C.D. Cal. 2005); Flash Elecs., 312 F. Supp. 2d at 396-97; Santana Prods., Inc. v. Sylvester &

Assocs. Ltd., 121 F. Supp. 2d 729, 737-38 (E.D.N.Y. 1999); Phoenix Elec. Co. v. Nat'l Elec.

Contractors Ass'n, Inc., 867 F. Supp. 925, 941 (D. Or. 1994); Sun Dun, Inc. v. Coca-Cola Co.,

740 F. Supp. 381, 390-91 (D. Md. 1990).

     Lime Wire contends that even if a shared monopoly cannot form the basis of

monopolization or attempted monopolization claims under § 2, "[c]laims for *conspiracy* to form

shared monopolies . . . have been more clearly recognized as viable." (Counter-P. Mem. 25.)

The Supreme Court's decision in American Tobacco Co. v. United States, 328 U.S. 781 (1946),

affirming the conviction of three major tobacco companies for a § 2 conspiracy, has given some

courts pause about categorically rejecting the shared monopoly theory in the context of a

conspiracy to monopolize claim. See, e.g., H.L. Hayden Co. v. Siemens Med. Sys., Inc., 672 F.

Supp. 724, 741-42 (S.D.N.Y. 1987). Some district courts, moreover, although expressing

skepticism generally about the shared monopoly theory, have suggested that the theory may be

viable in the context of a claim for conspiracy to monopolize "if the aim of the conspiracy is to

form a single entity to possess the illegal market power," Sun Dun, 740 F. Supp. at 391-92, or

"where two or more competitors seek to allocate a market and exclude competitors, even if they

do not form a single corporate entity," Santana Prods., 121 F. Supp. 2d at 740 n.1. Even

assuming *arguendo* the correctness of this suggestion, however, the FAC alleges neither that

counter-defendants sought to unite in a single monopolistic entity nor that they sought to allocate

shares of the relevant market. Furthermore, even if the FAC did contain such allegations, Lime

Wire still would fail to state a claim for conspiracy to monopolize because, as explained above, the FAC does not contain sufficient facts to plausibly suggest the existence of a conspiracy. See In re Elevator Antitrust Litig., 502 F.3d at 50 (noting that "our precedents support application of Twombly to the conspiracy claims asserted under both Section 1 and Section 2").

Accordingly, Counts Two through Four of the FAC, alleging claims under § 2 of the Sherman Act, must be dismissed.

E.     State Law Claims

Counts Five and Seven of the FAC allege violations of New York State statutory law prohibiting conspiracy in restraint of trade, see N.Y. Gen. Bus. Law § 340 ("Donnelly Act"), and deceptive trade practices, see id. § 349, respectively.[33] (FAC ¶¶ 74-77, 82-86.) Count Eight alleges a claim under common law for tortious interference with prospective business relations. (FAC ¶¶ 87-91.) Counter-defendants urge dismissal of these state law claims on the ground that dismissal of Lime Wire's federal antitrust counterclaims deprives the Court of subject matter jurisdiction over the state law claims. (Counter-D. Mem. 26.) Lime Wire contends that the Court retains discretion to exercise supplemental jurisdiction over its state law claims even if its federal antitrust counterclaims are dismissed. (Counter-P. Mem. 26.)

Congress has directed that "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "A state law claim forms part of the same controversy if it and the federal

_____

[33] Lime Wire has withdrawn its claim under Count Six alleging a violation of the Crawford-Feld Act, N.Y. Gen. Bus. Law § 369-A. (FAC ¶¶ 78-81; Counter-P. Mem. 27.)

claim 'derive from a common nucleus of operative fact.'" Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004), quoting Cicio v. Does, 321 F.3d 83, 97 (2d Cir. 2003), quoting City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 165 (1997), quoting United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966); see Lyndonville Sav. Bank & Trust Co. v. Lussier, 211 F.3d 697, 704 (2d Cir. 2000) (noting that supplemental jurisdiction does not exist "when the federal and state claims rest[] on essentially unrelated facts"). Where, as in this case, a defendant has asserted counterclaims, § 1367(a) "confers supplemental jurisdiction over those counterclaims that fall within the same case or controversy as either (1) the plaintiff's original claims or (2) the counterclaims asserted under federal law, because all of these claims are 'within [the Court's] original jurisdiction.'" Pro Bono Investments, Inc. v. Gerry, No. 03 Civ. 4347, 2005 WL 2429787, at *12 (S.D.N.Y. Sept. 30, 2005) (alteration in original), quoting 28 U.S.C. § 1367(a).

Although Lime Wire's state law counterclaims do not share a "common nucleus" of facts with the record companies' federal copyright claims,[34] they do share such a factual relationship with its own federal antitrust counterclaims. Indeed, Lime Wire's Donnelly Act claim overlaps completely with its federal antitrust claim, see Reading Int'l, 317 F. Supp. 2d at 332-33 (observing that "[u]nder New York law, the state and federal antitrust statutes require identical basic elements of proof" (internal quotation marks omitted)), and its claims for deceptive trade practices and tortious interference with prospective business relations rely on many of the same factual allegations regarding counter-defendants' anticompetitive conduct underlying its antitrust

---

[34] See infra at 41-42.

37

claims.  (See Counter-P. Mem. 27-29.)  Although counter-defendants argue that dismissal of Lime Wire's federal antitrust counterclaims deprives the Court of subject matter jurisdiction over the state law claims, it is well settled that a Rule 12(b)(6) dismissal of a federal counterclaim does not impact a court's authority to exercise supplemental jurisdiction under § 1367(a).  See Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1187 (2d Cir. 1996) (affirming district court's exercise of supplemental jurisdiction over state law claim, even though federal claim had been dismissed pursuant to Fed. R. Civ. P. 12(b)(6)); Sea-Land Service, Inc. v. Lozen Int'l, LLC, 285 F.3d 808, 814 (9th Cir. 2002) (holding that district court did not abuse its discretion in considering merits of state law counterclaim that "form[ed] part of the same case" as federal counterclaim, even though court had dismissed federal counterclaim, quoting 28 U.S.C. § 1367(a)).  Accordingly, despite dismissing Lime Wire's federal antitrust counterclaims, the Court retains the discretion to exercise supplemental jurisdiction over its state law claims because they "form part of the same case" as the federal antitrust counterclaims.  28 U.S.C. § 1367(a).

In deciding whether to use its discretion to exercise supplemental jurisdiction, however, a court must also "consider whether any of the four grounds set out in subsection 1367(c) are present to an extent that would warrant the exercise of discretion to decline assertion of [such] jurisdiction." Jones v. Ford Motor Credit Co., 358 F.3d 205, 214 (2d Cir. 2004).[35]  "[W]here at

---

[35] Under § 1367(c), a district court may decline to exercise supplemental jurisdiction over a state law claim if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims
> over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has

least one of the subsection 1367(c) factors is applicable, a district court should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote . . . economy, convenience, fairness, and comity."  Id.; see Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 446-48 (2d Cir. 1998).

As an initial matter, supplemental jurisdiction should clearly be exercised over Lime Wire's Donnelly Act claim because, as noted above, that claim overlaps completely with its federal antitrust counterclaims.  Accordingly, like its federal counterclaims, Lime Wire's Donnelly Act claim must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).  See Wright v. Associated Ins. Cos. Inc., 29 F.3d 1244, 1251 (7th Cir. 1994) ("If the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim, there is no use leaving the latter to the state court.").  With respect to Lime Wire's remaining state law claims, § 1367(c)(1) is inapplicable because those claims assert routine business-related harms that do not involve particularly "novel or complex" questions of state law.  28 U.S.C. § 1367 (c)(1).  Subsection 1367(c)(2) is also inapposite as the remaining state law claims do not "substantially predominate[] over the claim or claims over which the district court has original jurisdiction." Id. § 1367 (c)(2).  Although Lime Wire's state law antitrust claim could potentially have "predominate[d]" over the record companies' federal copyright claims, see Twombly, 127 S. Ct. at 1967 (noting that "proceeding to antitrust discovery can be expensive" and citing study discussing the "unusually high cost of discovery in antitrust cases"), its remaining state law

---

original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

claims are not "more complex" or "more salient in the case as a whole" than the record

companies' federal copyright claims, <u>Luongo v. National Mut. Ins. Co.</u>, No. 95 Civ. 3190, 1996

WL 445365, at *5 (S.D.N.Y. Aug. 7, 1996). Subsection 1367(c)(3) also appears inapplicable

because the Court, despite dismissing Lime Wire's federal antitrust counterclaims, still retains

"original jurisdiction" over the federal copyright claims that are the subject of the record

companies' Complaint.[36] 28 U.S.C. § 1367(c)(3); <u>see</u> <u>Pro Bono Investments</u>, 2005 WL 2429787,

at *14, citing <u>Jones</u>, 358 F.3d at 214. Accordingly, the only remaining basis for declining

supplemental jurisdiction is § 1367(c)(4), which permits courts to decline supplemental

jurisdiction if, "in exceptional circumstances, there are other compelling reasons for declining

jurisdiction." 28 U.S.C. § 1367(c)(4).

---

[36] Although § 1367(c)(3) authorizes a court to decline supplemental jurisdiction only where "the district court has dismissed *all* claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3) (emphasis added), a literal application of that rule might lead to an anomalous result where, as here, the defendant's state law counterclaims share a "common nucleus" of facts, not with the federal claims asserted in the plaintiff's complaint, but rather, with its own federal counterclaims. <u>Gibbs</u>, 383 U.S. at 725. Because a federal counterclaim may be heard in federal court without being "part of the same case" as the federal claim in the plaintiff's complaint, 28 U.S.C. 1367(a), a defendant with a state law counterclaim that could not be brought independently in federal court may nevertheless be able to secure a federal forum for that claim by bootstrapping it onto a federal counterclaim that shares a "common nucleus" of facts with its state law counterclaim. Even if the federal counterclaim is later dismissed, a literal application of § 1367(c)(3) in this context would render that subsection unavailable as a basis for declining supplemental jurisdiction because the court would still retain "original jurisdiction" over the federal claim in the plaintiff's complaint. 28 U.S.C. § 1367(c)(3); <u>see</u> <u>Pro Bono Investments</u>, 2005 WL 2429787, at *14. Such an interpretation of § 1367(c)(3) would thus encourage defendants with state law counterclaims that could not otherwise be brought in federal court to bring weak (but not frivolous or insubstantial, <u>see</u> <u>Nowak</u>, 81 F.3d at 1188-89) federal counterclaims to strategically take advantage of this boot-strapping procedure. The Court need not decide whether this interpretation of § 1367(c)(3) is correct, however, because even if that subsection is inapplicable on its face, the Court concludes that, pursuant to § 1367(c)(4), supplemental jurisdiction over Lime Wire's remaining state law claims should not be exercised. <u>See</u> <u>infra</u> at 41-43.

The Second Circuit has instructed that in determining whether to apply § 1367(c)(4), a district court should "articulate why the circumstances of the case are exceptional in addition to inquiring whether [economy, convenience, fairness, and comity] provide compelling reasons for declining jurisdiction." Itar-Tass Russian News Agency, 140 F.3d at 446 (internal quotation marks omitted). A district court should decline supplemental jurisdiction under § 1367(c)(4) "only if the circumstances are quite unusual." Id. at 448 (internal quotation marks omitted); see Jones, 358 F.3d at 215. This is such an "unusual" case.

In contrast to the typical case involving supplemental jurisdiction, in which a defendant brings a state law counterclaim that shares the same "common nucleus" of facts as the federal claim asserted in the plaintiff's complaint, jurisdiction over Lime Wire's state law counterclaims is predicated on those claims sharing the same "common nucleus" of facts as its own federal antitrust counterclaims. Indeed, the factual relationship between Lime Wire's remaining state law counterclaims and the record companies' federal copyright claims is attenuated at best. In their Complaint, the record companies allege, inter alia, that Lime Wire "creat[ed] unauthorized reproductions" of copyrighted sound recordings, "distribut[ed] copies of such sound recordings to the public," sold software "designed specifically to facilitate high volumes of infringement," and "buil[t] and maintain[ed] a business model to profit directly from a high volume of infringing use." (Compl. ¶¶ 66, 70.) In contrast, Lime Wire's remaining state law counterclaims are based largely on allegations that the record companies imposed "artificially high prices," "hack[ed] into the files" of Lime Wire software users, coerced ISPs to refrain from doing business with Lime Wire, and "spread[] false information" that Lime Wire is a "smut peddler" that promotes child pornography. (Counter-P. Mem. 27-29.) As this comparison makes clear,

the factual allegations underlying the record companies' federal copyright claims do not share a "common nucleus" of operative facts with Lime Wire's remaining state law counterclaims,[37] and thus Lime Wire could not have brought those counterclaims independently in federal court without bootstrapping them to its federal antitrust counterclaims. Now that the federal (and state) antitrust counterclaims have been dismissed, it would be an anomalous result if those same state law counterclaims were now permitted to remain in federal court when the only federal claims left in the action are the record companies' copyright claims. Such a result would encourage defendants with state law counterclaims that could not otherwise be brought in federal court to bring weak federal counterclaims to take advantage of this boot-strapping procedure.[38] Accordingly, to discourage such strategic behavior, supplemental jurisdiction over Lime Wire's remaining state law counterclaims should not be exercised.

This conclusion is further buttressed by considerations of fairness, judicial economy, convenience and comity. See Itar-Tass Russian News Agency, 140 F.3d at 447. Although fact discovery is underway and has been scheduled to conclude later this month, Lime Wire has requested that the discovery period be extended for "at least six months." (Letter from Charles S. Baker, Esq., to the Court, dated Oct. 19, 2007, at 4.) Lime Wire's request indicates to the Court that, at least from Lime Wire's perspective, discovery on its claims and defenses,

---

[37] Although Lime Wire has raised an affirmative defense of "copyright misuse" (D. Corrected First Amended Ans. 12), it is not clear whether, if at all, the factual bases underlying that defense will overlap with the factual allegations that form the basis of Lime Wire's state law counterclaims. Indeed, Lime Wire itself has not asserted, much less demonstrated, that such a factual relationship exists. Within the Second Circuit, moreover, "misuse or abuse of copyright is not firmly established as . . . an affirmative defense." Shady Records, Inc. v. Source Enters., Inc., No. 03 Civ. 9944, 2005 WL 14920, at *15 (S.D.N.Y. Jan. 3, 2005).

[38] See supra note 36.

including its state law counterclaims, is far from complete.  This is not a case, then, where "there has been substantial expenditure in time, effort, and money in preparing the [state law] claims" such that "knocking them down with a belated rejection of supplemental jurisdiction may not be fair."  Motorola Credit Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004) (internal quotation marks omitted).  As discovery has not yet been completed, moreover, the Court has not expended any of its own judicial resources reviewing a voluminous factual record, for example, or conducting a trial.  Cf. id. (noting general proposition that "if [all] federal claims are dismissed *before trial* . . ., the state claims should be dismissed as well" (internal quotation marks omitted) (alteration and omission in original)).  Lime Wire does not explain why any other factors, such as inconvenience to the parties or comity, would point toward the exercise of supplemental jurisdiction, nor could it, since the New York State court, located directly across from the federal courthouse in Manhattan, routinely adjudicates the business-related state law claims asserted by Lime Wire.

Accordingly, pursuant to 28 U.S.C. § 1367(c)(4), the Court declines to exercise supplemental jurisdiction over Lime Wire's remaining state law counterclaims.

F.    Leave to Replead

In its opposition papers, Lime Wire requests leave to amend the FAC to cure any deficiencies in its pleading.  (Counter-P. Mem. 29-30.)  Under Rule 15 of the Federal Rules of Civil Procedure, a party generally "may amend the party's pleading only by leave of court . . . and leave shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  Although "[l]eave to amend should be freely granted, . . . the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the

opposing party." <u>Jin v. Metro. Life Ins. Co.</u>, 310 F.3d 84, 101 (2d Cir. 2002).  Counter-defendants oppose Lime Wire's motion for leave to replead solely on the ground that granting leave would be futile.  (Counter-D. Reply Mem. 10.)  "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." <u>Lucente v. IBM Corp.</u>, 310 F.3d 243, 258 (2d Cir. 2002); <u>see</u> <u>Ruffolo v. Oppenheimer & Co.</u>, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend.").

Although Lime Wire has already amended its counterclaims once, it has since received substantial discovery from counter-defendants, including "more than 1 million pages of documents and approximately 100 gigabytes [] of data . . . which roughly equates to more than 29 million pages."  (Letter from Charles S. Baker, Esq., to the Court, dated Oct. 19, 2007, at 2.) By the record companies' own admission, these documents include two million pages relating specifically to antitrust productions that the companies previously made to government authorities or other parties in prior lawsuits.  (<u>Id</u>. at 12.)  Despite receiving such discovery, Lime Wire has not yet identified any additional facts it would plead that would enable it, for example, to demonstrate the existence of a conspiracy among counter-defendants.  Because briefing for the pending motion concluded before Lime Wire received the bulk of the discovery materials it now has in its possession, the Court will deny Lime Wire's motion for leave to replead without prejudice.  Without some indication of what additional facts, if any, Lime Wire can assert in support of its failed counterclaims, the Court cannot conclude that leave to replead is in the interests of justice, and the Court accordingly will not grant Lime Wire an open-ended permission to replead that could result in another round of motions to dismiss.  However,

without such an indication, neither can the Court determine that the projected repleading would be futile. Thus, if Lime Wire submits another motion for leave to replead, it must provide the Court with an "indication of what additional facts [it] would allege if permitted to amend" by attaching its proposed pleading to the motion. 2 Broadway L.L.C. v. Credit Suisse First Boston Mortg. Capital L.L.C., No. 00 Civ. 5773, 2001 WL 410074, at *13 (S.D.N.Y. Apr. 23, 2001).

## CONCLUSION

Counter-defendants' motion to dismiss Lime Wire's counterclaims is granted. Lime Wire's first through fifth claims for relief are dismissed with prejudice for failure to state a claim. Lime Wire's sixth through eighth claims for relief are dismissed without prejudice to refiling in New York State court. Lime Wire's motion for leave to replead is denied without prejudice.

SO ORDERED:

Dated: New York, New York
    December 3, 2007

GERARD E. LYNCH
United States District Judge

45