## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARISTA RECORDS LLC; ATLANTIC RECORDING CORPORATION; BMG MUSIC; CAPITOL RECORDS, INC.; ELEKTRA ENTERTAINMENT GROUP INC.; INTERSCOPE RECORDS; LAFACE RECORDS LLC; MOTOWN RECORD COMPANY, L.P.; PRIORITY RECORDS LLC; SONY BMG MUSIC ENTERTAINMENT; UMG RECORDINGS, INC.; VIRGIN RECORDS AMERICA, INC.; and WARNER BROS. RECORDS INC., | CIVIL ACTION NO. 06 CV. 5936 (GEL) |
| Plaintiffs/Counterclaim Defendants, | **DEFENDANTS LIME WIRE LLC'S, LIME GROUP LLC'S, MARK GORTON'S, AND GREG BILDSON'S CORRECTED FIRST AMENDED ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT AND LIME WIRE'S RESTATED FIRST AMENDED COUNTERCLAIMS** |
| v. | |
| LIME GROUP LLC; MARK GORTON; and GREG BILDSON, and M.J.G. LIME WIRE FAMILY LIMITED PARTNERSHIP | |
| Defendants, | |
| and | **JURY TRIAL DEMANDED** |
| LIME WIRE LLC, | |
| Defendant/Counterclaim Plaintiff. | |

Defendants Lime Wire LLC ("Lime Wire"), Lime Group LLC ("Lime Group"), Mark Gorton ("Gorton") and Greg Bildson ("Bildson") (collectively, "Defendants") respond to Plaintiffs' First Amended Complaint (the "FAC") as follows:

### NATURE OF THE ACTION

1.  Defendants lack sufficient knowledge to admit or deny the allegations of the first sentence in paragraph 1 of the FAC and on that basis deny the allegations. Defendants deny the allegations of the second sentence in paragraph 1 of the FAC. Defendants Lime Group, Gorton

and Bildson deny the allegations of the third sentence in paragraph 1 of the FAC.  Defendant Lime Wire admits that it has designed, distributed, supported and maintained the LimeWire software but denies the remaining allegations in the third sentence in paragraph 1 of the FAC. Defendants deny the allegations of the fourth sentence in paragraph 1 of the FAC.

2.   Defendants deny the allegations of paragraph 2 of the FAC.

3.   Defendants deny the allegations of paragraph 3 of the FAC.

4.   Defendants deny the allegations of paragraph 4 of the FAC except that defendant Gorton admits he is the general partner of the M.J.G. Lime Wire Family Limited Partnership.

## JURISDICTION AND VENUE

5.   Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 5 of the FAC and on that basis deny the allegations.

6.   Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 6 of the FAC and on that basis deny the allegations.

7.   Defendants admit that personal jurisdiction lies over them in the Southern District of New York but deny the remaining allegations of paragraph 7 of the FAC.

8.   Defendants admit the allegations of paragraph 8 of the FAC.

## THE PLAINTIFFS AND THEIR BUSINESS

9.   Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 9 of the FAC and on that basis deny the allegations.

10. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 10 of the FAC and on that basis deny the allegations.

11. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 11 of the FAC and on that basis deny the allegations.

12. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 12 of the FAC and on that basis deny the allegations.

13. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 13 of the FAC and on that basis deny the allegations.

14. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 14 of the FAC and on that basis deny the allegations.

15. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 15 of the FAC and on that basis deny the allegations.

16. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 16 of the FAC and on that basis deny the allegations.

17. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 17 of the FAC and on that basis deny the allegations.

18. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 18 of the FAC and on that basis deny the allegations.

19. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 19 of the FAC and on that basis deny the allegations.

20. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 20 of the FAC and on that basis deny the allegations.

21. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 21 of the FAC and on that basis deny the allegations.

22. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 22 of the FAC and on that basis deny the allegations.

23. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 23 of the FAC and on that basis deny the allegations.

24. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 24 of the FAC and on that basis deny the allegations.

25. Defendants lack sufficient knowledge to admit or deny the allegations of the first three sentences in paragraph 25 of the FAC and on that basis deny the allegations.  Defendants deny the allegations of the fourth sentence in paragraph 25 of the FAC.  Defendants lack knowledge sufficient to admit or deny the allegations of the last sentence in paragraph 25 of the FAC and on that basis deny the allegations.

26. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 26 of the FAC and on that basis deny the allegations.

27. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 27 of the FAC and on that basis deny the allegations.

28. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 28 of the FAC and on that basis deny the allegations.

## **THE DEFENDANTS**

29. Defendant Lime Wire admits that it has designed, built, distributed, sold and supported certain software known as LimeWire, but denies the remaining allegations of paragraph 29 of the FAC.  Defendants Lime Group, Gorton and Bildson deny the allegations of paragraph 29 of the FAC.

30. Defendants admit the allegations of paragraph 30 of the FAC.

31. Defendants deny the allegations of the first sentence of paragraph 31 of the FAC but admit that Lime Wire is a Delaware limited liability corporation with its principal place of business in New York, New York.  As to the second sentence of paragraph 31 of the FAC, Defendants deny those allegations but admit that Lime Wire designed, updated, improved and distributed the LimeWire software.

32. Defendants admit that defendant Gorton is the general partner of the M.J.G. Lime Wire Family Limited Partnership, but deny the remaining allegations in paragraph 32 of the FAC.

33. Defendants deny the allegations of paragraph 33 of the FAC.

34. Defendants deny the allegations of paragraph 34 of the FAC, but admit that that defendant Gorton is the Chief Executive Officer of defendant Lime Wire and a general partner of the M.J.G. Lime Wire Family Limited Partnership.

35. Defendants deny the allegations of paragraph 35 of the FAC but admit that defendant Bildson is currently the Chief Technology Officer and Chief Operating Officer of defendant Lime Wire.

36. Defendants deny the allegations of paragraph 36 of the FAC.

37. Defendants deny the allegations of paragraph 37 of the FAC.

38. Defendants deny the allegations of paragraph 38 of the FAC.

## BACKGROUND DESCRIPTION OF THE ILLEGAL CONDUCT

39. Defendants deny the allegations of paragraph 39 of the FAC, but admit that defendant Lime Wire has designed, distributed, sold, supported and maintained the LimeWire software.

40. Defendants deny the allegations of the first sentence of paragraph 40 of the FAC except they admit that LimeWire is a P2P software application that has been designed to allow users both to exchange files and to handle open-ended schema and xml based searches. Defendants deny the allegations of the second sentence of paragraph 40 of the FAC, but admit that defendant Lime Wire developed and maintained the LimeWire software.  Defendants deny the remaining allegations of paragraph 40 of the FAC.

41. Defendants deny the allegations of the first sentence of paragraph 41 of the FAC, but admit that defendant Lime Wire designed, updated and distributed two versions of the LimeWire software. Defendants admit the remaining allegations of paragraph 41 of the FAC.

42. Defendants admit the allegations of the first and second sentences of paragraph 42 of the FAC. Defendants deny the remaining allegations of paragraph 42 of the FAC.

43. Defendants admit the allegations of the first sentence of paragraph 43 of the FAC. Defendants deny the remaining allegations of paragraph 43 of the FAC, but admit that the LimeWire software application can automatically launch upon startup of a user's computer for Windows versions only, unless the user designates otherwise.

44. Defendants deny the allegations of paragraph 44 of the FAC.

45. Defendants deny the allegations of paragraph 45 of the FAC.

46. Defendants deny the allegations of paragraph 46 of the FAC.

47. Defendants deny the allegations of paragraph 47 of the FAC, but admit that the LimeWire software application contains a third party Java-based built-in audio player component.

48. Defendants deny the allegations of paragraph 48 of the FAC, but admit that the LimeWire website states that "[t]he purchase of LimeWire PRO gives users better search results, turbo-charged download speeds, connections to more sources, [and] a guarantee of no ads or nagware…"

49. Defendants deny the allegations of paragraph 49 of the FAC.

50. Defendants deny the allegations of paragraph 50 of the FAC, but admit that the LimeWire website operated by defendant Lime Wire contains the statement "Keep in mind that many users disobey copyright laws".

51. Defendants deny the allegations of paragraph 51 of the FAC, but admit that defendant Gorton, as Chief Executive Officer of defendant Lime Group, received a letter dated September 13, 2005 from Steven M. Marks, as general counsel for the Recording Industry Association of America, and that this letter speaks for itself.

52. Defendants deny the allegations of paragraph 52 of the FAC.

53. Defendants deny the allegations of the first three sentences of paragraph 53 of the FAC, but admit that defendant Lime Wire distributes the LimeWire software and provides upgrades and updates to this software.  Defendants deny the allegations of the last sentence of paragraph 53 except that defendant Lime Wire admits these allegations.

54. Defendants deny the allegations of paragraph 54 of the FAC, but admit that defendant Lime Wire has the ability to send messages to computers running the LimeWire software application.

55.  Defendants deny the allegations of paragraph 55 of the FAC, but admit there are methods to prevent the alleged exchange of copyrighted works which defendant Lime Wire has implemented as an optional feature since the release of version 4.11.

56. Defendants deny the allegations of paragraph 56 of the FAC.

57. Defendants deny the allegations of paragraph 57 of the FAC.

58. Defendants deny the allegations of paragraph 58 of the FAC except that Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 58 of the FAC concerning how many copies of the LimeWire software have been downloaded.

59. Defendants deny the allegations of paragraph 59 of the FAC.

60. Defendants deny the allegations of paragraph 60 of the FAC.

61. Defendants deny the allegations of paragraph 61 of the FAC, but admit that defendant Gorton is the general partner of the M.J.G. Lime Wire Family Limited Partnership.

62. Defendants deny the allegations of paragraph 62 of the FAC.

63. Defendants deny the allegations of paragraph 63 of the FAC except that defendant Gorton admits that he approved certain distributions be made to the members of defendant Lime Wire in accordance with the Delaware law.

64. Defendants deny the allegations of paragraph 64 of the FAC.

## COUNT I:  INDUCEMENT OF COPYRIGHT INFRINGEMENT

65. Defendants incorporate paragraphs 1-64 by reference as if fully set forth herein.

66. Defendants deny the allegations of paragraph 66 of the FAC.

67. Defendants deny the allegations of paragraph 67 of the FAC.

68. Defendants deny the allegations of paragraph 68 of the FAC.

69. Defendants deny the allegations of paragraph 69 of the FAC.

70. Defendants deny the allegations of paragraph 70 of the FAC.

71. Defendants deny the allegations of paragraph 71 of the FAC.

72. Defendants deny the allegations of paragraph 72 of the FAC.

73. Defendants deny the allegations of paragraph 73 of the FAC.

74. Defendants deny the allegations of paragraph 74 of the FAC.

75. Defendants deny the allegations of paragraph 75 of the FAC.

76. Defendants deny the allegations of paragraph 76 of the FAC.

77. Defendants deny the allegations of paragraph 77 of the FAC.

## COUNT II:  CONTRIBUTORY COPYRIGHT INFRINGEMENT

78. Defendants incorporate paragraphs 1-64 by reference as if fully set forth herein.

79. Defendants deny the allegations of paragraph 79 of the FAC.

80. Defendants deny the allegations of paragraph 80 of the FAC.

81. Defendants deny the allegations of paragraph 81 of the FAC.

82. Defendants deny the allegations of paragraph 82 of the FAC.

83. Defendants deny the allegations of paragraph 83 of the FAC.

84. Defendants deny the allegations of paragraph 84 of the FAC.

85. Defendants deny the allegations of paragraph 85 of the FAC.

86. Defendants deny the allegations of paragraph 86 of the FAC.

87. Defendants deny the allegations of paragraph 87 of the FAC.

88. Defendants deny the allegations of paragraph 88 of the FAC.

89. Defendants deny the allegations of paragraph 89 of the FAC.

90. Defendants deny the allegations of paragraph 90 of the FAC.

## COUNT III:  VICARIOUS COPYRIGHT INFRINGEMENT

91. Defendants incorporate paragraphs 1-64 by reference as if fully set forth herein.

92. Defendants lack sufficient knowledge to admit or deny the allegations of paragraph 92 of the FAC and on that basis deny the allegations.

93. Defendants deny the allegations of paragraph 93 of the FAC.

94. Defendants deny the allegations of paragraph 94 of the FAC but admit that the LimeWire software contains certain filtering mechanisms.

95. Defendants deny the allegations of paragraph 95 of the FAC.

96. Defendants deny the allegations of paragraph 96 of the FAC.

97. Defendants deny the allegations of paragraph 97 of the FAC.

98. Defendants deny the allegations of paragraph 98 of the FAC.

99. Defendants deny the allegations of paragraph 99 of the FAC.

100.     Defendants deny the allegations of paragraph 100 of the FAC.

101.     Defendants deny the allegations of paragraph 101 of the FAC.

102.     Defendants deny the allegations of paragraph 102 of the FAC.

## COUNT IV:  COMMON LAW COPYRIGHT INFRINGEMENT
## OF PRE-1972 RECORDINGS

103.    Defendants incorporate paragraphs 1-64 by reference as if fully set forth herein.

104.    Defendants deny the allegations of paragraph 104 of the FAC.

105.    Defendants deny the allegations of paragraph 105 of the FAC.

106.    Defendants deny the allegations of paragraph 106 of the FAC.

107.    Defendants deny the allegations of paragraph 107 of the FAC.

108.    Defendants deny the allegations of paragraph 108 of the FAC.

## COUNT V:  UNFAIR COMPETITION AS TO
## PRE-1972 RECORDINGS

109.     Defendants incorporate paragraphs 1-64 by reference as if fully set forth herein.

110.    Defendants deny the allegations of paragraph 110 of the FAC.

111.    Defendants deny the allegations of paragraph 111 of the FAC.

112.    Defendants deny the allegations of paragraph 112 of the FAC.

113.    Defendants deny the allegations of paragraph 113 of the FAC.

114.    Defendants deny the allegations of paragraph 114 of the FAC.

## COUNT VI: CONVEYANCE MADE WITH INTENT TO DEFRAUD
## AGAINST MARK GORTON

115.    Gorton incorporates paragraphs 1-64 by reference as if fully set forth herein. Because Count VI is not directed to Lime Wire, Lime Group, and Bildson, no answer is required from them.

116.    Gorton denies the allegations of paragraph 116 of the FAC.  Because Count VI is not directed to Lime Wire, Lime Group, and Bildson, no answer is required from them.

117.    Gorton denies the allegations of paragraph 117 of the FAC.  Because Count VI is not directed to Lime Wire, Lime Group, and Bildson, no answer is required from them.

118.    Gorton denies the allegations of paragraph 118 of the FAC.  Because Count VI is not directed to Lime Wire, Lime Group, and Bildson, no answer is required from them.

119.    Gorton denies the allegations of paragraph 119 of the FAC.  Because Count VI is not directed to Lime Wire, Lime Group, and Bildson, no answer is required from them.

120.    Gorton denies the allegations of paragraph 120 of the FAC.  Because Count VI is not directed to Lime Wire, Lime Group, and Bildson, no answer is required from them.

## COUNT VII: UNJUST ENRICHMENT AGAINST M.J.G. LIME WIRE FAMILY LIMITED PARTNERSHIP

121.    Because Count VII is not directed to Defendants, no answer is required from them.

122.    Because Count VII is not directed to Defendants, no answer is required from them.

123.    Because Count VII is not directed to Defendants, no answer is required from them.

124.    Because Count VII is not directed to Defendants, no answer is required from them.

125.    Because Count VII is not directed to Defendants, no answer is required from them.

126.    Because Count VII is not directed to Defendants, no answer is required from them.

127.    Defendants deny the "prayer" paragraph contained in pages 32-34 of the FAC.

## AFFIRMATIVE DEFENSES

**First Affirmative Defense**

The FAC fails to state a claim upon which relief can be granted.

**Second Affirmative Defense**

Plaintiffs have failed to join indispensable parties.

**Third Affirmative Defense**

Plaintiffs' claims are barred by the doctrine of copyright misuse.

**Fourth Affirmative Defense**

Plaintiffs' claims are barred by the doctrine of unclean hands.

**Fifth Affirmative Defense**

Plaintiffs' claims are barred by laches.

**Sixth Affirmative Defense**

Plaintiffs lack standing.

**Seventh Affirmative Defense**

Plaintiffs do not own or control the rights giving rise to the claims purportedly raised in the FAC.

**Eighth Affirmative Defense**

Plaintiffs' claims are barred in whole or in part to the extent they seek to claim copyright or other intellectual property rights as to works that are in the public domain and therefore not protected.

**Ninth Affirmative Defense**

Plaintiffs' claims are barred by the Audio Home Recording Act.

**Tenth Affirmative Defense**

Any injury that Plaintiffs' may have allegedly suffered is a result of independent acts taken by third parties for which Defendants are not responsible.

**Eleventh Affirmative Defense**

Plaintiffs' claims are barred because they cannot establish that the accused products or services are incapable of substantial non-infringing uses.

### Twelfth Affirmative Defense

Plaintiffs' claims are barred by license, consent, acquiescence, waiver, and estoppel.

### Thirteenth Affirmative Defense

Plaintiffs' claims are barred by the Digital Millennium Copyright Act.

### Fourteenth Affirmative Defense

Plaintiffs' claims are barred by the doctrine of fair use.

### Fifteenth Affirmative Defense

Plaintiffs' claims for statutory damages are barred by the U.S. Constitution.

### Sixteenth Affirmative Defense

Plaintiffs' claims are barred for lack of subject matter jurisdiction to the extent Plaintiffs lack valid registrations of copyrights alleged in the FAC.

### Seventeenth Affirmative Defense

Plaintiffs' claims are barred to the extent they have caused fraud upon the Copyright Office.

### Eighteenth Affirmative Defense

Plaintiffs' claims are barred by the first sale doctrine.

### Nineteenth Affirmative Defense

Plaintiffs' claims are barred by their failure to mitigate damages.

### Twentieth Affirmative Defense

Plaintiffs' claims are barred to the extent they have forfeited or abandoned copyright.

### Twenty-First Affirmative Defense

Plaintiffs' claims are barred because of deceptive and misleading advertising in connection with the distribution of their copyrighted works.

### Twenty-Second Affirmative Defense

Plaintiffs' claims are barred to the extent any persons, based on whose behavior Plaintiffs

seek to hold Defendants liable, are innocent infringers.

## FIRST AMENDED COUNTERCLAIMS

Counterclaimant Lime Wire LLC ("Lime Wire") hereby alleges as follows:

## PARTIES

1.      Counterclaimant Lime Wire is a Delaware limited liability corporation with its principal place of business located in New York, New York.

2.      Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Arista Records LLC is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of New York.

3.      Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Atlantic Recording Corporation is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of New York.

4.      Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant BMG Music is a general partnership duly organized and existing under the laws of the State of New York, with its principal place of business located in the State of New York.

5.      Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Capitol Records Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of New York.

6.      Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Elektra Entertainment Group Inc. is a corporation duly

organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of New York.

7.   Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Interscope Records is a general partnership duly organized and existing under the laws of the State of California, with its principal place of business located in the State of California.

8.   Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant LaFace Records LLC is a limited liability corporation duly organized and existing under the laws of State of Delaware, with its principal place of business located in the State of New York.

9.   Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Motown Record Company LP is a limited partnership duly organized and existing under the laws of the State of California, with its principal place of business located in the State of New York.

10.   Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Priority Records LLC is a limited liability company with its principal place of business located in the State of California.

11.   Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant SONY BMG MUSIC ENTERTAINMENT is a general partnership duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of New York.

12.   Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant UMG Recordings, Inc. is a corporation duly organized and

existing under the laws of the State of Delaware, with its principal place of business located in the State of California.

13.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Virgin Records America, Inc. is a corporation duly organized and existing under the laws of the State of California, with its principal place of business located in the State of New York.

14.     Lime Wire, upon information and belief, and on that basis alleges, that Plaintiff and Counter-Defendant Warner Bros. Records Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of California.

## JURISDICTION AND VENUE

15.     This Court has personal jurisdiction over Counter-Defendants, all of whom do business in the State of New York and in this District.  Moreover, Counter-Defendants' conduct occurred in part in the State of New York and in this District.

16.     Counts I, II, III and IV of the Counterclaim allege antitrust violations under the Sherman Act, 15 U.S.C. §1, and the Clayton Act, 15 U.S.C. §15.  Accordingly, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 4 and 5.

17.     Supplemental subject matter jurisdiction exists for Counts V, VI, and VII of the Counterclaim under 28 U.S.C. §1367 because these claims are so related to the Plaintiffs' claims in this lawsuit that they form part of the same case or controversy.  Supplemental subject matter jurisdiction also exists for Counts V, VI, and VII of the Counterclaim under 28 U.S.C. §1367 because these claims are so related to Counts I, II, III and IV of the Counterclaim that they form part of the same case or controversy arising under federal antitrust law.

18.     Venue is proper in this District under 28 U.S.C. §1391 and 15 U.S.C. §§ 15 and 22.

## ALLEGATIONS COMMON TO ALL COUNTERCLAIMS

**The Recorded Music Industry**

19.     The recorded music industry involves several distinct layers of businesses that have evolved significantly in the latter part of the 20th century and early part of the 21st century.

20.     Artists, including performers and composers, create music that is recorded. To reach a large audience of potential buyers of the recorded music, artists traditionally needed radio and/or television broadcasts of their recordings which, along with concert performances and advertising, could inform consumers of the availability of an artist's music and stimulate purchases of recorded music.  Thousands of artists create recorded music that is sold or licensed to consumers.

21.     Until recently, the most economical forms in which recorded music could be disseminated to consumers was through tangible recordings ("media") such as piano rolls, later wax cylinders, then vinyl records, eight track and cassette tapes, and finally compact disks. Recorded music was played by consumers almost entirely on electronic devices made exclusively for that purpose, most recently record players, tape players, and compact disk players.

22.     The music distribution industry, of which all of Counter-Defendants are a part, contracted with artists to record their music in these media, promote the music to broadcasters, and distribute the media to consumers.  Until recently, the recording of music was expensive, and the duplication of recorded music even more expensive, requiring vast sums to be invested in recording and duplication equipment.  Likewise, the physical distribution of recorded music to retail vendors was quite expensive.  Few if any individual artists had the resources to

record music, duplicate it on media, promote it, and physically distribute the recorded media to vendors without the assistance of specialized companies in the music distribution industry. While there are thousands of artists of recorded music, and hundreds of millions of consumers of recorded music, only four record labels –UMG, Warner Bros., Sony/BMG and EMI (the "Major Labels") – sell and distribute over 85% of all recorded music in the United States.

23.     The emergence of the personal computer, the Internet, and modern compression technology changed significantly the economics and practices of artists, music distribution, and consumers of recorded music.  Artists, at relatively low cost, could digitally record their own music using their own equipment and personal computers.  Physical records and CDs are no longer essential for consumers to own or play copyrighted audio content and likewise, the traditional roles of manufacturing, selling and distributing physical products at retail locations or through the mail, are no longer necessary for consumers to receive copyrighted audio content.  Recorded music could be distributed digitally at very low cost over the Internet to consumers unburdened by any tangible media such as a CD.  Consumers could learn of new music not only through traditional broadcasters, but also through websites via the Internet. Consumers could also record and play recorded music on their personal computers and arrange and burn their own CD's or place the digitally recorded music on iPod's, other personal music players, and even cell phones.

**The Development of Digital Technology Disrupts the Plaintiffs' Traditional Distribution Models**

24.     Over the years, the music industry has largely profited, not directly from the ownership of copyrights, but by controlling the sale and distribution of the physical products (i.e., records, audio cassettes and CDs).

25.     The ability of a consumer to search the Internet and copy a digital audio file on his or her hard drive had powerful, commercial consequences when the general public began to utilize the Internet in the mid 1990s.

26.     The Internet is a network built out of millions of hosts/users all over the world.  Once limited to the domain of the scientific community, the Internet is now used by millions of people around the world in a multitude of different ways including information gathering, communication and the exchange of goods and services.  Internet search engines such as Google provide all Internet users the means to locate and download digital files of all types, including MP3, video and executable files, from millions of websites around the world.  Millions of Internet users have also begun using their computers to connect to each other directly, forming powerful user-friendly networks that allow these users to search for, locate and distribute digital files and data.  This technology is known as "peer-to-peer" or simply, "P2P".

27.     As a result of the proliferation of the Internet and the ease to exchange MP3 and similar files, consumers were no longer restricted in choice and not dependent exclusively on the physical media products and distribution channels that historically had been controlled by the Counter-Defendants, and on which the business and profits of the music industry have historically been based.

28.     These changes threatened the oligopoly that Counter-Defendants maintained in the distribution of recorded music, because they created significant alternative means for electronically distributing music at lower cost and outside the control of the Counter-Defendants.  Counter-Defendants and their co-conspirators conspired to delay and disrupt the entry and emergence of these alternative means for distribution, and to extend their oligopoly in the distribution of recorded music over the new market for the electronic distribution of music via the Internet.

29.     Counter-Defendants and their co-conspirators had a powerful incentive to preserve their oligopoly in the distribution of recorded music.  They did not confine themselves to competing on the merits with the new means of distribution, which would have required them to improve their services or lower their charges to consumers, or raise their compensation to artists.  Instead, they sought to inhibit their new competitors and raise their competitors' costs.

30.     Counter-Defendants individually possessed significant leverage through the licenses they held in their existing catalogs of recorded music and the exclusive contracts they held with popular artists.  Consumers by and large are interested in the works of artists already under contract to Counter-Defendants in addition to new works by those artists and new works of emerging artists that do not yet have established reputations.  Accordingly, consumers seek out recorded music, both new and old, from multiple artists, both established and emerging.  However, whatever market power any single one of Counter-Defendants had by reason of its catalog of recorded music paled in comparison to the collective market power they had in their combined catalogs.   Thus, Counter-Defendants sought to preserve the market power they possessed by conspiring to refuse to license their catalogs for competitive digital distribution, and instead acting together to delay and inhibit digital distribution both of the recorded music they controlled and what little recorded music they did not control.  The Major Labels' initial response was a concerted refusal to license their copyrights and to litigate their online competitors out of the marketplace.

**Plaintiffs' Illegal and Anticompetitive Activities In The Market of Online Distribution of Music**

31.     Counter-Defendants' latest attack on such "disruptive" technology is not new, for history shows that when new technology is invented that potentially disrupts the exclusive distribution channels content owners are accustomed to and profit from, they usually attack such technology with vengeance.  Piano rolls, radios, cassette recorders, VCR's, digital audio tape,

and MP3 players, just to name a few, were each met with protestations of gloom and doom and attempts to stop them.  But the technologies the Counter-Defendants and their predecessors wanted to ban—jukeboxes, record players, radio stations and VCR's—have introduced competition and services that have served artists and consumers very well.

32.     This case is but one part of a much larger modern conspiracy to delay or destroy innovation that the Major Labels and their co-conspirators cannot control that disrupts their historical business models, or that offers new competition in the distribution of recorded music.  In recent years, the Major Labels and their co-conspirators have tried to prevent the exploitation of new technology by suing makers of software, makers of devices that play music (RIAA v. Diamond Multimedia Systems), ISP's, Internet search engines, venture capitalists that invest in Internet companies (Hummer Winblad), software that allows one to share and download their music online (MP3.com) and even the lawyers who represent these companies (Universal, which acquired MP3.com after litigating it into a forced sale, sued MP3.com's counsel in the underlying case.)  Their goal is quite simple:  to prevent or delay the development of any technology—even the Internet—that undercuts their market power in the distribution of recorded music.

33.     Ultimately Counter-Defendants and their co-conspirators sought to extend their power over online digital distribution of recorded music.  During 2000, each of the Major Labels, through their distribution companies, launched their own digital distribution websites.  But Counter-Defendants and their co-conspirators had larger desires—they joined together and embarked on a scheme to cartelize that market and its financial promise for themselves.  Their goal was simple:  to destroy any online music distribution service they did not own or control, or force such services to do business with them on exclusive and/or other anticompetitive terms so as to limit and ultimately control the distribution and pricing of digital music, all to the detriment

of consumers, composers, and performers.  And to do so, Counter-Defendants and their co-conspirators had at their disposal a potent weapon—the exclusivity rights inherent in their existing copyrights—that they deployed with a vengeance, by unlawfully extending and pooling those rights to cartelize the network for the online distribution of music.  They also pooled their huge monetary resources to combat and eventually defeat many of their online competitors.

34.    Counter-Defendants and their co-conspirators pursued and effected their plan to dominate the market for online recorded music distribution by various means.  Among these was the formation and use of two captive joint ventures—MusicNet and pressplay—that became the exclusive vehicles through which Counter-Defendants and their co-conspirators would license music content for online distribution.  These joint ventures were formed in mid-2001, with the ostensible aim of providing platforms for the digital distribution of music.  MusicNet was a joint venture among EMI, BMG and Warner Music.  Pressplay was a joint venture between UMG and Sony Music.

35.    Counter-Defendants and their co-conspirators persistently and concertedly refused to license any online distribution of their copyrighted works by any entity other than their own captive joint ventures.  MusicNet and pressplay, and later companies such as iMesh, Mashboxx, Altnet and Audible Magic (described hereinafter), have served as the vehicles through which Counter-Defendants and their co-conspirators imposed anticompetitive contract terms in the form of unduly restrictive licensing agreements or other measures to restrict and eventually prevent competition in the marketplace.  The formation of these captive joint ventures has led the Court overseeing the Napster Litigation to observe—even on an underdeveloped record—that MusicNet and pressplay "look bad, sound bad and smell bad."

36.    Counter-Defendants and their co-conspirators further conspired to use MusicNet and pressplay as a means to pool their copyrights for anticompetitive purposes.

Specifically, they intended to use their captive joint ventures to effect a price-fixing arrangement among horizontal competitors in the wholesale distribution of recorded music in digital form to retail digital distribution companies.  Upon information and belief, MusicNet's wholesale price was a share of a licensee's revenues, subject to a minimum payment, to be shared among the Major Labels, rather than a price per copy or work.  That pricing system, by design and effect, eliminated price competition among BMG, EMI and Warner Music in offering their recorded music in digital form through MusicNet to retail digital distribution companies.  And since these agreements established MusicNet as the sole source for Sony and Universal content as well, MusicNet eliminated wholesale price competition among all the Counter-Defendants and their co-conspirators.   Among other pernicious results, independent retailers faced excessive wholesale prices, and consumers faced higher than competitive prices.   Composers and performers were deprived of competition from alternative means for the electronic distribution and marketing of their music.

37.     Pressplay's pricing system had a similarly anticompetitive purpose.  At the time, Sony and Universal—the two distribution companies that formed the joint venture—accounted for nearly half of all sales of recorded music.  Counterclaimant alleges on information and belief that pressplay set both wholesale and retail prices for other retail digital distributors. As a result, all competition between Universal and Sony could be eliminated at both the wholesale and retail level.

38.     Counter-Defendants and their co-conspirators also used MusicNet and pressplay as a means to facilitate other unlawful collusive activity.  As a condition of the license agreements, licensees were obligated not to negotiate with the Major Labels directly.  The joint ventures were therefore part and parcel of Counter-Defendants' and their co-conspirators' concerted refusal to deal with others seeking to enter into and compete in the online recorded

music distribution space, and a means by which the participating distribution companies sought to enhance their market power and stifle competition through combination and joint action.  In addition, Counter-Defendants and their co-conspirators used MusicNet and pressplay as conduits for colluding to fix prices for licenses.  On information and belief, Counterclaimant alleges that the captive joint ventures provided a forum in which executives of the parent distribution companies met to discuss their own pricing and prices of competitors.  Given the corporate affiliations of the joint ventures and the market power they wielded, Counterclaimant alleges on information and belief that those discussions allowed them to set prices both inside and outside the joint ventures in a coordinated and anticompetitive manner.  Indeed, MusicNet and pressplay offered their basis service plans for $9.95 per month.  Lime Wire further alleges on information and belief that since for each distribution company the price rules of their affiliated joint venture operated to reduce price competition, each distribution company had an incentive to accommodate the joint venture when setting its own prices.

39.     Although the Counter-Defendants have for the most part divested themselves of these illegal joint ventures, the illegal effects from their anticompetitive conspiracy continue through today.  The Attorney General of the State of New York, as well as the Department of Justice, have begun separate investigations into the pricing of online distribution of music by the music industry.  And there are reportedly over fourteen (14) separate class action lawsuits recently filed against the Major Labels for online price-fixing.  The Major Labels are no strangers to this sort of activity.  They entered into a settlement related to the charge that they engaged in price-fixing in the sale of CD's, agreeing to pay $67.375 million in cash to the settling states and to provide 5.5 million CD's valued at $75.7 million to the public, and they recently admitted to doling-out payola to radio stations.  Moreover, anticompetitive and collusive activities by the Counter-Defendants continue through today as described below.

40.     In taking the above actions, Counter-Defendants' and their co-conspirators' purpose and effect was to delay, suppress and/or eliminate competition in the market for the online distribution of recorded music, to further concentrate their power over the market and to eventually set prices for online distribution to insure their continued profitability.  Through their concerted and unlawful actions, Counter-Defendants and their co-conspirators have been successful in eliminating many actual and potential competitors in the distribution of recorded music, and continue to reap the profits of their collusive activities.

**The Recording Industry's Coordinated Attack of P2P Technology and Lime Wire's Efforts to Compete**

41.     One means of distributing digital data, whether in the form of spreadsheets, word processing files, executable programs, or digitally recorded music, is through peer-to-peer personal computer file exchanges over the Internet.   True P2P technology is totally decentralized, meaning there are no central servers that assist in the searching and downloading of files.  There are many systems that are referred to as P2P but in fact are not, even though they appear to be totally decentralized on their face.  For example, AOL Time Warner's instant messaging application appears to be a peer-to-peer network because the user's friend will receive the message.  But AOL Time Warner's system, like all major instant messaging systems, have some sort of central server on the back end that facilitates computers/users to communicate with one another.

42.     Napster, a well-known application, did not qualify as a true P2P application. Although Napster users connected to one another to exchange MP3 files, the directory of the files that a user was searching for was located on servers run by Napster.  These servers acted as "brokers" for users, they answered search queries and brokered client connections.  It was these servers that eventually caused Napster to be held liable for vicarious and contributory copyright infringement (but not inducing copyright infringement).

43.     In contrast, Lime Wire has developed and distributed a communication software program that is truly decentralized P2P technology.  Unlike the Napster architecture, the Lime Wire application does not rely on any central server, database or other single point of authority to organize a network or to broker transactions, and there are no Lime Wire servers that maintain directories of file names to facilitate search requests or to broker client transactions. Using the P2P networking functionality of the application, users may search for any share and kind of computer file, including text, images, audio, video and software files, with other users connected to the network.  No Lime Wire server assists in the transfer and copying of files that may be shared by users of the Lime Wire application.  Users who install Lime Wire on their computers do so by their own volition and are only able to install the Lime Wire application if they first agree not to use the application to infringe the copyrights of others.  Thereafter, those persons make use of Lime Wire in the manner that they alone choose.  In July, 2003, Lime Wire created a website known as "MagnetMix" that linked digital rights managed, licensed, and copyrighted content available over the Internet through the LimeWire software application.  At the time the website was created, any content that was linked through this website was done so without charge but it was Lime Wire's intention to utilize this application as a means to ultimately charge customers for downloading copyrighted content (via subscription-based, per-download fee or ad-supported).

44.     Lime Wire created MagnetMix for the business purpose, among other things, of acquiring, distributing, and selling licensed, digitally rights managed, copyrighted content over the Internet.  Lime Wire actively solicited licensed content from media and content owners that would then be distributed, first from independent labels and artists, as well as from independent retailers/distributors such as CDBaby, which provides a feed for all of their WeedShare content.  Weedshare is an online music store and file-sharing system with an

innovative payment structure that also includes digital rights management of the content.   In addition, MagnetMix was created to foster Lime Wire's vision of making free content available over the Internet.

45.     In addition to using the MagnetMix website, it was Lime Wire's intent to use a step-by-step plan to educate users that downloading copyrighted material was potentially illegal, and to instead encourage users to purchase music legally by re-directing them to licensed sites such a iTunes, or by using the DRM-wrapped technology in MagnetMix and have users purchase content through that site.  As part and parcel of this plan, Lime Wire intended to use a robust hash-based filtering mechanism to inhibit users from downloading copyrighted material without a license, and educate them about lawful downloading of copyrighted works.   By providing significant incentives to encourage users of Lime Wire to pay for or otherwise permissively use the DRM content which would result in remuneration (in such form and value as determined by the copyright owners) to the copyright owners, Lime Wire intended to promote and encourage only appropriate file sharing and to share the proceeds of works lawfully exchanged by users of the Lime Wire software with legal sites such as iTunes, or by purchasing such works through MagnetMix.  Lime Wire planned to utilize a robust filtering mechanism to inhibit users from downloading copyrighted works and to allow competitive access to the Counter-Defendants' copyrighted works to make available for download and purchase by users of the LimeWire application.   Lime Wire has, in fact, developed such a filter application, by deploying what is known as a "hash-based" filter.   This filter operates to block files based on certain metadata (hash) unique to each work, acting as a unique identifier.   In order for such a filter to work, content owners must provide those unique hashes to Lime Wire, and many content owners have agreed to do so free of charge.

46.     However, for anticompetitive and wrongful purposes, the Counter-Defendants and their co-conspirators have concertedly declined to participate, refused to do business and have denied Lime Wire reasonable access to the hashes of their copyrighted works.  In addition to refusing to allow access to these hashes, the Counter-Defendants have insisted that Lime Wire utilize their "preferred" methodology of filtering based on acoustic fingerprinting technology, such as Audible Magic, and have gone so far as to "suggest" that the only viable alternative is for Lime Wire to proceed to do a deal with its "preferred" (i.e., licensed) peer-to-peer company iMesh, so as to continue their control over digital distribution of their content over the Internet. In addition, Counter-Defendants also insisted that they would not provide any hashes unless Lime Wire first obtained a license from a company called Altnet, which allegedly held the proprietary rights to hash-based filtering.  Upon information and belief, Altnet and its related entity Sharman Networks have conspired with the Major Labels to "force" Lime Wire and other P2P companies to enter into a license with Altnet in order to obtain these necessary hashes.  This boycott and collusive activity was directed at and intended to injure Lime Wire because it owned and operated a service for the digital distribution of copyrighted works, which it intended to use to forge a direct relationship with Lime Wire users so as to compete directly with the Counter-Defendants and their affiliates in their roles as distributors of copyrighted works.

47.     iMesh is the Counter-Defendants' latest venture to funnel their efforts to control the distribution of their content over U.S.-based P2P companies.  iMesh is allegedly the only "authorized" P2P file-sharing company in the U.S.  It claims to have been granted a license by the Major Labels to allow distribution of their content, and also offers a "one-stop shop" for what iMesh promotes as the only RIAA-approved filtering mechanism.  While from outward appearances iMesh is not controlled by the RIAA and the Counter-Defendants, dealings with iMesh by Lime Wire and other P2P companies demonstrate, in reality, that is not the case.

Officials of iMesh, including its CEO who used to be head of the RIAA, boast that because iMesh is the only RIAA-sanctioned business, it is the sole means by which P2P companies in the United States can survive.  Upon information and belief, iMesh and the Counter-Defendants, through the RIAA, have conspired to deal exclusively with iMesh so as to limit competition among them and foreclose entry by other competitors in the distribution of recorded music. They have implemented a plan in an attempt to coerce all P2P companies based in the United States to accept iMesh's purchase offers or they will be sued, so as to unlawfully maintain Counter-Defendants' market power in the distribution of music.  iMesh's and the RIAA's goal is to have these P2P companies concede, under the threat of expensive litigation, to sell their assets for essentially nothing, with the promise of a "get out of jail free" card from the RIAA.  In return, the P2P company must simply turn-over its user base (which is the single largest asset typically) to iMesh so they can then force a conversion to the iMesh platform which, in turn, will lead to huge profits to iMesh and, of course, the Major Labels.  Upon information and belief, the Counter-Defendants and their co-conspirators have also entered into illegal agreements with Altnet, Sharman Networks and others to force Lime Wire and others to take a license from Altnet (even thought the patents Altnet allegedly owns are invalid), if they wish to obtain the necessary hashes to filter copyrighted works.

48.     Evidence of iMesh's and Altnet's close ties with the Counter-Defendants, and the control it exerts over iMesh and Altnet, is undeniable.  When Lime Wire approached the RIAA to obtain appropriate licenses and to seek approval of its hash-based filtering system, officials at the RIAA, while very careful to not directly state that iMesh was the only "approved" mechanism to convert to a "legal" site, certainly implied it given the fact that they rejected any other alternatives proposed by Lime Wire and instead, demanded that Lime Wire (and others) convert their user base on a very short schedule, using only acoustic fingerprinting technology to

filter, which  inescapably points to only one solution:  iMesh, who has both the "approved" filtering and the only RIAA-"approved" short-conversion plan.  Further evidence of iMesh's conspiracy with the RIAA and Counter-Defendants is the fact that iMesh disclosed to Lime Wire financial statements of Sharman Networks (who recently settled with the Major Labels), in an effort to leverage Lime Wire into accepting iMesh's one-sided, take-it-or-leave-it proposal. Counter-Defendants also demanded that Lime Wire obtain a license from Altnet before it would grant Lime Wire access to their library of hashes.  Clearly, like MusicNet and pressplay, Counter-Defendants and their co-conspirators are using iMesh, Altnet and others as a means to facilitate their unlawful collusive activities.  And like before, the Counter-Defendants have unlawfully coordinated their behavior so as to maintain their market power in music distribution by coordinating with whom they would do business and on what terms.

49.   In furtherance of a conspiracy to monopolize and drive Lime Wire out of business, the Counter-Defendants and their co-conspirators have also implemented various strategies to control, stop, or delay the means by which others, including Lime Wire, offer digital technology useful for sharing digital files.  Those strategies include (a) targeting Lime Wire and other peer-to-peer companies in an effort to drive them out of business through boycott and concerted exclusionary practices; (b) collusively refusing to license content to any digital distributor of content over the Internet on other than a restricted license basis aimed at preventing decentralized peer-to-peer file sharing software from distributing that licensed content; (c) selectively and concertedly licensing content in a discriminatory and anticompetitive manner simultaneously to promote companies owned and affiliated with or approved by the Counter-Defendants that distribute digital files through decentralized peer-to-peer software such as iMesh; (d) concertedly pressuring advertisers and other vendors and customers of Lime Wire and other peer-to-peer companies to stop doing business with them; (e) by collusively employing

certain anti-piracy methods that redirect or disrupt users of "non-approved" digital distribution technology (such as peer-to-peer); (f) by employing other unified anti-piracy protection methods, such as digital watermarking and other security technology, that prevent users from copying their own music for their own personal use, thereby improperly restricting consumer's legitimate fair use rights; and (g) engaging in unfair business practices intending to drive Lime Wire and any peer-to-peer provider out of business.

50.     Counter-Defendants' concerted anticompetitive scheme has been directed at Lime Wire because Lime Wire is a market participant and a competitor of the Counter-Defendants' affiliates in the market for the distribution within the United States of copyrighted commercially valuable music over the Internet.  The means by which the Counter-Defendants sought to harm Lime Wire was through a concerted refusal to deal with Lime Wire to deprive it of hashes so it could filter their copyrighted works using hash-based filtering technology developed by Lime Wire, among other things.

51.     This concerted conduct was intended to further the Counter-Defendants' goal of restraining trade in, attempting to monopolize, and monopolizing the market for digital distribution of recorded music.  Although exclusive distribution rights to a copyrighted work are within the bundle of rights received by a copyright owner, an anticompetitive agreement among multiple copyright owners not to distribute their content to targeted third parties, such as Lime Wire, or to destroy the revenue streams and business of distribution competitors, is not within the limited grant of a copyright monopoly conferred by the government.  The Counter-Defendants' goal was to concertedly extend their collective market power in the ownership of copyrighted content to preserve their market power and collective monopoly over the distribution of recorded music, and to obtain market power and a collective monopoly over the digital distribution of recorded music by destroying competitive technology and businesses, and to delay and suppress

the digital distribution of copyrighted recorded music over the Internet so as to preserve as long as possible their effective control the pricing of that content across all avenues of digital distribution.

52.     In addition, and as part of their scheme to control the marketplace, upon information and belief the Counter-Defendants by agreement are refusing to license their content to third parties except under so-called "dead end licenses" (hereinafter "DEL") which are restrictive in their terms beyond restrictions reasonably required for pro-competitive, profit maximizing purposes, absent unlawful collusion.   A DEL is a one-time license to retrieve a digital file from a server only.   Even though digital rights managed technology exists to assure the copyright owner is remunerated each time a DRM file is downloaded from either a peer or a server, the collective decision by the Counter-Defendants to use only DELs precludes licensing at all to peer-to-peer platforms such as LimeWire.

53.     This concerted business strategy by the Counter-Defendants is intended by them, over time, to exercise market power and monopolize the relevant market.   The first anticompetitive purpose of this conspirational conduct is to drive distributors of content using peer-to-peer platforms out of business.   The second anticompetitive purpose is to limit the means for future digital distribution of musical works in a way that the Counter-Defendants can in the future more directly control the relevant market, which they have done by inflating the price across the board of licensing their content.

54.     The Counter-Defendants with anticompetitive intentions are conspiring to pursue a digital distribution world without peer-to-peer distribution in which the Counter-Defendants achieve market power over the means of digitally distributing content over the Internet.   The exclusive use of DEL's assures that the Counter-Defendants effectively license mere "store fronts," such as Rhapsody and iTunes for a limited time on a one- license basis.   In

addition, Counter-Defendants have colluded to price their licenses so that most independent digital distributors cannot literally afford to stay afloat unless they have another product tied to the distribution of music.  For example, it is a well-known fact that Major Labels charge at least 70-80 cents for each 99 cent iTunes download, and that the only way Apple can justify and profit from such an onerous licensing regime is by restricting the use of such downloads in portable players, iPods, that Apple alone sells. Recently, it was announced that Microsoft had to concede to even more onerous terms by agreeing to pay a royalty to at least one Major Label on the sale of its Zune portable player, in order to obtain a license for the distribution of music content.

55.    The Counter-Defendants' collective decision to limit third party licenses to DELs to fix prices and licensing terms and refuse to license peer-to-peer providers, except upon unfair and unreasonable terms, and to unfairly require these companies to take a license from related entities and by refusing to provide the necessary hashes to compete in the marketplace, promotes the preservation of their market power.  Competitive peer-to-peer distribution would not allow the Counter-Defendants to position themselves to control retail distribution in the future.  Once content is distributed to a peer, it is distributable by a peer in the future.  Although the content owner would be remunerated each time the file was distributed by a peer, the Counter-Defendants would lack the means to stop further distribution in order to acquire control of the entity directly providing digital copyrighted content to the user in the future.

56.    The Counter-Defendants have concertedly promoted the distribution of licensed content through companies in which many of the Counter-Defendants and their corporate affiliates have or had direct equity interests, such as MusicNet, pressplay and Roxio or through entities that they have a business relationship with, such as iMesh, Altnet, Mashboxx and others, with the purpose and intent of restraining trade in the market for the digital distribution of copyrighted content over the Internet.

57.     The Counter-Defendants have unreasonably and concertedly refused to do business with Lime Wire in order to harm Lime Wire in its business or property and to prevent the use of decentralized peer-to-peer technology for the secure distribution of their licensed, copyrighted content.

58.     Upon information and belief, the conspiratorial acts of the Counter-Defendants to coerce actual and potential advertisers, vendors, and customers of Lime Wire to stop doing business with Lime Wire include, among others, the Counter-Defendants have collectively required that contracts for the provision of content to other Internet Service Providers (ISPs) have a clause forbidding those ISPs from doing business with providers of peer-to-peer software, including Lime Wire.

59.     Upon information and belief, in furtherance of the Counter-Defendants' anticompetitive scheme, the Counter-Defendants have engaged in, among other things, the following wrongful, unlawful and unfair conduct:

(a)     Violating state and federal personal privacy laws and the Digital Millennium Copyright Act ("DMCA") anti-hacking provisions by hacking and exploring the files of LimeWire users in order to frighten legitimate users of the LimeWire;

(b)     Falsely claiming that Lime Wire promotes child pornography;

(c)     Falsely claiming that Lime Wire is a "pirate";

(d)     Falsely claiming that Lime Wire is a "smut peddler";

(e)     Falsely claiming that their goal is to deter illegal file sharing, when their true motive is to deter all uses, legitimate and illegitimate, of peer-to-peer technology;

(f)     Threatening users of peer-to-peer technology with potential litigation and liability, based upon information obtained by illegal means;

(g)     Pressuring artists not to license their works to providers of peer-to-peer software, such as Lime Wire, that were not owned or controlled by the Counter-Defendants;

(h)     Refusals to deal with, and boycotts of, ISP's around the world that had entered, or proposed to enter, into advertising arrangements with Lime Wire; and

(i)     Refusals to give Lime Wire hashes of their copyrighted content so as to allow Lime Wire to effectively filter these works.

60.     The Counter-Defendants, individually and collectively, through the Recording Industry of America (the "RIAA") and other organizations and companies, have engaged in these unfair business practices, for the specific purpose of eliminating sources of decentralized peer-to-peer file sharing and acquiring a monopoly over digital distribution of commercially valuable copyrighted music and movie content.  In fact, these same persons and entities have been both secretly and publicly engaged in promotion of their own digital distribution technologies which permitted exchanges of copyright infringing files, such as instant messengering, email and other similar technologies only, in each case engineering the technologies to use a central server thus retaining for themselves the same knowledge and control held by Napster.  They have also utilized peer-to-peer technology to "test" the distribution of their works.

61.     Lime Wire is informed and believes that each of the named parties in this action was, and is, the agent and co-conspirator of the other in connection with the concerted conduct alleged in these counterclaims and aided and assisted the named parties in doing the wrongful acts alleged herein, including but not limited to conspiring with the named parties to

unreasonably restrain trade and making statements and performing acts in furtherance of the combination and conspiracy alleged herein, and that Lime Wire's damages as alleged herein were proximately caused by them.  Lime Wire is informed and believes that the parties and co-conspirators have utilized, and continue to utilize, the RIAA, as well as their employees, attorneys, representatives, and agents, to plan, coordinate, and perpetrate the wrongful acts alleged herein.  More specifically, Lime Wire alleges that the named Counter-Defendants have developed schemes to monopolize the relevant markets described herein, and to destroy Lime Wire principally through the RIAA, and that the co-conspirators have perpetrated the acts of conspiracy through attorneys of the RIAA and the named Counter-Defendants with the specific intention of using the attorney-client privilege to keep secret their acts in furtherance of conduct that constitutes criminal conspiracy under Title 15 of the United States Code.

## CLAIMS FOR RELIEF

### COUNT I
### CONSPIRACY IN RESTRAINT OF TRADE IN VIOLATION OF § 1 OF THE SHERMAN ACT AND § 15 OF THE CLAYTON ACT

62.     Lime Wire realleges and incorporates in this Count the preceding allegations of this Counterclaim as if fully set forth herein.

63.     The Counter-Defendants have contracted, combined and conspired with the intent to unreasonably restrain trade in the markets for the distribution of recorded music and online distribution of recorded music.

64.     As a direct and proximate result of the concerted refusals to deal, unduly restrictive and exclusive licensing arrangements, unlawful pooling of their copyrights, price-fixing arrangements, refusal to provide access to the hashes of their content, and other anticompetitive activities of Counter-Defendants, Lime Wire has been and will continue to be injured in its business and property.

## COUNT II
## MONOPOLIZATION IN VIOLATION OF § 2 OF THE SHERMAN ACT

65.     Lime Wire realleges and incorporates in this Count the preceding allegations of this Counterclaim as if fully set forth herein.

66.     The Counter-Defendants, when they act in concert, have monopoly power in the relevant market for the digital distribution within the United States of commercially valuable copyrighted recorded music over the Internet, and have concertedly acted with specific intent to maintain and exercise that monopoly power to dictate (i) the terms, conditions, and technology by which such works will be digitally distributed, and (ii) the entities allowed to digitally distribute such works, in violation of § 2 of the Sherman Act.

67.     As a direct and proximate result of the violations alleged herein, Lime Wire has been and will continue to be damaged by the Counter-Defendants.

## COUNT III
## ATTEMPTED MONOPOLIZATION IN VIOLATION OF § 2 OF THE SHERMAN ACT

68.     Lime Wire realleges and incorporates in this Count the preceding allegations of this Counterclaim as if fully set forth herein.

69.     The Counter-Defendants have attempted to monopolize the distribution of commercially valuable recorded music and the digital distribution of commercially valuable recorded music over the Internet, and have concertedly acted with specific intent to acquire, maintain, and exercise that monopoly power to dictate (i) the terms, conditions, and technology by which such works will be digitally distributed, and (ii) the entities allowed to digitally distribute such works, in violation of § 2 of the Sherman Act.

70.     As a direct and proximate result of the violations alleged herein, Lime Wire has been and will continue to be damaged by the Counter-Defendants.

## COUNT IV
## CONSPIRACY TO MONOPOLIZE IN VIOLATION OF § 2 OF THE SHERMAN ACT

71.     Lime Wire realleges and incorporates in this Count the preceding allegations of this Counterclaim as if fully set forth herein.

72.     The Counter-Defendants have conspired to attempt to monopolize and monopolize the distribution of commercially valuable recorded music and the digital distribution of commercially valuable recorded music over the Internet, and have concertedly acted with specific intent to acquire, maintain, and exercise that monopoly power to dictate (i) the terms, conditions, and technology by which such works will be digitally distributed, and (ii) the entities allowed to digitally distribute such works, in violation of § 2 of the Sherman Act.

73.     As a direct and proximate result of the violations alleged herein, Lime Wire has been and will continue to be damaged by the Counter-Defendants.

## COUNT V
## VIOLATION OF THE DONNELLY ACT (N.Y. GEN. BUS. LAW §340)

74.     Lime Wire realleges and incorporates in this Count the preceding allegations of this Counterclaim as if fully set forth herein.

75.     The Counter-Defendants have contracted, combined and conspired in an unreasonable and illegal restraint of trade as described above.

76.     Additionally, the Counter-Defendants, when they act in concert, have monopoly power in the relevant market for the digital distribution within the United States of commercially valuable copyrighted sound recordings over the Internet, and have concertedly acted with specific intent to maintain and exercise that monopoly power to dictate (i) the terms, conditions, and technology by which such works will be digitally distributed, and (ii) the entities allowed to digitally distribute such works, in violation of the Donnelly Act.

77.     As a direct and proximate result of the violations alleged herein, Lime Wire has been and will continue to be damaged by the Counter-Defendants.

## COUNT VI
## VIOLATION OF N.Y. GEN. BUS. LAW §349

78.     Lime Wire realleges and incorporates in this Count the preceding allegations of this Counterclaim as if fully set forth herein.

79.     The Counter-Defendants employed unlawful, unfair and/or deceptive business practices, as described above, that are consumer-oriented and have broad impact on consumers at large.

80.     The Counter-Defendants' false allegations and unlawful, unfair and/or deceptive business practices are each aimed at deterring the consumer from engaging in legitimate business with Lime Wire.

81.     As a direct and proximate result of this these deceptive trade practices, Lime Wire has been and will continue to be injured in its business and property.

82.     As a direct and proximate result of this these deceptive trade practices, consumers have been and will continue to be injured.

## COUNT VII
## TORTIOUS INTERFERENCE OF PROSPECTIVE BUSINESS RELATIONS

83.     Lime Wire realleges and incorporates into this Count the preceding allegations of the FAC as if fully set forth herein.

84.     As described above, Lime Wire has lost both actual and potential customers because of Counter-Defendants' improper actions.   Moreover, Lime Wire has lost potential business dealings with one or more third parties because of Counter-Defendants' threats and actions.

85.     Counter-Defendants were aware of these relationships.

86.     There was a reasonable probability that these customers and business clients would have entered into a business relationship with Lime Wire but for the Counter-Defendants'

tortious and unlawful activities and wrongful means that interfered with these prospective business relationships.

87. As a proximate result of Counter-Defendants' conduct, Lime Wire has been damaged.

## PRAYER FOR RELIEF

WHEREFORE, Defendants/Counterclaimant pray for relief as follows:

88. That Plaintiffs take nothing as a result of their FAC, that Plaintiffs' claims be dismissed with prejudice and that Defendants be awarded their costs and reasonable attorneys' fees.

89. On Count I of the Counterclaim:

(a) An award of actual damages in an amount according to proof, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

(b) An award of attorneys fees, costs and expenses of suit incurred herein; and

(c) Such other and further relief as this Court may deem just and proper.

90. On Count II of the Counterclaim:

(a) An award of actual damages in an amount according to proof, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

(b) An award of attorneys fees, costs and expenses of suit incurred herein; and

(c) Such other and further relief as this Court may deem just and proper.

91. On Count III of the Counterclaim

(a)     An award of actual damages in an amount according to proof, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

(b)     An award of attorneys fees, costs and expenses of suit incurred herein; and

(c)     Such other and further relief as this Court may deem just and proper.

92.     On Count IV of the Counterclaim:

(a)     An award of actual damages in an amount according to proof, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

(b)     An award of attorneys fees, costs and expenses of suit incurred herein; and

(c)     Such other and further relief as this Court may deem just and proper.

93.     On Count V of the Counterclaim:

(a)     An award of actual damages in an amount according to proof;

(b)     An award of attorneys fees, costs and expenses of suit incurred herein; and

(c)     Such other and further relief as this Court may deem just and proper.

94.     On Count VI of the Counterclaim:

(a)     An award of actual damages in an amount according to proof;

(b)     An award of attorneys fees, costs and expenses of suit incurred herein; and

(c)     Such other and further relief as this Court may deem just and proper.

95.     On Count VII of the Counterclaim:

(a)     An award of actual and punitive damages in an amount according to proof;

(b)     An award of attorneys' fees, costs and expenses of suit incurred herein; and

(c)     Such other and further relief as this Court may deem just and fair.

## DEMAND FOR JURY TRIAL

Defendants hereby demand a trial of this action by jury.


Dated: September 4, 2007.

Respectfully Submitted,

Of counsel:                                    _____/s/_____

Lauren E. Handler                        Charles S. Baker (CB1365)
SDNY (LEH 6908)                        Joseph D. Cohen (JC3017)
PORZIO, BROMBERG &           Susan K. Hellinger (SH8148)
NEWMAN, P.C.                           PORTER & HEDGES, LLP
100 Southgate Parkway             1000 Main Street, 36th Floor
P.O. Box 1997                            Houston, Texas  77002
Morristown, NJ  07962-1997    (713) 226-6000 (Telephone)
(973) 538-5146 (Facsimile)      (713) 228-1331 (Facsimile)
(973) 889-4326 (Telephone)     cbaker@porterhedges.com
lehandler@pbn.com                   jcohen@porterhedges.com
                                                    shellinger@porterhedges.com

                                                    *Attorneys for Defendants/*
                                                    *Counterplaintiff*

## CERTIFICATE OF SERVICE

This is to certify that the foregoing pleading was filed by means of the Court's ECF system. Accordingly, it is assumed that all counsel of record received notice of this filing from the ECF system.  Lead counsel, listed below, will also receive a courtesy copy via email.


_____/s/_____
Charles S. Baker

TO:

Katherine B. Forrest
Teena-Ann V. Sankoorikal
Cravath, Swaine & Moore, LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019-7475
(212) 474-1000
(212) 474-3700 (fax)

*Counsel for Plaintiffs/*
*Counterclaim Defendants*

Of Counsel:

Kenneth L. Doroshow
Karyn A. Temple
Recording Industry Association of America
1025 F Street, NW, 10th Floor
Washington, DC 20004
(202) 775-0101
(202) 775-7253 (fax)