UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARISTA RECORDS LLC; ATLANTIC
RECORDING CORPORATION; BMG MUSIC;
CAPITOL RECORDS, INC.; ELEKTRA
ENTERTAINMENT GROUP INC.;
INTERSCOPE RECORDS; LAFACE
RECORDS LLC; MOTOWN RECORD
COMPANY, L.P.; PRIORITY RECORDS LLC;
SONY BMG MUSIC ENTERTAINMENT;
UMG RECORDINGS, INC.; VIRGIN
RECORDS AMERICA, INC.; and
WARNER BROS. RECORDS INC.,

                         Plaintiffs,

            v.

LIME GROUP LLC; LIME WIRE LLC; MARK
GORTON; GREG BILDSON, and M.J.G. LIME
WIRE FAMILY LIMITED PARTNERSHIP

                    Defendants.

CIVIL ACTION NO. 06 CV. 5936
(GEL)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT LIME WIRE LLC'S**
**MOTION FOR SUMMARY JUDGMENT**

Of counsel:

Lauren E. Handler
SDNY (LEH 6908)
PORZIO, BROMBERG &
NEWMAN, P.C.
100 Southgate Parkway
P.O. Box 1997
Morristown, NJ 07962-1997
(973) 538-5146 (Facsimile)
(973) 889-4326 (Telephone)
lehandler@pbn.com

Charles S. Baker (CB1365)
Joseph D. Cohen (JC3017)
Susan K. Hellinger (SH8148)
PORTER & HEDGES, LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
(713) 226-6000 (Telephone)
(713) 228-1331 (Facsimile)
cbaker@porterhedges.com
jcohen@porterhedges.com
shellinger@porterhedges.com

*Attorneys for Defendants*

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................... 1

FACTUAL BACKGROUND ........................................................................................... 5
    A.    *The LimeWire Software And How It Works* ................................... 5
    B.    *What LimeWire Is Not* ........................................................................ 9

ARGUMENT ............................................................................................................... 11

I.      STANDARD OF REVIEW ...................................................................... 11

II.    LW IS NOT LIABLE FOR VICARIOUS AND CONTRIBUTORY
      COPYRIGHT INFRINGEMENT UNDER THE *SONY-BETAMAX* SAFE
      HARBOR. ................................................................................................... 11
    A.    *Public Domain Works* ................................................................ 16
          1.  Project Guttenberg. ............................................................ 16
          2.  Internet Archives. ................................................................ 16
          3.  Creative Commons. ............................................................ 18
    B    *Musicians and Artists* ................................................................ 19
    C.    *LW's Magnet Mix* ........................................................................ 20
    D.    *Authorized Media* ........................................................................ 21
    E.    *Permitted Distribution of Computer Software* .......................... 24
    F.    *Distribution Of Content By So-Called "Legitimate"*
          *P2P Companies* ............................................................................ 24
    G.    *Use Of P2P By Major Labels* .................................................... 25
    H.    *Promoting New TV Through P2P* .............................................. 26
    I.    *Other Noninfringing Uses.* .......................................................... 26

III.   LW IS NOT LIABLE FOR CONTRIBUTORY COPYRIGHT
      INFRINGEMENT BECAUSE IT HAS NOT MATERIALLY
      CONTRIBUTED TO ANY LIMEWIRE USER'S INFRINGEMENT ......... 30

IV.   LW IS NOT VICARIOUSLY LIABLE BECAUSE IT LACKS THE RIGHT
      AND ABILITY TO SUPERVISE THE ACTIVITIES OF ITS END-USERS.
      ................................................................................................................... 33

V.    PLAINTIFFS' CLAIMS FAIL BECAUSE THEY DO NOT HAVE ANY
      EVIDENCE OF DIRECT INFRINGEMENT BY A LIMEWIRE USER. ... 38
    A.    *Plaintiffs Cannot Show that any LimeWire User*
          *Reproduced Any Of Plaintiffs' Copyrighted*
          *Recordings.* .................................................................................... 38
    B.    *Plaintiffs Cannot Show That Any LimeWire User*
          *Distributed Any Of Plaintiffs' Copyrighted*
          *Recordings.* .................................................................................... 39

VI.   PLAINTIFFS' STATE LAW COPYRIGHT INFRINGEMENT AND
      UNFAIR COMPETITION CLAIMS ALSO FAIL. ......................................... 40

CONCLUSION ......................................................................................................... 40

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

**TABLE OF AUTHORITIES**

Page

## Cases

*ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619 (4th Cir. 2001) ....................1

*A&M Records, Inc. v. Napster, Inc.* 239 F.3d 1004 (9th Cir. 2001) .................. 14, *passim*

*A&M Records, Inc. v. Napster*, 284 F.3d 1091 (9th Cir. 2002)..........................................1

*Arista Records, Inc. v. Mp3Board, Inc.*, No. 00 CIV 4660(SHS), 2002 WL 1997918
    (S.D.N.Y. Aug. 29, 2002)................................................................................ 40

*Ashcroft v. ACLU*, 535 U.S. 564 (2002) ..........................................................................29

*Banff Ltd. v. Limited, Inc.*, 869 F. Supp. 1103 (S.D.N.Y. 1994) ......................................34

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................11

*Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007).......................................................................39

*Demetriades v. Kaufmann*, 690 F. Supp. 289 (S.D.N.Y. 1988)...........................30, 33, 34

*DVD Copy Control Ass'n v. Bunner*, 113 Cal. Rptr. 2d 338 (Ct. App. 2001), *rev'd* 75
    P.3d 1 (Cal. 2003) ............................................................................................. 1

*Ellison v. Robertson*, 189 F. Supp. 2d 1051 (C.D. Cal. 2002)............................................ 1

*Faulkner v. National Geographic Soc.*, 211 F. Supp. 2d 450, *modified*, 220 F. Supp. 2d
    237 (S.D.N.Y. 2002), *aff'd*, 409 F.3d 26 (2d Cir. 2005) .....................................34

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159 (2d Cir. 1971) ....
    ............................................................................................................ 30, 31, 33

*In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003)..................................... 12, 35

*In re Napster, Inc. Copyright Litig.*, 377 F. Supp. 2d 796 (N.D. Cal. 2005)................... 39

*Kelly v. Arriba Soft, Corp.*, 280 F.3d 934 (9th Cir. 2002) ..................................................1

*Livnat v. Lavi*, 46 U.S.P.Q.2d 1300 (S.D.N.Y. 1998)................................................. 31, 33

*London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153 (D. Mass. 2008) .....................40

*Mathieson v. Associated Press*, 23 U.S.P.Q.2d 1685 (S.D.N.Y. 1992).............................16

*Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693 (2d Cir. 1998) ......15, 16, 30, 33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).........................11

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 259 F. Supp. 2d 1029 (C.D. Cal.
    2003), *aff'd*, 380 F.3d 1154 (9th Cir. 2004), *rev'd on other grounds*, 545 U.S. 913
    (2005)................................................................................................... 31, 32

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 380 F.3d 1154 (9th Cir. 2004).......
    ............................................................................................................ 32, 33, 36

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ....... 3, *passim*

*Monroe v. Janes*, No. 9:06-CV-0859 (FJS/DEP), 2008 WL 508905 (N.D.N.Y. Feb. 21, 2008) .................................................................................................................... 39

*mp3.com v. Cooley, Godward, LLP*, No. 1-02-cv-806837, California County Superior Court, Santa Clara County ............................................................................................ 1

*National Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426 (8th Cir. 1993) ................................................................................................................... 39

*Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ............................... 36, 39

*Religious Technology Center v. Netcom On-Line Communications Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) .................................................................................. 1

*RIAA v. Diamond Multimedia Systems, Inc.* 180 F.3d 1072 (9th Cir. 1999) ...................... 1

*Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963) .......... 33, 34, 35

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ............. 3, *passim*

*Sygma Photo News, Inc. v. High Soc. Magazine, Inc.*, 778 F.2d 89 (2d Cir. 1985) ..........34

*Vault Corp. v. Quaid Software, Ltd.*, 847 F.2d 255 (5th Cir. 1988). .................................12

*Universal City Studios v. Corley*, 273 F.3d 429 (2d Cir. 2001) ......................................... 1

## Statutes and Rules

17 U.S.C. § 106(1) ..........................................................................................................38

17 U.S.C. § 106(3) ..........................................................................................................39

FED. R. CIV. P. 56(e) ......................................................................................................11

FED. R. CIV. P. 56(e)(2) ..................................................................................................11

## Miscellaneous

2 *Goldstein on Copyright* § 7.5.1 (3d ed. 2007) ............................................................. 39

2 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 8.11[A], at 8-124.1 n.2 (2007).... 39

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright*, §12.04[A][2][a] at 12-75 (1996)... 31

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

Technology Officer Greg Bildson, and its largest former shareholder (Lime Group LLC) for secondary copyright infringement.[2] Plaintiffs submit that they are bringing this action to stop "Defendants massive and daily infringement of Plaintiffs' copyrights."  First Amended Complaint ("FAC") ¶1.  In support of their claims, Plaintiffs allege, without basis, that Defendants, who they label "pirates," are responsible for the actions of users of LW's popular LimeWire peer-to-peer ("P2P") software ("LimeWire") which allows users to share freely and openly all sorts of digital files over the Internet.  But this case is not really about stopping the underlying infringement that Plaintiffs claim they so desperately seek to stop, since forcing LW to close its doors will not stop the underlying infringement.  Instead, Plaintiffs' true goals are to stifle innovations that they cannot control and punish those who dare cross the line and invest in a company that produces a product that can be used to infringe; Plaintiffs thereby preserve their historic market power.

Simply put, the suppression of innovation is detrimental to the public and the American entrepreneurial spirit.  LW is not responsible for Plaintiffs' lot in life or their failing businesses.  LW is not responsible for Plaintiffs' failure to protect their own content.  Most importantly, LW is not liable for secondary copyright infringement

LW cannot be liable for contributory and vicarious copyright infringement based on the mere distribution of a product that, because of its inherent design, is capable of both noninfringing and infringing uses.  The facts are not controverted; the parties and

---

Interscope Records, and Motown Record Company, L.P. ("UMG"); and (4) EMI labels —Capital Records, Inc., Priority Records LLC, and Virgin Records America, Inc. ("EMI") (collectively, "Plaintiffs").

[2]     Plaintiffs have also brought a claim of fraudulent transfer against Mark Gorton and the MJG Lime Wire Family Limited Partnership.

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

their experts generally agree as to how LW's software works.   Based on those uncontroverted facts, LW is entitled to summary judgment for several reasons.[3]

First and foremost, LW is shielded from liability for contributory and vicarious copyright infringement by the *Sony-Betamax* doctrine which provides a safe harbor for products capable of substantial noninfringing uses. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).   Peer-to-peer technology like LW's has previously been determined to be capable of substantial noninfringing uses by all of the *Grokster* courts (including the Supreme Court, which did not upset the lower courts' rulings on this issue). *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 913-14 (2005).  As a result, LW and its software are entitled to the protections afforded by the *Sony-Betamax* doctrine.

LimeWire allows users to search for, obtain, and disseminate a wide variety of digital content: software, video, audio, graphics, and documents.  Many actual uses of the program are substantial and noninfringing; the potential uses and capabilities are vast and still unfolding.   As such, LW cannot be held liable for contributory or vicarious infringement.

Yet even if the *Sony-Betamax* doctrine did not apply, LW would remain entitled to summary judgment on Plaintiffs' claims for contributory and vicarious infringement. Plaintiffs cannot establish crucial elements of those torts as a matter of law.  Instead, in an effort to sway this Court to join their anti-innovation campaign, Plaintiffs attempt to

---

[3]      Although LW believes it is not liable for inducement infringement, LW does not seek summary judgment on this claim except to the extent that inducement like all secondary copyright infringement requires an act of direct infringement. *See infra.* § V. The other elements of inducement require a fact-intensive analysis that does not easily lend itself to summary judgment and, here, there are substantial genuine issues of material fact on those elements.

3

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

tar LW, taking every opportunity to equate LW with Napster, the pioneer in digital file-sharing, and with Aimster and Grokster, alleged successors to Napster.[4] Unlike Napster and Aimster, however, LW does not operate a file-sharing service nor does it maintain any servers that participate in the exchange of files in any way. In contrast, like Grokster,[5] LW distributes a software product that users employ to create an open, publicly-available, P2P network directly between their own computers. Unlike Napster and Aimster, LW has no involvement with LimeWire users' subsequent file-sharing activities, whether infringing or not, and lacks the power to control or stop infringing uses once the product is delivered to users, just as Xerox has no control over what its customers may do with its photocopiers.

Moreover, like Sony, at the time it delivers its product, LW has no particular knowledge whether the product will be used by a specific consumer for infringing or noninfringing uses. LW has no ability to take effective action against a particular user based on after-acquired knowledge that the user has allegedly employed the product for unlawful purposes.

For these reasons, Plaintiffs cannot establish contributory infringement's crucial element of "material contribution" to the infringing conduct and, thus, LW is entitled to summary judgment on this claim. Likewise, Plaintiffs cannot establish that LW has the

---

[4]     Likewise, Plaintiffs have repeatedly mischaracterized exactly what the LimeWire software application is and what it does. Plaintiffs incorrectly claim that LW's business is some vague "system/network and related services." FAC ¶1. But in reality, LW is in the business of distributing a software product. It offers no "services" that are involved in any file-sharing by LimeWire users, nor is there any LimeWire "system" or network *per se*. The only thing close to a "system" is the network of users of the LimeWire software. However, as explained *infra*, this "system" is not unique to LW users; any person running Gnutella-based software is part of that network.

[5]     No court ever found the makers of the software in *Grokster* liable for secondary copyright infringement. Instead, the overwhelming evidence of intent to induce infringing uses of the Morpheus software by the StreamCast defendant led to a finding of inducement liability in that case.

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

"right and ability to supervise the infringing activity" of which they complain, so LW is also entitled to summary judgment on Plaintiffs' claim for vicarious liability.

## FACTUAL BACKGROUND

### A. *The LimeWire Software And How It Works*

The LimeWire software program is a communication tool that allows users to connect to one another independently to form a user network, commonly known as a user-to-user or "peer-to-peer" network. SoF ¶¶ 8, 40 & 41. Using the P2P networking functionality of the software, users may search for and share any kind of computer file, including text, images, audio, video, and software files, with other computer users connected to the network. SoF ¶¶ 1, 23 & 41.

Decentralization is the hallmark of Gnutella-based software products, including LimeWire. SoF ¶ 12 (detailing technical benefits that flow from network decentralization). LimeWire's searching and file-sharing functions are entirely decentralized; after downloading and installing LimeWire on their computers, users decide for themselves what information to seek out, send, and receive with the software, without any further involvement from LW or any other defendant in this case. SoF ¶ 23.

All versions of the LimeWire software have been based on a technology known as "Gnutella." Originally developed by employees of Nullsoft (an AOL-Time Warner subsidiary), Gnutella is a simple, open networking protocol intended to enable communications between computers over the Internet.[6]  SoF ¶¶ 8, 9 & 10. Because Gnutella is an open protocol (*i.e.*, publicly disclosed and free for use by all), anyone can

---

[6]      For an overview of Gnutella networking, *see* Andy Oram (ed.), PEER TO PEER (2001) at 94-122 (describing the history and functional principles behind the Gnutella networking protocol.) The relevant chapter from this text is attached as Exhibit 1 to the Declaration of Charles Baker ("Baker Decl.").

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

build Gnutella-compatible software, and any computer running Gnutella-compatible software can interoperate with any other computer running Gnutella-compatible software. *Id.* LimeWire is only one of several Gnutella-compatible products. SoF ¶¶ 41, 44. A user of any of these products can search and share files with users of any of the others. *Id.* Millions of computers running Gnutella-compatible software are connected with one another at any given moment, forming a single global Gnutella user network. *Id.*

After downloading and installing LimeWire,[7] a user must connect to the Internet through an Internet Service Provider ("ISP") in order to use the software. SoF ¶¶ 24, 27. In order to join the Gnutella network for the first time, the LimeWire software must obtain the IP address of at least one other person who is connected to the network, a process known as "bootstrapping." SoF ¶¶ 12-14, 45. In order to accomplish this, LimeWire contacts a "host cache"[8] maintained by LW. SoF ¶¶ 15, 46-48. The host cache responds with a list of the IP addresses of other computers worldwide that are at that moment running Gnutella-compatible software. SoF ¶¶ 14, 15, 48 & 49. LimeWire then uses the IP addresses to contact these other Gnutella users and thereby joins the new LimeWire user to the global Gnutella network. *Id.* LimeWire uses this "bootstrapping" function only once, when it is first launched. After that, LimeWire connects directly to the Gnutella network. SoF ¶ 50.

In order to join the Gnutella network, LimeWire users are not required to identify themselves with any "user name" or other word or code. Unlike Napster and many other

---

[7]     The LimeWire software is available for downloading over the Internet, either from web sites (including LW's) or from the Gnutella network itself. SoF ¶¶ 42, 43 & 56.

[8]     A "host cache" is, in essence, a computer that keeps a list of the addresses of the other computers that have contacted it recently, and provides the list to each subsequent computer that asks. SoF ¶ 48. Host caches generally do not receive or store any information regarding the content being transferred or shared by the computers that contact it. *Id.* Users may also manually input an IP address. *Id.*

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

P2P networks, the Gnutella network does not require user-specific accounts or unique names, and there is no need to "log-in" with any central authority. SoF ¶ 51. Nor does LimeWire require such identifiers for using its P2P networking functionality. *Id.* The only information required for connecting to the Gnutella network is an IP address of another person using Gnutella-compatible software and that is only required to launch the program the first time. SoF ¶ 52.

Once connected to the Gnutella network, a LimeWire user seeking a particular file must enter a search term into LimeWire's search screen on the user's computer. SoF ¶¶ 16, 29 & 53. LimeWire then transmits the search request to an ultrapeer to which it is connected. SoF ¶¶ 16, 30 & 53. An ultrapeer is a peer that has certain enhanced features that assist in the locating and downloading of files. SoF ¶¶ 5-7, 53.

After the search request is received by the ultrapeer, the search process resembles a giant game of "Telephone," with the search request propagating from ultrapeers to other peers (or "leafs") connected to the ultrapeer through the Gnutella network. SoF ¶¶ 17, 53. If a Gnutella peer receives a query that matches a file that it is currently sharing, the peer will generate a response "query list" message that includes metadata about the matching files. *Id.* Such "hit" messages flow back to the peer that initiated the query. SoF ¶¶ 17, 31 & 53.

LimeWire then displays to the user all the "query hit" responses in a "Search Results" window within the LimeWire graphical user interface. SoF ¶ 18. To download a file listed in the "Search Results," the user "double-clicks" the desired file in the "Search Results" window. SoF ¶¶ 18, 19 & 54. The download request is sent directly to

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

the IP address of the computer that is sharing the file, and the two computers then establish a direct file-transfer connection to accomplish the download. SoF ¶¶ 19, 54.

Because the Gnutella network is self-organizing, LW has no involvement whatsoever in the P2P networking functions described above. SoF ¶ 55. LW does not maintain any file indices, does not process search requests, does not compile search results, and does not send search results to users. SoF ¶¶ 30, 32 & 55. LimeWire does not report any information on the content of searches to any LW server. *Id.* LW's computer servers do not participate in identifying locations of user files, do not participate in requesting those files for transfer, do not communicate with the host users, do not participate in the transfer files from one user to another, do not control or monitor transfers of files, and do not control or monitor management or use of files. *Id.* LW servers receive no information regarding any particular files being transferred among users. SoF ¶¶ 20, 32 & 55. In short, LW has no involvement whatsoever with the search and transfer of files of users who chose to utilize the P2P networking functions of the LimeWire software. SoF ¶ 55.

Indeed, LW's involvement with the LimeWire software after its download by the user is very limited.  For example, the first time a user launches LimeWire, he connects to LW's host cache to obtain a list of IP addresses so that the LimeWire client (*i.e.*, the software on the user's computer) can directly connect to the Gnutella network. Additionally, LW will, on occasion, send out a "viral message." SoF ¶¶ 33, 40. A viral message is a message that contains new parameter settings that the LimeWire client should adopt.  SoF ¶¶ 33-35. This mechanism allows LW to fine tune remotely various

performance and operational aspects of the software's interactions with the Gnutella network. SoF ¶¶ 35, 36 & 37.

None of these limited interactions between the LimeWire software and LW enable LW to discover, monitor, or control what files users search for, choose to share, or download. SoF ¶¶ 20-22, 57. Also, LW has no ability to alter, disable, or upgrade LimeWire remotely once it has been downloaded and installed by the user.[9] If LW went out of business today, users could continue using LimeWire without interruption. SoF ¶¶ 39, 58. Once the software leaves LW's hands, LW has no control over what the ultimate user does with it. SoF ¶¶ 20-22.

In this regard, LW is no different from other software vendors who distribute communications tools capable of being misused. Microsoft, for example, has no ability to control the many unlawful uses to which its Internet Explorer web browser is doubtlessly put (including locating and downloading infringing works). Similarly, Google has no ability to control the uses to which its popular search-engine software is put (including searching for and downloading copyrighted works). Each of these products can and is, without question, used by some individuals to locate, publish and download copyrighted material without authorization.

**B.**     *What LimeWire Is Not*

Plaintiffs brazenly—and incorrectly—claim that because the LimeWire software is "essentially the same" as Napster and Aimster, LW should somehow be automatically held liable for its users' infringement. LW does not disagree that a comparison of its

---

[9]     As with most software manufacturers, LW occasionally makes upgrades of its software available to the general public. When an upgrade to the software is available, users are notified of the availability of the upgrade and given the opportunity to download the newer version. SoF ¶ 38. Users may decline the upgrade and the file-sharing functionality of the older versions of LimeWire will continue to function indefinitely. *Id.*

9

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

software to that of Napster's, Aimster's and Grokster's is vitally important, if not outcome determinative, of the matters at issue. Once the Court compares the various software applications, the many differences between LimeWire and the software in *Napster* and *Aimster* will be plain and LimeWire's similarities to the legal software in *Grokster* will be self-evident. For example, in stark contrast to LimeWire, the Napster software relied upon many central servers—all owned and maintained by Napster— whose sole function was to keep an index of the music files available for downloading, and to provide the necessary address for two computers to transfer music files. SoF ¶ 2. Each and every search query and result passed through Napster's central index which was maintained on Napster servers. SoF ¶ 3. This afforded Napster perfect knowledge and complete control over the specific file-sharing activities of its users. SoF ¶ 4. This combination led to the Ninth Circuit's finding of liability.

Then there was Aimster, a company whose instant messaging software was akin to Napster's because it was centralized. Moreover, unlike LW, Aimster went to great lengths—deliberately—both to influence and to encourage direct infringement among its users. For example, Aimster utilized a tutorial that taught users how to download copyrighted music and offered a service called "Club Aimster" which provided users direct access to copyrighted music for ease of downloading. Aimster also controlled access to its network, retaining the right to terminate its users from that network.

In contrast, the architecture of LW's P2P Gnutella-based software is essentially the same as the software at issue in the *Grokster* case—as both Plaintiffs and LW agree. It is completely decentralized in that LW has no involvement whatsoever in the file-sharing activities of its users. SoF ¶¶ 57, 58. As such, based on the Ninth Circuit's and

10

the district court's rulings in *Grokster*, LW's P2P software should likewise be deemed noninfringing.

## ARGUMENT

### I.   STANDARD OF REVIEW

Summary judgment must be granted where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party moving for summary judgment bears the initial burden of setting out the basis for its motion and identifying those portions of the record that "demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmovant to produce evidence sufficient to create a genuine issue of material fact for trial. FED. R. CIV. P. 56(e)(2); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### II.  LW IS NOT LIABLE FOR VICARIOUS[10] AND CONTRIBUTORY COPYRIGHT INFRINGEMENT UNDER THE *SONY-BETAMAX* SAFE HARBOR.

---

[10]   Plaintiffs are expected to argue that the *Sony-Betamax* doctrine has no impact on LW's potential liability for vicarious copyright infringement. Yet, that argument is without support. In *Sony*, the Supreme Court noted that the distinction between the two forms of secondary liability recognized in copyright law is often blurred in practice.

> [T]he District Court correctly observed [that] "the line between direct infringement, contributory infringement and vicarious liability are not clearly drawn . . . ." The lack of clarity in this area may, in part, be attributable to the fact that an infringer is not merely one who uses a work without authorization by

11

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

The Supreme Court's *Sony-Betamax* opinion represents the starting point for evaluating a secondary copyright infringement claim against a technology vendor. Realizing that courts must act cautiously when extending judge-made secondary liability principles to new technologies, the Court established the rule on which innovators of all stripes have come to depend—that manufacturers and distributors of mass-market technology suitable for a variety of uses may not be subject to liability for its creation or distribution so long as the products are "merely capable of substantial noninfringing uses." *Sony*, 464 U.S. at 442. This rule applies even if the defendant knows that the technology is used by the public for infringing uses. *Id.*

In *Sony*, the Court ruled in favor of Sony, the Betamax video recorder's manufacturer, holding that the Betamax was capable of at least two noninfringing uses—taping programs authorized for recording and fair use "time shifting" of programs.[11] *See Sony*, 464 U.S. at 442. The Supreme Court's analysis is rooted in the recognition that a judicial finding of infringement "would enlarge the scope of respondents' statutory monopolies to encompass control over an article of commerce that is not the subject of copyright protection." *Id.* The Court emphasized the importance of not allowing a

---

the copyright owner, but also one who authorizes the use of a copyrighted work without actual authority from the copyright owner.

> We . . . observe . . . that reasoned analysis of respondents' unprecedented contributory infringement claim necessarily entails consideration of arguments and case law which may also be forwarded under the other labels, and indeed the parties to a large extent rely upon such arguments and authority in support of their respective positions on the issue of contributory infringement.

*Sony*, 464 U.S. at 435, n.17 (citations omitted).

The policy rationale the Supreme Court articulated for limiting technology providers' liability applies with equal force to both forms of secondary infringement, especially since claims invoking them typically are joined. Thus, the *Sony-Betamax* principle is best understood as representing a general limitation on secondary liability as a whole. *See In re Aimster Copyright Litig.*, 334 F.3d 643, 654 (7th Cir. 2003).

[11]    This decision has since been applied to protect software with only a single noninfringing use. *See Vault Corp. v. Quaid Software, Ltd.*, 847 F.2d 255 (5th Cir. 1988).

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

copyright owner to leverage its statutory monopoly into technology markets. *See id.* at 441 n.21. ("It seems extraordinary to suggest that the Copyright Act confers upon all copyright owners collectively, much less the two respondents in this case, the exclusive right to distribute VTR's simply because they may be used to infringe copyrights. That, however, is the logical implication of their claim.").

After stating its rationale, the Court turned to patent law for guidance, noting that the Patent Act "expressly provides that the sale of a 'staple article or commodity of commerce suitable for substantial noninfringing use' is not contributory infringement." *Id.* at 440. The Court then explained the reason for this limit:

> [I]n contributory infringement cases arising under the patent laws the Court has always recognized the critical importance of not allowing the patentee to extend his monopoly beyond the limits of his specific grant. These cases deny the patentee any right to control the distribution of unpatented articles unless they are unsuited for any commercial noninfringing use.  Unless a commodity has <u>no use</u> except through practice of the patented method, the patentee has no right to claim that its distribution constitutes contributory infringement.

*Id.* at 441 (emphasis added) (internal quotations and citations omitted).  Importing this insight from patent law to copyright law, the Court concluded that the challenged product "need merely be capable of substantial noninfringing uses" in order to avoid liability. *Id.* at 442.  This "mere capability" standard is the core of the Supreme Court's holding, creating a bright-line test for innovators and establishing a zone of necessary security from the uncertainties of potential copyright litigation.

Additionally, the *Sony* Court rejected any weighing of the infringing as compared to the noninfringing uses.  It was on that very point that the Supreme Court reversed the lower court. *See id.* at 428 (noting that the Ninth Circuit had erroneously focused on "the major use" of the Betamax); *see also id.* at 498-99 (Blackmun, J., dissenting).  In fact, the

13

Court specifically held that one "substantial" noninfringing use for the Betamax was to tape programs authorized by copyright owners for recording, notwithstanding the fact that such uses accounted for a small portion of all uses. *Id.* at 424 (finding that 7.3% of all Betamax use was to record professional sports, and that this use constituted a substantial noninfringing use); *id.* at 493-94 & n.45 (dissenters recognizing this holding).[12]

In *Napster*, the Ninth Circuit applied the *Sony-Betamax* rule to file-sharing software and refused to consider the possible use of the software for infringement: "[t]o enjoin simply because a computer network allows for infringing use would, in our opinion, violate *Sony* and potentially restrict activity unrelated to infringing use." *A&M Records, Inc. v. Napster, Inc.* 239 F.3d 1004, 1021 (9th Cir. 2001). *Napster* also underscored the Supreme Court's bright-line "mere capability" standard. On this point, the Ninth Circuit criticized the district court:

> We depart from the reasoning of the district court that Napster failed to demonstrate that its system is capable of commercially significant noninfringing uses. The district court improperly confined the use analysis to current uses, ignoring the system's *capabilities*. Consequently, the district court placed undue weight on the proportion of current infringing use as compared to current and future noninfringing use.

*Id.* (emphasis added).

Consequently, *Sony* and *Napster* render irrelevant Plaintiffs' expected, manufactured arguments regarding the *proportion* of infringing to noninfringing uses of

---

[12]    In so holding, the Court expressly rejected the plaintiffs' contention that, where a substantial proportion of the alleged use is infringing, contributory liability should attach. In *Sony*, the respondents argued that noninfringing uses of the Betamax were dwarfed by the allegedly infringing uses, and thus that the staple article of commerce doctrine should not apply. *Sony*, 464 U.S. at 444. The dissent in *Sony* agreed, noting that the evidence of noninfringing use was at best only 7% of all use, and urged a decision based upon the proportions of infringing and noninfringing use. *Id.* at 494 n.45. The majority, however, disagreed, and held that – in order to avoid contributory liability – a new technology "need merely be capable of substantial noninfringing uses." *Sony*, 464 U.S. at 442 (emphasis added).

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

LimeWire software.  Plaintiffs cannot deny the software's *capability* for noninfringing uses.

The Supreme Court briefly revisited *Sony* in its 2005 *Grokster* decision.  In that case, the Court considered whether defendants could be held secondarily liable for the infringing conduct of their users under an inducement theory. *Grokster*, 545 U.S. at 913-14.  Although the Court held that such a theory of liability existed, the Court was careful to distinguish between the higher inducement standard, which precludes the protection afforded by *Sony*, and mere actual or constructive knowledge of the users' infringement on the part of the distributor. *Id.* at 937.  Further, the Court warned that a mere failure to "take affirmative steps to prevent infringement" was inadequate to establish liability because it "would tread too close to the *Sony-Betamax* safe harbor." *Id.* at 934, 939 n.12. The Supreme Court expressly refused to revisit or quantify the *Sony* standard further,[13] thereby leaving the broad protection of the *Sony-Betamax* safe harbor intact. *Id.* at 934.[14]

The Second Circuit has applied *Sony* on numerous occasions.  For instance, the Second Circuit noted that Matthew Bender's use of West's star pagination in CD ROMs "does not amount to contributory infringement if the equipment is '*capable* of substantial noninfringing uses,' including uses authorized under the fair use doctrine." *Matthew*

---

[13]   The petitioners in *Grokster*, many of which are plaintiffs in the current case, urged the Supreme Court essentially to re-write *Sony*, arguing that where a service is used "principally" for infringement the safe harbor does not apply, and that *Sony* offered no protection when the infringer could have prevented infringing uses. *See* Opening Brief of Petitioners, Ex. 2 to Baker Decl.

[14]   The concurring opinions in *Grokster* indicate a split among the justices regarding how broadly the *Sony* standard should be interpreted. Justice Breyer's concurrence, for instance, captures *Sony*'s focus on the promotion of new technology. *Grokster*, 545 U.S. at 952, 957 (Breyer, J. concurring) ("*Sony* thereby recognizes that the copyright laws are not intended to discourage or to control the emergence of new technologies, including (perhaps especially) those that help disseminate information and ideas more broadly and more efficiently. Thus, *Sony*'s rule shelters VCRs, typewriters, tape recorders, photocopiers, computers, cassette players, compact disc burners, digital video recorders, MP3 players, Internet search engines, and *peer-to-peer software*") (emphasis added).

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

*Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998) (citing *Sony*, 464 U.S. at 442) (emphasis added). The court found that West, like the plaintiffs in *Sony*, was seeking to leverage the copyrights in its own work to control distribution and obtain royalties from a product that had substantial noninfringing uses. *Id.* (citing *Sony*, 464 U.S. at 440-42). Because Matthew Bender's product had substantial noninfringing uses (namely to refer to the location of a particular text within West's case reporters, a practice that has become standard in the legal industry), Matthew Bender was found not liable as a contributory infringer. *Id.* at 706-07; *see also Mathieson v. Associated Press*, 23 U.S.P.Q.2d 1685, 1687 (S.D.N.Y. 1992) (Associated Press cover photo featuring copyrighted photo had at least one substantial noninfringing use warranting protection under *Sony*).

The Supreme Court in *Sony*, as well as the Second Circuit in *Matthew Bender*, made it clear that the mere capability of substantial noninfringing uses is all that is required to protect a technology from attack grounded on allegations of secondary infringement. Here, there is no material fact dispute that the LimeWire software program is capable of significant noninfringing uses as the examples below demonstrate.

### A.   *Public Domain Works*

#### 1. Project Gutenberg

As described more fully in the Declaration of Gregory Newby ("Newby Decl."), Project Gutenberg makes available electronic copies of books that are either in the public domain or whose authors have given their consent for distribution of their works. There are currently over 15,000 eBooks available through Project Gutenberg.[15]   Project

---

[15]    Project Gutenberg's collection includes, among other works, the King James Bible (New and Old Testament), all major works of William Shakespeare; *The Odyssey* by Homer; *Moby Dick* by Herman

16

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

Gutenberg seeks to convert to digital form and widely distribute over the Internet many different types of media. SoF ¶ 61. Many of Project Gutenberg's files are presently made available on Gnutella and can be found using LimeWire. SoF ¶ 11. LimeWire allows more decentralized (and less expensive) distribution of Project Gutenberg's eBooks and music. *Id.* at ¶ 12.

### 2. Internet Archives

Peer-to-peer networks also play an integral role in the efforts of the Internet Archive. The Internet Archive is an attempt to create an "Internet library" to offer permanent digital access to historical collections, many of which are no longer available through traditional publishers. SoF ¶¶ 66-80.

The amount of material available through the Internet Archive is enormous. The Internet Archive currently hosts 947,472 books and music, software and video items. SoF ¶ 81. Approximately ten terabytes of data is downloaded from the Internet Archive each day. *Id.* This is the equivalent of 2 million MP3 songs being downloaded each day. *Id.*

Much of the Internet Archive is text-based material, but both the number and percentage of audio and video files are increasing rapidly as are downloads of such files. For example, Prelinger Archives, a for-profit company,[16] has assembled over 60,000 advertising, educational, industrial, documentary, and amateur films produced between 1903 and 1990. SoF ¶ 82. Approximately 60% of its holdings are in the public domain;

---

Melville; *Ulysses* by James Joyce; *The Scarlet Letter* by Nathanial Hawthorne; *Grimm's Fairy Tales* by Jacob and Wilhelm Grimm; *The Adventures of Sherlock Holmes* by Sir Arthur Conan Doyle; *Roget's Thesaurus* by Peter Mark Roget; *Don Quixote* by Miguel de Cervantes Saavedra; *The Prince* by Niccolo Machiavelli; *The Adventures of Huckleberry Finn* by Mark Twain; *On the Origin of Species* by Charles Darwin; *The Art of War* by Sun Tzu; and *An Inquiry into the Nature and Causes of the Wealth of Nations* by Adam Smith. A complete list of the current collection can be found at the Project Gutenberg Internet site, located at http://gutenberg.org/dirs/GUTINDEX.ALL.

[16]     Prelinger Archives furnishes stock footage for the motion picture industry, television networks, software publishers, educational media producers, advertising agencies, and artists and non-profit organizations. SoF ¶ 183.

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

it owns the copyright in approximately 5% of its holdings. *Id.*. Over 1,900 of the company's important public domain files, which physically reside in the Library of Congress, have been digitized and made available through the Internet Archive. Prelinger Archives profits from providing access to its archives, even when its materials are in the public domain, and it welcomes redistribution by users of the LimeWire software. SoF ¶¶ 83-95.

### 3. Creative Commons

Creative Commons is a nonprofit corporation that enables artists and authors to mark their creative work with the freedoms that they intend the work to carry. Through a site on the World Wide Web, http://creativecommons.org, creators are invited to choose a copyright license to attach to their own creative work. That license reserves some rights to the author, or copyright holder, while granting other rights to the public. SoF ¶169. A copyright holder can choose whether to authorize commercial use of the licensed content, whether to permit derivative use of the licensed content, and, if derivative use is allowed, whether to require that works that build upon the licensed work also be made available under a similarly free license. *Id.* These licenses then travel via Internet hyperlinks with the copyrighted content, helping others to know, and to rely upon, the freedoms they secure. *Id.*

In the two and a half years since Creative Commons launched its licensing project, more than 10,000,000 objects have been marked with Creative Commons licenses according to Yahoo! Search. *Id.* The vast majority (75%) reserve to the copyright owner commercial rights to the content, while authorizing the public to use the work for noncommercial purposes. Almost 65% grant derivative rights, though half of

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

those condition that grant upon the requirement that the derivative works be licensed under a similarly free license. And about 2% purport to dedicate their work to the public domain. *Id.*

**B.**   ***Musicians and Artists***

Even musicians and artists, some of whom argue that they have been most affected by the improper uses of P2P networks, have turned to P2P technology as a cost-effective mechanism to gain wider distribution of their works. For example, some up-and-coming musicians who do not have a large record label promoting their work rely on P2P technology to create a "buzz" among listeners. See Chris Nelson, *Upstart Labels See File Sharing as Ally, Not Foe*, N.Y. Times, Sept. 22, 2003, at Cl (SoF ¶ 100).

Established artists are also using P2P technology for commercial purposes. *See* Katie Dean, *Winwood: Roll With P2P, Baby*, Wired Magazine, July 9, 2004, *available* at http://www.wired.com/entertainment/music/news/2004/07/64128 (discussing how Steve Winwood's release of one track on P2P networks caused sales of his album to increase up to eight times in some regions) (SoF ¶ 101). Some well-known musicians even encourage their fans to share recordings of live shows on P2P networks to spur attendance at concerts, which are their main source of income (as opposed to royalties). *See* Neil Strauss, *File-Sharing Battle Leaves Musicians Caught in Middle*, N.Y. Times, Sept. 14, 2003, at A1 (SoF ¶ 102).

Other artists are actually releasing their content unrestricted over the Internet. Dissatisfied with the music labels, the band Nine Inch Nails left UMG last year and experimented with self-distribution on the web, including their release of the album *Ghosts.* SoF ¶ 103. Even the new president of Plaintiff EMI's digital unit found the

19

experiment "fascinating." SoF ¶ 104. Nine Inch Nails has also released its new album, *The Slip*, on its website for free. SoF ¶ 155. At least one track can be found using LimeWire. *Id.* Additionally, the Internet Archive provides access to authorized recordings of over 20,000 live performances by more than 850 artists such as Hank Williams III, Maroon5, the Grateful Dead, and Vanessa Carlton. SoF ¶ 107. *See also* SoF ¶¶ 97-89 (discussing other available content on the Internet Archive as well as the ability to find it using LimeWire).[17] Free live band performances can be found at www.nugs.net and www.vidablue.net, with some of the same songs also being available by using LimeWire. SoF ¶¶ 156, 157. Internet sites www.jamendo.com and www.converse.com make works available for free, also with copies available using LimeWire. SoF ¶¶ 158-160.

### C.  *LW's Magnet Mix*

Since August 2003, LW has maintained a service known as MagnetMix. SoF ¶ 108. MagnetMix is a service that allows content owners, such as independent labels, software developers and musicians, to distribute their content over the Gnutella network. *Id.* This service distributes independent works over the Internet, including the Gnutella network. *Id; see also* SoF ¶ 160. Since MagnetMix's creation, hundreds of artists and other content owners have submitted their content for distribution via MagnetMix. SoF ¶ 108.

---

[17]     Given these marketing advantages, it is not surprising that a December 2004 report based on a survey of over 2,700 artists and musicians concluded that "across the board, artists and musicians are more likely to say that the internet has made it possible for them to make more money from their art than they are to say it has made it harder to protect their work from piracy or unlawful use." SoF ¶¶ 105, 106.

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

**D.**   *Authorized Media*

LimeWire also provides a technology for wide and economical distribution of authorized media content. Peer-to-peer networks provide content owners with distinct business advantages over alternate online distribution technologies. SoF ¶ 109. Peer-to-peer technologies allow more cost-effective distribution of a greater selection of content to a wider audience. *Id.* By using P2P file-sharing networks, bandwidth cost is spread among millions of Internet users rather than placing it all on the original distributor. *Id.*

It is precisely because P2P networks reduce costs that some content providers are increasingly relying on them to distribute their products. *See, e.g.*, James Pearce, *Lindows Offers Software For Free Over P2P*, CNET News.com, Jan. 30, 2004, *available* at http://news.cnet.com/Lindows-offers-software-for-free-over-P@P/2100-7344_3-5150931.html?tag=st.rn (discussing how a company is lowering costs and seeking to attract new customers by distributing its Linux-based operating system software over P2P networks). SoF ¶ 129. The cost savings are, in turn, passed on to the consumer; indeed, because the distribution costs are so much lower, some companies are offering their products for free via P2P networks. *Id.* Examples of these companies abound.

Skype, for example, is the first Internet telephony technology to use P2P distributed computing. SoF ¶ 110. Skype relies on P2P networks, not only for completing telephone calls, but also for distributing its telephony software. *Id.* GridNetworks is an Internet television delivery service that enables content owners to deliver programming to broadband Internet users utilizing a "one-to-many" delivery control model. SoF ¶ 111. Abacast is a company utilizing technology combining P2P delivery with the features of a central server or unicast delivery which is known as "Hybrid P2P." SoF ¶¶ 121-122.

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

Without P2P technology, Abacast would not be possible. SoF ¶ 123. As a result of P2P technology, Abacast can insure the quality of data delivery. *Id.* If one server goes down, users can be rerouted to another peer group immediately, allowing Abacast to correct data transmission problems in real time. *Id.*

Yet another company, NFA Group Inc. d/b/a BuyDRM, provides a digital rights platform called KeyOS to its customers allowing them to "market, monetize and monitor their services using peer to peer 'P2P' technology." SoF ¶ 161. Peer-to-peer technology allows BuyDRM's customers to acquire new customers in a safe manner and it provides a global audience allowing BuyDRM's customers to expand their client base. SoF ¶¶ 162, 163. BuyDRM's customers could not reach the large audience necessary to remain competitive without P2P technology. *Id.* Examples of BuyDRM customers include Brand Asset Digital which markets its digital media products by using KeyOS to seed digital media content onto P2P networks; Ellusionist, which delivers pay-per-view content to magicians worldwide; and QTrax which uses KeyOS to enable customers to discover, download, and listen to free music using the Gnutella network. *Id.*

Another innovative company, RazorPop, Inc., developed and distributes TrustyFiles, P2P software similar to LimeWire. SoF ¶ 124. TrustyFiles allows a user to access multiple P2P networks including Gnutella and BitTorrent. *Id.* RazorPops's P2P Street Team is a program that enables artists such as Grammy Award-winning artist Sananda Maitreya (f/k/a/ Terence Trent D'Arby) to distribute music and video throughout the P2P file sharing networks. SoF ¶¶ 124-126.

A leader in P2P-based communications, information, entertainment, and social networking services, Raketu Communications, Inc., has proprietary P2P services that

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

utilize distributive peer nodes in a network environment to significantly reduce costs, improve quality and reliability, and decrease security risks.  SoF ¶ 127.  Raketu allows free calls to other Raketu users, free calls to land and cellular phones, free calls from phone-to-phone, file transfers, instant messaging, off-line messaging, and distribution and viewing of P2P-based streaming content (web TV).  *Id.*  Without P2P technology, Raketu could not be competitive in the current marketplace.  SoF ¶ 128.  Simply put, "P2P technology promotes innovation and better quality products in the technology marketplace."  SoF ¶¶ 128, 129.

Other examples of innovative P2P technology include Joost, an on-line video platform delivering high-quality, full-screen, professionally produced video content to users on a free ad-supported basis using P2P technology (SoF ¶ 112); Pando Networks, Inc. which distributes P2P software that makes downloading, streaming, and sharing large media files fast and easy (SoF ¶ 113); and Jun Group, LLC, an Internet marketing company that utilizes P2P technology (SoF ¶ 112).  The pioneering Jun Group creates branded music, video, sports, and game programming which it delivers to consumers using P2P networks.  SoF ¶¶ 114-120.  Jun Group also:  (1) created the first music video program featuring major artists Ne-Yo and Jay-Z that was distributed over P2P networks for Coca-Cola.  (SoF ¶ 114)*; see also,* pages from www.jungroup.com (SoF ¶ 120); (2) released a previously unavailable song and two videos from Steve Winwood over P2P networks (SoF ¶ 115); (3) released five previously unavailable tracks from recording artists Kevin Martin and HiWatts over P2P networks, three tracks from Lake Trout, and footage from "Starting Over," a daytime television program (SoF ¶¶ 116-118); and (4)

released The Scene, Jun Group's first original P2P series (SoF ¶ 19). These items have been downloaded millions of times. *Id.*

### E. *Permitted Distribution of Computer Software*

Another significant noninfringing use of LimeWire is the authorized distribution of computer software. Many software developers grant express, blanket authorizations for redistribution of their software. This is true for several categories of software developers: (1) developers of "freeware" who are happy for their works to have wide distribution; (2) developers of "ad-ware" software products, in which advertising is embedded in entertaining content intended for widespread distribution; and (3) developers of software that rely upon distribution of "evaluation," "shareware" or "demo" versions that are distributed for free on a trial basis to stimulate sales of full-featured software. One example is WinZip, one of the most popular software titles in the world. *See* www.winzip.com/elicense.htm (SoF ¶ 131). WinZip redistribution is expressly authorized by the WinZip license agreement. *Id.* Another example is http://distribution.openoffice.org/p2p/magnet.html which specifically provides a magnet link for downloading Open Office software via LimeWire and other P2P clients. SoF ¶ 132.

### F. *Distribution Of Content By So-Called "Legitimate" P2P Companies*

Peer-to-peer technology is currently being utilized by at least two companies that have been authorized to distribute content by Plaintiffs. One company, iMesh, which claims to be the longest-standing P2P file-sharing company, indisputably uses P2P technology to allow its users to download authorized content, some for free and others for payment via a subscription model or a per download fee. SoF ¶ 133. Ironically, iMesh

24

claims to be the inventor of certain P2P features, such as "swarming," that Plaintiffs claim LW implemented. *Id.*

QTrax is another P2P company authorized by Plaintiffs, despite REDACTED

REDACTED

REDACTED (SoF ¶ 135). Tellingly, QTrax professes to be "the world's first free and legal P2P music download network." SoF ¶ 134. On its website, QTrax claims that it has the blessing of every major record label in the world, and is freely authorized to allow its users to download music over their P2P networks.[18] *Id.*

### G.   *Use Of P2P By Major Labels*

News reports have revealed that Plaintiffs themselves (or their authorized agents) use programs like LimeWire as a kind of Nielsen rating system, tracking the popularity of downloaded works and using that information to guide their decisions about which bands to sign and which CDs to promote. *BigChampagne Is Watching You*, Wired Magazine, Issue 11.10, Oct. 2003, *available* at http://www.wired.com/wired/archive/11.10/fileshare_pr.html. SoF ¶ 136. Plaintiffs also use P2P programs to target regions of the country for promotion when a band or artist is particularly popular in that region and to persuade radio stations in those regions to play their songs. *Id.* All indications are that this form of distribution will continue to gain in popularity as P2P and digital rights management technologies develop. Already, a

REDACTED

REDACTED (SoF ¶¶ 137, 138).

---

[18]    Despite Plaintiffs' claims that P2P, and specifically the Gnutella network, lacks noninfringing uses, in the past, REDACTED . SoF ¶ 135.

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

H.   *Promoting New TV Through P2P*

Viacom-owned cable network Spike has even put one of its shows on open P2P networks for free distribution in order to attract potential viewers, using it as a viral marketing mechanism.  SoF ¶ 139.

I.   *Other Noninfringing Uses*

Even the United States armed forces have recognized the benefits and cost efficiencies of P2P networks.  "America's Army" is a free combat video game produced by the United States Army in an attempt to attract young recruits.  Seth Schiesel, *On Maneuvers With The Army's Game Squad*, N.Y. Times, February 17, 2005, at G1. (SoF ¶ 140).  The video game is so popular that it is believed to be more effective at delivering the Army's messages than the millions of dollars in advertising spent by the Army.  *Id.* Not surprisingly, the Army has distributed the video game on P2P networks like LimeWire.  Aliya Sternstein, *Gnutella Wants You*, Forbes Magazine, Nov. 10, 2003, *available* at http: // www.forbes.com/forbes/2003/1110/077sidebar_print.html SoF ¶ 141.[19]  It is also available via LW's MagnetMix service.  SoF ¶ 164.

Additionally, academic institutions are beginning to look to P2P networks to further their educational mission.  For example, the Berklee College of Music has initiated a program called "Berklee Shares" to make many of the school's music lessons available to the public for free through P2P networks.  Katie Dean, *Teaching Music Traders A Lesson*, Wired News, Nov. 12, 2003, *available* at http://www.wired.com/entertainment/music/news/2003/11/61173 SoF ¶ 143.   In addition to

---

[19]    The armed forces are also utilizing P2P technology on the battlefield itself.  *See* Paul Rubens, *Army Tactics Are The Business*, Financial Times, Nov. 26, 2003, *available* at http://www.groove.net/pdf/armytactics.pdf (discussing Army's use of P2P technology and how businesses could similarly utilize the technology); SoF ¶ 142.

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

providing the public with access to the resources and knowledge of the school, Berklee Shares has also benefited the school by increasing awareness of its programs and faculty and increasing revenues. Press Release, Berklee College of Music, *File Sharing Works for Berklee College of Music,* May 18, 2004, *available* at http://www.berkleeshares.com/press/pressrelease2 (SoF ¶ 144).

Peer-to-peer networks are also being utilized by individuals to express and disseminate their political views to as many people as possible and to provide the public with access to a vast assortment of government information and political speech. *See* Kim Zetter, *Downloading ForDemocracy,* Wired News, July 19, 2004, *available* at http://www.wired.com/politics/law/news/2004/07/64237 (discussing the www.outragedmoderates.org website, which contains hundreds of government and court documents and makes them available for download through P2P networks) (SoF ¶ 145). One website includes links to numerous government documents such as the 9/11 Commission Report, all seventeen of the accompanying staff statements, and the actual testimony of many principal staff members from the Clinton and Bush administrations. *See* http://www.outragedmoderates.org/HowtoUseP2PNetworks.html (SoF ¶ 146). Although these public documents are available from other sources as well, the nature of P2P technology makes it much easier—and quicker—to access and view the documents, many of which are quite lengthy and otherwise difficult to locate. *Id.* LimeWire users can find various items of significance, such as the Constitution, the Declaration of Independence, Martin Luther King's "I Have a Dream" speech, and the works of William Shakespeare(SoF ¶¶ 165-168).

Recordings of oral arguments before the Supreme Court are being digitized and made available on P2P networks. *See Download Top Supreme Court Hits!*, CBSNews.com, Aug. 6, 2003, *available* at http://www.cbsnews.com/stories/2003/08/06/tech/main567017.shtml (SoF ¶ 147). Indeed, the oral argument from the *Sony* case that is at the heart of this very matter is now readily accessible. *See The Oyez Project*, *Sony Corp v. Universal City Studies*, 464 U.S. 417 (1984), *available* at http://www.oyez.org/cases/1980-1989/1982/1982_81_1687/ (SoF ¶ 148).

People living in countries under totalitarian regimes that censor "unpatriotic" or "inappropriate" websites will increasingly be able to circumvent that censorship and access information from anywhere in the world using P2P technology. *See New Technology May Foil PRC Attempts At Censorship Effort*s, The China Post, March 12, 2003, *available* at http://chinapost.com.tw/print/35737.htm (noting that Internet users in mainland China are unable to access information directly from websites on subjects such as Taiwan, democracy, Tibet, Falun Gong, and major news sites such as CNN and BBC) (SoF ¶ 149); Heather Green, *The Underground Internet*, Business Week, Sep. 15, 2003, at 80 (discussing Freenet-China, a Mandarin language version of a widely used P2P network that enables users to access news and websites, such as CNN.com, that the Chinese government censors) (SoF ¶ 150). Among the documents that have been shared on P2P networks in China are the Tiananmen Papers, a compilation of the transcripts from 1989 meetings among Chinese leaders in the aftermath of the student protests. *See* Jennifer Lee, *Grass-Roots War Heats Up Against Government Web Blocks*, Chicago

Tribune, Oct. 14, 2002, at 4 (SoF ¶ 151).[20]  And while P2P technology may not provide a

foolproof method for avoiding government censorship, it will certainly be much more

difficult for totalitarian states to stifle the flow of information on P2P networks than to

block a handful of centralized websites.

The First Amendment embodies "'[o]ur profound national commitment to the free

exchange of ideas.'"  *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (citation omitted).

The Supreme Court's decision in *Sony* reflected a similar commitment when it held that

traditional notions of secondary liability for copyright infringement should not be used to

deny law-abiding individuals access to valuable tools for sharing information and ideas

simply because others may use those tools for improper purposes.  Despite a changing

technological environment, the same principle applies with equal force here.

In light of these facts, Plaintiffs cannot seriously dispute that LW's P2P

technology has numerous, current significant noninfringing uses and vast possibilities for

future development.  As explained by Justice Breyer:

> And that is just what is happening.  Such legitimate noninfringing uses are
> coming to include the swapping of: *research information* (the initial
> purpose of many peer-to-peer networks); public domain files (*e.g.,* those
> owned by the Prelinger Archive); *historical recordings and digital
> educational materials* (*e.g.,* those stored on the Internet Archive); *digital
> phones* (OurPictures, for example, is starting a P2P photo-swapping
> service); *"shareware" and "freeware"* (*e.g.,* Linux and certain Windows
> software); *secure license music and movie files* (Internet MediaWorks, for
> example, protects licensed content sent across P2P networks); *news
> broadcasts, past and present* (the BBC Creative Archive lets users "rip,
> mix and share the BBC"); *user-created audio and video files* (including
> "podcasts" that may be distributed through P2P software); *and all manner
> of free "open content" works collected by Creative Commons* (one can
> search for Creative Commons material on Streamcast).

---

[20]   One of the P2P systems being used in China is called the "Six/Four System," which refers to the
date of the Tiananmen Square massacre on June 4, 1989.  *See* Jim Rapoza, *Six/Four: The Internet Under
Cover*, Eweek from ZDWire, March 6, 2003, *available* at http://eweek.com/c/a/Past-Reviews/SixFour-The-
Internet-Under-Cover (SoF ¶ 152).

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

*Grokster*, 545 U.S. at 954 (Breyer, J., concurring) (emphasis orig.).   Because the LimeWire software is plainly capable of present and future substantial noninfringing uses, LW cannot be liable for any secondary copyright infringement.

### III.   LW IS NOT LIABLE FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT BECAUSE IT HAS NOT MATERIALLY CONTRIBUTED TO ANY LIMEWIRE USER'S INFRINGEMENT.

Even if LW were not entitled to the *Sony-Betamax* safe harbor, it would remain entitled to summary judgment on Plaintiffs' claim for contributory copyright infringement.  Plaintiffs cannot establish all of the elements of contributory infringement as a matter of law.

Contributory infringement is "founded on the tort concept of enterprise liability." *Demetriades v. Kaufmann*, 690 F. Supp. 289, 292 (S.D.N.Y. 1988).  A defendant is contributorily liable when there is (1) direct infringement by a third party; (2) the defendant has knowledge of the infringing activity; and (3) the defendant induces, causes or materially contributes to the infringing conduct.  *Matthew Bender*, 158 F.3d at 706. "Just as benefit and control are the signposts of vicarious liability, so are knowledge and participation the touchstones of contributory infringement." *Demetriades*, 690 F. Supp. at 293.   In this case, there is no issue of triable fact on the touchstone of material participation; accordingly, LW cannot be held liable for contributory infringement.

In the Second Circuit, the material contribution element of contributory infringement requires "substantial involvement" in the underlying infringement. *Demetriades*, 690 F.Supp. at 294 (recognizing that the defendant's participation cannot be attenuated).  To hold otherwise would flatly contradict the plain law of the Second Circuit requiring "pervasive participation." *Id.* (citing *Gershwin Publ'g Corp. v.*

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

*Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1163 (2d Cir. 1971)). Thus, the alleged contributory infringer "must make more than a 'mere qualitative contribution' to the primary infringement." *Livnat v. Lavi*, 46 U.S.P.Q.2d 1300, 1302 (S.D.N.Y. 1998) (citing *Gershwin*, 443 F.2d at 1162). The contribution must also bear a "direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer." *Id.* (citing 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright*, §12.04[A][2][a] at 12-75 (1996)).

As a result of these requirements, participation in the infringement sufficient to impose liability "may not consist of merely providing the 'means to accomplish an infringing activity.'" *Livnat*, 46 U.S.P.Q.2d at 1302 (quoting *Sony*, 464 U.S. at 435 n.17). Thus, material contribution is not present when the only contact between the defendant and the primary infringer occurs at the time of sale. *See Sony*, 464 U.S. at 438. Subsequent, minimal contact is also insufficient. For instance, providing technical assistance and other incidental services to alleged primary infringers is not material to the alleged infringement. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 259 F. Supp. 2d 1029, 1042 (C.D. Cal. 2003), *aff'd*, 380 F.3d 1154 (9th Cir. 2004), *rev'd on other grounds*, 545 U.S. 913 (2005).

The Ninth Circuit's decision in *Grokster*[21] is illustrative. The P2P defendants in that case were found not to have materially contributed to any direct infringement by their users because they did not provide the "site and facilities" for infringement (*i.e.*, the

---

[21]     Plaintiffs have cited the *Grokster* Supreme Court case from the first pleading in this lawsuit (*see* Orig. Complaint at ¶ 3), but they consistently fail to mention that the Supreme Court never addressed, much less reversed, the Ninth Circuit's decision for defendants on vicarious and contributory liability. *See Grokster*, 545 U.S. at 930 n.9 ("Because we resolve the case based on an inducement theory, there is no need to analyze separately [plaintiffs'] vicarious liability theory.") Thus, the Ninth Circuit's opinion and the district court's opinion evaluating technology like LW's—and exonerating the defendants' decentralized Gnutella architecture—still stands.

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

infringement occurred on the user's computer). *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 380 F.3d 1154, 1163 (9th Cir. 2004). The defendants also were not access providers, did not provide file storage and index maintenance, and did not have the ability to suspend user accounts. *Id.* Significantly, the Court deemed irrelevant the fact that the defendants did not alter the software residing on users' computers. *Id.* at 1163-64. The Court determined that a "failure" to alter others' software was unlike the failure to delete a filename from one's *own* computer, the failure to cancel the registration name and password of a user from one's *own* user list, or the failure to make modifications to software on one's *own* computer. *Id.*

Moreover, the district court determined that the technical assistance provided by the P2P defendants did not amount to material contribution, because they rendered their assistance after the alleged infringement occurred and it was routine and non-specific in nature. *Grokster,* 259 F.Supp. at 1042. In most cases, the defendants' technical support related to the use of other companies' software, like third-party media players. *Id.* Likewise, the district court found it insignificant that the P2P defendants could communicate with their users incidentally and provide software updates. *Id.* All of these activities were too tangential to any direct copyright infringement to constitute material contribution. For these reasons, summary judgment for the defendants on contributory infringement was affirmed by the Ninth Circuit and undisturbed by the Supreme Court.

Like the *Grokster* defendants, LW has not materially, much less substantially or pervasively, participated in any alleged infringement:

- LW's primary contact with its users is at the time of distribution.

- LW occasionally provides minimal technical support or updates to its users that bears no relationship to the alleged infringement.

32
REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

- LW does not in any way assist, much less participate in, users' searching for and downloading of files.

At most, LW provides the means by which third parties can, if they so chose, commit infringement; as a matter of law, this does not support a finding of contributory liability. *See Livnat*, 46 U.S.P.Q.2d at 1302 (quoting *Sony*, 464 U.S. at 435 n.17).

## IV.   LW IS NOT VICARIOUSLY LIABLE BECAUSE IT LACKS THE RIGHT AND ABILITY TO SUPERVISE THE ACTIVITIES OF ITS END-USERS.

As with contributory infringement, even if the *Sony-Betamax* safe harbor does not apply to LW, summary judgment for LW is still warranted. As a matter of law, Plaintiffs cannot establish all of the elements of a claim for vicarious liability for infringement.

Vicarious liability for copyright infringement is grounded in the agency doctrine of *respondeat superior*. *Gershwin*, 443 F.2d at 1162. As a result, the tort focuses on the relationship between the direct infringer and the defendant and the degree to which the defendant can control the direct infringer. *See Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 306-09 (2d Cir. 1963); *Demetriades*, 690 F. Supp. at 292. Specifically, the elements of vicarious liability are: (1) direct infringement by a third party; (2) the right and ability to supervise the infringing activity; and (3) a direct financial interest in the infringing activity. *Matthew Bender*, 158 F.3d at 706; *Gershwin*, 443 F.2d at 1162. In the context of technology and specifically P2P software, the Ninth Circuit has further cautioned that any evaluation of the "right and ability" to police must be "cabined by the systems' current architecture." *Napster*, 239 F.3d at 1024; *Grokster*, 380 F.3d 1154.

In analyzing the "control" element, "the formal relationship between [the] parties is not the driving force behind liability; rather, the parties' paths must cross on a daily basis, and the character of this intersection must be such that the party against whom

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

liability is sought is in a position to control the personnel and activities responsible for the direct infringement." *Banff Ltd. v. Limited, Inc.*, 869 F. Supp. 1103, 1109 (S.D.N.Y. 1994). While the requirement that the parties' paths cross daily should, perhaps, not be taken literally, the thrust of *Banff*'s holding—"the notion that the control must be substantial and have practical force"—remains sound. *See Faulkner v. National Geographic Soc.*, 211 F. Supp. 2d 450, 473 n.140, *modified*, 220 F. Supp. 2d 237 (S.D.N.Y. 2002), *aff'd*, 409 F.3d 26 (2d Cir. 2005). For this reason, courts considering vicarious liability "repeatedly have emphasized that some degree of control or supervision over the individual directly responsible for the infringement is of crucial importance." *Demetriades*, 690 F. Supp. at 292 (finding no meaningful evidence suggesting that the defendants exercised any degree of control over the direct infringers). Thus, actual control, not power to control, is the test. *Banff*, 869 F. Supp. at 1110 (citing *Sygma Photo News, Inc. v. High Soc. Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir. 1985)).

The classic example of the required control is found in the Second Circuit's leading opinion in *Shapiro*. In that case, a department store was held vicariously liable for bootleg records sold by the concessionaire of the store's record department. *Shapiro*, 316 F.2d at 306. Examining the relationship between the store and the record concessionaire, the court noted that the store had the authority to fire the concessionaire's employees who acted improperly. *Id.* The store collected the concessionaire's sales receipts and calculated and withheld various deductions, including its own 10-12% commission, before returning the remaining proceeds to the concessionaire. *Id.* Additionally, customers of the record department received receipts bearing the store's name. *Id.* From these facts, the Second Circuit concluded that the store retained the

ultimate right of supervision over the concessionaire and its employees and it had the power to police the conduct of the concessionaire. *Shapiro,* 316 F.2d at 308. Although the court recognized that the ability to police was not essential to its holding, that ability reinforced the court's conclusion that in many cases, the party found strictly liable is in a position to police the conduct of the primary infringer's conduct. *Id.* at 309.

The control analysis does not change in the technology context. For instance, in the infamous *Napster* case, the developer of a centralized P2P software application was found vicariously liable because it had supervisory control of the infringing activity as a result of the architecture of its system. *Napster,* 239 F.3d at 1023 (9th Cir. 2001). Napster had a closed system requiring registration and, thus, could terminate user accounts and block their access to the system. *Napster,* 239 F.3d at 1011, 1024. It even had an express reservation of rights policy published on its website. *Id.* at 1023. "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Id.* at 1023. For these reasons, Napster had the ability to police its users. *Id.* at 1023; *see also In re Aimster,* 334 F.3d at 654-55 (finding a right and ability to supervise when the defendant controlled access of its users and had the ability to terminate users at any time pursuant to its own posted policy).

Moreover, the software developer, Napster, had a centralized structure. *See Napster, 239 F.3d* at 1012. Napster's central servers maintained a search index of "Napster's collective directory." *Id.* When a user entered a search term, the search was transmitted to a Napster server and compared to the file names listed in the server's search index. *Id.* The Napster server then compiled a list of all the responsive files and transmitted the list to the searching user. *Napster,* 239 F.3d at 1012. To transfer a copy

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

of a requested file, the Napster server software would transmit the responding user's Internet address to the requesting user.  *Id.*  Then, the two computers could directly connect to affect the transfer, finally operating "peer-to-peer."  *Id.*  As a result of its crucial involvement in the search process, Napster had "the ability to locate infringing material listed on its search indices."  *Id.* at 1024.  These indices, which resided on Napster's servers, were within the "premises" that Napster could police and that Napster thus had the right and ability to block infringers from accessing the indices.

More instructive than *Napster* is the more recent *Grokster* case involving P2P software utilizing the Gnutella network that architecturally is almost identical in operation to LimeWire.  In *Grokster,* the Ninth Circuit affirmed summary judgment for the defendants on vicarious copyright infringement, reasoning that the Gnutella P2P technology was "truly decentralized."  *Id.* at 1165.  Distinguishing *Napster,* the court held that the *Grokster* defendants did "not operate and design an 'integrated system' . . . which they monitor and control."  *Id.* at 1164 (cite omitted).   Instead, the *Grokster* software distributors "are not access providers, and they do not provide file storage and index maintenance . . . Rather, it is the users of the software who, by connecting to each other over the internet, create the network and provide the access."  *Id.* at 1163.  As such, the "monitoring and supervisory relationship that has supported vicarious liability in the past" was "completely absent."  *Grokster,* 380 F.3d at 1165.  Because a defendant only exercises control over a direct infringer when he has both a legal right to stop or limit the infringing conduct and the practical ability to do so, the vicarious liability claim against *Grokster* defendants was dismissed.  *Id.* at 1167; *see Perfect 10 v. Amazon.com, Inc.,* 508 F.3d 1146, 1173 (9th Cir. 2007) (discussing *Grokster* holding).

36
REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

A similar result is mandated here. First, LW has no continuing relationship with the users of LimeWire, through contracts, agreements, or otherwise. In most instances, LW does not know who those users are since LimeWire users do not register with LW or log in to a system. Like the distributor of any other product, whether copy machines or VCRs, LW has only minimal contact with users after product distribution. Those encounters are largely limited to providing technical support and updates, much as Xerox's customer contacts relate to service calls and recall notices. Thus, much as users of VCRs and Xerox machines are responsible for their proper use of those technologies, LimeWire users are responsible for utilizing LimeWire legally. In fact, LW advises users of this obligation at the time they download the software. SoF ¶¶ 152, 153.

Likewise, LW does not have the ability to control the manner in which users employ the LimeWire software. Unlike the *Napster* defendants, LW does not maintain central servers containing files or indices of files. It does not process or assist users' search requests. LW does not even know for which files its users are searching; it cannot see or monitor the searches. LW's system is like that analyzed by the Ninth Circuit in *Grokster*: "truly decentralized." LW users connect to each other over the Internet, create the network, and share what they will independent of LW. In fact, if LW ceased to exist, users of its software could continue to connect to the network and conduct searches. LW no more controls the actions of its customers than do any of the thousands of companies that provide the hardware and other software used in connection with the Internet.[22]

---

[22]     Many other manufacturers and distributors make products that permit the alleged infringers to copy audio files, such as Intel chips and CD burners. Plaintiffs, however, are not suing those companies, perhaps, because some of their own affiliates sell these very items, *e.g.* Sony. LW, in which Plaintiffs have no interest, is much simpler to target.

37

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

Moreover, it is undisputed that LW does not have the right and ability to police its users' conduct.  LW does not have the legal right to repossess or disable the LimeWire software possessed by users. It has no contract or any form of agreement with its users legally to allow LW to block access to the Gnutella network or disable the software.  Like any other distributor of a product, once it leaves its hands, LW has no ability to police its users' conduct.  As such, vicarious liability does not attach to LW as a matter of law.

V.   **PLAINTIFFS' CLAIMS FAIL BECAUSE THEY DO NOT HAVE ANY EVIDENCE OF DIRECT INFRINGEMENT BY A LIMEWIRE USER.**

A threshold requirement of all of Plaintiffs' claims is an act of direct infringement.  To satisfy that requirement, Plaintiffs consistently allege that unidentified LimeWire users "have directly infringed and are directly infringing Plaintiffs' copyrights . . . by, for example, creating unauthorized reproductions of Plaintiffs' copyrighted sound recordings and distributing copies of such sound recordings to the public in violation of Plaintiffs' exclusive rights under [Sections 106 and 501] of the Copyright Act."  FAC ¶¶ 66, 79, 92.  Plaintiffs have no evidence that any LimeWire user reproduced or distributed copies of any of Plaintiffs' 3,000 plus recordings that they claim have been infringed; thus, they cannot establish this threshold requirement of the various infringement claims.

A.   ***Plaintiffs Cannot Show That Any LimeWire User Reproduced Any Of Plaintiffs' Copyrighted Recordings.***

Plaintiffs first allege that unidentified LimeWire users created unauthorized reproductions of Plaintiffs' copyrighted recordings.  FAC ¶¶ 66, 79 and 92.  Section 106 of the Copyright Act grants copyright holders the exclusive right "to reproduce the copyrighted work in copies or phonorecords."  17 U.S.C. § 106(1).  In order to establish a claim for copyright infringement under Section 106(1), therefore, proof is required "of

38

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

both ownership of a valid copyright and copying of protected elements of the work in question." *Monroe v. Janes*, No. 9:06-CV-0859 (FJS/DEP), 2008 WL 508905, at *10 (N.D.N.Y. Feb. 21, 2008) (citing *Davis v. Blige*, 505 F.3d 90, 98-99 (2d Cir. 2007)).

LW is not aware of any evidence produced by Plaintiffs showing that any LimeWire user reproduced any of Plaintiffs' copyrighted sound recordings. Consequently, Plaintiffs cannot establish a direct infringement of any right of reproduction under the Copyright Act.

**B.     *Plaintiffs Cannot Show That Any LimeWire User Distributed Any Of Plaintiffs' Copyrighted Recordings.***

Plaintiffs next allege that unidentified LimeWire users distributed copies of Plaintiffs' copyrighted sound recordings.     FAC at ¶¶ 66, 79, 92.  Section 106 of the Copyright Act grants copyright holders the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). Accordingly, a threshold requirement in an action for infringement of the distribution right in Section 103 is that there must be "an actual dissemination of either copies or phonorecords." *National Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 434 (8th Cir. 1993); *see* 2 *Goldstein on Copyright* § 7.5.1 (3d ed. 2007) ("crux of the distribution right lies in the transfer...of a copy or phonorecord"; "actual transfer must take place."); 2 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 8.11[A], at 8-124.1 n.2 (2007) ("right of distribution apparently is not infringed by the mere offer to distribute to members of the public").

Thus, "proof of direct infringement by the primary infringer is a necessary precondition to establishing both contributory and vicarious liability under the Copyright Act." *In re Napster, Inc. Copyright Litig.*, 377 F. Supp. 2d 796, 801 (N.D. Cal. 2005);

39

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

*see also Perfect 10,* 508 F.3d at 1162 (agreeing with district court's holding that "distribution requires an 'actual dissemination' of a copy"); *Arista Records, Inc. v. Mp3Board, Inc.,* No. 00 CIV 4660(SHS), 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002) (links to infringing material on website did not establish "unlawful 'distribution'"; record companies were required "to show that an unlawful copy was disseminated 'to the public'"). "[M]erely exposing music files to the internet is not copyright infringement." *London-Sire Records, Inc. v. Doe 1,* 542 F. Supp. 2d 153, 176 (D. Mass. 2008).

As with Plaintiffs' allegations of unauthorized reproduction, LW is not aware of any evidence produced by Plaintiffs showing that any LimeWire user distributed any of Plaintiffs' copyrighted sound recordings.  Plaintiffs' burden to show direct infringement by unauthorized distribution cannot be met by merely showing that a copyrighted work was *available* to be downloaded by a LimeWire user.

## VI.   PLAINTIFFS' STATE LAW COPYRIGHT INFRINGEMENT AND UNFAIR COMPETITION CLAIMS ALSO FAIL.

Plaintiffs also assert two separate state law claims in Counts IV and V:  common law copyright infringement and unfair competition.  As fully briefed in the Memorandum of Law in Support of Greg Bildson, Mark Gorton, Lime Group LLC, and M.J.G. Lime Wire Family Limited Partnership's Motion for Summary Judgment, those claims cannot survive.  LW hereby incorporates by reference the arguments in that Memorandum regarding Plaintiffs' state law claims and similarly asks this Court to dismiss those claims against LW.

## CONCLUSION

LW respectfully requests summary judgment in its favor on all of Plaintiffs' claims.

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL

Dated:  July 18, 2008.

Respectfully Submitted,

Of counsel:

/s/
Charles S. Baker (CB1365)
Joseph D. Cohen (JC3017)
Susan K. Hellinger (SH8148)

Lauren E. Handler
SDNY (LEH 6908)
PORZIO, BROMBERG &
NEWMAN, P.C.
100 Southgate Parkway
P.O. Box 1997
Morristown, NJ  07962-1997
(973) 538-5146 (Facsimile)
(973) 889-4326 (Telephone)
lehandler@pbn.com

PORTER & HEDGES, LLP
1000 Main Street, 36th Floor
Houston, Texas  77002
(713) 226-6000 (Telephone)
(713) 228-1331 (Facsimile)
cbaker@porterhedges.com
jcohen@porterhedges.com
shellinger@porterhedges.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

        This is to certify that the foregoing pleading was filed by means of the Court's
ECF system on the 18th day of July, 2008.  Accordingly, it is assumed that all counsel of
record received notice of this filing from the ECF system.  Lead counsel, listed below,
will also receive a courtesy copy via Federal Express.

Katherine B. Forrest
Teena-Ann V. Sankoorikal
Cravath, Swaine & Moore, LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019-7475
(212) 474-1000
(212) 474-3700 (fax)

Kenneth L. Doroshow
Karyn A. Temple
Recording Industry Association of America
1025 F Street, NW, 10th Floor
Washington, DC 20004
(202) 775-0101
(202) 775-7253 (fax)

/s/
Charles S. Baker

1348192

REDACTED VERSION – COMPLETE VERSION FILED UNDER SEAL