UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARISTA RECORDS LLC; ATLANTIC RECORDING
CORPORATION; BMG MUSIC; CAPITOL RECORDS, INC.;
ELEKTRA ENTERTAINMENT GROUP INC.; INTERSCOPE
RECORDS; LAFACE RECORDS LLC; MOTOWN RECORD
COMPANY, L.P.; PRIORITY RECORDS LLC; SONY BMG
MUSIC ENTERTAINMENT; UMG RECORDINGS, INC.;
VIRGIN RECORDS AMERICA, INC.; and
WARNER BROS. RECORDS INC.,

                                        **Plaintiffs,**

                    v.

LIME WIRE LLC; LIME GROUP LLC; MARK GORTON;
GREG BILDSON; and M.J.G. LIME WIRE FAMILY
LIMITED PARTNERSHIP,

                                        **Defendants.**

06 Civ. 5936 (GEL)
ECF CASE

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Katherine B. Forrest
Teena-Ann V. Sankoorikal
Joanne M. Gentile
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiffs Arista Records LLC; Atlantic
Recording Corporation; BMG Music; Capitol Records
LLC; Elektra Entertainment Group Inc.; Interscope
Records; LaFace Records LLC; Motown Record
Company, L.P.; Priority Records LLC; Sony BMG
Music Entertainment; UMG Recordings, Inc.; Virgin
Records America, Inc.; and Warner Bros. Records Inc.*

July 18, 2008

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 4

I.      THE LIMEWIRE SOFTWARE HAS BEEN AND IS WIDELY USED FOR THE
        DIRECT INFRINGEMENT OF PLAINTIFFS' COPYRIGHTS ...................................... 5

II.     PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT I
        BECAUSE THE UNDISPUTED EVIDENCE SHOWS THAT DEFENDANTS
        ACTED WITH THE OBJECT OF PROMOTING INFRINGEMENT ............................. 8

        A.      The Sheer Volume and Notoriety of the Infringement Committed By
                Users of the LimeWire Software, Which Defendants Distribute, Is Itself
                Indicative of Defendants' Intent to Facilitate Infringement. .................................. 9

        B.      Lime Wire Pursued and Aggressively Sought to Retain the Customer Base
                of Known Infringers ............................................................................................... 11

        C.      Lime Wire's Business Model is Predicated on Promoting Massive
                Infringement ........................................................................................................... 16

        D.      Lime Wire Has Taken No Meaningful Affirmative Steps to Prevent
                Infringement ........................................................................................................... 19

        E.      Lime Wire Designed Its Technology to Facilitate Infringement. .......................... 24

        F.      Lime Wire Has Assisted and Turned a Blind Eye to Infringement. ...................... 28

III.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT II
        BECAUSE THE UNDISPUTED EVIDENCE SHOWS THAT DEFENDANTS
        KNOWINGLY AND MATERIALLY CONTRIBUTED TO THE INFRINGING
        CONDUCT OF LIMEWIRE USERS .......................................................................... 30

        A.      Lime Wire Has Knowledge of Its Users' Infringing Activity. .............................. 30

        B.      Lime Wire Has Induced, Caused and Materially Contributed to Direct
                Infringement ........................................................................................................... 33

        C.      LimeWire Has No "Substantial" or "Commercially Significant"
                Noninfringing Uses. ............................................................................................... 33

IV.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR
COMMON LAW COPYRIGHT INFRINGEMENT AND UNFAIR
COMPETITION CLAIMS (COUNTS IV AND V) WITH RESPECT TO
PRE-1972 SOUND RECORDINGS..................................................................................39

CONCLUSION.............................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records, Inc. v. Abdallah,*
  948 F. Supp. 1449 (C.D. Cal. 1996) ...........................................................................36

*A&M Records, Inc. v. Napster, Inc.,*
  114 F. Supp. 2d 896 (N.D. Cal. 2000), *aff'd in part and rev'd in part,* 239 F.3d 1004
  (9th Cir. 2001)...........................................................................................................11, 19

*A&M Records, Inc. v. Napster, Inc.,*
  239 F.3d 1004 (9th Cir. 2001) ...............................................................................1, 7, 30, 33

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)...........................................................................................................4

*Arista Records, Inc. v. Flea World, Inc.,*
  No. 08-2670 2006 WL 842883 (D. N.J., Mar. 31, 2006) ..................................30, 33

*Atari, Inc. v. JS&A Group, Inc.,*
  597 F. Supp. 5 (N.D. Ill. 1983) ......................................................................................37

*Atlantic Recording Corp. v. Heslep,*
  No. 4:06-cv-132-4, 2007 WL 1435395 (N.D. Tex. May 16, 2007)................................ *passim*

*BMG Music, et al. v. Gonzalez,*
  430 F.3d 888 (7th Cir. 2005) ............................................................................................7

*Capitol Records, Inc. v. Naxos of America, Inc.,*
  4 N.Y.3d 540 (N.Y. Ct. App. 2005).............................................................................6, 39

*Dennison Mfg. Co. v. Ben Clements & Sons, Inc.,*
  467 F. Supp. 391 (S.D.N.Y. 1979) ................................................................................37

*Erico Intern. Corp. v. Doc's Marketing, Inc.,*
  2007 WL 108450 (N.D. Ohio 2007)................................................................................35

*Faulkner v. National Geographic Society,*
  211 F. Supp. 2d 450 (S.D.N.Y. 2002)............................................................................30

*Firma Melodiya v. ZYX Music GmbH,*
  882 F. Supp. 1306 (S.D.N.Y. 1995)................................................................................39

*Fromberg, Inc. v. Thornhill,*
  315 F.2d 407 (5th Cir. 1963) ...........................................................................................35

*Gershwin Pub. Corp. v. Columbia Artist Management, Inc.*,
    443 F.2d 1159 (2d Cir. 1971)..................................................................................30

*Hamil Am. Inc. v. GFI*,
    193 F.3d 92 (2d Cir. 1999)......................................................................................6

*Higazy v. Templeton*,
    505 F.3d 161 (2d Cir. 2007)....................................................................................4

*Hoffman-La Roche, Inc. v. Promega Corp.*,
    33 U.S.P.Q.2d 1641, 1648-49 (N.D. Cal. 1994 .....................................................38

*In re Aimster Copyright Litigation*,
    334 F.3d 643 (7th Cir. 2003) ........................................................................ *passim*

*Island Software and Computer Service, Inc. v. Microsoft Corp.*,
    413 F.3d 257, 260-261 (2d Cir. 2005) ....................................................................5

*Jeffreys v. City of New York*,
    426 F.3d 549, 553 (2d Cir. 2005)............................................................................4

*Lauratex Textile Corp. v. Allton Knitting Mills Inc.*,
    517 F. Supp. 900 (S.D.N.Y. 1981) .........................................................................4

*Matthew Bender & Co., Inc. v. West Pub. Co.*,
    158 F.3d 693 (2d Cir. 1998)............................................................................30, 33

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007).....................................................................................4

*McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*,
    2005 WL 2346919 (E.D. Cal. Sept. 23, 2005).......................................................36

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*
    ("*Grokster*"), 545 U.S. 913 (2005) ............................................................. *passim*

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    454 F. Supp. 2d 966 (C.D. Cal. 2006) ......................................................... *passim*

*Mini Maid Svcs. Co. v. Maid Brigade Sys., Inc.*,
    967 F.2d 1516 (11th Cir. 1992) .............................................................................10

*Pickholtz v. Rainbow Technologies, Inc.*,
    260 F. Supp. 2d 980, 989 (N.D. Cal. 2003) ..........................................................38

*PolyVision Corp. v. Smart Technologies Inc.*,
    501 F. Supp. 2d 1068, 1090-91 (W.D. Mich. 2007)..............................................38

*Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992) ........................................................5

*Roy Export Co. v. CBS, Inc.*,
672 F.2d 1095 (2d Cir. 1982)........................................................39

*RSO Records, Inc. v. Peri*,
596 F. Supp. 849 (S.D.N.Y. 1984) ........................................................4

*Sony Corp. of Amer. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)........................................................30, 33, 34, 36

*Sony Pictures Home Entertainment, Inc. v. Lott*,
471 F. Supp. 2d 716 (N.D. Tex. 2007) ........................................................2

*Universal Music Australia Pty Ltd. v. Sharman License Holdings Ltd.*,
(2005) 220 A.L.R. 1 (Austl.), 2005 WL 2119310 (Sept. 5, 2005)........................................................14

*Warner Bros. Records, Inc. v. Does 1-4*,
No. 2:07 cv 0424 TC, 2007 WL 1960602 (D. Utah July 5, 2007) ........................................................2

*Worlds of Wonder, Inc. v. Vector Intercontintental, Inc.*,
No. C86-2671, 1986 WL 15608 (N.D. Ohio Dec. 31, 1986)........................................................38

**Statutes & Rules**

17 U.S.C. § 102(a)(7)........................................................6

17 U.S.C. § 106........................................................6, 7

17 U.S.C. § 106(1)........................................................7

17 U.S.C. § 106(3)........................................................7

17 U.S.C. § 301(c)........................................................6, 39

17 U.S.C. § 401(c)........................................................6

17 U.S.C. § 504(c)(2)........................................................6

Fed. R. Civ. P. 56(c) ........................................................4

**Other Authorities**

2 M. & D. Nimmer, *Nimmer on Copyright* § 8C.02 at 8C-4 ........................................................39

Restatement (Second) of Torts § 8A (1965) ........................................................10

Plaintiffs ("plaintiffs" or "Record Companies") submit this memorandum in support of their motion for partial summary judgment on Counts I, II, IV and V of their First Amended Complaint against defendants Lime Wire LLC, Lime Group LLC, Mark Gorton and Greg Bildson (collectively "defendants" or "Lime Wire").

## PRELIMINARY STATEMENT

After two years of litigation, thirty-seven depositions and the production of over seven million pages of documents, the undisputed facts confirm what everybody (certainly every teenager and college student) already knows: Lime Wire LLC's eponymous peer-to-peer ("P2P") software, LimeWire, is good for one thing and used for one thing--massive infringement of sound recordings each and every day. The testimony of Lime Wire's current and former employees and the documents produced in this case demonstrate that defendants intended and assisted this unprecedented level of piracy.

This case is not the first of its kind. It occurs against the backdrop of a steady progression of prominent cases involving unlicensed and infringing P2P services--from Napster to Aimster to Grokster, Morpheus and Kazaa. These cases, and now LimeWire, have rendered the infringing use of unlicensed P2Ps a matter of common knowledge. *See, e.g.,* *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.* ("*Grokster*"), 545 U.S. 913, 920 (2005) ("[A]lthough the [peer-to-peer (P2P)] networks . . . can be used to share any type of digital file, [users] have prominently employed those networks in sharing copyrighted music and video files without authorization."); *In re Aimster Copyright Litigation*, 334 F.3d 643, 645 (7th Cir. 2003) ("Teenagers and young adults who have access to the Internet like to swap computer files containing popular music. If the music is copyrighted, such swapping, which involves making and transmitting a digital copy of the music, infringes copyright."); *A&M Records, Inc. v.*

*Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) ("*Napster*") ("The record supports the district court's determination that 'as much as eighty-seven percent of the files available on Napster may be copyrighted and more than seventy percent may be owned or administered by plaintiffs [copyright holders]'").[1]

This motion addresses whether defendants have either induced or knowingly contributed to such infringement by users of the LimeWire software. Clearly, they have done both. Indeed, on the record of this case, no reasonable jury could find otherwise. The enormous scope of the infringement--roughly 93% of the material made available by LimeWire's users, and nearly 99% of the actual download requests to LimeWire users--puts the Lime Wire defendants' unlawful objective in proper perspective.

These statistics result from purposeful action. No benign intentions could have created a business that has only one purpose--piracy. In fact, the Lime Wire defendants left their fingerprints all over advertisements, business plans, technology development and press releases, all intended to make LimeWire "the next Napster". Email after email and document after document establish beyond any doubt that the Lime Wire defendants employed a business model based upon free and unauthorized access to unlimited quantities of copyrighted sound recordings in order to build a vast userbase and business. And the illegality of what they were doing did not

---

[1] See also *Warner Bros. Records, Inc. v. Does 1-4*, No. 2:07 cv 0424 TC, 2007 WL 1960602 at *1 (D. Utah July 5, 2007) ("The [P2P] networks . . . . have also become a very popular medium for the transfer of copyrighted music and video files without proper authorization."); *Atlantic Recording Corp. v. Heslep*, No. 4:06-cv-132-4, 2007 WL 1435395, at *1 (N.D. Tex. May 16, 2007) ("It is now well-known that there are numerous programs that anyone can install onto one's computer that will provide access to online networks (referred to as "peer-to-peer" or "P2P" networks) that link millions of users' computers simultaneously to a common peer-to-peer network throughout the world and allow a person to access, acquire (download), and distribute (upload), illegally, billions of copyrighted sound recordings, movies, and software."); *Sony Pictures Home Entertainment, Inc. v. Lott*, 471 F. Supp. 2d 716, 719 (N.D. Tex. 2007) ("P2P services . . . allow their users to share files. This file sharing can and often does result in the infringement of copyright holders' rights.").

bother them a bit. Lime Wire openly coveted and competed for Napster's notoriously infringing users and, when some of those users went to Lime Wire's competitors, Lime Wire acted aggressively to bring those customers and their large libraries of infringing sound recordings to its own userbase. To secure the loyalty of its users, Lime Wire incorporated design elements into its software to make infringement of copyrighted sound recordings easy and as free from detection as possible, and refused to implement readily-available filtering measures that would have prevented or limited infringement.

Lime Wire succeeded in its goal of turning LimeWire into one of the world's largest infringing file-sharing applications. As defendant Mark Gorton boasted just days before the Supreme Court rendered its decision in *Grokster*, "[a]fter Napster got shut down, Kazaa became the most popular program. We [LimeWire] are now more popular than Kazaa." (SOF ¶ 228). And that popularity--based entirely on infringement--translated directly into dollars. *Grokster*, 545 U.S. at 926 ("While there is doubtless some demand for free Shakespeare, the evidence shows that substantive volume is a function of free access to copyrighted work. Users seeking Top 40 songs, for example, or the latest release by Modest Mouse, are certain to be far more numerous than those seeking a free Decameron, and [distributors of P2P systems] translated that demand into dollars.").

In the end, Lime Wire does not differ from the P2P companies in the *Grokster* case, each of which Lime Wire regarded as its direct competitor in the market for online infringement. Like those companies, Lime Wire specifically targeted a known community of infringing users, built its business on the draw of free and unauthorized access to copyrighted works and failed to make meaningful efforts to curb infringement. Like the distributors in *Grokster*, defendants' own statements and actions unequivocally show Lime Wire's unlawful

intent that its software be used for infringement and its knowledge that its software was in fact
being used in the way it intended.  For these reasons, plaintiffs are entitled to summary judgment
on their inducement, contributory infringement and state law claims.

## ARGUMENT

Summary judgment should be granted where "there is no genuine issue as to any
material fact and . . . the movant is entitled to judgment as a matter of law".  Fed. R. Civ. P.
56(c).  An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a
verdict for the nonmoving party,'" (*Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007)
(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), and a fact is material when
it "'might affect the outcome of the suit under the governing law.'"  *McCarthy v. Dun &
Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (quoting *Jeffreys v. City of New York*, 426
F.3d 549, 553 (2d Cir. 2005)).

On August 4, 2006, the record company plaintiffs filed suit against Lime Wire,
Lime Group, Mark Gorton, and Greg Bildson for, *inter alia*, inducement of copyright
infringement (Count I), contributory copyright infringement (Count II), and with respect to
pre-1972 recordings, common law copyright infringement and state law unfair competition
(Counts IV and V).  (SOF ¶¶ 32-35; *see also* ¶¶ 1-31; 36-42.)  For much of the time relevant to
this action, Gorton owned Lime Group, which in turn owned Lime Wire.  Lime Wire, which
Gorton (CEO, Chair and sole director) and Bildson (CTO and COO) ran, developed and
distributed the LimeWire P2P software (the "LimeWire client" or "LimeWire software").[2]  (*Id.*
¶¶ 16-21, 43-44.).

---

[2] Gorton and Bildson personally participated in acts that induced and contributed to
infringement using the LimeWire client (*see, e.g.*, SOF ¶¶ 15-21, 154-155, 159-162, 271, 304,
322, 380, 473, 486) and thus are personally liable.  *Cf. Lauratex Textile Corp. v. Allton Knitting*

As the Supreme Court observed in the context of the very similar *Grokster* litigation, "[w]hen a widely shared service . . . is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability . . . ." 545 U.S. at 929-30 (citing *In re Aimster Copyright Litigation*, 334 F.3d 643, 645-646 (7th Cir. 2003)). Given the vast number of infringements that occur every day using LimeWire and the lack of a genuine issue as to any material fact, the argument for imposing secondary liability on this summary judgment motion is as powerful as it was in *Grokster*. *See e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966 (C.D. Cal. 2006) ("*Grokster (Remand)*") (granting a summary judgment to copyright holders)*; see also Grokster* 545 U.S. at 929 ("The argument for imposing indirect liability . . . [i]s a powerful one, given the number of infringing downloads that occur everyday using . . . [the] software.")

## I.   THE LIMEWIRE SOFTWARE HAS BEEN AND IS WIDELY USED FOR THE DIRECT INFRINGEMENT OF PLAINTIFFS' COPYRIGHTS

There is no genuine dispute that LimeWire's users have engaged in direct infringement of copyrights that plaintiffs own or control. Direct copyright infringement consists of just two elements: (1) ownership of the copyright; and (2) infringement by unauthorized copying or distribution. *Island Software and Computer Service, Inc. v. Microsoft Corp.*, 413 F.3d 257, 260-261 (2d Cir. 2005); *Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992). Both elements are present here.

---

*Mills Inc.*, 517 F. Supp. 900, 904 (S.D.N.Y. 1981)); *see also RSO Records, Inc. v. Peri*, 596 F. Supp. 849 (S.D.N.Y. 1984) (individual defendants held liable for copyright infringement because they were personally involved in the infringing actions). Lime Group, which owned Lime Wire until right after the *Grokster* decision was announced (SOF ¶¶ 23-25, 28-29), also was directly responsible for acts that induced and contributed to infringement (*see e.g.* SOF ¶¶ 162-167, 198-203, 206-209), and thus is also liable.

*First*, plaintiffs own or control the copyrights in thousands of sound recordings, including a subset of thirty representative sound recordings that are the basis for determining liability in this case. (SOF ¶¶ 97-98, 100-102.)[3]  Copyright registration certificates and other documents demonstrate that plaintiffs own or control copyrights in twenty-five of the representative sound recordings. (*Id.* ¶ 101.)  Copyright registration certificates are *prima facie* evidence of ownership and validity of copyright under federal law. *See* 17 U.S.C. § 401(c); *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir. 1999).  The five remaining sound recordings were initially "fixed" prior to February 15, 1972.  With respect to those recordings, plaintiffs have entered into agreements by which they obtained the common-law copyrights in those recordings. (*Id.* ¶ 102.)[4]  Lime Wire, which is well aware of the exclusive rights granted to copyright holders under 17 U.S.C. § 106 and common law (*see, e.g.*, SOF ¶¶ 603-604), has no authorization or licenses for it or its users to copy or distribute plaintiffs' works. (*Id.* ¶ 103; *see also* ¶ 534.)

---

[3] Exhibits A and B (revised on January 31, 2008) to plaintiffs' First Amended Complaint in this matter identified thousands of plaintiffs' copyrighted sound recordings that are available for free, unauthorized download using LimeWire. (*See* Compl., Exs. A, B; SOF ¶ 98.)  Although that list was itself a mere sample of the many thousands of plaintiffs' works that are infringed via LimeWire every day, plaintiffs move for summary judgment here, pursuant to the Court's instructions on December 7, 2007, only as to issues of liability based on the thirty representative sound recordings listed in Attachment A to Plaintiffs' 56.1 Statement filed herewith. (SOF ¶¶ 99-102.)  The questions of damages based on a larger number of works--including enhanced damages for willful infringement of copyright pursuant to 17 U.S.C. § 504(c)(2) (of which there is evidence (*see e.g.*, SOF ¶¶ 603-623))--and injunctive relief, are reserved for future proceedings.

[4] All sound recordings are protected by either federal or state copyright law.  Sound recordings have been protected by federal copyright since 1972. *See* 17 U.S.C. § 102(a)(7).  Sound recordings "fixed" before February 15, 1972 are protected under state law. *See* 17 U.S.C. § 301(c); *Capitol Records, Inc. v. Naxos of America, Inc.*, 4 N.Y.3d 540, 558-61 (N.Y. Ct. App. 2005).  The twenty-five works for which plaintiffs have provided copyright registration certificates were "fixed" after February 15, 1972, whereas the other five works are so-called "pre-1972" works protected under state law.

*Second*, LimeWire users have engaged in direct infringement of plaintiffs' copyrights, and have done so on a massive scale. Among the exclusive rights conferred by 17 U.S.C. § 106 are the rights of reproduction, § 106(1), and distribution, § 106(3). The "download and upload of copyrighted music . . . constitute[s] direct infringement of plaintiffs' musical compositions, [and sound] recordings." *Napster*, 239 F.3d at 1013-14 (quoting the district court's ruling); *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 648-49 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003), *cert. denied*, 540 U.S. 1107 (2004) ("*Aimster*"); *see also Grokster*, 545 U.S. at 936, 940-941; *BMG Music, et al. v. Gonzalez*, 430 F.3d 888, 889 (7th Cir. 2005) ("[P]eople who post or download music files are primary infringers.") (*citing Aimster*).

Lime Wire has long acknowledged that its customers use the LimeWire software to engage in copyright infringement. Indeed, Lime Wire recognized as early as 2001, in its Offering Memorandum, that

REDACTED

(SOF ¶¶ 125; 126.) Each of the thirty representative sound recordings at issue here is available on the Gnutella network and has been distributed and reproduced by numerous LimeWire users without plaintiffs' authorization. (SOF ¶¶ 103, 119-122.)[6]

---

[5] The Gnutella network is the peer-to-peer network on which LimeWire operates. (SOF ¶¶ 49; *see also* ¶¶ 54-55.) It "enables users to share files and information with other members of the network". (*Id.* ¶ 49.) Each application that connects to the network, including LimeWire, has its own unique feature set, user interface and other characteristics. (*Id.* ¶¶ 51-53.) LimeWire is the most widely distributed and most prominent application on the Gnutella network. (*Id.* ¶ 86.)

[6] Using LimeWire, multiple Gnutella users were observed sharing identical copies (with the same hash) of each of the thirty recordings. (SOF ¶ 121.) Two files that are identical in all respects have the same "hash", a unique identifier for a file. Any difference within a file, no matter how trivial, will alter a file's hash, even if the underlying content (*e.g.*, song) is the same.

## II. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT I BECAUSE THE UNDISPUTED EVIDENCE SHOWS THAT DEFENDANTS ACTED WITH THE OBJECT OF PROMOTING INFRINGEMENT

As the Supreme Court held in *Grokster*, "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." 545 U.S. at 936-37. That defendants should be held liable under this standard is clear--indeed, the *Grokster* case presented a fact pattern virtually identical to this case, and involved P2P defendants who were Lime Wire's direct rivals in the same market for online infringement.[7]

The Supreme Court's *Grokster* decision provides the controlling blueprint for analysis of Lime Wire's liability under this "inducement" theory. The *Grokster* Court looked first at the fact that Morpheus and Grokster (P2P software distributed by the *Grokster* defendants), were used primarily to download copyrighted files, and that the scope of the resulting infringement was "staggering." 545 U.S. at 923. Then, the *Grokster* Court identified three "particularly notable" aspects of the record that confirmed Grokster's and StreamCast's unlawful object: *first*, the defendants sought to "satisfy a known source of demand for copyright infringement," *i.e.*, they actively pursued former Napster users, *id.* at 939; *second*, the defendants' business models depended upon widespread infringement for their revenue and profit, *id.* at 940; and *third*, the defendants failed to implement filtering mechanisms that would

---

(SOF ¶478-479; *see also* ¶¶ 122-123.) If multiple users are sharing a file with identical hashes, as is the case here, that file doubtless has been transferred over the network.

[7] Defendants in *Grokster* were Grokster, Ltd., StreamCast Networks, Inc. ("StreamCast") and Kazaa BV (subsequently, Sharman Networks), which distributed the Grokster, Morpheus and Kazaa P2P software, respectively. StreamCast and Grokster were respondents before the Supreme Court (*Grokster*, 545 U.S. 913), but, on remand, the sole defendant remaining was StreamCast (distributor of Morpheus). *Grokster (Remand)*, 454 F. Supp. 2d at 971.

diminish direct infringement on their networks. *Id.* at 939. The Court also considered other evidence--including internal communications, marketing plans, advertising and software design elements to facilitate infringement (such as a "Top 40" search option)--that provided additional direct and "unequivocal" indications of an objective to promote infringement. *Id.* at 923-27, 938.

   Viewed through this framework, the record against Lime Wire (which distributes the LimeWire software)[8] is at least as compelling as that in the *Grokster* case and is replete with "unequivocal indications" that Lime Wire "acted with a purpose to cause copyright violations." *Grokster,* 545 U.S. at 923, 938. As Lime Wire knows full well, its customers use the LimeWire software almost exclusively to infringe, and on a vast scale (*see infra* II.A); Lime Wire has aggressively targeted the known infringing userbases of Napster, Grokster, Morpheus and Kazaa (*see infra* II.B); Lime Wire's business model depends on massive infringing use of the LimeWire client (*see infra* II.C); Lime Wire has failed to undertake genuine efforts to filter copyrighted materials from users' downloads or otherwise reduce infringement (*see infra* II.D); Lime Wire ensured that its technology had infringing capabilities (*see infra* II.E); and Lime Wire assisted and did not discourage infringement by LimeWire's users. (*See infra* II.F).

  **A.**  **The Sheer Volume and Notoriety of the Infringement Committed By Users of the LimeWire Software, Which Defendants Distribute, Is Itself Indicative of Defendants' Intent to Facilitate Infringement.**

   The amount of infringement using the LimeWire software is enormous. Even more so than in *Grokster*, the record here "gives reason to think that the vast majority of users' downloads are acts of infringement." 545 U.S. at 923. Indeed, a statistical study of LimeWire

---

  [8] Lime Wire distributes the LimeWire software via its own website, *www.limewire.com,* as well as through links from other websites. (SOF ¶¶ 84-85; *see also* ¶¶ 86-96.) *See Grokster,* 545 U.S. at 940 n.13 (finding that the defendants' software was "the tool intended for infringing use") (citations omitted).

users shows that nearly 99% of all download requests to LimeWire users are for infringing files. (SOF ¶¶ 104; 109.)[9] Because hundreds of millions of copies of the LimeWire software have been downloaded and billions of files are shared each month (*see e.g.*, SOF ¶¶ 90-96)--significantly more than the 100 million estimated downloads in *Grokster*--"the probable scope of copyright infringement is staggering."[10] *See Grokster*, 545 U.S. at 923.

   The vast scale of the copyright infringement by users of LimeWire points directly and surely to defendants' unlawful purpose. *See Mini Maid Svcs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1522 (11th Cir. 1992) ("If the infringement is serious and widespread, it is more likely that the [party alleged to have induced infringement] knows about and condones the acts . . . ."); *see also* Restatement (Second) of Torts § 8A (1965) (stating the general rule that a party legally "intends" consequences that are substantially certain to result from his actions). The massive and known scope of LimeWire's infringing uses provides the "backdrop" to assess defendants' actions and strongly suggests that defendants intended the illegal use of its software. *See Grokster (Remand)*, 454 F. Supp. 2d at 985 (using the "staggering scale of infringement" demonstrated by plaintiffs' study as the "backdrop" against which to assess defendants' actions and finding that the scale of infringement, by itself, made it "more likely" that the illegal use was condoned by defendants). Defendants here have always known of the widespread infringing use of their software. In fact, Gorton once

___

[9] As in *Grokster*, the LimeWire defendants have not offered an alternative study and "say [ ] nothing about the percentage of files available on the network that are infringing," which was interpreted as a failure to dispute the findings of the plaintiffs' study. *Grokster (Remand)*, 454 F. Supp. 2d at 985; *see also Grokster*, 545 U.S. at 923.

[10] In November 2007, Lime Wire's CEO stated that LimeWire "gets about seven million new downloads per month and its users generate a total of five billion searches per month". (SOF ¶ 93.)

REDACTED

REDACTED

(SOF ¶ 135; 445-446.)  Defendants

understood who their customers were, and condoned and intended their mass infringement.

**B.     Lime Wire Pursued and Aggressively Sought to Retain the Customer Base of Known Infringers.**

Napster, the first widely-used P2P file-sharing system, was, like LimeWire today, notoriously dedicated to the infringement of copyrighted sound recordings.  When a federal court ordered Napster to filter for copyrighted works or cease operations, *see A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896 (N.D. Cal. 2000), *aff'd in part and rev'd in part*, 239 F.3d 1004 (9th Cir. 2001) (*see also* SOF ¶¶ 140-141, 143-148), Lime Wire and its competitors seized on an ideal business opportunity, as millions of Napster users would soon be seeking new tools for their infringement.  (SOF ¶¶ 149-167.)

The *Grokster* defendants' efforts to supply "services to former Napster users," the Supreme Court found, "indicate[d] a principal, if not exclusive, intent . . . to bring about infringement."  *Grokster*, 545 U.S. at 939; *see also Grokster (Remand)*, 454 F. Supp. at 985-86 (reviewing StreamCast's promotional efforts, internal communications, advertising, etc. aimed at Napster users).  The evidence demonstrates the same intent here.

Defendants released LimeWire in August 2000, just one month after the initial *Napster* injunction was announced.  (SOF ¶¶ 44, 144.)  As defendants noted in their own internal documents,[11]

REDACTED

(*Id.* ¶ 159; *see also* ¶¶ 150-153, 156-167.)  In fact, defendants stated publicly that

---

[11] The Supreme Court made clear that internal documents, like advertisements, "illuminate StreamCast's purposes" whether or not they were released to the public or communicated to its users.  *Grokster*, 545 U.S. at 925 n.7.  Such documents confirm *intent*.

-11-

LimeWire "expect[ed]" its network to capture 30% of Napster users, "[w]ith possibly up to 100 percent". (*Id.* ¶ 157.)

(SOF ¶¶ 369-389.)

REDACTED

(*Id.* ¶ 150.)

      To reach Napster's massive user base, Lime Wire's marketing plans included reaching out to "Napster-banned colleges," logging on to Napster chatrooms to promote LimeWire, and displaying user testimonials on the LimeWire website, such as one that enthused that LimeWire had "all but replaced Napster." (SOF ¶¶ 154-156, 161.) Gorton certainly understood Napster's immense popularity on college campuses, where copyright infringement was rampant. In an April 2000 fundraising letter, Gorton wrote,

(*Id.* ¶ 149.) In January 2001, Gorton wrote in an internal email:

REDACTED

(*Id.* ¶ 155.) In response to Gorton's email, Lime Wire's Business Developer replied:

*Id.*

In furtherance of their efforts to attract former Napster users, defendants launched a Google AdWords campaign, whereby Google users who entered queries for phrases such as would see an advertisement leading them to LimeWire. (SOF ¶¶ 162-167.)  In emails to websites to secure links to LimeWire, written while the *Napster* case was pending, Lime Wire described the LimeWire client as "similar to the popular Napster service" because "it enables the sharing, searching and downloading of MP3 music files."[12]  (*Id.* ¶ 156.)

Lime Wire also monitored the press accounts related to Napster and LimeWire, passed around emails and articles that compared LimeWire with Napster (SOF ¶¶ 168-176) and made it its "goal" for Lime Wire to be mentioned in Napster articles. (*Id.* ¶ 160.)  Lime Wire even intended to append a *Fortune* magazine article on Napster to its Offering Memorandum. (*Id.* ¶ 177.)

The record in this case, including defendants' own words, emails and other documents, contains ample evidence that these defendants, like those in the *Grokster* litigation, "developed promotional materials to market [their] service as the best Napster alternative." 545 U.S. at 925; *see also Grokster (Remand)*, 454 F. Supp. 2d at 975-76.  Like StreamCast in *Grokster*, Lime Wire's "[i]nternal company documents indicate that [defendants] hoped to attract large numbers of former Napster users" and in fact "planned to be the next Napster." *Grokster*, 545 U.S. at 923.

---

[12] An MP3 is an audio file that commonly contains music. (SOF ¶ 127; *see also Napster*, 239 F.3d at 1011.)

But Napster users were not Lime Wire's only target community of known, large-scale infringers. Lime Wire also targeted the users of Grokster, Morpheus and Kazaa--LimeWire's primary competitors in the market for online infringement. (SOF ¶¶ 198-216.) Lime Wire was well aware that these three P2Ps were fertile ground for music infringers. *(See, e.g., id.* ¶¶ 183, 187, 197.) Indeed, in a March 27, 2002 letter to investors, Gorton wrote:

*(Id.* ¶ 219.)

Starting in 2002, defendants bid on Google AdWords for scores of keywords related to Grokster (SOF ¶¶ 198-199), Morpheus *(id.* ¶ 200; *see also* ¶¶ 202-204) and Kazaa.[13] *(Id.* ¶ 207.) Indeed, some advertisements for LimeWire and some of its website banners read:

- 
- "Outperforms Morpheus!"
- "Faster than Kazaa and No Bundled Software"
- 
- 

REDACTED

---

[13] In 2005, an Australian federal court found Kazaa's distributor (Sharman Networks) to be liable for the copyright infringement it facilitated through the Kazaa P2P application. *See Universal Music Australia Pty Ltd. v. Sharman License Holdings Ltd.*, (2005) 220 A.L.R. 1 (Austl.), 2005 WL 2119310 (Sept. 5, 2005). The Australian court found that Sharman knew the Kazaa system was used overwhelmingly for sharing copyrighted files, that Sharman's business success depended on maximizing its users' infringement, that Sharman could have but declined to filter copyrighted material from the Kazaa system and that Sharman exhorted Kazaa users to increase their infringing file-sharing and to defy copyright owners. *Id.* Following this decision, Sharman settled the claims against it in the *Grokster* litigation in the United States, became subject to a court-ordered injunction and implemented a copyright filter in the Kazaa software. (SOF ¶¶ 185-189, 194.)

-                                                                              (SOF ¶¶ 199, 201,

      205, 206, 208, 210.)

Defendants touted LimeWire as

                                     (SOF ¶ 213.) Lime Wire press releases,

emails and quoted statements in the press compared LimeWire to Morpheus and Kazaa. (*See*

*e.g., id.* ¶¶ 205, 214-215.) And, as it had with Napster, Lime Wire aimed to put itself on an equal

technological footing with Kazaa (*id.* ¶¶ 390-398) and Morpheus. (*Id.* ¶¶ 399-401.) (*See also id.*

¶¶ 210-212, 216.)

       Lime Wire not only targeted Napster users and then Kazaa, Morpheus and

Grokster users (all universally recognized infringers), but it also positioned itself as a participant

in the market for distribution of infringing music more generally to lure *all* music consumers into

infringing conduct. (SOF ¶¶ 230-251.) Lime Wire used Google AdWords and a Yahoo!

advertising campaign, bidding on myriad music-related words and phrases

                             (*id.* ¶¶ 234-236), which, when entered, would lead users to

LimeWire. When registering on *download.com,* Lime Wire chose only the keyword "mp3". (*Id.*

¶ 231.) And, *download.com* categorized LimeWire under "MP3 and audio". (*Id.* ¶ 230-232.)

Lime Wire sponsored a survey of almost 11,000 LimeWire users that dealt solely with music

downloads (¶¶ 239-240), and posted user testimonials on its website--like LimeWire is

"excellent for downloading music files," "music to my ears," and "[h]ands-down best current

mp3 search tool"--to bring in music fans. (*Id.* ¶¶ 246, 533; *see also* ¶¶ 216, 245.) Lime Wire's

purpose in using these testimonials was

     (*Id.* ¶ 306.) Lime Wire also built a feature into the LimeWire software called a "Media

Player," which plays *only* audio files (*id.* ¶¶ 330-331), integrated LimeWire with Apple's iTunes

REDACTED

REDACTED

REDACTED

software (*id.* ¶¶ 337-341) and drafted promotional materials stating that searches on LimeWire

(*Id.* ¶ 243.)  In fact, a former LimeWire Business Developer testified that

. (*Id.* ¶ 238.)

REDACTED

Lime Wire obviously engaged in these actions to "attract users [already] of a

mind to infringe," *Grokster*, 545 U.S. at 925-26, as well as other users who could be induced to

infringe.  As a Lime Wire employee wrote in 2006,

(SOF ¶ 248.)

**C.**     **Lime Wire's Business Model is Predicated on Promoting Massive Infringement.**

Lime Wire's business model explains its obvious and unmistakable intention to

become the next Napster, more popular than Kazaa, and a leader in infringing music downloads:

free access to copyrighted music is where the demand is, and Lime Wire, like the defendants in

*Grokster*, "translated that demand into dollars." *Grokster*, 545 U.S. at 926.  Lime Wire's

dependence on massive copyright infringement for revenue was well-understood.  In October

2006, Lime Wire's former Senior Software Engineer wrote, "I have [a problem] with the p2p

companies [including Lime Wire]: . . .  Their business[es] were entirely built off of

infringement."  (SOF ¶ 402.)  Comparing LimeWire with a P2P telephone service known as

"Skype," he wrote, "I agree, the underlying technology for LimeWire and Skype are similar.

The point is that one [Lime Wire] makes all its money off of infringing content while the other

[Skype] does not."  (*Id.* ¶ 403.)

In *Grokster*, the Supreme Court pointed to StreamCast's revenue from infringing use of Morpheus as evidence of its unlawful intent. *Grokster*, 545 U.S. at 926, 939. StreamCast gave the Morpheus software (which, like LimeWire, ran on the Gnutella network) to its users for free. It obtained its revenue from sales of advertisements that would be streamed to users, from paid distribution of bundled software, *id.,* 545 U.S. at 926, 939, and, from 2004 on, from sales of Morpheus Ultra, a premium version of Morpheus (like LimeWire Pro). *Grokster (Remand)*, 454 F. Supp. at 983. Thus, StreamCast's business model turned on "high-volume use, which the record shows is infringing." *Grokster*, 545 U.S. at 940. As the Supreme Court observed, "the more the software is used, the more ads are sent out and the greater the advertising revenues becomes." *Id.*

Here, too, Lime Wire distributes the "Basic" version of the LimeWire software for free (SOF ¶ 56) in order to build a huge user base that it has monetized over the years in various ways: through sales of advertising, paid distribution of bundled software, sales of LimeWire "Pro" (the paid version that Lime Wire advertises as providing "[o]ptimized search results" and faster downloads than LimeWire Basic (*id.* ¶¶ 56-69)) and, most recently, directing LimeWire users to Lime Wire's own music store. (*Id.* ¶¶ 413, 456-461.) Lime Wire's business model with respect to advertising and bundling was exactly the same as that in *Grokster*--the more that the free LimeWire software was downloaded and used, the larger the market for advertisements and bundled software became and, accordingly, the more money LimeWire would make. Similarly, growing LimeWire's userbase through the free distribution of the "Basic" version of the software created a larger and more attractive market for the sales of the "Pro" version, thereby further increasing Lime Wire's revenues. (*See id.* ¶¶ 410-413, 417-418; *see also* 408, 413-416, 420, 431-432 (Lime Wire's income from 2000 - 2006).) Lime Wire

-17-

REDACTED

Basic, distributed for free, increases LimeWire's

(*Id.* ¶ 419.)

To achieve the necessary high level of users, Lime Wire sought to increase the usage of the LimeWire client and the amount of material available for sharing on the Gnutella network. Lime Wire's goal was to create what it referred to as the "virtuous cycle": Users of the LimeWire client would bring content to the network by sharing more, which would in turn draw in additional users interested in that content, who would in turn share more content and increase the efficiency of the network, and the cycle would repeat itself. (SOF ¶ 426.) To further its goal of increasing sharing on the network, which in turn would draw in more users, Lime Wire came up with ways to "enforce" sharing and reduce "freeloading" on the network. (*Id.* ¶ 302, 376-385.) Lime Wire called its efforts to encourage "strongly" users to share files "'Good Citizen' Features". (*Id.* ¶ 427.)

And Lime Wire promoted its software and the Gnutella network, even though it knew that their dominant uses were for infringement. (SOF ¶¶ 421-434.) For example, Lime Wire's Offering Memorandum stated

(*Id.* ¶ 421.) Drafts of the same memorandum stated that

REDACTED

(*Id.* ¶¶ 126, 442.) In 2002, Gorton openly acknowledged that

REDACTED

(*Id.* ¶ 130.) And Gorton understood that

(*Id.* ¶ 424.).

Not surprisingly, Lime Wire's business model has been wildly successful, as it is predicated on giving users for free what they otherwise must pay for. Lime Wire has reaped millions of dollars from the enormous base of infringing users that it has steadily and purposefully built over the years. (*See, e.g.*, SOF ¶ 434.) As with Napster, "[t]he ability to download myriad popular music files without payment seems to constitute the glittering object that attracts" LimeWire's users. *Napster*, 114 F. Supp. 2d at 922. And like that of the *Grokster* defendants, Lime Wire's business model "turns on high-volume use, which the record shows is infringing." *Grokster,* 545 U.S. at 940.[14]

### D.   Lime Wire Has Taken No Meaningful Affirmative Steps to Prevent Infringement.

Even though Lime Wire knew of the "staggering" amount of copyright infringement committed by LimeWire users, Lime Wire never implemented effective filtering technology or tried otherwise to restrict the exchange of infringing content. (SOF ¶¶ 473-516.) In *Grokster*, the Supreme Court found Grokster's and StreamCast's failure to attempt "to develop filtering tools or other mechanisms to diminish the infringing activity using their software" to be an indication of their intent to facilitate infringement. 545 U.S. at 939; *see also Grokster (Remand)*, 454 F. Supp. 2d at 989 ("StreamCast . . . must at least make a good faith attempt to mitigate the massive infringement facilitated by its technology."); *Aimster*, 334 F.3d at

---

[14] Lime Wire also planned

(*See* SOF ¶¶ 133-35; 435-455.)

for sound recordings *only*. (*Id.* ¶ 449-453.)

REDACTED

-19-

653 ("if the infringing uses are substantial then to avoid liability . . . the provider of the service must show that it would have been disproportionately costly for him to eliminate or at least reduce substantially the infringing uses."). Such a finding is equally appropriate here.

Lime Wire made no attempt to develop filtering for copyrighted works prior to the *Grokster* decision in 2005. Before *Grokster*, Lime Wire had

(SOF ¶ 473.) Bildson stated that

(*Id.*; *see also* ¶¶ 474-475.) It was not until almost a full year after the *Grokster* decision that Lime Wire first implemented an optional hash-based "content filter" in its May 10, 2006 release of Version 4.11.0. (*Id.* ¶¶ 476-492.)[15] But even this supposed (and belated) "filter" is no filter at all.

As a threshold matter, LimeWire's hash-based "content filter"--even if it were otherwise effective, which it is not--is set by default to "off".[16] (SOF ¶ 484; *cf.* ¶ 354 (Lime Wire recognizes that when set to "off" by default,                                    There is no technological reason why Lime Wire could not have set the hash content filter to "on" by default. (*Id.* ¶ 485.) Lime Wire's own expert testified that

REDACTED

REDACTED

---

[15] A digital file's "hash" is a numeric representation of the file produced by running an algorithm against the bits ("0s and 1s") of a given file. The hash can be used as a shorthand to identify the file. If two files have the same hash, then they are bit-for-bit identical to each other. (SOF ¶ 478.) Any difference within a file, no matter how trivial (a change of even a single bit, for instance), will alter the file's hash. (*Id.*) Thus, because a hash is a property of a particular digital file, not of the underlying work (*id.* ¶¶ 478-79), two audio files can sound the same but have different hashes. For example, if two music files are created from the same CD using different "ripping" software or using different settings, they will have different hashes, even though the underlying musical work is identical in both files. (*id.* ¶ 479.) LimeWire's hash-based "content filter" purports to prevent transfers of files whose hashes are in a database of hashes to be blocked. (*Id.* ¶ 477)

[16] LimeWire's Senior Software Developer testified that

(*Id.* ¶ 486.)

REDACTED

(*Id.* ¶¶ 488-491.)  Indeed, other filters within LimeWire are set to "on" by default  (*Id.* ¶ 523).

In any event, Lime Wire's hash content filter--even if ever turned on--is ineffective as a filter for copyrighted files, and intentionally so.  Lime Wire Chief Financial Officer described LimeWire's hash content filter as                              (SOF ¶ 493.)  He was so concerned about Lime Wire's liability in light of the *Grokster* Court's discussion of filtering that he

[17]  (*Id.* ¶ 494.)  Although Lime Wire thereafter had discussions with several companies offering filtering services for copyrighted works based upon acoustic fingerprinting,[18] and considered other filtering strategies, Lime Wire rejected them all. (SOF ¶ 495.)

For example, Lime Wire actually developed plans for that would have included

as other P2P file-sharing applications have implemented to filter out copyrighted works effectively.  (SOF ¶ 499.)  Although there was no technical impediment to Lime Wire's implementing such                              (by Bildson's own

---

[17] The CFO testified that he (SOF ¶ 494.)

[18] Acoustic fingerprinting is a type of content recognition technology that analyzes the actual audio content of an file, creating a fingerprint for an audio or video file based on its acoustic properties.  Two audio files that sound the same will have the same acoustic fingerprint, even if other characteristics of the files are different.  (SOF ¶ 497.)

REDACTED

admission) would be

(*id.* ¶ 500),[19] Lime Wire never implemented                    (*Id.* ¶ 501.)

As part of its post-*Grokster* plans            infringing LimeWire users

(*see* SOF ¶¶ 133-135, 435-455), Lime Wire also considered implementing


(*Id.* ¶ 502.)  Lime

Wire expected that,

(*Id.*)  Lime Wire believed that


(*Id.* ¶ 503.)

One of Lime Wire's            (*see* SOF ¶¶ 505-506, 508) contemplated a


(*Id.*)

Again, although there were no technical impediments to implementing

REDACTED

REDACTED

---

[19] Because Lime Wire's filter relies exclusively on hashes (*see supra* n.15), that filter (assuming it is even on) will not catch unauthorized copies of copyrighted works even if some hashes associated with those works have been added to LimeWire's hash database.  (*Id.* ¶ 480; *see also* ¶¶ 482-483.)  In contrast,                              involving both
will recognize the underlying sound recording, regardless of any differences in the digital file, because the audio fingerprint is not dependent on any characteristics of the file other than its audio properties. (*Id.* ¶¶ 497-498.)

Lime

Wire failed to implement any of these mechanisms.  (SOF ¶¶ 504, 508-509.)

Lime Wire even considered an easy and cheap option to reduce infringement.  In 2006, Lime Wire developed the '

(SOF ¶¶ 510-511.)  The concept of this plan was

(*Id.*)  Specifically, Gorton believed

REDACTED

(*Id.* ¶ 513.)

(*Id.*)

(*Id.*)

(*Id.* ¶ 515.)  Despite the technological ease and low cost of this

Lime Wire has not implemented it.  (*Id.* ¶ 516.)

In contrast to its treatment of plaintiffs' copyrighted works, Lime Wire filters or makes a genuine attempt to filter for other types of files.  For example, by default, LimeWire filters certain file types by their extensions, like .vbs (software).  LimeWire, however, includes no extension-based filter for audio files (*e.g.*, mp3).  (SOF ¶¶ 522-525)  Similarly, Lime Wire provides a keyword-based filter for adult content (*e.g.*, "playboy"), but provides no keyword-

-23-

based filter for sound recordings. (*Id.* ¶¶ 517-521)  Significantly, for those sound recordings that it sells through its own LimeWire store, Lime Wire has

<div style="text-align: right">(<em>Id.</em> ¶¶ 526-529.)</div>

REDACTED

There can be no genuine dispute that Lime Wire's failure to implement effective filtering in its software or to take other effective steps to reduce infringement reflects a conscious choice to foster infringement.  The measures that Lime Wire has taken (*see* SOF ¶¶ 463-473), are designed to pay lip-service to the law while allowing the widespread copyright infringement of plaintiffs' copyrighted works that is the life-blood of Lime Wire's ongoing and highly profitable business to continue.

**E.    Lime Wire Designed Its Technology to Facilitate Infringement.**

Like the defendants in *Grokster*, Lime Wire "took steps to ensure that the technology it deployed would be capable of infringing use".  *Grokster (Remand)*, 454 F. Supp. 2d at 987.  Lime Wire software developers, including Bildson, had copyrighted music on their minds while testing and designing the LimeWire software.  (SOF ¶¶ 321-322.)  Just as *Grokster* defendant StreamCast "created screenshots of a search for music by Sting," *Grokster (Remand)*, 454 F. Supp. 2d at 987, Lime Wire software developers

<div style="text-align: center">(<em>Id.</em> ¶ 321.)  Just as StreamCast's chairman "evaluated FastTrack by</div>

searching for Garth Brooks songs on the FastTrack network" and concerned himself with insufficient "availability of Garth Brooks songs," *Grokster (Remand)*, 454 F. Supp. 2d at 987, Bildson expressed concern

REDACTED

---

[20] Sinead O'Connor's recording of the song "Nothing Compares 2 U" was a major hit record, spending four weeks at number 1 on the Billboard charts in 1990.  The copyright in the sound recording is owned by plaintiff Capitol Records LLC, and has never been authorized for

<div style="text-align: center">-24-</div>

REDACTED

(*Id.* ¶ 322.)  Lime Wire, like StreamCast in *Grokster*, "would not have evaluated [the P2P software] by its infringing capabilities if it did not intend widespread infringing use."  *Grokster (Remand)*, 454 F. Supp. 2d at 987.

The very design of the LimeWire software reflects this intent.  Knowing that free music was the draw bringing in users (*see, e.g.*, SOF ¶¶ 128, 130), Lime Wire built into the LimeWire client several features specifically for the exchange and enjoyment of popular music. (*Id.* ¶¶ 324-345.)  For example, Lime Wire added a "LimeWire Media Player with a playlist so that you can listen to mp3 files," but included no such feature for images, text, or any type of file other than audio.  (*Id.* ¶ 330-331; *see also* ¶¶ 332-336.)  Lime Wire also integrated its software with Apple's iTunes music software, enabling iTunes users to play music they downloaded using LimeWire automatically and enabling LimeWire to stream such music to other individuals using iTunes on the same local area network.  (*Id.* ¶¶ 337-340.)[21]  In addition, Lime Wire gives its users the ability to search for music by artist and album title, or by genre, such as "Top 40" or "Classic Rock" songs, which are "inevitably copyrighted".  (*Id.* ¶¶ 67-68; *see Grokster*, 545 U.S. at 926 ("Morpheus in fact allowed users to search specifically for 'Top 40' songs, . . . which were inevitably copyrighted.") (citation omitted).)  And LimeWire's default search mechanism is based on the assumption that users are seeking musical content: By default, upon a search for

---

distribution on the Gnutella network, through LimeWire or LimeWire's users.  (SOF ¶ 322 (McMullan Decl. ¶¶ 7-8.).)

[21] Indeed, when iTunes was introduced and made popular the "M4A" audio file format (which iTunes creates when it rips CDs), LimeWire added "M4A" to its list of file extensions shared by default.  (SOF ¶ 525.)

"All Types" of files, LimeWire displays narrowing options only for "Media," "Artist" and "Album," regardless of what type of file the user is actually seeking.  (SOF ¶¶ 324-329.)

Lime Wire also added technological features to the LimeWire client to ensure that the network was populated with popular sound recordings.  For instance, Lime Wire implemented features designed to ensure that files downloaded using LimeWire would automatically be shared again.  (SOF ¶¶ 382-384.)  In an August 2000 email to LimeWire's developers, attorney Gregory Silberman wrote:

*(Id.* ¶ 302) (emphasis added).  In response, Bildson suggested that

*(Id.* ¶ 380.)  The software engineer who designed the initial LimeWire client agreed that, if this so-called

*(Id.* ¶¶ 376-378.)  Lime Wire implemented this default sharing feature in the actual LimeWire client not only for complete downloads but even for partially-downloaded files as well, thereby hastening each downloading user's further infringing distribution of unauthorized files.  *(Id.* ¶¶ 379-382; 384-385.)  Lime Wire's own expert testified that

*(Id.* ¶ 383.)

Further demonstrating its intent to bring about infringement, Lime Wire "took active steps to prote[c]t illegal file trading from the enforcement efforts of copyright holders." *Grokster (Remand)*, 454 F. Supp. 2d at 988; *see also Grokster*, 545 U.S. at 927 (StreamCast "blocked the Internet Protocol addresses of entities it believed were trying to engage in [anti-piracy] monitoring on its networks").  Lime Wire introduced technological features that

REDACTED

-26-

enable its users to share while avoiding detection, impeding the efforts of copyright owners and anti-piracy vendors to identify infringing users. (SOF ¶¶ 346-354.) Lime Wire's intent with regard to these features is unmistakable: A document from Bildson's files disparages the idea that

REDACTED

(*Id.* ¶ 313.) The *New York Post* wrote that Bildson said that LimeWire users would be able to "mask their identities and avoid lawsuits," quoting Bildson as stating that "[t]he RIAA is not going to be able to contain this problem." (*Id.* ¶ 314.) Similarly, in a set of "Talking Points for Greg Bildson," Bildson was to respond to the potential question "Aren't the file sharing companies doing what Napster did?" by saying:

REDACTED

(*Id.* ¶ 312.)[22]

Lime Wire's implementation of these and other "feature[s] that made it easier for users to share copyrighted content" and to protect infringing activity from detection gives rise to an "inference of intent," which is "particularly forceful when considered alongside the fact that [Lime Wire] tested the system by searching for infringing content." *Grokster (Remand)*, 454 F. Supp. 2d at 987-88. As Lime Wire's former Senior Software Engineer wrote: "Sure, it's the users sharing the infringing material, but the programs are designed to maximize that infringement." (SOF ¶ 320.)

---

[22] Defendants have elsewhere expressed and communicated hostility toward copyright holders, plaintiffs and copyright law in general. (*See e.g.*, SOF ¶¶ 307-311, 315-319.)

-27-

**F.**   **Lime Wire Has Assisted and Turned a Blind Eye to Infringement.**

Beyond the purposeful design of the LimeWire software, Lime Wire employees assisted and encouraged users sharing infringing material and, in other instances, turned a blind eye to that infringement. *Cf. Grokster (Remand)*, 454 F. Supp. 2d at 986-97 (finding that "StreamCast demonstrated an intent to encourage use of its technology for infringement" through technical assistance to and encouragement of infringing users). For example, Bildson wrote, in response to a user looking for "Dixie Chicks" videos, "I'm sharing some good stuff on Gnutella . . . I'm partial to LimeWire." (SOF ¶ 304.) Bildson responded to another user who stated that LimeWire was "[s]o much like Napster that I don't even miss it anymore" by helping that user resolve technical problems without discouraging him from engaging in copyright infringement. (*Id* ¶ 301.) Lime Wire's Senior Software Engineer likewise encouraged and assisted a user seeking to "share about 30gig of music" and another trying to make his "entire mp3 collection available--that's some 4000 mp3's." (*Id.* ¶¶ 305.)

Lime Wire also directed users to the "LimeWire Forums" website it operated, where "moderators" or "supermoderators" appointed by Lime Wire (in consultation with Bildson and the "whole team" of software developers) rendered assistance to users obviously engaging in copyright infringement. (SOF ¶¶ 253-279.) For example, a Lime Wire-appointed supermoderator responded publicly to a user's post that he or she was unable to download a particular song as follows: "Users of LimeWire agree not to use LimeWire for copyright infringement . . . . Well there seem to be one or two who don't stick to this stipulation and the record companies have picked up on this fact and plant piles of fake files on the network which is a pain . . . as if they couldn't find something better to do with their lives . . . but those are most likely what you are seeing . . . in your search window . . . enable the columns for kind, size and title . . . don't download songs under about 3 MB best to only go for songs showing in the title

column, and avoid .wma files you can filter .wma out in the words filter." (*Id.* ¶ 273.) Another Lime Wire-appointed supermoderator, Aaron Walkhouse--who maintains a prominent blacklist of "hostile" IP addresses that enables LimeWire users to avoid connecting to computers of known anti-piracy vendors (*id.* ¶¶ 275, 355-359)--responded to a user who was having trouble finding a particular "old school rap" song by advising the user to identify the song by first searching Google for the song lyrics, and stating, "I replied by [private message] because LimeWire LLC is in court against the RIAA right now. The forums have to be careful." (*Id.* ¶ 275.)

Lime Wire monitored these forums closely and, while it had the ability to relieve a supermoderator from duty--and did so on at least one occasion--it never terminated a supermoderator for repeatedly assisting users with copyright infringement. (SOF ¶¶ 269, 274, 276, 279.) Lime Wire also directed its users to the LimeWire client section of the Gnutella Forums website, on which several Lime Wire employees (including Bildson) have acted as moderators and where LimeWire users also received assistance with copyright infringement. (*Id.* ¶¶ 280-295.)

Moreover, Lime Wire remained silent when users asked specifically about the legality of downloading media files, and failed to discourage users who it knew were engaging in copyright infringement. (SOF ¶¶ 296-306.) Indeed, on its website, Lime Wire's FAQ contains the question, "Is it legal to use LimeWire software?", to which Lime Wire responds unequivocally, "[y]es, it is legal to use LimeWire software. It is an Internet enabling technology," without any warning here that the use of LimeWire to infringe copyrights--its dominant use and the actual question its users were asking--is against the law. (*Id.* ¶ 299; *see also* ¶¶ 297-298.)

-29-

III.   **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT II BECAUSE THE UNDISPUTED EVIDENCE SHOWS THAT DEFENDANTS KNOWINGLY AND MATERIALLY CONTRIBUTED TO THE INFRINGING CONDUCT OF LIMEWIRE USERS**

A party is liable for contributory copyright infringement if, "with knowledge of the infringing activity," it "induces, causes, or materially contributes to the infringing conduct of another." *Matthew Bender & Co., Inc. v. West Pub. Co.*, 158 F.3d 693, 706 (2d Cir. 1998) (quoting *Gershwin Pub. Corp. v. Columbia Artist Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). Contributory liability may be predicated on (1) "conduct that encourages or assists the infringement," or (2) the "provision of machinery or goods that facilitate the infringement." *Matthew Bender*, 158 F.3d at 706. The provision of goods that facilitate infringement, with knowledge of such infringement, is sufficient for contributory liability if the goods are not capable of "substantial" or "commercially significant" noninfringing uses. *Sony Corp. of Amer. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984); *Matthew Bender*, 158 F.3d at 706.

**A.   <u>Lime Wire Has Knowledge of Its Users' Infringing Activity.</u>**

To support a finding of contributory copyright infringement, "knowledge of the infringing activity may be actual or constructive." *Faulkner v. National Geographic Society*, 211 F. Supp. 2d 450, 474 (S.D.N.Y. 2002); *accord Aimster*, 334 F.3d 643, 650 (7th Cir. 2003) ("Willful blindness is knowledge, in copyright law . . . as it is in the law generally."); *Napster*, 239 F.3d at 1020 ("Contributory liability requires that the secondary infringer 'know or have reason to know' of direct infringement."). Accordingly, plaintiffs are not "required to prove that defendants had knowledge of 'specific infringement(s)'" to support a finding of contributory infringement. *Arista Records, Inc. v. Flea World, Inc.*, No. 08-2670, 2006 WL 842883 at *14 (D. N.J., Mar. 31, 2006) (stating that finding otherwise would be contrary to *Napster*).

As demonstrated above (*see supra* pp. 7, 10-11, 16, 18-19), ample evidence establishes defendants' *actual* knowledge of LimeWire's widespread use for infringement. Indeed, Lime Wire itself divided its entire userbase into four categories,

<div align="right">(SOF ¶¶ 135, 445-446; *see also id.* ¶¶ 124-139.)</div>

Evidence of constructive knowledge of infringement also is easily found. For example, Lime Wire received emails from users indicating their use of LimeWire to download copyrighted music (SOF ¶¶ 531-532); Lime Wire received a cease-and-desist letter from the RIAA notifying it that it had been and was at the time inducing, enabling, encouraging and facilitating infringement of plaintiffs' copyrighted sound recordings; (*id.* ¶ 535); and major news outlets wrote articles, including some in which Lime Wire provided information or Gorton or Bildson were quoted, likening Lime Wire's software to other infringing software such as Napster. (*See, e.g., id.* ¶¶ 168-70, 173-76, 536.) Lime Wire even collected "user testimonials," some of which it included on its website or used in other promotions, praising LimeWire's effectiveness for infringement, like one that praised LimeWire as "excellent for downloading music files". (*Id.* ¶ 533.) (*See also id.* ¶¶ 537-538.)

Moreover, in the earliest days of Lime Wire's business, Gorton and other Lime Wire employees were keenly aware of the *Napster* litigation and the importance of Napster's centralized control over its system to the finding of liability against it. (*See, e.g.,* SOF ¶¶ 181, 312, 369-371.) Accordingly, they set out to give LimeWire "Napster's functionality" without developing any ability to control or monitor LimeWire's users in a centralized fashion. (*Id.* ¶¶ 369-389.) But this design choice was not without its technical costs. Lime Wire's own former Senior Software Engineer observed that Lime Wire "could never compete with the speed or collaborative filtering of centralized search," and that "[i]n every case I've ever seen, it's

<div align="right" style="writing-mode: vertical-rl">REDACTED</div>

orders of magnitude harder to distribute a task than it is to centralize it . . . What took us 6 months to distribute [at Lime Wire] would have taken a couple of days to centralize. Distributed networks also make updating much harder . . . If you have a choice, centralized search wins every time." (SOF ¶ 372.)

Despite the advantages of centralization, a Lime Wire Software Developer objected to the inclusion of a feature that would have created a

stating that although it

REDACTED

(SOF ¶ 389.) Lime Wire's own expert

confirms that,

(*Id.* ¶ 373.) In an attempt to distinguish itself from Napster and avoid liability, however, Lime Wire chose the option that blinded it to its users' copyright infringement.[23] As Judge Posner concluded in *Aimster*, "a service provider that would otherwise be a contributory infringer does not obtain immunity by . . . shield[ing] itself from actual knowledge of the unlawful purposes for which the service is being used." 334 F.3d at 650-51.

---

[23] Shortly after Napster shut down, a lawyer who would become StreamCast's counsel authored a prominent legal "primer" encouraging P2P developers to create "plausible deniability" of the infringement on their networks by "choos[ing] an architecture that will convince a judge that . . . monitoring and control is impossible." Fred von Lohmann, *IAAL: Peer-to-Peer File Sharing and Copyright Law After Napster* (2001). (SOF ¶ 606.)

**B.**    **Lime Wire Has Induced, Caused and Materially Contributed to Direct Infringement.**

The "material contribution" prong of contributory copyright infringement is satisfied by showing (1) "conduct that encourages or assists the infringement," or (2) the "provision of machinery or goods that facilitate the infringement" if those goods are not capable of "substantial" or "commercially significant" noninfringing uses. *Matthew Bender*, 158 F.3d at 706.

As demonstrated above, the evidence of defendants' intent to facilitate infringement, and their conduct that "encouraged or assisted" that infringement, is clear. (*See supra* II.) Moreover, defendants have also provided the "machinery or goods that facilitate the infringement"--namely, the LimeWire software--which by itself is material contribution to the infringement by LimeWire users. (*See* SOF ¶¶ 43, 540.) *Cf. Aimster*, 252 F. Supp. 2d at 651-52 (holding that Aimster materially contributed by providing "the software and the support services necessary for individual Aimster users to connect with each other"); *Napster*, 239 F.3d at 1022 (holding that Napster "materially contribute[d] to the infringing activity" of its users by providing them with "the site and facilities for direct infringement") (internal quotation marks omitted); *cf. Flea World*, 2006 WL 842883, at *15 (holding that flea market "need only provide a central 'hub' for infringing activity to materially contribute to infringement").

**C.**    **LimeWire Has No "Substantial" or "Commercially Significant" Noninfringing Uses.**

Nothing in the record shows that LimeWire has any "substantial" or "commercially significant" noninfringing uses. In *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), the Supreme Court considered whether manufacturers of a video cassette recorder could be held liable for the copyright infringement of their customers. Drawing an analogy to patent law's "staple article of commerce" doctrine, the Court held that

-33-

"the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes." *Id.* at 442. In other words, contributory liability is barred if the defendant's product is capable of "substantial" or "commercially significant noninfringing uses." *Id.* The Court declined to "give precise content to the question of how much use is commercially significant," finding that the "primary" use of Sony's VCR was for "time-shifting," *id.* at 422-423, which qualified as fair use and thus "plainly satisfie[d] this standard, however it is understood." *Id.*[24]

This case, however, does not require this Court to draw any fine lines between which infringing uses are "commercially significant" and which are not. Simply put, defendants have provided virtually *no* evidence that LimeWire has been used for noninfringing purposes. (SOF ¶¶ 541-602.) Indeed, while Gorton expounded at great length upon the benefits of his technology for                                                                                          [25] he specifically disclaimed all knowledge of any particular noninfringing uses of LimeWire. (SOF ¶¶ 570-571; 547.) Although Gorton

he does not know of anyone who used LimeWire for those purposes. (*See e.g. id.* ¶¶ 548, 552.)[26]

---

[24] The Court in *Grokster* likewise declined to quantify how much noninfringing use is "substantial," deciding the case instead on the theory of inducement. *Grokster*, 545 U.S. at 934.

[25] Gorton admitted having "no specific knowledge"                                    using LimeWire to share information. (SOF ¶ 572.)

[26] For example, Gorton could not identify or recall anyone using LimeWire to download authorized movie trailers or movies, Shakespeare, personal pictures or home movies, open-source software, freeware or shareware, noninfringing video games, documents, books in the public domain, authorized music, recipes, academic articles, legal documents, public datasets, speeches or to share bookmarks. (SOF ¶¶ 548-570.)

REDACTED

REDACTED

Similarly, Lime Wire's own expert

REDACTED

(SOF ¶¶ 593-594; *see also id.* ¶ 587.) Other Lime Wire

employees speculated about possible noninfringing uses of LimeWire, but also failed to provide

any specific examples. (*Id.* ¶¶ 573-78, 586.) That these witnesses could not give any examples

is unsurprising, given the fact that nearly 99% of all download requests to LimeWire users are

for infringing files. (*Id.* ¶ 109.)

It is not enough for defendants to assert that LimeWire is "physically capable" of

noninfringing use, or to hypothesize about searches for scattered noninfringing files (such as

recipes, Shakespearian plays, family photos or unspecified "text files"), that could potentially be

found on the Gnutella network. Rather, defendants must present evidence that LimeWire has *in

fact* been used for such purposes to a commercially significant degree. *Aimster*, 334 F.3d at 653

("It is not enough, as we have said, that a product or service be physically capable, as it were, of

a noninfringing use . . . defendants here have provided no evidence whatsoever (besides the

unsupported declaration of [Aimster's owner]) that Aimster is *actually* used for any of the stated

non-infringing purposes."); *see also Grokster*, 545 U.S. at 945 (Ginsburg, J., concurring)

(noninfringing use is not "substantial" where there is "little beyond anecdotal evidence of

noninfringing uses"); *id.* at 957-58 (Breyer, J., concurring) ("*Sony's* rule does not shelter

descramblers, even if one could *theoretically* use a descrambler in a noninfringing way");

*Fromberg, Inc. v. Thornhill*, 315 F.2d 407, 415 (5th Cir. 1963) (in patent context, even if product

"may physically be used" for noninfringing use, "a mere theoretical capability would hardly

suffice"); *Erico Intern. Corp. v. Doc's Marketing, Inc.*, 2007 WL 108450, at *6 (N.D. Ohio

2007) (in patent context, stating that "hypothetical" and "anecdotal" claims of noninfringing uses

are "*not* evidence of a substantial noninfringing use"). They have not done so. (*See* SOF
¶¶ 541-594.)

Even if LimeWire were occasionally used to download noninfringing files,
whatever small amount of noninfringing file sharing that may take place is "dwarfed" by the
massive scope of copyright infringement carried out using LimeWire every day. *See Aimster*,
334 F.3d at 649-50 ("more than a mere showing that a product may be used for infringing
purposes" is required; "some estimate of the respective magnitudes of these uses is necessary");
*A&M Records, Inc. v. Abdallah*, 948 F. Supp. 1449, 1456-57 (C.D. Cal. 1996) ("[A]lthough
time-loaded cassettes can be used for legitimate purposes, these purposes are insubstantial given
the number of [the defendant's] customers that were using them for counterfeiting purposes.")
Lime Wire has estimated that LimeWire's forty million monthly users generate "five billion
searches per month." (SOF ¶¶ 92-93.)  Given this enormous volume of activity on the network,
the fact that defendants can point to virtually no instances of downloads of noninfringing
material on LimeWire is dispositive.

In any event, minimal or incidental use of LimeWire to download noninfringing
files (for which Lime Wire does not even attempt to market or promote itself (SOF ¶¶ 595-602)),
cannot be considered "substantial" or "commercially significant" in the face of the massive
copyright infringement at issue here. *See Grokster*, 545 U.S. at 948 (Ginsburg, J., concurring)
("The number of noninfringing copies may be reflective of, and dwarfed by, the huge total
volume of files shared.") *id.* at 953 (Breyer, J., concurring) (stating that the "language and
analysis [of *Sony*] suggest that a figure like 10%, if fixed for all time, might well prove
insufficient"); *Sony*, 464 U.S. at 442 (stating that substantial noninfringing use can be shown
when "a significant number of [uses] would be non-infringing"); *see also McKesson Information*

-36-

*Solutions, Inc. v. Bridge Medical, Inc.*, 2005 WL 2346919, *9 (E.D. Cal. Sept. 23, 2005) (substantial noninfringing use in patent context "requires a qualitatively significant noninfringing use" and "[w]hether a use is 'substantial' or not depends on how likely and often the use will occur") (internal quotation marks omitted); *Dennison Mfg. Co. v. Ben Clements & Sons, Inc.*, 467 F. Supp. 391, 427-28 (S.D.N.Y. 1979) (in patent law, "occasional aberrant use" for noninfringing purposes "does not make defendant's device a staple article or commodity of commerce suitable for substantial noninfringing use").

Moreover, there is no evidence that anybody has ever gone to the trouble of downloading and installing, let alone paying for, the LimeWire software to find material such as Shakespeare,[27] open-source software[28] or the Mozilla Firefox web browser,[29] all of which are readily available for free elsewhere, and logic dictates that few people would do so.[30] *See Grokster*, 545 U.S. at 926 (observing that "substantive volume is a function of free access to copyrighted work," not demand for free "Shakespeare" or "Decameron"); *Atari, Inc. v. JS&A Group, Inc.*, 597 F. Supp. 5, 8 (N.D. Ill. 1983) (rejecting claim of "noninfringing use" in patent case because "[i]t strains credulity to assert" that anyone would purchase defendant's product for

---

[27] *See, e.g.*, http://shakespeare.mit.edu/.

[28] *See, e.g.*, http://sourceforge.net/.

[29] *See* http://www.mozilla.com/en-US/firefox/.

[30] Indeed, defendants' own computer science expert testified that,

REDACTED

(SOF ¶¶ 591-594.)

noninfringing use alone).[31]  This logical conclusion is confirmed by Lime Wire's own estimate

that                                                              leaving no subsection of its user base that

acquires, let alone purchases, LimeWire for noninfringing use alone. (SOF ¶¶ 135, 445.)  A

smattering of noninfringing uses, which could never sustain LimeWire's business, cannot be

considered "commercially significant".  *See also Worlds of Wonder, Inc. v. Vector*

*Intercontintental, Inc.*, No. C86-2671, 1986 WL 15608, at *1 (N.D. Ohio Dec. 31, 1986)

(rejecting claim of "substantial noninfringing use" in patent case because "the commercial value

of [defendants' products] is dependent on their infringing use").

        At bottom, the undisputed evidence demonstrates that Lime Wire's product is,

and has been since its release nearly eight years ago, used almost exclusively for copyright

infringement, and that Lime Wire's business--now worth many millions of dollars in revenue

each year--is and has always been entirely dependent on such infringement.  Defendants have at

all times known of this infringement (indeed, they specifically intended it) and materially

contributed to it through the provision of their LimeWire software.  Defendants should therefore

be found contributorily liable for the direct copyright infringement that LimeWire users commit

on a vast scale every day.

REDACTED

---

[31] *See also PolyVision Corp. v. Smart Technologies Inc.*, 501 F. Supp. 2d 1068, 1090-91 (W.D. Mich. 2007) (rejecting claim of "noninfringing use" in patent case on grounds that much cheaper product alternatives existed for that purpose, making it "unlikely that a customer would spend" the money for defendants' product to use it for noninfringing purposes); *Pickholtz v. Rainbow Technologies, Inc.*, 260 F. Supp. 2d 980, 989 (N.D. Cal. 2003) ("[I]nefficient and uneconomical uses are less likely to be deemed 'substantial'") (*quoting Hoffman-La Roche, Inc. v. Promega Corp.*, 33 U.S.P.Q.2d 1641, 1648-49 (N.D. Cal. 1994) (denying defendant's motion for summary judgment where evidence showed that noninfringing uses of defendant's product were "not commercially viable, efficient, or recommended uses")).

IV.   **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR COMMON LAW COPYRIGHT INFRINGEMENT AND UNFAIR COMPETITION CLAIMS (COUNTS IV AND V) WITH RESPECT TO PRE-1972 SOUND RECORDINGS.**

Pursuant to New York common law, defendants are also liable for copyright infringement and unfair competition with respect to plaintiffs' pre-1972 sound recordings (*see supra* p. 6, n.4), which are not protected under federal copyright law. *See* 17 U.S.C. § 301(c); *Firma Melodiya v. ZYX Music GmbH*, 882 F. Supp. 1306, 1316 (S.D.N.Y. 1995).

New York common law copyright infringement provides plaintiffs the same protections with regard to their sound recordings as does its federal analogue, *see Capitol Records, Inc. v. Naxos of America, Inc.*, 4 N.Y.3d 540, 558-61 (N.Y. Ct. App. 2005); 2 M. & D. Nimmer, *Nimmer on Copyright* § 8C.02 at 8C-4 to 5, and parallels such a claim under federal law. *See Capitol Records*, 4 N.Y.3d at 563-64 n.10. Thus, to prevail on a claim of common law copyright infringement, New York law requires "(1) the existence of a valid copyright; and (2) unauthorized reproduction of work protected by such a copyright." *Capitol Records, Inc. v. Naxos of America, Inc.*, 4 N.Y.3d 540, 563-64 (N.Y. Ct. App. 2005). As plaintiffs have demonstrated above, they have exclusive rights in the five pre-1972 sound recordings at issue here (*see* SOF ¶ 102.), and there has been direct, unauthorized reproduction of those works using LimeWire. (*See id.* ¶¶ 119-123.)

New York common law also provides a claim for unfair competition with respect to the pre-1972 recordings. *Roy Export Co. v. CBS, Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982). To prevail on that claim, plaintiffs must establish: (1) the elements of common law copyright infringement, which as shown above, they have done (*see supra* p. 5, 6-7), and (2) that there is "competition in the marketplace or similar actions designed for commercial benefit". *Capitol Records*, 4 N.Y.3d at 563-564. As shown above, Lime Wire has positioned itself in the market

-39-

for music distribution and, for its commercial benefit, has induced its users to infringe plaintiffs' sound recordings through its LimeWire software. (*See supra* pp. 15-16; SOF ¶¶230-251.)

Summary judgment on plaintiffs' state law claims should therefore be granted.

## CONCLUSION

For the reasons set forth above and based upon the facts in the accompanying Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, plaintiffs respectfully request that this Court enter summary judgment on their behalf on Counts I, II, IV and V of their First Amended Complaint.

Dated:  July 18, 2008

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,

By  *Katherine B. Forrest*
Katherine B. Forrest
Teena-Ann V. Sankoorikal
Joanne M. Gentile

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000
(212) 474-3700 (fax)
kforrest@cravath.com
tsankoor@cravath.com
jgentile@cravath.com

*Attorneys for Plaintiffs*

Of Counsel:

Kenneth L. Doroshow
Recording Industry Association of America
1025 F Street, NW, 10th Floor
Washington, DC  20004
(202) 775-0101
(202) 775-7253 (fax)
kdoroshow@riaa.com

-40-