**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARISTA RECORDS, LLC, et al. | CIVIL ACTION NO. 06 CV 5936 (GEL) |
| Plaintiffs, | ECF Case |
| v. | |
| LIME WIRE LLC, et al. | |
| Defendants. | |

### *AMICUS CURIAE* BRIEF OF THE ELECTRONIC FRONTIER FOUNDATION, CENTER FOR DEMOCRACY AND TECHNOLOGY, COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, CONSUMER ELECTRONICS ASSOCIATION, HOME RECORDING RIGHTS COALITION, INFORMATION TECHNOLOGY ASSOCIATION OF AMERICA, PUBLIC KNOWLEDGE, SPECIAL LIBRARIES ASSOCIATION, AND U.S. INTERNET INDUSTRY ASSOCIATION IN SUPPORT OF NEITHER PARTY

Edward Hernstadt
HERNSTADT ATLAS LLP
11 Broadway, Suite 615
New York, New York 10004
Tel: 212-809-2501
Fax: 212-214-0307
ed@heatlaw.com
www.heatlaw.com

*Attorney for Amici*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF INTEREST ............................................................................................ 2

ARGUMENT ..................................................................................................................... 5

   I.  COPYRIGHT'S SECONDARY LIABILITY DOCTRINES MUST PROTECT
      COPYRIGHT OWNERS WITHOUT CHILLING LEGITIMATE INNOVATION ........... 5

  II.  THE COURT SHOULD REJECT ARGUMENTS THAT WOULD SUBVERT THE
      BETAMAX DOCTRINE, WHICH ESTABLISHES A CLEAR, ADMINISTRABLE
      LIMITING PRINCIPLE FOR CONTRIBUTORY INFRINGEMENT ............................ 7

      A.  The Betamax doctrine does not turn on the proportion of infringing and noninfringing
         uses. ............................................................................................................................ 8

      B.  The Betamax doctrine does not depend upon a showing that noninfringing uses alone
         would "sustain" a defendant's business or a product's commercial success. ............. 9

      C.  Plaintiffs misconstrue both the "knowledge" and "material contribution" elements of
         contributory infringement liability............................................................................ 11

 III.  THE COURT SHOULD TAKE CARE TO AVOID FORMULATIONS OF
      INDUCEMENT LIABILITY THAT WOULD CHILL LEGITIMATE INNOVATION .. 14

      A.  Inducement requires affirmative acts that communicate and encourage infringement. 15

      B.  The scope of inducement liability must bear a proximate relation to the acts of
         inducement. ............................................................................................................... 17

 IV.  COURTS MUST BE CAUTIOUS IN APPLYING VICARIOUS LIABILITY TO
      TECHNOLOGY VENDORS ....................................................................................... 19

CONCLUSION ................................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**

*A&M Records v. Napster, Inc.*, 239 F. 3d 1004 (9th Cir. 2001) ................................................. 21

*A&M Records, Inc. v. General Audio Video Cassettes, Inc.*, 948 F. Supp. 1449 (C.D. Cal. 1996).. ....................................................................................................................................................... 6

*A. Stucki Co. v. Worthington Industries, Inc.*, 849 F. 2d 593 (Fed. Cir. 1988) ............................ 15

*Arista Records, Inc. v. Flea World, Inc.*, No. Civ. 03-2670 (JBS), 2006 WL 842883 (D.N.J. Mar. 31, 2006) ..................................................................................................................................... 13

*Banff, Ltd. v. Limited, Inc.*, 869 F. Supp. 1103 (S.D.N.Y. 1994) ................................................. 20

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F. 3d 1558 (Fed. Cir. 1994) ...................... 15

*C.R. Bard, Inc. v. Advanced Cardiovascular Systems, Inc.*, 911 F. 2d 670 (Fed. Cir. 1990) ....... 17

*CoStar Group v. LoopNet, Inc.*, 164 F.Supp.2d 688 (D. Md. 2001) ..................................... 12, 14

*Demetriades v. Kaufmann*, 690 F. Supp. 289 (S.D.N.Y. 1988) ................................................... 13

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt.*, 443 F. 2d 1159 (2d Cir. 1971) ............. 20, 21

*Hoste v. Radio Corp. of America*, 654 F. 2d 11 (6th Cir. 1981) .................................................. 19

*In re Aimster Copyright Litig.*, 334 F. 3d 643 (7th Cir. 2003) .............................................. 11, 12

*Livnat v. Lavi*, No. 96 CIV. 4967, 1998 WL 43221 (S.D.N.Y. Feb. 2, 1998) ............................ 14

*Makedwede Publ'g Co. v. Johnson*, 37 F. 3d 180 (5th Cir. 1994) ............................................... 19

*Marvullo v. Gruner & Jahr*, 105 F. Supp. 2d 225 (S.D.N.Y. 2000) ........................................... 14

*Matthew Bender & Co. v. West Publishing Co.*, 158 F. 3d 693 (2d Cir. 1998) ..................... 11, 13

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ...................... passim

*MGM v. Grokster*, 259 F. Supp. 2d 1029 (C.D. Cal. 2003) ................................................... 21, 22

*MGM v. Grokster*, 454 F. Supp. 2d 966 (C.D. Cal. 2006) .......................................................... 17

*MGM v. Grokster*, 518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................................... 8, 17, 19

*Monotype Imaging, Inc. v. Bitstream Inc.*, 376 F. Supp. 2d 877 (N.D. Ill. 2005) ........................ 12

*Parker v. Google*, 242 Fed. Appx. 833 (3d Cir. 2007) ............................................................... 11

*Parker v. Google*, 422 F. Supp. 2d 492 (E.D. Pa. 2006).................................................................11

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F. 3d 1146 (9th Cir. 2007) ............................ 12, 16, 21

*Perfect 10, Inc. v. VISA Int'l Serv. Ass'n,* 494 F. 3d 788 (9th Cir. 2007)............................... 14, 16

*Rodime PLC v. Seagate Tech., Inc.,* 174 F. 3d 1294 (Fed. Cir. 1999).........................................15

*Roley v. New World Pictures, Ltd.,* 19 F. 3d 479 (9th Cir. 1994) .................................................19

*Sony v. Universal City Studios,* 464 U.S. 417 (1984)........................................................... passim

*Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.,* 754 F. 2d 345 (Fed. Cir. 1985) ........18

*Stone v. Williams,* 970 F. 2d 1043 (2d Cir. 1992) ......................................................................18

*Vault Corp. v. Quaid Software Ltd.*, 847 F. 2d. 255 (5th Cir. 1988) ................................. 9, 11, 12

*Warner-Lambert Co. v. Apotex Corp.,* 316 F. 3d 1348 (Fed. Cir. 2003).....................................16

**Statutes**

17 U.S.C. § 504.............................................................................................................................6

17 U.S.C. § 506.............................................................................................................................6

17 U.S.C. § 507...........................................................................................................................18

35 U.S.C. § 286...........................................................................................................................18

**Other Authorities**

*In re Formal Complaint of Free Press & Pub. Knowledge Against Comcast Corp. for Secretly
    Degrading Peer-to-Peer Applications*, FCC 08-183 ..................................................................8

Timothy Wu, *Copyright's Communications Policy*, 103 MICH. L. REV. 278 (2004) ...................5

**INTRODUCTION**

When a copyright owner asserts an infringement claim against the distributor of a

technology that is capable of both infringing and noninfringing uses (*i.e.,* a multi-use technology)

based on infringements committed by those who use the technology, the case inevitably

implicates not just copyright policy, but also technology policy.  In such cases, "[t]he more

artistic protection is favored, the more technological innovation may be discouraged; the

administration of copyright law is an exercise in managing the trade-off."  *Metro-Goldwyn-*

*Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 928 (2005).  Because copyright's secondary

liability doctrines are judge-made law, it falls to the courts to strike the appropriate balance

between the statutory copyright monopoly and the freedom to innovate.  Here, striking the

correct balance is essential, as this Court's conclusions will guide not only the parties, but also

future innovators, creators, and courts as they develop, use, and evaluate the next generation of

multi-use technologies.

*Amici* represent diverse facets of the U.S. innovation economy: information technology

companies, consumer electronics companies, technology retailers, small entrepreneurs, amateur

tinkerers, and consumers. They are united, however, in their interest in balanced secondary

liability standards for copyright that punish bad actors while simultaneously protecting legitimate

innovators from the chilling effects of legal uncertainty. The Supreme Court set out just such a

standard in its landmark ruling in *Sony v. Universal City Studios*, 464 U.S. 417 (1984), declaring

that a court may not impose liability nor infer culpable intent to induce infringement based on the

development and distribution of a product capable of substantial noninfringing use—even if the

product's maker knows that some infringing uses are certain to occur.

Unfortunately, some of the factors Plaintiffs point to here would, if accepted as a basis

for secondary liability, upend the standard set by the Supreme Court in *Sony v. Universal* and

recently reaffirmed in *MGM v. Grokster*. As discussed further below, relying on certain of Plaintiffs' arguments would replace the limiting principles set out in those cases with broad, ill-defined substitutes that would chill innovation in multi-use technologies, to the detriment of at least three constituencies. First, the technology industry would be denied the opportunity to develop and market technologies that form an increasingly important segment of the global economy. Second, consumers would be denied the legitimate, noninfringing benefits that multi-use technologies offer. And third, copyright owners who are eager to take advantage of opportunities made possible by these new technologies would be stymied.

Because an erroneous reinterpretation of secondary liability would chill legitimate innovation to the detriment of the technology sector, consumers, and ultimately copyright owners themselves, *Amici* file this brief in order to contribute a more comprehensive overview of the relevant secondary liability principles that ought to guide the Court's resolution of this case. Because much of the factual record is under seal, *Amici* offer no view on which parties should prevail in the pending cross-motions for summary judgment. The copyright principles at issue in this case, however, are of crucial importance to the technology sector. Regardless of the outcome in this case, the legal standards the Court enunciates will be persuasive precedent in future cases. *Amici* will therefore focus on the proper legal standards that should apply in secondary liability cases.

## STATEMENT OF INTEREST

The Electronic Frontier Foundation (EFF) is a member-supported, nonprofit public interest organization devoted to maintaining the traditional balance that copyright law strikes between the interests of copyright owners and the interests of the public. Founded in 1990, EFF represents more than 13,000 dues-paying members including consumers, hobbyists, computer programmers, entrepreneurs, students, teachers, and researchers united in their reliance on a

balanced copyright system that ensures adequate protection for copyright owners while ensuring broad access to information in the digital age.

The Center for Democracy & Technology (CDT) is a nonprofit public interest group that seeks to promote free expression, privacy, individual liberty, and technological innovation on the open, decentralized Internet. CDT advocates balanced copyright policies that provide appropriate protections to creators without curtailing the openness and innovation that have been vital to realizing the democratizing potential of new digital media.

The Computer & Communications Industry Association (CCIA) is an international, nonprofit trade association dedicated to open markets, open systems, and open networks. CCIA members participate in the information and communications technology industries, ranging from small entrepreneurial firms to the largest in the business. CCIA members employ nearly one million people and generate annual revenues exceeding $200 billion. A complete list of CCIA's members is available online at <http://www.ccianet.org/members.html>.

The Consumer Electronics Association (CEA) is the preeminent trade association of the U.S. consumer electronics industry. CEA members lead the consumer electronics industry in the development, manufacturing and distribution of audio, video, mobile electronics, communications, information technology, multimedia and accessory products, as well as related services, that are sold through consumer channels. Its more than 2,200 corporate members contribute more than $173 billion to the U.S. economy.

The Home Recording Rights Coalition (HRRC), an unincorporated association, is a leading advocacy group for consumers' rights to use home electronics products for private, non-commercial purposes. The members of HRRC include consumers, retailers, manufacturers and professional servicers of consumer electronics products. The HRRC was founded in 1981, in

3

response to the Ninth Circuit's ruling, in *Sony v. Universal*, later overturned by the Supreme Court, that distribution of consumer video recorders constituted contributory copyright infringement.

The Information Technology Association of America (ITAA) is the premier information technology (IT) and electronics industry association working to maintain America's role as the world's innovation headquarters.  ITAA provides leadership in market research, standards development, business development, networking and public policy advocacy to some 350 corporate members doing business in the public and commercial sector markets.  These members range from the smallest start-ups to industry leaders offering Internet, software, services and hardware solutions.  ITAA offers the industry's only grassroots-to-global network, carrying the voice of IT to companies, markets and governments at the local, state, national and international levels to facilitate growth and advocacy.

Public Knowledge (PK), a nonprofit public interest advocacy organization in Washington, D.C., represents consumers' rights and works with consumer and industry groups to promote balance in intellectual property law and technology policy, ensuring that the public can benefit from new innovations, access to knowledge, and the use of content.

The Special Libraries Association (SLA) is a nonprofit global organization for innovative information professionals and their strategic partners.  SLA serves more than 12,000 members in 83 countries in the information profession, including corporate, academic and government information specialists. SLA promotes and strengthens its members through learning, advocacy and networking initiatives.

The U.S. Internet Industry Association (USIIA) is the North American trade association for Internet commerce, content and connectivity.  Founded in 1994, USIIA advocates effective

4

public policy for the Internet and provides its members with essential business news,
information, support and services.  With members of every size, engaged in virtually every facet
of the Internet, USIIA works to craft a business environment in which Internet companies can
thrive.

## ARGUMENT

## I.   COPYRIGHT'S SECONDARY LIABILITY DOCTRINES MUST PROTECT COPYRIGHT OWNERS WITHOUT CHILLING LEGITIMATE INNOVATION

In the twenty-four years since the Supreme Court's landmark ruling in *Sony v. Universal*,
innovators have introduced a remarkable array of new digital technologies that have transformed
everyday life and fueled the global economy.  Digital technologies and the networks that connect
them must invariably make copies as part of their basic operations; they are, by their natures,
copying technologies.  Thus, there is always a risk that these tools, however well intentioned
their designers, will be put to infringing uses.  Moreover, innovators cannot, at the time they are
innovating, anticipate all the uses to which their inventions may ultimately be put.  Fortunately,
by imposing a clear limiting principle on copyright's secondary liability doctrines, the Supreme
Court has shielded legitimate innovators from ruinous liability that might otherwise arise from
misuse of their technologies in the hands of others.  That limiting principle, announced in *Sony v.
Universal* and recently reaffirmed in *MGM v. Grokster*, has made it possible for investors to
invest in, and companies to develop, the personal computers, hard drives, MP3 players, CD
burners, Internet services, and cellular phones that consumers take for granted today.

Accordingly, when a copyright owner urges a court to find a technology vendor liable for
distributing a multi-use technology capable of both infringing and noninfringing uses, the dispute
inevitably implicates innovation policy more broadly.  *See* Timothy Wu, *Copyright's
Communications Policy*, 103 MICH. L. REV. 278, 342 (2004) (reviewing historical antagonism

between incumbent copyright industries and new technologies and noting that "judge-made secondary and vicarious liability principles . . . represent[] a new type of judge-mediated communications policy."). As the Supreme Court has recognized, the imposition of secondary liability "is normally the functional equivalent of holding that the disputed article is within the statutory monopoly granted to the [copyright owner]." *Sony v. Universal*, 464 U.S. at 441. Consequently, where the imposition of secondary liability on technology vendors is concerned, "[t]he more artistic protection is favored, the more technological innovation may be discouraged." *MGM v. Grokster*, 545 U.S. at 928.

This is not to say that secondary liability can never reach a technology vendor that distributes a multi-use technology. *Id.* at 919 (recognizing liability for inducement of infringement); *A&M Records, Inc. v. General Audio Video Cassettes, Inc.*, 948 F. Supp. 1449 (C.D. Cal. 1996) (imposing liability where defendant knowingly conspired with and supplied materials to counterfeiters). But if new multi-use technologies are to see the light of day, the lines separating lawful innovation from infringement liability must be clearly drawn. Copyright infringement liability triggers a potent arsenal of remedies, including potential criminal sanctions, 17 U.S.C. § 506, and mandatory statutory damages of as much as $30,000 *per work infringed*, 17 U.S.C. § 504. Consider, for example, Apple's iconic iPod MP3 player, each of which is capable of storing as many as 40,000 songs. Even a minimum statutory damage award against Apple for the potentially infringing uses of its millions of iPod products would be ruinous. In light of these realities, it is critical that the applicable legal standards permit "those who develop new products that are capable of substantial noninfringing uses to know, *ex ante*, that distribution of their products will not yield massive monetary liability." *MGM v. Grokster*, 545 U.S. at 957 (Breyer, J., concurring).

6

## II.   THE COURT SHOULD REJECT ARGUMENTS THAT WOULD SUBVERT THE BETAMAX DOCTRINE, WHICH ESTABLISHES A CLEAR, ADMINISTRABLE LIMITING PRINCIPLE FOR CONTRIBUTORY INFRINGEMENT

In *Sony v. Universal*, the Supreme Court considered whether Sony could be held

contributorily liable for infringements committed with its "Betamax" video cassette recorder

(VCR).  In rejecting the infringement claim, the Court set out the rule that has been described as

the Magna Carta[1] for U.S. innovators:

> [T]he sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. *Indeed, it need merely be capable of substantial noninfringing uses.*

464 U.S. at 442 (emphasis added).  This holding, known as the "Betamax doctrine," marks the

border between the exclusive rights of copyright owners, on the one hand, and the free market in

technology, on the other, thereby securing "breathing room for innovation and a vigorous

commerce" and ensuring that copyright law does not "compromise legitimate commerce or

discourage innovation having a lawful promise." *MGM v. Grokster*, 545 U.S. at 933, 937.

Plaintiffs here, however, offer evidence and arguments that seem predicated not on the

"mere capability" test set out in *Sony v. Universal*, but rather on a narrower "predominant use" or

"commercially sustaining" standard, alternatives that have been rejected by the courts.  Plaintiffs

also understate both the specificity of knowledge that they must demonstrate and the quantum of

contribution that they must show in the event that the Betamax doctrine does not apply.

Following either of these approaches would be contrary to legal authority and would chill a

broad range of legitimate technology innovation.

---

[1] *See, e.g., Court Mulls File-Sharing Future*, BBC NEWS, Mar. 30, 2005 (quoting Gary Shapiro, head of *Amicus* CEA: "The Betamax principles stand as the Magna Carta for the technology industry and are responsible for the explosion in innovation that has occurred in the U.S. over the past 20 years.") (<http://news.bbc.co.uk/2/hi/technology/4394371.stm>).

A.    **The Betamax doctrine does not turn on the proportion of infringing and noninfringing uses.**

As Plaintiffs themselves admit, "contributory infringement is barred if the defendant's product is capable of 'substantial' or 'commercially significant noninfringing uses.'" (Plfs. Br. at 34); *Sony v. Universal*, 464 U.S. at 442; *MGM v. Grokster*, 545 U.S. at 932-33.[2]  In arguing that noninfringing uses of LimeWire fall short of being "substantial," Plaintiffs urge the Court to focus on the proportion of infringing and noninfringing uses, arguing that where the former are "dwarfed" by the latter, the technology in question should be viewed as lacking any "substantial" noninfringing use. (Plfs. Br. at 36.)  In *Sony v. Universal*, the lower court had embraced precisely such a proportionality approach, and it was on this very issue that the Supreme Court reversed. *Compare Sony v. Universal*, 464 U.S. at 428 (explaining that the court of appeals had concluded "VTRs . . . are sold 'for the primary purpose of reproducing television programming'") *with id.* at 441-42 (in reversing the lower court, adopting "mere capability" test from patent law).  In fact, a test focusing on which uses predominate is precisely the one endorsed by the *dissenters* in *Sony v. Universal. Id.* at 491 (Blackmun, J., dissenting) (concluding that secondary liability should be imposed unless "a significant portion of the product's use is noninfringing").

The facts underlying the Supreme Court's holding in *Sony v. Universal* preclude any "predominance" or "proportionality" analysis.  The Court there specifically held that one

---

[2] Both courts and regulators have found that peer-to-peer file sharing software like LimeWire is capable of substantial noninfringing uses. *See, e.g., MGM v. Grokster*, 518 F. Supp. 2d 1197, 1231 (C.D. Cal. 2007) (district court in later proceedings noting that the Supreme Court left undisturbed its finding that the defendants' P2P software was capable of substantial noninfringing uses); *In re Formal Complaint of Free Press & Pub. Knowledge Against Comcast Corp. for Secretly Degrading Peer-to-Peer Applications*, FCC 08-183 at ¶ 4 (Order adopted Aug. 1, 2008) ("Although once relegated to serving, in most cases, the savviest Internet users with unsavory or even unlawful purposes, BitTorrent and other peer-to-peer technologies, such as Gnutella, have entered the mainstream.") (available at <http://fjallfoss.fcc.gov/edocs_public/attachmatch/FCC-08-183A1.pdf>).

"substantial noninfringing use" for the Betamax was to tape programs authorized by copyright owners for recording, notwithstanding the fact that such uses accounted for less than 10% of all uses. *MGM v. Grokster*, 545 U.S. at 951 (Breyer, J., concurring) (pointing out that the Court in *Sony v. Universal* found that this 9% use "alone constituted a sufficient basis for rejecting the imposition of secondary liability."). Lower courts applying the Betamax doctrine have also eschewed any inquiry into the proportion of infringing and noninfringing uses, instead focusing solely on a technology's capacity for noninfringing uses. *See, e.g., Vault Corp. v. Quaid Software Ltd.*, 847 F. 2d. 255, 263-67 (5th Cir. 1988) (holding that software copying program was capable of substantial noninfringing use without inquiring into infringing uses).[3]

**B.    The Betamax doctrine does not depend upon a showing that noninfringing uses alone would "sustain" a defendant's business or a product's commercial success.**

Plaintiffs alternately suggest that LimeWire's noninfringing uses cannot be "substantial" within the meaning of the Betamax doctrine because those uses "could never sustain LimeWire's business." (Plfs. Br. at 38.) This "commercially sustaining" standard again echoes the *dissenters'* view in *Sony v. Universal*, rather than the binding majority opinion. *See Sony v. Universal*, 464 U.S. at 491 (Blackmun, J., dissenting) (arguing that liability should be imposed "if no one would buy the product for noninfringing purposes alone"). As previously discussed, the Supreme Court held that one "substantial noninfringing use" for the Betamax was the taping of programs that had been authorized by the copyright owner for recording, notwithstanding the fact that this activity comprised only 9% of the use of the Betamax. Nothing in the majority

---

[3] *Amici* are aware that the Seventh Circuit, in dicta, appears to have endorsed a proportionality analysis. *See In re Aimster Copyr. Litig.*, 334 F. 3d 643, 653 (7th Cir. 2003). Because the defendant in that case had come forward with no evidence regarding noninfringing uses, the court's re-imagining of *Sony v. Universal* was unnecessary to the outcome of the appeal and thus *obiter dicta. See id.* Moreover, for the reasons discussed above, *Amici* note that the Seventh Circuit's approach has not been adopted in any other circuit and respectfully suggest that its view cannot be squared with the binding precedent in *Sony v. Universal*.

opinion suggests that this 9% use accounted for the commercial appeal of the VCR or "sustained" Sony's business.[4]

The Betamax doctrine's focus on "mere capability" has not only stood the test of time and been endorsed by subsequent rulings, but is also good policy. It permits courts to consider not only extant noninfringing uses, but also noninfringing uses that may develop in the future. As both concurrences (together comprising six Justices) recognized in *MGM v. Grokster*, uses for new reproduction and distribution technologies change over time in response to changing markets. *MGM v. Grokster*, 545 U.S. at 948 (Ginsburg, J., concurring) (considering whether noninfringing uses "were likely to develop over time"); *id.* at 954 (Breyer, J., concurring) (noting that the language of *Sony v. Universal* requires "looking to potential future uses of the product to determine its 'capability.'"). In the early days of a new technology, infringing uses may predominate until new business models develop—one need only recall the dramatic change in VCR usage that occurred after Hollywood movie studios began making movies available for sale and rental on prerecorded video cassettes. Something similar may yet occur with respect to P2P file sharing software. Only a legal standard focused on "capability," rather that current "proportions" or "commercial success," can adequately take these future uses into account.

In addition, the Supreme Court's "merely capable" test is good policy because it crafts a clear, administrable rule of law that provides *ex ante* guidance to technology innovators. In cases where there is no evidence of active inducement (discussed further below), the Betamax

---

[4] To the extent that the Supreme Court in *Sony v. Universal* left any doubt on this score by its interchangeable use of the terms "substantial" and "commercially significant," those doubts were resolved by *MGM v. Grokster*, where the Court repeatedly preferred the term "substantial" over "commercially significant" when recapitulating the meaning of the Betamax doctrine. *See MGM v. Grokster*, 545 U.S. at 932 ("substantial lawful as well as unlawful uses"), 933 ("capable of substantial lawful use"), 939 n.12 ("capable of substantial noninfringing uses"), 941 ("capability of substantial lawful employment").

doctrine facilitates early disposition of contributory infringement actions.  The question of

whether a product is capable of a noninfringing use is one that innovators can readily answer,

and that can be proven at summary judgment without intrusive, expensive, and often equivocal

discovery into the state of mind of engineers or executives, or intrusive discovery aimed at

discovering how consumers are using technologies in their homes.  It also protects innovators

from the unintended consequences that may accompany early, unanticipated, infringing uses of

their products, while acting as a prophylactic against meritless "strike suits" brought by marginal

copyright owners in an effort to secure settlements with the threat of expensive discovery and

large statutory damages awards.  *See, e.g., Parker v. Google*, 422 F. Supp. 2d 492 (E.D. Pa.

2006), *aff'd,* 242 Fed. Appx. 833 (3d Cir. 2007), *cert. denied* (2008) (dismissing a prolix

complaint by pro se copyright owner against Google based on Google's automated copying of

plaintiff's own website).

**C.     Plaintiffs misconstrue both the "knowledge" and "material contribution"
elements of contributory infringement liability.**

As discussed above, where a technology is capable of substantial noninfringing uses and

the defendant has not intentionally induced infringing conduct, the Betamax doctrine bars

contributory infringement liability.  Therefore, there is no need to address the traditional

"knowledge" and "material contribution" elements of contributory infringement.  *See Matthew*

*Bender & Co. v. West Publishing Co.*, 158 F. 3d 693, 706-07 (2d Cir. 1998) (not addressing

"knowledge" or "material contribution" after concluding that defendant's product was capable of

substantial noninfringing uses); *accord In re Aimster Copyright Litig.*, 334 F. 3d 643, 649 (7th

Cir. 2003) (rejecting recording industry argument that specific knowledge of actual

infringements overcomes the Betamax doctrine); *Vault v. Quaid*, 847 F. 2d at 267 (omitting

analysis of "knowledge" and "material contribution" after finding that the Betamax doctrine

applied).  Nevertheless, because Plaintiffs also misconstrue these elements, *Amici* will briefly

address them here.

      With respect to the "knowledge" element of contributory infringement, Plaintiffs claim

that they "are not required to prove that defendants had knowledge of specific infringements."

(Plfs. Br. at 30) (internal quotations omitted).  Plaintiffs also suggest that news articles and user

testimonials discussing infringing uses provide evidence of "constructive knowledge" for

contributory infringement purposes. (Plfs. Br. at 31).  Were this an accurate statement of the law,

reading the newspaper would be fraught with peril for technology company executives, lest they

come across an item discussing infringing uses of their products and thereby acquire

"constructive knowledge."  But courts consistently require something more than general

knowledge that a product or service is being used for infringement.[5]  *See, e.g., Perfect 10, Inc. v.*

*Amazon.com, Inc.*, 508 F. 3d 1146, 1172 (9th Cir. 2007) ("we hold that a computer system

operator can be held contributorily liability if it has *actual* knowledge that *specific* infringing

material is available using its system") (emphasis in original; quotation marks and citation

omitted); *Monotype Imaging, Inc. v. Bitstream Inc.*, 376 F. Supp. 2d 877, 889 n.13 (N.D. Ill.

2005) (holding that constructive knowledge will not support a claim of inducement under *MGM*

*v. Grokster*); *CoStar Group v. LoopNet, Inc.*, 164 F. Supp. 2d 688, 707 (D. Md. 2001)

("[Plaintiff] needs to establish that the notice it gave to [defendant] comprised at least

---

[5] As mentioned above, where the Betamax doctrine otherwise applies, there is no need to consider knowledge evidence. *MGM. v. Grokster*, 545 U.S. at 937 ("*Sony* did not find intentional inducement despite the knowledge of the VCR manufacturer that its device could be used to infringe."); *In re Aimster*, 334 F. 3d at 649 (concluding that even actual knowledge of infringing activity does not trump the Betamax doctrine); *Vault v. Quaid*, 847 F. 2d at 262 (defendant prevails despite "actual knowledge that its product is used to make unauthorized copies of copyrighted material . . . .").

constructive knowledge of specific infringing activity which [defendant] materially contributed to or induced by its alleged failure to halt the activity.").[6]

With respect to "material contribution," Plaintiffs incorrectly assert that merely "provid[ing] the machinery or goods that facilitate the infringement . . . by itself is material contribution to the infringement." (Plfs. Br. at 33.)  This miscasts the applicable legal test as little more than an inquiry into "but for" causation; liability would lie whenever, but for the software, the infringement would not have occurred.  As noted above, the Second Circuit and Supreme Court have both rejected this approach where the Betamax doctrine applies: "[T]he provision of equipment does not amount to contributory infringement if the equipment is 'capable of substantial noninfringing uses.'"  *Matthew Bender v. West*, 158 F. 3d at 706 (quoting *Sony v. Universal*, 464 U.S. at 442).

But even in cases that do not involve the Betamax doctrine, courts in this circuit have consistently required more than "but for" causation when deciding whether a defendant's contribution to third party infringement is "material."  For example, in *Demetriades v. Kaufmann*, 690 F. Supp. 289 (S.D.N.Y. 1988), Judge Goettel held that a real estate broker could not be liable for contributory infringement for having sold property despite knowing that the purchaser would use infringing architectural plans in subsequent construction efforts. "Something more—deriving from one's *substantial* involvement—is needed." *Id.* at 294

---

[6] One district court in an unpublished ruling has suggested that copyright owners may hold flea market operators contributorily liable without having to demonstrate specific knowledge regarding the infringements of the flea market vendors. *See Arista Records, Inc. v. Flea World, Inc.,* No. Civ. 03-2670 (JBS), 2006 WL 842883 at *14 (D.N.J. Mar. 31, 2006).  In that case, however, there was extensive evidence that the operators had been repeatedly informed of the identities and previous activities of the direct infringers. *Id.* at *15.  Accordingly, that ruling will not support Plaintiffs' more radical argument here, which would hold flea market operators liable based on their merely having read about infringing activities in news articles or customer feedback.

(emphasis in original). Similarly, Judge Sweet has insisted that "[p]articipation in the infringement must be substantial." *Livnat v. Lavi*, No. 96 CIV. 4967, 1998 WL 43221 at *3 (S.D.N.Y. Feb. 2, 1998). "The authorization or assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer." *Id.*; *accord Marvullo v. Gruner & Jahr*, 105 F. Supp. 2d 225, 230 (S.D.N.Y. 2000) (quoting *Livnat v. Lavi*). Other courts also agree that, while providing the means for infringement *can* rise to the level of "material contribution," it does not *always* do so. *See Perfect 10, Inc. v. VISA Int'l Serv. Ass'n*, 494 F. 3d 788, 796-800 (9th Cir. 2007) (providing payment services does not constitute "material contribution"); *CoStar v. LoopNet*, 164 F. Supp. 2d at 706 ("While liability for contributory infringement can be based on 'merely providing the means for infringement,' merely providing the means is not always sufficient to prove infringement.") (internal citation omitted).

## III.    THE COURT SHOULD TAKE CARE TO AVOID FORMULATIONS OF INDUCEMENT LIABILITY THAT WOULD CHILL LEGITIMATE INNOVATION

The Betamax doctrine will not shield "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement." *MGM v. Grokster*, 545 U.S. at 936-37. But for the reasons explained above, courts must take care not to read the inducement standard so broadly that it eviscerates the Betamax doctrine. As the Supreme Court noted, the standard for inducement liability should not "discourag[e] the development of technologies with lawful and unlawful uses." *Id.* at 937.

In particular, this court must take care to observe two important limiting principles on the inducement doctrine adopted by the Supreme Court in *MGM v. Grokster*. First, bad intent alone is not enough to support inducement liability—there must be sufficient evidence of

14

unambiguous, affirmative acts promoting infringement ("clear expression or other affirmative steps taken to foster infringement"). *Id.* at 937. Second, there must be some proximate temporal and causal relation between those affirmative acts of inducement and the direct infringements caused by them ("resulting acts of infringement by third parties"). *Id.*

### A.    Inducement requires affirmative acts that communicate and encourage infringement.

Inducement requires affirmative bad acts. *Id.* at 936 (inducement liability requires evidence of "active steps" to induce infringement). Inducement liability arises from the same common law basis as aiding and abetting liability. *See, e.g., Rodime PLC v. Seagate Tech., Inc.,* 174 F. 3d 1294, 1306 (Fed. Cir. 1999) ("Inducement requires proof that the accused infringer knowingly aided and abetted another's direct infringement of the patent."). Consequently, a mere failure to prevent infringing conduct does not trigger liability. *See, e.g., Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F. 3d 1558, 1569 (Fed. Cir. 1994) (in the patent context, noting that inducement cannot be premised on an omission because "active inducement of infringement requires the commission of an affirmative act"); *A. Stucki Co. v. Worthington Industries, Inc.,* 849 F. 2d 593, 596-97 (Fed. Cir. 1988) (parent company's inaction in the face of subsidiary's patent infringement does not constitute inducement).[7]

Distribution of a tool capable of substantial non-infringing uses is, at worst, ambiguous conduct, and thus cannot constitute the "active steps" on which inducement liability is based. As the Supreme Court explained, to establish inducement, the plaintiff must offer evidence of "*clear* expression or other affirmative steps to foster infringement." *MGM v. Grokster,* 545 U.S. at 919 (emphasis added). Reliance on anything less risks "compromis[ing] legitimate commerce or discourag[ing] innovation having a lawful promise." *Id.* at 937. After all, the Supreme Court did

---

[7] In *MGM v. Grokster,* the Supreme Court adopted the inducement rule from patent law, 545 U.S. at 936, and thus patent cases addressing inducement liability are instructive here.

not intend its ruling in *MGM v. Grokster* to create a *sui generis* category of "thought crimes" for innovators. So long as no affirmative message encouraging or inducing infringement is communicated to users, the internal thoughts of those who develop and produce CD burners, MP3 players, personal computers, hard drives, and myriad other multi-use tools are entirely irrelevant to the inducement analysis. Any other result would invite wasteful litigation against the distributors of all of these technologies, where copyright owners could engage in limitless discovery seeking some evidence of "bad thoughts" in the executive suite.

Indeed, the notion that mere distribution of a multi-use product can provide the basis for inducement liability has been squarely rejected in the patent context. In *Warner-Lambert Co. v. Apotex Corp.*, 316 F. 3d 1348 (Fed. Cir. 2003), the court rejected liability based on the sale of a drug that could be used for non-infringing, FDA-approved uses, but also for infringing off-label uses. The Federal Circuit held that Apotex's act of distributing this drug was not an affirmative act sufficient to establish inducement: "In the absence of any evidence that Apotex has or will promote or encourage doctors to infringe the neurodegenerative method patent, there has been raised no genuine issue of material fact." *Id.* at 1364.

The same principle applies equally in the copyright context. Distributing a tool that can be used both lawfully and unlawfully is not a clear expression or action that fosters or encourages infringement. *See Perfect 10 v. Amazon.com*, 508 F. 3d at 1170 n.11 ("Google's activities do not meet the 'inducement' test explained in *Grokster* because Google has not promoted the use of its search engine specifically to infringe copyrights"); *Perfect 10 v. Visa*, 494 F. 3d at 801 ("to establish inducement liability, it is crucial to establish that the distributors

'communicated an inducing message to their . . . users'") (quoting *MGM v. Grokster*, 545 U.S. at 937).[8]

If there is any ambiguity as to whether the affirmative acts actually promoted infringement, summary judgment of infringement must be denied. *C.R. Bard, Inc. v. Advanced Cardiovascular Systems, Inc.*, 911 F. 2d 670, 675 (Fed. Cir. 1990) (patent case). A lesser standard would negate the Betamax doctrine, which protects technology that can be used both lawfully and unlawfully.

### B.    The scope of inducement liability must bear a proximate relation to the acts of inducement.

Inducement liability under *MGM v. Grokster* is limited to "resulting acts of infringement by third parties." *MGM v. Grokster*, 545 U.S. at 937. As a result, even where a defendant engages in acts of inducement, the resulting liability must bear some proximate relation, both in time and causation, to the acts of inducement. For example, if a vendor of multi-use technologies runs an advertisement inducing infringement for one day, to a limited audience, it should not thereby become liable for every direct infringement committed by every customer. Similarly, the resulting inducement liability should not stretch indefinitely into the future, lest it

---

[8] The Supreme Court did not suggest otherwise when it noted that, where "evidence shows that the distributor intended and encouraged the product to be used to infringe[,] . . . the culpable act is not merely the encouragement of infringement but also the distribution of the tool intended for infringing use." *Grokster*, 545 U.S. at 940 n.13. Distribution of the tool can give rise to liability only if, as the Supreme Court noted, there is evidence of intent and that the defendant "encouraged the product to be used to infringe." *Id.*

Thus, the district court on remand erred when it asserted that "Plaintiffs need not prove that StreamCast undertook specific actions, beyond product distribution, that caused specific acts of infringement. Instead, Plaintiffs need prove only that StreamCast distributed the product with the intent to encourage infringement." *MGM v. Grokster*, 454 F. Supp. 2d 966, 985 (C.D. Cal. 2006). While the Supreme Court required proof that the distributor "intended *and* encouraged" infringement, *MGM v. Grokster*, 545 U.S. at 940 n.13 (emphasis added), the district court on remand concluded that intent alone sufficed, *MGM v. Grokster*, 454 F. Supp. 2d at 985, even in the absence of any distinct act that encouraged infringement. The district court, in its later injunction ruling, appears to have accepted that its earlier statement was incorrect. *See MGM v. Grokster*, 518 F. Supp. 2d at 1229 n.26.

effectively "enlarge the scope of [copyright's] statutory monopoly to encompass control over an article of commerce that is not the subject of copyright protection." *Sony v. Universal*, 464 U.S. at 421. Without some proximate limiting principle, one unwise advertising campaign by Sony could have resulted in liability for every infringement committed by a VCR owner, past, present and future.

For example, Plaintiffs appear to rely in part on evidence dating to well over three years prior to the 2006 filing of this lawsuit.[9] In *Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*, 754 F. 2d 345 (Fed. Cir. 1985), a patent case, the Federal Circuit affirmed a summary judgment non-infringement granted to the defendant, who stood accused only "only with 'inducing infringement' or 'contributory infringement.'" *Id.* at 347. Because the only acts by the defendant allegedly giving rise to secondary patent infringement liability had taken place more than six years prior,[10] the court held that no recovery was allowed. *Id.* at 349.

For a copyright claim, then, inducement liability cannot be premised on conduct that took place more than three years prior to the filing of the action. *See* 17 U.S.C. § 507(b); *Stone v. Williams*, 970 F. 2d 1043, 1050-51 (2d Cir. 1992) ("Recovery is allowed only for those acts occurring within three years of suit, and is disallowed for earlier infringing acts."). As the Fifth Circuit has opined,

> We are persuaded by the Ninth, Sixth and Second Circuits' interpretation of section 507(b). Jones is only liable for *his* acts of infringement committed within three years prior to Plaintiffs' lawsuit. Jones' last involvement with CTMRI or the recording and distribution of "Carnival Time" was on January 2, 1985. After January 2, 1985, Jones was not responsible "directly or vicariously, individually or jointly" in the operations of CTMRI.

---

[9] *See, e.g.*, Plfs. Br. at 11 (". . . in August 2000 . . . ."), 12 ("In January 2001, . . ."), 14 ("Starting in 2002, . . . .").

[10] Under the Patent Act, "no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action." 35 U.S.C. § 286.

*Makedwede Publ'g Co. v. Johnson,* 37 F. 3d 180, 182 (5th Cir. 1994) (emphasis in original).[11]
Any liability imposed on Defendants must be based on actions *they* took during the limitations
period. Imposing some temporal limit on inducement evidence is critical, lest companies be
haunted by stray remarks made years before.[12]

     The scope of inducement liability must also bear some relation to the potential reach of
the affirmative acts of inducement. In other words, to the extent a defendant communicates a
message of inducement only to a narrow circle of customers, liability should be limited to the
direct infringements that could reasonably have been influenced or promoted by that
communication. If liability is premised on affirmative acts with limited reach and potential
audience, the scope of liability should be similarly limited. Any other rule would potentially
deprive the public of a multi-use tool as the result of nothing more than a few ill-advised public
statements by a young and relatively unsophisticated start-up company, or unfortunate customer
support procedures.[13]

## IV.    COURTS MUST BE CAUTIOUS IN APPLYING VICARIOUS LIABILITY TO TECHNOLOGY VENDORS

     Vicarious liability may be imposed "when the defendant profits directly from the
infringement and has a right and ability to supervise the direct infringer, even if the defendant

---

[11] *See also Hoste v. Radio Corp. of America,* 654 F. 2d 11, 11 (6th Cir. 1981); *Roley v. New World Pictures, Ltd.,* 19 F. 3d 479 (9th Cir. 1994).

[12] On remand, the district court in *MGM v. Grokster* stated, "[O]nce the market has internalized the inducer's promotion of infringement, the resulting infringements should be attributable to that defendant even though he/she no longer chooses to actively promote that message." 518 F. Supp. 2d at 1234. The court did not suggest, however, that this could extend even to acts of promotion so far in the past as to be outside the statute of limitations. Instead, the court was merely addressing the issue of whether a permanent injunction could preclude distribution of software even in the absence of continuing affirmative acts of inducement.

[13] *Amici* do not concede that ambiguous conduct by customer support staff, marketing personnel, or other "ordinary acts incident to product distribution" could, by themselves, be the kinds of "affirmative steps" on which inducement liability may be founded. *MGM v. Grokster,* 545 U.S. at 937 (cautioning that such "ordinary acts" do not support liability in themselves).

initially lacks knowledge of the infringement." *MGM v. Grokster*, 545 U.S. at 930 n.9.
Plaintiffs here have pled a vicarious liability claim, but have not moved for summary judgment
on that claim.  Defendants, however, have sought summary judgment on the vicarious liability
claim, arguing that the undisputed facts establish that they have no ability to supervise or control
those who use the LimeWire software.

The Supreme Court has not yet had an opportunity to address vicarious liability. *MGM v.
Grokster*, 545 U.S. at 930 n.9 (declining to reach vicarious liability question).  Nevertheless, the
Court's warning that secondary liability principles ought not "compromise legitimate commerce
or discourage innovation having a lawful promise" applies with equal force in the vicarious
liability context.  *Id.* at 937.  Accordingly, courts must be vigilant against efforts to use vicarious
liability claims to evade the Betamax doctrine or the requirements of inducement to the detriment
of legitimate innovators.

In their motion for summary judgment, Defendants correctly articulate the applicable
legal standards governing vicarious liability as applied to the vendor of a multi-use technology.
(Defs. Br. at 33-38.)  Because the doctrine is derived from principles of *respondeat superior*
liability, a plaintiff must show that the defendant enjoys a right and ability to supervise and
control the direct infringers that is akin to that which employers traditionally exercise over
employees.  *See Gershwin Publ'g Corp. v. Columbia Artists Mgmt.*, 443 F. 2d 1159, 1163 (2d
Cir. 1971) (imposing liability where the direct infringers "depended upon [defendant] for
direction . . . and [defendant] was in a position to police the infringing conduct of its artists").  A
mere formal or legal right to control is insufficient—an actual, practical right of control must be
shown.  *Banff, Ltd. v. Limited, Inc.*, 869 F. Supp. 1103, 1110 (S.D.N.Y. 1994) (reading Second
Circuit authority to "require that culpable persons *actually exercise* control." (emphasis in

original)).  Vicarious liability also requires a showing that the defendant derives a direct financial benefit from the direct infringement. *Gershwin v. Columbia,* 443 F. 2d at 1162.

In the technology context, courts must resist any effort to impose vicarious liability simply because a technology "could have been designed differently," in a manner that might have reduced its infringing uses.  A defendant's right and ability to control must be evaluated in light of the "current architecture" of the technology it chose to develop, not in light of hypothetical technologies it might have built. *A&M Records v. Napster, Inc.*, 239 F. 3d 1004, 1024 (9th Cir. 2001) ("Napster's reserved 'right and ability' to police is cabined by the system's current architecture."); *accord Perfect 10 v. Amazon.com,* 508 F. 3d at 1175 (any evidence regarding the "failure to change" a technology goes to contributory infringement, not vicarious liability).  Similarly, a technology vendor's ability to offer "upgrades" or other post-purchase services to existing customers does not, without more, establish control over its customers' uses of the technology. *MGM v. Grokster,* 380 F. 3d at 1166 ("[P]ossibilities for upgrading software located on another person's computer are irrelevant to determining whether vicarious liability exists."), *vacated on other grounds,* 545 U.S. 913 (2005).  Any other rule would effectively impose on innovators an ill-defined, on-going duty to design and continually upgrade technologies to minimize infringing uses, without any guidance as to when they had "done enough."  That outcome would significantly chill legitimate innovation.

Particularly instructive on this point is the district court's vicarious liability analysis in *MGM v. Grokster,* which was affirmed by the Ninth Circuit and left undisturbed by the Supreme Court's subsequent inducement analysis. *MGM v. Grokster,* 259 F. Supp. 2d 1029 (C.D. Cal. 2003), *aff'd,* 380 F. 3d 1154, 1164-66 (9th Cir. 2004), *vacated on other grounds,* 545 U.S. 913 (2005).  In that case, the defendants Grokster and StreamCast distributed P2P file-sharing

software similar to that distributed by LimeWire here. *Id.* at 1032-33. The plaintiffs argued that

the software in question could have been designed so as to enable control over the behavior of its

users. *Id.* at 1045. In the words of Judge Wilson: "The doctrine of vicarious infringement does

not contemplate liability based upon the fact that a product could be made such that it is less

susceptible to unlawful use, where no control over the *user* of the product exists." *Id.* at 1045-46

(emphasis in original).

## CONCLUSION

*Amici* respectfully urge the Court to protect the copyright balance and let its ruling on

parties' cross-motions for summary judgment be guided by the traditional secondary liability

principles discussed above.

Dated: September 26, 2008

Edward Hernstadt
HERNSTADT ATLAS LLP
11 Broadway, Suite 615
New York, New York 10004
Tel: 212-809-2501
Fax: 212-214-0307
ed@heatlaw.com
www.heatlaw.com

*Attorney for Amici*

*Of counsel:*

Fred von Lohmann
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell St.
San Francisco, CA 94110
(415) 436-9333 x123

David Sohn
CENTER FOR DEMOCRACY AND
TECHNOLOGY
1634 Eye Street, NW #1100
Washington, D.C. 20006

22

fred@eff.org

Matthew Schruers
COMPUTER & COMMUNICATIONS
INDUSTRY ASSOC.
900 17th Street, NW, Suite 1100
Washington, DC 20006
(202) 783-0070 x109
mschruers@ccianet.org

Joshua Lamel
INFORMATION TECHNOLOGY
ASSOCIATION OF AMERICA
1401 Wilson Blvd., Suite 1100
Arlington, VA 22209
(703) 284-5302
jlamel@itaa.org

Jonathan Band
SPECIAL LIBRARIES ASSOCIATION
Jonathan Band PLLC
21 Dupont Circle, NW
Washington, D.C. 20036
(202) 296-5675
jband@policybandwidth.com

(202) 637-9800 x317
dsohn@cdt.org

Robert S. Schwartz
CONSUMER ELECTRONICS
ASSOCIATION
HOME RECORDING RIGHTS COALITION
Constantine Cannon LLP
1627 Eye Street, NW
Washington, D.C. 20006
(202) 204-3508
rschwartz@constantinecannon.com

Sherwin Siy
PUBLIC KNOWLEDGE
1875 Connecticut Avenue, NW
Suite 650
Washington, D.C. 20009
(202) 518-0020
ssiy@publicknowledge.org

David P. McClure
U.S. INTERNET INDUSTRY ASSOCATION
815 Connecticut Avenue, NW
Suite 620
Washington, D.C. 20006
(703) 851-4784
david.p.mcclure@usiia.org

23