UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARISTA RECORDS LLC; ATLANTIC
RECORDING CORPORATION; BMG MUSIC;
CAPITOL RECORDS, INC.; ELEKTRA
ENTERTAINMENT GROUP INC.;
INTERSCOPE RECORDS; LAFACE
RECORDS LLC; MOTOWN RECORD
COMPANY, L.P.; PRIORITY RECORDS LLC;
SONY BMG MUSIC ENTERTAINMENT;
UMG RECORDINGS, INC.; VIRGIN
RECORDS AMERICA, INC.; and
WARNER BROS. RECORDS INC.,

        Plaintiffs/Counterclaim Defendants,

        v.

LIME GROUP LLC; LIME WIRE LLC; MARK
GORTON; GREG BILDSON, and M.J.G. LIME
WIRE FAMILY LIMITED PARTNERSHIP

        Defendants.

ECF CASE

06 CV 5936 (GEL)

**FILED UNDER SEAL**

## DEFENDANT LIME WIRE LLC'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Of counsel:

Lauren E. Handler
SDNY (LEH 6908)
PORZIO, BROMBERG &
NEWMAN, P.C.
100 Southgate Parkway
P.O. Box 1997
Morristown, NJ 07962-1997
(973) 538-5146 (Facsimile)
(973) 889-4326 (Telephone)
lehandler@pbn.com

Charles S. Baker (CB1365)
Joseph D. Cohen (JC3017)
Susan K. Hellinger (SH8148)
PORTER & HEDGES, LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
(713) 226-6000 (Telephone)
(713) 228-1331 (Facsimile)
cbaker@porterhedges.com
jcohen@porterhedges.com
shellinger@porterhedges.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................................ iii

INTRODUCTION ............................................................................................................................ 1

BACKGROUND .............................................................................................................................. 4

ARGUMENT .................................................................................................................................... 7

I.      Plaintiffs Have Failed to Conclusively Establish that LimeWire Users Committed Direct Copyright Infringement of the Works at Issue .................................................................... 7

II.     Genuine Issues of Material Fact Exist as to Whether LW Knowingly and Actively Induced Its Users to Commit Copyright Infringement ...................................................... 11

        A.      Plaintiffs Have Not Offered Competent, Admissible Evidence of the Alleged Scope of Infringement by LimeWire Users, Much Less Shown that Widespread Infringement Establishes LW's Intent to Induce Infringement ............................... 14

        B.      LW Sought to Direct Attention to Its Product and the Gnutella Network, Not to Lure Known Infringers ........................................................................................... 17

        C.      LW's Business Model Was Based on Distributing Useful, Cutting-Edge File-Sharing Technology ................................................................................................ 25

        D.      LW Has in Good Faith Taken Steps to Reduce Infringement ................................ 29

        E.      LimeWire Was Designed for High-Speed, Efficient Sharing of Information ........ 32

        F.      LW Did Not Encourage or Assist Infringement ..................................................... 35

III.    Plaintiffs Have Not Established Contributory Copyright Infringement as a Matter of Law ................................................................................................................... 37

        A.      LimeWire Is Capable of Substantial Noninfringing Uses as a Matter of Law ....... 38

        B.      LW Did Not Have Specific Knowledge of Infringement by LimeWire Users ....... 42

        C.      There is a Genuine Issue of Fact as to Whether LW Materially Contributed to Copyright Infringement ......................................................................................... 44

IV.     Plaintiffs Have Not Established the Elements of Their Common Law Copyright Infringement and Unfair Competition Claims .................................................................. 45

CONCLUSION .............................................................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*A&M Records, Inc. v. Napster, Inc.,*
    239 F.3d 1004 (9th Cir. 2001) ........................................................................................39

*Abilene Music, Inc. v. Sony Music Entm't, Inc.,*
    320 F. Supp. 2d 84 (S.D.N.Y. 2003) ..................................................................................7

*Arista Records, Inc. v. Mp3Board, Inc.,*
    No. 00 CIV. 4660(SHS), 2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002) ..............7, 10, 11

*Atlantic Recording Corp. v. Brennan,*
    534 F. Supp. 2d 278 (D. Conn. 2008) ..................................................................................9

*Atlantic Recording Corp. v. Howell,*
    554 F. Supp. 2d 976 (D. Ariz. 2008) ...................................................................................9

*Ballentine v. Montefiore Med. Center,*
    93 Civ. No. 4387 (JFK), 1995 WL 728469 (S.D.N.Y. Dec. 8, 1995) ...............................21

*Chevron Oil Co. v. Huson,*
    404 U.S. 97 (1971) .....................................................................................................11, 12

*DSU Med Corp. v. JMS Co.,*
    471 F.3d 1293 (Fed. Cir. 2006) ........................................................................................17

*Elektra Entm't Grp., Inc. v. Barker,*
    551 F. Supp. 2d 234 (S.D.N.Y. 2008) .................................................................................9

*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.,*
    228 F.3d 56 (2d Cir. 2000) ...........................................................................................7, 14

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
    499 U.S. 340 (1991) ...........................................................................................................7

*Fonovisa v. Napster, Inc.,*
    No. 3:01-CV-02669, 2002 WL 398676 (N.D. Cal. Jan. 28, 2002) ....................................42

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,*
    443 F.2d 1159 (2d Cir. 1971) ...........................................................................................44

*In re Joint E. & S. Dist. Asbestos Litig.,*
    52 F.3d 1124 (2d Cir. 1995) .............................................................................................16

*In re Omeprazole Patent Litig.,*
    258 F. Supp. 2d 221 (S.D.N.Y. 2001) ...............................................................................14

*Kerman v. City of New York,*
    374 F.2d 93 (2d Cir. 2004) ...............................................................................................14

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.,*
    424 F.3d 195 (2d Cir. 2005) ...............................................................................................7

*Livnat v. Lavi,*
    96 CIV. 4967(RWS), 1998 WL 43221 (S.D.N.Y. Feb. 2, 1998) ......................................44

*London-Sire Records, Inc. v. Doe 1,*
    542 F. Supp. 2d 153 (D. Mass. 2008) ..............................................................................39

*Matthew Bender & Co. v. West Publ'g Co.,*
    158 F.3d 693 (2d Cir. 1998) ........................................................................................7, 38

*Metabolite Labs., Inc. v. Lab Corp. of Am. Holdings,*
    370 F.3d 1354 (Fed. Cir. 2004) .......................................................................................14

*Metro-Goldwyn-Mayer Studios, Inc. v, Grokster, Ltd.,*
    259 F .Supp. 2d 1029 (C.D. Cal. 2003), *aff'd,* 380 F.3d 1154 (9th Cir. 2004),
    *rev'd on other grounds,* 545 U.S. 913 (2005)............................................................42, 44

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.,*
    380 F.3d 1154 n.10 (9th Cir. 2004), *rev'd on other grounds,* 545 U.S. 913 (2005)....42, 45

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster,*
    545 U.S. 913 (2005)............................................................................................... *passim*

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
    454 F. Supp. 2d 966 (C.D. Cal. 2006) .................................................................... *passim*

*Metro-Goldwyn-Mayer Studios, Inc.*v. *Grokster, Ltd.,*
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) ...........................................................................31

*Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.,*
    967 F.2d 1516 (11th Cir. 1992) ..................................................................................16, 17

*National Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.,*
    991 F.2d 426 (8th Cir. 1993) .............................................................................................9

*Perfect 10, Inc. v. Amazon.com. Inc.,*
    508 F.3d 1146 (9th Cir. 2007) .........................................................................................17

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,*
    494 F.3d 788 (9th Cir. 2007), *cert. denied,* ___ U.S. ___, 128 S. Ct. 2871 (2008) ..........21

*Press v. Chemical Inv. Servs. Corp.,*
    166 F.3d 529 (2d Cir. 1999) ........................................................................14

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) ....................................................................................38

*Walsche v. First Investors Corp.,*
    981 F.2d 649 (2d Cir. 1992) ........................................................................12

*Winstead v. Georgia Gulf Corp.,*
    77 Fed. Appx. 267 (5th Cir. 2003) ..............................................................15

## Statutes and Rules

17 U.S.C. §106(3) ....................................................................................................9

Fed. R. Civ. P. 56(c) ................................................................................................7

## Miscellaneous

3 Melville B. Nimmer, David Nimmer, *Nimmer on Copyright* (1996) ..........................................44

## INTRODUCTION

*I personally was not aware of any plan or discussion regarding the design of the LimeWire software application so as to enhance the ability of users to commit copyright infringement. To the contrary, our goal in designing and building LimeWire was to be the premiere content sharing application that allowed users to efficiently locate and download all sorts of digital content. For example, design features such as xml based structured queries, and enhancement of Gnutella protocol to enable these were implemented by Lime Wire so as to allow real time searching of content made available by various content providers.*

*It was never the plan or the goal of Lime Wire to design a piece of software that enhanced it's users ability to locate and download unauthorized content, and in particular, unauthorized music. I am personally not aware of any LimeWire feature that made it easier for users to share copyrighted content. Nor am I personally aware of any efforts by Lime Wire to somehow protect any alleged infringing activity from detection. It is my personal opinion that LimeWire was not designed to maximize infringement based on my experience at Lime Wire.*

*In addition, it was never our goal to attract Napster users nor was it ever our goal to be the "next Napster". To the contrary, our goal was to distance ourselves from Napster.*

Declaration of Anurag Singla, Former Lime Wire Software Developer

*I personally did not design the LimeWire software P2P application to specifically enhance the ability of users to commit copyright infringement. My goal in designing and building the LimeWire P2P software application was to enable it to be the premiere file sharing application that allowed users to efficiently locate and download any type of digital file. During my time of employment at Lime Wire it was and still is my belief the LimeWire P2P software application is a natural innovation of the Internet given the specifications and capabilities of Internet Technologies such as TCP/IP and HTTP. The many innovations and capabilities that I helped create during my employment at Lime Wire were "content agnostic", i.e., they were intended to enable general purpose digital communication, just as TCP/IP and HTTP enable general purpose digital communication.*

Declaration of Susheel M. Daswani, Former Lime Wire Software Developer

There are two sides to every story. This case is no exception.

Mark Gorton, Lime Wire LLC's ("LW") founder, Chairman, and former CEO, is a technologist and entrepreneur. In early 2000, Gorton became interested in the myriad opportunities created by emerging peer-to-peer ("P2P") technology. To Gorton, the idea of

1

millions of people around the world contributing resources to a common pool presented amazing opportunities. It was his hope that eventually the development of P2P protocols would lead to the development of new technologies and business ecosystems like the ones surrounding the World Wide Web.

Gorton chose a system based on a decentralized architecture because, while somewhat inefficient, he believed it would allow users to efficiently share all sorts of information, not just music files. Decentralized computer networks provide strong protections against any one organization controlling the Internet. Gorton believed that a decentralized architecture would better facilitate the development of a network where data of all types could be uploaded and downloaded with ease, with important social benefits to be realized.

LW's strategy was to attempt to highlight the long-term potential of P2P technology to do things other than simply share music files. Initially, the software was released to the public for free, with the hope of one day selling other services to complement the software, much as Google, Yahoo!, Wikipedia, and Facebook have successfully done. The LimeWire software, however, began to flounder, as did the Gnutella network upon which it was based. To increase interest in the product, LW's engineers set about to improve the product to be the best ubiquitous file-sharing product in the world. In order to generate capital, because after all, LW was not a charity, LW began to sell advertising.

LW was aware that its software could be used to commit copyright infringement, just as photocopiers, scanners, and VCRs can, and took efforts to thwart that infringement. LW maintained strict written policies prohibiting its employees from participating in copyright infringement. LW helped build libraries of legally sharable material in furtherance of Gorton's vision. Long before Plaintiffs filed this suit, LW required users of the LimeWire software to

assert that they would not engage in copyright infringement before LW would distribute the software to them. LW built a filter into the LimeWire software to attempt to remove copyrighted material from the network. LW continues to believe that it is possible to have an effective copyright infringement regime for the Internet, and hired a consultant to help lobby Congress for such legislation. LW has never advocated or encouraged copyright infringement, and has worked diligently to promote and expand the many exciting, legitimate uses of P2P technology.

Unfortunately, the problem of copyright infringement has obscured the tremendous potential that P2P technology has to play a positive role in our society. The holders of the copyrights to most of the musical works in the world try to place blame on enterprising companies like LW for their own failure to profit and embrace the digital world. LW, in response to the copyright holders' threats of litigation, tried to appease them with filtering suggestions and other proposals. But Plaintiffs had no interest in cooperating with LW to implement any of these strategies.

To their credit, Plaintiffs do an admirable job of spinning their side of the story, one in which LimeWire was created for the sole purpose of facilitating copyright infringement. But it is just that—a story, cobbled together with innuendos, bogus statistics, stale e-mails, inadmissible settlement documents, and snippets from a handful of documents that when read in their entirety do not say what Plaintiffs claim they say. None of this evidence satisfies Plaintiffs' burden to show that LW intended to induce copyright infringement by LimeWire users -- no such evidence exists.

Which party's story is to be believed is a matter that must be reserved for the jury. Because of the many fact issues relating to LW's intent, among other things, Plaintiffs' Motion for Partial Summary Judgment ("Mot.") must be denied.

## BACKGROUND

LW's founder, Gorton, conceived of LimeWire in the Spring of 2000. *See* RSOF ¶¶ 624, 625.[1] LimeWire is a P2P software application, operating over the Gnutella network, which permits individual users to connect directly to one another's PCs. Gorton had big plans for LimeWire. In April 2000, Gorton wrote to potential investors that the Gnutella network "allows for sharing of many different file types (not just MP3's)," and discussed the "important implications for freedom of speech" posed by this decentralized technology that, unlike the Internet, is "beyond the control of any government." RSOF ¶ 626. For example, Gorton noted that the technology could be used to permit citizens to share statistical information on police brutality in New York and to permit Iranian democracy advocates to distribute banned literature. *Id.* "The software I propose to develop will allow anyone with an Internet connection to build a community around an issue." *Id.* Gorton's ambitions included "form[ing] a team of programmers who can build the utilities to unleash the power of these new networks." *Id.* Gorton did just that.

Over the years, LW made enhancements to its software. *See generally* RSOF ¶¶ 657-682. Those enhancements improved the performance of the product in a generic fashion. At no time were these improvements made to enable users to more easily commit copyright infringement. *Id.* Plaintiffs' computer science expert admitted that an enhancement implemented by LW's software developers made searching using LimeWire more efficient for finding *all* types of files. Horowitz Tr. 77:12-78:7.

---

[1]     References to Defendants' Response to Plaintiffs' Statement of Material Facts are cited "RSOF [¶]." References to Plaintiffs' Exhibits are cited as "PX [page]." References to Defendants' Exhibits are cited as "DX [page]."

LW used various means to promote its superior P2P software. LW advertised its software for sharing files—all types of files, including video, computer games, and word documents. RSOF ¶¶ 628, 630, 633, 634-635, 647, 652. LW also advertised that LimeWire could be used to share music files since music files or "MP3s" are not per se illegal, and authorized MP3s are legally traded on the Gnutella network. When Napster was making headlines and P2P software was in the media spotlight, LW sought to take advantage of the free publicity arising from the public interest in P2P software. RSOF ¶¶ 640-652. But LW never went after Napster's copyright infringers and never designed any features whose purpose was to allow users to locate and download unauthorized content more easily. RSOF ¶¶ 657-682. LW was interested in accomplishing something broader than what Napster did. As Gorton said in a press release, LW "hope[d] that LimeWire [would] help attract academic interest and research to the network. File-sharing is just the tip of the iceberg – the Gnutella network has the potential to become an alternative not just to Napster, but to the World Wide Web itself." RSOF ¶ 647.

Throughout its history, LW has attempted to balance the competing concerns of copyright enforcement, free speech, and innovation. Like everyone else in the industry, LW followed the *Grokster* lawsuit and developments in the law of secondary copyright infringement generally. *See generally* Declaration of Mark Gorton ("Gorton Decl.") ¶ 36. In the wake of the *Napster* and *Grokster* decisions, LW also took steps to thwart infringing activity. Gorton Decl. ¶¶ 30-44. It educated its users. *Id.* It also developed a filter. *Id.* Unfortunately, LW could never fully implemented the filter because Plaintiffs, the world's largest record companies, would not cooperate with LW and refused to communicate which files they wanted filtered. *Id.* LW hired a lobbyist to endeavor to have Congress pass legislation that would have resulted in an

effective copyright enforcement regime by leveraging Internet Service Providers' ("ISPs") ability to act as a unique gateway to the Internet. Gorton Decl. ¶¶ 62-67.

Refusing to adapt and compete in the digital world, Plaintiffs filed this case for secondary copyright infringement—as part of their larger campaign to stifle P2P technology—against LW, Gorton, its Chief Technology Officer Greg Bildson ("Bildson"),[2] its former shareholder Lime Group LLC, and the M.J.G. Lime Wire Family Limited Partnership. Plaintiffs claim these defendants are responsible for the infringement allegedly committed by some LimeWire users.

Plaintiffs, however, fail to prove the threshold element of each of their claims—that third parties committed direct infringement using LimeWire. To prove their claim for inducement of copyright infringement, Plaintiffs must prove that LW intended to distribute its software with the goal of promoting its use to infringe copyrights. But Plaintiffs lack summary judgment evidence to conclusively establish LW's intent—the quintessential fact issue—as a matter of law. LW's summary judgment evidence showing that LW intended only to design and promote the quickest and most efficient P2P software on the market, clearly raises a fact issue as to LW's intent. Likewise, Plaintiffs cannot prove their claim for contributory copyright infringement as a matter of law. LimeWire's substantial noninfringing uses entitles it to the protection of the Supreme Court's *Sony/Betamax* safe harbor. Finally, Plaintiffs do not even try to establish the essential elements of their common law claims as a matter of law.

---

[2]      On September 9, 2008, Bildson resigned from LW. A few days later he settled with Plaintiffs, presumably trading favorable testimony for a broad release.

## ARGUMENT

Summary judgment is only appropriate when the pleadings, depositions, answers to interrogatories and admissions, along with the affidavits, if any, show there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c). The court is not to weigh the evidence, but rather must construe the evidence in the light most favorable to, and draw all inferences and resolve all ambiguities in favor of, the nonmovant. *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005). Courts should be "especially wary of granting summary judgment in cases involving copyright infringement, because they often are highly fact dependent." *Abilene Music Inc. v. Sony Music Entm't, Inc.,* 320 F. Supp. 2d 84, 88 (S.D.N.Y. 2003). Likewise, questions of intent are "best left in the hands of the trier of fact." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 68 (2d Cir. 2000). Although summary judgment can be useful in eliminating unmeritorious claims, it is, nevertheless, a "'drastic device since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury.'" *Carofino v. Forester*, 450 F. Supp. 2d 257, 264 (S.D.N.Y. 2006) (citation omitted).

## I. PLAINTIFFS HAVE FAILED TO CONCLUSIVELY ESTABLISH THAT LIMEWIRE USERS COMMITTED DIRECT COPYRIGHT INFRINGEMENT OF THE WORKS AT ISSUE.

The first element of every secondary copyright infringement claim is direct infringement by a third party. *See, e.g., Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998) (contributory infringement requires direct infringement by a third party). Direct infringement, in turn, requires proof that the plaintiff owns a valid copyright and that there has been unauthorized infringement by third parties. *Arista Records, Inc. v. Mp3Board, Inc.*, No. 00 CIV. 4660(SHS), 2002 WL 1997918, *3 (S.D.N.Y. Aug. 29, 2002); *see Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

7

Plaintiffs gloss over the requirement of proving direct infringement—the gateway element of both their inducement and contributory infringement claims.[3]   Instead, Plaintiffs argue that each of the thirty representative sound recordings at issue is *available* on the Gnutella network, and that multiple Gnutella—not LimeWire—users were purportedly "observed" sharing identical copies of those recordings. From this, Plaintiffs leap to the sweeping conclusion that if multiple Gnutella users are sharing an "identical" file, then that file "doubtless" has been transferred over the network. Mot. at 7 n.6. But Plaintiffs' "hunch" is not competent summary judgment evidence, and does not make up for the fact that Plaintiffs wholly fail to prove LimeWire's involvement in the process (or that the file was identical).

Plaintiffs' argument misses the mark in many respects. First, Plaintiffs are suing LW, not the entire Gnutella network. Accordingly, they must prove that third parties used *LimeWire,* not the Gnutella network generally, for direct copyright infringement, which they have not.

Second, Plaintiffs' "proof" that Gnutella users were "observed" sharing files is either nonexistent or incomplete. The majority of the proof Plaintiffs claim to offer is not in the record. This "proof" is supposedly on hard drives that Plaintiffs intentionally chose not to append to their Motion. *See* Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Plaintiffs' SoF")[4] at ¶ 120 n.5. The evidence Plaintiffs do put in the record is incomplete. RSOF ¶¶ 119-121; Defs' Objs.[5] As evidence that Gnutella users made identical copies of files available on the network, Plaintiffs include screen shots listing the names of those works. *See* PX 50. Apart from the fact that "making files available" is not the test, these screen

---

[3]   Plaintiffs do not seek summary judgment on their claim for vicarious copyright infringement.
[4]   Although Plaintiffs entitle their Statement of Facts "Undisputed," the contents of the document are anything but. *See* RSOF.

[5]   References to Defendants' Memorandum of Law in Support of Defendants' Objections to Plaintiffs' Exhibits and Deposition Excerpts to Their Motion for Partial Summary Judgment and Defendants' Motion to Strike Plaintiffs' Exhibits and Deposition Excerpts are cited as "Defs' Objs. at [page]."

shots do not prove direct infringement using LimeWire. RSOF ¶ 120. Nowhere in the record is there any competent evidence that these files are indeed copies of the songs at issue, nor is there evidence that even one individual used LimeWire to request the 30 songs at issue, find those 30 songs, download those 30 songs, or even make those 30 songs available.

Third, Plaintiffs' conclusion that if an identical file has been shared, that file "doubtless" has been transferred over the network is unjustified. Mot. at 7 n.6. Assumptions and assurances that actions have "doubtlessly" occurred are no substitute for competent evidence. There is simply no evidence that anyone improperly copied any of the works at issue using LimeWire.

Fourth, that copyrighted works are *available* on the Gnutella network—or otherwise—is irrelevant to determining whether Plaintiffs' copyrights have been infringed using LimeWire. The Copyright Act of 1976 gives the copyright owner "the exclusive rights . . . to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). As Plaintiffs know, having lost this argument before, "[t]he general rule, supported by the great weight of authority," is that infringement of the distribution right requires an actual dissemination of the copies. *Atlantic Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 981 (D. Ariz. 2008). "Merely making an unauthorized copy of a copyrighted work available to the public does not violate a copyright holder's exclusive right of distribution." *Id.* at 983; *see also National Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 434 (8th Cir. 1993) (holding that infringement requires actual dissemination); *Atlantic Recording Corp. v. Brennan*, 534 F. Supp. 2d 278, 282 (D. Conn. 2008) (denying motion for default judgment when complaint relied on allegations that defendant made copies of plaintiffs' recordings available to others online); *Elektra Entm't Grp., Inc. v. Barker*, 551 F. Supp. 2d 234, 245 (S.D.N.Y. 2008) (allegations that a Kazaa user violated the distribution

right by making music files available online failed to state a claim for infringement); *In re Napster, Inc., 377* F. Supp. 2d 796, 802, 806 (N.D. Cal. 2005) (merely listing a copyrighted work in an index of available files is not actual dissemination and factual disputes about the actual dissemination of copyrighted works via online file-sharing services "will only rarely be an appropriate subject for resolution on a motion for summary judgment"); *Mp3Board*, 2002 WL 1997918, at *4 (explaining that RIAA investigators following online links to infringing audio files did not show unlawful distribution "to the public"). Plaintiffs' expert acknowledges that making a work available and downloading that work are two different animals. Waterman Tr. 74:4-75:6 (explaining that a file can be "available on a network, but nobody ever downloaded it, so that would have no activity associated with it. You know, activity isn't necessarily the same as availability."). Plaintiffs' persistent reliance on the disfavored "making available" theory does not overcome their evidentiary shortcomings. Plaintiffs fail to show that any LimeWire user actually disseminated copies of Plaintiffs' works.[6]

Finally, Plaintiffs twist LW's statements, claiming they are "proof" that LimeWire users have committed direct infringement. LW has admitted no such thing. Plaintiffs take a statement by LW saying that its software *allows* users to infringe and that, at one point, most activity on the Gnutella network involved file sharing, and attempt to elevate it to an admission.[7] But technical possibility is not reality, and the activity of Gnutella users generally is not proof of the conduct of LimeWire users specifically. *See Mp3Board*, 2002 WL 1997918, at *3-4. Even evidence of the statistical likelihood of direct infringement is insufficient to prove the same. *See id.*

---

[6]     Likewise, Plaintiffs have failed to establish with competent summary judgment evidence that any of the works at issue were "reproduced by numerous LimeWire users." Mot. at 7.

[7]     Officials at LW dispute that they "recognized" that most of the activity on Gnutella has been the trading of media files. RSOF ¶¶ 422, 424.

Judge Stein's opinion in *Arista Records v. Mp3Board* is instructive. In that case, record companies sued a defendant that listed links to infringing material on its website. *Mp3Board*, 2002 WL 1997918, at \*3. The defendant's principals admitted that infringement may be conducted with the help of its site and that the defendant "generally encourages" and "allows" site visitors to download music files. *Id.* Despite this evidence, the court held that the record companies failed to prove that there was any direct infringement. *Id.* at \*3. The court determined that although the structure of the defendant's website and the scale of the operation gave rise to "a strong statistical inference" that defendant's users downloaded copyrighted files, the record companies failed to eliminate all genuine issues of material fact. *Id.* The plaintiffs did not submit any direct evidence of infringement, such as user logs or other technical data showing actual downloading of unauthorized files. *Id.* The court denied the record companies' motion for summary judgment on secondary infringement because "[a]t the summary judgment stage, the record companies cannot rely solely upon circumstantial evidence and admissions . . . that it is statistically 'likely' that direct infringement occurred." *Id.* at \*4. The same is true here.

In sum, Plaintiffs' legally irrelevant arguments and paltry proof of the first element of their claims does not satisfy their burden to conclusively establish that any LimeWire user committed direct infringement. Plaintiffs' "everyone knows it" contention does not fill in the gaping evidentiary hole in Plaintiffs' argument. Plaintiffs' Motion should be denied.

## II. GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER LW KNOWINGLY AND ACTIVELY INDUCED ITS USERS TO COMMIT COPYRIGHT INFRINGEMENT.

In June 2005, the United States Supreme Court created a new tort of secondary copyright infringement—inducement.[8] *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 545 U.S. 913

---

[8]    Evidence relating to the period before the June 2005 *Grokster* decision is not admissible to prove inducement. Prior to June 2005, the tort did not even exist. Under the *Chevron* test and the law of this Circuit, inducement of copyright infringement cannot be applied to conduct prior to the date the new rule was handed down.

(2005). The *Grokster* Court described the new doctrine of inducement as "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Id.* at 936-37. The Court explained the limitations on what constitutes inducement: "[M]ere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability. . . . The inducement rule, instead, premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful promise." *Id.* at 937.

The *Grokster* opinion did not set out a clear list of elements comprising the new tort or provide a bright-line test to guide the courts or the technology industry. The Court did, however, find three significant features of the evidence of Grokster's and StreamCast's intent: (1) each defendant, Grokster and StreamCast, "showed itself to be aiming to satisfy a known source of demand for copyright infringement, the market comprising former Napster users;" (2) neither defendant "attempted to develop filtering tools or other mechanisms to diminish the infringing activity using their software;" and (3) each defendants' revenue depended upon the volume of the use of their software since they profited from streaming advertisements to users during use. *Id.* at 939-40. The Court's considerations provide some minimal guidance for when inducement liability may attach.

Plaintiffs use *Grokster* as though it provides a "blueprint" for every case rather than the host of questions it left unanswered. Mot. at 8. Plaintiffs attempt to shove LW into *Grokster's*

---

*See Chevron Oil Co. v. Huson,* 404 U.S. 97, 106 (1971); *Walsche v. First Investors Corp.,* 981 F.2d 649, 653 (2d Cir. 1992); *see also* Defendants' Settlement Related and Pre-August 2003 Objections to Plaintiffs' Exhibits to Their Motion for Summary Judgment and Defendants' Motion to Strike Plaintiffs' Exhibits at 5-10. For these reasons, Plaintiffs' pre-June 2005 evidence is inadmissible. If, however, the Court considers that evidence in support of Plaintiffs' arguments, then evidence from the same time period should also be considered in support of LW's position.

shoes, arguing that LW's actions and conduct were "virtually identical" to that of the *Grokster* defendants, that they were direct rivals in the P2P arena, and that as a matter of law, liability is "clear" and "at least as compelling," as in the *Grokster* case. Mot. at 8-9. In fact, at times it is difficult to tell if Plaintiffs are arguing the facts in this case or the more compelling facts from *Grokster*. LW, however, is neither Grokster nor StreamCast. The mounds of evidence LW offers demonstrate the exact opposite—at a minimum it shows that there is a material fact dispute as to whether LW consciously and intentionally directed its users to commit copyright infringement. Unable to point to direct evidence proving that LW intended to induce LimeWire users to infringe, Plaintiffs and their experts resort to manipulating numbers, excising language from its context, twisting the meaning of LW's statements, urging improper and unjustified inferences about documents (many of which are inadmissible settlement offers), and attempting to confuse LW with other, vastly different P2P companies based solely on similarities in their software.

The hugely exaggerated level of infringement Plaintiffs try to prove with the invalid opinion Plaintiffs crafted for their statistics expert is not evidence of purposeful action by LW. *See infra* § II.A. Unlike Grokster and StreamCast, LW never sought to be the next Napster. To the contrary, LW attempted to build an open business ecosystem where businesses could respond to requests for any type of information. Nor does LW's business model resemble those of the *Grokster* defendants. *See infra* § II.C. LW also took many steps to impede infringement. *See infra* § II.D. LW's evidence shows that it did not seek to promote infringement, but rather, to develop a world where the benefits of P2P technology could multiply. And LW did not knowingly assist infringement. *See infra* § II.F.

There is a wide gulf between the skewed picture Plaintiffs paint of LW's conduct and LW's own version of its history and intentions. It is for the jury to weigh the competing evidence and determine LW's true intent. Questions of intent are the ultimate jury issues because they are highly subjective. *See EMI Catalogue P'ship*, 228 F.3d at 68 ("Because the issue goes to defendants' intent, it 'is best left in the hands of the trier of fact.'") (citation omitted); *Kerman v. City of New York*, 374 F.3d 93, 116-17 (2d Cir. 2004) (stating that intent and other issues "are questions of fact to be answered by the jury" and holding that the trial court improperly decided such issues); *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) ("'Whether a given intent existed is generally a question of fact,' appropriate for resolution by the trier of fact.") (citation omitted). This applies with equal force in inducement cases. *See In re Omeprazole Patent Litig.*, 258 F. Supp.2d 221, 235 (S.D.N.Y. 2001) (holding in a patent infringement inducement case that "intent is a fact question particularly appropriate for resolution by a jury."); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F. 3d 1354, 1365 (Fed. Cir. 2004) (explaining that "'[i]ntent is a factual determination particularly within the province of the trier of fact'" in patent infringement inducement cases) (citation omitted). The question of LW's intent to induce infringement is properly reserved for the jury.

### A.   Plaintiffs Have Not Offered Competent, Admissible Evidence of the Alleged Scope of Infringement by LimeWire Users, Much Less Shown that Widespread Infringement Establishes LW's Intent to Induce Infringement.

Plaintiffs proffer the report of their statistics expert, Richard P. Waterman, for the wildly inflated and remarkably convenient proposition that "nearly 99% of all download requests to LimeWire users are for infringing files." Mot. at 10, 35. Surprisingly, Plaintiffs' first swing at proving LW's intent relies not only on incompetent, unreliable, and inadmissible expert evidence, but also on a factor that the Supreme Court did not adopt for determining intent. *Id.*

14

Apart from the fact that Waterman's survey is inadmissible, it cannot establish that LW intended for its product to be used for infringement. *See* Mot. to Exclude[9] at 5-21, which is incorporated herein by reference in its entirety.

As an initial matter, Plaintiffs offer only Waterman's unsworn and unverified report, which is incompetent summary judgment evidence. *See Winstead v. Georgia Gulf Corp.*, 77 Fed. Appx. 267, 276 (5th Cir. 2003); Defs' Objs. at 13. Additionally, Waterman's opinions are themselves inadmissible for multiple reasons including the fact that Waterman's study is not his own, it relies on faulty methodology, and is premised on the admitted speculation of an attorney hired by Plaintiffs but not offered as an expert witness. *See* Mot. to Exclude at 5-21.

Waterman developed and executed a "protocol" in collaboration with Plaintiffs' attorneys and persons hired to implement the protocol, yet he did not make many of the important decisions pertaining to the design of the protocol. *Id.*; *see* Waterman Tr. at 41-44; 125-28; 132; 134; 140; 141-42; 153; 216-17; RSOF ¶¶ 104-111. His methodology was flawed from the start, as Waterman relied upon a nonexpert attorney to "classify" the various files purportedly gathered according to Waterman's collaborative protocol. German Tr. at 9, 20, 43; *see* Mot. to Exclude at 9-12. Yet, these classifications were admittedly "made up." German Tr. at 72. Worse yet, for no reason other than to skew the results upward in favor of Plaintiffs, Waterman monkeyed with the denominator of the "99%" result by jettisoning from the study any downloaded material that appeared to be viruses, pornography, spam, or spoof files. Waterman Tr. at 216-17, 229, 236-37, 243; *see* Mot. to Exclude at 12-14.

---

[9]     References to Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proffered Expert Summary Judgment Evidence from the Depositions and Reports of Ellis Horowitz, Ph.D. and Richard P. Waterman, Ph.D. are cited as "Mot. to Exclude at [page]."

Waterman also failed to determine whether this collaborative protocol was properly implemented. Waterman Tr. at 46, 51-53; *see also* Mot. to Exclude at 14-15. He failed to follow his own flawed protocol and did not properly obtain a selection of "random" hashes. Mot. to Exclude at 16-20. Moreover, his master hash library from which he drew his sample was based on an invalid and unreliable sampling frame. *Id.*

Finally, Waterman testified that what the study was looking for was the set of all files *made available* by LimeWire users. Waterman Tr. at 8. As explained in Section I, *supra*, available files are irrelevant. Nor can the volume of infringement be established merely by looking at the requests for files being made. That does not prove infringement; it shows only that Gnutella—not LimeWire—users are asking to download certain files. Requests do not equal infringement. Likewise, requests do not prove the amount of allegedly infringing content on the network. The proffered expert evidence is incompetent and inadmissible summary judgment evidence that proves nothing.[10]

In any event, the alleged scope of infringement was not a factor considered by the *Grokster* Court in its intent analysis. *Grokster*, 545 U.S. at 939-40. Plaintiffs cite two cases for the proposition that the scope of infringement is relevant. The first is a trademark, not copyright, infringement case. *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F. 2d 1516 (11th Cir. 1992). The second is the opinion after remand in *Grokster*. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966 (C.D. Cal. 2006) ("*Grokster* Remand"). Both cases state only that the scale of infringement makes it "more likely" that infringement was condoned by the

---

[10]    If Waterman's report is ruled admissible, then the jury should be allowed to determine the weight it should be given in light of its many defects—defects to which Defendants' expert will testify. In a "battle of the experts," the jury should be the ultimate arbiter. *See In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995) (holding that trial courts "should not abrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts." (Internal quotations omitted).

defendants. *Mini Maid*, 967 F. 2d at 1522; *Grokster* Remand, 454 F. Supp. 2d at 987. Whether something that is "more likely" actually happened, however, is a jury issue.

Moreover, whether LW knew of users' misuse of the technology—at any level—is immaterial. "[M]ere knowledge" of a product's infringing potential or of actual infringing uses is not enough to subject a distributor to liability. *Grokster*, 545 U.S. at 937. Instead, some form of encouragement is required. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1171 (9th Cir. 2007). In a recent patent case, the Federal Circuit explained the level of intent required by the inducement tort created in *Grokster*:

> the intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement. Beyond that threshold knowledge, the inducer must have an affirmative intent to cause direct infringement. . . . inducement requires 'that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.'

*DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (*en banc*) (citations omitted).

Plaintiffs' manufactured evidence of the purported scope of infringement by LimeWire users does not satisfy Plaintiffs' burden to establish LW's intent to promote direct copyright infringement. Genuine fact issues exist regarding LW's intent, precluding summary judgment.

**B.    LW Sought to Direct Attention to Its Product and the Gnutella Network, Not to Lure Known Infringers.**

The *Grokster* Court and the district court on remand determined that the defendants were aiming to satisfy a demand for copyright infringement, namely, the market of former Napster users. *Grokster*, 545 U.S. at 939; *Grokster* Remand, 454 F. Supp. 2d at 985-86. The Court based this conclusion on a variety of evidence. Importantly, both Grokster and StreamCast gave away a software program called "OpenNap" that was essentially an open-source version of the original Napster software that was specifically designed to be compatible with the Napster program and permit Napster users to download files from other Napster and OpenNap users.

*Grokster*, 545 U.S. at 924, 939; *Grokster* Remand, 454 F. Supp. 2d at 975.  StreamCast monitored the number of music files downloaded by OpenNap users. *Grokster*, 545 U.S. at 924, 939.  It also measured its progress by comparing itself to Napster.  *Grokster* Remand, 454 F. Supp. 2d at 986.  StreamCast had its agents participate in chat rooms to encourage Napster users to migrate to its product. *Id.*  It also ran advertisements to Napster users promoting itself as the next Napster. *Id.*  Grokster's newsletters even promoted its ability to provide certain popular copyrighted music. *Id.*  Tellingly, Grokster's name was a derivative of Napster's. *Grokster*, 545 U.S. at 925, 939.

LW's evidence shows that LW did not target Napster users.  Plaintiffs make much of the coincidental timing of LW's launch of LimeWire in August 2000, near the announcement of the injunction against Napster.  But LW's software had been in development for months before that, and its release was unrelated to anything happening with Napster.  Gorton Decl. ¶¶ 7-16.  Unlike Grokster, LW did not release its product under the name "Limester" or some other derivative of "Napster."  Moreover, at the time of Napster's demise, former Napster users actually passed on using LimeWire in favor of aggressively marketed companies such as Kazaa and Morpheus, whose popularity skyrocketed while LW struggled to survive (in August 2004, *Gnutella's* market share was an abysmal 8%).  *See* RSOF ¶ 642.  This is, perhaps, because LW sought to "attract academic interest and research" to the Gnutella network; apparently not something of interest to these former Napster users.  PX 79 (3/1/01 press release).  The fact that individuals may have decided to use LimeWire many years later does not support Plaintiffs' contention that LW courted former Napster users during Napster's collapse.[11]

---

[11]    Naturally, to the extent Napster users were technologically-savvy consumers, many technology-based businesses would have been interested in getting their attention.

The only substantive evidence Plaintiffs point to is a lone press release that mentions Napster and a handful of stale internal emails from 2000 and 2001 in which LW employees bantered around ideas to attract more attention to the Gnutella network and the LimeWire software.[12]  While these documents discuss expectations that user traffic may increase due to Napster's litigation woes, observing possible effects of the Napster litigation cannot be considered actively courting Napster infringers.

Plaintiffs are left spinning the meaning of the handful of e-mails and press releases they cite as evidence of "luring" Napster's users. Not surprisingly, Plaintiffs cannot point to a single word or phrase in any of these documents which says, "let's get Napster users by doing this." Importantly, the LW employees who authored those documents explained the documents' true meaning in their depositions.  For example, Plaintiffs rely heavily on two e-mails written by LW employee Steven Cho claiming that they prove that LW anticipated growth from the migration of Napster users and tried to lure Napster users to achieve this growth.  RSOF ¶¶ 150-153, 155, 640-644.  Not only are there no words in any of these documents evidencing an intent to lure Napster users, there never was any sort of "state of PR readiness" so as to allow LW to deploy an "extensive" campaign if some newsworthy development were to happen as Cho's email says. RSOF ¶¶ 640-642.  Cho and marketing director J.K. Barret confirmed in their depositions that there never was any effort to attract Napster users, and that their goal was to try to get the press and others (not Napster infringers) interested in LimeWire and the Gnutella network.  RSOF ¶¶ 648-650.

Plaintiffs also point to a lone LW press release that announced that LW anticipated a surge of growth in the Gnutella network due to Napster's legal issues, as evidence that LW was

---

[12]     Because it is dated years before inducement even became a tort, none of this evidence is admissible.  *See* n.8, *supra.*

trying to attract Napster users.  The author of that press release testified in her deposition, however, that she was not trying to attract Napster users.  She used the word "Napster" simply as a "hook" so that the various news wires would pick up the story.  RSOF ¶¶ 647-649; PX 80 (explaining that "the word napster might get us picked up (given that napster news is happening this week).").  There is _no_ evidence that LW ever portrayed itself as the "next Napster."  *See* RSOF ¶¶ 624-654.

Plaintiffs also try to gain traction from LW's internal discussions about marketing LimeWire to college students.[13]  *See* PX 71 (1-17-01 LW email exchange discussing contacting college "computer science clubs. . ." and "getting our name everywhere")); RSOF ¶¶ 150, 155, 645.  But LW's actual interactions on campuses fell well short of any offhand and rejected recommendations made by Steven Cho, for LW did nothing.  In any event, sophisticated college students, regardless of what P2P application they may use, are an attractive, legitimate target audience for many products.  There is nothing sinister about trying to obtain their business – Plaintiffs desire it as much as anyone else.  Plaintiffs also try to imply a nefarious intent by citing an LW document that pointed out that college students are "cheap and poor."  PX 146.  Plaintiffs insinuate that these traits indicate that students are inclined to steal music.  But those same traits could just as well indicate that students will be attracted to a low-cost means of communication, like LimeWire and the idea of a free digital commons.  Indeed, another statement in the same document contemplates creating "a special student price page."  *Id.*

---

[13]     Plaintiffs also rely on internal LW memoranda brainstorming on ways to promote the LimeWire software. For instance, Plaintiffs note PR firm Widmeyer's recommendations that LW promote itself in connection with Napster. PX 77. LW, however, never utilized this strategy because it did not reflect LW's goals. Gorton Decl. ¶ 19. Plaintiffs even cite e-mails meant as jokes in an effort to support their theory of inducement. *See* Plaintiffs' SoF at ¶ 161 (citing an e-mail in which Bildson jokes that LW should turn a users' comment that LimeWire has "all but replaced Napster" into a user testimonial). Bildson was kidding and such a testimonial never appeared.

LW never posted any user testimonials comparing itself to Napster, nor did it ever log onto any Napster chatroom. RSOF ¶¶ 154, 161. LW management also rejected Cho's desires, if any, to be more aggressive. RSOF ¶ 644. Because these ideas were rejected, if anything they evidence an intent *not* to induce infringement. While the *Grokster* Court provided little guidance on this point, evidence of internal musings was not what the Court found damning. Rather, it was outward communications that the Court found to be compelling evidence of intent to induce infringement. *Compare Grokster*, 545 U.S. at 937 (inducement requires that the defendant communicate an inducing message to its users) *with id.* at 925 n.7 (considering proposed advertisements). Thus, the Court held that "[t]he classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations." *Id.*; *see Perfect 10, Inc. v. Visa Int'l. Serv. Ass'n*, 494 F.3d 788, 800-801 (9th Cir. 2007), *cert. denied*, _____ U.S. _____, 128 S. Ct. 2871 (2008) (affirming the dismissal of inducement claim where plaintiff alleged "no facts suggesting that Defendants promoted their payment system as a means to infringe.").

Plaintiffs' reliance on a Google AdWord campaign is also misplaced. A LW intern came up with that idea independently and pursued the campaign without permission. RSOF ¶¶ 166, 167, 651. LW management did not authorize bidding on AdWords using the term "Napster," an terminated the campaign once they learned of it. *Id.*[14] LW also bid on many other Google keywords, including many generic terms, such as "mac p2p sharing," "mac pc sharing," "p2p," "file sharing," "gnutella," and "photo sharing." RSOF ¶ 203. These Google keywords show

---

[14]     One rogue employee's actions do not reveal the true intentions of LW. *See Grokster*, 545 U.S. at 937 (inducement "premises liability on purposeful, culpable expression and conduct"). Nor are such actions binding on LW since this employee acted outside the scope and authority of his position. *See, e.g., Ballentine v. Montefiore Med. Center*, 93 Civ. No. 4387 (JFK), 1995 WL 728469, at *4 (S.D.N.Y. Dec. 8, 1995) ("an employer is not liable in respondeat superior for the intentional torts of its employees acting outside the scope of their employment").

only that LW was trying to advertise its software to consumers—not necessarily Napster users, and certainly not "known infringers."

Finally, Plaintiffs imply that LW collected articles about Napster for some illicit purpose. The evidence, however, shows that LW collected all sorts of articles about itself and the industry, regardless of whether the word "Napster" appeared in the article.  RSOF ¶¶ 168-176, 654.  But even if LW had a whole scrapbook of Napster articles, that is not proof that LW was trying to attract Napster users.  The articles could, for example, have been used to monitor developments in the evolving case law, or as a lesson in how *not* to conduct a file-sharing business.

Simply put, while LW thought Napster users might give its software a try, it did not take affirmative actions to attract their attention.  This is in direct contrast to the *Grokster* defendants, who aggressively courted those users by beaming banner advertisements specifically to them. From the start, LW promoted its product as different and superior to Napster—and not for the purpose of infringement.  For instance, the 2001 article Plaintiffs cite, in which Bildson is quoted as anticipating that music-loving Napster users will try Gnutella, also highlights that LimeWire allows users to share anything "from an unsigned band's homemade video to grandma's spaghetti recipe."  RSOF ¶ 157.  Similarly, in the one press release Plaintiffs cite, LW discussed the surge in growth on Gnutella, but also bragged that LimeWire can be used "to share *all types of files*."  RSOF ¶¶ 159, 160.  Plaintiffs also quote a LW email sent to a media service stating that LimeWire is similar to Napster "in that it enables the sharing, searching, and downloading of MP3 music files."  Mot. at 13.  Plaintiffs purposely neglect to include the next line of that e-mail: "However, LimeWire takes information sharing a step further by enabling the user to share and search for all types of computer files, including movies, pictures, games, word processing documents, recipes, and more."  RSOF ¶ 156.  Plaintiffs also quote from "Talking Points for

Greg Bildson," noting that it compares Napster and LimeWire. RSOF ¶ 312. Again, Plaintiffs purposely omit the rest of the relevant paragraph: "P2P is not just about file sharing music/movies, etc.; it has enormous benefits which have yet to be explored. One of the benefits is to provide users with the ability to share files that are too large to be sent over email." *Id.*

It is significant that LW's software was not designed to mimic Napster's functionality. LimeWire was, however, given a few capabilities that Napster shared. Primarily based on the recommendation of Greg Bildson and then Chris Rohrs, LW made it so that all of the files downloaded using LimeWire would be put in a shared directory. RSOF ¶¶ 150, 369-389, 638, 639. LW engineers made this change not to copy Napster, but to make the Gnutella network more efficient.[15] *Id.* Indeed, when Bildson and Rohrs suggested this functionality, the word Napster was not present in their communications. LW has taken the best features of all file-sharing applications in order to make LimeWire the best P2P software available. *See* PX 232 (LW 3-16-01 e-mail stating "the best answer . . . is to build the best software with the best features").

Regardless, similarities in features or functionality are not the issue. Napster was found secondarily liable for infringement because it had a centralized structure through which Napster controlled and assisted users' infringement. *Napster*, 239 F.3d at 1023-34. As Plaintiffs concede, LW does not have a centralized structure. *See* Plaintiffs' SoF at ¶¶ 369-70. LW's decision to use a decentralized structure was a design choice made in order to have an open ecosystem—a network not controlled by one company, but one that many could hopefully work together to have a new open internet protocol much like the World Wide Web. Gorton Decl. ¶¶

---

[15] Despite Plaintiffs' efforts to prejudice the Court against P2P technology, there is nothing inherently illegitimate about seeking to emulate Napster's networking capabilities. *See Napster*, 239 F.3d at 1020 ("We are compelled to make a clear distinction between the architecture of the Napster system and Napster's conduct in relation to the . . . system.").

7-15, 26. Nothing obligated LW to structure itself like Napster, and Plaintiffs' suggestion that to do otherwise was illegal is unfounded. Certainly there was nothing wrong in trying to avoid Napster's architectural demise (even though that is not the case). And for the sake of clarity, LW did not design the already existing Gnutella network; it simply participated in the network through its already existing open design. *Id.*

Plaintiffs accuse LW of improperly trying to lure other P2P users, including users of Grokster, Morpheus, and Kazaa. RSOF ¶¶ 198-216. LW advertised that LimeWire was better than Morpheus and Kazaa in order to promote the benefits of its file-sharing software and of the Gnutella network generally—not to promote infringement or to suggest that its software was better for committing copyright infringement. *See, e.g.,* PX 116 (touting LimeWire and Gnutella). And of course, there is nothing inherently wrong with LW marketing its product to the public or users of other file-sharing applications—those users could be noninfringers just as easily as they could be infringers. LW properly promoted the superiority of its software's features for searching and locating all sorts of files, just as Xerox may claim the superiority of its copiers over Canon's, without knowledge of or control over what its users may do with the technology.

Plaintiffs also argue that LW targeted no less than all music consumers to commit infringement, again pointing to Google AdWord campaigns that used words such as "free music." RSOF ¶¶ 230-251. But LimeWire can be used legally to search for and download free music, more of which is being released every day, and LW has been in the music distribution business for years through MagnetMix. Plaintiffs also point to LimeWire's incorporation of certain features, mainly a music player, as evidence of LW's intent to corrupt the entire population of music listeners. LW, however, added the player because there was no other Java-

supported device available on the market. RSOF ¶¶ 330-331. Similarly, LimeWire's addition of iTunes integration, RSOF ¶¶ 337-341, and having search results show all metadata within an MP3 file, is not conclusive summary judgment evidence that LW sought to attract users of a mind to infringe. RSOF ¶¶ 243, 327-329, 342-345. It proves, at most, that LW sought to make it easier for people enjoy their music, period.

The complete record in this case debunks Plaintiffs' myth that LW sought to be the next Napster. LW talked about the growth that it expected due to Napster's demise and how it might raise the awareness of its software and the Gnutella network. But unlike the *Grokster* defendants, there is not one shred of evidence, in any business plan, internal e-mail, or elsewhere, that it was ever LW's goal to attract Napster's infringers. LW never voiced the objective that it desired Napster users.[16] None of Plaintiffs' evidence regarding LimeWire's marketing and functionality suffices to establish as a matter of law the necessary "clear expression" to foster infringement. *See Grokster*, 545 U.S. at 936-37. A genuine issue of material fact exists as to whether LW's intent was neutral, its only desire to build and promote a superior communications technology. LW is entitled to have a jury weigh these competing views of the evidence.

**C.     LW's Business Model Was Based on Distributing Useful, Cutting-Edge File-Sharing Technology.**

From the start, StreamCast's business plans unequivocally showed its intention to attract the millions of Napster users and leverage those users into a revenue model in the hundreds of millions of dollars. *See Grokster* Remand, 454 F. Supp. 2d at 975-76. "[F]rom the moment Grokster and StreamCast began to distribute their free software, each one clearly voiced the objective that recipients use it to download copyrighted works. . . ." *Grokster*, 545 U.S. at 923-

24. The *Grokster* defendants also had unique business models that created the incentive for them to encourage infringement; both made money the more their software was used to download files because the software streamed advertisements to users while they were using the software. *Id.* at 926, 939-40 ("the more the software is used, the more ads are sent out and the greater the advertising revenue becomes."). This evidence alone, however, would not justify an inference of unlawful intent, but must be viewed in the context of the entire record. *Id.* at 940.

LW's business plans have never remotely looked like StreamCast's. RSOF ¶¶ 421-429. LW's earliest business plan was to enable a business ecosystem using the open decentralized Gnutella protocol. Its original business plan describes LW's "Business Objective" as "the creation of a comprehensive, powerful, and cost-effective solution to enable corporations and other organizations to distribute information and files to targeted audiences via the Gnutella network." PX 3 at LW DE 486253. Although the author of this document speculated that most of the activity on the network at that time was media file-sharing, he also noted that "the Gnutella network enables its users to broadcast requests for any type of information. As new types of information transactions take place on the Gnutella network, LW believes that corporate demand for Gnutella products and services will grow, and LW will be placed at the center of a fast growing information network." *Id.* Likewise, in its Offering Memorandum, LW surmised that a majority of files shared on the Gnutella network are media files, like MP3s. *See* DX4. But it went on to state that "a small but growing minority of files include text files, computer code libraries, recipes, images, and shareware programs." *Id.* at LW DE 1120649. LW sought to foster this growing minority, and to increase the adoption of the Gnutella network as a whole.[16]

---

[16]    Numerous witnesses have testified that it was never LW's goal to attract Napster users. *See* RSOF ¶¶ 640-650.

RSOF ¶¶ 624-634.  In fact Bildson, LW's former CTO, once identified the selling points of P2P

technology to include:

- "alternative to high cost distribution channels";

- "Corporate America will save millions through the elimination of server farms and bandwidth costs during peak load of online delivery";

- "Send a copy of the children's school play to your Grandma on the other side of the world in minutes"; and

- "There is more to P2P than just music."

PX 195 at LW DE 1074847.

LW's revenue model also reflects its legitimate intentions.  Unlike StreamCast, LW's

revenue does not increase the more users utilize LimeWire.  Although LW initially made money

in the early days based on advertisements and bundling software, since 2004 LW's revenue has

been almost exclusively based on sales of its PRO version.  *See* PX 252 at LW DE 149247.  The

extent to which LimeWire is used—for any purpose—does not affect LW's bottom line.  LW,

like any other software distributor, has of course sought to increase its number of users, but

whether they use the software once a day or ten times a day, LW's revenue will not change.

Plaintiffs rely on an inadmissible private blog post by a former LW software engineer

named Adam Fisk to detract from the substantial evidence of LW's legitimate business model.

In October 2006, Fisk wrote that in his opinion P2P companies built their software for

infringement.  Mot. at 16; *see* Defs' Objs. at 12-13.  Other current and former employees have

sharply disagreed with this inadmissible lay opinion.  *See* RSOF ¶¶ 402, 403, 434, 679.  More

importantly, however, Fisk explained in his deposition and in his recent declaration that what he

meant by this blog post was that LW clearly did not intend to make its money off infringement.

RSOF ¶¶ 677-678.  Fisk's statement was likely motivated by the fact that he has a competing

P2P software program on the market. *Id.* LW is entitled to have a jury assess Fisk's credibility and the import of his "blog post."

Plaintiffs further insinuate that LW's goal to increase usage evidences a business model based on massive infringement. But there is a complete lack of evidence that LW sought to make money by increasing the infringing uses of its software. Although LW has concededly made money and has many users, if LW truly desired to "make money" off infringement it would have continued to use its earliest business model.

Without a doubt, LW sought to enrich the number of files available on the Gnutella network. More users and more files on the network increases the efficiency of searches for all types of material and benefits all users, much like early telephone users were benefited when more people obtained telephone service. Like all successful companies, LW sought to improve the performance of its product to make it more attractive to the public. But there is no credible evidence to show that LW made these changes to enable its users to more easily find unauthorized content. The record evidence consistently shows that LW's goal was to make the best file-sharing software on the planet. *See* RSOF ¶¶ 624-635, 657-682.

Plaintiffs also chastise LW for its efforts to generally promote its product, claiming that LW's knowledge that users could use it for infringement creates a presumption that LW intended to draw more infringing users. Plaintiffs' theory, if accepted, would have staggering implications for corporate America. If promoting a product with knowledge that it could be misused results in liability, then Apple, Sony, HP, and many other companies that promote products that can be used for infringement (such as iPods and CD burners) can all be held liable for inducement. Thankfully, the Supreme Court already rejected that absurd argument.

*Grokster*, 545 U.S. at 937 ("mere knowledge of actual infringement" is not enough, "nor would ordinary acts incident to product distribution. . . support liability).

LW's business model, based on PRO sales, does not support a presumption that it is predicated on infringement.  LW's PRO version does not assist others in finding or downloading unauthorized content any better than LW Basic.  PRO users benefit from and pay for technical support and nothing else.

### D.     LW Has in Good Faith Taken Steps to Reduce Infringement.

The *Grokster* Court did not mandate filtering.  *See Grokster*, 545 U.S. at 939-40.  The Court only considered whether the defendants had tried to filter, not whether they actually implemented a filter, much less one that eliminated infringement.  *Id.*  The Court found it relevant that neither defendant "*attempted* to develop filtering tools or other mechanisms to *diminish* the infringing activity using their software." *Id.* at 939 (emphasis added).

Long before the *Grokster* decision, LW implemented measures to reduce infringement. For example, at the time potential users download the program, they are reminded of the copyright laws and their obligation to comply with them.  RSOF ¶¶ 463-472.  Users cannot download LimeWire until they agree in advance to comply with copyright laws.  *Id.*  LW's policy has always been to forbid its technical support personnel to assist with infringement.  *See* RSOF ¶¶ 296.  Internally, LW had strict written policies against infringement on the job, either in the form of downloading infringing files or using unauthorized content to test the product. RSOF ¶¶ 655; Gorton Decl. ¶ 31.

LW complied with the law.  It, like everyone else in the industry, followed the *Grokster* case[17] and when the Supreme Court issued its decision in 2005 and announced the new theory of

---

[17]     Plaintiffs chastise LW for "closely" monitoring *Grokster*, as further evidence of intent.  LW monitored *Grokster* in order to ensure that it was following the law, which is continually evolving in this area.

inducement liability, LW immediately began to try to meet with the RIAA and the Record Labels in order to discuss appropriate filtering technologies and ways to reduce further infringement.[18] Gorton Decl. ¶¶ 36-61. LW met with officials from Yahoo!, Napster, iMesh, RealNetworks, and AOL relating to potential plans to try to convert LimeWire users to those respective music services. Gorton Decl. ¶ 54. LW officials also began discussions as early as September 2005 with several companies offering different forms of filtering technology including SNOCAP, GraceNote, Magix, and Audible Magic. Gorton Decl. ¶¶ 36-61.

LW proposed several plans to convert possible infringing LimeWire users to paying customers for the Record Labels in an effort to assuage Plaintiffs' concerns and settle their threatened lawsuit. *Id.* As part of its proposed conversion plans, LW entertained a variety of ideas, including plans that would have resulted in no content on LimeWire except Creative Commons material. *Id.* LW offered to undertake those efforts simply as a means of settlement, even though it believed it had no duty to go to such extremes (such as using "time-bombed" code or other measures that would have resulted in the inability of users to use LimeWire for noninfringing purposes). *Id.* When Plaintiffs rejected all of its proposals in early 2006, LW abandoned those ideas and began exploring other filtering options. *Id.* During Spring 2006, LW tested several filtering technologies. In each instance, however, LW discovered that they were not feasible on their own. Instead, a hybrid filtering plan was developed, using a SHA-1 filter plus audio fingerprinting. *Id.* That filter, however, cannot be implemented absent the necessary hashes from the Plaintiffs, at a minimum. *Id.*

---

[18] Plaintiffs have improperly attempted to use as evidence LW's efforts to settle their dispute. If the Court does allow this evidence to be submitted, then Defendants should be allowed to submit the entire record on settlement efforts with the Plaintiffs.

LW designed and implemented the SHA-1 filter, which is a hash-based filter that compares a file's unique identifier with a database of identifiers. RSOF ¶¶ 476-480; ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ When the hybrid filter was ready to be launched, LW met with representatives of the RIAA to demonstrate it. RSOF ¶¶ 37-42, 55, 59-61. It worked well. *Id.* In order for the hybrid filter to be effective, however, LW needed the hashes for Plaintiffs' copyrighted works. *Id.* LW has no way of knowing which companies own the copyrights to which files. Plaintiffs flatly refused to provide them. *Id.* Thwarted, LW nevertheless implemented its SHA-1 content filter which simply requires content owners to supply hashes to filter their content. Some content owners, such as Adobe, have done so, and now hashes for this material are live in LimeWire's filtering database. *Id.* Others have not.

Plaintiffs criticize LW's efforts, claiming LW's filter is "belated" and "ineffective," [19] and point to allegedly "better" filtering technology offered by Audible Magic. RSOF ¶¶ 497, 498. But even if LW was required to implement a "better" filter, ▮▮▮



---

[19] Attacking filtering systems is a favored tactic of Plaintiffs. On remand in *Grokster*, the plaintiffs sought an injunction and argued that StreamCast's "homemade" filter (a combination keyword and hash filter) was ineffective as well. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1203-05 (C.D. Cal. 2007). They argued, as here, that the court should force StreamCast to incorporate into its filter both "acoustical fingerprint" technology, like Audible Magic's, and "file hash" technology as part of a mandatory injunction. *Id.* at 1205, 1237. Judge Wilson, however, refused their request, finding there were material issues of fact and appointed a special master to determine "a filtering regimen that reduces Morpheus's infringing capacity, preserves its noninfringing functionality as feasible, and analyzes any potential cost concerns." *Id.* at 1237.

███████████████████████████████████████

██████████████████████ Plaintiffs also make much ado about LW's Chief Financial

Officer's concerns about the effectiveness of LW's filtering. His concerns, however, have been

resolved. RSOF ¶¶ 494, 495. He testified that he "is satisfied with the filter" and he is still

employed by LW today. *Id.* The fact that LW's CFO raised concerns about LW"s filter

demonstrates, if anything, corporate responsibility.

Plaintiffs disingenuously point to other filters LimeWire uses and claim that LW could

employ a better copyright filter if it desired. While LimeWire does include simple keyword

filters to block pornography and other undesirable content, such simple keyword filters are

unsuitable for copyrighted music. RSOF ¶¶ 517-521. While the pornography filter includes

only about 30 keywords, filtering music would require an impossibly long list of keywords and

would still be hopelessly over-and under-inclusive.[20] *Id.* LimeWire also includes default filters

that block harmful files by their file extension, like the ".vsb" file extension known to contain

viruses, because those files have no purpose other than destruction. RSOF ¶¶ 522-525.

Plaintiffs suggest that LW should have added a filter to block the download of all files with an

"mp3" extension. Not every MP3 file, however, is unauthorized. Blocking all "mp3" file

extensions would block authorized MP3s as well as unauthorized ones, and would destroy much

of LimeWire's noninfringing functionality.

### E.   LimeWire Was Designed for High-Speed, Efficient Sharing of Information.[21]

---

[20]    The *Grokster* Remand court determined that "a jury could reasonably find that copyright-filtering does not work perfectly, and implementing it would negatively impact usability. *Grokster* Remand, 454 F. Supp. 2d at 990.

[21]    Whether a technology was designed for infringement was not a factor considered by the Supreme Court in *Grokster*, but a consideration the district court came up with on remand. *Grokster* Remand, 454 F. Supp. 2d at 987. Regardless, LW's evidence shows that LW designed its software to assist users in locating and downloading all sorts of files.

There is not a single piece of evidence to establish that anyone at LW tested and designed LimeWire for infringing capabilities. When LW employees tested LimeWire to determine what, in general, was happening on the Gnutella network, including inefficiencies and bottlenecks in the network, its engineers searched for authorized content, such as Shakespeare or Creative Commons music. RSOF ¶ 655. In contrast, StreamCast employees downloaded music by Britney Spears, and developed screenshots showing search results for infringing content. *Grokster* Remand, 454 F. Supp. 2d at 980, 987. The evidence Plaintiffs cite to claim that LW used search terms like "Beatles" in testing, falls short of proving that LW engineers used these terms in search query algorithms. At most, these documents show LW engineers discussing query routing protocols using these query terms in the abstract. RSOF ¶ 321.

The single instance Plaintiffs can claim that a LW employee searched for unauthorized music while on the job is not what Plaintiffs make it out to be. Although in his deposition Bildson could not recall doing so, Plaintiffs' Exhibit 188 appears to show that Bildson searched for a Sinead O'Conner song in testing the *Gnutella network*, not LimeWire. In contrast to StreamCast's CEO who chastised his developers for not being able to locate infringing content, Bildson was not testing LimeWire for infringing capabilities (it had not even been released yet). Instead, he was testing the network to determine why Gnutella was so inefficient at locating files that he believed should be easy to locate. RSOF ¶¶ 322, 656. Bildson discussed the dearth of files on Gnutella generally, not infringing content. ("Too few people are sharing <u>files</u> and everyone is piggybacking on the network to do searches") *Id.* (emphasis added). Bildson talked about *sharing* having broken down, and he recommended two courses of action if "we want effective community based file sharing." *Id.* Bildson's search merely confirmed his suspicions that people on Gnutella were not sharing content in general.

33

As described above, LW designed LimeWire so that users could more efficiently search for and share all sorts of digital content. *See* RSOF ¶¶ 657-682. Each of the features Plaintiffs attack were added to LimeWire to assist users in locating all sorts of content, not just music. For instance, Plaintiffs stress LW's efforts to eliminate "freeloading" on the network by making all downloaded files save to the user's shared directory by default. This feature, however, was implemented to increase the number of <u>files</u> on the Gnutella network in general which, in turn, would allow users to locate content more efficiently. RSOF ¶¶ 380, 658, 659. The same is true for LimeWire's ultrapeer structure. Using ultrapeers allows LimeWire users to use less bandwidth in searching for all sorts of files. RSOF ¶¶ 661, 662.[22]

LW's addition of various features that allow users to listen to music, such as the media player and iTunes interaction, does not reflect a conscious effort to foster infringement. Instead, these features reveal an intent to make LimeWire as user-friendly as possible. RSOF ¶¶ 330-341. Users may now listen to music obtained via LimeWire, iTunes, or even CDs that are stored on their computers.

LW also improved LimeWire's user interface to display all sorts of information. When search results come back, various columns are displayed, including Bitrate, file type, and title. Bitrate was included not because LW expected that most of its users were searching for unauthorized songs, but so that when files containing bitrate metadata were located, all metadata information could be displayed. RSOF ¶¶ 327-329. Likewise, the "Top 40" and other genre search categories had nothing to do with locating infringing content. Those categories relate to specific genre metadata contained in some files, more commonly known as an "ID3 tag." RSOF

---

[22]    Contrary to speculation by Chris Rohrs about how ultrapeers work, ultrapeers do not serve to protect the activities of LimeWire users. Indeed, if that were the case, then how was Plaintiffs' counsel able to download screenshots of LW users' activities?

¶¶ 67, 68. LW did not select these 146-plus genre categories; they are industry standard. *Id.*
Moreover, other genres are listed that clearly have nothing to do with music, such as "noise" and
"house." *Id.* Other design features, such as listing search displays in decreasing order according
to the number of sources, or the fact that LimeWire uses "swarming" technology to transfer files
quicker, are again not evidence of a "design" intended to infringe. RSOF ¶¶ 342, 343. Instead,
they reflect an intent to build the most efficient P2P software for locating and downloading all
types of files.

Unlike StreamCast, LW has *never* taken any active steps to block the enforcement efforts
of copyright holders on the Gnutella network,[23] nor is there any evidence in the record that LW
*ever* implemented any feature that avoided user detection. RSOF ¶¶ 346-354. *See Grokster
Remand*, 454 F. Supp. 2d at 988. For example, Plaintiffs point to the fact that LimeWire uses
"TLS" encryption technology. TLS, however, only encrypts the communications between users,
not what users are uploading or downloading; and it does not "hide" the identity of those users.
RSOF ¶ 352. Even if TLS worked as Plaintiffs profess, LW's intent was not to assist others to
hide their infringing activities. The only reason any data were encrypted was because it provided
a programming challenge to LW software developer Sam Berlin. *Id.*

**F.     LW Did Not Encourage or Assist Infringement.**

Plaintiffs try to paint LW as assisting infringers via two means: (1) direct assistance
through emails; and (2) information exchanged through online forums. Both points lack merit.

LW has produced over 2 million pages of documents. After scouring all of that material,
Plaintiffs can cite to only three instances in which it even marginally appears that LW provided
assistance or encouragement to users who might commit infringement. In the first instance,

Bildson told a user in a 2001 e-mail that he is sharing "good stuff" on Gnutella and states his preference for LimeWire. RSOF ¶ 304. Whereas Plaintiffs urge that this e-mail should be interpreted as encouraging infringement, others would read it as generally promoting LimeWire. Bildson expresssly denied that he was sharing any unauthorized content. *Id.* This vague e-mail certainly does not constitute a "clear expression" of the intent to induce required by *Grokster*.

The second instance Plaintiffs submit involves Bildson helping a user resolve technical problems, "without discouraging him from engaging in copyright infringement." Mot. at 28; RSOF ¶ 301. Failing to discourage is vastly different than actively encouraging infringement. *Grokster* itself permits distributors to provide technical assistance without crossing the line to inducement. *See Grokster*, 545 U.S. at 937 ("ordinary acts incident to product distribution, such as offering customers technical support" will not support liability in themselves). Moreover, there is no requirement, legal or otherwise, that LW or its employees actively protect Plaintiffs' copyrights.

The only other example Plaintiffs offer is a LW engineer helping users seeking to share a large volume of music. RSOF ¶ 305. There is no evidence, however, that these users were seeking to share *unauthorized* music. Nor is there evidence that the LW engineer did more than provide simple technical support.

Plaintiffs' attack on the LimeWire forums is similarly misplaced.[24] First, the LimeWire forums were instrumental in identifying bugs and technical flaws in LimeWire. Berlin Decl. ¶¶ 15-19. LW valued the community assistance. *Id.* Second, these forums were moderated by

---

[23]     LW does not dispute that if an IP addressing is repeatedly flooding the network with files, the software will block those IP addresses based on blind statistical analysis, not because it knows that the IP address is associated with anti-piracy companies.

[24]     As an initial matter, the forum exchanges are hearsay. *See* Defendants' Evid. Objs. Plaintiffs cite only communications between Gnutella users and moderators who are not LW agents. As such, none of Plaintiffs' evidence on this point is admissible.

people who were neither LW's agents nor employees, but were individuals who decided to help people who had questions about LimeWire. *Id.; see also* RSOF ¶¶ 253-279. Although LW told the moderators to adhere to certain practices and polices, including the policy not to assist infringement, *id.*, LW did not monitor the LimeWire forum. *Id.* While several rogue moderators apparently did not adhere to LW's policies on a few rare occasions, others did most of the time. In fact, in forum posts cited by Plaintiffs, one moderator, "Only a Hobo," informed users of the following:

- "[t]he forum has a rule 'You may not use LimeWire for copyright infringement, nor discuss such activity here."

- "Hi Quinn, I have deleted your post [asking about music by Janis Joplin] sadly as it does clearly indicate that you are using Limewire to ddownload [*sic*] copyright [*sic*] material, which is against the forum rules . . ."

- "In answer to your post [which was deleted because LimeWire may not be used for infringement] No it is not legal."

PX. 165. Ignorant of the rare occasions on which they may have violated LW policy, LW gave awards to some of the moderators believing that they promoted the good of the network. *Id.* Once LW learned of the posts Plaintiffs cite, it took appropriate action to the extent it could. *Id.*

LW does not monitor the Gnutella Forums at all, and it has no control over what happens in that forum. RSOF ¶¶ 280-295. Indeed, one of Plaintiffs' own exhibits shows a moderator writing "[w]e very much care about our users' concerns, but Gnutellaforums is too big for us to read every message . . . it's best to contact the LimeWire staff personally if there's something urgent to report." PX 175 at 3. Plaintiffs' unfounded suggestion that LW is responsible for the activities of moderators in this general forum is absurd.

### III.   PLAINTIFFS HAVE NOT ESTABLISHED CONTRIBUTORY COPYRIGHT INFRINGEMENT AS A MATTER OF LAW.

37

A defendant is contributorily liable for copyright infringement when there is (1) direct infringement by a third party;[25] (2) the defendant has knowledge of the infringing activity; and (3) the defendant induces, causes or materially contributes to the infringing conduct. *Matthew Bender*, 158 F.3d at 706. As demonstrated above, Plaintiffs have not—and cannot—prove the first element of direct infringement. *See* § I, *supra*. Plaintiffs have not—and, again, cannot—prove as a matter of law that LW had knowledge of infringing activity on LimeWire much less that it materially contributed to any infringing conduct. The record evidence demonstrates that material fact issues exist on both elements. Because LimeWire has substantial noninfringing uses as a matter of law, it is entitled to the protection of the *Sony-Betamax* safe harbor.

### A.    LimeWire Is Capable of Substantial Noninfringing Uses as a Matter of Law.

In its seminal decision on secondary copyright infringement, the Supreme Court held that manufacturers and distributors of mass-market technology ("staple articles of commerce") may not be subjected to liability for the distribution of their products to the public so long as those products are "merely . . . capable of substantial noninfringing uses." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984). Applying this test, the *Sony* Court determined that the Betamax video tape recorder was capable of at least two noninfringing uses: taping authorized programs and fair use "time shifting" (*i.e.*, recording programs for later viewing), and thus, Sony could not be liable under the new safe harbor. *Id.* at 442, 456.

In an effort to avoid the inescapable conclusion that LimeWire meets the *Sony-Betamax* safe harbor, Plaintiffs pervert the language and application of *Sony*. First, Plaintiffs rely on other language in the opinion to substitute the word "substantial" in the *Sony-Betamax* test for "commercially significant." The Court, however, clearly stated that the test looks to the product's "*substantial* noninfringing uses." *Sony*, 464 U.S. at 442. Importantly, however,

---

[25]    Tellingly, Plaintiffs omit direct infringement from their own statement of the elements. Mot. at 30.

Plaintiffs recognize that the *Sony-Betamax* test only requires that the product be "capable" of substantial noninfringing uses. *Id.*; *see A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020-21 (9th Cir. 2001) (emphasizing the "capability" standard and criticizing the district court for focusing on the product's current uses rather than its capabilities).

Second, Plaintiffs misinterpret *Sony* to argue that courts should compare the *magnitude* of the noninfringing uses with the infringing ones. This is not the law. Although the *Sony* Court's minority argued for that rule, the majority rejected the rule in favor of the capability/substantiality standard. *Sony*, 464 U.S. at 491. The Court expressly declined to quantify the meaning of "substantial," leaving the issue open to a broad interpretation based on the facts presented. *Id.* at 442.

In order to qualify for the *Sony-Betamax* safe harbor, a product must be "merely capable of substantial noninfringing uses." *Sony*, 464 U.S. at 442. LimeWire undoubtedly meets this test. *See, e.g., London-Sire Records, Inc. v Doe 1*, 542 F. Supp. 2d 153, 159 (D. Mass. 2008) (recognizing that many files transferred over P2P networks "are entirely legitimate"). LW has submitted evidence of myriad substantial noninfringing uses of its P2P technology with its Motion for Summary Judgment, which is incorporated herein in its entirety. *See* Memorandum of Law in Support of Defendant LimeWire LLC's Motion for Summary Judgment ("LW's MSJ") at 16-30.







These examples demonstrate the substantial noninfringing uses of P2P technology like

LW's.  Perhaps the best evidence is that 

Failing to anticipate the overwhelming evidence of LimeWire's substantial noninfringing

uses, Plaintiffs emphasize the fact that in his deposition Gorton could not specifically recall

noninfringing uses by any specific LimeWire user.[26]  Of course he could not.  As explained in

LW's summary judgment motion, LW and its personnel do not have the ability to monitor users'

activity on LimeWire.  LW's MSJ at 8-9.  Thus, Gorton has no more knowledge of a Chinese

dissident's uploading a video of brutality against the falun gong than he does an American

teenager's downloading of the Wilco song.  Other LW employees and its expert are in the same

position.  LimeWire's structure does not allow LW to monitor its users' activities.  Regardless,

---

[26]     Gorton did recite numerous examples of noninfringing uses of LimeWire in general.  *See* Gorton Tr. at 171-93..

the test is whether a product is "capable of substantial infringing uses," not whether the distributor's employees can specifically name such uses. *See Sony*, 464 U.S. at 442.[27]

Plaintiffs cannot overcome the overwhelming evidence that LimeWire is capable of substantial noninfringing uses. LW is entitled to the protection of the *Sony-Betamax* safe harbor as a matter of law. Regardless, the conflicting evidence on this point creates a material fact issue that must be resolved by a jury.

**B.    LW Did Not Have Specific Knowledge of Infringement by LimeWire Users.**

In cases involving a technology capable of substantial noninfringing uses, generalized knowledge of infringing uses does not satisfy the knowledge element of contributory infringement. *See Sony*, 464 U.S. at 439 (finding no precedent to support liability against Sony based "on the fact that they have sold equipment with constructive knowledge of the fact that its customers may use that equipment to make unauthorized copies of copyrighted material"). Instead, what is required is actual knowledge that "specific infringing material was available" and a failure to act to block infringers' access. *See Grokster*, 380 F.3d at 1162 (holding that the copyright owners had to establish that the defendants had specific knowledge of infringement at the time they contributed to the infringement and failed to act upon their knowledge); *Fonovisa v. Napster, Inc.*, No. 3:01-CV-02669, 2002 WL 398676, at *7 (N.D. Cal. Jan. 28, 2002).[28]

---

[27]     Plaintiffs ignore LW's structure and claim that the inability of Gorton and others to identify specific noninfringing uses is because "nearly 99%" of all LimeWire download requests are infringing. Mot. at 35. That figure is incorrect and the study producing it invalid and inadmissible. *See* § II.A, *supra*. At best, Plaintiffs' study establishes that at most 45% of the material examined is their content that is being infringed. *Id.* Plaintiffs have not proven that the other 55% is not noninfringing or not authorized. And even if 92% of the files on the Gnutella network were established to be infringing, given the fact there are billions of files available, that percent is not insubstantial. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 380 F.3d 1154 n.10 (9th Cir. 2004), *rev'd on other grounds*, 545 U.S. 913 (2005).

[28]     The *Napster* district court recognized that "conduct sufficient for liability may take other forms" and provided this example of the type of constructive knowledge of specific infringing activity that would be relevant to overcome the *Sony-Betamax* safe harbor: "For example, assume Napster tracked down a single individual with a vast library of sound recordings, some of which Napster suspected but did not know were copyrighted by other parties. If Napster extended a personal invitation to that individual to join the Napster Music Community in order to

The Ninth Circuit determined that Napster had both constructive and actual knowledge of infringement by its users. *Napster*, 239 F.3d at 1020. Since, however, the technology was capable of noninfringing uses, it was entitled to the *Sony-Betamax* safe harbor. *Id.* at 1021-22. Thus, more than generalized knowledge of infringement was required. *Id.* "[I]n an online context, evidence of actual knowledge of specific acts of infringement is required to hold a computer system operator liable for contributory infringement." *Id.* at 1021. The court then conditioned liability on specific knowledge and the capacity to act: "Napster has *actual* knowledge that *specific* infringing material is available using its system, that it could block access to the system by suppliers of the infringing material, and that it failed to remove the material." *Id.* at 1022 (emphasis orig.).

Here, Plaintiffs have failed to eliminate all issues of material fact relating to LW's actual knowledge of specific acts of infringement and capacity to act. Plaintiffs have pointed only to signs that LW had *constructive* knowledge of infringement or, at most, knowledge of general infringement. Plaintiffs argue only LW's knowledge that LimeWire could be used for infringement and LW's general knowledge that consumers were using *Gnutella*—not LimeWire—for infringement. *See* § II, *supra.*

Plaintiffs also point to the decentralized design of LimeWire as some type of sinister decision. It was not. LW's core business strategy of enabling an open business ecosystem was predicated on the network being decentralized. On closed networks, only the company that owns the network can participate. On the open Gnutella network, however, dozens of companies have produced software that interacts with the network in various ways. Among these companies are Big Champagne and Qtrax, who operate businesses in conjunction with content owners.

---

increase the number of songs available on its system, Napster's conduct might render it liable for the individual's infringement." *Napster*, 2002 WL 398676, at *7.

Moreover, LW did not have the capacity to act on even generalized or constructive knowledge of infringement. For instance, when LW received the RIAA's cease-and-desist letter, LW's software had already been distributed. LW had no ability to act on the information. It did not have the legal right to repossess the software nor the technical ability to disable the distributed software, just as Sony lacked the capacity to repossess or disable the VCRs it had sold. Accordingly, Plaintiffs have failed to carry their burden of proving the knowledge element of their contributory infringement claim as a matter of law. Material fact issues as to whether LW possessed the requisite level of knowledge and capacity to act preclude summary judgment.

### C.    There Is a Genuine Fact Issue as to Whether LW Materially Contributed to Copyright Infringement.

The material contribution element of contributory infringement requires "substantial involvement" in the underlying infringement. *Demetriades v. Kaufman*, 690 F. Supp. 289, 294 (S.D.N.Y. 1988) (recognizing that the defendant's participation cannot be attenuated). Thus, the alleged contributory infringer must make more than a 'mere qualitative contribution' to the primary infringement." *Livnat v. Lavi*, No. 96 CIV. 4967(RWS), 1998 WL 43221, at *3 (S.D.N.Y. Feb. 2, 1998) (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). The contribution must also bear a "direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer." *Id.* (citing 3 Melville B. Nimmer, David Nimmer, *Nimmer on Copyright*, §12.04[A][2][a] at 12-75 (1996)). Material contribution is not present when the only contact between the defendant and the primary infringer occurs at the time of sale. *See Sony*, 464 U.S. at 438. Subsequent, minimal contact is also insufficient. For instance, providing technical assistance and other incidental services to alleged primary infringers is not material to the alleged infringement. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 259 F. Supp. 2d 1029, 1042

(C.D. Cal. 2003), *aff'd*, 380 F.3d 1154 (9th Cir. 2004), *rev'd on other grounds*, 545 U.S. 913 (2005). For these reasons, in *Grokster*, the Ninth Circuit found the distributors of software had not materially contributed to infringement. Like LW, the defendants did not provide the site and facilities for infringement because they were not access providers. *Grokster*, 380 F.3d at 1163. Moreover, the defendants did not provide file storage and index maintenance. *Id.* Rather, the software users created the network and provided the access. *Id.*

Likewise, LW does not create the network or provide the access; LimeWire users do. For that reason and for all the reasons explained in LW's motion for summary judgment and in Section II, *supra*, Plaintiffs have failed to prove as a matter of law that LW has materially contributed to third parties' copyright infringement. Plaintiffs' Motion should be denied.

## IV.   PLAINTIFFS HAVE NOT ESTABLISHED THE ELEMENTS OF THEIR COMMON LAW COPYRIGHT INFRINGEMENT AND UNFAIR COMPETITION CLAIMS.

Plaintiffs have failed to carry their burden of proving that they are entitled to summary judgment on their state law claims of common law copyright infringement and unfair competition. Namely, both causes of action require proof of unauthorized reproduction. As demonstrated in Section I, *supra*, Plaintiffs have offered no such evidence. For this reason and those set forth in the Memorandum of Law in Support of Greg Bildson, Mark Gorton, Lime Group LLC, and M.J.G. Lime Wire Family Limited Partnership's Motion for Summary Judgment, which is incorporated herein by reference in its entirety, at 20-21, Plaintiffs' summary judgment motion should be denied.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion should be denied.

45

Dated:  September 26, 2008.

Respectfully Submitted,

_____

Charles S. Baker (CB1365)
Joseph D. Cohen (JC3017)
Susan K. Hellinger (SH8148)
PORTER & HEDGES, LLP
1000 Main Street, 36th Floor
Houston, Texas  77002-6336
(713) 226-6000 (Telephone)
(713) 228-1331 (Facsimile)
cbaker@porterhedges.com
jcohen@porterhedges.com
shellinger@porterhedges.com

*Attorneys for Defendants*

Of counsel:

Lauren E. Handler
SDNY (LEH 6908)
PORZIO, BROMBERG &
NEWMAN, P.C.
100 Southgate Parkway
P.O. Box 1997
Morristown, NJ  07962-1997
(973) 538-5146 (Facsimile)
(973) 889-4326 (Telephone)
lehandler@pbn.com

## CERTIFICATE OF SERVICE

This is to certify that the foregoing pleading was filed by means of the Court's ECF system on the 26th day of September, 2008.  Accordingly, it is assumed that all counsel of record received notice of this filing from the ECF system.  Lead counsel, listed below, will also receive a courtesy copy via email.

Katherine B. Forrest
Teena-Ann V. Sankoorikal
Cravath, Swaine & Moore, LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019-7475
(212) 474-1000
(212) 474-3700 (fax)

Steven A. Hirsch
Keker & Van Nest, LLP
710 Sansome St.,
San Francisco, California 9411
(415) 391- 5400
(415) 397-7188 (fax)

Karyn A. Temple
Recording Industry Association of America
1025 F Street, NW, 10th Floor
Washington, DC 20004
(202) 775-0101
(202) 775-7253 (fax)

_____/s/_____
Charles S. Baker