UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARISTA RECORDS LLC; ATLANTIC RECORDING CORPORATION; BMG MUSIC; CAPITOL RECORDS, INC.; ELEKTRA ENTERTAINMENT GROUP INC.; INTERSCOPE RECORDS; LAFACE RECORDS LLC; MOTOWN RECORD COMPANY, L.P.; PRIORITY RECORDS LLC; SONY BMG MUSIC ENTERTAINMENT; UMG RECORDINGS, INC.; VIRGIN RECORDS AMERICA, INC.; and WARNER BROS. RECORDS INC., | ECF CASE<br><br>06 CV 5936 (GEL) |

Plaintiffs,

v.

LIME GROUP LLC; LIME WIRE LLC; MARK GORTON; and GREG BILDSON, and M.J.G. LIME WIRE FAMILY LIMITED PARTNERSHIP

Defendants.

## DECLARATION OF MARK GORTON IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Mark Gorton, the undersigned, hereby declare as follows:

1.    My name is Mark Gorton. I am over eighteen years of age, of sound mind, and in all ways qualified and competent to make this declaration. I have personal knowledge of the facts contained in this declaration and they are true and correct.

2.    I am the founder and Chairman of Lime Wire. Until April 2007, I was also Lime Wire's CEO. I am also the founder of several other organizations including, Tower Research Capital LLC, a quantitative trading company, Lime Brokerage LLC, a high performance electronic broker dealer that caters to electronic traders, The Open Planning Project, a not for profit that produces open source software to improve government transparency and empower

citizens to advocate for change, Lime Medical LLC, a company that produces software to help doctors deal with completing insurance paperwork, and Lime Labs LLC, a company that seeks to enable on open source code sharing community and an online marketplace for coders.

3.     I am an engineer by training having earned an undergraduate degree in electrical engineering from Yale and a masters in electrical engineering from Stanford, as well as an MBA from Harvard.

4.     In the year 2000, the enormous opportunities created by breakthroughs in peer-to-peer ("P2P") technology caught my attention.  The idea of millions of people contributing resources to a common pool presented amazing opportunities.  Since the beginning of my involvement with P2P technology, I have been aware that the issue of copyright infringement has surrounded the technology.

5.     I have always had a strong conviction that P2P has a positive roll to play in our society, and that the correct approach to this technology has been to find a regulatory structure which preserves what is good about P2P while addressing the problems of copyright infringement.  LimeWire has always encouraged good uses of our technology while fighting to solve the vexing problems of copyright infringement.

6.     As a technologist and entrepreneur, part of my job is to try to see just a little bit into the future, so perhaps my view of P2P technology is different from people who cannot see beyond the immediate facts on the ground.  P2P can play a valuable role delivering media on the Internet.  These technological capabilities have already been proven.  P2P file sharing can be properly regulated to preserve the powerful benefits of P2P technology while at the same time eliminating the harm done to copyright holders.

**History of Lime Wire**

7.      Back in 2000, the Internet revolution was in full force. A new industry was being birthed at light speed, capital flowed like a river, and fortunes were made in the blink of an eye. I was an entrepreneur in New York, and I was on the lookout for ideas for businesses that could take advantage of the rapid change brought on by the Internet.

8.      In March of 2000, Justin Frankel, a programmer at Nullsoft (a division of AOL Time Warner), wrote a prototype version of a distributed P2P protocol. Justin released an early beta version of this file sharing program on the Nullsoft website. Within hours, corporate executives at AOL Time Warner heard about this program and ordered Nullsoft to remove the program from their website and to stop development of the program.

9.      Within days, the Gnutella file sharing protocol was reverse engineered by hackers around the world, and specifications for the Gnutella protocol began to appear on the Internet. Very quickly, hundreds of hackers began to write Gnutella compatible programs, and an open file sharing protocol was born.

10.      I have always been a huge believer in open protocols and open standards, and the birth of an open P2P protocol (one of the core Internet protocols, like web and e-mail protocols) was a very exciting event. I hoped that the birth of open P2P protocols would lead to the creation of entirely new technology and business ecosystems like the ones that surrounded the World Wide Web. In a few months, I decided to pursue opportunities in the P2P space. The P2P world was one of the most exciting, fastest growing parts of the whole Internet. Sun Microsystems launch a major P2P initiative called project JXTA founded by their CTO. O'Reilly hosted large conferences filled with venture capitalists, academic researchers, big corporations, little start ups, the media, and hackers. The open source community was buzzing

with new projects, and Andy Grove, Chairman of the Intel Corporation said, "the entire Internet could be rearchitected with peer-to-peer technology."

11.    The most prominent use of P2P technology at that time was sharing mp3's on Napster, but the potential for P2P technology far exceeded media file sharing. People were building distributed versions of eBay and PayPal and a whole host of other ideas. Marc Andreesen, Co-Founder and CTO of Netscape said, "Peer-to-peer technology will do for search what the Internet did for communications ... it will change the Internet in a way it hasn't changed since the browser."

12.    My initial approach to the opportunities provided by the P2P revolution was to form a not-for-profit to pursue opportunities in this space. I saw enormous opportunities to disaggregate data from the websites on which they resided. Websites can provide data, but the privilege of publishing that data belongs to the operator of the website. I imagined enormous social benefit from creating a network where data of all types could be uploaded with equal ease as downloaded. Decentralized computer networks provide strong protections against any one organization controlling the Internet. However, decentralized networks suffer the problem of individuals lacking a monetary incentive to build tools that can be shared by all. However, I was unable to raise funding for the not-for-profit approach to P2P, so I decided to form a traditional software company to pursue this technology.

13.    My initial business thoughts for P2P technology were two fold. I imagined a world where the vast number of queries on P2P networks would be harvested and routed to companies who valued these queries. In order to allow this world to come into being, these companies needed software that would allow their websites to be able to connect to the Gnutella network, and a company would need to gather up the large number of Gnutella queries and route

them to the correct location. A longer description of Lime Wire LLC's original business plan can be found in Defs' Ex. 4 (LW DE 1120636 – 670).

14.    The original Gnutella protocol was crude. LimeWire built the LimeWire client software in order to expand the Gnutella protocol to support structured queries that would also for users to search in a more targeted way other than a simple text match. Our structured queries allowed users to search for books, tickets, and other products. Our aim was to broaden the use of the Gnutella network and to get users searching for things other than media files. The LimeWire team went on the road to promote these new capabilities and we gave a demonstration of Gnutella's new capabilities at the second O'Reilly P2P conference in San Francisco in November 2001. The demonstrations included a working version of a distributed structured search including book search and real estate search.

15.    The Gnutella protocol allows users to broadcast a request widely to the network and allows other members of the network to respond to these requests. From a computer architecture point of view, this interaction is fundamentally different from the web, e-mail, ftp, instant messaging, or any other Internet communication interaction. I wanted to expand the range of items being searched for on peer networks from simply media files to a much wider variety of information and products.

16.    At the time of the founding of LimeWire, P2P file sharing was a phenomenon with large numbers of people using Napster, iMesh, AudioGalaxy, Scour, Soul Seek, and Direct Connect; however, despite the large interest from the community of software developers surrounding Gnutella, the interest of the general public in the Gnutella network was quite small. In February of 2001, the doom of the Gnutella network was being prophesized, and the total number of computers around the world connected to the Gnutella network was as small as 250.

17.    At the time I started LimeWire, I never imagined that the Napster service would be shut down. The Napster servers provided links to files. My expectation was that over time the open development community that surrounded the Gnutella network would build functionality that closed P2P development environments could never provide. I imagined Gnutella gaining P2P dominance much the way the World Wide Web surpassed closed systems like CompuServe.

18.    In the wake of the demise of Napster, other file sharing companies tried hard to attract Napster users to their networks, and services such as Morpheus and Kazaa quickly experienced explosive growth. LimeWire continued with its strategy of attempting to highlight the long term potential of P2P technology to do other things other than simply share music files. LimeWire's scrupulous failure to court the community of users engaged in copyright infringement led to generation after generation of P2P file sharing software providers commanding a vast P2P audience while LimeWire existed in the shadows.

19.    Lime Wire has done almost no marketing or promotion during its history. In the first few years of its existence, Lime Wire issued only one press release, the March 1, 2001 press release that the Plaintiffs claim we were using to somehow "lure" Napster users. This press release, however, highlighted Lime Wire's strategy of attempting to build alternate uses for P2P technology. In the press release dated March 1, 2001, I am quoted as saying, "Gnutella is one of the most interesting and sophisticated computing problems today. We hope that Lime Wire will attract academic interest and research to the network. File sharing is just the tip of the iceberg – the Gnutella network has the potential to become an alternative not just to Napster but to the World Wide Web itself." Lime Wire always resisted efforts by others to somehow associate itself with Napster. A good example is the issue with respect to an outside public relations firm

by the name of Widenmeyer – which pitched a PR campaign to Lime Wire in 2001. That proposal, which is contained in Pltfs's. Ex. 77, was flatly rejected by Lime Wire because our goal was not to compare ourselves to Napster. Lime Wire's actions demonstrate that while many companies were focused on becoming the next Napster, Lime Wire consciously turned away from this path and focused on completely different business models.

20.    Plaintiffs also point to a handful of Google Adwords among hundreds that were purchased. However, Plaintiffs fail to mention that the purchase of these Napster-related keywords was an unauthorized action by a summer intern, and that the Adword campaign was shut down as soon as management discovered it.

21.    Up through 2002, LimeWire focused on three primary software products and services. In addition to the Lime Wire client, Lime Wire built the LimeWire peer server software, which allowed corporations to connect their websites to the Gnutella network. Lime Wire also built the Lime Information Routing service which was designed to harvest and forward relevant query traffic to corporations who would be interested in responding to these queries. Just when the LimeWire released the first version of its peer server software, the Internet Bubble began to pop. Technology companies large and small were hit hard as their funding dried up and their customers went out of business. The market which LimeWire was targeting, Internet companies which wanted traffic for their websites, went from being robust and cash rich to struggling and cash poor in a very short period of time, and Lime Wire had a very difficult time finding corporations interested in its server software.

22.    The swirl of innovation that surrounded the Gnutella network began to die down as companies started to pursue P2P opportunities ran out of funding. The pace of innovation from the Gnutella development community slowed down and Internet time went from fast

forward to slow motion. Lime Wire found itself with client software which was moderately popular while our product offerings for the corporate market languished.

23.    Lime Wire experienced a tough few years, but eventually customer interest in the Lime Wire Pro software allowed Lime Wire to earn money which could be reinvested in new products. LimeWire has maintained its original goal of selling query traffic to targeted users, and LimeWire now calls this initiative Lime Engine. Lime Wire has also invested millions of dollars building an online store to allow content holders to earn money by selling their digital content online. This store is currently available at store.limewire.com.

### The Power of Open Source and the Digital Commons and the Enormous Legal Potential of P2P

24.    Philosophically and temperamentally, I have long been drawn to open source software. The source code for the LimeWire client is released under the General Public License (GPL), and can be accessed by anyone for free at www.limewire.org. I also support open source software development through a not-for-profit organization which I fund called The Open Planning Project (TOPP) (topp.openplans.org). TOPP produces GeoServer, the best server of geographic information in the world. GeoServer aims to help standardize the delivery of geographic information so governments, academics, corporation, and community activists can better share information and collaborate. TOPP also produces the OpenPlans software suite, an open source set of tools to empower community activists. TOPP aims to catalyze a process where government funding can be directed to open source software projects to create a more efficient and transparent government with technology enabled sharing of best practices.

25.    In the last decade, open source software has gone from being considered a toy of a bunch of idealistic academics to concept embraced by businesses of all sorts and the dominant platform for many key software applications (Linux, Apache, etc.).    However, the current

standing of the open source software movement is still small compared to its future potential. We are just beginning to witness a phase where open source software is adopted by governments on large scale and the concept open source web based applications is still in its infancy. I am pursuing opportunities in this space by launching LimeBits (www.limebits.com) the world's first open source code sharing community for applications rendered through the browser.

26.    When I founded Lime Wire, I imagined helping to foster an open media sharing community analogous to the open source movement. Lime Wire LLC has taken a number of steps over time to help foster this movement. At the time that LimeWire was founded, many of the components necessary for the success of the open media community were not available. P2P file sharing solved a crucial technical problem by providing a mechanism to share bandwidth costs, so that media publishers without deep pockets to pay for Internet distribution costs could distribute media files. However, it was not until December of 2002 that the first set of creative commons licenses was created that provided a mechanism to for artists and musicians to easily license their music for sharing. Even today, the identifying the copyright state of any media file is still extraordinarily difficult. Similarly, the legal enforcement regime surrounding media on the Internet is so out of date that artists who wish to distribute their media for free rarely bother to explicitly license their work for this sort of distribution.

27.    I continue to believe in an open sharable media pool as a public resource. Our society has too rich of a media cannon for this to fail to come about. As a society, we have an artistic legacy that should be able to be passed down from generation to generation without constraint. For the first time in human history, the Internet provides a mechanism to freely put the artistic heritage at the fingertips of average men and women. This digital commons is a resource which can exist in our world. It currently exists in only embryonic form, but it can be

brought into being. I am proud of Lime Wire's work to build the technological underpinnings of such a digital commons.

28.     Lime Wire has engaged in outreach efforts to college campuses to promote the digital commons. We have worked with the Free Culture organizations at Harvard, Columbia and NYU. In addition to promoting the digital commons, Lime Wire has also worked with open source programmers and computer science departments doing research on P2P networks at various colleges and universities. Plaintiffs' motion paints Lime Wire e-mails discussing the possibility of doing outreach to college students as nefarious. Yet if Plaintiffs' had bothered to examine the actual interactions between Lime Wire and college students, they would have seen a concerted effort on Lime Wire's part to promote the positive aspects of P2P technology. [Need examples of these efforts]

29.     The inevitability of a large pool of free and legally available media on the Internet has long been clear to me and many savvy observers of the Internet. Our country has a long history of free media distribution with old-fashioned broadcast technology called radio and television. Given the much more advanced and flexible nature of the Internet, free media distribution is sure to be a part of our digital future. P2P has proven to be the best technology for distributing media on the Internet. However, although media distribution technology has made breathtaking advances in the past decade, the legal framework in terms of licensing, regulation and business structure has not keep pace with the technological advances. Even television commercials which sponsors surely want to have viewed as many times as possible are not legally available for Internet viewing due to a lack of a digital compensation agreement for performers in these commercials. Sooner or later, companies will work out all of the tricky

digital distribution compensation arrangements for commercials (and other forms of media), but until that time, the amazing legal potential of P2P will be underutilized.

**Lime Wire LLC's Positive and Proactive Actions on Copyright Enforcement**

30.    Since founding LimeWire, I have been aware that my dreams of rich, open, public, sharable media pool have been thoroughly mixed with copyright infringement. I have always believed that a sensible copyright regime has a solid place in our society. Right from the very start, Lime Wire has taken steps to avoid the copyright infringement taking place on P2P networks while at the same time promoting the free information sharing capabilities of P2P that have a potential to play such a positive role in our society.

31.    Lime Wire has always had strict policies against any employees participating either directly or indirectly with copyright infringement. Software developers have always been required to use legally sharable material for development and testing of the search, upload, and download capabilities of the Lime Wire client software. Lime Wire has always had a policy of requiring our customer support personal to not have any dealings whatsoever with Lime Wire users who seem that they might be engaging in copyright infringement.

32.    At LimeWire, we have never done anything to advocate copyright infringement, and we have worked hard to promote the positive uses for P2P technology. At my first public appearance on behalf of Lime Wire at the first O'Reilly P2P conference, I spoke on a panel of my hope that there would be a world in which the copyrighted material prevalent on P2P networks would be suppressed so that the good legally sharable material would be able to shine by itself.

33.    Lime Wire LLC has worked hard to promote the search and sharing of legally available files on the Gnutella network. Lime Wire LLC has implemented a Creative Commons

search function that searches only for material published with a creative commons license. We have also incorporated into the LimeWire software a creative commons publishing tool that allows artists to tag and distribute their work with Creative Commons licenses. LimeWire also built and supported the MagnetMix web site that contains a library of legally sharable material. For several years, a button linking to MagnetMix was prominently featured on the front of the LimeWire client application.

34.    Lime Wire LLC also invested time into integrating Weedshare functionality into the LimeWire client. Weedshare provides a mechanism for artists to be compensated for works which are legally shared on peer-to-peer networks. For several years before the advent of litigation against Lime Wire LLC, Lime Wire demanded that all users of the LimeWire software assert that they will not engage in copyright infringement before we will distribute the LimeWire software to a consumer. LimeWire refuses to download our software to users who say they "might consider" using it for copyright infringement.

35.    Lime Wire LLC also has built an effective filter into the LimeWire client to remove copyrighted material from the network.

36.    I have always run Lime Wire LLC to be in full compliance with the law. Despite the fact that the effectiveness of copyright filtering in a P2P client is subject to much debate, when the Supreme Court specifically stated that a P2P company that tried to reduce infringement by implementing a copyright filter could not be liable for copyright infringement, I had Lime Wire LLC build a copyright filter.

37.    In order to be effective a copyright filter needs two things: a working piece of software and a list of the copyrighted material to be filtered. As a software company, Lime Wire LLC is capable of building the software part of the copyright filter. However, Lime Wire LLC

has no ability to know which companies own the copyrights to which material and what is the desired distribution status for each copyrighted work. The LimeWire client has the ability to calculate the SHA1 hash for files that exist on a users computer, but knowing the copyright status of those files is impossible without the cooperation of the copyright holders.

38.     After building our copyright filter, Lime Wire LLC publicized the availability of our copyright filter, and approached each of the major record labels requesting a list of their claimed works for Lime Wire to filter. Each and every major record labels refused to give us a list of their claimed works to be filtered.

39.     In the face of these refusals of the record labels to provide Lime Wire with a list of claimed material for filtering, Lime Wire continued to approach each of the major record labels attempting to talk to different people within those organizations about working collaboratively on a program of copyright enforcement. Greg Bildson conducted the bulk of our outreach to the recording industry regarding our filtering solution.   In June and July of 2006, Greg had conversations with representatives of each of the four major record labels regarding Lime Wire's filtering system. Greg described our filtering system to Ralph Munson and Ken Parks of EMI, David Ring and Chris Bell of Universal Music Group, Mark Eisenberg of Sony BMG, and Howard Singer and George White of Warner Music Group.

40.     We were aware that producing a list of claimed material was a relatively new thing for the labels, so Lime Wire LLC offered to provide technical assistance to the labels in order to help them get their list of claimed material in a format that would work with Lime Wire's copyright filter. On August 2, 2006, Greg Bildson sent a white paper to each of the above mentioned representatives of the major record labels that provided a detailed technical guide for the labels to use the Lime Wire copyright filter. A copy of that white paper is Pltfs's.

Ex. 289. At no point, did any representative of the labels attempt to give Lime Wire even one sample piece of claimed material to filter.

41.    I personally demonstrated a live working version of this filter to Ken Doroshow of the RIAA at the RIAA office in Washington, DC on June 5, 2006. I directly asked Ken Doroshow for the RIAA's help getting a list of the claimed copyrighted material, but I was told that figuring out what to filter was LimeWire's problem.

42.    On September 13, 2005, I personally attended a meeting at the office of EMI where I asked Ken Parks, an in house attorney, for a list of EMI's claimed material, and I was told the EMI would only provide a list of their claimed material if Lime Wire would license their catalog. Lime Wire was trying very hard to assist the record labels with their problem of copyright infringement, yet the labels were unwilling to cooperate with Lime Wire on even anything so blatantly in their self interest as copyright enforcement.

43.    The software maker Adobe was easily able to provide LimeWire with a list of hashes for its copyrighted material that LimeWire entered into its filtering database to be filtered from the network. Adobe's actions demonstrate that any company who wished to have their material entered into our filtering system could easily do so.

44.    Lime Wire has always stood ready to cooperate with law enforcement including training FBI agents on how to track child pornographers using the Gnutella network. Lime Wire has never done anything to hide the identity of its users or mask their IP address to make identifying copyright infringers difficult. A whole new wave of so called third generation P2P clients has been created with the specific intention of making behavior on those networks hard to police, but LimeWire has never implemented any these features despite the fact that these technologies are well known.

**Lime Wire's Attempts to Reach out and Engage the Recording Industry**

45.     In conjunction with the attempts of Lime Wire to populate its filtering system with the lists of claimed material from the record labels as part of a global settlement, as part of a process to reach a global settlement with the recording industry, Lime Wire proposed to the RIAA a graduated process which would not only filter copyright material from the Gnutella network but would also educate consumers about copyright law and encourage consumers to purchase music legally. Those plans have been referred to as the "Conversion Plans".

46.     In June of 2005, on the eve of the Grokster decision, before we conceptualized these Conversion Plans, I was contacted by a P2P file-sharing service called iMesh. In 2003, iMesh, a file sharing company based in Israel that operated central servers similar to Napster, was sued by the recording industry. IMesh reached a settlement with the record industry that contained a plan for the music industry to take advantage of P2P technology. The basic idea of the iMesh plan was that iMesh would build a licensed, approved P2P music service using Digital Rights Managements (DRM) technology, and once this service was built, iMesh would convert its free P2P user base to a paid subscription service. IMesh planned to issue an upgrade to its traditional P2P software and iMesh hoped its user base would seamlessly find itself using a paid subscription service.

47.     When iMesh contacted LimeWire in 2005, the music industry had bought into the iMesh plan as a silver bullet that would solve the industry's P2P problems. On September 19, 2005, I attended a meeting with several executives from Warner Music including George White and Howard Singer. At this meeting I was told that the music industry planned for iMesh to acquire the entire P2P industry and covert the user bases of all the P2P companies to its subscription service. The music industry's plan was for the RIAA to use the threat of litigation

to force all the other P2P companies to sell themselves to iMesh.    The next day I received a cease and desist letter from the RIAA.

48.    The initial contact between Lime Wire and the music industry occurred when Dean Garfield, formerly of the RIAA and the lawyer most responsible for the iMesh deal, called me and told me that I should talk to the people from iMesh. Soon after that call, representatives from iMesh contacted me and proposed purchasing Lime Wire.

49.    IMesh portrayed itself as acting as representatives for the recording industry. They told me that they had worked out a deal with the recording industry which gave them the unique right to negotiate a settlement on behalf of Lime Wire and the music industry. In addition to Lime Wire, iMesh also approached several other P2P companies with similar proposals.  At the time of these discussions, the iMesh DRM'd subscription service was still under development, and iMesh was operating a traditional P2P network under a waiver from the RIAA.

50.    Despite the recording industry's enthusiasm for the iMesh plan, I clearly saw that the iMesh plan was badly flawed. Back in 2005, the music industry was enamored of Digital Rights Management (DRM) technology.  Using encryption technology, DRM allows rights holders to set rules which control exactly how a consumer can consume music or video content. DRM allows record companies to distribute a file containing a song which can be listened to only 3 times or only for one month. The benefits of DRM technology are obvious to content companies; the benefits to consumers much less so.

51.    However, the most serious problems with the DRM technology used by iMesh were the compatibility issues that it caused for users. IMesh was using DRM technology developed by Microsoft, but Microsoft's DRM technology was incompatible with iPod and the vast majority of portable MP3 players on the market. Microsoft's DRM technology was also

incompatible with most software MP3 players used by consumers. In fact, the Microsoft DRM technology used by iMesh is incompatible with the Zune portable MP3 player built by Microsoft which uses a different DRM technology.

52.     In other words, for the vast majority of iMesh users, the record industry's requirement that iMesh use DRM technology meant that the iMesh subscription service would be functionally broken as it would not work with their existing computer and portable MP3 player set up.

53.     From my point of view, the iMesh plan had another flaw that made it impossible for Lime Wire to accept the iMesh proposal: the iMesh plan tried to trick iMesh users into switching from a traditional P2P application to a subscription service. At no point in the conversion process did iMesh ever tell its users that they were changing the way they did business. IMesh hoped to get credit card information without ever being clear to its users what they would be paying for. Lime Wire has always been honest and straight forward with our users, and I could never sign off on a plan that would involve Lime Wire lying to its users. I have founded multiple companies using the Lime name, and I could not be comfortable selling any Lime property to iMesh or anyone who would not be honest with the users of any Lime software or service.

54.     However, I very much wanted to avoid litigation with the record industry, so as part of the settlement process with the recording industry, Lime Wire developed a plan that was in every way superior to the iMesh plan. Lime Wire talked with several companies including iMesh, Real Networks and the new Napster 2.0 about possible plans. These were all known as "Conversion Plans," all of which were drafted after we received the RIAA cease and desist letter. Lime Wire eventually settled on a plan that was developed together with iMesh. Lime Wire and

iMesh together submitted this proposal to the RIAA. The joint Lime Wire/iMesh proposal involved using a clear, honest description of the iMesh subscription service and encouraging Lime Wire users to switch to the paid iMesh subscription service. The plan provided an easy path for interested users to transition from the Lime Wire software to the iMesh subscription service. The plan also provided for iMesh to use its filtering technology to filter copyrighted material from the Lime Wire client. The end result of this plan would have been a Lime Wire client that took into account the record industry's copyright enforcement concerns and also helped to generate revenue for the record industry. After sitting on the joint Lime Wire/iMesh plan for 6 months, the RIAA rejected the plan without comment.

55.    While the RIAA was considering the joint Lime Wire/iMesh plan, Lime Wire LLC independently developed a filtering system to remove claimed copyrighted material from the Lime Wire client. Within weeks of the rejection of the Lime Wire/iMesh plan, on June 5, 2006, I traveled down to Washington, DC to meet with lawyers from the RIAA. At this meeting, I demonstrated the live, working filtering system that had been built into the LimeWire client. I asked for the help of the RIAA in getting a list of the claimed material that they wanted filtered. I also discussed with the RIAA Lime Wire's "Plan for Digital Market Growth" Pltfs's. Ex. 276 [LW DE 1499011 – 1499055 ]. The "Plan for Digital Market Growth" contained a strategy for educating Lime Wire users about copyright infringement and persuading people engaged in copyright infringement to compensate copyright owners for their works. This document, along with the various conversion plans that were drafted in the Fall of 2005, were prepared as part of our effort to settle the Labels claims against us.

56.    The "Plan for Digital Market Growth" contained a phased strategy that started with educational messages, information about copyright status, and warnings. Armed with the

exact copyright status of the files which they would be downloading, users would be required to make explicit choices about their behavior, and easy paths to purchase content would be offered. Over time, the copyright messaging would get stronger and restrictions on users' ability to access copyrighted material would be enforced. After several months of education and persuasion, strict copyright filtering would be enabled.

57.    Plaintiffs falsely assert that I once labeled all of Lime Wire's users as infringers. Plaintiffs craftily take a chart from a draft version of a confidential settlement document which is provided as in illustration of the commercial conversion potential of infringing Lime Wire users. In this chart (LW DE 383421), Lime Wire only referenced users who might have been major label music consumers because by definition a person who has no interest in major label music could not be converted to a paying customer. I have never considered all of Lime Wire's users to be infringers.

58.    Through the iMesh and BearShare deals, the record industry had shown an interest in plans which would convert P2P users to paying customers of the music industry. Lime Wire's "Plan for Digital Market Growth" was designed to take advantage of this conversion potential. Although I was perfectly content to simply filter any material claimed by the recording industry from the LimeWire client, an abrupt filtering of claimed material from the LimeWire client would have resulted in a large lost opportunity for the recording industry to educate users about copyright infringement and enhance monetization of P2P users.

59.    However, implementing a graduated filtering plan requires the consent of the copyright holders. The copyright holders gave this consent to iMesh and BearShare for their conversion plans. Lime Wire's "Plan for Digital Market Growth" was far superior to the iMesh and BearShare plans, and I was hopeful that the music industry would see the value in an honest

educational campaign for their customers and give their consent to our graduated filtering with messaging.

60.     In addition to talking to the RIAA, as part of an attempt to reach a settlement with the record labels, Lime Wire presented its request for claimed material to be filtered and the "Plan for Digital Market Growth" to each of the major record labels individually. Lime Wire also offered technical assistance to each of the major record labels to help them translate any databases of claimed material to a format that was compatible with Lime Wire's filtering system.

61.     None of the major record labels or the RIAA ever provided Lime Wire with a list of any copyrighted material that they wanted filtered from LimeWire clients. None of the record labels ever responded to Lime Wire's proposal, and the next action that the recording industry took with Lime Wire was to initiate the litigation in which we are now engaged. So Lime Wire was left with a filtering system poised to implement the first steps of a graduated filtering plan but with no list of material to filter. Since part of the gradual conversion process involved messaging about the copyright status of the files, the copyright filter was initially made optional in order to allow for a messaging period to take place. Lime Wire still remains ready to filter either gradually or abruptly should the record labels decide to give to Lime Wire a list of their claimed material.

**Lime Wire's Efforts Beyond Filtering to Address the Problem of Copyright Infringement**

62.     Since copyright filtering at the client level on P2P networks has been proven to be a failure, and since I am committed to building a world where the good qualities of P2P technology can shine through and the problems of copyright infringement can be reduced, I have engaged in a campaign to bring about truly effective copyright enforcement on the Internet in this country. Lime Wire LLC by itself does not have the ability to effectively combat copyright

infringement on the Internet. Solving the large problem of Internet copyright infringement will ultimately require legislative action.

63.    The Internet is not unpolicable. However, the current regulatory environment fails to provide any effective way for copyright holders to enforce their legal rights. As a result of this regulatory and policing failure, copyright infringement is widespread on the Internet.

64.    The solution that I have advocated involves using a technique proven to work at universities. This system is sometimes called "three strikes and you're out". It involves sending warning messages to users who are engaging in copyright infringement. If the user does not stop the offending activity, their internet service is disconnected by their ISP.

65.    This plan is reasonable in its punishment, provides users the ability to dispute false allegations without undo costs, and is effective because the ISP is a unique point of control for each computer on the Internet. I have testified before congress on the efficacy of this plan. I have tried to persuade senior executives in both the movie and record industries of the wisdom of this plan, and LimeWire has paid to have a lobbyist advance this plan in Congress. With our limited resources, we have done a great deal to advance this idea.

66.    In the spring of 2006, Lime Wire LLC hired Laura Tunberg as a consultant to help lobby for legislation that would result in an effective copyright enforcement regime for the Internet. Prior to working for Lime Wire as a consultant, Laura Tunberg was employed as an attorney and vice president of intellectual property enforcement at MGM. Laura was MGM's representative to the Motion Picture Association of America (the MPAA). Laura was MGM's in house lawyer responsible for supervising the Grokster litigation, and she lobbied on behalf of MGM and the movie industry for legislation. Her lobbying resulted in the passage of the Artists' Rights and Theft Protection act of 2003.

67.    Laura has done a very able job with her lobbying for a proper copyright enforcement regime on behalf of Lime Wire LLC. She managed to get support for my proposal from key law makers and the staffers who do much of the legislative work. The judiciary committee is where this legislation would originate, but the judiciary committee has been consumed the patent reform legislation this past year. Now with elections nearing, no new copyright legislation will be passed until after the election. We look forward to the start of the next Congress, so that progress may be made of putting into place a proper copyright enforcement mechanism.

68.    With the selection of George Searle as the CEO of Lime Wire LLC in April 2007, Lime Wire LLC has reinforced its core commitment to making the Internet be a place where copyright owners can earn money for their works. Prior to joining Lime Wire, George formed Mediaguide as a joint venture with The American Society of Composers, Authors and Publishers (ASCAP), where he developed and implemented an automated tracking system to help ASCAP better monitor, collect, and disburse payments to copyright holders while simultaneously expanding the royalty base. ASCAP is a membership association of more than 300,000 U.S. composers, songwriters, lyricists, and music publishers of every kind of music; and the largest Performing Rights Organization (PRO) in the world. ASCAP is in business to make sure that songwriters, composers, and music publishers get paid for their music.

**Conclusion**

69.    P2P technology has enormous potential to play a positive role in our society. Unfortunately, the problem of copyright infringement has obscured the strengths of P2P technology. Lime Wire has worked to promote the technological abilities of P2P while at the same time combating the endemic problem of copyright infringement. Lime Wire has worked in

many different ways to reduce copyright infringement on P2P networks and the Internet in general, and Lime Wire has never done anything to encourage copyright infringement. Without ever trying to discover the truth, the record industry has gone to great lengths to portray Lime Wire as a villain. Yet Lime Wire remains open to working toward a constructive relationship with the recording industry. My hope is that this costly, time consuming litigation, in its own twisted, convoluted way, can provide the impetus for a rapprochement between the recording and P2P industries.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed in New York, New York on September 26, 2008.

_Mark Gorton_
Mark Gorton