UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARISTA RECORDS LLC; ATLANTIC RECORDING CORPORATION; BMG MUSIC; CAPITOL RECORDS, INC.; ELEKTRA ENTERTAINMENT GROUP INC.; INTERSCOPE RECORDS; LAFACE RECORDS LLC; MOTOWN RECORD COMPANY, L.P.; PRIORITY RECORDS LLC; SONY BMG MUSIC ENTERTAINMENT; UMG RECORDINGS, INC.; VIRGIN RECORDS AMERICA, INC.; and WARNER BROS. RECORDS INC.,<br><br>Plaintiffs,<br><br>v.<br><br>LIME GROUP LLC; LIME WIRE LLC; MARK GORTON; GREG BILDSON, and M.J.G. LIME WIRE FAMILY LIMITED PARTNERSHIP<br><br>Defendants. | ECF CASE<br><br>06 CV 5936 (GEL) |

**DECLARATION OF MARK GORTON IN SUPPORT
OF DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR
MOTIONS FOR SUMMARY JUDGMENT**

I, Mark Gorton, the undersigned, hereby declare as follows:

1.      My name is Mark Gorton.  I am over eighteen years of age, of sound mind, and in all ways qualified and competent to make this declaration.  I have personal knowledge of the facts contained in this declaration and they are true and correct.

2.      I am the founder and Chairman of Lime Wire LLC ("LW") and Lime Group LLC ("LG").  Until April 2007, I was also LW's CEO.

3.      I am an engineer by training having earned an undergraduate degree in electrical engineering from Yale and a Masters in electrical engineering from Stanford, as well as an MBA from Harvard.

4.      I have reviewed the declaration of Gregory L. Bildson ("Bildson Decl.") filed as part of the Plaintiffs' Opposition to Defendants' Motions for Summary Judgment. This declaration is a mix of lies, half-truths and true facts.

5.      In paragraph 4 of the Bildson Declaration, Bildson claims that in the year 2000 I made certain design choices to somehow provide LW with "legal cover" to avoid liability for copyright infringement. This assertion is absolutely false.  The decision to adopt the decentralized architecture had nothing to do with the *Napster* lawsuit or somehow avoid liability for copyright infringement. As I explained in my earlier declaration, what drew me to this architecture were the parallels that it had with the advent of the World Wide Web itself.  If you review the early business plans attached and referenced in that declaration, you will see that I was counting on a business and technological ecosystem developed around a new core Internet protocol *(i.e.*, Gnutella). Napster's closed system was nothing new in that regard and it could have never achieved this ecosystem that I was envisioning because it was my expectation that Gnutella would thrive because a diverse and deep technology development community would contribute to and add functionality that a closed network could never match. And our early marketing documents back these points up.

6.      I was drawn to the decentralized nature of Gnutella because I have always been a huge believer in open protocols and open standards, and the birth of an open P2P protocol (one of the core Internet protocols, like web and e-mail protocols) was a very exciting event.  I hoped that the birth of open P2P protocols would lead to the creation of entirely new technology and business ecosystems like the ones that surrounded the World Wide Web.  In early 2000, I decided to pursue opportunities in the P2P space.  The P2P world was one of the most exciting, fastest growing parts of the whole Internet.

7.      My initial approach to the opportunities provided by the P2P revolution was to form a not-for-profit to pursue opportunities in this space.  I saw enormous opportunities to disaggregate data from the websites on which they resided.  Websites can provide data, but the privilege of publishing that data belongs to the operator of the website.  I imagined enormous social benefit from creating a network where data of all types could be uploaded with equal ease as downloaded.  Decentralized computer networks provide strong protections against any one organization controlling the Internet.  However, because decentralized networks suffer the problem of individuals lacking a monetary incentive to build tools that can be shared by all, I was unable to raise funding for the not-for-profit approach to P2P, so I decided to form a traditional software company to pursue this technology.

8.      My initial business thoughts for P2P technology were two fold.  I imagined a world where the vast number of queries on P2P networks would be harvested and routed to companies who valued these queries.  In order to allow this world to come into being, these companies needed software that would allow their websites to be able to connect to the Gnutella network, and a company would need to gather up the large number of Gnutella queries and route them to the correct location.  A longer description of Lime Wire LLC's original business plan can be found in Defs' Ex. 4 attached to my previous declaration.

9.      The Gnutella protocol allows users to broadcast a request widely to the network and allows other members of the network to respond to these requests.  From a computer architecture point of view, this interaction is fundamentally different from the web, e-mail, ftp, instant messaging, or any other Internet communication interaction.  I wanted to expand the range of items being searched for on peer networks from simply media files to a much wider variety of information and products.

10.     I do agree that a decentralized architecture does create engineering difficulties not found in a centralized architecture. But only the decentralized architecture allows for the building of open communities.

11.     At the time I started LW, I never thought that the Napster service would be shut down, and contrary to Bildson's statements in his declaration, I never said that I expected Napster to be found liable primarily because of its centralized architecture.  The Napster servers provided links to files.  I never imagined that a company could be held liable for copyright infringement simply for providing the location of a file.  My expectation was that over time the open development community that surrounded the Gnutella network would build functionality that closed P2P development environments could never provide.  I imagined Gnutella gaining P2P dominance much the way the World Wide Web surpassed closed systems like CompuServe.

12.     Bildson also suggests in his declaration that I rejected recommendations allegedly made by unknown LW engineers that LW should implement central control. I never rejected any ideas regarding making the network centralized. None were ever proposed. In fact, if indeed I rejected these ideas, it shows that I was not primarily interested in file sharing since Bildson claims it would have made our software more efficient for the purposes of file sharing.

13.     In paragraph 4 of his declaration, Bildson also claims that LW implemented ultrapeers so as to somehow avoid legal issues.  The implementation of ultrapeers had nothing to do with legal concerns. It was simply a more efficient design for locating all sorts of files on the Gnutella network.

14.     I do not understand what Bildson is talking about in paragraph 5 of his Declaration in which he claims that "LimeWire" always understood that its users were primarily interested in obtaining and sharing copyrighted music files. That certainly was not my

understanding, and I do not recall ever attending any meeting or being a party to any conversation in which this "understanding" was discussed in whole or in part. Yes there were discussions about adding features so that users could easier locate and download all sorts of files, but I am not aware of any specific design changes or implementations specifically focused at music. For example, LW designed its software so that all files downloaded by LimeWire users are automatically "shared". This applies to all files not just audio files.

15.     In paragraph 9 of his declaration Bildson discusses the development of a "wizard". That project was done without my knowledge or approval and once I discovered it I had it removed because it created a risk of personal information being inadvertently revealed.

16.     Paragraph 14 in the Bildson Decl. is an outright lie. Filtering technology did not exist in 2001. Moreover, Bildson never approached me with this idea, and I never consciously did anything because I was waiting for the outcome of the Morpheus lawsuit.

17.     At paragraph 15 of his declaration Bildson claims that I instructed others to turn the filter "off" so as to avoid hurting our business. That is not true.  The initial decision that the filter be turned off was intended to be in a state of readiness for a conversion campaign that I described extensively in my previous declaration at paragraphs 35 to61, and to also allow us to beta test the filter. However, implementing a graduated filtering plan requires the consent of the copyright holders.  None of the major record labels or the RIAA ever provided LW with a list of any copyrighted material that they wanted filtered from LimeWire clients.  So LW was left with a filtering system poised to implement the first steps of a graduated filtering plan but with no list of material to filter.  Since part of the gradual conversion process involved messaging about the copyright status of the files, the copyright filter was initially made optional in order to allow for a

messaging period to take place.  LW still remains ready to filter either gradually or abruptly

should the record labels decide to give to LW a list of their claimed material.

18.     I have reviewed paragraph 16 of the Bildson Decl. in which he claims that there

are certain deficiencies in our filter.  This is the first I have heard of this and I am quite surprised

because I instructed Bildson to develop a fully-operational filter.  If there are deficiencies, then it

is the fault of Bildson.  I never instructed Bildson or anyone else to design the filter in this

fashion.  However, I will say that if in fact these issues exist, they are easily curable.

19.     Bildson's statements in paragraph 19 of his Declaration are untrue. I have never

made any such statements.  In addition, the statements in paragraph 20 are also false.  I have

never stated that I wanted to somehow reduce or eliminate any alleged "evidence" of

infringement.  If that truly was the case then why did LW produce millions and millions of pages

of documentary evidence in this case, some dated as far back as April 2000. The statements

regarding the posters in the office are a stretch of Bildson's imagination. Our office contains

many types of artwork.  The predominant decorating theme is Asian.  Our office contains many

Buddhas, Chinese sculptures, Indian sculptures, Asian lamps, scholar stones, and Japanese prints

and scrolls.  In addition to the WWII propaganda posters, in terms of Western art work, we also

have British rail posters, French advertising posters, and Russian propaganda posters.   Never did

I make any comment at any party in 2007 about the "intent" of the WWII posters.

20.     As to the statements in Paragraph 21, based on advice we received from counsel,

we made tentative steps toward putting in place a document retention policy, but as can be seen

from the large number of documents produced at great expense in this case, this policy was never

followed.   At times, I did come by LW to discuss e-mail documents that various people might

have had.   However, I never conducted any reviews of people's e-mail including Bildson.

Bildson claims that I instituted a two week document retention policy and then personally reviewed his e-mail. Yet, Bildson retained in his e-mail many many thousands of documents many of them years old. So the documentary evidence already produced in this case shows Bildson's statement to be false.

21.    As to paragraph 26, other than the statement regarding decentralized architecture, and some limited input on a filtering system, I did not direct or approve any of the design decisions described in this paragraph. Bildson was in-charge of these matters.

22.    A majority of the statements made in paragraph 28 are absolutely false. I was not involved in decisions regarding third party advertising. I did make the decision about being "open source", but as I stated above, I have been a proponent of open source software for some time. I had very little to do with most of LW's public relations efforts. At some point, Bildson hired a PR firm and they were able to have various articles about him and the Company placed in a variety of publications. I had nothing to do with that. I did approve one early press release, but beyond that press release I have had almost no involvement in the LW public relations process. I never intended to sell LW to anyone. However, I was the decision maker about the iMesh and Real deals, etc. and Lime Store was my decision. I did have the authority to hire and fire. However the vast majority of hiring and firing went on without my knowledge or approval. To the best of my knowledge, LW only fired one person, and Bildson did that without consulting me. After the first six (6) months of LW's existence, I do not believe I was involved in any of the hiring decisions at all.

23.    Paragraph 29 is also not true. I tend to call myself the founder of LW or CEO when I was the CEO. From early on, LW had a number of investors, and I would not have called myself the owner.

24.      LG and LW have always been separate companies with separate employees and separate books and records. The LimeWire software was developed by employees of LW. While it is true that Bildson and a few others were initially hired by Tower Capital, that was because LW had not been formed yet. When it was formed in August 2000, all employees such as Bildson became employees of LW. Moreover, LG provides a variety of management services to LW and other Lime companies.

25.      Paragraph 39 of the Bildson Declaration is a fabrication.  I never directly or indirectly through Bildson ever attempted to dissuade or prevent Mr. Falco from reaching a settlement with the RIAA.  At some point, I did speak to Mr. Falco from Bildson's desk. However, Bildson's description of this call is a complete fabrication.  I called Mr. Falco to see if I could get any information about details of the settlement that BearShare reached with the RIAA.  I spoke briefly to Mr. Falco, but the conversation took place after Mr. Falco had reached a settlement with the RIAA, and the only words that Mr. Falco would say during this entire conversation were, "No comment."  During this conversation, no mention whatsoever was made of family limited partnerships, my assets, my potential liability, or any suggestions of what Mr. Falco should do.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed in New York, New York on November 7, 2008.

_____

Mark Gorton