UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARISTA RECORDS LLC; ATLANTIC RECORDING
CORPORATION; BMG MUSIC; CAPITOL RECORDS,
INC.; ELEKTRA ENTERTAINMENT GROUP INC.;
INTERSCOPE RECORDS; LAFACE RECORDS LLC;
MOTOWN RECORD COMPANY, L.P.; PRIORITY
RECORDS LLC; SONY BMG MUSIC
ENTERTAINMENT; UMG RECORDINGS, INC.; VIRGIN
RECORDS AMERICA, INC.; and
WARNER BROS. RECORDS INC.,

                                        **Plaintiffs,**

                    v.

LIME WIRE LLC; LIME GROUP LLC; MARK
GORTON; GREG BILDSON; and M.J.G. LIME WIRE
FAMILY LIMITED PARTNERSHIP,

                                        **Defendants.**

---

06 Civ. 5936 (GEL)
ECF CASE

## PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS AND ADDITIONAL MATERIAL PURSUANT TO LOCAL CIVIL RULE 56.1(b)

Katherine B. Forrest
Teena-Ann V. Sankoorikal
Joanne M. Gentile
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiffs Arista Records LLC;
Atlantic Recording Corporation; BMG Music;
Capitol Records LLC; Elektra Entertainment
Group Inc.; Interscope Records; LaFace
Records LLC; Motown Record Company, L.P.;
Priority Records LLC; Sony BMG Music
Entertainment; UMG Recordings, Inc.; Virgin
Records America, Inc.; and Warner Bros.
Records Inc.*

November 7, 2008

# TABLE OF CONTENTS

**Page**

I.    THE PARTIES.................................................................................7

    A.    Plaintiffs ...........................................................................7

    B.    Defendants ........................................................................8

II.   THE LITIGATION .........................................................................14

III.  THE RELEASE, OPERATION AND DISTRIBUTION OF LIME WIRE
      BY DEFENDANTS.......................................................................18

    A.    The LimeWire Client ........................................................18

    B.    Operation..........................................................................23

          1.    Downloading and Installing the LimeWire Client.........................23

          2.    Searching For Files ................................................24

          3.    Downloading Files ................................................25

          4.    Sharing Files .......................................................27

    C.    Distribution ......................................................................28

IV.   THE LIME WIRE SOFTWARE HAS BEEN USED TO COPY AND
      DISTRIBUTE PLAINTIFFS' COPYRIGHTED WORKS WITHOUT
      AUTHORIZATION......................................................................31

    A.    The Record Company Plaintiffs Own or Control the Copyrights, or
         Exclusive Rights Under Copyright, in Certain Sound Recordings...........31

    B.    Plaintiffs Have Not Authorized Lime Wire or LimeWire Software
         Users to Copy or Distribute Their Sound Recordings ...............................33

    C.    The LimeWire Software Has Been Used for Massive Infringement,
         Including Infringement of Plaintiffs' Copyrights or Exclusive
         Rights in Sound Recordings........................................................34

          1.    LimeWire Is Used Overwhelmingly for Infringement .................34

          2.    LimeWire Users Have Directly Infringed Plaintiffs'
             Copyrights..................................................................42

3.    The Overwhelming Use of LimeWire Has Always Been and Is for Media Files, Including Copyrighted Music that Is Unauthorized for Free Distribution on P2P Networks...................44

V.    LIME WIRE'S INTENT HAS BEEN AND IS TO INDUCE COPYRIGHT INFRINGEMENT..........................................................................54

A.    Lime Wire Targeted Users of Other P2P Services Well-Known for Music Copyright Infringement and Viewed Such Infringing P2Ps as Competitors of Its LimeWire Software in the Music Download Market ........................................................................................................54

1.    Napster Users .................................................................54

2.    Grokster/Morpheus/Kazaa Users ....................................72

B.    Lime Wire Positioned and Promoted Itself As a Participant in Music Distribution ......................................................................91

C.    Lime Wire Has Provided Support for and Not Discouraged LimeWire Users' Infringement, and Also Has Communicated Hostility to Copyright Protection.............................................100

1.    Lime Wire Agents Provided Support for Infringing Users and Uses in Forums.....................................................100

2.    Lime Wire Has Not Discouraged or Has Turned a "Blind Eye" To Infringement Using LimeWire ......................113

3.    Lime Wire Has Expressed and Communicated Hostility Toward Copyright Protection .......................................117

D.    Lime Wire Has Ensured That LimeWire Has Infringing Capabilities ..............................................................................123

1.    Lime Wire Employees Worked to Ensure LimeWire Could Be Used Effectively to Find Copyrighted and Unauthorized Content.........................................................................124

2.    LimeWire is Optimized for the Exchange and Use of Popular Audio Files ..................................................126

3.    LimeWire is Designed to Assist Users in Evading Antipiracy Measures .................................................136

4.     Lime Wire Sought to Achieve Napster's Functionality for the LimeWire Client While Avoiding the Ability to Control or Monitor the Network in a Centralized Fashion ......................144

5.     Lime Wire Designed LimeWire with Reference to and in an Effort to Surpass the Functionality of Kazaa .........................154

6.     Lime Wire Compared LimeWire's Functionality to That of Morpheus ...................................................................................156

E.     Lime Wire's Business Model and Revenues Depend on Massive Infringing Use of LimeWire ...................................................................158

1.     Lime Wire's Early Business Model Failed to Generate Sufficient Revenue ....................................................................159

2.     Lime Wire Sought to Earn Revenue by Monetizing the Infringing User Base of its LimeWire Client...............................160

3.     Lime Wire Promoted File Sharing on the Gnutella Network When It Knew the Dominant Use of Gnutella and LimeWire Was for Infringement of Copyrighted Sound Recordings ................................................................................163

4.     Lime Wire Planned to Monetize LimeWire's Infringing User Base by "Converting" LimeWire's Users Into Paying Music Customers ......................................................................168

5.     Lime Wire Seeks to Monetize its Infringing User Base by Selling Music Through the LimeWire Store................................178

F.     Lime Wire Has Taken No Meaningful Affirmative Steps to Prevent Infringement ........................................................................179

1.     Lime Wire Had the Ability and Opportunity to Implement an Effective Filter for Copyrighted Works ..................................191

2.     Lime Wire Attempts to Filter Other Kinds of Files....................202

VI.    LIME WIRE IS LIABLE FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT...............................................................................206

A.     Lime Wire Was Aware Of or Had Reason to Be Aware of the Direct Infringement or at the Very Least, Turned a "Blind Eye" to Such Infringement Through LimeWire ....................................206

**Page**

B.     Lime Wire Has Induced or Materially Contributed to Infringement by Users of the LimeWire Software ..........................................................209

C.     There Is No Evidence of "Substantial" or "Commercially Significant" Noninfringing Uses of the LimeWire Software .................210

VII.   LIME WIRE INDUCED AND CONTRIBUTED TO COPYRIGHT INFRINGEMENT WILLFULLY.......................................................................227

**DEFENDANTS ADDITIONAL MATERIAL IN SUPPORT OF THEIR RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

I.      LIME WIRE HAS NEVER INTENDED TO INDUCE INFRINGEMENT.......235

        A.      All Business Plans Reflect Lime Wire's Goal:  To Develop
                A Ubiquitous P2P Information Sharing Tool ...........................................235

        B.      Lime Wire Did Not Target Napster Users Or Any Users Of
                a Mindset To Infringe ...............................................................................241

        C.      The Lime Wire Software Was never Developed With Infringement
                In Mind.......................................................................................................248

Plaintiffs Arista Records LLC; Atlantic Recording Corporation; BMG Music; Capitol Records LLC; Elektra Entertainment Group Inc.; Interscope Records; LaFace Records LLC; Motown Record Company, L.P.; Priority Records LLC; Sony BMG Music Entertainment; UMG Recordings, Inc.; Virgin Records America, Inc.; and Warner Bros. Records Inc. (collectively, "plaintiffs" or the "Record Companies") set forth their replies in support of their motion for partial summary judgment.[1]

For the convenience of the Court, plaintiffs have set forth herein their statement of undisputed material facts, defendants' responses, and plaintiffs' replies to the responses. In reproducing defendants' responses verbatim, plaintiffs have not attempted to correct what may be typographical errors. Plaintiffs have indicated by a shaded "Undisputed" those responses that are entirely undisputed.

Defendants have based a majority of their objections to plaintiffs' undisputed statements of material fact on the admissibility of certain documents, portions of deposition testimony or reports, citing to one of three evidentiary briefs filed in conjunction with their opposition to plaintiffs' motion for partial summary judgment: (1) Defendants' Settlement Related and Pre-August 2003 Objections to Plaintiffs' Exhibits ("Defs. Pre-2003/*Grokster* Br."); (2) Defendants' Objections to Plaintiffs' Exhibits and Depositions Excerpts ("Defs. Mot. to Strike Br."); and (3) Defendants' Motion to Exclude Proffered Expert Summary Judgment Evidence From the Depositions and Reports of Ellis Horowitz, Ph. D., and Richard Waterman, Ph. D. ("Defs. Expert Br.") (collectively, the "evidentiary briefs"). While defendants have offered no guidance in the responses set forth here as to the basis for their objection except to

---

[1] Unless otherwise indicated, "defendants" or "Lime Wire" refers to Lime Wire LLC, Lime Group LLC, and Mark Gorton. "Lime Wire LLC" refers to the defendant company, and "LimeWire" refers to the software application.

broadly point to one of their evidentiary briefs to dispute the evidence submitted by plaintiffs, plaintiffs have, for the convenience of the Court, responded to these arguments as well as provided citations to the full arguments made in opposition to the evidentiary motions.[2]

## I.   THE PARTIES

### A.   Plaintiffs

1.   **Plaintiff Arista Records LLC is a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York. (Plaintiffs' First Amended Complaint ("Compl.") ¶ 10.) [Undisputed]**

2.   **Plaintiff Atlantic Recording Corporation is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York. (Compl. ¶ 11.) [Undisputed]**

3.   **Plaintiff BMG Music is a general partnership duly organized and existing under the laws of the State of New York, with its principal place of business in the State of New York. (Compl. ¶ 12.) [Undisputed]**

4.   **Plaintiff Capitol Records LLC is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York. (Compl. ¶ 13.) [Undisputed]**

5.   **Plaintiff Elektra Entertainment Group Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York. (Compl. ¶ 14.) [Undisputed]**

6.   **Plaintiff Interscope Records is a general partnership duly organized and existing under the laws of the State of California, with its principal place of business in the State of California. (Compl. ¶ 15.) [Undisputed]**

7.   **Plaintiff LaFace Records LLC is a limited liability corporation duly organized and existing under the laws of the State of Delaware, with its**

---

[2] Plaintiffs respectfully refer the Court to their three memoranda which respond to defendants' motions.  *See* (1) Plaintiffs' Memorandum of Law in Opposition to Defendants' Settlement Related and Pre-August 2003 Objections to Plaintiffs' Exhibits ("Pls. Pre-2003/*Grokster* Opp'n Br."); (2) Plaintiffs' Opposition To Defendants' Objections To Plaintiffs' Exhibits and Depositions Excerpts ("Pls. Mot. to Strike Opp'n Br"); and (3) Plaintiffs' Opposition to Defendants' Motion to Exclude Proffered Expert Summary Judgment Evidence From The Depositions and Reports of Ellis Horowitz, Ph. D, and Richard Waterman, Ph. D. ("Pls. Expert Opp'n Br.").

principal place of business in the State of New York. (Compl. ¶ 16.) [Undisputed]

8.      Plaintiff Motown Record Company, L.P. is a limited partnership duly organized and existing under the laws of the State of California, with its principal place of business in the State of New York. (Compl. ¶ 17.) [Undisputed]

9.      Plaintiff Priority Records LLC is a limited liability company with its principal place of business in the State of California. (Compl. ¶ 18.) [Undisputed]

10.     Plaintiff SONY BMG MUSIC ENTERTAINMENT is a general partnership duly organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York. (Compl. ¶ 19.) [Undisputed]

11.     Plaintiff UMG Recordings, Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in the State of California. (Compl. ¶ 20.) [Undisputed]

12.     Plaintiff Virgin Records America, Inc. is a corporation duly organized and existing under the laws of the State of California, with its principal place of business in the State of New York. (Compl. ¶ 21.) [Undisputed]

13.     Plaintiff Warner Bros. Records Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in the State of California. (Compl. ¶ 22.) [Undisputed]

B.      **Defendants**

14.     Defendant Lime Wire LLC ("Lime Wire") is a Delaware limited liability corporation with its principal place of business in New York, New York. (Compl. ¶ 31; Defendants' Corrected First Amended Answer and Counterclaims ("Answer" or "Countercl.") ¶ 31.) [Undisputed]

15.     Defendant Mark Gorton ("Gorton") "founded [Lime Wire] in June 2000". (Ex. 1; Gorton Tr. 31:3-5.) [Undisputed]

16.     Gorton was the Chief Executive Officer ("CEO") of Lime Wire from its inception until 2007. (Gorton Tr. 10:18-25; see also Ex. 2.) [Undisputed]

17. **During the time that Gorton was CEO, he ran Lime Wire. (Gorton Tr. 11:2-5.)**

**Defendants' Response:**

*Disputed. The testimony reflects that Mr. Gorton thought of himself as someone who ran the company. Gorton Tr. 11:2-5.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement -- that Gorton ran Lime Wire LLC while he was its CEO. Indeed, in addition to the cited Gorton testimony, Gorton also acknowledged in an email that "I run Lime Wire". (Ex. 101.)[3] Greg Bildson, former Lime Wire LLC's Chief Technology Officer and Chief Operations Officer, has testified that Gorton was the "ultimate decision-maker" at Lime Wire LLC (Pls. Add'l (Gorton) SOF ¶ 662) and was "involved in every major business decision relating to Lime Wire". (*Id.* ¶ 668.) Moreover, Lime Wire employees testified that they reported to Gorton (*id.* ¶ 669) and that Gorton made everyday decisions at the company. (*See id.* ¶¶ 672, 674, 678-680; *see also id.* ¶¶ 671, 673, 675-677.) Thus, this statement must be deemed undisputed.

18. **Gorton is now and has always been the sole Director of Lime Wire. (Ex. 3 at LW DE 486246; Gorton Tr. 68:23-25.) [Undisputed]**

19. **Gorton is the Chairman of Lime Wire. (Gorton Tr. 68:23-25.) [Undisputed]**

20. **Defendant Greg Bildson ("Bildson") is the Chief Technology Officer and Chief Operating Officer of Lime Wire and has been since Lime Wire's inception. (Ex. 4 (http://www.limewire.com/about/team.php); Bildson Tr. 4:16-19, 36:15-37:6.) [Undisputed]**

---

[3] In support of plaintiff's July 18, 2008 motion for partial summary judgment, plaintiffs submitted Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Pls. 7/18/08 SOF") accompanied by Volumes I to VII to the Declaration of Katherine B. Forrest, dated July 18, 2008 ("Forrest 7/18/08 Decl."). In opposition to defendants' July 18, 2008 motions for summary judgment, plaintiffs submitted statements of additional facts (*see* "Pls. (Gorton) Add'l SOF" ¶¶ 124-715; "Pls. (LW) Add'l SOF" ¶¶ 1-53) to their responses to defendants' 56.1 Statement ("Pls. (LW) 56.1 Resp."; "Pls. (Gorton) 56.1 Resp."). Unless noted otherwise, citations in the form ("Ex. __"), ("_____ Tr. _____"), ("_____ Decl. _____") or ("_____ Report _____") are contained in Volumes I-VII, exhibits to the Declaration of Katherine B. Forrest, dated July 18, 2008 ("Forrest 7/18/08 Decl."); Volumes VIII-X, exhibits to the Declaration of Katherine B. Forrest, dated September 26, 2008 ("Forrest 9/26/08 Decl."), submitted in opposition to defendants' motions; or in Volume XI - XIII, exhibits to the Declaration of Katherine B. Forrest, dated November 7, 2008 ("Forrest 11/07/08 Decl."), submitted herewith.

**21.**     **Gorton testified that Bildson "ran Lime Wire on a day-to-day basis".
(Gorton Tr. 33:13-17.) [Undisputed]**

**22.**     **Bildson earned $1,887,304 in 2007 from Lime Wire; Bildson's Lime Wire
earnings above $150,000 came from profit-sharing.  (Ex. 5 (Bildson 2007
W-2); Bildson Tr. 72:7-17.)**

**Defendants' Response:**

*Disputed as to earnings from profit sharing.  Bildson's testimony on this point was
speculation ("I guess") and thus not admissible.  Bildson Tr. 72:7-17.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement -- that
Bildson earned $1,887,304 in 2007 from Lime Wire LLC.  Nor do defendants dispute the
admissibility of Exhibit 5, which is Bildson's W-2 form showing income for 2007
totaling $1,887,304.  Although defendants objected to and moved to strike specific
exhibits and deposition excerpts, they have *not* objected to this Bildson testimony.  (*See*
Defs. Mot. to Strike Br. at 8-9.)  In any event, this testimony by Bildson as to the source
of his own income is *not* speculation.  Thus, this statement must be deemed undisputed.

**23.**     **Defendant Lime Group LLC ("Lime Group") is a Delaware limited liability
company with its principal place of business in New York, New York.
(Comps. ¶ 30; Answer ¶ 30.) [Undisputed]**

**24.**     **Lime Wire was a "wholly owned subsidiary of the Lime Group".  (Ex. 6.)**

**Defendants' Response:**

*Disputed.  For a short period of time, Lime Group held 100% ownership in Lime Wire
(from June 2000 to March 2001.)  See Declaration of Elizabeth Weiner ("Weiner Decl.")
at ¶ 3.*

**Plaintiffs' Reply:**

Defendants' response to this statement does *not* dispute it.  In fact, Weiner's Declaration
supports the material point and accuracy of this statement -- that Lime Wire LLC was a
wholly owned subsidiary of Lime Group.  At the time that Lime Group's interests in
Lime Wire LLC were transferred to the M.J.G. LW Partnership (*see infra* Pls. 7/18/08
SOF ¶ 27), Lime Group owned over 87% of Lime Wire LLC.  (Ex. 7.)

**25.**     **At the time Lime Group owned Lime Wire, defendant Gorton owned 100%
of Lime Group. (Gorton Tr. 15:13-21, 17:19-21.) [Undisputed]**

**26.**     **Defendant M.J.G. Lime Wire Family Limited Partnership ("M.J.G. LW
Partnership") is a Nevada limited partnership that operates under the
control of its general partner Mark Gorton. (Compl. ¶ 32; Answer ¶ 32;**

**M.J.G. Family Ltd. Partnership Answer ¶ 32; Ex. 7 at LW F 000001.)**
**[Undisputed]**

27.     **On June 30, 2005, three days after the U.S. Supreme Court's decision in**
        ***Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)**
        **("*Grokster*") was announced (*see infra* ¶ 192), Lime Group's interests in**
        **Lime Wire were transferred to the M.J.G. LW Partnership.  (Ex. 7 at LW F**
        **000014; Ex. 8.)**

**Defendants' Response:**

> *Undisputed that this was the date of the transfer.  However, the timing of the Grokster*
> *decision had nothing to do with the date these documents were executed and the transfer*
> *took place.  Mr. Gorton has testified both in his deposition and in his declaration (that*
> *was filed as part of Defendants summary judgment motion) that after years of listening to*
> *his accountants and tax advisors, he took their advice and met with estate planning*
> *counsel, who advised him of this transaction, including its estate planning benefits . Mr.*
> *Gorton met with this counsel in January 2005, many months before the Grokster decision*
> *was issued. Mr. Gorton has also testified that the outcome of the Grokster case had no*
> *impact on his decision to implement this tax avoidance strategy.  Moreover, Defendants*
> *have submitted undisputed evidence that Gorton began this process many, many months*
> *before these documents were actually executed, having met with counsel as early as*
> *January 2005 in order to start this process.  See generally Defendants' Memorandum of*
> *Law in Support of Defendants Greg Bildson, Mark Gorton, Lime Group LLC, and M.J.G.*
> *Lime Wire Family Limited Partnership's Motion for Summary Judgment filed on July 18,*
> *2008. See Gorton Tr. 77:17 - 81:21.1* [4]

**Plaintiffs' Reply:**

> This statement is undisputed.  Moreover, Gorton's testimony that his tax advisors and
> counsel advised him to set up the partnership is hearsay and inadmissible.  *Second*,
> Gorton's purported January 10, 2005 meeting with his counsel -- "many months before
> the *Grokster* decision was issued" -- took place just weeks after the Supreme Court
> granted a writ of certiorari in the *Grokster* case.  *See Metro-Goldwyn-Mayer Studios, Inc.*
> *v. Grokster Ltd.*, 543 U.S. 1032 (Dec. 10, 2004).  *Third*, the last sentence in defendants'
> response is not true -- defendants have not submitted any such "undisputed evidence".
> (See Pls. (Gorton) 56.1 Resp. ¶¶ 49-52, 58.)  *Fourth*, defendants' citation to their July 18,
> 2008 Memorandum of Law is improper as it does not point to any specific evidence. [5]

---

[4] Documents cited herein as ("Defs.' Ex. ___") and excerpts from deposition testimony
("___ Tr. ___") are contained in Volumes I - XVI of the Exhibits to the Declaration of Charles S.
Baker dated September 26, 2008 ("Baker Decl.").  [Footnote in original]

[5] *See* S.D.N.Y. Local Civil Rule 56.1(d) ("Each statement by the . . . opponent . . . must be
followed by citation to evidence which would be admissible"); *see also* Fed. R. Civ. P. 56(e)(2)
("[A]n opposing party may not rely merely on allegations or denials . . . its response must . . . set

Further, the remainder of defendants' response is nonresponsive and argumentative.[6]
Thus, this statement must be deemed undisputed.

28.    **The M.J. Gorton Limited Partnership is another Nevada limited partnership
that operates under the control of Mark Gorton as general partner. (Ex. 9 at
LW F 000153 at 00153.)**

**Defendants' Response:**

*Undisputed that this was the date of the transfer. However, the timing of the Grokster
decision had nothing to do with the date these documents were executed and the transfer
took place. Mr. Gorton has testified both in his deposition and his declaration that after
years of listening to his accountants and tax advisors, he took their advice and met with
estate planning counsel, who advised him of this transaction, including its estate
planning benefits. Mr. Gorton met with this counsel in January 2005, many months
before the Grokster decision was issued. Mr. Gorton has also testified that the outcome
of the Grokster case had no impact on his decision to implement this tax avoidance
strategy. Moreover, Defendants have submitted undisputed evidence that Gorton began
this process many, many months before these documents were actually executed, having
met with counsel as early as January 2005 in order to start this process. See generally
Defendants' Memorandum of Law in Support of Defendants Greg Bildson, Mark Gorton,
Lime Group LLC, and M.J.G. Lime Wire Family Limited Partnership's Motion for
Summary Judgment filed on July 18, 2008. See Gorton Tr. 77:17-81:21.*

**Plaintiffs' Reply:**

This statement is undisputed. The remainder of defendants' response is not responsive to
the statement and is argumentative. (*See* note 6.)

29.    **Also three days after the *Grokster* decision was announced, Gorton's 100%
ownership interest in defendant Lime Group was transferred to the M.J.
Gorton Limited Partnership. (Ex. 9 at LW F 000167.)**

---

out specific facts"); *Deluca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 06 Civ. 5474, 2008
WL 857492, at *1 (S.D.N.Y. Mar. 31, 2008) ("nonmoving party must produce evidence in the
record and may not rely simply on conclusory statements or on contentions that the affidavits
supporting the motion are not credible") (citations omitted); *Parks v. Lebhar-Friedman, Inc.*,
Civil Action No. 04-7133, 2008 WL 3833802, at *7 (S.D.N.Y. Aug. 11, 2008) (striking
responses where party "failed to cite to admissible evidence").

[6] *See Goldstick v. Hartford, Inc.*, No. 00 Civ. 8577, 2002 WL 1906029, at *1 (S.D.N.Y.
Aug. 19, 2002) (striking party's "argumentative" 56.1 response which attempted to "spin" the
facts in the party's favor).

**Defendants' Response:**

*Undisputed that this was the date of the transfer.  However, the timing of the Grokster decision had nothing to do with the date these documents were executed.  Mr. Gorton has testified both in his deposition and his declaration that after years of listening to his accountants and tax advisors, he took their advice and met with estate planning counsel, who advised him of this transaction, including its estate planning benefits.  Mr. Gorton has also testified that the outcome of the Grokster case had no impact on his decision to implement this tax avoidance strategy.  Moreover, Defendants have submitted undisputed evidence that Gorton began this process many, many months before these documents were actually executed, having met with counsel as early as January 2005 in order to start this process.  See generally Defendants' Memorandum of Law in Support of Defendants Greg Bildson, Mark Gorton, Lime Group LLC, and M.J.G. Lime Wire Family Limited Partnership's Motion for Summary Judgment filed on July 18, 2008.  See Gorton Tr. 77:17-81:21.*

**Plaintiffs' Reply:**

This statement is undisputed.  Further, the remainder of defendants' response is identical to the response to ¶ 28 and is nonresponsive, inadmissible and improper for the same reasons.  (*See* Pls. Reply ¶ 28.)

30.   **Gorton has described the ownership structure of companies with which he has a relationship, including Lime Wire and Lime Group, as "complicated" and "convoluted". (Gorton Tr. 27:19-23, 40:25-41:5.) [Undisputed]**

31.   **Gorton has acknowledged that he was "highly concerned about being sued" and has admitted that "one of the benefits . . . [of the M.J.G. LW Partnership] was that it did help protect the assets in the event of a legal judgment against me personally".  (Gorton Tr. 77:8-78:4; *see also* Ex. 10 at ¶ 5; Falco Tr. 158:13-159:20.)[7]**

**Defendants' Response:**

*Disputed.  Mr. Gorton did not say that he was concerned about being sued when the transfer occurred. Instead, Gorton testified that he was highly concerned about being sued <u>after</u> he received a cease and desist letter from the RIAA (which was in September 2005) and after he met with the RIAA in the Fall of 2005. Gorton Tr. 76:14-77:6.  As to the reasons why he did these transactions, Gorton testified that the <u>primary</u> reason he had set these partnerships up was for estate planning purposes.  He also testified that it took over a year to complete the various transactions.  Gorton Tr. 72:14 – 78:04. Moreover, Gorton disputes any implications or accusations that he implemented these transactions solely to protect his assets against an adverse judgment against him.  See*

---

[7] "Defendants" or, except where the context indicates otherwise, "Lime Wire" includes defendants Lime Group, Lime Wire LLC, Gorton and Bildson.  [Footnote in Original]

*generally Defendants' Memorandum of Law in Support of Defendants Greg Bildson, Mark Gorton, Lime Group LLC, and M.J.G. Lime Wire Family Limited Partnership's Motion for Summary Judgment filed on July 18, 2008. As to Falco's testimony, Gorton denies he told Mr. Falco that he did this to avoid paying any sort of judgment against him, and he also denies telling Mr. Falco that he should do the same. Gorton did recall telling Mr. Falco that his primary goal was for estate planning purposes and that one of the benefits of the transactions was that it helped to protect his assets. Gorton Tr. 75:17-77:16.*

**Plaintiffs' Reply:**

Defendants' do not dispute the material point and accuracy of this statement. Defendants take issue with the timing of Gorton's acknowledgement and admission, not the fact or accuracy of them. Moreover, defendants do not dispute any of the evidence cited in support. The remainder of defendants' response is nonresponsive. Defendants cite to Gorton's testimony as support only for Gorton's claim that the transactions were not implemented *solely* for this reason. Defendants' citation to their July 18, 2008 Memorandum of Law is improper as it does not point to any specific evidence. (*See* note 5.) In addition, Mr. Falco's testimony is corroborated by Greg Bildson. (*See* Bildson 9/10/08 Decl. ¶ 39.) Accordingly, the statement must be deemed undisputed.

## II.   THE LITIGATION

32.    **On August 4, 2006, plaintiffs filed this action.** [Undisputed]

33.    **Plaintiffs allege that all defendants (except the M.J.G. LW Partnership) are liable for: Inducement of Copyright Infringement (Count I); Contributory Copyright Infringement (Count II); Vicarious Copyright Infringement (Count III); Common Law Copyright Infringement of Pre-1972 Recordings (Count IV); and Unfair Competition as to Pre-1972 Recordings (Count V). (Compl. ¶¶ 65-114.)** [Undisputed]

34.    **Plaintiffs also allege that Mark Gorton and the M.J.G. LW Partnership are liable for Conveyance Made With Intent to Defraud (Count VI). (Compl. ¶¶ 115-120; Stipulation and Order, dated September 13, 2007.)** [Undisputed]

35.    **Plaintiffs are moving for summary judgment on Counts I, II, IV and V. (See plaintiffs' motion for partial summary judgment filed herewith.)** [Undisputed]

36.    **Plaintiffs have produced approximately 4,817,469 pages of documents in the copyright action.** [Undisputed]

37.    **Defendants have produced approximately 2,468,220 pages of documents.** [Undisputed]

14

38. **Third parties (including the Recording Industry Association of America ("RIAA")) have produced approximately 47,376 pages of documents. [Undisputed]**

39. **Plaintiffs have taken the depositions of the following current or former Lime Wire employees:**

   (a) **Jennifer-Kate Barret Formerly in charge of Public Relations (January to May 2001) (Barret Tr. 21:15-21, 32:7-11, 214:4-10.)**

   (b) **Samuel Berlin Senior Software Developer (May 2003 – Present) (Berlin Tr. 5:8, 10:14-16.)**

   (c) **Gregory Bildson Chief Technological Officer and Chief Operating Officer of Lime Wire (2000 – Present) (See supra ¶¶ 20-21.)**

   (d) **Kathryn Catillaz Business Developer and formerly responsible for customer support (October 2004 - Present) (Catillaz Tr. 7:21-8:2, 8:10-11, 8:19-9:18.)**

   (e) **Stephen Cho Former Business Development Leader (July 2000 to November 2001) (Cho Tr. 11:13-16, 12:25-13:6.)**

   (f) **Kevin Faaborg Junior Software Developer (2005 - Present) (Faaborg Tr. 5:10-14, 28:2-9.)**

   (g) **Adam Fisk Former Software Engineer and Senior Software Engineer (2000 - February 2004) (Fisk Tr. 8:11-22, 9:21-25.)**

   (h) **Mark Gorton Former owner of Lime Group; founder, former Chief Executive Officer and current Chairman of Lime Wire. (See supra ¶¶ 15-19.)**

   (i) **Adam Harris Former Business Developer (June 2003 - July 2004) (Harris Tr. 10:24-11:5, 38:13-18.)**

   (j) **Kirk Kahn Technical Support Representative (March 2005 - Present) (Kahn Tr. 10:13-15, 11:18-24.)**

   (k) **Christine Nicponski Former Technical Support Representative (March 2005 - January 2006) (C. Nicponski Tr. 20:12-15, 44:18-23.)**

   (l) **David Nicponski Former Software Engineer (January 2005 - September 2005) (D. Nicponski Tr. 14:9-14, 9:9-16.)**

   (m) **Christopher Rohrs Former Software Engineer (2000-2002) at Tower Research Capital and Lime Wire (Rohrs Tr. 11:13-12:8.)**

(n)   **Jesse Rubenfeld Chief Financial Officer (April 2006-Present) and former Business Analyst at Lime Group (March 2003-2005) (Rubenfeld Tr. 5:25-7:4.) [Undisputed]**

40.   **Defendants have taken the deposition of the following current and former Record Company employees:**

(a)   **Victoria Bassetti Senior Vice President, Industry and Government Affairs, Global and Vice President, Antipiracy, North America, EMI Music**

(b)   **Christopher Bell Vice President, Advanced Technology, Universal Music Group**

(c)   **Jennifer Cavanaugh Former Vice President, New Technology, SONY BMG MUSIC ENTERTAINMENT (departed February 2008)**

(d)   **Michael Elias Former Senior Director of Digital Technology, Warner Music Group (departed August 2007)**

(e)   **Lawrence A. Kanusher Senior Vice President, Business and Legal Affairs, Global Digital Business Unit, SONY BMG MUSIC ENTERTAINMENT**

(f)   **Kenneth Parks Former Senior Vice President of Business Development and Strategy, EMI Music**

(g)   **Jay Pomeroy Vice President of New Business Development, EMI Music**

(h)   **Howard Singer Vice President of Strategic Technology and Chief Technology Officer, Warner Music Group**

(i)   **David Weinberg Senior Vice President, Universal Music Group**

(j)   **George White Senior Vice President of Strategy and Product Development, Warner Music Group [Undisputed]**

41.   **The following non-parties have been deposed:**

(a)   **Adam Friedman Associates Adam Friedman, Principal (Friedman Tr. 4:25-5:9, 6:17-7:16.)**

(b)   **CNET Networks, Inc. Sarah Brook, Senior Publisher Relations Manager**

(c)   **Vincent Falco Former Chief Executive Officer of Free Peers, Inc., which distributed BearShare (Falco Tr. 99:16-18, 100:20-101:1.)**

  (d)  **Google, Inc. Jill T. Randell, Strategic Partner Manager (Randell Tr. 3:12-4:22.)**

  (e)  **Amy Gorton Owner of Tower Public Relations, sister of Mark Gorton, Consultant to Lime Wire (2004 - May 2005), and investor in Lime Wire LLC, the MJG Lime Spot Family Partnership, Lime Brokerage, and the Spire Fund. (A. Gorton Tr. 10:8-16, 7:12-14, 74:14-23, 62:11-13, 24:14-27:10.)**

  (f)  **Talmon Marco President and Chief Marketing Officer of iMesh, Inc.**

  (g)  **QTrax Allan Klepfisz, as corporate representative**

  (h)  **SpiralFrog Joseph T. Mohen, as corporate representative [Undisputed]**

42.  **The following witnesses have been deposed as part of expert discovery:**

  (a)  **Eric German Partner at Mitchell Silberberg & Knupp LLP and Declarant (Exhibit C to the report of Professor Richard Waterman (see infra ¶ 42(e))) (German Tr. 9:1-4, 15:15-16, 34:16-24.)**

  (b)  **Steven Gribble, Ph.D. Defendants' Computer Science Expert (Gribble Report at 2.)**

  (c)  **Ellis Horowitz, Ph.D., Plaintiffs' Computer Science Expert (Horowitz Report at 4.)**

  (d)  **Matthew Mercurio, Ph.D., Plaintiffs' Statistics Expert (Mercurio Report at 2.)**

  (e) **Richard Waterman, Ph.D.**   **Plaintiffs' Statistics Expert (Waterman Report at 1-2.)**

**Defendants' Response:**

  *(c) Defendants do not dispute that Horowitz has been proffered as an expert for Plaintiffs.  Defendants, however, object to any reference to his report as it is inadmissible.  See Defendants' Objections to Plaintiffs' Exhibits and Deposition Excerpts to Their Motion for Partial Summary Judgment and Defendants' Motion to Strike Plaintiffs' Exhibits and Deposition Excerpts ("Defendants' Motion to Strike").  Defendants have also moved to strike Horowitz as an expert.  See generally Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proffered Expert Summary Judgment Evidence from the Depositions and Reports of Ellis Horowitz, Ph.D and Richard P. Waterman, Ph.D.*

  *(e) Defendants do not dispute that Waterman has been proffered as an expert  for Plaintiffs.  Defendants, however, object to any reference to his report  as it is*

*inadmissible.  See Defendants' Motion to Strike.  Defendants have  also moved to strike Waterman as an expert.  See generally Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proffered Expert Summary Judgment Evidence from the  Depositions and Reports of Ellis Horowitz, Ph.D and Richard P. Waterman, Ph.D.*

**Plaintiffs' Reply:**

(c) Defendants do not dispute the material point and accuracy of this statement--that Dr. Horowitz has been deposed as an expert witness.  Instead, they object to the admissibility of Dr. Horowitz's report.  Accordingly, the statement must be deemed undisputed.

(e) Defendants do not dispute the material point and accuracy of this statement--that Dr. Waterman has been deposed as an expert witness.  Instead, they object to the admissibility of Dr. Waterman's report.  Accordingly, the statement must be deemed undisputed.

## III.   THE RELEASE, OPERATION AND DISTRIBUTION OF LIME WIRE BY DEFENDANTS

### A.   The LimeWire Client

**43.**   **Lime Wire "designed, built, distributed, sold and supported" the software application known as LimeWire (the "LimeWire client", the "LimeWire application" or the "LimeWire software"). (Answer ¶¶ 29, 31; see also Ex. 1.) [Undisputed]**

**44.**   **Lime Wire released the LimeWire client in August 2000. (Ex. 1.) [Undisputed]**

**45.**   **LimeWire is a peer-to-peer ("P2P") file sharing application. (Ex. 11 (www.limewire.com/about/company.php). ) [Undisputed]**

**46.**   **Lime Wire designed the LimeWire application to implement the Gnutella protocol and connect to the Gnutella network.  (Ex. 3 at LW DE 486245-46; Rohrs Tr. 12:13-13:7.)**

**Defendants' Response:**

*Disputed.  Moreover, disputed as to admissibility of Exhibit 3, because it pre-dates August 2003.  See generally Defendants' Settlement Related and Pre-August 2003 Objections to Plaintiffs' Exhibits to Their Motion for Partial Summary Judgment and Defendants' Motion to Strike Plaintiffs' Exhibits and Deposition Excerpts ("Defendants' Settlement/Pre-August 2003 Objections").*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute the cited portion of the Rohrs testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 3, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-4; *id.* at n. 3, 5.)  In fact, defendants themselves have proffered Exhibit 3 as their *own* Exhibit 2 and so have waived any objection this document.  (*See* Baker 9/26/08 Decl. ¶ 4.)  Thus, the statement must be deemed undisputed.

**47.    A P2P file sharing application is a software application that enables its users to exchange digital files directly with each other. (Ex. 12 (http://www.limewire.com/about/p2p.php); Ex. 6.) [Undisputed]**

**48.    P2P file sharing applications can be referred to as, inter alia, "clients". (See Ex. 3 at LW DE 486263-64.) [Undisputed]**

**49.    The "Gnutella Network", as defined in Lime Wire's Offering Memorandum (*see infra* ¶ 124), "enables users to share files and information with other members of the network."  (Ex. 3 at LW DE 486253.)  It evolved from "Nullsoft's distribution of the 'file-sharing tool which could be even more potent then Napster'".  (*Id.* at LW DE 486279.)**

**Defendants' Response:**

*Disputed.  Moreover, disputed as to admissibility of Exhibit 3.  See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 3, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-4; *see also* Pls. Reply ¶ 46.)  Thus, this statement must be deemed undisputed.

**50.    The original Gnutella software application was initially taken down for its "Napster-like" capabilities.  (Ex. 13 at LW DE 1976153; *see also* Ex. 3 at LW DE 486279 (appendix to Lime Wire Offering Memorandum (*see infra* ¶ 124) quoting description of Gnutella as an "open-source Napster clone", a "file-sharing software tool which could be even more potent than Napster" and a "potential threat . . . to record labels Warner Music and EMI").)**

**Defendants' Response:**

*Disputed.  Moreover, disputed as to admissibility of Exhibits 3 and 13.  See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Even if these documents are admitted into evidence, Defendants wish to point out that when he read Exhibit 3, Bildson disputed the description of Gnutella as an "open source Napster*

*clone." Bildson also testified that he believes that the author of this document, Steven Cho, made all of this up. Bildson Tr. 449:07 – 449:16; 469:25 – 472:04. Mr. Cho also confirmed in his deposition that he had no personal knowledge as to these statements. Cho Tr. 47:21-49:02.*

**Plaintiffs' Reply:**

Defendants do not dispute that the material point and accuracy of this statement.  Nor do they dispute that these phrases were used in the exhibits cited.  Defendants dispute only the admissibility of Exhibits 3 and 13, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; Pls. Mot. to Strike Opp'n Br., Attachment A ("Attach. A") at Ex. 13; *see also* Pls. Reply ¶ 46.)  Thus, this statement must be deemed undisputed.

**51.**     **LimeWire can "interoperate" with other file sharing clients that properly implement the Gnutella protocol.  LimeWire users can search for files on the computers of, and download from, users of these other file sharing clients and vice versa.  (Horowitz Report at ¶ 32; Ex. 14 at 16-17; Rohrs Tr. 117:14-119:2.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report and Exhibit 14.  See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute the Rohrs testimony, which alone provides support for the statement.  Defendants dispute only the admissibility of Exhibit 14, which is, in fact, admissible (*see* Attach. A at Ex. 14), and the Horowitz Report, which is also admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**52.**     **Successfully maintaining interoperability among clients that implement the Gnutella protocol requires developers to adjust regularly elements of the technology to maintain compatibility.  (*See* Fisk Tr. 46:15-47:6; *see, e.g.*, Ex. 15; Ex. 16.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 15. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute that the material point and accuracy of the statement.  Nor do defendants dispute Exhibit 16 or the Fisk testimony, which provide sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 15, which is, in fact, admissible.  (*See* Attach. A at Ex. 15.)  Thus, the statement must be deemed undisputed.

**53.    Although numerous applications connect to the Gnutella network, each application, including LimeWire, has its own unique feature set, user interface and other characteristics.  (*See* Ex. 3 at LW DE 486263-64, 486267-69; Horowitz Report at ¶ 32; Gribble Tr. 118:4-19.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 3 and the Horowitz Report.  See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute that the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 3, which is, in fact, admissible (*see* Pls. Reply ¶ 46), and the Horowitz Report, which is also admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**54.    LimeWire implemented only the Gnutella protocol from LimeWire's creation until version 4.13.0 (released on or about October 30, 2006), when support for another protocol known as BitTorrent was added.  (Ex. 17 at 13; *see also* Faaborg Tr. 98:5-16.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 17. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute that the material point and accuracy of this statement.  Nor do defendants dispute the Faaborg testimony, which provides support for the statement that LimeWire provided BitTorrent support.  Defendants dispute only the admissibility of Exhibit 17, which is, in fact, admissible.  (*See* Attach. A at Ex. 17.)  Moreover, defendants themselves have proffered Exhibit 17 as their own Exhibit 43 and so have waived any objection this document. (*See* Baker 9/26/08 Decl. ¶ 45.)  Thus, this statement must be deemed undisputed.

55.     **BitTorrent and Gnutella are different protocols, which operate separately within the LimeWire client. (Ex. 18 (http://wikilimewire.org/index.php?title=User_ Guide_Bittorent).) [Undisputed]**

56.     **Defendants make the LimeWire client available in two versions: LimeWire BASIC, which is free, and LimeWire PRO, which is available for a fee. (Ex. 19 (http://www.limewire.com/download/).)**

**Defendants' Response:**

*Disputed. Only defendant Lime Wire LLC makes the client available in two versions; the other defendants do not. Ex. 19.*

**Plaintiffs' Reply:**

Defendants do not dispute the central point of this statement. Defendants dispute only the word "Defendants". Plaintiffs hereby substitute "Lime Wire LLC" for "Defendants" in the statement. Thus, this statement must be deemed undisputed.

57.     **According to Lime Wire, LimeWire PRO offers "[o]ptimized search results", "[t]urbo-charged downloads", "[c]onnections to more sources", "[m]ore reliable downloads", "[f]ree technical support" and "[f]ree updates for up to six months". (Ex. 19 (http://www.limewire.corn/download/).) [Undisputed]**

58.     **As of July 10, 2008, LimeWire PRO costs $21.95 for six months of technical support and updates. (Ex. 19 (http://www.limewire.com/download/).) [Undisputed]**

59.     **As of July 10, 2008, LimeWire Extended PRO, which is the same software as LimeWire PRO but the purchase of which entitles the user to one year (rather than six months) of technical support and updates, costs $34.95. (Ex. 19 (http://www.limewire.com/download/). ) [Undisputed]**

60.     **Lime Wire has periodically released new versions of the LimeWire client. As of July 10, 2008, the latest version of the LimeWire client is Version 4.18.3, which was released after May 28, 2008. (Ex. 20 (http://wiki.limewire.org/index.php?titleChangelog).) [Undisputed]**

61.     **To obtain the LimeWire application, an individual can begin by connecting to the website located at www.limewire.com, where Lime Wire makes the LimeWire client available for download. (Ex. 19 (http://www.limewire.com/download/).) [Undisputed]**

**B.**   **Operation**

**1.**   **Downloading and Installing the LimeWire Client**

**62.**   **By navigating through a short series of pages located at *www.limewire.com*, an individual can download and install LimeWire BASIC or LimeWire PRO. (Horowitz Report ¶¶ 40-41.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report.  See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the central point or accuracy of this statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  (The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**63.**   **Once the LimeWire client is installed, the user can begin searching for and downloading files from the computers of other users connected to the Gnutella network.  (Ex. 21 at LW DE 382612-16; see infra ¶¶ 65-76.) [Undisputed]**

**64.**   **A LimeWire user can also make his or her own files available for searching and downloading by others. (Ex. 21 at LW DE 382620; see infra ¶¶ 77-83.) [Undisputed]**

**65.**   **To locate content using LimeWire, a user can "perform a keyword search by typing keywords into the search field, then click[ing] the Search button". (Ex. 22 (http://wiki.limewire.org/index.php?title=User_Guide_Search_Basic) at 2; Ex. 25.) [Undisputed]**

**66.**   **A user can search using LimeWire for "all types" of files at once or for particular file types identified as "Audio", "Images", "Video", "Documents", or "Programs". (Ex. 22 (http://wiki.limewire.org/index.php?title=User_Guide_Search_Basic) at 2.) [Undisputed]**

**67.**   **A user searching for "Audio" files using LimeWire can search by entering search terms into specific fields, such as "Title", "Artist", "Album", "Track", "Genre" and "Copyright". (Ex. 22 (http://wiki.limewire.org/index.php?title=User_Guide_ Search_Basic) at 2; see also Gribble Tr. 306:12-16.) [Undisputed]**

2. __Searching For Files__

68.   **The LimeWire client has a built-in set of "Audio" genres from which the user can choose to refine his or her search, including "Top 40", Classic Rock, Country, Disco, Folk, Gangsta, Gospel, Hip-Hop, Jazz, Opera, Pop, R&B, Reggae, Showtunes and SoundTrack.  (Ex. 23; Berlin Tr. 168:2-171:7; Ex. 24.)**

__Defendants' Response:__

*Defendants do not dispute that the LimeWire software contains this capability; however, it is also true that there are over 140 such genres including such generic terms as "pranks," "trance," "house," "noise," "humor" and "speech." Ex. 24. These genres are standard ID3 tags that are contained in the metadata of all mp3 files.  LimeWire did not select these names. Berlin Decl. ¶ 13, 14.  These tags have no true meaning. In other words, in searching for a "Top 40" song does not mean that the mp3 file is truly associated with a Top 40 song.  That is because people can categorize a file as a "Top 40" and it truly was never a Top 40 song. Id. See also Gribble Decl. ¶ 30, 31.*

__Plaintiffs' Reply:__

Defendants do not dispute this statement.  The remainder of defendants' response is immaterial and irrelevant.  On remand in *Grokster,* defendant Streamcast made a similar distinction, about which the court stated:  "'Top 40' is a term typically used to refer to the best-selling or most frequently broadcast pop music songs at a given time.  Such songs are almost invariably copyrighted.  [Defendants] explain[] that [their] software does not itself identify particular files as Top 40 content.  Rather, the Top 40 feature enables a user to search for files that other users have designated as Top 40 content.  Even though [Defendants'] peer-to-peer architecture gives users responsibility for categorizing content, the fact remains that [*Defendants*] *implemented a feature that made it easier for users to share copyrighted content.*" *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 987-88 (C.D. Cal. 2006)  ("*Grokster (Remand)*") (emphasis added).

69.   **A LimeWire user searching for video files can search by entering search terms into specific fields, such as "Title", "Rating", "Studio", "Director", and "Producer". (Ex. 22 (http://wiki.limewire.org/index.php?title=User_Guide_Search_Basic) at 2.) [Undisputed]**

70.   **Once a user enters search terms and clicks the "Search" button, LimeWire displays the results as a list of files that are available on the network for download.  (Ex. 21 at LW DE 382613; *see, e.g.*, Ex. 25; Ex. 26; Ex. 27; Horowitz ¶¶ 45-46.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 26, 27 and the Horowitz Report.  See Defendants'*
*Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do
defendants dispute Exhibits 21 and 25, which provide sufficient support for the statement.
Defendants dispute only the admissibility of Exhibits 26 and 27, which are, in fact,
admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Exs. 26, 27.)  The Horowitz
Report is also admissible.  (The Horowitz Report was, in fact, "signed" as required by
Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his
sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25.)  In any event, Horowitz hereby
submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/26/08 Decl.
¶ 13.)  Thus, this statement must be deemed undisputed.

71.    **A user also can click the "What's New" button to view content recently made**
       **available by users of LimeWire and other Gnutella clients that support this**
       **feature. (Ex. 22**
       **(http://wiki.limewire.org/index.php?title=User_Guide_Search_Basic) at 3.)**
       **[Undisputed]**

72.    **A user also can directly connect to another host on the network and**
       **"browse" that host's files by clicking on the "Browse Host" button. (Ex. 22**
       **(http://wiki.limewire.org/index.php?title=User_Guide_Search_Basic)at 3-5;**
       **Berlin Tr. 314:11-21.) [Undisputed]**

       3.    **Downloading Files**

73.    **Once the LimeWire user has found the file he or she is looking for, the user**
       **can initiate a download of it by using the "Download" button.  (Ex. 28**
       **(http://wiki.limewire.org/index.php? title=User_Guide_Download) at 2;**
       **Horowitz Report ¶ 46; fig. 5.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report.  See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do
defendants dispute Exhibit 28, which alone provides sufficient support for the statement.
Defendants dispute only the admissibility of the Horowitz Report, which is, in fact,
admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26,
and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See*
Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event,

Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**74.     Clicking on the "Download" button will cause LimeWire to transfer a copy of the chosen file from one or more other computers to the user initiating the download.  (Ex. 28 (http://wiki.limewire.org/index.php?title=User_Guide_Download) at 2; Horowitz Report ¶ 46.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report.  See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the central point or accuracy of this statement.  Nor do defendants dispute Exhibit 28, which alone provides sufficient support for the statement. Defendants dispute only the admissibility of the Horowitz Report, which is also admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**75.     If the downloaded file is an audio file, the user can then play it using a built-in player. (Ex. 28 (http://wiki.limewire.org/index.php?title= User_ Guide_Download) at 4; see also infra ¶¶ 330-31.) [Undisputed]**

**76.     A LimeWire user can also "burn" a successfully downloaded audio file to a CD using software designed for that purpose, or transfer the file to his or her iTunes library.  (Ex. 29 (http://wiki.limewire.org/index.php? title= Frequently_Asked_Questions) at 13.)**

**Defendants' Response:**

*Undisputed.  However, Defendants wish to point out that any file can be burned to a CD or a DVD, not just audio files, assuming the user has appropriate software.*

**Plaintiffs' Reply:**

This statement is undisputed.  Further, the remainder of defendants' response is irrelevant, argumentative and conclusory.[8]  (*See* note 6.)

---

[8] *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (stating that "reliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion").

77.    To "share" a file using LimeWire means to make the file available for searching and downloading by others on the Gnutella network. (Fisk Tr. 32:5-15; (Ex. 30 (http://wiki.limewire.org/index.php?title=User_Guide_Installation) at 4.) **[Undisputed]**

78.    A user may share any file contained on his or her computer through LimeWire, except that files sold by the LimeWire Store are blocked from such sharing by Lime Wire. (Ex. 29 (http://wiki.limewire.org/index.php?title=Frequently_Asked_Questions) at 8; Berlin Tr. 257:9-260:6; see infra ¶¶ 526-29.) **[Undisputed]**

   4.    Sharing Files

79.    To share a file, a LimeWire user can move the file from a folder on his or her computer into his or her "shared directory". (Ex. 29 (http://wiki.limewire.org/index.php? title=Frequently_Asked_Questions) at 12; *see, e.g.*, Ex. 31 (showing user's shared directory).)

**Defendants' Response:**

   *Disputed as to admissibility of Exhibit 31.  See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

   Defendants do not dispute the central point or the accuracy of the statement.  Nor do defendants dispute Exhibit 29, which alone provides sufficient support for the statement. Defendants dispute only the admissibility of Exhibit 31, which is, in fact, admissible. (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 31.)  Thus, this statement must be deemed undisputed.

80.    Alternatively, a user can elect to share the contents of an entire directory by designating it as a "shared directory". (Ex. 29 (http://wiki.limewire.org/index.php?title=Frequently_Asked_Questions) at 12.) **[Undisputed]**

81.    A user can also share files individually, even if the folders containing them are not shared. (Ex. 32 (http://wiki.limewire.org/index.php?title=User_Guide_Library_Basic) at 3-4.) **[Undisputed]**

82.    Lime Wire "recommend[s] all LimeWire users share generously with one another". (Ex. 29 (http://wiki.limewire.org/index.php?title=Frequently_AskedQuestions) at 12; see also infra ¶¶ 426-27.) **[Undisputed]**

83.    By default, LimeWire automatically makes downloaded files available for other users to download. (Fisk Tr. 88:6-10; see also infra ¶ 379-85.) **[Undisputed]**

27

C.   **Distribution**

84.   **Lime Wire makes the LimeWire client available for download through www.limewire.com. (Ex. 19 (http://www.limewire.com/download).) [Undisputed]**

85.   **Lime Wire authorizes other websites, such as *download.com* and *gnutelliums.com*, to make links to the LimeWire program and/or installer available so that the LimeWire client also may be downloaded through those links.  (Ex. 33 at CNET 000035-7, 35-36; Ex. 34; Fisk Tr. 32:19-34:23; *See e.g.*, Ex. 35 (www.download.com/LimeWire/3000-2166_4-10051892. html? hhTest=1&tag=pop. software&cdlPid=10847936); Ex. 36 (http://www. gnutelliums.com/).)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 33.  See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the central point or accuracy of this statement.  Nor do defendants dispute Exhibits 34, 35 and 36 and the Fisk testimony, which provide sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 33, which is, in fact, admissible.  (*See* Attach. A at Ex. 33.)  Thus, the statement must be deemed undisputed.

86.   **LimeWire is likely the most widely distributed and most prominent P2P client on the Gnutella network.  (Gribble Tr. 367:22-25; Horowitz Tr. 59:19-24.)**

**Defendants' Response:**

*Disputed as to admissibility of Horowitz Tr. 59:19 - 24.  See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute the Gribble testimony, which alone provides support for the statement. Although defendants objected to and moved to strike certain exhibits and deposition excerpts, they have *not* objected to the Horowitz testimony.  (*See* Defs. Mot. to Strike at 8-9.)  Thus, this statement must be deemed undisputed.

87.   **LimeWire's website states that, within the first year of its existence, the LimeWire application was downloaded over three million times. (Ex. 11 (http://www.limewire.com/about/company.php); see also, Ex. 1.) [Undisputed]**

88.     In December 2002, Bildson estimated that LimeWire was downloaded about 100,000 times a week and had about two million total users. (Ex. 37.) [Undisputed]

89.     In 2003, Lime Wire estimated that the LimeWire client averaged two million users a month.  (Ex. 38; Ex. 39.)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 39.  See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute Exhibit 38, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 39, which is, in fact, admissible. (*See* Attach. A at Ex. 39.)  Thus, this statement must be deemed undisputed.

90.     In June 2005, Lime Wire drafted a letter stating: "Peer-to-peer (P2P) sharing is becoming a global phenomenon: over 100 million people, spanning all ages [sic] groups, are downloading more than 3 billion songs each month. Among P2Ps, LimeWire is the industry standard for content distribution, reaching 20 million users per month." (Ex. 40 (emphasis added)). [Undisputed]

91.     In September 2005, Mark Gorton estimated that "LimeWire is currently doing over 2 million downloads of our program a week, and we estimate that we have 40,000,000 - 50,000,000 users.  Probably 70-80% of these users are in the US.  We are currently the largest file sharing application out there."  (Ex. 41.)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 41.  See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 41, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-14.)  Thus, this statement must be deemed undisputed.

92.     In April 2007, Lime Wire stated that the LimeWire client was installed on 18.71% of all computers worldwide.  (Ex. 42; *see also* Ex. 43 (August 14, 2007 article that cites a BigChampagne ("a third-party company that tracks and monitors . . . peer-to-peer usage" (Catillaz Tr. 250:7-10)) estimate that "17.7% of U.S. Internet users have installed LimeWire's software, a number that has increased 3.5% in the last year").)

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibits 42 and 43.  See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Defendants dispute only the admissibility of Exhibits 42 and 43, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-14; Pls. Mot. to Strike Opp'n Br., Attach. A at Exs. 42, 43.)  Thus, this statement must be deemed undisputed.

93.   **In a November 2007 speech at a P2P Advertising Upfront event, Lime Wire CEO George Searle was quoted as telling the audience that LimeWire "gets about seven million new downloads per month and its users generate a total of *five billion* searches per month".  (Ex. 44 (emphasis added).)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 44.  See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 44, which is, in fact, admissible.  (*See* Attach. A at Ex. 44; *see also* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-14.)  Thus, this statement must be deemed undisputed.

94.   **Lime Wire claims that, "[s]ince early 2005, LimeWire has consistently been one of the most popular downloads on download.com, with downloads in the hundreds of millions". (Ex. 11 (http://www.limewire. com/about/company.php).)  [Undisputed]**

95.   **As of July 12, 2008, the LimeWire client has been downloaded from *download.com* alone 152,452,975 times.  (Ex. 35 (www.download.com/LimeWire/3000-2166_4-10051892.html?hhTest=1&tag=pop.software&cdlPid=10847936).)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 35.  See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 35, which is, in fact, admissible.  (*See* Attach. A at Ex. 35.)  Thus, this statement must be deemed undisputed.

96. **Lime Wire claims that there currently are as many as four million unique LimeWire users each day. (Ex. 11 (http://www.limewire.com/about/company.php) at 2.) [Undisputed]**

IV. **THE LIME WIRE SOFTWARE HAS BEEN USED TO COPY AND DISTRIBUTE PLAINTIFFS' COPYRIGHTED WORKS WITHOUT AUTHORIZATION.**

A. **The Record Company Plaintiffs Own or Control the Copyrights, or Exclusive Rights Under Copyright, in Certain Sound Recordings**

97. **The Record Companies and their affiliates sell and distribute the vast majority of all recorded music in the United States. (Compl. ¶ 1; Countercl. ¶ 22.) [Undisputed]**

98. **The Record Companies own the copyrights or exclusive rights under copyright in the thousands of sound recordings listed in Exhibits A and B to the Complaint; revised Exhibits A and B were produced to defendants on January 31, 2008.  Ex. 45 (Letter from T. Sankoorikal without enclosures.)**

**Defendants' Response:**

*Unable to dispute or confirm at this time.  Defendants reserve the right to contest this position at the damages phase of any trial, for there can be genuine issues of material fact as to the ownership of these works, contrary to Plaintiffs' statements.*

**Plaintiffs' Reply:**

Defendants' claim that they are unable to dispute or confirm at this time is improper.  Defendants "cannot simply claim insufficient knowledge to form a belief in response to a 56.1 Statement, but must either admit or deny with citations to admissible evidence."[9]  Plaintiffs produced the evidence of ownership [to defendants] over nine months ago.  Thus, this statement must be deemed undisputed.

99. **At a hearing on December 7, 2007, however, the Court instructed the parties to try the liability issues in this litigation as to a small subset of plaintiffs' copyrighted sound recordings. (Ex. 46 (December 7, 2007 Hr'g. Tr. 3-4).)**

---

[9] *Parks*, 2008 WL 3833802, at *6.

**Defendants' Response:**

*The transcript speaks for itself.*

**Plaintiffs' Reply:**

"The transcript speaks for itself" is an improper response and must be disregarded.  (*See infra* note 12.)

100.   A subset of 30 of the Record Companies' copyrighted sound recordings are listed in Attachment A hereto. [Undisputed]

101.   The Record Companies own or control the copyrights, or exclusive rights under copyright, in the 25 post-1972 sound recordings listed in Attachment A that were initially "fixed" after February 15, 1972.  (RC00000009 - RC00000010; RC00000035 - RC00000036; RC00000133 - RC00000134; RC00000145 - RC00000146; RC00000237 - RC00000238; RC00000383 - RC00000384; RC00000475 - RC00000478; RC00000501 - RC00000502; RC00000615-RC00000616; RC00000659-RC00000660; RC00000701-RC00000702; RC00000713-RC00000714; RC00000717-RC00000718; RC00000739-RC00000740; RC00000741-RC00000742; RC00000751-RC00000752; RC00000803-RC00000804; RC00000967-RC00000968; RC00001017-RC00001018; RC00001171-RC00001172; RC00001211-RC00001212; RC00001435-RC00001436; RC00001447-RC00001448; RC00001533-RC00001534; RC00001547-RC00001548; EMI-LW5000000 - EMI-LW5000333; SONY-LW05000000 - SONY-LW05001114; UMG-LW5000000 - UMG-LW5000457; UMG-LW05000464 - UMG-LW05000707; WMG-LW05000156 - WMG-LW05000252; WMG-LW05000257 - WMG-LW05000730.)[10]

**Defendants' Response:**

*Unable to dispute or confirm at this time.  Defendants reserve the right to contest this position at the damages phase of any trial, for there can be genuine issues of material fact as to the ownership of these works, contrary to Plaintiffs' statements.*

---

[10] **This documentation supporting the Record Companies' ownership of the 30 sound recording listed in Attachment A is voluminous. Because there can be no genuine dispute as to plaintiffs' ownership of these sound recordings, for the Court's convenience, plaintiffs are submitting ownership evidence for one post-1972 sound recording (Ex. 47) and for one pre-1972 sound recording (Ex. 48). The remaining evidence is available to the Court immediately upon request.  [Footnote in Original]**

**Plaintiffs' Reply:**

Defendants' response is identical to their response to ¶ 98 and is improper for the same reasons.  (*See* Pls. Reply ¶ 98; *see also* note 9.)  Thus, this statement must be deemed undisputed.

**102.   The Record Companies have entered into agreements by which they obtained the common-law copyright rights in the five sound recordings, also cited in Attachment A, that were initially "fixed" prior to February 15, 1972.  (EMI-LW05000400 - EMI-LW05000424; SONY-LW05000349.001 - SONY-LW05000980.003; SONY-LW05001115 - SONY-LW05001165; UMG-LW05000458 - UMG-LW05000463; UMG-LW05000708 - UMG-LW05002044; WMG-LW05000253 - WMG-LW05000256; WMG-LW05000731 - WMG-LW05000735.)**

**Defendants' Response:**

*Unable to dispute or confirm at this time.  Defendants reserve the right to contest this position at the damages phase of any trial, for there can be genuine issues of material fact as to the ownership of these works, contrary to Plaintiffs' statements.*

**Plaintiffs' Reply:**

Defendants' response is identical to their response to ¶¶ 98 and 101 and is improper for the same reasons.  (*See* Pls. Reply ¶¶ 98, 101; *see also* note 9.)

**B.   Plaintiffs Have Not Authorized Lime Wire or LimeWire Software Users to Copy or Distribute Their Sound Recordings**

**103.   The Record Companies that own the rights to the 30 sound recordings at issue in this phase of the litigation (*see supra* ¶¶ 100-102) have never authorized or licensed Lime Wire or any users of the LimeWire software application to distribute, publish or otherwise copy the sound recordings.  (Declarations of JoAn Cho, Alasdair McMullan, Silda Palerm and Jennifer Pariser (Exhibits:  Vol. VII).)**

**Defendants' Response:**

*Lime Wire does not dispute that it has never received a license per se from the Plaintiffs.  Defendants do dispute that they are somehow required to obtain a license in that Lime Wire does not distribute, publish or otherwise copy Plaintiffs' works.*

**Plaintiffs' Reply:**

Defendants' response to this statement does not dispute it.  Further, defendants fail to cite to admissible evidence in support of the statement that they are not required to obtain a license.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

33

**C.**   **The LimeWire Software Has Been Used for Massive Infringement, Including Infringement of Plaintiffs' Copyrights or Exclusive Rights in Sound Recordings**

   **1.**   **LimeWire Is Used Overwhelmingly for Infringement**

**104.**   **Plaintiffs' expert witness devised a statistical study using a sampling procedure in which several million file hashes were randomly collected using LimeWire.  A random sample of thousands of these hashes was used to download the associated files from the Gnutella network, and files containing viruses or appearing to contain child pornography were removed from the set.  (Waterman Report at 3-6.)**

**Defendants' Response:**

*Disputed.  First, Dr. Waterman's report is inadmissible. See Defendants' Motion to Strike.  See also Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proffered Expert Summary Judgment Evidence from the Depositions and Reports of Ellis Horowitz, Ph.D and Richard P. Waterman, Ph.D. Second, even if the report were admissible, Waterman claims to have devised a statistical study using a procedure that randomly collects file hashes using Lime Wire, but in reality, others, including counsel for the RIAA, devised a procedure whereby a cluster sample of file hashes was collected and then a download sample was drawn from that cluster sampling frame.  Mercurio Decl. ¶¶ 3 - 26; Waterman Tr. at 42:24-43:3; 125:3-127:3; 140:3-19; 151:12-153:13; Bogle Tr. at 76:16-22.  Regardless of whether the sample of downloads of these hashes was random, any sample of these hashes is not and cannot be, as Plaintiffs claim, a random sample of files from LimeWire. Id.  Any sample taken from that sampling frame and any statistics taken from such a sample cannot be used to draw any valid conclusions about the actual population of files available for download using the LimeWire client. Id.  Moreover, given that the LimeWire system is decentralized, meaning that there is no centralized listing of all available files and the list of available files changes depending upon the various peers and ultrapeers who log on to and log off from the system, there is no conceivable way in which a valid statistical sample can be taken from LimeWire. Mercurio Decl. ¶ 24-25.  Additionally, there is no valid reason to remove viruses from the collection of files collected by Dr. Waterman, other than to attempt to artificially inflate the number of files Plaintiffs claim to be non-infringing. Mercurio Decl. ¶ 21. See also Gribble Decl. ¶¶ 58-66.*

**Plaintiffs' Reply:**

Defendants dispute the admissibility of the Waterman Report, which is, in fact, admissible. (*See* Pls. Mot. to Strike Opp'n Br. at 16-17)  Defendants' response contains the same arguments defendants make in their Motion to Exclude the Waterman Report. Plaintiffs respectfully refer the Court to their opposition where they have shown that the Waterman Report is valid and admissible.  (*See* Pls. Expert Opp'n Br. at 3-19; *see also* Forrest 11/07/08 Decl. ¶ 14.)

105.    **The first 1800 files appearing in this set were analyzed and assigned classifications. (Waterman Report at 6; German Decl. at 2.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of the Waterman Report. See Defendants' Motion to Strike. See also Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proffered Expert Summary Judgment Evidence from the Depositions and Reports of Ellis Horowitz, Ph.D and Richard P. Waterman, Ph.D. Second, even if the report were admissible, any "classifications" of the 1800 files is invalid, as discussed more fully infra.*

**Plaintiffs' Reply:**

Defendants dispute the admissibility of the Waterman Report, which is, in fact, admissible. (*See* Pls. Mot. to Strike Opp'n Br. at 16-17) Defendants' response contains the same arguments defendants make in their Motion to Exclude the Waterman Report. Plaintiffs respectfully refer the Court to their opposition where they have shown that the Waterman Report is valid and admissible. (*See* Pls. Expert Opp'n Br. at 3-19; *see also* Forrest 11/07/08 Decl. ¶ 14.)

106.    **This analysis showed that of the 1,800 files analyzed, 774 were confirmed by their Record Company owners to be infringing; 870 were determined to be highly likely infringing; 38 were determined to be highly likely noninfringing; 18 were determined to be part of the LimeWire client itself; 17 were determined to be spam or spoofs; and 9 were determined to be pornographic. The identity or authorization status of 74 files could not be determined. (Waterman Report at 7; German Decl. at 4-5.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of the Waterman Report. See Defendants' Motion to Strike. See also Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proffered Expert Summary Judgment Evidence from the Depositions and Reports of Ellis Horowitz, Ph.D and Richard P. Waterman, Ph.D. Second, even if the report were admissible, in a further attempt to artificially inflate the percentage of files that Plaintiffs claim are infringing, Plaintiffs and the RIAA hired Eric German of Mitchell Silberberg & Knupp, L.L.P. in Los Angeles, not as their lawyer, but to review the 1800 files and "classify" them. German Tr. at 8:1-4; 16:24-17:22; 19:25-20:17; 46:15-17; 47:15- 16; 50:24-51:2; 56:24-57:2. In doing so, German "made up" classifications including that of "highly likely infringing," where the largest percentage of the 1800 files were placed, but cannot even say "for sure" that he "double click[ed] on and sort of experience[d] every single [file]." German Tr. at 57:3-8; 72:6-17. Plaintiffs do not offer German as an expert; in fact, their counsel objected more than a dozen times during his deposition to certain questions calling for a legal opinion. See Plaintiffs' Rule 26 Expert Disclosure; German Tr. at 149:10-11; 150:21- 22; 151:11-12; 163:21-22; 178:24-25: 188:25-189:1; 189:19-20; 190:12- 13; 221:17-18; 235:6-7;*

*236:11-12; 239:25-240:1; 241:6-7; 241:22-23; 242:1-2; 318:5-6.  Instead, German claims that his classifications are a "fact," all the while conceding that he has no idea whether anyone verified his classifications, he cannot say under oath that the "highly likely infringing" files are indeed infringing, and a "highly likely infringing file is one he "think[s]" is infringing German Tr. at 70:19-73:10; 117:20- 119:19. Oddly though, in Paragraph 118 of Plaintiffs' Statement of Facts, Plaintiffs claim that "neither of Defendants' experts disputes the validity of any other classification made as part of Plaintiffs' statistical study."  Thus, Plaintiffs berate Defendants for not offering expert testimony on an issue for which they similarly do not offer expert testimony. Instead, they offer "made up" classifications and then claim it is a "fact." German Tr. at 70:19-73:10. Defendants do not need an expert to dispute Mr. German's "made up" classifications that are the inadmissible testimony of a nonexpert.  Moreover, many of Mr. German's individual classifications are without merit. Mr. German: 1) classified many individual files or "slivers" of a program as highly likely infringing based upon assumptions that the individual files were parts of programs (which he states is a "quirk of the sampling protocol"); 2) assumed that the whole programs were available for distribution on LimeWire; 3) assumed that the publisher objected to even a "white screen" being disseminated without ever contacting anyone at any of the companies that owned the rights to the entire software.  See, e.g., German Tr. at 141:25-146:5; 148:9-14; 149:17-151:6; 151:15-153:22; 155:6-156:4; 186:2-188:13; 189:17-194:12.  Based on all of these and other reasons, Defendants object to Waterman's opinions (given, among other reasons, their basis in German's Declaration) and Defendants incorporate these objections here.  See Defendants' Memorandum of Law in Support of Defendants' Objections to Plaintiffs' Exhibits to Their Motion for Partial Summary Judgment and Defendants' Motion to Strike Plaintiffs' Exhibits and Defendants' Memorandum of Law in Support of Defendants' Motion to Strike Plaintiffs' Proffered Expert Summary Judgment Evidence.*

**Plaintiffs' Reply:**

Defendants dispute the admissibility of the Waterman Report, which is, in fact, admissible. (*See* Pls. Reply ¶ 104.)  Defendants' response contains the same arguments defendants make in their Motion to Exclude the Waterman Report.  Plaintiffs respectfully refer the Court to their opposition where they have shown that the Waterman Report is valid and admissible.  (*See* Pls. Expert Opp'n Br. at 3-19; *see also* Forrest 11/07/08 Decl. ¶ 14.)

**107.    The 26 files classified as spam, spoofs or pornography were removed from the sample.  (Waterman Report at 7.)**

**Defendants' Response:**

*Disputed.  First, disputed as to admissibility of the Waterman Report.  See Defendants' Motion to Strike. See also Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proffered Expert Summary Judgment Evidence from the Depositions and Reports of Ellis Horowitz, Ph.D and Richard P. Waterman, Ph.D. Second, even if the report were admissible, there is no valid reason to remove the twenty-*

*six files classified as spam, spoofs or pornography from the sample other than in an attempt to artificially inflate the percentages of allegedly infringing material. Mercurio Decl. at ¶ 21. Based on all of these and other reasons, Defendants object to this report and Waterman's opinions and Defendants incorporate these objections here. See Defendants' Memorandum of Law in Support of Defendants' Objections to Plaintiffs' Exhibits to Their Motion for Partial Summary Judgment and Defendants' Motion to Strike Plaintiffs' Exhibits and Defendants' Memorandum of Law in Support of Defendants' Motion to Strike Plaintiffs' Proffered Expert Summary Judgment Evidence.*

**Plaintiffs' Reply:**

Defendants dispute the admissibility of the Waterman Report, which is, in fact, admissible. Defendants' response contains the same arguments defendants make in their Motion to Exclude the Waterman Report. Plaintiffs respectfully refer the Court to their opposition where they have shown that the Waterman Report is valid and admissible. (*See* Pls. Expert Opp'n Br. at 3-19; *see also* Forrest 11/07/08 Decl. ¶ 14.)

**108.   Plaintiffs' statistical study concludes that an estimated 92.7% of the files available for download using the LimeWire client are not authorized for free distribution on P2P networks. (Waterman Report at 2-3, 7-8.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of the Waterman Report. See Defendants' Motion to Strike. See also Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proffered Expert Summary Judgment Evidence from the Depositions and Reports of Ellis Horowitz, Ph.D and Richard P. Waterman, Ph.D. Second, even if the report were admissible, Plaintiffs' determination that 92.7% of the files available for download are based on an invalid study and invalid assumptions (Mercurio Decl. ¶ 3-26; Gribble Decl. ¶¶ 58-66) as well as invalid and "made up" classifications (German Tr. at 70:19-73:10). Based on all of these and other reasons, Defendants object to this report and Waterman's opinions and Defendants incorporate these objections here. See Defendants' Memorandum of Law in Support of Defendants' Objections to Plaintiffs' Exhibits to Their Motion for Partial Summary Judgment and Defendants' Motion to Strike Plaintiffs' Exhibits and Defendants' Memorandum of Law in Support of Defendants' Motion to Strike Plaintiffs' Proffered Expert Summary Judgment Evidence.*

**Plaintiffs' Reply:**

Defendants dispute the admissibility of the Waterman Report, which is, in fact, admissible. Defendants' response contains the same arguments defendants make in their Motion to Exclude the Waterman Report. Plaintiffs respectfully refer the Court to their opposition where they have shown that the Waterman Report is valid and admissible. (*See* Pls. Expert Opp'n Br. at 3-19; *see also* Forrest 11/07/08 Decl. ¶ 14.)

**109.   Plaintiffs' statistical study concludes that an estimated 98.8% of the download requests to LimeWire users for authorized or unauthorized files**

are for files that are unauthorized for free distribution on P2P networks. (Waterman Report at 3, 8.)

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of the Waterman Report. See Defendants' Motion to Strike. See also Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proffered Expert Summary Judgment Evidence from the Depositions and Reports of Ellis Horowitz, Ph.D and Richard P. Waterman, Ph.D. Second, even if the report were admissible, in order to conclude that 98.8% of the download requests to Lime Wire users were for unauthorized files, Plaintiffs again incorrectly assume that their statistical "study" is valid and that their "classifications" are valid. Moreover, logic dictates that if you claim that 93% of a particular set of files made available are infringing, you would expect an artificially inflated percentage of download requests to be for allegedly infringing material. Mercurio Decl. ¶ 23. Finally, given the decentralized nature of the Gnutella Network, it is virtually impossible to draw reasonable conclusions about user behavior. Gribble Decl. ¶¶ 63-66. Based on all of these and other reasons, Defendants object to this report and Waterman's opinions and Defendants incorporate these objections here. See Defendants' Memorandum of Law in Support of Defendants' Objections to Plaintiffs' Exhibits to Their Motion for Partial Summary Judgment and Defendants' Motion to Strike Plaintiffs' Exhibits and Defendants' Memorandum of Law in Support of Defendants' Motion to Strike Plaintiffs' Proffered Expert Summary Judgment Evidence.*

**Plaintiffs' Reply:**

Defendants dispute the admissibility of the Waterman Report, which is, in fact, admissible. Defendants' response contains the same arguments defendants make in their Motion to Exclude the Waterman Report. Plaintiffs respectfully refer the Court to their opposition where they have shown that the Waterman Report is valid and admissible. (*See* Pls. Expert Opp'n Br. at 3-19; *see also* Forrest 11/07/08 Decl. ¶ 14.)

**110. Plaintiffs' statistical study concludes that an estimated 43.6% of the files available for download using the LimeWire client are owned by plaintiffs or their affiliates. (Waterman Report at 2, 7.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of the Waterman Report. See Defendants' Motion to Strike. See also Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proffered Expert Summary Judgment Evidence from the Depositions and Reports of Ellis Horowitz, Ph.D and Richard P. Waterman, Ph.D. Second, even if the report were admissible, Plaintiffs' statistical study is invalid; therefore no valid percentage calculations can be made. Mercurio Dec. at ¶ 3-26. Gribble Decl. ¶ 58-66. Plaintiffs can, at best, claim they or their affiliates own 43.6% of the files Mr. German examined; no other generalizations can be made because the sampling frame is invalid. Based on all of these and other reasons, Defendants object to*

*this report and Waterman's opinions and Defendants incorporate these objections here.
See Defendants' Memorandum of Law in Support of Defendants' Objections to Plaintiffs'
Exhibits to Their Motion for Partial Summary Judgment and Defendants' Motion to
Strike Plaintiffs' Exhibits and Defendants' Memorandum of Law in Support of
Defendants' Motion to Strike Plaintiffs' Proffered Expert Summary Judgment Evidence.*

**Plaintiffs' Reply:**

Defendants dispute the admissibility of the Waterman Report, which is, in fact,
admissible. Defendants' response contains the same arguments defendants make in their
Motion to Exclude the Waterman Report.  Plaintiffs respectfully refer the Court to their
opposition where they have shown that the Waterman Report is valid and admissible.
(*See* Pls. Expert Opp'n Br. at 3-19; *see also* Forrest 11/07/08 Decl. ¶ 14.)

111. **No expert for defendants has performed a statistical study or estimated the
percentage of infringing files available to LimeWire users, the percentage of
unauthorized download requests to LimeWire users or the ownership of files
available for download.  (*See, e.g.*, Mercurio Tr. 249:17-19; *see also id.* 96:7-
98:14, 104:10-105:4 (defendants' expert made no attempt to look for a study
from which he could draw valid and reliable conclusions about the
population of files made available to LimeWire users, nor did he give any
thought as he reviewed plaintiffs' expert's report to whether a better survey
could be performed).)**

**Defendants' Response:**

*Plaintiffs are indeed correct that no expert for Defendants has performed a statistical
study or estimated the percentage of infringing files available to LimeWire users.  As
previously explained, no such valid or admissible study can be conceived given the
decentralized nature of LimeWire. Mercurio Decl. at ¶ 25. Gribble Decl. at ¶ 58-66.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is argumentative.
(*See* note 6.)  Moreover, the Waterman Report is admissible.  (*See* Pls. Expert Opp'n Br.
at 3-19; Pls. Reply ¶ 104.)  While defendants' expert Dr. Mercurio argues the statistical
impossibility of creating a representative sample of subpopulation files on Gnutella, he
purported to do precisely the same thing in *Grokster*.  (*See* Pls. Expert Opp'n Br. at 18.)
Further, Dr. Mercurio acknowledged that many alleged imperfections in the study that
defendants claim to be fatal are not even problematic: he admitted that (i) there are
occasions where samples may not be representative, but still yield valid results; (ii) if the
statistician chooses many clusters, the end results will likely be accurate; and (iii) he
based his critique of Dr. Waterman's "cluster" method on speculation.  (*See id.*)

112. **Defendants' expert ("Gribble") testified that he could not tell whether the
number of files made available by LimeWire users that is potentially
infringing is higher or lower than 92.7%.  (Gribble Tr. 378:13-379:1-13.)**

**Defendants' Response:**

*Disputed. Gribble testified that due to the bias in Waterman's report he did not believe that this number could be correct and in essence, that it would be impossible to make such a determination. Gribble also describes in his declaration several troubling areas in Waterman's analysis, including the fact that he believes Waterman did not utilize a representative sample. Gribble Decl. ¶¶ 58-66.*

**Plaintiffs' Reply:**

Defendants response mischaracterizes Gribble's testimony, which states expressly that Gribble could not tell whether "the number of [potentially infringing] files . . . is higher or lower" than the 92.7% figure reported by Dr. Waterman and does not say that the determination would be "impossible" or that the number could not be correct. (Gribble Tr. 378:13-379:13.) Moreover, defendants' response only underscores the accuracy of the central point in the factual statement above, *i.e.*, that Gribble *did not know* whether more or less than 92.7% of the files offered for download could be potentially infringing. (*Id.*) The remainder of defendants' response is immaterial and argumentative. (*See* note 6.)

113.    **Another expert for defendants ("Mercurio") likewise testified that he is unable to estimate the percentage of infringing files available to LimeWire users. (Mercurio Tr. 90:18-92:20, 96:7-24.)**

**Defendants' Response:**

*Disputed. Neither Mercurio nor anyone can estimate the percentage of any types of files available to Lime Wire users.*

**Plaintiffs' Reply:**

Defendants' response is improper because defendants fail to cite to admissible evidence controverting the statement. (*See* note 5.) Moreover, defendants' response is improper as it is argumentative and conclusory. (*See* notes 6, 8.) Finally, defendants' claim that it is impossible to conduct a valid study analyzing the authorization content of files made available to LimeWire users is demonstrably false. (*See* Pls. Expert Opp'n Br. at 3-19; *see also* Pls. Reply ¶¶ 104, 106-07, 111.)

114.    **Defendants' expert Gribble testified that, in connection with his review of plaintiffs' statistical study, he did not attempt to do any investigation into the kinds of files available on the Gnutella network. (Gribble Tr. 283:11-22.) [Undisputed]**

115.    **In his report, defendants' expert Mercurio identified only one file that he believes was inaccurately classified as "Highly Likely Infringing": the file_install_easyshare.exe, which is part of the Kodak EasyShare software, distributed freely at Kodak's website. (Mercurio Report at 15.) [Undisputed]**

116.   **Kodak EasyShare software is distributed at no charge, but subject to an end user license agreement, which states:  "You may permanently transfer the software to another party if the other party agrees to accept the terms and conditions of this license *and you retain no copies of the software*."  (Ex. 49 at RC00007313 (emphasis added); Mercurio Tr. 231:18-233:2.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 49. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute the Mercurio testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 49, which is, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 49.)  Thus, this statement must be deemed undisputed.

117.   **When presented with the Kodak EasyShare end user license agreement at his deposition, defendants' expert Mercurio testified that he now agrees with plaintiffs' classification of the file install_easyshare.exe as "Highly Likely Infringing".  (Mercurio Tr. 233:16-24.)**

**Defendants' Response:**

*With respect to the one file that was addressed in Dr. Mercurio's report and of which much is made here, Dr. Mercurio only used this file as an example of free software.  He specifically stated in his report that he is not an expert on computer file types. Mercurio Report at 15 attached as Exhibit C to Mercurio's Declaration.  Moreover, he specifically stated that he is not holding himself out as a copyright status expert.  Mercurio Tr. 247:18-21. More importantly, with respect to this particular file of which Plaintiffs make much ado, in classifying this file as "highly likely infringing," Plaintiffs assume that the user retained a copy of the Kodak Easy Share software. German Tr. at 372:15-373:23. It is certainly possible that the user did not retain the copy and would then be in compliance with the agreement and thus non-infringing.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement--that Dr. Mercurio agreed with plaintiffs' classification.  Defendants dispute no other classification and have presented no evidence that any classification was incorrect.  Moreover, it is irrelevant whether a user "retained a copy" of the unauthorized software.  What is relevant is that the content is not authorized for free distribution on LimeWire, which is what Dr. Waterman's study sought to--and did--analyze.  (*See* Pls. Expert Opp'n Br. at 3-19.)  Thus, this statement must be deemed undisputed.

118.   **Neither of defendants' experts disputes the validity of any other classification made as part of plaintiffs' statistical study.**

**Defendants' Response:**

*No expert is needed to dispute the validity of classifications since they were "made up" and are the inadmissible opinions of a fact witness.  German Tr. at 70:19-73:10.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement--that neither of defendants' experts dispute the validity of any other classification.  Moreover, defendants' claim that the classifications were "made up" and improperly relied upon by Dr. Waterman is wrong:  the courts in *Napster* and *Grokster* used and relied upon nearly identical classifications.  Moreover, Eric German testified as to his classification method; Mr. German and his team verified every classification and produced back-up documentation supporting each one; and defendants have failed to identify a single file that was miscategorized.  (*See* Pls. Expert Opp'n Br. at 3-6; *see also* Pls. Reply ¶¶ 106-107.)

### 2.     LimeWire Users Have Directly Infringed Plaintiffs' Copyrights

**119.    Users of the LimeWire software application have made digital copies of *all* the copyrighted works upon which plaintiffs are suing (*see supra* ¶ 98) available for download.  (RC 00001609; RC 00004264; RC 00004270; RC 00004271; RC 00004273.)**

**Defendants' Response:**

*Disputed.  There is no admissible evidence to show that LimeWire users made digital copies of these works. The RC documents are nothing more than a series of electronic information concerning certain files.  See Defendants' Exhibits 69-71.  They prove nothing nor is there any evidence submitted by the Plaintiffs to prove what these documents Plaintiffs purport them to be.*

**Plaintiffs' Reply:**

Defendants' response that plaintiffs' evidence contains "nothing more than a series of electronic information" is unintelligible, as fundamentally all electronic files, such as mp3s, are "a series of electronic information".  To the extent that defendants mean to suggest that plaintiffs' did not provide digital copies of the works in question as downloaded from a LimeWire user, defendants are wrong and mischaracterize plaintiffs' evidence in several ways.  *First*, defendants describe the information on the hard drives as "documents" when it is, in fact, a group of electronic storage mediums -- two external hard drives (RC 00001609 and RC 00004270) and three cd-roms (RC 00004264, RC 00004271, RC 00004273.)  *Second*, defendants suggest that their own exhibits 69-71 are something more than printed snapshots of the indexes listing the contents of the three cd-roms.  In fact, defendants' exhibits show what plaintiffs produced: an audio file and a packet capture showing the audio file was downloaded from a Lime Wire user for each sound recording -- Defs. Ex. 70 describes the packet capture not in those words, but as "DownloadLog.txt" and "RequestLog.txt".  As explained in footnote 5 in Pls. 7/18/08

SOF at 16, plaintiffs did not append the hard drives because they are voluminous and they were produced long ago to defendants. Given defendants' response here, however, plaintiffs are submitting as Exhibit 466 the two hard drives and three cd roms to enable the Court to verify that defendants' "indexes" are correct, *i.e.*, that plaintiffs included an actual copy of the audio file downloaded and a packet capture showing that the mp3 file included was downloaded from a LimeWire user for each of the sound recordings at issue. (*See* Ex. 466.)

**120.    These works, including the 30 sound recordings in Attachment A, have been successfully downloaded by plaintiffs' investigators. (RC 00001609; RC 00004264; RC 00004270; RC 00004271; RC 00004273.)**

**Defendants' Response:**

*Disputed. There is no admissible evidence to support this contention. The RC documents are nothing more than a series of electronic information concerning certain files. See Defendants' Exhibits 69-71. They prove nothing nor is there any evidence submitted by the Plaintiffs to prove what these documents Plaintiffs purport them to be. And, there are no declarations from these investigators proving that they downloaded songs and have confirmed that each of the 30 songs is in fact a complete and accurate rendition of the works at issue. Moreover, even if such declarations were submitted, they do not prove that the works at issue were being distributed by a LimeWire user.*

**Plaintiffs' Reply:**

*See* Pls. Reply No. ¶ 119. The test tracks were downloaded completely and accurately. (*See* Ex. 466; *see also* Forrest 11/07/08 Decl. ¶ 4.)

**121.    Multiple Gnutella users made available *identical* digital copies of each of plaintiffs' 30 copyrighted sound recordings listed in Attachment A. Ex. 50 (screenshots showing LimeWire client reporting multiple sources for the relevant results); Ex. 51 (http://wiki.limewire.org/index.php?title=User_Guide_Searching) (explaining that the "#" column in LimeWire displays the "number of identical files found for that one result").)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of Exhibit 50. See Defendants' Motion to Strike. And even if this exhibit was admissible, it proves nothing by itself. For example, it does not prove that the files being available are in fact the songs at issue. In addition Exhibit 51 by itself also does not prove that multiple Gnutella users have made available identical copies of each of Plaintiffs' copyrighted works at issue.*

**Plaintiffs' Reply:**

Exhibit 50 consists of screenshots of LimeWire search results for each of the 30 copyrighted sound recordings listed in Attachment A to Pls. 7/18/08 SOF. Contemporaneous with the taking of those screenshots, each of the highlighted songs was downloaded and verified as a copy of one of the 30 copyrighted sound recordings listed in Attachment A. (*See* Minarovich 11/07/08 Decl. ¶ 4.) Moreover, Exhibit 50 is, in fact, admissible. (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 50) Exhibit 51 is Lime Wire LLC's explanation of its search results screen, which plaintiffs provides as an aid to interpretation of Exhibit 50. In particular, plaintiffs highlight that Lime Wire LLC defines the "#" column as the "[n]umber of identical files found for that one result". Accordingly, since each of the highlighted sound recordings in Exhibit 50 have a number of two or greater in the "#" column, there is more than one identical file for that result. In any event, defendants' response is improper because it does not cite to any admissible evidence controverting the statement. (*See* note 5.) Thus, this statement must be deemed undisputed.

**122.    Two files that are identical in all respects will have the same hash. (Berlin Tr. 220:11-221:14.) [Undisputed]**

**123.    As shown in more detail below (see infra ¶¶ 478-79), if a file is created using different "ripping" software or using different settings, it will have a different hash, even though the underlying work is the same. [Undisputed]**


**3.    The Overwhelming Use of LimeWire Has Always Been and Is for Media Files, Including Copyrighted Music that Is Unauthorized for Free Distribution on P2P Networks**

**124.    In 2001, Lime Wire drafted an Offering Memorandum (the "Lime Wire Offering Memorandum") seeking financing from "friend and family" of Lime Wire employees. (Ex. 3; Cho Tr. 42:16-43:13.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 3. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Nor do defendants dispute the Cho testimony, which alone provides sufficient support for the statement. Defendants dispute only the admissibility of Exhibit 3, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-4; s*ee also* Pls. Reply ¶ 46.) Thus, this statement must be deemed undisputed.

**125.** **The Lime Wire Offering Memorandum stated: "Currently, most of the activity on the Gnutella network consists of individuals sharing media files" (Ex. 3 at LW DE 486253), and listed copyright infringement litigation brought by the RIAA as a "Risk Factor" for the entity that became Lime Wire. (*Id.* at LW DE 486249.)**

**Defendants' Response:**

*Disputed. See response to para. 124 above. Moreover, this statement is hearsay; the basis of this statement came from reading outside sources and it is not based on personal knowledge. Cho. Tr. 48:04-49:02. In the event this exhibit is admitted into evidence, Defendants wish to point out that Greg Bildson has testified that this entire section of the Offering Memo dealing with what was being allegedly shared over Gnutella was "made-up" by Cho (Bildson Tr. 469:25 – 472:04) and that he disputed this statement. Bildson Tr. 439:22 – 440:13. Mark Gorton has also disputed these statements and that it was never his belief that the primary use of Gnutella was for sharing "media" files. Gorton Tr. 207:02 – 209:17. Defendants also wish to note that this document states that "the LimeWire Client has the potential to become an informational tool with capabilities beyond those currently being used on the Internet, such as the search engines on the World Wide Web. Server entities on a peer-to-peer network will be able to respond to queries with dynamically-generated, real-time information. Individual users are currently able to communicate simultaneously with multiple computers in real-time, and, in the future, might be able to preselect the type and form of information they will receive in response to their requests. Lime Wire has already developed technologies to communicate over peer-to-peer networks though structured XML queries, transcending the text-based search capabilities of both the World Wide Web and the current Gnutella network." LW DE 486246. Also, in the Risk Factor Section, the document states that [g]iven the fundamental differences in the architecture of the Gnutella network from the Napster service Lime Wire believes that it has valid arguments why its service should not be liable. . . ." LW DE 486249. Moreover, on this same document it says, "Currently, most of the activity on the Gnutella network consists of individuals sharing media files. However, the Gnutella network enables its users to broadcast requests for any type of information. As new types of information transactions take place on the Gnutella network, Lime Wire believes that corporate demand for Gnutella products and services will grow, and Lime Wire will be placed at the center of a fast growing information network. Lime Wire's server product should enable corporations to connect their databases and e-commerce engines to consumers using the Gnutella network." (emphasis added) LW DE 486253.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. *First*, defendants dispute the admissibility of Exhibit 3, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-4; *see also* Pls. Reply ¶ 46.) *Second*, defendants' hearsay claim is wrong. The statement is admissible because it is offered to show defendants' knowledge and belief. Even were that not the case, "[h]earsay evidence is admissible at the summary judgment stage if the contents would be otherwise admissible

at trial."[11]  Moreover, Steven Cho was the Leader of Business Development at Lime Wire LLC when he stated drafted this document making his statements in it admissions by a party opponent.  *See* Fed. R. Evid. 801(d)(2)(D).  In any event, defendants do *not* object to Cho's testimony in their Motion to Strike.

The rest of defendants' response is immaterial, although plaintiffs agree that Gorton understood the risks and deliberately designed LimeWire to appear to be unlike Napster. (*See* Pls. 9/26/08 (LW) Add'l SOF ¶¶ 10-13a.)  The additional quotations from Exhibit 3 that defendants include in their response reflect only "potential" uses of P2P (Gnutella) but provide no evidence that the LimeWire software was ever (much less "substantially") used for any such purposes.  Further, LimeWire is *not* Gnutella.  (*See* Pls. 7/18/08 SOF ¶¶ 45-54.)

126.    **A draft of the Lime Wire Offering Memorandum stated that, "Like Napster", "the LimeWire software . . . allows people to exchange copyrighted mp3 files".  (Ex. 52 at JB 0287.)**

**Defendants' Response:**

*Disputed as to the admissibility of Exhibit 52.  See Defendants' Settlement/Pre-August 2003 Objections.  Moreover, Exhibit 52 is not a complete document and Defendants object to Plaintiffs' attempted use of this partial document.  After reviewing the entire document, one can see why Plaintiffs cut and paste from that document: not only does the entire  document detail all of the various positive things about LimeWire and its business plans, it also states how LimeWire is not Napster (JB 0287-288):*

*However, there are numerous differences between LimeWire and Napster or Scour, which might be legally relevant to the issue of whether Lime Wire is engaged in activity which violates the American copyright laws. As discussed extensively above, the Gnutella Network is a fully distributed system with no owner or centralized control mechanism. Lime Wire does not maintain any central database of users, nor does Lime Wire exercise any supervision or control over what these users are searching for or downloading using the LimeWire software. The fact that that Napster and Scour did own and exercise centralized control over their respective networks did play a role in the lawsuits against these companies, and this may represent a legally relevant difference between these companies and Lime Wire. Further, the Gnutella Network existed before Lime Wire, and would continue to exist without Lime Wire, as there are numerous other entities that have written publicly available Gnutella-compatible software.* <u>*Finally, Lime Peer Technologies is not focusing its attention on or building its business model around the sharing of mp3 files unlike Napster or Scour.*</u>

*(emphasis added).*

---

[11] *Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 215 (S.D.N.Y. 2007).

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 52, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Moreover, defendants themselves have proffered Exhibit 52 as their own Exhibit 1 and so have waived any objection to this document. (*See* Baker 9/26/08 Decl. ¶ 3.)  Thus, this statement must be deemed undisputed.

127.   **An MP3 or mp3 is an audio file that commonly contains music. MP3 files generally have the file extension ".mp3". (Fisk Tr. 97:12-16; Falco Tr. 105:6-8; Berlin Tr. 216:23-217:14.) [Undisputed]**

128.   **Another draft of the Lime Wire Offering Memorandum stated that "[a]t the moment, the only information being shared on peer networks are media files" (Ex. 53 at JB 0273), while another version with an introductory letter from Mark Gorton noted:  "[s]haring media files is bringing the initial user base to the [Gnutella] network".  (*Id.* at JB 0274.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of Exhibit 53.  See Defendants' Settlement/Pre-August 2003 Objections. However, if the document is admitted into evidence, Defendants wish to point out that this document also states that this sort of file-sharing was "not really what peer-to-peer networks are all about." JB0271. Moreover, after the second quote the document states:*

*However, any type of information can be shared.  This information can include information about where other information exists and what is good and trusted information.  A small example should help enlighten this point.  When I was shopping for a car, I spent a good bit of time searching the web. By the time I was done, I had accumulated a nice list of bookmarks of auto web sites.  If I had had access to this list of bookmarks at the beginning, I could have saved myself quite a few hours. I now have on my hard drive a little bit of information about where automobile info exists on the web. But that information (those bookmarks) is trapped on my computer. Similar bits of info are trapped on computers all over the world. A peer network helps to liberate that information.  If my bookmarks are in my shared directory, anyone who is running the Gnutella net can get access to them. Bookmark sharing wasn't built in as part of the core functionality of the WWW, so even with the help of a peer network, the sharing process is cumbersome.  However, we intend to make this sort of sharing incidental to the use of the Gnutella net, so it happens without the user having to make any extra effort."*

*Moreover, after the second quote, the document states that "[h]owever, the applications of the Gnutella net that have the most commercial potential have little to do with media files." JB0274.*

*Greg Bildson has also testified that the entire section dealing with what was being shared over Gnutella was "made-up" by Cho (Bildson Tr. 469:25 – 472:04) and that he disputed this statement. Bildson Tr. 439:22 – 440:13. Mark Gorton has also testified that*

*Cho's statements were wrong and not the Company's official position, noting that this exhibit was a draft that he had never seen before. Gorton Tr. 207:02 – 209:17.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 53, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Moreover, defendants themselves have proffered Exhibit 53 as their own Exhibit 15 and so have waived any objection to this document.  (*See* Baker 9/26/08 Decl. ¶ 17.)  The remainder of defendants' response is immaterial.  The additional quote from Exhibit 53 that defendants include in their response reflect only "potential" uses of P2P (Gnutella), but provide no evidence that LimeWire was ever used for any such purposes.  Further, in the testimony cited by defendants, Bildson did *not* dispute that "the vast majority of files" being shared on the Gnutella network were media files; he said "I really wouldn't know".  (Bildson Tr. 439:22-440:2.)  Also, in the Gorton testimony cited by defendants, Gorton could provide no specific instance of any noninfringing use of media files.  (Gorton Tr. 207:02-209:17.)  Plaintiffs agree that Gorton understood the risks and deliberately designed LimeWire to appear to be unlike Napster.  (*See* Pls. 9/26/08 (LW) Add'l SOF ¶¶ 10-13a.)

> **129.   The files shared using LimeWire never ceased being primarily media files. (Gorton Tr. 194:14-16; Bildson Tr. 559:16-560:4; Gribble Tr. 133:21-134:3.)**

**Defendants' Response:**

*Disputed.  None of these witnesses have ever had any personal knowledge of what is being shared by Lime Wire users.  Moreover, Bildson did not testify that the files shared using LimeWire never ceased being primarily media files. During his deposition, Mr. Bildson was asked about the goals of Lime Wire, and he explained what those goals were.  He did not say that one of the goals was to cease LimeWire users from sharing media files.  See Bildson Tr. 557:07 – 560:04.  In addition, Gorton testified that it was never his understanding or belief that media files were primarily being shared. Gorton Tr. 209:13 – 17.*

**Plaintiffs' Reply:**

Each of the witnesses cited in the statement testified that LimeWire was, at least primarily, used to download media files.  In response to the question: "Are you aware of any actual use of LimeWire to download anything?", Gorton responded, "I mean, again, it is my understanding that the most common uses of LimeWire are for media files." (Gorton Tr. 194:8-18.)  In response to the question: "Are you aware of Lime Wire ever being used by a user to conduct research on anything other than media files?", Bildson responded, "[n]o."  (Bildson Tr. 559:16-22.)  In response to the question: "Do you assume that Lime Wire is primarily used to distribute media files?", defendants' expert Gribble responded, "[b]ased off of the measurement studies that I've seen in the past, I think that's a reasonable assumption".  (Gribble Tr. 133:21-134:3.)

With respect to defendants' contention that Bildson did not testify that one of Lime Wire LLC's goals was "to cease LimeWire users from sharing media files", plaintiffs never contended to the contrary.  In fact, plaintiffs' agree that Lime Wire LLC never sought "to cease LimeWire users from sharing media files".  With respect to Gorton's testimony, defendants are wrong.  Gorton did not testify as to whether media files were *primarily* being shared since the question he was asked was whether "the *only* information being shared on peer networks were media files".  (*See* Gorton Tr. 209:13-17 (emphasis added).)

**130.    A September 2002 Statement of LimeWire Goals began:  "The detractors of the Gnutella Network claim that it is nothing but a bunch of thieves and pornographers.  On the surface, their accusations have a good deal of truth to them.  Currently, the most common use of the Gnutella Network is the sharing of music files, many of them copyrighted."  (Ex. 54 at LW DE 387106.)**

<u>**Defendants' Response:**</u>

*Disputed.  First, disputed as to admissibility of Exhibit 54. See Defendants' Settlement/Pre-August 2003 Objections. Second, as noted above, Bildson and Gorton dispute this statement regarding the "most common use" of Gnutella.  See supra response to ¶¶ 128, 129.  Third, when asked about this document in his deposition, Gorton disavowed any knowledge of it, and stated that it did not reflect Lime Wire's goals. Gorton Tr. 279:03-281:14.*

<u>**Plaintiffs' Reply:**</u>

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibit 54, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, Bildson and Gorton do *not* dispute the statement regarding "the most common use" of Gnutella.  (*See* Pls. Reply ¶¶ 128, 129.)  Nowhere in the testimony cited by defendants does Gorton testify that the document does not reflect Lime Wire's goals.  Moreover, when asked about this document at this deposition, he did not "disavow any knowledge of it", but rather stated that he had "no recollection of it" and admitted that it contained the words "author Jody", came from his wife's computer, and admitted that his wife's name is "Jody".  (*See* Gorton Tr. 281:2-283:13.)

**131.    In 2005, former Lime Wire Senior Software Engineer Adam Fisk stated, "I agree with you that piracy has been the primary driver of Bit Torrent's 'success', along with all of the other P2P apps [including LimeWire].  When you're enabling copyright infringement on a massive scale, you'd have to suck pretty badly not to succeed".  (Ex. 55 at LW DE 2323954.)**

<u>**Defendants' Response:**</u>

*Disputed. First, disputed as to admissibility of Exhibit 55. See Defendants' Motion to Strike.  Even if it is admitted into evidence, there is no evidence that it was an official*

*Lime Wire position. In fact, Fisk admitted at his deposition that this was his own personal opinion. Fisk Tr. 179:24 - 180:06. Mr. Fisk has also stated in his recent declaration that when he made this statement, he did not mean to imply that LimeWire's success, to the extent users use it for infringement, was the reason for the design of the software. Fisk Decl. ¶ 6.*

**Plaintiffs' Reply:**

Defendants do not dispute that Fisk made this statement, or the accuracy of this statement. *First*, defendants object to the admissibility of Exhibit 55, which is, in fact, admissible. (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 55.) *Second*, Fisk's declaration as to what he meant or did not mean to imply by this statement does not negate the fact of the statement. *Third*, Fisk's testimony is relevant in that it is the opinion of Lime Wire's former Senior Software Engineer. Further, defendants' last sentence is irrelevant and unrelated to the central point of this statement. (*See also* Pls. Reply ¶ 320.)

**132.** **Fisk testified that "it was clear that [LimeWire] was being used for infringement". (Fisk Tr. 160:7-18.)**

**Defendants' Response:**

*Disputed. That was Fisk's opinion. See supra response to ¶ 131*

**Plaintiffs' Reply:**

Defendants do not dispute that Fisk made this statement or the accuracy of the quoted words in the statement. Nothing in the cited portion of the Fisk transcript indicates this statement is *not* a statement of fact. However, even if it were not a statement of fact, Fisk's opinion is relevant and admissible. (*See* Pls. Reply ¶ 131.)

**133.** **As described in more detail below (*see infra* ¶¶ 435-55), in late 2005 and 2006 Lime Wire developed business plans to "convert" LimeWire users who were downloading and sharing copyrighted music files without a license to users who paid for copyrighted sound recordings or were blocked from downloading infringing files ("Conversion Plans"). (Catillaz Tr. 98:4-10; *see* Ex. 41; Ex. 56 at LW DE 1191097 ("Lime Wire in perfect position to convert existing music fans to legitimate consumers"; *see, e.g.*, Ex. 57.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibits 41 and 57. See Defendants' Settlement/Pre-August 2003 Objections. In any event, Lime Wire presented these plans to the Plaintiffs and the RIAA in an effort to work with the music industry and, hopefully, decrease infringement. As detailed in the Declaration of Mark Gorton, ¶¶ 30 – 61 and in more detail below (see infra ¶¶ 435-455), Plaintiffs refused to assist in these efforts.*

50

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Nor do defendants dispute Exhibit 56 or the Catillaz testimony, which provide sufficient support for the statement.  Defendants object only to the admissibility of Exhibits 41 and 57, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.)  Thus, this statement must be deemed undisputed.

134.   **Lime Wire estimated that the economic opportunity represented by at least one of the Conversion Plans could be worth hundreds of millions of dollars in annual revenue.  (Ex. 41; Ex. 58; Ex. 59; Ex. 60.)**

**Defendants' Response:**

*Disputed.  Moreover, disputed as to admissibility of Exhibits 41, 58, 59 and 60. See Defendants' Settlement/Pre-August 2003 Objections.  Moreover, the estimated revenue would be worth hundreds of millions of dollars to the Record Labels, not Lime Wire.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants' dispute only the admissibility of Exhibits 41, 58, 59, and 60, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.)  Defendants' last sentence is unsupported by citations to any admissible evidence.  (*See* note 5.)  The recipient of the revenue is not relevant.  What is relevant and material is that Lime Wire LLC believed and communicated that the conversion to paying subscribers of even "a couple percent" of its userbase that was infringing music files would be worth hundreds of millions of dollars.  In addition, Rubenfeld's testimony that Lime Wire LLC estimated that each converted user would provide $30 and up of revenue and there were 40-50 million LimeWire users supports this statement and is undisputed.  (*See* Rubenfeld Tr. 308:2-312:4; *see also id.* 321:4-24.)

135.   **In documents about one of the Conversion Plans, Lime Wire broke the entire LimeWire user base into four categories -- *all* of whom were engaged in music piracy:  25% were considered "hardcore pirates", 25% morally persuadable, 20% legally unaware users, and 30% samplers and convenience users.  (Ex. 59; Ex. 60 at LW DE 383421; *see* also Ex. 61 at LW DE 1932841-42; Ex. 62; Catillaz Tr. 323:19-324:2 (testifying that Gorton "coined" the term "hardcore pirates" in this context).)**

**Defendants' Response:**

*Disputed.  Moreover, disputed as to admissibility of Exhibits 59, 60, 61 and 62.  See Defendants' Settlement/Pre-August 2003 Objections.  If these documents are admitted into evidence Lime Wire wishes to point out that it did not agree in this document, nor has it ever agreed, that all of its users engage in music piracy.  See Gorton Decl. ¶ 57.  Moreover, Ms. Catillaz did not testify that this chart meant that all Lime Wire users were infringers.  See Catillaz Tr. 268:2 - 21.  Finally, the statement is rank speculation*

*because it is impossible to determine what Lime Wire users are doing or what their habits are.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants object only to the admissibility of Exhibits 59, 60, 61, and 62, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-4, 11-24.)  Thus, this statement must be deemed undisputed.  The remainder of defendants' response disavows documents that *defendants themselves* created.  Those documents were identified by Catillaz and Rubenfeld.  (*See* Catillaz Tr. 322:9-324:2; *see also* Rubenfeld Tr. 328:2-330:22.)  Further, previous courts have used statistical studies akin to Dr. Waterman's to demonstrate the wide-scale infringement facilitated by peer-to-peer file sharing applications.  (*See* Pls. Expert Opp'n Br. at 1-2; *see also* Pls. Reply ¶ 111.)

**136.    Lime Wire received and relied on information from BigChampagne (*see supra* ¶ 92), indicating that, as of July 2006, over 90% of all P2P usage was audio or video.  (Ex. 63 at LW DE 1486400.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 63. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Defendants dispute only the admissibility of Exhibit 63, which is, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 63.)  Moreover, this statement is supported by Catillaz's undisputed testimony that Lime Wire LLC relied on information from Big Champagne.  (*See* Catillaz Tr. 250:11-14; 313:13-314:13.)

**137.    In a 2002 paper entitled "An Analysis of Internet Content Delivery Systems", defendants' expert and his co-authors concluded that 94% of the data transferred over the Gnutella Network was audio and video files.  (Ex. 64 at 6; Gribble Tr. 142:24-144:15.)**

**Defendants' Response:**

*Disputed.  First, disputed as to admissibility of Exhibit 64. See Defendants' Settlement/Pre-August 2003 Objections.  Second, Gribble testified that he and his colleagues estimated that 94% of the bytes (not data) transferred over the Gnutella network were related.  He also said that this figure did not tell one what was available over the network nor did it tell you how many files are transferred and what their relative frequency was. Gribble Tr. 144:16 – 145:11.  Defendants would also point out that the survey is irrelevant because this was not an impartial survey of Gnutella users; it was conducted through The University of Washington computer system; and it does not evidence that these files were unauthorized.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute the Gribble testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 64, which is, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 64; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  The remainder of defendants' response is nonresponsive, immaterial, and argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

138.   **When asked whether he had ever used the LimeWire client, Mark Gorton responded that he could not "recall typing on LimeWire" (Gorton Tr. 503:10-16), explaining that "I have dropped out of the demographic of people who consume media.  So in the last five years I don't think I bought a new CD, I barely watch any TV, I hardly listen to music.  I hardly watch any video.  I've never opened an MP3 player, I don't watch really videos on the internet . . .  And so I don't personally have much use in my life recently, or really ever, for digital media."  (*Id.* 503:17-504:22.)**

**Defendants' Response:**

*Disputed as to admissibility of the cited portion of Gorton Transcript.  See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the cited portion of Gorton testimony, which is, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attachment B ("Attach. B") at 4.)  Thus, this statement must be deemed undisputed.

139.   **When asked by a reporter "[W]hy would someone who uses LimeWire to help themselves to an unlimited amount of music for free want to pay [at the LimeWire store (*see infra* ¶¶ 456-57)]…?", Lime Wire CFO Rubenfeld responded:  "It's *legal* to buy music through our store -- that's the reason to do it."  (Ex. 43 (emphasis added); *see also* Rubenfeld Tr. 288:21-290:24.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 43.  See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Nor do defendants dispute the Rubenfeld testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 43, which is, in fact,

admissible.  (*See* Attach. A at Ex. 43; *see also* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-14.)  Thus, this statement must be deemed undisputed.

## V.   LIME WIRE'S INTENT HAS BEEN AND IS TO INDUCE COPYRIGHT INFRINGEMENT

### A.   Lime Wire Targeted Users of Other P2P Services Well-Known for Music Copyright Infringement and Viewed Such Infringing P2Ps as Competitors of Its LimeWire Software in the Music Download Market

#### 1.   Napster Users

140.   **Napster was a P2P file-sharing application used to facilitate the transmission of MP3 music files between and among its users. (A&M Records, Inc. v. Napster, Inc. ("Napster II"), 239 F.3d 1004, 1011 (9th Cir. 2001).) [Undisputed]**

141.   **It was widely known that Napster -- called the "notorious file-sharing service" by the Supreme Court (*Grokster,* 545 U.S. at 924)--enabled users to obtain copyrighted music files for free through P2P sharing.  (*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 975 (C.D. Cal. 2006) ("*Grokster (Remand)*").)**

**Defendants' Response:**

*Disputed. There is no evidence that it was "widely known."*

**Plaintiffs' Reply:**

Defendants dispute only the words "widely known" in this statement.  Those words are not materiality or central to the point of the statement, and plaintiffs hereby strike "It was widely known that" from this statement.  Thus, this statement must be deemed undisputed.

142.   **Several of Lime Wire's current and former employees used Napster to search for and download music files or asserted their Fifth Amendment privilege when asked about their use of P2P file sharing applications, including Napster. (Bildson Tr. 111:16-112:21; Catillaz Tr. 34:21-35:6; Faaborg Tr. 61:4-63:8, 65:19-67:7, 114:17-116:12; D. Nicponski Tr. 15:9-16:5; Harris Tr. 19:4-12; Berlin Tr. 354:2-19; C. Nicponski Tr. 69:23-72:6; Rohrs Tr. 29:17-19.) [Undisputed]**

143.   **On December 6, 1999, eighteen record companies filed a complaint against Napster for, inter alia, contributory and vicarious copyright infringement. (A&MRecords, Inc. v. Napster, Inc. ("Napster 1"), 114 F. Supp. 2d 896, 900 (N.D.Cal. 2000).) [Undisputed]**

144. **On July 26, 2000, the United States District Court for the Northern District of California issued a preliminary injunction against Napster. (Napster I, 114 F. Supp. 2d at 927 n.32.)** [Undisputed]

145. **On February 12, 2001, the United States Court of Appeals for the Ninth Circuit upheld the preliminary injunction against Napster with some modifications. (Napster II, 239 F.3d at 1029.)** [Undisputed]

146. **On March, 5, 2001, the district court entered a revised injunction against Napster. A&M Records, Inc. v. Napster, Inc., 2001 WL 227083 (N.D.Cal. March 5, 2001.)** [Undisputed]

- **Napster Lawsuit**

147. **Subsequently, Napster shut down its file sharing service. (Ex. 65 at 61.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 65. See Defendants' Motion to Strike*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute only the admissibility of Exhibit 65, which is, in fact, admissible. (*See* Attach. A at Ex. 65.) Thus, this statement must be deemed undisputed.

148. **Napster was rebranded as Napster 2.0 and opened as a licensed service through which users could acquire music for a fee. (Ex. 66 (http://www.sonic.com/about/press/news /2003/october/napsters-back.aspx); Ex. 67.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 68. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Nor do defendants dispute Exhibit 66, which alone provides sufficient support for the statement. Defendants' objection to the admissibility of Exhibit 68 is irrelevant as ¶ 148 refers only to Exhibit 67. Regardless, Exhibit 67 is, in fact, admissible. (*See* Attach. A at Ex. 67.) Thus, this statement must be deemed undisputed.

- **Lime Wire Specifically Targeted Napster Users**

149. **Gorton wrote in an April 19, 2000 letter seeking funds to develop his P2P software that "Napster has allowed all the college students in the country to pool their MP3 files. Almost any song can be easily found and shared in the pool. Napster is the realization of the music industry's fear of completely unregulated distribution of music." (Ex. 68.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 68. See Defendants' Settlement/Pre-August 2003 Objections. If the exhibit is admitted into evidence, Defendants wish to point out that a more complete review of this document shows* <u>Gorton and Lime Wire were not targeting Napster users:</u>

*"These new networks are coming. They will allow the free sharing of all types of information. In order for these networks to grow beyond the simple sharing of media files, new tools will need to be built which will allow individuals to generate, edit and structure the information to be shared. These tools will allow people on the network to organize and build on-line information sharing communities.*

*For example, if some people in New York City wanted to create a mechanism for the collecting, reporting and distributing of information about police brutality in NYC. They could define a police incident record type. Whenever someone wanted to publish an incident with the police, they could find a sample police incident on the network and use that data as a template to build a blank record to fill out. They could then generate their report and publish it to the network. Other people across the network could then gather this information to generate reports, statistical studies, lists of police officers involved in multiple incidents, etc.*

*This same system has potential to have a great impact in many other situations. For example, Chinese dissidents sharing information about their government or attempting to organize demonstrations, as a tool for the Iranian democracy movement to distribute banned literature, for independent Peruvian ballot-monitors who wish to quickly report and collate problems and results at polling stations, or neighbors gathering information on health problems created by a nearby toxic waste dump. The software I propose to develop will allow anyone with an Internet connection to build a community around an issue. The information will be equally available to all members of the community. Anyone could add, organize, compile, or edit the information.*

*These tools, which would help realize the potential of these new networks, do not exit. I propose to form a team of programmers who can build the utilities to unleash the power of these new networks. The software I am proposing to build is not conceptually complicated. However, building tools that are easy to learn and use requires a team of skilled programmers. We want to build tools that are so simple that they can be used by anyone with Internet access, in any language, whether they are standing at a village Internet kiosk in rural India or at a computer science lab in Shanghai." LE DE 378087.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Defendants dispute only the admissibility of Exhibit 68, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-4.)  Moreover, defendants themselves have proffered Exhibit 68 as their own Exhibit 5 and so have waived any objection to this document.  (*See* Baker 9/26/08 Decl. ¶ 7.)  Plaintiffs note that the quoted language in the statement reflects Gorton's knowledge and the actual use of P2P technology by Napster while the long quote "pointed out" by defendants in their response reflects only potential or possible uses of P2P software.

150.    **In an August 22, 2000 email, Lime Wire's then-leader of Business Development, Stephen Cho, wrote in reference to the injunction against Napster:  "Hopefully we will experience a jump as many students return to school in September to their fast T3 connections and vast stores of sharable files.  I like the idea of having downloads and uploads being the same directory or folder, a la Napster.  I think a lot of Napster users are just too lazy to pull the stuff [music files (Cho Tr. 79:15-81:11.)] out, given that there is a convenient built-in MP3 player in the Napster program."  (Ex. 69.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of Exhibit 69. See Defendants' Settlement/Pre-August 2003 Objections. Second, there is no evidence that Mr. Cho wrote this "in reference to the injunction against Napster." In reality, the topic of this email dealt with Mr. Cho's concerns, and others at Lime Wire, that Gnutella was dying ("our studies. . . are also suggesting that activity is waning rapidly on Gnutella Net"), and he was trying to come up with ideas to increase traffic on Gnutella. See Ex. 69.*

*Finally, the person that actually suggested the feature (Bildson) did so in a vacuum of Napster.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement--that is, that Lime Wire sought to implement the same features as Napster.  Defendants dispute the admissibility of Exhibit 69, which is, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 69; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Moreover, defendants use Exhibit 69 affirmatively to support their additional facts and so have waived any objection to this document.  (*See* Defs. LW 9/26/08 Add'l SOF ¶ 639.)  The last sentence of defendants' response is unintelligible and does not cite to any admissible evidence.  (*See* note 5.)

151.    **Lime Wire was previously known as Lime Peer or Lime Peer Technologies. (Ex. 3 at LW DE 486246.) [Undisputed]**

152.    **On January 9, 2001, Cho wrote a "Memo on PR" to Gorton and Lime Wire employees, stating:  "Lime Peer has already achieved a state of PR readiness**

which will allow us to deploy an extensive press and online campaign should anything dramatic happen with Napster or Scour, or some other development unfolds which will necessitate our increasing our visibility." (Ex. 70.)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 70. See Defendants' Settlement/Pre-August 2003 Objections. If the document is admitted into evidence, then Defendants wish to point out that Mr. Cho and Ms. Barret testified in their respective depositions that nothing of the sort ever occurred, i.e., that Lime Peer had developed a state of PR readiness, i.e., it was all talk. See Cho. Tr. 98:17-99:13; Barret Tr. 85:11 – 86:3. In fact, Exhibit 70 also shows that there had been a conscious decision to "hold off" on major press releases or PR campaigns. ("It has been a conscious decision by the business side to hold off on major press releases or PR campaigns, thus far.") In addition, Plaintiffs' inference that Lime Wire had a plan to pursue Napster is wrong. Cho and Barret were responding to complaints that they were not doing enough about publicity since certain of their competitors had. Their so-called "state" of readiness was in the event some development occurred which would necessitate increasing visibility in general. Barret also testified that she did not believe that Lime Wire was competing for Napster users or that Lime Wire was trying to lure away Napster users. Barret Tr. 64:11 – 13, 67:4 – 8. Cho has also testified that their target market was not Napster users. Cho Tr. 100:11- 102:14.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Defendants dispute only the admissibility of Exhibit 70, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Moreover, defendants use Exhibit 70 affirmatively to support their additional facts and so have waived any objection to this document.  (*See* Defs. LW 9/26/08 Add'l SOF ¶ 640.)  The remainder of defendants' response is immaterial and inaccurate.  The development of these public relations ("PR") plans, whether or not actually implemented, "illuminate[s]s" Lime Wire LLC's intent or purpose.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 925 n.7 (2005) ("*Grokster*").  Moreover, in the Barret testimony cited by defendants, Barret says that she does not "recall the campaign existing", not that it never existed.  (Barret Tr. 85:11-86:3.)  With respect to defendants' contention that the January 9, 2001 email cited by plaintiffs is about "holding off" on PR campaigns, Cho states in that same email that it could be "as early as next week" that such a campaign would be launched.  (*See* Ex. 70.)  In addition, Cho noted that they had "achieved a state of PR readiness which will allow us to deploy an extensive press and online campaign should anything dramatic happen with Napster or Scour, or some other development unfolds which will necessitate our increasing our visibility".  (*Id.*)  Beginning in January, Lime Wire LLC wrote emails to various websites attempting to secure a link to LimeWire's website describing the LimeWire client as "similar to the popular Napster service" because "it enables the sharing, searching, and downloading of MP3 music files."  (*See* Pls. Reply ¶ 156.)  Then, on March 1, 2001, Lime Wire issued a press release, specifically approved by Gorton and Bildson, entitled "In Wake of Napster Controversy, Lime Wire Announces Explosive

Growth of Gnutella [N]etwork", which stated that it was "[a]nticipating a surge in demand later this week [when a *Napster* ruling was expected (*see supra* ¶ 146)]". (*See* Pls. Reply ¶ 159.) Moreover, the Barret testimony cited by defendants does not support defendants' statement, since Barret qualifies her answer with "I don't know" before speculating that LimeWire was not competing for users with Napster (Barret Tr. 64:11-13) and says "she doesn't remember very specifically" whether she ever believed LimeWire could have been successful in that endeavor (*id.* 67:4-8). Cho does not deny that Lime Wire targeted Napster users in the testimony cited by defendants. In response to the question: "While you were at Lime Wire, do you know of any efforts to specifically target Napster users?", Cho responded "No, not particularly", but then goes on to say, "I mean, to the extent that Napster users were sort of tech-savvy and open to the idea of peer to peer networking, yeah, but there were other groups as well." (Cho Tr. 101:6-14.)

**153.    With regard to his January 9, 2001 "Memo on PR", Cho testified that one of his jobs as Business Development Leader was to increase Lime Wire's visibility should anything happen to Napster or Scour. (Cho Tr. 78:24-79:12.)**

**<u>Defendants' Response:</u>**

*Disputed as to admissibility of cited portion of Cho Transcript. See Defendants' Settlement/Pre-August 2003 Objections. Even if the document and related testimony is admitted into evidence, increasing the visibility of Lime Wire had nothing to do with trying to attract Napster users. In fact, as Mr. Cho and many others have testified to, Lime Wire did not ever attempt to target or attract Napster users. Cho. Tr. 100:16 – 102:14; Barret Tr. 64:11 – 13, 67:4 – 8; Fisk Decl. ¶ 4; Singla Decl. ¶ 6; Rohrs 43:11 - 43:19.*

**<u>Plaintiffs' Reply:</u>**

Defendants do not dispute the central point and the accuracy of the statement. Defendants dispute the admissibility of the cited portion of Cho testimony, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Although defendants objected to and moved to strike specific exhibits and deposition excerpts, they have *not* objected to this portion of the Cho testimony. (*See* Defs. Pre-2003/*Grokster* Mot. at Exs. A, B; *see also* Defs. mot. to Strike at 8-10.) Thus, this statement must be deemed undisputed.

**154.    On January 17, 2001, Bildson suggested logging on to Napster chatrooms to promote LimeWire. (Ex. 71.)**

**<u>Defendants' Response:</u>**

*Disputed as to admissibility of Exhibit 71. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute only the admissibility of Exhibit 71, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Moreover, defendants use Exhibit 71 affirmatively to support their additional facts and so have waived any objection to this document. (*See* Defs. LW 9/26/08 Add'l SOF ¶ 643.) Thus, this statement must be deemed undisputed.

155.    **In response to a January 20, 2001 internal email from Gorton stating, "We should start working connections on college campuses. We should think about a press campaign for college daily newspapers" (Ex. 72 at LW DE 1974933), Cho wrote: "I'm sure college newspapers are writing stuff about file-sharing and getting free MP3's. I also think it might be nice to hire campus reps . . . especially at Napster-banned colleges". (*Id.* at LW DE 1974932-33; *see also* Ex. 73 ("LimeWire initiative" included "contacting colleges – particularly that ban napster or other file sharing tools").)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 72 and 73. See Defendants' Settlement/Pre-August 2003 Objections. Moreover, even if the document is admitted into evidence, Mr. Cho testified that this was just brainstorming and that Lime Wire never followed-through with any of these suggestions. Cho. Tr. 98:17-102:14. Mr. Gorton also confirmed this. Gorton Tr. 248:04 – 8; 252:18-25. Moreover, Exhibit 73 shows that contacting colleges would be a great way to try to "raise knowledge about Lime Wire." Also, Cho's idea was rejected by Bildson ("I don't know about hiring college representatives as Stephen says . . ."). Finally, Gorton's suggestion about a press campaign was not focused on Napster but on going to campuses and tolling this "hometown boy makes good" story. LW DE 1974933.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute only the admissibility of Exhibits 72 and 73, which are, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Moreover, defendants use Exhibit 72 affirmatively to support their additional facts and so have waived any objection to this document. (*See* Defs. LW 9/26/08 Add'l SOF ¶ 644.) The remainder of defendants' response is immaterial and irrelevant. For example, the development of these PR plans, whether or not ever implemented, "illuminate[s]s" Lime Wire LLC's intent or purpose. *See Grokster,* 545 U.S. at 925 n.7. Thus, this statement must be deemed undisputed.

156.    **Between January and April 2001, Lime Wire wrote emails to various websites attempting to secure a link to LimeWire's website describing the LimeWire client as "similar to the popular Napster service" because "it enables the sharing, searching, and downloading of MP3 music files". (Ex. 74.)**

60

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 74. See Defendants' Settlement/Pre-August 2003 Objections. Even if the document is admitted into evidence, Defendants wish to point out that in those same emails Lime Wire promoted the fact that it was different than Napster by stating "[h]owever, LimeWire takes information sharing a step further by enabling the user to share and search for all types of computer files such as. . ." Ex. 74. J. K. Barrett, the author of these emails, testified in her deposition that she would use the Napster name on occasion to serve as a hook, i.e., an attention getter, so that others would take notice. Barrett Tr. 130:04-130:11; Barret Tr. 111:07-14. She also testified that she never tried to attract or lure-away Napster users. Barrett Tr. 64:11-13; 67:4-8.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibit 74, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Moreover, defendants use Exhibit 74 affirmatively to support their additional facts and so have waived any objection to this document. (*See* Defs. LW 9/26/08 Add'l SOF ¶ 645.) The remainder of defendants' response is immaterial and irrelevant. The material and relevant undisputed fact is that Lime Wire LLC was comparing LimeWire to Napster. Thus, this statement must be deemed undisputed.

**157.    In a February 23, 2001 article appearing several days after the February 12, 2001 *Napster* injunction was announced (*see supra* ¶ 145), Lime Wire was quoted as stating that it "expect[ed] 30 percent of Napster users to try Gnutella," "[w]ith possibly up to 100 percent." (Ex. 75; *see also* Ex. 76 at LW DE 1976393.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 75. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Even if the document is admitted into evidence, Defendants wish to point out that in the same article (Ex. 75), Bildson is also quoted as saying "[T]here is room for great innovation here. Gnutella may be the next step along the path that was started by the printing press." Moreover, in his deposition, Bildson testified that he had no reason to believe that any Napster users would try Gnutella, that he had made up those numbers and that he did not believe in the accuracy of those numbers. Bildson Tr. 541:21 – 543:12.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute only the admissibility of Exhibit 75, which is, in fact, admissible. (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 75; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-4.) The remainder of defendants' response is immaterial and irrelevant. The material and relevant undisputed fact is that Lime Wire LLC was comparing LimeWire to Napster. Thus, this statement must be deemed undisputed.

158.    **On February 23, 2001, Scott Ward of Widmeyer Communications, a public
relations firm, wrote a public-relations campaign proposal to Lime Wire
after meeting with Gorton that included the following "Situation Analysis":
"Napster's fate will soon be sealed, . . . With news interest at its peak, the
time is ripe to introduce what lies 'Beyond Napster,' the system that offers
the same ease, simplicity and efficiency of use. And that is LimeWire . . .".
The "Strategy" was to "[d]eclare March 2 [when Napster decision was
expected] as 'Napster Independence Day' . . .". (Ex. 77 at LW DE 1974945.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 77. See Defendants' Motion to Strike; Defendants'
Settlement/Pre-August 2003 Objections. Even if the document is admitted into evidence,
Defendants wish to point out that it is undisputed that Gorton and Lime Wire ignored this
advice because it was way over the top and totally inconsistent with the way the company
desired itself to be marketed. Gorton Decl. ¶ 19.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants
dispute only the admissibility of Exhibit 77, which is, in fact, admissible. (*See* Attach. A
at Ex. 77; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Moreover, defendants use Exhibit
77 affirmatively to support their additional facts and so have waived any objection to this
document. (*See* Defs. LW 9/26/08 Add'l SOF ¶ 652.) The remainder of defendants'
response is immaterial and irrelevant. The development of this public-relations
campaign, whether or not actually implemented, "illuminate[s] [Lime Wire LLC's]
purposes". *See Grokster,* 545 U.S. at 925 n.7. Plaintiffs also note that just six days later,
Lime Wire LLC issued the press release described in Pls. Reply ¶ 159. Thus, this
statement must be deemed undisputed.

159.    **On March 1, 2001, Lime Wire issued a press release, specifically approved by
Gorton and Bildson, entitled "In Wake of Napster Controversy, Lime Wire
Announces Explosive Growth of Gnutella Network", which stated that it was
"[a]nticipating a surge in demand later this week [when a *Napster* ruling was
expected (*see supra* ¶ 146)]". (Ex. 78; Ex. 79; *see also* Ex. 37 (Bildson stating
that "[t]here was always a cause and effect when Napster was in the news").)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 37, 78 and 79. See Defendants' Settlement/Pre-
August 2003 Objections. If these documents are admitted into evidence, Defendants
would show that this press release was not issued in response to the Napster ruling (see
supra ¶ 146) and that the press release extolls the non-Napster features of LimeWire
such as (1) in the title it also says "[N]etwork designed to revolutionize concept of file
and information sharing"; (2) that the software allows users to "share all types of files"
(emphasis original); (3) "while often compared to Napster, Gnutella has potential far
greater than simply sharing mp3 files"; and (4) "we hope that LimeWire will attract*

*academic interest and research to the network." Moreover, as to Exhibit 37, Bildson testified that there was no real correlation between Gnutella usage and Napster being in the news. In fact, he pointed-out in his deposition that Gnutella usage increased well before and after Napster issues were in the news. Bildson Tr. 532:03 - 535:10.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute the admissibility of Exhibits 37, 78 and 79, which are, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Moreover, defendants themselves have proffered Exhibit 37 as their own Exhibit 18 and so have waived any objection this document. (*See* Baker 9/26/08 Decl. ¶ 20.) Defendants also use Exhibit 78 affirmatively to support their additional facts and so have waived any objection to this document as well. (*See* Defs. LW 9/26/08 Add'l SOF ¶ 647.) Plaintiffs provide no evidence to support their statement that the press release was not issued in response to the *Napster* ruling. (*See* note 5.) Moreover, the press release itself indicates that it was indeed issued in response to the *Napster* ruling. Thus, this statement must be deemed undisputed.

**160. Jennifer-Kate Barret, who was then responsible for drafting Lime Wire's press releases (Barret Tr. 93:11-17), wrote in an email with regard to the March 1, 2001 press release that "the goal is to be mentioned in napster [sic] articles, as mark [Gorton] described it". (Ex. 80.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 80. See Defendants' Settlement/Pre-August 2003 Objections. Even if the document is admitted, Defendants wish to point out that, as Ms. Barret explained in her deposition, the goal of this press release was to get attention to the Gnutella network, and that she used the Napster name to do that because it was so popular at the time (it served as a "hook" for getting that attention). She also testified that it was never Lime Wire's intent to attract Napster users, and that Napster news presented an opportunity to obtain attention in the press. Barret Tr. 96:8 – 10, 97:11 – 14, 111:7 – 14, 130:4 – 11. Ms. Barret also testified that her goal was not to attract Napster users and that the focus of the press release was on <u>the differences</u> between Napster and LimeWire. Barret Tr. 97:20 – 98:2, 98:6 – 15. Cho also stated the same. See supra 153. Gorton has also confirmed that he allowed Barrett to issue the press release with the word Napster as for the same reason. ("I think there was a lot of news interest in Napster and so just as a kind of press strategy --- its like reporters write stories around events. And so what wouldn't have been a particularly newsworthy thing at another time, us trying to attract academic computing interests in research ... the hook of Napster... that's the sort of thing that would get reporters to pick up on that...") Gorton Tr. 274:15-276:20. Others have also testified that it was never the company's goal to attract Napster users or be the "next Napster." See supra response 153.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Defendants dispute only the admissibility of Exhibit 80, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Moreover, defendants themselves have proffered Exhibit 80 as their own Exhibit 13 and thus have waived any objection to this document.  (*See* Baker 9/26/08 Decl. ¶ 15.)  The remainder of defendants' response is immaterial and argumentative.  (*See* note 6.)  In the testimony cited by defendants, Barret did not testify that Lime Wire's goal was "not to attract Napster users".  (Barrett Tr. 97:20-08:2; 98:6-15.)  Furthermore, in the testimony cited by defendants, Gorton does not deny that Lime Wire sought to attract Napster users  (Gorton Tr. 274:15-276:20.)  Thus, this statement must be deemed undisputed.

    **161.**    **On March 21, 2001, Bildson suggested that a LimeWire user's assertion that Lime Wire had "all but replaced Napster" should be included in the user testimonials section of the LimeWire website.  (Ex. 81.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of Exhibit 81. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, the idea was flatly rejected.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Defendants dispute only the admissibility of Exhibit 81, which is, in fact, admissible. (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 81; *see also* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  The remainder of defendants' response is immaterial and irrelevant.  Even if Bildson's idea was rejected, it "illuminate[s]s [Lime Wire LLC's] purpose."  *See Grokster,* 545 U.S. at 925 n.7.  Further, defendants fail to cite any admissible evidence in support.  (*See* note 5.)

    **162.**    **On November 19, 2002, Lime Group opened an advertising account with Google through Google's AdWords program ("Google AdWords") with Greg Bildson listed as the account owner.  (Ex. 82 at GOOG 001-002, 027; Randell Tr. 11:6-12:11, 38:17-39:14, 53:5-15.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of Exhibit 82. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not open the account. See Ex. 82.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Nor do defendants dispute the Randell testimony, which alone provides sufficient support for the

statement.  Defendants dispute the admissibility of Exhibit 82, which is, in fact, admissible.  (*See* Attach. A at Ex. 82; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Although defendants say that "Lime Group did not open the account", Exhibit 82 shows that Lime Group's name is listed at the top of the "Control Center" page next to Greg Bildson's name and the email address *marketing@limewire.com*.  (Ex. 82 at GOOG 001.)  Further, defendants do not cite any admissible evidence to support their statement that Lime Group did not open the account.  (*See* note 5.)  Thus, the statement must be deemed undisputed.

**163.    Lime Group's Google AdWords campaign contained multiple "Ad Groups", each of which consisted of an advertisement written by Lime Group associated with various keywords selected by Lime Group ("AdWord keyword").  (Ex. 82; Randell Tr. 33:11-35:22, 50:15-19.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of Exhibit 82 and the cited portions of the Randell Transcript. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, even if the Court rules that this evidence is admissible, Defendants dispute the statement of fact. Lime Group did not select the advertisement. It was one or more employees of Lime Wire, if at all. See Ex. 82. Moreover, there is no evidence that Lime Wire selected the words for the written advertisement itself. Randell Tr. 50:15–50:24.*

**Plaintiffs' Reply:**

*First*, defendants dispute the admissibility of Exhibit 82 and the cited portion of the Randell testimony, which are, in fact, admissible.  (*See* Attach. A at Ex. 82; Attach. B at 6; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, the testimony cited by defendants does not support their statement, but instead describes how the "advertiser or the owner of the account comes up with [] keywords".  (Randell Tr. 50:15-24.)  Thus, this statement must be deemed undisputed.

**164.    Users of Google or other websites using Google AdWords, who entered queries using an AdWords keyword successfully bid on by Lime Group were shown advertisements for LimeWire, including a link to Lime Wire's website.  (Ex. 82; Randell Tr. 33:11-35:22, 24:21-25:12, 45:10-46:3.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of Exhibit 82 and the cited portions of the Randell Transcript. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not bid on any keywords, it was Lime Wire.*

**Plaintiffs' Reply:**

Defendants do not dispute the central point of the statement.  Defendants dispute the admissibility of Exhibit 82 and the Randell testimony, which are, in fact, admissible.  (*See* Attach. A at Ex. 82; Attach. B at 6; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Defendants also assert that Lime Wire, not Lime Group, bid on keywords.  Exhibit 82, however, appears to list Lime Group as the account owner (*see* Pls. Reply ¶ 162) and defendants cite to no admissible evidence showing otherwise.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**165.**     **Lime Group bid on AdWords for keywords related to Napster, including: "replacement napster", "napster mp3", "napster download", and in French, "programmers comme le napster" and "napster remplacement".  Google users who searched these keywords would see an advertisement for LimeWire.  (Ex. 82 at GOOG 039-40, 089-90; Randell Tr. 33:11-35:22.)**

**Defendants' Response:**

*Disputed.  First, disputed as to admissibility of Exhibit 82 and the cited portions of the Randell Transcript.  See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.  Second, Lime Group did not bid on any keywords.  In addition, there is no evidence that Google users ever saw a LimeWire ad; in fact, GOOG 039 reflects that the campaign was never really launched (it says "ceased"), nor is there any evidence what the ad said (assuming it was ever active).  Finally, the Lime Wire employee that attempted to bid on these keywords was not authorized to do so and once Lime Wire discovered his actions the campaign was immediately stopped.  See Bildson Tr. 836:6–10; Gorton Decl. ¶ 20.*

**Plaintiffs' Reply:**

*First*, defendants dispute the admissibility of Exhibit 82 and the cited portion of the Randell testimony, which are, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 82; Attach. B at 6; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, defendants assert that Lime Group did not bid on any keywords, but fail to cite to admissible evidence in support of this statement.  (*See* note 5.)  *Third*, nowhere in the Bildson testimony cited by defendants does Bildson say that once Lime Wire discovered the intern's actions, the campaign was immediately stopped.  Further, Gorton offers no support for his statement that "Napster-related keywords was an unauthorized action by a summer intern".

**166.**     **Lime Group bid AdWords for keywords related to Napster, including "return Napster", "return napster", "napsterbits", "napster mp3", and simply "Napster".  Google users who searched these laywords would be shown the advertisement "Download with LimeWire - Share any files quickly with Lime Wire Pro.  Only $18.88!" along with a link to LimeWire's website.  (Ex. 82 at GOOG 084-085; Randell Tr. 61:6-21, 86:24-89:5.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of Exhibit 82. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not bid on any keywords. Moreover, even if there was evidence that Lime Wire bid on these AdWords, they were done without any authority from management and this campaign was immediately ceased upon discovery. Bildson Tr. 836:06 – 838:10; Gorton Decl. ¶ 20.*

**Plaintiffs' Reply:**

*First*, defendants do not dispute the material point and accuracy of the statement. Defendants dispute only the admissibility of Exhibit 82 which is, in fact, admissible. (*See* Attach. A at Ex. 82; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, defendants assert that Lime Group did not bid on any keywords but fail to cite to any admissible evidence in support.  (*See* note 5.)  *Third*, nowhere in the Bildson testimony cited by defendants does he say that once Lime Wire discovered the intern's actions, the campaign was immediately stopped.  Further, Gorton offers no support for his self-serving statement that "Napster-related keywords was an unauthorized action by a summer intern".  Thus, this statement must be deemed undisputed.

**167.**   **Lime Group bid on AdWords for keywords related to Napster, including "napster mp3" and "napster".  Google users who searched these keywords would be shown an advertisement stating:  "Turbo Limewire Pro -- Find and download files quickly with LimeWire Pro.  Now Turbo Charged!" along with a link to LimeWire's website.  (Ex. 82 at GOOG 010-11.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of Exhibit 82. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not bid on these keywords. Third, even if there were evidence that Lime Wire bid on these AdWords, such bids were done without any authority from management and this campaign was immediately ceased upon discovery. Bildson Tr. 836:06 – 838:10; Gorton Decl. ¶ 20.*

**Plaintiffs' Reply:**

*First*, defendants do not dispute the material point and accuracy of this statement. Defendants dispute the admissibility of Exhibit 82, which is, in fact, admissible.  (*See* Attach. A at Ex. 82; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, defendants assert that Lime Group did not bid on any keywords but do not cite to any admissible evidence in support.  (*See* note 5.)  *Third*, nowhere in Bildson's testimony cited by defendants does he say that once Lime Wire discovered the intern's actions, the campaign was immediately stopped.  Further, Gorton offers no support for his self-serving statement that "Napster-related keywords was an unauthorized action by a summer intern".

- **Lime Wire Monitored Napster in the Press to Measure Whether Its Efforts to Capture Napster Users Were Successful**

**168.     Lime Wire maintained files that included articles, emails, and forum posts indicating that LimeWire and Gnutella were Napster clones or Napster alternatives.  (*See*, *e.g.*, Ex. 75, Ex. 83, Ex. 84.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 75, 83, and 84. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Even if the documents are admitted, Defendants wish to point out that Lime Wire kept numerous articles written about the company and its software over the years and some of these articles just so happened to mention Napster. See Bildson Tr. 556:05 – 556:12; see also Defs.' Exhibits 50-56, (other articles saved by Lime Wire). There is simply no evidence that there ever was any conscious effort to save Lime WireNapster related articles; assertions that that such an effort at Lime Wire existed is inadmissible speculation at best.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute the admissibility of Exhibits 75, 83 and 84, which are, in fact, admissible.  (*See* Attach. A at Exs. 75, 83, 84; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  The remainder of defendants' response is argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

**169.     On January 14, 2001, Bildson wrote an internal email attaching a *Wall Street Journal* article entitled "Web Sees No Shortage Of Napster Alternatives", which discussed LimeWire among the "Napster alternatives".  Bildson wrote in the email, "I don't want to break copyright but HERE IS THE WSJ article!".  (Ex. 85.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 85. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Defendants dispute only the admissibility of Exhibit 85, which is, in fact, admissible.  (*See* Attach. A at Ex. 85; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Thus, this statement must be deemed undisputed.

**170.     On February 1, 2001, Bildson circulated an article in French, the title of which was translated as "Gnutella is prepared to take the place of Napster". Bildson's email added an exclamation point at the end of the title and stated: "LimeWire especially".  (Ex. 83.)**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of Exhibit 83. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, there is no summary judgment evidence reflecting the true title of this article in English. Third, Bildson disputed that he wrote this email. See Bildson Tr. 524:13 – 524:25.*

**Plaintiffs' Reply:**

Defendants do not dispute the central point of the statement.  *First*, defendants dispute the admissibility of Exhibit 83, which is, in fact, admissible.  (*See* Attach. A at Ex. 83; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, it does not matter what the "true title" of the article is in English.  What is relevant is the title Bildson used when circulating the article.  This email was produced by defendants out of Lime Wire LLC's files and is thus, authenticated whether or not Bildson recalled writing it.  (*See* Pls. Mot to Strike Opp'n Br. at 4-8.)  Thus, this statement must be deemed undisputed.

171.   **In a February 20, 2001 email to a reporter, Bildson stated that "there has been a huge increase in Gnutella usage long before and even more during news about the Napster decision". (Ex. 76 at LW DE 1976393.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 76. See Defendants' Settlement/Pre-August 2003 Objections. If this document is admitted into evidence, Defendants would show that Bildson also stated in this same document that "[w]e don't have an opinion on the Napster issue." Moreover, when asked in his deposition about this document, Bildson stated that Napster being in the news had nothing to do with increase in LimeWire usage and that because there was increase usage both before  and after Napster being in the news, he did not see any real correlation. Bildson Tr. 532:03 – 535:10.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Defendants dispute only the admissibility of Exhibit 76, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  In fact, defendants themselves have proffered Exhibit 76 as their own Exhibit 14 and so have waived any objection this document.  (*See* Baker 9/26/08 Decl. ¶ 16.)  The remainder of defendants' response is immaterial in that it does not matter whether the increase in LimeWire usage was, in fact, due to Napster being in the news.  What is material is that Bildson linked the increase in LimeWire's usage to Napster.  Moreover, the remainder of defendants' response is argumentative. (*See* note 6.)  Thus, this statement must be deemed undisputed.

172.   **On February 28, 2001, Rohrs sent an email to Bildson and other Lime Wire employees, the subject of which was "Napster to shut down Friday?", with a link to an online article. (Ex. 86.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 86. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute only the admissibility of Exhibit 86, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Thus, this statement must be deemed undisputed.

173. **On March 2, 2001, Barret, then in charge of public relations for Lime Wire, sent to Bildson, Cho, and Gorton an Associated Press article entitled "Flurry of Downloads as End Nears for Napster Song-Swapping", which stated that Napster's shut-down "won't solve the RIAA's problems, since other ways of getting free music are sprouting up. These difficult-to-trace peer-to-peer applications have funny names such as Gnutella, LimeWire, ToadNode and BearShare . . . Interest in non-Napster file-sharing programs has exploded with every headline in the RIAA's case". (Ex. 87.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 87. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. However, if Exhibit 87 is ruled admissible, Defendants do wish to note that the article also states that "interest in non-Napster file sharing programs has exploded with every headline in the RIAA's case," proving that interest in LimeWire increased without Lime Wire doing anything. Ex. 87.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute only the admissibility of Exhibit 87, which is, in fact, admissible. (*See* Attach. A at Ex. 87; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) The remainder of defendants' response is immaterial since the article attached to the email is offered not for its truth, but for the fact that Lime Wire's head of public relations, J.K. Barret, circulated it to Gorton, Bildson and Cho. Moreover, the remainder of defendants response is argumentative. (*See* note 6.) Thus, this statement must be deemed undisputed.

174. **A March 16, 2001 email exchange among Lime Wire employees included a description of LimeWire's functionality from a third-party website stating: LimeWire "is similar to the popular Napster service, in that it enables the sharing, searching, and downloading of MP3 music files". (Ex. 88.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 88. See Defendants' Settlement/Pre-August 2003 Objections. Even if the document is admitted into evidence, Defendants wish to show in that same document that an employee of Lime Wire also pointed-out that the draft release*

*needed a more fuller description of LimeWire, such as the fact that LimeWire allows users to share more than just music. ("It might be worth having a fuller description of what the LimeWire software does" such as "LimeWire takes information sharing a step further by enabling the user to share and search for all types of computer files including movies, pictures, games, word proceeding documents, recipes, and more.") Ex. 88.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. *First*, defendants dispute the admissibility of Exhibit 88, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Moreover, defendants themselves have proffered Exhibit 88 as their own Exhibit 10 and so have waived any objection to this statement. (*See* Baker 9/26/08 Decl. ¶ 12.) Defendants also use Exhibit 88 affirmatively to support their additional facts and again waived any objection to this document. (*See* Defs. LW 9/26/08 Add'l SOF ¶ 652.) The remainder of defendants' response is immaterial and argumentative. (*See* note 6.) Thus, this statement must be deemed undisputed.

175. **On March 28, 2001, under the subject heading "LimeWire good article", Bildson circulated a Miami Herald article that asserted that LimeWire "most closely clones Napster's success", "catalogs downloaded songs on your hard drive" and "will help you forget Napster ever existed." (Ex. 89.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 89. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Even if the document is admitted into evidence, Defendants wish to point out that the article also refers to another Gnutella P2P file sharing company named BearShare, and Mr. Bildson testified in his deposition that this is what got his attention (i.e., comparison to BearShare), and why he thought it was a good article. Ex. 89; Bildson Tr. 585:05 – 588:02. Bildson also testified that he did not consider Gnutella to be a Napster clone. Bildson Tr. 201:2- 11.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute the admissibility of Exhibit 89, which is, in fact, admissible. (*See* Attach. A at Ex. 89; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) The remainder of defendants' response is immaterial. The relevance of Exhibit 89 is relevant in that it shows that Bildson circulated the article; it is not being offered to show whether he believed it to be true. Moreover, the remainder of the defendants' response is argumentative. (*See* note 6.) Thus, this statement must be deemed undisputed.

176. **On May 5, 2001, Bildson circulated a research report on Napster and file-sharing that asserted that LimeWire was one of the "Top Napster Competitors". (Ex. 90; Ex. 91 at JB 0007.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 90 and 91. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. However, if Exhibits 90 and 91 are admitted into evidence, Defendants wish to point out that the report was not about Napster competitors but instead was focused on the penetration rates of file-sharing software in general and Napster's effect on the PC community. See Ex. 91.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute the admissibility of Exhibits 90 and 91, which are, in fact, admissible. (*See* Attach. A at Exs. 90, 91; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) The remainder of the defendants' response is immaterial and argumentative. (*See* note 6.) Thus, this statement must be deemed undisputed.

177. **An article in Fortune magazine entitled "Napster: The Hot Idea of the Year" (Ex. 92 at LW 003433-34) was listed as Appendix I in drafts of the Lime Wire Offering Memorandum. (Ex. 93 at LW DE 376962; Ex. 94 at LW DE 1120871; Ex. 95 at LW DE 1120670.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 93, 94 and 95. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute only the admissibility of Exhibits 93, 94 and 95, which are, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Moreover, defendants themselves have proffered Exhibit 95 as their own Exhibit 4 and so have waived any objection this document. (*See* Baker 9/26/08 Decl. ¶ 6.) Thus, this statement must be deemed undisputed.

2. **Grokster/Morpheus/Kazaa Users**

178. ***Grokster,* Ltd. distributed *Grokster,* a P2P file sharing application. (*Grokster,* 545 U.S. at 919-20.) [Undisputed]**

179. **StreamCast Networks, Inc. distributed Morpheus, a P2P file sharing application that, like LimeWire (see supra ¶ 46) ran on the Gnutella network for much of the relevant time. (*Grokster,* 545 U.S. at 919-20, 921.) [Undisputed]**

180. **Sharman Networks distributed Kazaa, a P2P file sharing application. (*Grokster (Remand),* 454 F. Supp. 2d at 971.) [Undisputed]**

181.   Whereas Napster maintained a centralized index of files available for download (NapsterII, 239 F.3d 1004 at 1011-12), *Grokster,* Morpheus and Kazaa used decentralized indices of available files, which were stored on certain users' computers rather than on a central server. (*Grokster,* 545 U.S. at 921-22; *Grokster (Remand),* 454 F. Supp. 2d at 979.) **[Undisputed]**

182.   *Grokster,* Morpheus and Kazaa were primarily used to share copyrighted music and video files without authorization from their copyright owners. (*Grokster,* 545 U.S. at 923-24. (Universal Music Australia Pty. Ltd. v. Sharman License Holdings Ltd. (2005) 220 A.L.R. (Austl.), 2005 WL 2119310.)

**Defendants' Response:**

*The opinions speak for themselves.*

**Plaintiffs' Reply:**

The response that the "opinions speak for themselves" is improper and must be disregarded.[12]  Thus, this statement must be deemed undisputed.

183.   It was widely reported that *Grokster,* Morpheus and Kazaa enabled users to copy and transfer copyrighted music files without authorization from copyright owners. (See, e.g., Ex. 96 (Steve Lohr, The Sharing Society; In the Age of the Internet, Whatever Will Be Will Be Free on the Internet, N.Y. Times, Sept. 14, 2003; David Lieberman, Piracy Pillages Music Industry, USA Today, April 8, 2002; Jane Black, Napster 's Sons: Singing a Different Tune?, Bus. Wk, Feb. 21, 2002; Matt Richtel, Free Music Service Is Expected to Surpass Napster, N.Y. Times, Nov. 29, 2001; Daniel B. Wood, In Napster-Less World, Plenty of Other Options, Christian Science Monitor, Oct. 22, 2001).)

**Defendants' Response:**

*Disputed as to "widely reported".*

**Plaintiffs' Reply:**

Defendants dispute only the words "widely reported".  The word "widely" is not material or central to the point of the statement, and plaintiffs hereby strike the word "widely" from the statement.  Thus, this statement must be deemed undisputed.

   •   **Copyright Litigation**

---

[12] *Parks,* 2008 WL 3833802, at *5 (a defendant "cannot merely state that the document or testimony 'speaks for itself'").

184.  In October 2001, copyright holders, including record companies and motion picture studios, sued Grokster, Ltd. and StreamCast Networks, Inc. for contributory and vicarious copyright infringement in connection with their distribution, respectively, of the Grokster and Morpheus file sharing applications. (Grokster (Remand), 454 F. Supp. 2d at 970.) [Undisputed]

185.  On July 12, 2002, plaintiff copyright holders in Grokster named Sharman Networks, which distributed the Kazaa file sharing application (see supra ¶ 180), as a defendant in the lawsuit. (Grokster (Remand), 454 F. Supp. 2d at 970-71.) [Undisputed]

186.  On February 5, 2004, thirty record companies filed suit against Sharman Networks Ltd. in the Federal Court of Australia for copyright infringement with respect to its distribution of the Kazaa file sharing application. (Universal Music Australia Pty. Ltd. v. Sharman License Holdings Ltd. (2005) 220 A.L.R. (Austl.), 2005 WL 2119310.) [Undisputed]

187.  Lime Wire was aware of the litigation against Sharman Networks Ltd. in Australia. A document entitled "LimeWire 2004 Marketing Plan" states that "[t]he significance of this case [the Australia lawsuit against Kazaa] is unclear. As a company with no offices in Australia, Lime Wire might be free from copyright fraud prosecution even if Kazaa is found liable, because [the Music Industry Piracy Investigations, an intellectual property rights enforcement organization in Australia] had to physically search Kazaa's computers for electronic evidence. Nonetheless, the outcome of the trial and public support for Kazaa should be monitored, and LimeWire's presence in Australia monitored accordingly". (Ex. 97 at LW DE 1172925-26.) [Undisputed]

188.  The Federal Court of Australia found that "the predominant use of Kazaa was for the sharing of copyright-infringing material". (Universal Music Australia Pty. Ltd. v. Sharman License Holdings Ltd. (2005) 220 A.L.R. (Austl.), 2005 WL 2119310.)

**Defendants' Response:**

*The opinion speaks for itself.*

**Plaintiffs' Reply:**

The statement "the opinion speaks for itself" is improper and must be disregarded. (*See* note 12.) Thus, this statement must be deemed undisputed.

189.  The Federal Court of Australia found Sharman Networks Ltd. liable for copyright infringement of the plaintiffs' sound recordings in connection with its distribution of the Kazaa file-sharing application. (Universal Music Australia Pty. Ltd. v. Sharman License Holdings Ltd. (2005) 220 A.L.R. (Austl.), 2005 WL 2119310.)

**Defendants' Response:**

*The opinion speaks for itself.*

**Plaintiffs' Reply:**

The statement "the opinion speaks for itself" is improper and must be disregarded.  (*See* note 12.)  Thus, this statement must be deemed undisputed.

190.   On April 25, 2003, the district court in Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd. granted summary judgment in favor of Grokster, Ltd. and Streamcast Networks, Inc. (259 F. Supp. 2d 1029 (C.D. Cal. 2003).)

**Defendants' Response:**

*The opinion speaks for itself.*

**Plaintiffs' Reply:**

The statement "the opinion speaks for itself" is improper and must be disregarded.  (*See* note 12.)  Thus, this statement must be deemed undisputed.

191.   On August 19, 2004, the Ninth Circuit affirmed the district court's decision. (Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 380 F.3d 1154 (9th Cir. 2004).)

**Defendants' Response:**

*The opinion speaks for itself.*

**Plaintiffs' Reply:**

The statement "the opinion speaks for itself" is improper and must be disregarded.  (*See* note 12.)  Thus, this statement must be deemed undisputed.

192.   On June 27, 2005, the United States Supreme Court unanimously ruled that Grokster, Ltd., and StreamCast Networks, Inc. could be held liable for distributing a device with the object of promoting its use for copyright infringement (the "inducement doctrine"). (Grokster, 545 U.S. 913 (2005).)

**Defendants' Response:**

*The opinion speaks for itself.*

**Plaintiffs' Reply:**

The statement "the opinion speaks for itself" is improper and must be disregarded.  (*See* note 12.)  Thus, this statement must be deemed undisputed.

193. **The Supreme Court found that "the probable scope of copyright infringement" on the FastTrack and Gnutella networks is "staggering". (Grokster, 545 U.S. at 923.)**

**Defendants' Response:**

*The opinion speaks for itself.*

**Plaintiffs' Reply:**

The statement "the opinion speaks for itself" is improper and must be disregarded.  (*See* note 12.)  Thus, this statement must be deemed undisputed.

194. **Shortly after the Supreme Court published its opinion, *Grokster,* Ltd. and Sharman Networks, Ltd. settled their lawsuits with the copyright holder plaintiffs. (*Grokster (Remand),* 454 F. Supp. 2d at 971.)**

**Defendants' Response:**

*Undisputed as to Grokster. However, it took almost a year for Sharman Networks to settle. Grokster (Remand), 454 F. Supp. 2d at 971.*

**Plaintiffs' Reply:**

This statement is undisputed as to Grokster.  Defendants dispute only the word "shortly" as to Sharman Networks, Ltd.  The word "shortly" is not material or central to the point of the statement, and plaintiffs hereby strike the word "shortly" from the statement.  Thus, this statement must be deemed undisputed.

195. **On September 27, 2006, the United States District Court for the Central District of California granted summary judgment against StreamCast Networks, Inc., distributor of the Morpheus client (a Gnutella client), finding it liable for copyright infringement under the inducement doctrine. (*Grokster (Remand)*, 454 F. Supp. 2d at 999.)  The court found that "the evidence of StreamCast's unlawful intent [was] overwhelming."  (*Id.* at 985.)**

**Defendants' Response:**

*The opinion speaks for itself.*

**Plaintiffs' Reply:**

The statement "the opinion speaks for itself" is improper and must be disregarded.  (*See* note 12.)  Thus, this statement must be deemed undisputed.

196. **In September 2007, a consent judgment and permanent injunction was entered against Sharman Networks in the Grokster case whereby Sharman Networks (Kazaa) was, inter alia, permanently enjoined from "directly or**

**indirectly infringing . . . any and all sound recordings . . .". (Ex. 98 (Stipulation and Amended Consent Judgment and Permanent Injunction, filed September 6, 2007).)**

**Defendants' Response:**

*The opinion speaks for itself.*

**Plaintiffs' Reply:**

The statement "the opinion speaks for itself" is improper and must be disregarded. (*See* note 12.) Thus, this statement must be deemed undisputed.

197. **Lime Wire followed the legal proceedings in the Grokster case closely. (Ex. 97 at LW DE 1172925; Ex. 99; Ex. 100; Ex. 101; see also infra ¶¶ 610-619.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 100. See Defendants' Motion to Strike. Additionally disputed as to "closely." Lime Wire did monitor the litigation.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Nor do they dispute Exhibits 97, 99 or 101, which provide sufficient support for the statement. *First*, defendants dispute the admissibility of Exhibit 100, which is, in fact, admissible. (*See* Attach. A at Ex. 100.) *Second*, defendants dispute the use of the word "closely". The word "closely" is not material or central to the point of the statement, and plaintiffs hereby strike the word "closely" from the statement. Thus, this statement must be deemed undisputed.

- **Lime Wire Specifically Targeted *Grokster*, Morpheus and Kazaa Users**

198. **Lime Group bid on Google AdWords for keywords related to *Grokster*, including: "grokster mac", "grokster macintosh", "grokster linux", "grokster windows", "grokster man", "grokster", "grokster music", "grokster music download", "grokster mp3", "grokster mp3 download", "grokster lite", "grokster download", "grokster light", and "clean grokster". (Ex. 82 at GOOG 009, 016, 031, 032, 035, 093; Ex. 102 at GOOG 147, 148.)**

**Defendants' Response:**

*Disputed. First, Exhibit 82 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not have an account with Google.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Nor do they dispute Exhibit 102, which alone provides sufficient support for the proposition that Lime Group bid on the words "grokster", "grokster lite", "grokster light", and "clean grokster". Defendants dispute the admissibility of Exhibit 82, which is, in fact, admissible.  (*See* Attach. A at Ex. 82; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Defendants also dispute that Lime Group had an account with Google, but fail to cite any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**199.    Advertisements written by Lime Group and displayed to Google users promoted the LimeWire client as superior to Grokster. (See Randell Tr. 45:10-46:3.) For example:**

**a.    "Sick of Grokster spyware? Try LimeWire Pro . . ." (Ex. 102 at GOOG**

**b.    "Grokster Vs. LimeWire Pro. CNet recommends LimeWire over Grokster . . ." (Ex. 82 at GOOG 031, 035.)**

**Defendants' Response:**

*Disputed. First, Exhibits 82 and 102 are inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not write these advertisements. See response ¶ 198 supra.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  *First*, defendants dispute the admissibility of Exhibits 82 and 102, which are, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Exs. 82, 102; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, defendants dispute that Lime Group wrote the advertisements, but fail to cite any admissible evidence in support.  (*See* note 5.) Thus, this statement must be deemed undisputed.

**200.    Lime Group bid on Google AdWords for keywords related to Morpheus, including: "morpheus", "morpheus kazaa", "new morpheus", "morphues", "morpheus lite", "morpheus 2.0", "morpheus 2", "morpheus file sharing", "www morpheus", "morpheus ultra", "morpheus gnutella", "morpheus file sharing", "morpheus file share", "morpheus downloads", "morpheus de", "morpheus corn", "morpeus", "mrpheus", "morphus", "morphius", "morphes", "morpheous", "morpheos", and "morhpeus". (Ex. 82 at GOOG 041, 073, 098; Ex. 102 at GOOG 125, 126, 157.)**

**Defendants' Response:**

*Disputed. First, Exhibits 82 and 102 are inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not bid on these keywords. See response ¶ 198 supra.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Defendants dispute the admissibility of Exhibits 82 and 102, which are, in fact, admissible.  (*See* Attach. A. at Exs. 82, 102; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Defendants also dispute that Lime Group bid on these keywords, but fail to cite to admissible evidence in support.  (*See* note 5.)  Defendants cite to their response to ¶ 198, but that response likewise does not cite to any admissible evidence in support of their proposition.  (*See* note 5; *see also* Defs. Resp. ¶ 198.)  Thus, this statement must be deemed undisputed.

201.  **Advertisements written by Lime Group and displayed to Google users promoted the LimeWire client as superior to Morpheus. For example, "Disappointed by Morpheus? Try LimeWire Pro . . .". (Ex. 102 at GOOG 125.)**

**Defendants' Response:**

*Disputed. First, Exhibit 102 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not write these advertisements. See response to ¶ 198 supra.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  *First*, defendants dispute the admissibility of Exhibit 102, which is in, fact, admissible.  (*See* Attach. A at Ex. 102; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Defendants also dispute that Lime Group wrote these advertisements, but fail to cite to any admissible evidence in support.  (*See* note 5.)  Defendants also cite to their response ¶ 198, but likewise do not cite any admissible evidence in support.  (*See* note 5; *see also* Defs. Resp. ¶ 198.)  Thus, this statement must be deemed undisputed.

202.  **Lime Group also had an advertising account with Yahoo! Search Marketing, with Greg Bildson as the account owner. (Ex. 103 at YAHOO 006.)**

**Defendants' Response:**

*Disputed. First, Exhibit 103 is inadmissible. See Defendants' Motion to Strike. Second, even if Exhibit 103 is ruled admissible, Lime Group did not have an account with Yahoo! See Ex. 103.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibit 103, which is, in fact, admissible.  (*See* Attach. A at Ex. 103.)  *Second*, defendants dispute that Lime Group had an account with Yahoo!, but fail to cite to admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

203. **Lime Group bid on the keyword "morpheus" as part of its advertisement campaign with the search engine Yahoo!. (Ex. 103 at YAHOO 011-012.)**

**Defendants' Response:**

*Disputed. First, Exhibit 103 is inadmissible. See Defendants' Motion to Strike. Second, even if Exhibit 103 is ruled admissible, Lime Group did not have an account with Yahoo! nor did it bid on any keywords. Third, this document also reflects that Lime Wire bid on words like "mac p2p sharing", "mac pc sharing", "p2p", "file sharing", "gnutella" and "photo sharing".*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. *First*, defendants dispute the admissibility of Exhibit 103, which is, in fact, admissible. (*See* Attach. A at Ex. 103.) *Second*, defendants dispute that Lime Group had an account with Yahoo! or bid on keywords, but fail to cite to admissible evidence in support. (*See* note 5.) Thus, this statement must be deemed undisputed.

204. **A 2002 email sent to Yahoo! in the name of "Lime Wire LLC" states: "Hello, I'm not sure I understand why our bid for the keyword 'M 'Morpheus' was declined on the grounds that it is the primary domain for another company, but over a dozen other (possibly less useful) sites have been approved for this listing. The Morpheus software offers similar services to us, but differs in features and interface. Many users prefer our program to Morpheus after trying it. Additionally, we offer versions of our program to Mac and Linux users who may be searching for a Mac/Linux compatible version of Morpheus which does not exist. These searchers may find our software valuable. We think that our ad provides useful information to Morpheus searchers. Many Morpheus searchers are unfamiliar with our software but find it much to there [sic] liking after using it. I hope you will consider approving Morpheus as a keyword for our Lime Wire Pro listing. Thank you". (Ex. 103 at 9.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 103. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute only the admissibility of Exhibit 103, which is, in fact, admissible. (*See* Attach. A at Ex. 103.) Thus, this statement must be deemed undisputed.

205. **Lime Wire drafted advertising language using Morpheus users' migration to LimeWire as a selling point, stating: "Join millions of Morpheus users and download the best P2P file sharing application for free. Free music downloads, video, games, movies, media player and . . .". (Ex. 104.)**

**Defendants' Response:**

*Disputed as to the intent of the scrivener of this document, i.e., to migrate Morpheus users. The document speaks for itself, and there is no evidence that the author used Morpheus users' migration as a selling point. Ex. 104.*

**Plaintiffs' Reply:**

"The document speaks for itself" is an improper response to the statement, and should be stricken and disregarded.  The words "using Morpheus users' migration to Lime Wire as a selling point" are not material or central to the point of the statement, and plaintiffs hereby strike them from the statement.  Thus, this statement must be deemed undisputed.

206.   **LimeWire promoted itself on its website with the slogan "Outperforms Morpheus!". (Ex. 105; Ex. 106.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 105. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute Exhibit 106, which alone provides sufficient support for the statement. Defendants dispute only the admissibility of Exhibit 105, which is, in fact, admissible. (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 105.)  Moreover, defendants do not dispute the admissibility of Exhibit 105 in their Pre-2003/*Grokster* objections.  (*See* Defs. Pre-2003/*Grokster* Br. at Exs. A, B.)  Thus, this statement must be deemed undisputed.

207.   **Lime Group created a Google Ad Group devoted entirely to Kazaa, in which Lime Group bid up to fifty cents per click on each of more than eighty AdWords (including several in Spanish) related to Kazaa: "www kazaa", "uninstall kazaa", "speed up kazaa", "remove kazaa", "programa kazaa", "participation level kazaa", "my kazaa", "morpheus kazaa", "linux kazaa", "like kazaa", "kazaa without", "kazaa version", "kazaa v2", "kazaa spy", "kazaa speedup", "kazaa speed up", "kazaa speed", "kazaa software", "kazaa skins", "kazaa skin", "kazaa security", "kazaa search", "kazaa problems", "kazaa preview", "kazaa ports", "kazaa port", "kazaa participation level", "kazaa participation hack", "kazaa participation", "kazaa p2p", "kazaa no", "kazaa news", "kazaa music downloads", "kazaa music download", "kazaa music", "kazaa mp3", "kazaa media desktop download", "kazaa media", "kazaa macintosh", "kazaa mac", "kazaa title", "kazaa lite v2", "kazaa lite skins", "kazaa lite participation", "kazaa lite free download", "kazaa lite free", "kazaa lite espanol", "kazaa lite downloads", "kazaa lite download", "kazaa lite com", "kazaa lit", "kazaa light download", "kazaa light", "kazaa k++", "kazaa help", "kazaa gratis", "kazaa gold", "kazaa free download", "kazaa for macintosh", "kazaa for**

mac", "kazaa for linux", "kazaa en espanol", "Kazaa download", "kazaa download", "kazaa donload", "kazaa desktop", "kazaa com", "kazaa client", "kazaa", "Kazaa", "Kaza mp3", "free download kazaa", "el kazaa", "downloads kazaa", "download kazaa media desktop", "download kazaa media", "download kazaa lite", "download kazaa light", "donload kazaa", "download kazaa", "descargar kazaa en espanol", "descargar kazaa", "descargar el kazaa", "descarga de kazaa", "clean kazaa", "block kazaa", "bajar kazaa", "bajar el kazaa", and 21 deleted keywords. (Ex. 82 at GOOG 041-045.)

**Defendants' Response:**

*Disputed. First, Exhibit 82 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group had no involvement with any Google AdWords campaign.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. *First*, defendants dispute the admissibility of Exhibit 82, which is, in fact, admissible. (*See* Attach. A at Ex. 82; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) *Second*, defendants dispute that Lime Group had involvement with "any Google AdWords campaign", but fail to cite to any admissible evidence in support. (*See* note 5.) Thus, this statement must be deemed undisputed.

208. **The advertisement that Lime Group intended to appear if any of the Ad Words listed above (see supra ¶ 207) were entered into a query was "Faster than Kazaa Want downloads that are faster than Kazaa? Get LimeWire Pro". (Ex. 82 at GOOG 041.)**

**Defendants' Response:**

*Disputed. First, Exhibit 82 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group had no involvement with any Google AdWords campaign, nor is there any evidence that a Lime Wire employee wrote this ad.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. *First*, defendants dispute the admissibility of Exhibit 82, which is, in fact, admissible. (*See* Attach. A at Ex. 82; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) *Second*, defendants dispute that Lime Group had involvement with "any Google AdWords campaign" or that "a Lime Wire employee wrote this ad", but fail to cite to any admissible evidence in support. (*See* note 5.) Thus, this statement must be deemed undisputed.

209. **Additional advertisements written by Lime Group and displayed to Google users promoted the LimeWire client as superior to Kazaa. For example:**

a.  **"*Kazaa to LimeWire Pro*" (Ex. 82 at GOOG 027.)**

**<u>Defendants' Response:</u>**

*Disputed. First, Exhibit 82 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not write any advertisements. Third, there is no admissible evidence that a Lime Wire employee wrote this ad or that these ads were in fact displayed to Google users.*

**<u>Plaintiffs' Reply:</u>**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibit 82, which is, in fact, admissible. (*See* Attach. A at Ex. 82; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, defendants dispute that Lime Group wrote any advertisements, but fail to cite to any admissible evidence in support. (*See* note 5.)  *Third*, that the ads were developed, whether or not they were in fact displayed to Google users, "illuminate[s] [Lime Wire LLC's] purposes". See *Grokster*, 545 U.S. at 925 n.7.  *Fourth*, whether the advertisements were actually displayed is not relevant to the issue of intent or purpose. *See id.*  Thus, this statement must be deemed undisputed.

b.  **"*Tired of Kazaa spyware*? Try LimeWirePro. Tech support. No ads. No spyware" (Ex. 82 at GOOG 066.)**

**<u>Defendants' Response:</u>**

*Disputed. First, Exhibit 82 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not write any advertisements. Third, there is no admissible evidence that a Lime Wire employee wrote this ad or that these ads were in fact displayed to Google users.*

**<u>Plaintiffs' Reply:</u>**

Defendants dispute this statement on the same basis as ¶ 209.a.  (*See* Pls. Reply ¶ 209.a.) This statement must be deemed undisputed.

c.  **"*Lime Wire Pro en Francais*. Si vous utilisez Kazaa, obtenez LimeWire Pro" (Ex. 82 at GOOG 089.)**

**<u>Defendants' Response:</u>**

*Disputed. First, Exhibit 82 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not write any advertisements. Third, there is no admissible evidence that a Lime Wire employee wrote this ad or that these ads were in fact displayed to Google users.*

**Plaintiffs' Reply:**

Defendants dispute this statement on the same basis as ¶ 209.a.  (*See* Pls. Reply ¶ 209.a.) This statement must be deemed undisputed.

**d.     "*Can't find Kazaa Mac?* Try LimeWire Pro . . ." (Ex. 102 at GOOG 140.)**

**Defendants' Response:**

*Disputed. First, Exhibit 102 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not write any advertisements. Third, there is no admissible evidence that a Lime Wire employee wrote this ad or that these ads were in fact displayed to Google users.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibit 102, which is, in fact, admissible.  (*See* Attach. A at Ex. 102; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, defendants dispute that Lime Group wrote any advertisements, but fail to cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**e.     "Lime Wire Pro $9.50 Tired of KaZaA Ads and Spyware? LimeWire Pro. No ads. No spyware" (Ex. 102 at GOOG 159.)**

**Defendants' Response:**

*Disputed. First, Exhibit 102 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Group did not write any advertisements. Third, there is no admissible evidence that a Lime Wire employee wrote this ad or that these ads were in fact displayed to Google users.*

**Plaintiffs' Reply:**

Defendants dispute this statement on the same basis as ¶ 209.a.  (*See* Pls. Reply ¶ 209.a.) This statement must be deemed undisputed.

**210.   Lime Wire posted the banner "Faster than Kazaa and No Bundled Software" in large letters at the top of the homepage and numerous other pages of LimeWire's official website (Ex. 107; see also Ex. 113) and included promotions of the LimeWire client on its website comparing it to Kazaa. (Ex. 109; Ex. 108 at LW DE 1288249; Ex. 110.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 107 and 110. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute Exhibits 108, 109 or 113, which provide sufficient support for the statement.  Defendants object only to the admissibility of Exhibits 107 and 110, which are, in fact, admissible.  (*See* Attach. A at Exs. 107, 110.)  Thus, this statement must be deemed undisputed.

> **211.** **Lime Wire advertised "[a]utomatic local network searches for lightning-fast downloads" on LimeWire's website; the same web page advertised LimeWire as "faster than Kazaa". (Ex. 109.)**

**Defendants' Response:**

*Disputed. There is no evidence to establish that this advertisement ever appeared on Lime Wire's website. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  The remainder of defendants' response is argumentative and conclusory.  (*See* notes 6, 8.)  Further, it does not cite to any admissible evidence in support.  (*See* note 5.)  That this advertisement was developed, whether it ever appeared on Lime Wire's website, "illuminate[s] [Lime Wire LLC's] purposes".  *See Grokster,* 545 U.S. at 925 n.7.  Furthermore, whether this advertisement appeared on Lime Wire's website is not relevant to the issue of intent or purpose.  *See id.*  Thus, this statement must be deemed undisputed.

> **212.** **In November 2004, a Lime Wire employee suggested that certain changes be made to the LimeWire webpage, including that the word "Downloads" in LimeWire's "Faster Downloads than Kazaa" slogan be in lower case. Bildson responded: "Careful! That list is our bread and butter". He directed the employee to "maintain the [capital] 'D' [in Downloads] to emphasize the whole phrase. That is our main slogan in some sense." (Ex. 111; see also Ex. 112; Ex. 113.)**

**Defendants' Response:**

*Disputed to the extent it implies that Bildson was honestly concerned about that suggestion. A closer look at the entire quote from Exhibit 111 shows that Bildson was just kidding ("careful. . . the last set of changes to that list increased our sales by a factor of 3."). Ex. 111.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  The remainder of defendants' response is argumentative.  (*See* note 6.)  In fact, nothing in Exhibit 111 indicates that Bildson was "just kidding" about the central point of the

statement, namely that "Faster Downloads than Kazaa" was LimeWire's slogan and that it was a profitable one for Lime Wire LLC. Thus, this statement must be deemed undisputed.

**213.    In May 2004, Lime Wire touted LimeWire as "[s]imilar to the popular Kazaa, it [LimeWire] enables the sharing, searching and downloading of MP3 files". (Ex. 114; see also, e.g., Ex. 115 at 16:12-25; Ex. 116 at LW DE 382592-93.)**

**Defendants' Response:**

*Disputed. First, Exhibit 114 is inadmissible. See Defendants' Motion to Strike. Second, there is no admissible evidence that Lime Wire "touted" or made these statements to the general public. Moreover, Exhibit 115 is wholly inadmissible (see Defendants' Motion to Strike) and as to Exhibit 116, again there is no evidence that these statements were ever released outside of Lime Wire or that a Lime Wire employee drafted the statements. Finally, there is nothing inherently wrong or illegal with promoting the fact that LimeWire can be used to share mp3 files.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. *First*, defendants dispute the admissibility of Exhibits 114 and 115, which are, in fact, admissible. (*See* Attach. A at Exs. 114, 115.) *Second*, whether the statements were ever released is not relevant to the issue of intent or purpose. *See Grokster*, 545 U.S. at 925 n.7. The fact that Lime Wire *made* this statement, whether or not it was ever released to the public, "illuminate[s] [Lime Wire LLC's] purposes". *See id. Third*, the last sentence of defendants' response is argumentative and conclusory. (*See* notes 6, 8.) Moreover, it ignores the fact that mp3 files are overwhelmingly copyrighted. *See Grokster*, 545 U.S. at 922-23. Thus, this statement must be deemed undisputed.

**214.    In a December 2004 email to a reporter at the *Wall Street Journal*, Bildson promoted LimeWire's searches as "more powerful than Kazaa's in some ways". (Ex. 117 at LW DE 1275408.)**

**Defendants' Response:**

*Undisputed. However, Bildson also promoted how Lime Wire has certain positive features over BitTorrent, a legal file-sharing service. Ex. 117 at LW DE 1275408.*

**Plaintiffs' Reply:**

This statement is undisputed. The remainder of defendants' response is irrelevant and immaterial, and does not alter the central point of this statement. Moreover, it is argumentative. (*See* note 6.)

215.   An article maintained in Lime Wire's files, in which Bildson was interviewed, states "Lime Wire says its latest release- v. 4.0 . . . will outKazaa Kazaa". (Ex. 118.)

**Defendants' Response:**

*Undisputed. This is an article that appeared in May 2004, well before Kazaa settled with the Plaintiffs and again, well before the Grokster opinion.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is irrelevant and immaterial, and does not alter the central point of the statement -- namely that Lime Wire LLC was comparing the LimeWire software to Kazaa.  Moreover, defendants' response is argumentative.  (*See* note 6.)  In any event, the *Grokster* case began in October 2001 and was ongoing in 2004.

216.   As of February 19, 2008, the French LimeWire website included a user testimonial that translates to "Kazaa move over" or "Kazaa make room". (Ex. 119; see Catillaz Tr. 162:13-163:10, 164:7-165:2 (translating relevant portions of Ex. 119 from French into English).)

**Defendants' Response:**

*Disputed. First, Exhibit 119 is inadmissible. See Defendants' Motion to Strike. Second, there is no summary judgment evidence in the record that establishes that Exhibit 119 was from the official French LimeWire website.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibit 119, which is, in fact, admissible.  (*See* Attach. A at Ex. 119.)  *Second*, defendants dispute that Exhibit 119 was from the official French LimeWire website.  Catillaz, however, identified Exhibit 119 as being from the website.  (*See* Catillaz Tr. 161:24-162:6.)  Thus, this statement must be deemed undisputed.

- **Lime Wire Viewed *Grokster*, Morpheus and Kazaa as Competitors**

217.   Bildson stated in a December 17, 2001 email to Jennifer Watkins of CNET (Download.com): "We are close to rolling out the most important release to date of LimeWire as version 2.0. This version brings Ultrapeers and swarm downloads to the Gnutella network. We believe that it will work better than the whole FastTrack family of Kazaa, Morpheus, etc, once it is fully rolled out. Even in our extended beta testing, it has been a hit with users." (Ex. 120.)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 120. See Defendants' Settlement/ re-August 2003 Objections. If the document is admitted into evidence, the document reflects that Bildson was most interested in getting a spotlight on Download.com's Mac, PC and Linux sections (and not the Audio downloads section). Ex. 120.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants only dispute the admissibility of Exhibit 120, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) The remainder of defendants' response is argumentative. (*See* note 6.) Thus, this statement must be deemed undisputed.

**218.   A Lime Wire press release dated March 6, 2002 was entitled: "LimeWire Sees Usage Surge as Morpheus Falters". (Ex. 121; *see also* Ex. 122.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 121 and 122. See Defendants' Settlement/Pre-August 2003 Objections. And even if the documents are admitted into evidence, Defendants wish to point out that the usage surge was apparently due to technical difficulties at Morpheus, not because of anything Lime Wire did.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibits 121 and 122, which are, in fact, admissible. (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 122; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) The remainder of defendants' response is argumentative and conclusory. (*See* notes 6, 8.) Further, defendants do not cite to any admissible evidence in support. (*See* note 5.) Thus, this statement must be deemed undisputed.

**219.   In a March 27, 2002 letter to investors, Gorton observed that "[t]he main reason for the relatively slow growth [of LimeWire] has been the superior functionality of several competing file sharing networks, primarily the FastTrack network (now Kazaa and Grokster) and AudioGalaxy. The bulk of the Napster users migrated to these two networks". (See, e.g., Ex. 123; Ex. 124.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 123 and 124. See Defendants' Settlement/Pre-August 2003 Objections. And even if the documents are admitted into evidence, Defendants wish to point out that the documents actually prove that Lime Wire never sought to migrate Napster users. Ex. 123; Ex. 124.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibit 123 and 124, which are, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) The remainder of defendants' response is inaccurate as the documents do not "prove" what defendants claim they do. Moreover, it is argumentative. (*See* note 6.) Thus, this statement must be deemed undisputed.

220. **At the end of 2002, Bildson stated that LimeWire hit its then-peak of 330,000 daily users when "Morpheus was cut off Fast Track . . .". (Ex. 37.) [Undisputed]**

221. **A draft Lime Wire press release announced that "LimeWire 4.0 was the most downloaded file sharing software for the week ending May 23, [2004] according to Download.com" and noted that LimeWire outperformed "rival[s]" Morpheus, *Grokster,* and iMesh in that regard. (Ex. 125.)**

**Defendants' Response:**

*Undisputed. But "outperforming" Morpheus or other P2P clients is not evidence Lime Wire was seeking known infringers. Moreover, the Gnutella P2P architecture of both Morpheus and Grokster has never been declared illegal.*

**Plaintiffs' Reply:**

This statement is undisputed. The remainder of defendants' response is argumentative and conclusory (*see* notes 6, 8) and does not cite to any admissible evidence in support of the proposition. (*See* note 5.) Further, the last sentence of defendants' response is immaterial and irrelevant. Thus, this statement must be deemed undisputed.

222. **A Lime Wire press release dated February 4, 2005 and entitled "LimeWire Is the Leading File Sharing Program on <u>Download.com</u>" notes that LimeWire version 4.2 is leading "rival Morpheus" in downloads on <u>download. com</u>. (Ex. 126)**

**Defendants' Response:**

*Undisputed. But "outperforming" Morpheus or other P2P clients is not evidence Lime Wire was somehow seeking known infringers. Moreover, the Gnutella P2P architecture of Morpheus and Grokster has never been declared illegal.*

**Plaintiffs' Reply:**

This statement is undisputed. The remainder of defendants' response should be disregarded as it is argumentative. (*See* note 6; *see also* Pls. Reply ¶ 221.)

223. **Lime Wire set up automated news tracking of Morpheus. (Ex. 127.) [Undisputed]**

224. **Bildson wrote that "until we catch up to Kazaa -- no inventing". (Ex. 128; Bildson Tr. 850:18-851:2.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 128. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibit 128, which is, in fact, admissible. (*See* Attach. A at Ex. 128.) Thus, this statement must be deemed undisputed.

225. **Lime Wire set up automated news tracking of Kazaa. (Ex. 129 (email from "Google Alerts" for keyword "Kazaa"); Ex. 130 (same).)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 129 and 130. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibits 129 and 130, which are, in fact, admissible. (*See* Attach. A at Exs. 129, 130.) Thus, this statement must be deemed undisputed.

226. **A March 23, 2005 email from Bildson to a reporter at the *Cornell Daily Sun* stated: "The network architecture that LimeWire uses is now more advanced than Kazaa and other clients. We have worked for 5 years to improve the Gnutella protocol and give it state-of-the-art features." (Ex. 131.)**

**Defendants' Response:**

*Undisputed. But "outperforming" Morpheus or other P2P clients is not evidence Lime Wire was somehow seeking known infringers. Moreover, the Gnutella P2P architecture of Morpheus and Grokster has never been declared illegal.*

**Plaintiffs' Reply:**

This statement is undisputed. The remainder of defendants' response should be disregarded. (*See* note 6; *see also* Pls. Reply ¶ 221.)

227. **In March 2005, Lime Wire commissioned a study of P2P software available through *download.com*, including Kazaa and Morpheus, and published a press release criticizing Kazaa, Morpheus and others for having "bundled software". (Ex. 132, Ex. 133.)**

**Defendants' Response:**

*Disputed. First, Exhibit 133 is inadmissible. See Defendants' Motion to Strike. Second, there is no evidence that Lime Wire "commissioned" this study. In addition, "outperforming" Morpheus or other P2P clients is not evidence Lime Wire was somehow seeking known infringers. Moreover, the Gnutella P2P architecture of Morpheus and Grokster has never been declared illegal.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibit 133, which is, in fact, admissible.  (*See* Attach. A at Ex. 133.)  *Second*, defendants paid for the study to be conducted, and publicized its release.  (*See* Ex. 469.)  Further, the remainder of defendants' response is argumentative and conclusory (*see* notes 6, 8) and is unsupported by citations to admissible evidence.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

228.    **In June 2005, Gorton wrote: "After Napster got shut down, Kazaa became the most popular program. We [LimeWire] are now more popular than Kazaa." (Ex. 101.) [Undisputed]**

229.    **In a June 19, 2006 email, Bildson expressed concern that LimeWire had "fallen below Morpheus" on <u>download.com</u>. (Ex. 134.)**

**Defendants' Response:**

*Disputed as to whether Bildson was truly "concerned." This is an improper inference.*

**Plaintiffs' Reply:**

Defendants dispute only the word "concerned" in this statement.  The word "concerned" is not material or central to the point of the statement, and plaintiffs hereby strike the word "concerned" from the statement and substitute the word "said".  Thus, this statement must be deemed undisputed.

B.    **<u>Lime Wire Positioned and Promoted Itself As a Participant in Music Distribution</u>**

230.    **Since February 2001, <u>download.com</u> has categorized LimeWire under "audio" or "audio and video" software. (Ex. 135, Ex. 136.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 135 and 136. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibits 135 and 136. Defendants cite to their Motion to Strike for the grounds on which they dispute these document, but in fact, they dispute them in their Pre-2003/*Grokster* Motion. In any event, these exhibits are, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Thus, this statement must be deemed undisputed.

**231.  On March 20, 2001, when registering LimeWire on CNET's download.com, Lime Wire chose the keyword "mp3". It did not choose keywords related to any file types other than "mp3". (Ex. 137 at JB 0152.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 137. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. And even if this exhibit is admitted into evidence, the testimony from the CNET witness that was deposed reflects that CNET customers do not select the keywords. See S. Brook Tr. 23:10 – 24: 10.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibit 137, which is, in fact, admissible. (*See* Attach. A at Ex. 137; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Thus, this statement must be deemed undisputed.

**232.  In March 2001, J.K. Barret emailed Lime Wire employees, as well as Mark Gorton, asking that if they "find any places where BearShare et al is listed and we're not, let me know, and I will get them resolved" to which Adam Fisk responded, "I noticed BearShare is listed on the first page under 'Mp3 and Audio' and we are not . . .". (Ex. 138.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 138. See Defendants' Settlement/Pre-August 2003 Objections. Moreover, even if this document is admitted into evidence, this is not proof that Lime Wire promoted itself as a "participant in music distribution." Download.com's category says nothing about music distribution; instead, it lists software one can download related to audio or video.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibit 138, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) The remainder of defendants' response is argumentative and conclusory (*see* notes 6, 8), and is unsupported by citations to admissible evidence. (*See* note 5.) Thus, the statement must be deemed undisputed.

**233. On March 22, 2001, Bildson wrote to Gorton and Lime Wire employees suggesting that he could facilitate Lime Wire's sponsoring of a "music event" in response to Gorton's email addressing Lime Wire's public relations campaign. (Ex. 139.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 139. See Defendants' Settlement/Pre-August 2003 Objections. Even if the document is admitted into evidence, Defendants wish to point out that in this same document it shows that Lime Wire sought to promote the use of its software by independent music groups, such as the IMG of New Jersey. See Ex. 139 at JB0183 (reflecting that Bildson thought that the "best" answer to lack of downloads was to* <u>build the best software and to do features/ideas that appeal to the media</u>*). Notably, there is no word of trying to attract Napster users. Id.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute the admissibility of Exhibit 139, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Moreover, defendants themselves have proffered Exhibit 139 as their own Exhibit 25 and so have waived any objection to this document. (*See* Baker 9/26/08 Decl. ¶ 27.) The remainder of defendants' response is immaterial and argumentative. (*See* note 6.) The central point of this statement is not that Lime Wire LLC was trying to attract Napster users, but rather that Lime Wire LLC was positioning itself as a participant in music distribution. Thus, this statement must be deemed undisputed.

**234. Lime Group bid on Google AdWords (including several in French, Spanish, Portuguese and German) related to downloading music, including: "music macintosh", "music mac", "mp3 download macintosh", "mp3 download mac", "macintosh mp3", "mac music sharing", "mac mp3", "mp3s mac", "mp3 macs", "mp3 macintosh", "mp3 mac", "music sharing", "mp3 sharing", "linux mp3 download", "p2p music", "p2p mp3s", "p2p mp3", "p2p audio", "songs", "song", "mp3s", "play sounds", "play mp3s", "mp3 player", "mp3 decoder", "mp3 burner", "itunes", "itune", "i tunes", "i tune", "digital music", "musica motores de busca", "musica compatilhar de lima", "compartilhar da lima mp3", "compartilhadores de Arquivos mp3", "mp3s search", "mp3s find", "mp3 software download", "mp3 free download", "mp3 client", "free mp3s download", "download mp3s", "téléchargements mp3", "téléchargement mac mp3", "téléchargement linux mp3", "musique de téléchargement", "mp3 remplacement téléchargements", "francais téléchargement mp3", "download partage de dossier mp3", "download musique téléchargement", "fernladenakte mac mp3", "fernladen linux mp3", "sea of sound music", "sea of sound mp3", "mp3 downloads ", "free mp3 downloads", "free mp3 download", "intercambiar archivos mp3", "descargar musica", "descargar mp3", "descargar mac music", "descargar mac mp3", "descargar linux music", "descargar linux mp3", "descarga**

mp3", "descarga mac musica", "descarga mac mp3", "descarga linux musica", "descarga linux mp3", "descarga de musica", "bajar musica", "bajar mp3", "bajar mac music", "bajar mac mp3", "bajar linux music", "bajar linux mp3", "baja mp3", "baja mac musica", "baja mac mp3", "baja linux musica", "baja linux mp3", "baja de musica", "musica motores de busca", "musica compartillhar da lima", "motores de busca mp3", "compartillhar da lima mp3", "compartillhadores de Arquivos mp3", "free music files", "free MP3s", "free MP3", "telecargement mac mp3", "télécargement linux mp3", "mp3 remplacement telechargements", "Francais téléchargement mp3", "download partage de dossier", "download musique telechargement", "music mac", "mac music sharing", "mp3s macs", "mp3s macintosh", "macintosh audio", "mp3s sharing", "mp3 sharing", "mp3 share", "mp3 network", "mp3 files", "mp3 down load", "linux mp3s", "linux mp3", "gnutella mp3", "mp3s search", "mp3 software", "mp3 site", "mp3 free", "mp3 finder", "mp3 client", "free mp3 download", "download mp3s", "download mp3", "mp3 german", "mp3 downloaden", "mp3 download", "mp3", "file mac mp3 sharing", "file mac music sharing", "mp3 sharing", and "mp3 share".  (Ex. 82 at GOOG 006, 007, 009, 010, 016, 019, 021, 024, 029, 031, 037, 039, 042, 044, 046, 047, 048, 049, 050, 053, 055, 057, 058, 062, 064, 067, 069, 070, 071, 072, 075, 076, 078, 084, 086, 089, 090, 093, 094, 095; Ex. 102 at GOOG 127, 128, 136, 137, 141, 142, 144, 145, 163.)

**Defendants' Response:**

*Disputed. First, Exhibit 82 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, there is no evidence Lime Group bid on these keywords.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute Exhibit 102, which provides sufficient support for the fact that Lime Group bid on over 30 of the words listed in ¶ 234.  (*See* Ex. 102.)  Defendants dispute the admissibility of Exhibit 82, which is, in fact, admissible.  (*See* Attach. A at Ex. 82; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  The remainder of defendants' response is argumentative and conclusory (*see* notes 6, 8), and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

235.    **Advertisements written by Lime Group and displayed to Google users promoted LimeWire for downloading music and media files.  For example:**

a.    **"LimeWire Pro for Linux.  Get media downloads for Linux . . .".  (Ex. 82 at GOOG 016);**

b.    **"P2P with LimeWire Pro.  Download your favorite audio and video files from Gnutella"  (Ex. 82 at GOOG 018, GOOG 020);**

c.   **"P2P Download LimeWire Pro.  Download songs and video files from Gnutella"  (Ex. 82 at GOOG 024);**

d.   **"Find many different songs and lyrics files through Gnutella"  (Ex. 82 at GOOG 037); and**

e.   **"Get Songs:  LimeWire Pro. Download your favorite audio and video files from Gnutella." (Ex. 82 at GOOG 046.)**

**Defendants' Response:**

*Disputed. First, Exhibit 82 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, there is no evidence that Lime Group or Lime Wire wrote these ads, nor is there any evidence that these ads were in fact ever displayed. In any event, through Magnet Mix, Lime Wire has been in this business of music distribution for years.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibit 82, which is, in fact, admissible.  (*See* Attach. A at Ex. 82; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, defendants dispute that Lime Group or Lime Wire wrote these ads or that they were ever displayed, but do not cite to any admissible evidence in support.  (*See* note 5.)  Moreover, whether the ads were ever in fact displayed is not relevant to the issue of intent or purpose.  *See Grokster,* 545 U.S. at 925 n.7.  Further, MagnetMix is not LimeWire.  MagnetMix is a website released in 2003 that allowed "a magnet enabled Gnutella client *like* LimeWire" to download content.  (Ex. 310 (emphasis added); Catillaz (Vol. VI) Tr. 216:3-12.)  "When a user clicks on a link to a file (called magnets) on MagnetMix, a P2P client *like* LimeWire downloads the file instantly."  (Ex. 40 (emphasis added).)  In any event, Lime Wire LLC employee Faaborg testified that on March 27, 2006, "Mark [Gorton]" requested that the MagnetMix button be "[r]emove[d]" from the LimeWire client.  (*See* Ex. 311 at LW DE 1908724; Faaborg (Vol. VI) Tr. 145:9-146:12.)  Thus, this statement must be deemed undisputed.

**236.**   **Lime Group bid on the keywords "file mac music sharing", "file mac MP3 sharing", "mp3 sharing", and "mp3 share".  (Ex. 103 at Yahoo 007, 010, 011, 012, 014.)**

**Defendants' Response:**

*Disputed. First, Exhibit 103 is inadmissible. See Defendants' Motion to Strike. Second, even if Exhibit 103 is ruled admissible, Lime Group did not bid on these keywords.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibit 103, which is, in fact, admissible.  (*See*

95

Attach. A at Ex. 103.)  *Second*, defendants dispute that Lime Group bid on these keywords, but do not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**237.    In November 2003 Lime Wire wrote a document listing "[u]rls to pop the LimeWire ad" that included: www.napster.com/download.html, http://www.apple.com/itunes/download/, www.bearshare.com, http://www.morpheus.com/, http://www.kazaa.com/us/products/downloadKMD.htm, www.buymusic.com, http://www.musicmatch.com/, http://www.musicmatch.com/download/music intro.htm, www.grokster.com and other various media sites.  (Ex. 141.)**

**Defendants' Response:**

*Undisputed that someone wrote this document and that it came from Lime Wire's files. However, there is no evidence this ever occurred i.e., that these urls were ever used or that a Lime Wire employee authored this document.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is argumentative and conclusory.  (*See* notes 6, 8.)  That these urls were listed "to pop the LimeWire ad", whether they were actually ever used, "illuminate[s] [Lime Wire LLC's] purposes".  *See Grokster,* 545 U.S. at 925 n.7.

**238.    Adam Harris, Lime Wire Business Developer in 2003-2004, testified that he did not recall ever writing a press release or a blurb about LimeWire that did not start with the statement that LimeWire enables the sharing, searching and downloading of MP3 files.  (Harris Tr. 108:14-24.)**

**Defendants' Response:**

*Disputed. First, the cited portions of the Harris Transcript are inadmissible. See Defendants' Motion to Strike. Second, even if the cited portions are ruled admissible, Mr. Harris testified that when he first answered this question, he was confused because it contained double- negatives, and that what he meant to say was that he could not recall one way or another. Harris Tr. 248:11 – 252:10. In any event, through Magnet Mix, Lime Wire has been in this business of music distribution for years.*

**Plaintiffs' Reply:**

*First*, defendants dispute the admissibility of the Harris transcript, which is, in fact, admissible.  (*See* Attach. B at 4.)  *Second*, the portion of the Harris transcript cited by defendants does not contradict the statement.  *Third*, defendants' final sentence is immaterial and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

239. **In 2003, Lime Wire sponsored a survey of 10,771 active LimeWire users as to their preferences with respect to downloading songs online ("survey"). (Ex. 142; Ex. 143; Ex. 144; Ex. 145.)** [Undisputed]

240. **In a November 24, 2003 press release, Lime Wire reported that its survey showed that fewer than 10% of LimeWire's users were willing to pay the price charged by iTunes and Napster to download music legally. (Ex. 143.)** [Undisputed]

241. **A November 2003 Lime Wire document states "Objective: Infiltrate College Markets to increase network size."  The document then asks, "Why This Works?" and lists as answers:  "1.  College students have high speed internet access", "2.  College students are often seen as the trend setters in file sharing", "3.  getting in Student's [sic] faces is important to getting them to use the product", and "4.  Students are cheap and poor" (emphasis added).  The document proposes to "[s]elect a University in Boston to take advantage of the large college aged community" and to "[g]ive [campus] representative[s] give away cds to distribute to friends in the hopes of making LimeWire viral on campus".  (Ex. 146 (emphasis added).)**

**Defendants' Response:**

*Undisputed.  However, it should be noted that there is no evidence that this ever occurred.  Moreover, the inference that college students were more than likely to download music for free because they are "cheap and poor" is improper (all inferences are to be construed in Lime Wire's favor at this stage as the non-movant).*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is argumentative and conclusory.  (*See* notes 6, 8.)  That Lime Wire LLC developed this proposal, whether it was actually followed through on, "illuminate[s] [Lime Wire LLC's] purposes".  *See Grokster,* 545 U.S. at 925 n.7.  Further, there is no "inference" in this statement of fact.

242. **In a January 15, 2004 New York Post article, Bildson is quoted as responding to Tower Records representatives who had approached Lime Wire to purchase the record store, stating:  "We're trying to put you out of business, why would we want to buy you?".  (Ex. 147.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 147. See Defendants' Motion to Strike.  In any event, through Magnet Mix, Lime Wire has been in this business of music distribution for years.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute the admissibility of Exhibit 147, which is, in fact, admissible.  (*See* Attach. A at Ex. 147.)  The remainder of defendants' response is immaterial and does not cite to any admissible evidence.  (*See* note 5; *see also* Pls. 9/26/08 (LW) SOF ¶¶ 108, 160, 164.)  Further, MagnetMix is not LimeWire.  MagnetMix is a website released in 2003 that allowed "a magnet enabled Gnutella client *like* LimeWire" to download content.  (*See* Ex. 310 (emphasis added); Catillaz (Vol. VI) Tr. 216:3-12.)  "When a user clicks on a link to a file (called magnets) on MagnetMix, a P2P client *like* LimeWire downloads the file instantly."  (Ex. 40 (emphasis added).)  In any event, Lime Wire LLC employee Faaborg testified that on March 27, 2006, "Mark [Gorton]" requested that the MagnetMix button be "[r]emove[d]" from the LimeWire client.  (*See* Ex. 311 at LW DE 1908724; Faaborg (Vol. VI) Tr. 145:9-146:12).  Thus, this statement must be deemed undisputed.

**243.** **A 2004 "publicity outline/proposal for the launch of LimeWire 4.0" addressed to "Adam and Greg" ("2004 publicity outline"), states as a proposed description of one of Version 4.0's "most important new features": "New Name for this. [sic]  Itunes Like Filtering- Finding your favorite artist or album just got easier.  Searches in LimeWire now immediately display the artists, albums and other information that fully describes files.  By clicking on the artist or album information, users can easily limit their search results and see only what they want more quickly… [sic] No more spending five minutes hunting in the search window to find what you are looking for." (Ex. 148.)**

**Defendants' Response:**

*Undisputed as to this statement; however, this is just one of six new features that Lime Wire believed were most important and that were being promoted in this document, including non-music features such as firewallto-firewall transfers, community search feature and support for international groups. Ex. 148.*  In any event*, through Magnet Mix, Lime Wire has been in this business of music distribution for years.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is immaterial and does not cite to any admissible evidence in support.  (*See* note 5; Pls. 9/26/08 (LW) SOF ¶¶ 108, 160, 164.)  Further, MagnetMix is not LimeWire.  MagnetMix is a website released in 2003 that allowed "a magnet enabled Gnutella client *like* LimeWire" to download content.  (*See* Ex. 310 (emphasis added); Catillaz (Vol. VI) Tr. 216:3-12.)  "When a user clicks on a link to a file (called magnets) on MagnetMix, a P2P client *like* LimeWire downloads the file instantly."  (Ex. 40 (emphasis added).)  In any event, Lime Wire LLC employee Faaborg testified that on March 27, 2006, "Mark [Gorton]" requested that the MagnetMix button be "[r]emove[d]" from the LimeWire client.  (*See*

Ex. 311 at LW DE 1908724; Faaborg (Vol. VI) Tr. 145:9-146:12).)  Thus, this statement must be deemed undisputed.

**244. The 2004 publicity outline also states that another of the "most important new features" of Version 4.0 was "ID3 v2 support- Using the latest standard for mp3 descriptive information, LimeWire ensures that search results will be even more accurate than in the past".  (Ex. 148.)**

**Defendants' Response:**

*Undisputed as to this statement; however, this is just one of six new features that Lime Wire believed were most important and that were being promoted in this document, including non-music features such as firewallto-firewall transfers, community search feature and support for international groups. Ex. 148.* In any event, *through Magnet Mix, Lime Wire has been in this business of music distribution for years.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is identical to their response to ¶ 243.  (*See* Pls. Reply ¶ 243.)

**245. An internal Lime Wire document written in March of 2004 included a list of user testimonials to be used for LimeWire advertising purposes including "Hands-down best current mp3 search tool" and a list of features including the "[A]bility to search by artist, title, genre, or bitrate".  (Ex. 140; Gribble Tr. 305:19-25 (testifying that Lime Wire made a design choice for LimeWire regarding the metadata for which a user can search; see also infra ¶ 533 (user testimonials).) [Undisputed]**

**246. A CD sleeve for LimeWire PRO included the user testimonial "Hands-down the best current mp3 search tool!".  (Ex. 149 at 006893.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 149.* See *Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 149, which is, in fact, admissible.  (*See* Attach. A at Ex. 149.)  Thus, this statement must be deemed undisputed.

**247. A November 10, 2004, Lime Wire press release touted the introduction of "complete iTunes integration on both Mac and PC" and a "Completely new MP3 player, with less skipping". (Ex. 150.) [Undisputed]**

**248.    In 2006, a Lime Wire employee wrote:  "Lime Wire attracts a large number of teens and young adults, many of whom do not differentiate between legal and illegal downloading and associate LimeWire with their everyday habit of music consumption . . . .  LimeWire is the central hub for their music experience."  (Ex. 151.)**

**<u>Defendants' Response:</u>**

*Disputed. Moreover, disputed as to admissibility of Exhibit 151.* See *Defendants' Motion to Strike; Defendants' Settlement/Related Pre-August 2003 Objections.*

**<u>Plaintiffs' Reply:</u>**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 151, which is, in fact, admissible.  (*See* Attach. A at Ex. 151; Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.)  Thus, this statement must be deemed undisputed.

**249.    Lime Wire considered developing and launching its own hardware MP3 player. (Ex. 97 at LW DE 1172933.) [Undisputed]**

**250.    Lime Wire has opened the "LimeWire Store" which is a store for hosted and purportedly authorized music downloads. (See infra ¶¶ 456-61.) [Undisputed]**

**251.    LimeWire runs a music blog.  (Ex. 152 (http://blog.limewire.com/).)**

**<u>Defendants' Response:</u>**

*Disputed as to admissibility of Exhibit 152.* See *Defendants' Motion to Strike.*

**<u>Plaintiffs' Reply:</u>**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only to the admissibility of Exhibit 152, which is, in fact, admissible.  (*See* Attach. A at Ex. 152.)  Thus, this statement must be deemed undisputed.

**C.    <u>Lime Wire Has Provided Support for and Not Discouraged LimeWire Users' Infringement, and Also Has Communicated Hostility to Copyright Protection</u>**

**1.    <u>Lime Wire Agents Provided Support for Infringing Users and Uses in Forums</u>**

**•    <u>The Lime Wire Forums</u>**

**252.    Lime Wire does not provide "official user support" for LimeWire BASIC users. (Ex. 153 at 17; Rohrs Tr. 35:15-23; Catillaz Tr. 181:17-183:4.) [Undisputed]**

253.    Lime Wire set up the LimeWire Forums. (Berlin Tr. 9:12-22.) **[Undisputed]**

254.    The LimeWire Forums are publicly accessible forums available at http://forum.limewire.org. (Ex. 154 (http://forum.limewire.org).) **[Undisputed]**

255.    The data associated with the LimeWire Forums is stored on a server owned by Lime Wire. (Berlin Tr. 10:24-11:25.) **[Undisputed]**

256.    Lime Wire can and does ban individuals or entities by IP address from accessing the LimeWire Forums. (Ex. 155; Berlin Tr. 351:10-352:14.) **[Undisputed]**

257.    An IP address is a machine-readable name associated with a computer connected to the internet. (Gribble Report at 6.) **[Undisputed]**

258.    For example, IP addresses used by Cravath, Swaine & Moore LLP have been banned from accessing the LimeWire Forums.  (Ex. 156; Berlin Tr. 30:18-31:24.)

**Defendants' Response:**

*Disputed. First, Exhibit 156 is inadmissible. See Defendants' Motion to Strike. Second, this was speculation on the part of Mr. Berlin.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute the admissibility of Exhibit 156 which is, in fact, admissible.  (*See* Attach. A at Ex. 156.)  The remainder of defendants' response is argumentative and conclusory (*see* notes 6, 8), and does not cite to any admissible evidence.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

259.    The LimeWire Forums are maintained by users known as "administrators", "moderators", and "supermoderators". (Berlin Tr. 12:2-14:4, 17:5-18:11.) **[Undisputed]**

260.    Administrators are moderators who have access to certain additional administrative functions. (Berlin Tr. 12:18-13:25.) **[Undisputed]**

261.    Lime Wire Senior Software Developer Berlin was an administrator on the LimeWire Forums.  (Berlin Tr. 12:2-8.)

**Defendants' Response:**

*Undisputed. But Berlin was never an active administrator. Berlin Decl. ¶ 19.*

**Plaintiffs' Reply:**

This statement is undisputed. The remainder of defendants' response is immaterial to the central point of the statement and is argumentative. (*See* note 6.)

> **262. Berlin does not know if there is a difference between the terms "supermoderator" and "moderator", and the terms appear to be used interchangeably. (Berlin Tr. 17:5-9; Ex. 158.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 158.* See *Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Nor do they dispute the cited portion of the Berlin testimony, which alone provides sufficient support for the statement. Defendants dispute only the admissibility of Exhibit 158, which is, in fact, admissible. (*See* Attach. A at Ex. 158.) Thus, this statement must be deemed undisputed.

> **263. Lime Wire selects the users who serve as supermoderators or moderators. [Undisputed]**

> **264. Lime Wire communicated policies of the LimeWire Forums to the supermoderators assisting in the management of the LimeWire Forums. (Berlin Tr. 16:11-17:4, 17:19-18:5.) [Undisputed]**

> **265. Berlin provided the moderators with a non-publicly accessible forum within the LimeWire Forums in part "so they wouldn't rebel". (Berlin Tr. 29:9-30:6; Ex. 157.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 157.* See *Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibit 157, which is, in fact, admissible. (*See* Attach. A at Ex. 157.) Thus, this statement must be deemed undisputed.

> **266. Lime Wire gives supermoderators access to administrative functions on the LimeWire Forums, such as the ability to move posts or threads, change the text of a post after it has been made, prevent users from making additional posts in a given thread ("close a thread"), move threads to different places ("manage a thread"), and prevent users from logging into the LimeWire Forums ("ban a user"). (Berlin Tr. 23:19-24; 45:9-47:5; 49:7-10; Ex. 158.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 158.* See *Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Nor do they dispute the cited portion of the Berlin testimony, which alone provides sufficient support for the statement. Defendants dispute only the admissibility of Exhibit 158, which is, in fact, admissible. (*See* Attach. A at Ex. 158.) Thus, this statement must be deemed undisputed.

267. **A "post" is a message written by a forum user that is made publicly available on the forums for others to see. (Berlin Tr. 19:6-12.) A "thread" is a series of related posts under a common heading. (*See, e.g.*, Ex. 159; Ex. 160.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 159 and 160.* See *Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Nor do they dispute the Berlin testimony cited, which alone provides sufficient support for the statement. Defendants dispute only the admissibility of Exhibit 159 and 160, which are, in fact, admissible. (*See* Attach. A at Exs. 159, 160.) Thus, this statement must be deemed undisputed.

268. **Lime Wire had the ability to change the powers granted to each supermoderator or moderator on the LimeWire Forums. (Ex. 161; Ex. 162.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 161 and 162.* See *Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibit 161 and 162, which are, in fact, admissible. (*See* Attach. A at Exs. 161, 162.) Thus, this statement must be deemed undisputed.

269. **Lime Wire had the power to terminate a user's status as supermoderator or moderator and has exercised that power. (Berlin Tr. 28:4-6, 29:4-6, 106:12-108:l4; Ex. 163.)**

103

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 163.* See *Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Berlin testimony, which alone supports the statement that "Lime Wire had the power to terminate a user's status as supermoderator or moderator".  Defendants dispute only the admissibility of Exhibit 163, which is, in fact, admissible.  (*See* Attach. A at Ex. 163.)  Thus, this statement must be deemed undisputed.

270. **Lime Wire Software Developer Faaborg was responsible for "baby-sitting" the LimeWire Forums until Lime Wire hired Nathan Lovejoy, and the "responsibility of baby-sitting the forums was transferred to him".  (Faaborg Tr. 139:4-141:23, 143:20-144:8; Ex. 164.)**

**Defendants' Response:**

*Disputed. Neither Faaborg nor Lovejoy "babysat" the LimeWire Forums. Faaborg Tr. 139:04 – 141:23, 143:20 – 144:08. In fact, no one from Lime Wire has ever actively monitored the Lime Wire Forum.* See *Berlin Decl. ¶ 16.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Nor do they dispute Exhibit 164, which alone provides sufficient support for the fact that Faaborg was "responsible for babysitting the forum".  In the testimony cited by defendants, Faaborg did not dispute "babysitting the forum" (Faaborg Tr. 141:9-14), but stated that "I don't know how much forum baby-sitting I've actually done" and that beyond the date of Exhibit 164, he did not think he had "done much forum baby-sitting".  (*Id.* at 141:15-21.)  Nowhere in Faaborg's testimony cited by defendants does he say that Nathan Lovejoy did not "baby-sit" the forums.  (*See id.* at 143:20-144:8.)

271. **Berlin appointed supermoderators on the LimeWire Forums, including individuals who use the following account names: "Aaron Walkhouse", "Kath" and "Only a Hobo". (Berlin Tr. 25:22-26:2, 64:18-64:24.) Bildson "okay[ed]" Berlin's actions. (Id. 25:22-26:5.) Berlin consulted the "whole team [of client developers]" before appointing these users as supermoderators. (Id. 27:11-17.) [Undisputed]**

272. **Lime Wire's appointed supermoderator Only a Hobo repeatedly assisted users obviously engaging in copyright infringement with their infringement. (Ex. 165 (http://www.limewire.org/forum/showthread.php?t=2645, http://www.limewire.org/forum/showthread.php?p=9695#post9695, http://www.limewire.org/forum/showthread.php?p=8617#post8617, http://www.limewire.org/forum/showthread.php?t=2698,**

**http://www.limewire.org/forum/showthread.php?t=2320);** *see also* **Berlin Tr. 68:10-69:7, Berlin Tr. 69:24-71:6.)**

**Defendants' Response:**

*Disputed. First, Exhibit 165 is inadmissible.* See *Defendants' Motion to Strike. Second, there is no evidence that this moderator was acting as an agent of Lime Wire. Third, this moderator was acting outside any authority given to him by Lime Wire, and no one at Lime Wire knew that Only a Hobo was posting these threads.* See *Berlin ¶ 16-17. Fourth, even if Exhibit 165 is ruled admissible, these posts do not show that this moderator was assisting users in engaging in copyright infringement. Ex. 165. At best, this moderator assisted others in the locating and downloading of music in general.*

**Plaintiffs' Reply:**

*First*, defendants dispute the admissibility of Exhibit 165, which is, in fact, admissible. (*See* Attach. A at Ex. 165.)  *Second*, defendants dispute that the moderator was acting as an agent of LimeWire, but do not cite to any admissible evidence in support.  (*See* note 5.)  *Third*, defendants' response is conclusory and argumentative.  (*See* notes 6, 8.) *Fourth*, these posts do indeed show assistance to users engaging in copyright infringement.  In response to a LimeWire forum member's request for information that might help "find" a song, Only A Hobo responded with names of artists and song titles. (Ex. 165 at http://forum.limewire.org/showthread.php?t=2645.)  When that user complained that they had no success in downloading a complete and accurate version of the song, Only A Hobo responded that it was due to anti-piracy measures implemented by the record companies and then provides advice on how to get around the record companies measures.  (*Id.* at http://forum.limewire.org/showthread.php?p=9695.)  In response to another user  Only A Hobo provides that copyright infringement is not allowed and then "recommends" the use of "bitzi.com" (*id.* at http://forum.limewire.org/showthread.php?p=8617), a website that maintains metadata related information about files.  (*See* Bildson Tr. 242:13-242:18.)  Only A Hobo recommends bitiz to another user who is searching for video.  (Ex. 165 at http://forum.limewire.org/showthread.php?t=2698.)   Thus, this statement must be deemed undisputed.

**273.  For example, in response to a user's public post that he or she was unable to download a particular song in numerous attempts, Only a Hobo responded publicly, stating, "[u]sers of LimeWire agree not to use LimeWire for copyright infringement", but continued:  "Well there seem to be one or two who don't stick to this stipulation and the record companies have picked up on this fact and plant piles of fake files on the network which is a pain . . . as if they couldn't find something better to do with their lives . . . but those are most likely what you are seeing . . . .  in your search window . . . enable the columns for kind, size and title . . . don't download songs under about 3 MB best to only go for songs showing in the title column, and avoid .wma files**

you can filter .wma out in the words filter." Ex. 165 at
(http://www.limewire.org/forum/showthread.php?p=9695#post9695.)

**Defendants' Response:**

*Disputed. First, there is no evidence that this moderator was acting as an agent of Lime Wire. Second, this moderator was acting outside any authority given to him by Lime Wire, and no one at Lime Wire knew that Only a Hobo was posting these threads. See Berlin ¶ 16-17. Third, even if Exhibit 165 is ruled admissible, these posts do not show that this moderator was assisting users in engaging in copyright infringement. Ex. 165. At best, this moderator assisted others in the locating and downloading of music in general.*

**Plaintiffs' Reply:**

Defendants dispute this statement for the same reasons they dispute ¶ 272. (*See* Pls. Reply ¶ 272.)

274.    **Lime Wire could have removed Only a Hobo as a supermoderator but did not do so. (Berlin Tr. 28:22-29:8; see also Ex. 166 (July 21, 2006 email from "Only a Hobo" to Berlin saying "I quite understand it if you wish to remove me from the list of mods ....").) [Undisputed]**

275.    **Lime Wire's appointed supermoderator Aaron.Walkhouse repeatedly assisted LimeWire users obviously engaging in copyright infringement with their infringement. (Ex. 167.) For example, in response to a user's post seeking "an old school rap [where] the guy rapping speak really fast" and specifying the lyrics of the song he was seeking, Aaron.Walkhouse advised the user to search Google for the song lyrics to determine the song name, and stated, "I replied by PM [private message] because Lime Wire LLC is in court against the RIAA right now. The forums have to be careful". (*Id.*, Ex. 167.)**

**Defendants' Response:**

*Disputed. First, Exhibit 167 is inadmissible. Second, there is no evidence that this moderator was acting as an agent of Lime Wire. Third, this moderator was acting outside any authority given to him by Lime Wire, and no one at Lime Wire knew that Walkhouse was posting these threads. See, Berlin ¶ 16-17. Fourth, even if Exhibit 167 is ruled admissible, these posts do not show that this moderator was assisting users in engaging in copyright infringement. Fifth, Defendants object to the use of the word "repeatedly"; there is no evidence of this fact and it is argumentative. Finally, all this moderator did was to assist a user in remembering the name of the song and the lyrics; he did not materially assist the user in committing copyright infringement. Ex. 167.*

106

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute only the admissibility of Exhibit 167, which is, in fact, admissible.  (*See* Attach. A at Ex. 167.)  *Second*, defendants dispute that the moderator was acting as an agent of Lime Wire or that Lime Wire knew of the posts, but do not cite to any admissible evidence in support.  (*See* note 5.)  *Third*, defendants' response is argumentative.  (*See* note 6.)  Defendants' "fourth" statement is also unsupported.  *Fifth*, the word "repeatedly" is not material and central to the point of the statement and plaintiffs hereby strike "repeatedly" from this statement.  Defendants' last sentence is conclusory.  (*See* note 8.)  Thus, this statement must be deemed undisputed.

276.   **Lime Wire could have removed Aaron Walkhouse as a supermoderator (see supra ¶ 269), but did not do so. [Undisputed]**

277.   **Lime Wire could have removed Aaron.Walkhouse as a supermoderator (*see supra* ¶ 269), but did not do so.  (Berlin Tr. 54:11-57:23; Ex. 160.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 160.* See *Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 160, which is, in fact, admissible.  (*See* Attach. A at Ex. 160.)  Thus, this statement must be deemed undisputed.

278.   **Lime Wire's appointed supermoderator Kath assisted users obviously engaging in copyright infringement with their infringement.  (Ex. 168.)  For example, after informing a user that she had edited the text of his post "asking for those, because I wasn't sure whether they are copyright [smiley emoticon]", Kath provided a link to the user, stating "I hope that link will help you find it".  (*Id.*)**

**Defendants' Response:**

*Disputed. First, Exhibit 168 is inadmissible.* See *Defendants' Motion to Strike. Second, there is no evidence that this moderator was acting as an agent of Lime Wire. Third, this moderator was acting outside any authority given to her by Lime Wire, and no one at Lime Wire knew that Kath was posting these threads.* See *Berlin Decl. ¶ 16-17. Fourth, even if Exhibit 168 is ruled admissible, these posts do not show that this moderator was assisting users in engaging in copyright infringement. Ex. 168. At best, this moderator assisted others in the locating and downloading of music in general.*

107

**Plaintiffs' Reply:**

*First*, defendants dispute the admissibility of Exhibit 168, which is, in fact, admissible. (*See* Attach. A at Ex. 168.)  The remainder of defendants' response is the same as their response to ¶ 272 and must be deemed undisputed for the same reasons.  (*See* Pls. Reply ¶ 272.)  Berlin's self-serving declaration says, without any concrete or documentary support, that no one at LimeWire monitored these forums and that he himself had never seen the posts shown to him in depositions.  In addition to the post quoted by plaintiffs, another Kath post contained in Exhibit 168 states "[y]ou show a search for Judas Priest, their material is copyright.  Try using the search criteria they use on the LimeWire skins download page [smiley emoticon]".

**279.    Lime Wire could have removed Kath as a supermoderator (*see supra* ¶ 269), but did not do so.**

**Defendants' Response:**

*Undisputed. But Lime Wire was unaware of these activities and since that time has reminded these moderators of their responsibilities. Berlin Decl. ¶ 17.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is argumentative. (*See* note 6.)

- **The Gnutella Forums**

**280.    The Gnutella Forums is an internet discussion forum maintained by Gnutelliums LLC.  (Ex. 169 (http://www.gnutellaforums.com/); *see also supra* ¶ 85 (LimeWire can be downloaded through *gnutelliums.com*).)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 169. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 169, which is, in fact, admissible.  (*See* Attach. A at Ex. 169.)  Thus, this statement must be deemed undisputed.

**281.    The Gnutella Forums includes a forum dedicated to the discussion of the Lime Wire client.  (Ex. 170 (http://www.gnutellaforums.com/LimeWire-cross-platform).)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 170. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 170, which is, in fact, admissible.  (*See* Attach. A at Ex. 170.)  Thus, this statement must be deemed undisputed.

> **282.  Links for "technical support" on the LimeWire website bring users to the LimeWire client section of the Gnutella Forums.  (Ex. 171; Berlin Tr. 119:6-121:2.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 171.* See *Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 171, which is, in fact, admissible.  (*See* Attach. A at Ex. 171.)  Thus, this statement must be deemed undisputed.

> **283.  Lime Wire technical support personnel referred LimeWire users to the Gnutella Forums. (Ex. 172 at LW DE 848923; Kahn Tr. 72:4-22.) [Undisputed]**

> **284.  Lime Wire asked the Gnutella Forums to "mirror the structure" of Lime Wire's. www.limewire.org website. (Ex. 173.) [Undisputed]**

> **285.  Lime Wire's trademarked logo appears on the LimeWire client section of the Gnutella Forums.  (Ex. 174; Fisk Tr. 138:5-140:3.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 174.* See *Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 174, which is, in fact, admissible.  (*See* Attach. A at Ex. 174; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Thus, this statement must be deemed undisputed.

> **286.  Lime Wire announced new versions of LimeWire on the Gnutella Forums (Fisk Tr. 122:14-21), and attempted to monitor postings on the Gnutella Forums.  (Ex. 175 at 3.)**

**Defendants' Response:**

*Disputed. First, Exhibit 175 is inadmissible.* See *Defendants' Motion to Strike. Second, Lime Wire did not ever attempt to monitor the Gnutella Forums. Berlin Decl. ¶¶ 16-19.*

**Plaintiffs' Reply:**

*First*, defendants dispute the admissibility of Exhibit 175, which is, in fact, admissible. (*See* Attach. A at Ex. 175.)  Further, defendants cite Exhibit 175 in their 9/26/08 Memorandum of Law in Support of Defendants' Resp. in Opp'n to Pls. Mot. for Partial Summary Judgment at 37 and so have waived their objections to this document.  *Second*, defendants do not dispute the Fisk testimony, which supports the statement that new versions of LimeWire were announced on the Gnutella Forums.  *Third*, although Berlin claims that no one at LimeWire monitored the forum, he does not and cannot state that anyone, other than himself, did not know about the activity occurring in the forums.

287.  **A moderator is a Gnutella Forums user that has been granted administrative powers that exceed those of regular forum users. (Berlin Tr. 124:4-14, 12:18-13:18.)** [Undisputed]

288.  **Greg Bildson is a "Super Moderator" on the Gnutella Forums.  (Ex. 176 (http://localhost/gnutella/member.php?u=305) (Document provided by Lime Wire).)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 176.* See *Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 176, which is, in fact, admissible.  (*See* Attach. A at Ex. 176.)  Thus, this statement must be deemed undisputed.

289.  **Lime Wire employees, including Berlin and likely Fisk, acted as moderators on the Gnutella Forums.  (Berlin Tr. 124:4-6; Fisk Tr. 120:19-121:17.)**

**Defendants' Response:**

*Disputed. They testified that were given moderator access, not that they acted as moderators.*

**Plaintiffs' Reply:**

The transcripts do not dispute the statement.  In the Berlin testimony cited, Berlin does not deny that he acted as a moderator.  (Berlin Tr. 124:4-6.)  In the Fisk testimony cited,

Fisk does not deny acting as a moderator, instead saying "I don't recall specific- -- I think I did.  I'm not totally sure, though".  (Fisk Tr. 120:19-22.)

**290.  Gnutella Forums moderators used private messages to provide technical assistance to users searching for copyrighted works. ((Ex. 177 at GFORUMS 0001, GFORUMS 0003, GFORUMS 0022.) Moderators also discussed exchanging copyrighted files between themselves, and provided each other advice on locating particular copyrighted works. (Ex. 177 at GFORUMS 0005, GFORUMS 0007, GFORUMS 0009-0011.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 177.* See *Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 177 which is, in fact, admissible.  (*See* Attach. A at Ex. 177.)  Thus, this statement must be deemed undisputed.

**291.  Gnutella Forums moderators publicly provided assistance to LimeWire users on how many files they could "safely" share before they risked prosecution for copyright infringement, and on ways to avoid being "caught" for such infringement, such as by using PeerGuardian (*see infra* ¶¶ 360-62).  (Ex. 177 at GFORUMS 0047-0053, GFORUMS 0062-0065, GFORUMS 0066-0067.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 177. See Defendants' Motion to Strike. Furthermore, if this document is admitted into evidence, Defendants would show that the Gnutella Forums, which are distinct from the Lime Wire Forums, are not "run" or maintained by any Lime Wire employee. See response ¶ 280.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibit 177, which is, in fact, admissible.  (*See* Attach. A at Ex. 177.)  The remainder of defendants' response is immaterial and fails to cite to any admissible evidence in support.  (*See* note 5.)  Moreover, defendants' citation to response ¶ 280 does not provide any admissible evidence in support of the response to this statement.  (*See also* Pls. Reply ¶ 280.)  Thus, this statement must be deemed undisputed.

292.    **Gnutella Forums moderator Only a Hobo (*see also supra* ¶¶ 271-72) publicly provided technical assistance to a user seeking to share his entire CD collection using LimeWire.  (Ex. 177 at GFORUMS 0034-0038.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 177. See Defendants' Motion to Strike. Furthermore, if this document is admitted into evidence, Defendants would show that the Gnutella Forums, which is distinct from the Lime Wire Forums, are not "run" or maintained by any Lime Wire employee.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibit 177, which is, in fact, admissible.  (*See* Attach. A at Ex. 177.)  *Second*, the remainder of defendants' response is immaterial and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

293.    **Gnutella Forums moderator TruStarWarrior repeatedly assisted and encouraged users obviously engaging in copyright infringement.  (Ex. 178.)**

**Defendants' Response:**

*Disputed. First, Exhibit 178 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, even if Exhibit 178 is ruled admissible, this exhibit does not reflect that this moderator, who was not an agent of Lime Wire, ever assisted anyone in committing copyright infringement. Ex. 178. At best, the moderator was trying to provide general technical assistance to users. Moreover, if this document is admitted into evidence, Defendants would show that the Gnutella Forums, which is distinct from the Lime Wire Forums, are not "run" or maintained by any Lime Wire employee.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibit 178, which is, in fact, admissible.  (*See* Attach. A at Ex. 178; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, the remainder of defendants' response is argumentative (*see* note 6), and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

294.    **When TruStarWarrior retired from the Gnutella Forums, then Senior Software Engineer Fisk posted on the Gnutella Forums, "I would like to take this opportunity to thank TruStarWarrior for his invaluable contributions to this forum over the last seven months.  His departure is an immeasurable loss".  Fisk also wrote that "LimeWire would not be what it is today without**

112

him, . . .".  In the same thread, Bildson added, "Agreed!  We owe a lot to TruStarWarrior".  (Ex. 179 at 1-2.)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 179. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 179, which is, in fact, admissible.  (*See* Attach. A at Ex. 179; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Thus, this statement must be deemed undisputed.

295.   **Lime Wire publicly thanked users who served as moderators in the Gnutella Forums, and offered them "small gifts for their help with LimeWire's user forums". (Berlin Tr. 51:13-53:23; Ex. 180 at 1.) [Undisputed]**

2.   **Lime Wire Has Not Discouraged or Has Turned a "Blind Eye" To Infringement Using LimeWire**

296.   **Lime Wire's customer service policy for "Answering Feedback Emails" explicitly states that Lime Wire employees should not answer any email "mentioning copyrighted work". (Ex. 181 at LW 000969.) [Undisputed]**

297.   **Lime Wire has received numerous emails from users asking if its download service was "legal".  (*See, e.g.*, Ex. 182; Ex. 183.)**

**Defendants' Response:**

*Disputed as to "numerous." On a daily basis Lime Wire technical support receives hundreds of emails and on occasion a few emails ask for this sort of information. Kahn. Tr. 18:06-11. Katie Catillaz testified that she removed only a few dozen between October 2004 and March 2005. Catillaz Tr. 111:13 – 112:4.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the use of the word "numerous".  The word "numerous" is not material or central to the point of the statement, and plaintiffs hereby strike the word "numerous" from the statement.  The remainder of the defendants' response is argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

298.   **Lime Wire did not respond to emails asking specifically about the legality of using the LimeWire client.  (*See, e.g.*, C. Nicponksi Tr. 82:14-101:2; cf. Ex. 184.)**

**Defendants' Response:**

> *Disputed as to admissibility of Exhibit 184. See Defendants' Motion to Strike. Additionally, however, Lime Wire's website discusses the legal ramifications of using Lime Wire. See Gribble Decl. ¶ 72. Lime Wire's policy is to not render legal advice and instead to tell users to seek their own counsel. Catillaz Tr. 107:16 – 108:9.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Nicponksi testimony, which alone provides sufficient support for the statement.  Defendants dispute the admissibility of Exhibit 184, which is, in fact, admissible.  (*See* Attach. A at Ex. 184.)  The remainder of defendants' response is argumentative.  (*See* note 6.)  In any event, the warnings on the website are ineffective.  (*See* Pls. 7/18/08 SOF ¶¶ 463-72.)

**299.** **One of Lime Wire's FAQs asks, "Is it legal to use LimeWire's software?", to which the response is:  "Yes, it is legal to use LimeWire's software.  It is an Internet enabling technology."  Lime Wire's response to this question contains no warning as to copyright infringement.  (Ex. 185 at LW DE 006619.)**

**Defendants' Response:**

> *Disputed. First, there is no evidence that this FAQ (Exhibit 185) was posted on Lime Wire's website. Second, even if it were, there are warnings about copyright infringement on other locations at the Lime Wire website. See Gribble Decl. ¶ 72.*

**Plaintiffs' Reply:**

*First*, defendants do not object to the material point and accuracy of this statement.  Nor do they object to the admissibility of Exhibit 185.  *Second*, Adam Harris testified as to the authenticity of Exhibit 185 at his deposition.  (*See* Harris Tr. 204:16-25.)  *Third*, the remainder of defendants' response is argumentative.  (*See* note 6.)  In any event, the warnings on the website are ineffective.  (*See* Pls. 7/18/08 SOF ¶¶ 463-72.)

**300.** **No Lime Wire FAQ asks whether it is legal to download copyrighted sound recordings using LimeWire, a question asked by numerous LimeWire users.  (*See* Ex. 185; Ex. 29 (http://wiki.limewire.org/index.php?title=Frequently_Asked Questions at 2-4); *see also*, Ex. 186, Ex. 183 at LW DE 1993246.)**

**Defendants' Response:**

> *Disputed. There is no evidence that this FAQ (Exhibit 185) was posted on Lime Wire's website. Moreover, even if it were, there is a warning about copyright infringement on another location of the Lime Wire website. See*

*(http://www.limewire.com/support/ftc4.php). Finally, Lime Wire disputes there were numerous questions of this sort.* See *response ¶ 297* supra.

**Plaintiffs' Reply:**

Defendants dispute this statement on the same grounds as ¶ 299.  (*See* Pls. Reply ¶ 299.)

**301.    In a Gnutella Forums posting, Bildson responded to a post from a user who stated that LimeWire was "[s]o much like Napster that I don't even miss it anymore" without mentioning copyright infringement.  (Ex. 187.)**

**Defendants' Response:**

*Disputed. First, Exhibit 187 is inadmissible.* See *Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. In addition, being a former Napster user does not equate to being a "known" infringer that only commits copyright infringement.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 187, which is, in fact, admissible.  (*See* Attach. A at Ex. 187; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  The remainder of defendants' response is conclusory and argumentative (*see* notes 6, 8), and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**302.    In August 2000, Gregory Silberman, an attorney at Lime Group, wrote an email to Gorton and Bildson in which he stated:  "You can sue 40 and maybe even 400 but 4000 or 40,000 becomes difficult.  Lime needs to work on a way to increase the 'from each, to each' ethos or make it technically infeasible to track down the major servers" (Ex. 188 at JB 0325), to which Bildson replied "we may need to take some more radical action . . . we may need to enforce sharing . . .".  (*Id.; see also infra ¶ 380.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 188.* See *Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 188, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Moreover, defendants use Exhibit 188 affirmatively to support their additional facts and so have waived any objection to this document.  (*See* Defs. LW 9/26/08 Add'l SOF ¶ 656.)  Thus, this statement must be deemed undisputed.

303.    In January 2002, on the Gnutella Forums, a LimeWire user said she was
        "trying to share about 30gig of music" but having trouble.  In response, Lime
        Wire Software Engineer Fisk wrote:  "We definitely encourage all sharing."
        He then proceeded to try to help the LimeWire user make her music
        available.  (Ex. 189.)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 189. See Defendants' Motion to Strike;
Defendants' Settlement/Pre-August 2003 Objections. In addition, generally
helping a user to make his or her files available for sharing is not the equivalent
of assisting one to commit copyright infringement. There is no evidence that this
music was not authorized for distribution and in addition, sharing music is not
illegal absent proof of an actual dissemination and lack of authorization.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*,
defendants dispute only the admissibility of Exhibit 189, which is, in fact, admissible.
(*See* Attach. A at Ex. 189; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, the
remainder of defendants' response is conclusory and argumentative (*see* notes 6, 8), and
does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement
must be deemed undisputed.

304.    In response to a post on a public forum from a Napster user looking for
        "Dixie Chicks" videos, Bildson wrote, "I'm sharing some good stuff on
        Gnutella . . . .  I'm partial to [L]ime[W]ire".  (Ex. 190.)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 190. See Defendants' Motion to Strike;
Defendants' Settlement/Pre-August 2003 Objections. In addition, Bildson
testified that he doubts very seriously that he was sharing anything because he
did not normally share files. Bildson Tr. 432:08 – 434:03. He also testified that
he was trying to promote Lime Wire in general. Id. "Sharing good stuff" is not
assisting a customer in committing infringement.*

**Plaintiffs' Reply:**

*First*, defendants dispute the admissibility of Exhibit 190, which is, in fact, admissible.
(*See* Attach. A at Ex. 190; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  *Second*, the
remainder of defendants' response is immaterial and argumentative (*see* note 6), and does
not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be
deemed undisputed.

305.    In response to a Gnutella Forums user who referred to having used Napster
        and reported having trouble making his "entire mp3 collection available
        [using LimeWire] -- that's some 4000 mp3's", Fisk wrote:  "In response to

**your point about sharing large numbers of files, we will be making some slight tweaks to this code for the next version of LimeWire." (Ex. 174 at LW 001408-10.)**

## Defendants' Response:

*Disputed as to admissibility of Exhibit 174. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. In addition, even if Exhibit 174 is ruled admissible, this is not evidence of assisting someone to commit infringement. Fisk is simply stating that the software will be enhanced in the future to allow sharing a larger number of files. Id. Finally, there is no evidence that these slight "tweaks" were ever made.*

## Plaintiffs' Reply:

Defendants dispute the admissibility of Exhibit 174, which is, in fact, admissible.  (*See* Attach. A at Ex. 174; Pls. Pre-2003/Grokster Opp'n Br. at 3-11.)  The remainder of defendants' response is argumentative and conclusory (*see* notes 6, 8), and does not cite to any admissible evidence in support.  (*See* note 5.)  Moreover, whether the "tweaks" were ever made is not relevant to the issue of intent or purpose.  *See Grokster*, 545 U.S. at 925 n.7.  Thus, this statement must be deemed undisputed.

**306.  At least during 2003-2004, Lime Wire maintained a to-do-list indicating that one of its projects was "[g]athering a list of user testimonials to place on a non-obtrusive link on the free download page. Idea is to let users know what the current buzz about LimeWire is in the hope to encourage more downloads for those users that need a little extra push." (Ex. 191 at LW DE 0910885; Ex. 191 at LW DE 1152324.)**

## Defendants' Response:

*Undisputed; however, the inference Plaintiffs make about "pushing" users to make more downloads of files is improper; the downloads referenced here are the downloads of the software, not the downloading of files. Ex. 191. All inferences must be construed in favor of the non-movant Lime Wire.*

## Plaintiffs' Reply:

This statement is undisputed.  The remainder of defendants' response is argumentative and conclusory.  (*See* notes 6, 8.)

### 3.      Lime Wire Has Expressed and Communicated Hostility Toward Copyright Protection

**307.  In a 2002 post on the Gnutella Forums, Berlin wrote that, "copyrights [sic] are artificial limits on resources, a way of maintaining a capitalistic view on resources, where the ruling class can limit what the peasants can use.  now, [sic] this is done under the auspices of 'allowing greater innovation and**

117

invention', but this use is patently absurd in the current context of copyrights".  (Ex. 192 at 6; *see also* Berlin Tr. 6:4-9:11.)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 192 and the cited portions of the Berlin Transcript. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. And even if Exhibit 192 is ruled admissible, Defendants wish to point out that this was a post on a public discussion forum, and the personal opinion of Mr. Berlin and not Lime Wire.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 192, and the cited portion of the Berlin testimony, which are, in fact, admissible.  (*See* Attach. A at Ex. 192; Attach. B at 1; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  The remainder of defendants' statement is incorrect.  Berlin's testimony is relevant because it is probative of the fact that Berlin, who has been Lime Wire LLC's Senior Software Developer for 5 years, is of the opinion that copyright infringement is not stealing.

308.  **Lime Wire's FAQ section has contained the statement, "The company defends Freedom of Speech and believes that existing laws are an over-reaching abuse of copyright laws.  The company believes that there is no way to completely control piracy in a file sharing system".  (Ex. 185 at LW DE 006619.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to the admissibility of Exhibit 185. See Defendants' Motion to Strike. There is no evidence in the record to establish this fact, i.e., that this exhibit was part of the Lime Wire FAQ.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Although defendants objected to and moved to strike specific exhibits and deposition excerpts, they have *not* objected to Exhibit 185.  (*See* Defs. Mot. to Strike at 2-8.)  Further, Adam Harris testified as to the authenticity of the document at his deposition.  (*See* Harris Tr. 204:16-25.)  The remainder of defendants' response is improper because it is unsupported by citations to admissible evidence.  (*See* note 5.)  Moreover, defendants' response that there is "no evidence in the record" is improper.[13]  Thus, this statement must be deemed undisputed.

---

[13] *See AFL Fresh & Frozen Fruits & Vegetables, Inc. v. De-Mar Food Servs. Inc.*, No. 06 Civ. 2142, 2007 WL 4302514, at *4 (S.D.N.Y. Dec. 7, 2007) (Lynch, J.) ("*AFL*").

309. **An email to Adam Friedman, principal of Lime Wire's public relations company in 2003, from a member of his staff stated that "LW" approved three quotes "to be used in media pitches":  "P2P technology will be here 100 years from now when the RIAA will be a footnote in history next to the Politburo", "They [RIAA] have a horse and buggy mentality in the automobile age", and "They're [RIAA] just a bunch of schoolyard bullies that are stealing kid's [*sic*] lunch money".  (Ex. 193; Friedman Tr. 4:25-5:4, 11:2-12:15.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to the admissibility of Exhibit 193. See Defendants' Motion to Strike. Even if Exhibit 193 is ruled admissible, Defendants would show that these were nothing but "media pitches" drafted by a PR firm, not a policy of Lime Wire.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 193, which is, in fact, admissible.  (*See* Attach. A at Ex. 193.)  The remainder of defendants' response is argumentative (*see* note 6), and does not cite to any admissible evidence in support.  (*See* note 5.)  Moreover, the fact that these quotes for media pitches were developed by Friedman, Lime Wire's public relations firm, whether or not implemented, "illuminate[s] [Lime Wire LLC's] purposes".  *See Grokster,* 545 U.S. at 925 n.7.  Thus, this statement must be deemed undisputed.

310. **A document entitled "Talking Points for Greg Bildson" stated:  "Copyright law has been corrupted over time from a limited term to nearly an unlimited term thanks to the efforts of copyright holders [*sic*] self interest . . .  The public should be incensed at this injustice".  (Ex. 194 at AF 0176; *see also* Ex. 39.)**

**Defendants' Response:**

*Disputed. First, it is inadmissible hearsay. See Defendants' Motion to Strike. Second, even if it is admitted into evidence, this was a document prepared by Friedman & Assoc., not Lime Wire, and there is no evidence in the record that Lime Wire ever saw it or approved of it. And, it does not reflect Lime Wire's policies; it is a PR stunt.*

**Plaintiffs' Reply:**

*First*, this is not inadmissible hearsay.  The statement is offered not for its truth but to demonstrate that Lime Wire's PR firm believed this was Lime Wire LLC and Bildson's view and that Lime Wire's PR firm believed that such a statement would promote the LimeWire software.  Even were it hearsay, "[h]earsay evidence is admissible at the summary judgment stage if the contents would be otherwise admissible at trial."  (*See* note 11.)  *Second*, Friedman & Assoc. was engaged by defendants to provide "general public relations services" in particular "media exposure" in an effort to be perceived as "a leader in [the peer-to-peer] sector when compared to Kazaa and Morpheus".  (Friedman

Tr. 10:2-12:24.)  Moreover, defendants' assertion that there is "no evidence in the record" is improper.  (*See* note 13.)  Thus, this statement must be deemed undisputed.

**311.  Stating that LimeWire users had been "targeted" by the RIAA, other "Talking Points for Greg Bildson" stated:  "[W]e find this bullying action to be ludicrous and in violation of the first amendment", "[w]e are outraged that the RIAA is picking on the little guy…", and "it's ludicrous to think that kids [avid music fans] are being sued for enjoying their constitutional right to privacy implied in the Bill of Rights".  (Ex. 194 at AF 0176.)**

**Defendants' Response:**

*Disputed. First, Exhibit 194 is inadmissible. See Defendants' Motion to Strike. Second, even if Exhibit 194 is ruled admissible, this was a document prepared by Friedman & Assoc., not Lime Wire, and there is no evidence in the record that Lime Wire ever saw or approved of it. And, it does not reflect Lime Wire's policies; it is a PR stunt.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibit 194, which is, in fact, admissible.  (*See* Attach. A at Ex. 194.)  *Second*, the remainder of defendants' response in which they state that "there is no evidence in the record" is improper.  (*See* note 13.)  *Third*, defendants do not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**312.  In "Talking Points for Greg Bildson", the question, "Aren't the file sharing companies doing what Napster did?" is accompanied by the suggested response, "Napster ran on a centralized server, which made file sharers less anonymous and more vulnerable to the prying eyes of the RIAA.  [LimeWire runs] on a decentralized server [which] offers more privacy and makes it harder for organizations such as the RIAA to shut it down."  (Ex. 194 at AF 0177; *see also infra* ¶¶ 369-70, 388.)**

**Defendants' Response:**

*Disputed. First, Exhibit 194 is inadmissible. See Defendants' Motion to Strike. Second, even if this document is admitted into evidence, this was a document prepared by Friedman & Assoc., not Lime Wire, and there is no evidence in the record that Lime Wire ever saw it or approved of it. And, it does not reflect Lime Wire's policies; it is a PR stunt.*

**Plaintiffs' Reply:**

Defendants dispute this statement on the same grounds as ¶ 311.  (*See* Pls. Reply ¶ 311.)

**313.  A document from Bildson's files, created on July 14, 2003, listed some "Myths and Facts About P2P Networks", including:  "MYTH:  Crawling**

**P2P network users' computers will solve the RIAAs [*sic*] problems[.]  The RIAA announces lawsuits against end users of file-sharing networks in the hope to curb piracy.  FACT:  The RIAA threatens the rights of individuals to privacy.  FACT:  Anonymity is inevitable.".  (Ex. 195.)**

**Defendants' Response:**

*Disputed. First, Exhibit 195 is inadmissible. See Defendants' Motion to Strike. Second, there is no evidence that this came from Bildson's files, nor is there any evidence that it was authored by him or anyone else at Lime Wire.*

**Plaintiffs' Reply:**

*First*, defendants dispute only the admissibility of Exhibit 195.  While defendants cite to their Motion to Strike for the inadmissibility of Exhibit 195, in fact, they do not actually dispute it in that motion or in their Pre-2003/*Grokster* Motion.  In any event, Exhibit 195 was produced by Lime Wire LLC and Bildson is listed as the "custodian" of Exhibit 195 on the metadata.  The remainder of defendants' response is improper because defendants fail to cite to any admissible evidence in support.  (*See* note 5.)  Defendants' response is also argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

314.  **A *New York Post* article on September 11, 2003, maintained in Lime Wire's files, stated:  "Bildson said that he expects users will tinker with the LimeWire software over the next few months, developing ways to mask their identities and avoid lawsuits".  Bildson is quoted as saying:  "The RIAA is not going to be able to contain this problem".  (Ex. 196.)**

**Defendants' Response:**

*Disputed. First, Exhibit 196 is inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Bildson testified that he did not say this and in any event, this never happened. Bildson Tr. 611:07 – 612:21; 615:05 – 615:22.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute the admissibility of Exhibit 196, which is, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 196; Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Though defendants provide no evidence that this event never happened, whether it happened and whether Bildson said it or not does not matter since the relevance of this evidence is that defendants were aware of how LimeWire was perceived in the media.  Thus, this statement must be deemed undisputed.

315.  **Lime Wire titled a November 24, 2003 press release giving the results of its music survey (*see supra* ¶¶ 240-41):  "Lime Wire Study Reveals That Music Industry Gouges Consumers To Detriment of Artists".  (Ex. 143.)**

121

**Defendants' Response:**

*Undisputed. But this is no evidence of hostility towards copyright protection.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is argumentative and conclusory.  (*See* notes 6, 8.)

**316.    An article in *MacWorld* quotes Bildson as stating, "Given the economics of the Internet, selling digitally-restricted songs for 99 cents is a rip-off."  The article then referred to Lime Wire's own survey (*see supra* ¶¶ 240-41) and quoted Lime Wire as having stated "Lime Wire sees no reason that songs should cost more than five cents, certainly no more than 20 cents."  (Ex. 197 at LW 001274; *see also id.* at LW 001285; Ex. 142; Ex. 198 at LW DE 0886826.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 197 and 198. See Defendants' Motion to Strike. Additionally, this is not evidence of hostility towards copyright protection.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibits 197 and 198, which are, in fact, admissible.  (*See* Attach. A at Exs. 197, 198.)  The remainder of defendants' response is argumentative and conclusory.  (*See* notes 6, 8.)  Thus, this statement must be deemed undisputed.

**317.    A document authored by Mark Gorton in July 2004 titled "In defense of  file sharing" stated that there is a "huge difference" between "stealing a physical item and "making a copy of a piece of digital media" (Ex. 199 at LW DE 1651059), and that the current copyright system is a "regime" consisting of "unreasonable rules" that only benefit "media corporations".  (*Id.* at LW DE 1651061; *see also* Gorton Tr. 403:14-16.)  Gorton also wrote:  "I am the founder of LimeWire LLC, the company which produces the popular LimeWire file sharing program.  And I feel good about what I've created.  I don't feel like I am undermining art and hurting the world".  (Ex. 199 at LW DE 1651059.)**

**Defendants' Response:**

*Undisputed. However, in this same document Gorton explains what he means is that copyright laws needed to be more balanced in his opinion. LW DE 1651062. See also Gorton Tr. 402:14 – 424:17. Gorton has also testified that he believes in copyright laws. Gorton Tr. 144:148 – 145:16; see also Gorton Decl. ¶¶ 30-36.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is immaterial and argumentative.  (*See* note 6.)

**318.    Gorton was quoted as saying that software like LimeWire will continue to exist regardless of whether the Supreme Court in *Grokster* deems it illegal. (*See*, *e.g.*, Ex. 200; Ex. 201; Ex. 202.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 201 and 202. See Defendants' Motion to Strike. Additionally, this is not an expression of hostility to copyright. Gorton was discussing the fact that the LimeWire software was open source and that Lime Wire could not control its distribution. This document also shows that Lime Wire would comply with the laws of this country. Gorton confirmed this in his deposition. Gorton Tr. 477:11 – 479:20.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute Exhibit 200, which alone is sufficient to support the statement. Defendants dispute the admissibility of Exhibits 201 and 202, which are, in fact, admissible.  (*See* Attach. A at Exs. 201, 202.)  Further, defendants fail to cite to any admissible evidence in support.  (*See* note 5.)  Thus, the statement must be deemed undisputed.

**319.    In an article in the July 2005 *Technology Review*, published just before the Supreme Court announced its *Grokster* decision, Gorton was quoted as saying of the "legal threat", "I doubt most of our users even think about it" and that the music industry "need[s] to get over it [the illegal file-sharing of copyrighted material]".  (Ex. 202.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 202. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 202, which is, in fact, admissible.  (*See* Attach. A at Ex. 202.)  Thus, this statement must be deemed undisputed.

**D.    Lime Wire Has Ensured That LimeWire Has Infringing Capabilities**

**320.    In an October 2006 email, former Lime Wire Senior Software Engineer Fisk wrote, "I do think the p2p companies generally cross that line [beyond which tolerance for infringement is overall detrimental]. Sure, it's the users sharing**

the infringing material, but the programs are designed to maximize that infringement". (Ex. 203 at 2.)

**Defendants' Response:**

*Disputed. First, this was Fisk's personal post and personal opinion. Second, when he was questioned about this post in his deposition, he stated just that, that he had no evidence that LimeWire had been designed for infringement and that he himself had never made design changes in order to enhance infringement. Fisk. Tr. 157:21 – 180:06. Fisk has also confirmed this in a recent declaration. Fisk. Decl. ¶ 4-6. Moreover, other developers have disputed Fisk's opinions, stating that they did not design LimeWire for infringing purposes and instead, their goal was to build the best general purpose communications tool. See Daswani Decl. ¶¶ at 4, 5; Singla Decl. ¶¶ 4, 5.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. The rest of defendants response is irrelevant. The only thing relevant is that Lime Wire's former senior software engineer believed the statements above. Contrary to defendants' argument, Fisk does not deny that he believed defendants were "devoted" to infringement, only that he did not have evidence to support his view. (*See* Fisk Tr. 179:09-19.) He stated he did, however, have evidence that many users used LimeWire for infringement. (*Id.*) The other Lime Wire developers to whose declarations defendants cite did not dispute that LimeWire was used for infringement, only that they personally did not program with the intent of increasing infringement.

    1.    **Lime Wire Employees Worked to Ensure LimeWire Could Be Used Effectively to Find Copyrighted and Unauthorized Content**

321.    **Lime Wire software developers used terms associated with copyrighted content while testing and designing the LimeWire software. (Ex. 174 at LW 001412 ("Beatles"); Ex. 204 at LW 000533 ("Britney"); Ex. 205 (Bildson responding to a query regarding "alien ant farm"); Ex. 206 ("Meta-data works with QRP just fine as long as you have well-defined rules for hashing. In the above example, 'mozart' and 'beatles' would be treated as a normal keyword."); Ex. 207 at 1 ("The Query for 'beatles with year=1960-1962' will be forwarded needlessly to some connections because the 'year' field is ignored when hashing."); Ex. 208 at 2 ("Query hits certainly are prime candidates for compression since they have lots of redundancy--especially with full XML metadata. (Consider 100 audio results for 'Beatles'.)"); Ex. 209 at 2 ("Lime Wire XML Proposal" stating, "[t]he query will look exactly like the Queries in the previous proposals. Let the rich query look like this:<audio schema="http://www.limewire.com/schemas/audio.xsd"> <artist>Rolling Stones</artist><genre>Classic Rock</genre></audio>" and describing potential results of this query to include "Paint it black and It's Only Rock and Roll"); Ex. 210 at 1 ("We hash all the words in the annotations for files. So for example if a file is annotated as title='Paint it**

black' and Artist='Rolling stones', then the words paint, it, black, rolling and stones all get hashed into the query route table.").)

**Defendants' Response:**

*Disputed. First, Exhibits 174, 205, 206, 207, 208, 209, and 210 are inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Fisk did not test LimeWire using the term "Beatles"; all he did was use the term as an example of not what to use. Furthermore, insofar as certain of these Exhibits are ruled admissible: Exhibit 204 does not establish any evidence of any testing; Exhibit 205 only shows that Bildson responded to a user who had used the term "alien ant farmer"; Exhibit 206 shows only that developer C. Rohrs was giving an example of metadata searches. As to the rest of the exhibits, there is simply no evidence that Lime Wire developers used these terms while testing and developing the software. In fact, all of the evidence is to the contrary. Every software engineer has testified that they tested LimeWire using authorized content. D. Nicponski Tr. 91:17 – 91:24; Bildson Tr. 97:09 – 97;15; Singla Decl. ¶ 7; Cho. Tr. 49:08 – 49:22 (he used the word "funny"); Barret Tr. 48:11 – 4813 (does not recall Lime Wire employees searching for music); Catillaz Tr. 24:16 – 23 (Creative Commons); Faaborg (used generic search terms such as the letter "A"). This is nothing but pure speculation as to what these documents mean.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibits 174, 205, 206, 207, 208, 209, and 210, which are, in fact, admissible. (*See* Attach. A at Exs. 174, 205-10; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) In fact, defendants themselves have proffered Exhibits 207, 208 and 209 as their own Exhibits 60, 61 and 59, respectively, and so have waived any objection to these documents. (*See* Baker 9/26/08 Decl. ¶¶ 62, 63, 61.) Further, defendants fail to cite to any admissible evidence in support. (*See* note 5.) Thus, this statement must be deemed undisputed.

322. **In August 2000, Bildson sent an email to Gorton and Lime employees, stating: "Too few people [on Gnutella] are sharing files and everyone is piggybacking on the network to do searches . . . My definitive test is to search for Sinead (O'Conner) on Gnutella. After 2 minutes of waiting, I get 2 copies of 'Nothing compares to you' listed and that is all. After 20 seconds on napster, I get 100 results encompassing her whole career. I had thought that the Gnutella network was getting overloaded after the first napster ruling but it now appears that sharing has just broken down". (Ex. 188 at JB 0324-25; *see also* Barret Tr. 56:9-58:2 (Barret testifying that searches for music, like Bildson's query described in Ex. 188, were "in accordance with my general memory of what we were using to test the product [LimeWire]" and that searches for music were relevant as "comparative data" with Napster); *see also*, Ex. 211, ownership of documents for "Nothing Compares 2U" and other works by Sinead O'Connor; McMullan Decl. ¶¶ 7-8.)**

125

**Defendants' Response:**

*Disputed. First, Exhibits 188 and 211 are inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, Bildson has testified that he was not testing LimeWire to ensure he could locate copyrighted music. He could not have because it did not exist. Instead, he testified that he was trying to determine what was causing the demise of the Gnutella network (the title of the email was "Death of Gnutella"). Third, Ms. Barret was unsure of her testimony about what people used as search terms; in fact, she actually testified that she could not recall anyone searching for music. Barret Tr. 48:11 – 48:13. Moreover, others have testified that Lime Wire employees adhered to the company's policy and did not search for unauthorized content. Nicponski Tr. 91:17 – 91:24; Bildson Tr. 97:09 – 97;15; Singla Decl. ¶ 7; Cho. Tr. 49:08 – 49:22 (he used the word "funny"); Barret Tr. 48:11 – 4813 (does not recall Lime Wire employees searching for music); Catillaz Tr. 24:16 – 23 (Creative Commons); Faaborg (used generic search terms such as the letter "A").*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. *First*, Defendants dispute only the admissibility of Exhibits 188 and 211, which are, in fact, admissible. (*See* Attach. A at Ex. 211; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Further, defendants use Exhibit 188 affirmatively to support their additional facts and so have waived any objection to this document. (*See* Defs. LW 9/26/08 Add'l SOF ¶ 656.) *Second*, defendants provide no support for their statement that Bildson was attempting to "determine what was causing the demise of the Gnutella network". (*See* note 5.) In addition, the testimony cited by plaintiffs refreshed Barret's memory as to music searches asked about in the earlier testimony cited by defendants.

### 2.  LimeWire is Optimized for the Exchange and Use of Popular Audio Files

**323.  In an October 2006 email to a private email group, Lime Wire's former Senior Software Engineer Fisk wrote, "There's so much room to innovate with p2p outside of infringement that its mind boggling there hasn't been more.  One of the reasons there hasn't been more is that everyone's [including Lime Wire] been writing code to share MP3s".  (Ex. 203 at 4; Fisk Tr. 151:15-153:6.)**

**Defendants' Response:**

*Disputed. First, this was Fisk's personal post and personal opinion. Second, when he was questioned about this post in his deposition, he stated just that, that he had no evidence that LimeWire had been designed for infringement and that he himself had never made design changes in order to enhance infringement. Fisk. Tr. 157:21 – 180:06. Fisk has also confirmed this in a recent declaration. Fisk. Decl. ¶ 4-6. Moreover, other developers have disputed Fisk's opinions, stating that they did not design LimeWire for infringing*

*purposes and instead, their goal was to build the best general purpose communications tool. See Daswani and Singla Decls.*

**Plaintiffs' Reply:**

Defendants response to this statement is the same as their response to ¶ 320.  (*See* Pls. Reply ¶ 320.)

- **LimeWire is Designed with the Expectation that Its Users Seek Musical Content**

324.   **When executing a keyword search, LimeWire returns a list of search results, which the user can narrow by certain criteria.  (Horowitz Report ¶ 57; Ex. 212 (Ex. 212 (http://wiki.limewire.org/index.php?title=User_Guide_Search_More);** *see supra* **¶¶ 65-70.)**

**Defendants' Response:**

*Disputed as to the admissibility of the Horowitz report. See Defendants' Motion to Strike).*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute Exhibit 212, which alone provides sufficient support for the statement. Defendants dispute only the admissibility of the Horowitz report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

325.   **By default, when executing an "All Types" search--regardless of what type of file the user is actually searching for--LimeWire displays narrowing options only for "Media", "Artist" and "Album".  (Berlin Tr. 182:21-24;** *see e.g.***, Ex. 26; Ex. 27; Horowitz Report ¶ 57.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of the Horowitz Report and Exhibits 26 and 27. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute the cited portion of the Berlin testimony, which alone provides sufficient support for the statement.  Defendants dispute the admissibility of Exhibits 26

and 27, which are, in fact, admissible. (*See* Attach. A at Exs. 26, 27.) Defendants also
dispute the admissibility of the Horowitz Report, which is, in fact, admissible. The
Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz
discussed the opinions contained in his report at his sworn deposition. (*See* Pls. Expert
Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.) In any event, Horowitz
hereby submits a sworn affidavit attesting to the validity of his report. (Forrest 11/07/08
Decl. ¶ 13.) Thus, this statement must be deemed undisputed.

**326.    Bildson was quoted in a July 7, 2005 article in Lime Wire's files as stating:
          "Our handy breakdown of artist and album information is a step forward
          over the primitive search results of most applications." (Ex. 213.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 213. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants
dispute only the admissibility of Exhibit 213, which is, in fact, admissible. (*See* Attach.
A at Ex. 213.) Thus, this statement must be deemed undisputed.

**327.    By default, LimeWire displays a search results column for "Bitrate",
          regardless of what type of content the user has queried. This is true even if
          the user has queried for files that would not generally have bitrates
          associated with them, such as text files. (Berlin Tr. 187:20-189:9; Horowitz
          Report ¶ 59; Ex. 22 (http://wiki.limewire.org
          /index.php?title=User_Guide_Search_Basic) at 4.)**

**Defendants' Response:**

*Disputed. First, the Horowitz report is inadmissible. See Defendants' Motion to Strike.
Second, Defendants wish to point out that this column, along with other columns such as
filename, type, size and icon, were all incorporated into the search results page because
this is information that is typically included in the metadata of most digital files, and it
was simply easier to leave this column in the search results page, even if files did not
have that information, versus changing it every time a search result occurs. Berlin Tr.
187:20 – 189:09. Moreover, Defendants' computer science expert has opined that this is
not evidence that LimeWire was designed for infringing purposes. Gribble Decl. ¶ 28.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Nor do they
dispute Exhibit 22 and the cited portion of the Berlin testimony, which alone provide
sufficient support for the statement. Defendants dispute only the admissibility of the
Horowitz Report, which is, in fact, admissible. The Horowitz Report was, in fact,
"signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions
contained in his report at his sworn deposition. (*See* Pls. Expert Opp'n Br. at 24-25; Pls.

Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)

**328.   Bitrate is a number that relates to "the amount of compression in certain kinds of multimedia files".  It is commonly associated with audio files. (Rohrs Tr. 76:4-10; *see also* Horowitz Report ¶ 59; Faaborg Tr. 234:15-20.) In its 2002 User Manual, LimeWire defines "Bitrate" as the "Rate at which [an] audio file was ripped".  (Ex. 214 at LW DE 1107212.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report, certain parts of the cited portions of the Gorton Transcript, and Exhibit 217. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portions of the Rohrs and the Faaborg testimony or Exhibit 214, which alone provide sufficient support for the statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)

**329.   According to defendants' expert, Lime Wire made a design choice to include the bitrate column in LimeWire's default search results window.  (Gribble Tr. 310:11-19.)**

**Defendants' Response:**

*Undisputed, just as Lime Wire made a design choice to include the other columns. Moreover, Defendants' computer science expert has opined that this is not evidence that LimeWire was optimized for audio content. Gribble Decl. ¶ 28.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is immaterial, irrelevant and argumentative.  (*See* note 6.)

> - **Lime Wire Designed the LimeWire Client to Play Audio Files but Built in No Such Feature for Any Other Kind of File**

**330.   Lime Wire includes a feature it describes as "a built in LimeWire Media Player with a playlist so that you can listen to mp3 files". (Ex. 29 (http://wiki.limewire.org /index.php?title=Frequently Asked_ Questions at 2); see also Ex. 214 at LW DE 1107210.) ("This is the LimeWire MP3 Player. You can now play your files directly from the application").) [Undisputed]**

**331.    The LimeWire Media Player plays only audio files.  (Ex. 29 (http://wiki.limewire.org/index.php? title=Frequently__Questions) at 16).)**

**Defendants' Response:**

*Undisputed. But there are two reasons for this. First, Java (the platform for LimeWire) does not support a video capable media player causing Lime Wire to not be able to add that feature. Second, Lime Wire chose not to add the additional features of opening other files (such as text) because third-party software applications that perform this function are already prevalent on most users' computers. See Berlin Decl. ¶ 23; Gribble Decl. ¶ 29.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is immaterial, irrelevant and argumentative.  (*See* note 6.)  Moreover, the support defendants cite for their "two reasons" does *not* support the reasons.  *First*, Gribble relies entirely on what Berlin told him.  (*See* Gribble 9/26/08 Decl. ¶ 29.)  *Second*, Berlin does not say that "Java does not support a video . . . player causing Lime Wire not to be able to add that feature", as defendants state in their response.  Berlin says that "Java does not allow developers to do that [include a video player] easily".  (Berlin 9/26/08 Decl. ¶ 23.)  Berlin does not say that Lime Wire could not add this feature or that Lime Wire developers could not do it.  Moreover, Berlin says nothing at all about defendants' second reason, which is thus entirely unsupported by any admissible evidence.  (*See* note 5.)

**332.    LimeWire does not include a player for video files.  (Berlin Tr. 176:21-22.)**

**Defendants' Response:**

*See response to ¶ 331, supra.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 331.

**333.    LimeWire does not include a viewer for image files.  (Berlin Tr. 176:23-24.)**

**Defendants' Response:**

*See response to ¶ 331, supra.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 331.

**334.    LimeWire does not include a viewer for text files.  (Berlin Tr. 176:25-177:2.)**

**Defendants' Response:**

*See response to ¶ 331, supra.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 331.

> **335.   LimeWire does not include a viewer for Word documents.  (Berlin Tr. 177:3-4.)**

**Defendants' Response:**

*See response to ¶ 331, supra.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 331.

> **336.   LimeWire does not include a viewer for PDF files.  (Berlin 177:5-7.)**

**Defendants' Response:**

*See response to ¶ 331, supra.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 331.

- **LimeWire Is Integrated with Apple iTunes Music Software**

> **337.   LimeWire is integrated with iTunes.  (Ex. 215 (http://www.limewire.com/features/); Horowitz Report ¶ 67.)**

**Defendants' Response:**

*Disputed. First, Defendants object to the use of the Horowitz Report. See Defendants' Motion to Strike. Second, integration in this context simply means allowing a user to browse and play music files downloaded by LimeWire so that it can be played on iTunes, similar to the media player. Berlin Tr. 315:01 – 319:10. Third, Defendants' computer science expert disputes Plaintiffs' claims that the inclusion of this feature somehow augments a user's ability to search for and download audio files. See Gribble Decl. ¶ 47, 48.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute Exhibit 215, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact,

admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  The remainder of defendants' response is immaterial and argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

338.    **iTunes is software distributed by Apple for playing and organizing digital music and video files.  (Ex. 216 (http://www.apple.com/itunes/download/); Harris Tr. 117:24-118:3, 134:7-9; Ex. 217; A. Gorton Tr. 101:18-102:12; Horowitz Report ¶ 67.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute Exhibits 216 or 217, or the cited portions of the Harris and the Gorton testimony, which provide sufficient support for the statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

339.    **LimeWire communicates with iTunes using a protocol known as "DAAP", which allows iTunes to stream files shared by LimeWire.  When enabled, these files will appear as a shared library in iTunes.  (Berlin Tr. 314:25-318:8; Ex. 218; Horowitz Report ¶ 67.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute Exhibit 218 or the cited portion of the Berlin testimony, which provide sufficient support for the statement.  Defendants dispute only the admissibility of Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  The remainder of defendants' response is immaterial and argumentative.  (*See* note 6.)

**340.    LimeWire's iTunes integration allows individuals on a local area network to stream music, through the DAAP protocol, to other individuals using iTunes on the same local area network.  (Berlin Tr. 319:11-320:16.)**

**Defendants' Response:**

*Disputed. First, the Horowitz Report is inadmissible. See Defendants' Motion to Strike. Second, integration in this context simply means allowing a user to browse and play music files downloaded by LimeWire so that it can be played on iTunes, similar to the media player. Berlin Tr. 315:01 – 319:10. Third, Defendants' computer science expert disputes Plaintiffs' claims that the inclusion of this feature somehow augments a user's ability to search for and downloading audio files. See Gribble Decl. ¶ 47, 48.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Berlin testimony, which alone provides sufficient support for the statement.  Further, defendants' response is nonresponsive because plaintiffs do not even cite the Horowitz Report in ¶ 340.  The remainder of defendants' response is immaterial, irrelevant and argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

**341.    Sharing with iTunes is turned on by default.  (Horowitz Report ¶ 67.)**

**Defendants' Response:**

*Disputed as to the admissibility of the Horowitz Report. See Defendants' Motion to Strike Expert Reports.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

- **LimeWire Is Optimized for Finding and Downloading Popular Files**

**342.    LimeWire displays search results in decreasing order according to the number of sources available for each file, with the file containing the highest number of sources listed first.  (Horowitz Report ¶¶ 58, 73 & figs. 9, 12.)**

**Defendants' Response:**

*Disputed as to the admissibility of the Horowitz Report. See Defendants' Motion to Strike).*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible. The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

343.    **"LimeWire downloads files from many different host computers at the same time through a process called swarming."  If a file is available from multiple hosts, "[s]warming enables LimeWire to download at much higher speeds since each host adds to the total download speed".  (Ex. 28 (http://wiki.limewire.org/index.php?title=User_Guide_Download at 2).)**

**Defendants' Response:**

*Undisputed. However, swarming has nothing to do with downloading "popular" files ("popular" in the context of Lime Wire means files with more than one source; see Bildson Tr. 535:11 – 537:12). It was implemented in order to increase the speed of downloads in general. Rohrs Tr. 107:04 – 111:15; see also Gribble Decl. 25.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is immaterial, irrelevant and argumentative.  (*See* note 6.)  Moreover, Gribble's declaration is based upon his discussions with Sam Berlin and his review of "deposition transcripts", but there are no admissible citations to those sources.  Accordingly, defendants' response is improper because it fails to cite to admissible evidence in support.  (*See* note 5.)

344.    **Defendants' own expert testified that if a file exists in the shared directories (*see supra* ¶¶ 78-80, 532) of more than one user, "it's likely to be a file that other people have as well, which means that it's likely to be a popular file, which means it's likely to be a song or video or something that many people want, which means it's more likely to be copyrighted".  (Mercurio Tr. 259:19-260:25.)**

**Defendants' Response:**

*Disputed. Mercurio is not proffered as, nor does he profess to be, an expert on the copyright status of files. In fact, he specifically stated that he does not hold himself out as a copyright expert. (Mercurio Tr. 247:18- 21). Moreover, "popular" in the context of*

*Lime Wire means that it is available from more than one source. (Bildson Tr. 535:11 – 537:12).*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Moreover, defendants' response is immaterial, irrelevant and argumentative.  (*See* note 6.)  The statement does not hold Mercurio out as an expert on copyright status and the Bildson testimony cited by defendants does not respond to the cited portion of the Mercurio testimony (defendants' own expert) as to the meaning of a "popular file".  Thus, this statement must be deemed undisputed.

**345.   When asked by defendants' counsel to explain this belief, defendants' expert testified:  "Well, I believe that's a logical assumption . . . [I]f we compare my computer to all of the computers that are sitting in this room right now, excluding the filings that relate to specifically to this case, there's likely to be fairly significant overlap, given that we all have a tremendous amount of files on the operating system.  So I believe that all the files in overlap probably are copyrighted.  After all, I have files from a lot of my other casework that you don't have, pictures of my children and so on and so forth, but you don't have those files.  So the files that we have in common are from programs or, if any of us happen to have the same taste in music and have our iTunes library on our work computers, there might be some overlap there.  But again, those would be copyrighted as well."  (Mercurio Tr. 250:16-251:22.)**

**Defendants' Response:**

*Disputed.  It is difficult to conceive how defense counsel could be asking Mercurio to explain "this" belief (referring to paragraph 344) when the question posed by Plaintiffs' counsel (on which defense counsel allegedly sought explanation) is located on page 259 of the Mercurio Transcript and defense counsel's alleged seeking of explanation took place eight pages earlier on pages 250-51. See Mercurio Tr. 250-51; 259. Moreover, by Plaintiffs' own quotation of Dr. Mercurio, Dr. Mercurio explained that he believed many of the overlapping files to be those of the operating system (hence the reason he believed it to be copyrighted) and he indicated this was all his belief and assumption. Additionally, as stated supra, Dr. Mercurio is offered as a statistician and for his unchallenged and unquestioned expertise in that area; not as an expert on the copyright status of various files.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, the Mercurio testimony cited by defendants explains the same belief expressed by Mercurio in the portion of his testimony cited by defendants, *i.e.*, the belief that "if there was a file that one user had in his or her shared folder and another user had that same file, then it was more likely to be copyrighted".  (*See* Mercurio Tr. 250:12-251:3.)  *Second*, the remainder of defendants' response is immaterial, irrelevant and argumentative.  (*See* note

6.)  The statement does not claim that Mercurio believed the operating files to be part of the operating system or that Mercurio is an expert on copyright status.  Dr. Mercurio is not an expert statistician, has not taken any courses on sampling, was not presented by FTI (his employer) as an expert on sampling, is not a member of the National Association of Statisticians, and was not presented by FTI as an expert witness.  (*See* Mercurio Tr. 39:12-41:20 & Ex. 490; *id.*at 45:16-47:7; 51:4-51:12; 55:4-59:2; 75:20-76:13 & Ex. 473.)

### 3.   LimeWire is Designed to Assist Users in Evading Antipiracy Measures

- **LimeWire is Designed to Enable Users to Avoid Detection, Impeding Efforts to Stop Piracy**

346.   **In the original Gnutella network, each peer (client) on the network was directly connected to other peers on the network for purposes of searching. (Fisk Tr. 50:21-52:10.) [Undisputed]**

347.   **Lime Wire software engineers, including Fisk, introduced "UltraPeers" to the network. (Ex. 219 (http://wiki.limewire.org/index.php?title=Ultrapeers); Fisk Tr. 57:5-58:19.) [Undisputed]**

348.   **In this configuration, peers on the Gnutella network are either "ultrapeers", which perform searches, or "leaves", which connect only to ultrapeers for purposes of searching.  (Ex. 219 (http://wiki.limewire.org/index.php=Ultrapeers at 1); Horowitz Report ¶ 35; Gribble Report at 11.)**

## Defendants' Response:

*Disputed as to the admissibility of the Horowitz Report. See Defendants' Motion to Strike.*

## Plaintiffs' Reply:

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute Exhibit 219 or the cited portion of Gribble Report, which provide sufficient support for the statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

349.   **When a leaf connects to an UltraPeer, it sends the UltraPeer an encoded list of the files that it is sharing, which is known as a Query Routing Protocol ("QRP") Table.  UltraPeers take the QRP Tables from the leaves and**

136

**"generate a composite QRP table that describes everything it and all of its leaves are sharing". (Ex. 220 (http://wiki.limewire.org/index.php?title=QRP at 2); *see also* Ex. 221 at LW DE 1151990; Horowitz Report ¶ 35.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report and Exhibit 221. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute Exhibit 220, which alone provides sufficient support for the statement.  Defendants dispute the admissibility of Exhibit 221, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Defendants also dispute the admissibility of the Horowitz Report which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**350.**   **Although an UltraPeer's QRP Table contains data regarding what files are being shared by the leaves connected to the UltraPeer, these tables do not contain the actual names of the files being shared.  Rather, information about the files is kept in a form that enables the files to be searched but that also makes it difficult for others to determine the names of the files being shared. (Ex. 222 at LW DE 006197; Rohrs Tr. 95:3-98:8.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 222.   See Defendants' Settlement/Pre-August 2003 Objections; see also Berlin Decl. ¶ 10.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 222, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Moreover, defendants themselves have proffered Exhibit 222 as their own Exhibit 33 and so have waived any objection to this document.  (*See* Baker 9/26/08 Decl. ¶ 35.)  Defendants dispute the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

351.     Lime Wire former Senior Software Engineer Rohrs testified that one of the
reasons the QRP tables were so designed was to enable individuals to
"upload anonymously".  When asked if copyrighted music would be one of
the things that individuals would want to upload anonymously, Rohrs
testified, "I suppose, yes, certainly".  (Rohrs 96:20-98:8.)

**Defendants' Response:**

*Disputed. First, his testimony is inadmissible. See Defendants' Motion to Strike. Second,
QRP tables do not allow users to upload anonymously in the context of shielding the
identity of what users are uploading. See Berlin Decl.  10. This was not a design decision
to purposefully hide users' activities, but simply a fact of the way the QRP Table works.
See also Defendants' Ex. 33 (discussing overall benefits of ultrapeers).*

**Plaintiffs' Reply:**

*First*, defendants dispute the admissibility of the Rohrs testimony, which is, in fact,
admissible.  (*See* Attach. B at 6.)  *Second*, defendants' objection is unintelligible.  *Third*,
defendants chose to implement a QRP table over other means of implementing their
software.  (*See* Ex. 222 (proposing the use of ultrapeers and QRP tables on the Gnutella
network).)  Thus, this statement must be deemed undisputed.

352.     TLS is a protocol that encrypts network traffic, making it very difficult to
determine the contents of that traffic.  For example, if a LimeWire user were
to establish a network connection to another LimeWire user, and both had
enabled support for TLS encryption, the users' Internet Service Providers
would be able to determine that there was network traffic between the two
clients, but *not* the content of the traffic.  (Berlin Tr. 329:6-330:7, 331:18-
332:20.)

**Defendants' Response:**

*Undisputed. However, this encryption does not hide a user's identity, nor does it encrypt
the files that are being downloaded or uploaded. Berlin Tr. 329:01 – 333:5; Berlin Decl.
¶ 20.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is irrelevant,
immaterial and argumentative.  (*See* note 6.)

353.     By default, LimeWire is configured to use TLS encryption.  (Berlin Tr.
330:8-331:17; Ex. 223.)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 223. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibit 223, which is, in fact, admissible. (*See* Attach. A at Ex. 223.) Thus, this statement must be deemed undisputed.

354. **Lime Wire Senior Software Developer Berlin testified that he decided to set TLS encryption to "on" by default because, had it been "default to off, it would have been a waste of time" because "[n]o one would have used it". (Berlin Tr. 333:9-15.)** [Undisputed]

- **LimeWire is Configured to Implement IP Blocklists, Which Inhibit Anti-Piracy Efforts**

355. **IP addresses associated with companies that placed files on the Gnutella network that purported to be copyrighted music, but were in fact not (an antipiracy practice known as "spoofing"), would generally "find themselves on a hostiles.txt list". (D. Nicponski Tr. 135:19-136:14, 138:7-139:10; *see also* Gribble Tr. 78:3-14, 206:9-15.)**

**Defendants' Response:**

*Disputed to the extent that this statement implies that Lime Wire intentionally placed these IP addresses on this list, which it did not.* See *Berlin Tr. 140:15 – 141:16; D. Nicponski Tr. 134:21 – 141:7.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement -- only what they deem to be the implication of the statement. The remainder of defendants' response is irrelevant, immaterial and argumentative. (*See* note 6.) Thus, this statement must be deemed undisputed.

356. **"Hostiles.txt was a data file used to contain information about IP addresses [associated with . . .] excessive spamming or other hostile activity". (D. Nicponski Tr. 134:21-135:11; *see also* Horowitz Report ¶ 79.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Nor do they dispute the cited portion of the Nicponski testimony, which alone provides sufficient support for the statement. Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible. The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his

report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**357.    Once an IP addresses was added to hostiles.txt, the "client software would block any connections to or search results from them".  (D. Nicponski Tr. 134:21-135:11; *see also* Horowitz Report ¶ 79.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Nicponski testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**358.    The LimeWire Forums supermoderator known as Aaron.Walkhouse maintains the hostiles.txt list.  (Berlin Tr. 94:6-95:3; *see also* Ex. 224 (http://www.gnutellaforums.com/open-discussion/53973-technotopia-fullsize-hostiles-list-bearshare-limewire.html) (Walkhouse providing instructions on how to obtain and use the hostiles.txt list with LimeWire); *see also supra* ¶¶ 271, 275.)**

**Defendants' Response:**

*Disputed. First, there is no such thing as "the" hostiles.txt.list; Walkhouse maintains a list of hostile IP addresses. Berlin Tr. 95:4 – 23. Second, a hostiles.txt.list is not "maintained" by anyone—and certainly not by an agent or employee of Lime Wire. Moreover, Exhibit 224 is not admissible. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

*First*, defendants dispute the admissibility of Exhibit 224, which is, in fact, admissible. (*See* Attach. A at Ex. 224.)  *Second*, defendants dispute that there is a "hostiles.txt. list", but themselves admit that Walkhouse maintains a "list of hostile IP addresses".  The remainder of defendants' response is argumentative (*see* note 6), and not supported by citations to admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

359.    **Lime Wire designed LimeWire to look for a file named "hostiles.txt" in a particular location upon startup, and, if that file contains a properly formatted set of IP addresses, will read those IP addresses and prevent the LimeWire client from connecting to them.  (Berlin Tr. 145:12-147:3, 148:8-16, 148:24-150:8; *see* Ex. 225 at 1-2; Ex. 226 at LW DE 1231777; Horowitz ¶ 79.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report and Exhibit 225. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Berlin testimony or Exhibit 226, which alone provide sufficient support for the statement.  Defendants dispute the admissibility of the Exhibit 225, which is, in fact, admissible.  (*See* Attach. A at Ex. 225.)  Defendants also dispute the admissibility of the Horowitz Report, which is also admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

360.    **PeerGuardian is an application that prevents computers operating from certain IP addresses from accessing a P2P user's computer, and allows users to prevent their computers from accessing those IP addresses.  (Horowitz Report ¶ 76.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to the admissibility of the Horowitz Report. See, Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

361.    **A Lime Wire glossary described PeerGuardian as "a cloaking application that attempts to block certain parties, such as the RIAA, from seeing what is on a users [*sic*] hard drive".  (Ex. 227 at LW DE 006608; Horowitz ¶ 76.)**

**Defendants' Response:**

*Disputed. There is no evidence that Lime Wire ever had a glossary. In fact, Sam Berlin denies such a thing. Berlin Tr. 129:06 - 11. In addition, the Horowitz Report is not admissible. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the admissibility of Exhibit 227, which alone provides sufficient support for the statement.  To the extent that defendants claim that Lime Wire did not have a glossary, Exhibit 227 is a document produced by defendants from their files, entitled "Glossary" with the Lime Wire LLC logo and address at the top.  The Berlin testimony cited by defendants is *not* based upon being shown this document.  (*See* Berlin Tr. 129:06-11.) Defendants also dispute the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**362.** **Former Lime Wire Software Engineer David Nicponski testified that PeerGuardian "operat[es] in a manner similar to this Hostiles.txt mechanism.  However, it's doing so in a client independent fashion".  (D. Nicponski Tr. 142:10-143:2.)**

**Defendants' Response:**

*Disputed as to the admissibility of the cited portions of the Nicponski Transcript. See Defendants' Motion to Strike. Furthermore, there is no evidence that Lime Wire ever promoted the use of this software.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the cited portion of the Nicponski testimony.  The remainder of defendants' response is immaterial, irrelevant and argumentative (*see* note 6), and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**363.** **Forum moderators (*see supra* ¶¶ 259, 287) encouraged LimeWire users to use PeerGuardian.  (*See e.g.*, Ex. 228 (http://www.gnutellaforums.com/connection-problems/76141-sent-email-roadrunner.html at 3).)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 228. See Defendants' Motion to Strike. In addition, there is no evidence that these moderators were acting as agents of Lime Wire, and thus any alleged encouragement was not that of Lime Wire.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute the admissibility of Exhibit 228, which is, in fact, admissible. (*See* Attach. A at Ex. 228.) The remainder of defendants' response is argumentative (*see* note 6), and does not cite to any admissible evidence in support. (*See* note 5.) Thus, this statement must be deemed undisputed.

364. **SIMPP is a mechanism that enables Lime Wire to control and change certain settings of installed LimeWire clients remotely by sending out "sign[ed]" messages, which are "propagated virally through the Gnutella network" by LimeWire clients. (Berlin Tr. 129:22-130:15, 134:10-19; Gribble Tr. 189:9-192:23.)**

**Defendants' Response:**

*Neither witness testified as to the word "control"; SIMPP allows Lime Wire to communicate with its clients. Berlin Tr. 129:24–130:03. Moreover, Defendants' computer science expert also disagrees with this statement. Gribble Decl. 46. ("The SIMPP mechanism does not permit Lime Wire LLC to control the activities of LimeWire user.")*

**Plaintiffs' Reply:**

Whether or not the witnesses themselves used the word "control" is irrelevant since the material point is that LimeWire was able to set parameters that controlled the functioning of users' LimeWire clients. (*See* Berlin Tr. 129:22-130:15, 134:10-19; Gribble Tr. 189:9-192:23.) Moreover, defendants response is argumentative. (*See* note 6.)

365. **Recent versions of SIMPP file, which Lime Wire distributes (*see supra* ¶ 364), contain a setting for filtersettings.hostileIps, which functions as an additional IP "blacklist" for LimeWire clients. (Berlin Tr. 136:22-138:9; Ex. 229 at 2; Gribble Report at 24; Horowitz Report ¶ 80.)**

**Defendants' Response:**

*Disputed as to the admissibility of the Horowitz Report and Exhibit 229. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute the admissibility of Exhibit 229, which is, in fact, admissible.  (*See* Attach. A at Ex. 229.)  Defendants also dispute the Horowitz Report which is also admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**366.**    **LimeWire users cannot connect to IPs specified in the "blacklist" and will not "download from them [or] receive search results from them". (Berlin Tr. 138:17-139:16.) [Undisputed]**

**367.**    **Until recently, use of the SIMPP IP blacklist was activated automatically in the LimeWire client with no user option within the client to disable it. (Berlin Tr. 156:17-157:22.) [Undisputed]**

**368.**    **In 2007 or 2008, Lime Wire implemented the user option to turn the SIMPP IP blacklist off, with the default set to "on".  (Ex. 230; Berlin Tr. 155:8-156:19.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 230. See Defendants' Motion to Strike. Again, there is no evidence that Lime Wire ever added the IP address of any anti-piracy outfit to this blacklist; in fact, Lime Wire absolutely denies it. Berlin Decl. ¶ 22.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 230, which is, in fact, admissible.  (*See* Attach. A at Ex. 230.)  The remainder of defendants' response is immaterial, irrelevant and argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

**4.**    **Lime Wire Sought to Achieve Napster's Functionality for the LimeWire Client While Avoiding the Ability to Control or Monitor the Network in a Centralized Fashion**

**369.**    **Lime Wire believed that the finding of secondary liability against Napster for copyright infringement was based upon Napster's centralized control over its system.  (Ex. 3 at LW DE 486249; Cho Tr. 31:10-32:9.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 3. See Defendants' Settlement/Pre-August 2003 Objections. Furthermore, these were Steven Cho's opinions, not those of Lime Wire.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Nor do they dispute the Cho testimony, which provides support for the statement.  Defendants dispute only the admissibility of Exhibit 3, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; *see also* Pls. Reply ¶ 46.)  Thus, this statement must be deemed undisputed.

> **370.   In its Offering Memorandum, Lime Wire asserted that "[g]iven the fundamental difference in the architecture of the Gnutella Network from the Napster service Lime Wire believes that it has valid arguments why its service should not be liable for contributory or vicarious copyright infringement".  (Ex. 3 at LW DE 486249.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 3. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 3, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; *see also* Pls. Reply ¶ 46.)  Thus, this statement must be deemed undisputed.

> **371.   When asked to explain the differences between Napster and LimeWire, Lime Wire witnesses responded that Napster was "centralized" and LimeWire is not.  (*See, e.g.* Berlin Tr. 354:23-355:12; D. Nicponski Tr. 61:6-21; Rohrs Tr. 29:11-16; *see also* Cho 31:20-32:9, 58:22-62:3.)  No Lime Wire witness responded that Napster was used for music copyright infringement and LimeWire is not.**

**Defendants' Response:**

*Disputed as to admissibility of D. Nicponski's Transcript 61:11 – 61:21. See Defendants' Settlement/Pre-August 2003 Objections. Also, because these witnesses were never asked this question regarding whether Lime Wire was used for infringement, there is no testimony one way or another.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute the cited portions of the Berlin, Rohrs, and Cho testimony, which provide sufficient support for the statement.  Although defendants purported to strike certain depositions and transcript portions, Defendants have not disputed the cited portion of the Nicponski testimony, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at Exs. A, B; *see also id.* at 11-24.)  Further, the remainder of defendants response is nonresponsive, immaterial and argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

**372.   In a May 5, 2008 post on his weblog, Lime Wire's former Senior Software Engineer Fisk asserted that "[i]n every case I've ever seen, it's orders of magnitude harder to distribute a task than it is to centralize it .  In support of his position, he reflected that LimeWire "could never compete with the speed or collaborative filtering of centralized search.  Most importantly, it could never compete with the simplicity of centralization.  What took us 6 months to distribute [at LimeWire] would have taken a couple of days to centralize. Distributed networks also make updating much harder . . . .  If you have a choice, centralized search wins every time."  (Ex. 231 (http://adamfisk.wordpress.com/2008/05/05/decentralized-twitter-a-bad-idea/).)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 231. See Defendants' Motion to Strike. In addition, this is the personal opinion of Mr. Fisk and it has no relevance to the issues in this lawsuit. Moreover, as shown by Mr. Gorton's testimony, Lime Wire chose this architecture for a host of good reasons, irrespective of Napster. Gorton Decl. ¶ 12-15. Notably, Lime Wire chose its decentralized architecture well before Napster was found liable. Finally, it should be noted that Fisk was apparently promoting his own P2P network he recently developed called Last Bamboo which is based on a centralized distribution model. Fisk Tr. 148:20 – 151:14.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 231, which is, in fact, admissible.  (*See* Attach. A at Ex. 231.)  This statement is material because it reflects the view of a LimeWire senior software engineer, employed by Lime Wire LLC from 2000 to February 2004, as to whether the LimeWire software was designed to maximize ease of design and the speed of the search or for reasons such as a desire to avoid liability.  Gorton's declaration offers no concrete or contemporaneous support for his assertions.  In fact, contemporaneous statements suggest that LimeWire was designed in a decentralized manner to avoid being "shut down" as Napster was.  (*See* Pls. 9/26/08 (LW) Add'l SOF ¶ 12.)  Moreover, LimeWire's CTO, Greg Bildson, directly contradicted Gorton in his declaration.  (*See* Pls. 9/26/08 (LW) Add'l SOF ¶ 13a; Forrest 9/26/08 Decl., Bildson

146

9/10/08 Decl. ¶ 4.)  The remainder of defendants' response is argumentative (*see* note 6), and fails to cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**373.** **Defendants' expert testified that it was technologically feasible for Lime Wire to construct a server to monitor all download requests sent from LimeWire clients. (Gribble Tr. 215:3-25.) [Undisputed]**

**374.** **On March 17, 2001, Lime Wire Business Development Leader Cho wrote to Bildson and Gorton, among others, that "it will be important to develop the [LimeWire] software to give it at least Napster's functionality".  (Ex. 232.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 232. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Furthermore, even if Exhibit 232 is ruled admissible, Defendants wish to point out that there is no evidence that Lime Wire gave its software the same functionality as Napster's. In fact, every developer at Lime Wire has testified just the opposite. See also Singla Decl. ¶¶ 5, 6; Fisk. Decl. ¶ 5. ("I'm not aware of any instances in which Lime Wire engineers made design decisions that enhanced the software so as to allow users to search for, locate and download unauthorized copyright content." See also Gribble Decl. ¶¶ 49-52 (describing automatic sharing of file feature as generic to all P2P software applications). Moreover, the "functionality" Cho refers to (viewing mp3 length, bitrate info) were actually features of the Napster user interface, and had nothing to do with Napster's decentralized architecture.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 232, which is, in fact, admissible.  (*See* Attach. A at Ex. 232; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  The remainder of defendants' response is irrelevant, immaterial and argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

**375.** **Cho testified that analyzing the features of Napster was part of his "competitive analysis", the goal of which was to "take the best features [of other clients and services] and integrate them into our [LimeWire] client". (Cho Tr. 73:12-74:5; *see also id.* 20:7-21:15, 28:14-29:6 (testifying that he used Napster and Aimster for "testing" and "competitive analysis").)**

**Defendants' Response:**

*Disputed. Cho reviewed several P2P clients, not just Napster. He also analyzed search engines such as Google and Yahoo! and would then determine what features users found attractive and would recommend them. Cho. Tr. 20:07–21:15, 72:23–74:24. However, there is no evidence that the "best features" of Napster were ever included in LimeWire. In fact, the only evidence of any "feature" that Napster had that was included in*

*LimeWire was the automatic uploading of all downloaded files. But as explained throughout this response, that functionality was added because it improved the overall efficiency of the network. See response infra ¶¶ 379, 380; see also Gribble Decl. ¶¶ 49-52 (it improves network performance).*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  The remainder of defendants' response is immaterial, irrelevant and argumentative (*see* note 6), and does not cite to any admissible evidence in support.  (*See* note 5.)  Further, whether Napster features were *actually* integrated into LimeWire is not relevant to the issue of intent or purpose.  *See Grokster,* 545 U.S. at 925 n.7.  Thus, this statement must be deemed undisputed.

**376.**   **In an early document discussing ways to improve the health of the Gnutella network, Lime Wire Software Engineer Rohrs wrote that, "[i]f the freeloader problem were solved, Gnutella might perform about as well as Napster".  (Ex. 233 at LW DE 1975015.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 233.  See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 233, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Moreover, defendants themselves have proffered Exhibit 233 as their own Exhibit 29 and so have waived any objection to this document.  (*See* Baker 9/26/08 Decl. ¶ 31.)  Thus, this statement must be deemed undisputed.

**377.**   **Rohrs defined "freeloaders" as "people who take files from the network but do not share.  They prevent the replication of popular files".  (Ex. 233 at LW DE 1975014.)  A Lime Wire Glossary similarly defines a Freeloader as "A user that utilizes network resources without making files available for upload.  These people are also known as leeches".  (Ex. 227 at LW DE 006607.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 233.  See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute Exhibit 227, which alone provides sufficient support for the statement.

Defendants dispute only the admissibility of Exhibit 233, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; *see also* Pls. Reply ¶ 376.) Thus, this statement must be deemed undisputed.

**378.     Rohrs further asserted that "[t]he problem with [servents that do not automatically reshare downloads] is that they reduce the number of files you can find on the network.  Assuming all servents [are configured in a particular way] you can search 4^6=4096 hosts.  That's actually a fairly respectable number—close to the number of people on a typical Napster server."  (Ex. 233 at LW DE 1975015.)**

## Defendants' Response:

*Disputed as to admissibility of Exhibit 233.  See Defendants' Settlement/Pre-August 2003 Objections.*

## Plaintiffs' Reply:

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 233, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; *see also* Pls. Reply ¶ 376.)  Thus, this statement must be deemed undisputed.

**379.     Early clients operating on the Gnutella network, including the original Gnutella client, did not automatically reshare downloads.  (Ex. 233 at LW DE 1975014-17; Ex. 235; *cf. supra* ¶ 83.)**

## Defendants' Response:

*Disputed as to admissibility of Exhibit 233. See Defendants' Settlement/Pre-August 2003 Objections. Even if Exhibit 233 is ruled admissible, Defendants wish to point out that this document really says that these early Gnutella clients did not "allow users to share their download because they were not completed downloads." Ex. 233 at LW DE 1975014.*

## Plaintiffs' Reply:

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute Exhibit 235, which provides support for the statement.  Defendants dispute only the admissibility of Exhibit 233, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; *see also* Pls. Reply ¶ 376.)  The remainder of defendants' response is immaterial, irrelevant and argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

**380.     In response to an August 2000 email (*see supra* ¶ 302), Bildson suggested two changes to the LimeWire client:  "[ ]upload and downloads [should] go to the same directory so sharing will happen by default", and LimeWire should consider taking "more radical action" to "enforce sharing in some ways" (Ex. 188 at JB 0324-35), to which Cho responded: "I like the idea of having**

**downloads and uploads being the same directory or folder, a la Napster. I think a lot of Napster users are just too lazy to pull the stuff [music files] out, given that there is a convenient built-in MP3 player in the Napster program".** (*Id.* **at JB 0324.**)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 188. See Defendants' Settlement/Pre-August 2003 Objections. Even if Exhibit 188 is ruled admissible, Defendants would show that the person that made this suggested change (Bildson) did so independently of any Napster considerations. It was inexperienced college kid Cho spouting off another of his crazy ideas, ideas that were underlined repeatedly rejected by management.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibit 188, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Moreover, defendants use Exhibit 69 affirmatively to support their additional facts and so have waived any objection to this document. (*See* Defs. 9/26/08 Add'l SOF ¶ 639.) The remainder of defendants' response is immaterial and argumentative (*see* note 6), and does not cite to any admissible evidence in support. (*See* note 5.) Thus, this statement must be deemed undisputed.

381. **Cho testified that the effect of having downloads and uploads in the same directory would be to "force – or it would have people sharing stuff that they had downloaded rather than just sort of downloading and holding on to it".** (Cho Tr. 80:20-81:7.)

**Defendants' Response:**

*Disputed as to admissibility of the referenced portion of Cho's Transcript. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of the cited portion of the Cho transcript, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Br. at 14.) Thus, this statement must be deemed undisputed.

382. **LimeWire automatically shares files the LimeWire user has downloaded.** (Horowitz Report ¶ 70; Fisk Tr. 88:6-10; Gribble Tr. 267:18-268:11, 269:13-25; *see also* Ex. 214 at LW DE 1107218 ("Anything you download will be placed [in the shared directory] by default"); Gribble Tr. 253:5-254:9 (testifying that LimeWire made a design choice to place downloaded files in the shared folder automatically).) **By default, LimeWire automatically shares even partially downloaded files.** (Horowitz Report ¶ 69.)

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike).*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portions of the Fisk and Gribble testimony or Exhibit 214, which provide sufficient support for the statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

383. **According to defendants' expert, Lime Wire could have made the design choice to prevent .mp3 files from being placed in the shared folder automatically, thus preventing the automatic sharing of .mp3 files.  (Gribble Tr. 273:19-274:3.)**

**Defendants' Response:**

*Undisputed. However, this would have prevented the sharing of all mp3 files, including authorized mp3 files.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is irrelevant and does not cite to any admissible evidence in support.  (*See* note 5.)

384. **LimeWire is designed with an additional feature that enables users to prevent others from connecting to them if the other users share fewer than a designated number of files.  (Horowitz Report ¶ 71; *see also* Ex. 234 at LW DE 1974978 ("LimeWire can be configured to deny connections to servents that are serving no files"); Ex. 235 at LW 005655-56.)**

**Defendants' Response:**

*Disputed. First, the Horowitz Report and Exhibits 234 and 235 are inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Second, there is no evidence that Lime Wire implemented this feature. In fact, there is testimony to the contrary. See Bildson Tr. 515:04 – 515:09.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  *First*, defendants dispute the admissibility of Exhibits 234 and 235, which are, in fact,

admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; Pls. Reply ¶¶ 51, 53.)
Defendants also dispute the admissibility of the Horowitz Report which is also
admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26,
and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See*
Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event,
Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest
11/07/08 Decl. ¶ 13.)  The remainder of defendants' response is immaterial and
irrelevant.  That Lime Wire was designed with this feature, whether or not it was
implemented, "illuminate[s] [Lime Wire LLC's] purposes".  *See Grokster,* 545 U.S. at
925 n.7.  Thus, this statement must be deemed undisputed.

385.   **In a March 2002 post on the Gnutella Developer Forum, Bildson wrote:
       "Guess what . . . LimeWire did to improve [download success rates]?  We
       drove clients that didn't automatically share downloaded files (Gnutella 0.56
       I believe) off the network and off download sites."  (Ex. 236 at 1.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 236. See Defendants' Settlement/Pre-August 2003
Objections. However, if Exhibit 236 is ruled admissible, Defendants wish to point out that
this document also states that this design change was made to "improve download
success rate," not achieve Napster's functionality. Ex. 236.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants
dispute only the admissibility of Exhibit 236, which is, in fact, admissible.  (*See* Pls.
Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Moreover, defendants themselves have proffered
Exhibit 236 as their own Exhibit 62 and so have waived any objections to this document.
(*See* Baker 9/26/08 Decl. ¶ 64.)  The remainder of defendants' response is argumentative
(*see* note 6), and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus,
this statement must be deemed undisputed.

386.   **In his paper, "A Measurement Study of Peer-To-Peer File Sharing Systems",
       defendants' expert concluded:  "There is an obvious similarity between
       Napster and Gnutella; for both, most sessions are quite short -- the median
       session duration is approximately 60 minutes.  This is not surprising, as it
       corresponds to the time it typically takes for a user to download a small
       number of music files from the service."  (Ex. 237 at 9.)**

**Defendants' Response:**

*Undisputed. But the length of a session does not mean LimeWire or Gnutella was
designed to emulate Napster.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of the defendants' response is immaterial, argumentative and does not cite to any admissible evidence in support.  (*See* notes 5, 6.)

387.   **In the same paper, defendants' expert also concluded that the size of the average file being shared on Napster and Gnutella was "virtually identical at 3.7MB, corresponding to the size of a shared typical MP3 audio file". (Ex. 237 at 11-12; Gribble Tr. 139:25-142:16; *see also* Ex. 238 at 11-12; Gribble Tr. 148:23-150:19.)**

**Defendants' Response:**

*Undisputed. But the length of a session does not mean LimeWire or Gnutella was designed to emulate Napster.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is immaterial, argumentative and does not cite to any admissible evidence in support.  (*See* notes 5, 6.)

388.   **Lime Wire's former Software Engineer David Nicponski testified that he would have "categorically" objected to any feature that "tried to take the decentralized networks and replaced it with a centralized one". (D. Nicponski Tr. 159:15-160:4.)**

**Defendants' Response:**

*Undisputed that a sole software engineer at Lime Wire, who worked there for a total of nine months, held this opinion. However, even if this were Lime Wire's opinion, this does not equate to a finding of bad intent as to avoiding Napster functionality. As explained in Mark Gorton's declaration, Lime Wire chose this functionality not to avoid liability but because it was more robust, it was different, and it prevented control by others. Gorton Decl. ¶ 12–15. Finally, even if Lime Wire consciously chose to design its software to avoid litigation, there is certainly nothing improper about that.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is immaterial, and argumentative and does not cite to any admissible evidence in support.  (*See* notes 5, 6.)

389.   **Nicponski objected to the inclusion of a feature in the SIMPP system (*see infra* ¶ 364) that he believed would have created a "centralized capability for [LimeWire] to try and deduce the contents of files that are being shared and produce warning messages [displayed to the user] as a result", (Nicponski Tr. 160:19-22; 161:6-162:22), stating that although it "[s]ounded initially like a good idea", his "only concern about this would be the potential for court-**

ordered or injunction cases where we would be forced to do this for IP rights' holders". (Ex. 239 at LW DE 1717411.)

**Defendants' Response:**

*See supra ¶ 388 response. Moreover, disputed as to admissibility. Also, Defendants object to Plaintiffs' attempt to introduce into evidence Nicponski Transcript 161:22 – 164:25. See Defendants' Motion to Strike*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 388. Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of the cited portion of the Nicponski testimony, which is, in fact, admissible. (*See* Attach. B at 6.) Thus, this statement must be deemed undisputed.

> ### 5. Lime Wire Designed LimeWire with Reference to and in an Effort to Surpass the Functionality of Kazaa

390. As shown above (*see supra* ¶ 219), Gorton wrote to investors in 2002 that "[t]he main reason for the relatively slow growth [of LimeWire] has been the superior functionality of several competing file sharing networks, primarily the FastTrack network (now Kazaa and Grokster) and AudioGalaxy. The bulk of the Napster users migrated to these two networks". (*See, e.g.*, Ex. 123; Ex. 124.)

**Defendants' Response:**

*See supra ¶ 377 response. Even if Exhibits 123 and 124 are ruled admissible, Defendants wish to point out that this is not evidence that Lime Wire sought to surpass Kazaa. It also seems to prove that Lime Wire did not attract Napster users as Plaintiffs constantly assert.*

**Plaintiffs' Reply:**

Defendants' response ¶ 377 is immaterial with respect to this statement. Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibits 123 and 124, which are, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) The remainder of defendants' response is argumentative (*see* note 6), and does not cite to any admissible evidence in support. (*See* note 5.) Defendants' last sentence is not accurate as plaintiffs have not "constantly asserted" anything in their 56.1 Statement, including that Lime Wire did not attract Napster users. Plaintiffs have submitted facts that show that Lime Wire *sought* to attract Napster users. (*See* Pls. 7/18/08 SOF ¶¶ 149-167.) Thus, this statement must be deemed undisputed.

391. In an October 2006 email to a private email group, Fisk wrote: "Kazaa made more money early on because it was a better program. Period. It took

us about a year at LimeWire to catch up to them . . . .  I think we ultimately surpassed them on pretty much all levels, but they beat us for awhile [sic]." (Ex. 203 at 4.)

**Defendants' Response:**

*Undisputed; however, this is not evidence that Lime Wire sought to surpass Kazaa.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of the statement is argumentative, conclusory, and unsupported by citations to admissible evidence.  (*See* notes 5, 6, 8.)

**392.**  **Lime Wire based its implementation of UltraPeers on Kazaa's "supernodes". (Ex. 219 (http://wiki.limewire.org/index.php?title=Ultrapeers); Fisk Tr. 53:11-54:25; 56:7-10.) [Undisputed]**

**393.**  **Fisk, who was one of the main developers of the LimeWire UltraPeer implementation (see supra ¶ 347), testified that the Kazaa supernode was "the most obvious implementation" of the UltraPeer concept of which he knew. (Fisk Tr. 53:11-25.) [Undisputed]**

**394.**  **LimeWire software engineers use the term "supernode" interchangeably with UltraPeer.  (Ex. 222; Ex. 240; Ex. 241.)**

**Defendants' Response:**

*Disputed as to the admissibility of Exhibits 222, 240, and 241 because they are inadmissible. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibits 222, 240 and 241, which are, in fact, admissible.  (*See* Attach. A at Exs. 240, 241; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Moreover, defendants themselves have proffered Exhibit 222 as their own Exhibit 33 and so have waived any objection to this document.  (*See* Baker 9/26/08 Decl. ¶ 35.)  Thus, this statement must be deemed undisputed.

**395.**  **Fisk argued to Vincent Falco of BearShare that LimeWire's choice of returning 150 search results was sufficient, and asked Falco, "Are you suggesting that you would prefer to get more than 150 results for a search. Note that this is \*100\* more results than Kazaa returns by default". (Ex. 242; Fisk Tr. 100:10-101:21; *see also id.* 102:15-19 (testifying that he was aware of how many results Kazaa returned "by searching on Kazaa").)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 242. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 242, which is, in fact, admissible.  (*See* Attach. A at Ex. 242; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Thus, this statement must be deemed undisputed.

**396.**   **In an email discussing the dynamic querying algorithm, Fisk wrote that "[w]here they [Kazaa] do beat us very badly is in their handling of metadata, as you pointed out – they're far more adept at propagating meta data [sic] out onto the network, which we'll [Lime Wire] be taking harder look at soon".  (Ex. 243.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 243.  See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 243, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Moreover, defendants themselves have proffered Exhibit 243 as their own Exhibit 35 and so have waived any objection to this document. (*See* Baker 9/26/08 Decl. ¶ 37.)  Thus, this statement must be deemed undisputed.

**397.**   **LimeWire source code contains references to the implementation of "Kazaa style settings" and "kazaa style keys". (Ex. 244 at LW DE 244384-86; Ex. 245 at LW DE 1963892-94.) [Undisputed]**

**398.**   **A March 23, 2005 email from Bildson to a reporter at the Cornell Daily Sun stated: "The network architecture that LimeWire uses is now more advanced than Kazaa and other clients. We have worked for 5 years to improve the Gnutella protocol and give it state-of-the-art features." (Ex. 246.) [Undisputed]**

**6.**   **Lime Wire Compared LimeWire's Functionality to That of Morpheus**

**399.**   **In a September 22, 2001 email, LimeWire Software Engineer Rohrs wrote: "I'm fairly convinced that query routing+supernodes will yield superior scalability to Morpheus or anything else out there."  (Ex. 240; *see also* Ex. 247 ("If you mouse over the file, metadata appears in a tooltip, a la Morpheus.").)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 240 and 247. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibits 240 and 247, which are, in fact, admissible. (*See* Attach. A at Exs. 240, 247; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; *see also* Pls. Reply ¶ 394.)  Thus, this statement must be deemed undisputed.

> **400.    In a March 6, 2002 email, Rohrs wrote: "We recently changed the search tab so that searches are initiated from the left side of the tab, a la (old) Morpheus or the Windows 2000 'find' feature.  This makes it easier for users to start metadata searches; no more clumsy pop-up windows."  (Ex. 248 at 2.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 248.   See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 248, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Thus, this statement must be deemed undisputed.

> **401.    Lime Wire's Senior Software Engineer Fisk researched Morpheus' implementation of an "anonymity" feature that was designed to cloak the activity of Morpheus users from the RIAA.  (Ex. 249.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 249. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 249, which is, in fact, admissible.  (*See* Attach. A at Ex. 249; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Thus, this statement must be deemed undisputed.

**E.     Lime Wire's Business Model and Revenues Depend on Massive Infringing Use of LimeWire**

402.    In an October 2006 email to a private email group, Lime Wire's former Senior Software Engineer Fisk wrote, "I have two problems with the p2p companies [including LimeWire]: . . . Their business[es] were entirely built off of infringement.  I don't see this an overall beneficial development, and I think we could have done far more with the technology".  (Ex. 250 at LW DE 1263218; Fisk Tr. 167:4-13.)

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 250. See Defendants' Motion to Strike. Fisk also testified in his deposition that he had no real evidence that Lime Wire's business was somehow devoted to infringement. Fisk. Tr. 179:09–179:19. Finally, other Lime Wire developers have testified to the contrary. See generally Daswani Decl.; Singla Decl.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 250, which is, in fact, admissible.  (*See* Attach. A at Ex. 250.)  In the testimony cited by defendants, Fisk does not deny that he believed defendants were "devoted" to infringement, only that he did not have evidence to support his view.  He did, however, state that he did have evidence that many users used LimeWire for infringement.  (*See* Fisk Tr. 179:09-19.)  The other Lime Wire developers whose declarations defendants cite did not dispute that LimeWire was used for infringement, only that they themselves did not program with the intent of increasing infringement.  *See* generally Daswani Decl.; Singla Decl.  Thus, this statement must be deemed undisputed.

403.    In an October 2006 email to the same group, Fisk wrote, "I agree the underlying technology for LimeWire and Skype are similar.  The point is that one [Lime Wire] makes all its money off of infringing content while the other does not".  (Ex. 203 at 4; Fisk Tr. 152:6-16.)

**Defendants' Response:**

*See supra ¶ 402 response.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Fisk testimony or Exhibit 203, which alone provides sufficient support for the statement.  Defendants' response to ¶ 402, which disputes the admissibility of Exhibit 250, is nonresponsive to ¶ 403.  In any event, Exhibit 250 is admissible.  (*See* Attach. A at Ex. 250.)  Thus, this statement must be deemed undisputed.

1. **Lime Wire's Early Business Model Failed to Generate Sufficient Revenue**

404. **Lime Wire's early business model was to develop and sell a product it called the Lime Peer Server.  (Ex. 115 at 6-7; Ex. 3 at LW DE 486245; Ex. 251 ("Very early on in LimeWire's history, we intended to only build server software for Gnutella.").)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 3 and 115. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute Exhibit 251, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibits 3 and 115, which are, in fact, admissible.  (*See* Attach. A at Ex. 115; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; *see also* Pls. Reply ¶ 46.)  Thus, the statement must be deemed undisputed.

405. **The Lime Peer Server was to promote the Gnutella network to corporations as "an information sharing and retrieval tool".  Lime Wire would "[d]evelop and sell software and network services to corporations and other entities to distribute information and digital products via the Gnutella Network or other peer-to-peer networks".  (Ex. 3 at LW DE 486245; *see also* Ex. 115 at 6 ("to be quite honest our original focus was on a very corporate space and we were -- that's why we actually built what we called the Lime peer server").)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 3 and 115. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants dispute this statement on the same grounds as ¶ 404.  (*See* Pls. Reply ¶ 404.)

406. **The Lime Peer Server was not successful. (Rohrs Tr. 171:22-24; Cho Tr. 45:16-46:25 (no recollection of anyone purchasing the server product).) [Undisputed]**

407. **Lime Wire also attempted to develop a product known as Lime Wire Information Routing, which was "a service which will route queries of customer-selected keywords or query types to corporate customers, maximizing their exposure to appropriate audiences on peer-to-peer networks such as Gnutella".  (Ex. 3 at LW DE 486245; Cho Tr. 47:2-20.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 3. See Defendants' Settlement/PreAugust 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 3, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 4 n.3; *see also* Pls. Reply ¶ 46.)  Thus, this statement must be deemed undisputed.

408.   **Lime Wire had a total net loss for the year 2000 of $286,911.78. (Ex. 252 at LW DE 1149253.) [Undisputed]**

2.   **Lime Wire Sought to Earn Revenue by Monetizing the Infringing User Base of its LimeWire Client**

409.   **By September 2001, Lime Wire needed to "make some quick cash" because it "had no money".  (Ex. 253; Rohrs Tr. 174:23-175:4.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 253. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 253, which is, in fact, admissible.  (*See* Attach. A at Ex. 253; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Thus, this statement must be deemed undisputed.

410.   **Lime Wire's plan to "make some quick cash" in 2001 was to generate revenue by integrating advertising into the LimeWire file sharing client (Ex. 253; Ex. 254), which since its release in August 2000 had been downloaded over three million times.  (*See supra* ¶ 87.)  For example, LimeWire "could show ads for CD and MP3 players to someone who is searching for music".  (Ex. 253; Rohrs Tr. 172:25-174:22.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibits 253 and 254 and the cited portions of the Rohrs Transcript. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibits 253 and 254 and cited portions of the Rohrs testimony, which are, in fact, admissible.  (*See* Attach. A at Exs. 253, 254; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; *see also* Pls. Reply ¶ 409.)  Thus, this statement must be deemed undisputed.

> **411.  Lime Wire implemented advertising through the LimeWire client, as well as "bundled" software, including software commonly referred to as "spyware".  (Ex. 255; Ex. 256; Rohrs Tr. 111:16-115:5.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 255 and 256 and the Rohrs Transcript. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibits 255 and 256 and the cited portion of the Rohrs testimony, which are, in fact, admissible.  (*See* Attach. A at Ex. 255; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Thus, this statement must be deemed undisputed.

> **412.  Lime Wire released LimeWire PRO, an enhanced "ad-free, bundled software-free" and paid-for version of the LimeWire client (*see supra* ¶¶ 56-59) in late 2001 or early 2002.  (Ex. 257 at 7; Ex. 115 at 17.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 257 and 155. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibits 155 and 257, which are, in fact, admissible.  (*See* Attach. A at Exs. 155, 257; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Thus, this statement must be deemed undisputed.

> **413.  By January 2002, Lime Wire's revenue was derived primarily from advertising, bundled software and sales of Lime Wire PRO.  (Ex. 257 at 6.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 257. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 257, which is, in fact, admissible.  (*See* Attach. A at Ex. 257; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; *see also* Pls. Reply ¶ 412.)  Thus, this statement must be deemed undisputed.

**414.** **Lime Wire's total income in 2001 was $174,099.28.  (Ex. 252 at LW DE 1149245.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 252.   See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 252, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Thus, this statement must be deemed undisputed.

**415.** **Lime Wire's total income in 2002 was $2,247,084.77.  (Ex. 252 at LW DE 1149246.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 252.   See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 252, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Br. at 3-11; *see also* Pls. Reply ¶ 414.)  Thus, this statement must be deemed undisputed.

**416.** **Lime Wire's total income in 2003 was $2,478,530.21. (Ex. 252 at LW DE 1149246.) [Undisputed]**

**417.** **Lime Wire removed all bundled software from LimeWire in 2004. (Ex. 258.) [Undisputed]**

**418.** **From 2004 onward, Lime Wire's income came almost entirely from sales of LimeWire PRO. (Ex. 252 at LW DE 149247-48; see also Rubenfeld Tr. 88:25-89:6.) [Undisputed]**

**419.** **LimeWire BASIC, distributed for free, "increases LimeWire's recognition – which is a large part of what sells [LimeWire] Pro".  (Ex. 259.)**

**Defendants' Response:**

*Disputed. This is pure speculation; there is no evidence that this in fact occurs.*

**Plaintiffs' Reply:**

Whether this in fact occurs is not relevant.  What is relevant is that Lime Wire LLC's Senior Software Developer, Sam Berlin, who has submitted a declaration on defendants' behalf, believed this to be true.  Moreover, defendants' response is argumentative and unsupported by admissible evidence.  Defendants also provide no evidence of what sells LimeWire Pro.  (*See* notes 5, 6.)

420.  **Lime Wire's total income in 2004 was $5,817,068.37. (Ex. 252 at LW DE 1149247.) [Undisputed]**

3.  **Lime Wire Promoted File Sharing on the Gnutella Network When It Knew the Dominant Use of Gnutella and LimeWire Was for Infringement of Copyrighted Sound Recordings**

421.  **A draft of the Lime Wire Offering Memorandum states that Lime Wire's business strategy was to "[p]opularize the Gnutella network and promote its use" and that the LimeWire application was "designed to encourage the growth of the Gnutella network".  (Ex. 95 at LW DE 1120638; Ex. 3 at LW DE 486245.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 3 and 95. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibits 3 and 95, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Moreover, defendants themselves have proffered Exhibits 3 and 95 as their own Exhibits 2 and 4, respectively, and so have waived any objection to these documents.  (*See* Baker 9/26/08 Decl. ¶¶ 4, 6.)  Thus, this statement must be deemed undisputed.

422.  **The Lime Wire Offering Memorandum stated that "the vast majority of files being shared on the Gnutella network are media files", including MP3s. (Ex. 95 at LW DE 1120649; Ex. 3 at LW DE 486253), and also recognized that "[The LimeWire software] can be, and has been, used to share files in violation of copyright and other intellectual property laws".  (Ex. 3 at LW DE 486249; *see also supra* ¶¶ 125-26, 128-30.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 3. See Defendants' Settlement/PreAugust 2003 Objections; see also response supra 125-26, 128-29 (discussing Lime Wire's business intent). Even if this document is admitted into evidence, Defendants wish to point out that Mr. Cho was speculating about what was being shared on Gnutella (Cho. Tr. 47;21 – 49:02). Moreover, Bildson testified that Cho "made this up" (Bildson Tr. 469:25 – 472:04) and that he disputed Cho's statements (Bildson Tr. 439:22 – 440:13). Gorton too disputes this statement. Gorton Tr. 202:03 – 209:17.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute the admissibility of Exhibit 3, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; *see also* Pls. Reply ¶ 46.)  Thus, this statement must be deemed undisputed.

**423.** **Lime Wire sought to increase the usage of the LimeWire client and the amount of material available for sharing on the Gnutella network.  (Ex. 71 (Bildson wrote in January 2001 "How do we saturate the market?  How do we win users [sic] mindshare? . . . I believe that there are massively powerful ideas on how to promote Gnutella and LimeWire directly and indirectly"); Ex. 260 at LW 004706 (Bildson stated in February 2002 that "[o]ur whole goal has been to evangelize that Gnutella is good . . . If Gnutella gets bigger, that's a good thing in general"); Ex. 97 at LW DE 1172918 (draft 2004 marketing plan listing as its "Mission" to "Increase adoption and usage of the Gnutella network for P2P activity" and "Increase adoption and usage of P2P technology as a whole").)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 260. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute Exhibits 71 and 97, which provide sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 260, which is, in fact, admissible.  (*See* Attach. A. at 260; Pls. Pre-2003/*Grokster* at 3-11.)  Thus, this statement must be deemed undisputed.

**424.** **As shown above (*see supra* ¶ 128), Gorton understood that "[s]haring media files" was the draw that was "bringing the initial user base to the network".  (Ex. 53 at JB 0274.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 53. See Defendants' Settlement/Pre-August 2003 Objections. In addition, Exhibit 53 does not state or imply that Gorton understood that this was the "draw" to the Gnutella network. In fact, Gorton disputes this. Gorton Tr. 202:03 – 209:17.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 53, which is, in fact, admissible.  (*See* Pre-2003/*Grokster* Opp'n Br. at 3-11; *see also* Pls. Reply ¶ 128.)  Thus, this statement must be deemed undisputed.

425.   **To further its goal of increasing sharing on the network, which in turn would draw in more users, Lime Wire came up with ways to "enforce sharing" and reduce "freeloading" on the network.  (*See supra* ¶¶ 376-85.)**

**Defendants' Response:**

*Disputed. (See response supra ¶¶ 376-85.) Bildson has testified that he is not aware of any anti-freeloading efforts being implemented. Bildson Tr. 575:04 – 515:09. Defendants' expert Gribble has also testified that any anti-freeloading feature serves to improve the overall Gnutella network performance, and that by having more files generally available, peers will be able to find content more easily and transfer the content with higher performance. Gribble Decl. ¶¶ 49-52. See also Rohrs Tr. 68:16-69:13.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  (*See* Pls. Reply ¶¶ 376-85.)  To the extent that defendants intended to cite page 515 rather than page 575 of Bildson's testimony, they contradict themselves. They cite Bildson for the proposition that he "was not aware of any anti-freeloading efforts being implemented" and then cite to Gribble's acknowledgement that LimeWire contained anti-freeloading features.  (*See* Gribble Decl. ¶ 51.)  Gribble's declaration does not undermine plaintiffs' statement above.  Thus, this statement must be deemed undisputed.

426.   **Lime Wire's goal was to create what it referred to as the "virtuous cycle": users of the LimeWire client would bring content to the network by sharing more, which would in turn draw in additional users interested in that content, who would in turn share more content, and the cycle would repeat itself.  (Ex. 95 at LW DE 1120648; Ex. 3 at LW DE 486254.)**

**Defendants' Response:**

*Disputed. First, Exhibits 3 and 95 are inadmissible. See Defendants' Settlement/Pre-August 2003 Objections. Second, Bildson has testified that this was not the goal of Lime Wire and that he does not believe in any virtuous cycle. Bildson Tr. 443:08 – 448:25.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute the admissibility of Exhibits 3 and 95, which are, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11; *see also* Pls. Reply ¶¶ 46, 421.) Thus, this statement must be deemed undisputed.

427. **LimeWire called LimeWire's features that "strongly" encourage users to share files "'Good Citizen' Features". (Ex. 52 at JB 0282-283; *see also* Ex. 261 (setting forth "Good Citizen Tips" for users).)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 52 and 261. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. There is no evidence that these "tips" or "features" were ever broadcasted to users. Moreover, even if this can be established, there is nothing wrong with promoting the sharing of files and being "good citizens." See response ¶ 425, supra.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibits 52 and 261, which are, in fact, admissible. (*See* Attach. A at Ex. 261; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Moreover, defendants themselves have proffered Exhibit 52 as their own Exhibit 2, and so have waived any objection to this document. (*See* Baker 9/26/08 Decl. ¶ 4.) The remainder of defendants' response is argumentative (*see* note 6), and does not cite to any admissible evidence in support. (*See* note 5.) Moreover, that "tips" and "features" were developed, whether or not they were ever broadcast to users, "illuminate[s] [Lime Wire LLC's] purposes". *See Grokster,* 545 U.S. at 925 n.7. Thus, this statement must be deemed undisputed.

428. **Lime Wire leveraged the increased sharing of files on the Gnutella network, and the growing user base it generated, into revenue, first through advertisements, then through sales of LimeWire PRO. (*See supra* ¶¶ 410-20.)**

**Defendants' Response:**

*Disputed. Lime Wire never sought to leverage its user base into more revenue through increased available files on the Gnutella network. See response ¶¶ 410 – 20.*

166

**Plaintiffs' Reply:**

Defendants' response fails to cite to admissible evidence in support.  (*See* note 5.)  In fact, nothing in responses ¶¶ 410-420 disputes this statement; those responses either do not dispute the statement at all or object only to the admissibility of documents. Moreover, as shown in Pls. Reply ¶¶ 410-420, defendants' document objections are meritless and do not dispute the statement.  Thus, this statement must be deemed undisputed.

**429.** **According to Lime Wire, LimeWire grew both in downloads of the client and number of unique users from 2001 through the present.  (*See supra* ¶¶ 87-94.)**

**Defendants' Response:**

*Undisputed. However, there is no evidence establishing that this increase was due to more sharing, more files, etc.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is argumentative. (*See* note 6.)

**430.** **As shown above (*see supra* ¶ 91), Gorton estimated in September 2005 that Lime Wire was "the largest file sharing application out there" with 2 million downloads a week, and approximately 40,000,000 - 50,000,000 users.**

**Defendants' Response:**

*Disputed. See response ¶ 91, supra.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  In their response to ¶ 91, defendants dispute only the admissibility of Exhibit 41, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 12.)  Thus, this statement must be deemed undisputed.

**431.** **Lime Wire's total income in 2005 was $15,595,061.38. (Ex. 252 at LW DE 1149247; Ex. 262 at LW DE 1142361.) [Undisputed]**

**432.** **In a December 6, 2006 email, Lime Wire CFO Rubenfeld estimated that Lime Wire's revenue for 2006 was approximately $20 million. (Ex. 263 at LW DE 1961298; see also Ex. 252 at LW DE 1149248 (stating Lime Wire's total income from January to September 2006 as $15,543,475.03).) [Undisputed]**

167

**433.** **As shown above (*see supra* ¶ 93), in 2007 Lime Wire estimated that LimeWire generated five billion searches per month.**

**Defendants' Response:**

*Disputed. See supra response ¶ 93.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. In their response to ¶ 93, defendants dispute only the admissibility of Exhibit 44, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.) Thus, this statement must be deemed undisputed.

**434.** **In an email, Fisk wrote, "the focus of the p2p applications has simply not lived up to those goals of creating a generalized platform, like the PC, that programmers can innovate on top of. Gnutella approaches it, but in practice it is simply not that platform. The money was always too tempting". (Ex. 264 at 2-3; Fisk Tr. 159:9-17.) Fisk testified that by "[t]he money was always too tempting", he meant that "when you have users using a program for something that they are paying money for it, you tend to do what those users want". (Fisk Tr. 159:18-23.) Fisk further testified that "it was clear that [LimeWire] was being used for infringement" and that it is his belief that LimeWire is still being used for infringement. (*Id.* 159:24-160:18.)**

**Defendants' Response:**

*Disputed. First, this is inadmissible lay opinion. See Defendants' Motion to Strike. Second, Fisk later explained in a post what he meant when he made these statements, namely that "it's the content that's infringing, not Lime Wire," and that while Lime Wire makes money it certainly does not intend to do so off of infringement. Fisk Decl. ¶¶ 4-6. Third, several other Lime Wire software developers dispute Fisk's opinions. See, generally, Singla Decl. and Daswani Decl.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Although defendants objected to and moved to strike certain exhibits and deposition excerpts, they have *not* objected to this Fisk testimony. (*See* Defs. Mot. to Strike at 11-24.) Thus, this statement must be deemed undisputed.

### 4.   Lime Wire Planned to Monetize LimeWire's Infringing User Base by "Converting" LimeWire's Users Into Paying Music Customers

**435.** **As shown above (*see supra* ¶¶ 133-35), in 2005-2006, Lime Wire developed Conversion Plans, aimed at "converting" LimeWire users who were downloading and sharing copyrighted files for free into paying customers of a subscription music service. (*See* Ex. 265; Ex. 266; Catillaz Tr. 278:6-19.)**

**Defendants' Response:**

*Disputed. First, Exhibits 265 and 266 are part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the Catillaz testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibits 265 and 266, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at Exs. 11-24.)  Thus, the statement must be deemed undisputed.  The remainder of defendants' response is irrelevant and does not cite to any admissible evidence in support.  (*See* note 5.)

436.   **Lime Wire contemplated agreements with Napster, RealNetworks, Inc., and iMesh, companies that operated existing subscription music services, to convert infringing LimeWire users into paying customers of one of those companies.  (Catillaz Tr. 257:8-259:20, 275:21-276:4; Ex. 266; Catillaz Tr. 276:18-278:19, 287:2-10.)**

**Defendants' Response:**

*Disputed. First, Exhibit 266 is part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portions of the Catillaz testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 266, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 435.)  The remainder of defendants' response does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

437.   **Lime Wire exchanged "detailed outline[s]" or "term sheets" with Napster, RealNetworks, Inc., and iMesh, setting forth the terms of a potential conversion plan.  (Ex. 265; Catillaz Tr. 269:23-271:5; Ex. 267; Ex. 268; Ex. 269; Catillaz Tr. 284:4-11; Ex. 270; Ex. 271; Ex. 272; Catillaz Tr. 286:19-288:9, 291:8-292:8, 294:25-295:10.)**

**Defendants' Response:**

*Disputed. First, Exhibits 265, 267, 268, 269, 270, 271 and 272 are part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants'*

169

*Settlement/Pre-August 2003 Objections. In addition, any so- called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the Catillaz testimony, which alone provides sufficient support for the statement. Defendants dispute the admissibility of Exhibits 265, 267, 268, 269, 270, 271 and 272, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 435.)  The remainder of defendants' response is irrelevant and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**438.**   **The conversion plans discussed with Napster, RealNetworks, Inc. and iMesh contemplated the implementation of a filtering program to eliminate the availability of unauthorized copyrighted works (*see infra* ¶¶ 502-09), paired with an advertising campaign aimed at converting LimeWire users to subscription music customers.  (*See* Ex. 265; Ex. 267; Ex. 268; Ex. 269; Ex. 270; Ex. 271; Ex. 272.)**

**Defendants' Response:**

*Disputed. First, Exhibits 265, 267, 268, 269, 270, 271 and 272 are part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. In addition, any so- called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants dispute this statement on the same grounds as ¶ 437.  (*See* Pls. Reply ¶ 437.)

**439.**   **For every user that Lime Wire successfully converted to a subscription service, Lime Wire anticipated that the subscription service would pay Lime Wire "[c]onversion bounties".  For example, Lime Wire contemplated that Napster would pay it a bounty for each converted LimeWire user of "$15 for the first month and an additional $20 after four months of continued subscription".  (Ex. 265; Ex. 266; *see also* Catillaz Tr. 278:20-279:17.)**

**Defendants' Response:**

*Disputed. First, Exhibits 265 and 266 are part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Catillaz testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibits 265 and 266, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 435.)  The remainder of defendants' response fails to cite to admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**440.    In its discussions with RealNetworks, Inc., Lime Wire contemplated receiving monthly compensation of $100,000 subject to certain performance requirements.  (Ex. 267 at LW DE 0965384; Ex. 268 at LW DE 0965784; Ex. 269 at LW DE 0965671.)**

**Defendants' Response:**

*Disputed. First, Exhibits 267, 268 and 269 are part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibits 267, 268, and 269, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 437.)  The remainder of defendants' response does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**441.    Lime Wire regarded its LimeWire PRO subscribers as particularly susceptible to conversion because, having "already opted to pay for something", they might be more willing to pay for music files.  (Catillaz Tr. 273:7-16; *see also id.* 273:17-274:7 (Lime Wire "knew that we had potential customers and people that were ready to pay for something that they used to receive for free"); Ex. 265.)**

**Defendants' Response:**

*Disputed. First, Exhibit 265 is part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Catillaz testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 265,

which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 435.)  The remainder of defendants' response does not cite to any admissible evidence.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**442.    Furthermore, Lime Wire had "[a]necdotal evidence . . . that both Pro and Basic demographics are receptive to new offers and willing to pay for content at widely variable price points".  (Ex. 265; Catillaz Tr. 274:8-25.)**

**Defendants' Response:**

*Disputed. First, Exhibit 265 is part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Catillaz testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 265, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 435.)  The remainder of defendants' response does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, the statement must be deemed undisputed.

**443.    A September 2005 email from Gorton to a third party stated that "[i]f we [Lime Wire] are able to convert a couple percent of our users to a subscription service, that would be huge.  This deal could be worth $50,000,000 - $400,000,000 a year in revenue and a decent fraction of that in profits".  (Ex. 41 at LW DE 0966063.)**

**Defendants' Response:**

*Disputed. First, Exhibit 41 is part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 41, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 91.)  The remainder of defendants' response does not cite to any admissible evidence in support.  (*See* note 5.) Thus, this statement must be deemed undisputed.

**444.    In 2006, Lime Wire developed a second conversion plan, which Gorton called the "Digital Sales Growth Plan", and which Lime Wire employees referred to as the "Educational Conversion Plan".  (Ex. 273; Catillaz Tr. 298:23-299:2,**

**300:11-301:4;** *see also* **Ex. 57; Ex. 274; Ex. 56 at LW DE 1191097 ("Lime Wire in perfect position to convert existing music fans to legitimate consumers.").)**

## Defendants' Response:

*Disputed. Exhibits 273, 57, 274, and 56 are part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections.*

## Plaintiffs' Reply:

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Catillaz testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibits 56, 57, 273 and 274, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 133.)  Thus, this statement must be deemed undisputed.

445.  **Lime Wire divided LimeWire's entire user base into four "behavioral groups" in order to evaluate the second conversion plan's potential: "Hardcore Pirates", "Morally Persuadable Users", "Legally Unaware Users", and "users who sample or users for convenience".  (Ex. 61 at LW DE 1932841-42; Ex. 62; Catillaz Tr. 322:9-323:7,** *see also* **Ex. 275 (employing the phrase "Morally Persuadable Pirates" instead of "Morally Persuadable Users"); Ex. 276 at LW DE 1499025 (employing the phrase "Entrenched P2P Users" instead of "Hardcore Pirates").)**

## Defendants' Response:

*Disputed. First, Exhibits 61, 62, 275, and 276 are part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Wire did not consider its entire user base as infringers. Gorton Decl. ¶ 57. Catillaz Tr. 268:2-21.*

## Plaintiffs' Reply:

Defendants do not dispute the material point and accuracy of this statement.  Defendants only dispute the admissibility of Exhibits 61, 62, 275 and 276, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 135.)  Gorton's declaration states that defendants only "referenced users that who might have been major label music consumers".  (Gorton 9/26/08 Decl. ¶ 57.)  However, Gorton does not cite any evidence that would support this statement, or any other information that would allow plaintiffs' to test his statement.  (*See* Catillaz Tr. 322:9-323:18, 323:22-324:2; *see also* Rubenfeld Tr. 328:2-330:22; *see also* Pls. Pre-2003/*Grokster* Opp'n Br. at 15 n.14.)  Thus, this statement must be deemed undisputed.

446.  **Mark Gorton "coined" the phrase "Hardcore Pirates".  (Catillaz Tr. 323:19-21.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of the cited portions of the Catillaz Transcript. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants only dispute the cited portion of the Catillaz testimony, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.)  Thus, this statement must be deemed undisputed.

447.   **Lime Wire CFO Jesse Rubenfeld estimated based upon market data, that, on average, each converted user would be worth $30 per year in revenue. (Ex. 58 at LW DE 1153009; Rubenfeld Tr. 310:2-24.)**

**Defendants' Response:**

*Disputed. First, the document is part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. Second, Lime Wire did not consider its entire user base as infringers. Gorton Decl. ¶ 57.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants only dispute the admissibility of Exhibit 58, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 134.)  Gorton's declaration states that defendants only "referenced users that who might have been major label music consumers".  (Gorton 9/26/08 Decl. ¶ 57.)  However, Gorton does not cite admissible evidence that would support this statement, or any other information that would allow plaintiffs' to test his statement.  Thus, this statement must be deemed undisputed.

448.   **As shown above (*see supra* ¶ 134), Lime Wire estimated that "converting" its users to purchasers of legally distributed music could bring in *hundreds of millions* of dollars.  (Ex. 58; Ex. 59; Ex. 60.)**

**Defendants' Response:**

*Disputed. First, Exhibits 58, 59 and 60 are part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants only dispute the admissibility of Exhibits 58, 59 and 60, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 134.)  The

remainder of defendants' response does not cite to any admissible evidence in support. (*See* note 5.)  What is relevant and material is that Lime Wire LLC believed and communicated that the conversion to paying subscribers of even "a couple percent" of its infringing userbase would be worth hundreds of millions of dollars.  In addition, Rubenfeld's testimony that Lime Wire LLC estimated that each converted user would provide $30 and up of revenue and there were 40-50 million LimeWire users supports this statement and is undisputed.  (*See* Rubenfeld Tr. 308:2-312:4; *see also id*. 321:4-24.) Thus, this statement must be deemed undisputed.

**449.    Lime Wire's projections were based on the value of converting LimeWire infringing users for sound recordings *only*.  (Rubenfeld Tr. 332:11-333:17.)**

**Defendants' Response:**

*Disputed. First, the cited portion of the Rubenfeld Transcript is inadmissible under Fed. R. Evid. 408. See Defendants' Settlement/PreAugust 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the cited portion of the Rubenfeld testimony, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.)  The remainder of defendants' response does not cite to any admissible evidence in support.  (*See* note 5.) Thus, this statement must be deemed undisputed.

**450.    Lime Wire did not project the value of a converted LimeWire user who was exchanging software.  (Rubenfeld Tr. 332:19-22.)**

**Defendants' Response:**

*Disputed. First, the cited portion of the Rubenfeld Transcript is inadmissible under Fed. R. Evid. 408. See Defendants' Settlement/PreAugust 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants purport to dispute the admissibility of the cited portion of the Rubenfeld testimony, but, in fact, do not offer any grounds in the statement or in the motion to which they cite on which the testimony must be deemed inadmissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n r. at 11-24; *see* Pls. Reply ¶ 448 for a reply to the last sentence in defendants' response.) The remainder of defendants' response does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

175

**451.   Lime Wire did not project the value of a converted LimeWire user who was exchanging pornography.  (Rubenfeld Tr. 332:23-333:4.)**

**Defendants' Response:**

*Disputed. First, the cited portion of the Rubenfeld Transcript is inadmissible under Fed. R. Evid. 408. See Defendants' Settlement/PreAugust 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants dispute ¶ 451 on the same grounds as ¶¶ 448-450.  (*See* Pls. Reply ¶¶ 448-450.)

**452.   Lime Wire did not project the value of a converted LimeWire user who was exchanging video files.  (Rubenfeld Tr. 333:5-9.)**

**Defendants' Response:**

*Disputed. First, the cited portion of the Rubenfeld Transcript is inadmissible under Fed. R. Evid. 408. See Defendants' Settlement/PreAugust 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants purport to dispute the admissibility of the cited portion of the Rubenfeld testimony.  However, defendants do not actually provide any grounds on which they dispute this evidence in the brief cited or in their statement.  (*See* Defs. Pre-2003/*Grokster* Mot. at Ex. A; Pls. Reply ¶ 448 for a reply to the last sentence in defendants' response.)  The remainder of defendants' response does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**453.   Lime Wire did not project the value of a converted LimeWire user who was exchanging images.  (Rubenfeld Tr. 333:10-13.)**

**Defendants' Response:**

*Disputed. First, the cited portion of the Rubenfeld Transcript is inadmissible under Fed. R. Evid. 408. See Defendants' Settlement/PreAugust 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants purport to dispute the admissibility of the cited portion of the Rubenfeld testimony.  However, defendants do not actually provide any grounds on which they dispute this evidence in the brief cited or in their statement and so have waived any objection to this evidence.  (*See* Pls. Reply ¶ 448 for a reply to the last sentence in defendants' response.)  The remainder of defendants' response does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

454.   **Lime Wire developed a third conversion plan, which sought to monetize its LimeWire user base through the sale of "premium content", targeted advertisement similar to Google's AdWords program, and the collection and distribution of user data to content owners.  (Ex. 277; Catillaz Tr. 336:20-25.)**

**Defendants' Response:**

*Disputed. First, Exhibit 277 and the cited portion of the Catillaz Transcript are part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute the admissibility of Exhibit 277, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.)  Further, defendants dispute the cited portion of the Catillaz Transcript.  Although defendants objected to and moved to strike a list of exhibits and deposition excerpts, they have *not* objected to this Catillaz testimony.  (*See* Defs. Pre-2003/*Grokster* Mot. at Ex. A; Pls. Reply ¶ 448 for a reply to the last sentence in defendants' response.)  The remainder of defendants' response does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

455.   **Lime Wire believed, and expressed in the context of this third conversion plan, that its users were also the "music industry's best customers".  (Ex. 277; Catillaz Tr. 337:17-24.)**

**Defendants' Response:**

*Disputed. First, Exhibit 277 and the cited portion of the Catillaz Transcript are part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. In addition, any so-called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 277, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.)  Although defendants objected to and moved to strike a list of exhibits and deposition excerpts, they have *not* objected to this Catillaz testimony.  (*See* Defs. Pre-2003/*Grokster* Mot. at Ex. A; Pls. Reply ¶ 448 for a reply to the last sentence in defendants' response.)  The remainder of defendants' response does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

> ### 5.  Lime Wire Seeks to Monetize its Infringing User Base by Selling Music Through the LimeWire Store

**456.**  Lime Wire operates an online music store called the LimeWire Store. (http://www.store.limewire.com/store/app/pages/Home; see also Berlin Tr. 251:7-19; Gorton Tr. 572:12-14.) [Undisputed]

**457.**  Lime Wire opened the LimeWire Store and began receiving revenue (less than a thousand dollars) from sales of recorded music in January 2008. (Rubenfeld Tr. 82:25-83:8; 146:5-8.) [Undisputed]

**458.**  Lime Wire has purportedly sought and obtained licenses from some digital distributors for the music sold through the LimeWire Store. (See Rubenfeld Tr. 133:15-20.) [Undisputed]

**459.**  Lime Wire has implemented controls designed to ensure that music purchased through its LimeWire Store cannot be distributed on Gnutella using the LimeWire client. (See infra ¶¶ 526-29.) [Undisputed]

**460.**  As of March 2008, approximately 500,000 songs were available through the LimeWire Store. (Rubenfeld Tr. 148:22-24.) [Undisputed]

**461.**  Lime Wire's Digital Market Growth Plan (*see supra* ¶ 444) had as one of its objectives to "make the transition to purchasing media as seamless as possible".  It contemplated that "[w]henever users query the network, the store will automatically display relevant titles and also advertise songs likely to interest them based on their observed searches and purchase history". (Ex. 278 at LW DE 1932751; *see also* Bildson Tr. 574:4-8 (testifying that the LimeWire Store "could be an important component" of the Digital Market Growth Plan).)

**Defendants' Response:**

*Disputed. First, Exhibit 278 and the Bildson Transcript are part of an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections. In addition, any so- called "monetization" plans were for the benefit of the Plaintiffs, who were to receive these funds.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 278 and the Bildson testimony.  Exhibit 278 is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.)  Further, although defendants objected to and moved to strike a list of exhibits and deposition excerpts, they have *not* objected to this Bildson testimony.  (*See* Defs. Pre-2003/*Grokster* Br. at Ex. A; Pls. Reply ¶ 448 for a reply to the last sentence in defendants' response.)  The remainder of defendants' response does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

>   **F.   Lime Wire Has Taken No Meaningful Affirmative Steps to Prevent Infringement**

>   **462.   According to Lime Wire's Senior Software Engineer, "LimeWire can do many things, I mean, anything you ask for could theoretically be done." (Berlin Tr. 348:15-350:15;** *see also id.* **243:14-17 ("LimeWire could do anything"), 280:4-10 ("Anything is possible").)**

**Defendants' Response:**

*Disputed. When asked in his deposition what he meant by this, Mr. Berlin explained that LimeWire really could not do everything one could ask for, that there were limitations. Berlin Tr. 355:21 – 356:18.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  The remainder of defendants' response is argumentative.  (*See* note 6.)  When asked what he meant by the testimony cited by plaintiffs, Berlin stated "[t]hat anything that's within the realm of possibility, anything that a program is capable of doing could be done".  (Berlin Tr. 256:5-256:18.)

>   •   **The Intent Page/License "Warning"**

>   **463.   A user seeking to download the LimeWire client from** *www.limewire.com***, is, in the course of navigating to the download page, presented with a page asking the user to state whether he "might" or "will not" use the client for copyright infringement (the "intent page").  (Horowitz Report ¶¶ 85-86, fig. 18; Berlin Tr. 277:9-278:10; Ex. 279.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute Exhibit 279 or the cited portion of the Berlin testimony, which provide sufficient support for the statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

464.    **Although a user indicating that he "might" use LimeWire for copyright infringement is presented with another page stating that "Lime Wire LLC does not distribute LimeWire Basic to people who intend to use it for purposes of copyright infringement" (Horowitz Report ¶¶ 86, fig. 19; Ex. 280, Berlin Tr. 279:6-16), nothing prevents the user from clicking "back" on the web browser, changing the answer to indicate that he or she would not use LimeWire for infringement, and then completing the download. (Horowitz Report ¶ 87; Berlin Tr. 279:6-22; *see also* Ex. 280.)**

**Defendants' Response:**

*Disputed. First, the Horowitz Report is inadmissible. See Defendants' Motion to Strike Expert Reports. Second, Defendants' expert has explained that using "cookies" in this fashion can have negative consequences and thus there is a good reason to not use them. Gribble Decl.  53 – 57. Third, Lime Wire also utilizes other mechanisms to warn users about copyright infringement. Gribble Decl. ¶¶  70-74.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute Exhibit 280 or the cited portion of the Berlin testimony, which provide sufficient support for the statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Moreover, the warnings used by Lime Wire are ineffective.  (*See* Pls. 7/18/08 SOF ¶¶ 104-139; Pls. 9/26/08 (Gorton) Add'l SOF ¶¶ 711-715.)  Thus, this statement must be deemed undisputed.

465.    **Lime Wire could have configured the LimeWire download website to place a software cookie on the computer of a user who stated that he "might" use LimeWire for copyright infringement, preventing such a user from going back and changing his answer to the infringement intent question on the intent page (and then proceeding to download LimeWire), at least until the**

180

**user cleared the cookie from his system.  (Horowitz Report ¶ 88; Berlin Tr. 279:23-280:10 ("Anything is possible . . . LimeWire can do many things.").)**

**Defendants' Response:**

*Disputed. First, this allegation relies upon the inadmissible Horowitz Report. See Defendants' Motion to Strike. Second, as Defendants' computer science expert explains, while such a thing is possible, it is ill- advised. See Gribble Decl.  53-57. Third, Lime Wire also utilizes other mechanisms to warn users about copyright infringement. Gribble Decl.  ¶¶ 70-74.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the Berlin testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  The remainder of defendants' response is argumentative.  (*See* note 6.)  Moreover, the warnings used by Lime Wire are ineffective.  (*See* Pls. 7/18/08 SOF ¶¶ 104-139; Pls. 9/26/08 (Gorton) Add'l SOF ¶¶ 711-715.)  Thus, this statement must be deemed undisputed.

466.  **LimeWire uses cookies for other purposes on its website. (Faaborg Tr. 160:3-161:3.) [Undisputed]**

467.  **If a user downloads the LimeWire application through another authorized site, such as *download.com* or *www.gnutelliums.com* (*see supra* ¶ 85), the user is not even shown the intent page asking his or her intentions with regard to copyright infringement.  (Horowitz Report ¶ 89.)**

**Defendants' Response:**

*Disputed. First, the Horowitz Report is inadmissible. See Defendants' Motion to Strike. Second, more recent versions of LimeWire ask the user to state that intention before launching the client, so the user will always be asked this question, irrespective of from where the user downloads the product. Gribble Decl.  ¶ 57.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible. The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl.

¶ 13.)  The remainder of defendants' response is irrelevant, immaterial and argumentative.  (*See* note 6.)  Defendants' statement as to "more recent versions" of LimeWire confirms the fact of the statement, yet defendants do not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**468.    After installation, LimeWire also initially warns a user when the user is about to download an "unlicensed" file.  (Horowitz Report ¶ 91, fig. 20.)**

**Defendants' Response:**

*Disputed. The Horowitz Report is inadmissible. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**469.    The warning takes the form of a dialogue box that states, in part: "LimeWire is unable to find a license for this file.  Download the file anyway?"  (Horowitz Report ¶ 91, fig. 20.)**

**Defendants' Response:**

*Disputed. The Horowitz Report is inadmissible. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**470.    The user is given the options to click "Yes", "No", or "Cancel" and may first check a box stating "Always use this answer".  (Horowitz Report ¶ 91, fig. 20.)**

**Defendants' Response:**

*Disputed. The Horowitz Report is inadmissible. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

> **471.**  **If the user checks the box stating "Always use this answer" and clicks "Yes", the user will not receive further warnings when he or she attempts to download an unlicensed file.  (Horowitz Report ¶ 91, fig. 20.)**

**Defendants' Response:**

*Disputed. The Horowitz Report is inadmissible. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

> **472.**  **No warning is displayed if a user attempts to share a file that is unlicensed.  (Horowitz Report ¶ 92, fig. 20.)**

**Defendants' Response:**

*Disputed. The Horowitz Report is inadmissible. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

> • **Lime Wire's Existing "Content Filter"**

**473.** **Lime Wire made no attempts to develop filtering for copyrighted works prior to the Supreme Court's June 2005 *Grokster* decision.  (Ex. 281 (Bildson stating that "Lime Wire has considered filtering as an option in the past and rejected it" and that "Lime Wire will not support anything that implies or enables filtering of any kind"); *see also* Rohrs Tr. 142:14-143:11.)**

## Defendants' Response:

*Disputed as to admissibility of Exhibit 281. See Defendants' Motion to Strike. Lime Wire fully complied with existing law and did not believe it had a duty to develop or consider a filter until the Supreme Court issued the Grokster opinion.*

## Plaintiffs' Reply:

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Rohrs testimony, which provides support for the proposition that Rorhs did not recall Lime Wire taking any steps to reduce copyright infringement while he was employed there.  Defendants dispute only the admissibility of Exhibit 281, which is, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 281.)  The remainder of defendants' response is argumentative and fails to cite to any admissible evidence in support.  (*See* notes 5, 6.)  Thus, this statement must be deemed undisputed.

**474.** **In 2004, while interviewing for a software developer job with Lime Wire, David Nicponski wrote an email to Bildson asking: "Do you have any intention of working with any company such as Audible Magic, or any other company whose purpose is filtering available content on Gnutella?  Do you intend to sell DRM-restricted files in place of the open (ie MP3) files currently available?  I am very much 'for the spirit' of file sharing, which is why I go into this business in the first place.  I wouldn't want to take job which went counter to the principles of sharing, such as the current Napster.  Since Lime Wire is open source, I expect the answer is No, but I'd like to hear it from you".  (Ex. 282 at NIC 00140.)**

## Defendants' Response:

*Undisputed. But this all occurred before the Grokster decision, and post-Grokster, Lime Wire agreed to implement a filter, and Mr. Nicponski no longer works for the company.*

## Plaintiffs' Reply:

This statement is undisputed.  The remainder of defendants' response is argumentative, conclusory and does not cite to any admissible evidence in support.  (*See* notes 5, 6, 8.)

**475.** **Although Bildson and Nicponski had been exchanging emails regarding Nicponski's potential job with Lime Wire, Bildson responded to Nicponski's question by writing, "Are you home now".  (Ex. 282 at NIC 00140.) Nicponski testified that he could not recall whether Bildson called him in**

response to his question (D. Nicponski Tr. 147:19-150:18), but Nicponski ultimately took the job with Lime Wire as a software developer.  (*Id.* at 151:16-18.)

**Defendants' Response:**

*Undisputed. But, this all occurred well before the Grokster decision, and post-Grokster, Lime Wire agreed to implement a filter, and Mr. Nicponski no longer works for the company.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is argumentative, conclusory and does not cite to any admissible evidence in support.  (*See* notes 5, 6, 8.)

476.   **In its March 10, 2006 release of LimeWire Version 4.11.0, Lime Wire first implemented an optional hash-based "content" filter (the "Content Filter"), which purports to filter out some copyrighted works. (Ex. 20 (http://wiki.limewire.org/index.php?title=Changelog at 17-18); Ex. 283.) [Undisputed]**

477.   **When enabled, the Content Filter "consults [a] database of files and SHA1 hashes each time a user attempts to download a file.  If the file has been blacklisted, LimeWire stops the user from downloading the file".  (Ex. 212 (http://wiki.limewire.org/index.php?title=User_Guide_Search_More); Berlin Tr. 222:21-223:6, 231:14-19; *see also* Horowitz Report ¶ 98; Gribble Report at 25.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute Exhibit 212, the Gribble Report or the cited portion of the Berlin testimony, which provide sufficient support for the statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

478.   **A file's "hash" is a numeric representation of the file produced by running a hash function (*i.e.*, an algorithm), commonly the SHA1 hash function, on the file.  The hash can be used as a shorthand to identify the file.  If two files have the same hash, then they are identical.  In contrast, any difference**

**within the file, such as length or bitrate, will alter the file's hash. (Berlin Tr. 218:23-219:21, 220:5-221:14; Horowitz Report ¶ 23; Gribble Report at 26.)**

## Defendants' Response:

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike.*

## Plaintiffs' Reply:

Defendants do not dispute the material point and accuracy of this statement. Nor do they dispute the cited portion of the Berlin testimony or the Gribble Report, which provide sufficient support for the statement that regarding similarities and differences within hashes. Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible. The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition. (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.) In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report. (Forrest 11/07/08 Decl. ¶ 13.) Thus, this statement must be deemed undisputed.

479. **A hash is a property of a particular digital file, not of the underlying content. As a result, two audio files can sound the same but have different hashes. If a music file is created from the same CD using different "ripping" software or using different settings, it will have a different hash, even though the underlying musical work is the same. (Horowitz Report ¶¶ 101-103; Gorton Tr. 547:22-548:9; Berlin Tr. 221:9-14.)**

## Defendants' Response:

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike.*

## Plaintiffs' Reply:

Defendants do not dispute the material point and accuracy of this statement. Nor do they dispute the cited portions of the Gorton and Berlin testimony, which provide sufficient support for this statement. Defendants dispute only the admissibility of the Horowitz Report, which is, in fact admissible. The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition. (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.) In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report. (Forrest 11/07/08 Decl. ¶ 13.) Thus, this statement must be deemed undisputed.

480. **Therefore, a user will still be able to find and download copyrighted and unauthorized works even if some hashes associated with those works have been added to LimeWire's hash database, and the user has turned the Content Filter on. (Horowitz Report ¶¶ 99-103; *see also* Gribble Report at 26 ("A particular movie might be available through the Gnutella network**

with dozens or hundreds of different encodings, each differing in quality and resolution, precise running time, or the program used to encode the movie, and each having a different hash.").)

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the Gribble Report, which alone provides sufficient support for the statement. Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

481.   When asked why LimeWire did not generate the hashes of the files purchased from the LimeWire Store and use the Content Filter to prevent them from being shared on the Gnutella network or LimeWire for free, Lime Wire Senior Software Engineer Berlin testified that such an approach "[w]ouldn't be very secure [because] the file could change [and then] the hash would change".  (Berlin Tr. 263:17-25; s*ee infra* ¶¶ 526-29 (describing non-hash-based mechanism Lime Wire uses to make sure the music sold through its own LimeWire Store is not downloaded for free using LimeWire).)

**Defendants' Response:**

*Disputed. What Mr. Berlin meant was that because LimeWire Store distributes the file, a "string" is the best method to filter in that context. However, for files shared over Gnutella, a "string" would not work, and a SHA-1 filter is best. Gribble Decl. ¶¶ 41-42.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  The remainder of defendants' response is argumentative (*see* note 6), and does not cite to any admissible evidence in support.  (*See* note 5.)  Defendants cite to their own expert, Gribble, to support their statement regarding what Berlin meant.  However, Gribble cannot purport to know what Berlin "meant".  Thus, this statement must be deemed undisputed.

482.   If a content owner wishes for a file not to be shared, the owner must affirmatively register hashes for its own files with Lime Wire.  (Horowitz Report ¶¶ 94-96, fig. 21; Ex. 212 (http://wiki.limewire.org/index.php?title=User_Guide_Search_More) ("If

**you are interested in adding a file to the database, please visit Lime Wire Filtering System.”); Ex. 284 (http://register.limewire.com/filter/).)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the central material point and accuracy of this statement.  Nor do they dispute the admissibility of Exhibits 212 and 284, which alone provide sufficient support for the statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, “signed” as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**483.     Lime Wire has not populated its hash filtering database with hashes of the sound recordings at issue in this lawsuit, even though it has had the original Exhibits A and B to the Complaint since August 2006 and the revised Exhibits A and B, and the list of 31 works for the liability phase of this litigation since January 31, 2008.  (ComPls., Exhs. A & B; Ex. 45; Gorton Tr. 537:15-22 (testifying that Lime Wire has not collected hashes for the sound recordings owned by the plaintiffs in this litigation), Gorton Tr. 538:7-11 (testifying that “Lime Wire has the ability to compute hashes”).)**

**Defendants' Response:**

*Undisputed; however, neither the Plaintiffs nor the RIAA have ever offered to give Lime Wire the necessary database of hashes. And hashes from content owners are critical irrespective of whether LimeWire can compute them because only content owners can provide Lime Wire with the necessary information to properly filter, such as proof of ownership of the content, and the identity of the content they want filtered. See Gorton Decl.  ¶ 37.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is argumentative.  (*See* note 6).  Moreover, in his declaration, Bildson indicates that LimeWire's limited efforts to filter were never intended to be effective.  (*See* Pls. 9/26/08 (LW) Add'l SOF ¶ 47.)  Thus, this statement must be deemed undisputed.

**484.     The Content Filter in the LimeWire client is disabled or set to “off” by default. (Gribble Report at 25.) [Undisputed]**

485.   There is no technological reason why LimeWire could not have set the Content Filter to "on" by default. (Berlin Tr. 243:14-17; Gribble Report at 33; Gribble Tr. 171:9-24; see also Gribble Tr. 199:11-17.) [Undisputed]

486.   Berlin testified that Gorton is personally responsible for determining whether the Content Filter should be on or off by default in a newly released version of the client.  (Berlin Tr. 243:18-244:15.)

**Defendants' Response:**

*Disputed as to admissibility of the cited portions of the Berlin Transcript. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the cited portion of the Berlin testimony, which are, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. B at 1.)  In his declaration, Bildson confirmed that Gorton was personally responsible for determining that the Content Filter would be "off" by default.  (*See* Pls. 9/26/08 (LW) Add'l SOF ¶ 47b.)  Thus, this statement must be deemed undisputed.

487.   LimeWire users tend not to change the default filter settings.  (Horowitz Report ¶ 97; *see also* Berlin Tr. 333:9-20 (if LimeWire was "implementing something that you intend people to make use of", it would turn the feature "on" by default); Gribble Tr. 174:23-175:18.)

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portions of the Berlin and Gribble testimony, which provide sufficient support for the statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, the statement must be deemed undisputed.

488.   According to defendants' own expert, turning the Content Filter "off" by default was "consistent with [LimeWire's] filtering design goals", because attempting to filter out copyrighted works does not "defend users against threats". (Gribble Report at 25; see also id. at 33 ("turning content authority filtering off by default is consistent with the LimeWire client design

principles ... that users are given enough flexibility to enable, disable, or configure filtering, and that filtering is enabled by default when security issues are concerned").) [Undisputed]

489.   According to defendants' own expert, "the LimeWire client is built in such a way that it ensures the user can leave filtering disabled". (Gribble Report at 26.) [Undisputed]

490.   Although the Content Filter is partially controllable through LimeWire's SIMPP mechanism (see supra ¶ 364), Lime Wire designed the setting such that Lime Wire could only turn content filtering "off" across the network. Setting the SIMPP parameter that deals with this setting to "on" only gives users the ability to turn content filtering "on". (Berlin (Day 2) Tr. 47:6-48:9.) [Undisputed]

491.   According to defendants' expert, Lime Wire could have designed LimeWire so that the Content Filter was always automatically active, or so that it was controlled by Lime Wire through the SIMPP mechanism rather than by the user.  (Gribble Tr. 198:21-199:10; see also id. 302:12-303:17 (testifying that LimeWire made a "design choice" in making all filtering mechanisms optional, and that it could have designed the software to make filtering mandatory).)

**Defendants' Response:**

Disputed. Lime Wire cannot control what its users do through SIMPP. Gribble Decl.  46.

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Nor do they dispute the evidence on which the statement relies.  Lime Wire's control over its users is irrelevant.  What is relevant is that defendants' expert confirmed that "Lime Wire itself, LLC, could make a design choice that it wanted to have its filtering mechanisms not option as shipped."  (Gribble Tr. at 303:9-303:12.)  Defendants' response is argumentative.  (See note 6.)  Thus, this statement must be deemed undisputed.

492.   Senior Software Developer Berlin, who added the Content Filter setting to the program, testified that it would have been possible to program the setting to allow LimeWire to force the Content Filter "on" (Berlin Tr. 243:14-17) ("LimeWire could do anything."), but that he chose not to. (Berlin (Day 2) Tr. 48:10-49:7.) Berlin further testified that the reason he choose not to was that such a configuration would "not [be] in line with the way we [Lime Wire] write the program". (Id. 49:2-12.) [Undisputed]

      **1.**      <u>**Lime Wire Had the Ability and Opportunity to Implement an**</u>
                  <u>**Effective Filter for Copyrighted Works**</u>

**493.**    **At his deposition, Lime Wire CFO Jesse Rubenfeld described the Content Filter as of May 25, 2006 as neither "complete" nor "operational". (Rubenfeld Tr. 59:20-60:2; *see also* Berlin Tr. 247:13-20 (testifying that, technologically, the Content Filter was substantially "the same" in April 2007 as it was in May 2006).)**

**Defendants' Response:**

*Disputed. The cited portions of the Berlin Transcript are inadmissible. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Rubenfeld testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of the Berlin testimony, which is, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. B at 2.)  Thus, this statement must be deemed undisputed.

**494.**    **Almost a year after the Supreme Court's *Grokster* decision was announced, Rubenfeld drafted a letter to Gorton and Bildson expressing concern as to Lime Wire's filtering efforts and concluding, "Accordingly, I want no part in the client's distribution until Lime Wire updates . . . clients with effective content filtering functionality of which the RIAA can avail themselves". (Ex. 285 at LW DE 260710.)  Rubenfeld testified that he did not actually deliver the letter, but discussed its contents with Gorton.  (Rubenfeld Tr. 52:2-53:17.)**

**Defendants' Response:**

*Disputed. Exhibit 285 is inadmissible. See Defendants' Settlement/PreAugust 2003 Objections. Also, Rubenfeld was concerned about the <u>progress</u> of the filter; Rubenfeld later became satisfied both with the progress and the effectiveness of Lime Wire's content filter and remained as an employee of the company. See Rubenfeld Tr. 52:02 – 59:19; 62:09 – 63:13.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Rubenfeld testimony, which alone provides sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 285, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-14.)  The remainder of defendants' response is argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

495. After the Supreme Court's decision in *Grokster,* Lime Wire employees had discussions with several companies to provide filtering services for copyrighted works based upon acoustic fingerprinting. Such companies included SNOCAP (Ex. 286 at SNO 000242-243; SNO 000229-230; SNO 000226-227 (Alex Rofman of SNOCAP stating "I read the news that LimeWire received a Cease and Desist letter from the RIAA yesterday. We're here and ready to move forward when you are."); LW DE 1222359-360; LW DE 1220600; 485903-906 (Rubenfeld reported to Bildson that SNOCAP is "willing to do it" and "already [has] a database of SHA-1 hashes that map to audio fingerprints"); LW DE 1241818-820; LW 000746; Rubenfeld Tr. 269:24-270:13; Catillaz Tr. 354:10-15); Audible Magic (Ex. 286 at LW DE 486683; LW DE 486685; LW DE 260585-588; LW DE 1770732-735; LW DE 1770749-751, Rubenfeld Tr. 251:14-252:19); Gracenote (Rubenfeld Tr. 254:24-255:19; Catillaz Tr. 361:25-362:10); Altnet (Ex. 286 at LW DE 247011; LW DE 246687-688); Bay TSP (Ex. 286 at LW DE 246689-690); Magix (LW DE 1935408-419; Rubenfeld Tr. 268:17-269:11); and MediaSentry (Ex. 286 at LW DE 2317738-743); Catillaz Tr. 360:19-361:16.)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 286 and the Rubenfeld Transcript. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Nor do they dispute the cited portion of the Catillaz testimony, which alone provides sufficient support for the statements for which the evidence is cited. Defendants dispute only the admissibility of Exhibit 286 and the Rubenfeld testimony, which are, in fact, admissible. (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 286; Attach. B at 7; Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.) Thus, this statement must be deemed undisputed.

496. Vincent Falco testified that Bildson told him that he believed that the "downside" to Lime Wire implementing filtering for LimeWire was that "as long as there were other [P2P] applications that didn't filter, users would always go to those places, whether it was Kazaa or other Gnutella applications that didn't filter." (Falco Tr. 157:17-158:11.)

**Defendants' Response:**

*Disputed as to admissibility of the Falco Transcript. See Defendants' Motion to Strike. Also, these discussions come before Grokster and are obviously not relevant since Lime Wire has implemented an effective filter.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of the cited portion of the Falco testimony, which is, in

fact, admissible.  (*See* Attach. B at 3.)  The remainder of defendants' response is argumentative (*see* note 6), and does not cite to any admissible evidence in support.  (*See* note 5.)  Moreover, these discussions are relevant to Lime Wire LLC's intent.  *Cf.* *Grokster,* 545 U.S. at 925 n.7.  Defendants did not implement a filter, which in all events is not effective, until after *Grokster*.  (*See* Pls. Reply ¶ 476; *see also* Gorton 9/26/08 Decl. ¶¶ 36-38; Bildson 9/10/08 Decl. ¶¶ 14-17.)  Thus, this statement must be deemed undisputed.

**497.  Acoustic fingerprinting is a type of content recognition technology that analyzes the audio content of an audio or video file, creating a digital fingerprint for that file based on its acoustic properties.  Two audio files that sound the same will generally have the same acoustic fingerprint, even if other characteristics of the files are different.  (Horowitz Report ¶ 20; Berlin Tr. 221:15-22 (describing acoustic fingerprinting as a "way of analyzing audio files to allow different recordings to be fingerprinted the same").)**

## Defendants' Response:

*Disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike. As to Berlin, he has testified that he is not an audio fingerprinting expert.*

## Plaintiffs' Reply:

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Berlin testimony, which provides support for the statement for which it is cited.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  The remainder of defendants' response is argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

**498.  Other P2P file sharing applications have implemented acoustic fingerprinting technology to filter out unauthorized works effectively without negatively affecting their performance.  (Horowitz Report ¶¶ 104, 108; Ex. 287 (Declaration of Talmon Marco (submitted in subsequent *Grokster* litigation)); Ex. 288 (Declaration of Benjamin Sorensen (submitted in subsequent *Grokster* litigation)).)**

## Defendants' Response:

*Disputed. First, the Horowitz Report is inadmissible. See Defendants' Motion to Strike. Also, Defendants object to Plaintiffs' attempt to introduce into evidence Exhibits 287 and 288 because they are inadmissible. See Defendants' Motion to Strike. Second, as shown by other evidence submitted in the Grokster litigation on remand, the issue of the effectiveness, and the impact filtering technology may have on performance, is and still*

*remains hotly contested. See Metro-Goldwyn Mayer Studios, Inc. v. Grokster, 518 F.*
*Supp. 2d. 1197-1203-05 (C.D. Cal. 2007). In fact, because of these disputes, Judge*
*Wilson ordered that a special master be appointed to determine the most effective filter in*
*light of a variety of factors, including cost and performance. Id. Moreover, Defendants'*
*computer science expert raises serious concerns about the so- called "real-world"*
*experience of audio fingerprinting technology. Gribble Decl. ¶¶ 36 – 39, 43 – 45.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants
dispute the admissibility of Exhibits 287 and 288, which are, in fact, admissible.  (*See*
Attach. A at Exs. 287, 288;  Pls. Reply ¶¶ 46, 51, 53.)  Defendants also dispute the
admissibility of the Horowitz Report which is also admissible.  The Horowitz Report
was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the
opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at
24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a
sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)
Further, in *Grokster (Remand),* the district court found that it would not be
"technologically feasible" for defendants to implement a "perfect filter" and appointed a
Special Master to assist "in selecting a filtering regimen that reduces Morpheus's
infringing capacity, preserves its noninfringing functionality as feasible, and analyzes any
potential cost concerns".  *Grokster (Remand),* 518 F. Supp. 2d 1197, 1235-37.  The
Horowitz report does not suggest that acoustic fingerprinting technology is a "perfect"
filter.  (*See* Pls. Expert Opp'n Br. at 24 n.43.)  In *Grokster,* the Supreme Court expressly
cited the failure to "develop filtering tools" as evidence of an "unlawful objective".  *See*
*Grokster,* 545 U.S. at 939.  *Third*, the contents of Marco's declaration relating to Mesh's
use of acoustic fingerprinting can also be found in his testimony.  (Marco Tr. 183:11-
185:12.)

   **499.    Lime Wire developed plans for a "hybrid" filtering system that would have
            included a hash-based filtering component and an acoustic fingerprinting
            component.  (Ex. 289; *see also* Ex. 290.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibits 289 and 290. See*
*Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants
dispute only the admissibility of Exhibits 289 and 290, which are, in fact, admissible.
(*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 21-22.)  Thus, this statement must be deemed
undisputed.

   **500.    Bildson testified that this "hybrid" filtering plan would be "more effective at
            filtering out [unauthorized] results" than the Content Filter (*see supra***

**¶¶ 476-92) that Lime Wire has implemented.  (Bildson Tr. 152:16-21, 161:16-162:20.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of the Bildson Transcript. See Defendants' Settlement/Pre-August 2003 Objections. Furthermore, such a hybrid filter can only be implemented if the Plaintiffs provide their hashes first. Gordon Decl. 237-43. Bildson also testified that he did not know, if this hybrid filtering was even technically feasible. Bildson Tr. 810:8-13.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the cited portion of the Bildson testimony, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 21-22; *see also* Bildson 9/10/08 Decl. ¶¶ 16-17.)

501.    **Other than the Content Filter (*see supra* ¶¶ 476-92), Lime Wire has not implemented any of the filtering solutions offered to it by filtering companies and never implemented acoustic fingerprinting.  (Faaborg Tr. 171:19-21, 192:19-25; Rubenfeld Tr. 251:14-252:19, 254:24-255:14, 257:15-18, 269:24-270:13; Ex. 291; Ex. 292.)**

**Defendants' Response:**

*Disputed as to admissibility of cited portion of Rubenfeld Transcript and Exhibits 291 and 292. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. However, each audio fingerprinting technology was rejected because of issues surrounding over-filtering (SNOCAP) or for other reasons, such as cost prohibitiveness (Audible Magic). Bildson Tr. 637:25-638:7 ("Audible Magic was pretty expensive"). Berlin Decl.  ¶ 21 ("SnoCap did not provide adequate filtering technology").*

**Plaintiffs' Reply:**

Defendants do not dispute the central material point and accuracy of this statement.  Nor do they dispute the cited portion of the Faaborg testimony, which provides sufficient support for the proposition that Faaborg is unaware of LimeWire implementing any acoustic fingerprinting.  Defendants dispute only the admissibility of Exhibits 291 and 292 and the cited portion of the Rubenfeld testimony, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 21-22.)  Although defendants purport to dispute Rubenfeld Tr. 257:15-18 and 269:24-270:13, nowhere in their cited evidentiary motions do they actually dispute this testimony.  (*See* Defs. Mot. Pre-2003/*Grokster* Mot. at Ex. A.)  Thus, this statement must be deemed undisputed.

502.    **As part of its Conversion Plan to convert infringing LimeWire users to paying Napster users (*see supra* ¶¶ 436-39), Lime Wire planned to implement**

"'time bombed' code", which would "self-activate for LimeWire users in 90 days", thereafter "restricting all uploading, downloading, and searching to Creative Commons files only".  During the course of those ninety days, Lime Wire expected that approximately 75% of users on the network would have upgraded to a new "filtered version" of the LimeWire client.  (Ex. 266.)

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 266. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 266, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 25 *id.* at n.22; *see also* Pls. Reply ¶ 435.)  Thus, this statement must be deemed undisputed.

   503.   **Lime Wire believed that this "'time bombed' code" would "effectively eliminate any copyrighted music, movies, and other media files from the LimeWire network".  (Ex. 266.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 266. See Defendants' Settlement/Pre-August 2003 Objections. In addition, this mechanism would have resulted in possibly eliminating all media files, even authorized ones. Additionally, this plan had its issues: because there is no "LimeWire" network, it would not have eliminated all such content on the Gnutella network.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Defendants dispute only the admissibility of Exhibit 266, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 435.)  The remainder of defendants' response is argumentative (*see* note 6), and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

   504.   **There was no known technical impediment to implementing the Conversion Plan with Napster.  (Catillaz Tr. 259:21-260:3; Gribble Tr. 201:6-22, 203:13-20 (testifying that Lime Wire could introduce a SIMPP setting requiring users to upgrade to a new version); Gribble Tr. 299:25-301:7 (testifying that Lime Wire could incorporate within its software a mechanism requiring users either to accept an updated version of the software or to exit the application).)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to the cited portions of the Catillaz and Gribble Transcripts. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the cited portion of the Catillaz and Gribble testimony, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 14-11.)  Thus, this statement must be deemed undisputed.

505. **Lime Wire's Conversion Plan with RealNetworks, Inc. (*see supra* ¶¶ 436-40) contemplated an upgrade to a filtered version of the LimeWire client.  Lime Wire first would distribute a new version of LimeWire that would "uninstall the previous version of the LW application(s) from a user's computer and replace such LW application(s) with a new application that is essentially the same, except that it includes the ability for LW to 'force upgrade' such users at a future date".  At a later date, Lime Wire then would "force upgrade" its users' applications such that they "filter and prevent the sharing of all files other than" those carrying licenses.  (Ex. 267; Ex. 268; Ex. 269; Catillaz Tr. 284:12-20.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of cited portion of the Catillaz Transcript and Exhibits 267, 268, and 269. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibits 267, 268 and 269, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. 11-24.)  Defendants purport to object to the Catillaz testimony, and although they have objected to and moved to preclude a list of exhibits and deposition excerpts in the objections they cite in their responses, they have *not* objected to this Catillaz testimony.  (*See* Defs. Pre-2003/*Grokster* Br. at Ex. A.)  Thus, this statement must be deemed undisputed.

506. **The "'time bombed' code" concept contemplated in the Conversion Plan discussed with Napster was similar to the "forced upgrade" discussed with RealNetworks, Inc.  The "forced upgrade" would "immediately [activate the new] code for converting the users to the new service", whereas the "'time bombed' code" would cause the program to "continue to function as normally until a remote trigger caused some code to be activated".  (Catillaz Tr. 285:7-21; Ex. 266; Ex. 267; Ex. 268; Ex. 269.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of cited portion of the Catillaz Transcript and Exhibits 267, 268, and 269. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibits 267, 268 and 269, and the cited portion of the Catillaz testimony, which are, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. 11-24.) Defendants purport to object to the Catillaz testimony, but although they have objected to and moved to preclude a list of exhibits and deposition excerpts in the objections they cite to in their response, they have *not* objected to this Catillaz testimony. (*See* Defs. Pre-2003/*Grokster* at Ex. A.) Thus, this statement must be deemed undisputed.

507. **There was no technical impediment to implementing the forced upgrade discussed with Real Networks, Inc.  (Catillaz Tr. 259:9-12; 285:22-286:3; Gribble Tr. 201:6-22, 203:13-20.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of the Catillaz and Gribble transcripts See Defendants' Settlement/Pre-August 2003 Objections..*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of the cited portions of the Catillaz and Gribble testimony, which are, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.) Thus, this statement must be deemed undisputed.

508. **Lime Wire's Conversion Plan with iMesh (*see supra* ¶¶ 436-39), like the plans contemplated with Napster and RealNetworks, Inc., centered on an "auto upgrade" or "forced upgrade" of the LimeWire client to a filtered version of the application.  (Ex. 270; Ex. 271; Catillaz Tr. 288:6-18.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibits 270 and 271 and the cited portion of the Catillaz Transcripts. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibits 270 and 271, and the Catillaz testimony, which

are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also* Pls. Reply ¶ 437.)  Thus, this statement must be deemed undisputed.

**509.**  **There was no technical impediment to implementing the "auto upgrade" concept contemplated in the Conversion Plan discussed with iMesh.  (Catillaz Tr. 288:19-22; *see also* Gribble Tr. 201:6-22, 203:13-20, 299:25-301:7.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of the cited portions of the Catillaz Transcript. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do the defendants dispute the cited portions of the Gribble testimony, which provide sufficient support for the statement.  Defendants dispute only the admissibility of the Catillaz testimony, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.)  Thus, this statement must be deemed undisputed.

- **Lime Wire Could Have Implemented a Plan to Educate LimeWire Users Regarding Copyright Law, but Failed to Do So**

**510.**  **As shown above (*see also supra* ¶ 444), in 2006, Lime Wire contemplated another Conversion Plan, the "Digital Sales Growth Plan", which would have involved an attempt to "reeducat[e] users".  (Catillaz Tr. 267:22-25.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of the cited portions of the Catillaz Transcript and any testimony surrounding same. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the Catillaz testimony, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.)  Further, defendants' reference to "any testimony surrounding same" is vague and must be disregarded.  Thus, this statement must be deemed undisputed.

**511.**  **The concept of the Digital Sales Growth Plan was to educate users regarding the unauthorized sharing of copyrighted files.  (Catillaz Tr. 302:13-17.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of the cited portions of the Catillaz Transcript and any testimony surrounding same. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants purport to object to the Catillaz testimony, and although they have objected to and moved to preclude a list of exhibits and deposition excerpts, they have *not* objected to this Catillaz testimony.  (*See* Defs. Pre-2003/*Grokster* Br. at Ex. A.)  Further, defendants' reference to "any testimony surrounding same" is vague and must be disregarded.  Thus, this statement must be deemed undisputed.

512. **Lime Wire Business Developer Catillaz testified that "reeducating" was a term that Mark Gorton used to describe an effort to convert LimeWire's infringing users into paying music customers.  (Catillaz Tr. 268:2-21.)**

**Defendants' Response:**

*Disputed. The document and any testimony surrounding it is an inadmissible settlement offer pursuant to Fed. R. Evid. 408. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the "document and any testimony surrounding it".  To the extent that by "any testimony" defendants mean the Catillaz testimony, that testimony is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24; *see also id.* at 15 n.13.)  Defendants do not identify "the document" they claim is inadmissible and thus, have not made an appropriate objection to the evidence.  Thus, this statement must be deemed undisputed.

513. **Catillaz testified that Gorton believed that LimeWire's entire "user base could be divided into several groups that could be characterized by their knowledge or lack thereof of copyright issues and whether -- to the extent to which we [Lime Wire] could influence their behavior".  Gorton believed that "a large proportion of people on the network that were using LimeWire didn't understand -- have a thorough understanding of copyright issues. And if they could be presented with accurate information, they would choose to purchase licensed music".  Gorton also believed that "there was another group of users that understood that their use of LimeWire may have been illegal and, if presented with the choice to download a quality licensed track, to pay for it, they would do so".  (Catillaz Tr. 268:2-21.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of the cited portions of the Catillaz Transcript and any testimony surrounding same. See Defendants' Settlement/Pre-August 2003 Objections. Moreover, Gorton disputes that he characterized Lime Wire's entire user base as infringers. Gorton Decl. ¶ 57.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Defendants dispute only the admissibility of the Catillaz testimony which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.)  Further, defendants' reference to "any testimony surrounding same" is vague and must be disregarded.  Gorton's declaration states that defendants only "referenced users that who might have been major label music consumers".  (Gorton 9/26/08 Decl. ¶ 57.)  However, Gorton does not cite to evidence that would support this statement, or any other information that would allow plaintiffs' to test his statement.  Thus, this statement must be deemed undisputed.

**514.  As part of Lime Wire's Digital Sales Growth Plan, Gorton proposed upgrading the LimeWire client to implement "Tools for Network Monitors", which would allow content owners and third-party companies such as MediaDefender or BayTSP to monitor activity on the Gnutella network. (Ex. 273 at LW DE 1070964-965; Catillaz Tr. 308:13-309:25.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of the cited portions of the Catillaz Transcript, and any testimony surrounding same, and Exhibit 273. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 273 and the Catillaz testimony, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 20 n.18; *see also* Pls. Reply ¶ 444.)  Further, defendants' reference to "any testimony surrounding same" is vague and must be disregarded.  Thus, this statement must be deemed undisputed.

**515.  The Digital Sales Growth Plan contemplated displaying "[m]essages" to users that would "present users with copyright law information, legal purchase options and material about the moral consequences of file sharing". (Ex. 273 at LW DE 1070962.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 273 and any testimony surrounding same. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibit 273, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 20 n. 18.) Further, defendants' reference to "any testimony surrounding same" is vague and must be disregarded. Thus, this statement must be deemed undisputed.

> **516.** **Lime Wire has not implemented the Digital Sales Growth Plan. (Catillaz Tr. 350:19-23.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of the Catillaz Transcript and any testimony surrounding same. See Defendants' Settlement/PreAugust 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants purport to object to the Catillaz testimony, and although they have objected to and moved to preclude a list of exhibits and deposition excerpts, they have *not* objected to this Catillaz testimony. (*See* Defs. Pre-2003/*Grokster* at Ex. A.) Further, defendants' reference to "any testimony surrounding same" is vague and must be disregarded. Thus, this statement must be deemed undisputed.

> **2.** **Lime Wire Attempts to Filter Other Kinds of Files**
>
> • **Pornography**
>
> **517.** **LimeWire contains a keyword filter that can be used to reduce the amount of pornography returned when searching. (Horowitz Report ¶ 83; Gribble Report at 23-24.)**

**Defendants' Response:**

*Disputed. First, the Horowitz Report is inadmissible. See Defendants' Motion to Strike. Second, the filter is ineffective. See, infra ¶ 518.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Nor do defendants dispute the Gribble Report, which alone provides sufficient support for the statement. Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible. The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition. (*See* Pls. Expert Opp'n Br. at 16-17; Pls. Mot. to Strike Opp'n Br. at 24-25.) In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report. (Forrest 11/07/08 Decl. ¶ 13.) Thus, this statement must be deemed undisputed.

**518.    The filter is not completely effective in eliminating pornographic results from searches. (Rohrs Tr. 145:2-5.) [Undisputed]**

**519.    The filter is off by default.  (Rohrs Tr. 149:20-151:14.)  A user can turn the pornography filter on by checking a box called "Ignore Adult Content" in the Options window in the LimeWire application.  When turned on, the filter causes LimeWire to apply 32 keyword terms that are defined within the LimeWire source code.  (Horowitz Report ¶ 83, Fig. 17.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz report. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible. The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**520.    When asked why Lime Wire made the default setting for the pornography filter "off", Rohrs, who designed the original LimeWire client, testified, "[p]opular music ['music that young people may listen to'], as you know, uses some profane words sometimes in song titles".  (Rohrs Tr. 151:15-152:2.)**

**Defendants' Response:**

*Disputed. Other developers such as Sam Berlin, and Defendants' expert Gribble, have stated that the reason it is turned "off" is consistent with Lime Wire's goals, i.e., to allow the user to control the settings. See Gribble Decl. ¶ 27.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Nor do they dispute the admissibility of the cited portion of the Rohrs testimony, which alone provides sufficient support for the statement.  The remainder of defendants' response is argumentative (*see* note 6), does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**521.    If a user enables the adult content filter, "LimeWire will look for the filtered keywords within the filenames of search results. If any keyword is found, that result is dropped so that the user will not see it". (Gribble Report at 24.) [Undisputed]**

- **Sensitive Files**

**522.** **The LimeWire client contains controls that reduce the likelihood that files with extensions likely to contain "sensitive" data ("Sensitive File Types") will be shared. (Ex. 293; Berlin Tr. 308:21-309:24.) Sensitive File Types include, for example, files saved in the Microsoft Word (.doc) and Adobe Acrobat (.pdf) format. (*Id*.) [Undisputed]**

**523.** **By default, LimeWire filters out files with the extensions .vbs (software), .wmv (video), and .asf (video).  (Ex. 294; Horowitz Report ¶ 52.)**

**Defendants' Response:**

*Disputed as to admissibility of the Horowitz report. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do defendants dispute Exhibit 294, which alone provides sufficient support for the fact that LimeWire filters these file extensions.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

**524.** **LimeWire is configured such that, by default, it does not consider any audio file type to be included in the "Sensitive File Types" list. (Ex. 295; Berlin Tr. 309:25-3 10:10.) [Undisputed]**

**525.** **Neither does LimeWire include M4A files, which are DRM-free music files purchased through Apple iTunes or ripped from audio CDs using iTunes, in the "Sensitive File Types" list.  (Horowitz Report ¶ 82.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of the Horowitz Report. See Defendants' Motion to Strike Expert Reports.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of the Horowitz Report, which is, in fact, admissible.  The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition.  (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.)  In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report.  (Forrest 11/07/08 Decl. ¶ 13.)  Thus, this statement must be deemed undisputed.

- **LimeWire Store Files**

**526.**   **Unlike its treatment of audio files on the Gnutella network, Lime Wire has implemented controls, known as the "Magic String",  to prevent unauthorized sharing of music files sold through its own LimeWire Store (*see supra* ¶¶ 526-29).  (Gribble Report at 37-38.)**

**Defendants' Response:**

*Disputed. Lime Wire has no ability to implement any controls or restrictions over the files that are shared over the Gnutella network. See Declaration of Dr. Steven Gribble in Support of Defendants' Motion for Partial Summary Judgment. Moreover, the "magic string" functionality is wholly different from any content filter because LimeWire Store controls the distribution of its content. See, Gribble Decl. ¶ 41, 42.*

**Plaintiffs' Reply:**

Defendants do not dispute the central point of this statement--that is, that defendants were able to control the sharing of copyrighted content through the LimeWire store, but chose not to do so.

**527.**   **The "Magic String" is a set of data that LimeWire adds to music files purchased from the LimeWire Store that marks the song as having been purchased from the LimeWire Store. (Berlin Tr. 251:7-252:25; Rubenfeld Tr. 283:17-22.) [Undisputed]**

**528.**   **Defendants prevent music files that contain the Magic String from being shared on the Gnutella network using LimeWire. (Berlin Tr. 258:19- 259:25, 261:15-21; Rubenfeld Tr. 283:23-284:14.) [Undisputed]**

**529.**   **When asked the reason for the "Magic String", Lime Wire CFO Rubenfeld responded, "Because . . . if the file that was just purchased from our store is shared on LimeWire, it could make it less likely that someone would buy the song if they could get it for free on LimeWire."  (Rubenfeld Tr. 150:15- 152:24; *see also id.* 283:23-285:8.)**

**Defendants' Response:**

*Disputed as to admissibility of the cited portions of the Rubenfeld Transcript. See Defendants' Motion to Strike*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the cited portions of the Rubenfeld transcript, which are, in fact, admissible. (*See* Attach. B at 8.)  Defendants also purport to dispute the admissibility of the Rubenfeld Tr. 238:23-285:8, but in fact offer no grounds on which this testimony must be

excluded in their response or in the motion to which they cite.  Thus, this statement must be deemed undisputed.

## VI.  LIME WIRE IS LIABLE FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT

### A.  Lime Wire Was Aware Of or Had Reason to Be Aware of the Direct Infringement or at the Very Least, Turned a "Blind Eye" to Such Infringement Through LimeWire

**530.    As shown above (*see*, *e.g.*, *supra* ¶¶ 252, 268-79, 290-93, 296-306), Lime Wire knew or had reason to know of infringement using the LimeWire client.**

**Defendants' Response:**

*Disputed.  While Lime Wire officials generally knew that its users could use the software for infringement, given the architecture of the network, no one person has specific knowledge of what LimeWire users are doing at any given moment in time.  See generally Defendants' Motion for Partial Summary Judgment.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  The remainder of defendants' response is argumentative (*see* note 6), and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**531.    Lime Wire received emails from users indicating their use of LimeWire for copyright infringement.  (*See*, *e.g.*, Ex. 296 at PX 61 (Destiny's Child and Kid Rock), PX 567 (Blink 182), LW DE 0967946 (Timbaland), LW DE 805006 (Destiny's Child), LW DE 0967959 (Madonna), LW DE 1008964 (Madonna), LW DE 0969730 (The Beatles), LW DE 1252083 (Justin Timberlake), LW DE 1995667 (Coldplay), LW DE 1969428 (Beach Boys), LW DE 1256696 (Billy Joel), LW DE 1250337 (Michael Jackson), LW DE 1249805 (Ray Charles), LW DE 1286010 (Mariah Carey), LW DE 328566 (Third Eye Blind), LW DE 328080 (Bob Marley), LW DE 1994499 (Bob Dylan), LW DE 1246860 (Tom Petty), LW DE 0966743 (Britney Spears and The Doors).)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 296. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 296, which is, in fact, admissible.  (*See* Attach. A at Ex. 296.)  Thus, this statement must be deemed undisputed.

**532.** Several of the user emails indicating infringing use of LimeWire included listings of the users' files found in their shared directories (*see supra* ¶¶ 79-80), each of which listed several pages of songs available for sharing. (*See, e.g.*, Ex. 31; Ex. 297.) At least five of the songs listed in the shared directories are listed in Attachment A hereto. (*See* Ex. 298 at LW DE 1226356, 1251561, 1716478, 1312357, 1220874.)

**Defendants' Response:**

*Disputed. First, Exhibit 298 is inadmissible. See Defendants' Motion to Strike. Second, the referenced exhibits do not by themselves prove what Plaintiffs purport them to prove—that a user was sharing these files; nor is there any evidence proving that Lime Wire knew that those users were actually sharing this content. See Bildson Tr. 767:8 – 767:23. These documents merely establish that these emails were received by Lime Wire.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute only the admissibility of Exhibit 298, which is, in fact, admissible. (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 298.) The remainder of defendants' response is argumentative. (*See* note 6.) Moreover, the portion of the Bildson testimony cited by defendants actually states that Bildson himself was not aware that Lime Wire became aware that users were sharing content. (*See* Bildson Tr. 767:8-767:23.)

**533.** Lime Wire collected "user testimonials"-- many of which it used to promote the LimeWire client on its website--that included the statements, "excellent for downloading music files", "music to my ears", "KAZAA STEP ASIDE", "beats Kazaa by a mile", and compared LimeWire to Napster and other P2P clients notorious for copyright infringement. (Ex. 119; Ex. 81; Ex. 299 (2004); Ex. 300 (2007); *see also supra* ¶ 245.)

**Defendants' Response:**

*Disputed. First, there is no evidence that Lime Wire "collected" user testimonials, especially those comparing itself to Napster. Second, Exhibits 119, 81, 299, and 300 are inadmissible. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute the admissibility of Exhibits 81, 119, 299, and 300, which are, in fact, admissible. (*See* Attach. A at Exs. 81, 119, 299, 300; *see also* Pls. Reply ¶¶ 161, 216.) Further, defendants dispute the word "collected" in this statement. Since the word "collected" is not necessary to the materiality or central point of the statement, plaintiffs hereby substitute the words "had in its files" for the word "collected" in this statement. The remainder of defendants' response is argumentative. (*See* note 6.) Thus, this statement must be deemed undisputed.

**534.** **Lime Wire is aware that the Record Companies have not authorized or licensed Lime Wire or LimeWire's users to copy or distribute copyrighted works using LimeWire. (See Bildson Tr. 82:25-85:12.)** **[Undisputed]**

**535.** **Lime Wire received a cease and desist letter dated September 13, 2005 from the RIAA, which notified it that it had been and was inducing, enabling, encouraging and facilitating infringement of plaintiffs' copyrighted sound recordings and demanded that Lime Wire cease and desist these activities. (Ex. 301.)**

**Defendants' Response:**

*Undisputed that Lime Wire received such a letter, which speaks for itself.*

**Plaintiffs' Reply:**

This statement is undisputed. The response "the documents speaks for itself" is improper. (*See* note 12.)

**536.** **Press accounts maintained in Lime Wire's files describe LimeWire as a widely-known means by which to search for and download unauthorized content. (*See, e.g.*, Ex. 302.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 302. See Defendants' Settlement/Pre-August 2003 Objections. Also disputed as to "widely known." These articles speak for themselves.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute the admissibility of Exhibit 302, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Defendants' also dispute the words "widely known" in the statement. Since those words are not necessary to the materiality or central point of the statement, plaintiffs hereby strike the words "widely known" from this statement. Further, a defendant "cannot merely state that the document or testimony 'speaks for itself'". (*See* note 12.) Thus, this statement must be deemed undisputed.

**537.** **In a file folder labeled "Knowledge of Infringement", Lime Wire maintained copies of articles dating from 2001 to 2004. (Ex. 197.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 197. See Defendants' Motion to Strike. There is no evidence that Lime Wire authorized anyone to maintain this file. Gorton flatly denies it. Gorton Tr. 245:4 – 6.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute the admissibility of Exhibit 197, which is, in fact, admissible.  (*See* Attach. A at Ex. 197.)  Plaintiffs' do not assert that anyone at Lime Wire authorized anyone to maintain this file.  Notably, however, in the testimony cited by defendants, Gorton testified only that he was not aware that Lime Wire LLC kept such a file, not that no one had authorization to do so.  (*See* Gorton Tr. 245:4-6.)  Thus, this statement must be deemed undisputed.

**538.    On occasion, Lime Wire investigated or sought answers to technical issues users experienced in downloading media files.  (*See, e.g.*, Ex. 303 (Bildson responding (internally) to email re user "It took almost three hours to load 2,832 songs"); Ex. 172 (LimeWire responds to a customer whose technical issues related to downloading music and films); Ex. 304 (re users' technical issues re searching songs); Ex. 305 (re technical issue re displaying title of songs); Ex. 306 (re not being able to launch films from the library but able to launch songs); *see also* Ex. 307; Ex. 308.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 304, 305, 306, and 307. See Defendants' Motion to Strike. It is undisputed that Lime Wire responded to emails from users generally inquiring about technical issues regarding media files; however, there is no evidence that these media files were unauthorized copyrighted works.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute Exhibits 172, 303, or 308, which provide sufficient support for the statement.  Defendants dispute only the admissibility of Exhibits 304, 305, 306 and 307, which are, in fact, admissible.  (*See* Attach. A at Exs. 304-07.)  The remainder of defendants' response is argumentative (*see* note 6), and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**B.    Lime Wire Has Induced or Materially Contributed to Infringement by Users of the LimeWire Software**

**539.    As shown above (*see supra* ¶¶ 140-529), Lime Wire has induced and contributed to infringement by users of its LimeWire client.**

**Defendants' Response:**

*Disputed. See supra ¶¶ 140-529*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶¶ 140-529.

**540.    Lime Wire admits that it has designed, distributed, supported and maintained the LimeWire software. (Ans. ¶¶ 1, 29, 52; see also supra ¶ 43.) [Undisputed]**

**C.    There Is No Evidence of "Substantial" or "Commercially Significant" Noninfringing Uses of the LimeWire Software**

**541.    As shown above (*see supra* ¶ 135, 445-446), Lime Wire believed that 100% of its user base engaged in infringement.**

**Defendants' Response:**

*Disputed. Lime Wire has never believed that all of its users were copyright infringers. See supra ¶¶ 135, 445-446.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶¶ 135, 445-446.

**542.    As shown above (*see supra* ¶ 108), an estimated 92.7% of the files available for download using the LimeWire client are not authorized for free distribution on P2P networks.**

**Defendants' Response:**

*Disputed. The evidence cited by Plaintiffs is not only inadmissible but highly suspect. See supra Response ¶ 108.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 108.  The remainder of defendants' response is argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

**543.    As shown above (*see supra* ¶ 109), an estimated 98.8% of the download requests to LimeWire users for authorized or unauthorized files are for files that are unauthorized for free distribution on P2P networks.**

**Defendants' Response:**

*Disputed. The evidence cited by Plaintiffs is not only inadmissible but highly suspect. See supra Response ¶ 109.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 109.  The remainder of defendants' response is argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

**544.   Only an estimated 3.2% of the files available for downloading using the LimeWire client are authorized for free distribution on P2P networks. (Waterman Report at 3, 7.)**

**Defendants' Response:**

*Disputed. First, Dr. Waterman's report is inadmissible. See Defendants' Motion to Strike. See also Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proffered Expert Summary Judgment Evidence from the Depositions and Reports of Ellis Horowitz, Ph.D and Richard P. Waterman, Ph.D. Second, even if the report were admissible, inasmuch as German's "classifications" were "made up" and invalid, the 3.2% figure alleged by plaintiffs is no more valid or real than the 92.7% figure that plaintiffs claim to be not authorized for free distribution. See supra ¶¶ 106-08, 110. The 3.2% figure lacks any validity and was made artificially low by design. Id. See also Gribble Decl. ¶¶ 58 – 66 (unreliability).*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute the admissibility of the Waterman Report, which is, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br. at 16-17; Pls. Expert Opp'n Br. at 24-25.)  Defendants' response contains the same arguments defendants make in their Motion to Exclude the Waterman Report.  Plaintiffs respectfully refer the Court to their opposition where they have shown that the Waterman Report is valid and admissible.  (*See* Pls. Expert Opp'n Br. at 3-19; *see also* Forrest 11/07/08 Decl. ¶ 14.)  Thus, this statement must be deemed undisputed.

**545.   Only an estimated 1.2% of the download requests to LimeWire users for authorized or unauthorized files are for files that are authorized for free distribution on P2P networks.  (Waterman Report at 3, 8.)**

**Defendants' Response:**

*Disputed. First, Dr. Waterman's report is inadmissible. See Defendants' Motion to Strike. See also Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proffered Expert Summary Judgment Evidence from the Depositions and Reports of Ellis Horowitz, Ph.D and Richard P. Waterman, Ph.D. Second, even if the report were admissible, inasmuch as German's "classifications" were invalid as a starting point for the User Request Study, and since Plaintiffs' "study" was invalid, the 1.2% figure is equally invalid. See supra ¶ 109. The 1.2% figure lacks any validity and was made artificially low by design. Id. See also Gribble Decl. ¶¶ 58 – 66 (unreliability).*

**Plaintiffs' Reply:**

Defendants dispute the admissibility of the Waterman Report, which is, in fact admissible.  (*See* Pls. Mot. to Strike Opp'n Br. at 16-17; Pls. Expert Opp'n Br. at 24-25.)  Defendants dispute the admissibility of the Waterman Report, which is, in fact, admissible. Defendants' response contains the same arguments defendants make in their Motion to Exclude the Waterman Report.  Plaintiffs respectfully refer the Court to their

211

opposition where they have shown that the Waterman Report is valid and admissible. (*See* Pls. Expert Opp'n Br. at 3-19; *see also* Forrest 11/07/08 Decl. ¶ 14.)

**546.    As shown above (*see supra* ¶¶ 402-61), Lime Wire's current business model and those used for most of its existence, were and are dependent upon infringing users of LimeWire.**

**Defendants' Response:**

*Disputed. See supra response ¶¶ 402-61.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶¶ 402-461.

**547.    Gorton is not aware of any specific instance in which any person made noninfringing use of the LimeWire client. (Gorton Tr. 195:12-196:6.) [Undisputed]**

**548.    Gorton thinks that certain artists have authorized their music for distribution using LimeWire but is not aware of any user of LimeWire who has downloaded such music.  (Gorton Tr. 171:3-20, 191:19-192:11.)  When asked how he knew that certain music files are authorized for distribution, Gorton testified, "I must have read it somewhere".  (*Id.* at 176:13-18.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is "certainly" available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is not responsive to this statement.  In fact, when questioned about specific instances of noninfringing use of media files, Gorton could provide no specific examples.  (*See* Gorton Tr. 207:02-209:17.)

**549.    Gorton testified that he is not aware of any LimeWire users who had downloaded music files from bands seeking to promote their music.  (Gorton Tr. 174:13-21, 191:19-192:11.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 548.

**550.     Gorton testified that certain recordings of concerts constitute a noninfringing use of LimeWire but does not know the names of any of those concerts, and he is not aware of any users who had utilized LimeWire to download any such recordings.  (Gorton Tr. 197:16-198:6.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is not responsive to this statement.  In fact, when questioned about specific instances of noninfringing use of media files, Gorton could provide no specific examples.  (*See* Gorton Tr. 207:02-209:17.)

**551.     Gorton testified that LimeWire could be used to share bookmarks but he is not aware of anybody ever using LimeWire to share bookmarks.  (Gorton Tr. 212:23-214:8.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**552.     Gorton testified that he believes some movie trailers are authorized to be shared using LimeWire but he is unaware of any such trailers that have been downloaded using LimeWire.  (Gorton Tr. 177:16-179:12.)  Gorton testified that the only basis for his belief that some movie trailers are authorized for distribution on LimeWire is his having "read about it".  (*Id.* 179:5-21.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**553.    Gorton testified that some movies are authorized for distribution using LimeWire but could not name any such movies.  (Gorton Tr. 179:22-180:22.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**554.    Gorton testified that he thought a Mark Cuban movie had been authorized for distribution on Gnutella, but is not aware of anybody having ever downloaded that movie. (Gorton Tr. 180:15-181:15.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**555.    Gorton testified that he believed the distribution of the works of Shakespeare to be a noninfringing use of LimeWire but could not recall anybody using LimeWire to download any works of Shakespeare.  (Gorton Tr. 183:9-22.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**556.    Gorton testified that he believed the distribution of Weedshare files to be a noninfringing use of LimeWire but testified that he has "no idea" how many Weedshare files exist and knows of no specific instance of anybody using LimeWire to download Weedshare files.  (Gorton Tr. 184:21-185:18.)**

**Bildson likewise testified that he has no understanding of how many Weedshare sound recordings have been downloaded using LimeWire. (Bildson Tr. 148:14-20.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**557.    As of July 12, 2008, the Weedshare service is unavailable.  (Ex. 309 (www.weedshare.com).)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 304. See Defendants' Motion to Strike. Also, this does not mean that there is any corroborative evidence that Weedshare files cannot be utilized over the Gnutella network nor is there any such evidence.*

**Plaintiffs' Reply:**

Defendants do not dispute that the central material point and accuracy of the statement. Defendants dispute the admissibility of Exhibit 304 which is non-responsive to the statement because ¶ 557 cites Exhibit 309.  In any event, Exhibit 309 is, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 309.)  The remainder of defendants' response is argumentative (*see* note 6), and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, this statement must be deemed undisputed.

**558.    Gorton testified that he believes sharing of personal pictures or home movies by LimeWire users is a noninfringing use of LimeWire but is not aware of any users who have shared pictures or home movies using LimeWire. (Gorton Tr. 185:19-186:18.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**559.    Gorton testified that distribution of software released under an open source license constitutes a noninfringing use of LimeWire but is not aware of any software released under an open source license that has been downloaded using LimeWire.  (Gorton Tr. 186:19-187:3.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**560.    Gorton testified that distribution of software released as shareware or freeware constitutes a noninfringing use of LimeWire but is not aware of any shareware or freeware that has been downloaded using LimeWire.  (Gorton Tr. 187:4-20.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**561.    Gorton testified that the sharing of certain video games is a noninfringing use of LimeWire but is not aware of whether any such video games had ever been downloaded using LimeWire.  (Gorton Tr. 187:21-188:15.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**562.    Gorton testified that the sharing of files licensed under a Creative Commons license are a noninfringing use of LimeWire but is unaware of any Creative Commons files having been downloaded using LimeWire, other than by LimeWire developers in a testing capacity.  (Gorton Tr. 188:16-190:4.)**

216

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**563.   Gorton testified that he is not aware of LimeWire ever having been used to download documents.  (Gorton Tr. 191:11-13; *see also* Gribble Tr. 178:22-179:10 (testifying that he is unaware of anybody who has intentionally made a word processing document available for download using LimeWire).)**

**Defendants' Response:**

*Disputed as to admissibility of page 179 of the Gorton Transcript. See Defendants' Motion to Strike. It is undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See, Gorton Tr. 171:3-6; 191:11-13; see also, Gribble Tr. 178:22-179:10.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute the cited portion of the Gribble testimony, which alone provides sufficient support for the proposition for which it is cited.  Although defendants objected to and moved to preclude specific exhibits and deposition excerpts, they have *not* objected to this portion of the Gorton testimony.  (*See* Defs. Mot. to Strike Br. at 9.)  The remainder of defendants' response is not responsive to the statement, and does not cite to any admissible evidence in support.  (*See* note 5.)  Thus, the statement must be deemed undisputed.

**564.   Gorton testified that he is not aware of LimeWire ever having been used to download books that are in the public domain or that are otherwise authorized for distribution via P2P software.  (Gorton Tr. 191:14-18.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**565.**   **Gorton testified that he is not aware of LimeWire ever having been used to download "smaller" movies or independent films that were authorized for distribution.  (Gorton Tr. 192:12-21.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**566.**   **Gorton testified that he was not aware of LimeWire ever having been used to download recipes.  (Gorton Tr. 192:22-193:25.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**567.**   **Gorton testified that he is not aware of any users who used LimeWire to download academic articles that were authorized for distribution.  (Gorton Tr. 198:7-19.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**568.**   **Gorton testified that he is not aware of anybody who had ever used LimeWire to download legal documents that were authorized for distribution.  (Gorton Tr. 199:4-6.)**

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**569.** Gorton testified that the distribution of public datasets such as census data constitutes a noninfringing use of LimeWire, but does not know of whether any such datasets are available to users of LimeWire or whether any such datasets have ever been downloaded using LimeWire. (Gorton Tr. 199:3-21.)

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**570.** Gorton testified that he is not aware of LimeWire ever having been used to download recordings of speeches. (Gorton Tr. 199:22-200:14.)

**Defendants' Response:**

*Undisputed that Gorton does not know what Lime Wire users use the software for. He does know, however, that noninfringing material is generally available. See Gorton Tr. 171:3–6.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 550.

**571.** Gorton testified that the Gnutella network's lack of a central server has "important implications for freedom of speech". (Gorton Tr. 219:22- 220:19; see also id. 82:20-83:17 ("through sort of tortured legal reasoning, the copyright doctrine has managed to impinge upon the First Amendment ... I still believe that the First Amendment protections absolutely protect what we do at LimeWire"), 84:18-85:2 ("it [LimeWire] receives the highest protections afforded by the constitution"), 221:21-223:9 ("And in terms of you were asking about substantial noninfringing uses, I would say things like giving tools to Chinese dissidents."), 221:19-25 ("giving tools to Chinese

dissidents and Iranian --"), 223:18-224:14 ("China and Iran specifically benefit from technologies like the one that I've built").) [Undisputed]

572.  Gorton testified that he has "no specific knowledge" of LimeWire ever having been used by Chinese dissidents to share information. (Gorton Tr. 223:14-17; see also id. 224:15-20 ("I do not know of specific people in China using this technology."), 224:21-225:2 ("I don't know of anybody in China or Iran so I have a hard time answering that question.") [Undisputed]

573.  Bildson testified that he has no understanding as to the number of songs ripped from CDs distributed by Wired Magazine that have been downloaded using LimeWire. (Bildson Tr. 148:21-24.) [Undisputed]

574.  Bildson testified that he is unaware of any specific sound recordings that are in the public domain.  (Bildson Tr. 151:3-6.)

**Defendants' Response:**

*Disputed. While he may be unaware of any specific titles, Bildson certainly is aware of authorized content since he searched for and downloaded it, such as Creative Commons and Weedshare files. Bildson Tr. 97:09 – 97:15.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Nor do they dispute the admissibility of the cited portion of the Bildson testimony, which alone provides sufficient support for the statement.  The remainder of defendants' response is argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

575.  Bildson testified that he has no understanding as to the number of Creative Commons sound recordings that have been downloaded using LimeWire. (Bildson Tr. 148:21-24; *see also* Horowitz Tr. 88:17-89:4; *see also* (Catillaz Tr. 18:14-22) (testifying that she used LimeWire to search for Creative Commons music but could not recall the titles of any of those songs).)

**Defendants' Response:**

*Undisputed that Bildson does not know what Lime Wire users use the software for.*

**Plaintiffs' Reply:**

This statement is undisputed.  But, plaintiffs note that Bildson has stated that "[a]t Lime Wire, we understood that users use LimeWire exclusively to download copyrighted media files".  (*See* Bildson 9/10/08 Decl. ¶ 18.)

576.  Bildson testified that he does not recall anyone who has used LimeWire to download text files.  (Bildson Tr. 127:11-15.)

**Defendants' Response:**

*Undisputed that Bildson does not know what Lime Wire users use the software for. But he has searched for and located text files. Bildson Tr. 105:16 – 105:25.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is argumentative. (*See* note 6.)

577. **Bildson testified that he believes that in 2004 somebody made "educational material" available for download using LimeWire but is unaware of whether anybody has ever downloaded such material.  (Bildson Tr. 130:11-134:6.)**

**Defendants' Response:**

*Undisputed that Bildson does not know what Lime Wire users use the software for.*

**Plaintiffs' Reply:**

This statement is undisputed.

578. **Bildson testified that an America's Army program had been made available through MagnetMix and that his "assumption" is that it had been downloaded more than a thousand times in total, but does not know that to be true. (Bildson Tr. 134:7-136:9.) [Undisputed]**

579. **MagnetMix is a website released by Lime Wire in 2003, through which Lime Wire offers licensed content for download using LimeWire. (Ex. 310; Catillaz Tr. 216:3-12; Ex. 40.) [Undisputed]**

580. **The LimeWire client used to contain a button, the activation of which would open a web browser and direct the user to the MagnetMix website. (Ex. 311 at LW DE 1908724; Faaborg Tr. 144:24-146:4.) [Undisputed]**

581. **On March 27, 2006, Gorton instructed software developer Kevin Faaborg to "[r]emove the magnetmix button from the client". (Ex. 311 at LW DE 1908724; Faaborg Tr. 145:9-146:4.) Faaborg testified that Gorton wanted the MagnetMix button removed "because MagnetMix was old, and it wasn't up to the quality standards that our users expected". (Faaborg Tr. 146:5-12.) On Gorton's instructions, Faaborg removed the MagnetMix button from LimeWire. (*Id.*) [Undisputed]**

582. **Bildson testified that there is "a reasonably small number" of shareware games, "somewhere in the 5 to 20 range", available through MagnetMix (Bildson Tr. 136:21-137:2), but he has no understanding as to how many times such games had been downloaded. (Id. 138:9-12.) [Undisputed]**

583.   As of July 12, 2008, there are nine games available through MagnetMix. (Ex. 312 (http://www.magnetmix.com/games.shtml).) [Undisputed]

584.   Bildson testified that he does not know if anyone has ever used the BitTorrent functionality of LimeWire to download a BitTorrent file for pay or a free BitTorrent file that is authorized for distribution. (Bildson Tr. 145:19-24; see also Gribble Tr. 131:11-19 (testifying that he has seen no evidence demonstrating that anyone has ever used the BitTorrent functionality within LimeWire to download any files).)

**Defendants' Response:**

*Undisputed that neither Bildson nor Gribble know what Lime Wire users use the software for.*

**Plaintiffs' Reply:**

This statement is undisputed.

585.   When asked why he sought statistics from Napster (as it existed before it was a legal service) regarding the number of file names in a typical search horizon, Rohrs testified:

"A.   Certainly Napster had lots of users and would have a lot of data and would be at least in some estimate perhaps better than Shakespeare.

Q.   Why would it be better than Shakespeare?

A.   Well, I don't think Shakespearian English is relevant to files that are being shared on a peer-to-peer network.

Q.   Why not?

A.   I can't remember any files, to my knowledge, that use the word wormwood in the title, as I allude to in paragraph 3." (Rohrs Tr. 46:16-49:14; *see also* Ex. 313.)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 313. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections. Also, Rohrs did use Shakespeare as an example of a search term to test Gnutella. See Defs.' Ex. 30 (LW DE 1975001).*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute only the admissibility of Exhibit 313, which is, in fact, admissible. (*See* Pls. Mot.

to Strike Opp'n Br., Attach. A at Ex. 313; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)
The remainder of defendants' response is not responsive to the statement.  Thus, this
statement must be deemed undisputed.

**586.**   **When Lime Wire's counsel asked Rohrs for "examples" of "types of
legitimate content", Rohrs testified that "[t]here were books, music, movies,
documents" but did not provide any specific examples. (Rohrs Tr. 183:8-
184:4.) [Undisputed]**

**587.**   **Defendants' expert testified that in his study of the LimeWire client, he did
not download any audio files because he "didn't want to commit any
infringing act".  (Gribble Tr. 103:16-104:3.)**

**Defendants' Response:**

*Disputed. He did not attempt to download any audio because it was not a task that he
was assigned to do.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Further,
defendants' response is argumentative (*see* note 6), and does not cite to any admissible
evidence in support.  (*See* note 5.)  Moreover, when asked "Why didn't you download an
audio file?", Gribble's complete response was, "[i]t's not clear to me whether or not that
would have been an infringing act and I certainly didn't want to commit any infringing
act."  (Gribble Tr. 103:25-104:3.)  Thus, this statement must be deemed undisputed.

**588.**   **Defendants' expert testified that he is not aware of anybody who has used
LimeWire to share family photographs.  (Gribble Tr. 110:18-22.)**

**Defendants' Response:**

*Undisputed. But that was because he did not make any attempts to determine that one
way or another. Gribble Tr. 110:5-22.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is irrelevant, non-
responsive and argumentative.  (*See* note 6.)

**589.**   **Defendants' expert testified that he is not aware of anybody having used
LimeWire to download recipes.  (Gribble Tr. 108:6-8.)**

**Defendants' Response:**

*Undisputed. But that was because he did not make any attempts to determine that one
way or another. Gribble Tr. 110:5-22.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 588.

**590.   Defendants' expert testified that he is not aware of anyone having used LimeWire to search for academic literature.  (Gribble Tr. 110:5-8.)**

**Defendants' Response:**

*Undisputed. But that was because he did not make any attempts to determine that one way or another. Gribble Tr. 110:5-22.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 588.

**591.   Defendants' expert lists in his report only one example of a noninfringing file available on the Gnutella network--the open source web browser known as "Firefox". (Gribble Report at 16.)**

**Defendants' Response:**

*Disputed. Gribble only searched for one file and immediately found it.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Further, defendants' response does not cite to any admissible evidence controverting the statement.  (*See* note 5.)

**592.   The Firefox web browser is available for free download at the website of its distributor, without any need to download and install file-sharing software such as LimeWire, or connect to any peer-to-peer network. (Ex. 314 (http://www.mozilla. com/en-US/firefox/).) [Undisputed]**

**593.   Defendants' expert testified that he is not aware of anyone, other than himself in the context of his work in this case, who has ever used LimeWire to search for the Firefox web browser.  (Gribble Tr. 108:13-109:6.)**

**Defendants' Response:**

*Undisputed. But that was because he did not make any attempts to determine that one way or another. Gribble Tr. 110:5-22.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶ 588.

**594.** **Defendants' expert testified that, when he searched for Firefox using LimeWire, he was concerned that the file he would download would contain viruses. Accordingly, defendants' expert examined "some of the metadata, especially the size of the file, to try to infer whether or not the reported size of the file was reasonable with respect to Firefox software distribution". (Gribble Tr. 365:9-22; *see also* Horowitz Tr. 86:16-87:17 (testifying that users would go to Google, not LimeWire, to download Firefox because "[n]ot only would you not know which versions you were getting, but you don't know who supplied the version. Might have a virus in it.").)**

**Defendants' Response:**

*Undisputed except to the extent this purported statement of fact relies upon the inadmissible testimony of Horowitz. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

This statement is undisputed. Defendants dispute only the admissibility of the Horowitz testimony, which is, in fact, admissible. The Horowitz Report was, in fact, "signed" as required by Fed. R. Civ. P. 26, and Horowitz discussed the opinions contained in his report at his sworn deposition. (*See* Pls. Expert Opp'n Br. at 24-25; Pls. Mot. to Strike Opp'n Br. at 16-17.) In any event, Horowitz hereby submits a sworn affidavit attesting to the validity of his report. (Forrest 11/07/08 Decl. ¶ 13.)

**595.** **Of the 595 unique keywords in Lime Wire's Google AdWords campaigns (*see supra* ¶¶ 162-67, 198-201, 207-09, 234-35), only 2 contain the words "america's army".  (Ex. 82; Ex. 102.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 82 and 102. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibits 82 and 102, which are, in fact, admissible. (*See* Attach. A at Exs. 82, 102; Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.) Thus, this statement must be deemed undisputed.

**596.** **Of the 595 unique keywords in Lime Wire's Google AdWords campaign (*see supra* ¶ 595), none contains the word "Shakespeare".  (Ex. 82; Ex. 102.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 82 and 102. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

This statement must be deemed undisputed.  (*See* Pls. Reply ¶ 595.)

**597.    Of the 595 unique keywords in Lime Wire's Google AdWords campaign (see supra ¶ 595), none contains the word "recipe" or "cooking". (Ex. 82; Ex. 102.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 82 and 102. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

This statement must be deemed undisputed.  (*See* Pls. Reply ¶ 595.)

**598.    Of the 595 unique keywords in Lime Wire's Google AdWords campaign (see supra ¶ 595), none contains the words "home movies" or "home photographs". (Ex. 82; Ex. 102.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 82 and 102. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

This statement must be deemed undisputed.  (*See* Pls. Reply ¶ 595.)

**599.    Of the 595 unique keywords in Lime Wire's Google AdWords campaign (see supra ¶ 595), none contains the words "court files" or "court papers", etc. (Ex. 82; Ex. 102.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 82 and 102. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

This statement must be deemed undisputed.  (*See* Pls. Reply ¶ 595.)

**600.    Of the 595 unique keywords in Lime Wire's Google AdWords campaign (see supra ¶ 595), none contains the word "speech" or "oration", etc. (Ex. 82; Ex. 102.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 82 and 102. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

This statement must be deemed undisputed.  (*See* Pls. Reply ¶ 595.)

**601.** **Of the 595 unique keywords in Lime Wire's Google AdWords campaign (see supra ¶ 595), none contains the word "census", etc. (Ex. 82; Ex. 102.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 82 and 102. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

This statement must be deemed undisputed.  (*See* Pls. Reply ¶ 595.)

**602.** **Of the 595 unique keywords in Lime Wire's Google AdWords campaign (see supra ¶ 595), none contains the words "academic articles", "college publications", etc. (Ex. 82; Ex. 102.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 82 and 102. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

This statement must be deemed undisputed.  (*See* Pls. Reply ¶ 595.)

**VII.   LIME WIRE INDUCED AND CONTRIBUTED TO COPYRIGHT INFRINGEMENT WILLFULLY**

**603.** **Lime Wire's own web pages, and CD sleeves used to distribute LimeWire PRO, are marked with a copyright symbol © and the words "Copyright [Year] Lime Wire LLC".  (*See, e.g.* Ex. 119; Ex. 299; Ex. 108 at LW DE 1288266; Ex. 107; Ex. 105; Ex. 149.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibits 105, 107, 119, 149, and 299. See Defendants' Motion to Strike.*

227

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Nor do they dispute Exhibit 108, which provides support for the statement.  Defendants dispute only the admissibility of Exhibits 105, 107, 119, 149, and 299, which are, in fact, admissible.  (*See* Attach. A at Exs. 105, 107, 119, 149, 299; *see also* Pls. Reply ¶¶ 206, 210, 216, 246, 533.)  Thus, this statement must be deemed undisputed.

**604.     Lime Wire purportedly has sought licenses for the products it sells in its own LimeWire Store. (*See supra* ¶ 458.) [Undisputed]**

**605.     When asked the difference between Napster and LimeWire, Lime Wire witnesses pointed to Napster's centralized structure, but did not deny that LimeWire's users, like Napster's users, infringe copyrights. (See supra e.g., 371.)**

**Defendants' Response:**

*Undisputed. However, these witnesses were not asked that question so they could not "deny" it.*

**Plaintiffs' Reply:**

This statement is undisputed.  The remainder of defendants' response is argumentative. (*See* note 6.)

**606.     Lime Wire has stated it believed that, unlike Napster, LimeWire's P2P decentralized structure would render it not liable for secondary copyright infringement. (See supra e.g.,  312, 369-70; see also, Ex. 315 (www.gtamarketing.com/P2Panalyst/VonLohmann-article.html (encouraging P2P developers to "buil[d] a level of `plausible deniability' into [their] product ... and business model" such that they can "plausibly deny knowing what [their] end-users are up to" by "choos[ing] an architecture that will convince a judge that ... monitoring and control is impossible")**

**Defendants' Response:**

*Disputed. See supra, response  312, 369–370. Moreover, disputed as to admissibility of Exhibit 315. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

*See* Pls. Reply ¶¶ 312, 369-370.  Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 315, which is, in fact, admissible.  (*See* Attach. A at Ex. 315.)  Thus, this statement must be deemed undisputed.

607.   **Lime Wire knew in 2001 that "there [wa]s a risk that [it] w[ould] be sued by the RIAA or some other entity alleging that Lime Wire is engaged in or aiding in the copying of copyrighted materials". (Ex. 52 at JB 0287.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 52. See Defendants' Motion to Strike; Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 52, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 3-11.)  Thus, this statement must be deemed undisputed.

608.   **In April 2007, Jason Pelzer at Lime Wire forwarded an article, titled "Lime Wire Readying Digital Music Store", and wrote that Gorton "has been preparing for a fight for years .... One source ... noted that there were `no internal emails' and `no paper trail'. (Ex. 42.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 42. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 42, which is, in fact, admissible.  (*See* Attach. A at Ex. 42.)  Thus, this statement must be deemed undisputed.

609.   **In its 2004 Marketing Plan, Lime Wire discussed the Grokster case--then pending before the Ninth Circuit--in its "Political and legal environment" section, stating, inter alia, "in the event that it is decided that Grokster is liable, Lime Wire should look to developing technology that is far from any possible copyright issues or argument of non-neutrality." (Ex. 97 at LW DE 1172924-25.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 97. See Defendants' Motion to Strike.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 97, which is, in fact, admissible.  (*See* Attach. A at Ex. 97.)  Moreover, defendants themselves have proffered Exhibit 97 as their own

Exhibit 6 and so have waived any objection to this document.  (*See* Baker 9/26/08 Decl. ¶ 8.)  Thus, this statement must be deemed undisputed.

**610.   In several emails and documents in Lime Wire's files, Lime Wire recognized that a ruling against the P2Ps in the Grokster case would have serious implications for Lime Wire's business. (See, e.g., Ex. 316 (referring to a "trigger event" being "a negative ruling by the Supreme Court in the pending Grokster case"); Ex. 317 at LW DE 1656699 (Catillaz referring to possible issues "[i]f the Supreme Court remands"); see also Ex. 97 at LW DE 1172925; Ex. 318 at LW DE 1172934; Ex. 319 at LW DE 1903370; Ex. 320; Ex. 321; Ex. 322.)**

**Defendants' Response:**

*Disputed that a ruling would have "serious" implications. These documents discuss there might be implications.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the word "serious".  The word "serious" is not material or central to the point of the statement, and plaintiffs hereby strike the word "serious" from the statement.  Thus, this statement must be deemed undisputed.

**611.   Before the U.S. Supreme Court's Grokster decision, Gorton was quoted in the New York Times as saying that "[i]f the Supreme Court says it is illegal to produce this [P2P file-sharing] software, Lime Wire the company will cease to exist". (Ex. 201.)**

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 201. See Defendants' Motion to Strike. However, the Supreme Court has not said that P2P file-sharing software is illegal.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 201, which is, in fact, admissible.  (*See* Pls. Mot. to Strike Opp'n Br., Attach. A at Ex. 201.)  The remainder of defendants' response is not responsive and argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

**612.   In a February 21, 2005 letter before the Grokster decision, Bildson wrote that the District Court in California (see supra ¶ 190), "has upheld the right of software companies to create and sell our [LimeWire] software." (Ex. 99 (emphasis added); see also Ex. 320.) [Undisputed]**

613.   Also in February 2005, Bildson wrote: "The courts have affirmed our rights to produce and sell this [LimeWire] software. If there is any change ... it would be a negative ruling by the Supreme Court in the pending Grokster case." (Ex. 316) (emphasis added), and that if there was such a ruling "we [Lime Wire] will have plenty of lead time to make changes to our services to customers ... as there would be value in trying to transition existing users [to a different product or service]". (Id.) [Undisputed]

614.   In an email written three days after the Supreme Court's Grokster decision, Gorton stated that the decision had "put the LimeWire business in flux". (Ex. 323.) [Undisputed]

615.   Three days after the Grokster decision, Bildson wrote in an email to Download.com, "[w]e are in the process of deciding what to do with the future of the LimeWire product." (Ex. 33 at CNET 00039.)

### Defendants' Response:

*Disputed as to admissibility of Exhibit 33. See Defendants' Motion to Strike.*

### Plaintiffs' Reply:

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibit 33, which is, in fact, admissible.  (*See* Attach. A at Ex. 33.)  Thus, this statement must be deemed undisputed.

616.   Bildson understood in November 2005 that the Grokster ruling affected LimeWire's future: "I think our products [sic] future is a little too up in the air right now". (Ex. 324; see also; Ex. 325; Ex. 41.)

### Defendants' Response:

*Disputed as to admissibility of Exhibits 41, 324 and 325. See Defendants' Settlement/Pre-August 2003 Objections.*

### Plaintiffs' Reply:

Defendants do not dispute the material point and accuracy of this statement.  Defendants dispute only the admissibility of Exhibits 41 and 325, which are, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-24.)  Defendants purport to object to Exhibit 324.  Although defendants objected to and moved to preclude specific exhibits and deposition excerpts, they have *not* objected to Exhibit 324.  (*See* Defs. Pre-2003/*Grokster* Mot. at Ex. A.)  Thus, this statement must be deemed undisputed.

617.   A couple of months after the Grokster decision, Gorton wrote in an email "Looks like I am going to sell Lime Wire." (Ex. 41 at LW DE 0966063.)

**Defendants' Response:**

*Disputed as to admissibility of Exhibit 41. See Defendants' Settlement/Pre-August 2003 Objections.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of this statement. Defendants dispute only the admissibility of Exhibit 41, which is, in fact, admissible. (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-14.) Thus, this statement must be deemed undisputed.

**618.** **Gorton testified that "clearly the Grokster decision is relevant to LimeWire." (Gorton Tr. 480:14-19; see also id. 481:12-482:19.) [Undisputed]**

**619.** **Vincent Falco (founder and CEO of Free Peers, Inc. (Falco Tr. 99:3-18)), distributor of the BearShare P2P client which Free Peers shut down when it received a cease-and-desist letter from the RIAA following the Grokster decision (id. 66:17-20, 155:6-20), testified that he and Bildson discussed "going legit", which Falco defined as "peer-to-peer industry jargon for trying to end the infringing activities and getting the blessing of the recording industry." (Id. 156:5-157:16.) [Undisputed]**

**620.** **Gorton testified that he had no recollection of whether Lime Wire undertook any specific actions to comply with the Supreme Court's Grokster decision. (Gorton Tr. 485:5-20; see also id. at 481:12-485:4.)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Gorton Transcript 484:2-485:21. See Defendants' Motion to Strike. Furthermore, Lime Wire added a content filter. Gorton Decl. ¶ 36.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement. Defendants dispute only the admissibility of 484:2-485:21 of the Gorton testimony, which is, in fact, admissible. (*See* Pls. Mot. to Strike Opp'n Br., Attach. B at 4.) Further, the last sentence of defendants' response is not responsive to the statement. Thus, this statement must be deemed undisputed.

**621.** **In May of 2006, Lime Wire's newly recruited CFO, Jesse Rubenfeld, was so concerned about Lime Wire's lack of compliance or efforts to comply with the Supreme Court's June 2005 Grokster ruling with respect to filtering, that with his own counsel he drafted a letter to both Gorton and Bildson expressing his concerns and threatening to resign if more was not done. (Ex. 285; Rubenfeld Tr. 52:2-21.) Rubenfeld testified that while he never delivered the letter, he discussed the substance of the letter with Gorton. (Id.**

**52:22-56:15; see Gorton Tr. 528:9-532:15 (Gorton testified that he did not recall this conversation.).)**

**Defendants' Response:**

*Disputed. Moreover, disputed as to admissibility of Exhibit 285. See Defendants' Settlement/Pre-August 2003 Objections. Furthermore, Rubenfeld was concerned about the progress of the filter. Today, he remains an employee of Lime Wire because the filter is functional and operational, and because Lime Wire is in compliance with the Grokster decision. See Rubenfeld Tr. 52:0–59:19; 62:09–63:13.*

**Plaintiffs' Reply:**

Defendants do not dispute the material point and accuracy of the statement.  Nor do they dispute the admissibility of the Rubenfeld or Gorton testimony, which alone provide sufficient support for the statement.  Defendants dispute only the admissibility of Exhibit 285, which is, in fact, admissible.  (*See* Pls. Pre-2003/*Grokster* Opp'n Br. at 11-14; *see also* Pls. Reply ¶ 494.)  The remainder of defendants' response is not responsive and is argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

622.    **After the Grokster decision, Lime Wire could have made changes set out in the Conversion Plans (see supra ¶¶435-55), such as implementing effective filtering or even educating users to try to reduce or eliminate infringement, but it did not.**

**Defendants' Response:**

*Disputed. First, disputed as to admissibility of the referenced Exhibits. See Defendants' Motion to Strike. Second, these conversion plans are bilateral documents and require the cooperation of the Plaintiffs. See Gorton Decl. ¶ 45-61. Furthermore, Lime Wire has added effective filtering, and it does educate its users about copyright infringement.*

**Plaintiffs' Reply:**

*First*, defendants appear to dispute the admissibility of the exhibits cited in ¶¶ 435-455, which are, in fact, admissible.  (*See* Pls. Reply ¶¶ 435-455.)  Further, defendants' response is argumentative.  (*See* note 6.)  Thus, this statement must be deemed undisputed.

623.    **Three days after the Grokster decision, Gorton transferred his ownership interests in Lime Group and Lime Wire to family partnerships "to protect the assets in the event of a legal judgment against me personally." (See supra ¶¶ 24-29, 31.)**

**Defendants' Response:**

*Undisputed that those transfers occurred. However, it is disputed as to why Gorton set-up these partnerships and made these transfers. See supra response to  ¶¶ 24 – 29, 31.*

233

*Gorton has testified that the principle reason for setting-up these partnerships was for estate planning. Id.*

**<u>Plaintiffs' Reply:</u>**

This statement is undisputed.  (*See* Pls. Reply ¶¶ 24-29, 31.)

Plaintiffs Arista Records LLC; Atlantic Recording Corporation; BMG Music; Capitol Records LLC; Elektra Entertainment Group Inc.; Interscope Records; LaFace Records LLC; Motown Record Company, L.P.; Priority Records LLC; Sony BMG Music Entertainment; UMG Recordings, Inc.; Virgin Records America, Inc.; and Warner Bros. Records Inc. (collectively, "plaintiffs" or the "Record Companies") set forth in further support of their motion for partial summary judgment, the following responses to defendants' additional facts in support of their response in opposition to plaintiffs' statement pursuant to S.D.N.Y. Local Civil Rule 56.1:[14]

## DEFENDANTS' ADDITIONAL MATERIAL IN SUPPORT OF THEIR RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**I.**     **LIME WIRE HAS NEVER INTENDED TO INDUCE INFRINGEMENT**

**A.**     **All Business Plans Reflect Lime Wire's Goal: To Develop A Ubiquitous P2P Information Sharing Tool**

**Defendants' Statement No. 624:**

> *In the year 2000, Lime Wire's CEO Mark Gorton became intrigued by the enormous opportunities created by P2P technology. He knew that copyright issues surrounded the technology, but he believed that with the correct approach, and by encouraging good uses of the technology, P2P could have a very positive roll to play in society. Gorton Decl. ¶¶ 4-10.*

**Plaintiffs' Response to Defendants' Statement No. 624:**

Plaintiffs do not dispute the cited portions of Gorton's Declaration, however, they are entirely unsupported by documentary evidence and may be disregarded.[15]

---

[14] Unless otherwise indicated, "defendants" or "Lime Wire" refers to Lime Wire LLC, Lime Group LLC, and Mark Gorton.  "Lime Wire LLC" refers to the defendant company, and "LimeWire" refers to the software application.

[15] Although a proper declaration should contain facts based on the declarant's personal knowledge, *see Parks v. Lebhar-Friedman, Inc.,* No. 08-7133, 2008 WL 3833802, at *1 (S.D.N.Y. 2003) (*quoting* Fed. R. Civ. P. 56(e)(i)), many statements in Gorton's declaration do

**Defendants' Statement No. 625:**

> *Gorton first tried to raise money for a not-for-profit venture involving P2Ps Unsuccessful, he decided to form a more traditional software company. Gorton Decl. ¶ 12. His initial business thoughts were twofold. He imagined a world where most numbers of queries on P2P networks would be harvested and routed to companies. Gorton's goal was to expand the range of items being searched for on P2P networks. Gorton Decl. ¶¶ 13 – 15.*

**Plaintiffs' Response to Defendants' Statement No. 625:**

> Plaintiffs do not dispute this statement.  (*See* Pls. Reply ¶ 624.)

**Defendants' Statement No. 626:**

> *In a letter from April 2000 (Defs.' Ex. 5) in which Gorton seeks funding from investors, Gorton described his plans:*

> *These new networks are coming. They will allow the free sharing of all types of information. . . new tools will need to be built which will allow individuals to generate, edit and structure the information to be shared. These tools will allow people on the network to organize and build on-line information sharing communities.*

> *The software I propose to develop will allow anyone with an Internet connection to build a community around an issue. The information will be equally available to all members of the community.*

> *LWDE378087.*

**Plaintiffs' Response to Defendants' Statement No. 626:**

This statement is the same as that in Defendants' Response ¶ 149 *supra*.  *Note*:  In response to Pls. Statement ¶ 149, defendants object to the admissibility of Pls. Ex. 68 which is the *same* document as Defs. Ex. 5, and which they rely on here.  (*See* Pls. Reply ¶ 149.)

---

not.  (*See, e.g.,* Gorton (9/26/08) Decl. ¶¶ 6, 8, 9, 10-11, 25, 27, 29, 63).  Also, statements in declarations that are conclusory and/or self-serving or completely unsupported by documentary evidence, (*see e.g.* Gorton (9/26/08) Decl. ¶¶ 19, 20, 31, 32, 34, 36-37) should also be disregarded.  *See, e.g.*, *Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 218 (S.D.N.Y. 2007); *Toni & Guy (USA) Ltd. v. Nature's Therapy, Inc.*, No. 03 CV 2420(RMB), 2006 WL 1153354, at *4 (S.D.N.Y. May 1, 2006); *Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 307 (S.D.N.Y. 2003).

**Defendants' Statement No. 627:**

> A business plan was drafted in early 2001. In that plan (Defs.' Ex. 1), Andy Grove, the Chairman of Intel is quoted, "The entire internet could be rearchitected with [peer-to-peer] technology." In addition to mentioning Napster (because it was the world's first P2P client), the draft plan also discusses other technology called the SETI@Home project, noting that both technologies fueled "an explosion of interest" in P2P technology. Lime Wire's intention, as spelled out in this document, was to devise a network so that people could easily share all sorts of information. Id.

**Plaintiffs' Response to Defendants' Statement No. 627:**

Plaintiffs do not dispute that Defs. Ex. 1 (which is Pls. Ex. 52) contains the language that likened LimeWire to Napster and acknowledged that LimeWire enabled users to "exchange copyrighted mp3 files".  (Pls. Ex. 52 at JB 0287; *see also* Pls. Reply ¶ 126.)

**Defendants' Statement No. 628:**

> A February 19, 2001 email from Greg Bildson further highlights Lime Wire's objectives:
>
>> Our longer term intention is to make money on the server side of the equation. We will build a corporate level server with abilities to tie into databases, websites, etc. However, these will not be Gnutella spamming engines. We foresee a much broader information sharing Gnutella based world in the future. Our work on the client will be to create the abilities required for an information revolution and to work towards this vision incrementally. When you achieve a Gnutella network of 10 to 100 million users, corporate users will require other value added services that we intend to provide.
>
> Defs.' Ex. 14.

**Plaintiffs' Response to Defendants' Statement No. 628:**

*See* Pls. Resp. ¶ 625; *see also* Pls. SOF ¶¶ 404-406 (regarding Lime Peer Server).

**Defendants' Statement No. 629:**

> Interest in building business relations with Lime Wire sparked. For example, in January 2001, a company by the name of FILMSPEED contacted Lime Wire about a potential business arrangement. See, *Defs.' Ex. 9.* Another opportunity surfaced in October 2001 (Defs.' Ex. 16).

**Plaintiffs' Response to Defendants' Statement No. 629:**

Plaintiffs do not dispute this statement.

**Defendants' Statement No. 630:**

*In response to a reporter, Greg Bildson wrote in an email dated April 11, 2001 (Defs.' Ex. 12):*

> *I assume that you are talking about the Gnutella client business? We don't really view people as competitors there. We benefit by BearShare, Mactella, ToadNode, etc in their effort to build the Gnutella user base. Our interest, other than building a quality client, is to extend Gnutella users ability into information sharing. We want to give the Gnutella network the ability to build a global knowledge base, metadata for media and other searches and informational abilities in general. One specific example of this would be in having a user build and share a classified ad – or search for an apartment listing on Gnutella.*

> *Our true business once we build out the network and achieve informational capabilities is on the corporate server side. With 10 to 100 million consumers potentially using the Gnutella network, corporations will want to communicate information to them. This is obviously meant to not be spam. We want people to be able to do a search for car information and have Ford and all other interested parties to respond to a richly structured query. Obviously, preferencing and some network intelligence will be required to filter spam. In building server software, we would expect to see companies like Dss.Clip2, whatever current form InfraSearch takes and likely some application server vendors as competitors. That is still in the future.*

**Plaintiffs' Response to Defendants' Statement No. 630:**

Plaintiffs do not dispute this statement.

**Defendants' Statement No. 631:**

*Lime Wire disseminated a more formal business plan as part of an Offering Memorandum to potential investors around the Fall of 2001. The plan itself (Defs.' Ex. 2) and several prior drafts (Defs.' Exs. 3 and 4) envision a set of software products that would allow corporations to respond to queries from consumers via the Gnutella network.*

***Business Strategy:***

*Popularize the Gnutella network and promote its use as an information sharing and retrieval tool. Develop and sell software and network services*

> *to corporations and other entities to distribute information and digital products via the Gnutella network or other peer-to-peer networks.*

> *Defs.' Ex. 2 (LWDE 486261). The first page of the Offering Memorandum summarized the Company's objectives: to be the leading Gnutella software provider that would enable the distribution and delivery of information over the Gnutella network. Lime Wire intended to achieve its goal (1) by popularizing the Gnutella network; and (2) developing LimeWire as a tool for information sharing and retrieval.* Id.

> *The plan was to develop three products: a client, a server and a routing service. Gorton Decl. ¶ 21. Lime Wire had already developed the client (the LimeWire P2P software) and the plan was to develop the server and the routing service next.* Id.

## Plaintiffs' Response to Defendants' Statement No. 631:

Plaintiffs do not dispute that the Offering Memorandum and drafts contained the language cited in this statement.  *Note*:  Defs. Ex. 2 and Ex. 4 are identical to Pls. Ex. 3 and Ex. 95 to which defendants object.  (*See e.g.* Defs. Resp. ¶¶ 18, 46, 48-50 (Ex. 3); ¶¶ 177, 421-422, 426 (Ex. 95).)

## Defendants' Statement No. 632:

> *In November 2001, LimeWire attended the second O'Reilly P2P conference in San Francisco, and demonstrated their product using book and real estate searches. Gorton Decl. at ¶ 14.*

## Plaintiffs' Response to Defendants' Statement No. 632:

Plaintiffs do not dispute this statement.

## Defendants' Statement No. 633:

> *In response to a December 2002 inquiry from a reporter at Forbes, Greg Bildson wrote:*

>> *Please note that we have always been interested in the many possible uses of a P2P network. Much of our early work was on information sharing. Our Gnutella client has the most extended capabilities in areas beyond file sharing. We have demonstrated real estate searches and other inventive uses. We have a peer server that can tie into corporate databases and websites. This area has not taken off to date but we still see a lot of promise in P2P software.*

*Defs.' Ex. 18 (LWDE 1315189). In September 2002, Bildson stated, "We got into P2P because we saw it as useful for many purposes beyond just file sharing." Defs.' Ex. 21.*

**Plaintiffs' Response to Defendants' Statement No. 633:**

Plaintiffs do not dispute this statement.  *Note*:  Defs. Ex. 18 is the same as Pls.

Ex. 37.

**Defendants' Statement No. 634:**

In response to an email from the Zeropaid website (Defs.' Ex. 23), Bildson responded:

> *Very early on in LimeWire's history, we intended to only build server software for Gnutella. However, we saw that the Gnutella community needed a robust client. Through the client, we hoped to advance and mature the protocol, which is what we have been doing for the past two years. We do foresee a day as well when corporations will provide content to the network using something more like a traditional server. Our original goal was to sell servers and services to these companies. With millions of users on the Gnutella network, we see this day coming. The good news is that these companies will be a source of interesting and entertaining content.*

**Plaintiffs' Response to Defendants' Statement No. 634:**

Plaintiffs do not dispute that this is an accurate quotation from the cited exhibit.

*Note*:  Defs. Ex. 23 is the same as Pls. Ex. 251.

**Defendants' Statement No. 635:**

*In a draft document entitled* Wave of the Future, *Lime Wire outlined what it believed the future held for its P2P product, including consumer access to digital content similar to TV and radio, with independent artists to large conglomerates utilizing the Gnutella distribution network. Defs.' Ex. 24.*

**Plaintiffs' Response to Defendants' Statement No. 635:**

Plaintiffs do not dispute that this statement reflects *part* of what Lime Wire

outlined in Defs. Ex. 24.  *Note*:  Defs. Ex. 24 is the same as Pls. Ex. 195.

### B.   Lime Wire Did Not Target Napster Users Or Any Users Of a Mindset To Infringe

- **LIME WIRE'S BUSINESS PLANS ARE DEVOID OF ANY REFERENCE TARGETING NAPSTER USERS**

**Defendants' Statement No. 636:**

> *While Lime Wire's early business plans contained passing references to Napster, none of these documents expressly or even impliedly states that the Company's goal was to be the "next Napster," or that it was targeting Napster users. Every business plan drafted in 2001 (Defs.' Exs. 2, 3 and 4) explained that Lime Wire planned to build a file sharing tool that was content agnostic. Importantly, there is not a single mention in any of these documents that Lime Wire sought to be the next Napster, or that Lime Wire sought the Napster user base.*

**Plaintiffs' Response to Defendants' Statement No. 636:**

In its Offering Memorandum and drafts Lime Wire stated that, "Like Napster,"

the LimeWire software . . . allows people to exchange copyrighted mp3 files.  (*See* Pls.

Statement ¶ 126.)

- **LIME WIRE DID NOT IMPLEMENT ANY NAPSTER FUNCTIONALITY SPECIFICALLY DESIGNED TO CAPTURE NAPSTER USERS**

**Defendants' Statement No. 638 [sic]:**

> *The alleged Napster-esque functionality Lime Wire implemented (all downloads are automatically uploaded) had nothing to do with attracting Napster users or wanting to be the next Napster. Instead, this feature resulted to in greater network inefficiencies by making more content available generally available.*

**Plaintiffs' Response to Defendants' Statement No. 638 [sic]:**

This statement is unsupported by citation to any admissible evidence.  (*See*

note 5.)  It must therefore be deemed undisputed.  Moreover, defendants here repeat the same

statement affirmatively that they asserted in response to Pls. Statement ¶ 150.  (*See* Defs. Resp.

¶ 150; *see also* Pls. Reply ¶ 150.)

**Defendants' Statement No. 639:**

> *In August 2000, the Gnutella network was quickly disappearing. Alarmed, people at Lime Wire made suggestions on how to prevent the "death of Gnutella." In*

*response, Greg Bildson suggested, without any reference to Napster, that one way to "save" Gnutella was to try to ensure that all users have their uploads and downloads go to the same directory so "sharing will happen by default." Pls.' Ex. 69 LWDE 1976646.*

## Plaintiffs' Response to Defendants' Statement No. 639:

Defendants here repeat the same statement affirmatively that they asserted in

response to Pls. Statement ¶ 322.  (*See* Defs. Resp. ¶ 322; *see also* Pls. Reply ¶ 322.)

- **LIME WIRE DID NOT ACTIVELY SEEK-OUT NAPSTER USERS; INSTEAD, IT SOUGHT TO GRAB ATTENTION FOR ITS LANGUISHING PRODUCT**

## Defendants' Statement No. 640:

*In January 2001, Lime Wire employees were concerned that other Gnutella-based clients were getting more press. (Pls.' Ex. 70).  In response, Cho wrote a memo claiming that he and his team had held-back from marketing LimeWire because the product was not ready.*

## Plaintiffs' Response to Defendants' Statement No. 640:

Pls. Ex. 70, written by Cho, states that "It has come to our attention that there has

been some concern within Lime Peer about some publicity certain competitors have been getting,

and our relative lack thereof."  Defendants here repeat the same statement affirmatively that they

asserted in reply to Pls. Statement ¶ 152.  (*See* Pls. Reply ¶ 152.)  *Note*:  In their response to

¶ 152, defendants object to the admissibility of Pls. Ex. 70, which they rely on here.  (*See id.*)

## Defendants' Statement No. 641:

*Cho then states that the PR team will be ready if something happens with "Napster or Scour or some other development unfolds which will necessitate increasing our visibility." (*emphasis added*). This is not evidence of "aggressively" pursuing anyone, let alone Napster users. It was a wait-and-see campaign, based on events that would occur so as to allow the Company to use eye-catching storylines to garner attention. Notably, no where does Cho urge the Company to focus on Napster's demise or Napster's users.*

**Plaintiffs' Response to Defendants' Statement No. 641:**

This statement is unsupported by citations to admissible evidence (*see* note 5),

although plaintiffs assume defendants are referring to Pls. Ex. 70.  In all events, defendants here

repeat the same statement affirmatively that they asserted in response ¶ 152.  (*See* Defs. Resp.

¶ 152.)  *Note*:  In their response to Pls. Statement ¶ 152, defendants object to the admissibility of

Pls. Ex. 70, which they rely on here.  (*See* Pls. Reply ¶ 152.)

**Defendants' Statement No. 642:**

> *In typical LimeWire fashion, however, it never deployed any sort of campaign.
> (Cho Tr. 98:17 – 99:13; Barret Tr. 85:11 – 86:3). In fact, many have testified that
> the Company had no real marketing efforts in those days. Rohrs. Tr. 22:25-23:04;
> Gorton Decl. ¶ 19. A review of Plaintiffs' entire proof (one press release and a
> handful of e-mails to websites that were ignored) confirms this point. Even the
> Google AdWord Campaign was not launched until November 2002. Of course, by
> that time, Napster users flocked to the truly aggressive marketed P2P filesharing
> companies such as Kazaa and Morpheus, which became the predominant file-
> sharing applications for years (in fact, in a 2004 marketing plan, Lime Wire notes
> that its market share was abysmal. See Pls. Ex. 6.*

**Plaintiffs' Response to Defendants' Statement No. 642:**

It is immaterial to showing Lime Wire's intent and purpose whether the campaign

was "deployed" or Lime Wire had any "real marketing efforts".  *See Metro-Goldwyn-Mayer*

*Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 95 n.7 & 938 (2005).  Pls. Ex. 6 does not support

the last two sentences of this statement, which are thus unsupported by any admissible evidence.

(*See* note 5.)

**Defendants' Statement No. 643:**

> *In a January 17, 2001 email, Bildson asks his Business Development team a
> variety of questions about getting their name out in the marketplace, and how to
> win-over users in general by promoting Gnutella and Lime Wire. (Pls. Ex. 71) In
> response, J.K. Barret agreed that getting their name "everywhere" was crucial,
> and then suggested that Lime Wire appear everywhere that "BearShare,
> Hagelslag, Mactella, Toadnode, etc. appear" (all Gnutella clients). Notably,
> neither Barret nor Bildson discuss any sort of Napster positioning.*

**Plaintiffs' Response to Defendants' Statement No. 643:**

Plaintiffs dispute only the last sentence of this statement -- Bildson suggested "Log on napster chat, etc." *Note*: In their response to Pls. Statement ¶ 154, defendants object to the admissibility of Pls. Ex. 71, which they rely on here. (*See* Pls. Reply ¶ 154.)

**Defendants' Statement No. 644:**

*In a January 20, 2001 email, CEO Mark Gorton talks about his unhappiness that another Gnutella client, BearShare, is getting all of the press, and how the company should go to colleges such as Columbia, MIT and Brown to "play up" stories in their newspapers like the "hometown boy" has made good story, and promote that BearShare cannot be trusted. Pls.' Ex. 72. In response, Cho suggests a route different than Gorton's: hiring campus representatives at "Napster-banned" colleges and so forth. Bildson replies, rejecting Cho's suggestions ("I don't know about hiring college representatives") and instead suggests things similar to Gorton's ideas: releasing the client more often, "doing more in regards to the press," and making a better client. LWDE 1974931.*

**Plaintiffs' Response to Defendants' Statement No. 644:**

*First*, Lime Wire LLC's assertion that Bildson -- or anyone else -- rejected Cho's suggestions to capture Napster's user base is unsupported by citations to admissible evidence. (*See* note 5.) (*See also* Pls. Reply ¶ 155.) *Note*: In their response to Pls. Statement ¶ 155, defendants object to the admissibility of Pls. Ex. 72, which they rely on here. (*See id*.)

**Defendants' Statement No. 645:**

*J.K. Barret sent several emails to websites in an attempt to have LimeWire listed on their site and in each e-mail she mentioned Napster; however, each email always led with a story of what Lime Wire and Gnutella was all about, and how it was so very different than Napster Gnutella allows users to share more files, it supports group functionality and it is available on all sorts of computer platforms.) See Pls. Ex. 74.*

**Plaintiffs' Response to Defendants' Statement No. 645:**

The emails referenced in this statement specifically describe the LimeWire client as "similar to the popular Napster service" because "it enables the sharing, searching, and downloading of MP3 music files". (Pls. Ex. 74; *see also* Pls. Reply ¶ 156.) Defendants here

repeat the same statement affirmatively that they asserted in response to Pls. Statement ¶ 156.

*Note*:  In their response to Pls. Statement ¶ 156, defendants object to the admissibility of Pls.

Ex. 74, which they rely on here.  (*See* Pls. Reply ¶ 156.)

**Defendants' Statement No. 646:**

> When asked why she used the word Napster in these emails, Ms. Barret responded
> that it was a way to draw attention to the email; otherwise she feared it would be
> ignored. Barret Tr. 130:4 - 11.

**Plaintiffs' Response to Defendants' Statement No. 646:**

The testimony to which defendants cite is *not* discussing these emails.  It is

discussing a press release.

**Defendants' Statement No. 647:**

> *J.K. Barret drafted a single press release that was released on March 1, 2001 that*
> *mentioned Napster in the headline. Pls. Ex. 78. But that same headline also*
> *announced the explosive growth of Gnutella, a network that was "designed to*
> *revolutionize the concept of file and information sharing." Thereafter, trying to*
> *distinguish itself from Napster, Lime Wire emphasized that its software allows*
> *users to share all types of files (emphasis original).* Id. *And further emphasizing*
> *Lime Wire's goals, Gorton was then quoted "[w]e hope that LimeWire will*
> *attract academic interest and research to the network," and that the potential of*
> *Gnutella was greater than that of the World Wide Web itself.* Id.

**Plaintiffs' Response to Defendants' Statement No. 647:**

The headline of the press release read:  "In Wake of Napster Controversy, Lime

Wire Announces Explosive Growth of Gnutella Network".  (Pls. Ex. 78.)  The press release

stated that Lime Wire LLC was "[a]nticipating a surge in demand later this week [when a

*Napster* ruling was expected (*see supra* ¶ 146)]".  *Id.*  Defendants here repeat the same statement

affirmatively that they assert in response to Pls. Statement ¶ 159.  (*See also* Pls. Reply ¶ 159.)

*Note*:  Defendants dispute the admissibility of Pls. Ex. 78 in ¶ 159, but rely on it here.

**Defendants' Statement No. 648:**

> *When Barret was asked in her deposition why she used Napster in that headline, she said that it was simply a "hook" to garner attention so that the press release would hopefully be picked-up by some newswire. Barret Tr. 96:8-10. See also Pls. Ex. 80 (goal was to use it as a "hook"). Barret also testified that her plan was not to attract Napster users, and that the focus of the press release was on the differences between Napster and LimeWire. Barret Tr. 97:20 – 98:2; 98:6 – 15. Gorton has also confirmed that this was his goal as well. Gorton Tr. 274:15 – 276:20.*

**Plaintiffs' Response to Defendants' Statement No. 648:**

Defendants here repeat the same statement affirmatively that they assert in response to Pls. Statement ¶ 160.  (*See* Defs. Resp. ¶ 160.)  Barret did not testify that her plan was not to attract Napster users.  (*See* Pls. Reply ¶ 160.)  *Note*:  In their response to ¶ 160, defendants object to the admissibility of Pls. Ex. 80 which is the *same* document as Defs. Ex. 13 and on which they rely here.  (*See id*.)

**Defendants' Statement No. 649:**

> *Barret testified in her deposition that she did not believe that Lime Wire was competing for Napster's users (Barret Tr. 64:11 – 13) nor did she ever consciously try to lure-away Napster users. (Barret Tr. 67:4 – 8). She also believed that Napster being in the news was a good thing because it presented press opportunities for Gnutella and Lime Wire to latch onto. Barret Tr. 96:8 – 10.*

**Plaintiffs' Response to Defendants' Statement No. 649:**

Defendants here repeat a similar statement affirmatively that they assert in reply to Pls. Statement ¶ 153.  Barret testified that she did not know if Lime Wire was competing for Napster users, but she did not believe so.  Barret does *not* testify that she never consciously tried to lure such users.

**Defendants' Statement No. 650:**

> *Others at Lime Wire have confirmed that the Company's goals did not include courting Napster users. Fisk Decl. ¶ 4; Singla ¶ 6; Cho Tr. 100:11 – 102:14; Rohrs 43:11 – 43:19.*

**Plaintiffs' Response to Defendants' Statement No. 650:**

Defendants here repeat the same statement affirmatively that they assert in reply to Pls. Statement ¶ 160.  (*See* Defs. Resp. ¶ 160; *see also* Pls. Reply ¶ 160.)

- **LIME WIRE CONSCIOUSLY AVOIDED COMPARISONS TO NAPSTER**

**Defendants' Statement No. 651:**

*On his own, a summer intern by the name of Avi Jutagir decided to bid on certain Google AdWords that contained Napster. As soon as senior management at Lime Wire discovered these actions, they put a stop to it, consistent with their goal to not be associated with anything Napster. Bildson Tr. 836:6-10; Gorton Decl. ¶ 20.*

**Plaintiffs' Response to Defendants' Statement No. 651:**

The sole support for this statement is Gorton's declaration which is supported by no concrete admissible evidence.  (*See* note 15; *see also* Pls. Resp. ¶ 648.)  Further, defendants here repeat the same statement affirmatively that they asserted in reply to Pls. Statement ¶ 165.  (*See* Defs. Resp. ¶ 165.)  Bildson's testimony does not support the statement.  (*See* Pls. Reply ¶ 165.)

**Defendants' Statement No. 652:**

*In February 2001, Gorton met with a public relations firm named Widmeyer Communications. Widmeyer later proposed an aggressive marketing campaign based on Napster. See, Pls.' Ex. 77. Gorton flatly rejected it because the Company did not want to be associated with Napster. Gorton Decl. ¶ 19.*

**Plaintiffs' Response to Defendants' Statement No. 652:**

*First*, Gorton's declaration is supported by no concrete admissible evidence.  (*See* note 5; *see also* Pls. Resp. ¶ 648.)  *Second*, defendants repeat a similar statement affirmatively here that they asserted in response to ¶ 158.  (*See* Defs. Resp. ¶ 158; *see also* Pls. Reply ¶ 158.)

*Note*:  Defendants dispute the admissibility of Plaintiffs' Exhibit 77 in ¶ 158, but rely on it here.

**Defendants' Statement No. 652 [sic]:**

> *In a March 21, 2001 draft release announcement, J.K. Barret listed a host of exciting new features and performance "fixes" in the soon-to-be released version 1.3. Another Lime Wire employee suggested adding a more full description of what LimeWire does, which included wording that distinguished itself from Napster (Pls.' Ex. 88).*

**Plaintiffs' Response to Defendants' Statement No. 652 [sic]:**

*First*, defendants here repeat the same statement affirmatively that they asserted in response to ¶ 174.  (*See* Defs. Resp. ¶ 174; *see also* Pls. Reply ¶ 174.)  *Note*:  Defendants dispute the admissibility of Pls. Ex. 88 in ¶ 174, but rely on it here.

- **LIME WIRE DID NOT MONITOR NAPSTER ONLY PRESS ARTICLES**

**Defendants' Statement No. 654:**

> *Lime Wire kept copies of multiple types of news articles over the years, not just those that mentioned Napster. See Defs.' Exs. 50 - 56. Bildson has confirmed this; he has said Lime Wire generally kept all news articles mentioning Lime Wire. Bildson Tr. 556:05 – 556:12. While in the early years Napster's name appeared in several articles mentioning all sorts of file-sharing clients, including LimeWire, most of the articles also talked about which file-sharing product performed better, which caught the eye of Bildson and others at Lime Wire.  Bildson Tr. 585:05 – 588:02.*

**Plaintiffs' Response to Defendants' Statement No. 654:**

Defendants here repeat the same statement affirmatively that they asserted in response to ¶ 168.  (*See* Defs. Resp. ¶ 174; Pls. Reply ¶ 174.)

**C.    The LimeWire Software Was Never Developed With Infringement In Mind**

- **LIME WIRE EMPLOYEES TESTED THE SOFTWARE WITH AUTHORIZED CONTENT**

**Defendants' Statement No. 655:**

> *While testing the software, Lime Wire employees have consistently used terms or file types associated with authorized content such as Creative Common works, Weedshare files, the word "Funny", the letter "A" and Shakespeare titles. D. Nicponski Tr. 91:17 – 91:24; Bildson Tr. 97:09 – 97;15; Singla Decl. ¶ 7; Cho. Tr. 49:08 – 49:22 (he used the word "funny"); Barret Tr. 48:11 – 4813 (does not recall Lime Wire employees searching for music); Catillaz Tr. 24:16 – 23*

248

> *(Creative Commons); Faaborg Tr. 63:19-65:18 (used generic search terms such as the letter "A").*

**Plaintiffs' Response to Defendants' Statement No. 655:**

        *First*, defendants here repeat a similar statement affirmatively that they assert in reply to Pls. ¶¶ 321, 322.  Barret testified that searches for music, like Bildson's query described in Ex. 188, were "in accordance with my general memory of what we were using to test the product [LimeWire]" and that searches for music were relevant as "comparative data" with Napster.  (Barret Tr. 56:9-58:2; *see also* Defs. Resp. ¶¶ 321, 322; Pls. Reply ¶¶ 321, 322.)

**Defendants' Statement No. 656:**

> *Plaintiffs try to make much about Bildson supposedly searching for Sinead O'Connor on Gnutella in August 2000 (over eight years ago). But, Bildson was not testing LimeWire by searching for Sinead O'Connor, for LimeWire did not even exist in August 2000. Instead, Bildson testified that he searched on Gnutella to try to determine why it was so difficult to locate files in general, not infringing content. Bildson Tr. _____. And the email in question supports this testimony: Its title is "Death of Gnutella." (Pls.' Ex. 188).*

**Plaintiffs' Response to Defendants' Statement No. 656:**

        Defendants repeat a similar statement affirmatively here that they asserted in response to Pls. Statement ¶ 322.  (*See* Defs. Resp. ¶ 322; *see also* Pls. Reply ¶ 322.)  Moreover, in August 2000, Bildson sent the email cited in the statement to Gorton and Lime employees, stating:  "Too few people [on Gnutella] are sharing files and everyone is piggybacking on the network to do searches . . . My definitive test is to search for Sinead (O'Conner) on Gnutella. After 2 minutes of waiting, I get 2 copies of 'Nothing compares to you' listed and that is all. After 20 seconds on napster, I get 100 results encompassing her whole career.  I had thought that the Gnutella network was getting overloaded after the first napster ruling but it now appears that sharing has just broken down".  (*See* Pls. ¶ 322.)  *Note*:  Defendants dispute the admissibility of Pls. Ex. 188 in ¶ 322, but rely on it here.

- **THE OVERWHELMING EVIDENCE SHOWS THAT LIMEWIRE WAS DESIGNED TO LOCATE AND DOWNLOAD EFFICIENTLY ALL SORTS OF FILES NOT JUST MUSIC**

**Defendants' Statement No. 657:**

> *Document after document shows that LimeWire developers set about designing and developing an efficient file-sharing product and not a tool dedicated to infringement.*

**Plaintiffs' Response to Defendants' Statement No. 657:**

Defendants fail to cite to any admissible evidence in support of this statement.

(*See* note 5.)

**Defendants' Statement No. 658:**

> *Lime Wire worked continuously to improve the Gnutella network. For example, in January 2001, developer Chris Rohrs wrote a "quick and dirty" paper about the health of the Gnutella network. (Defs.' Ex. 29). In that paper, Rohrs described two problems plaguing the network: people not sharing and network inefficiencies. Rohrs made several recommendations, but he emphasized that for the network to "really scale," the Gnutella protocol would have to be changed to be more efficient. Rohrs suggested a variety of techniques, including caching pings and queries, and a UDP transport layer. Notably, not one word in this paper mentions improving LimeWire to locate any specific types of files more easily, including music. (LWDE 1975015 – 17). In fact, Rohrs gives an example of how to improve query routing by using Shakespeare search terms.* See*, LWDE 1975016.*

**Plaintiffs' Response to Defendants' Statement No. 658:**

In the paper referred to by Lime Wire LLC, Rohrs wrote that, "[i]f the freeloader problem were solved, Gnutella might perform about as well as Napster". (*See* Pls. Statement ¶ 376.) Rohrs defined "freeloaders" as "people who take files from the network but do not share. They prevent the replication of popular files". (*See* Pls. Statement ¶ 377.) Rohrs further asserted that "[t]he problem with [servents that do not automatically reshare downloads] is that they reduce the number of files you can find on the network. Assuming all servents [are configured in

a particular way] you can search 4^6=4096 hosts.  That's actually a fairly respectable number—

close to the number of people on a typical Napster server."  (*See* Pls. Reply ¶ 378.)

**Defendants' Statement No. 659:**

> *The next day Bildson responded to Rohrs' email, and made his own recommendations. Again, there is no mention how to improve LimeWire for finding unauthorized content or even music. (Defs. Ex. 30).*

**Plaintiffs' Response to Defendants' Statement No. 659:**

Plaintiffs do not dispute this statement.

**Defendants' Statement No. 660:**

> *Another feature Plaintiffs' attack is SIMPP, but LimeWire's SIMPP feature has nothing to do with enhancement for infringement. A Lime Wire developer by the name of Sumeet Thadani, wrote a white paper explaining how SIMPP works. (Defs.' Ex. 32). Yet no where does the paper claim that this feature allows LimeWire users to locate infringing content. Defendants' expert Gribble also described how SIMPP works and how it has no effect on a user's activities. Gribble Decl. ¶ 46.*

**Plaintiffs' Response to Defendants' Statement No. 660:**

Plaintiffs do not contend that SIMPP is an "enhancement for infringement", only

that it enabled Lime Wire LLC to control settings in the LimeWire client and therefore, the use

of LimeWire for copyright infringement.  (*See, e.g.*, Pls. 6/24/08 (LW) Add'l SOF ¶¶ 14-15, 20,

22-26.)  Further, defendants here restate affirmatively their response to ¶ 491.  (*See* Defs. Resp.

¶ 491; *see also* Pls. Reply ¶ 491.)

**Defendants' Statement No. 661:**

> *In another paper, authored by Lime Wire developers Singla and Rohrs, they discuss the benefits of ultrapeers and how they can make the network more efficient (Defs.' Ex. 33). These authors note that utilizing ultrapeers should result in a "significant reduction in the number of messages flowing thru the Gnutella network." LWDE 006196. Again, there is no mention in this document of how ultrapeers will allow users to more efficiently locate and download unauthorized content, or even music. Rohrs and Fisk both testified that ultrapeers were added to LimeWire's functionality because it improved performance of the network. Rohrs Tr. 68:16-69:3; 55:18-56:4.*

**Plaintiffs' Response to Defendants' Statement No. 661:**

Lime Wire LLC admits that ultrapeers made the Gnutella network more efficient. Thus, since LimeWire is primarily used for infringement, ultrapeers make infringement more efficient. Moreover, plaintiffs do not contend that ultrapeers allowed LimeWire users to "more efficiently locate and download unauthorized content", but that ultrapeers and, in particular the QRP tables they utilized, were part of the overall design of LimeWire to limit Lime Wire LLC's knowledge of what LimeWire users were sharing. (*See*, *e.g.*, Pls. 9/26/08 (LW) Add'l SOF ¶¶ 13(c) and (d).)

**Defendants' Statement No. 662:**

*In a paper dated May 20, 2003, developer Adam Fisk wrote about the topic of using Query Routing Tables on the Gnutella network. (Defs.' Ex. 34). Like others before, Fisk's focus was on improving the efficiency of search queries, not improving a user's ability to commit copyright infringement.*

**Plaintiffs' Response to Defendants' Statement No. 662:**

Lime Wire former Senior Software Engineer Rohrs testified that one of the reasons the QRP tables were so designed was to enable individuals to "upload anonymously". When asked if copyrighted music would be one of the things that individuals would want to upload anonymously, Rohrs testified, "I suppose, yes, certainly". (*See* Pls. ¶ 351.) *Note*: Defs. Ex. 34 is Pls. Ex. 221 to which defendants have objected. (*See* Defs. Resp. ¶ 349.)

**Defendants' Statement No. 663:**

*In an email dated May 30, 2003, Fisk wrote to a Yahoo! group talking about how LimeWire's next version would solve a latency problem. Defs.' Ex. 35.*

**Plaintiffs' Response to Defendants' Statement No. 663:**

In this email, Fisk compares Gnutella with Kazaa. *Note*: Defs.' Ex. 35 is Pls. Ex. 243 to which defendants object. (*See* Defs. Resp. ¶ 396.)

**Defendants' Statement No. 664:**

> In another group of emails from Lime Wire developers, they discussed general ideas about download meshes, including how to improve LimeWire to locate rare content. Defs.' Ex. 36.

**Plaintiffs' Response to Defendants' Statement No. 664:**

Plaintiffs do not dispute this statement.

**Defendants' Statement No. 665:**

> Lime Wire prepared internal "to-do" lists for its developers. Not one discusses making changes to the software so that users can more easily locate infringing content. See Defs.' Exs. 37 - 42.

**Plaintiffs' Response to Defendants' Statement No. 665:**

Plaintiffs do not dispute that "to-do" lists did not *specifically* state that the

software should be changed so that users can "more easily locate infringing content".  (*See also*

Defs. Resp. ¶ 306.)

**Defendants' Statement No. 666:**

> Lime Wire maintains a log of all changes to the LimeWire software. It is written in English, thus, one can easily determine what changes were made to the code over time. See Defs.' Ex. 43; Ex. 44; and Ex. 45. Notably, there is not a single notation in any of these change logs reflecting a modification or improvement to the software, expressly or impliedly, so as to optimize it for infringement. Even a more detailed log of the changes made by Bildson does not reflect those intentions. Defs.' Ex. 46.

**Plaintiffs' Response to Defendants' Statement No. 666:**

Plaintiffs do not dispute that Defs. Exs. 43, 44, 45 and 46 do not include express

references to optimizing infringement.  However, many of the changes and additions made to the

software, and reflected in Lime Wire's change log, assisted in optimizing infringement on a

massive scale.  (*See, e.g.* Horowitz Rep. ¶ 60 (media player), ¶ 67 (iTunes integration), ¶¶68-71

(anti-freeloading features).)

**Defendants' Statement No. 667:**

> *In another Lime Wire document entitled "Challenges of the Gnutella Architecture," the author notes several network problems, including scalability, bandwidth and greedy clients. Defs.' Ex. 47. Several recommendations are made to solve these "challenges." Yet no mention is made of improving Gnutella so that users can locate more infringing content.*

**Plaintiffs' Response to Defendants' Statement No. 667:**

Plaintiffs do not dispute that no specific mention is made on Ex. 47 as to users locating "more infringing content".  Lime Wire LLC admits that ultrapeers made the Gnutella network more efficient.  Thus, since LimeWire is primarily used for infringement (*see* ¶ 661), ultrapeers make infringement more efficient.  Moreover, plaintiffs do not contend that ultrapeers allowed LimeWire users to "more efficiently locate and download unauthorized content", but that ultrapeers and, in particular the QRP tables they utilized (*see* Pls. 7/18/08 SOF ¶¶ 350-351), were part of the overall design of LimeWire to limit Lime Wire LLC's knowledge of what LimeWire users were sharing.  (*See*, *e.g.*, Pls. 9/26/08 (LW) Add'l SOF ¶¶ 13(c) and (d).)

**Defendants' Statement No. 668:**

> *Two other more recent Lime Wire documents also reflect changes being made to the code: one to describe how DHT works (Defs.' Ex.48) and one that fixes a security issue (Defs.' Ex. 49). Neither have anything to do with optimizing infringement.*

**Plaintiffs' Response to Defendants' Statement No. 668:**

Plaintiffs do not dispute that the changes described in the statement above do not directly optimize infringement.  Moreover, defendants' last sentence is conclusory (*see* note 6), and unsupported by citations to any admissible evidence.  (*See* note 5.)

**Defendants' Statement No. 669:**

> *Every LimeWire employee denies that LimeWire was designed for infringement. For example, Lime Wire developer Susheel Daswani has testified to the following:*
>
> > *I personally did not design the LimeWire software P2P application to specifically enhance the ability of users to commit copyright infringement.*

*My goal in designing and building the LimeWire P2P software application was to enable it to be the premiere file sharing application that allowed users to efficiently locate and download any type of digital file. During my time of employment at Lime Wire it was and still is my belief the LimeWire P2P software application is a natural innovation of the Internet given the specifications and capabilities of Internet Technologies such as TCP/IP and HTTP. The many innovations and capabilities that I helped create during my employment at Lime Wire were "content agnostic", i.e., they were intended to enable general purpose digital communication, just as TCP/IP and HTTP enable general purpose digital communication.*

**Plaintiffs' Response to Defendants' Statement No. 669:**

Defendants do not cite to any admissible evidence for the first sentence of this statement.  (*See* note 5.)  Plaintiffs do not dispute that Daswani submitted a declaration that includes this language.  However, Daswani was not employed by Lime Wire LLC for the entire relevant period in this case.  (Daswani Decl. ¶ 2 (period of employment lasted from July 2001 to approximately October 2004).)

**Defendants' Statement No. 670:**

Lime Wire software engineer Anurag Singla says:

*First, I personally was not aware of any plan or discussion regarding the design of the LimeWire software application so as to enhance the ability of users to commit copyright infringement. To the contrary, our goal in designing and building LimeWire was to be the premiere content sharing application that allowed users to efficiently locate and download all sorts of digital content. For example, design features such as xml structured queries, and enhancements of Gnutella protocol to enable these were implemented by Lime Wire so as to allow real time searching of content made available by various content providers. It was never the plan or the goal of Lime Wire to design a piece of software that enhanced its users ability to locate and download unauthorized content, and in particular, unauthorized music. I am personally not aware of any LimeWire feature that made it easier for users to share copyrighted content. Nor am I personally aware of any efforts by Lime Wire to somehow protect any alleged infringing activity from detection. It is my personal opinion that LimeWire was not designed to maximize infringement based on my experience at Lime Wire.*

**Plaintiffs' Response to Defendants' Statement No. 670:**

Plaintiffs do not dispute that Singla submitted a declaration that includes this language.  But Singla was not employed at Lime Wire for the entire time relevant to this case. (*See* Singla Decl. ¶ 2 (employed from July 2000 to January 2002).)

**Defendants' Statement No. 671:**

*Chief Technology Officer Greg Bildson testified that Lime Wire developed its software with advanced capabilities irrespective of any Napster functionality. Bildson Tr. 455:11 – 25. He has stated that Lime Wire's goal was to build a ubiquitous P2P application. Bildson Tr. 488:09 – 17. Bildson also testified that there were many goals in designing the software but excluded mentioning anything about enhancing the software so that users can locate and download infringing content. Bildson Tr. 557:07 – 560:04.*

**Plaintiffs' Response to Defendants' Statement No. 671:**

Bildson has testified, "The LimeWire client was developed in 2000. At the time the LimeWire client was being developed, the *Napster* case was going on.  Mr. Gorton stated to me and others at [Lime Wire LLC] that he expected that Napster would be found liable for copyright infringement, primarily because of its centralized architecture, which allowed Napster to see what files its users were sharing. Accordingly, Mr. Gorton instructed [the Lime Wire LLC] software developers to build an application based on the preexisting Gnutella protocol for a decentralized filesharing application. Mr. Gorton said that the decentralized nature of the Gnutella protocol should provide legal cover to avoid liability for copyright infringement." (Bildson 9/10/08 Decl. ¶ 4.)

**Defendants' Statement No. 672:**

*Sam Berlin has testified that during his entire career at Lime Wire (the last 5 years) he is "not aware of any design choice, feature or functionality that has ever been implemented in the LimeWire software so as to allow users to more easily locate and download unauthorized content." Berlin Decl. at ¶ 24.*

**Plaintiffs' Response to Defendants' Statement No. 672:**

Lime Wire LLC made numerous design decisions enabling LimeWire users copyright infringement.  Some, such as its decision to implement a decentralized architecture and to implement ultrapeers utilizing QRP tables were intended to limit Lime Wire LLC's knowledge about the its users infringing activity so as to avoid legal liability and continue to provide its software for ingringement.  (*See* Pls. 9/26/08 (LW) Add'l SOF ¶¶ 13(c) and (d); Pls. 7/18/08 SOF ¶¶ 350-351.)  Others, such as swarming made the locating of popular files easier. (Pls. 9/26/08 (LW) Add'l SOF ¶¶ 344-45.)

**Defendants' Statement No. 673:**

*One of developer Dave Nicponski's duties was to improve LimeWire's abilities to locate rarer files. D. Nicponski Tr. 126:23 – 131:03.*

**Plaintiffs' Response to Defendants' Statement No. 673:**

Plaintiffs do not dispute this statement.

**Defendants' Statement No. 674:**

*Developer Kevin Faaborg does not believe that LimeWire is mp3 "focused." Faaborg Tr. 233:8 – 233:10.*

**Plaintiffs' Response to Defendants' Statement No. 674:**

Lime Wire does not dispute that Faaborg -- who worked at Lime Wire only since 2005 (*see* Pls. 7/18/08 SOF ¶ 39(f)) -- may believe this.

**Defendants' Statement No. 675:**

*Rohrs developed a "swarming" technique so that files in general (and irrespective of size) could be downloaded more quickly. Rohrs Tr. 107:04 – 111:15. His primary concern was that LimeWire scaled as much as possible. Rohrs Tr. 127:14 – 128:05*

**Plaintiffs' Response to Defendants' Statement No. 675:**

Defendants here repeat the same statement affirmatively that they assert in response to ¶ 343.  (*See* Defs. Resp. ¶ 343; *see* Pls. Reply ¶ 343.)

**Defendants' Statement No. 676:**

> *Even Adam Fisk, the developer to whom Plaintiffs most often try to cite as proof of intended infringement, testified that various features added to LimeWire were added to make the network more efficient, including ultrapeers, query routing protocols and swarming. Fisk Tr. 55:18 – 80:20.*

**Plaintiffs' Response to Defendants' Statement No. 676:**

Lime Wire LLC admits that ultrapeers made the Gnutella network more efficient. Thus, since LimeWire is primarily used for infringement (*see* Pls. Resp. ¶ 661), ultrapeers make infringement more efficient. Moreover, plaintiffs do not contend that ultrapeers allowed LimeWire users to "more efficiently locate and download unauthorized content", but that ultrapeers and, in particular the QRP tables they utilized (*see* Pls. 7/18/08 SOF ¶¶ 350-351), were part of the overall design of LimeWire to limit Lime Wire LLC's knowledge of what LimeWire users were sharing. (*See* Pls. 9/26/08 (LW) Add'l SOF ¶¶ 13(c) and (d).) In addition, "swarming", a feature implemented in LimeWire, is the process by which "LimeWire downloads files from many different host computers at the same time". (*See* Pls. Resp. ¶ 343.) Defendants' own expert testified that if a file exists in the shared directories of more than one user, "its likely to be a file that other people have as well, which means that it's likely to be a popular file, which means it's lilkely to be a song or video or something that many people want, which means it's more likely to be copyrighted". (Pls. 9/26/08 (LW) Add'l SOF ¶¶ 344-45.)

**Defendants' Statement No. 677:**

> *Fisk explained in his deposition what he meant by his pho posts. First, he agreed that Lime Wire was not truly "devoted to infringement." And what he meant to say is that it is the users that commit infringement, not LimeWire. Fisk. Tr. 157:21 – 158:17. Fisk also testified in that same deposition that he never made any design decisions in order to enhance infringement. Fisk Tr. 176:08 – 177:13.*

**Plaintiffs' Response to Defendants' Statement No. 677:**

   With respect to the first citation, Fisk's testimony is that "I'll let the statement [his

pho posts] stand as it is."  As to the second citation, Fisk did not testify that he never made any

design decisions in order to enhance infringement, but rather that he did not "particularly" make

design changes for infringement purposes.

**Defendants' Statement No. 678:**

   *In a message post immediately after his deposition, Fisk further explained why he*
   *did not mean what he said in those posts and in his deposition. Defs.' Ex. 72.*

**Plaintiffs' Response to Defendants' Statement No. 678:**

   Throughout his deposition, Fisk testified as to those posts, without disavowing

them; in his declaration, he does not disavow his deposition testimony.

**Defendants' Statement No. 679:**

   *At least two former Lime Wire software developers, Anurag Singla and Shusheel*
   *Daswani, who both worked with Adam Fisk, strongly disagree with Fisk's bizarre*
   *pho posts, posts that even Mr. Fisk agrees are incorrect and easily taken out of*
   *context.* See generally *Fisk Decl.; Singla Decl.; Daswani Decl.*

**Plaintiffs' Response to Defendants' Statement No. 679:**

   Plaintiffs do not dispute that Singla and Daswani do not personally agree with

Fisk.

**Defendants' Statement No. 680:**

   *Defendants' computer science expert, Prof. Gribble, has opined that he sees no*
   *evidence of design changes or features that assist or optimize LimeWire users in*
   *locating and downloading infringing content. Gribble Decl. ¶¶ 25 – 35.*

**Plaintiffs' Response to Defendants' Statement No. 680:**

   Dr. Gribble has previously found that 94 percent of the data transferred over the

Gnutella network are audio or video files (Gribble Tr. at 143:8-145:5), and testified at his

deposition in this matter that "most files transferred are still media, audio and video files" (*id.* at

156:19-157:5).  Gribble has also published the results of his own statistical studies concluding that the file types stored on the old Napster and on the Gnutella network that LimeWire utilizes were the same:  mp3 (or audio) files (*id.* at 139-42).

**Defendants' Statement No. 681:**

> The LimeWire user manual (Defs.' Ex. 58) shows searches and search results using authorized content. LWDE 382612-13.

**Plaintiffs' Response to Defendants' Statement No. 681:**

> Plaintiffs do not dispute this statement.

**Defendants' Statement No. 682:**

> In a series of posts to a Yahoo! group dedicated to Gnutella developers, various LimeWire developers discuss generic improvements to the Gnutella network. Defs.' Ex. 59, Ex. 60, Ex. 61 and Ex. 62.

**Plaintiffs' Response to Defendants' Statement No. 682:**

> Plaintiffs do not dispute this statement.  Defs.' Exs. 59, 60, 61 and 62 are Pls. Exs.

209, 207, 208, 236, respectively, all of which defendants object to.  (*See* Defs. Resp. ¶¶ 321,

385.)

260

November 7, 2008

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,

by

Katherine B. Forrest
Teena-Ann V. Sankoorikal
Joanne M. Gentile

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
(212) 474-3700 (fax)
kforrest@cravath.com
tsankoor@cravath.com
jgentile@cravath.com

*Attorneys for Plaintiffs*

261