UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARISTA RECORDS LLC; ATLANTIC RECORDING CORPORATION; BMG MUSIC; CAPITOL RECORDS, INC.; ELEKTRA ENTERTAINMENT GROUP INC.; INTERSCOPE  RECORDS; LAFACE RECORDS LLC; MOTOWN RECORD COMPANY, L.P.; PRIORITY RECORDS LLC; SONY BMG MUSIC ENTERTAINMENT; UMG RECORDINGS, INC.; VIRGIN RECORDS AMERICA, INC.; and WARNER BROS. RECORDS INC.,<br><br>                                          Plaintiffs,<br><br>                    v.<br><br>LIME WIRE LLC; LIME GROUP LLC; MARK GORTON; GREG BILDSON; and M.J.G. LIME WIRE FAMILY LIMITED PARTNERSHIP,<br><br>                                          Defendants. | 06 Civ. 05936 (KMW)<br>ECF CASE |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR PERMANENT INJUNCTION**

Glenn D. Pomerantz
Kelly M. Klaus
Jonathan H. Blavin
Munger, Tolles & Olson, LLP
355 South Grand Avenue
Los Angeles, CA 90071
(213) 683-9100

*Attorneys for Plaintiffs*

June 4, 2010

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.      FACTUAL BACKGROUND ............................................................................... 4

III.      ARGUMENT ...................................................................................................... 8

    A.     An Injunction Must Issue To Mitigate The Continued Irreparable Harm To Plaintiffs ..... 8

       1.     Plaintiffs Have Suffered Irreparable Harm And Will Continue To Do So Absent An Injunction ................................................................................................. 9

       2.     Plaintiffs Have No Adequate Remedy at Law ............................................. 13

       3.     The Balance Of The Equities Weighs Decisively In Plaintiffs' Favor ...................... 13

       4.     An Injunction Is Necessary To Serve The Public Interest .......................................... 14

    B.     Plaintiffs' Proposed Injunction Is Necessary And Appropriate ......................................... 14

       1.     Plaintiffs' Proposed Injunction Orders Lime Wire To Take All Technologically Feasible Steps To Curtail Infringement ...................................................................... 14

       2.     The Burden Of Operating Lime Wire In Compliance With The Law Should Fall On Lime Wire -- Not On Plaintiffs Or This Court ............................................................. 18

IV.      CONCLUSION ................................................................................................... 21

**CASES**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ...................................................................... 8, 13, 14

*Aimster Copyright Litigation*,
334 F.3d 643 (7th Cir. 2003) ................................................................................. 2, 10

*Arista Records LLC v. Usenet.com, Inc.*,
No. 07-CV-8822 (HB) (Doc. No. 284) (S.D.N.Y. Oct. 8, 2009) ........................... 1, 8

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946) .................................................................................................. 18

*Branch v. Ogilvy & Mather, Inc.*,
772 F. Supp. 1359 (S.D.N.Y. 1991) ........................................................................ 10

*Cadence Design Systems, Inc. v. Avant! Corp.*,
125 F.3d 824 (9th Cir. 1997) .................................................................................... 14

*Columbia Pictures Indus., Inc. v. Fung*,
No. CV 06-5578 SVW (JCx) (Doc. No. 426) (C.D. Cal. May 20, 2010) ........... 1, 8, 12, 21

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ................................................................................................... 9

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009) ....................................................................................... 9

*Forest City Daly Hous., Inc. v. Town of N. Hempstead*,
175 F.3d 144 (2d Cir. 1999) ................................................................................... 9, 12

*Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Procter & Gamble Co.*,
285 F. Supp. 2d 389 (S.D.N.Y. 2003) .................................................................... 3, 17

*Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd.*,
518 F. Supp. 2d 1197 (C.D. Cal. 2007) .............................................................. passim

*Napster, Inc. Copyright Litigation*,
No. C 04-2121 MHP, 2006 U.S. Dist. Lexis 30338 (N.D. Cal. May 17, 2006) ...... 20

*Northwestern Nat'l Ins. Co. of Milwaukee, Wisconsin v. Alberts*,
937 F.2d 77 (2d Cir. 1991) ......................................................................................... 2

*Salinger v. Colting*,
____ F.3d. _____, No. 09-2878-cv, 2010 WL 1729126, at *12 (2d Cir. Apr. 30, 2010) .. passim

*Tuccillo v. Geisha NYC, LLC*,
635 F. Supp. 2d 227 (E.D.N.Y. 2009) ................................................................. 14, 17

*Twentieth Century Fox Film Corp. v. Streeter*,
438 F. Supp. 2d 1065 (D. Ariz. 2006) ..................................................................... 12

*UMG Recordings, Inc. v. Blake*,
  No. 06-CV-00120BR, 2007 WL 1853956, at *3 (E.D.N.C. June 26, 2007) ........................... 12

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
  No. 00 CIV. 472(JSR), 2000 WL 1262568 (S.D.N.Y. Sept. 6, 2000) ..................................... 11

## <u>STATUTES</u>

17 U.S.C. § 106 ................................................................................................................. 12
17 U.S.C. § 504(a)(2)-(c) ................................................................................................. 10
17 U.S.C. § 504(c) .............................................................................................................. 2

## I.    INTRODUCTION

The Court has held defendants Lime Group LLC, Lime Wire LLC, and Mark Gorton ("Lime Wire") liable for inducing the infringement of Plaintiffs' copyrighted works on a "massive scale." (May 25, 2010 Amended Opinion & Order (Doc. No. 223) at 33 ("Order").) Notwithstanding this Court's Order, Lime Wire does not appear to have done anything to change its illegal ways. Every recording on the "Billboard Top 40" chart of most popular Pop recordings today is available through the LimeWire software, as is every song on the current Top 40 Country, Top 40 Rock and Top 40 Latin Pop charts. The Top 40 songs from 2008 and 2009 remain freely available for downloading. (*See* Declaration of Jillian Song ("Song Decl.") ¶¶ 5-6.) The 30 popular "Recordings" addressed in the 2008 summary judgment motions and the Court' Order are still being uploaded and downloaded today through LimeWire, *id*., as are countless numbers of other protected recordings owned by Plaintiffs. (*Id*. at ¶ 4.) It is patently obvious that the rampant illegal conduct that Lime Wire intentionally induced, and for which it has been adjudged liable, will continue uninterrupted day after day unless and until the Court issues an injunction to rein in this massive infringing operation.

In every case in which a perpetrator of massive online infringement has been held liable on summary judgment, the courts have promptly issued an injunction to try to stop the continued harm to the Plaintiffs. The courts did so in the *Grokster* case (following the Supreme Court's unanimous opinion), in the *Usenet.com* case, and, just a few weeks ago, in the *Fung* case (decided by the same District Judge in the *Grokster* case).[1] This Court likewise should issue an injunction against Lime Wire. Plaintiffs' success on the merits has been conclusively established. And, as summarized below, every one of the equitable factors the Second Circuit

---

[1] *Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1241 (C.D. Cal. 2007) ("*Grokster Remand*"); *Arista Records LLC v. Usenet.com, Inc*., No. 07-CV-8822 (HB) (Doc. No. 284) (S.D.N.Y. Oct. 8, 2009) (Declaration of Kelly Klaus ("Klaus Decl."), Ex. 1); *Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578 SVW (JCx) (Doc. No. 426) (C.D. Cal. May 20, 2010) (Klaus Decl., Ex. 2).

- 1 -

says this Court must consider in granting injunctive relief weighs decisively in favor of a permanent injunction:

**_An injunction is required to prevent continued irreparable harm to Plaintiffs_**:  Every day that Lime Wire's conduct continues unabated guarantees harm to Plaintiffs that money damages cannot and will not compensate.  The scope of the infringements that Lime Wire induced – and that continue to this day – boggles the mind.  Lime Wire's illicit plan to induce infringements on a massive scale succeeded exactly as Lime Wire intended.  As the Court found, Lime Wire's users "employ [the software] to commit a substantial amount of infringement." (Order at 31-33.)  More than 200 million copies of Lime Wire's software (the "LimeWire Client") have been downloaded to date, and Lime Wire users generate billions of searches and downloads every month.  Lime Wire's liability for this mass illegality easily will outstrip any assets that conceivably could be available from these Defendants to pay a final judgment.  Courts repeatedly have recognized that the continuation of infringing conduct that cannot and will not be fully compensated in money damages constitutes irreparable harm.  *In re Aimster Copyright Litigation*, 334 F.3d 643, 655 (7th Cir. 2003); *Grokster Remand*, 518 F. Supp. 2d at 1219. Further evidence of irreparable harm stems from the fact that the infringement that Lime Wire has induced itself spawns exponential amounts of further copying and distribution of infringing music files *ad infinitum*.  This, too, establishes irreparable harm that the Court can remedy only with an injunction, *see Grokster Remand*, 518 F. Supp. 2d at 1217, and undermines the legitimate market for the authorized distribution of recorded music.

**_Plaintiffs' legal remedies are manifestly inadequate_**:  Plaintiffs have no adequate remedy at law for Lime Wire's inducement for the same reasons they have suffered irreparable harm.  *See Northwestern Nat'l Ins. Co. of Milwaukee, Wisconsin v. Alberts*, 937 F.2d 77, 80 (2d Cir. 1991) (noting "overlap[]" between showing of irreparable harm and adequacy of remedy at law.).  The evidence of Lime Wire's illicit intent that justified entry of summary judgment also overwhelmingly demonstrates that Lime Wire acted willfully, which increases the upper ceiling of the statutory damage range to $150,000 per work per infringer.  17 U.S.C. § 504(c).  Lime

Wire's liability undoubtedly will run into the hundreds of millions or even billions of dollars. Recognizing this exposure, Lime Wire started funneling its assets to Mark Gorton's "family partnerships" within mere days of the Supreme Court's *Grokster* decision, and the Court has cited evidence that Gorton directed these transfers to shield Lime Wire's assets from a money judgment. Whatever dollars remain after trial will not come close to satisfying the legal judgment Lime Wire will owe. An injunction must issue.

***The balance of equities is not even close***: Plaintiffs have suffered and will continue to suffer massive, irreparable harm absent an injunction. Lime Wire cannot be heard to complain of any hardship, since it built its business on illegal conduct and knowingly assumed the risk that a Court one day would issue an injunction. *See Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Procter & Gamble Co*., 285 F. Supp. 2d 389, 394 (S.D.N.Y. 2003) (finding no hardship from injunction against company forced to stop conduct it "should not have engaged in to begin with.").

***The public interest demands a halt to Lime Wire's illegal conduct***: Requiring a brazen infringer, such as Lime Wire, to conform its conduct to the law unquestionably serves the public interest. *Salinger v. Colting*, ____ F.3d. _____, No. 09-2878-cv, 2010 WL 1729126, at *12 (2d Cir. Apr. 30, 2010).

In sum, the equitable factors demand an injunction to ameliorate the continuing harm from Lime Wire's inducement of the infringement of Plaintiffs' works. That injunction must have three equally indispensable parts. *First*, Lime Wire must immediately halt the distribution of and support for the Lime Wire Client. *Second*, Lime Wire must take immediate action to prevent the continued mass infringement of Plaintiffs' works through the millions upon millions of legacy Lime Wire Clients that Lime Wire has previously distributed. *Third*, Lime Wire must promptly report to the Court on the effectiveness of its implemented measures. Plaintiffs are submitting a Proposed Injunction (attached as Exhibit A) that incorporates each of these crucial elements.

## II.    FACTUAL BACKGROUND

In a world in which numerous unscrupulous actors have sought to build illegal business models on the backs of copyright holders, Lime Wire stands out for its sheer brazenness.  Not only did Lime Wire induce infringement on a massive scale, but it continued to do so even after its ignominious predecessors had been shuttered by the federal courts, after the Supreme Court unanimously made clear that business models like Lime Wire's are infringing, and even for weeks after this Court's Order adjudicating it to be liable.  Lime Wire has made clear for years its contempt for the rights of copyright holders and its unwillingness to operate in accordance with the law.  The record of Lime Wire's infringing operations – which continue to this day – cries out for the Court's injunctive authority to require Lime Wire to act lawfully.

Lime Wire's founder launched the business *after* Napster was enjoined, with his eyes wide open as to the rampant copyright infringement on which his business would depend.  (*See* Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, dated July 18, 2008 ("SUF") ¶¶ 44, 144.)[2]  According to Gorton's sworn testimony in this case: "Since founding LimeWire, I have been aware that my dreams . . . have been thoroughly mixed with copyright infringement."  (Declaration of Mark Gorton in Support of Opposition to Pl's Mot. for Summ. J. ("Gorton Decl.") ¶ 30 (Doc. No. 146) (entered September 16, 2008).)  That did not stop Gorton from developing LimeWire into a device for infringement on an enormous scale.  Indeed, Lime Wire built Lime Wire's tremendous user base from confirmed infringers lured away from shuttered services like Napster, Morpheus and Kazaa.  (*See* Order at 33-34.)

By June of 2005, Lime Wire had declared itself the "industry standard" in peer-to-peer file-sharing, a "global phenomenon" to which Lime Wire attributed billions of song downloads every month.  (SUF ¶ 90.)  Shortly before the Supreme Court decided *Grokster*, Gorton publicly acknowledged that the Court's decision would decide Lime Wire's fate.  Gorton wrote, "If the Supreme Court says it is illegal to produce this software, *Lime Wire the company will cease to*

---

[2] So as not to burden the Court by submitting duplicate sets of voluminous evidence, Plaintiffs cite to the evidence submitted in support of the parties' motions for summary judgment where possible.  If the Court prefers, Plaintiffs can submit the cited evidence again upon request.

10798896.4

*exist*." (Klaus Decl., Ex. 4 (Pl's Ex. 625) (emphasis added); *see also* Saul Hansell and Jeff Leeds, "A Supreme Court Showdown for File Sharing," N.Y. Times, March 28, 2005 (publicly quoting Gorton).) The day the Supreme Court decision came down, Gorton and his closest family members recognized the *Grokster* decision spelled doom for Lime Wire's operation. (*See id.* at Ex. 5 (Pl's Ex. 640) (email from Gorton's parents on day Supreme Court decided *Grokster*).) The very next day, Gorton told the New York Times that he would likely stop distributing LimeWire in reaction to the ruling: "Some people are saying that as long as I don't actively induce infringement, I'm OK. . . . I don't think it will work out that way." (*Id.* at Ex. 6 [6/28/05 NY Times Article "Sharing Cultures Likely to Pause but Not Wither"].) In short, Gorton saw the *Grokster's* writing on the wall in June 2005. He knew then that, under the rule of law, Lime Wire and the massive infringing conduct it intentionally induced would "cease to exist."

It is now 2010. And, as everyone knows, Lime Wire did not "cease to exist." On the contrary, Gorton and Lime Wire doubled down, and decided their illegal business would grow even further while other illegal peer-to-peer services stopped their illicit ways. The results of Lime Wire's unlawful conduct have been staggering. Two years ago, when the summary judgment motions were filed, Lime Wire boasted that four million unique users accessed the LimeWire Client *every day* (SUF ¶ 96); at that time, end-users had downloaded the LimeWire Client just from one website (download.com) *more than 152 million times*. (*Id.* at ¶ 95.) In the nearly two years since the parties filed their motions, Lime Wire has continued to be a tool of choice for rampant infringement of Plaintiffs' works. According to the website download.com, since July 2008, users downloaded the LimeWire Client more than *50 million times*, bringing the total downloads of the Client from just that one website – *i.e.*, exclusive of downloads from Lime Wire's own website – to more than 200 million. (Klaus Decl., Ex. 7 (total downloads of Lime Wire from website download.com).) Not only did Lime Wire continue to exist, it mushroomed exponentially into the largest peer-to-peer file-sharing facilitator on the block, at the top of the illegitimate heap.

- 5 -

On May 11, when this Court filed its Summary Judgment Order, the Court held what Lime Wire and everyone else has known is undeniable for more than five years: that Lime Wire "intentionally encouraged" the "massive scale" copyright infringement committed by its "enormous user base." (Order, as amended, at 29, 33, 36.) Lime Wire's main product —the LimeWire Client software—is used "overwhelmingly for infringement." (*Id*. at 31.) Indeed, without infringement, Lime Wire would have no business at all. The Court recognized that Lime Wire's very existence *depends* on the "massive user population generated by" the LimeWire Client's "infringement-enabling features." (*Id*. at 37.)

The Court recognized that throughout Lime Wire's history, it had acted with full knowledge of its users' illegal conduct:

- Lime Wire marketed the LimeWire Client to Napster users – known copyright infringers – and promoted the LimeWire Client's infringing capabilities. (*Id*. at 33-35.)

- Lime Wire "actively assisted infringing users" in their infringement efforts. (*Id*. at 36.)

- Lime Wire tested the infringing capabilities of the LimeWire Client by searching for copyrighted material. (*Id*. at 35.)

- Lime Wire considered – and rejected – technological barriers and design choices aimed at diminishing infringement. (*Id*. at 38.)

The Court further acknowledged that Lime Wire has known for years about the undeniably "massive scale" of Lime Wire's induced infringement. (*Id*. at 33.) "[N]early all of the files shared and downloaded by LimeWire users are copyrighted, and not authorized for free distribution through LimeWire." (Order at 31-32; *see also* SUF ¶ 108 (vast majority of files available for download (estimated at 92.7%) not authorized for free distribution on peer-to-peer networks).) Plaintiffs' evidence at summary judgment further showed that 98.8% of all download requests among Lime Wire's enormous user base are for unauthorized files, and many of those files contain one of Plaintiffs' protected works. (SUF ¶¶ 109-110.)

- 6 -

In the weeks since this Court's Order, what has Lime Wire done to try to halt or limit the infringement it has induced? The answer, from all appearances, is nothing. The LimeWire Client not only continues to be downloaded, but also continues to be used for the widespread infringements that Lime Wire intended to induce. This Court determined Lime Wire's liability based on 30 Recordings, as Judge Lynch had directed. (*See* Order at 5 n.7.) The LimeWire Client still permits the download of every single one of those 30 Recordings. (Song Decl. ¶ 4.) Indeed, the LimeWire Client facilitates the download of every recording currently on Billboard Magazine's chart of "Top 40" Pop hits. Not only that, the LimeWire Client freely accesses Billboard's Top 40 for 2008 and 2009, as well as the current Top 40 Country hits, Top 40 Rock hits and the Top 40 Latin Pop songs. (Song Decl. ¶¶ 5-6.) Obviously, every time Plaintiffs release a new copyrighted recording, Lime Wire users feed it into the infringing Lime Wire system. There, it joins Plaintiffs' existing catalogues in a loop of unauthorized reproduction and distribution without end. Lime Wire intended to create precisely that system, and it succeeded in doing so.

Rather than addressing the harm it has caused, Lime Wire and its executives instead have been busily channeling their energy into a public relations offensive, apparently designed to score points in the court of public opinion. Lime Wire's initial press release following the Order proclaimed that the company "strongly opposes the Court's recent decision." (Klaus Decl., Ex. 8.) Lime Wire's current CEO, George Searle, recently gave an interview purporting to claim that "Lime Wire does not know" that the LimeWire Client is used overwhelmingly for infringement; Searle also continued the campaign of blaming a rogue intern for incriminating evidence. (*Id.* at Ex. 9.) Gorton, meanwhile, has been giving interviews saying, "[p]erhaps I was naïve" about the litigation, that the Plaintiffs should look at his company as a kind of "Woodstock," and that "I have a lot of work to do to get my karma scores up." (*Id.* at Ex. 10.)

Lime Wire's campaign of infringement must stop. But without this Court's intervention, nothing will change. Plaintiffs seek this Court's prompt intervention to give Plaintiffs the equitable relief to which they are clearly entitled.

## III. ARGUMENT

### A. An Injunction Must Issue To Mitigate The Continued Irreparable Harm To Plaintiffs

Plaintiffs' entitlement to immediate injunctive relief to curtail the mass infringement that Lime Wire intentionally induced is clear. Indeed, courts in analogous circumstances have repeatedly recognized that equity demands an injunction. In case after case where courts have found defendants liable on summary judgment for inducing infringement, the courts unsurprisingly have granted the plaintiff copyright owners a permanent injunction, notwithstanding that further litigation (including on the issue of damages) remains in the District Court.

For example, in the *Grokster* litigation, Judge Wilson of the Central District of California followed up the summary judgment order with a permanent injunction against the remaining defendant in that case (StreamCast). *Grokster Remand*, 518 F. Supp. 2d at 1241. Just within the last few weeks, Judge Wilson followed a ruling of summary judgment in favor of the plaintiff motion picture studios with an injunction against the operators of an online site who intentionally induced infringement of plaintiffs' movies. *Fung*, No. CV 06-5578 SVW (JCx) (Klaus Decl., Ex. 2). In this District, Judge Baer followed his decision granting summary judgment on inducement of copyrights with a permanent injunction. *Arista Records, et. al. v. Usenet.com, Inc.*, No. 07-CV-8822 (HB) (Klaus Decl., Ex. 1).[3]

The Court's Order conclusively establishes that Lime Wire *is* liable for intentionally inducing the infringement of Plaintiffs' copyrighted works and (as to the pre-1972 recordings) the related state law claims. The fact that Plaintiffs have prevailed on the merits of these claims

---

[3] In the well-known cases involving two other of Lime Wire's ignominious predecessors – Napster and Aimster – the courts issued injunctions against the defendants even without a summary judgment of liability. *See A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1099 (9th Cir. 2002) (*"Napster II"*) (affirming District Court's order to shut down the Napster service); *Aimster*, 334 F.3d at 656 (affirming injunction against Aimster). Plaintiffs' entitlement to an injunction against Lime Wire is only the stronger by virtue of the Court's finding of Lime Wire's liability.

- 8 -

will not change through trial.  Accordingly, as the Second Circuit recently confirmed, Plaintiffs

are entitled to a permanent injunction upon showing:

> (1) that [they] ha[ve] suffered an irreparable injury; (2) that
> remedies available at law, such as monetary damages,
> are inadequate to compensate for that injury; (3) that, considering the
> balance of hardships between the plaintiff and defendant, a remedy
> in equity is warranted; and (4) that the public interest would not be
> disserved by a permanent injunction.

*Salinger,* 2010 WL 1729126, at *7 (quoting *eBay Inc.  v. MercExchange, L.L.C.*, 547 U.S. 388,

391 (2006)).  Every one of these equitable factors weighs in favor of a permanent injunction

against Lime Wire.

### 1.      Plaintiffs Have Suffered Irreparable Harm And Will Continue To Do So Absent An Injunction

Plaintiffs have suffered – and will continue to suffer – irreparable harm from Lime

Wire's inducement of widespread infringement of their works.  "Irreparable harm" is an "injury

that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an

award of monetary damages." *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d

144, 153 (2d Cir. 1999); *see also Faiveley Transp. Malmo AB v. Wabtec Corp*., 559 F.3d 110,

118 (2d Cir. 2009).  As a direct result of Lime Wire's intentionally inducing widespread

infringement, Plaintiffs are continuing to suffer at least three forms of harm judicially recognized

to be irreparable.

*First*, Plaintiffs face irreparable harm because it is virtually certain that the enormous

damage award that they will be entitled to after trial will far exceed Lime Wire's ability to pay.

In *Grokster*, Judge Wilson held that irreparable harm to Plaintiffs resulted from the potential for

a massive statutory damages award that the defendants almost certainly would be unable to pay.

*See Grokster Remand*, 518 F. Supp. 2d at 1217 ("Because it is extremely unlikely that

[defendants] will be able to compensate Plaintiffs monetarily for the infringements it has induced

in the past, or the infringements it could induce in the future . . . Plaintiffs have and will continue

to suffer irreparable harm.").  The Seventh Circuit (with Judge Posner writing for the court)

- 9 -

reached the same conclusion in *Aimster*: the court there observed that Aimster's likely inability to satisfy any damages award weighed in favor of the district court's finding of irreparable harm. *Aimster*, 334 F.3d at 655.

As in *Grokster* and *Aimster*, Plaintiffs have suffered —and will suffer— irreparable harm because Lime Wire will most likely owe far more in damages than it will ever be able to pay. *See Grokster Remand*, 518 F. Supp. 2d at 1217. As they are entitled to do, Plaintiffs seek statutory damages under the Copyright Act as a remedy for Lime Wire's unlawful conduct. (First Amended Complaint ¶¶ 74, 87, 99.) For each work for which Lime Wire bears liability for an act of direct infringement, Lime Wire owes Plaintiffs a statutory award within a Congressionally prescribed range. Where the defendant's conduct is willful, the range of statutory damages runs from $750 to *$150,000*. *See* 17 U.S.C. § 504(a)(2)-(c). "[I]n order to prove willfulness, a plaintiff must show that the defendant knew or should have known that its conduct constituted copyright infringement." *Branch v. Ogilvy & Mather, Inc*., 772 F. Supp. 1359, 1364 (S.D.N.Y. 1991). The Court's Order catalogues extensive evidence of Lime Wire's willful conduct. Among other things, the Order describes uncontroverted evidence "that LW *intended* to encourage infringement by distributing LimeWire" given in part "LW's awareness of substantial infringement by users"; "that LW knew that LimeWire users were committing copyright infringement"; and that "[t]he massive scale of infringement committed by LimeWire users, and LW's knowledge of that infringement, supports a finding that LW intended to induce infringement." (Order at 31-33.) This evidence, along with numerous other items detailed in the summary judgment record, shows Lime Wire almost certainly will be liable for statutory damages where the upward limit for each statutory award is $150,000. *See Grokster Remand*, 518 F. Supp. 2d at 1217 (noting the "potential relationship between inducement and a finding of willfulness").

The specific amount within the statutory range is only one part of the equation for calculating statutory damages. The other component is the number of works, and here that number will be many thousands. In accordance with Judge Lynch's instructions (*see* Klaus

- 10 -

Decl., Ex. 11 (Dec. 7, 2007 Hr'g Tr.), Plaintiffs in January 2008 provided Lime Wire with an updated list of works known to Plaintiffs to be infringed through Lime Wire. (*Id.* at Ex. 12 (letter to Lime Wire's counsel Jan. 31, 2008).) There are more than *6,600* works identified on that list. The list of infringed works will only continue to grow, since (as exemplified by Lime Wire's use to infringe the current "Top 40" recordings), Lime Wire users have continued to upload and download new recordings as Plaintiffs have released them since 2008.

In *UMG Recordings, Inc. v. MP3.Com, Inc.*, No. 00 CIV. 472(JSR), 2000 WL 1262568 (S.D.N.Y. Sept. 6, 2000), where the court found that the defendant MP3.com had engaged in willful infringement, the plaintiff (which was one of the major record companies) was awarded $53.4 million in statutory damages calculated at $25,000 per work for just over 2,100 works. *Id.* at *1, *6; (Klaus Decl., Ex. 3) (Nov. 16, 2000 Final Judgment and Order) (Doc. No. 162) (awarding damages)). Here, there are *four* record company Plaintiffs, and *thousands* more works in issue. It does not require sophisticated mathematics to calculate that the likely damage award in this case will run into the hundreds of millions, if not the billions of dollars.

As in *Grokster*, the amount of statutory damages at issue here "is so staggering" that it "would very probably be well beyond" Lime Wire's "anticipated resources." *Grokster Remand*, 518 F. Supp. 2d at 1217. Lime Wire's 2006 income was at least around $20 million. (SUF ¶ 432.) Of course, Lime Wire's total assets exceed that. Lime Wire has attempted to secrete assets into Mark Gorton-controlled "family partnerships" with the intention of shielding those assets from a judgment award in this case. Nevertheless, even if Plaintiffs can unearth the assets Lime Wire has buried in an effort to protect them from judgment, Lime Wire has provided no evidence that it could satisfy a damages award of hundreds of millions of dollars (or more). Indeed, Lime Wire almost certainly will be unable to satisfy the likely damages award in this case.

*Second*, Plaintiffs are being subjected to a different, but no less irreparable, type of injury from the nature of the infringement that Lime Wire has induced, specifically from the continued infringement of their works through Lime Wire's viral system. Plaintiffs have the exclusive

- 11 -

right to reproduce and distribute their copyrighted works. 17 U.S.C. § 106. Even if defendants somehow miraculously satisfied a full damages award, Lime Wire's large-scale unauthorized distribution of digital copies of Plaintiffs' copyrighted works will continue to facilitate generations of infringement. *See Grokster Remand*, 518 F. Supp. 2d at 1217. Each time a user downloads an illegal copy of one of Plaintiffs' copyrighted works through the LimeWire Client, that copy can spawn countless derivative infringing copies. These derivative copies inflict exponential harm on Plaintiffs' exclusive rights. *See Twentieth Century Fox Film Corp. v. Streeter*, 438 F. Supp. 2d 1065, 1072, 1073 n.2 (D. Ariz. 2006) (every user "who receives one of the copyrighted works [through the peer-to-peer service] is in turn capable of also transmitting perfect copies of the works. . . . Accordingly, the process is potentially exponential rather than linear, threatening virtually unstoppable infringement of the copyright.").

No damages award can compensate Plaintiffs for the harm to their exclusive rights stemming from generations of derivative infringements. *Grokster Remand*, 518 F. Supp. 2d at 1218-19; *see also UMG Recordings, Inc. v. Blake*, No. 06-CV-00120BR, 2007 WL 1853956, at *3 (E.D.N.C. June 26, 2007) ("The remedy available at law for this injury, monetary damages, will only compensate for Defendant's one-time infringement of each recording, and not for inevitable future transfers."). Because damages cannot address this continued vulnerability, Lime Wire's induced infringement causes irreparable harm. *See Forest City Daly Hous. Inc.*, 175 F.3d at 153 (harm that cannot be remedied by damages award is irreparable).

*Third*, Plaintiffs face irreparable harm because Lime Wire facilitates the unauthorized, free distribution of Plaintiffs' copyrighted works — precisely the same product that Plaintiffs pay millions to market and sell to consumers. *See Salinger*, 2010 WL 1729126 at *9-10. "[T]he availability of free, infringing copies of Plaintiffs' works" through Lime Wire "irreparably undermines the growing legitimate market for consumers to purchase access to the same works." *Fung*, No. CV 06-5578 SVW (JCx) at 3-4 (Klaus Decl., Ex. 2). As a result of Lime Wire's inducement, generations of potential purchasers of Plaintiffs' products have instead grown up accustomed to downloading their music for free. *See Metro-Goldwyn-Mayer Studios Inc. v.*

- 12 -

*Grokster, Ltd.,* 545 U.S. 913, 928-29 (2005) ("digital distribution of copyrighted material threatens copyright holders as never before, because every copy is identical to the original, copying is easy, and many people (especially the young) use file-sharing software to download copyrighted works"); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1017 (9th Cir. 2001) ("*Napster I*") (citing "Napster's deleterious effect on the present and future digital download market"). That harm can never be remedied in money damages; an injunction must issue.

### 2. Plaintiffs Have No Adequate Remedy at Law

Plaintiffs have no adequate remedy at law for Lime Wire's inducement for the same reasons they have suffered irreparable harm. *See Northwestern Nat'l Ins. Co. of Milwaukee, Wisconsin v. Alberts*, 937 F.2d 77, 80 (2d Cir. 1991) (noting "overlap" between showing of irreparable harm and adequacy of remedy at law.). The total damages award here will most likely exceed any that Lime Wire could ever have the means to pay. *See supra* at III.A.1.; *Grokster Remand*, 518 F. Supp. 2d at 1219-20. The irreparable harm to Plaintiffs' exclusive rights cannot be remedied even in the highly unlikely event defendants can satisfy a damages award. Plaintiffs will never recover damages for the substantial derivative infringements that illegal copying and distribution through Lime Wire spawns. The lack of an adequate remedy at law weighs in favor of granting the Proposed Injunction.

### 3. The Balance Of The Equities Weighs Decisively In Plaintiffs' Favor

The balance of hardships between Plaintiffs and Lime Wire tips sharply in Plaintiffs' favor if an injunction is not entered. As explained, Plaintiffs' past and future harm is irreparable. *See Salinger*, 2010 WL 1729126 at *10 (noting relationship between irreparable harm and balancing hardships). Absent an injunction, the destruction of Plaintiffs' exclusive rights will continue, resulting in countless lost sales and innumerable derivative infringements.

By contrast, Lime Wire cannot complain about any potential harm to its business an injunction may cause. As the Court has held, Lime Wire built its business around infringement. (Order at 36.) Indeed, the Court held that Lime Wire depends on infringement for its

- 13 -

commercial success.  (Order at 37.)  A knowing infringer "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities."  *Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997).   By knowingly constructing its business around an unlawful goal, Lime Wire assumed the risk that a court order may one day shut that business down – as courts have done every time the issue has arisen before.  *See Napster II*, 284 F.3d at 1099 (affirming order shutting down Napster); *see also Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 247-48 (E.D.N.Y. 2009) (knowing infringer assumed risk, so any harm from loss incurred as a result of an injunction was "self-imposed").

### 4. An Injunction Is Necessary To Serve The Public Interest

An injunction that requires Lime Wire to bring its conduct into conformance with the law serves the public interest.  As the Second Circuit recently explained in *Salinger*, the public interest underlying the copyright laws is to promote the store of knowledge available to the public.  2010 WL 1729126 at *11.  An injunction serves that end by protecting copyright holders' financial incentive to contribute to the store of knowledge.  *Id.*  Infringing conduct of the type engaged in by Lime Wire – "patently infring[ing] another's copyright" – does not prompt any free expression interest that might apply in a narrower infringement case.  *Id.* at *12. Entering the Proposed Injunction serves the public interest.

### B. Plaintiffs' Proposed Injunction Is Necessary And Appropriate

### 1. Plaintiffs' Proposed Injunction Orders Lime Wire To Take All Technologically Feasible Steps To Curtail Infringement

Plaintiffs' Proposed Injunction  sets forth three principal categories of requirements. *First*, Lime Wire must immediately halt any further distribution of the LimeWire Client or any similar software product, so that no new infringers enter the Lime Wire system.  Lime Wire must also cease supporting the LimeWire Client and engaging in other acts through which it profits from the infringements it induced.

*Second*, Lime Wire must be ordered to implement all technologically-feasible actions that will curtail the continued infringements though the millions of legacy copies of the LimeWire

- 14 -

Client that have already been distributed. The burden of devising an appropriate mechanism properly falls to Lime Wire, as the designer of the LimeWire service.

*Third*, Lime Wire must report promptly on the nature and efficacy of its proposed technological changes to its software and service in order to meet the requirements of the Court's injunction.

We discuss each of these points in turn.

### a. Part One: Lime Wire Must Stop Further Distribution And Profiteering From Ongoing Infringement

Part One of the Proposed Injunction compels an end to the conduct that the Court has deemed unlawful. Lime Wire must stop inducing further infringements of Plaintiffs' copyrighted works through the LimeWire Client. To do that, Lime Wire must cease further distribution of the LimeWire Client immediately, both the free and paid versions. The continued distribution of the LimeWire Client only serves to broaden Lime Wire's user base and continue Lime Wire's inducement of massive-scale infringement.

Stopping further distribution of the LimeWire Client, however, is only the first step toward curtailing the irreparable harm to Plaintiffs that Lime Wire has caused. Lime Wire must also redress the ongoing harm caused by the hundreds of millions of installed versions of the LimeWire software already on user's computers ("Legacy Clients"). The Proposed Injunction first orders Lime Wire to cease profiting from the ongoing infringement through the Legacy Clients through advertising or other revenue. Specifically, the Proposed Injunction requires Lime Wire to stop streaming advertising through the Legacy Client to its millions of existing users. Without this proscription, Lime Wire continues to profit from existing LimeWire users' ongoing infringing conduct.

Lime Wire also must stop providing software upgrades and support to Legacy Clients, except as otherwise provided for in the Proposed Injunction. Continued updates and "bug fixes" improve the ease of using a system designed (and used overwhelmingly) for copyright infringement. (Declaration of Ellis Horowitz ("Supp. Horowitz Decl.") ¶ 8.) Not only must

- 15 -

Lime Wire's own employees stop updating the Lime Wire Client; Lime Wire also must stop the support provided to the broader software development community. Lime Wire currently maintains the source code for the LimeWire Client on a website accessible to all developers. The Proposed Injunction requires that the source code be taken offline so that Lime Wire does not facilitate software support by non-Lime Wire employees.

> **b.** **Part Two: Requiring Lime Wire To Institute Affirmative Measures To Curtail Infringement Through The Legacy Clients**

Part Two of the Proposed Injunction requires Lime Wire to do everything in its power to stop the rampant ongoing infringement it has induced through its past distribution of the Legacy Clients. To that end, Lime Wire must take all steps that are technologically possible to curtail the ongoing infringing file-sharing through the LimeWire software, including but not limited to disabling its users' ability to search for and share audio files through the Legacy Clients, providing a means for users to erase the Legacy Clients, and incorporating an effective and secure content filter into the Legacy Clients. If Lime Wire contemplates the distribution of any new version of the LimeWire software to serve these goals, Lime Wire must provide it to Plaintiffs and the Court for testing and evaluation of effectiveness prior to its implementation.

Lime Wire undoubtedly will contend—as it has throughout this litigation—that it will be very difficult to stop users of Legacy Clients from continuing to infringe Plaintiffs' works. (*See, e.g.,* Declaration of Dr. Steven Gribble in Opp. to Plaintiffs' Mot. for Partial Summ. J., ¶ 5 (contending that it would be "virtually impossible" to impose centralized control over the peer-to-peer network or its users).) If that is true, then it is a result of Lime Wire's specific design choices that it has made with full knowledge of copyright owners' efforts to protect their rights against the likes of Napster. As one of Lime Wire's software engineers put it, the design team resisted mechanisms that would allow for centralized control over the LimeWire Client, for fear that it would create the "potential for court-ordered or injunction cases" where Lime Wire "would be forced" to use some centralized function to protect copyright holders. (SUF ¶ 389.)

- 16 -

As the Court discussed at length in the Order, Lime Wire repeatedly failed to take actions to mitigate the massive infringements that Lime Wire intentionally induced.  For example, Lime Wire purposefully rejected the incorporation of an effective content filter into the Legacy Clients.  Lime Wire's purported "filter" is entirely optional:  Lime Wire can turn content-filtering *off* in all of the Legacy Clients through settings sent remotely.  (Order at 38.)  But it purposefully designed the system so that it could not do the opposite.  (*Id*.)  Lime Wire's purported filter is thus no filter at all, because each individual user can simply turn it on and off at will.

Moreover, Lime Wire's "filter" implements an ineffective limiting criteria:  hash value.  As the Court noted, hash-based filtering alone cannot stop all infringement on the Lime Wire system.  (Order at 38 n. 28.)  Removing all audio files with a particular hash value from the Lime Wire system would not even remove all copies of one individual song.  Lime Wire intentionally rejected more effective filtering mechanisms because it knew what would happen if it implemented filtering that worked:  its enormous user base would vanish.  (*Id*. at 39-40.)  Instead, it elected to continue its illegal operation without any impediments on its users' infringing conduct.

Having made these design choices itself, Lime Wire, therefore, is itself absolutely responsible for coming up with the technological solutions to fix the problems that Lime Wire deliberately created.  *See Johnson & Johnson-Merck Consumer Pharmaceuticals Co.,* 285 F. Supp. 2d at 394 (company forced to stop conduct it "should not have engaged in to begin with" required to bear burden of injunction); *Tuccillo*, 635 F. Supp. 2d at 247-48 (E.D.N.Y. 2009) (party cannot complain about burden as a result of injunction when it "assumed th[e] risk" through knowingly unlawful action).  The Proposed Injunction contains a non-exhaustive list of immediate goals, but the Court can and should order Lime Wire to utilize all available mechanisms immediately to curtail infringement through the Legacy Clients to the full extent technologically possible.  Lime Wire should also be ordered to utilize all other mechanisms at its disposal – including without limitation through devising an upgraded version that will include

- 17 -

meaningful and effective filtering – as part of the injunction.  If a new, upgraded version is devised (and approved by the Court), Lime Wire further must be ordered to use all reasonable, lawful means to compel Legacy Users to relinquish their old, unfiltered Legacy Clients in favor of the new version that contains meaningful content filtering.

### c.      Part Three:  Accountability And Notice

Finally, the Proposed Injunction requires Lime Wire to report back to the Court on its progress in 14 days.  The required report must (1) certify that distribution, sales and advertising has stopped; (2) identify what steps have been taken to stop the ongoing rampant infringement; (3) quantify the precise effect of those steps on the ongoing infringement, including a report that identifies how many songs currently charting on Billboard Magazine's Top 200 list are still available for download through the LimeWire Client; and (4) identify what further technological changes are in the process of being made or will be made to combat ongoing infringement.  At that time, the Court can assess whether the measures employed sufficiently remedy the ongoing harm wreaked by the Legacy Clients.  Part Three also requires Lime Wire to give notice of this injunction to any future assignee of the Lime Wire assets and to known Lime Wire customers, and describes other reservations of rights and administrative requirements for maintaining the injunction.

### 2.      The Burden Of Operating Lime Wire In Compliance With The Law Should Fall On Lime Wire -- Not On Plaintiffs Or This Court

Lime Wire no doubt will attempt to deflect responsibility for any effort to stop the ongoing infringements through the Legacy Clients on to Plaintiffs.  Lime Wire will insist that it is Plaintiffs' obligation to identify infringing content on the Lime Wire system by hash value before Lime Wire has any obligation to remove it through its weak, ineffective hash-based filter. Experience has revealed that to be a futile and burdensome exercise that would be wholly unfair to impose on Plaintiffs here.  *See, e.g., Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

- 18 -

Requiring Plaintiffs to identify lists of infringing works available through the LimeWire software before the works must be removed would be an extraordinarily ineffective and inefficient means of curtailing infringement. Plaintiffs have no way to identify all of the infringing works on the Lime Wire system at any given time. When a user searches for a particular work through the LimeWire Client, the results show only a small subset of all of the files available from other Lime Wire Client users who then happen to be online. (Supp. Horowitz Decl. ¶ 4.) A user's search results only extend to the subset of computers that give the fastest response to a particular query. (*Id.*) Beyond the search horizon, a user cannot see what files are available. (*Id.*) Even within a user's search horizon, only those files that are being shared by users simultaneously accessing the system are visible. (*Id.*) Giving notice of all "available" files is impossible because Plaintiffs simply cannot see what that universe of infringing files is at any given moment.

Even if Plaintiffs could catalogue hash values, it would be an unduly burdensome enterprise that would ultimately be useless in any event. Because a hash value is a product of the particular digital file and not its content, two audio files may contain the same copyrighted audio file, but have different hash values. Therefore, the same copyrighted content may appear on the Lime Wire system in files with numerous hash values. (SUF ¶¶ 121-123; Supp. Horowitz Decl. ¶ 5.) Before Plaintiffs can meaningfully catalogue existing infringing hashes, new hashes can pop up in their place. (Supp. Horowitz Decl. ¶ 6.) Forcing Plaintiffs to compile lists of the millions of infringing hashes that are available through the LimeWire Client while others are still being created would be extremely burdensome. Ultimately, the exercise would be to no avail. Plaintiffs could never know whether their copyrighted content was being ripped again with different ripping software and replaced onto the system with a different hash value. (SUF ¶ 123.) What is more, Lime Wire made certain that it would be up to the individual user whether to employ hash filtering in the first place, so even if Plaintiffs were forced to incur this tremendous burden it would not necessarily remove the infringing files from the system. (Supp. Horowitz.

- 19 -

Decl., ¶ 7.) Users could still elect to share them without impediment, because of the way that Lime Wire designed the system.

Lime Wire also may cite Judge Wilson's opinion in the *Grokster Remand* decision as legal support for a requirement that Plaintiffs provide Lime Wire with notice of where infringing works are available on the Gnutella network as a prerequisite to Lime Wire's obligation to remove content. *See Grokster Remand,* 518 F. Supp. 2d at 1238. In particular, Judge Wilson ordered that the remaining defendant's (StreamCast's) "duty to filter any particular copyrighted work will commence upon Plaintiffs' provision of notice. For each work, Plaintiffs will be required to provide the artist-title pair, a certification of ownership, and some evidence that one or more files containing each work is available on the Morpheus System and Software." *Id.* at 1239.

Although the Court in the *Grokster Remand* was right on many issues, Plaintiffs respectfully submit that the Court's decision to impose a notice-and-takedown system as part of the injunction was not one of them.[4] 518 F. Supp. 2d at 1238. Judge Wilson based this part of the decision on the Ninth Circuit's original opinion in *Napster,* which predated the Supreme Court's decision in *Grokster* by four years. The Ninth Circuit's original *Napster* decision relied on the "substantial non-infringing uses" discussion in the *Sony-Betamax* case to hold that notice had to be a component of a system of injunctive relief. The court reasoned that, without such a requirement, the injunction might impermissibly give rise to liability based on the nature of the technology itself. *Napster I,* 239 F.3d at 1027.

An opinion issued by the District Court in the *Napster* case – Judge Patel – after the Supreme Court's *Grokster* decision, demonstrates why this reading of the law in the Ninth Circuit is wrong. *See In re Napster, Inc. Copyright Litigation*, No. C 04-2121 MHP, 2006 U.S. Dist. Lexis 30338 (N.D. Cal. May 17, 2006). Analyzing the Supreme Court's decision, Judge

---

[4] The *Grokster* court required this notice at its own initiative – it was not briefed by the parties. The scope of the injunction in *Grokster* led to the appointment of a special master and several months of legal wrangling. That protracted procedure is unnecessary here. Lime Wire must simply be ordered to do whatever is technologically feasible to redress the ongoing harm.

Patel held that the Ninth Circuit's original "notice-based structure" (set forth in the pre-*Grokster* Ninth Circuit *Napster* decision) was inconsistent with the Supreme Court's opinion in *Grokster*. *Id*. at *30. Specifically, Judge Patel held that where liability is based on the defendant's intentional inducement of infringement, liability "does not require actual or even reasonable knowledge of specific infringing files." *Id*. at *32. In a recent permanent injunction issued in another inducement of infringement case, Judge Wilson himself did not require the onerous notice-and-takedown he required in *Grokster*, impliedly accepting this logic. *See Fung*, No. CV 06-5578 SVW (JCx) (Klaus Decl., Ex. 2).

For the reasons articulated by Judge Patel, requiring notice of an infringing copy of a work as a prerequisite to the defendant's obligation to block access to the work (or remove it) is inconsistent with the basis for defendant's liability in the first place. There is no danger of liability or an equitable decree being imposed because of the design of the software – the concern underlying the Ninth Circuit's original *Napster* decision and Judge Wilson's *Grokster Remand* injunction. Lime Wire's wrongful conduct – and its responsibility to curtail the consequences of the same – stems from Lime Wire's intentional inducement of the infringement of Plaintiffs' works. There is no basis in law or equity to require Plaintiffs to shoulder the burden of ameliorating unlawful conduct that Lime Wire intentionally unleashed.

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court enter the Proposed Permanent Injunction submitted herewith.

Dated:  June 4, 2010                    Respectfully submitted

                                         _____/s/ Kelly M. Klaus_____
                                             Kelly M. Klaus

                                         Attorney for Plaintiffs
                                         Munger, Tolles & Olson, LLP
                                         355 South Grand Avenue, 35th Floor
                                         Los Angeles, CA 90071-1560
                                         (213) 683-9100
                                         (213) 687-3702 (Fax)
                                         Kelly.Klaus@mto.com

- 21 -