UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x
ARISTA RECORDS LLC; ATLANTIC RECORDING
CORPORATION; ARISTA MUSIC, fka BMG
MUSIC; CAPITOL RECORDS, INC; ELEKTRA
ENTERTAINMENT GROUP INC; INTERSCOPE
RECORDS; LAFACE RECORDS LLC; MOTOWN
RECORD COMPANY, L.P.; PRIORITY RECORDS
LLC; SONY MUSIC ENTERTAINMENT, fka SONY
BMG MUSIC ENTERTAINMENT; UMG RECORDINGS,
INC; VIRGIN RECORDS AMERICA, INC.; and                  06 CV 5936 (KMW)
WARNER BROS. RECORDS INC.,

                                                        OPINION & ORDER
                            Plaintiffs,

        -against-

LIME GROUP LLC; LIME WIRE LLC; MARK
GORTON; GREG BILDSON; and M.J.G. LIME WIRE
FAMILY LIMITED PARTNERSHIP,

                            Defendants.
---------------------------------------------------------------------x
KIMBA M. WOOD, U.S.D.J.

        Plaintiffs move to disqualify Willkie, Farr & Gallagher LLP ("Willkie") from

representing Defendants in the above-captioned matter (hereinafter the "LimeWire Matter").

Plaintiffs base their motion on the fact that Jeffrey Korn, now a partner at Willkie, was

previously an associate at Cravath, Swaine & Moore, LLP ("Cravath"), where he served as the

senior associate on Cravath's representation of Plaintiffs in the LimeWire matter.[1]  Because the

Court finds that the conflict does not pose a significant risk of trial taint, the Court DENIES

Plaintiffs' motion.

I.      **Factual Background**

        A.      2006-2007: Korn's Transition from Cravath to Willkie

---

[1] Plaintiffs have since substituted counsel, and are now represented by Munger, Tolles & Olson
LLP.

In August 2006, Plaintiffs, represented by Cravath, filed a lawsuit against Defendants. During the active litigation period between November 2006 and August 2007, Korn, in his own words, was "the senior associate on the Lime Wire case." (Klaus Decl. ("KD") Ex. D at 88:11-12.) It is undisputed that Korn gained access to confidential information relating to the LimeWire matter during his time at Cravath.[2] (See Def. Opp. at 5 ("Defendants do not dispute that Korn had access to confidential information when he worked at Cravath.")

In September 2007, Korn joined Willkie as an associate. (KD Ex. G.) Korn took no documents concerning the LimeWire case with him from Cravath. (Netzer Decl. Ex. 1 at 94:25-95:9.) When Korn began working at Willkie, he listed over forty matters on a conflict sheet, including the LimeWire matter. (KD Ex. G.) Willkie did not enter Korn's LimeWire conflict into its conflicts database. (KD. Ex. E at 35:4-36:11.) Korn testified that, after joining Willkie, he had lunch with the Cravath partner in charge of the LimeWire matter on two occasions. (KD Ex. D at 54:17-55:16.) Korn testified that, although they discussed the status of the LimeWire litigation, they did not discuss anything substantive about the case. (KD Ex. D at 55:5-56:4.)

B.   October 2008: Willkie Approached to Represent Defendants in the LimeWire Matter

On October 8, 2008, William Ried, a lawyer at Willkie, circulated an email, stating, "we have been asked to represent [the LimeWire Defendants] in defending copyright litigation brought by [Plaintiffs]." (KD Ex. I, at 2.) Another lawyer replied to Ried, stating, "Jeff Korn

---

[2] Korn, who billed hundreds of hours to the LimeWire matter, was involved in multiple facets of the case. He (1) drafted Plaintiffs' motion to dismiss Defendants' antitrust counterclaims; (2) oversaw the collection, review, and production of documents; (3) drafted a preliminary outline for the summary judgment motion; (4) worked and communicated with Plaintiffs' experts; and (5) communicated with Defendants' counsel on discovery. (Pariser Decl. ¶¶ 3-5.)

had a significant relationship with a Lime Wire litigation," and copied Korn on the email.  (Id.)

Korn then responded to the email, stating:

> Cravath represents the record companies in this litigation.  Before I left Cravath in
> September 2007, I spent almost a year as the senior associate on this case.  Charles Baker
> and Joe Cohen (current counsel to Lime Wire) will remember me.  Strange timing – I was
> just discussing the case last night with Katherine Forrest [Cravath partner on the matter].

(KD Ex. H, at 1.)  Korn testified that he could not recall anything about the episode beyond his

own email.  (KD Ex. D at 63:9-64:2.)  Following the receipt of Korn's email, Willkie still did

enter Korn's LimeWire conflict into its conflicts database.  (KD Ex. E at 55:17-56:16.)  Ried

forwarded Korn's email to Francis Menton, chair of Willkie's "Conflicts and Ethics Committee."

Ried and Menton exchanged a series of emails that have been redacted based on claims of

privilege and work product.  (KD Ex. I.)  Willkie did not undertake the representation of the

Limewire Defendants in 2008.[3]

C.    May-July 2010: Willkie Represents Tower in the LimeWire Matter

In late May 2010, after the Court issued its summary judgment ruling finding Defendants

liable for secondary copyright infringement, Sandy Choi, General Counsel to Tower Research

Capital ("Tower"),[4] contacted Tariq Mundiya, a partner at Willkie, about representing Tower in

---

[3] Plaintiffs assert that the "inescapable inferences are that Willkie recognized that (a) it had a
conflict because of Korn's prior representation of Plaintiffs and (b) Willkie could not cure that
conflict consistent with the ethical rules."  (Pl. Mem. at 7.)  Jeffrey Farmer, Vice President of
Legal Affairs for LimeWire, states that Defendants did not hire Willkie in 2008 because
Defendants were looking for a law firm to take a single deposition, and decided to go with a
smaller law firm for that limited purpose.  (Farmer Decl. ¶¶ 11, 12.)

[4] Tower is the "hedge fund" managed by Mark Gorton, who is also the founder of LimeWire.
(KD Ex. M at § 8.1.)  Tower is part of the "financial and technology companies collectively
known as the Lime Group."  (KD Ex. L.)  Although the Lime Group is a named defendant in the
LimeWire litigation, Tower is not.

the "Limewire Litigation."[5]  (KD Ex. F at 11:12-13:23; Ex O; Ex. R.)  Tower was concerned

about how Plaintiffs' motion to freeze assets, filed against the LimeWire Defendants, would

impact Tower.  (KD Ex. F. at 21:10-22:18.)  In early June 2010, Willkie undertook the

representation of Tower in relation to the LimeWire Matter (hereinafter the "Tower/ LimeWire

Matter").[6]  Mundiya testified that, in early June 2010, he told Korn "that [he] … was monitoring

litigation involving an intellectual property dispute concerning Lime Wire."  (KD Ex. F at 17:6-

10.)  Korn testified that he then told Mundiya that he was the senior associate on the LimeWire

case during his time at Cravath.  (KD Ex. D at 88:11-13.)  Korn testified that he discussed with

Mundiya at a "high level of generality" the nature of the work he did on the case, specifically,

that he was involved in the formulation of the fraudulent conveyance and antitrust claims.  (KD

Ex. D at 88:14-24; KD Ex. F at 17:22-18:5.)  Mundiya and Korn then agreed not to discuss the

matter further, and Mundiya instructed Korn not to share confidential information about the

LimeWire case with anyone at Willkie.  (Korn Decl. ¶ 22; Mundiya Decl. ¶¶ 7-8; 11.)

Mundiya testified that, in early June 2010,  he also "informed [associate] Todd Cosenza

who was really the only principal person working on the [Tower] matter with [him] that he

shouldn't talk to Jeff Korn." (KD Ex. F at 32:7-14; 33:7-10.)  On June 18, 2010, Willkie

submitted a new matter form for the Tower/ LimeWire Matter.  (KD Ex. R.)  The form has a box

asking whether there are any conflict concerns.  Notwithstanding that the firm was aware of a

Korn's LimeWire conflict, the box is checked "no."  (Id.)

---

[5] Willkie has been representing Tower since 2008.  (KD Ex E. at 52: 12-16.)

[6] Another law firm represented Defendants in relation to Plaintiffs' motion to freeze assets.
Willkie represented Tower in relation to that motion.  In a series of telephone calls with
Plaintiffs' counsel throughout June 2010, Willkie agreed to a form of an asset-freeze order that
did not adversely impact Tower.  (Cosenza Decl. ¶ 10.)

On July 1, 2010, one month after being approached by Tower about the Tower/LimeWire matter, Willkie circulated an internal firm-wide email asking attorneys to comment on possible conflicts related to the Tower/ LimeWire Matter.  (KD Ex. U at 7.)  Korn responded, stating that, "[a]s [I] mentioned to Tariq Mundiya, I previously represented Plaintiffs in the Limewire litigation."  (Id. at 1.)  In response, Mundiya wrote, "we will have to have a wall placed so that Mr. Korn is not involved in the matter."  (Id.)

On July 21, 2010, almost three weeks later (and approximately seven weeks after being approached about the Tower/LimeWire Matter), Willkie's records manager sent Mundiya an email stating: "Just a reminder that I'm expecting a memo from you to wall off Jeff Korn (I believe) from a client/matter (possibly Tower), but I haven't gotten it yet."  (KD Dec. Ex. S.)  Mundiya responded, asking that Korn be blocked from "all matters" for Tower.  (Id.)  The next day, Willkie implemented an electronic wall and a screen of hard copy documents to block Korn's access to any Tower or LimeWire documents.[7]  (Id.)  However, Willkie did not circulate a screening memo to any attorneys in July or August of 2010.

D.      Late July-September 2010: Willkie Represents Defendants in the LimeWire Matter

In late July of 2010, Mundiya recognized that Willkie might be retained to represent Defendants in the LimeWire matter.  Mundiya consulted Menton to evaluate the potential imputation of Korn's conflict to Willkie.  (Munidya Decl. ¶¶ 19-20.)  To assist in that evaluation, Mundiya spoke again with Korn in late July or early August about the scope of Korn's work on

---

[7] Notwithstanding the electronic wall, a public folder regarding LimeWire became visible on Korn's computer.  On October 1, 2010, Korn emailed Mundiya stating, "I just noticed that there is a public folder [on the computer] for Limewire that is visible to me.  I have not tried to open it. Please confirm that my access is blocked."  (KD Ex. V.)  Defendants have submitted a declaration stating that, although the folder was visible to Korn, the documents within that folder remained inaccessible to him.  (Menton Decl. ¶ 11.)

the LimeWire matter during his time at Cravath.  (Netzer Decl. Ex. 2 at 40:3-24.)  Korn told

Mundiya that, although he could recall the <u>types</u> of things he had worked on, he was unable to

recall anything of substance about his work on the matter.  (Korn Decl. ¶¶ 27-28.)

On August 27, 2010, Willkie submitted a new matter form to "represent all defendants at

trial" in the LimeWire matter.  (KD Ex. W.)  Notwithstanding Willkie's knowledge of Korn's

LimeWire conflict, this new matter form states that there are no conflict concerns.  (<u>Id.</u>)

On September 1, 2010, approximately three months after Willkie began representing

Tower, Willkie's Conflicts Department submitted a firm-wide notice stating that Willkie would

be representing the LimeWire Defendants.  (Netzer Decl. Ex. 11.)  Korn responded, stating, "I

have observed, and will continue to observe, [the] restrictions."  (<u>Id.</u>)

On September 3, 2010, Willkie circulated a written conflict memo to certain attorneys.

(KD Ex. T.)  The memo was drafted by Mundiya, and purports to offer a "reminder" of the

screen in place between "anyone working on Tower or Gorton matters and Jeff Korn."  (<u>Id.</u>)  The

memo states that, "[t]o date, Mr. Korn has been walled off from all matters involving the Lime

Wire litigation and no communications concerning the substance of the litigation have occurred

with Mr. Korn."  (<u>Id.</u>)  The memo instructs recipients that no communications regarding "all

Tower matters" should be conducted around Mr. Korn.  (<u>Id.</u>)  Munidiya's memo was sent only to

those lawyers who had worked on the LimeWire or the Tower/LimeWire matter within the

preceding year.  It was not sent to the entire Willkie law firm.  (KD Ex. V.)  On September 7,

2010, Korn met with Menton to discuss the ethical screen.  (Korn Decl. ¶ 31.)

     E.     <u>The Motion to Disqualify</u>

Plaintiffs state that they first learned about Korn and the conflict in early December 2010.[8]  (See Pl. Letter Dec. 10, 2010.)  After conducting discovery on the matter, Plaintiffs filed a motion to disqualify on January 14, 2011.  (Dckt Entry No. 404.)  Notwithstanding Willkie's assertion that Korn has been "screened" off of the LimeWire matter since the moment Willkie began its involvement in the matter, and that no client confidences have been shared, Plaintiffs contend that Willkie did not implement a screen soon enough, and that, as implemented, the screen is ineffective.  Plaintiffs contend that disqualification is necessary because "[n]o other remedy will guarantee that Plaintiffs' confidential information will not be passed to Defendants." (Pl. Mem. at 1.)  On February 18, 2011, the Court held oral argument on the motion.

## II.    Discussion

### A.    Legal Standards

The authority of federal courts "to disqualify attorneys derives from their inherent power to 'preserve the integrity of the adversary process.'"  Hempstead Video, Inc. v. Inc. Vill. of Valley Stream, 409 F.3d 127,132 (2d Cir. 2005) (citing Bd. of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979).   In evaluating motions to disqualify, a court must "balances 'a client's right freely to choose his counsel' against 'the need to maintain the highest standards of the profession.'"  Id.  (quotations and citations omitted).

"Disqualification is only warranted in the rare circumstance where an attorney's conduct 'poses a significant risk of trial taint'" Decker v. Nagel Rice LLC, 716 F. Supp. 2d 228, 231

---

[8] Francis Menton, chair of Willkie's "Conflicts and Ethics Committee," testified that, although Willkie informed Defendants about the Korn conflict, Willkie decided not to tell Plaintiffs about the conflict.  (KD Ex. E at 83:1-85:9.)  Defendants invoke privilege with regard to the reasons why they chose not to disclose the conflict to Plaintiffs.  Plaintiffs assert that "the obvious inference . . . is that Willkie or its clients (or both) did not want Plaintiffs to be apprised of the conflict for fear that they would object and Willkie would not get the representation."  (Pl. Mem. at 15.)

(S.D.N.Y. 2010) (citing Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748 (2d Cir. 1981). See also Nyquist, 590 F.2d at 1246 (finding that a court should be hesitant to disqualify counsel unless it believes that "an attorney's conduct tends to taint the underlying trial"). "One recognized form of [trial] taint arises when an attorney places himself in a position where he could use a client's privileged information against that client." Hempstead Video, 409 F.3d at 133. One such situation, known as "successive representation," occurs where:

1. the moving party is a former client of the adverse party's counsel;
2. there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
3. the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

Id. (citing Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir.1983)).  In that situation, "conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences."   Id. (emphasis added).

However, in Hempstead Video, the Second Circuit joined other circuits in holding that "the presumption of confidence sharing within a firm [can] . . . be rebutted."  Id.  The Court held that there is "no categorical rule against considering practices and structures that protect client confidences within a firm in determining whether an attorney or firm should be disqualified."  Id. at 137; id. at 138 ("We see no reason why, in appropriate cases and on convincing facts, isolation—whether it results from the intentional construction of a [screen] . . . or from *de facto* separation that effectively protects against any sharing of confidential information—cannot adequately protect against taint.")  The Second Circuit instructed district courts to "inquire on the facts of the case before them whether the practices and structures in place are sufficient to avoid disqualifying taint."  Id. at 137.

"District courts have broad discretion to disqualify attorneys, but it is a 'drastic measure' that is viewed with disfavor in this Circuit."  Ritchie v. Gano, No. 07 Civ. 7269, 2008 WL 4178152, at *2 (S.D.N.Y. Sept. 8, 2008).  In particular, "[m]otions to disqualify based on an attorney's prior representation of a now adverse client are generally disfavored in this Circuit." Intelli-Check, Inc. v. Tricom Card Techs., Inc., 03cv3706, 2008 WL 4682433, at * 3 (E.D.N.Y. Oct. 21, 2008) (citing Papyrus Tech. Corp. v. New York Stock Exch., Inc., 325 F. Supp. 2d 270, 275-76 (S.D.N.Y. 2004) (emphasis added).  This is because such motions "are often tactically motivated, cause undue delay, add expense, and have 'an immediate adverse effect on the client by separating him from counsel of his choice.'"  D.R.T., Inc. v. Universal City Studios, Inc., No. 02 Civ. 0958, 2003 WL 1948798, at *2 (S.D.N.Y. Apr. 24, 2003) (citing Nyquist, 590 F.2d at 1246.)  For these reasons, "the Second Circuit has directed that courts faced with disqualification motions take a 'restrained approach that focuses primarily on preserving the integrity of the trial process.'"  Papyrus, 325 F. Supp. 2d at 276 (citations omitted).  "Although any doubts are to be resolved in favor of disqualification, the party seeking disqualification bears a heavy burden of demonstrating that disqualification is necessary."  Decker, 716 F. Supp. 2d at 231-32 (citing Murray v. Metro. Life Ins. Co., 583 F.3d 173, 178 (2d Cir. 2009) (emphasis added).

     **B.**    **Application**

There is no dispute (1) that Korn acquired confidential information in his representation of Plaintiffs during his time at Cravath; and (2) that Korn is now associated with Willkie, a firm that is representing the opposing side of the very active LimeWire matter.  (See Def. Opp. at 12 ("Defendants do not dispute that Korn had access to confidential information . . . .").)

Accordingly, there is a "presumption of confidence sharing" within Willkie. [9] Hempstead Video,

409 F.3d at 133.  The Court must thus determine whether the presumption of shared confidences

has been rebutted.  Id.

The Court finds that the presumption has been rebutted, because "there are no facts from

which it may be inferred" that Willkie has obtained confidential information, In re Methyl

Tertiary Butyl Ether ("MTBE") Products Liability Litig.,438 F. Supp. 2d 305, 309 (S.D.N.Y.

2006), and thus, there is no real risk that the trial will be tainted.  See Revise Clothing, Inc. v.

Joe's Jeans Subsidiary, Inc., 687 F. Supp. 2d 381, 388 (S.D.N.Y. 2010) ("[T]he motion [to

disqualify] will be granted only if the facts present a real risk that the trial will be tainted.")

(citing United States Football League v. Nat'l Football League, 605 F. Supp. 1448, 1452

(S.D.N.Y. 1985).

The Court recognizes that, in disqualification decisions, the Second Circuit has

emphasized the importance of screening procedures, and the importance of evaluating whether

those procedures were timely and effectively implemented by the law firm.  See Panebianco v.

First Unum Life Ins. Co., No. 04 Civ. 9331, 2005 WL 975835, at *3 (S.D.N.Y. April 27, 2005).

As a technical matter, Willkie's screening procedures were imperfect.  First, Willkie repeatedly

failed to enter Korn's LimeWire conflict into its conflicts database, as the firm says should have

happened.  (KD. Ex. E at 35:4-36:11; 55:17-56:16.)  Second, after undertaking representation of

Tower in LimeWire matter, Willkie waited approximately seven weeks to implement an

---

[9] Defendants assert that the "factual and legal issues" that were central to the LimeWire matter
during the time that Korn worked on it at Cravath have changed, and so the confidential
information that Korn received is irrelevant to the remaining issues at trial.  (Def. Opp. at 16-17.)
Simply put, that contention is false.  Korn testified that he told  Mundiya that he worked on the
fraudulent conveyance claim during his time at Cravath.  (KD Ex. D at 88:20-24.)  That claim
will be at issue in the upcoming trial, scheduled for May 2, 2010.

electronic screen, and approximately three months to circulate an internal screening

memorandum.  (KD Exs. S&T.)  Defendants argue that a screen was in place from "the get go"

because, in early June 2010, Mundiya informed Cosenza that he should not communicate with

talk to Jeff Korn."  (KD Ex. F at 32:7-14; 33:7-10.)  However, Cosenza testified that four other

Willkie lawyers were working on Tower/LimeWire Matter.  Cosenza also testified that he told

those four lawyers that they should not discuss the case with Korn, but he did not do so with at

least one of those lawyers until the end of August. [10]  (KD Ex. C. at 18:14-22:12.)  Last, when

finally implemented, Willkie's screening procedures were, to some extent, flawed.  First, the

screening memo drafted by Mundiya was sent only to those lawyers who had worked on the

LimeWire or the Tower/LimeWire matter within the preceding year; it was not sent to the entire

firm.[11]  (KD Ex. V.)  Second, Korn was still able to view an electronic LimeWire folder icon on

his computer months after the electronic wall was purportedly put in place, although he was not

able to view any documents contained within that folder.  (KD Ex. V; Menton Decl. ¶ 11.)

Notwithstanding these shortcomings, the Court finds that disqualification is not

warranted, because there is no "real risk that the trial will be tainted."  Revise Clothing, 687 F.

Supp. 2d at 388.  Multiple factors merit the Court's denial of Plaintiffs' motion.

---

[10] Recognizing their tardiness in implementing formal screening measures, Defendants make the
surprising contention that Tower was not adverse to Plaintiffs, and that therefore, Willkie was
not representing a party adverse to Plaintiffs until late August 2010, when it started representing
Defendants.  (See Def. Opp. at 7.)  The Court emphatically rejects that contention, which is flatly
contradicted by numerous facts.  Mundiya himself testified that, for purposes of the Tower
conflict check, Willkie treated the Plaintiffs in the LimeWire litigation as adverse parties.  (KD
Ex. F at 31:3-8.)  Moreover, Mundiya contends that Willkie screened Korn off immediately
when it commenced its representation of Tower.  (KD Ex. F at 32:7-14; 33:7-10.)  If Plaintiffs
were not adverse to Tower, there would have been no need to do so.

[11] As a result, a lawyer not working on the LimeWire matter who talked to a lawyer working on
the LimeWire matter may not have been instructed to refrain from later speaking to Korn about
what he or she learned during that conversation.

First, Defendants have submitted a declaration from Korn attesting to the fact that he has never disclosed Plaintiffs' confidential information to anyone.  (Korn Decl. ¶¶ 23; 32-40.)  The Court asked Plaintiffs' counsel whether they challenge the truth of any of the statements in Korn's declaration; Plaintiffs' counsel responded no.  (February 16, 2010 Telephone Conference with the Court.)  Plaintiffs have also submitted (1) declarations from every member of Willkie's LimeWire team who has billed 50 hours or more to the LimeWire matter attesting to the fact that Korn has not disclosed confidential information to them; and (2) a declaration from Menton attesting to the fact that he has confirmed with every other member of the LimeWire team that Korn has never disclosed confidential information to them.[12]  (Menton Decl. Ex. 1; Menton Decl. ¶ 14.)

---

[12] Plaintiffs note that Korn "has had several communications about the [LimeWire] case with core members of the LimeWire team."  (Pl. Reply Mem. at 10.)  First, Korn and Mundiya discussed the topic of LimeWire.  Korn testified that, in June 2010, he discussed with Mundiya at a "high level of generality" the nature of the work he did on the LimeWire matter.  (KD Ex. D at 88:14-24; KD Ex. F at 17:22-18:5.)  Mundiya and Korn then agreed not to discuss the matter further, and Mundiya instructed Korn not to share confidential information about the LimeWire case with anyone at Willkie.  (Korn Decl. ¶ 22; Mundiya Decl. ¶¶ 7-8; 11.)  Korn and Mundiya spoke again in late July or August about the scope of Korn's work during his time at Cravath.  (Netzer Decl. Ex. 2 at 40:3-24.)  Korn told Mundiya that, although he could recall the types of things he had worked on, he was unable to recall anything of substance about his work on the matter.  (Korn Decl. ¶¶ 27-28.)  Second, Korn recalls Mundiya telling him that the trial date had been pushed back.  (KD Ex. D. at 163:3-7.)  Third, Korn testified that, in August 2010, Cosenza told him that he had attended a mediation for the LimeWire matter. (KD Ex. D. at 101:9-15.)  Plaintiffs assert that the fact that a mediation had occurred was confidential by explicit agreement.  (Pl. Mem. at 10.).  However, the mediation agreement, governed by California law, does not state that the fact of mediation is confidential, and California Evidence Code § 1120(b)(3) expressly contemplates disclosure of the "fact that a mediator has served."  Fourth, Korn testified that four lawyers told him that they were working on the LimeWire matter, and that he had to remind those lawyers that he was "on the other side of an ethical wall."  (KD Ex. D at 20:4-23:14.)  Finally, a Willkie work coordinator partner once forwarded Korn an email from an associate assigned to LimeWire, stating "Gorton/Limewire, need to check in with team, as I've been out of the office, but I expect to continue receiving miscellaneous factual/legal research tasks."  (KD Ex. X.)  The Court finds that each of these conversations contain nothing more than a reference to the <u>topic</u> of the LimeWire matter.  There is no evidence that client confidences were shared in any of these conversations.

Plaintiffs urge the Court to reject those declarations, asserting that "courts repeatedly have rejected [reliance on] affidavits in precisely these circumstances—where the conflicted attorney and attorneys working on the case are in day-to-day contact." [13] (Pl. Reply Mem. at 13; Pl. Mem. 22 n. 14.)  However, the Second Circuit has implicitly approved the use of attorney affidavits in a court's evaluation of disqualification motions.  See Hempstead, 409 F.3d at 137 (finding that "uncontroverted affidavits" filed by attorneys, in addition to screening, "successfully rebut the presumption" of shared confidences with the firm); see also Papyrus, 325 F. Supp. 2d at 279 ("[A] party may attempt to rebut the presumption of shared knowledge through affidavits setting-forth the tainted attorney's recollection of any confidential information and whether the attorney shared such information with co-workers").

Second, Defendants are not relying solely on attorney affidavits, but are also relying on electronic audits showing that Korn has never accessed any LimeWire documents.  Specifically, Defendants have submitted a declaration stating that Willkie has audited all documents ever created in Willkie's document management system under either the Tower/LimeWire matter or the LimeWire matter.  (Menton Decl. ¶ 12.)  The resulting report from the audit shows every user who has ever accessed any version of those documents.  Korn is not listed included in that report. (Id.)

Third, Willkie is a large law firm, with more than 600 lawyers worldwide, more than 200 lawyers in its litigation department, and approximately 136 litigation lawyers in its New York office.  (Korn Decl. ¶ 6.)  Willkie's large size makes the risk of inadvertent disclosures of

---

[13] Plaintiffs cite to Papanicalaou v. Chase Manhattan Bank, N.A., 720 F. Supp. 1080, 1086 (S.D.N.Y. 1989), in which the court explicitly rejected "the sworn word of an infected attorney . . . that there was no cross pollination."  Not only was this decision issued before Hempstead, but this case did not involve an attorney's disqualification based on a prior representation.  Rather, it concerned disqualification resulting from an attorney's *ex parte* communications with his adversary's client.  Id. at 1081-82.

confidences less likely.  See Intelli-Check, 2008 WL 4682433, at * 5 (noting that, among other

factors, the law firm's size of approximately 420 attorneys "makes inadvertent disclosures

unlikely").  See also Filippi v. Elmont Union Free School Dist. Bd. of Educ., 722 F. Supp. 2d

295, 302, 307-308 (E.D.N.Y. 2010) (noting that the disqualified law firm is "a small firm" and

that "the presumption that client confidences are shared within a firm . . . is much stronger within

a small firm than a large firm."); Crudele v. N.Y. City Police Dep't, 2001 WL 1033539, at *4

(S.D.N.Y. Sept. 7, 2001) ("This Court likewise concludes that the danger of inadvertent

disclosure and the appearance of impropriety is sufficiently present here so as to require

disqualification.  [The law firm] . . . is comprised of only 15 lawyers.").[14]

Finally, approximately 32 months has elapsed between Korn's last day at Cravath in

August 2007, and late May 2010, when Willkie undertook representation of Tower in the

Tower/LimeWire matter.  During that time, Korn's recollection of any confidential information

has naturally diminished.  When Korn was speaking to Mundiya in July or August of 2010 about

the scope of his work on the LimeWire matter, for the purpose of assessing the conflict, he told

Mundiya that he "did not recall anything of substance" about his work on the case.  (Korn Decl.

¶ 28.)  Korn continues to state that, although he recalls working the antitrust and fraudulent

---

[14] Faced with the fact that Willkie is a large, international law firm with hundreds of attorneys,
Plaintiffs assert that the principles that apply to cases involving small law firms "apply equally to
a small group of attorneys who practice with one another within a larger law firm."  (Pl. Mem. at
21.)  Plaintiffs present evidence showing that Korn has billed more than 1,700 hours to matters
that involve lawyers who also work on the LimeWire matter, and has worked with 19 of the 40
individuals who were included on the LimeWire screening memorandum. (KD Ex. Q.; KD Ex. D
at 147:16-149:1.)  The Court rejects Plaintiffs attempt to analogize Willkie's litigation
department, with over 200 attorneys, to a small law firm.  The reality of a large law firm like
Willkie is that Korn, a partner, must continue to work on other matters with those attorneys
assigned to a matter as large as the LimeWire one.  The Court cannot ignore this reality, and
finds Korn's testimony that no client confidences have been shared to be credible.

conveyance elements of the LimeWire matter, he does not "recall the specifics of any of this work."[15]  (Korn Decl. ¶ 13.)

Despite all of these factors—most significantly, Korn's statement that he has not shared confidences, which Plaintiffs have stated they do not contest—Plaintiffs suggest that the Court must nevertheless disqualify Wilkkie as a matter of law.  First, Plaintiffs emphasize the "appreciable role" that Korn played in the LimeWire matter during his time at Cravath, and argue that that fact alone mandates disqualification.  It is true that one court in this circuit has held that "when an associate has played an 'appreciable role' in representing an adversary in the same matter, a screen will, as a matter of law, fail to rebut the presumption of shared confidences or secrets." Papyrus Technology Corp, 325 F.Supp.2d at 279.  However, that decision was issued before Hempstead, and represents the kind of per se rule that the Second Circuit rejected in Hempstead.  See Hempsetad, 409 F.3d at 135 ("A per se rule has the virtue of clarity, but in achieving clarity, it ignores the caution that when dealing with ethical principles, we cannot paint with broad strokes. The lines are fine and must be so marked.") (internal citations, alterations, and quotations omitted).  Indeed, a district court has since concluded that the imputation of disqualification was not warranted, notwithstanding the "appreciable role" that the conflicted attorney may have played in the prior representation.  See Intelli-Check, 2008 WL 4682433, at *4 ("The court declines to attach importance to such labels [as "appreciable role"].)

---

[15] In arguing that Korn's recollection of the LimeWire matter has not diminished, Plaintiffs direct the Court to Korn's testimony where he states that he continues to (1) communicate with the partner in charge of the LimeWire matter at Cravath; and (2) check the electronic docket for the LimeWire matter.  (KD Ex. D at 54:17-55:16; 162:6-23.)  However, Korn testified that he met with the Cravath partner on only two occasions, and that, although they discussed the status of the LimeWire litigation, they did not discuss anything substantive about the case.  (KD Ex. D at 55:5-56:4; 56:10-22.)  Korn has checked the electronic docket, which is public, on only three occasions since leaving Cravath in 2007.  (KD Ex. D at 55:23-56:9; 162:9-18.)

Second, Plaintiffs suggest that Willkie's delay in implementing the screen is fatal, because courts have held that "screening measures must have been established from the first moment . . . when the firm received actual notice of the conflict." Chinese Automobile Distris. of Am. LLC v. Bricklin, 07 Civ. 4113, 2009 WL 47337, at *4 (S.D.N.Y. Jan. 8, 2009). However, district courts have denied motions to disqualify notwithstanding the delay in implementing screening measures. See Intelli-Check, 2008 WL 4682433, at *5 ("The risk of taint from this minimal delay does not outweigh the risk of harm to Defendants in losing their counsel."). Moreover, in making this contention, Plaintiffs are again advocating the use of "per se" rules that the court in Hempstead explicitly rejected. See Hempstead, 409 F.3d at 135.

The Willkie firm's screening procedures appear to have been sub-standard. However, when evaluating a motion to disqualify, it is the Court's job to assess whether an attorney's conflict actually "poses a significant risk of trial taint." Decker, 716 F. Supp. 2d at 231. The Court is confident that Korn's conflict has not tainted, and will not taint, the upcoming trial. The conflict has existed for over two years, and Korn states that he has not disclosed any confidential information during those years, testimony that is not challenged. The risk that now—two years later, and with the heightened awareness of conflict issues going forward—there will be inadvertent disclosures is unlikely, particularly in view of the instant motion's focus on the issue. Given the "lack of a meaningful showing that the trial process here will be tainted in any way," and the significant hardship that disqualification would place on Defendants, Plaintiffs' motion must be denied. Reilly v. Computer Associates Long-Term Disability Plan, 423 F. Supp. 2d 5, 13 (E.D.N.Y. 2006). See also Hartford Accident & Indem. v. RJR Nabisco, Inc., 721 F. Supp. 534, 541 (S.D.N.Y.1989) (recognizing that, because attorneys frequently change firms, any per se imputation would increase the "number of disqualification motions, born of little more than

hardball litigation strategy sessions and advanced where there is no threat of actual prejudice");

MTBE Products Liability Litig., 438 F. Supp. 2d at 309-10 ("Considering the strong public

policy to allow persons to retain counsel of their choice and the need to avoid causing severe

prejudice to the client, who would have to secure new counsel to deal with somewhat complex

litigation with the accompanying increased expense and loss of time disqualification is not

warranted.") (internal quotations omitted).  Plaintiffs' motion to disqualify Willkie is hereby

denied.

SO ORDERED.

Dated: New York, New York
      February 18, 2011

                                     Kimba M. Wood
                                     United States District Judge