UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARISTA RECORDS LLC; ATLANTIC RECORDING CORPORATION; ARISTA MUSIC, fka BMG MUSIC; CAPITOL RECORDS, LLC fka CAPITOL RECORDS, INC.; ELEKTRA ENTERTAINMENT GROUP INC.; INTERSCOPE RECORDS; LAFACE RECORDS LLC; MOTOWN RECORD COMPANY, L.P.; PRIORITY RECORDS LLC; SONY MUSIC ENTERTAINMENT, fka SONY BMG MUSIC ENTERTAINMENT; UMG RECORDINGS, INC.; VIRGIN RECORDS AMERICA, INC.; and WARNER BROS. RECORDS INC., <br><br> Plaintiffs, <br><br> v. <br><br> LIME WIRE LLC; LIME GROUP LLC; MARK GORTON; and M.J.G. LIME WIRE FAMILY LIMITED PARTNERSHIP, <br><br> Defendants. | 06 Civ. 05936 (KMW) <br> ECF CASE |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO PRECLUDE CERTAIN PURPORTED EXPERT TESTIMONY BY ARAM SINNREICH**

Glenn D. Pomerantz *(pro hac vice)*
Kelly M. Klaus (pro hac vice)
Blanca F. Young
Melinda E. LeMoine
Susan T. Boyd *(pro hac vice)*
Jonathan H. Blavin *(pro hac vice)*
Munger, Tolles & Olson LLP
355 South Grand Avenue
Los Angeles, CA 90071
(213) 683-9100
Attorneys for Plaintiffs

Date: March 2, 2011

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 3

III.  ARGUMENT ..................................................................................................... 5

    A.   Legal Standard ........................................................................................ 5

    B.   Sinnreich's Causation Testimony Should Be Excluded ......................... 5

        1.   Sinnreich is Not Qualified to Offer an Opinion About Causation ............ 5

        2.   Sinnreich's Causation Testimony is Not Reliable ..................................... 9

            a.   Sinnreich's Analysis Does Not Employ An Appropriate
                Level of Intellectual Rigor ............................................................. 9

            b.   The Analytical Gaps in Sinnreich's Testimony Render it
                Unreliable ..................................................................................... 10

            c.   Sinnreich's Explanations For The Decline In Music Sales
                and Revenues Is Speculation And Conjecture ............................ 11

    C.   Sinnreich Should Be Precluded From Offering Irrelevant, Prejudicial
        Testimony That Does Not Assist the Trier of Fact ............................... 13

        1.   Testimony About Sources of Revenue Unrelated to File Sharing is
            Irrelevant and Prejudicial ................................................................ 13

        2.   Sinnreich's Testimony That Non-Parties Believe File Sharing is
            Good and the Record Labels Are Bad is Irrelevant and Prejudicial ........ 14

        3.   Sinnreich Encourages The Jury To Nullify The Law By Opining
            That There Are More Effective Ways to Solve Plaintiffs' Problems
            Than Awarding Damages ................................................................. 17

IV.   CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Bryant v. Media Right Productions, Inc.*,
603 F.3d 135 (2d Cir. 2010)................................................................2, 18

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).......................................................... passim

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)................................................................9

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007).........................................6

*Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.*,
518 F. Supp. 2d 1197 (2007) .............................................16, 17

*Stagl v. Delta Air Lines, Inc.*,
117 F.3d 76 (2d Cir. 1997)..........................................................6

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991).....................................................19

*United States v. Duncan*,
42 F.3d 97 (2d Cir. 1994) .........................................................19

*United States v. Tin Yat Chin*,
371 F.3d 31 (2d Cir. 2004)..........................................................6

*Zaremba v. GMC*,
360 F.3d 355 (2d Cir. 2004)........................................................5

**FEDERAL RULES**

Fed. R. Evid. 403 ...............................................................1, 13, 14

Fed. R. Evid. 702 ...................................................... passim

Fed. R. Evid. 703 ...............................................................1

**TREATISES**

4. J. Weinstein & M. Berger, Weinstein's Federal Evidence § 702.03[2][a] (J.
McLaughlin ed., 2d ed. 2010).................................................19

## I.    __INTRODUCTION__

Plaintiffs move to preclude testimony by Aram Sinnreich, whom Defendants offer in support of their damages case.  Although he admittedly lacks expertise in economics, Sinnreich proposes to testify that both LimeWire and file sharing generally have had a *net positive* effect on music sales and revenues, and that the tremendous decline in sales and revenues the music industry has experienced over the past decade is due entirely to other causes.  He also proposes to testify about a host of issues that are plainly irrelevant to damages and will serve only to prejudice and confuse the jury.  Sinnreich's proposed testimony fails in every respect to meet the requirements for the admissibility of expert testimony under Rules 702, 703, and 403[1]: he is not qualified to offer his opinions; his opinions are not reliable; they are speculative; they are largely irrelevant; and they are duplicative.[2]

*__Sinnreich should be precluded from offering testimony about causation.__*  The central opinion Sinnreich proposes to offer is that Plaintiffs' losses were not caused by LimeWire but instead by other factors.[3]  This opinion should be excluded.  *First, Sinnreich is unqualified to testify about the market effects of file sharing or other variables.*  Sinnreich is a journalism and media studies professor who studies the music industry.  He is not an economist, and he is not qualified to evaluate what caused music sales and revenues to decline.

*Second, Sinnreich's causation analysis is unreliable.*  In arguing that file sharing had a net positive effect, Sinnreich looked only at evidence that supported what he wanted to prove,

---

[1] Unless otherwise noted, all references to "Rules" are to the Federal Rules of Evidence.
[2] In addition to the matters addressed in this motion, Sinnreich's testimony should be excluded on the grounds discussed in Plaintiffs' Memorandum of Law In Support Of Plaintiffs' Motion To Preclude Defendants' Argument That Other Illegal Services Would Have Induced Infringement Of Plaintiffs' Copyrights If LimeWire Had Not (Dkt. No. 550), and to the extent it is inconsistent with any other motion in limine the Court may grant.
[3] Defendants have disclosed a different expert, George Strong, who purports to testify about the same subject matter. Plaintiffs have separately moved to exclude Strong's testimony.

and relied on outdated findings in unpublished studies.  Additionally, in attempting to argue that factors other than file sharing caused Plaintiffs' losses, Sinnreich failed to control for the impact of file sharing, ignored other variables relevant to causation, and failed to test his theories against the unavoidable fact that the declines experienced by the music industry are unprecedented in their magnitude, have continued for more than a decade, and are a world-wide phenomenon. Moreover, Sinnreich based his opinions on factual claims that have no empirical basis or are nothing more than "guestimates."  The gaping holes in his analysis, and its general lack of intellectual rigor, require the exclusion of his testimony.

### *Sinnreich should also be precluded from offering testimony on irrelevant and prejudicial issues.*

Even though Sinnreich purports to address damages, he offers testimony that has no relevance to that issue.  Seeking to distract the jury from the fact that Defendants intentionally facilitated the theft of Plaintiffs' copyrights on a massive scale, Defendants attempt to introduce testimony through Sinnreich that Plaintiffs have been "unfair" and "unethical" in their dealings with artists; that artists love file sharing; that Plaintiffs are still making money despite the existence of file sharing from a number of revenue streams (regardless of whether those revenue streams have anything to do with file sharing); and that there are more effective ways to solve Plaintiffs' problems than to award damages.  These opinions are plainly irrelevant and improper.  Defendants do not get to avoid damages because there may be "better" ways of solving Plaintiffs' problems, or because an expert thinks that Plaintiffs acted "unfairly" toward a non-party, or because Plaintiffs do not need a damage award to stay in business.  Nor should Defendants be rewarded because certain artists—who own none of the copyrights at issue in the case—believe that file sharing is a good thing.  None of these factors are relevant to the damages analysis. *Bryant v. Media Right Productions, Inc.*, 603 F.3d 135, 144 (2d Cir. 2010).  Sinnreich

should be precluded from inviting the jury to issue an award based on these irrelevant and prejudicial considerations

## II.  <u>BACKGROUND</u>

Aram Sinnreich is a professor of journalism and media studies who has focused his research on the music industry.  LeMoine Decl. Ex. 1 (Jan. 14 2011 Expert Report of Aram Sinnreich at 1 (hereafter "Report").   Sinnreich's report is divided into three general topics.  First, he describes the "structure and history of the music industry in recent decades."  (Report at 4-11).  Second, he purports to testify about the extent to which Plaintiffs have lost (or gained) sales and revenues as a result of illegal file sharing as opposed to other potential causes.  (*Id.* at 12-59).  Finally, he offers opinions on the likely effect of a statutory damages award.  (*Id.* at 60).

It is important to put Sinnreich's proposed testimony in context.  The music industry has experienced an unprecedented decline in sales and revenues over the last decade, which began at the precise moment that file sharing began to attract large numbers of users. (LeMoine Decl. Ex. 2 (Feb. 14 2011 Expert Report of Stanley Liebowitz ¶ 12) (hereafter "Liebowitz Report")).  Sales of recorded music in the U.S. had been going up in the decades prior to the advent of file sharing.  But starting in 1999—the same year file sharing made its debut through Napster—they plummeted into a sustained decline that continues today.  Sound recording trade revenues in the United States, adjusted for inflation, have declined nearly 58% between 1999 and 2009—a decline of over $6.2 *billion* over the last decade.  (Liebowitz Report at ¶ 13 and Table 1).  Per capita unit album sales in the U.S. (including digital singles aggregated in album-equivalents) have declined from a peak of over 5 in 1999 to just over 2 in 2009—lower than 1975 levels.  (*Id.* at ¶ 15 and Figure 1).  Significant declines in revenues and sales since 1999 have also occurred in every one of the ten largest music markets abroad.  (*Id.* at ¶ 13 and Table 1).

Sinnreich opines that the declines in music sales and revenues that have occurred over the last decade are *entirely* attributable to causes other than file sharing.  In fact, Sinnreich opines that LimeWire in particular and file sharing more generally have had a *net positive* effect on Plaintiffs' total revenues. (LeMoine Decl. Ex. 3 (Feb. 11, 2011 Sinnreich Depo. Tr. at 88:7-10; 89:7-16) (hereafter "Depo")).

Sinnreich identifies various factors that he claims are responsible for the losses Plaintiffs have sustained.  If Sinnreich is correct that file sharing has had a net positive effect, this means that the alternative causes he identifies must account for *more than 100%* of the declines described above.  The alternative causes identified by Sinnreich—the impact of which he did not attempt to quantify, either individually or collectively (Depo at 121:2-9; 121:23-131:2; 131:23-132:2; 133:9-18; 151:19-152:4; 162:23-163:22; 173:2-15; 177:3-9; 183:4-9; 193:16-20)—include: changing consumer psychology, an increase in small-scale commercial bootlegging, widespread economic recessions, increased competition for consumer entertainment spending, the bankruptcy of music retailers and declines in shelf space, the end of the "CD replacement cycle", the end of minimum advertised pricing for CDs, "unbundling" of songs, shrinking artist rosters and fewer album releases, and increased competition from used and independently distributed music.  (Report at 12-21).  Additionally, Sinnreich opines that Plaintiffs themselves are largely to blame for the declines they have suffered.  (*Id.* at 49-59).

Sinnreich concludes by opining that no statutory damages award, not even one in the billions of dollars, will have a deterrent effect.  (*Id.* at 60; Depo at 313:10-14; 314:24-315:4).  He opines that the only effect of an award will be to damage Plaintiffs' reputation, and that Plaintiffs would be better off giving "carrots" to infringers rather pursuing the "stick" of damages (Report at 60).

III.   **ARGUMENT**

    A.   **Legal Standard**

The admissibility of expert testimony is governed by Rule 702, which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is a product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 requires that the expert must be *qualified* in the subject areas on which he purports to testify, his testimony must be *reliable* and *based on facts*, not speculation, and his testimony must be *relevant* to the issues in dispute.  *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993).  Defendants bear the burden of establishing by a preponderance of proof that the expert testimony they seek to offer is admissible.  *Zaremba v. GMC*, 360 F.3d 355, 358 (2d Cir. 2004).  They cannot do so here.

    B.   **Sinnreich's Causation Testimony Should Be Excluded**

Sinnreich's causation testimony, offered at Section III of his report, should be excluded on two independent grounds:  (1) As a professor of journalism and media studies with no expertise in economics, Sinnreich is not qualified to conduct an economic analysis about what caused music sales and revenues to decline; (2)  Sinnreich's analysis is unreliable because he fails to employ "reliable principles and methods" and his opinion is premised largely on "guestimates" and speculation, rather than "sufficient facts and data."

       1.   **Sinnreich is Not Qualified to Offer an Opinion About Causation**

Sinnreich has no expertise in economics, and should therefore be disqualified from testifying about what did or did not cause Plaintiffs to lose sales and revenues.

Only a "witness qualified as an expert by knowledge, skill, experience, training or education" may offer expert opinion testimony.  Rule 702.  "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience or skill with the subject matter of the proffered testimony."  *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  "An expert qualified in one subject matter does not thereby become an expert for all purposes.  Testimony on subject matters unrelated to a witness's area of expertise is prohibited by Rule 702."  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007).   The court may also exclude the testimony of an expert whose "expertise is too general or too deficient," even if his or her proffered testimony is relevant to the case.  *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).  Additionally, the court should consider "whether other experts exist who are more specifically qualified and who are nonetheless not in the employ of the company or industry whose practices" are under review.  *Id.*

Sinnreich is a professor of journalism and media studies who has devoted his career "to understanding [the] complex relationships with industry and technology," with a focus on the music industry.  (Report at 2).  Although Sinnreich's expert report lists many areas within the music industry about which he professes to have specialized knowledge, the economics of the music industry is not one of them.  (See Report at 2).  At his deposition, Sinnreich confirmed that he is not qualified as an economist.  (Depo at 23:20-22).  He does not have a degree in economics, and indeed he has never taken a single academic course in which economics was the sole focus.  (Depo at 23:16-19).  Sinnreich was also unable to discuss economic theory, including

basic concepts like elasticity (the sensitivity of demand to price) (Depo at 167:3-6), and the economic theory of bundling, which he addresses in his report. (Depo at 171:25-172:25).

Despite his admitted lack of expertise in economics, Sinnreich purports to provide an economic analysis about the extent to which declines in sales and revenues in the music industry can be explained by file sharing compared to other possible causes.  In particular, Section III of his report, titled "Plaintiffs' losses cannot be substantially attributed to LimeWire," purports to, *inter alia* (1) provide a "simple economic analysis" showing that free downloads are not equivalent to lost sales (Report at 12-13); (2) analyze "several other contributory factors" besides file sharing that purportedly "have had a significant negative impact on the market" (*Id.* at 14-22); (3) discuss empirical studies by economists and other researchers about the impact of file sharing on music sales and revenues (*Id.* at 27-30); and (4) discuss the extent to which file sharing has "spurr[ed] additional revenue streams" that "significantly offset the decreases in album retail revenues over the past decade or two."  (*Id.* at 30-34).

Sinnreich is unqualified to offer these opinions.  Nothing in his training, education, and experience qualifies him to conduct an economic analysis of why music sales and revenues have declined.  Sinnreich may attempt to argue that his experience as a research analyst at Jupiter Research from 1997-2002, and as a consultant on the music industry since, makes him qualified to offer his opinions on causation.  But his research and consulting work has involved forward-looking "strategic consulting," "business development," and "competitive analysis" (Report, Ex. 1), and occasional consumer survey research (Report at 27), not economic analyses of cause and effect.  Sinnreich may well be qualified to offer testimony about the history and structure of the music industry, the rise of new technologies, how the music industry responded to those technologies, and other matters of historical fact.  And he does so in the first section of his

report.  (Report at 4-11).  He also may be qualified to offer opinions about consumer behavior, including how consumers responded to and used new technologies including LimeWire.  But Sinnreich has no specialized knowledge or experience that allows him to analyze the economic effect of file sharing or other variables on Plaintiff's sales and revenues.

Sinnreich has all but admitted as much.   As Sinnreich made clear at his deposition and in his expert report, he did not conduct any independent research about LimeWire's market effects, nor did he set out to analyze empirically the effect that factors other than file sharing had on the declines in music sales and revenues that have occurred over the last decade.  Instead, to support his conclusion that file sharing had a "net positive" effect on the music industry, Sinnreich simply presents "a meta analysis of a range of research" conducted by *other* analysts who have concluded that file sharing has either no effect or a positive effect on music sales, (Depo at 86:9-18; Report at 27-30), while emphasizing that **"*[i]t is neither my role nor my intention to dispute" the conclusions of a number of <u>other</u> studies finding that file sharing has a negative impact on music sales and revenues**.  (Report at 30).  It is not his "role" to dispute the conclusions of these other studies, because he is unqualified to do so.  As Sinnreich conceded at his deposition, he lacked the expertise necessary to assess whether many of the studies he relied on were methodologically sound.  (*Id.* at 95:9-16; 96:6- 25).

Sinnreich's testimony does not assist the jury.  By summarizing the analyses of *other* purported experts, without offering qualified analysis or opinions of his own, Sinnreich is not using his "specialized knowledge" to "assist the trier of fact to understand the evidence or to determine a fact in issue," as required by Rule 702.[4]  His opinions about the extent to which declines in music sales and revenues can be attributed to LimeWire as opposed to other factors,

---

[4] Indeed, as noted above, Sinnreich conceded that he did not independently verify the studies he cites and for many of those studies is unqualified to do so.

as found in Sections III of his report, should be excluded.

## 2.     Sinnreich's Causation Testimony is Not Reliable

Sinnreich's opinion as to the causes of the decline in music sales and revenues should also be excluded because it is not "the product of reliable principles and methods," nor is it based on "sufficient facts or data."  Rule 702.  An expert must apply appropriate reasoning in a reliable manner to reach the conclusions he purports to offer.  *Daubert*, 509 U.S. at 592.  Sinnreich fails this test because (1) he did not "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *see  Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); (2) he failed to control for the impact of file sharing on Plaintiffs' losses, ignored factors relevant to causation, and failed to test his theories against the facts; and (3) his opinions are premised largely on speculation.

### a.     Sinnreich's Analysis Does Not Employ An Appropriate Level of Intellectual Rigor

Sinnreich's analysis is unreliable because it is completely lacking in analytical rigor or integrity.  An expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho*, 526 U.S. at 152.  Sinnreich's analysis falls woefully short of this mark.

As noted above, Sinnreich purports to conduct a "meta-analysis" of studies addressing the impact of file sharing on music sales and revenues, (Report at 27-30), but admitted at his deposition that his analysis was one-sided and driven by the conclusion he wanted to reach.  As Sinnreich acknowledged, there are "somewhere on the order of ten" studies concluding that file sharing has a negative effect on sales.  (Depo at 100:24-101:9).  Yet the only studies that

Sinnreich actually reviewed, and the only ones he summarized in his report, are studies finding that file sharing either had no impact or a positive impact on music sales.  Sinnreich "did not take the time to examine" the studies finding a negative impact on sales because his objective "in preparing this report was to say whether there was credible evidence that file sharing had beneficial market effects." (*Id.* at 100:24-101:21).  In other words, he looked only at evidence that supported the conclusion he wanted to reach, and did not examine evidence that undermined his theory.  This is not sound scientific or academic inquiry.  *Daubert*, 509 U.S. at 590.

Though he did not know it, Sinnreich also relied on findings in unpublished versions of studies that were excluded from the later, published version of the same study.  (Depo at 92:21-93:10).  Sinnreich acknowledged that before citing a study, a "research professional" would consider whether the study has been published in a reputable venue. (*Id.* at 97:21-98:6).  He also testified that it would be important to know if the authors he cited altered their conclusions about their data.  (*Id.* at 93:11-94:4).  Sinnreich, however, failed to notice that two of the papers he cited were the *unpublished* versions of studies that, when published, did not include the findings Sinnreich reports.  (Liebowitz Report ¶¶ 71-73).  Rather than finding that file sharing had a positive impact on sales, as Sinnreich reports, the published version of the studies find no impact on sales.  (*Id.*)  Sinnreich's analysis does not demonstrate the analytical rigor that he acknowledged would be appropriate from a research professional.

b.      The Analytical Gaps in Sinnreich's Testimony Render it
        Unreliable

In concluding that the unprecedented decline the music industry has experienced can be attributed entirely to factors other than file sharing, Sinnreich (1) failed to control for the impact of the massive illegal market spawned by LimeWire and similar file sharing services (*see, e.g.,*

- 10 -

Depo at 123:15-124:7 (acknowledging that the market may not be an accurate reflection of consumer demand because some consumers are acquiring their music for free); *id.* at 157:1-7 (acknowledging that illegal online distribution contributed to declining shelf space and the bankruptcy of music retailers, which he identifies as a cause of the decline in music sales); *see generally* Report, Section III); and (2) failed to test his theories of causation against the facts to determine if they can explain a sustained, decade-long decline that resulted in billions upon billions of dollars in lost revenue in all major international markets (*see, e.g.,* Depo at 128:15-132:6 (attesting that declines are due to increased CD bootlegging based on a single data point from 2001 showing $450 million in *total* sales of bootlegged CDs in the top markets, which *do not* include the U.S.); Depo at 162:23-163:8 (attesting that declines are due to the end of minimum advertised pricing but without knowing when minimum advertised pricing was used, or for how many years; *see generally* Report, Section III).   In these respects, Mr. Sinnreich's analysis is unreliable and inadmissible for the same reasons discussed in Plaintiffs' separate motion to exclude the testimony of George Strong.  Rather than repeat those arguments here, Plaintiffs incorporate them by reference.  *See* Memorandum of Law in Support of Plaintiffs' Motion To Preclude Certain Purported Expert Testimony by George Strong at Section III(D).

> c.   Sinnreich's Explanations For The Decline In Music Sales And Revenues Is Speculation And Conjecture.

Rule 702 also requires expert testimony to be based on "sufficient facts or data."  Expert testimony that is based on "subjective belief or unsupported speculation" should be excluded. *Daubert*, 509 U.S. at 590.  Sinnreich makes many sweeping, factual claims throughout his report that have no empirical basis, or are at best "guestimate[s]."  The speculative nature of his causation testimony is an additional reason why it should be excluded.

To cite just a few examples:

- Sinnreich opines that "millions" of sales of used and independent recordings, representing "tens or hundreds of millions of dollars annually" compete materially for sales of new music, but states that such sales are largely "untallied."  (Report at 21).  Given that sales are "untallied," Sinnreich can only speculate about how many sales actually occur.

- Sinnreich claims that Plaintiffs' losses were caused by "[a]n increase in small-scale commercial CD-Bootlegging," citing *international* data that covers the top ten markets for bootlegged CDs, which *do not* include the U.S.—the only market at issue here.  Sinnreich did not know or attempt to determine the size of the U.S. market for bootlegged CDs, even though he conceded that data would have been relevant and that pirate CD markets are more prevalent in certain areas abroad than in the U.S.. (Depo at 128:15-131:22)

- Sinnreich testified that the "replacement cycle" for CDs ended "towards the end of the 1990s" but had no empirical evidence to support this conclusion (Depo at 160:15-161:24)

- Sinnreich claims that the end of minimum advertised pricing ("MAP") contributed to declines in sales and revenues, but did not know the time period during which MAP was used, or how many retailers reduced their prices when MAP ended (Depo at 163:1-166:4)

- Sinnreich testified that music labels get a "hefty" royalty from video game revenues and also make revenues from hardware royalties, but could offer no numbers or approximations of those royalties. (Depo at 236:23-237:3; 239:17-240:25)

- Although Sinnreich opines that Plaintiffs realize substantial revenues from "360 deals" in which they get a percentage of concert, merchandise and other revenue generated by artists, he could only "guestimate[]" as to what that percentage was.  (Depo at 225:19-226:19; 228:6-18).

Standing alone, the lack of sufficient facts or data for these statements might not be sufficient to exclude Sinnreich's testimony.  But coupled with the lack of analytical rigor, the failure to consider critical facts, and Sinnreich's lack of even basic economic expertise, the largely speculative nature of Sinnreich's testimony underscores its lack of reliability and

provides an additional reason why his causation testimony should be excluded. *Daubert,* 509 U.S. at 589-90.

**C.   Sinnreich Should Be Precluded From Offering Irrelevant, Prejudicial Testimony That Does Not Assist the Trier of Fact**

Sinnreich offers many opinions in his report that are irrelevant and appear calculated to inflame and confuse the jury. "Expert testimony which does not relate to any issue in the case is not relevant" and is inadmissible. *Daubert*, 509 U.S. at 591. Moreover, even relevant expert testimony should be excluded under Rule 403 if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* at 595. Courts must "exerci[se] more control over experts than over lay witnesses" in weighing possible prejudice against probative force under Rule 403, because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Id.*

**1.   Testimony About Sources of Revenue Unrelated to File Sharing is Irrelevant and Prejudicial**

Sinnreich opines that file sharing has allowed Plaintiffs to take advantage of "a host of … emerging revenue streams," which should offset any lost revenues claimed by Plaintiffs. (Report at 30-31). However, many of the revenue streams he describes have nothing to do with file sharing, or even the digital distribution of music. The only apparent purpose for mentioning these revenue streams is to convey to the jury that Plaintiffs still have ways to make money notwithstanding the devastating losses they suffered as a consequence of LimeWire's illegal conduct. The prejudicial impact of the testimony is obvious; its relevance is not.

In his report, Sinnreich discusses synch rights revenues that Plaintiffs collect when their works are used in television shows and movies. (Report at 31). He also discusses performance

rights revenues that Plaintiffs collect when their music is licensed to broadcast media like radio, satellite and internet broadcast services.  (*Id.*) Additionally, he discusses revenues Plaintiffs receive from the use of their sound recordings in video games such as *Rock Band* and *Guitar Hero*.  (*Id.* at 31-32).   As Sinnreich acknowledged, these revenue streams "don't have a whole lot to do with peer-to-peer."  (Depo at 234:2-7; *id.* at 234:14-19; *id.* at 236:5-14).  The only explanation Sinnreich could muster for why he was discussing these facts in an expert report addressing the impact of file sharing was that "to a certain degree" these revenue streams "are influenced by peer-to-peer behaviors in terms of giving -- providing a more accurate impression of what the market demand for various acts is, so that music licensors … will make better decisions in terms of which songs they want to license and at what rates they are willing to license them."  (*Id.* at 234:18-235:4).

Whether file sharing allows licensors to make better decisions has nothing to do with harms or benefits to Plaintiffs.  It does not mean that licensors will license more (or less) music. Sinnreich should be precluded from offering this irrelevant and prejudicial testimony.

> ### 2.     Sinnreich's Testimony That Non-Parties Believe File Sharing is Good and the Record Labels Are Bad is Irrelevant and Prejudicial

Sinnreich provides a lengthy exegesis in Section III.B of his report about positive sentiments non-parties have expressed about file sharing, and negative sentiments non-parties have expressed toward Plaintiffs.  This testimony has nothing to do with the amount of damages required to compensate Plaintiffs and deter future wrongdoing.  The obvious purpose of this testimony is to invite the jury to reduce Plaintiffs' damages based on irrelevant considerations about what artists and other non-parties think about file sharing ("it's good") and about the record labels ("they're bad").  This irrelevant and highly prejudicial testimony should be

excluded.

In the section of his report purporting to address the extent to which Plaintiffs' losses are attributable to Limewire, Sinnreich supplies sound bytes from "dozens of high-profile artists and their representatives" who "have expressed support for file sharing over the past decade." (Report at 36-40).  On their face, many of these statements express support for file sharing in terms having nothing to do with whether Plaintiffs in particular or the industry in general (including artists) are earning revenue and making sales because of file sharing—the central point that Sinnreich purports to make in this section of his report.  For example, Sinnreich reports that artists support file sharing because:

- it's a way to get back at the record labels for "ripping people off" (Report at 39 (quoting Nine Inch Nails' Trent Reznor, who encouraged fans to "steal it, steal away, steal and steal and steal some more and give it to all your friends and keep on stealing" because the record labels are "ripping people off and that's not right.");

- it makes them feel close to the fans (Report at 38 (quoting Shakira: file sharing makes her "feel closer to the fans and the people who appreciate the music. It's the democratization of music in a way. And music is a gift."); *id*. at 37 (quoting Sananda Maitreya: P2P is "perfect for me to ask my fans to share my music and at the same time continue to stay close to them"); *id*. at 40 (quoting Keith Richards: "I've always felt that if it's worth pirating, then it must be worth something. It's more important to me that people, they want that. And even if [I] don't get paid for it, that doesn't mean so much to me");

- it allows people to connect (Report at 38-39 (quoting Sonic Youth's Thurston Moore, who wrote that file sharing "simply exists as a nod to the true love and ego involved in sharing music with friends and lovers" and that trying to control file sharing "is like trying to control an affair of the heart"));

- it's the "modern way" (Report at 40 (quoting Snow Patrol's Gary Lightbody: "I'm not anti-filesharing at all.  This is the modern way.  This is what we've brought on ourselves and you have to live in the society you created."); *id*. at 36 (quoting Moby: "file sharing

is a reality, and it would seem that the labels would do well to
learn how to incorporate it into their business models somehow")

- people want free music, regardless of what the law says. (Report at
40 (quoting Neil Young: "it's up to the masses to distribute it
however they want. The laws don't matter at that point. People
sharing music in their bedrooms is the new radio"); *id.* at 39
(quoting Vampire Weekend's Rostam Batmanglij: "we all grew up
in an age of downloading music illegally, we're products of that
culture. I personally believe that if you want music to be free, then
it should be").

The positive views these artists and other individuals have expressed about file sharing,

and the negative views they have expressed about the record labels (and about the law), run far

afield of the question of whether and to what extent Plaintiffs have been harmed by LimeWire.

Allowing Sinnreich to testify that artists and other non-parties believe file sharing is beneficial

invites the jury to ignore the law, which provides that only the copyright owner gets to decide

how to distribute its copyrighted works. *Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.*, 518 F.

Supp. 2d 1197, 1218 (2007) ("Plaintiffs have the exclusive right to decide when and how their

material should be reproduced and/or distributed, regardless of whether their decisions make

good business sense."). As this Court has already determined, the copyright owners in this case

did *not* give their permission for their works to be shared over LimeWire.

Sinnreich also discusses "historical label-artist relations" to emphasize that the record

labels "have been consistently criticized for unfair or unethical business relations with their

artists." (Report at 48). He notes that "[m]ajor label record contracts typically include clauses

whose primary effect is to diminish actual royalties paid to the recording artist" and opines that

"[e]ven the more justifiable contractual elements can be damaging to artists," including

"recoupment" clauses, which "require the labels to make back their expenditures for producing,

distributing, and marketing the music before any royalties are owed to the recording artist." (*Id.*)

He also criticizes the record labels for "figh[ting] to diminish the degree of power, ownership and revenue recognized by recording artists, in the interest of maximizing their own profitability."  (*Id.* at 49).  Nowhere in his report does he attempt to explain how these "historical label-artist relations" relate to his conclusion that "Plaintiffs' losses cannot be substantially attributed to LimeWire."

When asked at his deposition to explain the relevance of his discussion about artist-label relations, Sinnreich testified that "[w]hen artists are … constrained from operating optimally, when they're not adequately compensated for their work, when they are embittered as a result of their labor relations, it negatively impacts their ability to produce and support products that are going to succeed in the marketplace.  And when that's the case, the labels, … as their partners in bringing those products to market suffer, as well."  (Depo at 254:9-255:12).  In other words, Sinnreich apparently believes that disputes between labels and artists result in lower quality music from the artists, which in turn hurts the labels.  Setting aside the entirely speculative nature of this testimony, its relevance is attenuated at best and substantially outweighed by the prejudicial effect of characterizing the record labels as "unfair" and "unethical" in their dealings with artists  (Report at 48).

Although Defendants may wish to distract from their own wrongful conduct by impugning Plaintiffs' relationship with artists and touting artists' and consumers' support for file sharing, it is Defendants who are on trial for inducing the massive infringement of Plaintiffs' copyrights.  How labels have treated artists, and what artists, consumers and other non-parties think about the record labels or about file sharing is not relevant to any issue in the case.

> **3.      Sinnreich Encourages The Jury To Nullify The Law By Opining That There Are More Effective Ways to Solve Plaintiffs' Problems Than Awarding Damages**

In his report, Sinnreich opines that there are more effective ways for Plaintiffs to address online piracy than suing infringers and collecting damages. (Report at 60). This opinion is utterly irrelevant, and serves only to suggest that the jury should nullify the law.

Both the Copyright Act and the common law reflect a policy judgment that rights holders should have recourse to the courts, and a remedy in the form of damages, when their rights are infringed. Sinnreich invites the jury to ignore this judgment, and their duty to apply the law, by opining that awarding damages is not "the most rational and effective response" to illegal services like LimeWire. (Report at 60). He asserts that "market-based 'carrots' will always be more effective than legal 'sticks' as a means to produce a functional digital music industry," (Report at 60), and that "there are alternative strategies to achieve the ends that -- this suit was -- undertaken in order to achieve that don't involve massive litigation." (Depo at 298:22-299:4). Sinnreich testifies that an award will have no deterrent effect, and even goes so far to suggest that a damages award will actually *harm* Plaintiffs by "further ero[ding] . . . the plaintiffs' already tarnished reputation among consumers and the business community." (Report at 60; Depo at 317:8-18 ("Q: … [A]re you saying that a large damages award is actually against the plaintiffs' interest? A: Reputationally, absolutely.")).

These opinions are completely irrelevant to any issue in dispute and entirely improper. The jury will not be charged with deciding whether Plaintiffs would be better served by providing "carrots" to infringers rather than pursuing the full scope of available legal remedies. Nor will the jury be charged with evaluating whether a significant damages award will backfire against Plaintiffs; under the law, the *only* effect of an award that is relevant to the jury's consideration is its deterrent effect. *Bryant*, 603 F.3d at 144. It is inappropriate for Defendants to suggest that the jury should award lower damages because there are "better" ways to solve

Plaintiffs' problems.

Sinnreich's testimony that better avenues exist to address Plaintiffs' problem than imposing an award he believes will have no deterrent effect (Report at 60) is also problematic because it is not based on any specialized knowledge and impermissibly "undertakes to tell the jury what result to reach." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). When pressed at deposition about his opinion that a damages award would have no deterrent effect, Sinnreich explained that prior litigation has not stopped illegal services from continuing to operate, and that there may be some people who are not motivated by financial considerations who are willing to break the law. (Depo at 313:24-315:18). None of this testimony is beyond the experience of lay people. The jury is perfectly capable of evaluating whether and to what extent a damages award will have a deterrent effect, and does not need the benefit of an expert's opinion to make that assessment.

It is textbook law that "[p]roffered expert testimony should be excluded when it will not assist the finder of fact to any degree beyond the assistance that lawyers representing the parties could provide during their closing arguments." 4. J. Weinstein & M. Berger, Weinstein's Federal Evidence § 702.03[2][a] (J. McLaughlin ed., 2d ed. 2010). Expert testimony that "undertakes to tell the jury what result to reach" does not "aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Duncan*, 42 F.3d at 101. The jury should make up its own mind about whether an award will deter other infringers; they don't need Sinreich to tell them what to do. Sinnreich's testimony about deterrence improperly "usurp[s] . . . the role of the jury in applying [the] law to the facts before it" and should be excluded. *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

IV.   <u>**CONCLUSION**</u>

For the reasons discussed above, Plaintiffs respectfully request that:

(1) The Court preclude Sinnreich from testifying about causation, as he proposes to do in Section III of his report, on the grounds that (a) he is unqualified to offer that testimony, (b) the testimony is unreliable, and (c) the testimony lacks a proper factual basis;

(2) The Court preclude Sinnreich from testifying about deterrence and that there are more effective ways for Plaintiffs to resolve their problems than seeking damages, on the grounds that the testimony is irrelevant, prejudicial, unnecessary to assist the jury, and usurps its function;

(3) The Court preclude Sinnreich from testifying that the labels derive revenues from synch rights, performance rights, video games and similar sources on the grounds that the testimony is irrelevant and prejudicial;

(4) The Court preclude Sinnreich from testifying that artists and other non-parties support file sharing and dislike Plaintiffs on the grounds that the testimony is irrelevant and prejudicial.


Dated:  March 2, 2011                    Respectfully submitted

                                         */s/ Melinda E. LeMoine*
                                         Melinda E. LeMoine

                                         Attorney for Plaintiffs
                                         Munger, Tolles & Olson LLP
                                         355 South Grand Avenue, 35th Floor
                                         Los Angeles, CA 90071-1560
                                         (213) 683-9100
                                         (213) 687-3702 (Fax)