REDACTED VERSION
COMPLETE VERSION FILED UNDER SEAL

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ARISTA RECORDS LLC; ATLANTIC
RECORDING CORPORATION; BMG MUSIC;
CAPITOL RECORDS, INC.; ELEKTRA
ENTERTAINMENT GROUP INC.; INTERSCOPE
RECORDS; LAFACE RECORDS LLC;
MOTOWN RECORD COMPANY, L.P.;
PRIORITY RECORDS LLC; SONY BMG MUSIC
ENTERTAINMENT; UMG RECORDINGS, INC.;
VIRGIN RECORDS AMERICA, INC.; and
WARNER BROS. RECORDS INC.,

            Plaintiffs,

– against –

LIME GROUP LLC; LIME WIRE LLC; MARK
GORTON; and M.J.G. LIME WIRE FAMILY
LIMITED PARTNERSHIP,

            Defendants.

ECF Case

06 Civ. 5936 (KMW)

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO PRECLUDE CERTAIN EXPERT TESTIMONY OF ARAM SINNREICH

WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019
Phone: (212) 728-8000

*Attorneys for Defendants*

6428525.1

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .......................................................................................................3

A.    Aram Sinnreich's Experience and Qualifications...............................................3

B.    Dr. Sinnreich's Report and Areas of Testimony Are Directly Relevant to the
      Question of Damages Causation. ..........................................................................5

ARGUMENT ...........................................................................................................10

DR. SINNREICH'S TESTIMONY SHOULD NOT BE EXCLUDED .......................................10

A.    The General *Daubert* Standards Support Admissibility. ...................................10

B.    Plaintiffs' Specific Criticisms Are Without Merit. ............................................14

      1.    The Argument That Dr. Sinnreich Is Not An Economist ......................14

      2.    The Assertion That Dr. Sinnreich's Causation Testimony Is Unreliable ..............16

      3.    Dr. Sinnreich's Other Testimony Should Not Be Excluded Based On
            Plaintiffs' Claims of Prejudice.............................................................22

CONCLUSION........................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Abrams v. Ciba Specialty Chems. Corp.,*
    2010 WL 779276 (S.D. Ala. Mar. 2, 2010) ........................................................... 17

*Adani Exps. Ltd. v. AMCI (Export) Corp.,*
    2008 WL 4925647 (W.D. Pa. Nov. 14, 2008) ...................................................... 20

*Advanced Tech. Incubator Inc. v. Sharp Corp.,*
    2010 WL 1170246 (E.D. Tex. Mar. 22, 2010) .................................................... 12

*Antenna TV v. Aegean Video,*
    1996 U.S. Dist. LEXIS 7688 (E.D.N.Y. Mar. 20, 1996) ...................................... 6

*Arista Records, Inc. v. Flea World, Inc.,*
    2006 U.S. Dist. LEXIS 14988 (D.N.J. Mar. 31, 2006) ............................. 11, 14, 19

*Arnold v. Cargill Inc.,*
    2006 WL 1716221 (D. Minn. June 20, 2006) ..................................................... 20

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,*
    2000 WL 1738338 (E.D.N.Y. Nov. 1, 2000) ..................................................... 15

*Borawick v. Shay,*
    68 F.3d 597 (2d Cir. 1995) ................................................................................. 11

*Bryant v. Media Right Prods., Inc.,*
    603 F.3d 135 (2d Cir. 2010) .................................................................................. 3

*Cary Oil Co., Inc. v. Magistrate Refining & Mktg., Inc.,*
    2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003) .................................................... 11

*City of Chicago v. Westchester Fire Ins. Co.,*
    2010 WL 3516066 (N.D. Ill. Sept. 1, 2010) ................................................ 13, 19

*Clarke v. LR Sys.,*
    219 F. Supp. 2d 323 (E.D.N.Y. 2002) .................................................................. 1

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ..................................................................... 1, 11, 12, 19

*Ebbert v. Nassau Cnty.,*
    2008 WL 8086382 (E.D.N.Y. Sept. 29, 2008) ................................................... 12

*Eclipse Elecs. v. Chubb Corp.,*
    176 F. Supp. 2d 406 (E.D. Pa. 2001) ................................................................. 19

*Emig v. Electrolux Home Prods. Inc.*,
   2008 WL 4200988 (S.D.N.Y. Sept. 11, 2008)..................................................................11

*Equal Employment Opportunity Comm'n v. Bloomberg L.P.*,
   2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010).................................................................2

*Figueroa v. Boston Scientific Corp.*,
   254 F. Supp. 2d 361 (S.D.N.Y. 2003).........................................................................12

*GII Indus., Inc. v. N.Y. Dept. of Transp.*,
   2010 WL 2044635 (Bankr. E.D.N.Y. May 19, 2010) ............................................24

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*,
   2010 WL 4065465 (S.D. Tex. Oct. 9, 2010)..........................................................15, 16

*In re Joint E. & S. Dist. Asbestos Litig.*,
   52 F.3d 1124 (2d Cir. 1995)..................................................................................12-13

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)..................................................................................................11

*In re Linerboard Antitrust Litig.*,
   497 F. Supp. 2d 666 (E.D. Pa. 2007) ................................................................16-17

*Marcus v. BMW of N. Am., LLC*,
   2010 WL 4853308 (D.N.J. Nov. 19, 2010) ............................................................16

*Miller v. Astucci Ltd.*,
   2007 WL 102092 (S.D.N.Y. Jan. 16, 2007) ..........................................................13

*In re MTBE Prods. Liability Litig.*,
   2008 WL 1971538 (S.D.N.Y. May 7, 2008) ..........................................................15

*N.A.S. Import Corp. v. Chenson Enters., Inc.*,
   968 F.2d 250 (2d Cir. 1992)......................................................................................5

*N.Y. v. Shinnecock Indian Nations*,
   523 F. Supp. 2d 185 (E.D.N.Y. 2007) ...................................................................11

*Park West Radiology v. Carecore Nat'l LLC*,
   675 F. Supp. 2d 314 (S.D.N.Y. 2008).....................................................................20

*SR Int'l Bus. Ins. Co. v. World Trade Center Props., LLC*,
   467 F.3d 107 (2d Cir. 2006)...........................................................................12, 18-19

*Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*,
   223 F.3d 585 (7th Cir. 2000) ...................................................................................15

6428525.1

*United States v. Abu-Jihaad*,
    553 F. Supp. 2d 121 (D. Conn. 2008) ........................................................................ 15-16

*UMG Recordings, Inc. v. Lindor*,
    531 F. Supp. 2d 453 (E.D.N.Y. 2007) .........................................................................11, 14

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2003) ........................................................................................ 10-11

*United States v. Jakobetz*,
    955 F.2d 786 (2d Cir. 1992) ...........................................................................................12

*VSI Holdings, Inc. v. SPX Corp.*,
    2005 U.S. Dist. LEXIS 45979 (E.D. Mich. Apr. 12, 2005) .........................................17

*Wisdom v. TJX Cos.*,
    410 F. Supp. 2d 336 (D. Vt. 2006) ................................................................................20

## OTHER AUTHORITIES

Fed. R. Evid. 702, Advisory Committee Note, 2000 Amendment ...........................................10, 11

3 Weinstein & Berger, Weinstein's Evidence § 702[03] at 730 (1989) ........................................12

iv

6428525.1

## PRELIMINARY STATEMENT

Plaintiffs intend to call dozens of witnesses to testify that Lime Wire has caused them massive harm over the past ten years[1] (although they admittedly cannot quantify it). They claim (contrary to their repeated public statements) that no other factors played much if any of a role in that harm. They plan to put on "some creative talent" to make the same generalized assertions on behalf of the artist community that file sharing is bad for them.[2] They will call a professor to opine that file sharing is responsible for all of the claimed decline in music sales (though he admits he does "not know what percentage is attributable to Lime Wire," the key question in the case).[3] Yet if Defendants' experts, including Professor Aram Sinnreich, dare to challenge any of these contentions, they must be excluded under *Daubert*,[4] because any opinions contrary to those of Plaintiffs are unqualified, unreliable, speculative, or just plain wrong, and must be kept from the jury.

Plaintiffs' arguments are directly inconsistent with those made by them earlier in this case, as well as in other recent cases where they successfully fended off *Daubert* challenges to their own damages experts on consumer music buying habits. More importantly, their arguments are meritless: *Daubert* does not require the exclusion of Professor Sinnreich's testimony, particularly under the Second Circuit's "especially broad" and liberal standard for admissibility of expert testimony[5] and the presumption of reliability accorded expert evidence.[6]

---

[1]    *See* 2/18/11 Hr'g Tr. (Dkt. No. 559),  at 18  (attached as Exhibit A to the Declaration of John R. Oller ("Oller Decl.") dated March 8, 2011, submitted herewith.); *see id.* at 23 ("Mr. Pomerantz: . . . Another thing we have to show [at trial] is lost revenue.... We have many aspects of our business that have been destroyed because of LimeWire").)

[2]    *See id.* at 18.

[3]    Liebowitz Tr. at 148 (Oller Decl. Ex. H).

[4]    *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[5]    *See Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 332 (E.D.N.Y. 2002).

6428525.1

The various arguments by Plaintiffs for excluding Professor Sinnreich's testimony at most go to the weight rather than admissibility of that evidence and can be tested through vigorous cross-examination at trial, as *Daubert* and the Federal Rules contemplate.

Moreover, each of the particular arguments advanced by Plaintiffs for exclusion here have repeatedly been rejected by the courts. That Professor Sinnreich is "not an economist" does not mean that he cannot testify about causal factors bearing upon declining music sales, particularly given his extensive experience in the music industry, and his own statistical and survey research concerning consumer behavior with regard to digital music and his *direct study of the impact of file sharing* (something Plaintiffs' expert admits he has never done). That Professor Sinnreich did not attempt to precisely quantify the impact of file sharing on music purchasing versus other alternative causes  does not render his opinions impermissibly speculative or unreliable; as the courts have held, experts may and frequently do provide useful insights to the jury concerning variables and factors bearing on damages and causation even if they cannot be precisely quantified. That Professor Sinnreich allegedly ignored evidence contrary to his opinion is not true, and even if it were, it would only provide a basis for cross-examination, not exclusion.   And just because Plaintiffs claim that their expert employed the "right" or "better" methodology in assessing the impacts of file sharing (which he did not) does not mean that only Plaintiffs' expert opinion should be admitted; as was true in another case recently decided by this Court, "it should be left to the jury to decide which expert engaged in proper analysis."[7]

---

[6]    Fed. R. Evid. 702, Advisory Committee Note, 2000 Amendment.

[7]    *Equal Employment Opportunity Comm'n v. Bloomberg L.P.*, 2010 WL 3466370, at *7 (S.D.N.Y. Aug. 31, 2010).

2

6428525.1

Plaintiffs' motion should be seen for what it is: yet another in a barrage of motions designed to make this a completely one-sided trial in which Plaintiffs, in search of a billion-dollar plus award, are allowed to support the various *Bryant* factors[8] with statements about how file sharing has cost them revenue; Defendants have acted willfully; and deterrence must be served; but Defendants cannot respond with fact and expert evidence of their own. Plaintiffs' motion, both on its own and as part of their larger effort to straightjacket Defendants at trial, should be denied.

## BACKGROUND

### A.     Aram Sinnreich's Experience and Qualifications

Aram Sinnreich is an Assistant Professor of Journalism and Media Studies at Rutgers University's School of Communications & Information, and a founding partner of Radar Research, an independent consultancy and custom research firm focused on the intersection of culture, business and technology.[9] He was a Visiting Assistant Professor in Media, Culture & Communication at New York University, a doctoral fellow and lecturer at the Annenberg School for Communication at the University of Southern California, and has taught classes such as "Musical Cultures and Industries," "Topics in Digital Media," and "Copyright, Commerce and Culture." He holds a Ph.D in Communication from USC; and Masters degrees in Communication and Journalism (from USC and Columbia University respectively).

From 1997 to 2002, covering the time period when music file sharing technologies first appeared, he was a researcher and later Senior Analyst at Jupiter Research, an Internet research firm where he managed both the Music and Policy Areas of research. During that time, all of the Plaintiffs in this case purchased his research reports. Of direct relevance

---

8       *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010).

9       *See* Sinnreich Report ("Report") at 1 (Oller Decl. Ex. B); Sinnreich Tr. (Oller Decl. Ex. C) at 60.

3

6428525.1

here, in 2000, after the emergence of Napster, he published the results of a survey analysis
showing that Napster users were 45 percent more likely than non-Napster users to have increased
their music purchasing habits over the previous 12 months, and a followup survey in 2002 that
"file sharers were 75 percent more likely than the average online music fan to have increased
their music purchasing habits since they started visiting online music sites." Report at 28.[10]  His
surveys at Jupiter, and other peer-reviewed publications since then, have employed standard
statistical methodologies such as correlation regression cluster analysis, the use of statistically
determined distributions and the evaluation of survey instruments and other statistical
instruments in producing reliable data.  Sinnreich Tr. at 24-31.

      Dr. Sinnreich is the author of *Mashed Up* (2010), a book about music and
technology, as well as academic articles on music and technology in a variety of peer-reviewed
journals, and has lectured on these topics at dozens of universities from Yale Law School to the
University of Tokyo and at scores of industry and academic conferences.  Report at 2.  He has
contributed expert testimony or reports in a number of cases involving music copyrights and
technology, including the Supreme Court *Grokster* case, and the class action suit against Sony
BMG regarding its use of "rootkit" copy-control technologies on CDs.  Report at 1-2; Sinnreich
Tr. at 66-68.   He has closely followed the music trade press for many years,[11] and has been in
regular contact with "literally hundreds of people" at record labels, management companies,
technology firms, media companies, journalists, analysts, and artists and their representatives,

---

[10] ████████████████████████████████████████████████████████

[11] *See* Sinnreich Tr. at  77:13-18; 129:9-12; 137:11-14; 164:8-12; 166:19-167:2; 176:23-177:2;
179:6-9; 226:16-19; 322:22-323:3; 331:15-16.

6428525.1

both one and one and at conferences, including people in the digital divisions of the labels. *Id.* at 77-84. His expertise and opinions in this case draw on a decade and a half of research and immersion in the music industry and technology communities. *Id.* at 77-79. Professor Sinnreich has also been a working musician for nearly 20 years, composing songs and playing with a variety of bands and artists. Report at 2. He licenses and sells his music in physical and digital formats through a broad range of distribution channels. Sinnreich Tr. at 48-50. He is familiar with, and has personally used, Lime Wire and other peer to peer services. *Id.* at 53-54, 197-98.

In short, Aram Sinnreich has devoted his life and career to music and to understanding its relationships with the industry and music technology. He has lived and breathed it. As a result, he has developed expertise including knowledge, understanding, and both qualitative and quantitative assessment of (1) consumer behavior in the music industry, especially with respect to digital media; (2) the role of digital technologies in consumer culture, and in changing the relationships among recording artists, industry and consumers; and (3) the availability of free music via the Internet, and the ways in which consumers access and use it. Report at 2.

Professor Sinnreich is eminently qualified to testify at this trial.

**B.    Dr. Sinnreich's Report and Areas of Testimony Are Directly Relevant to the Question of Damages Causation.**

Among the factors to be considered in determining statutory damages in a copyright case are "the revenues lost by the plaintiffs *as a result of the defendant's conduct.*" *N.A.S. Import Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992) (cited in *Bryant*, 603 F.3d at 144) (emphasis added). Indeed, this Court has ruled in this action that Defendants were entitled to discovery "relating to the actual damages suffered by Plaintiffs *as a result of Defendants' infringing conduct* . . . [because] the Court may consider actual damages in

5

6428525.1

determining the appropriate statutory damage award." 8/9/10 Order, Dkt. No. 302, at 5 n.2
(emphasis added).

As such, the extent to which Plaintiffs have been damaged by file sharing in
general, or Lime Wire in particular, turns on both the extent to which unrelated factors, as
opposed to a defendants' infringing conduct, proximately caused a plaintiff's alleged loss, as
well as whether, in a "but for" world where the infringer did not exist, the plaintiff nonetheless
would have suffered harm. *See Antenna TV v. Aegean Video*, 1996 U.S. Dist. LEXIS 7688, at
*8-9 (E.D.N.Y. Mar. 20, 1996) (to show actual damages, "Plaintiff must show that 'the
infringement was the cause-in-fact of its loss by showing with reasonable probability that, but for
the defendant's infringement, the plaintiff would not have suffered the loss.'") (quotation
omitted).

Professor Sinnreich's expert opinions are plainly relevant to causation, in at least
four respects. First, he cites the wide availability of free music via the Internet (including
through unlicensed sources that do not compensate Plaintiffs), and the many ways in which
consumers access free music, to make the point that "there are so many channels through which
music fans can access music freely over the internet that Lime Wire's absence from that mix
would have a minimal effect." Sinnreich Tr. at 194. Plaintiffs do not even purport to challenge
his qualifications to educate the jury as to the many alternative sources of free music ████████
████████████████████████████████.[12] They merely argue that this opinion is

─────────────────────

[12] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

████████████████

"irrelevant," but as Defendants have shown, such evidence goes directly to the question of "but for" causation, that is, whether in the absence of Lime Wire, consumers would have purchased the downloaded songs as opposed to obtaining them free from sources other than Lime Wire. *See* Report at 22-27; Sinnreich Tr. at 194, 206, 210-13, 219-24, 313-15, 330-34.[13]

Second, directly relevant to the issue of proximate cause is Professor Sinnreich's opinion that many different factors have contributed to declining music sales revenues in the past decade, including (1) two widespread economic recessions; (2) the bankruptcies of music retailers such as Tower Records and decline in CD shelf space offered by "big box" retailers such as Wal-Mart; (3) "unbundling" of songs in digital format so that consumers can pay 99 cents for a single rather than $10-$15 for a CD with one or two sought-after songs; (4) CD "ripping" and "burning" technologies enabling consumers to move songs easily from



[13]   In their reply brief on their motion to exclude evidence regarding "other illegal services" (Dkt. No. 604), Plaintiffs for the first time invoke patent cases to argue that the existence of "infringing substitutes" is irrelevant to "but for causation." But the patent cases have nothing to do with this one. In those cases, the infringers and patentees were competitors in the same market, with the same or similar business model, and the infringers made substantial *actual sales* of the same or similar product to consumers who willingly and lawfully bought the infringing product. The question was how many sales of the product to willing buyers were diverted from the patentee to the infringer. Here, the labels and Lime Wire are not competitors in the same market, and it begs the question to assume that Lime Wire users who downloaded music for free would have paid *anything* to obtain the music, as opposed to getting it from another free source. As the copyright cases cited by Defendants hold, and as the Court has recognized, the ultimate question in assessing lost revenues in this case is "how much higher music sales and profits would have been absent the infringement of the works by music consumers using LimeWire." Dkt. No. 554, at 7-8. The availability of free music alternatives, whether authorized or not, is a fact of life and economic reality and is plainly relevant to that inquiry.

6428525.1

commercial CDs to their own computers and from their computers to blank CDs; (5) the end of

the "CD replacement cycle" whereby consumers bought CDs in the 1990s to replace their

cassettes and LPs of songs they already owned; and (6) increased competition for consumer

entertainment spending from such forms as home video (*e.g.*, Netflix) and video games (*e.g.*,

Nintendo's "Wii"), high-speed Internet access and mobile applications (*e.g.*, BlackBerry and

iPhone). Report at 14-22; Sinnreich at Tr. 117:18-153:15. Again, Plaintiffs are in no position to

deem this opinion "unreliable" and "speculative" given that *they themselves have admitted on*

*numerous occasions that these factors have adversely affected their sales in the past ten years.*[14]

In fact, the outlier here is Professor Liebowitz, who implausibly maintains (contrary to the many

statements of his own label clients) that *none* of these factors, singly or in combination, has

---

[14]   For example, Warner Music recently told its shareholders in an SEC filing that "illegal
downloading of music, *cd-r piracy, industrial piracy, economic recession, bankruptcies of record*
*wholesalers and retailers, and growing competition for consumer discretionary spending and*
*retail shelf space **may all be contributing** to a declining recorded music industry*." *See* Warner
Music Group 2010 Annual Report at 24 (Oller Decl. Ex. M). *See also* Oller Decl. Ex. N [EMI
owner] Maltby Capital Ltd. 3/31/08 Interim Review at 17 (stating that "possibility of buying
individual album tracks rather than having to purchase a whole album also decreased overall
spend;" identifying "important changes to the retail market," and fact that "emergence of many
and diverse ways to listen to and buy music left consumers confused and deterred them from
purchasing," and concluding that "***All*** these factors have had a ***significant impact*** on music
industry sales") (emphasis added).



played any role in the decline in recorded music sales over the past decade. In any event, Professor Sinnreich, as someone who has immersed himself in and analyzed the music industry for more than 15 years and has spoken to hundreds of industry participants, including label executives, is in a position as good as or better than Professor Liebowitz to comment on whether Plaintiffs' current position – that none of these other factors is of any significance – should be credited over their contrary public and internal statements.

Third, Professor Sinnreich offers the opinion that file sharing can actually "help sales, revenues and profits" of the record labels. *See* Report at 27-47. He bases this on a number of studies, sources and facts, including (1) his own surveys while at Jupiter showing a net positive benefit from file sharing; (2) other academic studies concluding that the effects range from positive to neutral (which he frankly acknowledges are contested by other studies showing a negative or neutral effect); (3) his understanding and awareness of additional and emerging revenue streams (including "360" deals, where the labels participate in artists' concert and merchandising revenue), which in his opinion have been spurred by the increased exposure to music that file sharing creates; (4) research and marketing via p2p networks; and (5) many examples of artists whose careers were launched or boosted by file sharing and who have said as much. Again, these are not radical, unreliable views, but ones that the labels themselves have expressed, as Professor Sinnreich notes.[15] That Plaintiffs and their expert vigorously deny any such beneficial effects in this litigation is not grounds for exclusion of Professor Sinnreich's opinion.

---

[15]  *See* Report at 32 (quoting EMI owner's 2007 Annual Review stating that "Historically the industry has viewed digital principally as a piracy threat. In reality, it offers new possibilities across the value chain, from discovering and producing through to promoting music.")

6428525.1

Fourth, Professor Sinnreich points out a number of ways in which the labels' revenue declines are attributable to their own conduct, or that of third parties, and thus are not attributable to Lime Wire. These include the industry's decision to resist, rather than embrace, new digital technologies (something they themselves have admitted).[16] For example, it took the labels some 3½ years, from the creation of Napster in 1999 until the opening of the iTunes store in 2003, to provide consumers with a viable legal download option, by which time Apple's near-monopolization of the music retail market was ensured. *See* Report at 54-56, 58. And the labels insisted until 2007, despite much criticism from as early as 2000, on encrypting their music with digital rights management (DRM) software that frustrated the consumer's experience. Report at 50-51; Sinnreich Tr. at 272-78. Professor Sinnreich's opinion that DRM inhibited digital music sales is not uninformed or unreliable; it is held by many in the industry.[17] There is no basis for excluding it, or any of his other opinions, under *Daubert*.

## ARGUMENT

### DR. SINNREICH'S TESTIMONY SHOULD NOT BE EXCLUDED.

**A.    The General *Daubert* Standards Support Admissibility.**

Because "rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702, Advisory Committee Note, 2000 Amendment, "[t]he Rules of Evidence provide a liberal standard for the admissibility of expert testimony." *United States v. Dukagjini*, 326 F.3d

---

[16]    *See* Report at 53 (quoting 2007 statement that label revenues had been declining due to a "slow response, both by the industry and the company, to the move towards digital consumption.").

[17]    ██████████████████████████████████████████████████████████;
3/31/08 Maltby Ltd. Review (Oller Decl. Ex. N) at 47 (elimination of DRM "is expected to support EMI Music's digital sales" and meet consumer needs "through available and flexible digital downloads sales").
████████████████████████████████████████████████████
████████████████████████████████████████████████████

6428525.1

45, 52 (2d Cir. 2003). Rule 702 "must be read in light of the liberalizing purpose of the Rule," *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985), and "[c]ourts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert." *Cary Oil Co., Inc. v. Magistrate Refining & Mktg., Inc.*, 2003 WL 1878246, *1 (S.D.N.Y. Apr. 11, 2003). No single factor or credential controls; instead, the "court should look at the totality of the witness' qualifications in making this assessment." *N.Y. v. Shinnecock Indian Nations*, 523 F. Supp. 2d 185, 259 (E.D.N.Y. 2007).

Indeed, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Emig v. Electrolux Home Prods. Inc.*, 2008 WL 4200988, at *5 (S.D.N.Y. Sept. 11, 2008) ("Indeed, it is not uncommon for a person to qualify as an expert based on his or her experience alone.").

*Daubert*'s "test of reliability is 'flexible,'" *Kumho Tire*, 526 U.S. at 141, and a trial court must focus "solely on [the expert's] principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. "As the Second Circuit has noted, district courts should presume expert evidence is reliable." *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 456 (E.D.N.Y. 2007) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)). In accordance with that principle, an expert's methodology is "reliable" and, therefore, admissible where it is "consistent with the approach used by experts in the field." *Arista Records, Inc. v. Flea World, Inc.*, 2006 U.S. Dist. LEXIS 14988, at *43 n.14 (D.N.J. Mar. 31, 2006).

6428525.1

Expert testimony satisfies the relevance prong of *Daubert* when it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Figueroa v. Boston Scientific Corp.*, 254 F. Supp. 2d 361, 366 (S.D.N.Y. 2003) (quoting Fed. R. Evid. 702). "[B]ecause the federal rules emphasize 'liberalizing expert testimony, doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions.'" *United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992) (quoting 3 Weinstein & Berger, Weinstein's Evidence § 702[03] at 730 (1989)). "The jury is intelligent enough, aided by counsel, to ignore what is unhelpful in its deliberations." *Id.* *See also Ebbert v. Nassau Cnty.*, 2008 WL 8086382, at *6 (E.D.N.Y. Sept. 29, 2008) (expert testimony may be useful to the jury "even if it simply explains facts and evidence already in the record").

"To the extent that there are gaps or inconsistencies in [an expert's] testimony, those issues go to the weight of the evidence, not to its admissibility." *SR Int'l Bus. Ins. Co. v. World Trade Center Props., LLC*, 467 F.3d 107, 134 (2d Cir. 2006) (citing *Daubert*, 509 U.S. at 595) ("The focus [of the admissibility inquiry], of course, must be solely on principles and methodology, not on the conclusions that they generate.")).) (other citation omitted). *See also Advanced Tech. Incubator Inc. v. Sharp Corp.*, 2010 WL 1170246, at *6 (E.D. Tex. Mar. 22, 2010) ("this Court is not inclined to strike portions of [the expert's] report because Defendants claim his opinion is not properly supported. These issues are better left for cross-examination.").

Finally, exclusion of expert testimony is particularly inappropriate where, as here, it can be countered by the expert for the opposing party. As the Second Circuit has held, "trial courts "should not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts." *In re Joint E. & S. Dist.*

*Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995); *see also City of Chicago v. Westchester Fire Ins. Co.*, 2010 WL 3516066, at \*5 (N.D. Ill. Sept. 1, 2010) ("battle of the experts . . . is more properly undertaken at trial in pitting [the parties' respective experts] against each other.")

Ironically, Plaintiffs appear to have forgotten that they advanced these same arguments to support the admission of expert testimony earlier in this very case, as well as in other cases involving the issue of damages for music piracy. During the summary judgment phase in this action, Plaintiffs defeated motions to exclude the testimony of a pair of experts, among them Dr. Ellis Horowitz, whose opinions were challenged as both speculative and based on his own personal feelings. Plaintiffs argued that his conclusions were instead based on "extensive experience" which he used "to draw conclusions . . . about the way in which users are likely to interact with the software." Pls.' Br., Dkt. No. 177 at 21-22. As Plaintiffs argued, under *Daubert*, "experts may make inferences based on their experience and unique understanding of their field." *Id.* at 22 & n.37 (citing *Miller v. Astucci Ltd.*, 2007 WL 102092, at \*14 (S.D.N.Y. Jan. 16, 2007) ("[A]lthough [the expert] based his opinions solely upon his investigation and 'years of experience', '[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."). This Court denied the *Daubert* motion, finding that Horowitz' opinions were "based on his observation and collection of relevant information about existing infringement-reducing technologies." 5/25/10 Opinion and Order (Dkt. No. 223) at 11.

Likewise, in the *Flea World* case, these same Plaintiffs put forth a marketing professor to opine that the sale of pirated music recordings at a flea market at bargain basement prices created a "draw" that benefitted the flea market operator and hence was relevant to the question of damages. *See* Pls.' Brief in *Arista Records, Inc. v. Flea World, Inc.*, No. 1:03-cv-2670 (JBS), Dkt. No. 120 (D.N.J. Nov. 4, 2005) at 13 n.9 (Oller Decl. Ex. Q). Like Professor

6428525.1

Sinnreich, Plaintiffs' expert in *Flea World* identified and reviewed the relevant "body of literature" including academic articles, newspaper articles, published reports and Internet sites, and "synthesized this information with his own observations and own pre-existing research and published articles" to render pertinent conclusions, which they argued was "commonly done as an academic" and "a generally accepted methodology, which Courts have credited in a variety of contexts." *Id.* at 5-6, 10-11. Plaintiffs further argued that under *Daubert*, "whether or not an allegedly 'better' or 'more reliable' method of testing the expert's hypothesis exists is irrelevant." *Id.* at 13. The expert testimony was allowed. *See* 2006 U.S. Dist. LEXIS 14908, at *43. *See also UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d at 457 (allowing testimony by expert for these same record label plaintiffs to "explain the various technologies used to infringe copyrights over the internet," and noting Second Circuit admonition that "district courts should presume expert evidence is reliable").

### B.    Plaintiffs' Specific Criticisms Are Without Merit.

Not only do the general *Daubert* principles support admission of Professor Sinnreich's testimony in this case, but all of Plaintiffs' specific challenges to his qualifications and expertise, as well as their criticisms (often little more than quibbles) of his methodology, are without merit.

### 1.    The Argument That Dr. Sinnreich Is Not An Economist (Pl. Br. at 5-8)

That Professor Sinnreich is not an economist does not preclude him from testifying on damages. Preliminarily, a review of his testimony makes clear that he is familiar and can speak knowledgeably about economic theory as applied to the music industry. *See* Sinnreich Tr. at 21:25-22:26 (explaining the quantitative methodology known as network analysis); *id.* at 167:14-168:24 (explaining the economic implications of the end of minimum advertised pricing); *id.* at 184:25-186:11 (explaining the "long tail" concept and surrounding

6428525.1

debate in the economic community regarding its viability); *id.* at 276-78 (explaining "path dependencies"); *id.* at 325:18-326:16 (explaining the implications of potential label monetization strategies).

In any event, the caselaw is clear that one need not be an economist to testify as to damages. *See, e.g., Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (Posner, J.) (expressly rejecting argument that expert must have "a degree in economics or statistics or mathematics or some other 'academic' field that might bear on the calculation of damages"); *In re MTBE Prods. Liability Litig.*, 2008 WL 1971538, at *5-6 (S.D.N.Y. May 7, 2008) (scope of expert's opinion did not require an "advanced economics degree" or "complex economic statistical analysis" in light of his experience with the relevant industry)[18]; *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 2000 WL 1738338, at *2 (E.D.N.Y. Nov. 1, 2000) (expert's opinions on costs attributable to defendants not disqualified despite fact that expert was not an economist, given his "extensive involvement" with the relevant issues and ability to provide "insights useful to the jury."); *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 2010 WL 4065465, at *13 (S.D. Tex. Oct. 9, 2010) (although expert was not an economist, he could testify regarding the factors that impact commercial performance based upon his years of "practical experience in the industry").

In fact, Professor Sinnreich's experience as a researcher, a surveyor of consumer behavior, a published academic, and an observer of and a participant in the music industry for more than 15 years, make him well qualified to render the opinions he offers. *See United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 125-26 (D. Conn. 2008) (expert qualified in part because he

---

[18]    *See id.* at *5, *7 (expert opinion reliable despite being based on "extensive experience" rather than "social science methodologies such as regression analysis or econometrics," and fact that expert was "not trained as an economist" did not prevent him from testifying about economic factors he had considered "as part of his overall opinion") (citations omitted).

6428525.1

had published a book, written articles about the subjects on which he intended to testify, lectured

and spoke on such subjects and because it was clear that such subjects were his "life work" and

that he had "acquired a considerable amount of information and documentation on [them]");

*Marcus v. BMW of N. Am., LLC*, 2010 WL 4853308, at *17 (D.N.J. Nov. 19, 2010) (holding

admissible market researcher's expert testimony despite fact that he based his report on his

"reading of newspaper articles" and "surveys" because "it [was] unlikely a layperson would be

as capable as [the expert] of understanding what the information contained therein [meant]" and

"[expert's] many years of experience in the field of market research [gave] him specialized

knowledge of consumer behaviors that [would] assist the trier of fact.").

      2.      **The Assertion That Dr. Sinnreich's Causation Testimony Is Unreliable**

            (a)     **The claim that alleged "analytical gaps" in failing to control for, isolate or quantify the impact of file sharing render his testimony unreliable. (Pl. Br. at 10-11)**

      Professor Sinnreich has not attempted to quantify the impacts of file sharing and

other causes on the decline in recorded music sales, explaining that they are not precisely

quantifiable because of their interrelatedness. *See* Sinnreich Tr. at 152:8-11 ("the many different

factors don't operate discretely, but in confluence with one another"); *id.* at 153:13-15. What he

has done, instead, is to identify those factors and explain their significance and relevance,

allowing the jury to make its own ultimate conclusion as to what causes it thinks are most

probable and the extent to which they have impacted record label revenues. This is entirely

appropriate expert testimony. *See Interplan Architects,* 2010 WL 4065465, at *13 (although

expert could not "quantify the exact impact of certain variables," he could offer "non-

quantitative opinions regarding the factors that impact a store's performance based upon his

several years of practical experience in the industry."); *In re Linerboard Antitrust Litig.*, 497 F.

Supp. 2d 666, 683 (E.D. Pa. 2007) (denying motion to exclude expert testimony because

6428525.1

"quantifying the particular effect of any single factor is not essential in proving the causation of damages in antitrust cases"); *VSI Holdings, Inc. v. SPX Corp.*, 2005 U.S. Dist. LEXIS 45979, at *47-48 (E.D. Mich. Apr. 12, 2005) (expert's testimony sufficiently reliable to assist the trier of fact even though he could not quantify the amount of loss or profit resulting from plaintiff corporation's downturn).[19]

Moreover, the contention that Professor Sinnreich did not examine the impact of file sharing in isolation is untrue. His surveys at Jupiter Research did exactly that. His Report demonstrates through examination of sales data that free downloads are not equivalent to lost sales. Report at 12-13. And he points out that the decline in recorded music sales both pre-dates and post-dates the growth of Lime Wire, and that music sales have continued to decline even as file sharing growth has tapered off (*id.* at 13-14), which undermines the hypothesis that file sharing is responsible for virtually all of the decline. In fact it is Professor Liebowitz' analysis that is analytically flawed: he assumes that unless the various alternative factors identified by Professor Sinnreich were all on the rise when music sales began to decline around 1999, they cannot account for *any* meaningful portion of the decline from 1999-2009, which ignores the fact that the ten-year decline could easily be the result of a variety of factors that held different importance at different times. ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[19] *See also Abrams v. Ciba Specialty Chems. Corp.*, 2010 WL 779276, at *7 (S.D. Ala. Mar. 2, 2010) ("*Daubert* does not inflexibly demand quantification of expert opinions in order for them to be admissible."); *id.* at *6 ("the quantification objection is, essentially, an argument that Dr. Scates did not go about his . . . analysis in the right way").

6428525.1

███████████████████████████████████████████████████████████

████████████████████████████████████ 20

It is particularly hypocritical for Plaintiffs to criticize Professor Sinnreich for not specifically isolating the impact of file sharing ████████████████████████████████ when their expert, Professor Liebowitz, admits that (unlike Professor Sinnreich), he has "not used any actual file-sharing data" in his work (Liebowitz Tr. at 176), that he does not know whether file sharing increased after February 2002, following the shutdown of Napster (*id.* at 175-76), that he does not know what percentage of the decline from 1999 to 2009 was due to file sharing networks other than Lime Wire (*id.* at 147-48), or whether file sharing went down at all following the shutdown of Lime Wire. (*Id.* at 175). Astonishingly, in a case in which the issue is how much revenues have been "lost by plaintiffs as a result of *the defendant's* conduct," Professor Liebowitz has not even looked at that question. By contrast, Professor Sinnreich has, and for all the reasons in his Report, he opines that the amount of Plaintiffs' claimed losses *attributable to Lime Wire* (even *assuming* that file sharing is a net negative, as Plaintiffs claim) is minimal.

In any event, the claimed "analytical gaps" in Professor Sinnreich's studies at most go to the weight rather than admissibility of his opinions, and are proper subjects for cross-examination and competing expert testimony at trial, not exclusion. *See, e.g., SR Int'l Bus. Ins. v. World Trade Center Props., LLC*, 467 F.3d 107, 134 (2d Cir. 2006) ("To the extent that there are gaps or inconsistencies in [an expert's] testimony, those issues go to the weight of the

---

20   █████████████████████████████████████████████████████████████
█████████████████████████████████████████████

6428525.1

evidence, not to its admissibility.") (citing *Daubert*, 509 U.S. at 595); *City of Chicago,* 2010 WL

3516066 at *5 ("battle of the experts . . . is more properly undertaken at trial.").[21]

> **(b)    The claim that Dr. Sinnreich's analysis of other expert reports did not employ his own "specialized knowledge," and was "one sided and driven by the conclusion he wanted to reach" (Pl. Br. at 8-10)**

Plaintiffs' argument that Professor Sinnreich's "summary of the analyzes of *other*

purported experts" requires exclusion of his opinions (Pl. Br. at 8-9) is also wrong as a matter of

law.  An expert is not required to "reinvent the wheel" but may "may rely on the research,

studies, and expertise of others, so long as they are of the sort of information regularly relied on

by experts in the field."  *Eclipse Elecs. v. Chubb Corp.*, 176 F. Supp. 2d 406, 412 (E.D. Pa.

2001).  As held in the *Flea World* case, based on these Plaintiffs' own arguments, it was

sufficient that the record labels' expert reviewed the "body of scholarly research" and applied his

own prior research and experience in arriving at the conclusion that "the availability of infringing

music at below market prices is an incentive for consumers to shop at the [flea] Market."  2006

U.S. Dist. LEXIS 14988, at *43.  That is exactly what Professor Sinnreich (who is himself a peer

reviewer for journals and book publishers) did here.  *See* Sinnreich Tr. at 97-98 ("When you're a

research professional, you . . . develop a sense of whether individual pieces of research are – are

written . . . using methodologies that are supportable, written by people who understand what

they're doing and what they're talking about and published in venues that – that have reputations

for methodological rigor."); *id.* at 99-100.[22]  Plaintiffs also criticize him for relying on certain

---

[21]    For these reasons, Defendants have not filed a *Daubert* motion with respect to Professor Liebowitz, believing that the deficiencies in his analysis can be addressed through cross-examination at trial and the testimony of Defendants' experts.

[22]    Contrary to Plaintiffs' contention, Pl. Br. at 8, Dr. Sinnreich did not "concede" that he lacked expertise to assess  whether "many" of these studies were methodologically sound.  He specifically stated that he was qualified to  assess those that  used survey methodologies, and that although  there were "some" that used complex methodologies beyond the scope of his expertise,

6428525.1

"unpublished" versions of the other studies (Pl. Br. at 10), a curious contention in light of

Professor Liebowitz' testimony that publication provides "weak evidence" of quality and that

two of his own works that are the foundation for his attack on Defendants' experts have *not* been

published. *See* Liebowitz Tr. (Oller Decl. Ex. H) at 122, 109. In any event, whether articles

relied on are published or peer-reviewed goes to weight, not admissibility. *See Wisdom v. TJX*

*Cos.*, 410 F. Supp. 2d 336, 342 (D. Vt. 2006) (expert's report "[took] into account reliable

publications . . . even if it [did] not rely on peer-reviewed scientific journals").

        Plaintiffs' further contention that Professor Sinnreich ignored contradictory

studies (Pl. Br. at 10) that "undermined his theory" is not true, as he specifically testified that he

is "willing to accept that there is credible evidence on the other side" that he was not purporting

to dispute, as such. Sinnreich Tr. at 100-02; Report at 30. But regardless, "It is inappropriate to

preclude expert testimony simply because additional contradictory evidence exists." *Adani Exps.*

*Ltd. v. AMCI (Export) Corp.*, 2008 WL 4925647, at *4 (W.D. Pa. Nov. 14, 2008) (that expert

"did not include references to contradictory evidence in his expert report" did not warrant

preclusion because it is "a proper subject for cross-examination."); *Arnold v. Cargill Inc.*, 2006

WL 1716221, at *7 (D. Minn. June 20, 2006) ("the fact that some social-science research is

inconsistent with Bielby's [expert] testimony goes to the weight, not the admissibility, of

Bielby's testimony"). *See also Park West Radiology v. Carecore Nat'l LLC*, 675 F. Supp. 2d

314, 326 (S.D.N.Y. 2008) ("To the extent the [Plaintiffs] have any questions about the weight or

the sufficiency of the evidence upon which [the expert] relied, or the conclusions generated

therefrom, those questions can be asked on cross examination.").

---

his experience as a researcher and peer reviewer enables him to infer from the presentation of the
data and the identity of the publication and authors "how valid its analysis and methodologies
are." Sinnreich Tr. at 96-100.

6428525.1

    **(c)   The claim that Dr. Sinnreich's explanations for the decline in music sales is "speculative and conjecture" (Pl. Br. at 11-12)**

      Plaintiffs try to create the misleading impression that core aspects of Professor Sinnreich's opinion are based on nothing more than speculation. But the examples they cite refute that contention:

- Impact of the maturation of the CD format and end of the replacement cycle: As Professor Sinnreich explained during his deposition, there is no empirical evidence regarding the "specific point" in time when the replacement cycle ended because it was a "trend, not a discrete event encapsulated at a specific moment of time." He further explained that "it's described as a cycle [because] it begins, it reach[es] its apogee and then – then it ends" and that the "consensus" of academic literature is that the cycle lasted until the end of the 1990s. (Sinnreich Tr. at 160-62.). Moreover, as Professor Sinnreich notes, the labels themselves have acknowledged the impact of this factor on their revenues. *See* Report at 17-18 (quoting Warner Music annual report statements that "Additionally, the period of growth in recorded music sales driven by the introduction and penetration of the CD format has ended.").

- Impact of used and independent music: Professor Sinnreich has identified specific data to support the sales figures underlying his opinion that used and independent music increasingly competes with the major labels, including: (1) a Billboard report regarding growth in the percentage of revenues from used CD sales; (2) a book by the well-regarded editor-in-chief of *Wired* magazine which reports that as much as 45% of sales revenue at digital music seller Rhapsody stems from products "not available in the largest offline retail stores"; (3) data from CD Baby, a company that sells independent music and has paid out a total of $157 million to artists (more than one-third in the past 18 months); and (4) sales data from TuneCore, an independent digital music distributor which reported over $32 million in sales revenue in 2009. (*See* Report at 21-22; Sinnreich Tr. at 189-93.)

- Impact of the end of minimum advertised pricing ("MAP"): Plaintiffs' contention that Professor Sinnreich "did not know the time period" during which MAP was used by the major labels, or how many retailers reduced prices when MAP ended, ignores his testimony that MAP was "standard practice through the 1990s." (Sinnreich Tr. at 163.) He further testified that "the big box retailers who accounted for a – at the time probably a plurality of brick and mortar CD sales reduced their prices immediately." (*Id.* at 166.) His knowledge of the impact of MAP was based not on "conjecture" but on his review of "many articles about MAP over the

6428525.1

years," his review of pricing figures, participation in conferences and frequent contact with retailers. (*Id.* at 164-66.)

- <u>Revenue generated from video game and hardware royalties</u>: Plaintiffs again distort Professor Sinnreich's testimony in claiming that he "could offer no numbers or approximations" of the royalties the record labels receive from video game sales. In fact, he testified that he did "a significant amount of research" to determine that "there's a range of licensing rates and structures" for video games and that "typically songs that are licensed for games are licensed on a flat basis, that is, there's a fee against anticipated volume of sales, and for lesser known songs, it could be a few thousand dollars, for better known songs, it could be a half million dollars and there's an entire range between them." (Sinnreich Tr. at 237.)

- <u>Revenues generated from 360 deals</u>: Plaintiffs fault Professor Sinnreich for only "guesstimating" the percentage of revenues accruing to the labels from concerts and merchandise through so-called "360 deals." But again, Professor Sinnreich's opinion is not just speculation; he testified that the percentage varied from between 10 and 30 percent "[d]epending upon the revenue stream, depending on the artist, depending on the label, depending on the deal." (Sinnreich Tr. at 226.) He further noted that his approximation was based on his review of the trade press and extensive conversations with artists and their representatives and label personnel during the course of his career. (*See id.* at 226-27.)

3.      **Dr. Sinnreich's Other Testimony Should Not Be Excluded Based On Plaintiffs' Claims of Prejudice. (Pl. Br. at 13-20).**

        (a)     **The new revenue streams that he identifies are not "unrelated to file sharing."**

Contrary to Plaintiffs' contention, Professor Sinnreich does not opine that a host of emerging streams has completely offset any lost revenues by Plaintiffs. He *does* opine that these revenue sources have *benefitted* from "the newly-energized, P2P-driven fan base for their artists." Report at 30-32. The jury should be allowed to hear his expert opinion that these benefits undermine the Plaintiffs' claims that file sharing is an unmitigated curse.

Plaintiffs do not purport to attack the relevance of the explosion in 360-deal revenue, which Professor Sinnreich clearly relates to "the fact that a great many artists, attorneys, labels representatives and artists representatives have touted the benefits of file sharing for

22

6428525.1

driving sales of concert tickets and merchandise . . . ." Sinnreich Tr. at 227. Instead Plaintiffs

claim that Professor Sinnreich has not related file sharing to other new revenue streams, such as

performance rights, synch rights and video games, seizing on his statement that they "don't have

a whole lot to do with peer-to-peer." Pl. Br. at 14. But all that means, as he explained, is that

revenues from these channels do not directly accrue from peer-to-peer services. *Id.* at 234:8-13.

He went on to explain the basis for his opinion that peer-to-peer services *do* help spur these new

revenue sources: "Bands that are more successful due to, in part, to the degree of consumer

interest that's exhibited via peer-to-peer are more likely to get licensing deals in these channels

and – and to recognize revenues as a result of that. . . ." *Id.* at 235-36. Plaintiffs are free to

argue that these offsetting benefits are insignificant to them, but that goes to the weight, not

admissibility, of the testimony.

> **(b)    An exclusion of all testimony about artists is unwarranted.**

In the file sharing cases that have gone to trial, these Plaintiffs have

invariably claimed that file sharing has harmed not only them but "thousands of hardworking

people [who] lose their jobs because of piracy," including "artists . . . who are putting out new

records."[23] Plaintiffs may well make similar appeals to the jury in this case, including by way of

anecdotal testimony by an artist or two or other "creative talent" to testify to the harm caused by

file sharing. At a minimum, then, Defendants should be allowed to counter this type of

testimony with evidence of their own, including testimony by Professor Sinnreich, that many,

many, artists do *not* believe file sharing is bad (and is often a positive good), and that they do not

regard the record labels as the unqualified champions of their interests that Plaintiffs would have

the jury believe.

---

[23]    *See* Oller Decl. Ex. L (testimony in *Virgin Records America, Inc., et al. v. Jammie Thomas*, at 128-29.

6428525.1

If Plaintiffs end up not uttering a word at trial about how artists claim to have been harmed by file sharing, or how it is really the artists' and other label employees' livelihoods that Plaintiffs have at heart, then Defendants may well not seek to put on any evidence of artists' opinions or artists-label relations. But it is too early for a blanket exclusion ruling. *See, e.g., GII Indus., Inc. v. N.Y. Dept. of Transp.*, 2010 WL 2044635, at *3 (Bankr. E.D.N.Y. May 19, 2010) ("NYSDOT's motion in limine is denied because the record is insufficiently developed at this stage in the proceedings to determine whether any of the evidence at issue should be excluded.")

      (c)      **Dr. Sinnreich's testimony about the continued availability of free online music is relevant and should be allowed.**

Plaintiffs will undoubtedly argue to the jury that a large damages award in this case is necessary to serve the "deterrence" factor under *Bryant*. They are free to make that argument. But Defendants should be allowed to present evidence to the jury supporting the conclusion that the deterrent factor, to the extent it weighs in Plaintiffs' favor, should be given less weight than Plaintiffs claim because few people will, in fact, be deterred from accessing free music by a large award against Lime Wire. As Professor Sinnreich has testified, "file sharing is . . . just one of many, many, many different platforms that people use to achieve the same ends . . . . I can't really imagine a scenario in which the presence or absence of a large damages award in this case would significantly change the availability of free music or the – the overall pace of innovation in – in this arena." Sinnreich Tr. at 313-15.

Defendants do not intend to call Professor Sinnreich affirmatively to opine that Plaintiffs would be better off not suing Lime Wire or that a large award is against Plaintiffs' interests. But for the reasons discussed more fully in their opposition to Plaintiffs' motion to exclude evidence regarding other illegal music sites, Defendants *should* be allowed to call Professor Sinnreich to supply the jury with a foundation for the relevant question of whether,

6428525.1

regardless of any award in this case, millions of people will continue to access music freely online. That evidence will help the jury decide how much weight to place on the deterrent factor under *Bryant*. The rest is argument for the lawyers to make. The testimony should not be excluded.

## CONCLUSION

Plaintiffs' *Daubert* motion regarding Aram Sinnreich should be denied.

Dated: March 8, 2011

WILLKIE FARR & GALLAGHER LLP

Joseph T. Baio (jbaio@willkie.com)
John R. Oller (joller@willkie.com)
Tariq Mundiya (tmundiya@willkie.com)
787 Seventh Avenue
New York, New York 10019
Phone: (212) 728-8000
Fax: (212) 728-8111

*Attorneys for Defendants Lime Group LLC; Lime Wire*
*LLC; Mark Gorton; and M.J.G. Lime Wire Family*
*Limited Partnership*

25