REDACTED VERSION
-COMPLETE VERSION FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARISTA RECORDS LLC; ATLANTIC RECORDING CORPORATION; ARISTA MUSIC, fka BMG MUSIC; CAPITOL RECORDS, LLC fka CAPITOL RECORDS, INC.; ELEKTRA ENTERTAINMENT GROUP INC.; INTERSCOPE RECORDS; LAFACE RECORDS LLC; MOTOWN RECORD COMPANY, L.P.; PRIORITY RECORDS LLC; SONY MUSIC ENTERTAINMENT, fka SONY BMG MUSIC ENTERTAINMENT; UMG RECORDINGS, INC.; VIRGIN RECORDS AMERICA, INC.; and WARNER BROS. RECORDS INC., <br><br> Plaintiffs, <br><br> v. <br><br> LIME WIRE LLC; LIME GROUP LLC; MARK GORTON; and M.J.G. LIME WIRE FAMILY LIMITED PARTNERSHIP, <br><br> Defendants. | 06 Civ. 05936 (KMW) <br> ECF CASE |

**PLAINTIFFS' TRIAL BRIEF**

Glenn D. Pomerantz *(pro hac vice)*
Kelly M. Klaus *(pro hac vice)*
Melinda E. LeMoine
Susan T. Boyd *(pro hac vice)*
Jonathan H. Blavin *(pro hac vice)*
Munger, Tolles & Olson LLP
355 South Grand Avenue
Los Angeles, CA 90071
(213) 683-9100

*Attorneys for Plaintiffs*

April 4, 2011

## TABLE OF CONTENTS

## TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................................... 1

II. PLAINTIFFS' STATUTORY DAMAGES CLAIMS ARE NECESSARY TO COMPENSATE PLAINTIFFS FOR THE MASSIVE HARM THAT DEFENDANTS CAUSED .................................................................................................................... 3

    A. Statutory Damages Serve a Vital Compensatory Purpose ...................................... 3

    B. Defendants Caused Plaintiffs Massive Harm ......................................................... 3

    C. Defendants Are Responsible For Any Alleged Uncertainty in Plaintiffs' Proof of Harm, and Their Head-in-the-Sand Effort to Avoid Creating or Retaining Incriminating Information Justifies a Higher Statutory Award. .............................. 7

III. PLAINTIFFS' STATUTORY DAMAGES CLAIMS ARE ALSO WARRANTED ON DETERRENCE GROUNDS ................................................................................ 9

## TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*A&M Records, Inc. v. Napster, Inc.*,
 239 F.3d 1004 (9th Cir. 2001) ...........................................................................................7

*Anderson v. Local Union No. 3, Int'l Bd. of Elec. Workers*,
 582 F. Supp. 627 (S.D.N.Y. 1984)...................................................................................13

*Arista Records LLC v. Lime Group LLC*,
 715 F. Supp. 2d 481 (S.D.N.Y. 2010)......................................................................4, 5, 9

*Arista Records v. Usenet.com, Inc.*,
 2010 WL 3629688 (S.D.N.Y. Feb. 2, 2010).............................................................3, 12, 13

*Broad. Music, Inc. v. R Bar of Manhattan, Inc.*,
 919 F. Supp. 656 (S.D.N.Y. 1996)...................................................................................10

*Bryant v. Media Right Prods., Inc.*,
 603 F.3d 135 (2d Cir. 2010)........................................................................................8, 10

*Capitol Records Inc. v. Thomas-Rasset*,
 680 F. Supp. 2d 1045 (D. Minn. 2010)............................................................................13

*Disney Enters., Inc. v. Delane*,
 446 F. Supp. 2d 402 (D. Md. 2006).................................................................................13

*Dumas v. Dagl*,
 1990 WL 258343 (S.D.N.Y. May 22, 1990) .....................................................................9

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*,
 344 U.S. 228 (1952).....................................................................................................3, 10

*Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.*,
 807 F.2d 1110 (2d Cir. 1986).............................................................................................3

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
 302 F. Supp. 2d 455 (D. Md. 2004)...................................................................................9

*Manno v. Tenn. Prod. Ctr., Inc.*,
 657 F. Supp. 2d 425 (S.D.N.Y. 2009)..............................................................................10

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
 545 U.S. 913 (2005)................................................................................................. passim

*Original Appalachian Artworks Inc. v. Yuil Int'l Trading Corp.*,
 1987 WL 123986 (S.D.N.Y. Oct. 2, 1987) ....................................................................3, 9

*Tu v. TAD Sys. Tech. Inc.*,
   2009 WL 2905780 (E.D.N.Y. Sept. 10, 2009) ....................................................................12

*Twentieth Century Fox Film Corp. v. Robinson*,
   2007 WL 81936 (E.D.N.Y. Jan. 9, 2007) ..........................................................................13

*U2 Home Entm't, Inc. v. Kim*,
   1998 WL 966084 (E.D. Pa. Nov. 4, 1998) ..........................................................................4

**STATE CASES**

*Hytko v. Hennessey*,
   62 A.D.3d 1081 (N.Y. App. Div. 2009) ............................................................................13

**STATUTES AND RULES**

17 U.S.C. § 412(2) ............................................................................................................8

**OTHER AUTHORITIES**

H.R. Rep. No. 106-216 (1999) ...........................................................................................10

Restatement (Second) of Torts § 886A, cmt. J (1979) ......................................................13

**I.      INTRODUCTION**

The Court is very familiar with the facts of this case and the overwhelming evidence of Defendants' intentional inducement of the mass infringement of Plaintiffs' copyrighted works. Plaintiffs will not re-hash all of that evidence, much of which will be coming in at trial to establish (i) the damages that Plaintiffs are entitled to recover and (ii) Defendants' liability on the claims not resolved at summary judgment (vicarious liability, fraudulent conveyance and unjust enrichment). Plaintiffs instead submit this trial brief to review the fundamental nature of the remedy sought for the majority of Plaintiffs' post-1972 recordings at issue in this case: statutory damages under the Copyright Act.

Defendants will try to use the damages trial to argue—as they have throughout the post-summary judgment phase—that statutory damages would confer on Plaintiffs a "windfall far in excess of their actual damages."[1] The evidence at trial will show that this claim of "windfall" is not true. To the contrary, the evidence will demonstrate that there has been a *$55 billion* decline in record industry revenues over the last decade. Plaintiffs and Defendants disagree as to whether mass filesharing through peer-to-peer services has been the primary cause of this decline (Plaintiffs' position), or just one of several causes (Defendants' position). But even if LimeWire caused only a fraction of this decline, Plaintiffs' damages would still be in the billions of dollars. Plaintiffs will offer evidence at trial demonstrating that far greater than a fraction of this harm was caused by LimeWire.

Congress set the range of statutory damages to appropriately compensate plaintiffs for real damages whose full scope may be difficult to calculate, and to deter further intentional illegal conduct by defendants or other would-be infringers. In this case, the reason Plaintiffs do

---

[1] Defendants' Nov. 5, 2010 letter to Court at 9.

not know every one of the billions of infringements made and thus the full scope of their damages is because Defendants intentionally designed and operated LimeWire so it would not record the overwhelming evidence of theft that Defendants knew their users were engaged in. The statutory damage remedy provides compensation to Plaintiffs precisely when Defendants engage in such conduct to try to limit their liability.  As courts have made clear, one of the main reasons for the statutory damage remedy "was so that a copyright owner would not be prevented from a recovery simply because actual amounts may not be ascertainable *due to an infringer's success in hiding records of its illegal activities*."  *Original Appalachian Artworks Inc. v. Yuil Int'l Trading Corp.*, 1987 WL 123986, at *8 (S.D.N.Y. Oct. 2, 1987) (emphasis added).  That is exactly what Defendants have done here.

  The trial also will show that significant statutory damages will serve Congress's purposes of deterring illegal activity.  Defendants did not simply induce infringement on a massive scale; they continued to do so even after the federal courts shuttered their ignominious predecessors, after the Supreme Court unanimously made it clear in *Grokster* that inducers like Defendants were operating illegally, and through 2010.  Mark Gorton has made clear his contempt for the rights of copyright holders and his repeated unwillingness to comply with the law.  Defendants' retort that "if they didn't steal using our service, they would have used other services to steal," amplifies the need for the jury award in this case to send a strong message of deterrence.  *See Arista Records v. Usenet.com, Inc.*, 2010 WL 3629688, at *6 (S.D.N.Y. Feb. 2, 2010) (because it "is well documented that Defendants are not alone in their pursuit to make Plaintiffs' works freely available via internet downloads," the "need to deter future infringers is therefore great.").

## II. PLAINTIFFS' STATUTORY DAMAGES CLAIMS ARE NECESSARY TO COMPENSATE PLAINTIFFS FOR THE MASSIVE HARM THAT DEFENDANTS CAUSED

### A. Statutory Damages Serve a Vital Compensatory Purpose

Plaintiffs seek statutory damages to provide some measure of compensation for the extraordinary losses that Defendants caused. Statutory damages are not "fake" damages. As the Supreme Court has made clear, statutory damages "give the owner of a copyright *some recompense for injury done him*, in a case where the rules of law render difficult or impossible proof of damages or discovery of profits." *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 231 (1952) (emphasis added). *See also Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.*, 807 F.2d 1110, 1117 (2d Cir. 1986) ("[a]wards of statutory damages" have "compensatory" purpose); *U2 Home Entm't, Inc. v. Kim*, 1998 WL 966084, at *3 (E.D. Pa. Nov. 4, 1998) (statutory damages award will give "Plaintiff sufficient funds to alleviate any injuries suffered by the Plaintiff as a result of these infringements").

### B. Defendants Caused Plaintiffs Massive Harm

Illegal filesharing has been the dominant cause of the record industry's more than *$55 billion* decline over just the last decade. During much of that time—and in particular following the Supreme Court's unanimous decision in *Grokster*—LimeWire was the dominant illegal filesharing service.

As the Court found at summary judgment, Lime Wire's "enormous user base" committed copyright infringement on a "massive scale." *Arista Records LLC v. Lime Group LLC*, 715 F. Supp. 2d 481, 510, 512 (S.D.N.Y. 2010). *See also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.***,** 545 U.S. 913, 937 (2005) (peer-to-peer filesharing networks enable "massive infringement"). Three years ago, when the summary judgment motions were filed, four million

- 3 -

unique users accessed LimeWire *every day*, and users had downloaded the LimeWire client from just one website (download.com) *more than 152 million times*. (SUF ¶¶ 95, 96.[2]) On its website, LimeWire touted that it was the "world's most popular peer-to-peer file-sharing program," with "over 70 million unique monthly users."[3] LimeWire's CEO, George Searle, stated in November 2007 that LimeWire "gets about seven million new downloads per month, and its users generate a total of five billion searches per month." (Ex. 44.[4])

    These tens of millions of LimeWire users conducting billions of searches each month used LimeWire "overwhelmingly for infringement." *Arista Records,* 715 F. Supp. 2d at 517. Indeed, Lime Wire's very existence *depended* on its "infringement-enabling features." *Id*. at 512. Citing Dr. Richard Waterman's report, the Court found at summary judgment that "[n]early all of the files shared and downloaded by LimeWire users are copyrighted, and not authorized for free distribution through LimeWire." *Id*. at 509. ▌

    These astounding levels of piracy have caused staggering amounts of harm to Plaintiffs. The total reduction in sales revenues for Plaintiffs' sound recordings in the United States from

---

[2] References to Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, dated July 18, 2008, and Statement of Additional Material Facts, dated September 26, 2008, are cited as "SUF ¶ _."

[3] http://replay.waybackmachine.org/20100209143944/http://www.limewire.com/el/about (archive of February 2010 LimeWire website) (last visited April 4, 2011).

[4] Unless otherwise noted, documents (or excerpts) cited herein ("Ex. _") are contained in Volumes I - XIV of the Exhibits to the Declarations of Katherine B. Forrest. Excerpts from deposition testimony ("Tr. _") and Declarations ("Decl.") cited herein are arranged alphabetically by the witness or expert's last name and are contained in Volumes VI, VII and X, respectively, of the Exhibits to the Forrest Declarations.

1999, when Napster first hit the market, to today is over *$55 billion*.[5] The table below shows the declines in sound recording sale revenues for the 10 largest music markets over the period 1999 to 2009 (controlling for inflation). Revenues in the United States declined from $10.826 billion in 1999 to $4.562 billion in 2009 — a decline of over 57%.

| Table 1:Trade Revenue Change, 1999-2009 (inc ringtn) | | |
|---|---|---|
| | 1999 Revenues (inflation adjusted 2009 Local Currency) | Nominal 2009 Revenues | % Change |
| USA | 10,826.22 | 4,562.30 | **-57.86%** |
| Japan | 499,209.03 | 370,979.74 | **-25.69%** |
| UK | 1,464.48 | 928.80 | **-36.58%** |
| Germany | 2,036.83 | 1,046.40 | **-48.63%** |
| France | 1,379.22 | 622.76 | **-54.85%** |
| Canada | 1,165.96 | 430.21 | **-63.10%** |
| Australia | 908.72 | 470.23 | **-48.25%** |
| Italy | 604.22 | 162.05 | **-73.18%** |
| Spain | 599.83 | 151.06 | **-74.82%** |
| Netherlands | 345.42 | 156.11 | **-54.81%** |
| Switzerland | 376.45 | 186.07 | **-50.57%** |

(Rebuttal Report of Dr. Stan J. Liebowitz, dated Feb. 14, 2010 ("Liebowitz Report") ¶¶ 12-13 (attached as Exhibit 4 to the Declaration of Melinda LeMoine in Support of Plaintiffs' Motion to Preclude Certain Purported Expert Testimony By George Strong, Dkt. No. 577).)

Similarly, the chart below shows the unit quantity of album sales (including digital singles aggregated in album equivalents) per capita in the United States from 1999 to 2009. Beginning in 1999, record sales began a precipitous decline of unprecedented scope, with sales ultimately falling over 50% from 1999 to 2009.

---

[5] Liebowitz Report ¶ 94 (citing RIAA database, https://www.riaa.com/shipmentlogin.php).



(Liebowitz Report ¶¶ 14-15.)

Defendants have made it clear that they will try to use the trial to posit a number of speculative, alternative causes behind Plaintiffs' massive losses. The clear, obvious one is their own unlawful conduct. The economic logic behind Plaintiffs' losses is simple and irrefutable — a person who already has a free copy of work that is identical to the purchased version will not spend the money to purchase that work. When perfect, free copies are widely available, as LimeWire readily provided, consumer demand, and therefore sales, sharply decline. As the Supreme Court recognized in *Grokster*, the free "digital distribution of copyrighted material threatens copyright holders as never before, because every copy is identical to the original, copying is easy, and many people (especially the young) use file-sharing software to download copyrighted works." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 928-29 (2005). *See also A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1017 (9th Cir. 2001) (citing "Napster's deleterious effect on the present and future digital download market").

Indeed, Defendants themselves have acknowledged the immense financial harm their inducing service caused Plaintiffs. █████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

### C. Defendants Are Responsible For Any Alleged Uncertainty in Plaintiffs' Proof of Harm, and Their Head-in-the-Sand Effort to Avoid Creating or Retaining Incriminating Information Justifies a Higher Statutory Award

Defendants will argue at trial that because Plaintiffs cannot present precise evidence of every one of the billions and billions of illegal downloads, the jury should believe that LimeWire was "no big deal." The reason that Plaintiffs cannot pinpoint all of the illegal downloads that took place through LimeWire is that *Defendants* intentionally designed a system that did not keep track of which users were stealing which of Plaintiffs' works.[6] Indeed, this is why the Copyright Act affords Plaintiffs' the ability to seek statutory damages in the first place. Any alleged uncertainty with respect to the harm Plaintiffs have suffered as a result of Defendants' conduct militates in favor of a *larger* statutory award given Defendants' bad faith efforts to

---

[6] Plaintiffs will present evidence supporting a significant actual damages award for those works that, as a result of the Court's interpretation of 17 U.S.C. § 412(2), may be ineligible for statutory damages. Dr. Waterman will provide expert testimony, based on evidence of downloading collected by the NPD survey organization, that millions upon millions of sound recordings were downloaded through LimeWire. Plaintiffs will establish the revenue that they lost because of those illegal downloads through their agreements with digital providers. The contracts show that, when someone uses a service to obtain a digital copy of a sound recording, Plaintiffs are paid a certain amount. The "avoided cost" from such an exchange includes the statutory mechanical royalty set by Congress. Although these actual damages will have to suffice for now (Plaintiffs reserve their right to appeal the Court's rulings interpreting § 412(2) and § 504), those amounts will not come close to giving Plaintiff the full benefit of the statutory damage award, since the revenues that Plaintiffs lost is just one of multiple factors the jury must consider in setting the statutory award. *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010).

design a system intended to conceal Defendants' inducement of staggering amounts of copyright infringement.

Defendants purposefully designed LimeWire to hide all acts of infringement, not keeping any centralized records of downloading and uploading activity, in the aggregate or with respect to any individual recordings, because they purportedly believed that a decentralized structure, unlike Napster, would render LimeWire not liable for infringement.  (*See* SUF ¶¶ 312, 369-70, 388.  *See also* Ex. 194 at AF 0177 (LimeWire runs "on a decentralized server [which] offers more privacy and makes it harder for organizations such as the RIAA to shut it down."); Ex. 315 at 8 (www.gtamarketing.com/P2Panalyst/VonLohmann-article.html) (Fred Von Lohmann encouraging LimeWire and other P2P developers to "buil[d] a level of 'plausible deniability' into [their] product . . . and business model" such that they can "plausibly deny knowing what [their] end-users are up to" by "choos[ing] an architecture that will convince a judge that . . . monitoring and control is impossible").)[7]

Statutory damages exist to deal with precisely the sort of proof issues that Defendants opportunistically created.  Courts have made clear that the "main reason for the alternative statutory damage provision was so that a copyright owner would not be prevented from a recovery simply because actual amounts may not be ascertainable *due to an infringer's success in hiding records of its illegal activities*."  *Original Appalachian Artworks, Inc. v. Yuil Int'l Trading Corp.*, 1987 WL 123986, at *8 (S.D.N.Y. 1987) (emphasis added).  *See also Dumas v. Dagl*, 1990 WL 258343, at *3 (S.D.N.Y. May 22, 1990) ("main reason" for statutory damages is

---

[7] And as the Court found at summary judgment, Defendants made "conscious 'design choice[s]'" the "direct result of which was a *failure to mitigate infringement*."  *Arista Records*, 715 F. Supp. 2d at 513 (emphasis added).   Defendants "chose not to implement any meaningful infringement-reduction strategies in part because it recognized that, 'as long as there were other [P2P] applications that didn't filter,' LimeWire users would respond to filtering by switching 'to another [P2P application] that doesn't have that filtering behavior or that is less aggressive in making fewer files available.'" *Id.* at 515.

to ensure recovery given "infringer's success in hiding records of its illegal activities"); *Lowry's Reports, Inc. v. Legg Mason, Inc*., 302 F. Supp. 2d 455, 460 (D. Md. 2004) ("[s]tatutory damages exist in part because of the difficulties in proving – and providing compensation – actual harm in copyright infringement actions."). And indeed, where, as with Defendants, a "party frustrates proof of damages, either by withholding facts or through inaccurate record-keeping, any doubts about the actual assessment of damages will be resolved against that party, and the fact-finder may calculate damages at the highest reasonably ascertainable value." *Original Appalachian Artworks,* 1987 WL 123986, at *8 (discussing damages in context of Copyright Act) (quoting *Chesa Int'l, Ltd. v. Fashion Assocs., Inc.*, 425 F. Supp. 234, 238 (S.D.N.Y.), aff'd, 573 F.2d 1288 (2d Cir. 1977)).

### III. PLAINTIFFS' STATUTORY DAMAGES CLAIMS ARE ALSO WARRANTED ON DETERRENCE GROUNDS

The evidence further will show that significant statutory damages are necessary to deter not only Defendants but other would-be copycats who would seek to build a business on the infringement of copyright owners' works.

In setting the statutory award, the jury may consider the "deterrent effect on the infringer and third parties." *Bryant*, 603 F.3d at 144. As the Supreme Court has stated, statutory damages "do not merely compel[] restitution of profit and reparation for injury," but also are "designed *to discourage wrongful conduct*." *F.W. Woolworth,* 344 U.S. at 231 (emphasis added). *See also* H.R. Rep. No. 106-216, at 3 (1999) (Congress increased statutory award because "many infringers do not consider the current copyright infringement penalties a real threat and continue infringing, even after a copyright owner puts them on notice that their actions constitute infringement and that they should stop the activity or face legal action.")

The jury may set a statutory damages award vastly in excess of the plaintiff's actual damages given the "deterrent effect of an award on other potential infringers and the potential for discouraging the defendant from future similar conduct." *Manno v. Tenn. Prod. Ctr., Inc.*, 657 F. Supp. 2d 425, 434 (S.D.N.Y. 2009) (emphasis added). It is well settled that "'to put infringers 'on notice that it costs less to obey the copyright laws than to violate them,'" a "statutory damage award should significantly exceed the amount of unpaid license fees. . . . . Case law reflects many instances in which courts have set awards at *several times the amount of lost profits*." *Id.* (emphasis added). *See also Broad. Music, Inc. v. R Bar of Manhattan, Inc*., 919 F. Supp. 656, 660 (S.D.N.Y. 1996) (collecting cases in which courts found that statutory damage awards "should significantly exceed the amount" of actual damages).

The need for deterrence here is great and strongly counsels in favor of a large statutory award. Although several unscrupulous actors have sought to build illegal business models on the backs of copyright holders, Defendants take the cake for sheer brazenness. Gorton launched LimeWire *after* Napster was enjoined, with his eyes wide open as to the rampant copyright infringement on which his business would depend. (*See* ¶¶ 44, 144.) According to Gorton's sworn testimony in this case: "Since founding LimeWire, I have been aware that my dreams . . . have been thoroughly mixed with copyright infringement." (Declaration of Mark Gorton in Support of Opposition to Pl's Mot. for Summ. J. ¶ 30, Dkt. No. 146 (entered September 16, 2008).) That did not stop Gorton from developing LimeWire and enabling infringement on an enormous scale.

Shortly before the Supreme Court decided *Grokster*, Gorton publicly acknowledged that the Court's decision would decide Lime Wire's fate. Gorton stated to the New York Times, "If the Supreme Court says it is illegal to produce this software, *Lime Wire the company will cease*

*to exist.*" (Ex. 201 (emphasis added).)  The day the Supreme Court decision came down, Gorton and his closest family members recognized the *Grokster* decision spelled doom for Lime Wire's operation.  (Declaration of Kelly M. Klaus, Ex. 5 (Dkt. No. 304) (entered August 16, 2010) (email from Gorton's parents on day Supreme Court decided *Grokster*).)  The very next day, Gorton told the New York Times again that he would likely stop distributing LimeWire in reaction to the ruling:  "Some people are saying that as long as I don't actively induce infringement, I'm OK. . . . *I don't think it will work out that way.*" (*Id.*, Ex. 6 (emphasis added).)

In short, Gorton saw *Grokster's* writing on the wall in June 2005.  He knew then that Lime Wire and the massive infringing conduct it intentionally induced would eventually "cease to exist" under the law, but he nonetheless continued LimeWire's illegal business for another *five years*.  Indeed, Gorton viewed the *Grokster* ruling as yet another opportunity to capitalize off of a judicial ruling shutting down one of LimeWire's competitors, giving him the chance to further monopolize the illegal peer-to-peer market —he continued to build LimeWire's tremendous user base from confirmed infringers lured away from shuttered services like Napster, Morpheus, Kazaa, and finally Grokster.  Even following this Court's summary judgment ruling, Gorton and LimeWire showed contempt and defiance for the law.  Lime Wire's initial press release following the Order proclaimed that the company "strongly opposes the Court's recent decision."[8]  Gorton, meanwhile, gave interviews saying that "[p]erhaps" he "was naïve" about

---

[8] http://online.wsj.com/article/SB10001424052748704247904575240572654422514.html (last visited April 4, 2011).

the litigation, that Plaintiffs should look at his company as a kind of "Woodstock," and that he has "a lot of work to do to get [his] karma scores up."[9]

Because Gorton and LimeWire were "the owners or operators of businesses or services that facilitate[d] or induce[d] infringement," an "even larger" award is warranted against them. *Usenet.com, Inc.*, 2010 WL 3629688, at *8. Gorton and Defendants' "misuse of technology to pirate Plaintiffs' product was an egregious and willful act designed to 'sneer' in the face of Plaintiffs' copyright and intellectual property laws. An award of the enhanced statutory maximum is appropriate and reasonable to compensate Plaintiffs and to deter Defendants and future infringers." *Tu v. TAD Sys. Tech. Inc.*, 2009 WL 2905780, at *6 (E.D.N.Y. Sept. 10, 2009).

The need to deter *other* illegal services who would seek to replicate Defendants further justifies a maximum statutory award. Defendants' oft-stated claim, surely to be repeated at trial, that LimeWire's infringing user base would have used a different illegal service to infringe Plaintiffs' copyrights in the absence of LimeWire itself demonstrates the pressing need to deter online piracy. As the court noted in *Arista Records v. Usenet.com, Inc.*, 2010 WL 3629688, at *6, in setting the statutory damages award it is necessary to "consider the deterrent effect on both other potential infringers as well Defendants themselves. . . . It is well documented that Defendants are not alone in their pursuit to make Plaintiffs' works freely available via internet downloads. . . . The need to deter future infringers is therefore great." Several other courts similarly have held that large statutory damages awards against Internet pirates is warranted given the broader threat posed by other illegal online services. *See, e.g., Twentieth Century Fox Film Corp. v. Robinson*, 2007 WL 81936, at *3 (E.D.N.Y. Jan. 9, 2007) ("[I]nternet piracy cost

---

[9] http://dealbook.nytimes.com/2010/05/24/mark-gorton-man-behind-the-music-service/ (last visited April 4, 2011).

members of the Motion Picture Association of America ('MPAA') in excess of $2.3 billion in 2005. . . . [T]his Court finds that an award of statutory damage is necessary in order to deter defendant and others from infringing activity."); *Disney Enters., Inc. v. Delane*, 446 F. Supp. 2d 402, 407 (D. Md. 2006) ("[D]igital piracy has a continuing financial impact on the entire motion picture industry.  In light of [the defendant's] willful infringement, and to deter future violations, the court will grant Plaintiffs' request for statutory damages"); *Capitol Records Inc. v. Thomas-Rasset*, 680 F. Supp. 2d 1045, 1057 (D. Minn. 2010) (in setting statutory award taking into account "the need to deter online piracy in general").[10]

Dated:  April 4, 2011

Respectfully submitted,

*/s/ Kelly M. Klaus*
Kelly M. Klaus

Attorney for Plaintiffs
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
(213) 683-9100
(213) 687-3702 (Fax)

---

[10] As demonstrated in Plaintiffs' motion *in limine* regarding other illegal services, Defendants cannot avoid damages by pointing the finger at someone else who might have engaged in the same illegal conduct.   It is well settled that no right of contribution arises in favor of one who has intentionally caused harm to another.  *See, e.g.*, *Anderson v. Local Union No. 3, Int'l Bd. of Elec. Workers*, 582 F. Supp. 627, 632 (S.D.N.Y. 1984) ("It has long been the rule at common law . . . that contribution will not lie in favor of an intentional tort feasor."); *Hytko v. Hennessey*, 62 A.D.3d 1081, 1086 (N.Y. App. Div. 2009) ("[P]ublic policy precludes indemnification for those who commit intentional torts."); Restatement (Second) of Torts § 886A, cmt. J (1979).