UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ARISTA RECORDS LLC; ATLANTIC RECORDING
CORPORATION; ARISTA MUSIC, fka BMG
MUSIC; CAPITOL RECORDS, INC; ELEKTRA
ENTERTAINMENT GROUP INC; INTERSCOPE
RECORDS; LAFACE RECORDS LLC; MOTOWN
RECORD COMPANY, L.P.; PRIORITY RECORDS
LLC; SONY MUSIC ENTERTAINMENT, fka SONY
BMG MUSIC ENTERTAINMENT; UMG RECORDINGS,
INC; VIRGIN RECORDS AMERICA, INC.; and
WARNER BROS. RECORDS INC.,                           06 CV 5936 (KMW)

                                                     OPINION AND ORDER

                           Plaintiffs,

             -against-

LIME GROUP LLC; LIME WIRE LLC; MARK
GORTON; GREG BILDSON; and M.J.G. LIME WIRE
FAMILY LIMITED PARTNERSHIP,

                           Defendants.
-------------------------------------------------------------------x
KIMBA M. WOOD, U.S.D.J.:

## I.    Introduction

On May 11, 2010, this Court granted summary judgment in favor of Plaintiffs on their

claims against Defendants LimeWire LLC ("LW"), Lime Group LLC ("Lime Group"), and Mark

Gorton (collectively, "Defendants") for secondary copyright infringement.  The Court found that

Defendants had induced multiple users of the LimeWire online file-sharing program

("LimeWire") to infringe Plaintiffs' copyrights.  In the Court's Opinion and Order (as amended

on May 25, 2010), the Court detailed this case's procedural and factual background, familiarity

with which is assumed.  (*See* Dkt. Entry No. 223; *Arista Records LLC v. Lime Group LLC*, 715 F

Supp. 2d 481, 507 (S.D.N.Y. 2010).)  The litigation is now in the damage phase, with a trial on

damages scheduled for May 2, 2011.

Defendants have designated three witnesses to offer expert testimony on different aspects

of the damage proceedings: Professor Emin Gün Sirer, George Strong, and Professor Aram

Sinnreich.  Plaintiffs have moved to preclude certain portions of the testimony of each of these

witnesses under Rule 702 of the Federal Rules of Evidence.  (Dkt. Entry No. 572.)  As set forth

in more detail below, Plaintiffs' motions are GRANTED in part, and DENIED in part.

## II.   **Applicable Law**

The Supreme Court has assigned to district courts a "gatekeeping" role with respect to

expert opinion testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)

(holding that it is the district court's responsibility to ensure that "any and all scientific testimony

or evidence admitted is not only relevant, but reliable").  This "gatekeeping" function applies

whether the expert testimony is based on scientific, or on technical or "other specialized"

knowledge.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  "It is well-

established that the trial judge has broad discretion in the matter of the admission or exclusion of

expert evidence."  *Boucher v. United Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citation

omitted).

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of

Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

2

Fed. R. Evid. 702.  A court's inquiry thus focuses on three issues: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact.  *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005).  The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met.  *See Daubert*, 509 U.S. at 593 n.10; *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

(a) Qualification of an Expert

Whether a purported expert witness is qualified as such by his or her "knowledge, skill, experience, training or education," Fed. R. Evid. 702, is a "threshold question" to be resolved prior to the other inquiries. *Nimely*, 414 F.3d at 396 n.11.  *See Haimdas v. Haimdas*, 09 Civ. 2034, 2010 WL 652823, at *2 (E.D.N.Y. Feb. 22, 2010) (stating that "where an expert witness is insufficiently qualified, an analysis of the remaining factors 'seems almost superfluous'" (quoting *Zaremba v. Gen. Motors Corp.,* 360 F.3d 355, 360 (2d Cir. 2004)).  The Second Circuit has explained that this question is particularly important "because an 'expert' witness is permitted substantially more leeway than 'lay' witnesses in testifying as to opinions that are not 'rationally based on [his or her] perception.'"  *Nimely*, 414 F.3d at 396 n.11 (quoting *United States v. Garcia,* 291 F.3d 127, 139 & n. 8 (2d Cir.2002)).

In order to determine whether a witness is qualified to render an expert opinion, a court "must first ascertain whether the proffered expert has the educational background or training in a relevant field," *Cary Oil Co., Inc. v. MG Refining & Marketing, Inc*., No. 99 Civ. 1725, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) (citation omitted), by looking at the "totality of

[the] witness's background." *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009) (citation omitted). A witness may be qualified based on any one or more of the qualities listed in Rule 702 – knowledge, skill, experience, training or education. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007) (citing 4 Jack B. Weinstein, Weinstein's Federal Evidence § 702.04[1][c] (2d ed. 2006)).

The court must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). The court must ensure that the expert will actually be testifying "on issues or subject matter[s] within his or her area of expertise." *Haimdas*, 2010 WL 652823, at *2 (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)). "[A]n expert who is qualified in one field cannot offer an opinion about aspects of the case in another field for which she is not qualified." *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, MDL No. 1358, M21-88, 2008 WL 1971538, at *6 n.48 (S.D.N.Y. May 7, 2008). *See also Malletier v. Dooney & Bourke, Inc*., 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) ("An expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702.").

"Courts within the Second Circuit 'have liberally construed expert qualification requirements' when determining if a witness can be considered an expert." *Cary Oil*, 2003 WL 1878246, at *1 (quoting *TC Sys. Inc. v. Town of Colonie, New York,* 213 F.Supp.2d 171, 174 (N.D.N.Y. 2002)). *See also United States v. Brown,* 776 F.2d 397, 400 (2d Cir. 1985) (qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the rule"); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("In keeping

4

with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony,' the standard for qualifying expert witnesses is liberal." (quoting *Daubert,* 509 U.S. at 588-89) (internal citation omitted)); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.").

In light of the "liberal thrust" of the Rules, *Daubert*, 509 U.S. at 588, courts in this circuit have noted that an expert "should not be required to satisfy an overly narrow test of his own qualifications."  *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369, 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006) (citation and quotation marks omitted).  "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."  *In re Zyprexa*, 489 F. Supp. 2d at 282 (citing *Stagl*, 117 F.3d at 80).  *See also Johnson and Johnson*, 2006 WL 2128785, at *5 ("In considering a witness's practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." (citation omitted)); *Sullivan v. Ford Motor Co.,* No. 97 Civ. 593, 2000 WL 343777, at *4 (S.D.N.Y. Mar. 31, 2000) ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion." (quoting *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 8178 F.2d 791, 799 (4th Cir. 1989))). "Quibble[s] with an expert's academic training" go to the "testimony's weight . . . not its

admissibility," and are an appropriate subject for cross-examination.  *United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)).

(b) Reliability of Expert Testimony

Once a court has determined that a witness is qualified as an expert, it must ensure that the witness is proposing to testify to knowledge that both "rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  "As the Second Circuit has noted, district courts should presume expert evidence is reliable."  *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 456 (E.D.N.Y. 2007) (citing *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir.1995)).  In assessing the reliability of an expert's proposed testimony, the Court's focus "must be solely on principles and methodology, not on the conclusions they generate."  *Daubert*, 509 U.S. at 595; *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).[1]  Courts have held that claims "that the assumptions relied on by an expert are unfounded is generally an argument that goes to the weight rather than the admissibility of the evidence."  *MacQuesten General Contracting, Inc. v. HCE, Inc.*, 99 Civ. 8598, 2002 WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002) (citing *Boucher,* 73 F.3d at 21).  *See also Johnson & Johnson*, 2006 WL 2128785, at *7 ("As long as the expert uses reliable methods to reach his conclusion, 'lack of textual support

---

[1] In *Daubert*, the Supreme Court identified factors that may bear upon the reliability of proposed scientific testimony, including: (1) whether the theory or technique can be, and has been, tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique or theory has gained widespread acceptance in the relevant scientific community.  *Daubert*, 509 U.S. at 593-94 (noting that these factors do not constitute "a definitive checklist or test").  In *Kumho*, the Supreme Court held that a court may apply the *Daubert* factors, as appropriate, in cases dealing with technical or "other specialized," but non-scientific testimony.  526 U.S. at 141.

should go to the weight of the evidence, not its admissibility.'" (quoting *Amorgianos*, 303 F.3d at 267)).  As the Supreme Court stated, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

At the same time, under the court's "gatekeeping" function, the court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho*, 526 U.S. at 152.  "Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case" can serve as "grounds for rejection of expert testimony."  *In re Zyprexa*, 489 F. Supp. 2d at 284.  The Supreme Court has stressed that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  *See also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (holding that expert testimony should be excluded when it is "speculative or conjectural" (quoting *Boucher*, 73 F.3d at 21)).  Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Amorgianos,* 303 F.3d at 266.

(c) Helpfulness / Relevance of Testimony

Finally, the Court must determine that the expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  This inquiry essentially looks to whether the testimony is relevant.  *See In re Zyprexa*, 489 F. Supp. 2d at 283.

Under the Federal Rules of Evidence, evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401; *see also Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility").  A court should not admit expert testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *United States v. Mulder*, 273 F.3d 91, 104 (2d Cir. 2001) (quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)).

Expert testimony must also adhere to the other Federal Rules of Evidence, including Rule 403, which provides that relevant evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  The Rule 403 inquiry is particularly important in the context of expert testimony, "given the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397.  *See Daubert,* 509 U.S. at 595 ("'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991))).

## III.   Analysis

### A.     Emin Gün Sirer

Defendants offer Professor Emin Gün Sirer as an expert in technology and computer science.  Professor Sirer is an Associate Professor of Computer Science at Cornell University. He holds a Ph.D in Computer Science and Engineering from the University of Washington, and a Bachelor of Science in Engineering from the Computer Science Department of Princeton University.  A review of Professor Sirer's *curriculum vitae* shows that he has published papers and lectured widely on a broad range of topics relating to computer systems, and peer-to-peer systems in particular.  (*See* Klaus Dec. in Support of Pl.'s. Mot. to Preclude Certain Purported Expert Testimony by Emin Gün Sirer (hereinafter "Klaus Dec. (Sirer)"), Ex. 4, Expert Report of Emin Gün Sirer (hereinafter "Sirer Report"), Ex. A.)

Plaintiffs do not dispute Professor Sirer's technological expertise.  (*See* Pl. Mem. of Law in Support of Mot. to Preclude Certain Expert Testimony by George Strong (hereinafter "Pl. Mem. (Strong)") at 8 (describing Professor Sirer as a "technical expert").)  Instead, Plaintiffs challenge the admissibility of Professor Sirer's opinions regarding the statistical conclusions of Plaintiffs' purported statistics expert, Dr. Richard Waterman, concerning the total number of infringements on LimeWire of Plaintiffs' works at issue.  Specifically, Plaintiffs argue that Professor Sirer has insufficient expertise in statistics and statistical methodologies to offer an opinion admissible under Rule 702, and that, in any event, his opinions are insufficiently reliable. For the following reasons, the Court GRANTS in part and DENIES in part Plaintiffs' motion.

Plaintiffs point out that, unlike Dr. Waterman, Professor Sirer does not have a degree in statistics, does not teach statistics, has never published articles on statistics, and, in fact, has never taken a class in a statistics department or one where statistics was the primary focus of the class.  Although Professor Sirer claimed to use statistical methods in his computer science work, at his deposition, he was unable to provide specifics about the particular statistical methodologies

he has used.  He was also unwilling (if not unable) to answer basic questions about statistical

principles at his deposition.  (*See* Klaus Dec. (Sirer), Ex. 5, Deposition Transcript of Emin Gün

Sirer (hereinafter "Sirer Dep.") at 224:13-226:16.)  Plaintiffs also argue that, to whatever extent

Professor Sirer has experience working with statistics, he has never performed statistical

analyses or surveys of human populations.

The Court agrees that Professor Sirer is not qualified to offer an expert opinion about

statistics or surveying issues.  *See Zaremba*, 360 F.3d at 359-60 (affirming exclusion of

purported expert who had only a bachelor's degree in engineering, finding that purported expert

had "meager qualifications to offer . . . opinions as to automobile design"); *Haimdas*, 2010 WL

6852823, at *2-3 (excluding testimony of family therapist offered to rebut testimony of

psychologist regarding psychological analysis of children because psychology and family

therapy are different disciplines).  Professor Sirer has no doubt employed statistics to some

degree in his studies and work, "as most people do to one extent or another."  *Malletier*, 525

F.Supp.2d at 642 (precluding testimony on probabilities by expert in colorimetry because his

expertise in colorimetry "[did] not establish his expertise as a statistician").  However,

Defendants have not demonstrated that Professor Sirer possesses sufficient "knowledge, skill,

experience, training, or education" to provide testimony on statistical issues that will "assist the

trier of fact."  Fed. R. Evid. 702.  *Cf. Malletier*, 525 F. Supp. 2d at 642 (noting that the plaintiff

"certainly had the opportunity to retain an expert to interpret the statistical probabilities [at issue]

but it did not do so")

Defendants argue that Professor Sirer's criticisms of Dr. Waterman's study do not depend

upon sophisticated knowledge of statistics.  This is contradicted by the substance of his

criticisms, which focus on technical matters of statistical analysis and surveying techniques.  In

any event, to the extent that Professor Sirer's opinions do not depend upon any statistics or surveying expertise, they are not appropriate matters for expert testimony. *See Mulder*, 273 F.3d at 102 (precluding testimony "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help"); *see also In re Zyprexa*, 489 F. Supp. 2d at 283 ("Expert testimony should not merely reiterate arguments based on inferences that can be drawn by laypersons . . . ."). For these reasons, any of Professor Sirer's testimony that depends upon expertise in statistics is precluded.

Specifically, Professor Sirer is not qualified to offer expert opinions regarding demographics, population sampling methods, or statistical weighing with regard to the data from the market research firm, the NPD Group, from which Dr. Waterman extrapolated; or the validity of the statistical models Dr. Waterman used to reach his conclusions.[2] These types of opinions are dependent upon expertise in human surveying and statistics methodologies in which Professor Sirer has no experience or training.

This does not mean that Professor Sirer is precluded from testifying at all, nor does it mean that Professor Sirer may not criticize "Dr. Waterman's statistical conclusions concerning the total number of infringements on LimeWire of Plaintiffs' works at issue." (Pl. Mem. of Law in Support of Mot. to Preclude Certain Expert Testimony by Emin Gün Sirer (hereinafter "Pl. Mem. (Sirer)") at 21.) On the contrary, Dr. Waterman's conclusions, though ultimately arrived at through statistical analysis, are dependent upon several underlying assumptions about technological issues that are well within the scope of Professor Sirer's expertise.

---

[2] Indeed, Professor Sirer had no working familiarity with the particular statistical technique – the smoothing spline– used by Dr. Waterman to perform his extrapolations.

Given his broad experience with computer science in general, and peer-to-peer systems in particular, Professor Sirer is qualified to offer an opinion that one must take into account the presence of spoof files, viruses, and other "junk" files, in calculating the number of infringements taking place on a particular system.  Similarly, Professor Sirer is qualified to provide an expert opinion that it is possible to independently create multiple versions of a sound file with the same "hash" value.  He is also able to offer expertise on the computer science aspects of Dr. Waterman's methodology, such as the criticisms that Dr. Waterman's "data processing tools performed erroneous operations."  (Sirer Report at 17.)  To the extent that Plaintiffs believe that Professor Sirer is not sufficiently familiar with statistics methodologies to offer even these opinions on technological issues, they are free to elicit this through cross-examination.  *See Cary Oil Co.*, 2003 WL 1878246, at *3 ("The fact that a witness's qualifications are not unassailable does not mean the witness is incompetent to testify; rather it is for the jury, with the assistance of vigorous cross-examination, to measure the worth of the opinions." (quoting *Valentin v. New York City,* No. 94 Civ. 3911, 1997 WL 33323099, at *15 (E.D.N.Y. Sept. 9, 1997)).[3]

Plaintiffs argue further that, even if Professor Sirer is qualified as an expert, his opinions are unreliable because they are "speculative or conjectural."  (Pl. Mem. (Sirer) at 19 (citing *Major League Baseball Props.*, 542 F.3d at 311).)  The Court disagrees.  Plaintiffs argue that, for example, Professor Sirer has no empirical basis to assert that there were substantial numbers of "junk" files on the LimeWire system.  However, Professor Sirer does have a basis, from his

---

[3] Because the Court finds that Professor Sirer is not qualified as an expert to offer expert opinions on statistics issues, it is unnecessary to reach Plaintiffs' arguments regarding the reliability of those opinions.

experience with peer-to-peer systems alone, to offer an expert opinion on this issue.  *See In re MTBE*, 2008 WL 1971538, at *8 ("A non-scientific expert may rely on *experience* to assess facts."); *see also* Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").  Arguments about the assumptions and data underlying an expert's testimony go to the weight, rather than the admissibility, of that testimony.  *MacQuesten*, 2002 WL 31388716, at *2.  *See also Amorgianos*, 303 F.3d at 266 (holding that lack of textual support for expert's opinion goes to weight of testimony rather than admissibility (citing *McCullock,* 61 F.3d at 1044)).  Moreover, as other courts have recognized, a defendant's experts often "have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts."  *In re Zyprexa*, 489 F. Supp. 2d at 285.

Thus, Professor Sirer will be permitted to testify about technological matters within his area of expertise, even if his testimony implicates Plaintiffs' statistical conclusions.  However, he will not be permitted to testify about purely statistical issues that do not fall within his experience and expertise.  To the extent that issues as to specific statements arise during trial, the Court will make further *Daubert* and/or Rule 403 rulings as necessary.[4]

---

[4] Plaintiffs also suggest that Professor Sirer cannot be qualified because he is biased towards Defendants to the point that he is merely a "partisan."  (Pl. Mem. at 18 (citing *Caccioloa v. Selco Balers, Inc.*, 127 F. Supp. 175, 184 (E.D.N.Y. 2001) ("When expert witnesses become partisans objectivity is sacrificed to the need to win.")).)  The Court disagrees.  Although Professor Sirer's work makes clear that he does not share Plaintiffs' views about the interaction between copyright law and internet communities, he is not so biased as to render his testimony fundamentally unreliable.  More importantly, "many witnesses are biased to some degree, and lack of bias is not required for expert testimony to be admissible."  *In re MTBE*, 2008 WL 1971538, at *13 (citation omitted).  Professor Sirer's opinions fall far short of the degree of personal interest required to exclude an expert witness on grounds of bias.  *Cf. Tedone v. H.J. Heinz Co.*, 686 F. Supp. 2d 300, 311 (S.D.N.Y. 2009) (allowing testimony from expert who had

### B.    George Strong

Plaintiff's also move to exclude portions of the testimony of Defendants' purported damages expert, George Strong.

Mr. Strong is employed by Cornerstone Research, Inc., and has testified in over 100 cases, primarily on issues regarding the calculation of damages.  He is a CPA and a Certified Management Consultant with a degree in economics from Yale and an MBA from Harvard.  He is accredited in business valuation and financial forecasts by the American Institute of Certified Professional Accountants.  (*See* LeMoine Dec. in Support of Mot. to Preclude Certain Purported Expert Testimony by George Strong (hereinafter "LeMoine Dec."), Ex. 2, Expert Report of George Strong (hereinafter "Strong Report"), Ex. A.)  Defendants have retained Mr. Strong as a purported expert to calculate the appropriate level of damages in this case.

Plaintiffs move to exclude three broad areas of Mr. Strong's proposed testimony:

1)  His testimony criticizing the conclusions of Plaintiffs' expert, Richard Waterman, concerning the volume of infringements on the LimeWire system;

2)  His testimony regarding the music industry, and the degree to which LimeWire did or did not cause the decline in Plaintiffs' profits;

3)  His testimony applying a "hypothetical negotiation" framework to analyze the "expenses saved" by LimeWire because of its infringing conduct.  *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010).

For the reasons set forth herein, Plaintiffs' motion is GRANTED in part and DENIED in part.

---

been employed by defendant for 31 years, and holding that issue of bias is an issue more appropriate for cross-examination).

### 1.   Criticism of Dr. Waterman's Testimony Regarding Number of Infringements

Mr. Strong makes many of the same criticisms of Dr. Waterman's conclusions, and the assumptions and methodologies underlying those conclusions, as does Professor Sirer. (*See supra* Section III.A). Plaintiffs move to exclude this testimony for many of the same reasons as they moved to exclude Professor Sirer's testimony on this issue. However, the record demonstrates that, unlike Professor Sirer, Mr. Strong does have sufficient experience and expertise with regard to the statistics and survey methodologies at issue here to offer his expert criticisms of Dr. Waterman's testimony.

Mr. Strong's deposition testimony confirms that he has experience and expertise working with statistics and statistical methods. (Mundiya Dec. in Support of Defs.' Mem. of Law in Opposition to Pls.' Mot. to Preclude Certain Purported Expert Testimony by George Strong, Ex. B, Transcript of Deposition of George Strong (hereinafter "Strong Dep. (Opp.)") at 15:3-16:25 (testifying that he has employed regression analyses and other comparable statistical procedures professionally for over thirty years).) Plaintiffs point out that Mr. Strong does not have any experience working with the specific statistical method, the "smoothing spline" technique, employed by Dr. Waterman. Mr. Strong did, however, state that he had experience working with similar types of regression analysis. (*Id.*) Given Mr. Strong's background, the fact that he has not worked with the smoothing spline technique itself simply goes to the weight, not the admissibility, of his testimony, and can be brought out through cross examination. *Cary Oil*, 2003 WL 1878246, at *3.

Mr. Strong also has experience working with, and analyzing, surveys and survey methodologies. (*See* Strong Dep. (Opp.) at 26:2-27:23.) To the extent he is not well-versed in

the "technical aspects" of certain survey techniques, this lack of specific familiarity would similarly go to the weight, not the admissibility, of the testimony. *Cary Oil*, 2003 WL 1878246, at *3. He has sufficient experience in the area to render his testimony admissible.

Finally, Plaintiffs' argument that Mr. Strong lacks sufficient technical expertise to opine on the potential relevance of "spoof" files on the LimeWire network is misplaced. Mr. Strong's opinion in this regard does not depend upon any particular technical knowledge. Rather, he simply opines that a proper accounting of the number of infringements should take into account spoof files (the existence of which Plaintiffs do not dispute), at least to some extent. Given his experience with statistics and survey methodologies, this testimony is within his area of expertise and is therefore admissible.

### 2.    Causation

Mr. Strong devotes the bulk of his opinion to arguing that the declines in music industry sales and revenues were not caused by file sharing in general, or by LimeWire in particular. He opines that this decline can instead be attributed to a confluence of various micro- and macro-economic factors, including, *inter alia*, two global recessions, changes in consumer preferences with regard to digital music, music industry missteps in adapting to technological change, and increased competition from other forms of personal entertainment. He also opines that file sharing has not had a negative impact on the music industry, and may have had a positive impact. Mr. Strong bases his opinion upon his review of "academic literature, market research data, Plaintiffs' own financial statements and disclosures, industry reports, and government studies." (Defs.' Mem. of Law in Opposition to Pls.' Mot. to Preclude Certain Purported Expert Testimony by George Strong (hereinafter "Def. Opp. (Strong)") at 12.)

Plaintiffs level a variety of criticisms at Mr. Strong's testimony on causation.  Plaintiffs argue (1) that Mr. Strong has no expertise in the music industry or technology spheres; (2) that Mr. Strong's testimony on causation is unreliable because of his failure to control for file sharing as a potential cause, by looking at the effect of the other purported causes before and after the advent of file sharing; (3) that Mr. Strong did not consider other relevant factors, such as the total decline in Plaintiffs' revenue and sales, LimeWire's market share, or file sharing's impact on music prices; (4) that Mr. Strong failed to test his theories by analyzing his alternative causes over time; and (5) that Mr. Strong failed to acknowledge that some of the purported causes of the U.S. record industry's decline were far more prevalent in other countries, while also failing to account for the fact that many purported alternative causes did not affect the recording industries in other countries, and yet the latter's revenues also declined.  Plaintiffs also argue that his opinions are not based on "sufficient facts or data," Fed. R. Evid. 702, because they see no empirical basis for several of his conclusions.  Finally, Plaintiffs argue that Mr. Strong's testimony is not helpful to the jury because he does not offer his own analysis or expertise on the music industry.  Instead, he simply summarizes articles and studies performed by others without offering any opinion on the relative merits of those studies or whether they were accurate.

Although Plaintiffs couch their criticisms in a variety of ways, they all boil down to the same basic criticism: that Mr. Strong lacks expertise in the relevant areas, and thus, that he is merely uncritically reporting what others have said, without any independent analysis of his own. Mr. Strong concedes that he did not have any independent familiarity or expertise with the specific issues involved in this case prior to his review of the materials he cited in his report. (*See* LeMoine Dec. Ex. 1, Transcript of Deposition of George Strong (hereinafter "Strong Dep. (Mot.)") 24:25-25:4.)  When asked at his deposition whether he was "offering an opinion that

there is a causal relationship between downloading activity through peer-to-peer services and legal purchases," he responded, "Well, not per se.  I mean, what I'm doing is summarizing what I have read and what others have said.  But I haven't studied the issue specifically."  (Strong Dep. (Mot.) at 151:2-11.)  When asked if he "purport[s] to offer any opinion as to the relative [merits] of the studies that . . . analyzed the effect of file sharing on music sales," he responded, "[I]t's not my mission to render a professional opinion on each of these studies. . . . I make no independent assessment of any of these other studies."  (Strong Dep. (Mot.) at 164:16-165:14.)  (*See also* Strong Dep. (Mot.) at 124:10-19 ("Q. . . . [W]hat, if anything, did you do to satisfy . . . yourself that the studies cited in your report are . . . accurate and reliable?  A. . . . I did not do anything to determine the accuracy or validity of these studies.").)

      The Court agrees that, given Mr. Strong's lack of expertise in the music industry and technology spheres, and the fact that he appears to rely almost entirely on an uncritical review of others' views, much of his testimony on this issue must be excluded.  *See Loussier v. Universal Music Group, Inc*., 02 Civ. 2447, 2005 WL 5644422, at *3-4 (S.D.N.Y. June 28, 2005) (excluding expert witness in music industry case where the record indicates that she did not have any "relevant experience in the music industry").  Specifically, the testimony embodied in Section VI.C, and Sections VIII – X of his Report are excluded on this basis.  It is true that courts have accepted expert testimony from financial and economic analysts even when those witnesses lack "industry specific" knowledge.  *Johnson & Johnson*, 2006 WL 2128785, at *6 (allowing testimony from expert with "significant experience in conducting financial and economic analyses relating to products in the marketplace," even though he did not have "specific training in the field of optometry or experience related to the eye care profession").  *See also Regal Cinemas, Inc. v. W & M Props.*, 90 F. App'x 824, 833 (6th Cir. 2004) (holding that

18

witness who was "a certified public accountant, a certified business appraiser, a shareholder and director of litigation support group of an accounting firm, and [who] has offered testimony in at least fifty court cases," could testify on lost profits of a movie theater, even though he did not have any experience in the movie theater industry); *TC Sys.*, 213 F. Supp. 2d at 175 (allowing expert testimony even though witness had no practical experience in telecommunications industry because his opinions involved broader economic principles and he was sufficiently qualified in that field).

Here, however, Mr. Strong does not appear to apply his own economics expertise in reaching his conclusions on this issue. He appears to have little empirical basis for much of his testimony beyond the reports that he read, and he does not offer any opinion quantifying the degree to which any of the causes to which he attributed the music industry's decline were responsible for that decline, either individually or in the aggregate. This failure alone would not necessarily render his testimony about causation inadmissible, so long as he applied some of his own analysis. *See, e.g., UMG Recordings, Inc. v. Sinnott*, 300 F. Supp. 2d 993, 1003 n.9 (E.D. Cal. 2004) (holding that it "is not necessary for the expert to quantify the [impact]; his characterization of [the impact] as 'substantial' is sufficient to make his opinion relevant"). But here, Mr. Strong's failure to perform any independent analysis results in an opinion that is only a summary of what other experts have said, without application of his own expertise. This is not an appropriate type of expert testimony. *See R.F.M.A.S. v. So*, No. 06 Civ. 13114, 2010 WL 4341331, at *19 (S.D.N.Y. Oct. 12, 2010) (excluding expert testimony in case involving infringement of jewelry designs where witnesses "[did] not draw on their areas of actual expertise in arriving at the[ir] conclusion . . . Any juror could have employed common sense to perform the same analysis; no background in marketing or experience in the jewelry industry is

necessary."). Thus, Mr. Strong's testimony concerning causation contained in sections VIII – X of his Report must be excluded.

An additional reason this testimony should be excluded is that it is duplicative of the testimony of Defendants' music industry expert, Professor Aram Sinnreich. (*See infra* Section III.C.) Where expert testimony "substantially overlap[s]" with the testimony of another expert, courts exclude that testimony. *Price v. Fox Entm't Grp., Inc*., 499 F. Supp. 2d 382, 390 (S.D.N.Y. 2007). The Second Circuit has instructed that courts, in considering whether to admit expert testimony, should consider "whether other experts exist who are more specifically qualified and who are nonetheless not in the employ of the company or industry whose practices" are at issue. *Stagl*, 117 F.3d at 81. As an expert in the music industry, Mr. Sinnreich is more "specifically qualified" to offer opinions on these issues.

To the extent that Mr. Strong's opinions about causation are based upon his own economic analysis or expertise, they are admissible. Thus, for example, Mr. Strong may testify that "the effect of file sharing on music sales is small," based on economic principles of sloping demand curves, product substitution and displacement rates. (*See* Strong Report, Section VI.A. ,VI.B. and VI.D.) The fact that these conclusions are based, in part, upon a review of surveys and the relevant literature in the area does not render his testimony inadmissible, as long as Mr. Strong bases his conclusions on his own expertise and analysis, and as long as those sources are "of a type reasonably relied upon by experts" in his field." Fed. R. Evid. 703. *See B.F. Goodrich v. Betkoski*, 99 F.3d 505, 524-25 (2d Cir. 1996) (holding that where hazardous substances expert reviewed studies of particular areas and applied his expertise, testimony should have been admitted), *clarified on other grounds*, 112 F.3d 88 (2d Cir. 1997); *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) (expert testimony based upon review of books, press

20

releases and newspaper articles about terrorist groups was admissible when expert applied the "gold standard" methodology in the relevant area).  Mr. Strong's testimony on these points may assist the trier of fact, and is thus admissible.  But Mr. Strong may not testify that file sharing may have stimulated additional music purchases, when that conclusion is based on nothing more than quotations from, and citations to, other individuals' surveys and articles.  (*See* Strong Report, Section VI.C.)

Although Mr. Strong's opinions in Section VI.A, B and D are admissible as expert opinion testimony, this does not mean that all of the statements upon which he relies may be disclosed to the jury.  Under Rule 703 of the Federal Rules of Evidence, "[f]acts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion . . . unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."  Fed. R. Evid. 703.  The Court reserves judgment on whether all of the specific facts, data and statements upon which Mr. Strong relies meet this test.

### 3.   "Hypothetical Negotiation"

Mr. Strong opines on LimeWire's "expenses saved" based upon a "hypothetical negotiation" for a legal license to exploit the works at issue between LimeWire and the Plaintiffs.  Plaintiffs move to exclude this testimony not on the basis that Mr. Strong lacks expertise to perform this type of analysis, but rather that his analysis misconstrues the law and is based upon unrealistic factual predicates.

Mr. Strong's testimony attempts to arrive at a range for "the expenses saved, and profits earned, by the infringer," which the Second Circuit has held are relevant to a calculation of statutory damages.  *Bryant*, 603 F.3d at 144.  Mr. Strong first calculates the profits attributable to

the infringement of the works at issue by apportioning LimeWire's profits based on a percentage of the estimated total downloads on the LimeWire system represented by downloads of the works at issue.  Mr. Strong estimates that, depending upon which of several particular assumptions are applied, LimeWire's profits attributable to downloads of the infringed works was between $2-6 million dollars.

Mr. Strong then opines that the "expenses saved" by Defendants can be represented by the amount Defendants would have paid to Plaintiffs to obtain a license to exploit the infringed works.  This concept is imported from patent law, which requires courts to determine a "reasonable royalty for the use made of the invention by the infringer" as a floor for damages for infringement.  35 U.S.C. § 284 (2010).  In *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), this Court held that one relevant factor in calculating a reasonable royalty is:

> The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Id.* at 1120.  In applying this concept, courts are permitted to use 20/20 hindsight to look to the actual profits of the infringer to inform the amount that the patent holder would have expected to receive.  *See Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984).   Under Mr. Strong's analysis, Defendants, as rational economic actors, would not agree to pay more for a license than they would have made in profits from the infringing activity. He thus concludes that Defendants' expenses saved are no more than $2-6 million.

Plaintiffs argue that Mr. Strong's analysis misconstrues the law.  In particular, Plaintiffs argue that the reasonable royalty and hypothetical negotiation concepts are meant to establish "the floor, not the ceiling of damages."  *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995).  By allowing a royalty based on a hypothetical negotiation based upon 20/20 hindsight as to the patent's real value, a court can ensure that a patent holder is sufficiently compensated for the infringement.  Plaintiffs argue that, even if actual profits are probative of anticipated profits, there is no authority for the proposition that the actual profits serve as a *cap* on damages.  In addition, Plaintiffs argue that resort to a hypothetical negotiation is inappropriate when Plaintiffs have available data from actual negotiations for comparable licenses with such partners as the Apple iTunes store.

Plaintiffs argue further that Mr. Strong's entire hypothetical negotiation framework is "based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *Boucher*, 73 F.3d at 21 (citation omitted).  In particular, Plaintiffs argue that the idea that they would provide an unlimited license to over 10,000 of their works for $2-6 million, irrespective of the effect that such a license would have on the rest of their business, is so divorced from reality as to render Mr. Strong's analysis on this point irrelevant.  Plaintiffs argue that, even as Mr. Strong determines that LimeWire would not pay more than a rational economic actor would to obtain a license, he gives no consideration to whether it would be rational for Plaintiffs to *offer* a license at that price.  Moreover, Plaintiffs argue that it makes no sense to limit the price of a hypothetical license to LimeWire's actual profits without regard to what they were.  As Plaintiffs point out, by Mr. Strong's logic, if LimeWire had made only $1 in profits, Plaintiffs would license their works for only $1.  Plaintiffs argue that these analytical flaws are so fundamental as to render Mr. Strong's testimony inadmissible.

The Court finds that, although Plaintiffs expose potentially significant weaknesses in Mr. Strong's testimony, these criticisms go more to the weight of his testimony than to its admissibility.  *SR Int'l. Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 134 (2d Cir. 2006) (holding that "gaps or inconsistencies" in expert testimony "go to the weight of the testimony not to its admissibility" (citation omitted)).   Moreover, Plaintiffs misconstrue the import of Mr. Strong's opinion.  Mr. Strong does not conclude, as Plaintiffs seem to believe, that the amount of the "expenses saved" by Defendants must serve as a cap on the damage award.  Rather, Mr. Strong uses the hypothetical negotiation framework to arrive at the "expenses saved" factor from the test for calculating statutory damages set forth by the Second Circuit in *Bryant*.  603 F.3d at 144.  A calculation of how much Defendants would have paid for a license to legally exploit Plaintiffs' works is one, among several, ways to determine the expenses that Defendants saved by their infringement.  Plaintiffs do not point to any authority holding that such an approach may <u>never</u> be used to determine expenses saved by an infringer. The Court's task in reviewing the admissibility of expert testimony is to examine the expert's "principles and methodology, not . . . the conclusions that they generate." *Daubert*, 509 U.S. at 595.  Although some of the assumptions upon which Mr. Strong's conclusions rest are potentially weak, these weaknesses can be easily exposed through cross-examination, and do not render his testimony inadmissible.  *See MacQuesten*, 2002 WL 31388716, at *2; *Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009).

**C.    Aram Sinnreich**

Plaintiffs move to exclude portions of the testimony of Defendants' proposed music industry expert, Professor Aram Sinnreich.  Professor Sinnreich is an Assistant Professor of Journalism and Media Studies at Rutgers University School of Communication & Information.

24

He was previously a visiting Assisting Professor at New York University, in the Department of Media, Culture and Communication.  He was a doctoral fellow and lecturer at the Annenberg School for Communication at the University of Southern California, where he received his Ph.D in 2007.  He received his masters in journalism from Columbia University School of Journalism. Over the course of his academic career, he has taught such classes as "Musical Culture and Industries," "Topics in Digital Media," and "Copyright, Commerce and Culture."

Professor Sinnreich is also a founding partner of Radar Research, Inc., a consultancy and research firm founded in 2005 that focuses on the intersection of culture, business, and technology.  Prior to that time, he was the founder and president of Sinnreich Media Research, where he performed custom research and consulting for clients in the music and technology industries.  From 1997-2002 he worked at the internet research firm, Jupiter Research, where he managed the Music and the Policy research divisions.  During that time, Plaintiffs (and their affiliate companies) purchased his research reports and attended conferences that he organized and at which he presented.  In 2000 and 2002, Professor Sinnreich conducted and the published the results of surveys of users of Napster to determine their music purchasing habits.

Professor Sinnreich has written and published widely on issues of music and digital technology.  He has published a book about music and technology (*Mashed Up*, Univ. of Mass. Press 2010).  He has published academic articles on music and technology in peer-reviewed journals, and has reported on the music industry and technology issues in publications such as the New York Times, Wired News, and Billboard.  He has lectured about these issues at universities worldwide, as well as at industry conferences and academic conferences.  He is also a working musician, and has composed songs, played with various bands, and has licensed and sold his music in various formats over the years.  (*See* Oller Dec. in Support of Defs.' Brief in

Opposition to Pls.' Mot. to Preclude Certain Purported Expert Testimony of Aram Sinnreich (hereinafter "Oller Dec."), Ex. B, Expert Report of Aram Sinnreich (hereinafter "Sinnreich Report"), at 1-2, Ex. 1.)

He has previously offered expert testimony in a number of cases involving the music industry, copyright and technology, including the *Grokster* case in the Supreme Court, where his affidavit was cited several times. *See MGM Studios, Inc. v. Grokster*, 545 U.S. 913 (2005). Professor Sinnreich testified at his deposition that he regularly reads music industry trade journals. Defendants summarize that, over the course of Professor Sinnreich's journalistic and academic career he has been in "regular contact with 'literally hundreds of people' at record labels, management companies, technology firms, media companies, journalists, analysts, and artists and their representatives, both one [on] one and at conferences, including people in the digital divisions of the Plaintiff record labels." (Defs.' Brief in Opposition to Pls.' Mot. to Preclude Certain Purported Expert Testimony of Aram Sinnreich (hereinafter "Def. Opp. (Sinnreich)") at 4-5 (citing Oller Dec., Ex. C, Transcript of Deposition of Aram Sinnreich (hereinafter "Sinnreich Dep.") at 77-84.)

Professor Sinnreich states that, as a result of his "decade and a half of research and involvement in the music industry," (Sinnreich Dep. at 78:8-10), he has developed particular expertise in several areas relevant to this case, including (1) "Consumer behavior in the music industry, especially with respect to digital media"; (2) "The history and structure of the music industry, especially from the 1980s to the present"; (3) "The role of digital technologies in changing the relationships between recording artists, industry and consumers"; (4) "The availability of free music via the internet, and the ways in which consumers access and use it"; and (5) "The nature and mechanism of peer-to-peer file sharing, and the variety of platforms and

26

providers that have emerged over the past 12 years." (Sinnreich Report at 2.)   Plaintiffs

themselves acknowledge that Professor Sinnreich is a "music industry expert" (Pl. Mem.

(Strong) at 8 n.2.), and concede that he "may well be qualified to offer testimony about the

history and structure of the music industry, the rise of new technologies, [and] how the music

industry responded to those technologies." (Pl. Mem. in Support of Mot. Preclude Certain

Purported Expert Testimony of Aram Sinnreich (hereinafter "Pl. Mem. (Sinnreich)") at 7.)

   Plaintiffs move to exclude several portions of Professor Sinnreich's testimony. In

particular, Plaintiffs move to exclude (1) his testimony regarding causation of the decline in

Plaintiffs' sales and revenues; and (2) several portions of his testimony on the grounds that they

are irrelevant and prejudicial. For the following reasons, Plaintiffs' motion is GRANTED in

part, and DENIED in part.

### 1.   Causation

   Professor Sinnreich's report includes many of the same conclusions on the various causes

of the decline of the music industry as Mr. Strong's report. He also relies on many of the same

sources that were cited in Mr. Strong's report. Plaintiffs challenge these conclusions for many of

the same reasons as they challenged Mr. Strong's testimony: (1) that his testimony is unreliable,

(2) that his testimony lacks a proper factual basis, and (3) that he is unqualified to offer his

testimony. Plaintiffs object to Mr. Strong's testimony because, although he has economic

expertise, he had no relevant experience in the music industry. In their motion to exclude

Professor Sinnreich's testimony, Plaintiffs make the inverse argument—that, although Professor

Sinnreich has expertise in the music industry, he does not have any expertise in economics, and

is therefore not qualified to offer testimony on this issue.

#### a.   *Qualification*

27

The Court finds that Professor Sinnreich is qualified to offer his testimony on causation. Professor Sinnreich bases his conclusions on over a decade and a half of experience researching, observing and interacting with the music industry and the commerce and culture of the Internet. He is well qualified as an expert on these issues, and the Court finds that his opinions fall well within his expertise. *See Tin Yat Chin*, 371 F.3d at 40 (instructing courts to "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony").

Courts have long held that an expert testifying about damages need not be "trained as an economist." *In re MTBE*, 2008 WL 1971538, at *5. In the *MTBE* case, which related to the handling of a gasoline additive that resulted in contamination of groundwater, the plaintiffs presented the testimony of Robert Reynolds, "a consultant to the government and the petroleum industry specializing in the use of fuel oxygenates." *Id.* at *1. Mr. Reynolds testified about a variety of matters, including the feasibility of alternative means of fuel production, in the course of which he opined on issues of price, demand, and production cost. *Id.* at *4. The defendants in the case moved to exclude the portions of his testimony about these "economic factors" because he is "not trained as an economist." *Id.* at *5. The court denied the defendants' motion, holding that Mr. Reynolds was "qualified by experience" to testify about these issues. *Id.* The court noted that "[c]ourts allow experts to testify to matters within their general expertise when they lack qualifications as to certain technical matters within that field." *Id.* at *6. In the end, the court concluded that "Defendants' challenges to Reynolds' qualifications as an economist . . . may be a basis for cross-examination, but do not prevent him from testifying about ethanol production capacity," even where that testimony required him to discuss "considerations of cost, supply and demand [as] part of his overall analysis . . . ." *Id.* *See also Blue Cross and Blue*

*Shield of N.J. v. Philip Morris, Inc.*, No. 98 Civ. 3287, 2000 WL 1738338, at *2 (E.D.N.Y. Nov. 1, 2000) (allowing testimony by doctor quantifying smoking-related costs attributable to the defendants, even though he is "a medical doctor and not an economist," given "his extensive involvement in cigarette issues"); *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 08 Civ. 3181, 2010 WL 4065465, at *13 (S.D. Tex. Oct. 9, 2010) (allowing testimony by president of convenience store chain on the impact of certain variables on a convenience store's success, even though he was "not . . . an economist or econometrist," because he could base his opinion on his twenty five years of "practical experience in the industry").

Plaintiffs argue that these principles do not apply here, because unlike in those cases, Professor Sinnreich is engaged in "core economic analysis" of "how various factors impacted a particular market."  (Pl. Reply (Sinnreich) at 3 and n.3.)  Having reviewed Professor Sinnreich's report, the Court does not agree with Plaintiffs' characterization of his testimony.  Professor Sinnreich offers testimony based upon his years of experience working in and with the music industry about various issues that have had an impact on the industry's revenues.  He bases his opinions on his review of trade publications, academic literature, and the public statements and filings of members of Plaintiffs' industry, as well as conversations with leaders of these industries throughout his career.[5]  He does not purport to quantify the impact of these factors, and while he makes reference to certain basic economic concepts, he does not attempt to apply any technical econometrics to reach his conclusions.  *See Interplan Architects*, 2010 WL

---

[5] The Court reserves judgment as to whether the individual statements and reports on which Professor Sinnreich relies for his opinions may be disclosed to the jury if they are otherwise inadmissible.  Under Rule 703, such statements may only be disclosed to the jury if "their probative value in assisting the jury to evaluate the expert's opinion outweighs their prejudicial effect."  Fed. R. Evid. 703.

4065465, at *13 (allowing "general, non-quantitative opinions" by non-economist on variables affecting a store's success).

Professor Sinnreich's lack of economics expertise may be a basis for cross-examination, but it does not render his testimony inadmissible, even if his testimony touches on broad economic principles. *See In re MTBE*, 2008 WL 1971538, at *6. *See also Johnson & Johnson*, 2006 WL 2128785, at *6 (objections to witness's qualifications go to weight, not admissibility).

### b. Reliability and Factual Basis

For similar reasons, the Court finds Plaintiffs' contentions that Professor Sinnreich's testimony is unreliable misplaced. Plaintiffs argue that his testimony is unreliable because (1) he did not employ an appropriate level of "intellectual rigor," *Kumho*, 526 U.S. at 152; (2) he failed to test his theories; (3) he ignored relevant factors; (4) he failed to control for the impact file sharing on Plaintiffs' losses; and (5) his opinions are speculative.

Plaintiffs argue that Professor Sinnreich's selective citation of studies that support his conclusions (particularly his conclusion that file sharing has benefited record companies) demonstrates a lack of intellectual rigor. This argument misconstrues the conclusion that Professor Sinnreich offers. As Professor Sinnreich, himself, testified, he was "willing to accept that there is credible evidence on the other side," but that his role was to "say whether there was credible evidence that file sharing had beneficial market effects." (Sinnreich Dep. at 100:24-101:21.) Professor Sinnreich does not attempt to reach any kind of scientific conclusion, which might have required his accounting for any alternative evidence. *See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3,* 313 F. Supp. 2d 213, 238 (S.D.N.Y. 2004) ("An expert must demonstrate that he has adequately accounted for obvious alternative explanations in order for his testimony to be reliable."). Rather, his more modest conclusion is simply that there is

credible evidence that supports a particular conclusion, and he cites to that evidence.  Plaintiffs

are, of course, free to challenge his conclusions by pointing to studies that reach contrary

conclusions.  But that issue goes to the weight, not the admissibility of his testimony.  *See*

*MacQuesten*, 2002 WL 31388716, at *2 (holding that "a claim that the assumptions relied on by

an expert are unfounded" goes to weight, not admissibility); *see also SR Int'l*, 467 F.3d at 134

("gaps or inconsistencies" in a witness's testimony go to weight, not admissibility); *In re*

*Zyprexa*, 489 F. Supp. 2d at 285 ("The mere fact that an expert's testimony conflicts with the

testimony of another expert or scientific study does not control admissibility.").[6]

It is also relevant that Professor Sinnreich's conclusions on these points are not based on

a selective review of a limited universe of sources strictly for the purposes of preparing to testify

in this case.  *Cf. R.F.M.A.S.*, 2010 WL 4341331, at *19 (excluding expert testimony that was

"based on the set of assumptions that plaintiff directed them to employ and the circumscribed

universe of data available to them").  Rather, the record demonstrates that Professor Sinnreich

has reached his conclusions independently, based upon his own experience in the relevant

industries.  *See Kumho*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a

conclusion from a set of observations based on extensive and specialized experience.").

Plaintiffs' argument that Professor Sinnreich failed to test his theories or offer

quantitative analysis is rejected for the same reason.  As an initial matter, Professor Sinnreich

---

[6] Plaintiffs also point out that some of the studies cited by Professor Sinnreich were unpublished
versions, and that the later published versions altered the relevant conclusions.  It is well settled
that the sufficiency of "textual authority" for an expert's opinion goes to its weight, not its
admissibility.  *Johnson & Johnson*, 2006 WL 2128785, at *6 (citing *McCulloch*, 61 F.3d at
1044); *Id.* at *7 ("Publication is but one element of peer review and 'does not necessarily
correlate with reliability.'" (quoting *Daubert*, 509 U.S.at 593)).   This issue can be raised on
cross examination.

has, in fact, conducted his own research into the effects of file sharing on music purchasing

habits as a researcher at Jupiter Research.  That research did specifically control for file sharing's

effects.  But even as to effects to which he testifies, and for which he does not perform specific

quantitative analyses, he has sufficient experience in the relevant industries to render his

opinions admissible.

Plaintiffs also challenge the factual basis for many of Professor Sinnreich's conclusions,

focusing on his failure to base his conclusions upon empirical, quantified data concerning, *inter*

*alia*, the used and independent recordings market, the scale of commercial CD bootlegging, the

replacement cycle for CDs, the effect of Minimum Advertised Pricing on sales and revenues, and

the revenues Plaintiffs receive from alternative sources.  But again, as Professor Sinnreich

explained, these conclusions were based not only on a review of academic literature, but also

upon his direct experience in the industry, including, for example, extensive conversations with

industry executives, retailers, and the heads of retailer trade organizations.  (Sinnreich Dep. at

166:19-167:2.)  The fact that he did not precisely quantify these figures does not mean that they

are wholly lacking in factual basis.

The Court finds that Professor Sinnreich's conclusions depend not upon technical

economic analysis, but rather experience in the relevant industries.  Professor  Sinnreich has

extensive experience in the industry, and although he cites many of the same studies and

publications as Mr. Strong, his conclusions are grounded in his experience, and are thus

admissible.

### 2.      Prejudice / Irrelevance

Plaintiffs move to exclude several portions of Professor Sinnreich's testimony on the

grounds that this testimony is of limited relevance and that any relevance is substantially

outweighed by the danger of unfair prejudice to Plaintiffs.  Specifically, Plaintiffs move to exclude (1) Professor Sinnreich's testimony that a large damage award is unlikely to deter unlawful downloading of music, and that there are other, more effective ways for Plaintiffs to "resolve their problems than seeking damages" (Pl. Mem. (Sinnreich) at 20); (2) his testimony about Plaintiffs' alternative sources of revenue; and (3) his testimony about the degree to which artists and other non-parties support file sharing and/or have a negative view of the Plaintiff record labels.

The Court GRANTS in part and DENIES in part Plaintiffs' motions with regard to these issues.

### a. *Deterrence*

Professor Sinnreich concludes his report by opining that a large damage award in this case will not have any significant deterrent effect on illegal file sharing.  Instead, he argues that "market-based 'carrots' will always be more effective than legal 'sticks' as a means to produce a functional digital music industry."  (Sinnreich Report at 60.)  Plaintiff argues that this testimony is not only irrelevant and prejudicial, but that it does not assist the jury and impermissibly "undertakes to tell the jury what result to reach."  *United States v. Duncan*, 42 F.3d 97, 101 (3d Cir. 1994).  According to Plaintiffs, this testimony does not assist the jury, "but rather attempts to substitute the expert's judgment for the jury's."  *Id.*

The Court agrees that Professor Sinnreich's views on the best strategy "to produce a functional digital music industry," and whether a "carrot" or "stick" approach is more effective, are irrelevant and should be excluded.  Defendants appear to concede as much in their brief. (*See* Def. Opp. (Sinnreich) at 24 ("Defendants do not intend to call Professor Sinnreich

33

affirmatively to opine that Plaintiffs would be better off not suing Lime Wire or that a large award is against Plaintiffs' interests.").)  Thus, this testimony is excluded.

However, Professor Sinnreich's testimony on the deterrent effect of a large damage award is potentially relevant to the case.  Under *Bryant*, one factor to consider in setting statutory damages is "the deterrent effect on the infringer and third parties."  603 F.3d at 144.  Professor Sinnreich testifies about the availability of alternative online sources for free music, both legal and illegal; the lack of an impact on file sharing from the shutdown of other p2p programs; and the existence of open-source software and a "global community of coders," who are not motivated by financial gain, and are "ready to reverse-engineer any digital roadblock the industry can erect."  (Sinnreich Report at 60; Sinnreich Dep. at 312:10-315:18.)  All of these issues may to some extent bear on the degree of deterrence a damage award in this case will have on some third parties.  The probative value of this testimony is not substantially outweighed by its prejudice, and this testimony does not usurp the role of the jury.  He does not state that a particular damage award will have a particular deterrent effect.  Rather, he provides relevant testimony that will assist the jury in determining the potential deterrent effect of a damage award.

### b. *Alternative Revenue Sources*

Professor Sinnreich testifies about several new sources of revenue that record labels have been exploiting in recent years.  For example, Professor Sinnreich describes so-called "360 deals," wherein a record label shares in revenues from concerts and merchandise sales, as well as sales of recordings.  He also cites to royalties from the placement of recordings in movies, television shows, and music-based video games such as *Rock Band*.  Professor Sinnreich concedes that there is no direct relationship between these revenue streams and file sharing, but claims that the sharing of music aids in the marketing and promotion process for artists, and that

34

it allows record labels to measure and assess demand for particular artists, which also helps in determining which songs to license to other media.  (Sinnreich Dep. at 234:14-236:5.)  This testimony is relevant to the question of the impact that file sharing has had on music industry revenues.  Although the connection between file sharing and these revenue streams may be tenuous, that goes to the weight of the testimony.  Moreover, Defendants do not state that they will argue from this testimony what Plaintiffs fear they will (*i.e.*, that "Plaintiffs still have ways to make money" despite Defendants' infringement).

> c.     *Non-Party Opinion about File Sharing and Record Labels*

Professor Sinnreich devotes a section of his report to discussing the indirect benefits of file sharing by citing public statements of various recording artists in support of file sharing, and/or critical of recording companies.  He also includes a section on "historical label-artist relations," wherein he discusses the degree to which the major record labels "have been consistently criticized for unfair or unethical business relations with their artists."  (Sinnreich Report at 48.)  Plaintiffs move to exclude this testimony on the ground that it is irrelevant, as well as highly prejudicial, in that it is designed to make jurors unsympathetic to Plaintiffs.

Testimony about relations between recording companies and artists is likely to be excluded.  This case concerns Defendants' inducement of copyright infringement of Plaintiffs' works.  Any relevance of the nature of the relations between recording companies and artists is likely to be substantially outweighed by the danger of unfair prejudice to Plaintiffs.

As to the testimony relaying various recording artists' positive views of file sharing (including the view that it is beneficial to their livelihood), the Court reserves judgment.  The Court understands that Plaintiffs may seek to call witnesses to testify as to specific artists' views of the adverse impact that file sharing has had on their livelihood.  If they do so, the Court will

assess at that time the admissibility of contrary views held by other artists.[7]   However, if

Plaintiffs do not present such testimony, then Defendants' testimony about artists' views of file

sharing has limited relevance and is likely to be excluded.

## IV.   Conclusion

For the foregoing reasons, Plaintiffs motion to preclude portions of the testimony of Emin

Gün Sirer, George Strong and Aram Sinnreich (Dkt. Entry No. 572) are DENIED in part and

GRANTED in part.   As to certain specific matters arising under Rule 403 of the Federal Rules of

Evidence, the Court reserves judgment.

SO ORDERED.


Dated: New York, New York
      April 29, 2011

_____

Kimba M. Wood
United States District Judge

---

[7] One example of evidence excludable under Rule 403 is Trent Reznor's encouragement of fans
to "steal away, steal and steal and steal some more" because the record labels are "ripping people
off, and that's not right."  (Sinnreich Report at 39.)  The probative value of this evidence (if any)
is substantially outweighed by the danger of unfair prejudice.