UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ARISTA RECORDS LLC; ATLANTIC RECORDING
CORPORATION; BMG MUSIC; CAPITOL
RECORDS, INC; ELEKTRA ENTERTAINMENT
GROUP INC; INTERSCOPE RECORDS; LAFACE
RECORDS LLC; MOTOWN RECORD COMPANY,
L.P.; PRIORITY RECORDS LLC; SONY BMG
MUSIC ENTERTAINMENT; UMG RECORDINGS,
INC; VIRGIN RECORDS AMERICA, INC.; and                    06 CV 5936 (KMW)
WARNER BROS. RECORDS INC.,                                   AMENDED
                                                       OPINION & ORDER
                              Plaintiffs,

-against-

LIME GROUP LLC; LIME WIRE LLC; MARK
GORTON; GREG BILDSON; and M.J.G. LIME WIRE
FAMILY LIMITED PARTNERSHIP,

                              Defendants.
------------------------------------------------------------------x
KIMBA M. WOOD, U.S.D.J.:

## I.   __Introduction__[*]

  Plaintiffs are thirteen major record companies that collectively produce, manufacture,

distribute, sell, and license "the vast majority of copyrighted sound recordings sold in the United

States." (First Am. Compl. ¶ 1.) Plaintiffs raise various federal and state law claims of

secondary copyright infringement against Lime Wire LLC (LW); Mark Gorton, the Chairman

and sole Director of LW; Lime Group LLC ("Lime Group"); and the M.J.G. Lime Wire Family

Limited Partnership ("Lime Wire FLP") (collectively, "Defendants") for their role in distribution

of the LimeWire software program ("LimeWire"). LimeWire permits users of the program to

---

[*] By Order dated April 25, 2011, the Court stated that it would issue an amended version of
__Arista Records LLC v. Lime Group LLC__, 715 F. Supp. 2d 481 (S.D.N.Y. 2010) (the "May 2010
decision"). (__See__ D.E. 709.) The May 2010 decision is hereby withdrawn, and is replaced with
the instant Amended Opinion & Order (dated April 28, 2011).

share digital files over the Internet.  Plaintiffs allege that LimeWire users employ LimeWire to obtain and share unauthorized copies of Plaintiffs' sound recordings, and that Defendants facilitate this infringement by distributing and maintaining LimeWire.[1]

Plaintiffs raise the following claims against LW, Lime Group, and Gorton: (1) inducement of copyright infringement; (2) contributory copyright infringement; (3) vicarious copyright infringement; and (4) state common law copyright infringement and unfair competition.[2]  Plaintiffs also raise a state law fraudulent conveyance claim against Gorton and Lime Wire FLP, and a claim for unjust enrichment against Lime Wire FLP.

The parties now move for summary judgment.  Plaintiffs move for partial summary judgment on their claims of (1) inducement of infringement; (2) contributory infringement; and (3) common law infringement and unfair competition.  LW, Gorton, and Lime Group move for summary judgment on each of these claims, and on Plaintiffs' claim of vicarious copyright infringement.[3]  Gorton and Lime Wire FLP move for summary judgment on Plaintiffs' fraudulent conveyance and unjust enrichment claims.  Defendants also have submitted a number

---

[1] The case was transferred to the undersigned in October 2009 following the Honorable Gerard E. Lynch's appointment to the Court of Appeals for the Second Circuit.

[2] LW filed (1) antitrust counterclaims against Plaintiffs pursuant to Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and Section 4 of the Clayton Act, Act, 15 U.S.C. §15; and (2) ancillary counterclaims under New York State law for conspiracy in restraint of trade, deceptive trade practices, and tortious interference with prospective business relations. The Court dismissed LW's claims in 2007.  Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556 (S.D.N.Y. 2007).

[3] A joint amicus brief was submitted by the Electronic Frontier Foundation, Center for Democracy and Technology, Computer & Communications Industry Association, Consumer Electronics Association, Home Recording Rights Coalition, Information Technology Association of America, Public Knowledge, Special Libraries Association, and U.S. Internet Industry Association.

of motions to exclude evidence submitted by Plaintiffs in support of their motion for summary judgment.

For the reasons stated below, the Court:  (1) DENIES Defendants' motions to exclude evidence;[4] (2) GRANTS Plaintiffs' motion for summary judgment on the claim against LW of inducement of copyright infringement, and DENIES LW's motion for summary judgment on the claim; (3) DENIES the parties' cross-motions for summary judgment on the claim against LW of contributory copyright infringement; (4) DENIES LW's motion for summary judgment on the claim of vicarious copyright infringement; (5) GRANTS Plaintiffs' motion for summary judgment on their claims against LW for common law copyright infringement and unfair competition, and DENIES Defendants' motion for summary judgment on these claims; (6) GRANTS Plaintiffs' motions for summary judgment on the claims against Gorton and Lime Group for inducement of copyright infringement, common law infringement, and unfair competition, and DENIES Defendants' motions for summary judgment on these claims; (7) DENIES the parties' motions for summary judgment on the claims against Gorton and Lime Group for contributory copyright infringement and vicarious copyright infringement; and (8) DENIES Gorton's and Lime Wire FLP's motion for summary judgment on the fraudulent conveyance and unjust enrichment claims.

## II.   <u>Factual Background</u>

Unless otherwise noted, the following facts are undisputed by the parties:

A.   <u>File-Sharing Programs</u>

---

[4] Except that, as set forth below, the Court (1) places conditions on Plaintiffs' future meetings and conversations with Bildson; and (2) excludes certain exhibits containing emails and internet forum postings written by Adam Fisk, a former LW employee, after his employment with LW had ended.

Over the last several years, technologies have developed that make it inexpensive and easy to record, distribute, and share music via the Internet.  Many artists now digitally record songs to sell through online music retailers.  Individuals who purchase digital recordings often share them with others by using free or low-cost software or Internet programs, known as "file-sharing programs."  File-sharing programs allow users to exchange digital files, including digital recordings, with each other through the Internet.  Most digital recordings released in the United States, however, are copyright protected, and the copyright owners do not authorize sharing through file-sharing programs.  A number of companies that have distributed file-sharing programs, including the distributors of the programs Napster, Kazaa, Morpheus, and Grokster, have faced liability for copyright infringement, on the ground that they facilitated infringement committed by users of their programs.  See e.g., A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001).[5]

B.  Creation and Design of LimeWire

LW was founded in June 2000.  The company released LimeWire in August 2000.  LimeWire is a file-sharing program that utilizes "peer-to-peer" ("P2P") technology.  By employing P2P technology, LimeWire permits its users to share digital files via an Internet-based network known as the "Gnutella network."  LimeWire users can share almost all files stored on their computers with other LimeWire users.[6]  When a LimeWire user wishes to locate digital

---

[5] Napster, Inc. was one of the first companies to develop a file-sharing program that permitted users to exchange digital recordings via the Internet.  The vast majority of files that were shared through the Napster program were digital recordings protected by copyright, the sharing of which was not authorized.  Napster was found liable of contributory and vicarious copyright infringement.  The Napster program was shut down by a court-ordered injunction.

[6] LimeWire recommends that "all LimeWire users share generously with one another."  (Pl. SUF ¶ 82.)  LimeWire's default settings make all files that a user downloads through LimeWire available to other LimeWire users for download.  (Pl. SUF ¶ 83.)

files available through the network, she enters search criteria into the search function on LimeWire's user interface.  LimeWire then scans the computers of other LimeWire users, to locate files that match the search criteria.  The LimeWire user can download any files that LimeWire locates.  When the user downloads a file, LimeWire transfers a digital copy of the file from the computer on which it is located to the LimeWire user's computer.

C.  Plaintiffs' Copyrighted Recordings

Plaintiffs sell and distribute the vast majority of all recorded music in the United States. They allege that they own the copyrights or exclusive rights to more than 3000 sound recordings, which are listed in exhibits to the First Amended Complaint.  (First Am. Compl., Exs. A & B (as revised, Jan. 31, 2008).)  In this litigation, Plaintiffs have provided documentation establishing that they own the copyrights to thirty popular recordings (the "Recordings").[7]  Plaintiffs allege that LimeWire users share and download unauthorized digital copies of the Recordings via LimeWire, and that Defendants are secondarily liable for this infringement because they distribute and maintain LimeWire.

III.  **Evidentiary Motions**

---

[7] Plaintiffs provided this documentation pursuant to an instruction given by Judge Lynch at a hearing held on December 7, 2007.  Since 1972, all new sound recordings have been protected by federal copyright law.  See 17 U.S.C. § 102(a)(7).  Sound recordings created before February 15, 1972 are protected from infringement by New York common law.  See Capitol Records, Inc. v. Naxos of America, Inc., 830 N.E.2d 250, 263-64 (N.Y. 2005); 17 U.S.C. § 301(c).  Here, twenty-five of the Recordings were made after 1972.  Plaintiffs have provided federal copyright registration certificates that establish that Plaintiffs' own valid copyrights to these recordings. See 17 U.S.C. § 401(c); Hamil Am. Inc. v. GFI, 193 F.3d 92, 98 (2d Cir. 1999).  With respect to the five recordings created prior to 1972, Plaintiffs have provided copies of agreements granting them common law copyrights to these recordings.  (Pl. SUF ¶ 102.)  Plaintiffs have never authorized or licensed LW or users of LimeWire to distribute, publish, or copy any of the Recordings.

Defendants have filed a number of motions challenging the admissibility of evidence submitted by Plaintiffs (the "Evidentiary Motions").  The Court considers each of the Evidentiary Motions in turn.  The Court determines the admissibility of the challenged evidence based on the same principles as would apply at trial.  See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).  The Court finds that, except with respect to certain limited issues discussed below, Defendants' evidentiary objections are without merit.

A.   Motions to Exclude Reports and Testimony of Plaintiffs' Experts

Defendants move to exclude the reports and testimony of two expert witnesses retained by Plaintiffs, Dr. Richard P. Waterman and Dr. Ellis Horowitz.  The Court denies Defendants' motion.

1.   Legal Standard

A court may admit expert testimony once it has determined that such testimony is reliable.  Daubert v. Merrell Dow Pharms., Inc, 509 U.S. 579, 589 (1993); Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir. 2005).  Reliability is analyzed under Rule 702 of the Federal Rules of Evidence, which provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may provide testimony that is (1) based upon sufficient facts or data; (2) the product of reliable principles and methods; and (3) based on reliable application of the principles and methods to the facts of the case.  Fed. R. Evid. 702.  There must be "'a sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions . . . and . . . the scientific principles and methods [must] have been reliably applied by the expert to the facts of the case.'"  In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) (quoting Nimely, 414 F.3d at 397).  The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of

the evidence, that all requirements have been met.  See Daubert., 509 U.S. at 593 n.10 (1993);

United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).

    2.   Application

       a.   Dr. Richard P. Waterman

Dr. Waterman is an Adjunct Associate Professor of Statistics at The Wharton School at

the University of Pennsylvania, and the President and Co-Founder of Analytic Business Services,

Inc., a consulting company that provides expert advice and opinions in the field of statistical

analysis.

Plaintiffs hired Dr. Waterman to conduct a study of LimeWire that estimates the

percentage of digital files (1) available through LimeWire that are authorized for free

distribution; and (2) requested for download by LimeWire users that are authorized for free

distribution.[8]  For the study, Dr. Waterman analyzed a random sample of 1800 files available

through LimeWire.  He determined that 93% of files in the sample (1644 files) were protected or

highly likely to be protected by copyright, and thus not authorized for free distribution through

LimeWire.  (Waterman Report, 2-3.)  He found that 43.6% of the files were digital recordings

with copyrights owned by Plaintiffs.  (Id.)  Dr. Waterman next logged the number of times

LimeWire users sought to download each of the files in the sample.  Based on these results, Dr.

Waterman estimated that 98.8% of the files requested for download through LimeWire are

copyright protected or highly likely copyright protected, and thus not authorized for free

distribution.  (Id. at 7-8.)

---

[8] Dr. Waterman has conducted similar studies and provided expert opinion in other copyright
infringement cases in this and other districts.  Courts have approved and relied on his expert
testimony in those cases.  See Columbia Pictures Industries, Inc. v. Fung, Case No. 06-5578,
2009 U.S. Dist. LEXIS 122661, at *5-7 n.2 (C.D. Cal. Dec. 21, 2009); Arista Records LLC v.
USENET.com, 633 F. Supp. 2d 124, 131 n.4 (S.D.N.Y. 2009).

Defendants attack the reliability of Dr. Waterman's study and expert opinion, arguing that Dr. Waterman's methodology was deficient because (1) Dr. Waterman collaborated with Plaintiffs in designing and implementing the study; (2) the categories that Dr. Waterman used to classify the sample files were improper; and (3) the study improperly excluded certain files from the statistical analysis.[9]  The Court finds that Defendants' objections are without merit.  Dr. Waterman's expert report and testimony are admissible.

First, there is no support for the contention that Dr. Waterman's study is flawed because of his collaboration with Plaintiffs.  Plaintiffs assisted Dr. Waterman in a variety of ways, including obtaining the sample of files, categorizing the files in the sample, and implementing the statistical protocol that Dr. Waterman developed.  Plaintiffs' assistance in developing and implementing the study was entirely appropriate.  See Fed. R. Civ. P. 26(a)(2)(B) advisory committee's note (1993) (stating that counsel may provide "assistance to experts in preparing [expert] reports, and indeed . . . this assistance may be needed"); Inline Connection Corp. v. AOL Time Warner Inc., 470 F. Supp. 2d 435, 442-43 (D. Del. 2007) (noting that experts may rely upon information provided by the client, other experts, or counsel).  The Court finds that Dr. Waterman applied his expert knowledge to develop a reliable methodology.  Dr. Waterman's methodology obtained a suitably random and representative sample of files available through LimeWire.  Moreover, the limitations of Dr. Waterman's study are well defined.  Defendants can – and do – challenge the study's probative value, and the Court has sufficient information to properly weigh Dr. Waterman's findings and conclusions.

---

[9] The Court notes that Defendants offer no statistical study to rebut the accuracy or reliability of Dr. Waterman's findings and expert opinion, and do not challenge Dr. Waterman's expertise in the field of statistical analysis.

Second, the Court finds that the categories of downloaded files used in Dr. Waterman's analysis are appropriate.[10]  Similar studies using nearly identical file classifications have been considered and approved by other courts.  See, e.g., Metro-Goldwyn-Mayer Studios Inc. v. Grokster, 545 U.S. 913, 952 (2005) (Breyer, J., concurring) (considering findings of statistical study as to proportion of files available on file-sharing network that were "infringing" and "likely infringing"); A&M Records, Inc. v. Napster, Inc., 114 F. Supp. 2d 896, 903 n.6 (N.D. Cal. 2000) (considering expert report that applied digital file categories (1) confirmed as infringing, (2) likely to be infringing, and (3) confirmed as not infringing); Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 145 (S.D.N.Y. 2009) (denying motion to exclude similar study by Dr. Waterman that utilized the same classifications of copyright status).

Third, the Court rejects Defendants' contention that the exclusion of twenty-six files identified as "spam, spoofs, and pornography" from Dr. Waterman's sample renders his findings unreliable.  Dr. Waterman has provided sufficient reasoning for these files' exclusion from his analysis.  (See Waterman Depo. at 230-78.)  In any event, given the small number of files classified as "spam, spoofs, and pornography," their exclusion from the sample size of 1800 files had an inconsequential effect on Dr. Waterman's statistical findings and conclusions.

The Court finds that Dr. Waterman's expert report and testimony are based on reliable methodology and are therefore admissible.

   b.  Dr. Ellis Horowitz

Dr. Horowitz is a professor of Computer Science and Electrical Engineering at the University of Southern California.  He possesses substantial knowledge and experience in software engineering and development.  Dr. Horowitz has provided an expert report and

---

[10]   The categories used include:  (1) "confirmed infringing;" (2) "highly likely to be infringing;" (3) "highly likely noninfringing," and (4) "authorization status indeterminable."

testimony on how LimeWire functions and what infringement-reducing technologies are available to prevent or mitigate the distribution of unauthorized files through LimeWire.

Defendants seek to exclude Dr. Horowitz's report and testimony on the grounds that he improperly opines on (1) the intent or state of mind of Defendants and LimeWire users; and (2) the relative efficacy of various infringement-reducing technologies.[11]   The Court rejects both arguments and finds that Dr. Horowitz's expert opinion is admissible.

First, Dr. Horowitz has not opined on the parties' state of mind, but rather has provided information on the <u>design</u> and <u>functionality</u> of the LimeWire program.  <u>See, e.g.</u>, Horowitz Report ¶ 56 ("Although Lime Wire LLC professes to be agnostic about what files are transferred using LimeWire, LimeWire's feature set is optimized for downloading popular audio files."); <u>id.</u> ¶ 57 (noting that the design of LW's "user interface" supports the download of music files); <u>id.</u> ¶ 66 (opining that the use of a "Classic Rock" genre category has the effect of generating search results containing unauthorized works); <u>id.</u> ¶ 70 (discussing that some of LimeWire's features are "potentially confusing" to users).  Such expert opinion is proper and aids the finder-of-fact in understanding LimeWire's features.  Dr. Horowitz does not make any impermissible legal conclusions, such as stating that LW actually intended to facilitate copyright infringement.  He also does not cross the line into unreliable speculation about the intended purpose of various LimeWire design features.[12]   <u>See</u> <u>Nimely v. City of New York</u>, 414 F.3d at 396 n.11 (noting that

---

[11]  Defendants do not challenge Dr. Horowitz's expertise or his description of the LimeWire application and its file-sharing system.

[12] Dr. Horowitz's expert opinions on a computer software system and its features was found to be admissible and, in fact, "deserving of substantial weight" by another judge in this district.  <u>See</u> <u>Arista Records LLC v. Usenet.com, Inc.</u>, 608 F. Supp. 2d 409, 425 n.23 (S.D.N.Y. 2009); <u>see also</u> <u>Arista Records LLC v. Usenet.com, Inc.</u>, 633 F. Supp. 2d 124, 130-31, 133, 150, 152 (S.D.N.Y. 2009) (relying on Horowitz's testimony); <u>Columbia Pictures Indus., Inc. v. Fung</u>,

an expert witness is permitted substantially more leeway than a lay witness in testifying as to

opinions that go beyond on his or her immediate perception) (citing <u>United States v. Garcia</u>, 291

F.3d 127, 139 & n.8 (2d Cir. 2002)); <u>In re Zyprexa Prods. Liab. Litig.</u>, 489 F. Supp. 2d at 283-84

(noting that an expert is "permitted wide latitude to offer opinions," so long as they rely upon

expert knowledge and experience).

Second, the Court finds that Dr. Horowitz's expert opinions on the effectiveness of

various infringement-reducing technologies are reliable and satisfy the requirements of Rule 702

and <u>Daubert</u>.  Dr. Horowitz has substantial expertise in computer software design and

engineering.  His expert report makes clear that his opinions are based upon his observation and

collection of relevant information about existing infringement-reducing technologies.

The Court has found that Dr. Waterman's and Dr. Horowitz's expert reports and

testimony are reliable and admissible.  The Court thus DENIES Defendants' motion to exclude

the evidence.

B.  <u>Bildson Declaration</u>

Defendants move (1) to strike the declaration of Greg Bildson ("Bildson"), submitted by

Plaintiffs on September 26, 2008 (the "Bildson Declaration"); and (2) for a protective order

enjoining Bildson from speaking further with Plaintiffs' attorneys.[13]  The Court denies

---

Case No. 06-5578, 2009 U.S. Dist. LEXIS 122661, at *5-7 n.2 (C.D. Cal. Dec. 21, 2009)
(finding Horowitz's testimony admissible on summary judgment).

[13] Defendants also move for a stay of the summary judgment proceedings until the Court has
considered Plaintiffs' motion to strike the Bildson Declaration and for a protective order.
Briefing on summary judgment is complete, however.  The Court is capable of considering
Plaintiffs' motion to strike and for a protective order at the same time as the parties' summary
judgment motions, without prejudicing Defendants.  Accordingly, the Court denies Defendants'
motion for a stay.

Defendants' motion, except that the Court places certain limited conditions on Plaintiffs' future contacts with Bildson.

When Plaintiffs filed this action in 2006, they named Bildson, LW's Chief Technology Officer ("CTO") and Chief Operating Officer ("COO"), as a defendant.  On July 22, 2008, Bildson's attorney, Michael Page ("Page"), contacted Plaintiffs to make a settlement proposal, whereby Plaintiffs would drop the claims against Bildson in exchange for Bildson providing Plaintiffs with factual information about LW and LimeWire and paying a nominal settlement amount.  On July 28, 2008, Page contacted Charles Baker ("Baker"), LW's attorney, and asked whether he consented to Bildson meeting with Plaintiffs' attorneys to "speak substantively with [Bildson] . . . as a [LW] employee."  Baker consented.

On September 4, 2008, Bildson and Page met with Plaintiffs' attorney, Katherine Forrest ("Forrest"), to discuss settlement.  Forrest proposed a settlement agreement that included a cooperation clause, under which Bildson would cooperate with Plaintiffs' investigation of Defendants and provide information and, if necessary, testimony on LW's infringing activities. Following the meeting, Bildson set forth his knowledge of LimeWire and of LW's infringing activities in the Bildson Declaration.  On September 9, 2008, Bildson voluntarily resigned from LW.  On September 10, 2008, he executed the Bildson Declaration and the settlement agreement.

Defendants move to strike the Bildson Declaration, on the grounds that it arose from improper ex parte communications between Bildson and Plaintiffs' attorneys and that it contains information subject to the attorney-client privilege.  Defendants seek a protective order purportedly to prevent Bildson from disclosing privileged information to Plaintiffs.

1.  Legal Standard

In New York, attorneys are prohibited from soliciting information about an opposing party that is protected by attorney-client privilege.  See Muriel Siebert & Co. v. Intuit Inc., 868 N.E.2d 208, 210-11 (N.Y. 2007); Merrill v. City of New York, 2005 WL 2923520, at *1 (S.D.N.Y. Nov. 4, 2005); Wright v. Stern, 2003 WL 23095571, at *1 (S.D.N.Y. Dec. 30, 2003). The party invoking the attorney-client privilege bears the burden of establishing that the information at issue is privileged.  To do this, the party must show that there was "(1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice."  United States v. Constr. Prods. Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996).  The attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts."  Upjohn Co. v. United States, 449 U.S. 383, 395-96 (1981).  The Second Circuit "construe[s] the privilege narrowly because it renders relevant information undiscoverable; [it applies] only where necessary to achieve its purpose."  In re County of Erie, 473 F.3d 413, 418 (2d Cir. 2007) (internal citation omitted).

The New York Rules of Professional Conduct provide that a lawyer representing a client may not have ex parte communications with an opposing party who the lawyer knows is represented by counsel, unless the lawyer has the consent of that party's counsel.  N.Y. Rules Prof. Conduct 4.2 (2009).  The New York Court of Appeals has defined a "party" in this context to include "corporate employees whose acts or omissions in the matter under inquiry are binding on the corporation (in effect, the corporation's 'alter egos')."  Niesig v. Team I, 558 N.E.2d 1030, 1035 (N.Y. 1990); Estes v. City of New York, 2006 WL 2299350, at *1 (E.D.N.Y. Apr. 11, 2006).  A lawyer may have ex parte contact with the opposing party's former employees.

See Polycast Tech. Corp. v. Uniroyal, Inc., 129 F.R.D. 621, 628 (S.D.N.Y. 1990).  If the former

employee had access to privileged information while employed with the opposing party,

however, a court may enter a protective order placing conditions on such contact, in order to

prevent sharing of any privileged information.  See Lyondell-Citgo Refining, LP v. Petroleos de

Venezuela, S.A., No. 02 Civ. 0795, 2003 WL 22990099, at *2-3 (S.D.N.Y. Dec. 19, 2003).

    2.  Application

       The Court will not strike the entire Bildson Declaration.  The Declaration does not arise

out of improper ex parte communication between Bildson and Plaintiffs' counsel, Forrest.  Prior

to meeting with Bildson, Forrest received consent from Defendants' counsel for Forrest to

"speak substantively with [Bildson] . . . as a [LW] employee."[14]

       Defendants argue that, because Bildson received privileged information while working at

LW, the Court should conclude that the Bildson Declaration reflects confidential information and

strike the entire document.  Defendants, however, cite to no decision in which a court has struck

an entire factual declaration, without any evidence that the entire declaration was privileged.[15]

Rather, when presented with a declaration from a party with access to privileged information,

---

[14] Defendants argue that the meeting was improper because Baker intended to give Forrest
permission to speak with Bildson only about a settlement, not a declaration.  Defendants'
argument is unpersuasive.  Defendants have presented no evidence indicating that Baker
attempted to limit the scope of Forrest's conversation with Bildson, or that Forrest knew that
Baker's consent was limited.  In her email, Forrest asked if she could have a "substantive"
conversation with Bildson in his capacity "as a [LW] employee."  Baker responded "this is fine."
Baker's response did not limit the conversation between Plaintiffs' counsel and Bildson to
settlement.

[15] Defendants cite to two cases to support their argument that the Court should strike the Bildson
Declaration based on a presumption of disclosure, Hull v. Celanese Corp., 513 F.2d 568 (2d Cir.
1975) and MMR/Wallace Power & Indus., Inc. v. Thames Assocs., 764 F. Supp. 712 (D. Conn.
1991).  These cases involve attorney disqualifications.  They do not stand for the proposition that
a court should strike an entire declaration where there is no evidence that the entire declaration
contains privileged information.

courts strike only those portions of the declaration that actually contain privileged information. See Major League Baseball Properties, Inc. v. Opening Day Productions, 1997 WL 525482, at *6 (S.D.N.Y. Aug. 22, 1997) (striking only one phrase from party's testimony, because only that phrase reflected privileged information).  This approach is consistent with the Second Circuit's mandate that the attorney-client privilege be applied narrowly, so as not to exclude discoverable information.  See In re County of Erie, 473 F.3d at 418.

Defendants have provided two declarations that indicate that three statements in the Bildson Declaration may reflect privileged communications:  (1) in the second line of paragraph 11 of the Declaration, the words following the comma; (2) in the second-to-last line of paragraph 12 of the Declaration, the words following the word "feature;" and (3) in the first sentence of paragraph 21 of the Declaration, the words from "also" through "evidence."  The Court does not rely on these statements in deciding the instant motions.  Accordingly, there is no reason for the Court to rule on their status at this time.

The Court will not issue a protective order prohibiting Plaintiffs from speaking with Bildson.  Plaintiffs have made a good faith effort to avoid learning privileged information from Bildson.  Forrest and Page, Bildson's attorney, have submitted affidavits stating that Forrest met with Bildson only once, and that she never sought privileged information from him.  Forrest and Page both state that they repeatedly warned Bildson not to provide them with such information.  Defendants have presented no evidence that Bildson disclosed privileged communications to Plaintiffs, other than the two declarations discussed above.

Because Bildson had access to privileged information while at LW, however, the Court believes that it is sensible and fair to order additional precautions to ensure that Bildson does not reveal privileged information to Plaintiffs in the future.  Accordingly, the Court orders Plaintiffs:

(1) not to request privileged information from Bildson; (2) to stop Bildson from revealing privileged information, if Plaintiffs become aware that he is doing so; and (3) to promptly provide Bildson and his attorney with a copy of this order, and to ensure that Bildson's attorney discusses with Bildson his obligation not to disclose privileged information.

Accordingly, the Court DENIES Defendants' motion to exclude the Bildson Declaration and for a protective order, except to the extent that the Court places conditions on any future contacts between Plaintiffs and Bildson.

C.   Declarations of Sehested, Kempe, and Coggon

Defendants move to strike the declarations of Thomas Sehested, Andrew Kempe, and Katheryn Coggon, on the ground that Plaintiffs failed to identify the three individuals as potential witnesses.  The Court denies Defendants' motion.

Rule 26 requires parties to disclose the identity of individuals "likely to have discoverable information that the disclosing party may use to support its claims or defense." Fed. R. Civ. Pro. 26(a).  Parties must update and supplement their disclosures and other discovery responses in "a timely manner."  Fed. R. Civ. P. 26(e).  If a party fails to disclose a witness as required by Rule 26, a court may exclude evidence obtained from that witness, unless the failure to disclose was substantially justified or harmless.  Fed. R. Civ. P. 37(c).  A court has discretion to exclude evidence because of a party's failure to disclose.  See Semi-Tech Litig. LLC v. Bankers Trust Co., 219 F.R.D. 324, 325 (S.D.N.Y. 2004).  Because "'refusing to admit evidence that was not disclosed during discovery is a drastic remedy,' courts will resort to preclusion only 'in those rare cases where a party's conduct represents flagrant bad faith and callous disregard of the Federal Rules of Civil Procedure.'"  Ward v. The Nat'l Geographic

Soc'y, No. 99 Civ. 12385, 2002 WL 27777 (S.D.N.Y. Jan. 11, 2002) (quoting Grdinich v. Bradlees, 187 F.R.D. 77, 79 (S.D.N.Y. 1999)).

Here, there is no evidence that Plaintiffs' alleged failure to disclose Kempe, Coggon, and Sehested prejudiced Defendants.

The information provided by Kempe is no different from that possessed by a witness whose identity was timely disclosed, Thomas Carpenter.  Plaintiffs were not required to update their disclosure to state that they would speak with Kempe instead of Carpenter.  See Haritatos v. Hasbro, Inc., No. 6:05-CV-930, 2007 WL 3124626, at *3 (N.D.N.Y. Oct. 23, 2007). [16]

Defendants claim that they have been prejudiced because they have not had an opportunity to cross-examine Coggon and Sehested.  After Plaintiffs submitted the declarations, however, Defendants could have moved to depose the two witnesses, which would have remedied any prejudice Defendants claim to have suffered.  Defendants' failure to request depositions undercuts their argument of prejudice.

The Court thus DENIES Defendants' motion to exclude the declarations of Kempe, Coggon, and Sehested.

   D. Exhibits Purportedly Relating to Settlement Negotiations

Defendants move to exclude thirty-three of Plaintiffs' exhibits and related deposition testimony that they claim are inadmissible pursuant to Rule 408(a)(2) of the Federal Rules of Evidence.  Rule 408 provides that "conduct or statements made in compromise negotiations

---

[16] Kempe is the Manager of Technical Account Services at MediaSentry Services, a company hired by the Recording Industry Association of America to monitor various P2P programs, including LimeWire.  In their initial witness disclosure list, Plaintiffs included Thomas Carpenter, a "Director" at MediaSentry Services.  (See Forrest 12/05/08 Mot. To Strike/Exclude Decl., Ex. 492.)  Plaintiffs sought the same evidence from Kempe that they would have sought from Carpenter, namely MediaSentry's information regarding the infringing activity occurring through LimeWire.  Both Kempe and Carpenter derived their knowledge of that information from their work at MediaSentry.

regarding the claim" may not be admitted in evidence when offered to prove a party's liability.

Fed. R. Evid. 408(a)(2).  In determining whether to exclude evidence under Rule 408, a court

must weigh the need for evidence against the "potentiality of discouraging future settlement

negotiations."  Trebor Sportswear Co. v. Limited Stores, Inc., 865 F.2d 506, 510-11 (2d Cir.

1989) (citing 2 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 408[05], at 408-31 (1988)).

Defendants argue that the documents they seek to exclude were created for the purpose

of, or in the course of, settlement negotiations.  The challenged documents relate to a proposal by

LW to implement various digital file filtering systems, and LW's "Plan for Digital Market

Growth."  The documents include internal LW communications; external LW communications

with non-parties, such as online content providers; and LW's business plans.

The Court finds that exclusion pursuant to Rule 408 is not warranted.  The disputed

documents were created primarily to promote the growth and profitability of LW, and not for the

purpose of settlement negotiations.  Rule 408 does not shield business plans and communications

with non-parties.  See Union Carbide Corp. v. Montell N.V., 28 F. Supp. 2d 833, 841 (S.D.N.Y.

1998).

Accordingly, the Court DENIES Defendants' motion to exclude the evidence.

E.  Evidence of Defendants' Conduct Outside of Limitations Period

Defendants move to exclude documentary and testamentary evidence that predates

August 3, 2003.  Defendants argue that any evidence relating to activity prior to that date falls

outside the three-year statute of limitations applicable to Plaintiffs' copyright infringement

claims.

The Court finds that evidence of Defendants pre-August 2003 conduct is relevant,

probative, and admissible.  Although Plaintiffs may not recover for conduct that occurred outside

the limitations period, "evidence of such conduct may be admissible to shed light on the motives with which acts within the limitations period were performed." [17] Cooper v. Parsky, 140 F.3d 433, 440-41 (2d Cir. 1998); see also Sir Speedy, Inc. v. L&P Graphics, Inc., 957 F.2d 1033, 1038 (2d Cir. 1992) (noting that the statute of limitations does not "operate to bar the use of a document that predates the commencement of the limitations period but that is relevant to events during the period"). The disputed evidence is relevant to the determination of Defendants' state of mind, including whether they were aware of LimeWire users' infringing activities and whether they intended to facilitate those activities within the limitations period. Accordingly, the Court DENIES Defendants' motion to exclude evidence that predates August 3, 2003.

F.  Objections Based on Relevance, Authentication, and Hearsay

Defendants move to exclude a number of Plaintiffs' exhibits on the grounds that they are either (1) not relevant; (2) unauthenticated; or (3) inadmissible hearsay. The Court considers each objection in turn. With the exception of certain exhibits discussed below, the Court finds that Defendants' objections are without merit.

1.  Relevance

Evidence must be relevant in order to be admissible. Fed. R. Evid. 402. At trial or on a motion for summary judgment, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Determinations of relevance are entrusted to the sound discretion of the district court. See United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994). The standard for determining relevance is a liberal one. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 587; Contemporary Mission, Inc. v.

---

[17] Plaintiffs do not seek to recover for conduct that occurred outside the limitations period.

Famous Music Corp., 557 F.2d 918, 927 (2d Cir. 1977).  On a motion for summary judgment,

barring substantial cause for excluding evidence on relevance grounds, a court should admit and

consider the challenged exhibits and testimony.  See Presbyterian Church of Sudan v. Talisman

Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009).

Although the probative weight of each of the contested exhibits varies, each is related to

Defendants' alleged state of mind and intent, and provides context for the alleged conduct.  The

exhibits, therefore, are relevant, and the Court DENIES Defendants' motion to exclude them.

2.  Authentication

Rule 901 of the Federal Rules of Evidence requires evidence to be authenticated or

identified before it is admitted.  Fed. R. Evid. 901(a).  To authenticate evidence, the party

seeking to admit the evidence must present "evidence sufficient to support a finding that the

matter in question is what its proponent claims."  Id.; see also United States v. Ruggiero, 928

F.2d 1289, 1303 (2d Cir. 1991).  The standard for authentication is not rigorous.  See United

States v. Dhinsa, 243 F.3d 635, 658 (2d Cir. 2001).  Authenticity may be established through a

variety of means, including the testimony of a witness with knowledge of the document's

authenticity, see Fed. R. Evid. 901(b)(1), or based upon "[a]ppearance, contents, substance,

internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."

Fed. R. Evid. 901(b)(4).  "[T]he standard for authentication, and hence for admissibility, is one

of reasonable likelihood."  United States v. Pluta, 176 F.3d 43, 49 (2d Cir. 1999) (quoting United

States v. Holmquist, 36 F.3d 154, 168 (1st Cir. 1994)).

Having reviewed the disputed exhibits and the related deposition testimony, the Court

finds the "appearance, contents, substance," and other contextual indicators satisfy the

authentication requirement.  Accordingly, the Court DENIES Defendants' motion to exclude the evidence on authentication grounds.

3.  Hearsay

Defendants object to seventy-six exhibits offered by Plaintiffs on the ground that they constitute inadmissible hearsay.  Hearsay is an out-of-court statement offered to "prove the truth of the matter asserted."  See Fed. R. Evid. 801(c).  Such a statement is not admissible unless it qualifies as nonhearsay, see, e.g., Rule 801(d), or satisfies a hearsay exception as set forth in Rules 803, 804 or 807.

The Court finds that the disputed exhibits are admissible on the grounds that they: (1) constitute nonhearsay as admissions of a party-opponent; (2) constitute nonhearsay as evidence of LW's knowledge or intent; or (3) satisfy the business record exception to the hearsay rule.

a.  Admissions of a Party-Opponent

A statement is not hearsay if it is offered against a party and is the party's own statement, in either an individual capacity or a representative capacity.  See Fed. R. Evid. 801(d)(2)(A).  An admission made by a party's employee is admissible against the party if it was made during the course of the employee relationship and relates to a matter within the scope of the person's employment.  See Fed. R. Evid. 801(d)(2)(D); United States v. Lauersen, 348 F.3d 329, 340 (2d Cir. 2003), vacated on other grounds, 543 U.S. 1097 (2005); Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 537 (2d Cir. 1992).  Where a statement is deemed admissible as an admission by a party-opponent under Rule 801(d)(2), the surrounding statements providing essential context may also be considered.  See United States v. Dupre, 462 F.3d 131, 136-137 (2d Cir. 2006) (email messages sent by third parties to defendants were admissible to provide context for email messages sent by defendants in response); see, e.g., Metro-Goldwyn-Mayer

Studios, Inc. v. Grokster, Ltd., 454 F. Supp. 2d 966, 974 (C.D. Cal. 2006) ("Grokster Remand") (email chains and online exchanges deemed admissible as nonhearsay on the ground that the messages were offered to establish defendant's knowledge and state of mind as to the activities of its software users).

A number of the challenged exhibits contain email chains and internet forum postings that were written in whole or in part by LW employees, during the course of their employment with LW. The emails and postings pertain to infringement being committed by LimeWire users, and thus relate directly to matters within the scope of the employees' employment with LW. The exhibits therefore constitute direct or vicarious admissions by Defendants, and are not hearsay. The portions of the emails and postings written by LimeWire users and other non-parties provide essential context to the statements by LW employees, and are also admissible.

The Court finds that certain forum postings and email messages written by Adam Fisk, a former LW employee, are inadmissible hearsay, because they were written after Fink's employment with LW had ended.

Accordingly, the Court DENIES Defendants' motion to exclude the exhibits containing the email chains and forum postings, except that the Court excludes exhibits containing emails and postings written by Fisk after his term of employment at LW ended.

   b.   Evidence of Knowledge and Intent

Out-of-court statements are not hearsay if offered to show the context within which parties were acting, or to show a party's motive or intent for behavior. See 5 Weinstein's Federal Evidence, § 801.11[5]; see also United States v. Salameh, 152 F.3d 88, 112 (2d Cir. 1998). Out-of-court statements are also not considered hearsay if used to prove notice or

knowledge.  See Cameron v. Cmty. Aid for Retarded Children, 335 F.3d 60, 65-66 (2d Cir.

2003).

Defendants challenge the admissibility of exhibits that contain (1) screenshots of

software programs and related websites, (2) statements about LimeWire quoted in newspaper

articles, and (3) strategy memos and talking points provided by LW's public relations firm.  The

Court finds that these documents are admissible as probative of LW's knowledge of infringing

activity by LimeWire users or of LW's intent to induce infringement.  The Court DENIES

Defendants' motion to exclude the evidence.

     c.  Business Records

Rule 803(6) contains an exception to the hearsay rule for business records.[18]  The

business records exception has been construed generously in favor of admissibility, due to the

general trustworthiness of regularly kept records and the need for this type of evidence in many

cases.  See Conoco Inc. v. Department of Energy, 99 F.3d 387, 391 (Fed. Cir. 1996); see also

Health Alliance Network, Inc. v. Continental Cas. Co., 245 F.R.D. 121 (S.D.N.Y. 2007).

Defendants object to documents created by Google Inc., which contain details of an

advertising campaign that LW conducted through Google from 2002 through 2006.  The

documents include the specific keyword and search terms that LW purchased from Google for

the campaign.  Defendants argue that Plaintiffs have failed to lay a proper foundation to establish

that these documents constitute admissible business records.  Plaintiffs offered the testimony of a

---

[18] Rule 803(6) defines a business records as:  "A memorandum, report, record, or data compilation, in any form, of acts, events, [or] conditions …, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, … unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness."

Google employee and former AdWords account manager, Jill T. Randell, who stated that the documents were "business records" and that the exhibits were "a copy of what someone from Google would see when logging into our internal [advertising system.]"  Randell stated that the records were prepared in the normal course of business at Google. (Randell Tr. 11:12-11:15).

The Court finds that Randell's testimony is sufficient to establish that the Google documents are business records.  Further, the Court finds that the documents possess "sufficient indicia of trustworthiness to be considered reliable," and to warrant admissibility as business records.  See Potamkin Cadillac Corp. v. B.R.I. Coverage Corp., 38 F.3d 627, 632-33 (2d Cir. 1994) (quoting Saks Int'l, Inc. v. M/V "Export Champion", 817 F.2d 1011, 1013 (2d Cir. 1987). The Court DENIES Defendants' motion to exclude the Google documents.

In conclusion, the Court DENIES Defendants' Evidentiary Motions, except that, as discussed above, the Court places conditions on Plaintiffs' future meetings and conversations with Bildson and excludes the emails and forum postings written by Adam Fisk after his employment with LW ended.[19]  The Court now turns to the parties' motions for summary judgment.

## IV.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate only if the record before the court establishes that there is no "genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); In re "Agent Orange"

---

[19] In addition to the objections discussed above, Defendants have made a number of other objections to Plaintiffs' evidence.  The Court has considered those objections and finds them to be without merit.

Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir. 2008).  A motion for summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party."  NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178-79 (2d Cir. 2008); see also Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); Fed. R. Civ. P. 56(e).  Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The non-moving party may not rely on "conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998), or on mere denials or unsupported alternative explanations of its conduct.  See S.E.C. v. Grotto, No. 05-5880, 2006 WL 3025878, at *7.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and must set forth "significant, probative evidence" on which a reasonable factfinder could decide in its favor.  Anderson, 477 U.S. at 249.

**V.  Infringement Claims Against LW**

A.  Direct Infringement

Plaintiffs' infringement claims against LW are based on theories of secondary liability. To establish their secondary liability claims, Plaintiffs first must establish that LimeWire users directly infringed Plaintiffs' copyrights.  There are no genuine issues of material fact as to direct infringement.  The evidence in the record establishes that LimeWire users infringed Plaintiffs' copyrights by sharing unauthorized digital copies of the Recordings through LimeWire.

25

1.  Legal Standard

Secondary liability for copyright infringement may be imposed on a party that has not

directly infringed a copyright, but has played a significant role in direct infringement committed

by others, for example by providing direct infringers with a product that enables infringement.

See Grokster, 545 U.S. at 929-30; Sony Corp. v. Universal City Studios, 464 U.S. 417, 434-35

(1984). The rationale for secondary liability is that a party who distributes infringement-enabling

products or services may facilitate direct infringement on a massive scale, making it "impossible

to enforce [copyright protection] effectively against all direct infringers."  In such circumstances,

"the only practical alternative is to to go against the distributor of the copying device for secondary

liability."  Id. at 930 (citing In re Aimster Copyright Litig., 334 F.3d 643, 645-646 (7th Cir.

2003)).[20]

To recover on a claim based on secondary liability, a plaintiff first must establish direct

infringement by the relevant third party, i.e. the party that received the infringement-enabling

device.  See Grokster, 545 U.S. at 930, 940 (holding that liability based on an inducement theory

---

[20] It is notable that major record companies, including Plaintiffs, have pursued legal action
against individuals who commit direct copyright infringement, with considerable success.  See,
e.g., BMG Music v. Gonzalez, 430 F.3d 888 (7th Cir. 2005); Sony BMG Music Entertainment v.
Tenenbaum, 07-CV-11446-NG, 2009 WL 4547019 (D. Mass. Dec. 7, 2009); Atlantic Recording
Corp. v. Visione, No. 07-2268, 2008 WL 1924892 (N.D. Ill. Apr. 29, 2008); Arista Records,
LLC v. Butler, No. 8:07-cv-3-T-23EAJ, 2007 WL 4557198 (M.D. Fla. Dec. 21, 2007); Atlantic
Recording Corp. v. Falgout, No. 06-3784, 2007 WL 4163430 (E.D. La. Nov. 21, 2007).
Plaintiffs have sued more than 6,000 LimeWire users for direct copyright infringement.  They
have obtained judgments against more than 700 users and settled claims against almost 4,000
users.  (Coggon Decl. ¶ 4.)  The damage awards and other litigation costs imposed upon
individual infringers and the publicity concerning such cases have arguably had some deterrent
effect on Internet users' infringing activities through online networks.  See Justin Hughes, On the
Logic of Suing One's Customers and the Dilemma of Infringement-Based Business Models, 22
Cardozo Arts & Ent. L.J. 725, 731-35 (2005) (discussing the extent to which record companies'
lawsuits against music consumers for P2P copyright infringement are increasing awareness of
copyright law and deterring future infringement).

"requires evidence of actual infringement by recipients of the device," and noting that vicarious infringement occurs where one "profit[s] from direct infringement while declining to exercise a right to stop or limit it"); Faulkner v. Nat'l Geographic Enters. Inc., 409 F.3d 26, 40 (2d Cir. 2005) ("[T]here can be no contributory infringement absent actual infringement.").

To establish direct infringement, a plaintiff must show that (1) the plaintiff owns the copyright or copyrights at issue; and (2) the third party infringed the copyrights by unauthorized copying or distribution.  See Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 260 (2d Cir. 2005).

    2.   Application

The evidence establishes that LimeWire users have infringed Plaintiffs' copyrights.  First, Plaintiffs have proven that they own the copyrights for the Recordings.  (Pl. SUF ¶¶ 98-102.) Second, the evidence demonstrates that LimeWire users employed LimeWire to share and download the Recordings without authorization.  Plaintiffs have submitted documentation and electronic storage media data showing that LimeWire users share and download unauthorized digital copies of the Recordings through LimeWire.  Plaintiffs have provided hard drives that contain digital copies of the Recordings, with electronic evidence that establishes that the Recordings were downloaded by LimeWire users without authorization.[21]  (Exs. 466, 487.)

---

[21]    A genuine issue of material fact exists as to whether "hash"-based analysis may independently support a finding of direct infringement.  A "hash" is a property of a particular digital file that reflects certain aspects of that file, including its content, quality and resolution, length, encoding, and any "ripping" software that has been used to transfer the file.

    According to Plaintiffs, if two files have the same hash, "they are identical."  (Sehested Decl. ¶ 5 (filed 9/9/08); Kempe Decl. ¶ 6 (filed 9/8/08).)  Plaintiffs further contend that, "if two LimeWire users possess a file with identical hashes, one user's file is a copy of the other." (Sehested Decl. ¶ 5 (emphasis added).)

    Defendants dispute this conclusion.  According to Defendants' computer science expert, "[t]he fact that two users have a file with the same hash implies that the two users possess a file with (likely) the same contents.  It does not, however, imply that those two users shared the file

The report from Plaintiffs' expert, Dr. Richard Waterman, also supports a finding of direct infringement.  Dr. Waterman analyzed a random sample of files available on LimeWire, and determined that 93% of those files were protected or highly likely to be protected by copyright, and thus not authorized for free distribution through LimeWire.  (Waterman Report, 2-3.)  Dr. Waterman also analyzed the rate at which the sample files were requested for download by LimeWire users.  Based on this analysis, he estimated that 98.8% of the files requested for download through LimeWire are copyright protected and not authorized for free distribution.  (Id., 7-8.)

LW argues that statistical evidence of the "availability" of copyright-protected files and of download "requests" is insufficient to establish <u>actual</u> infringing activity by LimeWire users.  Some courts have held that "request" evidence, on its own, does not suffice to establish direct infringement.  <u>See, e.g.</u>, <u>Arista Records, Inc. v. Mp3Board, Inc.</u>, No 00-4660, 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002) (finding that availability of infringing material on a web site did not sufficiently establish unlawful distribution or dissemination); <u>London-Sire</u>

---

with each other, or that one copied the file from the other."  (Gribble Decl. ¶ 4(b) (filed 11/7/08) (emphasis added).)  This is because, according to Defendants, "[t]here are many different ways that the two users could have ended up with the same, identical file."  (<u>Id.</u> ¶ 4(c).)  Specifically, Defendants state that the two users

> could have both obtained [the file] from the same, non-P2P source (e.g., if they both downloaded it from a web site, or possibly from different web sites that happen to have obtained [it] some other way).  They could have obtained it from some non-gnutella-P2P network.  They could have obtained it from some non-LimeWire Gnutella peer.  It could be that this file is available on all of these sources, and each user obtained it using a different source.

(<u>Id.</u>)

The Court cannot decide at summary judgment a material dispute of fact.  <u>See, e.g.</u>, <u>Amnesty Am. v. Town of West Hartford</u>, 361 F.3d 113, 122 (2d Cir. 2004); <u>Diamond v. Sokol</u>, 468 F. Supp. 2d 626, 636 n.9 (S.D.N.Y. 2006) (Lynch, J.) ("the . . . opinions of dueling experts are issues for trial . . . .").  Whether the existence or the extent of digital file-sharing can conclusively be determined from the fact that two files have the same hash are questions for the trier of fact.

Records, Inc. v. Doe 1, 542 F. Supp. 2d 153, 176 (D. Mass. 2008) ("[M]erely exposing music files to the internet is not copyright infringement.").  Plaintiffs, however, do not rely solely on evidence of "requests" and "availability" of the Recordings.  Rather, they have submitted substantial direct and circumstantial evidence showing infringement by LimeWire users.  Dr. Waterman's report supports this evidence, and provides context as to the scope of infringement.

The Court therefore finds that LimeWire users have directly infringed Plaintiffs' copyrights.[22]  The Court turns to the merits of the parties' motions for summary judgment.

B.  Inducement of Copyright Infringement

The evidence establishes that LW, by distributing and maintaining LimeWire, intentionally encouraged direct infringement by LimeWire users.  Plaintiffs, therefore, are entitled to summary judgment on their claim against LW of inducement of copyright infringement.

1.  Legal Standard

In Grokster, the Supreme Court confirmed that inducement of copyright infringement constitutes a distinct cause of action.  The Court held that the Grokster defendants "induced" copyright infringement by distributing a device with the "object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps taken to foster infringement."  Grokster, 545 U.S. at 936-37.[23]

---

[22] Accordingly, the Court rejects Defendants' motion for summary judgment on this ground with respect to all claims of secondary liability.

[23] LW argues that because the tort of "inducement" was not defined until the 2005 Supreme Court decision in Grokster, pre-2005 evidence of inducement should not be considered.  (See Lime Wire Mem. Opp. Pl. Mot. for Partial Sum. J. at 11, n.8.)  This argument ignores the fact that an inducement claim is a form of the long-established cause of action for contributory copyright infringement.  See Grokster, 545 U.S. at 930 ("One infringes contributorily by intentionally inducing or encouraging direct infringement . . . .");  Kalem Co. v. Harper Bros.,

To establish a claim for inducement, a plaintiff must show that the defendant (1) engaged in purposeful conduct that encouraged copyright infringement, with (2) the intent to encourage such infringement.  See id. at 937 ("The inducement rule . . . premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage [lawful] innovation . . . ."); id. at 940 n.13 ("[T]he distribution of a product can . . . give rise to liability where evidence shows that the distributor intended and encouraged the product to be used to infringe.") (emphasis added); Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1170 n.11 (9th Cir. 2007) ("Google's activities do not meet the 'inducement' test explained in Grokster because Google has not promoted the use of its search engine specifically to infringe copyrights.").

A defendant's intent to foster infringement can be established by evidence of the defendant's "clear expression" of such an intent, or of "affirmative steps [the defendant has] taken to foster infringement."  Grokster, 545 U.S. at 936-37.  Direct evidence of inducement is an "advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations."  Id. at 937.  Such evidence, however, is "not [the] exclusive way of" proving inducement liability.  Id. at 938.  In Grokster, the Supreme Court found that three specific kinds of evidence, considered in the context of the record as a whole, supported a finding that the defendants intended to induce infringement:  (1) defendants' internal communications and advertising efforts, which evidenced a clear intent to target users of Napster, a population well-known for committing copyright infringement through file-sharing programs; (2) defendants'

222 U.S. 55, 62-63 (1911) (Holmes, J.) (finding contributory infringement liability appropriate where the "defendant not only expected but invoked by advertisement the [infringing] use" of its product); Gershwin Pub. Corp. v. Columbia Artist Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971) ("One who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer.") (emphasis added).  The Court rejects LW's argument.

failure to develop and implement filtering tools or other means of limiting infringement; and (3) defendants' reliance on infringing activity for the success of their business (including evidence that defendants' advertising revenue depended on Grokster having a high volume of users, which in turn depended overwhelmingly on users' ability to engage in infringing activities through the program).  Id. at 938-39.  After making these findings, the Supreme Court remanded the case to the district court to determine whether to grant Plaintiffs' motion for summary judgment on the inducement claim.

On remand, the Grokster district court found that the evidence established defendants' unlawful intent as a matter of law, and granted plaintiffs' motion for summary judgment.  The district court based its decision on evidence that:  (1) the Grokster file-sharing program was used "overwhelmingly for infringement"; (2) defendants marketed Grokster to Napster users (who were known for their infringing activities), as evidenced in defendants' internal communications and advertising and marketing efforts; (3) defendants provided technical assistance to users seeking to infringe; (4) defendants ensured that Grokster would be capable of infringing use; (5) defendants relied on revenue that depended on users' ability to commit infringement through the program; and (6) defendants failed to take meaningful affirmative steps to prevent or mitigate the infringement facilitated by Grokster.  Grokster Remand, 454 F. Supp. 2d at 984-92.

2.  Application

The evidence before the Court establishes that LW is liable for inducement of copyright infringement.

First, there is overwhelming evidence that LW engaged in purposeful conduct that fostered infringement:  LW created and distributes LimeWire, which users employ to commit a substantial amount of infringement.

Second, the following factors, taken together, establish that LW <u>intended</u> to encourage infringement by distributing LimeWire: (1) LW's awareness of substantial infringement by users; (2) LW's efforts to attract infringing users; (3) LW's efforts to enable and assist users to commit infringement; (4) LW's dependence on infringing use for the success of its business; and (5) LW's failure to mitigate infringing activities.

a.   <u>LW's awareness of substantial infringement by LimeWire users</u>

Plaintiffs have presented evidence showing that LimeWire is used overwhelmingly for infringement.  Dr. Waterman's report establishes that nearly all of the files shared and downloaded by LimeWire users are copyrighted, and not authorized for free distribution through LimeWire.  According to the report, the overwhelming majority of download requests through LimeWire are for copyright-protected files, which makes it nearly certain that most actual downloads involve unauthorized content.[24]

Plaintiffs also have presented evidence establishing that LW was aware of the substantial infringement being committed by LimeWire users.  In internal communications, LW regularly discussed the fact that LimeWire users downloaded copyrighted digital recordings through the program.  For example, a draft of a LW Offering Memorandum, created in 2001, states that LimeWire "allows people to exchange <u>copyrighted</u> mp3 files."[25]  (Ex. 52.) (emphasis added).  A September 2002 statement of LW's goals acknowledges that: "Currently, the most common use of the Gnutella Network is the sharing of music files, many of them copyrighted."  (Pl. SUF ¶ 130; Ex. 54.)  Other LW documents state that "the only information being shared on peer networks are media files," a category composed primarily of copyrighted digital recordings, and

---

[24] Defendants make several arguments contesting the reliability of Dr. Waterman's report, which the Court has already rejected.

[25] An "mp3 file" is a digital audio file that commonly contains music.

that the "[s]haring [of] media files is bringing the initial user base" to LimeWire.  (Pl. SUF ¶¶ 126-128; Ex. 53.)

In 2006, LW developed a strategic plan to "convert" LimeWire users who were sharing unauthorized digital recordings into customers of LW's online music store, which would sell authorized music (the "Conversion Plan").  In the Conversion Plan, LW openly acknowledged that the majority of LimeWire's users were infringers.  The Plan stated that (1) 25% of LimeWire's users were "hardcore pirates;" (2) 25% of users were "morally persuadable;" (3) 20% of users were legally aware; and (4) 30% of users were "samplers and convenience users." The Plan provided that over time LW would introduce features to LimeWire to block users from downloading infringing recordings, and to direct them to LW's online store.[26]  (Ex. 273, Catillaz Tr. 350; Pl. SUF ¶¶ 524-529.)

Further evidence that LW knew that LimeWire users were committing copyright infringement is contained in (1) emails sent to the company by LimeWire users (Exs. 296, 303, 304, 305, 307); (2) a collection of articles maintained by LW employees in a file labeled "Knowledge of Infringement" (Ex. 197); and (3) the numerous mainstream news articles about widespread infringing activities through LimeWire and similar peer-to-peer networking program (Ex. 302).

The massive scale of infringement committed by LimeWire users, and LW's knowledge of that infringement, supports a finding that LW intended to induce infringement.  See Grokster Remand, 454 F. Supp. 2d at 985, 992.

b.  LW's efforts to attract infringing users

---

[26] To date, LW has not implemented any such features.

Plaintiffs have presented significant evidence showing that LW purposefully marketed LimeWire to individuals who were known to use file-sharing programs to share copyrighted recordings, or who expressed an interest in doing so.

In February 2001, a court-ordered injunction shut down Napster, after Napster Inc. (the company that distributed the Napster program) was found liable for copyright infringement on the ground that it had facilitated copyright infringement committed by Napster users.  Following Napster's demise, LW announced that it expected thirty percent, "[w]ith possibly up to 100 percent," of Napster users to switch to using LimeWire and similar programs, such as Kazaa and Morpheus.  (Ex. 75.)  LW developed plans to attract Napster users to LimeWire.  Internal email correspondence, often involving LW's CEO and Director Mark Gorton, reveal that LW contemplated a number of strategies to promote LimeWire to Napster users, including initiating press campaigns on college campuses relating to "file-sharing and getting free MP3's"; hiring "campus reps" at "Napster-banned colleges"; running a "Napster Independence Day" promotion; and publicizing features of LimeWire that make "finding your favorite artist or album . . . easier."  (Exs. 72, 73, 77, 148.).

From 2002 to 2006, LW conducted a marketing campaign through Google AdWords, whereby Google users who entered certain search queries, such as "replacement napster," "napster mp3," "napster download," "kazaa morpheus," "mp3 free download," and dozens of other phrases containing the words "napster," "kazaa," or "morpheus," would see an advertisement leading them to the LimeWire website.  (Pl. SUF ¶ 162-167, Ex. 82.).  LW's Google advertisements promoted LimeWire with direct references to other infringement-fostering programs.  For example, LW purchased banner advertisements for LimeWire that read "Join Millions of Morpheus users and download the best P2P file-sharing application for free.

34

Free music downloads . . .";  "Outperforms Morpheus!"; and "Faster Downloads Than Kazaa!"
(Pl. SUF ¶¶ 199-210, Exs. 82, 102-105.)  In its promotional materials, LW touted user
testimonials declaring that the LimeWire application is "excellent for downloading music files"
and "[h]ands-down the best current mp3 search tool."  (Pl. SUF ¶¶ 246, 533; Exs. 119, 149.)
LW also marketed LimeWire as "similar to the popular Napster service, in that [LimeWire]
enables the sharing, searching, and downloading of MP3 music files."  (Pl. SUF ¶ 156; Ex. 74).
It is undisputed that the vast majority of "MP3 music files" are copyrighted and not authorized
for free distribution through LimeWire.

The evidence that LW marketed LimeWire to users of Napster and similar programs, and
promoted LimeWire's infringing capabilities supports the conclusion that LW intentionally
induced infringement.  See Grokster Remand, 454 F. Supp. 2d at 986.

### c.  LW's efforts to enable and assist users to commit infringement

The evidence demonstrates that LW optimized LimeWire's features to ensure that users
can download digital recordings, the majority of which are protected by copyright, and that LW
assisted users in committing infringement.

LimeWire's search functions are designed to facilitate searches for copyrighted digital
recordings.  The program's user interface allows users to search for specific artists or albums, or
to search for music by genre.  A number of LimeWire's genre categories – including "Classic
Rock," "SoundTrack," and "Top 40" – relate specifically to popular music and inevitably guide
users to copyrighted recordings. (Exs. 23, 24. See also Grokster, 545 U.S. at 926 (recognizing as
evidence of inducement-based liability that defendant "in fact allowed users to search
specifically for "Top 40" songs, . . . which were inevitably copyrighted") (internal citation
omitted); Grokster Remand, 454 F. Supp. 2d at 987 (finding that a feature that permits users to

narrow a file search to "Top 40" sound recordings constitutes strong evidence that the defendant intentionally enabled infringing activity)).

LW tested and sought to improve LimeWire's ability to search for and download unauthorized copies of digital recordings.  For example, in August 2000, LW conducted a search for Sinead O'Connor's copyrighted song "Nothing Compares 2 U," which it considered a "definitive test" of LimeWire's file-sharing capabilities.  The fact that LW tested LimeWire by searching for infringing content gives rise to a "particularly forceful" inference that LW intended to promote copyright infringement.  See Grokster Remand, 454 F. Supp. 2d at 979-80, 987 (finding that evidence that defendants tested Grokster program by searching for copyrighted music supported a finding of intent).

In addition to ensuring that users can obtain unauthorized copies of recordings through LimeWire, LW has actively assisted LimeWire users in committing infringement.  The record reveals several online communications between LW employees and LimeWire users that plainly relate to unauthorized sharing of digital recordings through LimeWire.  In many instances, LimeWire users requested assistance in sharing and downloading digital music files, most of which were copyrighted.  In response, LW employees offered technical information about the system's functionality, thereby helping users obtain unauthorized copies of recordings.   (Pl. SUF ¶¶ 288-305.)[27]

---

[27] LW contends that the employees who provided technical assistance and encouragement to infringing users were "rogue moderators," and that LW did not know of or endorse their actions. This "rogue employee" defense is belied by the evidence of LW's intent to facilitate copyright infringement over a period of several years.  See Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124,152 n.19 (S.D.N.Y. 2009).

Evidence that LW has ensured that LimeWire can be used to commit infringement, and that the company has actively assisted infringing users, supports a finding that LW "intended and encouraged" infringement.  See Grokster, 545 U.S. at 940 n.13.

d.  LW's dependence on infringement for success of its business

From 2004 to 2006, LW's annual revenue grew from nearly $6 million to an estimated $20 million.  (Pl. SUF ¶¶ 420, 432; Exs. 252, 263.)  Such growth has depended greatly on LimeWire users' ability to commit infringement through LimeWire.

Since 2000, LimeWire has developed an enormous user base.  The program is widely available online, and can be downloaded for free.  LW has estimated that LimeWire was downloaded over three million times during its first year in existence.  By 2003, LW boasted that around two million users accessed the program every month.  At the time Plaintiffs filed this action, LW claimed that LimeWire had four million users per day.  (Pl. SUF ¶¶ 86-96.)  LW has acknowledged that the "[s]haring [of] media files," a category comprised mostly of copyrighted digital recordings (Pl. SUF ¶¶ 126-127), "[brought] the initial user base" to LimeWire.  (Id. ¶¶ 126-128; Ex. 53.)  The company has continued to develop LimeWire's user base by promoting the program's infringing capabilities, and marketing it to users known to commit infringement.

LW's sources of revenue depend on LimeWire attracting the massive user population generated by its infringement-enabling features.  From 2000 to 2004, LW earned revenue primarily by selling advertising space on LimeWire and LW's website, and by distributing software bundled with LimeWire.  (Pl. SUF ¶¶ 410-417.)  As LimeWire's user base expanded, LW's revenues from advertising and software distribution increased.  (Pl. SUF ¶¶ 409-416)  In 2004, LW began selling LimeWire "Pro," an upgraded version of LimeWire that is available for purchase and makes file-sharing activities easier.  (Pl. SUF ¶¶ 56-60.)  In January 2008, LW

obtained licenses to sell approximately half a million songs, and opened an online LimeWire

Store offering authorized sales of digital music.  (Pl. SUF ¶¶ 456-460.)  LW markets LimeWire

"Pro" and the LimeWire Store to LimeWire users.  LW's commercial success, therefore, is

derived largely from the high-volume use of LimeWire, most of which is infringing. This

evidence supports a finding that LW intended to induce infringement.  Grokster, 545 U.S. at 940.

### e.   LW's failure to mitigate infringing activities

The evidence reveals that LW has not implemented in a meaningful way any of the

technological barriers and design choices that are available to diminish infringement through

file-sharing programs, such as hash-based filtering, acoustic fingerprinting, filtering based on

other digital metadata, and aggressive user education.

In May 2006, LW implemented an optional, hash-based content filter.  A hash-based

filter can identify a digital file that contains copyrighted content, and block a user from

downloading the file.[28]  The "default" setting of LimeWire's hash-based filter was "off,"

however, meaning that LimeWire users would have to affirmatively turn the filter "on" for it to

have any effect on the transfer of digital recordings to or from their computers.  LW could have

made the hash-based content filter mandatory for all LimeWire users, or made "on" the default

---

[28] Hash-based filtering utilizes a digital file's "hash," which is a numeric representation of a file based on a complex algorithm, to identify and block infringing files.  A hash-based content filter may compare files scheduled for online transfer against a database of digital files that are known to possess audio content protected by copyright.  Where there is a match, transfer of the digital file may be blocked to prevent unauthorized transfer and copyright infringement.  (Horowitz Report ¶¶ 93-103.) Two audio files may contain the same song recording but have different hashes as a result of different settings or "ripping" software that have been applied to the respective files.  Because a digital audio file's hash will depend not only on its audio content but also on a number of other factors and settings, a hash-based filtering system cannot be expected to recognize and thwart all infringement on a file-sharing system.  (Id.) A hash-based filter system nevertheless has the capacity to substantially diminish unauthorized transfers through a file-sharing system.

setting, so that a user's file-sharing activities would be subject to the filtering process unless he affirmatively deactivated the filter.  According to LW's expert Steven Gribble, LW chose to set the filter to "off" because it wished to provide users with "enough flexibility to enable, disable, or configure filtering."  (Gribble Report at 25, 33.)  LW's decision was a conscious "design choice" (Gribble Tr. 302-03.), the direct result of which was a failure to mitigate infringement.[29]

LW considered, but failed to implement, several other plans to block the availability of infringing content through LimeWire.  LW discussed a plan for a "hybrid" filtering system that would have combined hash-based filtering and acoustic fingerprinting.[30]  (Pl. SUF ¶ 499; Exs. 289, 290.)  The company also developed, but did not implement, its Conversion Plan, which would have included a user education campaign designed to inform users about the legal consequences of copyright infringement and to promote the purchase of authorized music through the LW online store.  Under the Conversion Plan, LW eventually would have implemented hash-based filtering and acoustic fingerprinting to prevent users from downloading unauthorized files.  (Pl. SUF ¶¶ 435-40, 444-53, 552-16; Exs. 50-53, 273, 274).

---

[29] LW contends that several of the record companies in this litigation chose not to provide LW with a list of copyright-protected song recordings and their hash content. (Gorton Decl. ¶¶ 59-61.)  This argument does not create a genuine issue of fact as to whether LW has taken meaningful steps to mitigate users' infringement.  As discussed in this section, LW's decision to set the hash-based filter to "off" by default and its failure to take other available action reveal an intentional course of action to preserve infringing activities among LimeWire users.

[30] Acoustic fingerprinting can monitor the uploading or downloading of digital files.  Two audio files that sound the same will have the same acoustic fingerprint.  Digital files may be transmitted to a content recognition filter that compares the files against an existing database of unauthorized digital content.  If the acoustic fingerprint of a particular file matches a copyright-protected file present in the existing database, the transfer of that file may be blocked.  Content filtering software tools have been effectively implemented by other P2P file-sharing systems. (Horowitz Report ¶¶ 104-111.)

LW was aware of other filtering mechanisms that it could have used to mitigate infringing use.  For example, LW could have used a keyword-based filter to block unauthorized recordings from appearing in LimeWire searches.  LW already uses keyword-based filtering to allow users to limit their receipt of adult content: a LimeWire user can activate a keyword-based filter that prevents a search from bringing up files containing keyword terms that LW has identified as likely to contain pornographic content.  LW also has implemented filters to prevent online sharing of personal document files and software program files.  (Pl. SUF ¶¶ 522-23.)

Plaintiffs also note that LW does in fact employ active filtering technology, but only to prevent LimeWire users from sharing digital recordings purchased from the LimeWire online store.  (Pl. SUF ¶¶ 524-529.)  This selective filtering further demonstrates LW's knowledge of infringement-mitigating technologies and the company's intentional decision not to employ any such technologies in a way that meaningfully deters LimeWire users' infringing activities.

The only step LW has taken to address infringement is to post an electronic notice that appears when a user first downloads LimeWire.  The notice states that "LimeWire Basic and LimeWire PRO are peer-to-peer programs for sharing authorized files only.  Downloading either program does not constitute a license for obtaining or distributing unauthorized content."  (Berlin Decl. ¶ 246; Ex. 5.)  Before a user can initiate the download of the LimeWire software, he must choose from the following statements:  (1) "I will not use LimeWire for copyright infringement," or (2) "I might use LimeWire for copyright infringement." (Ex. 5)   If the user selects the second option, LimeWire will not download.  The user may then change his response to "I will not use LimeWire for copyright infringement" in order to download the program.  (Horowitz Report ¶¶ 86-87.)  The notice and "statement of intent" requirement, on their own, do not constitute meaningful efforts to mitigate infringement.  See Grokster, 545 U.S. at 926 (finding that

defendant's transmission of e-mails warning users about infringing content does not prevent imposition of inducement-based liability where there is "no evidence that [defendant] made an effort to filter copyrighted material from users' downloads or otherwise impede the sharing of copyrighted files").

LW chose not to implement any meaningful infringement-reduction strategies in part because it recognized that, "as long as there were other [P2P] applications that didn't filter," LimeWire users would respond to filtering by switching "to another [P2P application] that doesn't have that filtering behavior or that is less aggressive in making fewer files available." (Falco Tr. 157-58.)

Failure to utilize existing technology to create meaningful barriers against infringement is a strong indicator of intent to foster infringement.  See Grokster, 545 U.S. at 939; Grokster Remand, 454 F. Supp. 2d at 989 ("[A]lthough [defendant] is not required to prevent all the harm that is facilitated by the technology, it must at least make a good faith attempt to mitigate the massive infringement facilitated by its technology."); cf. Aimster, 334 F.3d at 653 (in claim of contributory copyright infringement, if the infringing uses are "substantial," to avoid liability, the defendant "must show that it would have been disproportionately costly for him to eliminate or at least reduce substantially the infringing uses").

In conclusion, the evidence shows LW has engaged in purposeful conduct that fostered infringement, with the intent to foster such infringement.  LW distributes LimeWire, and (1) is aware that LimeWire's users commit a substantial amount of copyright infringement; (2) markets LimeWire to users predisposed to committing infringement; (3) ensures that LimeWire enables infringement and assists users committing infringement; (4) relies on the fact that LimeWire enables infringement for the success of its business; and (5) has not taken meaningful steps to

mitigate infringement.  Accordingly, the Court GRANTS Plaintiffs' motion for summary

judgment on their claim of inducement of infringement against LW.

C.  Contributory Copyright Infringement

Plaintiffs and LW cross-move for summary judgment on Plaintiffs' claim that LW is

secondarily liable for copyright infringement because it "materially contributed" to infringement

committed by LimeWire users.  The Court finds that summary judgment is not warranted

because the Court cannot determine, based on the record, whether LimeWire is capable of

substantial noninfringing uses.

1.  Legal Standard

A defendant may be held liable for contributory copyright infringement if, "with

knowledge of the infringing activity," it "materially contributes to the infringing conduct of

another."  Matthew Bender & Co., Inc. v. West Pub. Co., 158 F.3d 693, 706 (2d Cir. 1998)

(quoting Gershwin Pub. Corp. v. Columbia Artist Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir.

1971)).  Unlike an inducement claim, a claim for contributory infringement does not require a

showing that the defendant intended to foster infringement.  See Grokster, 545 U.S. at 942

(Ginsburg, J., concurring) (noting that an inducement claim and a contributory infringement

claim "capture different culpable behavior").  Rather, to establish a "material contribution"

claim, a plaintiff must show that the defendant (1) had actual or constructive knowledge of the

infringing activity, and (2) encouraged or assisted others' infringement, or provided machinery

or goods that facilitated infringement.  See Faulkner v. Nat'l Geographic Soc'y, 211 F. Supp. 2d

450, 473-74 (S.D.N.Y. 2002), aff'd at 409 F.3d 26 (2d Cir. 2005); Matthew Bender, 158 F.3d at

706; accord Napster, Inc., 239 F.3d at 1020 ("Contributory liability requires that the secondary

infringer know or have reason to know of direct infringement.").

A defendant's contribution to a third party's infringing activities must be "material" to give rise to a claim for contributory infringement.  See Gershwin, 443 F.2d at 1162; Dynamic Microprocessor Assocs., Inc. v. EKD Computer Sales, No. 92-2787, 1997 WL 231496, at *14 (E.D.N.Y. Apr. 14, 1997).  For example, a defendant who is peripherally involved in infringement, such as one who provides online payment services for transactions involving infringement, does not "materially contribute" to infringement.  See Perfect 10, Inc., 508 F.3d at 1172 (9th Cir. 2007).  In contrast, where a "computer system operator learns of specific infringing material available on his system and fails to purge such material from the system," that party "knows of and contributes to direct infringement" and may be liable for contributory copyright infringement.  Napster, 239 F.3d at 1021.

In Sony Corp. v. Universal City Studios, the Supreme Court established a rule, known as the Sony-Betamax rule, that shields some defendants from liability for contributory infringement.  464 U.S. at 442.  Pursuant to the Sony-Betamax rule, a defendant who distributes a product that materially contributes to copyright infringement will not be liable for contributory infringement if the product also is "widely used for legitimate, unobjectionable purposes" or is "merely . . . capable of substantial noninfringing use."  Id. (finding that the defendant was not liable for contributory infringement based on its distribution of the Betamax video recorder, because the recorder was "capable of a substantial non-infringing use," namely "time-shifting," i.e. permitting a user to record a television program to watch at a later time[31]).  The purpose of

---

[31] In Sony Corp., there was significant statistical evidence suggesting that about nine percent of the Betamax recorder's use was for time-shifting.  The Court found that this data, when considered in the context of the product's general capabilities, was sufficient to establish that the recorder was "capable of substantial noninfringing uses."

the Sony-Betamax rule is to "leave[] breathing room for innovation and a vigorous commerce." Grokster, 545 U.S. at 933 (citing Sony Corp, 464 U.S. at 442).[32]

The plaintiffs in Grokster brought a claim for contributory infringement. The defendants argued that the Grokster P2P file-sharing program was capable of supporting substantial non-infringing uses, such that the Sony-Betamax rule precluded defendants' liability for contributory infringement. The defendants offered evidence that Grokster users employed the program to exchange some authorized files, including authorized digital recordings, digital files of public domain books, and authorized software files. The defendants also argued that, in the future, users would exchange even more authorized content through Grokster, including academic research, public domain files, and user-created audio and video files. Id. at 954-55. The Ninth Circuit found that the defendants' evidence established that Grokster was "capable of substantial noninfringing" uses, and thus granted summary judgment in favor of defendants on the contributory infringement claim.

The plaintiffs appealed the Ninth Circuit's ruling regarding contributory infringement to the Supreme Court. On appeal, the Supreme Court did not decide whether the Ninth Circuit had been correct in granting summary judgment on the contributory infringement claim.[33] Rather,

---

[32] The rule also stems from the recognition of the tension between artistic protection and technological innovation. The Supreme Court has noted that the "administration of copyright law is an exercise in managing the tradeoff." Grokster, 545 U.S. at 928; see also Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156 (1975) ("[T]he ultimate aim [of copyright law] is . . . to stimulate artistic creativity for the public good. . . . When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose."). Judge Posner of the Seventh Circuit has recognized that in Sony Corp., the Supreme Court was reluctant to enforce copyright protections against a new technology, where such enforcement might deny noninfringing users the benefit of that technology. See Aimster, 334 F.3d at 649.

[33] The Court's controlling opinion addressed only the plaintiffs' claim for inducement of infringement.

the Supreme Court issued two concurring opinions, which took differing positions on whether the Ninth Circuit had been correct in holding, as a matter of law, that Grokster was capable of substantial non-infringing uses.

In her concurring opinion, Justice Ginsburg, joined by Chief Justice Rehnquist and Justice Kennedy, found that there was "at least a genuine issue of material fact" as to whether Grokster was capable of substantial noninfringing uses, and thus that the Ninth Circuit had erred in granting summary judgment in favor of defendants.  Id. at 942 (Ginsburg, J., concurring.) Justice Ginsburg stated that, at the time of the lawsuit, Grokster was "overwhelmingly used to infringe."  Given this, defendants' evidence of some non-infringing uses was insufficient, on summary judgment, to establish "a reasonable prospect that substantial or commercially significant noninfringing uses were likely to develop over time."  Id. at 948.

Justice Breyer, joined by Justice Stevens and Justice O'Connor, reached a different conclusion.  In his concurring opinion, Justice Breyer agreed that the vast majority of Grokster users employed the program for infringing purposes.  He concluded, however, that the defendants had established that Grokster was capable of significant non-infringing uses based on the evidence that (1) Grokster was already used for some noninfringing purposes; and (2) there was "a significant future market for noninfringing uses of [Grokster]."  Id. at 954-55. Accordingly, Justice Breyer stated, it was appropriate to grant summary judgment in defendants' favor on the contributory infringement claim.  Id. at 955.

2.  Application

As previously discussed, Plaintiffs have established that LW has been aware of the prevalence of its users' infringing activities since the creation of LimeWire.  LW "materially contributed" to the infringement by designing, distributing, supporting, and maintaining the

45

program.  See Usenet.com, 633 F. Supp. 2d at 155; see also Aimster, 252 F. Supp. 2d at 651

(holding that defendant materially contributed to online infringement by providing the "software

and the support services necessary for individual Aimster users to connect with each other");

Napster, 239 F.3d at 1022 (finding that defendant materially contributed to its users'

infringement by providing the "site and facilities" to commit direct infringement).

There exists a genuine issue of material fact, however, as to whether LimeWire is

"capable of substantial noninfringing uses" such that liability should not be imposed pursuant to

the Sony-Betamax rule.[34]  See Sony Corp., 464 U.S. at 442; Grokster, 545 U.S. at 939 n.12.

Currently, LimeWire is used overwhelmingly for infringement.  LW, however, has presented

evidence of some types of noninfringing content that users share and download through

LimeWire, including:  (1) electronic copies of books that are in the public domain or authorized

for online distribution; (2) historical documents, archival films, and other public domain works;

and (3) digital music recordings produced by musicians seeking to promote their work through

free online distribution, including musicians who use LW's MagnetMix service (a service that

assists musicians and other independent artists in distributing their works online, without the

assistance or expense of a recording company).  LW argues that additional non-infringing uses

for LimeWire are likely to develop in the future.

In light of the evidence presented, the Court cannot determine, as a matter of law,

whether LimeWire is capable of substantial non-infringing uses.  The record before the Court is

insufficient to permit the Court to assess the "technological feasibility or commercial viability"

---

[34]  In a recent decision in this district, Judge Baer held that the Sony-Betamax rule could not
apply to a contributory liability claim against an Internet service provider that operated a network
of Internet bulletin boards.  See Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124,
155-56 (S.D.N.Y. 2009).  The Court notes that the technology at issue in Usenet.com is different
from the technology at issue in this case.  In Grokster, the Supreme Court applied the Sony-
Betamax rule to a P2P file-sharing program similar to the LimeWire program.

of LimeWire's potential non-infringing uses.  Id. at 958 (Breyer, J., concurring).  Summary

judgment on Plaintiffs' contributory infringement claim, therefore, is not appropriate.

Accordingly, the Court DENIES the parties' cross-motions for summary judgment.

D.   Vicarious Copyright Infringement

LW moves for summary judgment on Plaintiffs' claim of vicarious copyright

infringement.  The Court denies LW's motion for summary judgment based on the evidence that

LW (1) had the right and ability to supervise and control LimeWire users' infringing activities;

and (2) possessed a direct financial interest in the infringing activity.

1.   Legal Standard

A defendant is liable for vicarious copyright infringement if it "profit[s] from direct

infringement while declining to exercise a right to stop or limit it."  Grokster, 545 U.S. at 930.

To establish liability, a plaintiff must show that the defendant "[1] had the right and ability to

supervise the infringing activity and . . . [2] has a direct financial interest in such activities."

Gershwin, 443 F.2d at 1162.

The first element of the test for vicarious liability is satisfied if the plaintiff proves that

the defendant had the ability to supervise or control the third parties' infringing activity and

failed to do so.  See Arista Records, Inc. v. Flea World, Inc., No. 03-2670, 2006 WL 842883, at

*9 (D.N.J. Mar. 31, 2006); Playboy Enter. v. Webbworld Inc., 968 F. Supp. 1171, 1177 (N.D.

Tex. 1997) (finding that operator of website was liable for vicarious infringement for failing to

exercise its ability to control use of website for infringement).

The second element of the vicarious infringement test requires showing a "causal

relationship between the infringing activity and any financial benefit [the] defendant reaps."  See

Ellison v. Robertson, 357 F.3d 1072, 1079 (9th Cir. 2004).  The financial benefit need not be tied

directly to sales of the infringing goods.  See Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259,

263 (9th Cir. 1996).  It may also be established by evidence showing that users are attracted to a

defendant's product because it enables infringement, and that use of the product for infringement

financially benefits the defendant.  See id.; Flea World, Inc., 2006 WL 842883, at *12.

     2.  Application

There is substantial evidence that LW had the right and ability to limit the use of its

product for infringing purposes, including by (1) implementing filtering; (2) denying access; and

(3) supervising and regulating users (Pl. SUF ¶¶ 364-368; Add'l SOF ¶ 20; Bildson Decl. ¶ 17).

LW has not exercised any meaningful supervisory control over LimeWire users' infringing

activity, or provided a legitimate reason for its failure to do so.[35]

The evidence establishes that LW possesses a direct financial interest in users' infringing

activity.  See Fonovisa, Inc., 76 F.3d at 263; Flea World, Inc., 2006 WL 842883, at *12.  As

discussed earlier, LimeWire users are drawn to LimeWire because the program permits

infringement.  LW has profited from its ability to attract infringing users, including through

increased advertising revenue and increased sales of LimeWire Pro and authorized music.

---

[35] In Grokster, the Court of Appeals for the Ninth Circuit affirmed the granting of summary judgment in favor of defendants on plaintiffs' vicarious liability claim.  Grokster, 380 F.3d 1154, 1164-66 (9th Cir. 2004).  LW urges the Court to follow the Ninth Circuit's decision and find that LW did not have the "right and ability to control" the infringing activity.  LW argues that the Supreme Court's decision the following year did not affect this holding.  This contention is incorrect.  Grokster, 545 U.S. at 941; see also id. at 942 (Ginsburg, J., concurring) (noting that the Court's decision "vacate[d] in full the judgment of the Court of Appeals for the Ninth Circuit").  The Court of Appeals for the Ninth Circuit has itself recognized that its 2004 decision is "persuasive authority only."  Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 804 n.15 (9th Cir. 2007).  In any event, the rulings of the district court and intermediate appellate courts in Grokster on the issue of vicarious liability were intensely fact-specific.  This Court conducts its own fact-specific inquiry on the evidence in this case.  Based on the facts presented, summary judgment in favor of Defendants is not warranted on Plaintiffs' claim of vicarious liability.

LW contends that because LimeWire is capable of substantial non-infringing uses, LW cannot be liable for vicarious infringement.  The Court, however, has found no case in which the Sony-Betamax rule was applied in the context of a vicarious infringement claim; some courts have explicitly rejected such an application.  See Napster, Inc., 239 F.3d at 1022.  The Court, therefore, declines to extend the Sony-Betamax rule to Plaintiffs' vicarious liability claim. Moreover, even if the rule did apply, summary judgment in favor of LW would be unwarranted because the record does not support a finding that LimeWire is capable of substantial noninfringing uses.

Accordingly, the Court DENIES LW's motion for summary judgment as to Plaintiffs' claim of vicarious copyright infringement.

E.   Common Law Copyright Infringement and Unfair Competition

The parties cross-move for summary judgment on Plaintiffs' claims of common law copyright infringement and unfair competition.  The Court finds that Plaintiffs are entitled to summary judgment on both claims.

1.   Common Law Copyright Infringement

Federal copyright law does not cover sound recordings made prior to 1972.  Rather, these recordings are protected by state common law on copyright infringement.  17 U.S.C. § 301(c); Capitol Records, Inc. v. Naxos of America, Inc., 830 N.E. 2d 250, 263-64 (N.Y. 2005) (recognizing that common law infringement protects pre-1972 recordings).  Plaintiffs have brought a claim for common law infringement with respect to their Recordings made prior to 1972.  A claim for infringement pursuant to New York common law consists of two elements: (1) the existence of a valid copyright; and (2) unauthorized reproduction of the work protected by the copyright.  See id. at 266.

LW argues that Plaintiffs cannot establish a common law infringement claim because New York common law prohibits only direct infringement, and does not impose secondary liability.  The Supreme Court, however, has explained that infringement claims based on secondary liability, including claims for inducement of infringement, derive from the common law.  See Grokster, 545 U.S. at 930, 934-36 (stating that secondary liability for infringement, including claims for inducement of infringement and contributory and vicarious infringement, "emerged from common law principles") (internal quotations and citations omitted); Kalem Co. v. Harper Bros, 222 U.S. 55, 62-63 (1911) (finding that common law principles rendered defendant liable for copyright infringement where defendant "expected" and "invoked" infringing use by a third party).  New York courts have recognized the possibility for secondary liability under the common law.  See Underhill v. Schenck, 238 N.Y. 7, 143 N.E. 773, 777 (1924) ("One who sells a film with the intention that the buyer shall use it in the infringement of a copyrighted drama is himself liable as an infringer."); see also Thomson-Houston Elec. Co. v. Kelsey Elc. Ry. Specialty Co., 75 F. 1005, 1007-08 (2d Cir. 1896) (finding defendant liable of inducing patent infringement).

The elements of a common law claim of inducement are the same as those of a federal inducement claim:  direct infringement, purposeful conduct, and intent.  See Underhill, 143 N.E. at 776; Grokster, 545 U.S. at 936 (stating that inducement of infringement under common law consisted of "active steps . . . taken to encourage direct infringement") (internal quotations and citations omitted); Kalem Co., 222 U.S. at 62-63.

As previously discussed, the evidence establishes that LimeWire users directly infringed Plaintiffs' copyrights, and that LW engaged in purposeful conduct intended to foster that

infringement.  Accordingly, the Court GRANTS Plaintiffs' motion for summary judgment on

their claim of common law copyright infringement.

      2.  <u>Unfair Competition</u>

Infringement of recordings made prior to 1972 may also give rise to a claim of unfair

competition by misappropriation.  <u>See Roy Exp. Co. v. Columbia Broad. Sys., Inc.</u>, 672 F.2d

1095, 1105 (2d Cir. 1982).  An unfair competition claim "usually concerns the taking and use of

the plaintiff's property to compete against the plaintiff's own use of the same property."

<u>Mp3Board, Inc.</u>, 2002 WL 1997918, at *12 (quoting <u>Roy Exp. Co.</u>, 672 F.2d at 1105).  To

establish such a claim, a plaintiff must show (1) unauthorized reproduction and distribution of

the plaintiff's work; and (2) the existence of "competition in the marketplace or similar actions

designed for commercial benefit."  <u>Capitol Records, Inc. v. City Hall Records, Inc.</u>, No. 07-6488,

2008 WL 2811481, at *4 (S.D.N.Y. July 18, 2008) (quoting <u>Naxos</u>, 830 N.E.2d at 266).

There is significant legal overlap between a claim for unfair competition by

misappropriation and a claim for infringement pursuant to federal copyright law.  <u>See</u>

<u>Mp3Board, Inc.</u>, 2002 WL 1997918, at *12 (citing <u>Kregos v. Associated Press</u>, 3 F.3d 656, 666

(2d Cir. 1993)).  Because of this overlap, courts have allowed claims for unfair competition to go

forward, where the claims were based on allegations that the defendant induced a third party to

reproduce and distribute the plaintiff's work.  <u>See id.</u> (denying defendant's motion for summary

judgment on unfair competition claim, where claim was based on allegations that defendant

induced third parties to make and distribute digital copies of plaintiffs' recordings).

The Court has already found that LW induced LimeWire users to infringe the

Recordings.  Free distribution of the Recordings through LimeWire competes with Plaintiffs'

sales of the Recordings.  Accordingly, the Court GRANTS Plaintiffs' motion for summary

judgment on their unfair competition claim against LW.

## VI.  Claims Against Other Defendants

Plaintiffs raise their federal and state-law infringement claims against Gorton (the sole

Director and former CEO of LW) and Lime Group (an investor in LW).  Plaintiffs move for

summary judgment on their claims of:  (1) inducement of infringement; (2) contributory

infringement; and (3) common law copyright infringement and unfair competition.  Gorton and

Lime Group cross-move for summary judgment on each of these claims, and on Plaintiffs' claim

for vicarious infringement.  Gorton and Lime Wire FLP also move for summary judgment on

Plaintiffs' fraudulent conveyance claim.  LimeWire FLP moves for summary judgment on

Plaintiffs' unjust enrichment claim.  The Court finds that Plaintiffs are entitled to summary

judgment on their claims for inducement of infringement, common law copyright infringement,

and unfair competition.  The Court denies the parties' motions for summary judgment on the

remaining claims.

### A.  Infringement Claims Against Gorton and Lime Group

#### 1.  Legal Standard

It is well established that "[a]ll persons and corporations who participate in, exercise

control over or benefit from an infringement are jointly and severally liable as copyright

infringers."  Musical Prods., Inc. v. Roma's Record Corp., No. 05-CV-5903, 2007 WL 750319,

at *1 (E.D.N.Y. Mar. 7. 2007) (quoting Sygma Photo News, Inc. v. High Soc'y Magazine, Inc.,

778 F.2d 89, 92 (2d Cir. 1985)).  "[A]n individual, including a corporate officer, who has the

ability to supervise infringing activity and has a financial interest in that activity, or who

personally participates in that activity is personally liable for infringement."  Stumm v. Drive

52

Entertainment, Inc., 2002 WL 5589, *5 (S.D.N.Y. 2002) (emphasis added); see also Aram, Inc. v. Laurey, No. 05 Civ. 8380, 2006 WL 510527, *2 (S.D.N.Y. Mar. 1, 2006).  These principles apply equally to claims of direct infringement and claims based on secondary liability.  See Capitol Records, Inc. v. Wings Digital Corp., 218 F. Supp. 2d 280, 284-85 (E.D.N.Y. 2002) (finding that CEO of defendant corporation could be individually liable for contributory and vicarious infringement committed by corporation).

   2.   Application

   Gorton is the sole Director of LW.  From 2000 to the end of 2006, Gorton was LW's CEO.  Gorton is also the CEO and sole Director of Lime Group.  Gorton owns 100% of Lime Group.  Until June 2005, Lime Group owned an 87% share of LW.[36]

   The Court has already found that LW is liable for inducement of infringement, common law copyright infringement, and unfair competition.  The evidence establishes that Gorton directed and benefited from many of the activities that gave rise to LW's liability.  In his deposition, Gorton testified that, as CEO, he "ran" LW.  (Gorton Tr. 10:11.)  LW's former Chief Operating Officer stated that Gorton was the company's "ultimate decisionmaker," and that his approval was required for "any major strategic and design decisions."  (Bildson 9/10/08 Decl. ¶ 25.)  Another LW employee stated that Gorton had the authority to "veto" decisions regarding the development of LimeWire.  (D. Nicponski Tr. 163:14-164:25.)

   Gorton directed and approved many aspects of LimeWire's design and development.  Gorton admits that he conceived of LimeWire and decided that the program should be decentralized and should use P2P technology.  (Gorton 11/07/2008 Decl. ¶¶ 21-22; Gorton

---

[36] In June 2005, Lime Wire FLP, a family limited partnership, purchased Lime Group's share of LW. Gorton had established Lime Wire FLP in early 2005, and serves as its general partner. Lime Wire FLP's limited partners are Gorton, Jody Gorton, Mira Even Gorton, and Zachary Kaleb Gorton.

9/26/2008 Decl. ¶¶ 7-18.)  Gorton oversaw the development of LimeWire's filtering system, and decided that the filter should be turned "off" by default.  (Bildson Decl. ¶ 26; Gorton 11/07/2008 Decl. ¶¶ 17, 21; Gorton 9/26/2008 Decl. ¶¶ 36-44; Berlin 11/07/2008 Decl. ¶ 20.)  Gorton conceived of and was heavily involved in developing the Conversion Plan.  (Catillaz Tr. 268:2-21, 322:9-324:21; Exs. 278, 458-460; Gorton 9/26/2008 Decl. ¶¶ 45-57.)  He represented LW in negotiations with the recording industry over the Conversion Plan and over plans that the industry proposed for filtering infringing content.  (Gorton 9/26/2008 Decl. ¶¶ 55-61.)  Gorton made decisions regarding LW's public relations and advertising efforts, and was involved in discussions about marketing LimeWire to Napster users.  (Pls. SOF ¶¶ 149-162.)  This evidence, taken together, also establishes that Gorton knew about the infringement being committed through LimeWire.  (See also Gorton 9/26/2008 Decl. ¶¶ 30-62.)

The evidence further shows that Lime Group was intimately involved in LW's operations.  Gorton was CEO of both LW and Lime Group.  While LW and Lime Group are formally separate companies, the evidence establishes that Gorton operated them "as a single company."  (Bildson Decl. ¶ 31.)  Lime Group and LW share offices, computer services, and support staff.  Employees moved between Lime Group and LW without changing titles or job responsibilities.  (Bildson Decl. ¶ 32.)  Lime Group employees developed much of LimeWire's original technology, and then provided systems administration support for LimeWire and developed user guides, FAQ guides, and merchandising for the program.  Lime Group provides numerous services to LW, including managing LW's financial operations and employee benefits; hiring LW employees; and performing investor relations, public relations, and customer support functions for LW.  (Pls. SOF ¶¶ 650-55.)

As the majority owner of LW until 2005, Lime Group directly benefited from LW's inducement of infringement through LimeWire, which drove the company's success.  Because he owned 100% of Lime Group, Gorton indirectly owned a majority share of LW, and thus also benefited from LW's infringing conduct.

As a result of the actions and benefits described above, Lime Group and Gorton are liable for LW's inducement of infringement.  See Capitol Records, Inc., 218 F. Supp. 2d at 284-85; Blum v. Kline, 1988 WL 52916, *2 (S.D.N.Y. May 17, 1988) (finding that president of defendant corporation could be found liable for infringement because he "owns all of [the corporation's] shares and is responsible for [its] daily activities.").

Accordingly, the Court GRANTS Plaintiffs' motion for summary judgment on their claims against Lime Group and Gorton for inducement of infringement, common law copyright infringement, and unfair competition.  For the reasons stated above with respect to LW, the Court (1) DENIES the parties' motions for summary judgment on the claim against Lime Group and Gorton for contributory infringement; and (2) DENIES Gorton's and Lime Group's motion for summary judgment on the vicarious liability claim.

B.  Fraudulent Conveyance and Unjust Enrichment Claims Against Gorton and Lime Wire FLP

1.  Legal Standard

A fraudulent conveyance claim arises under Section 276 of the New York Debtor and Creditor Law.  Section 276 provides that any "conveyance made . . . with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to [those] creditors." N.Y. Debt. & Cred. L. § 276.  A plaintiff must prove "actual intent" to defraud by "clear and convincing evidence."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  "Ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment" because

intent is "a factual question involving the parties' state of mind." Golden Buddha Corp. v.
Canadian Land Co. of America, 931 F. 2d 196, 201-02 (2d Cir. 1991).

To establish a claim for unjust enrichment, a plaintiff "must prove that the defendant was
enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such
that in equity and good conscience the defendant should return the money or property to the
plaintiff." Dolmetta v. Uintah Nat'l Corp., 712 F.2d 15, 20 (2d Cir. 1983).

2.   Application

Gorton established Lime Wire FLP, a family limited partnership, in 2005.  Gorton is the
general partner of Lime Wire FLP.  In June 2005, the partnership purchased Lime Group's 87%
interest in LW.  When Lime Group owned LW, it received periodic cash distributions from the
company.  When Lime Wire FLP purchased Lime Group's interest, however, LW began paying
the distributions to Lime Wire FLP.

Plaintiffs claim that the distributions from LW to Lime Wire FLP are fraudulent
conveyances.  Plaintiffs allege that Gorton established Lime Wire FLP and funneled LW's
distributions to it in order to protect Lime Group's and Gorton's assets should Plaintiffs receive a
judgment against either party.  Plaintiffs also claim that Lime Wire FLP has been unjustly
enriched by the distributions.  Plaintiffs allege (1) that Lime Wire FLP received the distributions
at Plaintiffs' expense, because money held by Lime Wire FLP cannot be used to satisfy
Plaintiffs' judgment against Gorton and Lime Group; and (2) that equity and good conscience
require that the distributions be used to satisfy any judgment Plaintiffs may receive against
Gorton and Lime Group, because Gorton intended to defraud Plaintiffs by channeling the
distributions to Lime Wire FLP.  Gorton and Lime Wire FLP move for summary judgment on
both claims, on the ground that Plaintiffs have failed to offer "credible competent summary

judgment" evidence showing that Gorton intended to defraud Plaintiffs by establishing Lime Wire FLP.

There is a genuine issue of material fact as to whether Gorton intended to defraud Plaintiffs by establishing Lime Wire FLP.  Plaintiffs have submitted a declaration from Vincent Falco, former Chief Executive Officer of a company that also distributed P2P software.  In his declaration, Falco states that Gorton told him that Gorton had "created a family limited partnership . . . [and] put his personal assets in to [it] . . . so that the record companies could not get his money if they sued him and won."  At his deposition, Gorton testified that he told "Falco that [he] had done some estate planning, and that one of the benefits of the [] planning . . . was that it did help protect [his] assets in the event of a legal judgment against [him] personally."  In a declaration submitted after his deposition, however, Gorton states that he did not establish Lime Wire FLP in order to protect his assets.  (Gorton Decl. ¶ 7.)  Falco's declaration and Gorton's deposition testimony and declaration create an issue of fact as to Gorton's intent when he established Lime Wire FLP.  Accordingly, the Court DENIES Gorton's and Lime Wire FLP's motion for summary judgment on Plaintiffs' fraudulent conveyance and unjust enrichment claims.

## VII.  Conclusion

For the reasons stated above, the Court (1) DENIES Defendants' motions to exclude evidence (D.E. 138, 140, 153, 165, 168);[37] (2) GRANTS Plaintiffs' motion for summary judgment on the claim against LW of inducement of copyright infringement, and DENIES LW's motion for summary judgment on the claim (D.E. 75, 108); (3) DENIES the parties' cross-

---

[37] Except that, as set forth above, the Court (1) places conditions on Plaintiffs' future meetings and conversations with Bildson; and (2) excludes certain exhibits containing emails and Internet forum postings written by Adam Fisk after his employment with LW had ended.

motions for summary judgment on the claim against LW of contributory copyright infringement (D.E. 75, 108); (4) DENIES LW's motion for summary judgment on the claim of vicarious copyright infringement (D.E. 108); (5) GRANTS Plaintiffs' motion for summary judgment on their claims against LW of common law copyright infringement and unfair competition, and DENIES Defendants' motion for summary judgment on these claims (D.E. 75, 101, 108); (6) GRANTS Plaintiffs' motions for summary judgment on the claims against Gorton and Lime Group for inducement of copyright infringement, common law infringement, and unfair competition, and DENIES Defendants' motions for summary judgment on these claims (D.E. 75, 101); (7) DENIES the parties' motions for summary judgment on the claims against Gorton and Lime Group for contributory copyright infringement and vicarious copyright infringement (D.E. 75, 101); and (8) DENIES Gorton's and Lime Wire FLP's motion for summary judgment on the fraudulent conveyance and unjust enrichment claims (D.E. 101).

        SO ORDERED.

DATED:     New York, New York
           April 28, 2011

                                   KIMBA M. WOOD
                              United States District Judge