14Q5ari1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ARISTA RECORDS, LLC. et al.,

 4                 Plaintiffs,

 5          v.                          06 Civ. 5936 (KMW)

 6   LIME WIRE, LLC, et al.,

 7                 Defendants.

 8   ------------------------------x

 9                                      April 26, 2011
                                        10:18 a.m.
10   Before:

11                    HON. KIMBA M. WOOD,

12                                      District Judge

13                         APPEARANCES

14   MUNGER, TOLLES & OLSON, LLP
          Attorneys  for Plaintiffs
15   BY:  GLENN POMERANTZ
          KELLY KLAUS
16        JENNIFER PARISER
          BLANCA YOUNG
17        HAILYN CHEN
          MELINDA E. LeMOINE
18
     WILLKIE, FARR & GALLAGHER, LLP
19        Attorneys for Defendants
     BY:  JOSEPH T. BAIO
20        TARIQ MUNDIYA
          JOHN OLLER
21        KATHARINE N. MONIN
          TODD COSENZA
22

23

24

25
```

14Q5ari1

```
 1              (Case called)
 2              MR. POMERANTZ:  Good morning, your Honor.  Glenn
 3    Pomerantz on behalf of the plaintiffs, and with me today is
 4    Kelly Klaus, Blanca Young and Hailyn Chen.
 5              THE COURT:  Good morning.
 6              MR. BAIO:  Good morning, your Honor.  Joseph Baio I'm
 7    here with Tariq Mundiya, John Oller and Katharine Monin.
 8              THE COURT:  Okay.  Thank you very much.
 9              My deputy has passed out certain instructions relating
10    to courtroom procedures and jury selection.  You may not have
11    had a chance to read them yet, you don't need to read them yet.
12    You have also been handed copies of draft preliminary
13    injunctions to the jury and voir dire.  I stress that they are
14    draft, they're really discussion documents.
15              I already have your views on voir dire.  I have looked
16    carefully over voir dire in other cases.  I think that what I
17    have strikes the balance of fairness but I'm ready to hear you
18    on any prejudice you think my instructions or questions would
19    cause or failure to ask or instruct with cause.
20              I conduct the voir dire myself with counsel, of
21    course, and parties if they wish.  I do a lot of the
22    questioning at side bar.  I have found that jurors here are
23    generally more comfortable at side bar.  They often don't know
24    what their answers are going to be to a question, they may want
25    time to think about it, and they certainly don't want to expose
```

14Q5ari1

1    their views to everyone in the courtroom before they've thought

2    about some of the questions.

3           If counsel want me to ask follow up questions during

4    voir dire I ask the juror to go about 12 feet away and I hear

5    what counsel's questions are and then I tell you whether I'm

6    going to ask the question or not.  I ask that counsel not speak

7    at all to jurors without my giving the go ahead.

8           Before getting into the substantive agenda today, I

9    would like to ask that each side bring your two lead counsel

10   into the robing room so that I can discuss a few matters

11   briefly with you and then I will come back out and we will get

12   to our agenda for the day.

13           (Discussion off record)

14           THE COURT:  Counsel, have you had enough time to look

15   over the voir dire to give me a quick reaction on any points

16   that you think are critical?

17           MR. KLAUS:  Good morning, your Honor.

18           THE COURT:  Mr. Klaus.

19           MR. KLAUS:  Just very briefly, the question no. 23.

20           THE COURT:  Wait one second.

21           MR. KLAUS:  Sorry.

22           THE COURT:  Yes, 23.

23           MR. KLAUS:  Your Honor, the question did not -- it

24   asks whether the prospective juror or a family member has used

25   one of the various services recently.  At least with respect to

14Q5ari1

```
 1    the legal services, the services, it doesn't ask the follow-up
 2    question of when did that last using it and we didn't know if
 3    that -- if your Honor was intending to excuse the jurors who
 4    answered yes for cause then there is no need to ask the
 5    follow-up question.
 6              THE COURT:  I'm disinclined at this point to view any
 7    use as disqualifying in and of itself, so I will ask relevant
 8    follow-up questions.
 9              How would you phrase it?  To the best of your
10    knowledge when did you or a family member last use each?
11              MR. KLAUS:  Yes.  Correct.
12              THE COURT:  Okay.
13              Anything else?
14              MR. KLAUS:  We've only briefly perused that.  I'm
15    sorry, your Honor; question No. 32.  I think you said that the
16    case is expected to last four to five weeks.  We think it
17    probably is fair to say three to four, if that makes any bit of
18    a difference.
19              THE COURT:  That would make a big difference to the
20    jury.  Okay.
21              Now, I don't recall whether we've talked about sitting
22    Friday.  I think that we should sit Fridays, but if counsel
23    have different views I'm ready to hear you.
24              MR. POMERANTZ:  Your Honor, we assumed we were sitting
25    on Friday.
```

14Q5ari1

1              THE COURT:  Okay.

2              MR. POMERANTZ:  The only date, if your Honor recalls,

3    that we had asked for, was May 23rd because of my son's

4    graduation.

5              THE COURT:  I remember that and I have that noted.

6    So, we will sit Fridays, three to four weeks.

7              MR. POMERANTZ:  Your Honor, one other thing on the

8    questionnaire.  We have not had an opportunity to review this

9    with our clients and so we would like to have the opportunity

10   tomorrow to come back if there is anything more.

11             THE COURT:  Of course.  I view this as preliminary

12   and, in fact, even as we are picking you can change your mind

13   on certain questions.

14             MR. POMERANTZ:  Thank you.

15             MR. BAIO:  Your Honor, we have no preliminary reaction

16   but we will absorb and refer.

17             THE COURT:  Please note that I need your list of

18   anyone you want me to identify, that is of course all the

19   lawyers and witnesses or folks whose names may come up.  So, if

20   you will just note that for questions 30 and 31 I will need

21   your lists.

22             On the subject of our being able to move appropriately

23   through trial, I think it is important for me to stress that

24   any rule 403 ruling I make now is tentative.  It is subject to

25   change when I see how the evidence might come in, in context.

14Q5ari1

1   Material can be deemed less probative when there is already a

2   fair amount in the record proving the same point.  It can tend

3   to be more prejudicial depending on the context.  So, I'm

4   giving you general guidance to the extent I can to try to be

5   helpful as you frame your opening remarks and decide witness

6   order and so on but these are tentative rulings.

7         Do you have preliminary reactions to my opening

8   remarks to the jury as opposed to the voir dire?

9         MR. KLAUS:  Yes, your Honor.  Thank you.

10        We were generally fine with it, subject of course we

11  have not had a chance to discuss it with our clients, but our

12  general tentative reaction was we were okay with it.

13        THE COURT:  Okay.

14        MR. BAIO:  Amazingly, we have the same reaction.

15        THE COURT:  This is promising.  I'm glad to hear that.

16        Mark Gorton's net worth.

17        I take the point on the IRA.  I will be interested to

18  hear defendant's response to anything in the recent letter

19  including the IRA material.  I had thought it was uncontested.

20  It is something I have never encountered in a lawsuit before so

21  I will have to learn about the law as you tell it to me.

22        I am not convinced by plaintiff's most recent

23  submission that Mr. Gorton's net worth and related information

24  about his finances will be more probative than it is highly

25  prejudicial at an early stage in the case, but I'm going to

14Q5ari1

1    wait to hear as the case progresses when plaintiffs want to

2    bring that up.  And I will decide at each stage whether it is

3    appropriate at an early time.

4              Do you wish to address this?

5              MR. POMERANTZ:  Yes, your Honor, because we would like

6    to mention it in the opening.

7              THE COURT:  I'm sure you would.

8              MR. POMERANTZ:  So, if I could have a moment to

9    explain?

10             When Mr. Gorton made the decision in June of 2005 to

11   move over $100 million of assets into these limited

12   partnerships, in order to protect them from a judgment which he

13   has said under oath that was one of his reasons for doing so,

14   the fact that he moved them and he moved them in that amount is

15   one of the strongest pieces of evidence that he knew what he

16   was doing was going to cause a large liability, that is, a lot

17   of damage that he would be responsible for.  It is really

18   perhaps one of the most compelling pieces of evidence of what

19   was in his mind and state of mind is the very first factor that

20   the Bryant Court lists.  And so, it is to us one of the most

21   important pieces of evidence because it will tell this jury

22   that this guy not only knew what he was doing was wrong but

23   that he knew it was going to cause an enormous amount of damage

24   because when one moves $100 million plus into accounts to

25   protect them from legal damages, if he didn't think that he was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14Q5ari1

1   causing at least $100 million worth of liability.  And for the

2   jury not to be able to hear that among the most persuasive

3   facts of Mr. Gorton's state of mind seems to us to be extremely

4   prejudicial to the Bryant factor of state of mind.  Nothing, in

5   our view, could be more telling to a jury about moving your own

6   money in that amount over to these kinds of accounts.

7             THE COURT:  Did your April 25 letter on this point

8   cite all relevant law on this point or was it an advocacy piece

9   that cited only the cases helpful to plaintiffs?

10            MR. POMERANTZ:  It was definitely an advocacy piece.

11  The question is whether there was other case law that addresses

12  the issue and I don't know.

13            MR. KLAUS:  I don't know whether there is other case

14  law that addresses this issue, your Honor.

15            THE COURT:  Okay.

16            MR. POMERANTZ:  We can call -- Mr. Blavin of our

17  office is the one who did the underlying research for this and

18  if your Honor would indulge us until tomorrow to see whether he

19  found additional case law we would be happy to find that out.

20            THE COURT:  Thank you.

21            Mr. Baio?

22            MR. BAIO:  Your Honor, just as a check, may we also

23  look and submit a letter to you?

24            THE COURT:  Of course.

25            MR. BAIO:  Thank you.  We will do that.

1          MR. POMERANTZ:  The other point, your Honor, is that

2    simply the deterrence factor which is, again, clearly a factor

3    under Bryant, there is case law on point and I know your Honor

4    has seen that already but we do think that that also -- but

5    here, although I think the case law is strongest on the

6    deterrence element, when you think about the fact pattern here

7    and you think about what we are trying to explain to the jury,

8    what was in Mr. Gorton's mind, what was his state of mind, I

9    really do believe that his decision after Grokster to move his

10   assets over is going to be among the most persuasive pieces of

11   evidence to the jury that he knew what he was doing was causing

12   a huge amount of damage and that he could be liable for it.

13         THE COURT:  Is part of your argument that what

14   Mr. Gorton did with his money in June of 2005 is probative of

15   what his state of mind was prior to 2005?  Or are you simply

16   looking prospectively.

17         MR. POMERANTZ:  Both, your Honor.  I think in other

18   words we will put on evidence that he was actively following

19   the Grokster case from the time it was filed in 2001 to the

20   time the Supreme Court decided it in 2005, and he knew that the

21   ruling in that case was going to affect, greatly, the legal

22   exposure of Lime Wire.

23         So, we will then tell the story that as soon as

24   Grokster was decided he moved his assets into these

25   partnerships for the express purpose of protecting them from a

14Q5ari1

1    legal judgment that the record companies may someday get.

2               THE COURT:  Why don't we do this.  Why don't we table

3    this until tomorrow, at which point Mr. Baio's team may have

4    come up with a response.

5               MR. POMERANTZ:  Thank you, your Honor.

6               THE COURT:  I don't know how quickly you can do that

7    if so many people are here in court, but.

8               MR. BAIO:  Your Honor, may I address one part of that?

9               THE COURT:  Yes.

10              MR. BAIO:  The opposing side says that the Grokster

11   case is critical because prior to the Supreme Court case the

12   rulings were in his favor, but only when the Grokster case came

13   down does he now have the exposure and then moves the money.

14   But, at the same time they want to open the door on Grokster

15   but not allow him to say that that means that up until the

16   Grokster decision his mindset was the opposite.  I don't know

17   how they can have it both ways.  They are opening up the door

18   as to the significance of the Grokster case and the fact of the

19   matter is that until June of 2005 the world, including our

20   opponents, thought that the law went the other way.  We have

21   Mr. Horowitz saying the law went the other way.

22              This is new law and gives us a new and fresh

23   opportunity.  At the same time they want the benefit of that

24   and they said they want his state of mind to be identified

25   before that but his state of mind of course before Grokster was

14Q5ari1

1    hip hip hooray, the law is on my side.

2                So, I'm not really sure how they can have it both

3    ways -- or three ways it might even be.

4                MR. POMERANTZ:  Your Honor, if I may briefly respond?

5                THE COURT:  Yes.

6                MR. POMERANTZ:  Mr. Baio is confusing two things.

7                The state of mind before Grokster and leading up to

8    Grokster of Mr. Gorton, the reason why they can't bring in

9    evidence on that is because they asserted the privilege.  Not

10   on relevance ground, because they asserted the privilege.  So,

11   that's certainly a totally different analysis.

12               Here what we are saying is that the conduct of moving

13   that amount of money or assets into the limited partnerships at

14   the time he did that is extremely compelling evidence of his

15   state of mind.  Just because they asserted the privilege

16   doesn't mean that we can't try to prove his state of mind in a

17   way that would be compelling to the jury as one of the factors

18   it is going to consider in thus setting the statutory awards.

19               THE COURT:  I want you to know that I haven't missed

20   the point that this would be very, very favorable for

21   plaintiffs and of course you will be fighting to get it in.  I

22   understand that.

23               MR. POMERANTZ:  Thank you.

24               THE COURT:  With respect to Mr. Von Lohmann, I was

25   handed material that my law clerk was handed material this

14Q5ari1

1    morning.  I have not been able to look at it.  Do you want to

2    give me a thumbnail sketch of what it says?  Or do you want to

3    wait until I read it?

4            MR. MUNDIYA:  Sure, your Honor.  I will give you a

5    summary.

6            Mr. Von Lohmann was deposed yesterday.  He had put in

7    a declaration last week, as did an internal lawyer at EFF to

8    answer your Honor's questions that were raised at the April

9    14th hearing.  At the deposition we believe many of the

10   questions that your Honor asked last week were answered.

11   Mr. Von Lohmann was giving legal advice to Lime Wire, he viewed

12   Lime Wire as his client.  He had other clients like Lime Wire.

13   He had two types of clients, he had litigation clients in which

14   he prepared pleadings, appeared in court; and then he had

15   confidential advisory clients like Lime Wire.

16           THE COURT:  How many clients did he have at any one

17   time?

18           MR. MUNDIYA:  Several dozen, less than 50.

19           THE COURT:  And did he do conflict checks for each of

20   them?

21           MR. MUNDIYA:  What Mr. Von Lohmann testified to is he

22   couldn't recall doing conflict searches for all clients.  He

23   did conflict searches for some clients and not for other

24   clients, but where it was obvious that there was no conflict he

25   would not do a conflicts check.

14Q5ari1

1          In this case I think we can assume that he did have a
2     conflict with the plaintiffs given the nature of his work.
3     But, certainly there were conflict searches done, in some cases
4     and not in other cases, but he could not recall -- he could not
5     recall a conflict search for Lime Wire.
6          THE COURT:  Yes, Mr. Klaus?
7          MR. KLAUS:  Very briefly, your Honor.
8          We have our own letter and a copy of the transcript
9     that should be coming today, we will send -- have sent it or
10    are sending it by e-mail to the defendant's counsel.
11         Very briefly, what he was asked was:  Generally, you
12    would run a conflict check before entering into a
13    attorney-client relationship with a counseling client?
14         He said:  Yes.  Generally I would try to do that.
15         You did not run a conflict check prior to entering a
16    attorney-client relationship at Lime Wire, is that correct?
17         He said he did not recall.
18         There was further testimony that the EFF, which is the
19    asserted law firm in this case, maintains a conflict check
20    database?
21         THE COURT:  I missed -- there was further testimony
22    that EFF maintains a database.
23         MR. POMERANTZ:  They maintain a database of their
24    clients.  He did not say whether they have, even today,
25    Lime Wire entered as a client in that database.  They submitted

14Q5ari1

1    a declaration from Ms. McSherry who is is at the Electronic

2    Frontier Foundation, it was Exhibit B to our submission of last

3    week.  She does not say that they have any written record,

4    conflict check record or anything of the type.

5         THE COURT:  Let me ask, do they or do they not have

6    written records of their conflict checks?

7         MR. MUNDIYA:  Your Honor, I'm not aware of that

8    specific answer to that question.  We can find that out this

9    afternoon, your Honor, from counsel to EFF.

10         THE COURT:  Now, as I understand it Mr. Von Lohmann is

11    available at 3:00 tomorrow.  Is that what --

12         MR. MUNDIYA:  Mr. Von Lohmann's counsel will be in New

13    York tomorrow and is available after 3:00 p.m.

14         THE COURT:  His counsel but not him?

15         MR. MUNDIYA:  No.

16         THE COURT:  Where is he?

17         MR. MUNDIYA:  He is in San Francisco.  He just flew

18    back from Europe, your Honor.

19         THE COURT:  Well, I don't -- I'm not comfortable with

20    the record that we have so far.  I'm very uncomfortable with

21    the fact that defense counsel cannot say right now whether

22    there was a written record of conflict checking.  That strikes

23    me as so basic as to suggest that someone isn't asking

24    Mr. Von Lohmann the right questions.

25         MR. MUNDIYA:  Let me go back and read the transcript

14Q5ari1

```
 1    and confirm what we know.  There were several privilege

 2    assertions by Mr. Von Lohmann's counsel based upon

 3    communications or -- based upon communications that they had

 4    with respect to other clients so there was a lot of privilege

 5    calls that we had no control over but we will endeavor to get

 6    answers to those questions this afternoon.

 7             THE COURT:  Okay.  Can Mr. Von Lohmann be here

 8    tomorrow?

 9             MR. MUNDIYA:  We will ask, your Honor.

10             THE COURT:  Okay.

11             Who is his lawyer?

12             MR. MUNDIYA:  Winston & Strawn.

13             THE COURT:  What individual?

14             MR. MUNDIYA:  Andrew Bridges.

15             THE COURT:  And how long has he been his lawyer?

16             MR. MUNDIYA:  I'm not sure, your Honor.

17             THE COURT:  Anything further that you wanted to say,

18    Mr. Klaus?

19             MR. KLAUS:  No, your Honor.

20             THE COURT:  With respect to plaintiff's motion to

21    preclude evidence or argument that other illegal services would

22    have induced infringement of plaintiff's copyright had

23    Lime Wire not done so, infringement, I have not found the cases

24    mentioned by counsel to be particularly illuminating.  Let me

25    ask for, essentially, oral argument first from plaintiffs and
```

14Q5ari1

1   then from defendants.  I am interested in knowing whether there

2   are copyright cases where other illegal services have been an

3   issue.

4            MR. POMERANTZ:  Your Honor, I think there are only --

5   I only can recall two District Court cases where that issue was

6   mentioned but not analyzed, I guess would be the right way to

7   do it, in the copyright context.

8            THE COURT:  Right.

9            MR. POMERANTZ:  One going one way in some respects and

10   the other going the other way in some respects.  Your Honor, I

11   can't say either one of those, there is a record company called

12   RSO and the Marobie District Court case in Illinois sort of

13   going the other way.

14            The ones that I found most persuasive were the patent

15   cases and this is one area where I think there is no reason not

16   to follow patent law.  The Grokster case says that patent law

17   is often something that the copyright case law looks to and

18   that's in fact a part of the rationale for the inducement

19   theory.

20            THE COURT:  Let me, if I may, I don't usually do this

21   during oral argument but I spent a fair amount of time

22   yesterday trying to understand whether the law would be

23   different in patent law cases from copyright cases.  Could

24   defense counsel give me the benefit of what you know on that?

25            MR. BAIO:  Your Honor, we, as you only found or that

14Q5ari1

1    really the patent cases and those few patent cases that

2    addressed it, we do think that the allegations -- and may I

3    step over here?

4              THE COURT:  Certainly.

5              MR. BAIO:  The allegations in those patent cases stand

6    in stark contrast, if I can explain why, from our case.

7              In this case the plaintiffs have a chart, you have

8    seen it, they put it on the third page of their trial brief,

9    and it says that in 1999 Napster showed up and everything

10   started going downhill from there and we, the record industry,

11   have suffered $55 billion of lost sales as a result of piracy.

12   And they want to present that to the jury.

13             At the same time they want to say but the defendants

14   caused some part of it but the defendants may not tell the jury

15   that huge swaths of that $55 billion was caused by something

16   else.

17             In the patent cases there were sales of knockoffs or

18   sales of infringing items and those sales were for a certain

19   amount of money --

20             THE COURT:  Wait.  Let me ask you this.  To the extent

21   that Lime Wire had a particular market share, let's say,

22   certainly that can be --

23             MR. BAIO:  Absolutely.

24             THE COURT:  It is really the but-for where push comes

25   to shove on this issue.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1        MR. BAIO:  I believe it is both, your Honor, because I

2   agree with you if they want to say $55 billion they can, but we

3   can say look at how many times they say that Napster itself

4   caused this tremendous economic impact on them.  They're the

5   ones who have put it in issue as a proximate cause matter.

6        They say here is a whole causal impact and you can't

7   say in the real world there has been impact by other forms.

8   Those patent cases say there is a question of lost profits, it

9   is lost profits on those sales; they don't point to their sales

10  revenue.  I will give an example:  In one of the cases the

11  infringing item was some kind of concrete mixer, I think.  And

12  the claim was, well, you sold a bunch of these and we're

13  entitled to our license or the amount of money that we would

14  have received; and the other side said, no, there are two other

15  infringing entities so we should be reduced by two thirds.

16       That was not allowed in this case but they didn't say

17  in that case we suffered $100 million as a result of

18  infringement and we want to blame defendant for everything that

19  we suffered.  And that defendant cannot say, wait, there were

20  other actual causes.  I'm not talking about those particular

21  sales, I'm talking about whether there was a cause that you,

22  yourself, record industries, have recognized wreaked havoc with

23  you, list after list, public statement after public statement.

24       So, they have set as a foundation a lost revenue

25  argument in the aggregate.  If you even read their papers they

14Q5ari1

1    say it is piracy that has done this as if we are the only

2    pirate.  It is peer to peer, as if during the entire period

3    including before the time Lime Wire existed which was really

4    2001, they're trying to put on us 1999.

5           So, they would show a chart, it would say Napster

6    started, here is the downplay, but we can't say that Napster

7    caused them any damage.  They have put it in issue in a way

8    that those patent cases absolutely have not.  They use the

9    trespassing example.  If you are a trespasser you can't use, as

10   a defense, the fact that someone else might have trespassed.

11   But, if I was trespassing a vineyard and I ran over the fence

12   and I had no right being there and I trampled some grapes, they

13   can say you trampled grapes, here is the evidence.  However, if

14   a whole bunch of people also trespassed and they ran over the

15   fence and they ran all through the vineyard and trampled all of

16   the grapes, if the plaintiffs want to say look at the havoc

17   that has been wreaked on my vineyard, in that situation we can

18   say, yes, but I was one person, there was a whole band of

19   marauders that ran through.  They would say no, no, no, that's

20   illegal.  You can't point to the illegal folks.

21          And that makes absolutely no sense.  It is not the

22   patent cases, it is not the -- that's why I am not surprised

23   that you don't see it in a copyright setting one single time.

24   It hasn't -- so far as we can tell either it hasn't come up but

25   you would think that it would be such a likely issue that it

14Q5ari1

1    would have come up.

2            So, I think that those patent cases are completely and

3    totally distinguishable.  That is not what we are talking about

4    here.  There are also other distinctions in that --

5            THE COURT:  I think I need some help to understand

6    your basic point.

7            I made an assumption fairly early on that may have

8    been incorrect.  Let me ask plaintiff's counsel:  Are you truly

9    contending that the entire downward slope since Napster is

10   attributable to Lime Wire?

11           MR. POMERANTZ:  We will -- the answer is that various

12   witnesses will say various things -- witnesses on our side --

13   as to what their views are as to the causes of the decline

14   downwards so I hesitate to put all of my witnesses into one box

15   because people have different business experiences.  But, if

16   you are asking as between Lime Wire and other peer-to-peer

17   services --

18           THE COURT:  That's not what I'm asking.

19           MR. POMERANTZ:  Just generally Lime Wire.  No, I think

20   there will be a number of witnesses who will point to other

21   causes.  By the way, we are not objecting to them pointing to a

22   whole host of other legitimate causes for that decline and we

23   will have a fair battle in the courtroom about that.  And they

24   have a bunch of factors they've listed that could be

25   alternative explanations or additional explanations for the

14Q5ari1

1   decline downwards from 2000 to 2010.  This motion does not, in

2   any way, seek to preclude them from offering evidence of any

3   legitimate cause.

4            THE COURT:  I understand.

5            MR. POMERANTZ:  So, I mean, if that answers your

6   Honor's question?

7            THE COURT:  Well, I had thought that this issue

8   matters most if Lime Wire contends that when Lime Wire was

9   taken down subscribers migrated to other unlawful services and,

10  hence, plaintiff's argument that they would have gotten some of

11  that migration is simply wrong.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

14QAARI2ps

1           MR. BAIO:  Your Honor, may I address that?  I think

2     that is entirely separate from what I am talking about.

3           THE COURT:  I think it is separate.

4           MR. BAIO:  Entirely separate.

5           THE COURT:  I want to understand your point better.

6           MR. BAIO:  OK.  My point would be, let's use the

7     analogy that was just had.  We can use legitimate reasons, but

8     we cannot use illegitimate means that cause them tremendous

9     harm that they themselves have said.

10          So in the vineyard examples, although marauders ran

11    through the vineyard, he would allow me to say that the weather

12    was bad that day and that there was a downpour and that that

13    contributed to the trampling of the vineyard, but I can't say

14    what is an actual cause.  There is not hypothetical.  On the

15    first page of the first brief, they say $55 billion of injury

16    based upon the fact as to what we think we would have made, had

17    there been no pirates, and what we made.  They are laying at

18    our feet everything.  Now then they'll say, well, maybe not a

19    hundred percent.

20          THE COURT:  I --

21          MR. BAIO:  That's in their brief, your Honor.

22          THE COURT:  Yes.  I am not able right now to

23    understand part of what you're saying.  It sounds to me as if a

24    number of different factors are being collapsed into one

25    argument and that when we tease them apart, they don't hold

1   water.

2               MR. BAIO:  May I try to explain the other side of it?

3               THE COURT:  Yes.  But first, looking at the Fifth

4   Circuit opinion, the *Compactors*, I recognize that it's very old

5   and that it may be the closest case in point.  I'm not sure

6   whether it is.  It essentially articulates, if we can give it

7   such a fine appellation, a public policy argument that a bad

8   actor should not be able to avoid being held accountable for

9   his bad acts simply because there were other bad actors who

10  would have stepped into his shoes.  Now, as a general public

11  policy argument, do you have a problem with that?  Or I mean --

12              MR. BAIO:  No, not directly, except when we get to the

13  statutory damage elements which bring into the consideration to

14  deterrence.  But that's a separate issue.  The key to what you

15  said, your Honor, was, you used the word "would," "would" go to

16  someone else.  And what we are saying is, the plaintiff is

17  identifying a historical impact of massive burden.

18              THE COURT:  Of massive?  Massive what?

19              MR. BAIO:  Massive burden or harm, that they have

20  suffered in this entire environment.  And they want the jury to

21  actually only hear about Lime Wire in the context of $55

22  billion.  Now, we can talk about CDs are now, you can only buy

23  a single because of iTunes as opposed to the whole thing.  But

24  we can't talk about the facts that they themselves

25  historically, not the word "would," but historically, other

1   causes, including other forms of piracy, caused them massive

2   injury.  That should not be put as a causal matter at our feet.

3   It's not a "would."  The "would" part, that is, w-o-u-l-d, is,

4   under the six factors, one of them is the deterrence on -- one

5   of the things that the jury should consider is the deterrence

6   on the defendant and on others.  Normally that would not be in

7   a civil case, the deterrence outside the world.  But the

8   plaintiffs get the benefit of having that as an issue.  So they

9   may say, as a matter of deterrence, you should give me a

10  trillion dollars, shut them down, they are already shut down,

11  but that will warn everyone else.  Now, we're not saying they

12  can't say it, in an ordinary civil case they wouldn't be able

13  to but with statutory they can, but we're a defendant.  We get

14  to defend.  So we should be able to tell them that they

15  themselves don't believe there's a deterrent effect because

16  they have 45 charts -- that's an exaggeration -- they have

17  charts that show that migration has historically occurred

18  automatically when they shut down -- Napster and Grokster --

19  and that it's continuing with the shutdown of Lime Wire.  It's

20  just so the jury can evaluate fairly whether deterrence will be

21  served by a monumentally gigantic amount.  We're not saying

22  they can't argue.  They are saying we can't argue.  But that

23  only gives the jury half the pie.  And that part of it is the

24  "would."  But the "did," they *did* suffer injury from others and

25  they *are* trying to lay that at our feet, has nothing to do with

14QAARI2ps

```
1    the public policy matter.  It has to do with causation.  And

2    that's why I used the vineyard as the example.  And there may

3    be a lot of others.  I own a lot of cars.  Somebody took one

4    car, but the entire lot has been cleaned out because some group

5    of chop-shop people came and pulled it out.  You're blaming me

6    for the one car.  OK.  But you can't present evidence to the

7    jury that my lot has been completely eliminated, because then

8    other people would say, but my car was stolen, actually stolen.

9    It's not what those cases stand for at all.  They can't.  It's

10   actually what happened.  It's not a hypothetical.  And I think

11   they are two different things.

12        THE COURT:  Let me go to an analogy that has been

13   bothering me.  In antitrust law, Congress has allowed treble

14   damages for the deterrent effect that they have.  I have never

15   heard of a court allowing the argument that just because the

16   awards of treble damages in the past have not completely

17   deterred price-fixing, that they shouldn't be awarded.

18        MR. BAIO:  I am not an antitrust lawyer, your Honor.

19   I don't know whether there is a distinction for that.  I assume

20   the defendant can mount some defense against treble damages,

21   that it or he are allowed to present something to the jury to

22   say, deterrence should not be applied here, or treble damages

23   shouldn't be awarded.  What the plaintiffs are saying is, we

24   have to sit mum, there is no question about -- if they say a

25   trillion dollar verdict will in fact stop the world from being
```

14QAARI2ps

 1    bad, I have to sit there mum.  And I don't know whether that's

 2    true in antitrust cases.

 3         THE COURT:  Now, what do you envision as the endpoint

 4    of allowable speculation as to what is likely to happen?  What

 5    if there were board of directors meetings of all recording

 6    companies saying, we haven't put much money into this yet, but

 7    having heard oral argument today in the Southern District, we

 8    are suing every purveyor, every unlawful purveyor or enabler of

 9    file sharing, music sharing.

10         MR. BAIO:  That might be --

11         THE COURT:  Could that be introduced?  Where do you

12    end on the speculation of who might do what?

13         MR. BAIO:  I think if it were the truth, it may in

14    fact have some impact.  What we are talking about is what can

15    be argued, not what the resolution is.  And what we're asking

16    for is an opportunity to be able to argue based on reality or

17    based on what they themselves have actually said, again and

18    again frequently.  And that distinction between what actually

19    occurred in the past, as a response to large damages, is

20    distinct from what might happen in the future and what has

21    happened in connection with migrating on the deterrence issue.

22    Those are entirely different, your Honor.  And I think if they

23    are going with this massive loss and harm historical argument,

24    we should be able to identify what really happened.

25         The migration is what would happen.  So don't give --

1    so those are distinct.  And I think -- I'm trying not to jumble

2    them together.  I'm trying to make them separate, because I

3    think the evidence gets in for the response to, we were harmed

4    to the tune of billions, billions, billions, billions.

5         THE COURT:  Well, I want to keep at this until I

6    understand your point because I know it's important to you.

7         MR. BAIO:  Also, there's only 10,000 or 11,000 works.

8    Yet we will hear about billions and billions of injury, which

9    of course cannot be part of the compensation, at least the

10   element of lost revenues.  It's lost revenues on the 11,000

11   works, so the confusion element of it is very significant.  And

12   it becomes substantially enhanced if the jury is kept blind to

13   the effects of all of these other occurrences in reality that

14   affected the dollar amount.  So not only will we be talking

15   about a number that really can't apply to the 11,000 works --

16        THE COURT:  It seems -- maybe you can defuse my

17   confusion.  It seems to me that a jury would certainly hear

18   what share of the market for any sales or sharing of music Lime

19   Wire had.

20        MR. BAIO:  Absolutely.

21        THE COURT:  The jury would not need to know whether

22   the other options were legal or illegal.  Would that be your

23   view?

24        MR. BAIO:  I wouldn't have to say they're illegal.

25   They're a fact, that people used Kazaa, according to the

14QAARI2ps

1   plaintiffs, for billions of downloads, that were not with

2   payment to us.  So they can't put that on our dime.  And it

3   also is not the 11,000 works.

4            THE COURT:  Are you arguing that, Mr. Pomerantz?

5            MR. POMERANTZ:  No, your Honor.

6            MR. BAIO:  Then the evidence gets admitted and I would

7   sit down at this point, your Honor.

8            THE COURT:  Which?  The evidence of --

9            MR. BAIO:  The fact that there were all of these other

10  causes that led to their loss, not Lime Wire.  That's the

11  evidence I want to put in.  I don't care whether I use the

12  label of, you know, illegal.  Somebody used Kazaa, other people

13  used YouTube, other people used Napster.  And they themselves

14  said, billions of dollars we lost, because of those things.

15  That's not us.  That's the point.

16           MR. POMERANTZ:  Your Honor, can I clarify what we

17  intend to do at trial?  That may help this discussion.

18           THE COURT:  Yes.

19           MR. POMERANTZ:  May I take the podium?

20           MR. BAIO:  Yes, sir.

21           MR. POMERANTZ:  We will put on evidence that there was

22  a lot of illegal file sharing, P2P usage going on.  We will put

23  on evidence that after the Grokster decision, a number of those

24  illegal sites stopped infringement, but Lime Wire did not.  And

25  after that, Lime Wire's percentage of the illegal file sharing

14QAARI2ps

1    business skyrocketed, up to 80 percent, let's say.  I don't

2    know the precise number, but let's say it's 80 percent.  What

3    we are trying to preclude them from arguing, and putting on

4    evidence, because they have their experts saying this, is that

5    if Lime Wire wasn't available, those 80 percent would have gone

6    to one of the other illegal services.  That's what we're trying

7    to preclude.

8            THE COURT:  That's the point I was trying to make when

9    I was talking with Mr. Baio now.  It's the but-for situation

10   that you're really concerned with.

11           MR. POMERANTZ:  Correct.  And so we're not saying that

12   somebody can't put on evidence, them or us -- I think it will

13   be us first -- that there was this little increment that wasn't

14   Lime Wire, because we need it for deterrence.  We want to tell,

15   we want to tell the jury that, you know, there are others out

16   there who are not only thinking of doing but doing what Mark

17   Gorton did and what Lime Wire did.  So we are going to tell the

18   jury -- we're not saying you can't tell the jury, they can't do

19   it with a but-for issue that your Honor identified.  What we're

20   trying to preclude is the evidence through their experts

21   Gorton, Mark Gorton, and argument through counsel that if Lime

22   Wire didn't exist, that 80 percent of the infringements would

23   have moved over here to another illegal service.  That is the

24   evidence and the argument that we're trying to avoid, which I

25   think is exactly what the *Brothers, Inc.* case, the Fifth

14QAARI2ps

1   Circuit case, and *Panduit* addressed.

2          THE COURT:  May I -- what you say is enlightening to

3   me about how you intend to use information on illegal

4   businesses.  You say plaintiffs need it in order to make your

5   deterrence argument.  If you need it for that, what you are

6   deterring is not past conduct, it's future conduct.  So what

7   you are deterring is migration to illegal services.  So that's

8   on the table.

9          MR. POMERANTZ:  Well, your Honor, I guess I would say,

10  the point of migration assumes that you're looking at the prior

11  users and what they in fact have done.  And that's not what we

12  are -- that is what we think should be excluded from evidence.

13  We are not talking about what actually has happened in the past

14  when you talk about -- I guess I -- that's not the -- I'm

15  sorry.

16         THE COURT:  Could I ask you, are you right now

17  addressing just any testimony as to what migration occurred

18  when Lime Wire was shut down?  Or are you addressing --

19         MR. POMERANTZ:  No, your Honor, I'm sorry.  I am not

20  addressing that issue.  What I am suggesting is that we will

21  put on testimony of what has happened in the past.  And we will

22  put on testimony --

23         THE COURT:  In what time frame?  Up to today?

24         MR. POMERANTZ:  Up till when Lime Wire shut down,

25  let's put it that way.  I'm not yet addressing what happened

14QAARI2ps

1    after Lime Wire shut down.

2            And we will show that a lot of infringements occurred

3    through Lime Wire.  We will show that that skyrocketed after

4    Grokster, when other popular services shut down and everybody

5    went over to Lime Wire.  And we don't think they could say,

6    well, if Lime Wire wasn't there, service X would have been the

7    one to get all of those users, because in fact those users went

8    to Lime Wire and downloaded music through Lime Wire.  And we

9    think -- I'm sorry.

10           THE COURT:  I'm sorry to interrupt you, but you would

11   be, in Mr. Baio's view, free to argue that.  You would be free

12   to argue whether the damages your client seeks would have a

13   deterrent effect on migration to other illegal sites.

14           MR. POMERANTZ:  Yes.  But I guess what I want to try

15   to avoid -- we would certainly not cross the line in the way we

16   argue deterrence -- is the line that's drawn in the *Brothers,*

17   *Inc.*, case, the Fifth Circuit case.  What the court there did

18   is, it looked at -- there were two other companies out there

19   offering infringing products.  And I don't see that it's a

20   rationale that had anything to do with what somebody was saying

21   publicly or privately about that.  What the court was saying

22   was, we're not going to allow you to argue that damages should

23   be reduced because some of the people who bought from the

24   defendant would have bought from these other infringers.  And

25   the reason why I think this is right on point is because first

14QAARI2ps

1    of all the rationale applies equally to the Copyright Act, but

2    the Copyright Act has one thing in addition that wasn't present

3    in *Brothers, Inc.*  And that is the idea of deterrence.  This is

4    an actual damages calculation.  And I don't believe, your

5    Honor, that deterrence was one of the factors in *Brothers,*

6    *Inc.*, or in the *Panduit* case, which follows *Brothers, Inc.*

7            THE COURT:  Let me just -- I'm pausing to read part of

8    *Brothers, Inc.*

9            Well, I don't disagree that *Brothers, Inc.* stands for

10   the proposition you stated.  It's remarkable that it's so old,

11   1963, and there has been so little similar case law since then.

12   It makes you, certainly makes you pause.  Makes me pause.

13           MR. POMERANTZ:  Well, the *Panduit* case in the Sixth

14   Circuit is a case that was often cited as setting forth the

15   considerations for calculating lost profits in a patent

16   infringement case.  And -- your Honor is looking for that case

17   law.

18           THE COURT:  I am.  One second.  I'm not sure I have it

19   here.  How do you spell it?

20           MR. POMERANTZ:  P-a-n-d-u-i-t.

21           THE COURT:  OK.  And its holding is?

22           MR. POMERANTZ:  What it says is, two different places,

23   the first is on 1156 of the opinion.  And it says, "To obtain

24   as damages the profits on sales he would have made absent the

25   infringement, a patent owner must prove" -- and then it lists

14QAARI2ps

1    four factors.  And the second factor is absence of acceptable

2    noninfringing substitutes.

3           THE COURT:  I know that in patent law that's been made

4    pretty clear.  And I'm wondering if there's some reason it's

5    been made clear in patent law and not as clear in copyright

6    law.

7           MR. POMERANTZ:  I don't know the answer to that, your

8    Honor, quite frankly.  There's another page cite here which

9    comes back to that point.  It's on page 1160 of the *Panduit*

10   decision, and there's a sentence that says, "Infringer Stalin,

11   however, cannot expect to pay a lesser royalty as compensation

12   for its infringement on the ground that it was not the only

13   infringer."

14          So I think it's established in patent law.  And I have

15   not yet heard an argument -- I don't know that I can think of

16   one -- why this particular doctrine from patent law shouldn't

17   apply in copyright cases when you're looking at actual

18   damages -- it's an actual damage calculation -- and then when

19   you move to statutory there's certainly no reason because

20   you're layering on top of it the congressional policy to use

21   statutory awards as a deterrence.  And it would be exactly

22   contrary to deterrence to say that if there are others out

23   there infringing, that that would be a reason to lower the

24   statutory award, which is what they want to argue, that because

25   others were available to induce infringement, that means Lime

14QAARI2ps

1    Wire should pay less.  That's what they want to argue.

2         THE COURT:  Willkie Farr sent me a letter listing

3    other copyright cases that had gone to jury.  Did this

4    particular issue come up in those cases?  Take just one

5    example.  Did it come up in *Tennenbaum*?

6         MR. POMERANTZ:  Well, again, because your Honor, with

7    a direct infringement case, I'm not sure that it would have

8    come up.  The question is, the individual defendant downloaded

9    the music.  And the question is how much should that

10   defendant -- it didn't really matter, in that particular case,

11   whether they downloaded it from illegal service A or illegal

12   service B.  They illegally, unlawfully, downloaded some music.

13        So I don't think this issue that we're debating here

14   today would come up, typically, in a direct infringement case

15   of that kind.

16        THE COURT:  Mr. Baio, do you want to respond on this

17   point?

18        MR. BAIO:  Yes, your Honor.

19        THE COURT:  I should also allow everyone a break.

20   It's about break time.

21        MR. BAIO:  Should we break and then come back?

22        THE COURT:  Whichever you prefer.

23        MR. BAIO:  I'll proceed, your Honor.

24        THE COURT:  OK.

25        MR. BAIO:  I think when we see the transcript you will

14QAARI2ps

```
 1   see that Mr. Pomerantz moved back and forth from "would" to

 2   actual.  And on the actual damages issue, how much harm they

 3   claim they suffered, historically, prior to the time Lime Wire

 4   shut down, they cannot say we suffered this massive injury from

 5   Lime Wire -- from all sources -- and you should make Lime Wire

 6   pay.  They can say it, but not preclude us from saying it.  But

 7   that there were other actual factors, not that people would

 8   have migrated, but other actual factors caused their actual

 9   injury.  That's one thing.

10            THE COURT:  That seems to me to be correct,

11   Mr. Pomerantz.

12            MR. POMERANTZ:  I'm sorry, your Honor.  I'm not --

13            THE COURT:  We're talking about what actually happened

14   as opposed to what would happen in a but-for situation.

15            With respect to what actually happened, he's saying

16   Lime Wire shouldn't be responsible for -- pick another company

17   that --

18            MR. BAIO:  Kazaa.

19            THE COURT:  -- Kazaa, for the downloading that

20   occurred through Kazaa.

21            MR. KLAUS:  But the reason that there would be

22   disagreement on that, to this point, your Honor, is because

23   they're experts and said people would have used, forget about

24   the billions of infringement through Lime Wire, it would have

25   happened anyway, and their proposed jury instruction, no. 54,
```

1    on but-for causation, says, "If you determine the loss would

2    have occurred anyway had there been no infringement of the

3    sound recordings by these defendants, you may not consider such

4    losses in your award of statutory damages." So if Mr. Baio is

5    backing way from that --

6            THE COURT:  I see.

7            MR. BAIO:  Your Honor, I'm not, and I will address

8    that issue.  But so long as we all understand that on the front

9    end, I will call it, on the actual damages issue, there will be

10   significant evidence, including their own statements, about the

11   massive impact that CD burning has had on them and how they've

12   lost billions of dollars because of that.  And if I can, that's

13   that point.

14           The point on now but-for, we have a situation unlike

15   the patent cases where the individual infringers paid nothing

16   for the music.  The plaintiffs want to argue that those

17   individuals would have paid -- and I think they're going to use

18   iTunes -- they seem to have been using iTunes as an example --

19   would have paid $1 for each one of these songs, and so that's

20   what you should pay, that's what you should make them pay.  And

21   you can make the argument.  Again, we're not trying to preclude

22   any arguments.  We, however, have expert testimony that people

23   who didn't pay anything, many of whom don't even listen to what

24   it is that they download, but they do it because it is free,

25   would not have bought for a dollar.  And they will not --

14QAARI2ps

| | |
|---|---|
| 1 | THE COURT:  How are you going to show that they would |
| 2 | not have bought for a dollar? |
| 3 | MR. BAIO:  There are a number of ways.  They have |
| 4 | didn't look at it.  They didn't buy -- they didn't pay -- |
| 5 | THE COURT:  I'm sorry.  Who is going to testify to |
| 6 | what? |
| 7 | MR. BAIO:  Our experts will testify to as to -- and in |
| 8 | addition they will to -- |
| 9 | THE COURT:  What will they testify to on this point? |
| 10 | MR. BAIO:  They will testify to the fact that people |
| 11 | who pay nothing, you cannot assume that they will pay a large |
| 12 | amount of money for music, that they will fill their iPods by |
| 13 | paying a dollar for each tune.  They will say that there were |
| 14 | other opportunities available to them so that they would not |
| 15 | have paid money to the music company because those other |
| 16 | opportunities, which included some legal opportunities that the |
| 17 | music industry itself made available to them, the post iMesh |
| 18 | site, 15 million songs, available for free, the YouTube, they |
| 19 | would use YouTube or My Space or Facebook in order to hear |
| 20 | music.  And they wouldn't -- there's no evidence that those |
| 21 | people would in fact have paid for the songs. |
| 22 | So they will be arguing from the reality that was |
| 23 | available to them as to whether the jury should assume that |
| 24 | they would have paid any money at all. |
| 25 | Now, they might go to concerts more because they're |

14QAARI2ps

listening to more music, and I understand they say, but that's

not going to us, and then we say, but in fact now it is going

to you, because you have 360 deals.  So as a matter of

evidence, we will submit what the reality was and what the

reality is.  They can argue that you shouldn't let them get

away with it because, you know, they were bad, whatever else

they want to say, but the idea that we can't talk about what

reality was and what the consumer was facing at the time and

that the hypothetical that they would have paid a dollar for

some songs that they don't even listen to, and a whole host of

other reasons.  They might not even have the money.  They

themselves recognize that some people who get music for free

don't have enough money to get it, so they wouldn't.  We want

to be able to present that to the jury, just to be able to be a

fair and full evaluation of reality.

THE COURT:  Mr. Klaus.

MR. KLAUS:  Very briefly.  I think that Mr. Baio is

conflating two things.  He's talking about the question of, on

actual damages, would somebody have paid the money that you say

they didn't, for the copy of the download that they have and

that they're not giving back.  We deal with that elsewhere in

the instructions.  The issue on the illegal services motion is,

are they allowed to bring in an expert, are they allowed to

argue to the jury that if they hadn't stolen it through Lime

Wire they would have stolen it through somebody else.  That's

1    what this issue is.  That's what his jury instruction no. 54

2    says.  If you determined they would have just stolen it

3    anyway -- it's not a question of would they have paid money for

4    it, would they not have paid money for it, would they have

5    stolen it.  That's what we seek to preclude from the illegal

6    services motion.

7                THE COURT:  OK.  This might be a good time for a

8    break.  Let's take a 15-minute break.

9                (Recess)

10               THE COURT:  Do counsel wish to argue more with respect

11   to these at this point?

12               I have one question for Mr. Baio.

13               MR. BAIO:  Yes, your Honor.

14               THE COURT:  Going back to your vineyard analogy,

15   suppose that a marauder comes through and tramples one quarter

16   of the vineyard.  Other people from the same village think,

17   marauding is a great idea and they come and they see, well, a

18   quarter has already been trampled, we're not going to trample

19   that, the fun is in trampling the grapes.  So they trample the

20   other three quarters.  Is your argument that the first marauder

21   should not be liable because the subsequent marauders would

22   have trampled all the grapes?

23               MR. BAIO:  He should be able to argue that those

24   marauders are not affiliated with me or related with me.  The

25   plaintiff can argue that I was the cause of all the marauding.

14QAARI2ps

1    But they can't preclude me from saying there were other

2    marauders.  That's the point.  It's an evidentiary point, not

3    an argument point.  Now, I may lose.  The jury may say, no, you

4    set the example of marauding for the world, or for your

5    community.  But that's an argument.  And I can say, but that

6    can't possibly be true for Napster, to transfer the analogy,

7    because that occurred before us.  It is impossible that it

8    included CD burning because it's an entirely different

9    approach.

10          So as a matter of evidence, if they can show the

11   causal link between us and an injury that they suffered, that

12   gets in and we get to respond.  But not we get to say nothing,

13   we get to pretend there were no other marauders.

14          THE COURT:  OK.  I understand that point.  Thank you.

15          MR. BAIO:  OK.

16          Anything further?

17          MR. POMERANTZ:  Just to continue to use your example,

18   just so our position is clear, we believe that either side can

19   put in evidence of what actually happened, 25 percent by

20   marauder one, the 75 percent by all of the other marauders.

21   What they are precluded from putting on evidence of or arguing

22   is that if the first marauder had not trampled that first

23   quarter, the other marauders would have trampled that quarter.

24   They are responsible for that quarter and they cannot put on

25   evidence or argument that somebody else would have done the

14QAARI2ps

1    same wrong.  And so that, you know, to move to the facts of

2    this case --

3            THE COURT:  No, you put it better than I did.

4    Mr. Baio, what is your answer to that specific point?

5            MR. BAIO:  Our answer, your Honor, is -- of course the

6    analogy limps a little bit -- and I know it's my analogy -- but

7    in our case, what was taken was taken for free.  And we think

8    the jury can evaluate whether someone who got something for

9    free would have paid anything, including whether other

10   alternatives were available to them, both legal and not.

11           THE COURT:  OK.  I understand.  With respect to

12   Mr. Gorton's net worth and finances, my tentative view is that

13   there will be enough evidence probative of his state of mind

14   and conduct without the jury hearing his net worth and other

15   information about his finances, except with respect to

16   fraudulent conveyance and punitive damages.  Defendants have

17   already conceded that punitives are awardable.

18           I'd like to have your views tomorrow on, if I stick

19   with that decision, which I expect to, how the issues will be

20   segregated for the jury.

21           MR. POMERANTZ:  Your Honor, may I ask one question on

22   that?

23           THE COURT:  Yes.

24           MR. POMERANTZ:  Because we will think about it

25   overnight and be prepared to respond.  But when you say his net

1    worth, there are two things I think happening with respect to

2    the events following the Grokster decision.  One is moving

3    assets into family limited partnerships, and the other is the

4    amount of those assets that are moved in.  While we

5    respectfully disagree with where your Honor is right now, I

6    would ask your Honor whether you would consider separating

7    those two out so that in the initial phase of the trial,

8    whatever gets incorporated into that, but the phase that

9    includes statutory awards, we are allowed to talk about his

10   decision to move assets into family limited partnerships even

11   if at that moment in time we cannot offer evidence about the

12   amount.  It's a line, your Honor, that would allow us to still

13   make some of the arguments we think are particularly relevant.

14          The other thing, just I became aware of from my

15   clients during the break, your Honor, is when we are on the

16   other side of copyright infringement cases, which happens from

17   time to time --

18          THE COURT:  "We" being the law firm or --

19          MR. POMERANTZ:  No, no, no.  No.  "We" being the

20   client, the record companies.  Occasionally somebody accuses

21   them of using their music to make this new song, something like

22   that.  And sometimes the plaintiff seeks statutory awards

23   against our clients.  And it's almost always the case that

24   because of the deterrence element in statutory awards, the

25   plaintiff is allowed to put on evidence of the net worth of the

1   record company.  And we can provide your Honor with some

2   examples of that.

3           THE COURT:  One second.

4           OK.  I'll be interested in hearing that.

5           MR. POMERANTZ:  We will get examples of that

6   overnight, your Honor, and be prepared to present those

7   tomorrow as well.

8           THE COURT:  OK.  With respect to your suggestion

9   that -- I think the argument is that if you separate the moving

10   of assets from the amount of assets moved, you have greatly

11   diminished the prejudicial effect of the evidence.  I'm not

12   persuaded at this point that the probative value of moving

13   assets is sufficient to outweigh the unfair prejudice.

14           MR. POMERANTZ:  All right.  We'll work on it.

15           THE COURT:  I think it can be motivated by many

16   different things, and I think you'll have enough else in the

17   word that you won't need this, but that's one reason Rule 403

18   judgments are saved for trial.

19           MR. POMERANTZ:  Thank you, your Honor.

20           THE COURT:  I'd like to move on to plaintiff's motion

21   in limine to preclude evidence or argument inconsistent with

22   facts established at summary judgment.  I grant the motion in

23   part and deny it in part.

24           I grant plaintiffs' request to preclude any evidence

25   or argument inconsistent with the facts established as a matter

14QAARI2ps

of law in the May 2010 decision.  Where issues are decided as a

matter of law on partial summary judgment, those issues are

deemed established for purposes of trial.  Unless and until the

Court changes its initial rulings pursuant to Rule 54(b), the

parties have a right to rely on the Court's rulings.

          Defendants question whether, in light of the May 2010

decision's failure to cite to Rule 56(g), the decision could

have "established" any facts.  I reject that argument.  Rule 56

permits but does not require the Court to narrow the issues to

be tried when it cannot grant all the relief requested by a

motion for summary judgment.  Specifically, the Court may

narrow the issues for trial by entering an order disposing of a

material fact not in dispute.  The existence of this

discretionary procedure does not, however, render obsolete the

traditional function of summary judgment.

          Pursuant to the May 2010 decision, I granted partial

summary judgment in favor of plaintiffs.  The decision found

that numerous facts have been established as a matter of law.

The parties thus may not introduce evidence or argument that is

inconsistent with those determinations.

          Plaintiffs contend that defendants may not present

evidence or argument that is inconsistent with the Court's

finding that a "conclusive determination" of infringement may

be made through analysis of a digital audio file's "hash."  My

order of yesterday amended the May 2010 summary judgment

14QAARI2ps

1    decision and stated that genuine issues of material fact exist

2    as to whether hash-based analysis can conclusively determine

3    the existence or extent of digital file sharing.

4                    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

14Q5ari3

1          THE COURT:  Accordingly, plaintiff's motion to

2     preclude defendant's from offering evidence and argument on

3     that matter is denied.

4          The plaintiffs seek to preclude defendants from

5     offering evidence or argument that is inconsistent with any

6     findings in the May 2010 decision relating to factors in the

7     statutory damage calculus.  Defendants state in their papers

8     that they wish to submit evidence and argument on all Bryant

9     factors but their arguments in the instant motion focus on two

10    factors alone, the infringers' state of mind and the conduct

11    and attitude of the parties.  I therefore address only those

12    two factors.

13         Yesterday's order affirmed that my May 2010 decision

14    established, as a matter of law, that defendant's conduct was

15    "willful" within the meaning of Section 504(c)(2) of the

16    Copyright Act.  Defendants are thus precluded from offering

17    argument or evidence that is inconsistent with that

18    determination.

19         Plaintiffs ask the Court to preclude defendants from

20    offering he was and argument on whether plaintiffs prevented

21    defendants from conducting effective filtering and on whether

22    other "distributors experienced occasional difficulties in

23    filtering copyright content."  I grant plaintiff's request.

24         In the May 2010 summary judgment decision I found, as

25    a matter of law, that Lime Wire failed to implement, in a

14Q5ari3

1    meaningful way, any of the technological barriers or design

2    choices that were available to diminish infringement.  On

3    summary judgment defendants contended that the alleged failure

4    of certain record companies to provide Lime Wire with lists of

5    copyrighted recordings and their hash contents precluded

6    Lime Wire from enabling effective filtering mechanisms to curb

7    infringement.

8           The argument in this regard did not create a genuine

9    issue of fact as to whether defendants took meaningful steps to

10   mitigate infringement.  Indeed, I found that defendants engaged

11   in an intentional course of action to preserve infringing

12   activities among Lime Wire users.  In short, I already

13   determined, as a matter of law, that defendants failed to

14   mitigate infringing activities.  This conclusion may not be

15   relitigated in the damage phase.  Accordingly, defendants are

16   precluded from introducing evidence or argument on, one,

17   plaintiffs' purported failure to provide defendants with lists

18   of copyrighted recordings and hash contents; and two, other

19   distributors' filtering difficulties.

20          Moving to defendant's motion *in limine* to preclude

21   certain references to the Court's statements, opinions or

22   conclusions in the May 25, 2010 opinion and order granting

23   summary judgment, I granted in part and denied in part.

24          As a preliminary matter, defendants note that the May

25   2010 decision did not cite to Rule 56G of the Federal Rules of

14Q5ari3

          1      Civil Procedure and defendants thus question whether the jury

          2      may properly be informed that the decision "established" any

          3      facts.  That is not an impediment, as I mentioned earlier.

          4              Turning to defendant's Rule 403-based objections,

          5      defendants have moved, pursuant to Rule 403, to preclude if I

          6      reference to the Court's "statements, opinions or conclusions"

          7      in the May 2010 decision beyond what is included in the

          8      defendant's proposed jury instructions.  Defendants also seek

          9      to preclude, pursuant to Rule 403, any reference to this

         10      Court's role in rendering previous decisions in the instant

         11      matter.

         12              I reserve decision on Rule 403 determinations until

         13      trial when the matters can be judged in context.  However, I

         14      think it may be useful to give some general guidance.  First,

         15      unless the Court specifically grants application to make a

         16      particular reference during trial but outside the presence of

         17      the jury, the parties will not be permitted to inform the jury

         18      of any rulings that the Court has not already articulated.

         19              Second, I am likely to permit counsel to inform the

         20      jury of rulings that established relevant facts such as, for

         21      example, that a Court has determined that defendants are liable

         22      for inducing the infringement of plaintiffs' copyrights, that

         23      defendants acted willfully, and that Lime Wire users directly

         24      infringed plaintiffs' copyrights.

         25              Any such references are likely to be permitted only to

14Q5ari3

1    the extent that the words used in front of the jury are

2    necessary to convey to the jury the legal determination at

3    issue.  For example, Rule 403 would permit this statement:  "A

4    Court has determined that Lime Wire users infringed plaintiffs'

5    copyrights by sharing unauthorized copies of plaintiffs' sound

6    recordings through Lime Wire."  However, Rule 403 would not

7    allow reference, as follows:  "A Court has determined that

8    Lime Wire users engaged in massive -- I underscore massive --

9    amounts of infringement, etc."

10        The core legal conclusion in that example can be

11   stated without including terms that might result in juror

12   confusion or unfair prejudice.  The parties should not

13   personalize my role in adjudicating previous decisions.  The

14   parties may state that the Court has previously determined that

15   Lime Wire users infringed plaintiffs' comprise but the parties

16   may not state that Judge Wood has previously determined that

17   Lime Wire users infringed plaintiffs' copyrights.

18        I order counsel to meet and confer before trial and to

19   attempt to stipulate to references to the Court's prior

20   decisions that are consistent with these guidelines.  I note

21   that no portion of the Court's earlier decisions may be read to

22   the jury.

23        Do counsel have any questions on this now?

24        MR. POMERANTZ:  Your Honor, I know we are going to get

25   to jury instructions either this afternoon or tomorrow, and if

14Q5ari3

```
 1   we have a jury instruction which I believe is proposed
 2   instruction no. 2 from the plaintiffs' which lists a bunch of
 3   what we thought were material, undisputed facts from your
 4   order, and I assume we are going to go over those in
 5   particular, maybe that's what you want to us to try to
 6   stipulate to first given your Honor's ruling?
 7             THE COURT:  Well, these -- let me ask you what you're
 8   asking me.
 9             MR. POMERANTZ:  That's a good question.  I'm thinking
10   about what I'm going to be allowed to say either in my opening
11   or in questioning a witness and as I understand, your Honor, if
12   your Honor has instructed the jury of something, we can go that
13   far and try to closely track what your Honor has already said
14   to the jury without using your Honor's name in that but just
15   simply saying the Court and I understand that.
16             So, that leaves us then to try to anticipate what your
17   Honor is going to actually say to the jury.  I know part of
18   it --
19             THE COURT:  Oh, I'm not going to keep you guessing.  I
20   will tell you ahead of time every time and allow argument.
21             MR. POMERANTZ:  Thank you.
22             THE COURT:  Mr. Baio.
23             MR. BAIO:  Your Honor, I'm sure I will have
24   clarification questions based on what you have said.  I just
25   haven't formulated them yet.
```

14Q5ari3

| | |
|---|---|
| 1 | THE COURT:  That's okay.  We have tomorrow. |
| 2 | I have questions about particular points of evidence |
| 3 | and I'm wondering whether plaintiffs can have a final song list |
| 4 | by tomorrow. |
| 5 | MS. LeMOINE:  Yes, your Honor.  Melinda LeMoine for |
| 6 | plaintiffs, your Honor. |
| 7 | The answer to that question is, I hope, yes. |
| 8 | THE COURT:  We shouldn't have asked for clarification |
| 9 | of your first answer. |
| 10 | Okay.  It is okay. |
| 11 | MR. BAIO:  Your Honor? |
| 12 | THE COURT:  Yes. |
| 13 | MR. BAIO:  There are, I think, although I'm not sure, |
| 14 | there will be an issue about the 412 songs and the 1,322. |
| 15 | THE COURT:  That's what I'm hoping you would work out. |
| 16 | MR. BAIO:  We will try, but I think we may have a |
| 17 | difference of opinion as to the law and your ruling and I'm not |
| 18 | sure -- we don't have to raise it today but we may want to |
| 19 | address that tomorrow. |
| 20 | THE COURT:  Well, if you have disagreement on the law |
| 21 | it would be helpful if you each send me a letter stating your |
| 22 | version of the law and what authorities support it. |
| 23 | MR. BAIO:  Yes.  We will. |
| 24 | THE COURT:  Okay. |
| 25 | I would like to ask plaintiffs' counsel at what point |

14Q5ari3

 1    in trial you expect to introduce evidence on fraudulent

 2    conveyance, unjust enrichment and vicarious liability.

 3             MR. POMERANTZ:  Our intent, your Honor, was to have

 4    only, given your Honor's prior ruling, what we were thinking

 5    was to simply have what I call two phases to the trial.  The

 6    first phase would be everything other than the amount of

 7    punitive damages including asking the jury whether punitive

 8    damages should be awarded which would require us to tinker with

 9    the instructions that have thus far been; submitted, and then

10    the second phase would simply be that if the jury answered that

11    question yes, we would come back with any evidence that would

12    be only relevant to setting the amount as well as any argument

13    relating to punitives.  But everything else, we believe, would

14    all come in in the first phase.

15             THE COURT:  Mr. Baio?

16             MR. BAIO:  I wasn't --

17             THE COURT:  Do you have a view on the propriety of

18    what Mr. Baio said?

19             MR. BAIO:  I wasn't sure whether that meant that the

20    fraudulent conveyance comes in -- that comes in in the front

21    end.

22             THE COURT:  I think that's your view; is that right,

23    Mr. Pomerantz?

24             MR. POMERANTZ:  That's correct, your Honor.

25             MR. BAIO:  We think, your Honor, that that increases

14Q5ari3

1    the chances significantly and, as a matter of 403, that the

2    jury will absorb and interpret that evidence that goes in on

3    the fraudulent conveyance on the statutory damages matters.

4    You will have already instructed on willfulness and I think

5    there is a certain cumulative piling on element that will lead

6    to perhaps confusion in the jury's minds as to how much they're

7    supposed to weigh that -- that is, the fraudulent conveyance

8    evidence -- in determining not punitives and not whether there

9    was a fraudulent conveyance but everything else that they'll be

10   doing.  So, you have a likelihood of mushing it up.

11        I could understand why the plaintiffs will want that

12   but we think that that would be unfair to us.  And if we are

13   talking about a bifurcation, we would propose that the

14   fraudulent conveyance be part of that second phase so that way

15   there is no either likelihood or opportunity for there to be

16   spillover on the Bryant factors based upon the conclusions on

17   the fraudulent conveyance.

18        THE COURT:  Upon what evidence would the jury rely in

19   the first phase to determine whether punitive damages are

20   appropriate?

21        MR. POMERANTZ:  You are asking us, your Honor?

22        THE COURT:  I will be asking Mr. Baio but I will ask

23   you too.

24        MR. BAIO:  I think, your Honor, part of your rulings,

25   I hope, or one of the effects of your rulings, is that it will

14Q5ari3

streamline some of the evidence.  I mean, the jury will hear, I

assume, based upon what your ruling was yesterday, that the

defendants were willful and that they, as you have described in

this document that we saw this morning, that there was

intentional inducement.  And they will be putting in evidence

as to the amount and they will be putting in evidence as to the

time and they say they're going to be putting in evidence as to

Grokster and there is no shortage of evidence that -- and

findings that have already been adjudicated that they bundle up

and they make the argument that there should be a hearing as to

punitive damages.  By separating out fraudulent conveyance you

eliminate the possibility that taints the analysis of the

statutory damages.

          So, other than the fraudulent conveyance they can have

at us largely based upon what your Honor has already found.  I

hope we don't end up with accumulation of you describing that

they were willful and that there was intentional inducement and

then we spend two days proving that they were willful and then

intentionally inducing.  That seems to me to increase the

likelihood significantly that the jury will be confused as to

what their role is.  You have already said they are willful,

you have already said there was intentional inducement.  If

they're going to be proving a great deal of what has already

been proven, I think it has a cumulative and unfair effect on

the jury.  They've won on those motions.

14Q5ari3

1          So, I think they have plenty that they can deal with

2     to argue in favor of punitive damages without enhancing the

3     likelihood that the fraudulent conveyance will taint that

4     process.

5          THE COURT:  Thank you.

6          Mr. Pomerantz?

7          MR. POMERANTZ:  Your Honor, I think our evidence that

8     supports our claim for statutory awards and the evidence we put

9     on for fraudulent conveyance both relate to whether punitive

10    damages should be allowed.  We will, I guess, be discussing

11    tomorrow whether there is sufficient reason to have what we

12    will call the fraudulent conveyance evidence is also relevant,

13    probative and outweighs the prejudice for the statutory awards

14    issue and we will come back to your Honor on that tomorrow.

15    But, I do believe that the kind of bifurcation that defendants

16    seem to be seeking would be prejudicial to us in getting the

17    right evidence in front of the jury to make all of the

18    decisions.  And I think that to the extent we are unable to

19    persuade your Honor tomorrow that the transfer of assets is

20    also relevant to statutory awards, I do believe that your Honor

21    could issue whatever instruction your Honor thinks is

22    appropriate to the jury without precluding us from having to --

23    from asking questions in a timely and organized way of

24    witnesses like Mr. Gorton.  But, I do believe at the end of the

25    day that we will hopefully be able to persuade your Honor that

14Q5ari3

1    all of this evidence is relevant to the issue of statutory

2    awards and so you are not presented with the problem that your

3    Honor I think may be grappling with and that only the amount of

4    punitives be separated and decided in the second phase.

5            THE COURT:  I have to confess ignorance about

6    bifurcation of this type because I have never had a trial where

7    damages were bifurcated from liability or where punitives were

8    bifurcated from compensatory.

9            Is there law supporting a trifurcation, that is, that

10   whether punitives are granted -- well, let's stick with

11   bifurcation.

12           MR. POMERANTZ:  Your Honor, I have not researched it

13   recently but I am aware of situations where Courts will do what

14   I thought your Honor might have been suggesting and in one of

15   your orders last week, which is to put the question of whether

16   punitives are available into a phase I and then if the jury

17   says yes, to put on the evidence and argument in a second phase

18   with respect to the amount of punitives.  I believe that is a

19   not uncommon approach.

20           THE COURT:  How common is the other approach which

21   would be to have the second phase deal with whether punitives

22   are appropriate and, if so, in what amount?

23           MR. POMERANTZ:  I'm not aware about trifurcation.  I

24   have not studied it but I'm not aware, if I understand your

25   Honor --

14Q5ari3

```
 1              THE COURT:  I didn't mean trifurcation, I meant
 2    bifurcation -- I meant a trial on statutory damages.  If I do
 3    not allow fraudulent conveyance in on statutory damages whether
 4    it can appropriately be saved for the punitive damage phase
 5    with respect to both whether punitive damages are appropriate
 6    and, if so, in what amount.
 7              MR. POMERANTZ:  I'm not aware of that kind of
 8    bifurcation occurring, your Honor, and I must say I have not
 9    researched it in depth but I am not aware of it as I stand
10    here.
11              THE COURT:  I will ask counsel to do whatever
12    preparation you can on that for tomorrow.
13              I think at this point if we might take a lunch break
14    and come back on Daubert issues?  Thank you.
15              We are adjourned.
16              MR. POMERANTZ:  Your Honor, what time would you like
17    us back?
18              THE COURT:  An hour from now, let's say at 1:30.
19              (Luncheon recess)
20              (Continued next page)
21
22
23
24
25
```

14QAARI4ps

```
 1            THE COURT:  I am sorry to have asked you to eat so
 2   fast and then be late.  We had production problems.
 3            My law clerk is going to pass out copies of a draft
 4   Daubert opinion, which we can discuss after a break today.
 5   I'll give you time to read it.  But I thought that before we
 6   get to that, we might want to deal with loose ends from this
 7   morning and other issues.
 8            I am still considering and I will still be considering
 9   as of tomorrow the issue of the extent to which evidence with
10   respect to other illegal services will be admitted.  And so we
11   will see that I've noted as tentative a portion of my Daubert
12   draft that deals with that evidence.
13            Going back to how many works there are, what is the
14   legal disagreement there?
15            MR. POMERANTZ:  Your Honor, I can state the issue, but
16   I would like someone else on my team to argue the issue.  But I
17   believe the issue is who has the burden of proof, and that
18   issue is set forth in at least one and maybe more jury
19   instructions that I have submitted to your Honor.  So I think
20   that's, in a 30,000-foot view, the issue that separates us.
21            THE COURT:  If I were to read and decide motions with
22   respect to jury charges a week before every trial, I would do
23   nothing but read jury charges all my life.  So I have not read
24   most of your jury charge.  And I don't expect to begin to do
25   that until you've given me revised instructions that reflect
```

14QAARI4ps

```
 1   all the decisions that have been made since you first brought
 2   them in.  I also won't expect to have a charge conference, a
 3   general one, until well into trial.
 4              MR. POMERANTZ:  Yes, your Honor.  We understood from
 5   one of your questions to us this morning that we would write a
 6   letter to your Honor tonight that would explain this burden of
 7   proof issue.  It would refer to some of the cases and arguments
 8   that we cite in that one jury instruction, but we would pull it
 9   out, and I think what your Honor asked us to do was to send a
10   letter explaining what that issue is.  And that's what we
11   intended to do tonight.  It would be available to your Honor
12   for tomorrow morning.
13              THE COURT:  That would be fine.  I was just curious as
14   to what issue could be left, and I guess burden of proof is one
15   that could be left.
16              I would appreciate plaintiff's counsel totaling up how
17   many works there are.  We simply don't have the resources to
18   have people count them.
19              MR. POMERANTZ:  We will do so, your Honor.
20              THE COURT:  There are remaining claims that we didn't
21   touch on, unjust enrichment being one.  I'm wondering how
22   plaintiffs expect to bring that claim forward, unjust
23   enrichment and vicarious liability, and whether these are
24   claims that are alternative to something else, whether you're
25   ready to strike them.
```

14QAARI4ps

1          MR. POMERANTZ:  No, your Honor.  We don't believe they

2    are alternative.  The vicarious liability claim will be based

3    upon the evidence that we would be offering already on

4    statutory awards and fraudulent conveyance.  And the unjust

5    enrichment claim would be based on the same evidence that would

6    support the fraudulent conveyance claim.

7          THE COURT:  If we picture special interrogatories to

8    the jury, that is, a special verdict form, what difference

9    would it make to a plaintiff's award if the jury finds

10   vicarious liability?

11         MR. POMERANTZ:  I believe the way the parties have

12   agreed on the instructions is the amount of damages would not

13   be different.  It would be an alternative theory of liability

14   upon which we could get the same damages.

15         THE COURT:  And the same for unjust enrichment?

16         MR. POMERANTZ:  Hold on a second, your Honor.  Let me

17   just... (Counsel confer)

18         That would track fraudulent conveyance claim in the

19   sense that it would seek the return of the money from the FLP

20   to Mr. Gorton so that it would then would become available to

21   us to satisfy the judgment.

22         THE COURT:  OK.  Thank you.

23         All right.  We've gone through most of my agenda.

24   This might be a good time for you to read the *Daubert* opinion

25   and shall I assume 30 minutes is enough time?

14QAARI4ps

 1          MR. POMERANTZ:  Yes, your Honor.

 2          PLF ATTY 2au:  Yes.

 3          THE COURT:  OK.  Thank you.  If you're not ready in 30

 4     minutes, you can let my law clerk know that.  Thank you.

 5          (Recess)

 6          THE COURT:  Would counsel like to discuss any part of

 7     the *Daubert* opinion today, or would you rather wait until

 8     tomorrow, the draft opinion?

 9          MR. POMERANTZ:  Yes.  There is an issue or two we

10     would like to discuss with your Honor tomorrow, if that's OK

11     with your Honor.

12          THE COURT:  That's fine.  Do you want to give me a

13     preview?

14          MR. POMERANTZ:  Sure.  Yes.  The illegal -- to the

15     extent your Honor has deferred ruling on what to do about

16     evidence relating to other illegal services, we think that

17     affects not just Mr. Sinnreich's testimony but also a portion

18     of Mr. Strong's.  But we will simply await tomorrow on that.

19          THE COURT:  I understand that.

20          MR. POMERANTZ:  The other issue that we want to

21     consider overnight and discuss with your Honor tomorrow is the

22     issues relating to whether the users of LimeWire would have

23     paid any money to buy the recording if illegal services -- if

24     they were not available for free.  And we think under the law

25     that that may not be a relevant consideration here.  And I'll

14QAARI4ps

1    just articulate briefly our thinking and then we'll be

2    hopefully a little more articulate tomorrow.  When someone in

3    LimeWire's position takes our recordings and distributes them

4    to others, we believe the appropriate analysis is, what is the

5    fair market value of what LimeWire took and gave to others, and

6    they're keeping.  They're not giving it back.  And the question

7    is not relevant whether those users would have, in a but-for

8    world, bought it.  They have it, and they're not giving it

9    back.  They have the copies of the recordings.  And in some

10   cases, such as the *Davis* case, the court looks at the fair

11   market value to determine what LimeWire should pay for these

12   infringements.  And we think that's the right way to look at

13   it.

14            And to put it in an example, when we sell the

15   recordings to legitimate retailers, like iTunes or Amazon, they

16   are free to turn around and sell it for any price they want.

17   They could sell it for 99 cents, or they could give it away for

18   free, as long as they turn around and pay us what the contract

19   says, which is roughly 70 cents in most of the relevant time

20   period for an individual track.  And they could make the

21   decision that they'll give it away for free for a while to

22   build a huge user base and then do whatever they want with that

23   user base to try to make money.

24            So we believe under the law -- and we'll give some

25   thought overnight to this -- but we think under the law it

 1    really doesn't matter whether the users would have bought the

 2    particular recording or not in the but-for world, because they

 3    are keeping that, and we therefore need to look at what the

 4    reasonable value, the fair market value is of what the

 5    agreement would have been between my clients and LimeWire.

 6    What LimeWire offered to its customers, to its users, is

 7    basically what iTunes was offering to its customers, a

 8    permanent copy of the recording.  So we would like to present

 9    to you case law and argument as to the relevance of that issue.

10    And that would bear upon, I believe, some of the portions of

11    the testimony of both Mr. Strong and Mr. Sinnreich.

12            THE COURT:  Mr. Baio.

13            MR. BAIO:  Your Honor, tomorrow, we will be preparing

14    to respond to those points, which I think are actually

15    interrelated.  The fact is, again, my initial reaction to that

16    is, what the plaintiffs say is that you're allowed to ignore

17    what the real-world environment is and only their argument gets

18    to the jury, that the argument that in fact people who have no

19    money wouldn't have bought a record shouldn't be allowed to be

20    put before the jury and that it is not a question of their

21    theories, which in fact change all the time, they are not just

22    suing for the license value of a particular set of songs,

23    because now they are selling those for as little as a half a

24    penny, and if they want to go that way, we want to be able to

25    respond to it.  They doesn't license now, it's not licensed to

14QAARI4ps

```
 1     iTunes.  ITunes sells it or not.  And when there is a YouTube
 2     click, YouTube will pay them something like one half of one
 3     penny.
 4              We think the jury has to know what's really going on
 5     in the world and not just the artificial world that the
 6     plaintiffs are trying to graft on what the jury is going to
 7     evaluate and what they're going to conclude.
 8              THE COURT:  In that real world, what evidence will you
 9     have as to who could afford what?
10              MR. BAIO:  There is, I believe, in our expert reports,
11     data that suggests and reports and studies that have been
12     undertaken and statements in -- I'm thinking of the EMI reports
13     right now -- that a download does not equal a sale.  In fact,
14     some people can't afford it.  That's right out of their own
15     mouths.
16              THE COURT:  The real world being as specific as "some
17     people."  I thought that was your position.
18              MR. BAIO:  Yes.  We're not going to be putting on a
19     particular person to say that I took music because I had no
20     money and it was available to me.  But their own statements and
21     their own evaluations and their own reviews show that they
22     recognize that.  And really, at the bottom of all this is, we
23     simply want to be able to present to the jury what really is
24     happening out there.  We understand that under statutory
25     damages, that Mr. Gorton and LimeWire will suffer consequences.
```

14QAARI4ps

1   And now we're talking about what are the extent of the

2   consequences of the and it isn't in an artificial world that

3   should one should evaluate that.  They say they lost billions

4   of dollars in revenues.  We have should be able to show that

5   that's not really true.  It would not have been the fastest

6   growing business in eternity if there hasn't hadn't been a

7   LimeWire, which is in a way what they are suggesting.  And we

8   want to be able to counter that.  That's all.  It's just a

9   question of the jury having before it a balanced presentation

10   of the real world, not the LimeWire-only world.  But we'll have

11   more tomorrow.

12         THE COURT:  Yes.  For reasons I can't explain, that

13   reminds me of a loose end, which is some of the testimony by --

14   how do you pronounce Sinnreich?  Reputational missteps.  That

15   page 59 of his contains a lot of material that I think is

16   inadmissible.  I just want to be sure that no one thinks that

17   my *Daubert* opinion is the final word on admissibility.  We

18   simply haven't been able to mill fine enough, I think, in our

19   conferences to get to these points.

20         Multiple sclerosis patients being sued --

21         MR. BAIO:  We understand that part of the ruling, your

22   Honor.

23         THE COURT:  OK.  A question for plaintiff's counsel:

24   How do you expect to present evidence about the damage award

25   per work?  Taking into account that there have been individual

1    judgments against some direct infringers with respect to a

2    work?  Are you going to somehow group these, or what are you

3    going to do?

4            MR. POMERANTZ:  Are you asking about the actual -- for

5    the pre-'72 recordings, or are you asking about in statutory

6    awards and whether there is going to be some deduction because

7    of the individual -- that ruling?

8            THE COURT:  Statutory awards, yes.

9            MR. POMERANTZ:  Can that be on the agenda for tomorrow

10   as well, your Honor?

11           THE COURT:  Yes.

12           MR. POMERANTZ:  I just want to think through the issue

13   how -- I understand what that prior order -- I think I remember

14   what that prior order said.  I just want to get it back in my

15   head and make sure we have an accurate response.

16           THE COURT:  OK.  My question is in part, are you going

17   to be presenting works to the jury as groups, or are you

18   planning to go one by one?  I'm trying to picture how the trial

19   can be four to five weeks.

20           MR. POMERANTZ:  I think for statutory awards, we are

21   assuming -- I believe the defendants are too in a way we've

22   worked through jury instructions -- that there would simply be,

23   these are the numbers of recordings that are subject to

24   statutory awards.  You pick a number between 750 and 150,000

25   dollars per award.  I believe that is the way both of us have

1   set up our jury instructions.

2          MR. BAIO:  That's the way the instructions are, your

3   Honor.  As a matter of evidence, I don't know what they plan on

4   putting on as to one song as opposed to another, as an oldy as

5   opposed to a newy, a word I just made up.  But we'll have to

6   see what is put before the jury to evaluate within individual

7   works, but we did anticipate a number times the works, at least

8   for statutory purposes.

9          THE COURT:  Good.  Thank you.

10          Do you have an answer on the availability of Mr. Von

11   Lohrmann?

12          MR. MUNDIYA:  Your Honor, we have e-mailed Mr. Von

13   Lohrmann's counsel.  He was getting on a plane.  He will be

14   there tomorrow.  He has reached out but we don't have an answer

15   yet.  As soon as we do, we'll let your Honor know.

16          THE COURT:  What do you think would be accomplished by

17   having his lawyer here without him?

18          MR. MUNDIYA:  To the extent your Honor has questions

19   about the EFF conflicts, database and written records, he may

20   be able to answer some of those questions, even though Mr. Von

21   Lohrmann is not present.

22          He's going to be in New York anyway.  He's not flying

23   up especially for this.

24          THE COURT:  Well, I understand that.  I wouldn't want

25   to hear him speculate, take hours of our time speculating.  I'd

14QAARI4ps

```
 1   much rather have the fact witness here.

 2                MR. MUNDIYA:  OK.  We're reaching out to him, your

 3   Honor.

 4                THE COURT:  Thank you.

 5                MR. KLAUS:  Your Honor, may I also ask that

 6   Mr. Mundiya also let us know as soon as he hears from Mr. Von

 7   Lohrmann whether --

 8                MR. MUNDIYA:  Of course.

 9                THE COURT:  Thank you.

10                Do counsel -- I'm sorry.  Do you need to confer?

11                MR. POMERANTZ:  That's OK.

12                THE COURT:  Would it be possible for counsel to submit

13   in writing your views on bifurcation?

14                MR. BAIO:  Sure.

15                THE COURT:  Or are they so simple that --

16                MR. BAIO:  If you would like, your Honor.

17                THE COURT:  Any authority would be helpful.

18                MR. BAIO:  All right.

19                MR. POMERANTZ:  That's fine, your Honor.

20                THE COURT:  Apart from a matter dealing with equipment

21   in the courtroom that my law clerk, Ms. Stein, will talk to you

22   about, I don't have e-mails on have anything else on my agenda.

23   Is there something you wish to raise today?

24                MR. POMERANTZ:  Your Honor, there are a couple of

25   matters that we have that we want to go over with your Honor,
```

1   but it probably makes sense to talk with defendant's counsel

2   first to see whether we just have agreement and tell your Honor

3   tomorrow whether we have or not.  So I think I will defer on

4   that until tomorrow if that's OK.

5            THE COURT:  That's fine.

6            MR. MUNDIYA:  One point of clarification if I may on

7   Mr. Von Lohrmann, Mr. Von Lohrmann doesn't work for EFF

8   anymore, he works for another company, which is part of the

9   reason why we're having some logistical issues.  I just want to

10  make that clear.  He is not currently at EFF.  I apologize if I

11  didn't make that clear.

12           THE COURT:  I see.  Perhaps, then, counsel for EFF

13  could answer a question about what documents EFF now has.

14           MR. MUNDIYA:  Right.

15           THE COURT:  But Mr. Von Lohrmann could probably answer

16  a question about what documents EFF maintained, for example,

17  client lists, when he worked there.

18           MR. MUNDIYA:  Understood, your Honor.

19           MR. POMERANTZ:  Your Honor, I do have one question for

20  your Honor.  We are trying to figure out scheduling for next

21  week, particularly for witnesses.  And your Honor described the

22  voir dire process.  We didn't spend much time on it today.  But

23  I'm just wondering whether your Honor has a thought, given the

24  kind of voir dire we're doing here, as to how long you think

25  that would go.  I know you had originally said you thought we

14QAARI4ps

```
1    might be able to get voir dire done in the morning of the first

2    day.  Is that still your Honor's expectation?

3              THE COURT:  Having read the voir dire in the

4    Tennenbaum case and the answer jurors give, you'll note that I

5    put in many more music industry-related questions than I

6    initially had in mind.  So I think it will take longer than I

7    had in mind.

8              MR. POMERANTZ:  That's what I was thinking too.  So is

9    it still your hope that we'll start openings the first day, or

10   are you thinking that openings may start the second day?

11             THE COURT:  I'd like for you to be ready to start the

12   first day.  I would say chances are 80 percent that we wouldn't

13   get to it until the second day.

14             How long do you each expect to spend in your opening

15   statements?

16             MR. POMERANTZ:  Still working on it.  But I would say

17   it would be probably between an hour, an hour and a half.

18             THE COURT:  That's quite a lot for an opening

19   statement.

20             MR. POMERANTZ:  I'm working on it.

21             THE COURT:  Yes.  I would definitely try to cut that

22   back by half.

23             Mr. Baio?

24             MR. BAIO:  I'm going to try to cut that back by half,

25   your Honor.
```

14QAARI4ps

1          One of the advantages of being the defendant.

2          THE COURT:  One of the many.

3          MR. BAIO:  I'm shooting for under 45 minutes.

4          THE COURT:  OK.  My law clerk, Ms. Stein, has

5    volunteered to make up an agenda for tomorrow, which will be

6    faxed to you.  So we'll do that.  And you can add anything you

7    want.

8          MR. POMERANTZ:  And I take it we are not going to be

9    going through jury instructions tomorrow, from what your Honor

10   said.

11         THE COURT:  I've been trying to figure out how to deal

12   efficiently with what you need to know before you open.  If

13   there are jury instructions as to which you must know the

14   answer before you open to the jury, I would try to deal with

15   them.

16         MR. POMERANTZ:  I will discuss that.  I would say that

17   instructions 1 and 2 of ours, which overlap, I think, with

18   instruction 2 of theirs, are ones that overlap with your

19   Honor's ruling this morning on the in limine motions dealing

20   with your summary judgment ruling.  And I think that it would

21   basically -- in large part we can rewrite our instruction no. 1

22   now based upon what your Honor is going to say to the jurors

23   and we'll try to track the language there.

24         THE COURT:  Yes.

25         MR. POMERANTZ:  Instruction 2, as we have it, is

14QAARI4ps

 1    basically those facts that your Honor has established in your

 2    summary judgment ruling that you want to tell the jury about

 3    before the trial begins.  And I think that that was one that

 4    you asked us to meet and confer and see if we can come up with

 5    a stipulated list.

 6            THE COURT:  Yes.

 7            MR. POMERANTZ:  And so we should do that.  I would

 8    just want to know that before the opening, what those would be.

 9            THE COURT:  I'm sorry.  I'm missing your point.  You

10    would want to know what my preliminary instruction to the jury

11    will be?

12            MR. POMERANTZ:  Will be with respect to which facts

13    that you've already established you are going to tell the jury

14    are established.  I'm assuming it's a very small, few in

15    number, but they're the ones that you believe would be most

16    important for them to understand as to why you, why "the Court"

17    has ruled the way it has.  And so we would just want to clarify

18    that one instruction before opening statements, so we know what

19    we can say and can't say.

20            THE COURT:  I did not have in mind as extensive an

21    instruction as a preliminary instruction as your no. 2.

22    Counsel will be revising your proposed instructions.  When you

23    do that for one such as Plaintiff's No. 2, I'll ask you to add

24    a citation to where in the opinion you found the statement and

25    whether what you have is a direct quote.  We have very limited

 1    resources.  We need help there.

 2            MR. POMERANTZ:  All right.  We will do that.  I think

 3    that is the one instruction that we would like some guidance on

 4    before we start openings.  I don't know that the others are

 5    essential before openings.

 6            There may be one or two others, but we'll discuss it

 7    overnight and let your Honor know tomorrow.

 8            THE COURT:  OK.  Now, in order for me to review

 9    submissions you make before we meet tomorrow, I think we had

10    better set a schedule for your submissions.

11            We've set a schedule for what we dealt with this

12    morning, but not yet with what we dealt with this afternoon.

13            What's left is the time by which you will get me

14    letters on bifurcation and your intended stipulation of facts

15    from the summary judgment motion.  If you could have those to

16    me by sometime tonight I could spend some of the morning

17    getting ready to talk to you about them.

18            So what time is good for you?

19            MR. BAIO:  I think the stunned silence is us

20    evaluating the various tasks.  And we really, it almost doesn't

21    matter.  We know there's going to be a lot of scurrying.  So

22    whatever works for your Honor.

23            THE COURT:  Let's say 7 a.m. tomorrow.

24            MR. BAIO:  OK.

25            THE COURT:  And someone needs to be meeting with

14QAARI4ps

 1    clients also.

 2              MR. BAIO:  Yes, your Honor.  We will do that.

 3              THE COURT:  So why don't we start at 11 tomorrow.  And

 4    please save Monday for any overflow pretrial conference.

 5              OK.  Thank you very much.

 6              MR. BAIO:  Thank you, your Honor.

 7              THE COURT:  See you tomorrow at 11.

 8              Please wait to talk to Ms. Stein.

 9              (Adjourned to 11:00 a.m., April 27, 2011)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25