14R5ari1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ARISTA RECORDS, LLC. *et al.*,

4                  Plaintiffs,

5           v.                        06 Civ. 5936 (KMW)

6    LIME WIRE, LLC, et al.,

7                  Defendants.

8    ------------------------------x

9                                     April 27, 2011
                                      11:17 a.m.
10   Before:

11                  HON. KIMBA M. WOOD,

12                                     District Judge

13                       APPEARANCES

14   MUNGER, TOLLES & OLSON, LLP
          Attorneys  for Plaintiffs
15   BY:  GLENN POMERANTZ
          KELLY KLAUS
16        JENNIFER PARISER
          BLANCA YOUNG
17        HAILYN CHEN
          MELINDA E. LeMOINE
18
     WILLKIE, FARR & GALLAGHER, LLP
19        Attorneys for Defendants
     BY:  JOSEPH T. BAIO
20        TARIQ MUNDIYA
          JOHN OLLER
21        KATHARINE N. MONIN
          TODD COSENZA
22

23

24

25

14R5ari1

```
 1          (Case called)

 2          THE COURT:  The Court calls Arista records versus

 3    Lime Wire.  Could counsel please identify themselves.

 4          MR. POMERANTZ:  Good morning, your Honor.  Glenn

 5    Pomerantz on behalf of the plaintiffs, and with me is Kelly

 6    Klaus, Blanca Young, Melinda LeMoine and Hailyn Chen.

 7          THE COURT:  Thank you.

 8          MR. BAIO:  For the defendants, Joseph Baio.  With me

 9    are Tariq Mundiya, John Oller and Todd Cosenza.

10          THE COURT:  Very good.  Thank you.

11          I would like to begin by taking any comments you have

12    on the revised voir dire and script.  And I will get, later, to

13    your proposed preliminary instructions.  I think you mean by

14    your reference to proposed jury instruction no. 2 by plaintiffs

15    that those would be preliminary instructions?

16          MR. POMERANTZ:  Correct, your Honor.

17          THE COURT:  Pretrial.  Okay.

18          So, on the voir dire itself, any questions?

19    Statements?

20          MR. KLAUS:  Good morning, your Honor.  With respect to

21    question no. 23 which I had asked yesterday if you would add

22    the date of last year's, just a couple of small suggestions.

23    One is perhaps we should ask the jurors what the most -- what,

24    approximately, the most recent time is that they remember so as

25    to avoid getting an answer such as:  I don't recall.
```

14R5ari1

```
 1              THE COURT:  Well, if they read the question, and
 2     that's a question in and of itself, they'll see that if they
 3     answered yes they need to indicate to the best of your
 4     knowledge the most recent time.
 5              MR. KLAUS:  I think that's probably fine.  It would
 6     just be to --
 7              THE COURT:  How about adding the word approximate date
 8     of last use.
 9              MR. KLAUS:  Approximate date of last use would be
10     fine.
11              THE COURT:  Anything else?
12              MR. KLAUS:  No.  That would be it.
13              THE COURT:  Okay.
14              Moving on to the 412 issue.
15              MR. BAIO:  Your Honor?
16              THE COURT:  Yes.
17              MR. BAIO:  May we move that down the list?
18              THE COURT:  Yes.
19              MR. BAIO:  Counsel who was handling that, who didn't
20     get much sleep, will be coming here very shortly.
21              THE COURT:  Okay.  That's fine.
22              MR. BAIO:  Thank you.
23              MR. POMERANTZ:  Your Honor, may I?  I don't know if
24     you have already skipped over the instruction to the assembled
25     venire, if that was part of the jury instructions.  I just
```

14R5ari1

1   wanted to ask for one comment on that.

2          THE COURT:  It is fine to deal with it now.  I had had

3   it toward the end of the day but --

4          MR. POMERANTZ:  That's fine.

5          THE COURT:  Now is a fine time.

6          MR. POMERANTZ:  The only question, you had changed

7   yesterday the language "I have ordered" to "a Court has

8   ordered."  I understand your Honor is not trying to put

9   yourself personally into it, but I think that's saying a Court.

10  It is sort of saying, almost suggesting something that isn't

11  right and I was wondering if we could just say the Court or

12  this Court, or something of that sort rather than a Court which

13  is to say not me which I think would be --

14         THE COURT:  I think the Court is probably okay.

15         Mr. Baio, any problem?

16         MR. BAIO:  Your Honor, the Court, it increases the

17  chances they think it is you and what we are trying to do is

18  neutralize it.

19         THE COURT:  I think that it would be something within

20  the kin of a lawyer but probably no one else that the Court

21  means this Court, this Judge.

22         MR. BAIO:  Okay.

23         THE COURT:  So, I will change it to "the" throughout.

24         Moving to plaintiff's proposed jury instruction no. 2,

25  as set forth in a letter dated today from Munger Tolles and the

14R5ari1

1    counter proposal from Willkie Farr, am I right in guessing that

2    what plaintiffs have in mind is a narrative along the lines of

3    what defendants are suggesting but adding in the specific

4    language quoted from my opinion?  Let me give you an example.

5    When you get down to paragraph 3 of the defense proposal it

6    describes --

7            MR. POMERANTZ:  Your Honor, I don't mean to interrupt

8    but I don't have a copy of what you have a copy of.  May I go

9    stand next to Mr. Baio and look at his copy?

10           THE COURT:  Sure.

11           MR. POMERANTZ:  I apologize.

12           THE COURT:  It would take us so long to make a copy

13   that it is probably better for you to look together.

14           MR. POMERANTZ:  It is the 7:00 deadline that we just

15   didn't get copies made.

16           THE COURT:  Do you want to deal with this later in the

17   day?  We can go get you copies.

18           MR. POMERANTZ:  That would be fine.

19           THE COURT:  Okay.

20           MR. POMERANTZ:  I can hand you the two so that you

21   have -- copies that we have made.

22           THE COURT:  Good.  Your copies may be better than

23   mine.

24           MR. POMERANTZ:  May I approach, your Honor?

25           THE COURT:  Sure.  So, we will deal with that a little

14R5ari1

1      later.

2              With respect to net worth, plaintiffs articulated, I

3      think most fully yesterday, that you wanted in your statutory

4      damages for state of mind, conduct and deterrence.  I have not

5      had time to read the case law that you sent in this morning and

6      I would like to read it and think about it.  This is one of the

7      very close legal calls that we've been talking about and it may

8      well be that it can come in.  I expressed yesterday a tentative

9      view to the contrary but I stressed tentative.  I need to

10     review your case law and perhaps I can get back to you after

11     lunch.

12             With respect to bifurcation, it would help me to hear

13     your views.  I know you expressed them to some extent in your

14     letters but precisely how does plaintiff see trying the case?

15     You want fraudulent conveyance in the first trial.

16             MR. KLAUS:  On bifurcation, yes, that's correct, your

17     Honor.  Our proposal would be everything except for the amount

18     of punitive damages if the jury decides that punitive damages

19     are warranted in the case.

20             THE COURT:  Now, if I allow net worth in in the first

21     phase of trial there won't be any need for a second phase

22     because the jury will have heard all of the purportedly

23     inflammatory testimony.

24             MR. KLAUS:  That is -- I don't think they would have

25     heard all of it because I think there is a question, still,

14R5ari1

  1  your Honor, regarding the IRA.

  2              THE COURT:  Oh.

  3              MR. KLAUS:  And those questions.  Our position is that

  4  that would still be part of the first phase but I don't know

  5  whether that is -- that may be an open issue.  But there may be

  6  no -- there may, in fact, be no need for any bifurcation if the

  7  evidence comes in with respect to the deterrence factor to the

  8  state of mind and to conduct and attitude.

  9              THE COURT:  You've both given me what appear to be

 10  equivocal positions on the IRA.  Is it your view, collectively,

 11  that New York Law governs?

 12              MR. BAIO:  It is our view; yes, your Honor.

 13              MR. KLAUS:  I believe it is our view that New York Law

 14  does govern.  I don't think New York Law absolutely immunizes

 15  the IRA.  There are exceptions that we have cited in our letter

 16  for certain amounts that are attachable.  Whether that is as a

 17  judgment collection matter is not something that needs to be

 18  decided at trial.  It is our position that it is an accurate

 19  statement as to what an appropriate deterrence award would be

 20  here and what the proper amount of punitive damages would be,

 21  to hide from the jury the fact that this gentleman has more

 22  than half of his wealth, to take that off of the table and out

 23  of the equation as though it doesn't exist for his net worth.

 24  Whether has a judgment collection matter which is reachable is

 25  a different matter.

14R5ari1

 1          (Counsel conferring)

 2          MR. KLAUS:  Mr. Pomerantz reminds me New York Law does

 3  not govern the relevance of the evidence, that's a federal law

 4  determination.

 5          THE COURT:  Right.

 6          MR. KLAUS:  It governs the issue of collection.

 7          THE COURT:  Right.

 8          Have any of you fully researched to what extent an IRA

 9  can be indicated to pay a judgment such as this?

10          MR. KLAUS:  I would say it is an issue that both sides

11  have looked at.  I'm not prepared to say that we have run this

12  to ground.

13          THE COURT:  Okay.  Then bifurcation will be dependent

14  on the net worth ruling which I will try to make after lunch.

15          MR. BAIO:  Your Honor?

16          THE COURT:  Yes.

17          MR. BAIO:  May I address the bifurcation irrespective

18  of the net worth?

19          THE COURT:  Yes.

20          MR. BAIO:  The bifurcation involves not spilling over

21  prejudicial matter to the resolution of the Bryant factors and

22  you have held that the fraudulent conveyance and whatever may

23  be proven in connection with that should not be part of the

24  evaluation of whether Mr. Gorton's state of mind is such that

25  that should be considered because the probative value is

14R5ari1

| | |
|---|---|
| 1 | outweighed by the unfair prejudicial value.  It strikes me that |
| 2 | that remains the same and the cases that we cited in our |
| 3 | letter, that is, it remains the same whether the net worth |
| 4 | information is in or not with respect to the evidence that they |
| 5 | will put in on the subject of fraudulent conveyance.  If it is |
| 6 | before the jury, it increases the chance of taint.  If it is |
| 7 | before the jury and it turns out that the damage award is less |
| 8 | than the amount that needs to be replenished in order to pay |
| 9 | the judgment, it becomes moot.  And its only effectiveness, its |
| 10 | only impact is to taint the jury. |
| 11 | THE COURT:  Just one moment, please. |
| 12 | I pause because you told me what I have held, what I |
| 13 | have found, and in fact I stated -- I purposely stated my |
| 14 | findings and views yesterday as tentative.  So, it is not that |
| 15 | I have found or held that at all. |
| 16 | MR. BAIO:  I was referring to the written decision |
| 17 | that we had received earlier in the week, your Honor. |
| 18 | THE COURT:  The written one?  Which?  The net worth? |
| 19 | MR. BAIO:  April 21st. |
| 20 | THE COURT:  Okay.  I understand. |
| 21 | MR. BAIO:  That's the Count One I was referring to |
| 22 | where -- |
| 23 | THE COURT:  I see. |
| 24 | MR. BAIO:  And you asked us how will the evidence come |
| 25 | in in light of the fact that it should not be used to determine |

14R5ari1

1    whether there should be an enhancement in the statutory damage

2    award.

3             THE COURT:  Right.

4             MR. BAIO:  And that really is what triggers the

5    deferral until later, because it will avoid the taint, it might

6    be rendered moot if the judgment is at a level that can be paid

7    without the fraudulent conveyance.  It avoids any jury

8    confusion as to they have to split their mind and say I can

9    consider it for one thing but not for another, and it

10   eliminates the Grokster discussion, all of which we think makes

11   sense and may never have to be reached.

12            So, independent of the inclusion of the net worth

13   information which we continue to believe is unduly prejudicial,

14   independent from that we think bifurcation makes sense because

15   it may never have to be reached and it will never then taint

16   whatever is done on the front end.

17            THE COURT:  I will give it more thought.  Counsel have

18   been adding new arguments, new precedents during the week, and

19   I have been trying to keep up with them and I will continue to

20   try to do that.  To the extent, as I said yesterday, that any

21   of these rulings implicate Rule 403 factors, it may be that I

22   won't decide until during trial.  But I recognize that net

23   worth is something that should be decided, if possible,

24   pretrial, because counsel would like to open on it if they can.

25            MR. BAIO:  Thank you.

14R5ari1

1          THE COURT:  With respect to other illegal services, it

2     is not clear to me whether plaintiff's position has changed

3     since you have offered proposed instruction no. 30.  That was

4     one in which you did not want the jury to consider ability to

5     pay because you were focusing on the possible inability to pay.

6     Yes, it did relate to net worth -- relates to net worth -- and

7     there is a question I wanted to ask in that regard.  Are you

8     withdrawing your proposed instruction 30?

9          MR. KLAUS:  Your Honor, I think the short answer is at

10    this point we would be willing to withdraw it if it obviates

11    the net worth issue, but I think it is still a correct

12    statement of the law.  One of the things we pointed out -- I

13    understand your Honor will be looking at the cases later today

14    that we have cited in our letter.  One of the things that you

15    have asked us is what is the case law?  Have you canvassed the

16    waterfront to find all the cases that we can?  And the only

17    case that we found that says something about an issue of a

18    defendant's worth being a factor on statutory damages is the

19    Bryant case which we cited which is also the source for our

20    no. 30.  And it actually supports our position because it says

21    that a defendant cannot come in to court and plead, in a sense,

22    poverty, to pay the statutory award.  That's not a -- the

23    prevailing statutory factors override that.

24          The other cases that we have cited say that it is

25    absolutely permissible and, indeed, it is one of the purposes

14R5ari1

1    of the deterrence factor for statutory damages that in awards

2    of one the Court's award should smart the defendant.  That was

3    the word they used.

4            THE COURT:  Now, defense counsel faxed this morning a

5    letter pointing out the universal music group brief in

6    Bridgeport Music.

7            MR. KLAUS:  Correct; which was a liability as well as

8    damages case.  And that's typically the case, your Honor, where

9    there is a question about whether or not net worth evidence

10   comes in.  The reason it is typically deemed to be prejudicial

11   is that the jury, in deciding whether or not the defendant is

12   liable, may be mistaken by thinking because this person has

13   significant assets I should find against them on liability.

14   But here liability has been found and it is simply the damages

15   determination that it is being made with respect to.

16           THE COURT:  If you look at the second clause of the

17   excerpt that appears in the Willkie Farr letter it states that

18   the evidence of you UMG's financial condition has nothing to do

19   with liability and has no bearing on potential recovery of

20   damages, etc.

21           MR. KLAUS:  Right; but then the very next sentence I

22   believe says that -- I think that it qualifies what was said

23   there which is that the overall size and financial condition of

24   the parent company of the label that was the defendant in the

25   case, the overall size and financial condition is irrelevant to

14R5ari1

1    any calculation of statutory damages, and then it says

2    including:  Whether the conduct was innocent or willful.

3         Again, here willfulness has been determined.  I don't

4    think that brief made any representation as to whether or not

5    the evidence might have some relevance to the question of

6    deterrence.

7         THE COURT:  Okay.

8         MR. POMERANTZ:  Your Honor, I don't mean to tag team

9    on an issue but I did want to make sure that one point about

10   instruction 30 is clear because I actually think it is -- there

11   is two related issues going on here.

12        One is, is the net worth of the defendant relevant?

13   And that's what we have been arguing in our letter briefs.  The

14   second point is, is it a cap.  In other words, if the jury

15   believes that the damage award should be higher because of the

16   lost revenues or state of mind or deterrence, what we don't

17   want is for the jury to think that the net worth of the

18   defendant here, Mr. Gorton, is a cap.  And I do believe that

19   that could be an issue because my recollection is that is

20   exactly what happened when the jury in the Thomas case came

21   back and was wondering whether the ability of the defendant to

22   pay should in some way be relevant to the amount of the award

23   that they issue.

24        Here that issue could very well arise because, as

25   wealthy as Mr. Gorton is, there will be evidence in the record

14R5ari1

```
1   of harm that may exceed that and then there are all the other
2   factors.
3              So, what we were trying to get at with this
4   instruction was not the relevance of net worth but that it is
5   not a cap if the jury believes that a statutory award should
6   exceed his net worth.
7              THE COURT:  Then I take it you would reword the
8   instruction with that in mind?
9              MR. POMERANTZ:  Exactly, your Honor.  Again, and maybe
10  the cap issue is one that we would reconsider but I do think it
11  is a correct statement of the law that net worth is relevant
12  but not a cap.
13             THE COURT:  Now, at what point did plaintiffs begin to
14  rely upon the concept of plaintiffs being wholesalers who sold
15  to the Lime Wire retailer?  Or at least that damages be
16  constructed on that basis?
17             MR. KLAUS:  I'm sorry, your Honor, is this in terms of
18  the actual damages?
19             THE COURT:  Yes.
20             MR. KLAUS:  I will defer to Ms. Young, your Honor.
21             MS. YOUNG:  I can address that, your Honor.
22             THE COURT:  Yes.
23             MS. YOUNG:  This was an issue that we addressed, I
24  think for the first time in our other illegal services motion,
25  and it is also something that we have addressed in the jury
```

14R5ari1

1    instruction.  And maybe you haven't had a chance to read in the

2    context of actual damages, but the notion is something that's

3    been around, it is the way that our clients do business in the

4    digital space and others which is they don't sell directly to

5    consumers, they sell to retailers like iTunes and then iTunes

6    turns around and they retail the product to the consumer and

7    that's simply how it operates.  Our point here is that you

8    can't come in and argue that a download is not equivalent to a

9    lost sale because that's not the way the market works that we

10   are operating in.

11          When our clients sell their product the sale they're

12   making is to an intermediary and they get value with that.

13   What Lime Wire did is they took that product and didn't pay any

14   value for it.  And the On Davis case that we cited in our

15   letter says it is appropriate to look at the fair market value

16   that somebody in this position ordinarily receives even if they

17   wouldn't be able to turn around and sell that in the market.

18          So, you know, if you go to a movie theater, anyone can

19   walk in and watch the movie and you don't pay any more to play

20   the movie that is already playing; you've got your movie

21   ticket.  And there might be seats that you haven't sold in the

22   movie but you still are supposed to get money for the movie

23   ticket because that's worth value to the retailer.  That's

24   basically the motion that On Davis articulates.

25          THE COURT:  Thank you.

14R5ari1

1          MR. BAIO:  Your Honor, may I respond?

2          THE COURT:  Yes.

3          MR. BAIO:  A couple of things.

4          In their other illegals briefs the plaintiffs were

5     referring to this theory for the pre-'72 works, not for the

6     statutory damages.  That was a brand-new element that popped up

7     yesterday.  That's number one.

8          Number two, the logic of what they are saying doesn't

9     really work and the law doesn't even support it.  The fact of

10    the matter is that they are saying they can't compete with free

11    and the fact of the matter is that the people they are pointing

12    to who downloaded got the music for free.  There is no

13    indication that there would have been a sale at all.  And

14    whether you are a wholesaler or a retailer, there ultimately

15    must be someone who will pay the money.  Even in On Davis they

16    said there could be a risk that you will have an inflated claim

17    if you look only at what a license would have been because of

18    what other licenses are.

19         So, I think the combination of them having shifted the

20    ground on us but more importantly under the law that we cited,

21    we think that the other illegals should be admitted.

22         There is something else we found out yesterday and

23    that is a Harvard journal did a study of a number of things and

24    they noted that the Fifth Circuit decision that the plaintiffs

25    are relying on has not been relied upon.  They don't say that

14R5ari1

1  it was reversed or altered or anything, they just say that it

2  has not been followed.  And the citation to that, we have a

3  copy for both sides -- sorry, for the Court and for our

4  opponent -- it is the Harvard journal of law and technology,

5  fall of 1991.  The computation of damages in patent

6  infringement actions.

7           May I hand that to the Court?

8           THE COURT:  Yes, thank you.

9           MR. BAIO:  Page 108.

10          THE COURT:  Thank you.

11          MR. BAIO:  Thank you.

12          MS. YOUNG:  Your Honor, may I respond?

13          THE COURT:  Yes, you may.

14          MS. YOUNG:  In the On Davis case, yes, the Court did

15  recognize that there was a risk but the Court said we weigh

16  those risks and we come out in favor of saying that we are not

17  going to deny a rights holder the ability to get damages for

18  something that they ordinarily can either license or sell and

19  get money for.  And when you have Mr. Strong and Mr. Sinnreich

20  proposing to testify that not every download is a lost sale you

21  are denying them that right.

22          I would also point out that as Mr. Pomerantz

23  articulated yesterday, the retailers can go and put the stuff

24  on the market for whatever they want; it would be 29 cents it

25  could be $2.  It happens to be 29 cents but it doesn't have to

14R5ari1

1    be that way.  And if they want to give it away for free, they

2    can, and if they did that's not a lost sale to the plaintiffs.

3    That may be -- you know, that's just the way that they're

4    opting to run their business and that's what Lime Wire opted to

5    do.  That doesn't mean that the plaintiff should not be able to

6    get compensation for a product that they make and that they

7    sell and that was actually taken and used permanently in this

8    case.  And we would like an opportunity to look at the Harvard

9    Law Review article which we haven't had a chance to look at

10   yet.

11            THE COURT:  That's fine.  You don't need to address it

12   now.

13            Mr. Baio?

14            MR. BAIO:  Your Honor, what we just heard was

15   something having to do with whether they can put on evidence.

16   It is not our motion *in limine*.  As the On Davis Court

17   recognized, an alternative argument can be advanced.  Our

18   argument is free does not equal a paid download so that you

19   cannot logically build from that that someone would pay a

20   trillion dollars for a license for the entire catalog to be

21   given away or charged.  It is an evidentiary issue, not a

22   ruling that they can't argue certain things.  That's not what

23   we are saying.

24            THE COURT:  All right.

25            Moving to other illegal services, if they come in as

14R5ari1

1    plaintiffs wish on the issue of, among other things,

2    deterrence, in other words you're deterring not just Mark

3    Gorton but other illegal services.  Do I have that right?

4             MR. POMERANTZ:  Yes, your Honor; in the sense they're

5    going to be known anyway.  The evidence will come in about the

6    fact of what has happened over the last 10 years and the jury

7    will see that the fact of what happened is that Lime Wire was

8    not the only one out there, they were 90 percent market share

9    for a good number of years but they weren't the only one.  That

10   fact will come out and we will argue from that fact about

11   deterrence at the end of the case.  Your Honor has raised, for

12   example, what happened after the Lime Wire shut down.  At this

13   time we haven't -- we are not sure that that evidence would

14   come in from either side, frankly.  There is scant evidence, we

15   have found one document, but we are not looking to try to put

16   on something looking forward about deterrence in an evidentiary

17   form --

18            THE COURT:  You lost me there.

19            MR. POMERANTZ:  I had a sense that your Honor was

20   concerned about evidence about what happened after Lime Wire

21   shut down and whether that was going to be used to talk about

22   other illegal services.  That isn't what we plan on doing.

23   What we plan on doing is to show over the last 10 years --

24   really the last five years since Grokster a number of major

25   services shut down, or after Grokster stopped infringing, put

1   it that way, and because of that Lime Wire shares exploded.  It

2   became 80 percent or more of the illegal download business.

3   Then there is a 10, 20 percent sliver that is going elsewhere

4   and that is a historical fact and that can come into evidence.

5   We are then each free to argue from that historical fact what

6   that means in terms of deterrence.  All we want to preclude

7   them from arguing, from putting on through their expert, is

8   that if Lime Wire hadn't been occupying that 80 percent share

9   its users would have gone and used one of the other services.

10  That was all we were seeking in this motion, was to preclude

11  them from that -- basically saying that point through their

12  experts and arguing it to the jury.

13            MR. BAIO:  Your Honor?

14            THE COURT:  Yes.

15            MR. BAIO:  May I address some of those points?

16            THE COURT:  Yes.

17            MR. BAIO:  The 80 percent number that we hear again

18  and again, we will see what evidence they're going to put in

19  about that, your Honor, and for what years.  But they tried --

20  their foundation is $55 billion over the last 11 years and

21  Lime Wire is the principal, responsible party.

22            Now, Mr. Pomerantz wants to be able to refer to the

23  fact that there were other illegals when it helps him because

24  then he wants it for deterrence purposes, but he doesn't want

25  the jury to know that this is a reality that existed in the

1    past.  And if he wants to say 80 percent for Lime Wire.  We

2    know it is a hundred percent for Napster in 1999 and 2000 and a

3    good chunk of 2001.  We know Kazaa was their major enemy in

4    2002 and 2003.  We are just saying we want to be able to put on

5    the evidence and the evidence is largely what they themselves

6    have said.  And this use one way but not for another way

7    strikes me as odd.

8            THE COURT:  Well, it struck me initially as odd but I

9    think the two points can be reconciled, that is it is

10   appropriate to have an award that deters unlawful infringing.

11   And assuming deterrence works, that option might not be

12   available in the but-for world.  I find all of that fairly

13   speculative and I am still wondering how much of it is

14   appropriate.  I think we will need to continue to talk about

15   this.

16           MR. BAIO:  But the appropriateness, at least with

17   respect to responding to the damage figure, there is no issue

18   about that.

19           THE COURT:  Right.

20           MR. BAIO:  I understand that.

21           THE COURT:  Right.

22           MR. BAIO:  But then the alternative is under the

23   but-for world they are trying to suggest to the jury that this

24   would have been converted into revenue and that means that

25   people would have paid money.

14R5ari1

```
 1          THE COURT:  Well, you have many ways, as your experts
 2   have shown and as you outlined so well yesterday, many ways of
 3   puncturing holes in that.
 4          MR. BAIO:  Yes, but the largest hole from their own
 5   perspective is the other piracy that has occurred.  That is
 6   their biggest hole, that's what they say.  I'm sure they use,
 7   although they will fight us on the recent recession and we have
 8   documents showing that they recognize it had a huge impact, but
 9   during all of the years there is a mountain of evidence from
10   them about the impact that they were suffering from these other
11   entities, not just peer-to-peer but other techniques and
12   devices that people used having nothing to do with Lime Wire.
13          THE COURT:  I hear you.  This reminds me of, really, a
14   footnote point, I think, that to the extent that your experts'
15   "record companies," it is not clear to me that they are using
16   their own expertise there.  It may be that you want to think of
17   that as an admission against interest or something along those
18   lines rather than expert testimony.
19          MR. BAIO:  Those admissions, however, your Honor, have
20   repercussions as a matter of economics, as a matter from
21   Mr. Sinnreich's point of view.
22          THE COURT:  It is not the admissions that represent
23   cushions, it is the underlying facts.
24          MR. BAIO:  Yes, but what they will do is then they
25   take the underlying facts and, using their expertise,
```

14R5ari1

1    articulate how that would have or did have an economic impact.

2    The facts themselves don't do it.

3              THE COURT:  Well, then you should call their people to

4    testify to that and they can be cross-examined.  Your expert --

5    you can't have an expert simply quoting other people right and

6    left.

7              MR. BAIO:  Absolutely.  And we don't think that it is

8    simply a quote.  It is then the combination of these events

9    lead to a conclusion as in a securities fraud case there are a

10   bunch of admissions and an expert may testify as to what the

11   economic effect was of those admissions and those events.  The

12   underlying facts are the evidence that they use.  I realize

13   that the expert cannot simply read evidence and say nothing and

14   not use his own expertise in order to build upon that.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

14RAARI2ps

1          THE COURT:  Can you give me an example of one of your

2    expert's quoting an industry source where your expert is using

3    his own expertise?

4          I saw them come up generally as, industry members have

5    already admitted X, Y, Z and this bolsters my conclusion that

6    X, Y, Z.

7          MR. OLLER:  Your Honor, I think what Professor

8    Sinnreich is doing is something similar to in the *Evergreen*

9    *Nassau County* case, Eastern District of New York, September of

10   2008, where the court said that expert testimony may be useful

11   to the jury "even if it simply explains facts and evidence

12   already in the record."  So what the experts are doing is

13   taking and synthesizing, in part, these quotes, which are

14   consistent in Dr. Sinnreich's case with his own views and

15   opinions on how the industry works, and he's taking it all

16   together, putting it all together in a useful way for the jury.

17   He's not just taking the stand to say -- and read from a bunch

18   of quotes.  He's interrelating it to each of the factors that

19   he talks about, such as unbundling of CDs and the big-box

20   retailers' taking over from the dedicated retailers such as --

21   he's putting it all together in a way that he can do based on

22   his having lived and been in that industry for 20 years.

23         THE COURT:  I hear you.  I'm just putting you on

24   notice that I'm going to be looking very carefully at

25   quotations from people in the industry to see if their 403

14RAARI2ps

 1   impact is more probative than unfairly prejudicial.

 2            MR. OLLER:  I understand.

 3            MS. YOUNG:  Your Honor, may I respond just very

 4   briefly on that point?

 5            THE COURT:  Yes.

 6            MS. YOUNG:  What Mr. Oller is talking about is having

 7   their experts give closing arguments by giving their own

 8   analogies and then bolstering it with quotes from a record

 9   company.  That happened repeatedly in both the Strong and

10   Sinnreich reports.  In just one example of many, in Section

11   3.A.i on page 12 of Mr. Sinnreich's report --

12            THE COURT:  Can you go a little more slowly.

13            MS. YOUNG:  Sorry.  He said three downloads are not

14   equivalent to lost sales.  He provides a simple economic

15   analysis where he's doing his own analysis.  And then he says

16   on the very next page, major labels have acknowledged the

17   validity of this fact themselves.  That's not him doing his own

18   analysis.  That's him just saying some record companies,

19   somebody in a record company, said something that supports what

20   I'm saying, and that's the kind of thing that a lawyer does at

21   closing argument, if the evidence has come in.  It's not

22   something that the expert does to bolster his own testimony.

23   If he wants to offer his own analysis, that's fine.

24            THE COURT:  Well, you've expressed well what I had in

25   mind.

14RAARI2ps

1          MR. OLLER:  Your Honor, just briefly, an expert is

2     entitled to rely on the sort of things experts rely on.  And in

3     this case, we are not dealing with a single transaction and its

4     economic impact analyzing, you know, damages from a breach of

5     contract.  We're looking at a pastiche over ten years of

6     history of an entire industry.  And what Dr. Sinnreich is doing

7     is drawing upon many, many sources, including the record-label

8     statements, including his own work, to pull it all together in

9     a useful way to the jury.  And we believe it is useful to the

10    trier of fact.  The *Bryant* factors are very broad.  The jury

11    has a lot of discretion but not a lot of guidance.  And it

12    helps to put it all in perspective however that can be done.

13    If it includes an occasional quote from an industry-label

14    executive which is consistent with the analysis and opinion, we

15    think that's helpful.

16         THE COURT:  I understand your position.  I haven't

17    bought it yet.  So before your experts quote others, I'd want

18    to hear you outside the presence of the jury.

19         Have you given thought to how many hours you need for

20    trial?

21         MR. POMERANTZ:  Yes, your Honor.  After our call with

22    your Honor last evening, we went back and started penciling

23    things out.  We still believe, as we pencil things out,

24    assuming a five-hour day, five hours of time in front of the

25    jury, we still believe that we will get done in three to four

14RAARI2ps

 1    weeks.  We still believe that.

 2             Let me briefly explain why.  I will assume your

 3    Honor's conservative guesstimate that the first two days may go

 4    by without any testimony of a witness.  Then we'll complete

 5    voir dire and openings but maybe not get our witness in until

 6    the beginning of day three.  I think that was what your Honor

 7    was saying to us last night.

 8             THE COURT:  As a distinct possibility.

 9             MR. POMERANTZ:  Conservative guesstimate.  We don't

10    think it will take two days to resolve the jury instructions at

11    the end because we think that there's a handful of issues that

12    resolve many of the instructions.  But let's say it's a day,

13    and it's possible that as the trial moves forward for some

14    reason or another a day gets shortened at the beginning and the

15    end and we can use that for resolving some of the jury

16    instruction.  But let's assume that's the third day.

17             We think that when we count up the hours, we will need

18    to put on our case in chief, plus their case.  Their case now,

19    your Honor, they, I think, only have their three experts to

20    testify in their case.  The only other live witness they've

21    indicated is Mr. Gorton.  They have withdrawn their other two

22    live witnesses.  And so they probably will only put on their

23    experts, because we're going to call Mr. Gorton in our case,

24    and I think virtually all of his examination will come in in

25    our case.  They have the right, I think, to recall him, and I'm

1    not precluding that, but I think as a practical matter they're

2    not going to have him restate what he has already said during

3    our case.

4           So their case, I think, is relatively short.  And then

5    whatever rebuttal we have, which I'm sure will be short.

6           THE COURT:  You are calling how many witnesses in

7    addition to Mr. Gorton?

8           MR. POMERANTZ:  Again, some of that depends on how the

9    first two witnesses come in and whether we feel like we've

10   accomplished what we've accomplished.  I think we imagine --

11   I'm trying to count up in my head -- I don't want to be held to

12   this, but I think it's about ten, 12 witnesses that we imagine.

13   But, again, depending in particular on, what Mr. Gorton says in

14   his examination may affect some of our decisions about, for

15   example, other LimeWire witnesses.  So I'm giving you, your

16   Honor, our best guess at this point, but I do believe that --

17   you know, we penciled it out again last night -- that three to

18   four weeks still seems like a reasonable estimate, assuming

19   five hours of testimony a day.

20          THE COURT:  And that would be based on an assumption,

21   I think, that you could put in your direct case in about 12

22   hours?

23          MR. POMERANTZ:  No, no, no.  I think if we did

24   somewhere closer to 20 and let's say they took 20, so that's 40

25   hours or eight trial days.  And then let's assume they're only

14RAARI2ps

1  going to put on three experts.  I don't think it will take

2  three days but let's assume three days.  And then one day of

3  rebuttal.  So we get to 12 days under that math.

4          THE COURT:  8, 3, and 1.

5          MR. POMERANTZ:  Right.  So that's 12.  Plus the three

6  that we have discussed earlier, with voir dire.  You know, it

7  just seems to us like that takes you up to 15.  And if we're

8  assuming that a four-week trial is 20 days, that gives us five

9  days of flexibility where we haven't misled the jurors in any

10 way.  So we come up with three to four weeks still seems like a

11 time, you know, seems comfortable to us to get this done.

12         THE COURT:  How many exhibits roughly do you expect to

13 put before the jury?

14         MR. POMERANTZ:  I'm glad your Honor mentioned that.  I

15 think the parties have agreed that any exhibit that's on the

16 exhibit list that neither side has objected to is automatically

17 deemed admitted into evidence, if your Honor is comfortable

18 with that.  We have agreed to that, unless your Honor has any

19 concerns.  What we then choose to publish to the jury obviously

20 will be each side's choice, and we're still working on that --

21 with one caveat that I'm not sure I know.

22         But I'm not sure -- we would expect that the most of

23 our exhibits -- let me just think about this -- exhibits will

24 come there through the cross-examination of Mr. Gorton, that

25 with our own witnesses, I'm sure we'll use a small number of

14RAARI2ps

1    exhibits with our own witnesses, but only a small number.

2    We'll probably use some demonstratives with our witnesses,

3    which we will share with them three days ahead of their

4    testifying.  But although I know that you've seen a very

5    lengthy exhibit list.  I think this is one of those cases, like

6    many that involve big law firms and big parties, that probably

7    you're going to see a very small fraction of those actually be

8    used with the jury.

9             THE COURT:  All right.  And are you planning to give

10   the jurors notebooks with your exhibits in them, or how are you

11   planning to help the jury?

12            MR. POMERANTZ:  We have not discussed this with the

13   other side.  What I was imagining for sure, that we would hand

14   a notebook to the witness, to each witness as they take the

15   stand so that that facilitates them looking at the documents.

16   And as we use an exhibit, we would definitely, assuming no

17   objection, we would publish it to the jury in the form of the

18   screens that are available, and probably both sides would

19   attempt to lift out language in the document so the jury can

20   focus on that and the witness can focus on that language.

21            We can discuss also putting physical copies into the

22   hands of the jurors.  I haven't had a chance to talk with

23   Mr. Baio about that yet, but we can discuss that if your Honor

24   wants to consider it.

25            THE COURT:  In most of the trials I've had where

14RAARI2ps

1    testimony was up on the screen, the jurors also had copies

2    because some of them can't see that well that far away.

3              MR. POMERANTZ:  Yes.  With the individual screens,

4    which I this think they're wiring up -- we just took a visit up

5    to 18B and I think they're doing that up up in 18B as well, and

6    I think -- one of the problems with giving them a physical copy

7    is that it causes some of them to go look at other parts of the

8    documents.

9              THE COURT:  Well, I can instruct them not to do that,

10   and they'll follow that instruction, I think.

11             One of the problems with the individual screens is

12   that jurors share screens, and they spend a lot of time bending

13   over to look at the screen.  So they do like to have their own

14   copies.  But I'll leave that up to you.

15             MR. POMERANTZ:  Yes.  If we could have a chance to

16   talk about it amongst ourselves and then with defendants'

17   counsel and then we can report back to your Honor.

18             THE COURT:  OK.

19             MR. BAIO:  Your Honor?

20             THE COURT:  Yes.

21             MR. BAIO:  On the timing, we believe that we can live

22   within the timing that your Honor has suggested.  We do not

23   just have three witnesses.  We have designated a bit of video

24   testimony from witnesses whose depositions were taken.  But

25   within the time constraints that -- and we may also use some of

14RAARI2ps

1   the witnesses that were placed on their list depending upon

2   what your Honor rules on, let's say, net worth.  There may be

3   need for an accountant to identify that and testify on that

4   subject.  So I think we can do it within the time period.

5       We will have an issue as to their examination of

6   Mr. Gorton, in light of the rulings that say that, number one,

7   he is willful.  Notwithstanding his thoughts to the contrary,

8   your Honor has held that, and has held that he can't say

9   anything that is in contradistinction of the summary judgment

10  rulings.  But if they are simply going to pile on, with having

11  the rulings that they have won from your Honor, by showing

12  documents that demonstrate or that they argue demonstrate

13  willfulness, and he's not allowed to say anything that might go

14  the other way, they're simply pounding him, on top of your

15  ruling, which is presented to the jury.

16      THE COURT:  But the degree of willfulness is a

17  question for the jury.

18      MR. BAIO:  But the jury will now say to themselves,

19  we've heard from the Judge, she's found him willful.

20      THE COURT:  The degree of willfulness is for the jury.

21  I did not find the degree of willfulness.

22      MR. BAIO:  So they will hear all the evidence, then,

23  that your Honor heard but not any of the evidence that was also

24  submitted.

25      THE COURT:  Your client is free to -- he has a choice.

14RAARI2ps

1    He can either state his view of the legality of what he did and

2    be examined on what legal advice he relied upon or failed to

3    rely upon in forming his view, or he cannot claim good faith.

4    That's really -- the law is clear on that.

5            MR. BAIO:  So he still can, your Honor, when they

6    reference *Grokster*, that *Grokster* was in his favor, all the way

7    up to the Ninth Circuit.

8            THE COURT:  What is your question?

9            MR. BAIO:  That he can then respond to a question,

10   well, you know, you thought your actions were legal or you had

11   no basis to do anything prior to *Grokster*, he would say, I did

12   have a basis.

13           I mean, these issues, they're going to ask questions

14   which will, if they elicit a truthful answer from him, will be

15   in contradistinction of what the ruling was.  And I don't know

16   how they can ask him a question that he believes the answer is

17   something else but he's precluded from giving an honest answer.

18           THE COURT:  I suggest that we have a voir dire of him

19   outside the presence of the jury, and I will rule on what is

20   appropriate for him to testify to and what is not, in light of

21   his assertion of attorney-client privilege.

22           MR. BAIO:  Thank you, your Honor.

23           THE COURT:  All right.  On *Daubert*, counsel had raised

24   the point that another expert also relies upon a but-for world,

25   with infringers.  I knew that.  The reason I didn't deal it in

14RAARI2ps

1    the *Daubert* opinions with that there was no *Daubert*-related

2    objection to it.  Rather, the objection was subsumed in a

3    broader in limine motion.  So of course the ruling is only

4    tentative on that point and would be consistent across experts.

5           My law clerk can distribute copies of the letters that

6    counsel faxed to the Court this morning but apparently you did

7    not receive one another's versions.

8           MR. POMERANTZ:  We didn't get our own version.

9           THE COURT:  This might be a good time to take a lunch

10   break.

11          MR. KLAUS:  Your Honor?

12          THE COURT:  Yes.

13          MR. KLAUS:  If it would help, one of my much more

14   organized colleagues has put together a list of the various

15   cases that we had cited in the network letter.  I have a copy

16   for your Honor and for your law clerk and also for the other

17   side, if that would be helpful.

18          THE COURT:  That would be very helpful.  Thank you.

19          MR. KLAUS:  May I approach?

20          THE COURT:  Yes, sure.  There is no need in this

21   courtroom to ask to approach.  I'll trust that you will show

22   one another what you're doing before you approach me or a

23   witness.

24          Thank you.  OK.  In light of what needs to be

25   accomplished, I would suggest that we meet at 2.

14RAARI2ps

 1          Thank you.  We are adjourned.

 2          MR. POMERANTZ:  Thank you, your Honor.

 3          MR. BAIO:  Your Honor, there is one issue.  I'm sorry.

 4   And that is, I'm supposed to be starting a deposition with

 5   Mr. Bainwol at 2:30.  If we can make him later, that would be

 6   fine.  I would like to be here for what we're going to continue

 7   doing.  But I can't be in two places at the same time.

 8          THE COURT:  Right.

 9          MR. BAIO:  And I am the one who had prepared for that

10   deposition.

11          MR. KLAUS:  I can get the information from --

12          MS. PARISER:  My understanding is that he has a flight

13   back to Washington at 10 o'clock.  So we can start later, but

14   he has a fixed --

15          MR. KLAUS:  That's the issue.  Ms. Pariser from the

16   RIAA reminds me that Mr. Bainwol does have a hard stop time

17   this afternoon.

18          MR. BAIO:  I can take him tomorrow.

19          MR. KLAUS:  He'll be back in Washington.

20          MS. PARISER:  He was available this morning at

21   defendants' request.  They pushed it to 2:30, and here we are.

22          THE COURT:  All right.  In light of this, would you

23   rather resume tomorrow morning?

24          MR. BAIO:  Yes.

25          (Pause)

14RAARI2ps

1    MR. POMERANTZ:  Your Honor, we have various

2    preparations scheduled tomorrow with witnesses and things like

3    that.  And Mr. Bainwol's deposition, both sides knew, were

4    scheduled at the same time as this.  The Court had asked us to

5    set aside all day for these hearings.

6        THE COURT:  Well, let's, without casting blame

7    anywhere, let's try to figure out how to accomplish everything.

8        MR. POMERANTZ:  Well, I would say that if we can get

9    started at 1:30 and finish by 2:30, which I think your Honor

10   has moved fairly -- I think we have only a limited number of

11   issues left.

12       THE COURT:  Yes.

13       MR. POMERANTZ:  Then I assume that we can get started

14   with Mr. Bainwol at 3, which gives them three hours with

15   Mr. Bainwol.

16       MS. LEMOINE:  Three and a half.

17       MR. POMERANTZ:  Three and a half if we agree to go to

18   6:30.

19       MR. BAIO:  That's certainly doable.  The question,

20   though, is whether we can be finished here by 2:30.

21       THE COURT:  Well, I'll make sure we are.  Anything

22   that there are matters that may not get finished between now

23   and then, I may need the extra time, and so we may need to meet

24   Monday on that.

25       MR. POMERANTZ:  Your Honor, I think -- we have a

14RAARI2ps

1    number of things that we are discussing.  I would think we

2    would like to at least reserve some time on Monday to have a

3    chance to talk to your Honor before Tuesday.  And so I, you

4    know, I think there will be issues that probably require some

5    discussion.

6            THE COURT:  All right.  Well then, perhaps we should

7    adjourn now.

8            MR. POMERANTZ:  There were a couple of issues that --

9            MR. KLAUS:  There are, yes, your Honor, there are some

10   issues, for example, with respect to Mr. Von Lohmann and the

11   EFF.

12           THE COURT:  My current thinking on that, having read

13   his deposition, is that unless plaintiffs produce some evidence

14   from EFF that undercuts Mr. Von Lohmann's contention that he

15   was representing Mr. Gorton, it would appear that the fact that

16   Mr. Gorton and Mr. Von Lohmann claim to have had an

17   attorney-client privilege may require me to hold that there is

18   such a privilege.  I'm still concerned about the fact that he

19   submitted an "amicus" brief at a time when he also claims to

20   have been representing Mr. Gorton.  I'd like some time to think

21   about that, but I did not require him, Mr. Von Lohmann, to be

22   here today because I thought we had few enough questions for

23   him.  It appears that he doesn't know, for example, what client

24   lists were maintained by EFF.  And that's something that may

25   have to be subpoenaed from EFF, or a paralegal, one of the two

14RAARI2ps

```
1     he mentioned, if you want to pursue that.

2              MR. KLAUS:  But, your Honor, we did serve a subpoena

3     on EFF.  We did not --

4              THE COURT:  For documents?

5              MR. KLAUS:  For documents.  And we did not receive a

6     client list.  There's nothing on their privilege log to

7     indicate that there's a conflict check or a client list that

8     they are withholding.  They submitted the declaration last week

9     in response to your Honor's request that EFF produce some type

10    of record substantiating the claim that there was a

11    lawyer-client relationship here.  There was nothing.

12    Mr. Bridges, who apparently is in New York, was EFF and Mr. Von

13    Lohmann's counsel.  We were told yesterday that he would be

14    here to answer Court's questions about this matter.  We were

15    told last night that he's not showing up, that nobody from EFF

16    is coming.

17             We've done what we can to try to get information to

18    substantiate it.  And what we have in response is Mr. Von

19    Lohmann saying, yes, I don't remember the specifics of when

20    this was created but I'm sure there was a lawyer-client

21    relationship, where I have no recollection of doing a conflict

22    check, the "law firm" that I worked for doesn't have any

23    records that they have submitted to substantiate that there was

24    a conflict check, even though it was their general practice to

25    do it when they actually had a client.
```

1    THE COURT:  Do they maintain a client list?  Do we

2    know that?

3        MR. KLAUS:  I think he said either they maintained a

4    conflicts database, and he said he had no recollection whether

5    they maintained a client list or not.  Again, this is something

6    where the information as to whether they have a client list is

7    something that's within the control of EFF.  If they had some

8    document, not privileged, memorializing the fact that LimeWire

9    was a client of theirs, they should have produced it in

10   response to our subpoena.  And so what we're really left with,

11   in the words of the Second Circuit case, is an ipse dixit

12   assertion.

13       THE COURT:  It would be very helpful to know, for

14   example, whether they maintained a client list and whether

15   Mr. Von Lohmann and/or LimeWire are missing from that list.

16       MR. KLAUS:  Your Honor, I think that a conflict

17   database is generally what we think of as a client list.

18   That's what a conflict check is run against.

19       THE COURT:  And you have testimony there that they did

20   not maintain one at any relevant time?

21       MR. KLAUS:  I believe that he says at page thirty -- I

22   also have a final copy of the deposition transcript if that

23   would be helpful to hand up, your Honor.

24       THE COURT:  All right.  Is the counsel to EFF

25   available in town today?

14RAARI2ps

| | |
|---|---|
| 1 | MR. MUNDIYA:  He is, your Honor.  We will reach out to |
| 2 | him as soon as we finish, if he still is available.  He was |
| 3 | available last night.  I don't know whether his plans have |
| 4 | changed, but I will call him. |
| 5 | THE COURT:  All right.  I would reach out to him now. |
| 6 | THE COURT:  And we will resume at 1:30 and stop at |
| 7 | 2:30. |
| 8 | MR. POMERANTZ:  Thank you. |
| 9 | THE COURT:  Anything further? |
| 10 | MR. KLAUS:  Your Honor had asked about where the |
| 11 | testimony was.  It's at page 37 of this transcript about |
| 12 | whether they maintained a conflicts-check database.  Mr. Von |
| 13 | Lohmann said they did.  And he has no recollection of whether |
| 14 | LimeWire was entered into that database. |
| 15 | THE COURT:  OK.  Thank you. |
| 16 | (Luncheon recess) |
| 17 | (Continued on next page) |
| 18 | A F T E R N O O N   S E S S I O N |
| 19 | 1:30 p.m. |
| 20 | THE COURT:  Mindful of your time, I'm going to try to |
| 21 | go fast.  I would like to know exactly what was served on EFF |
| 22 | and what their response was.  In other words, were they told to |
| 23 | produce a document custodian and bring certain documents with |
| 24 | them? |
| 25 | MR. KLAUS:  We served a subpoena on them, your Honor. |

14RAARI2ps

1    There was litigation practice in the Northern District.  There

2    were certain carve-outs.  There were instructed to produce a

3    witness on 30(b)(6) topics.  I don't have at hand every one of

4    the topics, but I'm quite confident one was the issue of the

5    relationship with LimeWire.

6                THE COURT:  Given that you don't have it here, can you

7    have to me, say by noon Friday, a copy of the subpoena and a

8    copy of their response?  Was a deposition taken?

9                MR. KLAUS:  There was a deposition of Mr. Von Lohmann.

10   There was a deposition of a representative of the EFF.  There

11   was a subpoena.  There was a response.  There is an order from

12   Judge White of the Northern District of California allowing the

13   subpoena to go forward.  I can have all of that to your Honor,

14   all in advance of Friday.

15               THE COURT:  Good.  And were any documents produced by

16   EFF?

17               MR. KLAUS:  The EFF did produce documents, and as I

18   say, nothing in a conflict-check database form.

19               THE COURT:  And did you depose anyone asking, did you

20   have a database for conflicts?

21               MR. KLAUS:  We deposed Ms. McSherry, who was the

22   individual who submitted the declaration last week.  I don't

23   believe that at her deposition the question of a conflict-check

24   database was asked.

25               THE COURT:  All right.  Is Mr. Von Lohmann's counsel

14RAARI2ps

1   going to be here?

2           MR. MUNDIYA:  Your Honor, we've just been told he's on

3   his way.

4           THE COURT:  OK.  Thank you.  When he gets here if you

5   could bring it to my attention.

6           MR. MUNDIYA:  All right.  I will.

7           THE COURT:  Thank you.

8           All right.  I'd like to move to other illegal

9   services.  As I understand plaintiffs' current damage theory,

10  plaintiffs are not going to argue that each download on

11  LimeWire constituted a lost sale to plaintiff.  Rather, you're

12  going to argue that, as a wholesaler, you would be entitled to

13  a royalty for each sale made by LimeWire.  If that's true, then

14  that would limit how much could come in in the way of migration

15  to an unlawful service.

16          MR. POMERANTZ:  Yes, your Honor.  We are, in order to

17  prove up our damages, we are not going to look to the sales

18  from LimeWire to the end user, but, rather, it's not a royalty,

19  just, you know, under most of our clients' contracts it would

20  be considered a sale --

21          THE COURT:  Fine.

22          MR. POMERANTZ:  -- from the record company to the

23  retailer, be it iTunes or LimeWire.

24          THE COURT:  OK.

25          MR. POMERANTZ:  That's not true for -- I think our

1    clients structure those arrangements somewhat differently

2    amongst themselves.  But in any event, that payment that the

3    retailer would need to make back to the --

4                 THE COURT:  Mm-hmm.

5            MR. POMERANTZ:  Now, we obviously are going to say to

6    the jury that when millions of people get your product for

7    free, that's going to mean that our clients have lost sales,

8    because those people aren't buying them, and the retailer

9    therefore is not paying us.  In other words, if a LimeWire user

10   had actually bought a download from iTunes, we would get paid.

11   ITunes doesn't pay us until they send a download.

12               THE COURT:  I know.

13           MR. POMERANTZ:  So I just want to make clear that I

14   don't want to be prohibited from making that basic point.  But

15   in terms of the way we calculate our harm, it's going to be the

16   lost revenue that the middleman pays to my client.

17               THE COURT:  All right.

18           MR. BAIO:  Your Honor, as I just heard that -- and I'm

19   sorry, I don't have access to the transcript -- what

20   Mr. Pomerantz wants to say is that you should look at the

21   number of -- that LimeWire has effectively taken a whole

22   catalogue and in a license arrangement we would have charged X.

23   Number one, this is a case about 11,000 songs.  So that doesn't

24   make sense as a beginning matter.  It's about the particular

25   songs that are at issue.

14RAARI2ps

1          Number two, he's going to tell the jury there were 500

2     million downloads of these songs, the inference being that

3     amount of sale, that amount of activity would have constituted

4     the basis for my client to secure the 70 cents, because that's

5     how he would have priced it.  We want to be able to say that

6     people would not have bought his product, because ultimately

7     there has to be a sale in conjunction with all of this or we're

8     dealing with a hypothetical of somebody entering into a license

9     without the opportunity to monetize it.

10          So it's a false world.  And they will be identifying

11    all of the ingredients that would say, 500 million downloads,

12    assume they were sales, because that's what we're going to do

13    in evaluating what the license would have been.  If they don't

14    want to talk about 500 million downloads, that's one thing.

15    But how can they do that and the clear implication to the jury

16    is, those were sales, multiply them by X.

17          THE COURT:  Yes.  All right.  Mr. Pomerantz.

18          MR. POMERANTZ:  Your Honor, that's exactly what

19    happened in *Davis*.  Here the end user receives something and is

20    keeping it.  And even though the plaintiff in *Davis* couldn't

21    prove, and didn't have to prove, whether that end user would

22    have bought it, the basic situation is that there is a fair

23    market value as between the supplier and the middleman of that

24    particular good or product, and that's what *Davis* says we're

25    entitled to.  That is the value we're seeking.  We're not

14RAARI2ps

1   seeking, you know, to get the retail value.  We're seeking to

2   get the wholesale value.

3        MR. BAIO:  There is no wholesale value if there is no

4   market.  Those folks will not pay.

5        MR. POMERANTZ:  Your Honor, they have the product just

6   like they did in *Davis*, and that product has a fair market

7   value at the wholesale level.  And that's what they did in

8   *Davis* and that's what we plan on doing here.

9        THE COURT:  I question it from an economic standpoint.

10  I think this just has to await better briefing, and consistent

11  briefing.  It's been very difficult for the Court to have

12  counsel changing horses midstream.  Today is the last day for

13  any changed arguments.

14       Which moves me right into net worth.  What is it,

15  Mr. Baio, that defendants concede can come in on net worth or

16  finances involving the defendants?

17       MR. BAIO:  In terms of his current net worth, we

18  don't -- I'm not even sure they want to do that, your Honor.

19  But I don't see that as --

20       THE COURT:  Do they want to, Mr. Pomerantz?

21       MR. POMERANTZ:  Yes, your Honor.

22       THE COURT:  OK.

23       MR. BAIO:  I'm not sure what that would go to, for

24  purposes of --

25       THE COURT:  They're talking about deterrence.  At

14RAARI2ps

```
1    least that's what they talked about yesterday.  My earlier

2    decision, April 21, didn't mention deterrence because that

3    issue hadn't been raised with me.  But it was raised yesterday.

4    It made sense to me that it does relate to deterrence.

5              MR. BAIO:  His current net worth.

6              THE COURT:  Yes.

7              MR. BAIO:  Well, we think that, actually, if it's

8    going to be embraced by the jury, they will include that in

9    evaluating the equivalent of punitives, how much should we

10   punish him based on what he has.

11             THE COURT:  Of course.

12             MR. BAIO:  And we think that that's better saved, more

13   appropriately saved for the second phase.

14             THE COURT:  Well, I don't think we have the option of

15   choosing.

16             MR. BAIO:  OK.

17             THE COURT:  If it's relevant to deterrence, it comes

18   in in the first instance.

19             MR. BAIO:  And we also believe that it should not

20   include the IRA, which is exempt.

21             THE COURT:  You've got to brief that to me.

22             MR. BAIO:  All right.  That briefing should be by

23   Friday at noon.

24             So it's not just current net worth, but it's the --

25   what has happened with the LimeWire and Gorton finances during
```

14RAARI2ps

1   the time of the infringement.  So how much Mr. Gorton received

2   as distribution.

3            THE COURT:  Not just that.

4            MR. BAIO:  All right.  What --

5            THE COURT:  How much he conveyed?  Everything else.

6            MR. BAIO:  OK.

7            THE COURT:  All right.  Section 412.  I'd like to ask

8   plaintiffs, how did it come about that you were able to find

9   the date of the first infringement on LimeWire for 60 works but

10  not the others?

11           MR. KLAUS:  The reason, your Honor, is that data that

12  was produced by MPD, which is a polling survey organization

13  that was utilized by one of our expert witnesses, Dr. Waterman,

14  for his statistical extrapolation.  Within that very large data

15  set, there are records of MPD putting in what was called a

16  digital meter into individuals' computers to measure their

17  activity on various websites.  We went back to that data, which

18  the defendants have long since had.  We ran it against the list

19  of what at that time I think was 1,320 works, and we found 60

20  of them, and so we took them off.  We didn't find any of the

21  others.  That's where the 60 came from.

22           THE COURT:  All right.  In my view, plaintiffs have

23  the burden on 412 and no shifting is appropriate.  In other

24  words, it does not shift to defendants just because they

25  purposely failed to keep certain information or to record

14RAARI2ps

1    certain information.

2            MR. KLAUS:  I take it you don't want -- do you want

3    argument or not on that, your Honor?

4            THE COURT:  Only if it's something other than what's

5    been argued in the briefs.

6            MR. KLAUS:  I think what we've argued in the briefs is

7    the equitable considerations here.  They said, we never had

8    knowledge of it, they didn't have knowledge because they were

9    willfully blind from acquiring that type of knowledge.  Under

10   equitable principles, under the *Aimster* decision, Judge Posner

11   said in the law of copyright, willful blindness is knowledge.

12   We think that counts.  We think it meets circumstances

13   effectively granting a windfall to them for --

14           THE COURT:  Well, there is willful blindness perhaps

15   to the fact of massive infringement.  But the willfulness may

16   not have extended to thinking through the 412 problem.

17           MR. KLAUS:  I don't -- it may or may not have.  What

18   it was was, I think, a blanket policy, we're going to try to

19   get -- not have this information for any purpose because it

20   could hurt us down the road with respect to a copyright suit.

21           THE COURT:  I understand.  And you've argued it well.

22   I come out the other way.

23           We have other deadlines that I just want to remind you

24   of.  The final song list Friday at noon, two copies, and to

25   state the number of works for each list.  And the revised jury

1   charges Friday at noon.

2          MR. POMERANTZ:  Your Honor, on that one, can we divide

3   that into two groups just because of the workload on us and on

4   Friday at noon provide your Honor with the instructions that

5   will be read to the jury before trial and have until Monday to

6   get to you the one that would be read to the jury at the end of

7   the trial?

8          THE COURT:  Yes.

9          MR. POMERANTZ:  All right.  Thank you.

10          THE COURT:  Can we say by 9 o'clock Monday?

11          MR. POMERANTZ:  That would be great.  Thank you, your

12   Honor.

13          THE COURT:  Thank you.

14          All right.  And as a reminder, there needs to be a

15   table of contents accompanying the revised charge.  And the

16   Court needs three bound copies of the revised charge and table

17   of contents, as well as an electronic CD containing the revised

18   charge and table of contents.

19          The IRA briefing, just a reminder again, is due Friday

20   at noon.

21          Is there anything else counsel would wish to address

22   today?

23          MR. POMERANTZ:  A couple things, your Honor.  With

24   regard to what was your Honor's proposed instructions 1 and 2

25   with regard to our copies, I agree with your Honor that there

14RAARI2ps

```
 1    really should be just one instruction and the two should be
 2    merged together.  We have received the proposal by the
 3    defendants and what we would propose to do is merge ours into
 4    theirs as part of our submission on Friday.  Whether theirs
 5    is -- theirs largely tracks what your Honor is going to be
 6    saying to the proposed jury before they answer the
 7    questionnaires, and we would agree with that general approach.
 8    This does not right now mention the other claims that we would
 9    be pursuing, which probably hinges on your Honor's decision on
10    the net worth issue.  And so assuming that that decision is
11    going to be put all together, which is what we'll assume until
12    we hear otherwise, we're going to -- I think if your Honor
13    agrees that the jury should at least know what the three or
14    four claims are that are going to be considered by them, we
15    would add those to what the defendants have largely put in here
16    and have one general instruction that says, here are the
17    claims.  And as to the first claim, it would include your
18    language plus the five facts that we have listed.
19              THE COURT:  Right.  That is roughly what I have in
20    mind.
21              MR. POMERANTZ:  All right.  We will do that, your
22    Honor.
23              THE COURT:  I did decide net worth.
24              MR. POMERANTZ:  OK.
25              THE COURT:  That is, that it is coming in.
```

14RAARI2ps

1          MR. POMERANTZ:  OK.  Then we will revise it in that

2     way.

3          THE COURT:  OK.

4          MR. POMERANTZ:  Then just a couple of ministerial

5     points.  On the number of jurors, I think your Honor had asked

6     us about that when we were here the last time.  I think our

7     recommendation was to have eight.  And I don't know if --

8          MR. BAIO:  Well, we certainly didn't want any chance

9     that there will be a mistrial, your Honor.  So as you had said

10    earlier, and not to be bound by anything, that nine pretty much

11    increases the chances, significantly, that we won't have a

12    problem at the end of week four, let's say.

13         THE COURT:  I think that's right.

14         MR. BAIO:  So we thought nine made sense in that

15    regard.  It's just --

16         THE COURT:  I think nine makes sense in light of the

17    length of the trial.  We may lose some to illness and family

18    emergencies.

19         MR. POMERANTZ:  Right.  There is an issue I was

20    discussing with defendant's counsel during a break today

21    relating to Mr. Bildsen.  If we are going to reconvene on

22    Monday, I think it would be better to let us complete our

23    discussions and then discuss that if necessary on Monday.

24         THE COURT:  All right.

25         MR. POMERANTZ:  And then finally, we are expecting

14RAARI2ps

1    that there may be a significant number of people who will

2    attend the first day or two of this trial.  It will probably

3    tail off after that.  And we were hoping that maybe the Court

4    would reserve the front row for the parties, so that we can

5    have room for our people and just put some "reserved" sign

6    there so that both people for the defendants and people for our

7    side can sit in the front row.

8            THE COURT:  That's fine.  If you will make and place

9    the "reserved" signs, that's fine.  And police it, since I

10   won't have a court marshal here.

11           MR. POMERANTZ:  Let me make sure if there are any

12   other issues.

13           Thank you, your Honor.  We assume that the -- I'm

14   sorry.

15           THE COURT:  It's all right.

16           MR. POMERANTZ:  We assume the IRA briefing is due on

17   Friday, is simultaneous briefing by both sides.

18           THE COURT:  Yes.

19           MR. POMERANTZ:  I think that's all we have for today,

20   your Honor.

21           THE COURT:  Mr. Baio?

22           MR. BAIO:  Yes.  I had a question, your Honor, about

23   the peremptories.  And as I understand it, there will be -- you

24   call them in groups, that is, the group of prospective jurors.

25   There will be for-cause.  And at some point after all the cause

14RAARI2ps

1    objections have been resolved there will be a group of 15

2    people sitting there?

3              THE COURT:  Yes.

4              MR. BAIO:  15.  All right.  And then what we do is, we

5    pick the jurors.  Even if they're not among the first nine, if

6    you think that Juror No. 11 is someone that you don't want on

7    even though that person may not end up there, you use the

8    peremptory, all three at the same time simultaneously provided

9    to you.

10             THE COURT:  Now, we want to end up with nine.  Each

11   side has three strikes.

12             MR. BAIO:  So that would be 15.

13             THE COURT:  That's how you get to 15.  At that point,

14   each side writes down the number, juror number, of each person

15   you're striking and hand it to me.  The first nine who survive

16   that will be our jury.

17             MR. BAIO:  Understood.

18             THE COURT:  That means that even if you strike the

19   same person, it still counts a strike for each side.

20             MR. BAIO:  But it will be the first nine.  So the

21   tenth person who was not -- whoever is tenth on the jury and we

22   only used five peremptories because there was an overlap, that

23   tenth person would not be on the jury.

24             THE COURT:  That's right.  In other words, I don't do

25   the chair-shifting that some judges do.

14RAARI2ps

1           MR. POMERANTZ:  And I think the other point that I

2     think Mr. Baio was getting at is if one of us thinks that they

3     don't want Juror No. 10, even though at that moment they're not

4     there, we just write no. 10 down, and we will end up with

5     whatever the first nine are that arrived.  In other words, we

6     can write no. 15 down on our peremptories.

7           MR. BAIO:  We all could, right.

8           MR. POMERANTZ:  Those numbers we could write down, 10,

9     11, 12, 13, 14, 15, even though at that moment in time they're

10    not sitting in the first nine chairs.

11          THE COURT:  Right.  No one moves chairs until we swear

12    the jury.

13          MR. POMERANTZ:  That's fine, your Honor.

14          The other thing I just wanted -- on voir dire, it

15    seems to me that we need to have an opportunity to have a

16    discussion with you on excusals for cause after we see the

17    questionnaires and see the numbers and what they tell us.  And

18    then your Honor can have the individual or a group voir dire as

19    appropriate.  Is that how your Honor has contemplated it, that

20    we'll look at the --

21          THE COURT:  That's right.  I was hoping that the

22    jurors would take no more than about ten minutes to fill out

23    that the questionnaire, that we could then go into the robing

24    room and, outside the presence of the jury, or come to sidebar

25    and tell me who you think should be struck for cause, from

14RAARI2ps

1  those questionnaires.

2           MR. POMERANTZ:  Right.  And we would need some time to

3  look at the questionnaires and figure out what they're telling

4  us.

5           THE COURT:  Right.

6           MR. POMERANTZ:  And we would have that time and then

7  come in and meet with your Honor.

8           THE COURT:  Yes.

9           MR. BAIO:  They will be copied, your Honor, and then

10 they'll have a set, we'll have a set, the Court will have a

11 set?

12          THE COURT:  Yes.

13          MR. POMERANTZ:  The other thing, if your Honor is

14 going to do individual voir dire, we're comfortable with the

15 approach that your Honor had described, but someone was telling

16 us of another court where the court follows a similar approach

17 that your Honor follows but the voir dire was -- the jury was

18 not in the room at the time that everybody was huddling.  The

19 jury was like in another courtroom or someplace else, and then

20 they were brought in one at a time, which sort of avoided the

21 huddling.  But we're comfortable either way.  But it was an

22 approach that we wanted to let your Honor know that somebody --

23 I have not seen that but somebody else had seen that.

24          THE COURT:  I think if you read the transcript that

25 Judge Gertner handed down, she did that.

14RAARI2ps

```
 1              MR. POMERANTZ:  I think that's right.

 2              THE COURT:  Sometimes jurors have to come and go back

 3     and forth as they think of new answers to questions, so I think

 4     it would probably go a little more quickly if we're huddling

 5     over here?

 6              MR. POMERANTZ:  Yes.  And maybe the privacy issues

 7     that we have talked about would be better with the huddling

 8     too, actually.  So, OK, we're fine with that.

 9              THE COURT:  OK.  So shall we meet at, what time?  11

10     a.m. Monday?

11              MR. BAIO:  Fine.

12              MR. POMERANTZ:  We're here for the long haul.  So OK.

13              MR. BAIO:  Your Honor, I had one other thing that was

14     on the checklist a while ago.  Were we supposed to be

15     stipulating about no impact for the jurors' responding in a

16     certain way?  I guess it's not us but --

17              THE COURT:  Now that we have anonymized it, I don't

18     think you need to.  It's not clear to me whether it is worth

19     the trouble to give new numbers to all the jurors, if I simply

20     keep only for as long as is needed the jury questionnaires, and

21     after that the jurors will be voir-dired by me.

22              MR. BAIO:  I see.

23              THE COURT:  As I think you once suggested.

24              MR. BAIO:  OK.  Thank you.

25              THE COURT:  Thank you very much.
```

14RAARI2ps

```
1              (Pause)
2              THE COURT:  Oh, yes, we have Mr. Von Lohmann's lawyer.
3              MR. OLLER:  Your Honor, while we're waiting?
4              THE COURT:  Yes.
5              MR. OLLER:  I have one very small question on the
6      proposed preliminary jury instructions, the listing of claims
7      that are going to be considered at some point.  I understand
8      your Honor has said what you've said on net worth.  I think I
9      understand the bifurcation issue has not been resolved.
10             THE COURT:  That's right.
11             MR. OLLER:  So I'm -- I think we would question
12     whether the jury should be told up front that there's going to
13     be a fraudulent conveyance claim if there is going to be a
14     bifurcation.
15             (Continued on next page)
16
17
18
19
20
21
22
23
24
25
```

14R5ari3

```
 1              MR. POMERANTZ:  Your Honor, if I may respond?  I
 2    believe the only issue left on bifurcation is what happens with
 3    the IRA which was not, you know, is not the subject of our
 4    fraudulent conveyance claim.  The subject of our fraudulent
 5    conveyance claim is what was put into the FLPs, not what was
 6    put into the IRA.  So, we believe the IRA, it is relevant to
 7    its overall net worth for purposes of calculating punitive
 8    damages.  So, we do believe that the evidence of the transfer
 9    into the FLPs, both the fact of those transfers and the amount
10    of those transfers, is going to be in that first phase of the
11    trial now and the only question that I think that is open is
12    what your Honor is going to do about the IRAs and therefore
13    what does that tell us about any appropriate bifurcation of
14    just that issue.
15              I think the only issue open is if you think the IRA is
16    only relevant to the amount of punitives, which we disagree
17    with -- I'm sorry.  We think it is relevant to the amount of
18    punitives.  Your Honor can either decide to have it come in
19    during Phase I and not have a Phase II, and figure that the
20    jury will be properly instructed as to how to consider that, or
21    your Honor can go through the entire Phase I and on punitives
22    just ask the question whether we are entitled to it.  And if
23    the answer is yes, then we come back to that jury at the very
24    end and say here is the amount of the IRA and here is our
25    argument.
```

14R5ari3

1          I think that's really the only issue now open and your

2     Honor has to first decide that the IRA is relevant and then,

3     second, decide whether you need to bifurcate because of that.

4               THE COURT:  Mr. Baio?

5          MR. BAIO:  Your Honor, we do have before you the

6     argument and the application to bifurcate the fraudulent

7     conveyance claim.  I realize that Mr. Pomerantz wants me to

8     lose it.  I didn't think that you yet had resolved whether in

9     fact the prejudice of exposing that information to the jury

10    would end up enhancing the award and that if we wait until

11    later, number one, it might be rendered moot because he may

12    have enough to pay whatever the verdict is, or, number two, it

13    can then be decided in that second phase.  I thought that was

14    still an issue.

15         THE COURT:  It was still an issue yesterday.  My view

16    is that fraudulent conveyance should be part of the first trial

17    because it has to do with conduct, attitude, state of mind and

18    so forth.  I believe that you can -- both sides can explore the

19    reasons for various conveyances and that prejudice can be

20    diminished by your good questioning.

21         MR. POMERANTZ:  Your Honor, on that last point I just

22    want to make sure that no one misinterprets what your Honor

23    just said.

24         There was a ruling on the Bilzerian motion that

25    because they did not provide us -- they asserted privilege as

14R5ari3

1    to legal advice given in connection with the formation of the

2    FLPs that they are not going to be permitted to bring in

3    evidence of their reasons for forming the FLP because they

4    didn't share with us their privilege information.

5           So, I believe with that one qualification we

6    understand your Honor's position.

7           MR. BAIO:  Your Honor, may I address that?

8           The timing is that before there is a retention or a

9    communication with a lawyer, that Mr. Gorton reached the

10   conclusion that he was going to proceed with this form of

11   planning.  That has nothing to do with the attorney-client

12   communications that occurred thereafter.

13          So, as you said, you can explore what the reasons were

14   for him going into it.  That had nothing to do with advice that

15   he received from counsel.  They have not derived anything along

16   those lines.  Once he gets to the point of meeting with the

17   counsel the curtain comes down.  But I don't see anything

18   before that.  He wasn't conferring with that counsel.

19          MR. POMERANTZ:  Your Honor, that is exactly what the

20   Bilzerian line of cases says you can't do.  We don't have to

21   accept at face value what they say was Mr. Gorton's state of

22   mind if the privilege documents were to show that this all came

23   up because Mr. Rubinstein recommended it to him to shield his

24   assets from this lawsuit.  We're entitled to know that and we

25   shouldn't be prejudiced by not having that information and just

14R5ari3

1    letting Mr. Gorton say, well, I thought about it before I met

2    with Mr. Rubinstein.

3           MR. BAIO:  But there is no evidence that he consulted

4    with Mr. Rubinstein until he actually did.  Before that he had

5    a mindset to contact someone for planning, he got a reference

6    for someone.  Why did he want to do it?  This is before he even

7    meets Mr. Rubinstein.  It has nothing to do with his state of

8    mind prior to the time that he approached Mr. Rubinstein.

9           THE COURT:  Sounds to me as if this is a good

10   candidate for voir dire of Mr. Gorton outside the presence of

11   the jury.

12          MR. BAIO:  That sounds right.

13          MR. POMERANTZ:  Your Honor, we will do that if your

14   Honor wants us to.  I just say that I do believe this was

15   exactly the arguments that we briefed in the Bilzerian motion

16   and your Honor has ruled on them.  So, I would ask that before

17   we have to have voir dire on this particular issue that we just

18   all have a chance to review --

19          THE COURT:  Revisit.

20          MR. POMERANTZ:  -- the briefing in that order and see

21   if there is anything more to do.

22          THE COURT:  You will do that.

23          Anything else?

24          MR. MUNDIYA:  On Von Lohmann, your Honor, I was given

25   an e-mail.  He will be close to 2:30 but he is on his way.

14R5ari3

1          MR. POMERANTZ:  Your Honor, we can have some of us

2     wait around and the rest of us break, if that's okay with your

3     Honor and okay with Mr. Baio?

4          MR. BAIO:  Works with me.

5          THE COURT:  That's fine.  So, we will reconvene at

6     2:30.

7          MR. POMERANTZ:  Thank you, your Honor.

8          THE COURT:  Thank you.

9          (Recess)

10          THE COURT:  All right.  I understand that counsel for

11     EFF is in the courtroom?

12          MR. BRIDGES:  Yes, your Honor.

13          THE COURT:  If you could come forward to the witness

14     stand?

15          MR. BRIDGES:  Your Honor, a colleague from the New

16     York office is here to move my motion for admission pro hac

17     vice.

18          THE COURT:  I ready to hear you.

19          MS. RUSSO:  My name is Jacqueline Russo, associate

20     with THE law firm of Winston & Strawn, counsel for EFF, and I'm

21     here to move for the admission of Andrew Bridges.

22          THE COURT:  He is admitted?

23          MS. RUSSO:  In California and Georgia, a member in

24     good standing of both bars.

25          THE COURT:  Thank you very much.  He is admitted pro

```
 1    hac vice.  If you could approach I will be able to hear you
 2    better from the witness stand.
 3              MR. BRIDGES:  I do gather I'm here as counsel, not as
 4    a percipient witness.
 5              THE COURT:  Well, I was told you may have some answers
 6    to factual questions that would obviate the need for me to talk
 7    to Mr. Von Lohmann, so as it goes along tell me what you are
 8    and are not comfortable with.
 9     ANDREW P. BRIDGES,
10         having been duly sworn, testified as follows:
11              THE WITNESS:  Andrew P. Bridges.
12              THE COURT:  Mr. Bridges, I may begin by asking you
13    questions and then perhaps other counsel will have questions.
14              In connection with my trying to gather information
15    bearing on whether Lime Wire was a client of EFF during the
16    time period relevant in this lawsuit, my understanding is that
17    Mr. Klaus' firm served a subpoena on EFF.  Is that correct?
18              THE WITNESS:  Yes, your Honor.  It was subject to a
19    motion to quash in the Northern District of California and
20    subject to a protective order issued by Judge Jeffrey white in
21    the Northern District of California which limited some of the
22    scope of the subpoena and deposition testimony.
23              THE COURT:  And, as best you recall, what was deemed
24    by that Judge to be the appropriate scope of the deposition
25    testimony?
```

14R5ari3

1              THE WITNESS:  I believe -- your Honor, frankly I can't

2      recall.  I didn't bone up on that for this.

3              I believe one major limitation was that there was a

4      distinction between Mr. Von Lohmann's records and EFF's

5      records, that EFF's records would not need to include

6      communications with any parties other than Lime Wire, it would

7      include only direct communications between EFF and Lime Wire.

8      I can't recall what the other limitations were.

9              THE COURT:  Okay.

10             How long have you been counsel for EFF?

11             THE WITNESS:  Since shortly after that subpoena issued

12     and I don't know when that was.

13             THE COURT:  Okay.

14             THE WITNESS:  I have been co-counsel with EFF on other

15     occasions.

16             THE COURT:  Okay.

17             THE WITNESS:  I am on its advisory board.

18             THE COURT:  Okay.

19             Do you know whether EFF maintains lists of clients?

20             THE WITNESS:  Yes, your Honor.  I'm aware of one

21     formal list and one informal listing.  The formal list is a

22     list of clients in an Excel spreadsheet that EFF has

23     represented in litigation or has anticipated serving as

24     litigation counsel for.  The details I have learned is that

25     there are approximately 230 names on that list, of whom perhaps

14R5ari3

1   twenty-some-odd EFF anticipated litigating on behalf of but

2   they ended up remaining, what we would call, counseling

3   relationships.  It is my understanding that EFF may have had --

4   and this is sort of a guess/recollection -- couple hundred

5   counseling relationships that it did not load into that

6   database which was primarily a litigation list.

7           THE COURT:  Now, for the counseling database, focusing

8   only on whatever you had on counseling, how did EFF keep track

9   of whom it was counseling?

10          THE WITNESS:  I may have misspoken, your Honor.  There

11  was no counseling database.

12          THE COURT:  You said informal list I think you said.

13          THE WITNESS:  The informal listing is on its website

14  of cases in which EFF is active or has an interest.

15          THE COURT:  I see.

16          THE WITNESS:  That's the only other list.  That's not

17  a counseling list, that's the informal list.  The formal list

18  is the Excel spreadsheet.  The informal list is what is on the

19  website.

20          THE COURT:  So, in the past 10 or so years roughly how

21  many clients -- to how many clients has EFF given legal advice?

22          THE WITNESS:  I don't know that question.  I'm not

23  sure it is easily recoverable.  I believe that Mr. Von Lohmann,

24  in his testimony the day before yesterday, gave some number

25  personally.  I'm sorry, I can't recall -- for some reason

14R5ari3

1    around a hundred sticks in my brain but that is only derived

2    from the deposition testimony because there is no list of

3    counseling clients, there is no place where one can go and get

4    that number.  It is a matter of recollection and feel.

5         THE COURT:  What record, if any, is kept of the fact

6    that a client sought EFF legal advice?

7         THE WITNESS:  Presumably records of communications to

8    and from the client to the extent those communications were

9    written.

10        THE COURT:  And how many lawyers work at EFF, roughly?

11        THE WITNESS:  I believe it's between 12 and 15.

12        THE COURT:  So, if you have 12 to 15 lawyers chatting

13   with people on the phone and giving legal advice, how do you

14   keep track of whether some of your clients take positions that

15   are at odds with other of your client's positions?

16        THE WITNESS:  There is a weekly new client intake

17   meeting among the legal staff at EFF and they discuss what has

18   come in during the previous week.  I believe that is a

19   principal method by which that is handled.

20        THE COURT:  And, are any records kept of those

21   meetings?

22        THE WITNESS:  Not that I know of.

23        THE COURT:  Suppose I'm a new lawyer and I started EFF

24   in 2008 and I get a call from someone wanting legal advice.

25   How do I check to see if I'm able to give that legal advice?

14R5ari3

1          THE WITNESS:  That's a question that I have not

2     covered in my communications with clients so I would be

3     speculating to give the Court an answer to that.  I believe

4     from what I do know that that would be a -- I believe there

5     would be an initial cutoff if EFF -- if the person receiving

6     the call immediately recognizes that it is not something for

7     which representation is appropriate, then EFF might do the

8     triage on that call of referring the prospective client out to

9     some other counsel or directing the client otherwise.

10          I do understand that EFF has been funded on a couple

11     of occasions actually by cy pres settlements, some class

12     actions to engage in that very function, and it has on --

13          THE COURT:  That very function being what?

14          THE WITNESS:  Of intake and referral.  I believe there

15     have been some cases where EFF has been -- EFF's name has been

16     given out for EFF to call to help locate attorneys to represent

17     certain individuals.

18          So, the first step is is this something that EFF is

19     likely to be interested in.  The person taking the call would

20     make that determination.  I assume if it is something that is

21     not to be referred out or is not to be simply declined as

22     inappropriate for EFF, my inferences based on what I know is

23     that that would be the subject of one of those weekly meetings.

24          THE COURT:  Do you know whether there was a weekly

25     meeting after the first contact between anyone at Lime Wire and

14R5ari3

1    Mr. Von Lohmann?

2              THE WITNESS:  I don't know.  I would have to speculate

3    on that.

4              THE COURT:  And, do you know when the next client

5    meeting was after the first contact between anyone at Lime Wire

6    and Mr. Von Lohmann?

7              THE WITNESS:  I don't have that information, your

8    Honor.

9              THE COURT:  Do you know whether Lime Wire's name came

10   up at any client intake meeting?

11             THE WITNESS:  I don't know about that, your Honor.

12   Presumably this would have been sometime in 2002 and I don't

13   know that there would be specific memories of that or specific

14   records.  I could inquire.

15             THE COURT:  It would be helpful if you could ask who

16   is the person most likely to be able to answer each of my

17   questions.

18             THE WITNESS:  I need to, if I can borrow a pencil

19   or --

20             THE COURT:  We will get you a printout of this.

21             What process does EFF go through in deciding whether

22   to file an amicus brief in litigation?

23             THE WITNESS:  I don't know the answer to that

24   question, your Honor.

25             THE COURT:  Are you aware of EFF ever filing an amicus

14R5ari3

1   brief on behalf of EFF at the same time that Mr. Von Lohmann

2   claims to have represented Lime Wire?

3           THE WITNESS:  Well, I understand that apparently

4   occurred in this case.  I don't know -- I don't know EFF's

5   amicus practice generally.

6           THE COURT:  It is certainly the first time I have

7   heard of a law firm filing an amicus brief when in fact they

8   represent one of the parties.  I'm wondering if that's EFF's

9   general practice or if this is the first time they ever did

10  that.  And, I would like to know whose decision it was to do

11  that.

12          THE WITNESS:  Yes, your Honor.  I don't know the

13  answers to that.

14          THE COURT:  Can you --

15          THE WITNESS:  I should say that I came here straight

16  from a four-hour meeting I was in.  I cancelled an opportunity

17  to speak to the client today to try to be prepared for this.

18          THE COURT:  No, I'm not faulting you in any way.  I'm

19  very appreciative of your being here and of my ability to ask

20  you some of these questions.  It is, well, I wonder if there

21  has been another case where an entity both represented an

22  individual in a litigation and filed an amicus brief saying

23  that it was not being filed on behalf of anyone in the

24  litigation.

25          THE WITNESS:  Well, your Honor, I did myself.  I

14R5ari3

1    represented the Digital Media Association and I filed a brief

2    in the Ninth Circuit in support of no party in the Napster

3    litigation at a time when I did Napster's trademark work.  And,

4    frankly, it did not occur to me to disclose that relationship

5    because I was representing Digital Media Association.

6              THE COURT:  I think that's different.  Let me see if I

7    have it right.  You had represented Napster in their

8    trademark --

9              THE WITNESS:  In trademark matters.  I did not

10   represent Napster in the copyright litigation.

11             THE COURT:  It is in the copyright litigation where

12   who filed?

13             THE WITNESS:  Digital Media Association filed an

14   amicus brief in support of neither party.

15             THE COURT:  To clarify a point.

16             You were not simultaneously representing each as to

17   the same matter, that is, Napster and the Electronic Media?

18             THE WITNESS:  That's correct.

19             I think it is my understanding that EFF never became

20   litigation counsel for Lime Wire in the Lime Wire litigation.

21             THE COURT:  Well, they would have had to file a notice

22   of appearance and I would certainly know it if they had done

23   that.  So, I think we're pretty clear they haven't done that.

24             Let's see.  I would very much appreciate your having

25   people at EFF collect any documentation they have of their

1    procedures for new client intake, how the meeting works,

2    whether someone's approval has to be gotten.  For example, did

3    Mr. Von Lohmann have to receive the approval of someone else to

4    take on Lime Wire as a client to whom he gave legal advice?

5         THE WITNESS:  I'm happy to make the inquiries.  My

6    expectation is that since EFF is a fairly small organization

7    that people were pretty generally current with what each other

8    was doing and it was not a matter of sign offs on paperwork.

9    That's my expectation but I will make the inquiry.

10        THE COURT:  How did it happen that Mr. Von Lohmann

11   took some documents with him personally when he left EFF and

12   left others behind?  Are you familiar with that?

13        THE WITNESS:  I think he -- I think he took his hard

14   drive.  I think he may have made copies of EFF matters to leave

15   behind.  My knowledge of that is only what he testified to at

16   some point in deposition and I haven't refreshed the

17   transcript.  I think that -- I suspect that there was a mix of

18   business and personal on the hard drive so it is easier to

19   segregate out the business to leave a copy of that behind.

20        I should say, for purposes of document production

21   here, we did collect both from Mr. Von Lohmann and from EFF.  I

22   believe that the plaintiffs declined for us to make a duplicate

23   collection from EFF of things that we have already collected

24   from Mr. Von Lohmann because they wanted to -- they're under a

25   cost order in the Northern District and they wanted to avoid, I

14R5ari3

1     think, extra expenses.

2              THE COURT:  Who was under a cost order?

3              THE WITNESS:  The plaintiffs.  There was cost shifting

4     part of the protective order in the Northern District of

5     California.

6              THE COURT:  Okay.

7              THE WITNESS:  And so, on certain matters, the

8     plaintiffs were quite nervous about additional expenses being

9     incurred so they wanted us to check with them on certain

10    things.  And I believe that they declined certain duplicate

11    collections but we felt, I believe, that collection from

12    Mr. Von Lohmann on certain things would be more inclusive --

13    not necessarily more inclusive but a safer place to collect.

14             THE COURT:  Roughly how many documents did EFF produce

15    in response to this subpoena?

16             THE WITNESS:  Very few, because so many documents were

17    privileged.  I believe we produced just under a hundred pages,

18    or something like that, of non-privileged documents.  We

19    certainly had a privilege objection that went through that --

20    that we made as part of the subpoena process in the Northern

21    District of California.

22             THE COURT:  Let me see if I can shortcut this.

23             If there is any document at EFF that shows that EFF

24    gave legal advice to Lime Wire, i.e. that there was an

25    attorney-client relationship between Lime Wire and EFF, I would

14R5ari3

```
 1    like to see that.  Now, if that is privileged it could be

 2    produced and perhaps a magistrate judge would look at it and

 3    determine whether it was privileged or not.

 4              THE WITNESS:  I think there is a willingness to make

 5    an in camera review but part of the problem is we can't waive

 6    the privilege to establish the privilege.

 7              THE COURT:  Right.

 8              THE WITNESS:  So, if there were a means of showing

 9    some items in camera to help establish that then EFF is

10    entirely open to that.

11              THE COURT:  Mr. Klaus, do you have any questions?

12              MR. KLAUS:  I have a few questions, your Honor.  Is it

13    okay if I stay here?

14              THE COURT:  Sure.  As long as the witness can hear

15    you.

16              MR. KLAUS:  Can you hear me, Mr. Bridges?

17              THE WITNESS:  Yes.

18              MR. KLAUS:  Good afternoon.

19    DIRECT EXAMINATION

20    BY MR. KLAUS:

21    Q.  I would like to follow up on a couple of answers that you

22    gave to Judge Wood.  One was with respect to you testified that

23    there was a formal list in an Excel spreadsheet at EFF, either

24    actual litigation clients or anticipated litigation clients.

25    Is that correct?
```

 1    A.  Yes.

 2    Q.  And is Lime Wire on that list?

 3    A.  I don't believe that it is.

 4    Q.  Is --

 5    A.  But I need to verify.  Again, I have come here with minimal

 6    preparation.

 7              THE COURT:  Yes.

 8              THE WITNESS:  And I'm very concerned.  I did not

 9    expect to be here today as a percipient witness.

10              THE COURT:  I understand.

11              THE WITNESS:  So, I consider my statements here today

12    to be as an officer of the court, as an attorney for EFF.

13              THE COURT:  Yes.

14              THE WITNESS:  And not as a percipient witness.

15              THE COURT:  You're right.

16    BY MR. KLAUS:

17    Q.  With that understanding, Mr. Bridges, is Mr. Gorton's name

18    on that list?

19    A.  I believe it is not on that list and it is my understanding

20    that EFF has not believed that Mr. Gorton was ever an

21    individual client of the Electronic Frontier Foundation.

22    Q.  And, you were at Mr. Von Lohmann's deposition on Monday of

23    this week, correct?

24    A.  Yes.  I guess it was Monday.

25    Q.  And at that deposition do you recall Mr. Von Lohmann

1  testified that EFF had a database of clients against which

2  people at EFF were able to run a conflict check?

3  A.  I don't recall what he said.  If it is in the transcript he

4  certainly said it.

5  Q.  Okay.

6  A.  I haven't read the transcript so I can't recall.

7  Q.  I will represent to you that that's what he did say and I

8  will just ask you, sir, to your understanding, are you aware of

9  any database of clients that EFF maintains other than the Excel

10  spreadsheet and the informal listing that is on the, I believe,

11  EFF website?

12  A.  No.  I'm not aware of any.

13  Q.  You told the Court that while you were trademark counsel to

14  Napster that you also submitted an amicus brief to the Ninth

15  Circuit on behalf of the Digital Media Association; is that

16  right?

17  A.  Yes.

18  Q.  And just to put this in the right time frame, this is in

19  2000 or 2001, correct?

20  A.  I don't recall.

21  Q.  Was it the original Napster case before Judge Patel that

22  you submitted the brief in?

23  A.  It was the Ninth Circuit appealed.

24  Q.  And is it what is colloquially called the old Napster that

25  Mr. Hank Barry was the CEO of that you were representing with

1   respect to trademark issues at the time?

2   A.  Yes.

3   Q.  And when you were representing that Napster at that time

4   you were not a lawyer at the Digital Media Association, were

5   you?

6   A.  No, I was not.

7   Q.  You were a partner at Wilson Sonsini in Palo Alto, correct?

8   A.  That's right.  Yes, I was.

9   Q.  And, is it your understanding and testimony today,

10  Mr. Bridges, that the EFF and Mr. Von Lohmann did not advise

11  the Lime Wire defendants with respect to this litigation?

12  A.  I don't specifically know the answer to that.  I don't -- I

13  don't believe, from my understanding, that EFF gave advice

14  about the litigation itself.  It may have been about issues

15  related to the litigation or issues that may have come up in

16  the litigation.  There may have been instances I think where

17  the litigation may have been referenced in some way.  I

18  can't -- I don't know.  I'm speculating.  And I'm not here to

19  testify, as I said, as a percipient witness.  I'm here as an

20  officer of the Court and I just don't know.

21  Q.  I appreciate that.

22          And with -- first of all, your law firm represented

23  EFF and Mr. Von Lohmann in responding to the subpoena that the

24  plaintiffs served in the Northern District of California,

25  correct?

1    A.   That's right.

2    Q.   And your clients, in response to that subpoena, withheld a

3    number of communications on the grounds of attorney-client

4    privilege --

5    A.   Right.

6    Q.   -- and/or work product; correct?

7    A.   I assume so.  I know we withheld documents on various

8    bases, some of which were privileges of EFF's client Lime Wire,

9    some of which were on behalf of other EFF clients because there

10   were other clients where the Lime Wire case might have been

11   very relevant to privileged communications with other clients

12   because this case has attracted attention and is the subject of

13   commentary and legal advice between lawyers and clients on

14   copyright matters generally.

15   Q.   And, your firm prepared a privilege log with respect to

16   withheld communications, correct?

17   A.   Yes.

18            MR. KLAUS:  May I approach?

19            THE COURT:  Yes.

20            MR. KLAUS:  Thank you, your Honor.

21            I don't have an extra copy of this exhibit, your

22   Honor.  It is Exhibit 14 to Ms. Boyd's declaration.  It is an

23   excerpt from Mr. Von Lohmann's privilege log that was produced

24   by Winston & Strawn.  That's my copy with my highlighting.  I

25   will hand it to Mr. Bridges.

14R5ari3                        Bridges - direct

1              And, do you see, Mr. Bridges, that there are several

2    references on that page to communications as early as April of

3    2008 that reference documents that have been withheld and the

4    subject describes them as confidential advice regarding this

5    litigation?

6    A.   I see confidential e-mail reflecting request for and

7    provision of legal advice Re Lime Wire Arista litigation,

8    correct.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

14RAARI4ps                    Bridges – direct

1  Q.  And that's this litigation, correct?

2  A.  Yes.

3  Q.  And those are communications between one or more of Mr. Von

4  Lohmann or his other colleagues at EFF and the defendants

5  and/or their counsel in this case, correct?

6  A.  That's correct.

7  Q.  Do you know when the motion for summary judgment, the

8  opening motion for summary judgment, was filed by the

9  defendants in this case?

10  A.  No, I have no idea.

11  Q.  Do you know when EFF filed its amicus brief in support of

12  either party in this case?

13  A.  I have no idea.

14  Q.  If I said September of 2008, would that jog your memory at

15  all?

16  A.  No.  I have no -- I did not follow the chronology in this

17  case.

18         THE COURT:  Given the informality of this proceeding,

19  may I ask Mr. Klaus a question?

20         MR. KLAUS:  Sure, your Honor.

21         THE WITNESS:  I'm happy to give the chair to him if

22  you'd like, your Honor.

23         THE COURT:  Did Mr. Von Lohmann sign the amicus brief

24  in this case?

25         MR. KLAUS:  Your Honor, Mr. Von Lohmann was listed as

1    of counsel in the amicus brief.  My understanding is that he is

2    not admitted to the Southern District of New York and that and

3    that a law firm -- I'm not -- maybe the Kernstadt Halper

4    firm -- I'm just not sure off the top of my head -- submitted

5    that brief with Mr. Von Lohmann, and others with his of

6    counsel, but Mr. Von Lohmann's was the first name listed as of

7    counsel.

8              THE COURT:  And was it submitted on behalf of the EFF?

9              MR. KLAUS:  It was submitted on behalf of the EFF and

10   several other parties.

11             THE WITNESS:  Your Honor, if I may interject, because

12   I think I -- I know that everyone here is moving quickly

13   towards trial.  There are a few things that if I could explain

14   orally in camera I think would take us several laps ahead in

15   the Court's understanding of the issue and of some of the

16   questioning Mr. Klaus has just made.  The difficulty is, for me

17   to say in open court, it would waive the privilege.

18             THE COURT:  All right.  So Mr. Klaus, it's up to you

19   to tell us whether you would like to have us follow that

20   procedure or not.

21             MR. KLAUS:  I think without knowing a bit more about

22   what it is that Mr. Bridges proposes to relate to the Court in

23   camera --

24             THE COURT:  It may be that Mr. Bridges can be a little

25   more specific without waiving attorney-client privilege, if it

14RAARI4ps                    Bridges - direct

1   has to do with --

2            THE WITNESS:  It has to do with the items on that

3   privileged log that he just questioned me about, your Honor,

4   because that would explain a lot.

5            MR. KLAUS:  If it would be the Court's preference to

6   hear Mr. Bridges in camera, I don't object to that.  But I

7   don't really -- I feel a bit uncomfortable, your Honor, in that

8   I don't have any way to test or understand what --

9            THE COURT:  I understand.

10           I'm prepared to hear Mr. Bridges in camera, but will

11   not likely use it in issuing a decision.  It would simply be a

12   step along the way trying to understand what happened.

13           So if you would like to...

14           MR. MUNDIYA:  Your Honor, to the extent there are

15   communications related to LimeWire, would it be appropriate for

16   counsel for LimeWire to be given a ruling --

17           THE WITNESS:  It is a matter that was known by

18   LimeWire -- well, in part.

19           MR. MUNDIYA:  But to the extent Mr. Bridges is going

20   to be talking about other clients, clearly we wouldn't be

21   involved in that.

22           THE COURT:  Well, he could come back down and tell you

23   what he said about LimeWire.

24           MR. MUNDIYA:  He could do that too.

25           THE COURT:  Good.  Actually, we probably ought to just

14RAARI4ps                    Bridges - direct

1   talk at sidebar because we're being moved out of the building

2   now.

3            THE WITNESS:  OK.  If I could have the exhibit that I

4   was being shown.

5            (Pages 157 through 160 sealed by order of the court)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Discussion held off the record)

2          THE COURT:  OK.  Please try to put out of your mind

3     anything you read in the realtime.

4          Any other questions, Mr. Klaus?

5          MR. KLAUS:  Judge, just one last question:

6     Q.  Are you aware of, as you sit here today, any document

7     within EFF or Mr. Von Lohmann's suggestion that referred to the

8     commencement of a lawyer-client relationship with LimeWire?

9     A.  I would say to a certain extent -- it depends on how one

10    interprets your question.  I think I gave an explanation in

11    some in camera discussion that indirectly bears on that.  And

12    so I think in my view and without relating the substance of any

13    communication because I'm going to protect the privilege, I

14    think my answer to that would be yes.

15    Q.  And would you assert privilege in terms of describing what

16    that document is?

17    A.  Yes.

18    Q.  Can you describe whether it's an e-mail message or is it a

19    formal memorandum or a summary of notes from a meeting?  Can

20    you describe the type of document without revealing the

21    content.

22    A.  I think for me to give an appropriate context, I would have

23    to say too much.

24          THE COURT:  Now, back for a moment -- what was your

25    first question?  What kind of document did you ask him whether

1   he has?

2           MR. KLAUS:  Just, he meant --

3           THE COURT:  Reflecting --

4           THE WITNESS:  Relating to the commencement of --

5           MR. KLAUS:  And my question is, what type of document

6   is that?

7   A.  To give a partial answer would be misleading.  To give a

8   full answer would waive the privilege.

9   Q.  Is it the type of document that someone within EFF would

10  customarily look to, to see whether or not they represented a

11  client and had a potential conflict?

12  A.  I don't know.

13  Q.  Does EFF represent LimeWire today?

14  A.  I think from EFF's perspective, the attorney-client

15  relationship has not ended.  If the question is, are there

16  pending tasks, I think the answer is no.

17  Q.  Who -- Mr. Von Lohmann left the EFF sometime in the summer

18  of 2010.  Is that about right?

19  A.  I think that's right.

20  Q.  It was sometime in 2010 he left to go to Google, right?

21  A.  Right.

22  Q.  Which lawyer at EFF has the relationship with LimeWire

23  today?

24  A.  I don't know that there is a particular lawyer at EFF.

25  Q.  How does EFF normally know that a lawyer-client

1    relationship with someone believed to be a client has ended?

2    A.   The difficulty is, this is way outside my briefing by my

3    client and this is almost sort of expert testimony on lawyer-

4    client relationships.  I'm not comfortable being here and

5    speaking for EFF on that particular point.

6            THE COURT:  Who could best speak for EFF on all of the

7    questions advanced today?

8            THE WITNESS:  I don't know that this person would

9    necessarily be able to answer on all of them, but EFF was

10   deposed pursuant to Rule 30(b)(6) and its designate for that

11   deposition was Corynne McSherry.

12           THE COURT:  And what is her position?

13           THE WITNESS:  I believe she is senior staff attorney.

14           THE COURT:  I am -- I know I'm jumping in.  You may

15   have more.  I am puzzled by how a group of lawyers can,

16   together, take on clients without there being a conflict check.

17   To the extent that there is no careful conflict check each time

18   a new client is taken on, it suggests that perhaps protected

19   legal advice is not being given to each of these purported

20   clients.

21           THE WITNESS:  Your Honor, several answers to that.

22   First, the protection actually attaches during discussion.  And

23   I'm not trying to tie that to this case.  I'm giving a broad

24   picture.  As I understand it, at least under California law,

25   upon a first inquiry regarding potential representation, an

14RAARI4ps                        Bridges - direct

1    attorney-client privilege attaches.  Then, upon there being an

2    understanding that an attorney is giving legal advice, an

3    attorney-client relationship arises.  I believe that that

4    exists regardless of what conflict practices are.  I think that

5    attorney-client relationship exists even if there is a flagrant

6    conflict of interest.  I think lawyers suffer other penalties

7    if there is a conflict of interest that impairs the

8    relationship.

9            THE COURT:  How would anyone in California, under

10   California law, know whether EFF would be involved in conflicts

11   of interest?  There doesn't seem to be any central repository

12   of information about who was giving legal advice to whom.

13           THE WITNESS:  There -- they do maintain a list of the

14   representations that they took on, if I understand it, that are

15   litigation, whether --

16           THE COURT:  But that's just one.

17           THE WITNESS:  Right.  They tend to -- they may

18   represent companies giving legal advice where there is not a

19   particular adversity identified.  So if a client, many clients

20   will call me and say, what are my obligations under the Digital

21   Millennium Copyright Act, what do I need to do.  Now, it's good

22   for them and the lawyer as well, it's good that I make sure

23   that some other partner in the law firm is not suing my client

24   or will not sue my client.  But in an organization where a

25   number of representations are simply giving legal advice

1    without advising in an adversary context, then taking that

2    client on short of that client being adverse in some other

3    matter is not a problem.  In a small organization like EFF,

4    that has a strong focus, as it does, then I believe it believes

5    the procedures it has in place are adequate to avoid conflicts.

6    I am unaware that anyone has ever asserted that EFF actually

7    had a conflict in the number of years that it has been active.

8         THE COURT:  It would be hard for someone to know that,

9    given how little information EFF divulges about who are the

10   clients to whom it gives advice short of litigation advice.

11        THE WITNESS:  Well, I don't think it's generally

12   giving adversarial advice in the counseling context.

13        THE COURT:  Well, what is someone's benevolent

14   counseling could end up being adversarial to another client.

15        THE WITNESS:  Well, as I understand the -- I'm not an

16   ethics expert, but I certainly try to stay current on the

17   ethics law, but the question, it's whether one represents two

18   clients where -- one represents one client in a matter that is

19   adverse -- in a matter that is adverse to another client or in

20   a matter adverse to a former client in an area substantially

21   related to the former representation.  I don't believe there

22   are any ethical constraints regarding, for example, positional

23   conflicts.  There may be a duty of disclosure in certain

24   instances.

25        THE COURT:  Right.  I appreciate what you're telling

14RAARI4ps                    Bridges - direct

1   me.

2            THE WITNESS:  If I may just finish that also:  I don't

3   think EFF finds itself in positional conflicts typically, given

4   the nature of its work.

5            THE COURT:  Under California law, if I may ask you as

6   an officer of the court, are there any boundaries as to what is

7   disclosed when an amicus brief is filed?  Is one supposed to

8   say who one is representing?

9            THE WITNESS:  I believe, your Honor -- and I'm not

10  specific to California law on this -- as I understand, the area

11  was rife with abuse in the United States Supreme Court,

12  culminating in some cases that were notorious for the parties'

13  sponsoring, paying for, commissioning briefs.  As a

14  consequence, I'm aware that the United States Supreme Court,

15  also the Second Circuit, because I filed an amicus brief

16  recently to the Second Circuit, and other courts have explicit

17  rules, and they set out, you must say who has contributed.  And

18  generally that rule is something on the order of, you must

19  disclose whether a party or anybody other than the named amicus

20  has contributed work or funding for the brief.  And I think

21  those rules are very specific.  And I think that is what

22  occupies the territory, as opposed to ethical rules, which deal

23  primarily with adversity and disclosure to clients of potential

24  adverse effects of advice.  That's how I understand the

25  landscape.

1          THE COURT:  As you understand the rule -- and I'll go

2     take a look at it later -- as you understand the rule, would it

3     permit EFF to simultaneously represent LimeWire in counseling

4     and file an amicus in this litigation saying it didn't

5     represent either party?

6          THE WITNESS:  I don't believe the amicus said it

7     didn't represent either party.  It was in support of neither

8     party.  And it was one of many organizations on the brief.  And

9     I believe -- and I don't know if there's a Southern District

10    rule or what rule there is, but I did look more recently at the

11    Second Circuit rule, and since the EFF was a party to -- was an

12    amicus itself and since EFF was not being paid to do that brief

13    and was filing it on its own behalf, there was an identity,

14    even if there were a Second Circuit-type rule, since the

15    parties did the work that was named as the amicus, or presumed

16    we did the work or contributed to the work of the brief, that

17    was named in the amicus, then that itself is straightforward.

18    Whether there is a rule that says an amicus must disclose

19    relationships with the parties, I'm unaware of that rule, and I

20    rather think there isn't, or else I think we would see vastly

21    different disclosures in many, many amicus briefs.  Whether or

22    not the United States Chamber of Commerce would say, well, it

23    happens to be that we were the following -- maybe it does.

24    Document know.  I don't know of any rule that requires that.

25    And I think the EFF does -- this is also an instance where the

1    EFF does take some public positions on its own, as well as in

2    other contexts.  It has represented other entities and persons

3    and -- other entities and persons, where they are the amicus,

4    where EFF would provide the legal work.  But here EFF was

5    speaking with its own interests.  And I didn't study the brief

6    by any means, but it's my understanding that EFF cares very,

7    very much about how courts apply certain principles of

8    secondary liability.  And without preordaining what the result

9    should be in this case, I think it wanted to make a statement

10   about how the rule should be approached.

11            And I do believe that I've seen law firms be amici.  I

12   haven't been personally an amicus.  We certainly see law

13   professors as amici on their views of the law.  The ACLU, I'm

14   sure that the ACLU should have to disclose, let's say if the

15   ACLU -- what it should have, that's a policy matter.  That's

16   not for me.  But in terms of a rule that says you must disclose

17   your clients with an interest, I don't think that that rule is

18   out there that I know of.

19            THE COURT:  OK.  Any other questions for Mr. Bridges?

20            MR. KLAUS:  Your Honor, I don't want to invade the

21   privilege, but I just want to ask Mr. Bridges:

22   Q.  Isn't it, without revealing any of the specific

23   communications, it's a fact, isn't it, that the discussions

24   that EFF and Mr. Von Lohmann were having with Mr. Gordon and

25   LimeWire concerned the same subject matter of the brief that

1    EFF filed in this court.  Isn't that right?

2    A.  I'm not going there. I think that would waive the privilege

3    for me to answer that.  That's a direct question as to what the

4    direct content of the communications was.

5    Q.  Well, Mr. Von Lohmann testified that the subject matter,

6    his representation with Mr. Gorton concerned copyright law --

7    with LimeWire concerned copyright law.  Correct?

8    A.  That's correct.  That's as far as I would let him testify.

9    Q.  And EFF's amicus brief to this Court on the summary

10   judgment motion concerned the application of copyright law to

11   LimeWire, correct?

12   A.  I'm not sure that that's actually correct.  I think it

13   concerned the construction of one part of copyright law.  I'm

14   not sure that it took a position on how it applied in this

15   case.  But I'm not particularly familiar with the amicus brief.

16        Similarly, when I did the brief for Digital Media

17   Association in the *Napster* case, the thrust of the brief was,

18   please don't mess up with the Supreme Court did in *Betamax*.

19   Once you've taken that new consideration, do what you're going

20   to do, but just don't mess up that area of the law.  So it's

21   entirely possible when you're doing a brief in support of

22   neither party to say, we're here to talk about certain

23   principles that we urge the Court to get right.  One can review

24   the amicus brief in this case and decide, for oneself, what the

25   thrust of it was.  But that is often what happens in an amicus

14RAARI4ps                    Bridges – direct

1    brief, that's in support of neither party.  It's not saying

2    that somebody should win and.  It's saying, this is an

3    important principle that we suggest that the Court get

4    correctly.

5    Q.  It's correct, Mr. Bridges, that there is no retention

6    letter between LimeWire and EFF for Mr. Von Lohmann.

7    A.  What I have -- what we have disclosed is that there is no

8    signed retention letter.

9    Q.  Was a retention letter ever sent to --

10   A.  I am not going to disclose the content of communications

11   between LimeWire and Electronic Frontier Foundation.

12          MR. KLAUS:  Your Honor, can I ask for a privilege

13   ruling on just the question of whether or not there is a letter

14   relating to the retention of the relationship?  Which I don't

15   think reveals the content of any request for or provision of

16   legal advice.

17          THE COURT:  I think you have what you are entitled to

18   already.

19   Q.  And to your knowledge, Mr. Bridges, when EFF represents

20   clients in the nonlitigation counseling capacity, are you aware

21   of any signed retention letters between EFF and the counseling

22   clients?

23   A.  Personally, no.

24   Q.  And just so were clear on it personally, without revealing

25   any specific one, do you know whether EFF has even a single

14RAARI4ps                    Bridges - direct

1   such signed retention letter with anyone, with a nonlitigation

2   counseling client?

3   A.  No.  Not, not that I know of.

4   Q.  No further questions, your Honor.

5            MR. MUNDIYA:  Nothing from me, your Honor.

6            THE COURT:  Mr. Bridges, thank you very much for being

7   here, on behalf of the Court and counsel.

8            (Witness excused)

9            MR. KLAUS:  Your Honor, maybe I should make

10  arrangements with the court reporter.  I certainly don't want

11  to have any part of the transcript that is being e-mailed to us

12  have whatever was discussed in camera.

13           THE COURT:  Right.  But you'd like the rest.

14           MR. KLAUS:  We would like the rest.

15           THE COURT:  As soon as possible.

16           MR. KLAUS:  Yes.

17           THE COURT:  OK.  Very good.  Thank you very much.

18           MR. KLAUS:  Thank you, your Honor.

19           MR. MUNDIYA:  Thank you.

20           (Adjourned to 11:00 a.m., May 2, 2011)

21

22

23

24

25