1525ari1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ARISTA RECORDS, LLC. *et al.*,

4               Plaintiffs,

5           v.                          06 Civ. 5936 (KMW)

6   LIME WIRE, LLC, et al.,

7               Defendants.

8   ------------------------------x

9                                       May 2, 2011
                                        11:30 a.m.
10  Before:

11                  HON. KIMBA M. WOOD,

12                                      District Judge

13                      APPEARANCES

14  MUNGER, TOLLES & OLSON, LLP
         Attorneys  for Plaintiffs
15  BY:  GLENN POMERANTZ
         KELLY KLAUS
16       JENNIFER PARISER
         BLANCA YOUNG
17       HAILYN CHEN
         MELINDA E. LeMOINE
18
    WILLKIE, FARR & GALLAGHER, LLP
19       Attorneys for Defendants
    BY:  JOSEPH T. BAIO
20       TARIQ MUNDIYA
         JOHN OLLER
21       KATHARINE N. MONIN
         TODD COSENZA
22

23

24

25

1525ari1

 1          (Case called)

 2          THE DEPUTY CLERK:  Starting with the plaintiff, can I

 3     have all counsel state their appearance for the record, please.

 4          MR. POMERANTZ:  Good morning, your Honor.  Glenn

 5     Pomerantz on behalf of the plaintiffs, and with me are my

 6     colleagues Hailyn Chen, Melinda LeMoine and Kelly Klaus.

 7          MR. BAIO:  Your Honor, Joseph Baio on behalf of

 8     defendants; next to me is Mark Gorton and my co-counsel are

 9     Tariq Mundiya, John Oller, Todd Cosenza and Mary Eaton.

10          THE COURT:  Good morning.

11          MR. BAIO:  Good morning.

12          THE COURT:  I have learned from the talk I just had

13     with the jury administrator that there is one other civil trial

14     on tomorrow and that we have a number of options as to how to

15     handle our 60 jurors.  They could fill out the form and go home

16     and be told to call in a certain time of day and be told when

17     to come back, or we can just tell them tonight to call in

18     tomorrow and they'll be told when to come in.

19          So, our options are almost limitless with the jury.

20          I would like to move to the jury questionnaire.  Have

21     you had a chance to look at the names under no. 30 listed in

22     bold?  Those are the names that we propose to delete because

23     they would elicit too much irrelevant information.

24          MR. POMERANTZ:  Your Honor, I am not sure if in our

25     view they all fit into that category.  Some we are comfortable

1525ari1

```
 1   with and others we would like to discuss with your Honor.

 2                 THE COURT:  Fine.

 3                 MR. POMERANTZ:  I don't believe we have any concerns

 4   about Apple.  We understand, that's fine with us.  The banks

 5   that are on here, my understanding is that the banks are on the

 6   witness list of the defendants.  I'm not sure if I remember

 7   why.

 8                 THE COURT:  All right.  What will the most important

 9   banker testify to?

10                 MR. MUNDIYA:  Your Honor, we don't plan to be calling

11   bankers to talk about substance.  It is really a document

12   custodian issue and we have reached out to the banks to see if

13   they will stipulate as to the authenticity of those documents.

14                 THE COURT:  Okay.

15                 MR. MUNDIYA:  So, it is likely that maybe there will

16   be no bankers testifying.

17                 THE COURT:  Even if there are bankers testifying, that

18   is document custodians, it matters not at all if a juror has

19   heard the name.  It is just not worth the time.  I think you

20   can all agree on that.

21                 MR. POMERANTZ:  We agree.

22                 THE COURT:  So, we will take the banks out.

23                 MR. MUNDIYA:  Yes.

24                 MR. POMERANTZ:  So, that then leaves services like

25   BearShare, Grokster, iMesh, Kazaa, Morpheous, Napster.
```

1525ari1

| | |
|---|---|
| 1 | THE COURT:  Google. |
| 2 | MR. POMERANTZ:  Although Google is going to be a |
| 3 | witness in this case, if your Honor recalls, because of the key |
| 4 | word searches, so there will very well -- there is likely to be |
| 5 | a witness from Google testifying in this case. |
| 6 | THE COURT:  But I don't think you want to know |
| 7 | everything every juror knows about Google.  I don't think we |
| 8 | need that at all. |
| 9 | MR. POMERANTZ:  Right.  Okay. |
| 10 | The questions about BearShare and the others, and I |
| 11 | think Google probably, I think eMusic and Rhapsody, the |
| 12 | legitimate services all fit into that same category, your |
| 13 | Honor, and the questionnaire will pick up some of that in other |
| 14 | places.  I think what is picked up in question 30 with respect |
| 15 | to services like BearShare and Kazaa and Grokster that I don't |
| 16 | think is picked up elsewhere is suppose they knew somebody -- |
| 17 | they never used the service but they knew somebody who worked |
| 18 | there or was affiliated with it and had some connection. |
| 19 | THE COURT:  That's an okay question but the question |
| 20 | being posed is not what you just said. |
| 21 | MR. POMERANTZ:  Right.  The question no. 30 is a |
| 22 | little broader than that and we do pick up their usage or their |
| 23 | family member's usage of those services elsewhere. |
| 24 | THE COURT:  Earlier you do. |
| 25 | MR. POMERANTZ:  Earlier. |

1525ari1

```
1              THE COURT:  Right.

2              MR. POMERANTZ:  So, it seems to me what is not picked

3    up elsewhere, unless I am forgetting a question, is what if

4    they know somebody who has worked at or who has some connection

5    to one of these services but they, themselves, or their family

6    members have not used it.  We haven't picked that up, I don't

7    think in other places in the questionnaire, and maybe that

8    merits a different question.

9              THE COURT:  Well, do you want to add to the list of

10   entities they have used the additional companies?

11             MR. POMERANTZ:  I think most of them are there.  Hold

12   on a second, your Honor.

13             THE COURT:  I'm looking at question 22.

14             MR. POMERANTZ:  Right.  The answer is yes, your Honor.

15   BearShare, for example, is one that is not listed there that

16   probably should be added.  I believe all the others are --

17             THE COURT:  EMusic.

18             MR. POMERANTZ:  That's, I believe -- that has always

19   been a legitimate site and that should be off, I think, under

20   the way we are doing it.

21             THE COURT:  Okay.

22             MR. POMERANTZ:  I think the only one is BearShare that

23   needs to be added, 22.  And then the question is, is there some

24   way to pick up whether they know anybody who has worked at or

25   has some affiliation with these as opposed to whether they
```

1525ari1

```
 1   themselves or a family member have downloaded through these

 2   services?

 3           THE COURT:  All right.

 4           So, we could have -- 22 could have a first question

 5   which would be 22A, 22B would be the next paragraph, and then

 6   we would add a new 22C which would say:  Do you know anyone who

 7   works at any of the following companies?

 8           MR. POMERANTZ:  Has worked.  Right.

 9           THE COURT:  Anyone who works or who has worked.

10           And then after that I think you would have a line and

11   you would say which one or ones.

12           MR. POMERANTZ:  Your Honor, a couple other minor

13   points.

14           THE COURT:  Sure.

15           MR. POMERANTZ:  On no. 30, about a third of the way

16   down the list on page 6 there is an entry for Edgar Bronfman

17   and right below that is Edgar Bronfman, Jr.  That is the same

18   person, he is junior.  Either one is fine but there is only one

19   Edgar Bronfman.

20           THE COURT:  I will keep the junior.

21           MR. POMERANTZ:  On the next page I don't know if your

22   Honor wants to make a change, but for NPD there is something

23   that says NPD and NPD Group, that's the same entity as well.

24           THE COURT:  So, I will strike NPD.

25           MR. MUNDIYA:  MGJ seems to be transposed, your Honor.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1525ari1

1    I think it is MJG Lime Wire Family Limited Partnership.  I

2    think the Js and Gs are transposed.

3              THE COURT:  What page are you on?

4              MR. MUNDIYA:  Sorry.  That's question 28 on page 5.

5              THE COURT:  We will make that change.

6              Anything else on the jury questionnaire?

7              Just a reminder, the jury pool will get the

8    questionnaires, they will get them either in this courtroom or

9    if we decide it is more efficacious as a group, I mean counsel

10   decide with me, it can be done in the jury administration room.

11   They'll be filling it out in pen so that we can Xerox it -- do

12   you wish to be heard?

13             MR. POMERANTZ:  I just wanted to ask a question, your

14   Honor.

15             THE COURT:  Yes.

16             MR. POMERANTZ:  Your Honor has a preliminary

17   instruction --

18             THE COURT:  Right.

19             MR. POMERANTZ:  -- that your Honor wants to say to

20   them before they answer this and I don't know if that can be

21   done in the jury administration room or whether it --

22             THE COURT:  I usually do it up here.  If you want me

23   to give them that instruction first, I can.

24             MR. POMERANTZ:  I think it is --

25             THE COURT:  These are alternative ways of doing it.

1525ari1

1          MR. POMERANTZ:  I think it is critical because the

2     whole point of that instruction is to encourage them to answer

3     this questionnaire honestly.

4          THE COURT:  Okay.

5          MR. POMERANTZ:  So, I think it is critical that that

6     instruction be given before they answer the question.

7          THE COURT:  I can do that.  I can do that.

8          Once they fill it out we are going to take back their

9     copies and Xerox them for you to look at.  You can then look at

10    them for about 20 minutes to half an hour and then we will move

11    on to the voir dire.  We can go into the robing room and we

12    probably should, right after you've had a chance to look them

13    all over so that we can see if we want to have any particular

14    ground rules for challenges for cause.

15         With respect to the net worth opinion that I have

16    issued, you will recall that because of plaintiff's later

17    post-briefing argument that the net worth material,

18    specifically the transfers and value of transfers that Mark

19    Gorton made to multiple family limited partnerships, is

20    relevant to the deterrence factor in calculating statutory

21    damages under Bryant.  I now find that net worth material is

22    relevant not only to the two issues noted in the April 21, 2011

23    order, punitive damages and plaintiff's fraudulent concealment

24    claim, but also to statutory damages.  I note, however, that I

25    have not yet ruled on whether Mark Gorton's IRA is relevant to

1525ari1

1    statutory damages and I will rule on that later.

2              Could counsel clarify for me what plaintiffs would

3    wish to bring in regarding Mr. Gorton's net worth during the

4    main trial other than the transfers to the family limited

5    partnerships and to the IRA?  Is there anything else you want

6    to bring in?

7              MR. POMERANTZ:  Well, your Honor, I think his net

8    worth falls into three buckets; it is the assets that are in

9    the family limited partnerships, it is the assets that are in

10   the IRA, and then there are assets that are outside of those

11   two -- and those assets are the smallest of the three buckets

12   so that would be the three that we think add up to, so far as

13   we know, add up to his total net worth and we would want to

14   bring that in for the various claims that we would be trying on

15   the merits.

16             THE COURT:  What is in No. 3?  I take it that is

17   already in the record?

18             MR. POMERANTZ:  What is that comprised of, what is in

19   bucket No. 3?

20             THE COURT:  Yes.

21             MR. POMERANTZ:  I don't recall all of it.  Mr. Gorton

22   testified under oath at the asset freeze hearing, I do believe

23   there is bank accounts.  That was probably the largest category

24   at that time.  Those numbers have changed since then.

25             THE COURT:  Okay.

1525ari1

 1          MR. POMERANTZ:  That was the largest number.  And then

 2     there were smaller, I think, investments that he held -- oh,

 3     and his home -- and his home was also a significant asset.  And

 4     so those comprise -- I probably now -- I think it is bank

 5     accounts, the home and smaller investments, and the three of

 6     those together add up to much less than either the IRA or the

 7     assets in the family limited partnerships.

 8          THE COURT:  Right.  Okay.  Thank you.

 9          Unless anyone wants to raise a preliminary matter, I

10     think we are then ready for Mr. Gorton's voir dire.  If you are

11     ready, then Mr. Gorton, could you please come to the witness

12     stand?

13          MR. POMERANTZ:  Your Honor, shall I be all the way

14     back here?

15          THE COURT:  You can be anywhere in front of the jury

16     box.

17          MR. POMERANTZ:  Thank you.

18      MARK GORTON,

19          called as a witness by the Defendant,

20          having been duly sworn, testified as follows:

21          MR. POMERANTZ:  Your Honor, may we have a moment to

22     shift seats?

23          THE COURT:  That's fine.

24          Mr. Gorton you may want to move your mic down to avoid

25     feedback.  There are pretty bad acoustics in here.

1525ari1

1      MR. POMERANTZ:  Thank you, your Honor.

2      MR. BAIO:  These are the two areas we discussed on the

3  phone, your Honor.

4      THE COURT:  Yes.

5  DIRECT EXAMINATION

6  BY MR. BAIO:

7  Q.  Mr. Gorton, are you married?

8  A.  Yes.

9  Q.  When did you get married?

10  A.  June 9th, 2001.

11  Q.  And what is your wife's name?

12  A.  Jody.

13  Q.  How many children do you have?

14  A.  Four.

15  Q.  Now, after you married your wife in 2001, did you own any

16  assets or property jointly?

17  A.  Yes.

18  Q.  What assets?

19  A.  Two bank accounts we owned jointly.

20  Q.  And when did you open those bank accounts?

21  A.  2002.

22  Q.  And when you say joint bank accounts, what percentage did

23  you own and what percentage did she own?

24  A.  Half each.

25  Q.  Are there any other assets that you jointly own with your

1    wife?

2    A.  Yes.

3    Q.  And what are those?

4    A.  Our house.

5    Q.  And when did you buy the house?

6    A.  In June 2005.

7    Q.  And what percentage of the house do each of you own?

8    A.  Half.

9    Q.  Do you own any other homes, either separately or jointly?

10   A.  No.

11   Q.  And, have you ever owned any other homes?

12   A.  No.

13   Q.  Now, when was your first child born?

14   A.  Mira was born January 8, 2003.

15   Q.  And, did you have any discussions about estate planning

16   after your first child was born in 2003?

17   A.  Yes.

18   Q.  With whom?

19   A.  My accountant recommended that I should start doing some

20   estate planning.

21   Q.  And, did you do any in 2003?

22   A.  No.

23   Q.  Why not?

24   A.  I was busy and it's easy to procrastinate about planning

25   for your death.

1  Q.  When was your second child born?

2  A.  Zach was born April 30th, 2004.

3  Q.  Did you take any steps after your second child was born in

4  dealing with estate planning?

5  A.  Yes.

6  Q.  What did you begin to do in 2004?

7  A.  Well, again, I got recommendations that I should do estate

8  planning so I knew in order to do this I would need a lawyer.

9  And one of my friends was a lawyer so I asked him if he could

10  ask around.  He had previously worked at Kay Scholer, asked if

11  he could find someone who specialized in that area.  He asked

12  around and it turned out that the brother of a partner at Kay

13  Scholer specializes in estate and trust work and he recommended

14  him to me.

15  Q.  And who was that person?

16  A.  Ken Rubinstein.

17  Q.  Did you contact Mr. Rubinstein?

18  A.  Yes.

19  Q.  When, for the first time?

20  A.  December 2004.

21  Q.  And, did you meet with Mr. Rubinstein?

22  A.  Yes.

23  Q.  When?

24  A.  In January 2005.

25  Q.  Now, after having met with him, did you undertake any steps

1   in furtherance of estate planning?

2   A.  Yes.

3   Q.  What did you ultimately do?

4   A.  I set up five family limited partnerships.

5   Q.  Why five?

6   A.  It was one for each of the companies I ran.

7   Q.  And, how did the family limited partnerships help your

8   estate planning?

9   A.  By transferring assets to my wife and my children it

10  reduced the size of my estate so in the event that I died,

11  there would be less assets which were required to pay taxes on.

12  Q.  What percentage of Lime Wire did you own before that

13  transfer?

14  A.  87 percent.

15  Q.  And, was that in your own name?

16  A.  It was in the name of Lime Group, LLC.

17  Q.  And, you transferred your 87 percent ownership interest in

18  Lime Wire to this family limited partnership, correct?

19  A.  Yes.

20  Q.  Where, by the way, or who owned the other 13 percent?

21  A.  Other investors.

22  Q.  And what was the name of that family limited partnership?

23  A.  It was the MJ Gorton Lime Wire Family Limited partnership.

24  Q.  Now, after the transfer did you own any percentage of the

25  family limited partnership?

1    A.  Yes.  I owned 48 percent.

2    Q.  I'm sorry?

3    A.  48 percent.

4    Q.  And, what percentage do you own today?

5    A.  48 percent.

6    Q.  And, what percentage of the family limited partnership did

7    your wife own after the creation of the family limited

8    partnership?

9    A.  48 percent.

10   Q.  And, what percentage does she own today?

11   A.  48 percent.

12   Q.  And, did your two children, who had then been born, did

13   they own any part of or have any ownership interest in that

14   family limited partnership?

15   A.  Yes.

16   Q.  What did they own?

17   A.  They each had 2 percent.

18   Q.  And, was that true for all of the family limited

19   partnerships that you set up at that time?

20   A.  Yes.

21   Q.  Now, at the time you created these family limited

22   partnerships did you consider transferring all of those assets

23   just to your wife and children?

24   A.  No.

25   Q.  When did you sign the documents that finalized the family

1    trust -- the family partnerships?

2    A.  June 30th, 2005.

3    Q.  And, how was that day selected?

4    A.  It was selected because it was month-end and in order to

5    set up the partnerships, we needed to get a proper valuation of

6    the assets and some of the assets were only valued monthly.

7    Q.  And when was that date established; that is, you would be

8    signing the documents on June 30th, 2005?

9    A.  A week or two beforehand.

10   Q.  And who did that?  Who set that date?

11   A.  It was done by Elizabeth Weiner.

12         MR. BAIO:  Your Honor, may I approach and show the

13   witness a document relating to that?

14         THE COURT:  Yes.  If you have one for the Court?

15         MR. BAIO:  I do.  Yes, your Honor.  And your Honor,

16   this document has been marked as Defendant's Exhibit 133.

17   BY MR. BAIO:

18   Q.  Mr. Gorton, can you look at this and tell me what it

19   appears to be?

20   A.  It is an e-mail exchange between Elizabeth Weiner and

21   myself.

22   Q.  And, who is Elizabeth Weiner at the time?

23   A.  She was an accountant who worked for me.

24   Q.  And, what is your understanding as to the subject matter of

25   this e-mail?

1  A.  It's selecting the date on which to finalize signing the

2  family limited partnership documents.

3  Q.  And, where is the suggestion -- which e-mail suggests the

4  date of June 30th?

5  A.  Liz writes:  Do you want to sign everything on June 30th?

6  Q.  And your response was?

7  A.  That works for me.  I'll check with Jody.

8  Q.  And did you check with Jody?

9  A.  Yes.

10  Q.  And, did you in fact execute the family limited partnership

11  documents on June 30th, 2005?

12  A.  Yes.

13  Q.  And, just a few days before that did you also close on your

14  house that you co-owned with your wife?

15  A.  Yes.

16  Q.  Now, did you have other assets that you transferred --

17  strike that.

18          On June 30th, 2005, did you transfer all the assets

19  that you owned into family limited partnerships?

20  A.  No.

21  Q.  What assets did you not transfer into the family limited

22  partnerships?

23  A.  Some bank accounts, some stock holdings, some holding in

24  investment funds.

25  Q.  Was there a time when you created another family limited

1525ari1                          Gorton – direct

1    partnership?

2    A.   Yes.

3    Q.   When was that?

4    A.   In 2007.

5    Q.   And, what family limited partnership was that?

6    A.   That was the MJ Gorton Lime Spot Family Limited

7    Partnership.

8    Q.   And what is Lime Spot?

9    A.   It is another software company that I started.

10   Q.   And, why did you create that family limited partnership?

11   A.   That was the structure that I have used to hold all the

12   companies which I have created.

13   Q.   And, what was the ownership structure of the Lime Spot

14   Family Limited Partnership after it was formed?

15   A.   At that time my wife and I had our third child and it was 2

16   percent for each of our children and the remaining 94 percent

17   was split evenly between Jody and me, 47 percent a piece.

18   Q.   So, you retained a 47 percent interest in that; correct?

19   A.   Yes.

20   Q.   And did you at the time consider transferring that 47

21   percent to your wife or children?

22   A.   No.

23   Q.   After the creation of that family limited partnership did

24   you take any additional estate planning steps?

25   A.   Yes.

1525ari1                    Gorton - direct

1    Q.  And what have they been?

2    A.  Well, we've set up -- my wife and I have set up educational

3    funds, I guess 529 plans for our children, and we have gifted

4    to our children money within the limits allowed by the tax

5    code.

6    Q.  Now, did you also come to learn that in addition to estate

7    planning there was another benefit to the creation of the

8    family limited partnerships?

9    A.  Yes.

10   Q.  And what was that?

11   A.  I learned that in the event that there was a claim against

12   me the assets that did not belong to me would not be subject to

13   that claim.

14   Q.  And, did you understand that the assets that did belong to

15   you were subject to claims?

16   A.  Yes.

17   Q.  And is that why you created the family limited

18   partnerships?

19   A.  No.

20   Q.  Other than birthday gifts and the like, have you

21   transferred any other money to family members?

22   A.  No.

23   Q.  Have you taken any steps to conceal any assets that you

24   own?

25   A.  No.

1   Q.  Have you opened any offshore bank accounts?

2   A.  No.

3   Q.  Now, that would be my examination on that subject, your

4   Honor.  I don't know what will be asked about the legal

5   decision that occurred and that's part of why we are doing

6   this, to see where it goes and what the witness can and cannot

7   say in response to questions.

8           THE COURT:  All right.  Perhaps we should have

9   examination by plaintiff's counsel now, on this topic.

10          MR. BAIO:  Okay.  Thank you.

11          THE COURT:  Thank you.

12  CROSS EXAMINATION

13  BY MR. POMERANTZ:

14  Q.  Mr. Gorton, good morning.

15  A.  Good morning.

16  Q.  If you would open up the notebook and take out a time line

17  that's in the front pocket of the notebook and just sort of

18  keep that out in front of you?  Because we are going to, from

19  time to time, be referring to that time line.  Maybe we will

20  start with the time line.  If you can look at that, I just want

21  to make sure that you agree with me on the dates that are set

22  forth on the time line.  The first date is December 10, 2004,

23  which is when the United States Supreme Court announced that it

24  was going to review the Grokster case.  Do you have any reason

25  to believe that that date is not accurate?

1525ari1                    Gorton - cross

1  A.  No.

2  Q.  Then, the next date down below that is January 7th, 2005,

3  and it says that is the first meeting that you had with

4  Mr. Rubinstein.  Do you have any reason to believe that that's

5  not accurate?

6  A.  No.

7  Q.  And then the Supreme Court issued its ruling in the

8  Grokster case on June 27, 2005.  Do you have any reason to that

9  that's not accurate?

10  A.  No.

11  Q.  And then three days later you transferred assets into

12  family limited partnerships.  Do you have any reason to think

13  that that date is not accurate?

14  A.  No.

15  Q.  When the United States Supreme Court issued its ruling in

16  the Grokster case you read that ruling, correct?

17  A.  Yes.

18  Q.  And you read that Grokster lost, correct?

19  A.  Yes.

20  Q.  And Grokster was a decentralized peer-to-peer service just

21  like Lime Wire, correct?

22  A.  Yes.

23  Q.  And you had said three months earlier that if Grokster lost

24  that case your Lime Wire business would cease to exist.

25  Correct?

1    A.  That's not what I said.

2    Q.  Well, let's go look at the exact words.  Turn to tab 6.

3    And if you look, fourth paragraph down in the article it

4    states:  If the Supreme Court says it is illegal to produce

5    this software Lime Wire, the company, will cease to exist.

6            Do you see that?

7    A.  Yes.

8    Q.  And that is what you told the New York Times in March of

9    2005, correct?

10   A.  Yes.

11   Q.  And after the United States Supreme Court issued its ruling

12   in Grokster you did not shut down Lime Wire, correct?

13   A.  Yes.

14   Q.  That's correct, right?

15   A.  Yes.

16   Q.  And you continued to operate Lime Wire, correct?

17   A.  Yes.

18   Q.  And three days after the Supreme Court issued its decision

19   you moved your assets into -- certain assets into family

20   limited partnerships, correct?

21   A.  Yes.

22   Q.  So, in this window that we have reflected on the time line

23   between December 2004 and June 2005 two things are happening at

24   the same time; one is that the United States Supreme Court

25   announces it is going to review Grokster and then decides

 1   Grokster, and the other is that you are meeting with

 2   Mr. Rubinstein and creating family limited partnerships;

 3   correct?

 4          MR. BAIO:  Your Honor, do I get to object?  I'm not

 5   really sure whether it serves a purpose here.

 6          THE COURT:  Let me note that because this is voir dire

 7   I'm going to permit some questioning that would not be

 8   permitted in front of a jury tying things together, some

 9   argumentation, just so that I can quickly understand the

10   points.

11          MR. BAIO:  Understood, your Honor.

12          MR. POMERANTZ:  And, your Honor, I should say up front

13   what I am going to try to do through my questioning is to show

14   that without knowing what Mr. Gorton and Mr. Rubinstein

15   discussed and what the legal advice was during this time

16   period, it is not fair -- we will not have a fair opportunity

17   to test the story that Mr. Gorton just told you.

18          THE COURT:  I follow you.

19          MR. POMERANTZ:  That's what I am seeking to do here.

20          THE COURT:  I follow you.

21   BY MR. POMERANTZ:

22   Q.  Mr. Gorton, I want to focus on the time period before

23   December 10, 2004, okay, that period and earlier.

24          One thing that was going on before December 10, 2004

25   based on what you just said, is that you were thinking about

1  estate planning, correct?

2  A.  Yes.

3  Q.  And in your testimony you had been thinking about it for at

4  least a couple of years before you did anything about it at the

5  end of 2004, correct?

6  A.  Yes.

7  Q.  But you actually didn't do anything about creating an

8  estate plan until after December 10, 2004, correct?

9  A.  Yes.

10 Q.  And you don't have any documents that show that you were

11 thinking about estate planning before December 10, 2004,

12 correct?

13 A.  Yes.

14 Q.  That's correct?

15         THE COURT:  I think when you add correct you inject

16 ambiguity into your questioning.

17         MR. POMERANTZ:  Okay.

18 Q.  Do you have any documents that show that you were thinking

19 about estate planning before December 10, 2004?

20 A.  None that I know of.

21 Q.  Did you contact a lawyer about protecting your estates

22 through estate planning at any time prior to December 10, 2004?

23 A.  No.

24 Q.  So, it is fair to say that, at least from your testimony,

25 that in the years 2003-2004 you were thinking about estate

1   planning, correct?

2   A.  Yes.

3   Q.  But during that same period of time you were also thinking

4   about Lime Wire's liability for copyright infringement,

5   correct?

6   A.  Maybe a little bit.

7   Q.  Well, you were aware that there was a significant risk that

8   Lime Wire would get sued for copyright infringement way back in

9   2001, correct?

10  A.  I wouldn't put it that way.

11  Q.  Well, let me ask you to turn to tab 5.  This is an offering

12  memorandum that Lime Wire wrote back in 2001, correct?

13  A.  Yes.

14  Q.  And if you could turn to page 7 you see a heading there in

15  the middle of the page, it says litigation risks.  Do you see

16  that?

17  A.  Yes.

18  Q.  And, in the middle of that paragraph there is a sentence

19  that states:  Lime Wire faces a significant risk that the RIAA

20  will attempt to limit its ability to promote the Gnutella

21  network through lawsuits and other judicial means.

22          Do you see that?

23  A.  Yes.

24  Q.  And then later on in that paragraph you state:  However,

25  there are no assurances that Lime Wire would be successful in

1    any lawsuit brought by the RIAA.

2            Do you see that?

3    A.  Yes.

4    Q.  And at the end of that sentence you also say that the

5    damages of any such suit may be substantial; correct?

6    A.  Yes.

7    Q.  So, that's what you knew as early as 2001, correct?

8    A.  This is a part of a risk section of an offering document

9    which is designed to highlight and perhaps exaggerate risks to

10   investors.  I mean, it contains a lot of things.  It's kind of

11   legal cover-your-butt language.

12   Q.  All right.

13          You also had concerns about Lime Wire's exposure to

14   copyright liability after the record company sued Grokster,

15   correct?

16   A.  I don't know.

17   Q.  Let's take a look at tab 7 and see if we can use this

18   document to refresh your recollection.  You wrote the document

19   that's behind tab 7, correct?

20   A.  Yes.

21   Q.  And you say at the top -- let's date this document.  If you

22   look at the next page, Mr. Gorton, this is what is referred to

23   as metadata that accompanies an electronic document and do you

24   see that 10 lines down there is a line that says create date

25   and it says 10/4/2001?

1          Do you see that?

2   A.  Yes.

3   Q.  Do you have any reason to believe you didn't write this

4   document around October of 2001?

5   A.  No.

6   Q.  And, in the very first line you say a note from Mark Gorton

7   on the issue of potential lawsuits against Lime Wire and its

8   impact of the open source community.  Do you see that?

9   A.  Yes.

10  Q.  And you say in the first sentence that the -- the next

11  sentence:  The lawsuits recently filed against Morpheous,

12  Grokster and FastTrack by the RIAA and the internal RIAA memos

13  recently released raise the specter of legal action against

14  Lime Wire.

15          Do you see that?

16  A.  Yes.

17  Q.  So, you knew by 2001 that Lime Wire was a target of a

18  potential lawsuit, correct?

19  A.  I knew that Lime Wire lived in a world in which litigation

20  was happening around it.

21  Q.  I'm sorry, I didn't hear you.  I apologize.

22  A.  I said Lime Wire existed in a world where litigation was

23  taking place around it.

24  Q.  Well, Lime Wire knew that it was a target of a potential

25  lawsuit, correct?

1   A.  I think that's a bit strong.

2   Q.  You wrote that Lime Wire raises the specter of legal action

3   against Lime Wire; correct?

4   A.  Yes.  I think that's not as strong as it was a target of a

5   lawsuit.

6   Q.  Now, because of the legal risks that Lime Wire faced, you

7   went and sought legal advice about the copyright laws, correct?

8   A.  Yes.

9   Q.  And one of the lawyers that provided you with legal advice

10  about the copyright laws is Fred Von Lohmann, right?

11  A.  Yes.

12  Q.  And you started consulting with Mr. Von Lohmann on

13  copyright issues around 2002, correct?

14  A.  I don't remember the date.

15  Q.  Well, let's look at tab 13.  And, Mr. Gorton, this is what

16  we refer to as a privilege log and actually I think I referred

17  you to the wrong tab.  I think what I want to do is tab 14.  Is

18  that right?  Does tab 14 at the top say Fred Von Lohmann's

19  privilege log?

20          THE COURT:  13 says that.

21          MR. POMERANTZ:  Okay, so I have a different -- so

22  that's what I want, 13.

23  Q.  Just by way of example, Mr. Gorton, if you could turn to

24  page 7 of 8 of this privilege log.  And you see in that, for

25  example, in lines 95 and 103 and 104 and 106 you see you and

1   Mr. Von Lohmann having communications relating to legal advice

2   about copyright law.  Do you see that?

3   A.  Yes.

4   Q.  And you understand that none of these were produced to us,

5   correct?

6   A.  Yes.

7   Q.  And also on this page, again around the 2002 time period,

8   Mr. Von Lohmann is also engaged in providing legal advice to

9   other employees at Lime Wire.  Do you see that?

10  A.  Yes.

11  Q.  And you also had communications with another lawyer before

12  December 2004 about copyright issues, correct?

13  A.  I don't know.

14  Q.  Do you know a gentleman by the name of Joshua Wattles?

15  A.  Yes.

16  Q.  He's a lawyer, correct?

17  A.  Yes.

18  Q.  And he provided you with legal advice regarding copyright

19  issues, correct?

20  A.  Yes.

21  Q.  And you have claimed privilege over your communications

22  with Mr. Wattles, correct?

23  A.  Yes.

24  Q.  And you have claimed privilege over your communications

25  with Mr. Von Lohmann, correct?

1525ari1                         Gorton - cross

1  A.  Yes.

2  Q.  And if you turn to tab 12, this is a privilege log that was

3  provided to us by Lime Wire and yourself as well, this is the

4  defendant's privilege log.  And if you turn to page 5 of 36 you

5  will see some references to communications between Mr. Wattles

6  and Mr. Von Lohmann, copy to you, concerning things such as the

7  RIAA subpoenas and an order in the Grokster case.

8          Do you see that?

9  A.  On page?

10  Q.  Page 5.

11  A.  Yes.

12  Q.  So, it is fair to say going back to our time line that

13  prior to December 10, 2004, you were getting legal advice about

14  copyright issues relating to Lime Wire, correct?

15  A.  Yes.

16  Q.  And you also say that you were thinking about estate

17  planning at the same time, correct?

18  A.  I mean roughly contemporaneous.

19  Q.  So now let's return to the period in that little gap in the

20  middle of the time line.

21          You met with Mr. Rubinstein on January 7, 2005, that

22  was a face-to-face meeting, correct?

23  A.  Yes.

24  Q.  And Mr. Rubinstein took notes during that meeting, correct?

25  A.  He might have.

1  Q.  If you could turn to tab 14, and you will see on the top if

2  I have the right document this time it says privilege log,

3  Kenneth Rubinstein, Esquire.  Do you see that?

4  A.  Yes.

5  Q.  If you turn to the third page, a little more than halfway

6  down you see an entry for 1/7/2005.  Do you see that?

7  A.  Third page?

8  Q.  Yes, 3 of 4.

9  A.  January 7?

10  Q.  Yes.

11  A.  Oh yes.  Okay.

12  Q.  And you see that over on the column on the right with the

13  description it says:  Counsel's handwritten notes re meeting

14  with clients seeking estate planning legal advice.

15          Do you see that?

16  A.  Yes.

17  Q.  Does that refresh your recollection that Mr. Rubinstein was

18  taking notes during your first meeting with him?

19  A.  No.

20  Q.  Now, you have claimed privilege over what you and

21  Mr. Rubinstein discussed during that meeting, correct?

22  A.  Yes.

23  Q.  And you have claimed privilege over Mr. Rubinstein's

24  handwritten notes, correct?

25  A.  I assume so.

1  Q.  So, you can't tell us whether the word Grokster came up

2  during that meeting, correct?

3  A.  No.

4  Q.  You can't tell us whether Mr. Rubinstein's notes say the

5  word Grokster, correct?

6  A.  I don't know.

7  Q.  And you can't tell us whether you told Mr. Rubinstein in

8  that meeting that you wanted to protect your personal assets

9  from a possible judgment by the record companies, correct?  You

10  can't tell us that because you asserted the privilege?

11  A.  Yes, I asserted the privilege.

12  Q.  And you have asserted the privilege over all of your

13  communication with Mr. Rubinstein, correct?

14  A.  As far as I know.

15  Q.  Right up to June 30th, 2005, correct?

16  A.  I assume so.

17  Q.  You have asserted privilege over all of your communications

18  with Mr. Rubinstein about why you created the family limited

19  partnerships, correct?

20  A.  We, I guess, asserted privilege over all the communication.

21  Q.  And because you have asserted the attorney-client privilege

22  with respect to your communications with Mr. Rubinstein, that

23  meant that Mr. Rubinstein refused to answer our questions

24  during a deposition about his communications with you.  You're

25  aware of that, correct?

1   A.  No.

2   Q.  Do you recall the hearing we had three floors down last

3   summer relating to our motion to freeze assets?

4   A.  Yes.

5   Q.  And you testified during that hearing, correct?

6   A.  Yes.

7   Q.  And, do you recall that a few days before that hearing your

8   lawyers told us that you were going to waive your privilege

9   with respect to your communication with Mr. Rubinstein?

10          MR. BAIO:  I'm not sure where this is going.

11          THE COURT:  I do recall this.  You don't need to -- if

12  this is to remind me you don't need to remind me.

13          MR. POMERANTZ:  All right.  And he testified to that

14  during the hearing, your Honor.  It was his personal knowledge

15  of that that we brought out at that hearing and I won't go over

16  that again.

17          THE COURT:  Yes.

18  BY MR. POMERANTZ:

19  Q.  Another thing I won't go over again, Mr. Rubinstein's

20  website; you recall that we had some discussions about that

21  last summer?

22  A.  Yes.

23  Q.  But you won't tell us whether the things that are reflected

24  in that website are things that you actually discussed with

25  Mr. Rubinstein during the time that he was providing legal

1525ari1                         Gorton - cross

1   advice to you, right?

2   A.   I don't know what is in the website.

3   Q.   Well, you understand that we have filed a claim against you

4   that's called a fraudulent conveyance claim?

5   A.   Yes.

6   Q.   And you understand that that claim asserts that your

7   transfer of the assets into the family limited partnerships on

8   June 30th, 2005 is a fraudulent conveyance?

9   A.   Yes.

10  Q.   Are you aware that Mr. Rubinstein's website discusses the

11  risks of a fraudulent conveyance?

12  A.   No.

13  Q.   Are you aware that that website says that you should say

14  that a conveyance into a family limited partnership is for

15  estate planning purposes in order to have a defense on a

16  fraudulent conveyance claim?

17             MR. BAIO:   I would probably assert lack of foundation

18  on that.

19             THE COURT:   Yes.

20             You may answer if you are aware.

21             THE WITNESS:   Well, I don't know what is on the

22  website.

23  BY MR. POMERANTZ:

24  Q.   But, if you and Mr. Rubinstein discussed the fact that you

25  should say that you were doing the family limited partnership

1525ari1                         Gorton - cross

1  transfers for estate planning purposes in order to defend

2  yourself against a fraudulent conveyance claim, you won't

3  answer that question because you're asserting privilege,

4  correct?

5  A.  I'm a little -- the question was a little complicated.

6  Q.  Yes, it was a really poor question.  I will try it again.

7       You won't tell us anything that you and Mr. Rubinstein

8  discussed during your conversations, correct?

9  A.  That's correct.

10 Q.  Including whether he advised you to say that you were doing

11 these transfers for estate planning purposes, correct?

12 A.  Correct.

13 Q.  But these transfers did not occur until June 30th, 2005,

14 correct?

15 A.  Yes.

16 Q.  And that happened after all of these communications with

17 Mr. Rubinstein, correct?

18 A.  Yes.

19 Q.  Mr. Baio showed you Defendant's Exhibit 133 which is a

20 chain of e-mails?

21 A.  Yes.

22 Q.  Do you see the redacted stamp that is on the first page of

23 this four different times?

24 A.  Yes.

25 Q.  Do you know what's been redacted from this document?

1525ari1                      Gorton - cross

1  A.  No.

2  Q.  Do you understand that's been redacted because you're

3  asserting the privilege?

4  A.  Yes.

5  Q.  At the time that you transferred the assets into the family

6  limited partnerships on June 30, 2005, you were aware that that

7  transfer could protect your assets in the event of a legal

8  judgment against you personally, correct?

9  A.  To some extent, yes.

10        MR. POMERANTZ:  Your Honor, that's all the questioning

11  I have on this particular subject.

12        THE COURT:  Okay.

13        Anything further from defense counsel?

14        MR. BAIO:  No, your Honor.

15        THE COURT:  Thank you, Mr. Gorton.  You may step down.

16        MR. BAIO:  We had another subject.

17        THE COURT:  Oh yes.

18        MR. BAIO:  The second subject.

19        THE COURT:  Go ahead with your --

20        MR. POMERANTZ:  Your Honor, that is not the case.  I

21  went back and read the transcript of the call on Friday where

22  this issue came up.  Your Honor only asked about the family

23  limited partnerships.  Your Honor's ruling with respect to the

24  Bilzerian issue dealt with two different subjects, both of

25  which we have briefed and both of which your Honor actually

1525ari1                           Gorton - cross

1  ordered, one relating to Mr. Gorton's view of the lawfulness of

2  his conduct in running Lime Wire and the other was with respect

3  to the lawfulness of the establishment of the family limited

4  partnerships.  Your Honor only asked about the family limited

5  partnerships, I believe, in that call.

6           The other issue has been briefed and ruled upon and I

7  believe your Honor's questioning was only with respect to the

8  family limited partnership.  I don't think we are re-opening

9  the door to --

10          THE COURT:  I focused on the family limited

11  partnerships because I had far less factual information about

12  them collected in any one place where I could put it all

13  together -- which you have helpfully done -- now, but I would

14  like to hear voir dire on the good faith.

15          MR. BAIO:  And your Honor, I think when you look at

16  the transcript you will see that I identified a series of

17  questions having to do with what Mr. Gorton could or couldn't

18  testify to in light of the various rulings that you have had.

19  And that's part of what this is about.

20          THE COURT:  Yes.

21  DIRECT EXAMINATION

22  BY MR. BAIO:

23  Q.  Mr. Gorton, did Lime Wire generate any operating profits?

24  A.  Yes.

25  Q.  And what are operating profits?

1    A.   The differences between -- or the difference between

2    revenues and operating expenses.

3    Q.   And, what did Lime Wire do with its operating profits over

4    its existence?

5    A.   Well, two things:   One is made distributions to investors;

6    and secondly, it re-invested in the business.

7    Q.   How much money have you and entities in which you have an

8    interest, including the family limited partnership, received

9    from Lime Wire since its inception?

10   A.   $31 million.   31.

11   Q.   When was the last time there was a distribution of profits

12   to the family limited partnership or any other owners of

13   Lime Wire?

14   A.   February of 2008.

15   Q.   And, did Lime Wire have operating profits since February of

16   2008?

17   A.   Yes.

18   Q.   And, what did Lime Wire do with those operating profits?

19   A.   It invested in building a subscription music service.

20   Q.   And what was Lime Wire's plan for that subscription music

21   service?

22   A.   The plan had two parts:   The first was the Lime Wire music

23   store which was a website which sold licensed independent music

24   online; and the second part was a conversion plan in which

25   Lime Wire proposed to attempt to convert free peer-to-peer

1    users to paying users of a licensed music subscription service.

2    Q.  And, what happened with that service?

3    A.  We had extensive negotiations with the record industry,

4    major record labels primarily, but also the music publishers

5    and the independent labels, and we were never able to reach a

6    deal with all of the parties and we were never able to launch

7    that service.

8            MR. POMERANTZ:  Your Honor, although we are going

9    to -- I'm not going to interrupt because we are only in voir

10   dire.  I do believe he has potentially crossed the line with

11   respect to one of your *in limine* rulings with respect to

12   settlement.

13           THE COURT:  I understand.

14           MR. BAIO:  Your Honor, that is what I would like to

15   argue because there are a number of things and I will read from

16   your -- actually, that's my examination but in the summary

17   judgment decision, your Honor, on page 53, you held that Gorton

18   conceived of and was heavily involved in developing the

19   conversion plan.  He represented Lime Wire in negotiations with

20   the recording industry over the conversion plan.

21           In addition, in the letter that they sent to you on

22   Friday they said specifically, in paragraph 28, that one of the

23   findings is that Mr. Gorton represented Lime Wire in

24   negotiations with the recording industry over the conversion

25   plan.

1           This is not discussing settlement.  It is not

2      discussing anything other than what was permitted and

3      actually --

4           THE COURT:  And if you were to articulate for the

5      record what the relevance of that is how would you articulate

6      it?

7           MR. BAIO:  I would say that it is relevant, certainly

8      as the way that they have articulated it in their letter which

9      was that it was a finding that they're asking you to read to

10     the jury and that there was a plan to move from free to a

11     subscription service.

12          THE COURT:  And the relevance of that, again, is what?

13          MR. BAIO:  The relevance of that is that that's where

14     the money went, among other things.

15          MR. POMERANTZ:  Your Honor, I believe Mr. Baio is

16     mistaken about what we ask your Honor to read to the jury.  We

17     only have five findings and those are in our proposed

18     instruction.

19          The letter we sent on Friday was solely for the

20     purpose of enforcing your Honor's order regarding the inability

21     to offer evidence inconsistent with factual findings and we

22     simply wanted to have a handy list for everyone to be able to

23     refer to in the event some evidence is offered that we think is

24     inconsistent with prior orders.  And we will submit a list,

25     your Honor with a check list and citation to the order.

1    May I request the following, your Honor?  We did not

2    anticipate subjects beyond the FLPs as part of this voir dire

3    and I understand your wants to hear this other part.  We could

4    quickly craft a short line of questioning for Mr. Gorton over a

5    lunch break and I'm sure it would be very short given that the

6    length of their examination and we would be prepared to finish

7    that examination and then argue whatever issues your Honor

8    wants to argue with respect to the Bilzerian issues after that

9    short examination.

10    THE COURT:  All right.  I'm attempting to speculate as

11    to what you each would argue with respect to Rule 403 on no. 28

12    of plaintiff's letter where the money went.  I will ask you to

13    argue that after lunch.

14    Okay.  Let's take a lunch break, then.  Shall we say

15    until 1:45?

16    MR. POMERANTZ:  That's fine, your Honor.

17    THE COURT:  Is that more time than you need?

18    MR. BAIO:  Yes, your Honor.  Thank you.

19    THE COURT:  Thank you.

20    (Luncheon recess)

21    (Continued next page)

22

23

24

25

152nari2

| | |
|---|---|
| 1 | MR. BAIO:  I was done, your Honor.  Did you want |
| 2 | argument or did you want more testimony. |
| 3 | THE COURT:  I thought we should take more testimony |
| 4 | first. |
| 5 | MR. BAIO:  OK. |
| 6 | I assume, your Honor, at the trial there will be one |
| 7 | cross-examiner, not two. |
| 8 | MR. POMERANTZ:  That is our plan, your Honor. |
| 9 | THE COURT:  I would assume so.  Thanks. |
| 10 | MR. BAIO:  OK.  This is not the same person. |
| 11 | THE COURT:  All right.  I remind you that you are |
| 12 | still under oath, Mr. Gorton. |
| 13 | THE WITNESS:  OK. |
| 14 | CROSS EXAMINATION |
| 15 | BY MR. KLAUS: |
| 16 | Q.  Good afternoon, Mr. Gorton. |
| 17 | A.  Good afternoon. |
| 18 | Q.  Mr. Gorton, so we are clear, it is your testimony that you |
| 19 | did not conceive of the plan of utilizing family limited |
| 20 | partnerships in order to avoid potential legal exposure from |
| 21 | being sued by the plaintiffs in this case or anyone else, |
| 22 | correct? |
| 23 | MR. BAIO:  Your Honor, I thought that we were moving |
| 24 | to the second issue.  That sounds like the first one. |
| 25 | THE COURT:  I will take any testimony that is |

1    relevant.  Would you repeat the question.

2                MR. KLAUS:  Sure.

3                THE WITNESS:  Thank you.

4    Q.  It is your testimony, sir, that you did not conceive of the

5    plan of utilizing family limited partnerships to avoid any

6    potential legal exposure from being sued by the plaintiff in

7    this lawsuit or anyone else, correct?

8    A.  Correct.

9    Q.  In fact, it is your testimony, sir, you have said under

10   oath that at the time those transactions took place, June of

11   2005, you did not believe that you or LimeWire would be sued

12   for copyright infringement, correct?

13   A.  Correct.

14   Q.  You have said that the first time you were threatened with

15   legal action by the plaintiffs in this case was on September

16   13, 2005, when you received a cease and desist letter on behalf

17   of them, correct?

18   A.  Yes.

19   Q.  Now, after September 13, 2005, you continued to have

20   discussions with Mr. Von Lohmann regarding copyright law,

21   correct?

22   A.  I don't know.

23   Q.  If I could ask you, sir, to turn to tab 13 in the binder

24   that we gave you, page No. 8.  Are you there?

25   A.  Yes.

152nari2                        Gorton - cross

1    Q.  If I could ask you to look at entry No. 119 on the

2    privilege log.  Do you see that there is an entry dated

3    December 10, 2006 from Mr. Von Lohmann to yourself and to

4    Mr. Baker?

5    A.  I see that.

6    Q.  Looking at that, does that refresh your recollection that

7    you continued to have discussions with Mr. Von Lohmann about

8    copyright law after September of 2005?

9    A.  No.

10   Q.  You have no reason on doubt the accuracy of that entry, do

11   you?

12   A.  No, I do not.

13   Q.  You had discussions, in fact, about your potential legal

14   exposure with respect to this matter and LimeWire with

15   Mr. Baker after September of 2005, correct?

16   A.  I had lots of conversations with Mr. Baker.

17   Q.  You had lots of communications with Mr. Baker about your

18   potential exposure to liability with respect to this case,

19   correct?

20          MR. BAIO:  Which Mr. Baker?  Is this the trial

21   counsel.

22          MR. KLAUS:  This is Mr. Charles baker.

23   A.  Yes.  So the question -- so I mean, I talked with him a

24   lot.  I mean, I hired him after the litigation had started.

25   Q.  I understand that, sir.

1          All I'm asking you is you had discussions with him,

2     with Mr. Charles Baker regarding the subject of your potential

3     legal exposure in connection with this case, correct?

4     A.  Yes.

5     Q.  You have claimed privilege over all of those conversations,

6     correct?

7     A.  Yes.

8     Q.  So you are not going to tell us any of the matters that you

9     discussed with Mr. Baker regarding your potential legal

10    exposure, correct?

11    A.  Yes.

12    Q.  You are not going to tell us the conversations that you had

13    with any of your litigation counsel with respect to your

14    potential legal exposure in this matter, that's right, isn't

15    it?

16    A.  Correct.

17    Q.  You are not going to tell us any conversations that you had

18    with Mr. Von Lohmann regarding your potential legal exposure in

19    this case with respect to this matter after September of 2005,

20    correct?

21    A.  Yes.

22    Q.  Now, you continued to have discussions with Mr. Rubinstein

23    after June of 2005, correct?

24    A.  Yes.

25    Q.  In fact, you had communications with Mr. Rubinstein or

152nari2                    Gorton - cross

1    people in his office in 2006, right?

2    A.  I don't know.

3    Q.  Would you take a look at tab 14 of your binder, which is

4    Mr. Rubinstein's privilege log.

5    A.  Which page?

6    Q.  The first page.

7    A.  OK.

8    Q.  Are you there?

9    A.  Yes.

10   Q.  If you look at the first several entries, do you see there

11   entries involving communications from Ms. Camblin, who is

12   someone who works in Mr. Rubinstein's office, with you in 2005,

13   2006 and 2007?  Do you see those entries?

14   A.  Yes.

15   Q.  You have no reason to doubt the accuracy of that log,

16   correct?

17   A.  No.

18   Q.  So is it a fact you continued to have discussions with

19   Mr. Rubinstein and people in his office in 2006, sir?

20   A.  I see there's one e-mail.  I am not sure that qualifies as

21   discussions.

22   Q.  If you look throughout this log you will see references to

23   communications in, multiple communications in 2006 and 2007?

24   A.  Yes.

25   Q.  Would this log refresh your recollection that you continued

1  to have discussions with Mr. Rubinstein's office in 2006 and

2  2007, sir?

3  A.  I have no memory of them, but I see that they are e-mails.

4  Q.  Seeing those e-mails, you don't doubt their accuracy, do

5  you?

6  A.  No.

7  Q.  Do you see on the first page of this log that you have a

8  communication six or seven lines down dated September 26 of

9  2008?  You received a fax from Mr. Rubinstein; do you see that?

10 A.  Yes.

11 Q.  It is a fax transmission and attachments reflecting legal

12 advice and work product re estate planning vehicle.  Do you see

13 that?

14 A.  Yes.

15 Q.  You don't have any reason to doubt the accuracy of that log

16 entry, do you?

17 A.  No.

18 Q.  You're claiming privilege over all of your communications

19 with Mr. Rubinstein and his office regarding the advice that

20 they gave to you, correct?

21 A.  Yes.

22 Q.  So if you had discussions with Mr. Rubinstein regarding

23 what actions you ought to take with respect to LimeWire to

24 maintain the validity of your prior transfers, that's not

25 information that you would be willing to share with us, would

1    you?

2    A.   I'm claiming privilege on all our communications.

3            MR. KLAUS:  Thank you.  No further questions, your

4    Honor.

5            MR. BAIO:  I have no other questions, your Honor, but

6    I'm prepared to argue.

7            THE COURT:  All right.  You may step down, Mr. Gorton.

8            THE WITNESS:  Thank you.

9            (Witness left the stand)

10           MR. BAIO:  Your Honor, I think the driver on the

11   objection is your -- at least the main one, there may be

12   others -- is your ruling on the motion in limine concerning

13   something very specific, and that is that the defendant

14   cannot -- I want to get it right.  He is not allowed to submit

15   evidence of his good faith belief in the lawfulness of his

16   conduct.

17           On both points, and I'll take them one at a time, we

18   are not suggesting, and the testimony did not suggest that we

19   are saying that he had a good-faith belief in the legality of

20   his conduct when he established, for example, the conversion

21   plan.  It has nothing to do with his mindset, at least with

22   respect to the legality of that conduct.  We are not going to

23   suggest to the jury that as a result that means the conduct was

24   legal.

25           There are, however, a number of factors under Bryant.

1    One of them, and as your Honor explained to me, the degree of

2    willfulness counts.  The jury must evaluate the degree.  Again,

3    I am not talking about the legality of the conduct.  I'm

4    talking about the conduct.

5         They will identify enhancing documents that

6    demonstrate, in their view, a high level of willfulness.  We

7    believe that the jury should be entitled to see what was

8    actually done to evaluate that conduct and to evaluate the

9    degree of willfulness independent from legality.  He was not

10   suggesting that the conduct was legal.  He was saying this is

11   the conduct that we did.

12        Now, the same is true as to his position with respect

13   to the events that occurred before he went to Mr. Rubinstein.

14   He is saying that he had an intent to engage in estate

15   planning.  They can cross-examine him, as they did, without

16   limit, as to when he started, when did it occur in relation to

17   the Grokster decision, why did he wait so long.  All of that is

18   available to them in cross-examination.

19        Their reference to the legal advice that was received

20   from 2002 and thereafter, including from trial counsel, is

21   something that can actually be raised every time anyone ever

22   had a lawyer.  We didn't learn whether you did X or Y or

23   whether you discussed those things with your lawyer.  That's

24   what the privilege does.

25        What the invocation of the privilege in this case has

1    done for Mr. Gorton and LimeWire is preclude them from saying

2    it was lawful, the conduct that they did.  But those two points

3    that I have identified really have nothing to do with that.

4                THE COURT:  Tell me again what those two points are.

5                MR. BAIO:  Yes, your Honor.

6          One is the use of proceeds from LimeWire and the

7    amount of investment and the extent of activity in the

8    conversion plan.  The conversion plan was admitted in evidence

9    on summary judgment.  The conversion plan does show that there

10   was an attempt to build a store which would require licenses,

11   which they did not receive.

12         He's not suggesting that that event, that is, whatever

13   money was received and was put into the creation of that store

14   and that subscription service was lawful, but we are saying

15   that this is where the money went.  This is what was being

16   built.  And you should evaluate that, jury, in deciding the

17   extent of the damages under, among other things, the expenses

18   saved and the profits earned by the defendant, the conduct and

19   attitude of the parties in respect of this very case, that is,

20   what was LimeWire's conduct and attitude with respect to the

21   business that they were building, and also the degree of

22   willfulness.

23         There were other things that money could be spent on

24   that show more willfulness, and they will bring that out.  But

25   what I am arguing here is that when you look at the actual

1    conduct you need to see that conduct, jury, in order to

2    evaluate what was done and what is the appropriate remedy.

3           Neither Mr. Gorton nor I will say what he did was

4    legal and that what, the steps that he had taken he should have

5    a defense because his conduct was legal or he relied on the

6    advice of counsel.

7           Their questioning on, well, we will never know whether

8    your lawyer told you that, that's true every time anyone has

9    ever invoked the privilege.  You will not know when the

10   invocation is asserted.

11          So what we are trying to do, your Honor, is stay away

12   from the idea, the evidence that what he was doing was lawful

13   because you have precluded that.  But that doesn't mean, and I

14   think where their argument goes is he's not allowed to say

15   anything and we're not allowed to say anything because we never

16   know whether a lawyer said the opposite, even if an event

17   actually occurred.

18          THE COURT:  I am getting quite confused by this oral

19   argument.  Let me see if I can separate the points.

20          The point of the voir dire today was to have the

21   individualized questioning and answers that you in your

22   briefing proposed were required before there be a preclusion --

23          MR. BAIO:  Yes.

24          THE COURT:  -- of a declarant's testimony about his

25   own good faith.

1              MR. BAIO:  Not his own good faith, your Honor.  We

2     also have the motion in limine relating to the summary judgment

3     and nothing running afoul there.

4              THE COURT:  Right.

5              MR. BAIO:  So what we wanted to find out was whether

6     these two areas stay within the scope of the Court's rulings.

7              THE COURT:  All right.

8              Now, one area is the amount of investment and the

9     conversion plan.

10             MR. BAIO:  Yes.  And the fact of the conversion plan

11    and the amount of money that was put in after February of 2008

12    in that plan.  Many millions went into that particular

13    approach, which was building the store, which actually did

14    occur, but only with independent licenses, so third parties

15    weren't involved.

16             THE COURT:  Tell me what the relevance of that is

17    again.

18             MR. BAIO:  The relevance is, among other things, your

19    Honor, Bryant factor number two, the expenses saved and profits

20    earned by the defendant.

21             THE COURT:  If he had put the money into the stock

22    market and it went up or down, you are saying that's relevant?

23             MR. BAIO:  They would have used that.  They have a

24    slide, your Honor, which says that he did this all for the

25    money.  And they are entitled to say that.  We want simply the

1    jury to see where the money went.

2             THE COURT:  What if it went to take care of his ailing

3    mother?  I don't understand the relevance of it.

4             MR. BAIO:  If it did take care of an ailing mother,

5    that might not be an ameliorating factor.  That might not show

6    an absence or a softening of willfulness.  They are going to

7    say he is the most willful person ever.

8             THE COURT:  Why does it necessarily show willingness?

9    What if the testimony from plaintiffs is he's, who knows what

10   they might say, he's so slippery, he's so impossible, of course

11   we could never have any serious business dealings with him.

12            MR. BAIO:  They can say all of that, your Honor.

13   There is nothing precluding them whatsoever.

14            THE COURT:  OK.  I will hear them on that.  What is

15   the second point?

16            MR. BAIO:  The second point, your Honor, is they are

17   accusing Mr. Gorton of a fraudulent conveyance.  So they say by

18   clear and convincing evidence they can say that he intended to

19   defraud them or other creditors.

20            What we simply want to do is allow Mr. Gorton to

21   describe how it came about and what its economic effect was;

22   that is, only a certain percentage went to his wife, went to

23   his children, other assets were outside.  It's factual.

24            It is factual as to the timing, and the other

25   questions that I asked put it in its context.  It has nothing

1    to do with legal advice.  It has nothing to do with their

2    ability to cross-examine him.  We are not asserting to the jury

3    that he is relying on something that he learned in a good-faith

4    belief that his conduct was lawful.  That's not the point

5    there.  It is addressing their allegations.

6            THE COURT:  I understand.  I understand you have a

7    work-around here.

8            MR. BAIO:  Yes, it is a work-around.  Actually, that

9    is what we are trying to do, your Honor.  We take your rulings

10   and we are trying to find out where we can go and where we

11   can't go.  We think these two places are places that do not go

12   afoul of your rulings.  They still have sufficient and ample

13   material to use to argue and to cross-examine the witness and

14   we just want the jury to know these facts.  That's it.

15           THE COURT:  Let me hear from plaintiffs' counsel.

16           MR. POMERANTZ:  Your Honor, if I may address

17   Mr. Baio's two points in reverse order.

18           THE COURT:  Yes.

19           MR. POMERANTZ:  The second point he raised, trying to

20   put his decision to put money into the FLPs into context, that

21   is exactly what we briefed in the, what I will call the

22   Bilzerian motion in limine and exactly what the court ruled

23   upon.

24           What they want to do is to say what Mr. Gorton was

25   thinking about why he put the money in there, I did it for

1  estate planning purposes, and talk about the birth of his

2  children, the marriage and all of that, but then deprive us of

3  what he actually talked to his lawyer about, the person who

4  created the FLPs with him.

5       His testimony has been that he didn't think of the

6  FLPs.  His lawyer advised him that that was the vehicle he

7  should use.  If you look at the questions that Mr. Baio asked

8  him during his voir dire today, it exposes why we would be

9  terribly prejudiced if we couldn't know exactly what

10 Mr. Rubinstein and Mr. Gorton discussed.

11      So, for example, Mr. Baio asked him, I learned that

12 assets didn't belong to me, so he asked him about,

13 did he learn that if you create the FLPs it will protect your

14 assets from a judgment.  He said yes.  And then Mr. Baio

15 followed up, Is that why you created the FLPs?  No.

16      You can't get, Mr. Gorton can't be allowed to testify

17 to just a portion of his state of mind, which is exactly what

18 he's doing, why did you create the family limited partnerships?

19 This is precisely the issue your Honor addressed in the order

20 that was issued.  Your Honor cited to the declaration that

21 Mr. Gorton had previously submitted in this case in which he

22 said that the reason why he created the FLPs had nothing to do

23 with his legal exposure for copyright infringement.  That's

24 exactly what he said, and your Honor quoted his declaration.

25 Of course we can't know that for certain unless we know what

1    his lawyers were telling him both about his exposure for

2    copyright infringement and about what the creation of family

3    limited partnerships may do to protect his assets in the event

4    that that exposure was realized.

5              THE COURT:  Just a moment.

6              Go ahead.

7              MR. POMERANTZ:  Your Honor quotes a decision in the

8    Pereira case in your order.  First you cite to Bilzerian, then

9    you cite this, the following:  "Indeed a party cannot be

10   permitted on one hand to argue that it acted in good faith and

11   without an improper motive and then on the other hand to deny

12   access to the advice given by counsel where that advice played

13   a substantial and significant role in formulating actions taken

14   by the defendants."

15             We know it is undisputed here that the family limited

16   partnerships were created upon advice by Mr. Rubinstein.  And

17   know from Mr. Rubinstein's website what his general modus

18   operandi is with respect to creating these kinds of family

19   limited partnerships.

20             THE COURT:  Now, as I understand it, at this point

21   that will not be before a jury because Mr. Gorton claims not to

22   have seen the website.

23             MR. POMERANTZ:  No, your Honor.  We will put it in

24   front of the jury through Mr. Rubinstein.  In other words, what

25   we have the absolute right to do is to have Mr. Gorton explain

1    what he did and then to have Mr. Rubinstein basically line up

2    what he recommends publicly through his website and be able to

3    show to the jury that Mr. Gorton in fact did exactly what

4    Mr. Rubinstein recommends doing to someone who wants to shield

5    their assets from a litigant.  It's expressed in the -- we

6    don't have to rely on privileged information to do that because

7    it's right in his website.

8              THE COURT:  Would the defense like to speak to that?

9              MR. BAIO:  Yes, your Honor.  I understand that's what

10   the cross-examination will be, and it will be significant.  We

11   are not trying to stop the evidence.  What they are trying to

12   do is take your Honor's ruling that said that the defendant may

13   not say that he acted in a good-faith belief that his conduct

14   was lawful, and that's not what he is saying anywhere, and they

15   will test that through all of the evidence that Mr. Pomerantz

16   has just said -- the website, what the lawyer has said to

17   people -- and it doesn't change what motivated Mr. Gorton to go

18   in the first instance.

19             They will get all of the inferences.  They will try,

20   they will build on it.  We are just saying that he has this

21   very preliminary beginning.  He goes to this lawyer and then he

22   ends up with a flip that has certain results, 48 percent for

23   him, still fully exposed, 48 percent for his wife, and 2

24   percent for each of his children.  That's it.

25             They can cross-examine until the cows come home if

1    they wish.  They have tons of information, and they intend to

2    put it on.  It is just a question of whether he can respond

3    with that one thing.

4           It is not to say that he has a good-faith belief in

5    the legality of his conduct.  We are not going to make that

6    argument anywhere.

7           MR. POMERANTZ:  Your Honor, I believe what they want

8    to do is tell the jury half the story.  This is exactly the

9    Bilzerian and Pereira case.  They want Mr. Gorton to be able to

10   get on the stand and say, I did this only for estate planning

11   purposes, and I did not do it to shield my assets.

12          But we know that there are privileged communications

13   between him and Mr. Rubinstein which were directly related to

14   creation of the FLPs that we are not being permitted to see or

15   question the witnesses about.

16          The whole issue here is why did he create the FLPs and

17   transfer his assets three days after the Grokster decision.

18   They are trying to get into evidence half the story in a way

19   that would deprive us then of effective cross-examination of

20   that story because they're shielding it behind the privilege.

21          THE COURT:  Just a moment.

22          How do you fit this case into Bilzerian factually?

23          MR. POMERANTZ:  Your Honor, the factual overlap is

24   that the state of mind of the defendant is what is at issue

25   here.  That is at the core of the fraudulent conveyance claim.

1    At the core of the fraudulent conveyance claim is what was he

2    thinking when he transferred the asset.  When that thinking is

3    substantially, to use the words of Pereira, when the legal

4    advice plays a substantial and significant role in formulating

5    the actions, you can't allow just half the story on state of

6    mind, that is, the part that they want to disclose.

7            Here, because the key to a fraudulent conveyance claim

8    is for us to be able to show that he took this action in order

9    to hinder our ability to collect on a judgment in the future,

10   therefore, front and center is state of mind and what he was

11   thinking at the time.  He wants to say I was acting in total

12   good faith.  I was doing it only for estate --

13           THE COURT:  There are many statements he has made in

14   the past that probably would have resulted in piercing the

15   attorney-client privilege.  But as I understand it, defense

16   counsel have backed off making those statements and you plan to

17   make much more modest statements.  Is that right, Mr. Baio?

18           MR. BAIO:  Yes, it is, your Honor.

19           THE COURT:  So I think some of your argument is

20   arguing from the case that used to be and not the case that

21   will be.

22           MR. POMERANTZ:  No, your Honor.  It was their choice

23   whether to assert the privilege.  It is their choice.

24           THE COURT:  I know.

25           MR. POMERANTZ:  Once they choose to assert the

1    privilege, they cannot then try to use only the nonprivileged

2    portion to show his state of mind on the very same subject

3    which he got legal advice on.  That's what Bilzerian is talking

4    about.

5               THE COURT:  I don't think you have gone far enough to

6    fit it within Bilzerian.  I will consider it further, but I

7    don't think you have done that.

8               MR. POMERANTZ:  Your Honor, I think the first time

9    this is likely to come up, assuming it's not raised in opening,

10   is when Mr. Gorton testifies.  I would ask for the opportunity

11   to have brief argument on this issue right before that so your

12   Honor can see it in the context of the trial as it exists at

13   that time.

14              THE COURT:  All right.  Where is he on the witness

15   list?

16              MR. POMERANTZ:  Several witnesses down.  I don't know

17   if it will be late this week or sometime next week.  I am not

18   sure.

19              THE COURT:  OK.

20              MR. BAIO:  The only issue I would have with that, your

21   Honor, is in opening, if we are going to hear all about

22   websites and intention and all of the other stuff and the

23   timing, for example, of the thing, the closing being set three

24   days after Grokster, I should be able to say that in fact that

25   was set before Grokster came down.  That is simply a fact.

1          THE COURT:  Some before, some after.

2          MR. BAIO:  Pardon me?

3          THE COURT:  Some before and some after.

4          MR. BAIO:  The setting of the time, that is, when will

5   this thing close, that was June 20.

6          THE COURT:  Right.

7          MR. BAIO:  The Grokster decision is the 27th.  Unless

8   they have some way of saying that they saw a crystal ball on

9   the 20th, and maybe they do, they can make whatever argument

10  they want, but as a matter of chronology that meeting was set

11  before the Grokster decision came down.  I am just talking

12  about facts now.  I don't know how much they will be putting in

13  their opening.

14          But if they do, I would like to be able to have some

15  understanding of what facts I can refer to.  Right now I would

16  assume that those facts are usable.  If they say that he waited

17  until after Grokster, three days after Grokster to move this

18  money, it is actually not fully accurate, and that has nothing

19  to do with privileged communications.

20          THE COURT:  Which portion is not accurate?

21          MR. BAIO:  That he did all of this three days after

22  Grokster.

23          THE COURT:  When you say "all of this," what do you

24  mean?

25          MR. BAIO:  He did this in reaction to Grokster.

1  Because he had everything --

2          THE COURT:  I would understand you if you would be

3  more specific.

4          MR. BAIO:  Yes, your Honor.

5          They are saying this he moved his assets three days

6  after Grokster, and we believe the jury should understand that

7  the timing of the signing was June 30 because that's when the

8  financial data is available for the companies, and that was

9  scheduled on June 20.  So at the time it was scheduled for

10  everybody to sign, when everybody could go, Grokster had not

11  come down.

12          So to say that it was somehow the provocative event is

13  inaccurate.  At least I should be able to argue it in terms of

14  the timing of the setting of the meeting.

15          THE COURT:  I understand.

16          MR. BAIO:  That is all, your Honor.

17          THE COURT:  OK.

18          MR. POMERANTZ:  Your Honor, all we were saying,

19  because I do intend to talk about the transfer of the assets

20  three days after Grokster in the opening.

21          The idea that they can sit there and say that his

22  state of mind was that he was doing this only --

23          THE COURT:  They are not using the word state of mind.

24  You have to look at the words they're using and argue from

25  that.

1           MR. POMERANTZ:  Your Honor, what they are saying --

2     forget about the words state of mind.  If they want to be able

3     to argue to the jury that he was doing this only for estate

4     planning purposes, then they had to produce the privileged

5     documents because those documents would tell us whether he was

6     only doing it for estate planning purposes or not.

7           THE COURT:  I am not sure you have made a good enough

8     case to pierce.

9           MR. POMERANTZ:  I'm sorry?

10          THE COURT:  I am not sure you have made a good enough

11    case to pierce the attorney-client privilege.

12          MR. POMERANTZ:  We don't want to pierce the

13    attorney-client privilege.  We want to hold them to the choice

14    they made, which is to say, once they have asserted the

15    privilege, then under Bilzerian and other cases they cannot

16    offer evidence of the state of mind, because it is affected by

17    the legal advice that they received that they are declining to

18    turn over.

19          THE COURT:  Now, in Bilzerian, as I understand it, the

20    defendant was saying I thought that it was lawful for me to

21    describe the source of my funds as "personal," which was

22    asserting the good faith of the legality of the disclosure he

23    made.  You are saying this case fits squarely within that?

24          MR. POMERANTZ:  The portion of your ruling which deals

25    with the family limited partnerships, which is the only portion

1   we are talking about, yes, we believe that fits squarely within

2   that.  What he's now saying is I thought I was doing this only

3   for estate planning purposes, and therefore it was a legitimate

4   transfer.  That's exactly the same kind of situation where he's

5   trying to justify the legality of the transfer by saying my

6   state of mind was to transfer it only for estate planning

7   purposes.

8           We believe that we will be able to show the primary

9   purpose for transferring was to shield the assets from a

10  potential judgment by the record companies, not for estate

11  planning purposes.

12          THE COURT:  I will give it more thought.

13          MR. POMERANTZ:  Thank you, your Honor.

14          MR. BAIO:  That is all we have today, your Honor.

15          THE COURT:  OK.  Good.

16          You will note on the voir dire that we have taken off

17  some names.  I think eMusic, iMesh, Rhapsody.

18          Is this an acceptable final questionnaire for the

19  jury?

20          Perhaps we should move to the final song list.

21          MR. BAIO:  Who would you like to hear from first on

22  that, your Honor?

23          THE COURT:  Let's see.  I think I should hear from

24  plaintiffs.

25          When did this distinction first come up, the

1   unpublished?

2          MR. KLAUS:  The unpublished versus the published

3   distinction, your Honor?

4          THE COURT:  Yes.

5          MR. KLAUS:  I believe it is within the last week.  I

6   am not positive, but I believe it was within the last week.

7          THE COURT:  OK.

8          MR. KLAUS:  This is the issue that concerns

9   approximately 30 of the works I think that are in dispute.  I

10  believe that, as to those, they were registered as unpublished

11  works.  I believe they were later registered as published

12  works, although outside of the 90-day time period.  And there's

13  simply a legal disagreement between the defendants and between

14  us as to whether or not that implicates Section 412.

15         THE COURT:  All right.

16         MR. KLAUS:  Just to be clear on the legal distinction,

17  your Honor, 412 itself subsections (1) and (2) are phrased in

18  the disjunctive.

19         THE COURT:  Do you have the text of them attached to

20  your May 2 letter.  I'm sorry.  Willkie Farr, do you have the

21  text attached to your letter?

22         MR. BAIO:  Your Honor, Mary Eaton from my office will

23  be handling this argument.

24         THE COURT:  OK.

25         MS. EATON:  Good afternoon, your Honor.  I don't have

1    the text of Section 412 attached to the letter, but if your

2    Honor would like I do have a copy here for my own use that I am

3    willing to share obviously.

4               THE COURT:  That would be helpful.  Thank you.

5               I will take a minute to read it.

6               OK.  Sorry, Mr. Klaus.  I'm ready.

7               MR. KLAUS:  That's OK.

8               So the question is whether or not, if one has

9    satisfied with respect to the same work -- although in

10   Ms. Eaton's letter this morning there is some claim that maybe

11   it's not the same work.  They concede that for purposes of

12   their argument they are going to accept that it's the same

13   sound recording that once was unpublished and registered as

14   such in an indisputably timely manner and then was later

15   registered as a published work.

16              It is simply our position that if one has satisfied

17   that registration requirement for the unpublished work under

18   Section 412(1), then under your Honor's construction of Section

19   412, where the purpose is to encourage prompt registration, the

20   plaintiff has done enough.

21              You will remember in your March 29 opinion, your

22   Honor, the entire basis for your construction of Section 412

23   was to say that the statute is designed to encourage prompt

24   registration.  Therefore, when we have this circumstance that,

25   insofar as anyone can tell, no Court has faced before about the

152nari2                         Gorton - cross

1    application of Section 412 to someone who induces copyright

2    infringement through a peer-to-peer service, we are going to

3    place a premium on that question of encouraging prompt

4    registration.  But where that has been done, it doesn't seem to

5    make sense to say that we're also going to hold you and tag you

6    for being late under 412(2).

7              THE COURT:  Can you tell me more simply what you are

8    saying.  I can try to rephrase it, but I know you will do it

9    better.

10             MR. KLAUS:  Our point, your Honor --

11             THE COURT:  Yes.

12             MR. KLAUS:  -- is that the works were registered as

13   unpublished works within the timing of the statute under

14   Section 412(1), and we think that's sufficient to make the

15   works eligible for statutory damages.

16             THE COURT:  Well, the statute seems to say there are

17   two circumstances in which no award of statutory damages shall

18   be made.  One is in paragraph numbered (1) and one is in

19   paragraphed numbered (2).  Is there a factual scenario that

20   mixes them up?

21             MR. KLAUS:  I'm sorry, your Honor.  I didn't follow

22   you.

23             THE COURT:  Does the same work fall within both

24   subparagraphs?

25             MR. KLAUS:  The same work falls within both

1    subparagraph (1) and (2).  You're correct.

2              THE COURT:  I don't know the answer.  What is your

3    argument?

4              MR. KLAUS:  Our argument, your Honor, going back, is

5    that it's phrased in the disjunctive.  That is number one.

6              The second argument, your Honor, is that the reason

7    for the construction of Section 412 that has been given in this

8    case, which is stated in your opinion and order, is that the

9    purpose of the statute is to encourage copyright owners to

10   register promptly.  If that has been done with respect to an

11   unpublished work, where the registration of it, it was

12   registered as such, and thereafter the work is infringed

13   through the system that the defendants used to induce

14   infringement, then in these circumstances Section 412 should

15   not be a bar to recovering statutory damages.

16             THE COURT:  All right.  And the defense?  Responses?

17             MS. EATON:  Good afternoon, your Honor.

18             There are actually two separate and distinct issues

19   that are posed by plaintiffs' second amended final list of

20   recordings, one of which is a relatively new issue, the one

21   that we've just been addressing; the other of which is an old

22   issue that we thought we had put behind us that we wanted to be

23   sure to cover with your Honor today.

24             Let me begin with the relatively new issue that has

25   arisen with respect to the appropriate interpretation of

152nari2                    Gorton - cross

1   Section 412 of the Copyright Act.

2            As I understand plaintiff's position, and it is laid

3   out in an e-mail exchange between Ms. LeMoine and I that took

4   place on April 27 and April 28, just last week, which is

5   Exhibit J to my letter of today to the Court, and in that

6   exchange you will see what plaintiffs' position is.  Our

7   position is that the Copyright Act, Section 412, encourages

8   prompt registration of all copyrights, and there are numerous

9   cases on that point, including cases that have been cited by

10  both sides to your Honor in prior briefing on Section 412, and

11  indeed in this court's prior decisions with respect to that

12  provision.

13           In either case, it was Congress' intent that the

14  copyright holder should register early, and only if the

15  copyright holder registers the work before it is infringed are

16  they entitled to statutory damages.

17           The only difference between subsection (1) and

18  subsection (2) is that subsection (1) applies to unpublished

19  works whereas subsection (2) applies to published works.

20           There are scenarios in the case law, including in the

21  Bouchat decision -- with which I'm sure the Court is familiar,

22  we've discussed it many times before -- whereby the work in

23  question was first infringed while in unpublished form, later

24  registered, and the infringement continued.

25           This was the case of course about the logo for the

Baltimore Ravens.  In that case the Fourth Circuit held that

there was no right to statutory damages because the

infringement began preregistration, even though that

infringement happened with respect to the unpublished work.

So the rule in the cases interpreting this statute is

that no award of statutory damages shall be made in any case

where the infringement commences prior to registration, and it

makes no difference whether that occurs when the work is in

published form or in unpublished form.

So it's our view that it remains plaintiffs' burden to

show the timing of the infringement for each work on their list

and to establish that that infringement happened through the

LimeWire system before the work was registered.  It doesn't

matter whether it was registered in published form or, as we

just learned last week, for some songs in unpublished form, the

result is the same in either case.

I would point out for your Honor that this is not an

issue that's limited to these 31 songs.  It's a much bigger

issue.  According to our calculations, there are 9,561 songs

for which the plaintiffs are seeking statutory damages.  4,497

of those songs were published versions of those songs that were

registered with the copyright office before the LimeWire system

became available.

That means that there are 5,064 songs that were

available and not registered in published form while the

1    LimeWire system was available.  Of that group of songs, we've

2    already established that 1,302 of them were not timely

3    registered within the meaning of subsection (2), that is to say

4    they were published songs that were not registered within three

5    months of the date of first publication.

6            If you crunch all of those numbers, you end up with

7    3,762 songs that could have been infringed in unpublished form

8    and prior to registration.  It is our position that under

9    subsection (1) of Section 412 of the Copyright Act that

10   plaintiffs bear the burden, as this Court has already

11   determined, of establishing that that infringement did not

12   occur until postregistration.  It is their burden to show that.

13           In that regard, your Honor, I would note that we

14   sought information about just this sort of thing last August in

15   interrogatories which we propounded regarding the date of first

16   infringement for all of the works at issue whether they were in

17   published or unpublished form and have never been supplied with

18   that information.

19           So if it's plaintiff's intent to prove that those

20   songs were in fact not infringed until postregistration, that

21   information has never been supplied to us during the discovery

22   period.

23           Which brings me back to the old issue, the 1,302

24   songs.  These are songs that were, as I say, not registered on

25   time within the meaning of subsection (2), i.e., three months

1   after the date of first publication.

2           Inexplicably those songs remain on plaintiffs' final

3   list of sound recordings.  Inexplicably there is an indication

4   in plaintiffs' proposed final jury instructions that they

5   intend to prove that they are entitled to statutory damages

6   with respect to those works regardless.

7           It is our submission, your Honor, that the game is

8   over with respect to those songs.  There is no genuine dispute

9   that the registrations were made late.  You can determine that

10  simply by looking at the registration certificates and

11  comparing the date of first publication indicated thereon with

12  the effective date of registration.  It is a simple

13  administrative matter that we did for plaintiffs.

14          There's no dispute that for those 1,302 works that

15  they were outside of the three-month grace period.  There is

16  also no dispute, I would have thought, that the plaintiffs are

17  unable to show that the infringement did not take place until

18  registration.

19          Indeed Mr. Pomerantz on more than one occasion has

20  represented both to this Court and to Judge Freeman that the

21  plaintiffs do not know when the first date of infringement

22  happened on the LimeWire system; that they were not in a

23  position to know.

24          And, as it is their burden to make that showing, it is

25  our submission that there's no longer any dispute, at least

152nari2                    Gorton - cross

1    with respect to those 1302 works, and they should be stricken

2    from plaintiffs' list and no mention made of them at the

3    upcoming trial.

4            It is a trial on damages.  These are works as to which

5    they have no claim for damages, either statutory damages or, as

6    your Honor has already held, actual damages.  We have a lot to

7    talk about.  These songs is not one of those things.

8            THE COURT:  Thank you very much.

9            MR. KLAUS:  If I can briefly respond, which I can stay

10   here for your Honor.

11           First, with respect to the smaller issue, it is, as

12   Ms. Eaton was saying, the 30 works, the Bouchat case, the

13   problem there was the works, she said well they were infringed

14   at a time when they were unpublished.  They were also

15   unregistered.  He didn't register them until much later.

16           The law that Ms. Eaton is relying on is the continuing

17   series of infringing acts doctrine, which says if it starts at

18   one point in time and it continues until later, it's just one.

19           I would just point out that in your Honor's opinion on

20   the meaning of 412 in this case, in footnote 3 on page 7, you

21   specifically said that you were not going to address the

22   applicability of the continuing series of infringing acts

23   doctrine.  I confess math is not my strong suit, and I couldn't

24   follow all of the numbers that Ms. Eaton had with respect to

25   the works at issue in this case.

1          THE COURT:  Let me ask you to stop for a minute and

2     compare notes on numbers.

3          MR. KLAUS:  Sure.

4          Your Honor, I did compare, if now is an OK time to

5     restart, I did compare numbers with Ms. Eaton.

6          I confess what I am baffled by is I thought on the

7     Section 412 issue that they were raising an issue with respect

8     to approximately 1,300 works where they said we have compared

9     the date of the registration to the date of -- the dates that

10    list of first publication, and we think there's more than 90

11    days.  So we therefore think the applicability of Section

12    412(2) possibly applies.

13         I thought I heard Ms. Eaton say for the first time in

14    the case, and she just told me again that what she believes is,

15    with respect to the remaining 3,762 works that postdate the

16    opening and operating of the LimeWire system, defendants are

17    now taking the position that it is plaintiff's burden in the

18    case to put on evidence of timely registration of those works.

19    I think that's what she just said.  I have never before heard

20    that we were expected to bring witnesses in to attest to the

21    registration certificates and to put 3,762 copyright

22    registration certificates up on the board with the publication

23    date.

24              (Continued on next page)

25

1525ari3

1          THE COURT:  What I have assumed all along is that you

2     could each look at the same data and come up with lists of

3     which falls within what category.  If you haven't done so, it's

4     time to do it now.

5          MR. KLAUS:  That's exactly what we have done, your

6     Honor, and I think we have this list of approximately 1,300

7     words which have asterisks on them of being outside of 412.2.

8     So, I don't think there is a jury instruction that says that we

9     are required to come in and put on evidence of our being within

10    Section 412.2.

11          So, that's what I --

12          THE COURT:  Help me with the area of controversy.

13    Ms. Eaton, what do you think is controverted here?

14          MS. EATON:  I wouldn't have thought it was

15    controverted but evidently it is.  Our view is that it is

16    plaintiff's burden to show compliance with Section 412 in order

17    to be awarded statutory damages.  What that means is that they

18    must prove that there was no infringement prior to

19    registration.  At the outset we raised the 412 issue generally

20    and by way of example said look at the certificate that they

21    have produced to us.  These certificates, on their face,

22    demonstrate registration.  That has no impact on whether they

23    would be barred from seeking statutory damages under Section

24    412.1, if what they just told me last Thursday is correct,

25    i.e., that the published version and the unpublished version of

1525ari3

the songs, in other words songs pre-release and post-release
are identical works, and that those pre-release songs could be
infringed through the Lime Wire system.  Then it is their
burden to show that they were not infringed until after they
were registered.

          Now, it could very well be that a great many of these
songs were registered in unpublished form.  I don't know that.
I only received a handful of registrations for unpublished
works late last week.  It could very well be that one or more
of the record labels never registered these unpublished songs,
that they waited until they were released and then they
registered them.  But, your Honor, if it's true that they could
have been, as Ms. LeMoine told me late last week, infringed in
unpublished form, then the fact that they were registered in
published form long after the fact does not give them a right
to statutory damages.

          And, I confess to you, I didn't realize that this was
an issue until Ms. LeMoine raised the unpublished registrations
as a justification for late registrations under Section 412.2.
And after she told me that, I went back and looked through the
record to see what the history of discussions on this issue was
and discovered that, yes, indeed, the plaintiffs must have
known that timeliness, in general, would be an issue in this
case because they pled it in their complaint.  You can look at
paragraph 74, for example, of their complaint, which says

1525ari3

1    they're seeking statutory damages for, quote unquote, timely

2    registered works.  It doesn't say timely registered published

3    works only or timely registered unpublished works.  It says

4    timely registered works.

5         You can see that we looked -- it would be propounded

6    in interrogatories, as I mentioned last August, saying tell us

7    the date of infringement for the works that you say you are

8    going to be suing on and their answer was:  A, we don't have to

9    provide you with that information; and B, we don't know that

10   information in any event.

11        If that's true, then I fail to see how they can have a

12   claim for statutory damages for these works.  What they do have

13   is a claim for actual damages, although that's a bridge that we

14   have already crossed, as your Honor will remember.

15        So the dispute, to sum it up is, in essence, the

16   burden is on them to show compliance with 412 either under

17   412.2 for published work or under 412.1 for unpublished works.

18   If they can't do that, those songs should be out of the case.

19        MR. KLAUS:  This is a brand-new argument that

20   Ms. Eaton has come up with within the last 24 hours, your

21   Honor.

22        To be very clear, the Section 412.2 says with respect

23   to published works, which are the overwhelming number of cases

24   here, all except for the 30 that we have been describing, it is

25   not the case -- she says it is our burden to show that there is

1525ari3

1   no infringement before registration as to any of those works.

2   That is wrong.  Section 412.2, on its face, says no award of

3   statutory damage for an infringement commenced after first

4   publication and before the effective date of registration.

5   This is the key proviso, your Honor:  Unless the registration

6   was made within three months of the first publication of the

7   work.

8         They went through the list of 5,064 works that were

9   published after Lime Wire came into existence where they

10  thought they might have a 412 argument.  They obviously

11  compared the first publication date to the effective date of

12  registration.  What they found was that the exception of these

13  1,300 works, they were all either timely or the registration

14  was made within 90 days.  And so, there is this subcategory of

15  1,300 where we have a dispute as to the question of when they

16  were first infringed through Lime Wire.

17        What your Honor resolved last week was a dispute in

18  the jury instructions that with respect to those works, those

19  works that are outside of that 90-day window, approximately

20  1,300 of them, which of us bears the burden of proving that the

21  works were not infringed through the Lime Wire system.

22        The reason we indicated those works with an asterisk,

23  your Honor, is because that is an issue where the jury will

24  hear evidence, they will hear your instruction on the burden of

25  proof, and they will decide either that we have satisfied the

1525ari3

1    burden that you have placed on us or we have not and they'll

2    make their ruling.

3         But, I think that with respect --

4         THE COURT:  I'm confused.

5         MR. KLAUS:  Sure.

6         THE COURT:  On the basis of what evidence will they

7    make that particular determination?

8         MR. KLAUS:  The evidence that we have, your Honor, is

9    we have evidence of when we know the works were, to our

10   knowledge the works were first infringed through Lime Wire.  We

11   have forensic -- we have forensic evidence of that and we

12   don't --

13        THE COURT:  That's contested?

14        MS. EATON:  Well, I can tell you it is news to me,

15   your Honor, and I can read you the quotes from Mr. Pomerantz in

16   his letter to the Court of September of last year, the

17   statements that he made at the November 1st hearing before

18   Judge Freeman, and what they recently wrote to us, I believe it

19   was on April 1st, respecting what evidence they had of the date

20   of first infringement.  I can read those quotes to you now,

21   your Honor.  We were told that they did not know and could not

22   know when the date of first infringement was and therefore

23   could not show that the infringements happened prior to

24   registration.

25        MR. KLAUS:  May I clarify what I said, your Honor?

1525ari3

```
 1            THE COURT:  Yes.

 2            MR. KLAUS:  We have evidence of dates that we know the

 3   works were infringed.  That's what we have physical evidence of

 4   of the date that we are certain that there was infringement.

 5   We are not certain and don't have information as to when,

 6   specifically, the works were infringed before that.  We don't

 7   know that.

 8            THE COURT:  Before what?

 9            MR. KLAUS:  Before those dates as to which we do have

10   certain knowledge.

11            THE COURT:  And you have certain knowledge as to the

12   dates for how many?

13            MR. KLAUS:  I believe it is for, of the 1,300

14   approximately they've placed in issue.  I keep saying

15   approximately, your Honor, because some number have been

16   eliminated from the 1,300 list and it is actually a little

17   closer to 1,200.  But, as to those 1,200 or so, we do have

18   evidence of dates that we know they were infringed.  We don't

19   know that those are the dates that they were not infringed.  We

20   have our witnesses, I would expect to say, that they don't know

21   the dates that they would have been infringed before that and

22   that will be the record.  There will be record evidence about

23   Lime Wire and how it operated and ultimately the jury will have

24   to make a decision as to whether we have satisfied our burden

25   of proof on that 412.2 issue.
```

1          But, as of now, I think what Ms. Eaton was hoping or

2   saying that she was expecting was that as a result of the

3   ruling on the instruction as to which side had the burden of

4   proof, that we would simply drop those works from the case.

5   That's not something that we -- I frankly can't imagine

6   standing before the Second Circuit and saying that because

7   there was a ruling on a burden of proof question that we would

8   have preserved our arguments as to those 1,200 to 1,300 works,

9   your Honor.

10          So, think that there has been a ruling on the burden

11   of proof.  The evidence will come in at trial.  If the evidence

12   is as they say it is, that may be the way that the jury ruled.

13   But, as of now, we just have a ruling as to which side has the

14   burden of proof.

15          THE COURT:  What, if anything, needs to be resolved

16   pretrial?

17          MS. EATON:  If they have further evidence respecting

18   the date of first infringement, your Honor, they should produce

19   it to us including by answering the interrogatories that were

20   propounded approximately 10 months ago.

21          THE COURT:  Are there any that you have not answered

22   as to which you have answers?

23          MR. KLAUS:  We have given them, your Honor, all of the

24   evidence that we are going to rely on on this issue.  They have

25   all of the evidence that we are going to rely on on this issue.

1525ari3

1  We are not going to come in as to one of these works and say,

2  aha, here is a piece of evidence showing a prior date of

3  infringement that we didn't give them.

4       THE COURT:  All right.  Thank you.

5       Yes?

6       MS. EATON:  Very briefly, your Honor.

7            It would not be accurate to say that a dispute over

8  the timing of the date of first infringement is a new issue.

9  This is an issue that we have been discussing from the very

10 beginning and there have been at least six or seven rounds of

11 briefing on this section since at least our firm was involved.

12 So, the notion that they should be surprised by this, I don't

13 think, is a meritorious one.

14           In addition, to which I would point out that the

15 plaintiffs seem to be trading Section 412 as if it was an

16 affirmative defense, the burden of which rests on defendants to

17 plead and prove.  That is simply not the case.  The burden is

18 on the copyright holder to show compliance with 412 before any

19 statutory damages can be awarded.  And if they can't make their

20 proof, they're not entitled to damages.

21           I don't want to test the Court's patience but one last

22 thing and then I promise I will sit down.  The notion that I

23 addressed this in my letter that a subsequent, timely

24 registration of a published work can somehow cure an existing

25 infringement of an unpublished work is bizarre.  Under

1525ari3

1    plaintiff's scenario, one of their songs could be unpublished

2    and infringed, as Ms. LeMoine told me herself last week.  As

3    such, it could be downloaded by, to use Mr. Pomerantz's phrase,

4    bazillions of Lime Wire users.  Subsequently, the label decides

5    to register the song in released form.  That registration is

6    timely, it is done within three months of the date of first

7    publication, i.e., release of the song.  They want to claim

8    that this history of substantial infringement of the unreleased

9    version is somehow inconsequential and that they're entitled to

10   statutory damages regardless.  We don't think that that's a

11   fair reading of the statute and we don't think that the case is

12   supported.

13            THE COURT:  Is there any case law, Mr. Klaus,

14   supporting your interpretation of 412.1 and 2?

15            MR. KLAUS:  Well, it is important to be clear, your

16   Honor, because -- we need to be very clear that what --

17   Ms. Eaton's new argument and I assure your Honor this argument

18   we have briefed 412 more than any of us would probably care to.

19   The Court has probably read more 412 briefing than the Court

20   would ever care to.  The first time we are hearing the argument

21   that's being made now is today.  What Ms. Eaton is saying is

22   that 412.1 establishes a gotcha.  It says that if you have a

23   work that has been an unpublished work, then if there is any

24   infringement of the work at any time that it was unpublished

25   forever, you're forever after that point barred from recovering

1525ari3

1    statutory damages.

2              THE COURT:  Just a moment.

3              Subsection 1 speaks of before the effective date of

4    its registration.

5              MR. KLAUS:  Correct, its registration as an

6    unpublished work.  That's what 412.1 is concerned with, where a

7    work is registered as an unpublished work and there is some

8    number of works that do get registered as unpublished works.

9    The 3,762 number that she gave you were registered as published

10   works and if they are registered as published works then the

11   timing rules of 412.2 applies.

12             THE COURT:  Okay.  If either of you have precedent

13   telling me I should interpret it your way, let me know.

14             MR. KLAUS:  Well, just to be clear, your Honor, we

15   have given -- I just want to make sure what the precedent is

16   that we are now supposed to be submitting to your Honor because

17   there are at least three different issues that I think are now,

18   have been lurking in the air.  I just want to make sure we are

19   clear on what they are.

20             THE COURT:  Go ahead.

21             MR. KLAUS:  Okay.

22             One is the burden of proof issue that we discussed

23   which is as to those works that were untimely registered under

24   412.2 where your Honor has said the plaintiffs have the burden

25   of proving that the work was not infringed prior to

1525ari3

1    registration, where that's been said, whether those works

2    remain in the case and the burden of proof issue goes to the

3    jury to decide whether we have satisfied it.  That, I believe,

4    covers something in the order of 1,223 works total.  That's the

5    number that had the little asterisk on the current schedule A.

6        The second issue is with respect to approximately 30

7    works that were registered as unpublished works and were later

8    registered as published works.  As to those 30 works does the

9    fact that they were registered as unpublished works mean that

10   they can remain on our list?

11       What I'm calling the new argument, which is the 3,762

12   argument which I understand Ms. Eaton to be making now for the

13   first time which is that if a work was ever unpublished and it

14   was ever infringed at a time that it was unpublished, then if

15   the work is later registered as a published work, does the fact

16   that it may have been infringed at some point when it was

17   unpublished and unregistered, does that mean that that

18   infringement triggered Section 412.1 and that work is

19   ineligible for statutory damages; that third argument, your

20   Honor, has never been raised in this case before.  Never been

21   raised in this case before today.  This is the first time that

22   it is being made.  And if your Honor would like to hear, if

23   your Honor would like us to submit precedent as to that third

24   argument, we will do it.  We simply think that that argument is

25   wrong and it's untimely being made the day before trial starts.

1525ari3

1          THE COURT:  Well, the argument was raised among

2     lawyers before today in e-mails.

3          MR. KLAUS:  Yes.  It was raised in e-mails but we

4     should be very clear it was raised in e-mails with respect to

5     what I have called now the second category of arguments

6     concerning the 30 works.  That's where Ms. Eaton says that she

7     was having a late night e-mail exchange with Ms. LeMoine

8     regarding these 30 works and I think what she, I believe said

9     was -- I just want to -- and I don't have the e-mail in front

10    of me but I think she said:  Is it your position that if a work

11    is subject to 412.1 and it was registered as an unpublished

12    work, that you can still claim damages even if later on the

13    same work was registered as a published work?  And that's the

14    critical point here, your Honor, is the effective date of

15    registration in 412.1 as opposed to 412.2 is talking about its

16    registration as an unpublished work.  In 412.2 it's

17    registration as an unpublished work, not from mixing and

18    matching here, which is that there was an unpublished work at

19    some point in time that may have been infringed.  And it was

20    later registered as a published work and if there was some act

21    of infringement between those two dates then the statutory

22    damages are barred.

23         THE COURT:  I have asked you each to give me any

24    authorities you have for your interpretations.

25         MR. KLAUS:  Of course, your Honor.

1525ari3

1          MS. EATON:  Your Honor, I'm happy to do that.  I would

2     like to note that I did cite one such case in my letter to the

3     Court already.

4          THE COURT:  Okay.

5          MS. EATON:  Which says, very simply, although the

6     NFLP -- this is Bouchat case, 506 F.3d at --

7          THE COURT:  I will read your letter.

8          MS. EATON:  -- 330 holds:  The NFLP violated the

9     copyright for the first time in June 1996 when it first

10    exhibited the flying V to the public in authorized Ravens

11    merchandise.  NFLP may have continued to violate the copyright

12    law after July 25, 1996 when Bouchat registered.  In using the

13    word "commenced," Section 412.1 instructs us to trace NFLP's

14    infringing conduct after registration back to NFLP's original

15    infringement in 1996.  The case is right on point.  If the

16    infringement occurs before registration, whether in published

17    or in unpublished form, no statutory damages are available.

18         THE COURT:  Would counsel like to raise anything else

19    today?

20         MR. POMERANTZ:  Yes, your Honor; a couple of smaller

21    points.

22         I had asked defendant's counsel if they would agree

23    not to mention the amount paid by Mr. Bildsen in settling the

24    claims against him unless and until we call Mr. Bildsen as a

25    witness because I think it is an irrelevant fact, unless and

1525ari3

1    until we call him.  And I thought they were going to agree to

2    that but then when I talked to Mr. Baio today, he wasn't sure.

3              MR. BAIO:  I haven't heard whether the name Bildsen

4    will come out of your mouth in your opening.

5              MR. POMERANTZ:  It is not.

6              MR. BAIO:  Then I will not mention it in my opening.

7              MR. POMERANTZ:  Thank you.

8              Second is I just wanted to confirm again another point

9    based upon one of the slides that they sent to us, one of the

10   demonstratives for the opening.  We don't think it is

11   appropriate or relevant and it is prejudicial.

12             MR. BAIO:  This may be a mistake.  Are you talking

13   about the last one?

14             MR. POMERANTZ:  Yes.

15             MR. BAIO:  That was a mistake.

16             MR. POMERANTZ:  Can I ask him one question, your

17   Honor?

18             THE COURT:  Sure.

19             (Counsel conferring)

20             MR. POMERANTZ:  Your Honor, they are reserving the

21   right to mention the compensation received by our witnesses or

22   our employees including as part of their opening, and we think

23   that is both irrelevant and highly prejudicial.  It really has

24   no relevance to this case and I don't see any need to do that

25   and we would ask that that be precluded, from them using that

1525ari3

1        during the opening.

2                MR. BAIO:  Your Honor, I think the plaintiffs are

3        going to say that people have lost their jobs as a result of

4        what Lime Wire did.  That's inappropriate because it is either

5        damages or not.  What they spend their damages on or the amount

6        is just an ancillary repercussion claimed by them.

7                If they're going to talk about lost jobs then the jury

8        should understand that the senior executives continue to get

9        raises year after year in the face of those layoffs.  I will

10       not mention it if he doesn't go that route, but if he does, I

11       would intend to blunt, what I believe, is the improper and

12       inaccurate statements by showing what happened at senior

13       executive levels.

14               THE COURT:  Okay.

15               MR. BAIO:  That's the only way.

16               THE COURT:  Whose lost jobs are we talking about?

17               MR. POMERANTZ:  Your Honor, the record companies are

18       my clients, have lost thousands and thousands of jobs over the

19       course of this past decade, and we do think that the total

20       devastation that has been caused to this industry by

21       peer-to-peer piracy, of which Lime Wire was the biggest for

22       many years, is something that is important for the jury to

23       understand as it is weighing all of the various factors that

24       are relevant to statutory damages as well as the punitive

25       damages.

1525ari3

```
 1        THE COURT:  How does it relate to statutory?

 2        MR. POMERANTZ:  Well, when we sit there and talk about

 3   the harm to our company and the deterrence that is necessary

 4   here, when we talk about the conduct and attitude of Mr. Gorton

 5   and the people at Lime Wire, truly this is an industry, unlike

 6   any other industry out there, that has been devastated for a

 7   straight decade during the good times and the bad times of the

 8   last decade.  And it's not just a matter of a financial

 9   statement, they want to make this like a financial statement

10   like you got $10 and now you have $5, but it is more than just

11   a financial statement, this is really something that is hurting

12   real people.

13        THE COURT:  Well, do you have any objection to

14   Mr. Baio bringing in the compensation of executives if that has

15   gone up at the same time that jobs were lost?

16        MR. POMERANTZ:  Yes, I do object to that.  And by the

17   way, I do not know if it went up or went down, but the fact

18   that there is various compensation structure from the top of

19   the company to the person who receives the least isn't

20   relevant, it is designed to sit there and say this individual

21   is making a lot of money so therefore don't worry about the

22   harm to the company.  This isn't about -- on my end it is not

23   about what a particular individual makes, it is the fact that

24   my client's own copyrights, they have the right to have them

25   copied in the way that they were copied through Lime Wire and
```

1525ari3

 1    if it caused massive harm to the copyright owner, not to an

 2    individual.

 3              THE COURT:  I'm not going to hear any more argument on

 4    that.  I will let defense counsel bring in relevant economic

 5    arguments including compensation to executives.

 6              MR. POMERANTZ:  Thank you, your Honor.

 7              THE COURT:  Anything else?

 8              MR. POMERANTZ:  Yes, your Honor.

 9              On the IRA.  I think we each submitted some letters

10    last Friday and I think your Honor was going to let us know how

11    you wanted to handle the evidence regarding the IRA.

12              THE COURT:  Right.  I'm going to need to continue to

13    review that.  Is there any argument you wish to make in

14    addition to what you have briefed?

15              MR. POMERANTZ:  No, your Honor.  Just in terms of the

16    opening, I guess we shouldn't mention it unless your Honor has

17    decided that we --

18              THE COURT:  No, I don't think you should mention it in

19    opening.

20              MR. POMERANTZ:  The only other thing that I think it

21    bears on -- well, it may not be the only thing -- is whether

22    your Honor is contemplating that we will have -- that the only

23    thing the jury will be asked at the end of Phase I is whether

24    to award punitives or whether your Honor is contemplating that

25    in Phase 1 the jury will be asked not only whether but, if so,

1525ari3

1    how much.  Because if that is the case, then we will need to

2    decide the IRA issue before we argue the case to the jury and

3    be able to put the evidence in if your Honor decides that it is

4    relevant.

5            THE COURT:  I understand.  Before the jury charge you

6    need to do that.

7            MR. POMERANTZ:  And we have to put the evidence in.

8            THE COURT:  Yes.

9            MR. POMERANTZ:  So, it is really probably before

10   Mr. Gorton testifies because that's where it would probably

11   come into evidence.

12           THE COURT:  All right.  Well, if I haven't ruled on it

13   before then, remind me.

14           MR. POMERANTZ:  Thank you, your Honor.

15           THE COURT:  Anything else?

16           MR. BAIO:  No, your Honor.

17           THE COURT:  Okay.

18           As I understand it, you will be attempting to meet

19   this evening.

20           MR. POMERANTZ:  Can we have a private conversation

21   with your Honor after we conclude this hearing, your Honor?

22           THE COURT:  Sure.  If we are finished we can have that

23   now.  We are adjourned.

24           (Adjourned to 10:00 a.m., Tuesday, May 3, 2011.)

25

INDEX OF EXAMINATION

Examination of:                              Page

MARK GORTON

Direct By Mr. Baio . . . . . . . . . . . . . 182

Cross By Mr. Pomerantz . . . . . . . . . . . 191

Direct By Mr. Baio . . . . . . . . . . . . . 208

Cross By Mr. Klaus . . . . . . . . . . . . . 213