1545ari1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ARISTA RECORDS, LLC. *et al.*,

4                  Plaintiffs,

5            v.                        06 Civ. 5936 (KMW)

6   LIME WIRE, LLC, et al.,

7                  Defendants.

8   ------------------------------x

9                                     May 4, 2011
                                      10:26 a.m.
10  Before:

11                  HON. KIMBA M. WOOD,

12                                    District Judge

13                  APPEARANCES

14  MUNGER, TOLLES & OLSON, LLP
        Attorneys  for Plaintiffs
15  BY:  GLENN POMERANTZ
        KELLY KLAUS
16      JENNIFER PARISER
        BLANCA YOUNG
17      HAILYN CHEN
        MELINDA E. LeMOINE
18
    WILLKIE, FARR & GALLAGHER, LLP
19      Attorneys for Defendants
    BY:  JOSEPH T. BAIO
20      TARIQ MUNDIYA
        JOHN OLLER
21      KATHARINE N. MONIN
        TODD COSENZA
22

23

24

25

1545ari1

1              (Case called)

2              THE COURT:  Good morning.  Please, have a seat.

3              We are going to continue with jury selection.  I thank

4   all of you for being back here today.  We are going to first

5   ask any follow-up questions we have for those 11 of you who are

6   in the jury box now.  I will ask you to line up, the first two

7   of you to come first.

8              Counsel, please approach, and the court reporter.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1545ari1

```
 1              (At side bar)

 2              (Juror no. 6 present)

 3              THE COURT:  We talked with you yesterday and we know

 4     you're a new teacher, we're hoping you can serve.  Have you

 5     learned anything since last night that we should know?

 6              JUROR:  About the case?

 7              THE COURT:  No, about the case or about whether you

 8     can serve.

 9              JUROR:  I can serve.

10              THE COURT:  Good.  Okay.

11              JUROR:  But I'm just feeling a little stressed about

12     it but, yes, I can serve.

13              THE COURT:  Do you want to tell me about the stress?

14              JUROR:  Because I have report cards due and stuff.  It

15     is just work-related stress, nothing --

16              THE COURT:  Okay.

17              JUROR:  But they were fine with it.

18              THE COURT:  They're fine with it?

19              JUROR:  Yes.  They're kind of okay with it.

20              THE COURT:  Okay.

21              JUROR:  It is just my own -- my own issue.

22              THE COURT:  Okay.

23              JUROR:  Okay?

24              THE COURT:  Will you be able to do some work on the

25     evenings and on weekends.
```

1545ari1

1        JUROR:  Maybe on Saturdays but the school closes, it

2   is open from 8:00 to 4:00 so the school will be closed by the

3   time I get there because it is from 9:00 to 5:00 here?

4        THE COURT:  Right.

5        JUROR:  By the time I get there it will be closed.

6        THE COURT:  Saturdays?

7        JUROR:  I can try to do Saturdays.

8        THE COURT:  Very good.  Thank you very much.

9        JUROR:  That's all the questions?

10       THE COURT:  Yes, that's all.  You may go back to your

11   seat.

12       (Juror not present)

13       THE COURT:  We are ready for juror no. 7.  That was

14   juror no. 6.

15       (Juror present)

16       THE COURT:  Good morning.  You're juror no. 7?

17       JUROR:  Yes.

18       THE COURT:  Has anything occurred to you since last

19   night about your ability to be fair on this case?

20       JUROR:  No.

21       THE COURT:  You can serve?

22       JUROR:  Yes.

23       THE COURT:  Very good.  Thank you.

24       JUROR:  Thank you.

25       THE COURT:  You may be seated.

1545ari1

```
 1              (Juror not present).

 2              THE COURT:  Juror no. 8.

 3              (Juror Present)

 4              THE COURT:  Good morning.  I have not yet called your

 5    employer.  Do you want me to do that?

 6              JUROR:  Yes, because I spoke to him this morning and

 7    told him that I may be detained for four weeks or so and he

 8    said the timing was bad and that if you wished to call him,

 9    that might be a good thing.

10              THE COURT:  Okay.

11              JUROR:  Maybe one other thing I should explain, too,

12    because I think it is pertinent, in my job at the EPA I was the

13    senior enforcement policy coordinator which means that I advise

14    senior management on how we should settle environment

15    litigation cases.  A lot of it involved cost recovery and

16    dollar amounts --

17              THE COURT:  Yes.

18              JUROR:  -- where the agent would say, well, we want a

19    million dollars and the defendant would say, well, we will give

20    you $50,000.  So, this is very relevant I think to this case so

21    I thought you should know it.

22              THE COURT:  That you have a familiarity with dealing

23    with damages.

24              JUROR:  Yes.

25              THE COURT:  Okay.
```

1545ari1

```
1            JUROR:  That could be a good thing or bad thing
2    depending how you decide.
3            THE COURT:  We will let that abide my talk with your
4    employer.
5            JUROR:  All right.
6            THE COURT:  Thank you very much.
7            JUROR:  You're welcome.
8            (Juror not present)
9            THE COURT:  We are ready to talk with juror 11,
10   please.
11           (Juror present)
12           THE COURT:  Good morning.
13           JUROR:  Good morning.
14           THE COURT:  You indicated yesterday that you would be
15   able to serve.  I want to be sure that you still feel today
16   that you can serve and that you can be a fair juror.
17           JUROR:  Oh, I can be a fair juror.
18           THE COURT:  Good.
19           And you can serve?
20           JUROR:  I can serve.
21           THE COURT:  Good.  Thank you very much.
22           (Juror not present)
23           THE COURT:  Juror no. 13, please.
24           (Juror present)
25           JUROR:  Good morning.
```

1545ari1

```
1            THE COURT:  Good morning.

2            You indicated yesterday that on May 19 you have a

3   monthly checkup?

4            JUROR:  Yes.

5            THE COURT:  And I told you that I would call your

6   doctor and see if that could be moved to 5:00 p.m. and if not

7   we would find some way to accommodate you.

8            JUROR:  Yes.  Okay.

9            THE COURT:  So, with that said.

10           JUROR:  Last night I called, I cancelled the one for

11  today.

12           THE COURT:  Oh, thank you.

13           JUROR:  And then I will call -- I will work it as it

14  goes.

15           THE COURT:  I appreciate that.  So, you can serve?

16           JUROR:  Yes.

17           THE COURT:  Thank you very much.

18           JUROR:  Thank you.

19           MR. MUNDIYA:  Thank you.

20           (Juror not present)

21           THE COURT:  Juror No. 14 has to end by May 27.

22           (Juror present)

23           THE COURT:  Juror No. 14?

24           JUROR:  Yes.

25           THE COURT:  Has anything occurred to you since we last
```

1545ari1

1    spoke with you that you think you need to tell us about your

2    service here?

3              JUROR:  You did make me a little bit nervous yesterday

4    that I have used the Lime Wire in the past.  Also, if I were to

5    serve, I live two hours away so I actually would be staying

6    with my friend that does work at Atlantic Records.

7              THE COURT:  Okay.

8              JUROR:  So I'm kind of not sure how that would be.

9              THE COURT:  Okay.

10             And about Lime Wire I made you nervous?

11             JUROR:  Yes.

12             THE COURT:  About what?

13             JUROR:  Because I used it in the past.

14             THE COURT:  And nervous that it was unlawful?

15             JUROR:  Yes.  Once I did find out I did terminate it.

16             THE COURT:  Right.

17             JUROR:  But it still made me very nervous.

18             THE COURT:  Let me ask you to step aside for a moment.

19             JUROR:  Okay.

20             (Juror not present)

21             THE COURT:  I think I could talk her into not being

22    nervous but the May 27 part could be a problem, counsel.

23             MR. KLAUS:  We think that it is a close call, your

24    Honor.

25             MR. MUNDIYA:  We think we should be done by May 27th,

1545ari1

1    I hope.

2              THE COURT:  Okay.  Even with deliberations?

3              MR. MUNDIYA:  Now, your Honor asked a question

4    yesterday about Memorial Day weekend.  If we stop at the end of

5    Thursday, take the Friday off and come back Tuesday, if we

6    haven't finished by then, I think that would be fine with us.

7              THE COURT:  Is that true for all counsel?

8              MR. POMERANTZ:  I think we are confusing weekends.

9    The Memorial weekend is after May 26.

10             THE COURT:  Right.

11             MR. POMERANTZ:  So this juror wouldn't be able to

12   serve if we are contemplating.

13             MR. MUNDIYA:  Yes.

14             THE COURT:  This would take care of the June 2 person

15   or not, right?

16             MR. MUNDIYA:  We hope to be done by May 27th.  We

17   really do.

18             MR. KLAUS:  I again would make our objection

19   particularly with respect to a juror who has now said that

20   having had the evening to consider it, she is concerned about

21   the lawfulness of her conduct.

22             THE COURT:  Now, what I propose to say to her is that

23   she has nothing to worry about about the lawfulness of her

24   conduct because her identity is not known to anyone, it is

25   anonymous.  Let me see if that gets rid of her concern.  And if

1545ari1

```
 1    you have follow-up questions, just tell me that you do.
 2              MR. KLAUS:  Okay.  I mean, I think even if she answers
 3    that question yes, your Honor, the follow-up question will be
 4    how that will impact her even if she is not concerned about
 5    personal liability in this case, how that will impact her
 6    consideration of the evidence.
 7              THE COURT:  Okay.
 8              (Continued next page)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

154nari2                          Voir Dire

 1              THE COURT:  We are ready to see No. 14 again.

 2              (Juror present).

 3              THE COURT:  Hi.  It may well be that a lot of people

 4    didn't know what they were doing on the Internet, didn't know

 5    who had the rights to what, a lot of individuals, particularly

 6    people your age and younger, and I wouldn't want that to cause

 7    you not to be able to sit.  I wouldn't want you to be worried,

 8    for example, that you might be sued, because you are completely

 9    anonymous here, so your answers won't be known to anyone.

10    These forms will all be destroyed.

11              So, with that in mind, do you think you could sit and

12    be a fair juror here, or do you think something about your past

13    use of LimeWire would be troubling you?

14              JUROR:  It definitely does trouble me.  I actually

15    didn't even think about it until yesterday when you brought it

16    up, but it does make me really nervous.

17              THE COURT:  Can you just explain that a little so I

18    will understand how it makes you nervous.

19              JUROR:  Just the fact that I had used it in the past.

20              THE COURT:  Why does that make you nervous?

21              JUROR:  Because it was unlawful.

22              THE COURT:  OK.  I will ask you to step aside.

23              (Juror not present)

24              THE COURT:  I think we have to excuse her for cause.

25              MR. MUNDIYA:  OK.

          SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

154nari2                          Voir Dire

1              THE COURT:  We will excuse her for cause with our

2     thanks.

3              Thank you very much.  We are excusing Juror No. 14 for

4     cause.

5              Could Juror No. 15 approach please.

6              (Juror present)

7              THE COURT:  Hi.

8              JUROR:  Hi.

9              THE COURT:  Since we last talked with you yesterday,

10    has anything occurred to you that you want us to know before we

11    go through the process of jury selection?

12             JUROR:  No.

13             THE COURT:  OK.

14             JUROR:  Nothing has changed.

15             THE COURT:  You are still OK about serving?

16             JUROR:  Yes.

17             THE COURT:  Thank you very much.

18             (Juror not present)

19             THE COURT:  We are ready for Juror No. 19.

20             (Juror present)

21             JUROR:  Good morning.

22             THE COURT:  Hello.

23             JUROR:  Since we last talked to you, has anything

24    occurred to you that you think you ought to tell us about your

25    possible service here or are all your answers just the same?

154nari2                              Voir Dire

1              JUROR:  They are the same.

2              THE COURT:  OK.  You can serve if you are selected?

3              JUROR:  Yes.  Except for that one date that we talked

4    about.

5              THE COURT:  Right.  Remind me what date that was.  I

6    didn't write it down.

7              JUROR:  May 13.

8              THE COURT:  That's the wedding?

9              JUROR:  Yes.

10             THE COURT:  OK.  And where is the wedding?

11             JUROR:  In New Jersey.

12             THE COURT:  Would you be able to be here for a morning

13   session for example from 9:00 to 12:00 if it were necessary?

14             JUROR:  To 12 I could.

15             THE COURT:  You could do 9:00 to 12:00 on that day?

16             JUROR:  Yes.

17             THE COURT:  We are not going to ask you that yet.

18   We'll wait and see how things go.

19             OK.  Thank you.

20             JUROR:  Thank you.

21             (Juror not present)

22             THE COURT:  No. 21.

23             (Juror present)

24             JUROR:  Good morning.

25             THE COURT:  Good morning.

154nari2                    Voir Dire

1          Since we last talked to you, have you had any thoughts

2     about your possible service as a juror here or is all the

3     information still the same?

4          JUROR:  It's about the same, as long as I can get out

5     of here by June 2.  My friend is having a heart attack over

6     this.

7          THE COURT:  No one should have a heart attack over

8     this.  Please tell your friend you will be able to go where you

9     want to go June 2.

10         JUROR:  OK.  I hope so.

11         THE COURT:  You don't even have to hope so.  I am

12    assuring you of that?

13         JUROR:  Terrific.  OK.  Thank you so much.

14         THE COURT:  OK.

15         (Juror not present)

16         THE COURT:  OK.  Juror No. 23.

17         (Juror present)

18         JUROR:  Good morning.

19         THE COURT:  Good morning.  Since we last talked to

20    you, have you had any thoughts that you want to tell us about

21    about your possible service here or is everything still the

22    same as yesterday?

23         JUROR:  I know when my kids found out that I could be

24    gone for three or four weeks, they were having a hard time with

25    it.

         SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1           THE COURT:  How old is that child?

2           JUROR:  They're nine and ten.  So they don't

3   understand me being gone for that long a time.  That was the

4   only thing.  I didn't tell my employment anything because I

5   wasn't sure if I am going to be on the jury.  So I didn't want

6   to -- my boss is new as of December.  I have been with the

7   agency for eleven years, so I know the ins and outs of the

8   agency.

9           THE COURT:  Yes.

10          JUROR:  That is the only difficulty.  Yesterday I had

11  like seven missed calls and texts.

12          THE COURT:  I understand.  Perhaps you can handle

13  missed calls at lunchtime or in the evening?

14          JUROR:  That's what I have been doing for the last two

15  weeks.

16          THE COURT:  OK.  Will you be able to explain to your

17  children that you are doing an important civic duty?  It might

18  be a good lesson for them.

19          JUROR:  I'm trying.  Yes.

20          THE COURT:  OK.  Thank you very much.

21          (Juror not present)

22          THE COURT:  No. 32.

23          (Juror present)

24          THE COURT:  Hello.

25          JUROR:  Good morning.

154nari2                    Voir Dire

1          THE COURT:  Since we last talked to you yesterday,

2     have you had any further thoughts about whether you can sit as

3     a juror here and be fair and impartial?

4          JUROR:  Well, yes, I have.  It was just the idea of

5     end-of-school-year consternation for the kids rather than

6     myself, but I think I could make due.  I couldn't help overhear

7     the last lady there.  I could perhaps turn it into a lesson

8     plan about civics.

9          THE COURT:  I have lots of demonstrative exhibits you

10    could use, lots of good things about jury service.

11         OK.  Well, I appreciate your candor and your

12    willingness to do your best here.  So we will leave you in the

13    pool of prospective jurors.  Thank you.

14         JUROR:  OK.

15         (Juror not present)

16         THE COURT:  I didn't realize the acoustics were so

17    good.  I will keep my voice down.  So we need to qualify five

18    more, right?

19         MR. MUNDIYA:  I thought you said between eight and

20    ten, just in case.

21         THE COURT:  Just in case.  Would you like to do it

22    that way?  We can.  It will take us a while to get there with

23    all the hardships, but fine.  Let's do that.  Why don't we say

24    we will try to qualify ten.  The reason I said that was that I

25    was worried about our first group.  Now that we know that we

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

154nari2                          Voir Dire

1   have ten in the first group, I think we're safe qualifying five

2   or six.

3              MR. MUNDIYA:  OK.

4              THE COURT:  OK.

5              MR. MUNDIYA:  OK.  Let's try that.  Thank you.

6              THE COURT:  It's probably better for you to stay at

7   side bar if you have the next group.  I can give an

8   instruction.

9              (In open court)

10             THE COURT:  For those of you who are in the jury box

11  and who we have already questioned this morning, if you would

12  like to leave the courtroom for the next 45 minutes, you are

13  free to do that.  That would mean that you would need to be

14  back here by 11:30.  OK.  If you want to sit where you are, you

15  can do that, too.  Thank you.

16             Today we will be questioning the remaining jurors up

17  here at the bench.  I think it may go a little more quickly for

18  you if we do it that way.  The first juror we would ask to come

19  to the bench is Juror No. 33.

20             (At side bar)

21             (Juror present)

22             THE COURT:  Good morning.  I have just a few follow-up

23  questions for you.

24             You have used LimeWire and --

25             JUROR:  My husband, not me.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

```
1              THE COURT:  Your husband has used LimeWire?

2              JUROR:  Yes.

3              THE COURT:  I see.  Your husband has used iTunes?

4              JUROR:  Yes.  And I have as well.

5              THE COURT:  You have?

6              JUROR:  Yes.

7              THE COURT:  OK.  You mention in response to No. 24

8    that record companies claim copyright infringement.  My opinion

9    is that this is a problem and a solution needs to be found on

10   both sides.

11             I think you might find a number of people agreeing

12   with you about what needs to be done in the future.  If you

13   serve as a juror here, what you will need to do is put out of

14   your mind the way --

15             JUROR:  A solution.

16             THE COURT:  A solution.

17             JUROR:  I understand that.

18             THE COURT:  That's good.  So you understand that I

19   would tell you what the law is?

20             JUROR:  Right.

21             THE COURT:  You will learn the evidence at trial

22   and --

23             JUROR:  I understand that.

24             THE COURT:  You can follow my instructions?

25             JUROR:  Yes.
```

154nari2                              Voir Dire

```
 1              THE COURT:  OK.  Thank you.
 2              (Juror not present)
 3              THE COURT:  So, No. 33 is qualified.
 4              Could Juror No. 34 come forward, please.
 5              (Juror present)
 6              JUROR:  Hi.
 7              THE COURT:  Good morning.  You mention that your
 8    husband has an operation --
 9              JUROR:  Yes.
10              THE COURT:  -- that may be coming up.  Can you tell us
11    a little about more about him?
12              JUROR:  He's had five bypasses.
13              THE COURT:  Heart bypass surgeries?
14              JUROR:  Yes, recently, like a year or so ago.  Now he
15    has something to do with his stomach.  He went yesterday to the
16    doctor and he's probably going to see another doctor sometime
17    this week, basically he's probably going to have to go in next
18    week or the following week.
19              THE COURT:  He would have the surgery soon?
20              JUROR:  I think so, yes.
21              THE COURT:  Would you say that you need to be there
22    for him?
23              JUROR:  Absolutely.
24              THE COURT:  We understand.  We will excuse you from
25    this jury.  Thank you.
```

154nari2                      Voir Dire

```
1              JUROR:  Thank you.

2              THE COURT:  Good luck.

3              JUROR:  I appreciate it.  Thank you.

4              (Juror not present)

5              THE COURT:  We have excused Juror No. 34.  Could Juror

6    No. 35 come forward, please.

7              Juror No. 35 was missing as of ten minutes ago.  He's

8    the 75-year-old man.  Let's put him aside in case he shows up.

9    My guess is he probably won't serve.

10             OK.  Could Juror No. 36 come forward, please.  I might

11   note that No. 43 was also missing as of ten minutes ago.

12             MR. MUNDIYA:  OK.

13             (Juror present)

14             JUROR:  Good morning.

15             THE COURT:  Good morning.

16             You have used Rhapsody from 2005 to the present?

17             JUROR:  Yes.

18             THE COURT:  You say in response to No. 24 what you

19   have heard about lawsuits by record companies against people

20   who have downloaded and shared?

21             JUROR:  Yes.

22             THE COURT:  You say, Trouble for the individual

23   responsible.  Reason why I opted for a paid subscription.

24             JUROR:  That is correct.

25             THE COURT:  I understand that.
```

154nari2                        Voir Dire

1              Does anything about this case trouble you in terms of

2     serving as a juror?

3              JUROR:  No.

4              THE COURT:  Or can you serve?

5              JUROR:  Yes, I can.

6              THE COURT:  OK.  Very good.  You can be a fair and

7     impartial juror?

8              JUROR:  Yes, I can.

9              THE COURT:  Any questions, counsel?

10             MR. KLAUS:  No.  OK.  Thank you.

11             (Juror not present)

12             THE COURT:  Could Juror No. 37 come forward, please.

13             (Juror present)

14             JUROR:  Good morning.

15             THE COURT:  Good morning.

16             JUROR:  Good morning.  How are you?

17             THE COURT:  Very well.  How are you?

18             JUROR:  Good.

19             THE COURT:  You are designing a dress collection?

20             JUROR:  Three.

21             THE COURT:  Three?

22             JUROR:  Yes.

23             THE COURT:  OK.  How long have you been a dress

24     designer?

25             JUROR:  I have been a designer for over ten years.  I

154nari2                        Voir Dire

1   have been designing dresses for about five of them.

2             THE COURT:  Is there a team who works with you?

3             JUROR:  I have a team of subordinates.

4             THE COURT:  And how many do you have?

5             JUROR:  About ten.

6             THE COURT:  And how many individual designs do you

7   have to have ready?

8             JUROR:  I am responsible for about 60 designs per

9   collection.  So I am pulling about 120 in the next few weeks.

10             THE COURT:  OK.  Is the work far enough along that if

11   you served as a juror here you could deal with the team in the

12   evenings and on weekends?

13             JUROR:  It is honestly very difficult because I am

14   conducting fittings every day on my models, and my models have

15   set times when they are available and those are usually morning

16   hours.

17             THE COURT:  If you were sick, would someone be able to

18   fill in for you for four weeks?

19             JUROR:  I wouldn't be sick for four weeks, God forbid.

20             THE COURT:  OK.  I will ask you to step aside for a

21   moment.

22             JUROR:  OK.

23             (Juror not present)

24             THE COURT:  I think we should let him go.

25             Do you agree?

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

154nari2                          Voir Dire

```
 1              MR. KLAUS:  Yes.

 2              MR. MUNDIYA:  Yes, your Honor.

 3              THE COURT:  Could you please come back.

 4              (Juror present)

 5              THE COURT:  We will let you go because of your

 6    hardship.  Good luck with your collection.

 7              JUROR:  Thank you so much.  Best of luck to you.

 8              THE COURT:  My deputy will tell you where you go next.

 9              (Juror not present)

10              THE COURT:  Could Juror No. 38 come forward, please.

11    This woman has a hardship and --

12              (Juror present)

13              THE COURT:  Hi.

14              JUROR:  Good morning.

15              THE COURT:  Good morning.  I would like to ask you

16    first about your hardship sitting here.

17              JUROR:  Yes.

18              THE COURT:  You have a 92-year-old mother?

19              JUROR:  Right.

20              THE COURT:  How much time do you tend to spend with

21    her every week?

22              JUROR:  Well, during the week I sleep over there a few

23    times a week because I only have a part-time aide, so I have to

24    stay there until like 10:00 in the morning on three nights,

25    three mornings until she gets there.
```

154nari2                         Voir Dire

```
 1                THE COURT:  I see.

 2                JUROR:  I have flexible hours at work, and some days I

 3    have to be there late in the afternoon to let her go.  I made

 4    arrangements for this week, but I can't make arrangements for

 5    more time.

 6                THE COURT:  OK.  I will ask you to step aside for a

 7    moment.

 8                (Juror not present)

 9                THE COURT:  I think she's sincere.  I think we should

10    let her go.

11                MR. MUNDIYA:  We agree, your Honor.

12                THE COURT:  Thank you very much.  You are excused.

13                (Juror not present)

14                THE COURT:  We have excused Juror No. 38.  Could Juror

15    No. 39 come forward, please.

16                (Juror present)

17                JUROR:  Good morning, your Honor.

18                THE COURT:  Good morning.  I have a few follow-up

19    questions for you.

20                JUROR:  Yes, ma'am.

21                THE COURT:  You say that you are aware that a

22    defendant was found liable for intentional inducement of

23    copyright infringement?

24                JUROR:  Yes, ma'am.

25                THE COURT:  How much do you know about that?
```

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

154nari2                          Voir Dire

1          JUROR:  Not very much.  Just what I have read in, for

2    instance, the New York Times.

3          THE COURT:  And the company who was held liable?

4          JUROR:  I don't recall.

5          THE COURT:  You have used Napster?

6          JUROR:  Yes, ma'am.

7          THE COURT:  And iTunes and BitTorrent?

8          JUROR:  Yes, ma'am.

9          THE COURT:  But not LimeWire?

10         JUROR:  That's correct.

11         THE COURT:  You know the law firm Munger Tolles and

12   you know Willkie Farr?

13         JUROR:  Yes, ma'am.

14         THE COURT:  How do you know them?

15         JUROR:  I am an attorney and I have worked, I believe,

16   with both of them, not as cocounsel but as like coplaintiffs or

17   codefendants on a couple of cases.

18         THE COURT:  Who were your clients in those cases?

19         JUROR:  I believe Willkie and Munger represented

20   clients in the, I want to say EMG v. Zagat.  It was a patent

21   case in the Eastern District of Texas.  I think also in Web Map

22   v. Zagat and a bunch of other names.  I am not certain but I

23   believe that those firms were named there.

24         THE COURT:  What do you know about the Electronic

25   Frontier Foundation?

154nari2                          Voir Dire

1              JUROR:  I know that sometimes the pro bono department

2      at my law firm has cases that are referred to them through the

3      EFF, and I worked on a defamation case in the, I think it was

4      the Northern District of Georgia, where a landlord was suing a

5      former renter who had complained about the landlord's business

6      practices.

7              THE COURT:  Was that connected to the Electronic

8      Frontier Foundation?

9              JUROR:  I believe that originally the renter had gone

10     to the Electronic Frontier Foundation, who had then sent out a

11     mass mailing to law firms saying does anyone want to take this

12     pro bono, and I think it went through the pro bono committee

13     and stuff like that.

14             THE COURT:  Do you know how your firm decided to do

15     pro bono work for the EFF?

16             JUROR:  I believe because of the defamation aspects

17     and also for the training aspects of it.

18             THE COURT:  Can you tell me a little more about the

19     defamation case?

20             JUROR:  Sure.

21             What had happened was the renter was renting a house

22     up in Appalachia in north Georgia.  Apparently it was falling

23     down.  They had issues and disputes with the landlord over

24     paying rent, and they had posted on the husband's website a

25     critical commentary essentially insulting the landlord, having

1   a picture of the landlord with a snout and horns and other

2   rather, not exactly the kindest of imagery.  The landlord then

3   sued them for defamation.  There might have been another count,

4   but the defamation was the primary count.

5              THE COURT:  You worked on that case?

6              JUROR:  Yes, ma'am.

7              THE COURT:  Who did you work with on that case?

8              JUROR:  The only places that actually were on the case

9   working on the case was us and our local counsel in Atlanta.

10  The EFF was not -- my understanding is the EFF, any affiliation

11  with it was sort of like the clearing house sending out to

12  someone else.

13             THE COURT:  What do you know about Forrester Research?

14             JUROR:  I believe that my firm has used them as an

15  expert at some point, but I am not certain.

16             THE COURT:  Do you know as an expert of what kind?

17             JUROR:  I don't recall.  I remember hearing some

18  attorney in our large firm mention that they were using

19  Forrester as an expert on a case but that is all.

20             THE COURT:  How long have you been with your firm?

21             JUROR:  Four years.

22             THE COURT:  What firm is it?

23             JUROR:  Paul Weiss Rifkind & Garrison.

24             THE COURT:  I know it.

25             Now, given your sophistication in law, I think you can

154nari2                        Voir Dire

1    look inside yourself and answer this question better than any

2    questions I could pose to you.

3           JUROR:  Yes, your Honor.

4           THE COURT:  Given your work with clients in the

5    recording industry, given your knowledge of EFF, given that

6    your firm does pro bono work for EFF, that your firm has used

7    Forrester Research and that you know something about the two

8    law firms here, I know you don't know what evidence there will

9    be, and in a minute if necessary I can tell you more about it,

10   but at this point do you think you can sit on this case as a

11   fair and impartial juror?

12          JUROR:  I believe so, your Honor.  So that you know, I

13   have not worked on, at Paul Weiss on any of the cases for the

14   recording industry.  I know that we have represented them in

15   the past.  I believe it's mainly been our corporate department,

16   but I could be wrong.

17          THE COURT:  OK.  If anything comes up in the case

18   involving the two law firms involved here, Electronic Frontier

19   Foundation, and Forrester Research, could you do your best to

20   keep out of your mind anything you know about them and

21   definitely not say one thing to any juror about any of them, in

22   other words, nothing about your knowledge of the law firms, the

23   foundation, or the research group?

24          JUROR:  Yes, your Honor.  I can segment that out,

25   especially since I know only minimal amounts about most of

154nari2                        Voir Dire

 1   those.

 2              THE COURT:  OK.  Very good.

 3              Do counsel have any questions?

 4              MR. MUNDIYA:  No, your Honor.

 5              MR. POMERANTZ:  No, your Honor.

 6              THE COURT:  OK.  Thank you very much.

 7              JUROR:  Thank you, your Honor.

 8              (Juror not present)

 9              THE COURT:  OK.  Juror No. 40 is next.  Juror No. 40,

10   please.

11              MR. KLAUS:  Your Honor, just so it's clear, he was a

12   current BitTorrent user.  I know your Honor has overruled our

13   objection on excusals for cause for current users.  If I can

14   just put that on the record, so we can preserve it.

15              THE COURT:  Let's do it after this juror because he

16   has just coming up.

17              MR. KLAUS:  Of course.

18              (Juror present)

19              THE COURT:  Are you Juror No. 40?

20              JUROR:  Yes, ma'am.

21              THE COURT:  OK.  You have just started a new job a

22   month ago?

23              JUROR:  Yes, ma'am.

24              THE COURT:  And you are concerned about losing four

25   weeks because it is a fast-paced high-tech company?

1          JUROR:  Yes.

2          THE COURT:  Can you tell me a little more about that.

3          JUROR:  The company.

4          THE COURT:  About your concerns about serving as a

5   juror here.

6          JUROR:  Sure.

7          THE COURT:  How you think it might impact you.

8          JUROR:  I was unemployed for a couple of months.  I

9   just started this new job.  And it is one of the top high-tech

10  companies in the world.  It is very fast paced.  I have been

11  there now a month and to sort of miss a month, right, it just

12  concerns me, especially since I just lost my job.  There is a

13  little concern there.

14         THE COURT:  Right.  How many jobs have you had?

15         JUROR:  In my life?

16         THE COURT:  Yes.

17         JUROR:  So, postcollege I have had, this is my sixth.

18         THE COURT:  Who is your employer?

19         JUROR:  Amazon.

20         THE COURT:  In your view, is this a really good job

21  for you?

22         JUROR:  Yes.

23         THE COURT:  It is one you would like to keep?

24         JUROR:  Yes.

25         THE COURT:  I will ask you to step aside for a moment.

1              JUROR:  OK.

2              (Juror not present)

3              THE COURT:  I recognize that No. 24 gives at least one

4       side pause.  I do think we should excuse him for cause.

5              Any objection?

6              MR. KLAUS:  We would agree.

7              THE COURT:  We will excuse No. 40 for cause.  Could

8       you tell him he's excused for cause.

9              Juror No. -- I'm sorry, before I call the next juror,

10      I need to be educated about BitTorrent.  How is it the same or

11      different as LimeWire?

12             MR. KLAUS:  BitTorrent is a computer protocol that is

13      used primarily for finding very large copyrighted files like

14      motion pictures.  The technology is similar to and the

15      incidence of illegal usage is very similar to LimeWire.  It is

16      the subject of, in fact, a case that Judge Wilson, who you may

17      recall was the Grokster district court judge, also had a case

18      involving BitTorrent liability and essentially adopted the same

19      reasoning, finding that they had intentionally induced

20      copyright infringement.  So within that community it is a very

21      well known legal peer-to-peer type service.

22             THE COURT:  It would seem to me that I ought to at a

23      minimum ask him more questions about that.  I didn't realize it

24      was equally unlawful and that it still is so.

25             MR. BAIO:  Yes.  And I think, tell me if this is

154nari2                          Voir Dire

1   right, the analogy is more to Gnutella, which is the network on

2   which people travel, but BitTorrent also makes a software that

3   allows people to download very quickly.

4             THE COURT:  Now I would like to be able to assure him

5   that every copy of his questionnaire will be destroyed.

6             MR. BAIO:  Yes.

7             THE COURT:  Do you have any copies back at your

8   offices?  If you do I will just ask that you destroy them.

9             MR. KLAUS:  Yes, your Honor.

10            MR. MUNDIYA:  Of course.

11            THE COURT:  Today.  Let's have him come back.

12            Could Juror No. 39 please come back.

13            (Juror present)

14            THE COURT:  I have a few questions for you about

15  BitTorrent.

16            JUROR:  Oh, yes, ma'am.

17            THE COURT:  How do you use it now?

18            JUROR:  I have used it for software transfers.  There

19  is a lot of particularly open source software like the Linux

20  kernel that gets transferred through BitTorrent because it is a

21  more efficient decentralized protocol.

22            THE COURT:  Is there anything unlawful about that, to

23  your knowledge?

24            JUROR:  Not that I am aware of, considering that it is

25  open source.  I don't think there's any sort of copyright

                SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

154nari2                         Voir Dire

1    infringement or anything like that.

2              THE COURT:  You know more about it than I do, but I

3    will be learning.  Please step aside.

4              JUROR:  Yes, ma'am.

5              (Juror not present)

6              THE COURT:  Does he pass the test?

7              MR. MUNDIYA:  For us it does, your Honor.

8              MR. KLAUS:  We would still make our objection for the

9    record, your Honor.

10             THE COURT:  If you want to elaborate on it, I will

11   hear you, but at this point it would appear that he is not

12   using an unlawful file sharing service.

13             MR. KLAUS:  I think that he is using a service that is

14   overwhelmingly used for infringement.  What he said is he uses

15   it just for a particularly small portion of what might be

16   called noninfringing use as one would say.  We still think it

17   would be a basis for implied bias.

18             THE COURT:  Do you believe he's not credible or do you

19   believe that anyone who does what he does is biased?

20             MR. KLAUS:  I believe that anyone who uses a network

21   like that would be, in the words of the Torres case, very

22   likely to spend a good portion of the trial wondering whether

23   what they were doing was wrong.

24             THE COURT:  Please come forward.

25             (Juror present)

1          THE COURT:  I understand that you are using BitTorrent

2     in a rather minimal way.

3          JUROR:  Yes, ma'am.

4          THE COURT:  You have indicated that you don't believe

5     there's anything unlawful about what you are doing and I am

6     going to assume that's right.  I don't know enough.  What I

7     would not want is for you to worry about this during the case.

8          So what I want to tell you is that this questionnaire

9     is anonymous.

10          JUROR:  Of course.

11          THE COURT:  And every copy that we have of it is going

12     to be destroyed today.

13          JUROR:  That's fine.

14          THE COURT:  So you don't have to worry about your own

15     situation.  With that in mind, can you put BitTorrent out of

16     your mind and listen just to the evidence in this case.

17          JUROR:  I would hope so, your Honor.

18          THE COURT:  OK.  Now, whenever anyone says that I have

19     to ask --

20          JUROR:  Of course, the follow-up.

21          THE COURT:  Are you confident?

22          JUROR:  Yes, ma'am, I am.

23          THE COURT:  OK.  Thank you very much.

24          (Juror not present)

25          THE COURT:  Are we down to 41 or have we done 41?

SOUTHERN DISTRICT REPORTERS, P.C.           (212) 805-0300

154nari2                          Voir Dire

1              MR. MUNDIYA:  We are on 41 now.

2              THE COURT:  Could Juror No. 41 come forward, please.

3              Good morning.

4              JUROR:  Good morning.

5              THE COURT:  I understand you are a forensic expert.

6              JUROR:  Psychologist, yes, ma'am.

7              THE COURT:  Psychologist.  OK.  Do you work in

8    criminal and civil cases?

9              JUROR:  Almost always civil, some criminal but very

10   rarely.

11             THE COURT:  In what courts?

12             JUROR:  Westchester, principally Westchester Supreme

13   Courts, Putnam, Rockland, Orange.  I have done stuff in, for

14   the -- in Canada.

15             THE COURT:  Are you scheduled to testify within the

16   next month?

17             JUROR:  I haven't received any subpoenas yet, but I

18   have at least -- you never know who knocks on my door.  I do

19   have one urgent case which I mentioned there which is

20   concerning to me that I have to fast track because of

21   psychological illness of one of the parents and the potential

22   impact on the children.

23             THE COURT:  The psychological what of one of the

24   parents?

25             JUROR:  The psychological impairment of one of the

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

154nari2                    Voir Dire

1   parents and the impact on the children.  I have had to fast

2   track this case.  I would like to do my best to try to get this

3   in as soon as humanly possible because of the children.

4           THE COURT:  What work remains to be done on it?

5           JUROR:  I need to contact the collateral sources and

6   write the report at this point.

7           THE COURT:  How long do you think that would take you?

8           JUROR:  If I'm lucky, a week.

9           THE COURT:  I see.  Five days you think?

10          JUROR:  At least.

11          THE COURT:  OK.

12          JUROR:  Because many times -- there's probably about

13  ten providers I have to get a hold of and a lot of times I play

14  phone tag with everybody.

15          THE COURT:  Is there anyone who could fill in for you

16  on that case?

17          JUROR:  That is impossible.  Unfortunately I don't

18  allow anyone to do the work except myself.

19          THE COURT:  Do you think the children are at risk?

20          JUROR:  Yes.  I actually had to have the mother

21  removed from the house for one weekend until I was able to

22  communicate with the psychiatrist, and I have received phone

23  messages that things are beginning to act up at home.  So I

24  would like to do my best to assist there, your Honor.

25          THE COURT:  Can you step aside briefly?

154nari2                          Voir Dire

```
 1              JUROR:  Certainly, your Honor.

 2              (Juror not present)

 3              MR. MUNDIYA:  Of course.

 4              THE COURT:  We have agreement to excuse Juror No. 41

 5    for cause.

 6              (Juror present)

 7              THE COURT:  We will excuse you.

 8              JUROR:  Thank you very much, your Honor.  I apologize,

 9    but I can't control these things when they crop up like that.

10              THE COURT:  I understand.

11              JUROR:  Take care.

12              (Juror not present)

13              THE COURT:  Could Juror No. 42 come forward, please.

14              (Juror present)

15              THE COURT:  Good morning.

16              JUROR:  Good morning, your Honor.

17              THE COURT:  You have two points that you made with

18    respect to hardship.

19              You are a schoolteacher?

20              JUROR:  Yes, ma'am.

21              THE COURT:  What do you teach?

22              JUROR:  High school special education.

23              THE COURT:  And where do you teach it?

24              JUROR:  Orange County.

25              THE COURT:  Does someone teach with you?
```

 1              JUROR:  For one of my classes, yes.

 2              THE COURT:  And the others?

 3              JUROR:  No.

 4              THE COURT:  And you are applying for a new job?

 5              JUROR:  Yes, ma'am.  I am in a replacement position

 6     which expires in June.

 7              THE COURT:  So you may be called for an interview?

 8              JUROR:  Yes, ma'am.

 9              THE COURT:  Now, if you were called for an interview,

10     we could arrange trial so that you could go to the interview --

11     or interviews, I hope you are that fortunate.  But with respect

12     to your current students, could they be adequately cared for

13     without you there in the next three to four weeks?

14              JUROR:  They would be cared for.  I can't state to the

15     quality of care they be provided with a substitute.

16              THE COURT:  Do you know the substitute?

17              JUROR:  It varies day by day.  I think there may, I

18     may be afforded some more stability if -- because I have been

19     forced to put in day by day, not knowing what my status in the

20     court would be day by day this week, and I know it's been a

21     different person each day.  While it's possible that could

22     continue, it is also possible that they would find somebody for

23     a week at a time, two weeks at a time, which I think would

24     help.  But still, not knowing the individual's background, it's

25     still anyone's guess.

1          THE COURT:  I will ask you to step aside for a moment

2     and see if we have follow-up questions.

3          JUROR:  Thank you, your Honor.

4          (Juror not present)

5          THE COURT:  I don't think he will be able to pay

6     enough attention to the case.  I think he's going to be

7     worried.  He is in a school system where things are kind of

8     wooden.  If he's not there teaching, I think it might be a

9     problem for him.  Is there any objection to an excusal for

10    cause?

11         MR. KLAUS:  No, your Honor.

12         MR. MUNDIYA:  No, your Honor.

13         THE COURT:  Could you come forward for a moment.

14         (Juror present)

15         THE COURT:  We will excuse you for cause.  I wish you

16    good luck in getting a job.

17         JUROR:  Thank you, your Honor.

18         (Juror not present)

19         THE COURT:  Could Juror No. 43 come forward, please.

20         THE DEPUTY CLERK:  Judge, she was one of the ones I

21    had listed as one that didn't show.

22         (Juror present)

23         THE COURT:  Good morning.

24         JUROR:  Good morning.

25         THE COURT:  Are you Juror No. 43?

1           JUROR:  I am.

2           THE COURT:  Do you know what time you got here today?

3           JUROR:  Arrived outside or got up here?

4           THE COURT:  Both.

5           JUROR:  I waited about an hour and ten minutes on the

6      line downstairs.

7           THE COURT:  Oh, dear.

8           JUROR:  Kind of wet.

9           THE COURT:  We will be able to change that if you

10     serve here.  I'm sorry you're wet.  I have a few questions to

11     ask you.

12          You have used Napster, is that right?

13          JUROR:  Yeah, I mean a lot of years ago when it first

14     sort of got popular and my family gave me an MP3 player, I

15     tried to download.  I tried to I say because it took like half

16     an hour to get one song, so I didn't really have much success.

17          THE COURT:  You didn't use it much?

18          JUROR:  I tried a few times, but I couldn't really get

19     songs without waiting a really long time, and my computer

20     crashed, so -- but I did try.

21          THE COURT:  OK.  Look at your answer to question 24.

22     You say you have a vague memory of the Napster getting sued by

23     record companies.  Originally you understood Napster to be

24     sharing content that had been purchased much the way friends

25     share books, but over time you came to believe that record

154nari2                     Voir Dire

 1    companies and artists were being taken advantage of.

 2              JUROR:  Or might be -- I think it's pretty

 3    complicated.

 4              THE COURT:  Yes.

 5              JUROR:  I'm not really sure, so I didn't use it

 6    anymore.

 7              THE COURT:  Right.

 8              If you were selected to serve here, your answers here

 9    are anonymous, so you wouldn't have to have any worry about any

10    service you've used.

11              You mention that you have heard or you know Motown

12    Record Company and Sony.  Could you tell me about that?

13              JUROR:  I had a friend who passed away about ten years

14    ago, and he was an executive at Motown.  Then my cousin is

15    married to a former executive at Sony music.

16              THE COURT:  OK.

17              JUROR:  I don't really know what their respective

18    roles were.

19              THE COURT:  If you were selected to serve here, what I

20    would be asking you to do is to put out of your mind what you

21    knew once about Napster and what you knew about record

22    companies and just listen to the evidence that you hear in

23    court, read the exhibits, and then deliberate with your fellow

24    jurors once you have heard my instructions on the law.  Could

25    you do that?

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

154nari2                          Voir Dire

1              JUROR:  Yes.

2              THE COURT:  OK.  Thank you very much.

3              JUROR:  Sure.

4              (Juror not present)

5              THE COURT:  Could Juror No. 44 come forward, please.

6         This is the juror who is expecting the baby May 27.

7              (Juror present)

8              THE COURT:  I understand that your wife and you are

9    expecting a baby.

10             Is this your first baby?

11             JUROR:  Third.

12             THE COURT:  Third.  OK.

13             JUROR:  Her first.

14             THE COURT:  Her first.  OK.  So you don't know for

15   sure when the baby will be born?

16             JUROR:  We don't we had one scare already.  Spent the

17   evening in a hospital.

18             THE COURT:  So you are nervous about it?

19             JUROR:  Yes.

20             THE COURT:  OK.  How would you feel about serving here

21   as a juror?  Do you think you could serve, do you think you

22   could listen to the evidence, concentrate on that and

23   deliberate with your fellow jurors, or do you think you would

24   be too nervous about your wife's situation?

25             JUROR:  I am not at all nervous about concentrating

154nari2                        Voir Dire

 1  and hearing the evidence.  I'm nervous about accompanying my

 2  wife to the hospital if she's in labor, and I wouldn't want to

 3  interrupt the proceedings.

 4          THE COURT:  You could interrupt the proceedings for

 5  that.

 6          JUROR:  For that?

 7          THE COURT:  For that you could, yes.  How far away do

 8  you live?

 9          JUROR:  Westchester County, seven miles north of the

10  city.

11          THE COURT:  So your commute would be an hour plus?

12          JUROR:  To come here, yes, about an hour.

13          THE COURT:  So would that give you enough notice to

14  get home?

15          JUROR:  That partly depends on the cell phone problem.

16  Is there a way for her to get a note in to me?

17          THE COURT:  Yes, there would be.

18          JUROR:  Then that would probably be all right.

19          THE COURT:  Then let me ask you a few follow-up

20  questions.  You are a journalist?

21          JUROR:  Yes.

22          THE COURT:  Which magazine?

23          JUROR:  Fortune magazine.  There wasn't space for it

24  in the form, but I should probably disclose that you and I have

25  met socially, our exes worked together.

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

154nari2                     Voir Dire

 1          THE COURT:  I see.  Thank you.

 2          Did we know one another well?  I hate to admit I have

 3  to ask that question.

 4          JUROR:  We had lunch in the summertime a couple of

 5  times.

 6          THE COURT:  OK.  Is there anything about -- be very

 7  frank.  Is there anything about any time you spent with me or

 8  anything you know about me that would make you not want to

 9  serve here?

10          JUROR:  No.  I just thought it needed to be mentioned.

11  I didn't see a spot to put it on the form.

12          THE COURT:  Next time.  You know Edgar Bronfman, Jr.?

13          JUROR:  That is an indirect question.  One of my jobs

14  has been to edit media stories for Fortune magazine, so my

15  writer would spend a lot of time with Bronfman and I would

16  spend a lot of time with the writer deciding what goes in and

17  out of the story.  I figured that's probably an indirect thing

18  that should be disclosed.

19          THE COURT:  Yes.  OK.

20          You answered question No. 24 saying that -- I should

21  also note that a member of your family has used Napster and

22  Kazaa.

23          Who would that be.

24          JUROR:  Son, and probably daughter as well, two

25  teenagers.

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1          THE COURT:  They won't be at any legal risk here

2     because these questionnaires are anonymous and will be

3     destroyed.

4          You mention in response to 24, Napster led the way and

5     was put out of business.  Then Steve jobs figured out the

6     business model and the litigation fever cooled off.

7          I understand that.

8          Do you have any expertise about this business?

9          JUROR:  Does a journalist have expertise?

10         THE COURT:  Ah.

11         JUROR:  Well, let's see how to say it.

12         THE COURT:  Have you written about record companies or

13    file sharing or music?

14         JUROR:  I have edited a huge number of stories on the

15    subject.

16         THE COURT:  OK.

17         JUROR:  I have done extensive edits and rewrites of

18    stories, for instance, about Steve Jobs, his business plan, his

19    personal life.  There are things that make it into stories and

20    things that don't.  And for a number of years -- I was formerly

21    the editor of all media stories for Fortune magazine, including

22    stories about our parent Time Warner, Warner Music and things

23    like that.

24         THE COURT:  You will be able to answer this question

25    far better than I can probe on it.

1            Looking to your life experience and your knowledge,

2      would you be able to sit here as a juror, listen to the

3      evidence in this case and deliberate with your fellow jurors

4      based on the evidence in this case and the law that I give you

5      and not let any past knowledge that you have interfere with

6      your fairness?

7            Would you like time to think about it?

8            JUROR:  No.  I think I would be able to, but you have

9      to wonder if you are flattering yourself.  I mean, I live in a

10     business, I work in a business, my livelihood depends on

11     copyright, and whether I can exclude that from my thinking,

12     whether I should exclude that from my thinking is a question.

13           THE COURT:  If you could step aside for just a moment,

14     I'll talk about counsel will how to word the next questions.

15           JUROR:  OK.

16           (Juror not present)

17           THE COURT:  I don't think that this should disqualify

18     him.  Are there questions you want me to ask him?

19           MR. BAIO:  I don't think so, your Honor.

20           MR. KLAUS:  One question.  What in particular he's

21     read or written about or edited about Mr. Bronfman, who will be

22     a witness.

23           THE COURT:  Could you please come back.

24           (Juror present)

25

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

398
       154nari2                    Voir Dire

1              THE COURT:  May I indicate that Mr. Bronfman will be a

2       witness in the case.  If you are a juror here, can you put out

3       of your mind what you knew about him in the past and judge him

4       the way you would any other witness --

5              JUROR:  Yes, I think so.

6              THE COURT:  -- is he credible and so on?

7              With respect to copyright, the jury here will largely

8       be deciding questions involving damages, and I think you can be

9       fair on that if you do.

10             JUROR:  OK.

11             THE COURT:  OK.

12             Thank you very much.

13             (Juror not present)

14             MR. KLAUS:  Do we have 16 now.

15             THE COURT:  We have qualified I think five.

16             THE DEPUTY CLERK:  15.

17             THE COURT:  We have 15 now.  Ten plus five.

18             MR. KLAUS:  Yes.

19             THE COURT:  I think we're OK if you do.

20             MR. OLLER:  We had the issue of No. 8 and his job was

21      still a question mark I think.

22             THE COURT:  That's right.  I will make a call now.

23      While I do that, perhaps you could at your, wherever you would

24      like to be, be considering your peremptories.

25             MR. KLAUS:  Yes, your Honor.

1          MR. MUNDIYA:  Yes, your Honor.

2          THE COURT:  You each have three strikes, and I ask you

3    to put them simultaneously on a piece of paper.

4          MR. KLAUS:  I apologize.  To show my lack of math

5    being in my strong suit, do the jurors come in in the order

6    they come in, do they go out -- in other words, the first juror

7    who was qualified I believe was No. 6.  She now becomes No. 1

8    on the list?

9          THE COURT:  Yes.

10         MR. KLAUS:  Thank you.

11         THE COURT:  Yes.  There is one other issue down the

12   road.  The jurors who were stricken simply disappear and

13   everyone else moves forward.

14         If you strike the same juror, we might have the option

15   of having an extra juror, which might be a good idea.  So I

16   just note that.  If you do strike the same juror, I will be

17   asking you if you would like to keep the extra.

18         MR. KLAUS:  Just to make sure we are on the same page.

19         THE COURT:  Who did we disqualify from the first

20   group?

21         MR. KLAUS:  I believe it was No. 14, your Honor.

22         THE COURT:  OK.  All right.

23         I have jurors 6, 7, 8, 11, 13, 15, 19, 21, 23, 32, 33,

24   36, 39, 43 and 44.

25         MR. MUNDIYA:  That is what I have, your Honor.

154nari2                          Voir Dire

1          THE COURT:  So I will be calling the employer now and

2     I'll let you know.

3          MR. MUNDIYA:  Just a clarification, the jurors will

4     keep the same numbers for the purposes of peremptories.

5          THE COURT:  Yes.  You don't have to change anything.

6     Just stick with --

7          MR. KLAUS:  We don't need a concordance table.

8          MR. MUNDIYA:  That's right.

9          THE COURT:  My deputy has helpfully given us this.

10    Would you like to have her copy it?

11         MR. MUNDIYA:  Yes.  That would be very helpful.  Thank

12    you.

13         MR. KLAUS:  Your Honor, we may leave the courtroom or

14    go to the jury room or across the hall?

15         THE COURT:  Yes.

16         MR. MUNDIYA:  Thank you.

17         (In open court)

18         THE COURT:  Members of the panel, I want to, first of

19    all, thank you for your patience.  I know some of you had to

20    wait a long time outside.  I know it was wet.  You're probably

21    uncomfortable.  I need to a few minutes to make a phone call on

22    behalf of one juror, and the lawyers are going to be meeting to

23    move along the process of jury selection.

24         So there will be about 10 to 15 minutes before I come

25    back to you.  If any of you want to leave for 10 to 15 minutes,

154nari2                    Voir Dire

1   you may do so, but please be back in your seat, let's say in

2   ten minutes.  Thank you very much.

3            (Recess)

4            THE COURT:  Could counsel come to the bench and could

5   Juror No. 8 come to the bench.

6            (Juror present)

7            THE COURT:  Hi, I had a nice talk with Mr. Mugdin.

8            JUROR:  Yes.

9            THE COURT:  He is a very charming man.

10           JUROR:  Yes, he is.

11           THE COURT:  Notwithstanding his charm, he has agreed

12  that you could serve.

13           JUROR:  He gave me up?  I can't believe that.

14           THE COURT:  I really twisted his arm.

15           JUROR:  He did tell me that if you pushed back he was

16  going to give up.

17           THE COURT:  He had some very nice things to say about

18  you.

19           JUROR:  Which made it worse.

20           THE COURT:  Yes.

21           JUROR:  He thinks you will be a wonderful juror.

22           THE COURT:  Thank you very much.

23           JUROR:  OK.

24           (Juror not present)

25           MR. KLAUS:  Your Honor, I need to raise one issue.  It

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    concerns Juror No. 39.  At a break I had the opportunity to

2    talk to my client, and Paul Weiss represents the Warner Music

3    Group, it's represented it for a significant period of time in

4    corporate transactions and in litigation, but it is currently

5    representing Warner in the sale of the company, which is the

6    single biggest transaction in its history.

7           We think, given the fact that he is an associate in

8    the law firm with knowledge of Warner Music Group and their

9    confidential information, this raises a concern of actual bias,

10   your Honor, and we would ask that he be disqualified on that

11   ground.

12          THE COURT:  You think he would be biased in favor of

13   record companies?

14          MR. KLAUS:  I think he would have access to

15   confidential information, and I don't know what he may know

16   about this lawsuit or any information that may relate to this

17   lawsuit.

18          THE COURT:  I will call him up and question him about

19   that.

20          MR. KLAUS:  Thank you, your Honor.

21          (Continued on next page)

22

23

24

25

```
 1              (At side bar)

 2              THE COURT:  Could juror no. 39 come forward, please?

 3              JUROR:  Yes, your Honor.

 4              MR. BAIO:  A few follow-up questions.

 5              JUROR:  Of course.

 6              THE COURT:  With respect to Warner, Warner is

 7    apparently now engaged in a very important transaction with the

 8    sale of the company.  Have you been privy to any information

 9    about the Warner transaction?

10              JUROR:  Not in the least.  This is the first I have

11    heard of it, actually.

12              THE COURT:  And have you worked on anything for Warner

13    or any case that involved Warner?

14              JUROR:  Not that I can recall.

15              THE COURT:  Are you a litigator?

16              JUROR:  Yes, ma'am.

17              THE COURT:  If you are selected as a juror here could

18    you promise that you will not access any information at your

19    law firm about any clients in the recording industry or anyone

20    involved in this case?

21              JUROR:  Yes, ma'am.  If you want, I believe my firm

22    can also put up some sort of firewalls.  I have heard them do

23    it before in some cases.

24              THE COURT:  Now, if you were selected to serve as a

25    juror here would you expect to go into Paul Weiss during the
```

1    three to four weeks here?

2            JUROR:  No, ma'am.  If it would be permissible with

3    you and of course with counsel, I believe Paul Weiss would

4    probably like me to do doc review for a case that I'm on but

5    that's hard copy.  In fact, that's why I have my suitcase here,

6    your Honor.

7            THE COURT:  Well, if you are doing that -- may I ask

8    you who is the client?

9            JUROR:  Of course.  That's Merck.

10           THE COURT:  Doesn't involve music at all.

11           JUROR:  Not in the least; beyond the disgruntled

12   groans of the associates under the doc review.  That's about

13   it.

14           THE COURT:  Thank you very much.

15           JUROR:  Thank you, your Honor.

16           (Juror not present)

17           THE COURT:  Okay.  He's still in our panel.

18           MR. KLAUS:  Thank you, your Honor.

19           MR. MUNDIYA:  Thank you, your Honor.

20           THE COURT:  So, how soon do you think you can give me

21   your strikes?

22           MR. KLAUS:  Can we have --

23           THE COURT:  10 minutes.

24           MR. KLAUS:  10 minutes would be fine, your Honor.

25           MR. MUNDIYA:  Thank you.

```
 1              (In open court)
 2              THE COURT:  We will take a recess for 10 minutes and
 3     then we will resume.  Feel free to stand, stretch, read, talk.
 4              (Recess)
 5              THE COURT:  Could counsel come forward?
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1545ari3                        Jury Selection

 1              (At side bar)

 2              THE COURT:  Plaintiffs strike no. 8, 39 and 44.

 3     Defendants strike 11, 15 and 32.

 4              So, our jurors are no. 6, 7, 13, 19, 21, 23, 33, 36

 5     and 43.

 6              MR. KLAUS:  Thank you, your Honor.

 7              MR. BAIO:  Thank you.

 8              THE COURT:  Counsel, what we are going to do now is

 9     seat the jurors, swear them, let them go for two hours.  I will

10     take about 10 minutes working on legal questions that you need

11     answers to before you open and then I will come out, we will

12     deal with that, and then you will be able to have, I hope, at

13     least an hour for lunch.

14              MR. BAIO:  Thank you, your Honor.

15              MR. MUNDIYA:  Thank you, your Honor.

16

17

18

19

20

21

22

23

24

25

1       (In open court)

2       THE COURT:  Members of the panel, a jury has now been

3   selected and what I am going to do is ask the jurors who are in

4   the jury box to step out and as I read the names of jurors who

5   have been selected, they should each come into the jury box and

6   my intern will help seat you.

7       I want to say to all of you who have not been selected

8   that you have performed a very important public service by

9   being here and by being willing to serve and I want to thank

10  you very much for that.

11      Those of you who have not been selected will need to

12  go back to the jury room with your cards and indicate to the

13  jury administrator that you were not selected for this case.

14  Again, you have my heartfelt thanks.

15      The jurors who have been selected are juror no. 6,

16  no. 7, juror no. 13, juror no. 19, juror no. 21 and juror

17  no. 23, juror No. 33 and juror no. 36 and juror no. 43.

18      At this point those of you who have not been selected

19  are free to leave the courtroom.  Thank you again for your

20  service.

21      Members of the jury, you are about to be sworn as

22  jurors and from that point on you are jurors in the case.  I

23  will give you preliminary instructions after lunch but I'd like

24  to let you go to lunch and take a two-hour lunch and then I

25  will be ready to give you my further instructions and you will

1   hear the lawyers' opening statements.

2          From this point on until the end of the trial and when

3   you go begin to deliberate, from this point on you must promise

4   me that you will not talk to one another about the case at all,

5   not about the case, the lawyers, the Judge -- anything about

6   the case -- and that you will not talk to anyone else about the

7   case.

8          I also need to have you promise me that you will not

9   do any research about the issues in the case; no reading, no

10  internet searches.  I will give you further instructions after

11  lunch but at this point I think that's all you need to know.

12         Could you swear the jurors.

13         (A jury panel of 9 was impaneled and sworn)

14         THE COURT:  My intern Britton will show you where the

15  jury room is.  I would like to have you go through it just so

16  you get familiar with it and I would like to ask you to be back

17  in a little under two hours at 2:00.

18         May I also mention that you should never come into the

19  courtroom until there is a knock on the jury door and you all

20  come in together.  You need to stay in the jury room or out to

21  lunch or on your break.  If, by chance, you run into any of the

22  lawyers or parties in the case, let's say in the elevator or on

23  the court house steps, they will not say hello to you because

24  I'm asking them not to have any interaction with you at all.

25  So, it is not strange, they're obeying my requirement that they

1545ari3                    Jury Selection

1     not talk to you.

2             Okay.  Have a good lunch.  See you at 2:00.  Thank

3     you.

4             (Jury not present)

5             THE COURT:  We will be adjourned for about 10 minutes.

6             MR. POMERANTZ:  Your Honor, may we approach?

7             THE COURT:  Yes.  On the record?

8             MR. POMERANTZ:  It doesn't need to be on the record.

9             (Discussion off record)

10            THE COURT:  Just to be sure, is there any juror in the

11    room now?  None.

12            What I intend to deal with now are the issues raised

13    in connection with Mr. Gorton's Ira, executive compensation,

14    Section 412, and then I will be asking how plaintiffs intend to

15    use the facts from the summary judgment opinion that are the

16    subject of the April 29 letter from Munger Tolles.

17            With respect to the IRA, I note that in letters dated

18    April 9, 2007, the jury may be advised of Mr. Gorton's

19    individual retirement account.  I find that the evidence

20    regarding that account is relevant to the jury's determination

21    of statutory damages and to their determination of punitive

22    damages.

23            I previously held that Mr. Gorton's net worth material

24    is admissible for the purposes of calculating statutory damages

25    under the Copyright Act and calculating punitive damages, as

1545ari3                    Jury Selection

1    well as proving plaintiffs' fraudulent conveyance claim.  I

2    reasoned that the net worth material is relevant to the

3    deterrence factor in calculating damages under the Bryant case.

4    In light of that, Mr. Gorton's IRA, which constitutes part of

5    his net worth, is relevant to and probative of whether a large

6    damage award is needed to effect deterrence here.

7           Second, I find that the probative value of that

8    evidence is not substantially outweighed by the danger of

9    unfair prejudice, confusion of the issues, misleading the jury,

10   considerations of undue delay, waste of time, or needless

11   presentation of cumulative evidence.

12          (Continued on next page)

13          THE COURT:  I disagree with defendants' contention

14   that because state law precludes the IRA from being attached by

15   judgment creditors, evidence of the IRA must be excluded.

16   Whether plaintiffs can ultimately collect from Mr. Gorton's IRA

17   is distinct from the question of whether evidence of the IRA is

18   admissible for the purposes of calculating statutory and

19   punitive damages.

20          Defendants cite no authority for the proposition that

21   an inability to execute a judgment requires the exclusion of

22   evidence at trial.  In fact, courts and juries often consider

23   accounts that cannot be attached by judgment creditors when

24   assessing a defendant's total net worth and when calculating

25   the amount of damages necessary to deter illegal conduct.

154nari4

```
 1                 I also disagree with defendants' arguments that

 2      evidence of the IRA should be excluded because the jury

 3      purportedly will have "more than ample evidence" to calculate

 4      damages without learning about the IRA.

 5                 Plaintiffs are not seeking to admit duplicative

 6      evidence of a single facet of Mr. Gorton's net worth.  Rather,

 7      they seek to offer evidence of various holdings in Mr. Gorton's

 8      portfolio in order to paint a complete picture of his net

 9      worth.

10                 Finally, I conclude that evidence of the IRA should

11      not be excluded as "grossly prejudicial" as defendants

12      characterize it.  As I have indicated, the extent of a

13      defendant's financial holdings is properly considered when

14      determining the amount of damages necessary to deter future

15      infringement.  In light of that, I find that evidence relating

16      to Mr. Gorton's IRA is not unfairly prejudicial within the

17      meaning of Rule 403.  Defendants are, of course, free to argue,

18      as they've indicated they would like to, that Mr. Gorton has

19      already been deterred.

20                 The parties appear to raise a nonevidentiary issue,

21      which is whether all portions of the IRA are subject to

22      attachment by judgment creditors.  I don't yet have enough

23      evidence to determine that, and, in any event, no ruling is

24      needed on that now.  If, following judgment, plaintiffs

25      petition for a writ of execution to attach the IRA and if
```

154nari4

1    defendants then move to quash the writ, I can decide at that

2    time the propriety of attachment.

3           With respect to the issue of the compensation of

4    plaintiffs' executives, I note that on May 2 I stated that "I

5    will let defense counsel bring in relevant economic arguments,

6    including compensation to plaintiffs' executives."

7           Yesterday plaintiffs raised privacy-related concerns

8    regarding certain executives whose compensation figures are

9    purportedly not publicly available and plaintiffs also renewed

10   their overall objection to defense counsel introducing evidence

11   on the compensation of plaintiff's executives.

12          I affirm my May 2 ruling that defense counsel may

13   introduce evidence and argument with respect to compensation of

14   plaintiffs' executives.  However, defense counsel may not name

15   specific names when speaking about executive compensation.

16   Rather, defense counsel should speak in general terms, with

17   statements such as two of plaintiffs' executives were

18   compensated at over X dollars in X year.  If you have any

19   questions about this later, you can raise them.

20          With respect to Section 412, I want to be sure that

21   the numbers I'm working with are correct.

22          For total post-1972 songs is the figure 9,561?

23          MR. KLAUS:  Your Honor, I apologize.  I would like to

24   be sure of this.

25          THE COURT:  That's all right.

154nari4

1          MR. KLAUS:  9,561.

2          THE COURT:  And the subset of post-1972 songs affected

3     by Section 412(2) is 1,223?

4          MR. KLAUS:  That's correct, your Honor.

5          THE COURT:  OK.  Thank you.

6          MS. EATON:  Your Honor, we have a disagreement on that

7     particular number.

8          THE COURT:  I'm sorry.  Could you speak up and tell me

9     what your argument is.

10          MS. EATON:  Yes, your Honor.

11          The parties have been exchanging communications about

12     what the correct number is of published, late registered works

13     subject to Section 412(2) of the Act.  There have been counting

14     errors on both sides and some debate about whether some of

15     their existing evidence of preregistration infringement of some

16     of those songs -- for example, last week we were told that the

17     plaintiffs had secured evidence that 60 of those songs they had

18     evidence that there was preregistration infringement.  On

19     Friday of last week, an additional 19 songs were removed from

20     that list.

21          I haven't received an explanation as to why that's so,

22     but I assume it's because they found additional evidence of

23     preregistration infringement.  So last night, after we were

24     informed that the Court wanted the final correct number for

25     reasons we can all understand, we went back and double checked

154nari4

1    the list and found a total of 1,331 late registered songs.

2    Those are songs that were late registered after the LimeWire

3    system was launched.

4          So the difference between the two sides is our number

5    is 1,331 and their number is, I believe, 1,223.

6          THE COURT:  All right.  I don't need to determine this

7    right now unless counsel want to mention specific numbers in

8    their opening statements.

9          MR. KLAUS:  No, your Honor.  There's no need to

10   determine it right now.

11         THE COURT:  OK.

12         I am going to move to points that are not dependent on

13   a precise number of songs.

14         On May 1 plaintiffs argued that for 31 of the works

15   affected by Section 412(2), that is, works that were not

16   registered within 90 days of publication, they intended to seek

17   statutory damages because those works had previously been

18   registered and subsequently infringed as unpublished works.

19         On May 3, plaintiffs sent a letter to the Court

20   stating that they are withdrawing that argument.  Thus, those

21   31 works are back in the pool of either 1,223 or 1,331 or

22   something in between the two.

23         Defendants recently argued for the first time that,

24   under Section 412(1), if a work was infringed prior to

25   publication and prior to registration as an unpublished work,

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

```
1    then statutory damages are barred.  This potentially

2    affected -- tell me if I have the number right -- 3,762

3    additional works beyond the 1,223 or 1,331 or something in

4    between the two.  Do I have the number right, or do you want me

5    to just hold off on the number?

6            MS. EATON:  I'm afraid to say it would be advisable to

7    hold off on the number, your Honor.

8            THE COURT:  I will hold off on that.  However, I go on

9    with the principle.

10           Defendants on May 3 submitted a letter pointing to

11   case law holding that if a work is infringed prior to

12   publication and prior to registration as either an unpublished

13   or a published work, then even if it is later published and

14   registered as a published work on time, statutory damages are

15   unavailable.

16           Plaintiffs argue that this rule is contrary to the

17   clear purpose of Section 412(2), which provides for a 90-day

18   grace period for published works.

19           And they argue that it creates a perverse incentive to

20   infringe a work prior to publication in order to preclude

21   statutory damages.  I need not resolve that issue because I

22   agree with plaintiffs' alternative argument that defendants

23   have waived this new argument.

24           It was not included in the pretrial order, which alone

25   effectuates a waiver.  But, moreover, throughout this
```

154nari4

1    litigation, including in the weeks after the pretrial order was

2    submitted, defendants consistently maintained that their 412

3    argument applied only to the roughly, again, 1,223 or 1,331 or

4    something in between works that had been the subject of

5    briefing and discovery until this point.

6           For defendants to switch to an entirely new theory so

7    shortly before trial would be extremely prejudicial to

8    plaintiffs, and I deem the argument waived.

9           I would like to ask plaintiffs to address how you

10   intend to meet your burden of proving that you complied with

11   Section 412(2), that is, that you would show that a work was

12   not infringed prior to late registration.  You've indicated

13   that you will meet your burden somehow, but I'm concerned about

14   juror confusion, so I'm asking you now what evidence do you

15   intend to put on in that regard.

16          MR. KLAUS:  The evidence that we'll put on, your

17   Honor --

18          THE COURT:  Yes.

19          MR. KLAUS:  -- are the dates as to those works.

20          THE COURT:  Could you be more specific.

21          MR. KLAUS:  Well, I think we are debating whether we

22   are somewhere between 1223 --

23          THE COURT:  Right.

24          MR. KLAUS:  -- and 1331.  That's the range.

25          THE COURT:  Correct.

154nari4

1          MR. KLAUS:  As to those works, we can put in the

2     evidence of dates that we know for certain those works were

3     infringed.  We can put in the copyright registration

4     certificates so that the two of them can be compared.

5          And I believe that the testimony of the witnesses, to

6     the extent they have knowledge on this, will be that they don't

7     have any indication whether those works were infringed any

8     earlier by LimeWire.

9          THE COURT:  It is your position that that meets your

10    burden?

11         MR. KLAUS:  It is our position that I don't know what

12    more we could do to meet our burden, your Honor.  I don't know

13    what more we could do than say this is the date we know when

14    the work was registered, that's your point A; that is a date

15    that we know of infringement, which is point B, and we don't

16    know of a different date.

17         THE COURT:  Right.

18         Are defense counsel ready to argue this or would you

19    rather address it after lunch?

20         MS. EATON:  I can address it now, your Honor.  The

21    statute, the statutory history, the case law is clear that the

22    burden is not an affirmative defense; it's a prerequisite for

23    entitlement to damages.  The burden is on plaintiffs to prove

24    when the infringement took place for each of the post-1972

25    works on their list and whether that infringement predated

154nari4

1    registration or not.  If they fail in that proof, they are not

2    entitled to statutory damages.

3           It does not do under the statutory scheme and the

4    numerous cases interpreting Section 412 to say, I have evidence

5    that an infringement happened at some point in history, which

6    is the only evidence that has been produced to us during the

7    discovery phase of this case.  All of that evidence -- or I

8    should correct myself, the vast majority of that evidence

9    indicates that there were downloads of a certain subsection of

10   this universe of songs that took place in the summer of 2010.

11          There is a smaller subset of evidence from studies

12   that the plaintiffs conducted, I believe it was in the 2004

13   time period, but as I say, most of that evidence is from the

14   summer of 2010 in connection with work that plaintiffs' experts

15   did.

16          It's our submission that that evidence is insufficient

17   to meet plaintiffs' burden of proof of showing when the date of

18   infringement took place for the purposes of an award of

19   statutory damages under 412.  It is just not enough, your

20   Honor.

21          THE COURT:  Mr. Klaus?

22          MR. KLAUS:  If I heard Ms. Eaton correctly, what she

23   said is we have to show the date of registration and the date

24   of known infringement.  I said that's exactly what we would

25   offer to discharge our burden.  I'm not sure what additional

154nari4

1    evidence we could provide to on this point, your Honor.

2             THE COURT:  I understand what you're saying.  My

3    preliminary view is that what you are suggesting, Mr. Klaus,

4    could not meet your burden and that the jury would be confused

5    if you were to introduce evidence on it.

6             What I would suggest is that, as we get close to any

7    time that you would want to introduce evidence on that, you

8    revisit it.

9             MR. POMERANTZ:  Your Honor, may I ask, I think the

10   evidence that Mr. Klaus is referring to, the date of the

11   infringement, we're going to be putting that into evidence, I

12   believe, no matter what.  For this issue or any other issue, it

13   will be in evidence.  The registrations are self-authenticating

14   and they can be published to the jury at any time once your

15   Honor makes the decision.

16            We would request that your Honor defer ruling on this.

17   I do believe that as the evidence comes in, we may want to

18   revisit the questions that underlie the burden of proof issue

19   and I think that the evidence may be illuminating on that

20   issue; that is, whether in this kind of a situation, with the

21   deliberate structuring of the LimeWire network in the way that

22   they did, does the law impose that burden on us, given the

23   choices made by the defendants?

24            I'm not asking to argue that issue now, but I do think

25   we may be in a position with all the evidence in the record or

154nari4

1    most of it in the record to revisit that question.  I don't

2    think it will be prejudicial to anyone, because the evidence we

3    would need to address this issue would largely be stipulated.

4    I think it's already stipulated.

5              THE COURT:  As I've indicated, my view is only

6    preliminary, and I will be prepared to revisit it when the

7    parties tell me it's time to do so.

8              All right.

9              With respect to the Munger Tolles April 29 letter

10   setting forth what the firm terms "facts explicitly articulated

11   by the court," as I understand it, you are seeking to have me

12   instruct defendants that they are precluded from offering

13   evidence or argument inconsistent with those facts?

14             MR. POMERANTZ:  Your Honor, I'm sorry.  The first

15   paragraph of that letter should have been clearer.

16             THE COURT:  OK.

17             MR. POMERANTZ:  We were really sending that letter to

18   your Honor so that we would have a handy checklist so we didn't

19   have to argue things in front of the jury.  And if we felt that

20   something happened in the courtroom that was inconsistent with

21   an order you've already issued regarding putting on evidence or

22   arguing inconsistent with certain findings, we would all have a

23   shorthand reference.  Then if your Honor needed a side bar, we

24   could have one.  But we were doing it because I know your Honor

25   does not want to have unnecessary side bars, and it gave us a

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

154nari4

1    checklist, so to speak, so that if something happened we could

2    just say, your Honor, you know, item No. 43 or whatever it is,

3    and your Honor could read it.  We cite to the page of your

4    Honor's summary judgment opinion and your Honor can consider it

5    without maybe interrupting the jury.

6           That was the only intention of that letter.  It wasn't

7    really intended for you to read anything to the jury or

8    anything, but for all of us to have a checklist.

9           THE COURT:  All right.  Thank you for that

10   clarification.

11          Do you wish to address this?

12          MR. BAIO:  Your Honor, I'm shortly going to be doing

13   an opening, and I believe I am sailing not close to the wind

14   and metaphors that you've used, but I don't know whether

15   something is going to come up and they're going to say 23, 41,

16   18, and that puts me at a little bit of a disadvantage.

17          MR. POMERANTZ:  Your Honor, with respect to openings,

18   I don't intend to do that.  If I do think that Mr. Baio has

19   said something inconsistent with one of those facts, I would

20   intend to address it with your Honor after the openings are

21   completed.

22          THE COURT:  I think that's the best way to handle it.

23          MR. BAIO:  Thank you, your Honor.

24          THE COURT:  Do you want to raise anything else before

25   we break for lunch?

154nari4

```
 1              MR. POMERANTZ:  No, your Honor.

 2              MR. BAIO:  No, your Honor.

 3              THE COURT:  OK.  Thank you.  Have a good lunch.  I

 4    will see you at 2:00.

 5              Counsel, I would aappreciate your giving copies of

 6    your questionnaire to my law clerk.  If you have any copies

 7    back at the office or at the hotel, could you bring them to

 8    court with you, please.  Thank you.

 9              (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

154nari4

```
 1              A F T E R N O O N    S E S S I O N

 2                        (2:00 p.m.)

 3            THE COURT:  My deputy is checking to see if the jurors

 4   are here.  I have about ten minutes' worth of preliminary

 5   instructions that I will be giving the jury.  They are a blend

 6   of what you have each submitted.  I am giving the rules of the

 7   road at the end.

 8            The jurors are here.  They can be brought in.  Please

 9   stand.

10            (Jury present)

11            THE COURT:  We are going to slightly shift where some

12   of you sit.  The first four stay in place, but the other five

13   should be behind in number order.

14            Thank you.  That way the lawyers won't be right on top

15   of you as they speak.  Please have a seat.

16            I want to thank you again for your service.  It is

17   very important to everyone in this room and we're grateful to

18   you.

19            As I explained to you earlier, in this case an

20   Internet company called LimeWire is being sued for money

21   damages by recording companies.  My intern is handing out pads

22   and pens.  I'll get to the note-taking instruction shortly, but

23   you are permitted to take notes if you wish to.

24            LimeWire is being sued for money damages by recording

25   companies.  LimeWire made money by inducing individuals to
```

1    engage in the copying and distributing of musical sound

2    recordings without the permission of the recording companies

3    who own the copyrights to those musical sound recordings.   That

4    is called copyright infringement.

5          A copyright is a set of legal rights that the law

6    gives to someone who owns an original work of authorship.   This

7    case involves one kind of original works of authorship, namely,

8    original musical recordings.

9          The United States Copyright Act calls these works

10   "sound recordings," and I will be using that term from time to

11   time.   Sound recordings are works that result from putting

12   musical sounds onto material objects in which they are

13   embodied, such as records, tapes, or disks.

14         The owner of the copyright to a sound recording is the

15   only one permitted to copy or distribute the recording or to

16   authorize someone else to copy or distribute the recording.   If

17   someone copies or distributes the sound recording without

18   authorization, that conduct is called copyright infringement.

19   If copyright infringement is induced by another person, then

20   the person inducing the unauthorized copying or distribution is

21   liable for copyright infringement.

22         Plaintiffs in this case are 13 record companies which

23   own the copyrights to the sound recordings that are at issue in

24   this case and that were infringed on the LimeWire system.

25         The defendants in this case are LimeWire LLC,

154nari4

LimeGroup LLC, Mark Gorton, and the M.J.G. LimeWire Family
Limited Partnership.  LimeGroup was the principal investor in
LimeWire LLC, which I will refer to from now on as LimeWire.
Mark Gorton was the founder and CEO of both LimeWire and
LimeGroup.

Plaintiffs assert four claims in this case.

Plaintiffs' first claim is that LimeWire, LimeGroup,
and Mr. Gorton are liable for copyright infringement for having
induced users of LimeWire to infringe plaintiffs' copyrighted
sound recordings.

In an earlier court proceeding, LimeWire, LimeGroup
and Mr. Gorton were found to be liable for copyright
infringement because they intentionally induced individual
users of the LimeWire system to infringe plaintiffs'
copyrighted sound recordings.

This ruling was based on the following findings among
others:

LimeWire users directly infringed plaintiffs'
copyrights in the work at issue through the LimeWire software;

Defendants, by marketing, distributing and maintaining
the LimeWire software, intentionally encouraged direct
infringement by LimeWire users.

Defendants, including Mr. Gorton, knew about the
infringement committed by users of the LimeWire software.

Defendants did not implement in a meaningful way any

1    of the technological barriers and design choices that were

2    available to defendants to diminish infringement.

3            LimeWire depended on infringement for the success of

4    its business, and Mr. Gorton and LimeGroup benefited from the

5    infringement committed by users of the LimeWire software.

6            The Court has ordered defendants to stop distributing

7    the LimeWire software, and LimeWire is no longer in operation.

8    Therefore, the jury's role in plaintiff's first claim for

9    copyright infringement will be to determine the amount of money

10   damages that plaintiffs are entitled to recover from

11   defendants.

12           I will explain to you later the types and amounts of

13   damages you may consider and who has the burden of proof on

14   various damage claims.

15           Plaintiff's second claim is that LimeWire, LimeGroup,

16   and Mr. Gorton are vicariously liable for the infringement of

17   the musical recordings at issue in the case.  Defendants deny

18   that.

19           As with inducement, vicarious liability holds someone

20   liable for infringements that were directly committed by

21   someone else.  I will instruct you on the legal standards for

22   vicarious liability later in the trial.

23           Plaintiffs' third claim is against Mr. Gorton for

24   conveying assets he owned with the intent to defraud.

25   Plaintiffs contend that Mr. Gorton conveyed assets he owned

154nari4

1    into a limited partnership that he created called the M.J.G.

2    LimeWire Family Limited Partnership with the actual intent to

3    hinder, delay, or defraud his present and future creditors,

4    including the plaintiffs in this case.

5            Mr. Gorton denies this allegation and maintains that

6    the transfers in question were solely for legitimate estate

7    planning purposes.  I will instruct you later on the legal

8    standards for a claim of fraudulent conveyance and the burden

9    of proof on this issue.

10           Plaintiffs' fourth claim is that the M.J.G. LimeWire

11   Family Limited Partnership is liable for unjust enrichment.

12   Plaintiffs contend that the M.J.G. LimeWire Family Limited

13   Partnership was unjustly enriched by the transfers that

14   Mr. Gorton made into the M.J.G. LimeWire Family Limited

15   Partnership.

16           Defendants deny this allegation.  They claim that the

17   asset transfers in question were for legitimate purposes.  If

18   you find that the M.J.G. LimeWire Family Limited Partnership

19   was unjustly enriched by a fraudulent conveyance, you will

20   determine the amount of damages that are owed to plaintiffs on

21   this claim.

22           As with the other claims, I will instruct you in much

23   more detail later on the legal standards and burden of proof.

24           I would like to say a few words about the nature of

25   evidence and how the trial will proceed.

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

154nari4

1          The evidence in this case will be the sworn testimony

2     of the witnesses, along with the exhibits received in evidence,

3     any stipulations, which are agreements among the parties, and

4     any judicially noticed facts.  I will describe that to you

5     later.

6          However, when the lawyers speak, their questions are

7     not evidence.  And when they give you oral argument or their

8     opening statements, that is not evidence.  It is the witnesses'

9     answers that are evidence, not the lawyers' questions.

10         At times a lawyer may on cross-examination incorporate

11    into a statement certain facts that he assumes are true and

12    then ask the witness if the statement is true.  If the witness

13    denies the truth of the statement and there is no direct

14    evidence in the record proving that assumed fact to be true,

15    then you may not consider it to be true simply because it was

16    contained in the lawyer's question.

17         Testimony that I order stricken or excluded is not

18    evidence and may not be considered by you in reaching your

19    verdict.  Also, if certain testimony is received for a limited

20    purpose, which I will tell you at the time, such as for the

21    purpose of assessing a witness's credibility, you must follow

22    the limiting legal instructions that I give you.

23         What the lawyers say to you in their opening

24    statements and summations, even though it is not evidence, it

25    is intended to help you understand what they believe the

154nari4

1    evidence will be or has shown.  If your recollection of the

2    evidence differs from the lawyers' statements, it is your

3    recollection that controls.

4         To constitute evidence, an exhibit must be received in

5    evidence.  The exhibit will be available to you during your

6    deliberations.  If an exhibit is marked for identification but

7    never is admitted into evidence, it will not constitute

8    evidence, and the same is true for materials brought forth only

9    to refresh a witness' recollection.  I'll tell you more about

10   that later.

11        Finally, any statements I make are not evidence.  It's

12   for you alone to decide the weight, if any, to be given to the

13   testimony you will hear and the exhibits you will see.

14        During the trial, it may occasionally be necessary for

15   me to meet with the lawyers to resolve a point of law outside

16   of your hearing.  I'm going to try to keep any such conferences

17   infrequent and short.  If we have such conferences and if you

18   find that you're waiting five minutes or ten while we have the

19   conference, I ask that you be patient, because the work that

20   we're doing will probably shorten the case for you.

21        A few words about note-taking.  Years ago jurors were

22   not permitted to take notes, and many jurors found it

23   frustrating because sometimes people can organize what they're

24   hearing better if they take notes.  Other people organize

25   information better without notes.  In any event, if you want to

1    take notes during the trial, you are welcome to do that.

2         If you take notes, make sure that your note-taking

3    does not interfere with your listening to witnesses and

4    considering everything they say.  If you take notes, don't

5    discuss them with anyone before your deliberations or during

6    your deliberations.  Your notes are simply to assist you, and

7    they are not to substitute for anyone else's recollection of

8    the evidence in the case.

9         The fact that a particular juror may take notes

10   doesn't make that juror's recollection any better than anyone

11   else's, so I would urge you not to rely on the notes of others.

12        I should also note in the evening you should place any

13   notes you have taken in an envelope with your name on it and it

14   will remain in the jury room untouched until you come back in

15   the room.  No one else will read them.

16        If during your deliberations you wish to have a copy

17   of the transcript of any part of the trial, I'll note that we

18   have a court reporter here taking down everything that is said.

19   If you want any of that transcript to help you remember what

20   was said at trial, I can send you a copy of the transcript.  So

21   that's one more reason you may not need to take notes.

22        You will also have the exhibits available to you when

23   you deliberate.  Before we actually start the trial and have

24   the opening statements, I want to mention a few what we call

25   rules of the road.

154nari4

1         First, please do not discuss this case with anyone.

2    This includes discussing it in person, in writing, by

3    telephone, by electronic means, text messaging, e-mail,

4    Facebook, Twitter, blogging, or any Internet chat room website

5    or any other feature.

6         If you need to tell someone such as your spouse or

7    your employer that you are serving on a jury and how long your

8    trial may last, that's OK.  But they often will ask you what

9    the case is about.  Please tell them that you are under strict

10   instructions from the judge not to say anything about the case

11   until it is completely over, until the jury has rendered its

12   verdicts.  The reason for this obviously is that we want you to

13   decide the case on the evidence presented in the courtroom and

14   not on the basis of anything you might hear from someone who

15   has not heard the evidence but who may nonetheless have an

16   opinion on the issues.

17        If you are asked or approached in any way about your

18   jury service or anything about this case, you should respond

19   that you have been ordered by the judge not to discuss the

20   matter and you should also report to Sarah Lajoie, my deputy

21   law clerk, what happened.  She will then tell me, and I'll

22   decide whether something needs to be done.

23        Along the same lines, you must not access any

24   information about the case on your own.  Don't do any research

25   on any issues that come up at trial.  That's not from any

154nari4

1    source, including the Internet, dictionaries, reference books,

2    or anything else.  Your sworn duty is to decide this case

3    solely and completely on the evidence presented in this

4    courtroom.

5           Finally, please do not discuss the case, even among

6    yourselves, until all the evidence has been presented and the

7    case has been given to you for your deliberations.

8           The reason for this is that the evidence is presented

9    one witness at a time and one exhibit at a time, and it's

10   important for you to keep an open mind until you have heard all

11   of the evidence.

12          If you start to discuss it with someone else, you may

13   find yourself taking a position that later you should fairly be

14   open to changing, and yet you may be less open to changing it,

15   because you have had a discussion about it.  So please don't

16   discuss the case with anyone.

17          We will keep the hours of 10:00 to 5:00 generally.  We

18   will have a break at about 3:00 or 3:30 for a snack that will

19   be brought to you in the jury room, and you will have a morning

20   break.

21          In addition, if you get here early, there will be

22   coffee, tea, and muffins and fruit for you, so you can come

23   early, read the newspaper and so forth.  It's time now for the

24   lawyers' opening statements and you will hear first from the

25   plaintiffs' lawyer.

154nari4

1          Thank you.

2          MR. POMERANTZ:  Thank you, your Honor.

3          Good afternoon.

4          LimeWire started in August of 2000 and it was started

5   by Mark Gorton, and Mr. Gorton remained the mastermind of

6   LimeWire for the last decade.

7          He deliberately designed and operated LimeWire to make

8   it very easy to copy music.  The user of LimeWire just had to

9   type the name of a song or the name of a recording artist into

10  the computer, and within seconds that user would have a

11  perfect, permanent copy of his own of that song, and it was

12  free.  LimeWire was intentionally designed so that no one got

13  paid, not the musician who created the song, not the recording

14  company that marketed the song, and not the retailers who were

15  out there legitimately trying to sell it.

16         What LimeWire did was called a copyright infringement.

17  It's what most of us would call stealing.  It happened

18  literally billions of times for ten straight years.

19         Mr. Gorton knew precisely what was happening.  He knew

20  that LimeWire was fostering massive copyright infringement, and

21  that's exactly what he intended LimeWire to do.

22         Now, six years ago, in 2005, Mr. Gorton also knew that

23  the law was closing in on him.  The United States Supreme Court

24  was about to decide the Grokster case.  Grokster was an

25  Internet service just like LimeWire.  It was used by people to

1    get free copies of music.  And Mr. Gorton knew that if the

2    Supreme Court ruled against Grokster, they were ruling against

3    LimeWire; and if that happened, LimeWire would have to shut

4    down.

5           Mr. Gorton knew that.  Here's what he told the New

6    York Times in March of 2005, just three months before the

7    Supreme Court ruled.  He told the New York Times, "If the

8    Supreme Court says it is illegal to produce this software,

9    LimeWire the company will cease to exist."

10          Well, on June 27, 2005, the Supreme Court ruled.  And

11   it ruled against Grokster.  The vote was 9 to 0.  That means

12   that every single justice on the United States Supreme Court

13   had ruled against Grokster.

14          So did Mr. Gorton live up to his word?  Did he shut

15   down LimeWire?  Unfortunately he didn't.

16          Mr. Gorton made some very different decisions.

17   Instead of shutting down LimeWire, Mr. Gorton did two things:

18          First, he decided to keep LimeWire going.  Grokster

19   and the other leading services that were operating the same way

20   as LimeWire, they shut down after the Grokster Court had ruled.

21          But not LimeWire, not Mr. Gorton.  He saw his

22   competitors shutting down and he kept on going.  He put his

23   foot on the accelerator and the infringements just kept on

24   rolling along.

25          (Continued on next page)

1          MR. POMERANTZ:  That's not all that Mr. Gorton did.

2     Within 72 hours of the Supreme Court issuing its ruling in the

3     Grokster case, Mr. Gorton hid his money.  And Mr. Gorton has a

4     lot of money.  He is a multi-multi-millionaire.  He has more

5     than $100 million just in his IRA account.  And just three days

6     after the Supreme Court ruled in the Grokster case Mr. Gorton

7     transferred a lot of his wealth into new accounts.  Why did he

8     do that?  Because he knew what he was doing was wrong.  Because

9     he knew that one day a Court could hold him personally

10    responsible for all the harm that he was causing.  Because he

11    knew that someday he could face you.

12         Now, this trial is not about whether what Mr. Gorton

13    did was right or wrong.  That's already been decided.  The

14    Court has already ruled that what Mr. Gorton did was wrong and

15    the Court has already ruled that Mr. Gorton and Lime Wire owe

16    my clients money.  So, what you will need to decide is how much

17    money Mr. Gorton and Lime Wire owe my clients.

18         The harm that Lime Wire caused is truly staggering.

19    Lime Wire became the dominant internet service for free music

20    after the Grokster court ruling in 2005.  More people were

21    using Lime Wire than all of the other internet services put

22    together and that remained true for years.

23         By 2006 40 million to 50 million people were using

24    Lime Wire to copy copyrighted music.  40 million to 50 million

25    people.  And those 40 million to 50 million people, they were

1545air5                         Opening - Mr. Pomerantz

1    downloading literally billions of copies of music for free

2    every month.  Every month they were downloading billions of

3    copies of sound recordings.

4          Now, imagine what would happen to any legitimate

5    business if millions of people were stealing billions of copies

6    of the very product you are trying to sell.  It is obvious:

7    That business would be devastated and that's exactly what

8    happened here.

9          Since Lime Wire started in 2000 sales of recorded

10   music have plummeted.  The record companies have lost literally

11   tens of billions of dollars.  Their sales are down 52 percent

12   in the decade.  That can't be explained by a two-year

13   recession.  That's ten years of literally falling off a cliff.

14   But the harm that we are talking about in this case isn't just

15   about numbers on a piece of paper.  Lime Wire has hurt real

16   people, real people who are trying to earn a living.  Thousands

17   and thousands of jobs have been lost in the recording industry

18   and musical artists themselves have been hurt -- not just

19   superstar artists but the new, promising artists, the artists

20   who are trying to find a record company but can't because they

21   can't afford to put out many new releases.

22         Now, you may ask yourself why did Mr. Gorton do all of

23   this?  What was in it for him?  Well, the answer is a lot.

24   Here was his strategy:  Get millions of people to use Lime Wire

25   by luring them to the temptation of free music and then once

1  you have them hooked on Lime Wire, start trying to make money

2  off of them.  And that strategy worked for Mr. Gorton and for

3  Lime Wire.  They got millions and millions of dollars from

4  Lime Wire users.  All of that money went to Lime Wire and

5  Mr. Gorton.  None of it went to the artists who created the

6  music or the record companies who marketed and distributed it.

7         And, Mr. Gorton's plan wasn't just to take a dollar

8  out of the record company's pocket or out of the artist's

9  pocket and put it into his pocket.  He was willing to do much

10 more than that.  He was willing to cause massive harm to others

11 in order to make some money for himself.  He was willing to

12 cause billions of dollars of damage so that he could make

13 millions of dollars.

14        Now, ladies and gentlemen, this is why we are here in

15 court today.  Mark Gorton used other people's property to make

16 money for himself.  He built a business on the back of honest

17 people who were obeying the law.  And when he was asked about

18 the harm that he was causing to my client here is what he said.

19 He said:  They need to get over it.

20        That's what he said, they need to get over it.

21        For 10 years Mr. Gorton never said I'm wrong.  It took

22 a Court of law to tell him that he was wrong.  It took a Court

23 of law to tell him that Lime Wire was based on copyright

24 infringement, pure and simple.  Copyright infringement.  And it

25 took a Court of law to order him to stop doing it.  But, the

1   Court cannot order him to pay for the harm that he has caused.

2   The law reserves that task for you.  Only you can make

3   Mr. Gorton and Lime Wire pay for the harm that they've caused.

4           My name is Glenn Pomerantz and I will be representing

5   the plaintiffs in this case along with my colleagues Kelly

6   Klaus, Melinda LeMoine, Blanca Young and Phil Nickels.

7           The plaintiffs in this case are four record companies.

8   Many of their representatives are here in the courtroom today

9   filling the courtroom and you will hear from a number of them

10  during the course of this trial.  On behalf of my clients and

11  my colleagues, thank you for your service.  We need you to do

12  this in order for there to be justice.

13          During this trial you will hear from a number of

14  witnesses and you will see several documents.  And we believe

15  this evidence is going to demonstrate three things to you:

16          First, we will show you that Mr. Gorton and Lime Wire

17  knew what they were doing was wrong.  Lime Wire tried to create

18  the false impression that they did not know what the Lime Wire

19  users were doing.  They'll say that they didn't know that it

20  was being used overwhelmingly to copy copyrighted music.  They

21  deliberately put their heads in the sand.  It was all a show.

22  Mr. Gorton and Lime Wire knew exactly what the Lime Wire users

23  were doing.  They knew that their users were engaged in massive

24  copyright infringement.

25          Here is just one example of a document you are going

1    to see in this case:

2              This is one of Lime Wire's internal documents.

3    Lime Wire created this document -- people within Lime Wire --

4    and this is Lime Wire dividing their users into four

5    categories.  You see the four categories in the box on the

6    right?  You don't describe 25 percent of your users as hardcore

7    pirates unless you know that they're using Lime Wire for

8    piracy.  You don't describe 25 percent of your users as morally

9    persuadable unless you know that what they're doing is morally

10   questionable.  And, you don't describe 30 percent of your users

11   as legally unaware unless you know that what you are doing is

12   against the law.

13             Now, second we will show you that Mr. Gorton kept

14   Lime Wire's infringing activities going because he wanted to

15   make more money for himself.

16             You will see documents showing that Mr. Gorton's

17   ambition from the get-go for Lime Wire was to use it to make

18   money for himself.  He didn't want to just mastermind the

19   biggest theft of music ever in the world, he wanted to use that

20   massive theft to make money for himself.  Here is one example

21   of the examples you are going to see in this case, it is a

22   document concerning Lime Wire Pro.

23             Once he lured people to Lime Wire with the temptation

24   of using it for free, he then tried to sell them Lime Wire Pro.

25   Lime Wire Pro was this turbo-charged version of Lime Wire.  For

1    just $18.88 you could get downloaded music faster than ever.

2    Mr. Gorton and Lime Wire made more than $100 million selling

3    Lime Wire Pro to the Lime Wire users who were first attracted

4    to Lime Wire to get free music.  All of that money went to

5    Lime Wire, none of it went to the artists or to the record

6    companies.

7           And this wasn't enough for Mr. Gorton and Lime Wire.

8    You are going to see some documents in this case about another

9    plan, a plan to make not hundreds of millions of dollars but

10   billions of dollars from Lime Wire users.

11          Third, we will prove to you during the course of this

12   case that Mr. Gorton's and Lime Wire's deliberate wrongdoing

13   devastated the record companies and their recording artists.

14   Here is what the evidence is going to show:

15          The legitimate seller opens up a store to sell music.

16   This is a legitimate seller.  He incurs all the costs of

17   running a legitimate business including paying for the music

18   that he's then going to turn around and try to sell to his

19   customers.  Along comes someone not so honest.  He steals the

20   music and he opens up a competing store right next-door and

21   worse, he offers the music for free.  It is not hard for him to

22   offer the music for free because he hasn't paid anything for

23   it, unlike the legitimate store, the music-for-sale store.  And

24   you will see in this case what happens to sales by the

25   legitimate store.  He has played by the rules.  He has paid for

1   the music that he's trying to sell.  How does he get someone to

2   buy from him instead of just getting the music for free from

3   the thief who opened up a store right next-door?

4            Well, he might get some people to buy the music if

5   they know that the store that's offering it for free is illegal

6   and they choose to follow the law.  But, he will most certainly

7   lose sales to anyone who doesn't know that the music-for-free

8   store is illegal or for anyone who just can't resist the

9   temptation of free music.

10           It doesn't matter if we are talking about music or any

11  other product.  It is very hard for a legitimate business to

12  compete with an illegitimate business who steals your product

13  and offers it for free.

14           Now, if we take these two stores and we move them from

15  the street to the computer screen, the result is exactly the

16  same.  Many, many people would choose free.  In fact, more

17  people might choose free if it is on the computer screen

18  because they're in the privacy of their own home and they feel

19  protected by the anonymity of the internet.

20           This is exactly what Lime Wire did.  Lime Wire is the

21  music-for-free store.  It opened up a business on the internet

22  by stealing music and offering it for free.  And it was

23  extremely hard for the legitimate store to compete against the

24  music-for-free store.

25           Now, in this case you are going to -- this is a list

1   of the recordings that have been infringed through Lime Wire

2   and are owned by my clients.  These have already been -- it has

3   already been determined by the Court that all of these

4   recordings have been infringed through Lime Wire.  There is

5   hundreds and hundreds of pages here, more than a dozen

6   recordings are listed on each and every page.  Thousands and

7   thousands of recordings in total.  These include virtually

8   every type of music you can imagine, recording artists who

9   recorded in the 1950s to the present day.  And this is just a

10  representative sample.  This doesn't include all of the

11  recordings that were infringed through Lime Wire.  Many, many

12  recordings were infringed through Lime Wire.  Virtually

13  everything that has ever been recorded in history was available

14  through Lime Wire for free, without permission, and without

15  payment.

16          So, you can imagine why legitimate music sales have

17  plummeted over the last 10 years.  As I said, sales have

18  dropped by 52 percent.  Tens of billions of dollars have been

19  lost over the last decade.  More than half of the industry has

20  disappeared.

21          The record industry has been in existence for more

22  than a half a century but it has never experienced a decline

23  like this.  It has never experienced Lime Wire; someone

24  stealing the product and then giving it away for free billions

25  of times a month, all in a matter of seconds you can get a free

1    copy.

2         If my clients had lost money fairly in the marketplace

3    they wouldn't be here in court asking you to award damages.

4    That's just the way legitimate competition works.  But that's

5    not what happened here.  My clients faced an illegitimate

6    competitor, one who took billions of dollars of revenue away

7    from my clients and that's why we are here today.

8         I think it might be helpful at the outset of this case

9    to just explain in some basic terms how Lime Wire worked so

10   that you will all have an idea of it as we head into this

11   trial.  Here is essentially how it worked:

12        First, the computer user has to download the Lime Wire

13   software onto his or her computer.  You can get it from many

14   places.  You can go to lime Wire's website, Lime Wire.com and

15   download the software straight to your computer.  You could go

16   to the popular website download.com where many people go for a

17   variety of programs and you could download it from there.  It

18   was available widely across the internet.

19        Once the user has the Lime Wire software on their

20   computer, now he or she is ready to start searching for music.

21   The user would type in the name of a recording artist into the

22   box on the left or the name of a song, pick either one.  So,

23   here let's use the example of the Red Hot Chili Peppers.

24   That's a band that records with one of my clients, Warner

25   Music.

1        So, you see over on the left that there is the band,

2   the Red Hot Chili Peppers typed into the box.  Press the button

3   and Lime Wire would then display a long list of files, song

4   after song, by the Red Hot Chili Peppers.  What were all of

5   these files that are now on this list?  Well, these were copies

6   of songs by the Red Hot Chili Peppers that were sitting on the

7   computers of other Lime Wire users.

8        The Lime Wire user would then pick one of the songs on

9   this list and click.  Let's say he clicked on the song, "I

10  could Have Lied," by the Red Hot Chili Peppers.  Presto, the

11  Lime Wire user now has a perfect, permanent copy of that song

12  of his own on his own computer.  He didn't have to go buy that

13  song from iTunes.  He didn't have to go get a CD at Best Buy.

14  He simply used Lime Wire and he got that song for free.

15       Now, this is what it looks like when one individual

16  Lime Wire user is downloading one song but this was happening

17  literally millions of times with billions of copies day after

18  day after day.

19       Let's use another artist as an example of what was

20  happening.  We will use Beyoncé who is an artist signed to a

21  different one of my clients, Sony Music.

22       If there is one copy on one computer and that became a

23  copy on many computers, each of those copies then becomes more

24  copies and so on and so on and so on.  It is like a virus.  It

25  keeps on spreading and spreading.  In fact, many people refer

1545air5                          Opening - Mr. Pomerantz

1   to a service by Lime Wire as viral distribution because one

2   copy can quickly spread and become literally millions of

3   copies.

4            Let me tell you a little bit about my four clients.

5            As the Court told you at the beginning, the named

6   plaintiffs are actually 13 record labels.  A record label is

7   basically a division of a record company that signs artists and

8   works with the artist to create and market their music.  These

9   13 record labels are part of four different record companies.

10  Each of these record companies works with hundreds of recording

11  artists from brand-new bands who have never released an album

12  yet to very successful artists who have been releasing records

13  for decades.  Each of these record companies works with

14  recording artists in many different types of music pop, rock,

15  R&B, hip hop, country, jazz, gospel, Latin, classical.  All of

16  those.

17           Sony Music is one of the plaintiffs in this case.  It

18  has a rich history of musical recording artists.  Some of its

19  current artists are on the top row:  Celine Dion, Bruce

20  Springstein, Britney Spears and Beyoncé.  And some of its

21  legendary artists have included Bob Dylan, Barbara Streisand,

22  Elvis Presley and Simon & Garfunkel.

23           Universal is another one of the record company

24  plaintiffs in this case.  Its current artists include U2, Elton

25  John, The Black Eyed Peas and Eminem and legendary artists

1   include Chuck Berry, Diana Ross and the Supremes, Stevie Wonder

2   and Lionel Richie.

3       Warner Music is a third record company plaintiff in

4   this case.  Its current artists include Linkin Park, Josh

5   Groban, Faith Hill and Michael Bublé and its legendary artists

6   include The Doors, Ray Charles, Fleetwood Mac and Aretha

7   Franklin.

8       EMI is the fourth plaintiff record company in this

9   case whose current artists include Keith Urban, Norah Jones,

10  Coldplay and Katy Perry.  And its legendary artists include Nat

11  King Cole, The Beach boys, Frank Sinatra and The Beatles.

12      Now, let's take a moment to talk about what a record

13  company really does.  What does a record company do?  Most of

14  us know the artists but we don't know the record companies.

15  Let's look at a chart.

16      Here is a recording artist over on the left and over

17  on the right is the CD or the download that the consumer would

18  buy.  There is a lot of things that have to happen to get the

19  music of that recording artist to the consumer in the form of a

20  CD or a download and that's where the record company fits in.

21  Each of these companies has thousands of employees, people who

22  go out and try to find the next new talented artist and then

23  work with him or her to create the music, people who develop

24  marketing plans for each new record and people who help to

25  distribute those records in both physical and digital formats.

1545air5                         Opening - Mr. Pomerantz

1    And then there are people who handle all of the kinds of things

2    that any legitimate business has:  Contracts, accounting, IT,

3    HR.  All of these people are trying to help their company make

4    money honestly by selling their company's products.

5            The process of getting music from the recording artist

6    to the consumer not only involves a lot of people, it also

7    involves a lot of costs.  For any one, just one new record, it

8    costs the record company anywhere from hundreds of thousands of

9    dollars to $10 million or more to bring that record to the

10   consumer and it is the record company that takes all of the

11   financial risk.  It initially pays for all of the costs of that

12   new record and if enough copies of that record are not sold to

13   cover those costs, it is the record company that takes the

14   loss.

15           So, how does a record company stay in business if it

16   has to pay for so many people in so many costs?  Well, they

17   stay in business the way any company stays in business, they

18   sell their products to consumers.

19           Record companies sell their artists' music through a

20   variety of legitimate retailers.  They sell compact disks and

21   they sell them through stores that you go to and visit on the

22   street, places like a record store or a Best Buy or a Wal-Mart

23   and they sell downloads of their music through stores that

24   exist on the internet, online stores like iTunes and Amazon.

25   And when one of these physical or online retailers sells a song

1   or an album, they turn around and pay the record company and

2   then the record company turns around and pays the artist.

3           These legitimate ways to sell music only work if

4   people respect the rights of the people who are involved.

5   That's true of any product.  Thou shalt not steal.  That's a

6   pretty basic idea and it is one of the fundamental reasons that

7   we have laws against stealing.  It doesn't matter if the

8   product that you are selling is recorded music, it is wrong to

9   steal.  And it is wrong to build a business that is based on

10  stealing.  And that's where copyright comes in.

11          Copyright laws apply to many types of creations, not

12  just music but to movies, books, software and other creations.

13  Since this case is about musical recordings let's focus on how

14  copyright applies to musical recordings.

15          If you own a copyright to a recording then you are the

16  only one who has the right to do a variety of things with that

17  recording.  You are the only one who can copy it or distribute

18  it or authorize someone else to copy it or distribute it.  And

19  if someone does not receive permission to copy and receive --

20  I'm sorry, to copy and distribute the copyrighted recording,

21  then they're not permitted to do it.  It is against the law to

22  do that.

23          Now, during this trial you are going to hear the word

24  piracy used quite a bit.  When you hear that term, that just

25  means copyright infringement.  Copying or distributed the

1    recording without the permission of the copyright owner.

2            In this case the copyright owners are the four record

3    companies, my clients.  All of their recordings are protected

4    by copyright and these recordings have been copied and

5    distributed by Lime Wire without permission and without

6    payment.

7            When we talk about the kind of piracy that Lime Wire

8    has engaged in we want to be clear about what we are not

9    talking about.  We are not talking about someone making a copy

10   of their own CD so that they can have another copy to listen to

11   in their car.  That's not piracy.  We are talking about in this

12   case -- nor are we talking about someone making a copy of songs

13   to make a mix for their boyfriend or girlfriend.

14           When we talk about piracy in this case we are talking

15   about piracy on a scale that has never existed before.  If all

16   that Mark Gorton had done was copy his own CDs for himself or

17   for his family, we wouldn't be here today, but that's not what

18   he did.  What he did is he created a gigantic music piracy

19   machine all for his own benefit.

20           Now, Mr. Gorton didn't invent massive internet piracy,

21   he just cornered the market on it.  To understand the history

22   of Mr. Gorton's mindset and his motives we need to start at the

23   beginning of massive internet piracy of music, we need to start

24   with the company called Napster.

25           Napster was a software program that was created in

1    1999 by a college student.  He created Napster to help his

2    roommate copy music and when he then put that software program

3    on the internet, it spread like wildfire.

4           Napster worked very much like Lime Wire, what I just

5    showed you.  A user sits at his or her computer terminal and

6    then types in the name of the music that they're looking for,

7    the name of the song or the name of an artist.  Napster would

8    then display on the user screen a list of files that matched

9    that search:  The Red Hot Chili Peppers, "I could have lied."

10   And the user then clicks on one of those files and, presto,

11   they have their own copy to keep right on their own computer

12   and no one got paid a penny.

13          Napster and Lime Wire are what some people refer to as

14   peer-to-peer services.  Sometimes you will hear to it referred

15   to as P2P services because one peer or computer user gets a

16   copy of the recording directly from another peer or another

17   computer user.  You may also hear some people refer to this as

18   file sharing.  Well, it is not the way most of us use the word

19   "share."

20          When people think of sharing something they give a

21   copy that they have to someone else.  If I share a book with a

22   friend I give my copy of the book to a friend and he reads it

23   and then he gives my copy back to me.  That's sharing.  There

24   is only one book and we all share it.  But that's not what is

25   happening with peer-to-peer services like Napster or Lime Wire.

1    These aren't friends, these are millions of people who have no

2    idea who each other is.  And no one gave anything back to

3    anyone.  Far from it.  They made their own copy and then helped

4    someone else to make another copy and another copy and another

5    copy.

6           Now, back in 2000 when Napster started, my clients

7    knew what Napster was really doing.  It was engaged in

8    copyright infringement and so my clients filed a lawsuit

9    against Napster to stop that illegal behavior -- and that's

10   precisely what the Courts did.

11          In July 2000 a federal court in San Francisco, a court

12   similar to this one, issued an order that required Napster to

13   stop infringing.  Unfortunately, Mark Gorton was waiting in the

14   wings.  Mr. Gorton saw an opportunity with Napster shutting

15   down.  Mr. Gorton saw an illegal opportunity.  He wanted to try

16   to get the millions of people who were using Napster to start

17   using a peer-to-peer service that he was just creating, a

18   peer-to-peer service that he called Lime Wire.  But, he had a

19   problem.  The Court had just said that what Napster was doing

20   was against the law so he needed a way around it and here is

21   what he came up with.  It was plausible deniability.

22          What does plausible deniability mean?  Well, here is

23   one of Mr. Gorton's lawyers describing plausible deniability in

24   a written game plan:  Can you plausibly deny knowing what your

25   end users are up to?  Have you built a level of plausible

1   deniability into your product architecture and business model?

2        In other words, deny knowing what people are using

3   Lime Wire to do even though you really know what they're doing.

4        But Mr. Gorton really didn't make Lime Wire any

5   different than Napster in any way that mattered.  He didn't get

6   rid of the copyrighted content.  He didn't ask and receive

7   permission from the copyright owners and he didn't pay the

8   artists or the record company.

9        So, who is Mr. Gorton?  Who is Mark Gorton?  Well, he

10  most certainly is not a college student sitting in a dorm room.

11  He lives on the Upper West Side.  He makes his money through

12  companies that he creates and runs and he is worth millions and

13  millions and millions of dollars.  Some of his millions come

14  from Lime Wire.  A lot of it comes from a hedge fund that

15  Mr. Gorton created that engages in high-speed stock trading.

16  And, make no mistake about it, Mr. Gorton is a smart guy.  He

17  has degrees from Yale and Harvard and Stanford and he knows a

18  lot about computers.  The question in this case is not whether

19  Mr. Gorton is smart.  The question is how he used, or misused,

20  his smarts.

21        So, how did he go about building Lime Wire?  Well, in

22  2000 Mr. Gorton hired a few people to work with him to create

23  his Lime Wire software.  Mr. Gorton ran the show, he was the

24  ultimate decision-maker on everything that mattered, and

25  Mr. Gorton set off to do two things:  First, plausible

1   deniability.  He had to design the software and operate the

2   business so it looked like he didn't know what Lime Wire users

3   were doing, to make it look like he didn't know that they were

4   using Lime Wire to copy copyrighted music.

5          Here is just one example of plausible deniability.

6   This was a written policy within Lime Wire:  Lime Wire

7   employees were instructed about certain e-mails you shouldn't

8   answer.  Those include:  Any user that mentioned a copyrighted

9   work; or any user that asked about legal questions.  Those were

10  the ones you shouldn't answer.  But while they didn't respond

11  to e-mails that mentioned anything about copyrighted music or

12  copyrighted works or about the legality of Lime Wire, they

13  certainly received a lot of those e-mails.  Here are some of

14  them.  I don't know if you can read these.  I will read a few

15  of them:

16         I have been using Lime Wire for a couple of months now

17  and I am concerned about whether it is legal or not.  It is a

18  free music downloader and I have seen on the news that around

19  30 people have been fined for downloading music illegally.  I

20  want a straight answer.  Is Lime Wire legal or illegal?

21         Here is another user:  I found my child downloading

22  music and film from your site.  Is this legal for the child to

23  do so?  I do not find any legal okay on your site.  Can you

24  please give me details if your downloads are okay and legal?  I

25  am just a concerned parent.

1          The next:  If I purchase Pro would it be illegal if I

2    download music?

3          And it goes on and on and on.  These were the e-mails

4    that Lime Wire told its employees not to respond to.

5          These e-mails were no surprise to Mr. Gorton.  He knew

6    that Lime Wire was going to be encouraging copyright

7    infringement from the very beginning.  Here is a document from

8    2001 that he sent to people who he was hoping would invest in

9    Lime Wire.  This is a section of the document that's called

10   litigation risks.  Mr. Gorton says:  This file sharing

11   technology can be and has been used to share files in violation

12   of copyright and other intellectual property protection laws.

13         Further down:  Lime Wire faces a significant risk that

14   the RIAA -- that's the Recording Industry Association of

15   America -- will attempt to limit its ability to promote the

16   Gnutella network through lawsuits and other judicial means.

17   And at the end of this paragraph he says:  The damages in any

18   such suit may be substantial.

19         The evidence of what Mr. Gorton and Lime Wire knew is

20   going to be even worse.  Mr. Gorton and Lime Wire not only knew

21   what their users were doing with Lime Wire, downloading

22   copyrighted music, they actively promoted it.  That's what they

23   wanted them to do and they took steps to make it happen as

24   often as possible.  Here is some of the evidence you will see:

25         These are ads that are put out by Lime Wire.  In these

```
 1    ads Lime Wire is trying to lure away users from two other
 2    peer-to-peer users, Grokster and Kazaa.  Lime Wire knew full
 3    well that the users of Grokster and Kazaa were downloading
 4    copyrighted music without permission and yet they deliberately
 5    advertised to try to lure those users away from Grokster and
 6    Kazaa and to Lime Wire so that more and more and more people
 7    would use Lime Wire to download copyrighted music.
 8              Faster than Kazaa.
 9              Sick of Grokster's spyware?  Try Lime Wire.
10              And here is some of the other evidence you are going
11    to see during this trial.  You will see evidence that Lime Wire
12    paid money to Google so that when someone did a search through
13    Google of certain words, Lime Wire would pop up at the top of
14    the list.  Lime Wire paid money to Google so that if someone
15    typed in the word "free music files" Lime Wire would come up at
16    the top; or "replacement Napster," or "Napster MP3."  In each
17    of these cases Lime Wire wanted the user to go to Lime Wire if
18    what you were looking for was free music.
19              Now, unfortunately for my clients Lime Wire wasn't the
20    only one who tried to become the next Napster.  After Napster
21    shut down, several others tried to get Napster users to come to
22    their site.  They went by a variety of names:  Grokster,
23    Morpheous, Kazaa, WinMX, eDonkey, BearShare and i2hub.  The
24    record companies firmly believed that all of these services
25    were no different than Napster if you intended to actively
```

1   promote and induce millions of people to steal music for your

2   own benefits.  That was wrong.

3       And so, the record companies filed a lawsuit against

4   three of the leading peer-to-peer sites that arose after

5   Napster, Grokster, Morpheous and Kazaa.  At the time that that

6   lawsuit was filed in 2001 they were among the biggest, they

7   were bigger than Lime Wire in 2001.

8       Now, although the lawsuit was filed in October 2001,

9   it took a long time to resolve to get to that final ruling.

10  Lawsuits sometimes take a long time.  In the case of the

11  Grokster lawsuit, it took four years.  The final ruling didn't

12  happen until June of 2005.

13      Mr. Gorton realized immediately that the Grokster

14  lawsuit was also a lawsuit about Lime Wire.  It was a lawsuit

15  about anyone who was stealing music and trying to build a

16  business without payment to the artist or to the record

17  company.  So, Mr. Gorton followed the Grokster case very

18  closely.  You will see documents showing that.  And Mr. Gorton

19  knew the obvious.  If Grokster lost, he lost.  I showed you

20  earlier the statement that Mr. Gorton made to the New York

21  Times in March of 2005 where he said he shut down Lime Wire

22  when the Supreme Court ruled against him.  Well, the Supreme

23  Court issued that decision on June 27, 2005.  And Grokster

24  lost.  The Supreme Court was unanimous, as I said, 9 to zero.

25  Mr. Gorton read what the Supreme Court wrote.  Most people

1    don't read the Supreme Court cases.  Maybe lawyers do, most

2    people don't, but Mr. Gorton read Grokster and here are some of

3    the things he read:  The probable scope of copyright

4    infringement is staggering.

5          And here is something else the Supreme Court said that

6    Mr. Gorton read:  The unlawful objective is unmistakable.

7          Everyone knew that this was bad news for Mr. Gorton

8    and for Lime Wire.  Here is a note that he received from his

9    parents who were also investors in Lime Wire on the very day of

10   the Supreme Court rulings.  We heard the Supreme Court decision

11   and are not happy.  We'll talk to you this evening to

12   commiserate.

13         This should have been the end of the Lime Wire

14   business.  Mr. Gorton had already said that if Grokster lost he

15   would shut down Lime Wire.  Lime Wire, the company, would cease

16   to exist, but that brings us back to where I started at the

17   outset.  Mr. Gorton made a very different choice, he kept

18   Lime Wire open for business and he did it with his eyes wide

19   open.  He knew the law.  He had read what the Supreme Court had

20   written and yet he continued to induce infringements,

21   infringement after infringement after infringement.

22         Now, the other peer-to-peer services, the leading

23   ones, saw what the Supreme Court said in Grokster and they

24   faced the same decision Mr. Gorton faced.  What did they do?

25   Well, they made very different choices.  After the Supreme

1    Court ruled, Grokster decided to stop infringing.  And so did

2    Morpheous and Kazaa, and WinMX and eDonkey and BearShare and

3    i2hub.  Lime Wire's main competitors who Lime Wire had been

4    working against for years, they all dropped out.  But not

5    Lime Wire.  Mr. Gorton decided to keep it going in full

6    operation and to try to attract all of the people who were

7    using these other services to now come to Lime Wire.  And he

8    decided to hide his money.

9            His efforts to hide his fortune began when he first

10   heard that the Supreme Court wanted to take a look at Grokster.

11   Let's look at a time line here.

12           On December 10, 2004, the Supreme Court made an

13   announcement that they wanted to review the Grokster case and

14   it took about six months, until June 27, 2005, for the Supreme

15   Court then to issue its ruling.  Now, just a few weeks after

16   December 10, 2004 Mr. Gorton set up a meeting with Ken

17   Rubinstein.  Who is Ken Rubinstein?  Well, Mr. Rubinstein

18   describes himself as an asset protection lawyer.  You go to

19   Mr. Rubinstein if what you want to do is shield your wealth

20   from creditors, from people you know who may sue you and seek

21   to make you pay for all the harm that you have caused.

22           And Mr. Rubinstein is right up front about what he

23   does.  You will meet him during this trial.  His web address is

24   www.assetlawyer.com.  And he has a particular speciality.  He

25   creates devices called family limited partnerships, also called

1    FLPs or FLPs, to shield assets.

2           And although Mr. Gorton met with Mr. Rubinstein just a

3    few weeks after the Supreme Court announced it was going to

4    review what happened with Grokster, he didn't set up his FLPs

5    right away, he waited until June 30th, 2005, three days after

6    the Supreme Court ruled in the Grokster case.  That's when he

7    decided to move his assets into the FLPs, three days after he

8    knew that Grokster had lost; three days after he decided to

9    keep infringing and he decided to quickly shift his assets into

10   FLPs.

11          Now, Mr. Gorton may take the stand and tell you that

12   the timing of these transfers of the assets was just sheer

13   coincidence, that the enormous legal risks he was taking by

14   keeping Lime Wire open for business had nothing to do with

15   moving his assets.  He may tell you that it is only about

16   estate planning and had nothing to do with hiding his assets

17   from the record companies.  If he says these things during this

18   trial, we will get a chance to question him about it and you

19   will have a chance to assess his credibility and to use your

20   common sense.

21          So, what happens after June of 2005?  Mr. Gorton knew

22   that his decision to keep Lime Wire going, while the other

23   leading peer-to-peer services shut down, meant that he had a

24   clear field to become the dominant peer-to-peer service and

25   that's just what happened.  The number of users of Lime Wire

1545air5                          Opening - Mr. Pomerantz

1    skyrocketed.

2          Before the Grokster decision, November of 2004,

3    Lime Wire had 20 million users.  That's a lot of users.  But,

4    three months after Grokster, the number of users had more than

5    doubled to 40 million, to 50 million people, and it kept on

6    growing.  And at the same time Lime Wire's total share of the

7    illegal download business, it also increased dramatically.

8    Here is one of Lime Wire's own documents which lays out

9    peer-to-peer usage from September of '05 to August of '06.  The

10   green line that we have shaded the line at the top, that's

11   Lime Wire, and you can see that it has become the dominant

12   services.  All the other services are way down at the bottom of

13   the chart, Lime Wire is up at the top.

14         And the number of infringements that occurred on

15   Lime Wire, they also went through the roof.  Every month

16   billions and billions of recordings were being copied without

17   permission and without payment.  Billions of copies.  That's

18   kind of a hard number to get your mind around.  Billions of

19   copies of recordings every month, virtually all the music

20   that's ever been recorded in the history of the world was

21   available for free through Lime Wire without anyone getting

22   paid.

23         Now, these dramatic increases in the number of

24   Lime Wire users and the number of illegitimate downloads, they

25   were very important to Mr. Gorton because it meant it could

1    make more money.

2              How did Mr. Gorton make money off of Lime Wire?  He is

3    offering the music for free.  Well, you saw one way, by trying

4    to sell Lime Wire Pro to people who had started using Lime Wire

5    for free.  For $18.88 you could get your own turbo charged

6    downloads and that scheme alone made Mr. Gorton more than $100

7    million.  That strategy worked particularly well after Grokster

8    when all the other peer-to-peer services had shut down, the

9    leading ones.

10             Let's look at a chart.

11             Before Grokster, monthly revenue from Lime Wire Pro

12   sales were down in the $500,000 to $1 million range.  After the

13   Grokster decision they more than doubled or even tripled.  And

14   while that was a lot of money, Mr. Gorton came up with

15   something called the conversion plan.  And you will see and

16   hear about the conversion plan during this trial and you will

17   see that Mr. Gorton planned to use Lime Wire to make even more

18   money.

19             Now, at the end of this trial you are going to have to

20   decide how much money Mr. Gorton and Lime Wire should have to

21   pay in damages and there will be three categories of damages

22   that you will be asked to consider and that's because the

23   law -- copyright laws, have a different method for determining

24   damages for usable recordings that were created before February

25   1972 versus after February of 1972.  It is just a quirk in the

1    law and that's the way it works.

2            First, we will ask you to award what is called

3    statutory damages for recordings that are created after 1972.

4    Why are they called statutory damages?  Well, that's because

5    they come from a federal statute, the Federal Copyright Act.

6    And here is how statutory damages work:

7            There are thousands of recordings that my clients own

8    that are subject to statutory damages.  As to each of those

9    recordings you are going to have to determine an amount of

10   damages and you are going to be given a range to choose within

11   from the low end of $750 to the high end of $150,000 for each

12   recording that was recorded after 1972 that was infringed by

13   Lime Wire.  That's thousands and thousands of recordings.  So,

14   the statutory damages will be the number of songs that were

15   created after 1972 that were infringed multiplied by the number

16   you pick within the range.

17           Judge Wood will tell you later in this trial about the

18   factors that should guide you in setting the amount of damages

19   for statutory damages.  For now we will just ask you to

20   consider, as you hear the evidence, whether the evidence you

21   hear about Mark Gorton's state of mind, about his conduct and

22   attitude, justifies the high end of the range.  We will ask you

23   to consider whether the evidence you hear about the huge loss

24   of revenue by the record companies justifies the high end of

25   the range.  We would ask you to consider whether the evidence

1    tells you that this case should be a precedent.  It should

2    deter people like Mark Gorton and others who may want to follow

3    in his footsteps not to do it again in the future.  And does

4    that justify the higher end of the range?

5            Second, we will ask you to award what is called

6    compensatory damages and those are for recordings created

7    before February 1972.  This amount is supposed to reflect a

8    fair estimate of the harm my clients have suffered, the harm

9    they've suffered because their legendary recordings, the

10   recordings that were created before February 1972, have been

11   massively infringed from Lime Wire.  And we will offer you

12   evidence during the course of this trial to help you determine

13   that fair amount.

14           And there was a third category of damages that you

15   will have to decide:  Does Lime Wire's and Mr. Gorton's

16   deliberate efforts to induce the infringement of these

17   legendary recordings deserve to be punished within an

18   additional reward of what the law calls punitive damages?

19           Besides these damages you will also be asked to decide

20   if Mr. Gorton's transfer of the money into the FLPs just three

21   days after the Grokster decision was designed to shield his

22   money from my clients.  We will offer evidence that Mr. Gorton

23   knew he could owe the record companies a lot of money and it

24   was that fear that caused him to move the money into the FLPs.

25           I have now summarized for you the evidence that we

1   think will come out during this trial.  In a few minutes I will

2   sit down and the defendant's counsel will stand up and he will

3   get a chance to tell you what Mr. Gorton and Lime Wire think

4   the evidence will show.  When you listen to his statements and

5   when you hear what Mr. Gorton and Lime Wire will ask you to

6   consider, I ask you to consider the following:

7          Lime Wire and Mr. Gorton spent a decade inducing

8   people to infringe thousands and thousands of songs millions

9   even billions of times over.  The Court has now told you that

10  what they did was wrong.  It was against the law and they are

11  now facing the very real risk that they will have to pay for

12  the tremendous harm that they've caused.  What will someone say

13  after they've been caught red-handed?

14         Well, first they'll say we didn't cause you any harm.

15  If you suffered harm, somebody else did that.  We didn't cause

16  you to lose billions of dollars over the last decade -- and

17  they'll point to a number of things.  They'll point to anything

18  but Lime Wire.  They'll say we've had recessions, that caused

19  you harm.  They'll say people burn CDs, that caused you harm.

20  They'll say more people are buying single tracks rather than

21  albums and that caused you harm.  They'll say people want to

22  spend money now on video games and DVDs and that caused you

23  harm.  Well, listen to that evidence and compare it to a very

24  simple fact:  What would it be like if the store next-door to

25  you was offering the same product for free?  What could

1545air5                         Opening - Mr. Pomerantz

1   possibly cause more harm than that?  There is no doubt that

2   people buy less during a recession but music sales are down for

3   an entire decade, not just during the recession.

4            People do pay less money for a single track than for

5   an album.  Consider how many more tracks would have been sold

6   if Lime Wire weren't the music-for-free store stealing music

7   and offering it for free.  Watch for the evidence in this trial

8   that tells you what any business goes through would go through

9   if someone was giving away your product for free with just a

10  click of the button any time of the day or night.

11           Now, second, Lime Wire will say to you it doesn't

12  matter if people stole your songs from Lime Wire because most

13  of those users wouldn't have paid for the music anyway.  Well,

14  think about that for a moment.  They're saying that someone can

15  go into a store, steal things off the shelf and then get away

16  with it by saying I wouldn't have bought it.

17           Here Lime Wire actively encouraged millions of people

18  to copy copyrighted music.  The people who Lime Wire

19  encouraged, they're not giving the music back, they're keeping

20  the music thanks to Lime Wire.  That music was stolen and it is

21  worth something, it is worth a lot to my clients and to their

22  recording artists.

23           And third, Lime Wire may stand up here and tell you

24  the record companies are responsible for their own harm because

25  they were slow to change when technology changed.  Well, think

1    about that.  They're saying because we think you made mistakes

2    we can steal from you.  These are the same people who told my

3    clients they just need to get over it.

4           My clients are thankful that the Court has already

5    stepped forward and ruled that what Mark Gorton and Lime Wire

6    did was clearly wrong and we're thankful that the Court has

7    ordered Lime Wire to stop its infringing content but that's not

8    enough.  Mr. Gorton has had many chances to admit that he was

9    wrong and to stop the infringements.  He could have done so

10   after the Court ruled in Napster.  He could have done so after

11   the Court ruled in Grokster but he never did so.  He was

12   willing to cause tens of billions of dollars of harm to my

13   clients in order to have a shot to make money for himself.  It

14   took a Court of law to stop him and it will take your efforts

15   to make him pay.

16          I think as this trial unfolds you are going to see

17   that this case isn't just Lime Wire or Mr. Gorton or any

18   particular record company or any particular recording artist.

19   This lawsuit goes to the heart of how we do business in this

20   country.  Whether you're a big company or a small company or an

21   internet entrepreneur, everyone needs to play fair.  Everyone

22   needs to play by the rules and not break the law.  And when

23   someone breaks the law, we need to hold them accountable.

24          At the end of this trial I will get a chance to come

25   back up here and speak to you again and I will ask you at that

1545air5                    Opening - Mr. Pomerantz

 1   time to determine a fair amount of damages to award to my

 2   clients an amount that takes into account the enormous harm

 3   that my clients have suffered and an amount that sends a

 4   message to Mark Gorton and to the people who would follow in

 5   his footsteps that your word not be ignored.

 6              Thank you very much.

 7              THE COURT:  Thank you, Mr. Pomerantz.

 8              We've come to the point in the afternoon for the

 9   jury's afternoon break.  There is a snack awaiting you in the

10   jury room.  We will take a 10-minute break.

11              Thank you.

12              (Jury not present)

13              THE COURT:  Do counsel wish to raise anything?

14              MR. BAIO:  No, your Honor.

15              THE COURT:  Okay.  I will see you in 10 minutes.

16              (Recess)

17              (Continued next page)

18

19

20

21

22

23

24

25

154nari6

            THE COURT:  Please have a seat.  We will see if the

jurors are ready.

            (Jury present)

            THE COURT:  All right.  We are ready to resume now.

            Mr. Baio will give you the opening statement for the

defendants.

            MR. BAIO:  Thank you, your Honor.

            May it please the Court, and good afternoon, everyone,

my name is Joe Baio, and I represent the defendants in this

case.  With me today from my office are Tariq Mundiya, John

Oller.  Over on the other side is Mary Eaton and Katie Monin.

In the middle is Mark Gorton.

            You have heard from the judge that while one of the

defendants in this case is LimeWire, LimeWire the company has

been shut down.  It is out of business.  Plaintiffs have

accomplished that.  The only individual defendant still in the

case is Mark Gorton, the former CEO of LimeWire.

            Now, Mr. Pomerantz's arguments to you about the injury

suffered by the record industry essentially boil down to this:

The record companies' revenues from the sale of recorded music

in the United States has decreased by billions and billions of

dollars over the last decade or so, and in this courtroom,

plaintiffs assert that there is one person above all on the

planet earth who is principally or significantly responsible

for those billions and billions of dollars of claimed revenue,

            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1    Mark Gorton, and one company, LimeWire.

2              As Mr. Pomerantz put it, Mr. Gorton and LimeWire's

3    conduct has devastated the record companies and their recording

4    artists.  Because of this, Mr. Pomerantz says, and will say in

5    closing, you should punish Mr. Gorton to the tune of millions

6    or even a billion dollars, even though that's wildly in excess

7    of what LimeWire and Mr. Gorton made on the songs that are at

8    issue in this case.

9              In fact, according to plaintiffs, you should make him

10   pay a gazillion dollars.  But, based on the evidence that will

11   be presented to you, the notion that this one person and one

12   company were the major or even a substantial cause of the

13   injury that was identified is simply not true.

14             Not only is it not true, but the plaintiffs don't

15   believe it's true.  Mr. Pomerantz said to you that I will be

16   telling you certain things and you should remember what he said

17   while I am telling you those things.

18             The judge has told you that the evidence will come

19   from the witnesses, and what I'm going to talk about now isn't

20   what I think.  It's what the plaintiffs think, what the

21   plaintiffs have said as to the causes of their problems.  These

22   are their words.  I'll be using public statements that they

23   have made.  I will be using documents that were written and

24   exchanged between the highest executives at the record

25   companies over that decade.

1          Those statements and documents will show that the

2     record companies know and have always known that their problems

3     started well before LimeWire and that the sharing of free music

4     over the Internet, which plaintiffs claim as the source of

5     their woes, will continue even with LimeWire out of the

6     picture, no matter what happens in this case.

7          You will see that some in the record industry have

8     conceded, not in this courtroom, mind you, but in their

9     documents and statements to one another behind the scenes, that

10     they made a massive blunder when they decided to go to war with

11     the consumer.

12          One document you will hear about contains a speech

13     given by Mr. Edgar Bronfman, who is the head of one of biggest

14     record companies in this case, Warner Music, a plaintiff.  He

15     gave the speech in 2007, and he talked about the music

16     industry's problems and the cause of those problems.

17          Can you put that on the screen.  Thank you.

18          Here's what he said in his speech to others in the

19     industry:

20          "We used to fool ourselves.  We used to think our

21     content was perfect just exactly as it was.  We expected our

22     business would remain blissfully unaffected even as the world

23     of interactivity, constant connection and file sharing was

24     exploding."

25          "And of course," he said, "we were wrong."

1          In addition to conceding that the industry was wrong,

2    he also said something much more revealing during that speech.

3    He said, and I'm quoting him:  "How were we wrong?  By standing

4    still or moving at a glacial pace, we inadvertently went to war

5    with consumers by denying them what they wanted and could

6    otherwise find and as a result, of course, consumers won."

7          Deny consumers what they want and you will lose.

8    Mr. Pomerantz also said during his opening that the record

9    companies, that no one really can compete with free.  He showed

10   you a slide that had two record stores next to each other and

11   one had music for sale and the other one had music for free.

12         Their store, which requires payment, is unable to

13   compete with the free stores, says Mr. Pomerantz.

14         But you are going to hear from one of the highest

15   officials at universal, his name is Zach Horowitz, admitting

16   the obvious; that is, that the record companies can and do

17   compete with free.

18         Here is an e-mail chain involving Mr. Horowitz, who is

19   the chief operating officer at Universal, and someone named

20   Tony Brummel, an executive of an independent music label.  This

21   exchange occurred in February of 2005.

22         Mr. Horowitz stated, "We have to find a way to meet

23   consumer desires.  That means making our music available

24   online.  The world is changing in ways we can't control.  We

25   have to embrace technological changes and show the consumer

1   that legitimate is more compelling than illegitimate.

2           Mr. Brummel responded much as Mr. Pomerantz has said:

3   "You cannot compete with free," he said.

4           And here's what Mr. Horowitz wrote in reaction:   "We

5   can.  We have to.  It's just that we have to be creative and

6   add value."

7           So the record companies can and do compete with free,

8   and the evidence will show you that they recognize that they

9   can and do make money and receive compensation and benefits

10  from their music catalog even when the consumer doesn't pay.

11          This isn't some new or radical idea.  They have been

12  doing this for years.  The record companies make their music

13  available on AM and FM radio, and they make it available to the

14  consumer for free because they recognize that airplay promotes

15  their music and their artists, and they continue to do it on

16  the Internet today.

17          More on this in a little bit, but let me mention some

18  of the things we actually agree with Mr. Pomerantz about.  Mark

19  Gorton was the founder of LimeWire.  He was 33 years old at the

20  time.  He also was the only individual defendant in this case.

21          With LimeWire, he hoped to create something that

22  people could use worldwide to share things -- and, yes,

23  music -- over the Internet.  With LimeWire, people could use

24  their computers to share with each other across the street or

25  across the country.

1              Now, at this point, I think it's important, and I hope

2    it will be helpful to you if I explain in greater detail than

3    Mr. Pomerantz did the technology that is involved in this case.

4    I am not a techie, and our expert will give a fuller picture at

5    trial, but I'll try.

6              For many years, as we all know, music was recorded on

7    vinyl record albums.  In the '70s and '80s, that became

8    eight-track tapes and cassettes.  But then the technology for

9    delivering recorded music changed dramatically.  Music was

10   recorded, reproduced, and distributed on CDs.

11             CDs are sturdier than records and tapes.  They're

12   easier to care for and sound better.  Although they spin like

13   records, there's no needle that is translating the grooves into

14   a sound.  Instead, there is a laser inside the CD that actually

15   reads numbers that are stored on the CD, millions of sequences

16   of numbers.  They appear in different order and in different

17   sequences.  Ones and zeros, those are the only numbers that

18   appear on a CD.  It's incredible that that gets translated into

19   music.

20             As the experts will show you, every unique sound, from

21   a particular guitar playing a particular chord to a particular

22   piano playing a single note, each one of them can be

23   represented by zeros and ones.  The CD stores the numbers and

24   the laser reader inside the CD sends the numbers to a machine

25   that translates the numbers back into music.

1            Now let's turn to the way in which people can store

2    music.  In the old days we just piled up records and put them

3    in the basement.  Then came CDs, which we put in CD towers, but

4    two developments came together in the 1990s that really changed

5    everything, the Internet and the digital music file which is

6    known as an MP3.

7            Let's start with the Internet.

8            Tapping into the Internet through their personal

9    computers, whether it's a desktop or a laptop or a cell phone

10   or an iPad, people can obtain and store all kinds of things,

11   pictures, music, books, articles, financial records.  They can

12   also write to each other electronically and attach things.

13           The Internet is like a highway.  Although it started

14   small, now it is a huge freeway system, constantly growing and

15   changing.  This highway itself is open to every one who has a

16   computer, completely open, completely free, even if you just

17   have a cell phone.

18           Now, how does this relate to music?

19           As you will see in here, once the music industry

20   released all of its music on CDs, which it did, and it

21   continues to do with every new release, people have had the

22   ability to store all the music they owned on their computers.

23   One way they can do that is by inserting the recorded CD into

24   their computers, which then converts those bits of information

25   on the CD into a digital file known as the MP3, and then they

1   can download it on to their computer.  Once that digital file

2   is on their computer, people also have the ability to copy it

3   to a blank CD, and they can do that with part of a computer

4   called a CD burner.  They transfer the music on to the blank CD

5   and they listen to it at home and in their cars or elsewhere.

6         That's CD burning.  All the evidence will show that it

7   is done countless, countless times.

8         But also, as the evidence will show, CD burning was

9   done before LimeWire came into existence, and it's continuing

10  after it's shut down.  As the record industry recognizes, and

11  these are their words, CD burning is a fact of life, a problem

12  that has cut into their sales for 15 years.

13        So far I haven't gotten to LimeWire, or even P2P

14  technology.  As Mr. Pomerantz noted, P2P stands for

15  peer-to-peer, but you can think of as person to person.

16        you will see that P2P technologies work on particular

17  highways on the Internet, they're called networks, and the

18  people who are on those networks or highways can share all

19  sorts of things with each other, including music.  Those

20  networks, again, are open to everyone who wants to travel on

21  them and they are free to the consumer.  There is no toll.

22        You will see that no one owns the networks, and

23  neither LimeWire nor anyone else can control a network.  But,

24  hundreds of millions of people around the world travel on them,

25  and they use them all the time.

1          P2P networks are one type of highway on the Internet.

2     There were a bunch of other types.  Let me explain some of them

3     to you.

4          E-mail.  E-mail is actually a network.

5          Websites are another one.

6          Search engines like Google, YouTube, Yahoo, they are

7     all networks.

8          Social networking sites, like Facebook and MySpace

9     instant messaging on AOL is actually a network that allows

10    people to transfer information to each other.

11         P2P is yet another network.  I want to be clear;

12    LimeWire is not a network.  It is not the highway.  LimeWire

13    was the product, and it was a sophisticated piece of software

14    and sharing device, that helped people find and actually get on

15    to their own computer digital music and also anything else they

16    wanted to share.

17         Now LimeWire was not the first P2P technology.  As

18    Mr. Pomerantz noted, the first was Napster.  Napster began

19    operation in 1999, and the evidence will show that it changed

20    the music industry overnight.

21         You will hear evidence that before LimeWire was even

22    in existence, Napster was being used by consumers to download

23    billions of songs.  Napster was shut down by court order, but

24    people in the record industry recognized that Napster changed

25    everything, and it brought about a transformation of consumer

1    psychology and expectations that really hasn't changed.

2             One of them was Edgar Bronfman, who, as I said before,

3    was the chairman and co-owner of Warner Music, and you will be

4    hearing from him.

5             Mr. Bronfman actually oversaw the operations of

6    another plaintiff in this case.  So, while he is now at

7    Universal, he used to be at Warner.

8             Here's what he said in 2000 in reaction to Napster,

9    and he said this to his lop lieutenants at the record

10   companies.  On May 11, 2000, there is an e-mail from him to

11   others and he said:

12            "I want a legal Napster.  I want it now.  I want all

13   of you, by Monday May 22, to give me a plan that can be quickly

14   implemented that moves us -- and the industry -- to this

15   model."

16            So this is dated May 11, and he's demanding that they

17   come up with a plan 11 days later.  But you will hear and see

18   that they didn't come up with a plan 11 days later or 11

19   months.  It took years.

20            Here's what Mr. Bronfman said, however, back in 2000:

21   "This is the most powerful and incredible opportunity for our

22   industry, which we are going to blow if we don't do something

23   radical, fast."

24            Well, they didn't do anything radical, and they didn't

25   do anything fast.  In fact, as you will hear, they did not come

154nari6                    Opening - Mr. Baio

1    up with a viable alternative to Napster until April of 2003,

2    some four years after Napster changed the industry.  Please

3    remember that when they say LimeWire and Mr. Gorton caused all

4    their industry problems.

5         Now let's examine what plaintiffs claim are the

6    damages that they have suffered over the last decade.  Let's

7    start with the chart that plaintiff and their own expert put

8    together and showed you during Mr. Pomerantz's opening.

9         Can you put that on.  Thank you, James.

10        According to the plaintiffs, the decline in revenue

11   started around or before 2000.  But LimeWire was virtually

12   nothing back then.  The record industry nevertheless asserts

13   that LimeWire has been the cause of its problems ever since.

14        But here's an interesting fact that was not mentioned

15   to you.  The record giants didn't sue LimeWire until five and a

16   half years after it was created, 2006.

17        So while they are in this courtroom saying that

18   LimeWire caused this massive decline, they didn't sue LimeWire.

19   They didn't sue in 2000, 2001, 2002, 2003, 2004, 2005, only in

20   August of 2006.

21        Now, we acknowledge here that we cannot and we will

22   not contest that people use LimeWire's product to commit

23   copyright violations.

24        LimeWire and Mr. Gorton are now legally responsible

25   for what those other people did in acquiring the songs, the

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    songs at issue in this case.  What was done was wrong.  But

2    this is a damages case, a damages case against a company that

3    has been put out of business, and Mr. Mark Gorton, one

4    individual.

5         We agree that it will be your job to set per-song

6    damage awards for most of the songs that you will be hearing

7    about, under 10,000 within that very wide band that

8    Mr. Pomerantz mentioned, and that's from $750 to $150,000 per

9    work, and that it will be your job to evaluate whether the

10   record companies are entitled to any damages for the

11   infringements of the pre-1972 songs, and, if so, to what

12   extent.  That will be your job, and we agree with it.

13        But you just won't pick a number out of thin air in

14   figuring out a dollar value for each of the songs.  We know

15   that you will be guided by the judge and what she tells you to

16   consider and that you'll use your best judgment, wisdom, and

17   common sense in setting an amount that you consider to be just

18   and fair for each work and a fair amount in total.

19        We also trust that you will consider the evidence and

20   you won't be swept away by one side's words or unproven claims

21   based on the evidence you will hear in this courtroom.  You

22   would have to abandon common sense in order to award even a

23   fraction of what Mr. Pomerantz wants you to give his clients.

24        So let's look a little bit more closely at the

25   evidence that you will see and you will consider in evaluating

1    the amount that should be paid per work.

2              One factor is the lost revenues of the record

3    companies that were caused by LimeWire, the judge will tell you

4    caused by LimeWire.  While Mr. Pomerantz presented his view of

5    the evidence and of the principal cause of all of his problems

6    and the record companies' problems, I would again like to turn

7    to the actual evidence that Mr. Pomerantz avoided or ignored in

8    his remarks.

9              The principal evidence I will put before you is out of

10   the mouths of the record executives and the e-mails of the

11   plaintiffs.

12             First, let's look at what plaintiff Warner Music told

13   all of its shareholders in 2009 as to the cause of its slowdown

14   in revenues.

15             So this is an annual report that Warner gives to its

16   stockholders and it says, "The industry began experiencing

17   negative growth in 1999 on a global basis, and the worldwide

18   recorded music market has contracted considerably."

19             So, as you will hear, Warner recognizes that the

20   recording industry's woes started in 1999, before LimeWire even

21   existed.  They can't blame LimeWire and Mark Gorton for that.

22             But let's look at what else they said to their

23   shareholders:  "Illegal downloading of music, CD-R piracy,

24   industrial piracy, economic recession, bankruptcies of record

25   wholesalers and retailers and growing competition for consumer

1    discretionary spending and retail shelf space may all be

2    contributing to a declining recorded music industry."

3          So Warner recognizes that a whole bunch of factors

4    caused their growth to slow, not just file sharers, and

5    certainly not just LimeWire.

6          Let's review the factors one at a time and I am going

7    to start with CD piracy.  I'll come back to illegal

8    downloading.

9          I talked about this a little bit already.  This is

10   where people use CD burning devices to copy music on to CDs,

11   and they either give it away or sometimes they sell it.

12         As I said before, you put a blank CD in your burner,

13   and you can move the music from your computer onto the CD.

14   It's been done by countless millions of people over the years,

15   and by some accounts it's much bigger a problem contributing to

16   the industry's supposed woes than P2P file sharing ever was.

17         One of the witnesses you will hear from and you will

18   hear from him soon is Mitch Bainwol.  He is the head, or the

19   top executive of the Record Industry Association of America,

20   RIAA.  He's one of the chief lobbyists that the record

21   companies use in Washington.

22         In a presentation to the recording industry in 2004,

23   he noted the following in one of his slides:  "Burning and

24   ripping are becoming a greater threat than P2P."

25         And to support his conclusion he used data from

154nari6                    Opening – Mr. Baio

1    something called the NPD Group.  You will also be hearing about

2    data that they have put together, and the industry uses them

3    frequently.

4            Here's what he said on that subject:

5            "Burned CDs accounted for 29 percent of all recorded

6    music obtained by fans in 2004, compared to 16 percent

7    attributed to downloads from online file sharing networks.  CD

8    burning is a problem that is really undermining sales."

9            Another witness you will hear from, Thomas Hesse,

10   Sony's digital music head, wrote something very similar to his

11   bosses in 2005.

12           Here he wrote, "Illegal P2P file sharing gets the most

13   headlines, but it's just one channel with CD ripping and

14   burning measured with far larger shares in studies such as this

15   one."

16           That's their words.  It's not my word.  It's what they

17   said away from the courtroom.  Ripping and burning measured

18   with far larger shares in studies such as this than file

19   sharing.

20           Ironically, as you will see, Sony Corporation itself

21   makes and sells CD burners.

22           Let's turn to the next item on the record companies'

23   list of major things that have cost them since 1999.  That's

24   industrial piracy.  It's also sometimes known as commercial

25   piracy.

1          This is where companies make music, they repackage it,

2     and they sell it as counterfeit or as bootleg product, not

3     LimeWire.

4          Here's what the record companies' international trade

5     organization said in 2004 on that subject:  "Commercial piracy,

6     contrary to what commentators mistakenly think, is just as

7     important a problem for the music industry today as Internet

8     piracy."

9          The next thing on Warner's 2009 list was economic

10    recessions, and you heard Mr. Pomerantz downplay economic

11    recessions.  But Warner identified it in its report to

12    shareholders as one of the causes of its decreased sales.  And

13    Vivendi, which owns Universal, said something very similar to

14    its shareholders.

15         Let's put that up.

16         "The decline in the market for audio recordings is due

17    to the combined effect of the economic recession, piracy,

18    counterfeiting, (both industrial and domestic, using recordable

19    CD-ROMs or the illegal downloading of music from the internet

20    made easier by the availability of works in digital formats)

21    and increased competition for consumer spending on leisure."

22         Another item that was a cause and has continued to be

23    a cause for the losses suffered in revenues by the record

24    companies, and we'll go back to Warner in 2009, bankruptcies of

25    record wholesalers and retailers.

1          Now this is talking about companies like Tower

2     Records and Virgin Megastore and places where we used to buy

3     CDs.  For many years they had huge stores that were filled with

4     the CDs.

5          But, as our experts will explain to you, these music

6     specialty stores simply couldn't survive in competition with

7     so-called big-box companies -- that's Wal-Mart or Best Buy --

8     whose prices were lower and offered fewer CDs and less shelf

9     space.  So it stands to reason that CD sales and revenues would

10    be down.  Again, nothing to do with LimeWire.

11         The next item, maturation of the CD market.

12         I want to mention something about that.  Here it says,

13    additionally -- I think you have to go to the next slide,

14    great.

15         This is also still on the Warner annual statement,

16    2009, explaining what their problems are:  "Additionally, the

17    period of growth in recorded music sales driven by the

18    introduction and penetration of the CD format has ended."

19         let me tell you what the evidence will show on this

20    point.  This object, the CD, was initially solid gold to the

21    record companies.  The technology took off in the late 1990s,

22    you may remember, and as a result, consumers went out and

23    bought songs and music that they already owned to replace vinyl

24    albums.

25         But there came a time when consumers caught up and

1    they didn't need to buy any more music that they already owned.

2    The record industry's sales declined after that, of course.

3    That started to happen in the late 1990s, again, before

4    LimeWire was ever on the scene.

5            But not only did the CD gravy train end for the record

6    industry, the record industry itself, and we'll ask you to pay

7    attention to the testimony as it comes in on this, they have

8    conceded that they failed to identify and embrace any new

9    technology that would have allowed them to make money, to

10   monetize the same songs all over again.

11           So while the digital transfer of music took off with

12   Napster in 1999, the record companies had no user friendly way

13   for people to download their music for years and years.

14           Only in April of 2003, based on the technology made by

15   another company, Apple Computers, were the record industry's

16   songs available for sale on the Internet in any meaningful way.

17           Like Mr. Bronfman, who criticized his industry for

18   moving at a glacial pace, Doug Morris, the head of one of the

19   other plaintiffs, Universal Music, had this to say in 2005

20   about the industry's response to technological change that had

21   occurred:  "Every time there is a new technology, it is

22   followed by an explosion in the industry.  From the cylinder,

23   which I wasn't around for, to the vinyl, to the cassette, to

24   the CD, each innovation in technology spurted growth in the

25   record business.

1           "Now, what happened here that caused all the

2     problems," he asks?   "The real problem was that there is no

3     technologies from record companies."

4           So the real problem when they are outside of this

5     courtroom was they had no technology at all after Napster until

6     Apple's iTunes.

7           The next item is the growing competition for consumer

8     discretionary spending.   Again, I'm using Warner as the

9     starting point, but the other companies have said the same

10    thing.   I think this will be familiar to you.

11          In the past ten years, the same period coinciding with

12    the labels' decreased sales, there has literally been an

13    explosion in new technology and entertainment forms, from the

14    Nintendo to Netflix, to DVDs, etc., smart phones, applications.

15    All of that is competition for music.

16          The point that is being made here is that Warner and

17    the other companies have recognized, with more and more new and

18    exciting things for consumers to spend their money on, that

19    they face greater competition and that has adversely affected

20    their sales.

21          Now, let's go to that first item, illegal downloading.

22    In this courtroom the plaintiffs attribute virtually all of

23    their sales decline in the past ten years or so to LimeWire.   I

24    think they said that it was the biggest theft of music in the

25    history of the world.   The history of the world.   They have to

1    show you evidence of that.

2            The incontestable evidence will show that there are

3    literally hundreds of ways that people have been able to

4    download music, and they can continue to download music.  They

5    have nothing whatsoever to do with LimeWire.

6            Over the past decade there have been many, many P2P

7    technologies, and they've been used for downloads.

8    Mr. Pomerantz had a slide that showed you some of them,

9    Napster, Morpheus, Audio Galaxy, Kazaa, WinMX, etc.

10           While some of these eventually were shut down, there

11   are others that he did not mention at all, that enter the scene

12   and continue as we sit here, things such as BitTorrent,

13   FrostWire, Emu, and a host of others that our experts will tell

14   you.

15           The point I ask you to consider as the evidence is

16   coming in is this:  These other P2P entities are not LimeWire,

17   and LimeWire is not all P2P.  Separate and apart from LimeWire

18   according to the industry itself those other services have

19   caused them massive harm.  They just don't concede it in this

20   courtroom.

21           Here's what Mr. Bainwol told Congress on September 30,

22   about Kazaa:  "As of July 2002, Kazaa -- the most popular

23   peer-to-peer network by far -- boasted 100 millimeter

24   registered users.  By May 2003, Kazaa had become the world's

25   most downloaded software program of any kind, with 278 million

1   downloads."

2           None of this told to you.  That isn't downloads of

3   songs, by the way.  That's downloads of the software which then

4   is used to exchange songs.

5           They can't claim that that was LimeWire.  They don't

6   even pretend that LimeWire was a significant participant at

7   that time.  Yet, they want to blame all of the losses on

8   LimeWire.

9           Now, you will also hear evidence that P2P file sharing

10  is not the be all and end all of improper file sharing.  As the

11  labels have recognized, there are lots of ways to share music

12  over the Internet and they have nothing to do with P2P.

13          According to the record companies, those events and

14  those technologies have severely impacted their sales, e-mail,

15  instant messaging, other mechanisms.

16          Here's just one example an internal e-mail sent by

17  Todd Moskowitz, the CEO of WNG's independent label group to

18  Warner Music CEO Lyor Cohen and this is the late 2008 period,

19  December 2, 2008.

20          Here's what he said:  "I feel like we have a lot of

21  ideas about why physical sales continue to slide, but I'm not

22  sure that anyone has a definitive answer as to how much is

23  piracy, whether piracy is increasing or has leveled off,

24  whether it is iTunes single sales taking away from physical

25  albums, etc.

1          "Stu pointed out to me yesterday that you can IM an

2     entire album in a matter of seconds to all of your IM buddies.

3     This is something that we wouldn't see by looking at LimeWire

4     or BitTorrent file sharing info, but may be a significant part

5     of piracy."

6          Outside this courtroom, that's what they said.

7          The same sentiment was echoed in a presentation from

8     Universal Music Group International in 2010: "Unfortunately

9     for us file sharing is a world that extends far beyond the

10    world of P2P networks and portals. At a rather more

11    'grassroots' level, for example, music can also be shared

12    instantly across e-mail, instant messaging, Bluetooth and other

13    forums."

14         It is not just illegal P2P or other illegal online

15    sources that the labels blame outside of the courtroom for

16    their declining sales. They have recognized that some of their

17    greatest threats that they face has come from companies like

18    Google and YouTube.

19         Let's start with the most popular search engine on the

20    planet, Google. As recently as July of 2010, a senior

21    executive and lawyer at Sony Music described Google's search

22    engine and blog spot product in an internal e-mail as a

23    virulent piracy problem: "Another virulent piracy problem is

24    the use of search engines to find links to third-party hosts

25    from which copyrighted music content may be illegally

154nari6                          Opening - Mr. Baio

1    downloaded or streamed.  As the world's number one search

2    engine, Google Search yields more of these links -- to both

3    legal and illegal sources of music -- than any other and its

4    use for illegal purposes is increasing."

5           And YouTube has which millions and millions of videos

6    and songs that are available to everyone without payment is

7    another provider that the record industry has recognized is a

8    great threat to them.

9           Here's what Universal said to YouTube, which, by the

10   way, is a partner with them, he said, in 2009, one of these

11   senior executives complained to YouTube that, "We are not being

12   compensated for the use of that content on YouTube even as that

13   content represents millions, even tens of millions, maybe

14   hundreds of millions of streams -- with the benefit of all that

15   traffic that such streams represent for YouTube."

16          The CFO of Sony Music, which also does business with

17   YouTube, even went so far as to call YouTube a vehicle of

18   digital piracy.  Yet the record companies put their songs and

19   videos on YouTube and other sites on the Internet knowing full

20   well that people can easily copy them and share them.

21          Now, although Mr. Pomerantz didn't say this directly,

22   we think that he was saying that free music, I'm sorry, to

23   create with his free versus paid music picture, was that if

24   people didn't get the music for free by downloading they would

25   buy it.

            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1          But, like the old song goes, it ain't necessarily so.

2    Let's focus on another part of Mr. Pomerantz's claim that

3    provides the foundation for his clients' request for a gigantic

4    damage award:  The notion that all or most unauthorized

5    downloads by people constitute a lost sale.

6          In fact, the evidence will show the record companies

7    concede that a big chunk of the downloading that had taken

8    place would not have been a sale.

9          Here's how Sony put it six years ago:  "On average,

10   for every album sold, one is successfully downloaded off of P2P

11   networks, but there is not necessarily a lost sale.  Data

12   indicates that a significant portion of P2P downloads may not

13   be lost sales based on usage patterns."

14         And that makes sense.  This is an iPod, and the first

15   version of this came out I think in October of 2001, even

16   before iTunes was launched.  This is an old one.

17         The current version of this can hold 40,000 songs.

18         That's pretty amazing, but that means that at a dollar

19   a song people would have to pay $40,000 to fill this with

20   music.  At 50 cents it would cause $20,000.  At 25 cents,

21   $10,000.  Even a dime a song would cost $4,000 to fill

22   something that costs $250.

23         You will also hear evidence that some inside the

24   record industry admit that sharing music might actually

25   increase the sales of music.  Here again, is an owner of

1    plaintiff EMI.  I'm not sure I've used this yet, but EMI was

2    owned by a company called Terra Firma and Maltby Capital, and

3    here's what he they said in 2008:

4            "The impact of piracy is complex and some have argued

5    that pirated tracks consumed cannot be proven to equate

6    directly to lost sales.  (People who cannot afford to buy CDs

7    may pirate them).  And that pirating may sometimes promote

8    consumption by helping to create a reputation for music.  There

9    is also evidence that people who pirate music buy more music

10   than some other consumer groups, people who sample music that

11   their friends recommend and if they like it they may buy it.

12   There is also evidence that people" --

13           OK.  Now, how much will music listeners pay?

14           Well, there is an important consequence of iTunes

15   showing up in 2003.  That is that for people who do buy music,

16   they are not paying what they used to at the height of the CD

17   eras.  For CDs we used to have to pay $15 to get a bunch of

18   songs that we didn't necessarily want.  We want one or two, but

19   in the old days people had no choice, buy the whole album or

20   hear the song you want on the radio and record it.  ITunes lets

21   you get the songs that you really want for a dollar, hassle

22   free.

23           It's called unbundling.  This has been a real problem

24   for the record industry.  Separating songs from a CD or an

25   album to sell them as individuals decreases significantly the

1    overall revenue that the record companies have gotten.

2              The evidence will show that even the dollar that

3    people pay to buy a song on iTunes overstates the value of that

4    song in the record industry's idea.

5              On the subject of value, the head of Warner Music,

6    Edgar Bronfman, again told his shareholders earlier this year

7    that the subscription service Spotify provided proper

8    compensation to his company.  And do you know how much the

9    record company receives when someone listens to a song?  Less

10   than one penny per listen.

11             A number of record companies have entered into deals

12   with Google as well to receive the same fraction of a penny

13   whenever we, the consumer, click.  That money doesn't even come

14   from the consumer, as we know.  It comes from Google, which

15   itself makes money from advertising.

16             Against LimeWire and Mr. Gorton, they want $500 a work

17   or $1,000 a work or $5,000 a work.  We think that when all the

18   evidence is before you, you will see that is inflated

19   significantly.  Now, Mr. Pomerantz talked about the industry

20   layoffs and the devastation that LimeWire and LimeWire alone

21   apparently caused.

22             Well, the fact of the matter is that the senior

23   executives at the record companies have been rewarding

24   themselves as this decrease in sales has occurred.  The top

25   three executives at Warner Music have collectively made over

154nari6                         Opening - Mr. Baio

1   $100 million since 2004.  They made that in salaries and

2   bonuses.  One executive at Universal received compensation

3   worth more than $60 million from 2005 through 2008.

4            So please consider that when you hear repeated claims

5   about the financial devastation and layoffs from the record

6   companies in this trial.

7            As you will also hear more about during the trial, the

8   music world has benefited from many, many, other revenue

9   streams using digital technology, and I'm not just talking

10  about the sale of music here.  Video games like Guitar Hero,

11  royalties from satellite radio, ring tones, you name it, they

12  have all been generating income for the record companies.

13           And more people are going to concerts.  In fact,

14  revenues generated by concerts have skyrocketed over the past

15  decade.  I couldn't help but notice that one of the artists

16  that was identified in the Universal list was U2, a great band,

17  terrific music, and one of the examples that the plaintiffs are

18  using in this case.  The fact is in April of this year, U2

19  broke the record for concert ticket sales in the history of the

20  music, $700 million.

21           Now, the fact of the matter is that the revenue

22  streams for many of these artists are driven by concerts.  In

23  fact, the record company now realizes that; the record

24  companies, they realize it, and they have entered into what are

25  called 360 arrangements with their artists.

154nari6                          Opening - Mr. Baio

1          Now, they didn't share in the YouTube proceeds, but

2     with their acts that they have signed up in the last few years,

3     they have a percentage of the concert activity, they have a

4     percentage of the merchandise, 360 being a full circle, and

5     they share in those proceeds.

6          Now, as people listen to more music, they desire more

7     music, and the record companies themselves recognize that.  And

8     as they desire more music, they go to more concerts.

9          They also mentioned, I think another one on this list

10    another artist, Eminem, he is -- let me see if I can find him.

11    He is a Universal performer.  He has sold, I know there are

12    gold records, there are platinum records, he actually has two

13    diamond records, all in this era when they couldn't compete

14    with free, one of the most successful selling artists in the

15    decade and one of the most successful of all time.

16         As you will see and hear about at trial, the music

17    world has benefited in other ways as well.  Performers

18    frequently appreciate the Internet and file sharing.  They

19    recognize that the biggest enemy that they face is obscurity.

20         The real nightmare for a writer is to be unknown; for

21    a musician to be unheard.  Performers want their music to be

22    heard and their videos seen.  They understand that people will

23    go to see them, but only if people hear their music again and

24    again.  Some embrace the idea of file sharing and understand

25    that if more people listen to their music, more people will buy

1    it.

2           Now, we aren't saying that LimeWire is responsible for

3    that surge in revenue and activity, no more than the record

4    companies should claim that LimeWire alone caused them millions

5    of dollars in damages.

6           Our point, which I hope you will consider as you hear

7    the evidence, is this:  Given all the things that I've talked

8    about today, you can't and shouldn't conclude that LimeWire is

9    wholly or even significantly responsible for the damages that

10   the record companies are claiming.  There is no evidence

11   supporting an award that would even come close to what he's

12   asking, not on this record.

13          You have heard that a huge award against LimeWire is

14   necessary to send a message to others not to do the same thing.

15   The evidence is not going to support that deterrence point.

16   The record companies have put LimeWire and a host of other

17   companies out of business year after year, but the evidence

18   will show that this hasn't limited music listeners' ability to

19   obtain music for free.

20          You will hear Mark Piibe, the person in charge of

21   EMI's digital business, testify as soon as the music industry

22   puts a song out, it is fully available to everyone on the

23   Internet.

24          Here's what he testified to.  You can put that up.  It

25   is not on mine.  Do you have it on your screens?  I have it

1    here.

2             "I don't know specific statistics, but every year more

3    music gets released and virtually all music that gets released

4    gets uploaded to the Internet.  So by definition, there's going

5    to be more unauthorized music every year on the Internet and

6    more copies of the same music proliferate.  So it's

7    inevitable."

8             Echoing the same thoughts, for example, Warner had

9    this to say in July of 2010.  Since Napster brought online

10   piracy to the mainstream, legal action closing other file

11   sharing platforms has failed to stem the flow of free

12   copyrighted files because users simply funnel into the next

13   best illegal file-sharing client."

14            In fact, as you will hear from one of the experts

15   there's really only one way to stop free music or to deter the

16   sharing of music over the Internet and that is by closing down

17   the Internet.  It would require that, and that's not going to

18   happen.

19            Now that leads me back to Mark Gorton, the only one

20   still standing on the defense side.  After graduating with the

21   degrees that you have heard of, he initially worked for a

22   defense contractor.  About 12 years ago, in his early 30s he

23   started his own business, Tower Research Capital, and other

24   businesses.  And they were very successful.

25            He made significantly more away from LimeWire.  At the

SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

154nari6                    Opening - Mr. Baio

1    end of the '90s, he got this idea for LimeWire.  He saw it as

2    an amazing machine that could enable people to connect and

3    share.

4          Now, you heard Mr. Pomerantz talk about how Mr. Gorton

5    was profiting off the backs of the record labels, but what did

6    he actually make?  I think he floated around a number of 100

7    and something million dollars.  That is just not the case.

8    It's $31 million.  It is a great deal of money.  But on the

9    songs that are at issue in this case, you will see that the

10   amount earned is approximately $6 million, still a lot of

11   money, but not the hundreds of millions and billions that

12   Mr. Pomerantz is talking about.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. BAIO:  Now, let me talk a minute about the

2  so-called fraudulent conveyance.

3      Mr. Pomerantz says the evidence proves that Mr. Gorton

4  transferred his assets to some family partnerships three days

5  after a Supreme Court ruling in 2005.  First, you should

6  understand that the family limited partnerships are with his

7  wife and two children.  He owns a home with his wife and the

8  family limited partnerships are essentially split 50/50.  He

9  owns 48 percent, his wife owns 48 percent, and two of his four

10  children who were born at the time own 2 percent each.  And

11  that has estate planning implications.

12      But, what Mr. Pomerantz said was Mr. Gorton was

13  reacting to the Grokster decision on June 27, 2005 when he went

14  into this FLP, when he created these devices, these techniques

15  in order to share with his wife and children.  Mr. Pomerantz

16  suggested that was hiding assets.  There is nothing hidden by

17  it, there is no offshore account, there is no place where there

18  is money and they will not put on any evidence along those

19  lines.  So, they say that it was after the Grokster case but

20  Mr. Gorton scheduled the closing before the Grokster case even

21  was handed down and you will see that.

22      Now, how could he have known that the Grokster

23  decision was coming down before it came down and somehow

24  scheduled something that he is reacting to the Grokster case

25  about?  It is not possible unless he was clairvoyant.  And he

1    wasn't.

2          Now, how does this relate to the damages issue and

3    your task here?  Your task is setting a dollar value on each of

4    the few thousand works that plaintiffs have identified in this

5    case.  That value will determine the damages that Mr. Gorton

6    will have to pay to the record companies.  Mr. Pomerantz says

7    that you should set a phenomenally high number for each work

8    and a phenomenally high damage award in the aggregate because

9    the record companies have lost billions of dollars.

10         Well, the industry's own financial results and their

11   own admissions establish that, number one, there were many,

12   many reasons and factors for their losses, apart from P2P and

13   apart from Lime Wire.  Some in the industry warned that they

14   would suffer in the marketplace if they did not embrace the new

15   technology.  And they didn't.  The industry itself releases

16   music that can be listened to for free again and again.

17         In the face of these facts, and I don't believe

18   they'll dispute them, we submit that Lime Wire and Mark Gorton

19   cannot be responsible for the millions of dollars in damages

20   that they have supposedly suffered as losses.

21         Ladies and gentlemen, as many in the record industry

22   and the record companies have recognized, music that is free is

23   here to stay.  The world has changed, the consumer is king, and

24   as Mr. Bronfman says, the consumer has won.  I submit to you

25   that you should not punish Lime Wire and Mr. Gorton with a huge

1545ari7                          Opening - Mr. Baio

1   damage award.  It will serve no purpose, it will accomplish

2   nothing, and we hope that you will evaluate the evidence and I

3   think I join with Mr. Pomerantz in this, that you use your

4   common sense to come up with a fair value for this music.

5              Thank you for listening to us here today.

6              THE COURT:  Thank you, Mr. Baio.

7              This would be a good time for everyone to stand and

8   stretch while we wait for the first witness.  (pause)

9              Let's have a seat.

10             MR. POMERANTZ:  Your Honor, the plaintiffs would call

11  Mr. Zach Horowitz as our first witness.

12             THE COURT:  Thank you.

13   ZACH HOROWITZ,

14        called as a witness by the Plaintiff,

15        having been duly sworn, testified as follows:

16             THE COURT:  You may proceed.

17             MR. POMERANTZ:  Thank you, your Honor.

18  DIRECT EXAMINATION

19  BY MR. POMERANTZ:

20  Q.  Mr. Horowitz, where are you currently employed?

21  A.  The Universal Music Group.

22  Q.  And what is your current position with Universal?

23  A.  I'm the president and chief operating officer.

24  Q.  Mr. Horowitz, let's go back a bit and briefly review your

25  personal history.  What is your educational background?

1  A.  I went to college at a school called Claremont McKenna and

2  I went to law school at Stanford Law school.

3  Q.  And what year did you graduate from Stanford Law school?

4  A.  1978.

5  Q.  And when was your first job in the music industry?

6  A.  1978.

7  Q.  Same year?

8  A.  Same year.

9  Q.  What led you to go from law school into the music industry?

10  A.  I always had a great passion for music.  I unfortunately

11  couldn't play any instruments.  I read every magazine, I

12  listened to music all the time.  I grew up at a time when I

13  believe people, many people in my generation believed music was

14  going to change the world -- I still sort of feel that way --

15  and I wanted to go into a profession that would allow me to

16  continue my interest in the music business and I thought that

17  law school would provide that.

18  Q.  What was your first job in the music industry?

19  A.  My first job in the music industry I worked for a law firm

20  for about six months and then was offered an opportunity to

21  work at what was then called CBS Records in the law department

22  there.

23  Q.  And you joined CBS, you said, in 1978?

24  A.  1978, yes.

25  Q.  How long did you stay at CBS Records?

1    A.  Five years, approximately.

2    Q.  So that's until 1983?

3    A.  Yes.

4    Q.  What did you do in 1983?

5    A.  I became the global head of business and legal affairs at a

6    record company called MCA Records.

7    Q.  There is a connection between MCA Records and the company

8    you are with today called Universal?

9    A.  Yes.  MCA, through a series of mergers and acquisitions,

10   becomes the Universal Music Group which is what it is today.

11   Q.  Back in 1983 was MCA a big music company?

12   A.  There were six so-called majors.  A major was a record

13   company that controlled its own distribution and sales and had

14   departments that handled the full array of marketing and

15   publicity and promotion and also had some companies around the

16   world.  We were the smallest of the six.

17   Q.  And so, you've been with MCA or now Universal since 1983?

18   A.  Yes.

19   Q.  When did you become president of Universal?

20   A.  Approximately 1999.

21   Q.  So, you've been president for the last 12 years?

22   A.  Yes.

23   Q.  And you have been in the music industry working in the

24   music industry for more than 30 years, correct?

25   A.  Yes.

1    Q.   What is the basic business of Universal Music?

2    A.   The basic business is finding artists and then trying to

3    market them, develop them, sell them in a way that brings them

4    to an audience.

5    Q.   Is there a particular kind of music that Universal develops

6    and sells?  Or is it a variety of things?

7    A.   We sell a variety of music from rock to pop to hip hop to

8    gospel to classical to Latin.

9    Q.   Can you give the jury some examples of the artists that

10   Universal is currently working with to create its own music?

11   A.   We have Lady Gaga, Eminem, Elton John, Black Eyed Peas.  On

12   the County front we have Sugarland and George Strait.  We have

13   Mary J. Blige.  We have Andreas Bocelli on the classical front.

14        We have a full array of companies around the world

15   with local artists that we sign in each territory around the

16   world.

17   Q.   By territory do you mean each country?

18   A.   Each country, yes.

19   Q.   And if you add them all up, how many different artists is

20   Universal currently working with to create and offer music?

21   A.   I don't know the exact number, probably in the United

22   States it is probably 500 to 700 artists.

23   Q.   Now, does Universal also distribute the musical artists who

24   recorded the music long ago?

25   A.   Yes.  We call that our catalog sometimes.  We have -- our

1    company goes back about a hundred years.  We have artists like

2    Hank Williams and artists like Ella Fitzgerald and Louis

3    Armstrong and a host of artists that basically trace the

4    history of popular music.

5    Q.  What music goes back a hundred years?  Do you have music

6    that goes back that long?

7    A.  We do.

8    Q.  What is some of your older music that is still in your

9    catalog?

10   A.  Well, you know, many of the classic jazz recordings that I

11   mentioned Ella Fitzgerald, Louis Armstrong go back to the '30s

12   and '40s.  Some of the country product that we have possibly

13   goes back to the '30s and '40s as well.  We have classical

14   music that goes back even longer.

15   Q.  We have heard the term through our openings called a record

16   label.  Have you heard that term before?

17   A.  Yes.

18   Q.  What is a record label?

19   A.  A record label is sort of a colloquial way of referring to

20   a recording company.  Under the music group we have Island

21   Records, Def Jam Records, we have Motown Records, we have

22   Republic Records.  All of those we would consider labels.

23   Q.  Do different labels sometimes specialize in certain kinds

24   of music?

25   A.  Yes.  We have Deutsche Grammophon, one of our labels, which

1    focuses entirely on classical music.  We have Universal

2    Nashville which focuses on country music.  We have a number of

3    contemporary labels that would focus on hip hop and pop and

4    rock.

5    Q.  Mr. Horowitz, before we get into Lime Wire and the impact

6    that it has had on your business, I would like to discuss with

7    you how music gets made in a company like Universal.  I'm going

8    to put on the screen a slide that is just there for you to

9    refer to, if you need to, to help explain things to the jury.

10        Let's start with finding artists.  How does a company

11   like Universal go about finding talented recording artists?

12   A.  Well, a record company sometimes is thought of as sort of a

13   faceless amorphous kind of thing, but ultimately a record

14   company is a collection of people.  Most of the people who work

15   at record companies care about music, care about the artist.

16   Their entire life is focused around trying to find artists and

17   make them successful.

18        If you look at the upper left-hand box there is

19   something that's called A&R, that stands for artist and

20   repertoire.  Those are basically talent scouts.  They'll look

21   for artists at clubs, they'll listen to demo tapes that may be

22   sent in, on the internet to try to find things that -- video

23   from new and unsigned artists.  They'll sign an artist and then

24   work to make the best album that they can with the artist

25   sometimes making song selections with them suggesting songs,

1   sometimes finding the producer who will help make the album

2   with the artist.

3   Q.  How do these talent scouts know the difference between a

4   recording artist who is going to be successful and one who

5   won't be successful?

6   A.  Well, no one really knows for sure.  The good ones are

7   probably wrong a lot more than they are right.  Statistically,

8   probably eight out of 10 albums that we record that we sign of

9   artists don't make their money back which means that the two

10  that are successful has to pay for all the ones that are not

11  successful.  But the really good ones understand what the

12  public will want, they can see an artist in a club and

13  visualize what that artist will sound like on a record a year

14  and a half later when the album comes out.

15  Q.  Do the same people, these talent scouts who go out and try

16  to find the next great rock artist or hip hop artist, do they

17  work?  Do they look for any kind of artist or do they tend to

18  specialize in certain types of music?

19  A.  It depends on the A&R person.  Some of them are diverse in

20  their tastes, some of them are specialized.  They might only

21  sign rock acts, others might only sign R&B acts.  It just

22  depends on the individual.

23  Q.  So, once the talent scout finds an artist that they're

24  interested in, what happens next?

25  A.  Usually what would happen is if the record label decides

1   that they want to sign an artist which may involve a series of

2   discussions between the A&R person and the label head or others

3   in the company, once the decision is made to sign the artist

4   the business affairs people, which is the box across from A&R,

5   would step in.  These are people who would negotiate the terms

6   of the contract between the recording artist and the record

7   label.  Usually these are long-term relationships, the artist

8   has a long-term relationship with the company; could be three,

9   four, five six albums, it could be five, 10, 15 years.  We have

10  U2 on our label that has been with us for probably in excess of

11  20 years.

12  Q.  Now, the business affairs people are handling the

13  negotiation of the artist agreement for the record company.

14  Who, typically, is handling the negotiation for the artist?

15  A.  The artists typically have a lawyer who specializes in the

16  music business as well, experienced with negotiations.

17  Sometimes the lawyer works in conjunction with the artist's

18  personal manager and together they would negotiate a deal.

19  Q.  So, now you have found the artist and you have signed the

20  artist to a recording agreement.  Does Universal then have a

21  role in working with the artist to then help make the music?

22  A.  Yes.  The creative people, the A&R people, as I mentioned,

23  will then work with the artist to shape the album, to find the

24  right songs, to find the right producer, sort of like a

25  director in the film business.  The producer will make

1    suggestions to work out the best possible album that they can.

2    Q.  So, let's keep going with the artist.

3         Once the artist makes a new record, does Universal

4    then put together a marketing plan?

5    A.  Yes.  The marketing people try to capture what the artist

6    is really about, what the artist's story is going to be, what

7    the artist's image should be, and they come up with a marketing

8    campaign that may include coming up with a particular video,

9    subsidizing the artist on a country, on a concert tour if they

10   think that's a way of artist promoting himself to let the

11   public see him or her in concert.  There may be a host of

12   internet-related marketing campaigns that we will do now, there

13   will be personal appearances at radio stations; a host of

14   different things to try to bring attention to the artist in

15   what is a very competitive business.

16   Q.  Would Universal typically have a different marketing plan

17   for each new record that it releases?

18   A.  Yes.

19   Q.  And would it also have a different marketing plan from one

20   artist to another artist?

21   A.  Yes.

22   Q.  And would it market a new record, let's say in the country

23   music genre, different than one, let's say, in the Latin music

24   genre?

25   A.  Yes.  It would depend upon the artist.  Different genres of

1    music require different kinds of focus.  The media may be

2    different, radio would be different.  The taste makers that you

3    would go to to try to get excited about your artist may be

4    different.  So, it depends upon the genre.

5    Q.  I have seen recording artists sometimes appear on

6    television.  Does Universal ever have any role in making that

7    happen?

8    A.  Yes.  We have a collection of people whose job that is, to

9    focus on trying to get our artists onto different television

10   shows because the exposure may be very good for them.

11   Q.  What kind of TV shows do you work with?

12   A.  Everything from Oprah to Jay Leno to MTV.  Anything that we

13   feel will reach the right audience for the artist concerned.

14   For some of our adult music artists, adult contemporary kind of

15   artist, middle of the road, the most important thing might be

16   getting them on "60 Minutes" or "The Sunday Morning Show" on

17   CBS.  For a rap artist the most important thing might be

18   getting them on a BET show.

19           It depends upon the artist involved.

20   Q.  I have also seen recording artists be interviewed.  Does

21   Universal play any role many helping to arrange for interviews?

22   A.  Yes.  We have a publicity department, a collection of

23   people whose job it is to try to bring attention in the media

24   to our artists.  They have contacts that they've developed over

25   the years and their job is to try to find the right media

1    outlets to bring attention to the artist in his or her new

2    album.

3    Q.   I think you mentioned earlier that Universal sometimes uses

4    the internet to promote its artists.  Does Universal help to

5    arrange websites for its artists?

6    A.   Yes.  We often are responsible for the official website for

7    the artist concerned.  We pay for the costs of creating it, we

8    work with the artist to design it.  We deal with the day-to-day

9    technical issues that come up.  We post information on it about

10   the artist's touring plans, about the new album that may be

11   coming out.  All of those would be done primarily through

12   someone at one of our labels.

13   Q.   And you also mentioned something, I think you referred to

14   it as a music video.  What, exactly, is a music video?

15   A.   A music video is a tool, is a vehicle to capture the artist

16   singing his or her song with visual images in a way that we

17   think is exciting to the consumer and creates an interest that

18   hopefully leads to sales.

19   Q.   Now, you also, I think you were here during the opening by

20   Mr. Baio, is that correct?

21   A.   Yes.

22   Q.   And you heard him refer to concert tours?

23   A.   Yes.

24   Q.   What is Universal's role with respect to concert tours?

25   A.   In the vast bulk of times, until very recently, the

1    concerts that an artist did were entirely for the artist, by

2    the artist in terms of keeping the revenue.  In the early days

3    of an artist's career it would not be unusual for a record

4    company to subsidize the tour because the artist, on his or her

5    own, would not be able to make enough money to afford to go

6    out.

7            As Mr. Baio mentioned, at times, particularly

8    recently, as the business has gone through the kind of dire

9    straits that it has, there has been a recognition on the part

10   of the artists and the record companies that the record

11   companies play a primary role in helping to create the artist's

12   brand.  Most people don't know about the record company as a

13   brand, they think of the brand as the artist.  Few people

14   understand that when they buy an Eminem album it is a Universal

15   product and that's not what we try to do with our marketing

16   money.

17           But, as Mr. Baio has said, what has happened as the

18   revenue base has begun to deteriorate is that we have said to

19   artists that in order for us to help create their brand we have

20   to share in other revenue streams that come from that brand and

21   not be limited just to the monies that come through the sale of

22   the records.  That's a relatively new phenomenon.

23   Q.  And so for an older, established artist who has been

24   selling music for a long time like U2, did Universal share in

25   the concert revenues from the U2 tour?

1    A.  No.  We had no participation.

2    Q.  Let me talk about another part of your marketing effort.

3    Do you have something that I will refer to as an art department

4    that helps create art related to the artist for a record?

5    A.  Yes.

6    Q.  What kind of art do you create?

7    A.  Well, there are a series of images that have to be created

8    during the course of an artist's history with the record

9    company.  The most basic may be the cover for the album but

10   there may be images that have to be created for advertising

11   that we do.  And all of those kinds of images would either be

12   done by our art department or would be coordinated through our

13   art department.

14   Q.  And for those of us who remember going to record stores and

15   seeing posters on the wall, is that something that the record

16   company created or someone else?

17   A.  Typically that would be something that the record company

18   created.  It would sometimes be the album cover, it would

19   sometimes be publicity stills that our publicity department

20   would have arranged.

21   Q.  Let's go back to this chart.  I think we have done A&R,

22   business affairs and marketing; what is the next box Promotion

23   referring to?

24   A.  Promotion is a department that we have at each of our

25   record companies -- I think it is important to mention that at

1    Universal each of our labels function autonomously in sort of

2    these basic functions, so each would have their own promotion

3    department that would focus on their own artist.  The promotion

4    department is responsible for trying to get the artist's music

5    to be played on radio and there would be, depending upon the

6    company, a significant number of people whose job it is to

7    traverse the country either making telephone calls or visits to

8    radio stations around the country in the style of music that

9    the artist is recording to try to convince the radio stations

10   to play the music.

11   Q.  Why do record companies try to get the music played on the

12   radio?

13   A.  Because radio traditionally has been a very good way to get

14   people excited about our artists and then to lead -- which

15   would in turn lead to sales.

16   Q.  Mr. Baio in his opening said that music on the radio was

17   free and compared it to Lime Wire.  Do you see a difference

18   between music available on the radio and the kind of music that

19   is available through Lime Wire?

20   A.  Yes.

21   Q.  What is the difference?

22   A.  Well, when you listen to something on the radio you don't

23   know what you are going to hear next, it is not on demand, it

24   is not like you are typing in what you want to hear and it just

25   pops up.  You have no idea what's going to pop up.  You may

1   continue to go to your favorite radio station because you hope

2   to hear the hits and you know that a particular song is a hit

3   but it's not like Lime Wire where you type in the words for the

4   favorite song that you have and you own the song forever, you

5   hear it whenever you want to hear it and it is yours to keep.

6   It is a very different kind of situation.

7   Q.  When you hear a song on the radio do you own a copy of the

8   recording?

9   A.  No, you don't.

10  Q.  What do you hope will happen when somebody hears a song on

11  the radio that they like?

12  A.  We hope that they'll hear it -- and this is the way the

13  business traditionally worked -- they hear something on the

14  radio, they like it, they want to hear it again.  They can't

15  get the immediate access to it by typing it in and keeping it,

16  so they would typically go to a record store -- or now a

17  digital store -- and they would buy it.

18  Q.  Now, we've gone through a lot of different things that the

19  record company does to market and to promote its new music.  Do

20  you think that marketing and promotion is important to the

21  success of an artist at a record company?

22  A.  Yes.  I think it is critically important.

23  Q.  Why?  Why is that?

24  A.  Well, there was a digital site called MP3.com at one point

25  that had 44,000 different artists that it showcased on its

1   service undifferentiated, but on the internet, and you could go

2   to the site and you could listen to the music by these artists.

3   No one ever heard of them.  They portrayed themselves in part

4   as the record company of the future but they had no way to

5   really market and promote the artist and create a buzz around

6   that artist, to create a sense that the artist was special and

7   should be listened to.  That's what the marketing and promotion

8   departments of a good record company do.

9           MR. POMERANTZ:  Your Honor, I'm about to go to the

10  next box, the sales and distribution box.  I didn't know --

11          THE COURT:  This would be a good time to stop for the

12  night.  We will stop.

13          I just want to mention to the members of the jury that

14  during the trial you are going to hear all the evidence that

15  you need in order to decide the case so I want to remind you:

16  Don't do any research about any of the issues in this case.

17  Don't go on the internet to try to learn anything about it.

18  Please don't talk to anyone about the case.

19          I wish you a good evening.  And if you get here before

20  10:00 tomorrow there will be coffee, tea and muffins.  I hope

21  everyone will be on time.  We are going to do what we can to

22  get you through the line on time.

23          Thank you.  Have a good evening.

24          (Continued on next page)

25

```
 1                    (Jury not present)
 2              THE COURT:  Thank you, Mr. Horowitz.  You are free to
 3    step down.
 4                    (Witness steps down)
 5              THE COURT:  Please have a seat.
 6              Counsel, would you like to raise anything before
 7    tomorrow morning?
 8              MR. BAIO:  Not us, your Honor.
 9              MR. POMERANTZ:  May we approach for one second, your
10    Honor?
11              THE COURT:  Sure.
12              (Discussion off record)
13              THE COURT:  We are adjourned and will see you in the
14    morning.
15              Mr. Klaus?
16              MR. KLAUS:  I'm terribly sorry, your Honor.
17              In terms of the exhibits that are on the exhibit list
18    that each side haven't objected to we have stipulation out to
19    the other side to move their admission.  Until that is done
20    would it be your Honor's preference that we point to the
21    exhibit and hand it up to the bench and ask for permission to
22    publish it to the jury if it has not been objected to?
23              THE COURT:  These are stipulated exhibits?
24              MR. KLAUS:  These are exhibits that are on each side's
25    list to which the other side has no objection requiring ruling.
```

1545ari7

1          THE COURT:  I don't need to see it.  Thank you.  I

2     will see whatever the jury sees.

3          MR. KLAUS:  Thank you, your Honor.

4          THE COURT:  All right.  Thank you very much.  Good

5     night.

6          (adjourned to 10:00 a.m., Thursday, May 5, 2011.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    ZACH HOROWITZ

4    Direct By Mr. Pomerantz  . . . . . . . . . . 501

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```